# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>   Plaintiff,<br><br> vs.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>   Defendants. | Case No.:  22-cv-02694 (JRT/JFD) |

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

## TABLE OF CONTENTS

INTRODUCTION................................................................................................1

BACKGROUND.................................................................................................3

LEGAL STANDARD ...........................................................................................6

ARGUMENT ......................................................................................................7

    I.    This Court has federal-question jurisdiction.......................................7

        A.    The complaint "necessarily raises" a federal issue....................8

        B.    The parties "actually dispute" the federal issue .....................22

        C.    The federal issue is "substantial" ...........................................22

        D.    Federal jurisdiction will not disrupt the balance between federal and state judicial responsibilities.................................................28

    II.    Alternatively, this Court has jurisdiction under the Class Action Fairness Act...........................................................................................30

CONCLUSION .................................................................................................32

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott v. Tonawanda Coke Corp.*,
   2012 WL 42414 (W.D.N.Y. Jan. 9, 2012) .................................................................. 20

*Abdale v. N. Shore-Long Island Jewish Health Sys., Inc.*,
   2014 WL 2945741 (E.D.N.Y. June 30, 2014) ............................................................ 20

*Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*,
   731 F.3d 740 (7th Cir. 2013) .................................................................................... 30

*Bd. of Comm'rs of Se. La. Flood Prot. Auth.–E. v. Tenn. Gas Pipeline Co.*,
   850 F.3d 714 (5th Cir. 2017) ........................................................................ 16, 23, 25

*Bor-Son Bldg. Corp. v. Heller*,
   572 F.2d 174 (8th Cir. 1978) ...................................................................................... 6

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005) ..................................................................................... 25

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) .................................................................................................. 18

*City of Chicago v. Int'l Coll. of Surgeons*,
   522 U.S. 156 (1997) .................................................................................................. 18

*City of Syracuse v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   2021 WL 23326 (S.D.N.Y. Jan. 2, 2021) .................................................................... 5

*Commonwealth v. Chatham Dev. Co.*,
   731 N.E.2d 89 (Mass. 2000) ..................................................................................... 31

*Corporan v. Wal-Mart Stores E., LP*,
   194 F. Supp. 3d 1128 (D. Kan. 2016) ................................................................. 17, 18

*D.N.N. v. Berestka*,
   2008 WL 313898 (Minn. Ct. App. Feb. 5, 2008) ...................................................... 17

*Daniel v. Armslist, LLC*,
   2016 WL 660894 (E.D. Wis. Feb. 17, 2016) ............................................................. 19

*DeLuca v. Tonawanda Coke Corp.*,
   2011 WL 3799985 (W.D.N.Y. Aug. 26, 2011) .......................................................... 20

*Empire Healthchoice Assur., Inc. v. McVeigh*,
  547 U.S. 677 (2006) ................................................................ 23

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ...................................................... 6, 17, 18

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983) ...................................................................... 7

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) ...................................................... *passim*

*Gradjelick v. Hance*,
  646 N.W.2d 225 (Minn. 2002) .............................................. 17

*Gunn v. Minton*,
  568 U.S. 251 (2013) ........................................................ *passim*

*Harris News Agency, Inc. v. Bowers*,
  809 F.3d 411 (8th Cir. 2015) ................................................ 28

*Hayes v. Am. Airlines, Inc.*,
  2005 WL 2367623 (E.D.N.Y. Sept. 27, 2005) ...................... 26

*Hughes v. Chevron Phillips Chem. Co.*,
  478 F. App'x 167 (5th Cir. 2012) ......................................... 16

*Missouri ex rel. Koster v. Portfolio Recovery Assocs., Inc.*,
  686 F. Supp. 2d 942 (E.D. Mo. 2010) .................................. 32

*Martinson v. Mahube-Otwa Cmty. Action P'ship, Inc.*,
  371 F. Supp. 3d 568 (D. Minn. 2019) ................................... 23

*Merrell Dow Pharms. Inc. v. Thompson*,
  478 U.S. 804 (1986) ........................................................ 26, 29

*Mims v. Arrow Fin. Servs., LLC*,
  565 U.S. 368 (2012) .................................................................. 7

*Minnesota v. Am. Petroleum Inst.*,
  2021 WL 1215656 (D. Minn. Mar. 31, 2021) .................... 31, 32

*Mitchell v. Advanced HCS, L.L.C.*,
  28 F.4th 580 (5th Cir. 2022) ............................................ 12, 16

*Mulcahey v. Columbia Organic Chem. Co.*,
    29 F.3d 148 (4th Cir. 1994) ................................................................... 20

*N.Y. City Health & Hosp. Corp. v. WellCare of N.Y., Inc.*,
    769 F. Supp. 2d 250 (S.D.N.Y. 2011) ................................................... 25

*NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*,
    770 F.3d 1010 (2d Cir. 2014) ........................................................... 16, 25

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
    559 F.3d 772 (8th Cir. 2009) ..................................................................... 6

*Pontarelli v. U.S. Dep't of the Treasury*,
    285 F.3d 216 (3d Cir. 2002) .................................................................... 28

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996) ................................................................................... 7

*Ranck v. Mt. Hood Cable Reg. Comm'n*,
    2017 WL 1752954 (D. Or. May 2, 2017) ................................................ 27

*Sam L. Majors Jewelers v. ABX, Inc.*,
    117 F.3d 922 (5th Cir. 1997) ..................................................................... 6

*Starkey v. Amber Enters., Inc.*,
    987 F.3d 758 (8th Cir. 2021) ..................................................................... 6

*Tisdale v. Pagourtzis*,
    2020 WL 7170491 (S.D. Tex. Dec. 7, 2020) .......................................... 19

*Williams v. Emps. Mut. Cas. Co.*,
    845 F.3d 891 (8th Cir. 2017) ................................................................... 31

*Wullschleger v. Royal Canin U.S.A., Inc.*,
    953 F.3d 519 (8th Cir. 2020) ........................................................... *passim*

**Statutes**

18 U.S.C. § 921, *et seq.* ................................................................................. 4

18 U.S.C. § 922 ............................................................................... *passim*

18 U.S.C. § 923 ............................................................................... *passim*

18 U.S.C. § 924 ................................................................................... 29

18 U.S.C. § 925 ................................................................................................ 28

18 U.S.C. § 932 ................................................................................................ 15

18 U.S.C. § 933 ................................................................................................ 14

28 U.S.C. § 599A .............................................................................................. 8

28 U.S.C. § 1331 ............................................................................................... 7

28 U.S.C. § 1332 ............................................................................................... 30

28 U.S.C. § 1338 ............................................................................................... 18

28 U.S.C. § 1367 ............................................................................................... 6

28 U.S.C. § 1441 ............................................................................................... 6

28 U.S.C. § 1453 ............................................................................................... 30

Minn. Stat. § 624.7132 ..................................................................................... 14

Minn. Stat. § 624.7133 ..................................................................................... 15

**Other Authorities**

27 C.F.R. § 478.23 ............................................................................................ 9

27 C.F.R. § 478.25a .......................................................................................... 9

27 C.F.R. § 478.41 ............................................................................................ 8

27 C.F.R. § 478.42 ............................................................................................ 8

27 C.F.R. § 478.43 ............................................................................................ 8

27 C.F.R. § 478.44 ............................................................................................ 8

27 C.F.R. § 478.45 ............................................................................................ 9

27 C.F.R. § 478.47 ............................................................................................ 8

27 C.F.R. § 478.49 ............................................................................................ 9

27 C.F.R. § 478.71 ............................................................................................ 9

27 C.F.R. § 478.72 ............................................................................................ 9

27 C.F.R. § 478.73 .................................................................................................... 9

27 C.F.R. § 478.78 ............................................................................................... 9, 28

27 C.F.R. § 478.99 .................................................................................................... 8

27 C.F.R. § 478.102 ............................................................................................. 9, 11

27 C.F.R. § 478.121 .................................................................................................. 9

27 C.F.R. § 478.123 ................................................................................................ 10

27 C.F.R. § 478.124 ......................................................................................... 9, 14, 29

27 C.F.R. § 478.125 ........................................................................................... 10, 13

27 C.F.R. § 478.126a .............................................................................................. 11

28 C.F.R. § 25.6 .............................................................................................. 10, 11

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Permanent Brady
    State Lists* (Feb. 14, 2022), https://www.atf.gov/rules-and-
    regulations/permanent-brady-state-lists ........................................................ 11

14C Charles Alan Wright et al., Fed. Prac. & Proc. § 3722.1 (4th ed. 2020) .................... 6

Pub. L. No. 90-351, sec. 901, 82 Stat. 225 (1968) ........................................................ 24

S. Rep. No. 109-14 (2005) ....................................................................................... 30

Store Locator, *Fleet Farm*,
    https://www.fleetfarm.com/sitewide/storeLocator.jsp ................................................ 24

## INTRODUCTION

This case arises from Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC's (together, "Fleet Farm") commercial firearm sales. The State of Minnesota, by Attorney General Ellison ("Attorney General"), contends that Fleet Farm improperly sold firearms to certain persons—known as "straw purchasers"—who then transferred those firearms to others, and that those firearms were eventually either possessed by ineligible persons or used in the commission of crimes. *See* ECF Doc. 1-1 ("Compl.") ¶¶ 1, 3-4. Although the Attorney General attempts to cloak his theory of liability under the guise of Minnesota common law, the complaint makes clear that ***federal*** law supplies the sole substantive basis for the Attorney General's claims. At its core, the Attorney General's complaint seeks to have a court broadly interpret firearm sellers' responsibilities under the federal Gun Control Act ("GCA") and a comprehensive set of implementing regulations and federal agency guidelines.

The Attorney General acknowledges that "[f]ederal laws and regulations closely regulate commercial sales of firearms." *Id.* ¶ 18. According to the Attorney General, ***federal*** laws, regulations, and agency guidance: (1) "prevent crime by keeping guns out of the hands of certain persons"; (2) "channel[] firearms commerce through firearms dealers"; (3) "prevent trafficking and reduce access to firearms by persons prohibited from possessing them"; (4) "create[] a nationwide licensing scheme for firearm dealers"; (5) "enforce[] … dealer-license provisions"; (6) train firearm dealers "to spot traffickers and straw purchasers"; and (7) establish "red flags that indicate a straw purchase to firearms dealers." *Id.* ¶¶ 18-20, 25. The Attorney General also contends ***federal*** laws, regulations,

and guidance obligate Fleet Farm to: (1) "[b]efore transferring a firearm … conduct a background check, examine the [customer]'s identification, and record the transaction on a firearms transaction record ('ATF Form 4473')"; (2) refuse to complete a sale if it "knows or has reason to know that the [customer's] ATF Form 4473 is inaccurate"; (3) "certify … [its] 'belief that it is not unlawful … to sell … the firearm(s)'" to the customer; (4) "determine the lawfulness of the transaction"; (5) "maintain proper records of the transaction"; (6) "stop the transaction if there is reasonable cause to believe the [customer] is prohibited from receiving or possessing a firearm"; (7) "report all transactions in which a [customer] purchases two or more handguns within five business days"; and (8) "work[] to detect illegal transactions and trafficking after a firearm is used unlawfully." *Id.* ¶¶ 21-22, 26-27, 30-32 (cleaned up).  These contentions make clear that although the Attorney General has asserted five claims premised nominally on Minnesota common law, those claims rest entirely on alleged duties created under federal statutes and regulations.

The Attorney General's reliance on federal law as the basis for his claims against Fleet Farm makes federal jurisdiction proper under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).  Although the complaint occasionally references state statutes, the sole source of Fleet Farm's alleged duties is the federal GCA, its implementing regulations, and federal agency guidelines.  Indeed, none of the state statutes referenced in the complaint are even cited in the Attorney General's remand brief.  Federal law permeates the complaint, with more than ***thirty*** paragraphs devoted to detailing Fleet Farm's duties under the GCA's comprehensive federal regulatory

scheme and its purported violations of that scheme. *E.g.*, Compl. ¶¶ 17-23, 25-28, 30-33, 36, 41-42, 44, 50, 52, 57, 59, 61, 73-74, 81-82, 84, 89-91, 99, 107, 111.

The Attorney General has "elected to premise [his state-law] claims on violations and interpretations of federal law." *Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521-22 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 621 (2020). Because those claims cannot be resolved without determining the scope and application of Fleet Farm's obligations under federal law, a federal issue is necessarily raised and actually disputed. Despite the Attorney General's protestations, this issue is also substantial: the complaint broadly implicates a robust and complex federal regulatory scheme, and Congress has recognized the critical importance of a consistent, nationwide approach to regulating commercial firearm sales. And having a federal court interpret and apply a broad swath of federal firearm laws and regulations will not upset the balance between federal and state judicial responsibilities.

Alternatively, federal jurisdiction is proper under the Class Action Fairness Act because the Attorney General is bringing claims on behalf of all Minnesota "citizens," "residents," and "visitors," asserting Fleet Farm's conduct purportedly has caused harm to all Minnesotans, and seeking remedies on behalf of all Minnesotans. *E.g.*, Compl. ¶¶ 5, 78, 99, 109; *id.*, Prayer for Relief ¶¶ 2, 5-6.

## BACKGROUND

The complaint's allegations show this lawsuit is an attempt by the Attorney General to use nominal state-law claims to interpret and enforce the federal laws and regulations that "closely regulate" commercial practices of federal firearm licensees ("FFLs"). Compl.

- 3 -

¶ 18.   At bottom, the complaint contends Fleet Farm is responsible for unforeseeable, criminal conduct of third parties because it purportedly sold firearms to straw purchasers in violation of its obligations under federal law.  *See id.* ¶¶ 1-5.  The Attorney General offers no allegations regarding Fleet Farm's actual policies for selling firearms, instead asserting in broad strokes that Fleet Farm has violated federal laws and regulations— specifically, the GCA, 18 U.S.C. § 921, *et seq.*, and its implementing regulations—which "closely regulate commercial sales of firearms."  Compl. ¶ 18.

The complaint details this comprehensive federal scheme, which, as discussed *infra* pp. 8-11, establishes robust standards for licensing firearm sellers and regulating their transactions.  *E.g.*, Compl. ¶¶ 17-23, 25-28, 30-33, 36, 41-42, 52, 57, 61-62.  *All* of the allegedly wrongful conduct the complaint ascribes to Fleet Farm is premised on federal obligations, including: (1) requiring customers to complete a federal ATF Form 4473 before purchasing a firearm, *id.* ¶¶ 21-22; (2) submitting a federal ATF Form 3310.4 if a customer is purchasing "two or more handguns within five business days," *id.* ¶ 30; (3) monitoring for "red flags" that a customer is engaging in a straw purchase, *id.* ¶¶ 25, 30, 36; (4) certifying it has determined a firearm sale is lawful, *id.* ¶¶ 27-28; and (5) "maintain[ing] proper records of [firearm] transaction[s]," *id.* ¶¶ 27, 31.  The federal nature of the Attorney General's complaint is confirmed by the fact that the only identified straw purchasers whom Fleet Farm purportedly aided-and-abetted in selling or transferring firearms to others were charged with (and pleaded guilty to) violating *federal* firearm laws. *Id.* ¶¶ 37-61.

The federal nature of the complaint is further confirmed by the Attorney General's recent practices.  For several years, undoubtedly recognizing this comprehensive federal scheme, the Attorney General has pursued federal solutions to issues relating to gun trafficking and gun violence.  By way of example, in 2020, the Attorney General joined a multi-state federal lawsuit challenging a federal rule that would have permitted 3D-printed gun files to be published online.  *See* ECF Doc. 2-1 at 2-3.  The Attorney General has also joined numerous amicus briefs arguing federal agencies should correct their interpretation of, and continue to enforce, provisions of federal law relating to "ghost guns,"[1] and urging the adoption of a federal regulation closing "loophole[s]" in federal law relating to those guns.  *See* ECF Doc. 2-3 at 2-3; ECF Doc. 2-6 at 2-3.  And relatedly, the Attorney General has signed multi-state letters urging the federal government to continue enforcing certain federal regulations relating to 3D-printed firearms, and to encourage federal agencies to finalize regulations outlawing ghost guns.  *See* ECF Doc. 2-4 at 2-3; ECF Doc. 2-5 at 2.  The Attorney General's federal approach to seeking tighter firearm regulation should come as no surprise.  As the Attorney General knows, nearly half the firearms recovered by law enforcement in connection with criminal investigations in Minnesota from 2019-2021 were traced to initial retail sales outside the state.  *See* Compl. ¶ 63.  In fact, these initial sales occurred in nearly every state in the nation.  *See id.*

---

[1] "Ghost guns" are guns that "do not have a serial number or other identifying markings and are untraceable."  *City of Syracuse v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2021 WL 23326, at *1 (S.D.N.Y. Jan. 2, 2021).

In short, federal law permeates the Attorney General's complaint. Accordingly, on October 26, 2022, Fleet Farm timely removed this case, asserting federal-question jurisdiction exists under the GCA and its implementing regulations, and that alternatively this Court has jurisdiction under the Class Action Fairness Act. *See* ECF Doc. 1. On November 7, 2022, the Attorney General filed a motion to remand. *See* ECF Doc. 15 ("AG Br.").

## LEGAL STANDARD

A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). The removing party bears the burden of demonstrating jurisdiction, *Bor-Son Bldg. Corp. v. Heller*, 572 F.2d 174, 182 n.13 (8th Cir. 1978), and removal is proper so long as federal jurisdiction exists over a ***single*** claim, *e.g.*, 28 U.S.C. § 1367; *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009).[2] The controlling fact in the removal analysis is whether at least one claim stated on the face of the complaint is federal ***in nature***—a plaintiff's characterization of claims as state-law claims is of no moment. *E.g.*, 14C Charles Alan Wright et al., Fed. Prac. & Proc. § 3722.1 (4th ed. 2020); *Sam L. Majors*

---

[2] It is thus incorrect for the Attorney General to assert federal law must be a "necessary element to [the] ***claims*** in this action," AG Br. 16 (emphasis added)—federal law being a necessary element to a ***single claim*** suffices. Fleet Farm submits that every claim in the complaint necessarily raises a federal issue, but if this Court concludes some, and not all, claims raise a federal issue, it should exercise supplemental jurisdiction over the remaining claims because all of the claims are so related that they "form part of the same case or controversy." 28 U.S.C. § 1367(a); *accord Starkey v. Amber Enters., Inc.*, 987 F.3d 758, 765 (8th Cir. 2021).

*Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997).   Whether a case arises under federal law, and is therefore properly removable, is a question of subject-matter jurisdiction that this Court must resolve for itself, subject to its "unflagging obligation" to exercise such jurisdiction where it exists.[3]   *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

<u>ARGUMENT</u>

**I.       This Court has federal-question jurisdiction.**

This action, which purports to allege claims under only Minnesota common law, arises under federal law.   Federal jurisdiction exists over nominal state-law claims if a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."   *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *accord Grable*, 545 U.S. at 315. Determining if federal jurisdiction is present "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."   *Grable*, 545 U.S. at 312-13 (cleaned up).   The Eighth Circuit has held these factors are satisfied in cases where state-law claims are predicated on violations of federal statutes that establish a comprehensive regulatory scheme.   *See Wullschleger*, 953

---

[3] The Attorney General suggests *Franchise Tax Board v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1 (1983), creates a presumption against federal jurisdiction.   *See* AG Br. 19-20.   But in *Mims v. Arrow Financial Services, LLC*, the Supreme Court held that "[d]ivestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331."   565 U.S. 368, 379 (2012) (cleaned up).   And here, a "clear rule"—the rule of *Gunn* and *Grable*, *infra* pp. 7-8— "demands" the exercise of federal jurisdiction.   *Franchise Tax Bd.*, 463 U.S. at 21 n.22.

F.3d at 522 (reversing remand order where state-law claims involving FDA labeling were "premise[d] … on violations and interpretations of federal law").  The face of the complaint makes clear that this Court has federal-question jurisdiction under *Grable*.

### A.      The complaint "necessarily raises" a federal issue.

The complaint "necessarily raises" a federal issue because the asserted right to relief under state law requires resolving a federal question.  *See id.* (concluding "a federal issue surrounding the state law claims" was "necessarily raised" where those claims "cannot be adjudicated without reliance on and explication of federal law" and "necessarily require[] the interpretation and application of federal law").  Because the GCA is the only possible source of Fleet Farm's alleged duties, federal law is necessarily raised and the first *Grable* factor is satisfied.

The Attorney General has ostensibly pleaded common-law claims against Fleet Farm, but federal law "permeates" the complaint.  *Id.*  For more than half a century, "[f]ederal laws and regulations [have] closely regulate[d] commercial sales of firearms." Compl. ¶ 18.  Specifically, the GCA and its implementing regulations—all of which are enforced by the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), *see* 28 U.S.C. § 599A—create a "nationwide licensing scheme for firearm dealers" and impose numerous duties on FFLs.  Compl. ¶ 18 (citing 18 U.S.C. § 921, *et seq.*).  Under the GCA, any person who wishes to become an FFL must obtain a federal license.  18 U.S.C. § 923(a); 27 C.F.R. §§ 478.41-.44, 478.47.  Federal law imposes numerous prerequisites to obtaining a license, and licensees may not sell firearms to certain classes of individuals.  18 U.S.C. §§ 922(d), 923; 27 C.F.R. § 478.99.  FFLs' licenses are subject

- 8 -

to renewal every three years, and ATF may revoke a license and impose civil fines if an FFL willfully violates the GCA or its regulations.[4]  18 U.S.C. § 923(e)-(f); 27 C.F.R. §§ 478.45, 478.49, 478.73.

FFLs are required to maintain various records relating to firearm sales, and ATF is authorized to conduct both warrant inspections of FFLs for suspected GCA violations and warrantless inspections for compliance purposes, to investigate suspected third-party criminal conduct, and to trace firearms used in crimes.  *See* 18 U.S.C. § 923(g)(1)(A)-(C); 27 C.F.R. §§ 478.23, 478.121; *see also* 27 C.F.R. § 478.25a (requiring that FFLs respond "immediately" to ATF requests for records to "determin[e] the disposition of one or more firearms in the course of a bona fide criminal investigation").

Federal law also mandates that FFLs submit certain forms to ATF in connection with a firearm sale.  Before completing an "over-the-counter transfer of a firearm," FFLs must require the customer to complete an ATF Form 4473 and submit that form to the federal "national instant criminal background check system" ("NICS").  18 U.S.C. § 922(t)(1); 27 C.F.R. §§ 478.102, 478.124; ECF Doc. 21-1 ("Form 4473") at 1; Compl. ¶¶ 21-22.  Form 4473 requires the customer to provide background information and certify, among other things, that they are "the actual transferee/buyer of the firearm(s) listed on th[e] form," not under indictment for and have not been convicted of a felony, not an unlawful user of controlled substances, and not in the United States illegally.  Form 4473

---

[4] GCA regulations outline various procedures to challenge an ATF decision to deny a license application, revoke a license, or impose a fine.  *See* 18 U.S.C. § 923(f)(3); 27 C.F.R. §§ 478.71, 478.72, 478.78.

at 1; Compl. ¶ 22.  Form 4473 also requires an FFL to provide information regarding the firearm(s) being purchased, state whether (as discussed below) NICS authorized the transaction, and affirm its belief that "it is not unlawful … to sell … the firearm(s) listed on this form to the [customer]."  Form 4473 at 3; Compl. ¶ 26.  An FFL must also "determine the lawfulness of the transaction and maintain proper records of the transaction," and "must stop the transaction if there is reasonable cause to believe that the [customer] is prohibited from receiving or possessing a firearm."  Form 4473 at 3; Compl. ¶ 27.  After a firearm sale is completed, an FFL must make the Form 4473 part of its "permanent records," and if a transaction is denied or cancelled by NICS, or not completed for any other reason, an FFL must retain the Form 4473 for five years.  Form 4473 at 3; 27 C.F.R. §§ 478.123(b), 478.125(e); Compl. ¶ 31.

As mentioned, before completing a firearm sale, an FFL must submit the customer's Form 4473 to NICS.  *See* 18 U.S.C. § 922(t)(1)(A).  NICS then advises the FFL if there is "any information [indicating] that the purchaser is prohibited by law from possessing or receiving a firearm" by sending one of four responses: "Proceed," "Denied," "Cancelled," or "Delayed."  Form 4473 at 6.  "Proceed" authorizes the transaction immediately, and "Denied" or "Cancelled" prohibits the transaction.  *Id.*; 28 C.F.R. § 25.6(c)(1)(iv)(A), (C).  If NICS sends a "Delayed" response, the FFL may not sell the firearm "unless 3 business days have elapsed and … NICS … has not advised [it] that the [customer]'s receipt or

possession of the firearm would be in violation of law."[5]   Form 4473 at 6; 27 C.F.R.

§ 478.102(a)(2)(ii); 28 C.F.R. § 25.6(c)(1)(iv)(B).  In Minnesota, the FBI is responsible for

conducting NICS background checks on all firearm transactions.[6]

GCA regulations also require FFLs to complete a Form 3310.4 to report if they sell

to a customer "at one time or during any five consecutive business days, two or more

pistols, or revolvers, or any combination of pistols and revolvers totaling two or more."  27

C.F.R. § 478.126a; *see also* 18 U.S.C. § 923(g)(3)(A); Compl. ¶ 30; ECF Doc. 21-2 ("Form

3310.4").  Form 3310.4s are generated automatically, and an FFL must submit the form to

ATF (with a second copy to a designated local law-enforcement officer) and retain one

copy for their records.  18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a; Compl. ¶ 30.  An

FFL may proceed with a sale even if a Form 3310.4 is generated.  In other words, GCA

regulations contemplate that an FFL may sell multiple firearms to an individual during a

single transaction or within a five-business-day period.  27 C.F.R. § 478.126a; Form 3310.4

at 2.

Against this robust federal regulatory backdrop, it is no surprise that the Attorney

General admits "[f]ederal law and regulations closely regulate commercial sales of

firearms."  Compl. ¶ 18.  Indeed, the Attorney General pleads that: "***[f]ederal*** firearm laws

… prevent crime by keeping guns out of the hands of certain persons who have a

---

[5] In this litigation, Fleet Farm will demonstrate its policy is to not sell a firearm until it has received a "Proceed" message from NICS, even if more than three business days have passed since submitting the Form 4473.

[6] *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Permanent Brady State Lists* (Feb. 14, 2022), https://www.atf.gov/rules-and-regulations/permanent-brady-state-lists.

heightened risk of misusing firearms," *id.* ¶ 19 (emphasis added); ***federal*** law was "designed … to [prevent crime] by channeling firearms commerce through firearms dealers," *id.* ¶ 20; ***federal*** regulation of firearm distribution "prevent[s] trafficking and reduce[s] access to firearms by persons prohibited from possessing them," *id.*; and the ***federal*** GCA establishes a "nationwide licensing scheme for firearm dealers," *id.* ¶ 18. And that ATF, a ***federal*** agency, is "charged with enforcing these [federal] dealer-license provisions." *Id.*

Most critically, the Attorney General's substantive allegations against Fleet Farm are all premised on Fleet Farm's alleged violations of—or its alleged aiding-and-abetting violations of—purported legal duties arising out of the GCA and its implementing regulations. *E.g.*, *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 588 (5th Cir. 2022) ("The type of claim that creates a federal question under *Grable* is typically a state-law claim premised on ***some component*** of federal law. For example, a negligence claim that is premised on ***the existence of a duty established by federal law*** creates a federal question." (emphases added)). To illustrate, the Attorney General alleges that:

- "Before transferring a firearm to any person who is not a licensed dealer … Fleet Farm[] must conduct a background check, examine the individual's identification, and record the transaction on a [Form 4473]." Compl. ¶ 21 (citing 18 U.S.C. § 922(t)(1); 27 C.F.R. §§ 478.102, 478.124(a)).

- It is a "violat[ion] [of] ***federal*** law" to fill out a Form 4473 "inaccurately." Compl. ¶ 22 (emphasis added).

- The ***federal*** Form 4473 requires Fleet Farm to certify its "belief that it is not unlawful [] to sell … the firearm(s) listed on th[e] form to the" purchaser. Compl. ¶ 26.

- The *federal* Form 4473 requires Fleet Farm to "determine the lawfulness of the transaction," "maintain proper records of the transaction," and "stop the transaction if there is reasonable cause to believe that the [buyer] is prohibited from receiving or possessing a firearm." Compl. ¶ 27.

- "*Federal* law regards the purchase of more than one handgun in a short period as a potential indication that the purchaser could be involved in trafficking," and *federal* law requires Fleet Farm to "report all transactions in which an unlicensed buyer purchases two or more handguns within five business days" on a *federal* ATF Form 3310.4.   Compl. ¶ 30 (emphasis added) (citing 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a).

- "*Federal* rules require [Fleet Farm] to keep a record of all transactions … in an acquisition and disposition book," failing to maintain such records "violates *federal* law." Compl. ¶ 31 (emphases added) (citing 18 U.S.C. §§ 922(m), 924(a)(1)(A), 924(a)(3); 27 C.F.R. §§ 478.123(b), 478.125(e)).

- "*Federal* law … enlists [Fleet Farm] in working to detect illegal transactions and trafficking after a firearm is used unlawfully." Compl. ¶ 32 (emphasis added).

- Fleet Farm is "required to know the *federal* firearms laws and regulations," that Fleet Farm is subject to *federal* ATF audits, and that following such audits Fleet Farm must "certify acknowledgement of *federal* laws and regulations." Compl. ¶ 33 (emphases added).

The Attorney General contends this comprehensive federal regulatory scheme—detailed and referenced in more than thirty paragraphs of the complaint[7]—is not necessarily raised because in addition to citing voluminous federal laws, regulations, and agency guidance, the complaint also name-checks two Minnesota statutes.  *See* AG Br. 8. Tellingly, the Attorney General's remand brief does not even attempt to explain how these state statutes supply a standalone basis for any of the Attorney General's claims—in fact,

---

[7] *E.g.*, Compl. ¶¶ 17-23, 25-28, 30-33, 36, 41-42, 44, 50, 52, 57, 59, 61, 73-74, 81-82, 84, 89-91, 99, 107, 111.

no Minnesota statute is even cited.  And on close look, the Attorney General's argument
falls apart.

For starters, it is simply wrong to assert Fleet Farm could be liable for negligence
"even if federal firearms regulations permitted Fleet Farm's sales."  AG Br. 2.  The two
Minnesota statutes cited in the complaint are entirely duplicative of the numerous cited
federal statutes and regulations.  *E.g.*, Compl. ¶¶ 19, 23-24, 28-29 (alleging Minnesota law
"reflects [the] purpose" of the federal GCA).  To illustrate, the Attorney General cites
Minn. Stat. § 624.7132, subds. 15(a)(2) and (4) to claim that under Minnesota law, an FFL
may not sell a firearm if they "have reason to believe they are selling to a straw purchaser."
Compl. ¶ 29.  The Attorney General alleges identical prohibitions exist under federal law
based on: (1) the federal Form 4473 mandating an FFL "stop [a firearm] transaction if there
is reasonable cause to believe that the [customer] is prohibited from receiving or possessing
a firearm" and warning that failing to do so "violates [federal] law, 18 U.S.C. § 922(d)";
and (2) 18 U.S.C. § 933(a)(1) "prohibit[ing] the transfer of a firearm if the [FFL] knows or
has reasonable cause to believe that the use, carrying, or possession of a firearm by the
recipient would constitute a felony."  Compl. ¶¶ 27-28.[8]  Likewise, the complaint cites

---

[8] Comparing the text of Minnesota and federal law confirms their identical nature.  Just as
Minn. Stat. § 624.7132, subd. 15(a)(2) prohibits "transfer[ing] a [firearm] to a person who
has made a false statement in order to become a transferee, if the transferor knows or has
reason to know the transferee has made the false statement," 27 C.F.R. § 478.124(c)(5)
prohibits an FFL from completing a transaction unless the FFL "does not know or have
reasonable cause to believe that the transferee is disqualified by law from receiving the
firearm."  And just as Minn. Stat. § 624.7132, subd. 15(a)(4) prohibits "mak[ing] a false
statement in order to become a transferee," 18 U.S.C. § 922(a)(6), among other federal
laws, makes it "unlawful … for any person in connection with the acquisition or attempted
acquisition of any firearm … from a[n] [FFL] … knowingly to make any false or fictitious

Minn. Stat. § 624.7133 to assert that under Minnesota law, an FFL may not "purchase[] or otherwise obtain[] a firearm on behalf of or for transfer to a person known to be ineligible to possess or purchase a firearm."  Compl. ¶ 24 (quoting Minn. Stat. § 624.7133).  Again here, the Attorney General also recognizes federal law "explicitly criminalizes straw purchasing in which any person knowingly purchases … a firearm at the request or demand of another person, knowing or having reasonable cause to believe that the other person … is ineligible to possess the firearm."  *Id.* ¶ 23 (citing 18 U.S.C. § 932(b)).

Moreover, the two Minnesota statutes cited in the complaint do not answer the core questions in this case—what duties Fleet Farm had during the course of a firearm transaction to determine if a customer was a straw purchaser, and whether it complied with those duties.  The answer to these questions will be determinative as to Fleet Farm's potential liability.  And the Attorney General's complaint makes clear that ***federal*** law alone establishes Fleet Farm's obligations when conducting firearms sales.[9]  *Supra* pp. 8-14.

The Attorney General does not contend that any Minnesota laws establish the warning signs or indicators of potential straw purchasers or trafficking that Fleet Farm is

---

oral or written statement … intended or likely to deceive [an FFL] … with respect to any fact material to the lawfulness of the sale."

[9] Although the negligent-entrustment claim does not expressly cite federal law, the complaint makes clear that the claim is premised on Fleet Farm's alleged failure to properly monitor for "red flags" of straw purchasing, *see* Compl. ¶¶ 89-91—*i.e.*, the same federal standards that provide the basis for the Attorney General's other claims.  Fleet Farm has explained why this legal theory is not viable, *see* ECF Doc. 20 at 23-26, but if this Court permits the negligent-entrustment claim to proceed as pleaded, that claim cannot be resolved without determining the scope of Fleet Farm's obligations under federal law, and whether it fulfilled those obligations.

purportedly obliged to look for.  Instead, the Attorney General alleges any such "red flags" are established solely by ATF—a federal agency.  *See* Compl. ¶¶ 25, 30 (identifying list of seven "red flags" of straw purchasing published by ATF and asserting that ***federal*** law "regards the purchase of more than one handgun in a short period as a potential indication that the purchaser could be involved in trafficking").  Put simply, because there is no "state law grounding for the duty that the [Attorney General] would need to establish for [Fleet Farm] to be liable," and any such duty would "have to be drawn from federal law," a federal question is necessarily raised.[10]  *Bd. of Comm'rs of Se. La. Flood Prot. Auth.–E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 723 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 420 (2017); *accord Mitchell*, 28 F.4th at 588.[11]  This Court should not countenance the Attorney General's "isolated focus" on the complaint's incidental references to state law, which is "nothing more than an apparent veil to avoid federal jurisdiction." *Wullschleger*, 953 F.3d at 522.[12]

---

[10] Fleet Farm explained in its memorandum in support of its motion to dismiss that no such duty exists under Minnesota common law.  *See* ECF Doc. 20 at 14-16.

[11] *See also, e.g.*, *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1020-23 (2d Cir. 2014) (concluding state-law claims "necessarily raised" federal issues because "the duty underlying each claim" turned on "the contours of [the] federal duty to maintain a fair and orderly market, the scope of that duty, and whether [certain] failure[s] … amounted to a breach of that duty"); *Hughes v. Chevron Phillips Chem. Co.*, 478 F. App'x 167, 170-71 (5th Cir. 2012) (concluding jurisdiction existed because state-law claims premised on purported breaches of fiduciary duties required determining if the defendants' actions were governed by federal law).

[12] It is of no moment that the Attorney General's negligence claim also purports to invoke "the general duty imposed on all persons and entities to not expose others to reasonably foreseeable risks of injury."  AG Br. 12 (quoting Compl. ¶ 71).  Setting aside causation issues, *see* ECF Doc. 20 at 29-32, whether a particular injury was reasonably foreseeable to an FFL will depend in large part on whether that FFL complied with its duties under

The Attorney General points to *Corporan v. Wal-Mart Stores East, LP*, 194 F. Supp. 3d 1128 (D. Kan. 2016), *see* AG Br. 9, but that case is neither controlling nor persuasive. There, relatives and heirs of a shooting victim claimed Walmart "negligently sold [a] shotgun to … a straw purchaser, with knowledge that [he] was falsely representing himself as the actual buyer of the firearm." *Corporan*, 194 F. Supp. 3d at 1129. The district court reclassified plaintiffs' negligence per se claim as "an alternative theory of negligence"— rather than a standalone claim—and concluded, once the complaint was reframed as asserting alternative ***theories*** of negligence (rather than distinct ***claims*** for negligence, negligence per se, and negligent entrustment), that no federal question was necessarily raised. *Id.* at 1131-32. The court then concluded (wrongly) that removal was inappropriate because the GCA did not provide a private cause of action, and also explained federal jurisdiction was improper because the case was a "fact-bound, private dispute between [the] parties." *Id.* at 1133.

*Corporan* is inapposite. ***First***, negligence, negligence per se, and negligent entrustment are distinct ***claims*** under Minnesota law, not alternative theories of liability. *E.g.*, *Gradjelick v. Hance*, 646 N.W.2d 225, 233-24 (Minn. 2002) (reversing district court for "confus[ing] and fail[ing] to separate the liablity standards for ordinary negligence and for negligence per se" and explaining "the elements are different" for each claim); *D.N.N. v. Berestka*, 2008 WL 313898, at *3 (Minn. Ct. App. Feb. 5, 2008) ("Appellant may have

---

federal law. Without reference to and interpretation of federal law, it is not possible to assess reasonableness. And regardless, even if the negligence claim is premised in part on non-federal authority, Fleet Farm need only establish federal jurisdiction for one of its claims. *E.g.*, *Exxon Mobil Corp.*, 545 U.S. at 563.

properly pleaded a claim of negligence, but negligence per se is a distinct claim."); *see also* AG Br. 8 (acknowledging the complaint asserts separate claims for negligence, negligence per se, and negligent entrustment).[13]  **Second**, *Corporan* ignored that to support removal under *Grable*, a defendant need establish only that a single claim raises a federal issue. *E.g.*, *Exxon Mobil Corp.*, 545 U.S. at 563; *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 166 (1997).  **Third**, the absence of a private cause of action does not foreclose federal-question jurisdiction.  *E.g.*, *Grable*, 545 U.S. at 317; *infra* pp. 27-29.  **Fourth**, this case is far from the "private dispute" between two parties addressed in *Corporan*—it was brought by the State of Minnesota on behalf of all Minnesotans and broadly implicates the comprehensive federal scheme regulating FFLs' commercial activities.  *Supra* pp. 8-14. And in contrast with *Corporan*, where the plaintiffs sought private redress for a criminal act, here the Attorney General is seeking to hold Fleet Farm broadly responsible for gun-related crimes and the general proliferation of firearms in Minnesota.  *E.g.*, Compl. ¶¶ 1-5, 62-69; *id.*, Prayer for Relief ¶ 2; *infra* pp. 22-30.

The other firearm-remand cases cited by the Attorney General are similarly not on point.  *See* AG Br. 10.

---

[13] *Corporan* is also inapposite because the case it cited in support of the notion that a federal issue is not necessarily raised when a claim presents "alternative and independent theories," *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988), supports federal jurisdiction in this case.  *See Corporan*, 194 F. Supp. 3d at 1132.  In *Christianson*, the Supreme Court interpreted a federal statute providing district courts with "original jurisdiction of any civil action arising under any Act … relating to patents."  486 U.S. at 807 (quoting 28 U.S.C. § 1338(a)).  The court concluded, in relevant part, that under 28 U.S.C. § 1338(a), federal jurisdiction existed if "patent law is a necessary **element** of **one** of the well-pleaded claims."  *Id.* at 809 (emphases added).  Here, the complaint makes clear that the federal GCA provides necessary elements to all of the Attorney General's claims.

In *Tisdale v. Pagourtzis*, 2020 WL 7170491 (S.D. Tex. Dec. 7, 2020), plaintiffs filed a lawsuit against a shooter, his parents, and businesses that sold ammunition online, asserting, among other things, claims for negligence, negligence per se, and civil conspiracy. *Id.* at *1, *4. The court's remand decision was premised largely on the fact that plaintiffs invoked only a single, narrow GCA provision unrelated to the broader federal licensing and regulatory scheme. *See id.* at *4 (citing 18 U.S.C. § 922(x)). And unlike Minnesota courts, Texas courts expressly recognize that "under common-law negligence principles and without the assistance of negligence per se … ammunition sellers owe a duty of ordinary care toward third parties who might be injured by an unreasonable sale of ammunition." *Id.* at *5 (citing *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. Ct. App. 1997)). Moreover, *Tisdale* does not appear to have considered that a defendant need only establish federal jurisdiction for a single claim (e.g., the plaintiffs' negligence per se claim expressly premised on the GCA) to warrant removal. *See id.* at *2-3.

And in *Daniel v. Armslist, LLC*, 2016 WL 660894 (E.D. Wis. Feb. 17, 2016), plaintiffs alleged specifically that, in addition to aiding-and-abetting violations of federal law, the defendant, an online firearm seller, aided-and-abetted a violation of Wisconsin law with no federal counterpart. *See id.* at *3 (citing Wis. Stat. § 941.20(1), which criminalizes "[e]ndanger[ing] another's safety by the negligent operation or handling of a dangerous weapon"). The district court also concluded that a state court deciding the case would "not intrude on any federal prerogative" relating to firearms because federal law did not impose background-check requirements for private online sales. *Id.* at *3 & n.3. By contrast, here the at-issue sales were subject to federal requirements, *e.g.*, Compl. ¶¶ 21-22, and any

decision on the merits will require a court to determine the scope of Fleet Farm's obligations under federal law, and what it (and all other FFLs) must do to fulfill those obligations.[14]

At bottom, the Attorney General would have this Court hold that because the complaint "brings only state law claims" and "reference[s] both federal and state law," it cannot exercise jurisdiction. AG Br. 7. Such a holding would allow plaintiffs to improperly plead around federal jurisdiction in almost all instances. It would also be inconsistent with the Eighth Circuit's recent ruling in *Wullschleger*. There, plaintiffs asserted only claims arising under Missouri law, including violations of state consumer-protection statutes, antitrust statutes, and unjust-enrichment law. *See* 953 F.3d at 520. The Eighth Circuit did not end its analysis merely because the complaint asserted state-law claims and referenced federal and state law. Instead, the court recognized that plaintiffs

---

[14] The other out-of-circuit removal decisions cited by the Attorney General are similarly inapposite. For example, in *Abdale v. North Shore-Long Island Jewish Health Sys., Inc.*, 2014 WL 2945741 (E.D.N.Y. June 30, 2014), the court concluded plaintiffs' negligence per se claims—the only claims defendants invoked as the basis for *Grable* jurisdiction, *see id.* at *2-4—did not necessarily raise federal questions because alongside alleging violations of HIPPA and 42 U.S.C. §§ 17921-53, the complaint also based its negligence per se claims on independent violations of state public-health and business laws. *Id.* at *1-4; *see also Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 149-50, 154 (4th Cir. 1994) (concluding federal question not necessarily raised because negligence per se based on violation of federal statute was asserted as a separate ***theory***, not a standalone ***claim***); *Abbott v. Tonawanda Coke Corp.*, 2012 WL 42414, at *4-5 (W.D.N.Y. Jan. 9, 2012) (concluding federal question not necessarily raised because plaintiffs' claim was also premised on independent violations of "New York environmental conservation regulations" and defendants' "obligations under a state environmental regulatory scheme"); *DeLuca v. Tonawanda Coke Corp.*, 2011 WL 3799985, at *5 (W.D.N.Y. Aug. 26, 2011) (concluding negligence per se claim did not necessarily raise federal issue because claim presented independent, "alternative grounds" such that "a factfinder could find negligence *per se* without determining whether Defendants violated federal law").

"rel[ied] explicitly on federal law throughout their pleadings," and examined each state-law claim to determine if resolving any claim would require relying on federal law. *Id.* at 520-21. The court concluded although plaintiffs' consumer-protection claim "might not depend on federal law," the antitrust and unjust-enrichment claims implicated federal law. *Id.* at 521-22. The court explained those claims were "premised[]" on "violations and interpretations of federal law," evidenced by plaintiffs including "no fewer than 20 paragraphs" in their complaint "explicitly claim[ing] that defendants violated [federal law], were non-compliant with [federal agency] guidance, and that their refusal to submit the[ir] [product] to [federal agency] review was improper." *Id.* at 522. And although plaintiffs ultimately alleged this conduct violated "federal and state law," the court held that plaintiffs' "dependence on federal law permeate[d] the allegations such that the antitrust and unjust enrichment claims cannot be adjudicated without reliance on and explication of federal law." *Id.*

Like *Wullschleger*, here the Attorney General has asserted claims that "cannot be adjudicated without reliance on and explication of federal law." *Id.* The Attorney General has "explicitly claim[ed] that [Fleet Farm] violated [federal law]" and was "non-compliant with [federal agency] guidance." *Id.* And the ***only*** source of the duties Fleet Farm allegedly breached—the duties to monitor for "red flags" of straw purchasing and to not sell firearms to suspected straw purchasers—is federal law. *Supra* pp. 15-16. The Attorney General makes no meaningful, non-conclusory effort to explain how ***every*** claim in the complaint may be resolved without reliance on federal law. The Attorney General's "dependence on

- 21 -

federal law permeates the allegations" in the complaint, *Wullschleger*, 953 F.3d at 522, and a federal issue is thus necessarily raised.

**B.      The parties "actually dispute" the federal issue.**

The federal issue necessarily raised by the complaint is "actually disputed." *Grable*, 545 U.S. at 314.  The Attorney General states in conclusory terms that "there is not a dispute about the content of federal firearms laws and regulations with respect to [its] claims."  AG Br. 15.  This is incorrect: the parties will undoubtedly dispute the scope of alleged duties arising under the GCA and its implementing regulations, and whether Fleet Farm violated any duties relating to monitoring for "red flags" of straw purchasing or whether specific firearms sales were consistent with federal law.  Indeed, if the complaint survives the motion-to-dismiss stage, this federal issue will be the "central point of dispute" regarding whether Fleet Farm is liable on the merits.  *Gunn*, 568 at 259.[15]  The second *Grable* factor is thus satisfied.

**C.      The federal issue is "substantial."**

The federal issue necessarily raised by the complaint is also "substantial" because the federal government has a strong interest in ensuring uniform interpretation and application of the federal statutes, regulations, and agency guidance that establish the parameters for commercial firearm sales.

---

[15] Because the scope of, and Fleet Farm's compliance with, the federal laws and regulations cited in the Attorney General's complaint implicate transaction-specific questions ill-suited for the Rule 12 stage, Fleet Farm's motion-to-dismiss focuses on the procedural and elemental legal issues that render the complaint inviable.  *See generally* ECF Doc. 20.

The substantiality inquiry looks to "the importance of the issue to the federal system as a whole," which requires assessing, among other things, if the federal government has a "strong interest" in the federal issue at stake and if allowing state courts to resolve the issue will undermine the "development of a uniform body of [federal] law." *Gunn*, 568 U.S. at 260-61 (quoting *Grable*, 545 U.S. at 315); *accord Martinson v. Mahube-Otwa Cmty. Action P'ship, Inc.*, 371 F. Supp. 3d 568, 574 (D. Minn. 2019). This inquiry "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. As a general rule, federal issues are substantial if "state adjudication would undermine the development of a uniform body of federal law," the case "presents a nearly pure issue of law that would have applications to other federal cases," or "resolution of the issue has broad significance for the federal government." *La. Flood*, 850 F.3d at 724 (cleaned up); *see also, e.g.*, *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) (explaining federal issues may be substantial where they are "both dispositive of the case and … controlling in numerous other cases").

Despite the Attorney General's objections, *see* AG Br. 16-18, Congress itself has recognized the substantial nature of the federal issue in this case. In enacting the GCA, Congress emphasized the importance of a consistent, nationwide approach to regulating commercial firearm sales, as well as the inadequacy of state regulation of the same. Specifically, Congress found that "only through adequate ***Federal*** control over interstate and foreign commerce in [firearms], and over all persons engaging in the business[] of …

- 23 -

dealing in [firearms], can this grave problem [of firearm trafficking] be properly dealt with." Pub. L. No. 90-351, sec. 901, 82 Stat. 225 (1968) (emphasis added). This strong federal interest in regulating commercial firearm sales uniformly is made more explicit in the GCA's text, which explains "[s]tates, localities, and school systems find it almost impossible to handle gun-related crime by themselves," and that "crime involving drugs and guns[] is a pervasive, **nationwide** problem." 18 U.S.C. § 922(q)(1)(A), (H) (emphasis added).

Federal courts are best situated to uniformly interpret the GCA and its implementing regulations, and to ensure FFLs nationwide are subject to uniform requirements when conducting commercial firearm sales.[16] Indeed, the scope of obligations the GCA places on FFLs—including (1) the circumstances under which an FFL, despite receiving a "Proceed" authorization from NICS, must refuse to sell a firearm; and (2) the "red flags" of straw purchasing that FFLs must monitor for when selling a firearm—presents legal questions with broad federal significance. Among other things, the answers to these questions may impact ATF's enforcement of the GCA and the circumstances under which an FFL may be fined or have its license suspended. *E.g.*, 18 U.S.C. § 923(e)-(f). The

---

[16] For example, Fleet Farm itself operates stores in Iowa, Minnesota, North Dakota, South Dakota, and Wisconsin. *See* Store Locator, *Fleet Farm*, https://www.fleet-farm.com/sitewide/storeLocator.jsp (last accessed Nov. 28, 2022). Allowing this action to proceed in Minnesota state court may result in stores in Minnesota being subject to different requirements than stores in Iowa, North Dakota, South Dakota, and Wisconsin, potentially creating the very patchwork of inconsistent requirements for selling firearms that the GCA is intended to prevent.

answer will also have broad application to all cases in which an FFL allegedly breached its obligations relating to commercial firearm sales and its duty to monitor for "red flags."

Numerous federal courts have concluded that federal issues are substantial where they ask courts to interpret and apply a robust, complex federal regulatory scheme. In *NASDAQ OMX*, the Second Circuit concluded the disputed federal issue—whether defendant violated certain Exchange Act obligations—was "sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to the federal system as a whole." 770 F.3d at 1024 (cleaned up). To support this conclusion, the court pointed to Congress's finding that "the securities markets are an important national asset which must be preserved and strengthened." *Id.* (quoting 15 U.S.C. § 78k-1(a)(1)(A)); *see also, e.g.*, *Grable*, 545 U.S. at 315 ("The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court."). Similarly, in *Louisiana Flood*, the Fifth Circuit held that a "substantial" federal issue was presented where the case implicated a "federal regulatory scheme" that "provide[d] the underlying legal basis for causes of action created by state law." 850 F.3d at 724. And in *Broder v. Cablevision Systems Corp.*, 418 F.3d 187 (2d Cir. 2005), the Second Circuit explained a federal issue is substantial if it implicates a "complex federal regulatory scheme … as to which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id.* at 195 (quoting *Grable*, 545 U.S. at 513). The court then concluded state-law claims that required determining if the defendant violated a provision of federal law raised a "substantial" federal question because that law was part of a "complex federal regulatory scheme." *Id.*; *see also N.Y. City*

*Health & Hosp. Corp. v. WellCare of N.Y., Inc.*, 769 F. Supp. 2d 250, 256-57 (S.D.N.Y. 2011) (concluding a substantial federal question was raised where state-law claims required interpreting certain Medicare regulations that were part of "the complex reimbursement schemes created by Medicare law"); *Hayes v. Am. Airlines, Inc.*, 2005 WL 2367623, at *4 (E.D.N.Y. Sept. 27, 2005) (concluding state-law claims raised a substantial federal issue where resolving the claims required determining if certain airfare refunds were "mandated by the relevant federal statutes and regulations"). Like these cases, here a court will be required to interpret and apply a complex federal regulatory scheme that provides the legal basis for the Attorney General's claims.

The crux of the Attorney General's argument against substantiality is that *Grable* and *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), purportedly held that "federal-question jurisdiction over state-law tort claims based on violations of federal standards would disrupt the division of responsibilities between federal and state courts," particularly where the federal statutes do not contain a private right of action. AG Br. 17. This is simply not an accurate characterization of the law. As the Supreme Court explained in *Grable*, *Merrell Dow* involved "a state tort claim **resting in part** on the allegation that the defendant … had violated a federal misbranding prohibition." 545 U.S. at 316 (emphasis added). Although *Merrell Dow* concluded the federal issue was not substantial in part because "Congress had not provided a private federal cause of action for violation of the federal branding requirement," *Grable* was clear that although *Merrell Dow* contained "some broad language," that language must be read in context. *Id.* at 317. And in context, *Merrell Dow* cannot be read to "overturn[] decades of precedent" authorizing

- 26 -

federal jurisdiction regardless whether the at-issue federal statute creates a private cause of action. *Id.* Indeed, *Merrell Dow* "disclaimed the adoption of any bright-line rule," concluding instead that "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." *Id.* (quoting *Merrell Dow*, 478 U.S. at 810). And notably, *Merrell Dow* "**expressly approved** the exercise of [federal] jurisdiction" in certain circumstances "despite the want of any federal cause of action." *Id.* (emphasis added) (citing *Merrell Dow*, 478 U.S. at 814 n.12). In short, *Merrell Dow* and *Grable* reaffirm that the existence of a federal cause of action is not required for a federal issue to be substantial. *See id.* (rejecting notion that *Merrell Dow* "convert[ed] a federal cause of action from a sufficient condition for federal questions into a necessary one").

Unsurprisingly, then, courts in recent years have concluded a federal issue may be "substantial" even where the at-issue federal statute does not provide a private cause of action. *Grable* itself concluded a substantial federal issue was presented despite the at-issue statute "providing no private right of action." *Id.* at 319. Similarly, in *Wullschleger*, the Eighth Circuit concluded it was appropriate to exercise federal jurisdiction under *Grable* despite the fact that Congress did not create a federal private right of action for FDCA claims. *See* 953 F.3d at 521; *see also, e.g.*, *Ranck v. Mt. Hood Cable Reg. Comm'n*, 2017 WL 1752954, at *4-5 (D. Or. May 2, 2017) (concluding state-law claims based on violations of federal statute raised substantial federal questions even though the federal statute did not create a private right of action). That the GCA does not provide a private

right of action for civil liability does not alter the fact that the federal issues in this case are substantial.

**D.    Federal jurisdiction will not disrupt the balance between federal and state judicial responsibilities.**

Lastly, the federal issue necessarily raised by the complaint may be resolved in federal court "without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

The complaint makes clear that commercial firearm sales are regulated predominantly at the federal level, and the duties Fleet Farm allegedly violated arise solely under that federal framework.  And unsurprisingly, federal courts often hear claims relating to the GCA.  For example, if an FFL's license is revoked for "willfully violat[ing]" the GCA, it may file a petition challenging that decision in "the United States district court for the district in which he resides or has his principal place of business."  18 U.S.C. § 923(f)(3); 27 C.F.R. § 478.78; *see also, e.g.*, *Harris News Agency, Inc. v. Bowers*, 809 F.3d 411, 414 (8th Cir. 2015).  Similarly, the GCA authorizes any person "prohibited from possessing … or receiving firearms" to seek "relief from the disabilities imposed by Federal laws with respect to the acquisition … or possession of firearms," and if the requested relief is denied, they may file a petition in "the United States district court" to seek judicial review of the denial.  18 U.S.C. § 925(c); *see also, e.g.*, *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 224 (3d Cir. 2002) (explaining federal district

courts have jurisdiction to review ATF denials of applications to restore firearm privileges).[17]

Here again, the Attorney General's resistance to federal jurisdiction rests on the flawed belief that *Merrell Dow* broadly proscribed exercising federal jurisdiction where the at-issue federal statute did not provide a private cause of action. *See* AG Br. 18-19. This ignores *Grable*'s mandate that the propriety of exercising federal jurisdiction over state-law claims necessarily raising federal issues "require[s] sensitive judgments" that must be evaluated on a case-by-case basis. 545 U.S. at 317 (quoting *Merrell Dow*, 478 U.S. at 810). The Attorney General is not merely asking a state court to interpret and apply a discrete portion of federal law to a unique factual scenario, as was the case in *Merrell Dow*, *see* 478 U.S. at 805-06. Instead, the Attorney General is asking a state court to broadly interpret FFLs' responsibilities under the GCA and a comprehensive set of implementing regulations and ATF guidelines. The Attorney General is also asking a state court to apply these federal principles to factual scenarios that are in no way unique—the complaint alleges that **all** FFLs have numerous federal duties to monitor for "red flags" of straw purchasing and to refuse to proceed with suspicious transactions, and even the two individuals who straw purchased firearms from Fleet Farm also made straw purchases from numerous other FFLs. *E.g.*, Compl. ¶¶ 21, 37-38, 53-54. The complaint thus implicates crucial questions of federal regulatory authority over an issue of nationwide importance,

---

[17] And, of course, criminal violations of the GCA are prosecuted in federal court—as was the case with the two individuals that Fleet Farm purportedly aided and abetted. *See* Compl. ¶¶ 37, 53; 18 U.S.C. § 922(a)(1), (a)(6), (m); *id.* § 923(a); *id.* § 924(a)(1)(A), (D); *id.* § 924(a)(3); 27 C.F.R. § 478.124(c)(1).

and there is no basis to believe exercising jurisdiction in this case will disrupt the balance between federal and state judicial responsibilities. *Gunn*, 568 U.S. at 258. On the contrary, exercising federal jurisdiction here would maintain that balance.

*   *   *

This Court should exercise federal jurisdiction over this action pursuant to *Grable* because the Attorney General's state-law claims "necessarily raise a stated federal issue, actually disputed and substantial, which [this Court] may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.

## II.   Alternatively, this Court has jurisdiction under the Class Action Fairness Act.

The Class Action Fairness Act ("CAFA") permits removing any "class action" that has minimal diversity, seeks to represent at least 100 "class members," and for which the amount in controversy exceeds $5 million. 28 U.S.C. § 1332(d)(1)-(2), (5); *see also* 28 U.S.C. § 1453(b). The Attorney General challenges only whether this case meets the statutory definition of "class action." *See* AG Br. 20-24.

CAFA defines "class action" to include "any civil action filed under [R]ule 23 … or similar state statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). The statutory term "class action" is intended to be interpreted "liberally," and "should not be confined solely to lawsuits that are labeled 'class actions.'" S. Rep. No. 109-14, at 35 (2005). Under CAFA, any lawsuit that "resemble[s] a purported class action should be considered [a] class action[]." *Id.*; *see also Addison Automatics, Inc. v. Hartford Cas. Ins.*

- 30 -

*Co.*, 731 F.3d 740, 742 (7th Cir. 2013) (explaining CAFA permits removing cases that are "in substance … class action[s]," irrespective of "attempt[s] to disguise the true nature of the suit"). Accordingly, courts should not "prioritize a complaint's use of magic words over its factual allegations" when determining if it is a CAFA "class action." *Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 901 (8th Cir. 2017).

This case has all the hallmarks of a class action. The Attorney General seeks to represent a class of similarly situated persons (Minnesota "citizens," "residents," and "visitors") purportedly injured by a common cause (gun violence). *E.g.*, Compl. ¶¶ 90, 109; *see also, e.g.*, *Commonwealth v. Chatham Dev. Co.*, 731 N.E.2d 89, 91 (Mass. 2000) ("An action brought by the Attorney General under [a state consumer-fraud statute] is comparable to a class action."). The central theory in this case is that Fleet Farm's purported negligence "has contributed, and will continue to contribute, to the irreparable harm to the health and well-being of Minnesotans caused by the ongoing gun trafficking crisis." Compl. ¶ 5. Moreover, the Attorney General seeks various remedies on behalf of all Minnesotans, including requiring Fleet Farm to "abate the [alleged] public nuisance" and requiring it "to disgorge all profits from [its allegedly] unlawful sales of firearms" due to the "substantial injuries and damages" purportedly suffered by "the State and its residents." *Id.* ¶¶ 78, 86, 95, 102, 113; *id.*, Prayer for Relief ¶¶ 2, 5-6. In substance, if not in form, this case is a class action.

Fleet Farm recognizes that in *Minnesota v. American Petroleum Institute*, 2021 WL 1215656 (D. Minn. Mar. 31, 2021), this Court declined to exercise CAFA jurisdiction in the absence of Eighth Circuit authority "appl[ying] CAFA to a State Attorney General's

- 31 -

representative action." *Id.* at *12.  But as of this filing, the issue of whether a state attorney general action may constitute a "class action" for CAFA purposes remains open in the Eighth Circuit.  *See Minnesota v. Am. Petroleum Inst.*, Case No. 21-1752 (8th Cir.); *see also Missouri ex rel. Koster v. Portfolio Recovery Assocs., Inc.*, 686 F. Supp. 2d 942, 944 (E.D. Mo. 2010) (explaining whether *parens patriae* claims are "class actions" under CAFA is an open question).  Should the Eighth Circuit hold that state attorney general actions are subject to CAFA, this Court should apply that holding and, if necessary, invoke CAFA as an alternative basis for jurisdiction.

CONCLUSION

For the foregoing reasons, the Court should deny the Attorney General's motion to remand.

Dated:  November 28, 2022

*/s/ Todd A. Noteboom*
Todd A. Noteboom (#0240047)
Andrew W. Davis (#0386634)
Sharon R. Markowitz (#0392043)
Andrew P. Leiendecker (#0399107)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
todd.noteboom@stinson.com
andrew.davis@stinson.com
sharon.markowitz@stinson.com
andrew.leiendecker@stinson.com

**ATTORNEYS FOR DEFENDANTS**