UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison, | Civil No: 22-CV-02694 (JRT/JFD) |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION DISMISS** |
| Fleet Farm LLC (f/k/a Mills Fleet Farm LLC), Fleet Farm Group LLC (f/k/a Mills Fleet Farm Group LLC), and Fleet Farm Wholesale Supply Co. LLC (f/k/a Fleet Wholesale Supply Co. LLC), | |
| Defendants. | |

As gun trafficking and gun violence continue to rise in Minnesota, Defendants seek to evade responsibility for negligently selling firearms to straw purchasers. These firearms have caused harm to Minnesotans—including one firearm that was used in a deadly mass shooting in St. Paul—and continue to pose an ongoing threat to public safety. The State's asserted claims based on Defendants' actions are all viable, and Defendants' Motion to Dismiss should be denied.

Defendants' clamorous protestation that they do not sell firearms without federal authorization following background checks misses the point. Straw purchasers are used by criminals and black-market gun dealers to procure firearms *precisely because straw purchasers have no criminal history and can pass a background check*. This is why the law requires firearm purchasers to certify that they are the actual buyers and makes it a

crime to buy firearms for others prohibited from possessing them. This is also why Defendants have a duty to vigilantly ensure that they are not selling to straw buyers.

Moreover, contrary to Defendants' sweeping assertions that this action is "arbitrar[y]" and "legislation via litigation," the gravamen of the Complaint are *Defendants'* specific actions—not the actions of the entire firearms industry—and how those actions violated existing law.

Beyond Defendants' policy assertions, Defendants' arguments that the State has not pled viable claims are unpersuasive. The Protection of Lawful Commerce in Arms Act ("PLCAA") does not inoculate Defendants from the State's action because it falls squarely within the Act's exceptions for negligence per se, negligent entrustment, and actions predicated on violations of state and federal law.

Further, the State's Complaint plausibly alleges all required elements of its five claims. First, the Complaint plausibly alleges that Defendants have a duty of care to prevent foreseeable harm caused by sales to straw purchasers, and that Defendants failed to comply with duties of care that are set by state and federal law. Next, the Complaint plausibly alleges that Defendants aided and abetted straw buyers by having sufficient knowledge of, and substantially assisting with, straw purchasers' unlawful conduct. The Complaint also plausibly alleges Defendants' liability for negligent entrustment under Minnesota law. Finally, the State's public nuisance claim against Defendants is well-grounded in Minnesota statute and precedent.

The Court should reject Defendants' arguments and deny the entirety of their Motion to Dismiss.

## BACKGROUND

The State's Complaint alleges that Defendants—three Fleet Farm corporate entities that sell firearms at 17 retail locations in Minnesota—repeatedly sold firearms to two straw purchasers despite significant warning signs. ECF No. 1-1, Ex. A (Compl.), ¶¶ 34, 36. These two straw purchasers procured a combined total of 37 guns from Fleet Farm in a 16-month span, often purchasing multiple guns on the same day and making sequential purchases within days of each other. Compl. ¶¶ 1, 38, 39, 54, 55.

One of the straw purchasers, Jerome Horton, purchased 33 guns from firearms dealers in the Twin Cities area from June 2021 through October 2021, with more than two-thirds (24) of these guns sold to him by Defendants' stores in Brooklyn Park, Blaine, Lakeville, and Oakdale.[1] Compl. ¶¶ 37–38. Defendants sold Horton multiple guns at once on five different days. *Id.* at ¶ 39. Defendants also sold Horton multiple guns at multiple visits within short timeframes, including by selling Horton eight 9mm semiautomatic pistols in one week in July 2021. *Id.* at ¶ 39. All but two of the guns Defendants sold to Horton were various models of 9mm semiautomatic pistols—the type of gun most frequently recovered in connection with crimes. *Id.* at ¶¶ 25, 38–39. In addition to all these warning signs, Horton was also captured on surveillance video from a Fleet Farm store

---

[1] Attempting to minimize Defendants' role in Horton's misconduct, Defendants note that Horton also purchased firearms from two other dealers in the Twin Cities area. Def. Mem. at 7, n.5. What Defendants fail to add is that Horton purchased far fewer firearms from these dealers, and that one of these dealers halted a sale to Horton and alerted ATF agents that they were suspicious that Horton was potentially making straw purchases. Affidavit of Kylie Williamson, *United States v. Horton*, Case No. 0:22-cr-00006, ECF Doc. 1-1 ¶¶ 9–13 (D. Minn. Oct. 18, 2021). Defendants, meanwhile, sold another firearm to Horton two days *after* the other dealer alerted the ATF and halted the sale. *Id.* at ¶ 14.

using his cellphone to take pictures or video of the firearms, presumably so Horton could verify which firearm the actual buyer of the firearm wanted Horton to straw purchase for them. *Id.* at ¶ 42.

After Fleet Farm sold these 24 guns to Horton, he trafficked them to criminals and persons prohibited from possessing firearms, causing harm to Minnesotans and putting the public in danger. *Id.* at ¶ 44. One of the 9mm pistols sold by Fleet Farm to Horton was transferred to Devondre Phillips, who allegedly fired the pistol in a chaotic shootout at a St. Paul bar involving three gunmen that left 14 people injured and killed a 27-year-old woman when a bullet pierced her left lung and her heart. *Id.* at ¶ 49. Devondre Phillips is ineligible to possess firearms due to a prior felony conviction for aggravated first-degree robbery. *Id.* Other firearms Defendants sold to Horton caused additional harm, including by being:

- Fired in public by a person without a permit, who was testing if the gun worked so he could sell it (*id.* at ¶ 45);

- Found by a six-year-old boy in his front yard after the gun was discarded there by suspects in a public shooting incident (*id.* at ¶ 46);

- Recovered by police from an individual without a permit, along with an extended 28-round magazine (*id.* at ¶ 47);

- Obtained by police from a person prohibited from possessing firearms due to prior felony robbery and burglary convictions, who tried to throw the firearm away as he was fleeing from police (*id.* at ¶ 48); and

- Secured by police from a person prohibited from possessing firearms due to prior convictions for felony assault and robbery (*id.* at ¶ 51).

Defendants continued to sell firearms to Horton even as these perpetrators were arrested and charged by law enforcement. *Id.* at ¶¶ 45–49. The other guns Fleet Farm sold to Horton

have presumably not been recovered by law enforcement and remain an active, ongoing threat to the health and safety of Minnesotans. *Id.* at ¶ 51.

Another straw purchaser, Sara Elwood, purchased 97 firearms from 9 different licensed dealers in Minnesota, with 13 handguns sold to Elwood by Defendants from June 2020 through May 2021. *Id.* at ¶¶ 53–54. On four different occasions, Defendants sold Elwood multiple handguns on the same day. *Id.* at ¶ 54–55. Some of these purchases took place over a very short period of time. For instance, Defendants sold Elwood two handguns on May 1, 2021, two more handguns on May 6, 2021, and two more handguns on May 12, 2021. *Id.* at ¶ 55. All the guns Defendants sold Elwood were small-caliber semiautomatic pistols, mainly 9mm handguns. *Id.* at ¶¶ 54, 57.

Elwood transferred the firearms she purchased to a co-conspirator in exchange for cash, and Elwood's co-conspirator admitted to federal agents that he knew the guns purchased by Elwood were being trafficked for criminal activity. *Id.* at ¶ 53. Defendants' sale thereby caused harm to Minnesotans and threatened public safety. At least one of the guns Defendants sold to Elwood was recovered by police in the possession of a person ineligible to possess firearms due to a prior conviction for first-degree aggravated robbery, who allegedly used the gun to threaten someone in public. *Id.* at ¶ 60. The remaining guns Fleet Farm sold to Elwood remain unrecovered, posing an ongoing threat to the health and safety of Minnesotans. *Id.*

Both of these straw purchasers were investigated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), charged with federal crimes related to their straw purchasing activities by the U.S. Attorney's Office for the District of Minnesota, and

ultimately admitted to their straw purchasing misconduct and pleaded guilty. *Id.* at ¶¶ 50, 59.

The straw purchasers were charged and convicted under provisions of the federal Gun Control Act that prohibit straw purchasers from lying about being the actual buyer of a firearm on a federal form, known as Form 4473. *Id.* at ¶¶ 21–22. Minnesota's Gun Control Act has parallel criminal statutes (Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133) that also directly prohibit buying firearms on behalf of persons prohibited from possessing them. *Id.* at ¶ 24.  The state and federal Gun Control Acts also directly prohibit firearms dealers, like Defendants, from knowingly selling to straw purchasers who misrepresent themselves as the actual buyer of the firearm. *Id.* at ¶¶ 25–29.

The Complaint alleges that, as a licensed firearms dealer, Fleet Farm has a duty under Minnesota and federal law to prevent unlawful gun purchases. *Id.* at ¶¶ 17–33. The State's Complaint also alleges that Fleet Farm knew or should have known it was selling to straw purchasers who were trafficking firearms. *Id.* at ¶¶ 34–61. This is because firearms dealers should be monitoring purchasers for red flags of straw purchasing, including purchases of multiple guns over short periods of time, staggered visits to different Fleet Farm locations to elude multiple-sale reporting requirements, purchases of small-caliber handguns of similar makes and models, and the buyer's use of communication with others while in store about which firearms to purchase. *Id.* at ¶¶ 25, 36.

On the basis of these allegations, the State's Complaint asserts five claims against Fleet Farm under Minnesota law: (1) negligence (Count I); (2) negligence per se (Count II); (3) negligent entrustment (Count III); (4) aiding and abetting (Count IV); and (5) public

nuisance (Count V). *Id.* at ¶¶ 70–113. The State's Complaint alleges that Fleet Farm's misconduct in selling to straw purchasers contributed to an increase in Minnesota gun trafficking and gun violence. *Id*. at ¶¶ 62–69.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), this Court accepts all factual allegations in the Complaint as true and draws all reasonable inferences in favor of the nonmoving party. *McDonough v. Anoka County*, 799 F.3d 931, 945 (8th Cir. 2015). This Court construes the complaint liberally. *Cook v. Goerge's, Inc.*, 952 F.3d 935, 939 (8th Cir. 2020).

The State's Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).[2] This "plausibility" standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard, however, is not a "'probability requirement,'" and "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). This Court should read the Complaint "as a

---

[2] The plausibility standard does not apply in Minnesota state court. *Walsh v. U.S. Bank*, 851 N.W.2d 598 (Minn. 2014). As the State has demonstrated, this action should be remanded to state court because there is no federal jurisdiction. Nonetheless, the State's allegations are plausible.

whole" instead of "pars[ing] piece by piece to determine whether each allegation, in isolation, is plausible." *Id.* at 594.

## ARGUMENT

## I. PLCAA DOES NOT BAR THE STATE'S ACTION.

Defendants argue that the Protection of Lawful Commerce in Arms Act (PLCAA) preempts some of the State's claims. A preemption analysis starts with the "assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation omitted); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). This presumption against preemption is especially strong in areas "traditionally occupied by the States." *United States v. Locke*, 529 U.S. 89, 108 (2000). The State's claims—negligence, aiding and abetting, and public nuisance claims seeking to protect public health and safety—have been recognized as areas of traditional state authority. *See, e.g.*, *State v. Standard Oil Co.*, 568 F. Supp. 556, 563 (D. Minn. 1983) ("A state maintains a quasi-sovereign interest . . . where the health and well-being of its residents is affected."); *State v. Red Owl Stores, Inc.*, 92 N.W.2d 103, 110 (Minn. 1958) (stating that, upon suit by the State, courts will enjoin "acts amounting to a public nuisance if they . . . endanger public health").

After applying the presumption against preemption, the next step is determining Congress's preemptive intent in enacting the federal law, for "[t]he purpose of Congress is

the ultimate touchstone in every pre-emption case." *Lohr*, 518 U.S. at 485 (quotation omitted).  When a federal law contains an express preemption clause, the Supreme Court instructs courts to "in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §§ 7901–03, was passed by Congress in 2005 to shield the gun industry from civil liability for "the harm *solely* caused by the criminal or unlawful misuse of firearms products . . . by others." 15 U.S.C. § 7901(b)(1) (emphasis added). PLCAA bars "qualified civil liability action[s]" in "any Federal or State Court," 15 U.S.C. § 7902(a), and defines such actions as lawsuits "brought by a person against a . . . seller of a [firearm] . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the person or a third party." 15 U.S.C. § 7903(5).

Importantly, PLCAA contains several exceptions for actions that are not subject to its liability shield. *See* 15 U.S.C. § 7903(5)(A). Two exceptions are applicable in this case: (1) "an action brought against a seller for negligent entrustment or negligence per se"; and (2) the "predicate exception," "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm], and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(ii)–(iii). "[A]s long as one PLCAA exception applies to one claim, the entire action continues." *Chiapperini v. Gander Mountain Co., Inc.*, 13 N.Y.S.3d 777,

9

787 (N.Y. Sup. Ct. 2014); *see also Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 151 (N.Y. App. Div. 2012), *amended by* 103 A.D.3d 1191 (N.Y. App. Div. 2013) (permitting entire action to go forward based on "conclusion that this action falls within the PLCAA's predicate exception and therefore is not precluded by the Act," and explaining that "we need not address plaintiffs' further contention that this action falls within the PLCAA's negligent entrustment or negligence per se exception"); *City of Kansas City, Missouri v. Jimenez Arms*, *Inc. et al.*, Case No. 2016-CV00829, slip. op. at 4–5 (Mo. Cir. Ct. Nov. 17, 2022) (Maloney Decl., Ex. A) ("[B]ecause the Court finds the predicate exception applicable to this action, there is no need to engage in a claim-by-claim analysis").

Because the State's action is expressly exempted, it is not preempted as a "qualified civil liability action" under PLCAA.

### A.   The State's Negligence Per Se and Negligent Entrustment Claims Are Expressly Permitted by PLCAA.

PLCAA expressly excludes actions against firearm sellers for negligent entrustment and negligence per se from its definition of "qualified civil liability action." 15 U.S.C. § 7903(5)(A)(ii). Accordingly, the State's action is not preempted by PLCAA.

As an initial matter, Defendants do not appear to contest that the State's negligence per se claim is expressly allowed by PLCAA and instead focus on other claims.  *See* ECF No. 20, Def. Mem. at 9 (arguing that federal law bars "four" of the State's claims). The State's action should proceed given PLCAA's express exception.

Similarly, the State's negligent entrustment claim meets PLCAA's express exception for such claims. PLCAA defines negligent entrustment as "the supplying of a

[firearm] by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903(5)(B).

Minnesota has adopted Restatement (Second) of Torts section 390 regarding negligent entrustment claims under Minnesota law. *See Johnson v. Johnson*, 611 N.W.2d 823, 826 (Minn. Ct. 2000); Restatement (Second) of Torts § 390 ("One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.").[3] The Restatement is nearly identical to the PLCAA exception. *See Bryant-Bush v. Shawnee Gun Shop, Inc.*, 2011 WL 13177539, at *4, n.1 (W.D. Mo. Mar. 29, 2011) (quoting the Restatement and noting that "this language is very similar to the PLCAA's definition of 'negligent entrustment'").

The plain language of both the PLCAA definition and the Restatement track almost exactly with the State's negligent entrustment claim, which alleges that Defendants "knew or reasonably should have known" that Jerome Horton and Sara Elwood were "engaged in unlawful straw purchasing or unlicensed dealings in firearms to prohibited persons or for use in the commission of crimes" which "created an unreasonable risk of harm to third

---

[3] As demonstrated *infra* at pages 28–32, the claim of negligent entrustment is not limited as Defendants contend and extends to straw purchasers.

parties," including the "foreseeable and likely consequence" of "gun violence resulting in serious injury or death, as well as criminal activity." Compl. ¶¶ 89–90. The State's negligent entrustment claim clearly meets the plain language of the PLCAA exception.

Defendants, however, argue that PLCAA's definition of "negligent entrustment" is ambiguous and cite legislative history to argue that the negligent entrustment claim is limited in scope to only the initial transfer and does not extend to subsequent transfers. Def. Mem. at 12–13 (citing *Soto v. Bushmaster Firearms Int'l, LLC*, 2016 WL 8115354, at *14–15 (Conn. Super. Ct. Oct. 14, 2016)). The *Soto* case was centered on the defendants' liability for selling an AR-15 to the mother of the Sandy Hook shooter, and the plaintiffs did not "allege that any of the defendants[] possessed any knowledge or had any specific reason to believe either that [the shooter's] mother would share the [assault rifle] with her son or that he was especially likely to operate it unsafely or illegally." *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 282 (Conn. 2019). PLCAA is not ambiguous on this point, and its plain language should control. Nonetheless, resolving this potential ambiguity is ultimately immaterial here because the State's Complaint alleges knowing entrustment of firearms by Defendants directly to the criminal wrongdoers, unlike the longer causal chain and lack of knowledge disputed in *Soto*. *See* Compl. ¶ 89–90. These allegations are more than sufficient to meet the definition of "negligent entrustment" in PLCAA.

**B.      All of the State's Claims Fit Within PLCAA's Predicate Exception.**

**1.      The State's Claims Are Predicated on Defendants' Violations of State and Federal Firearms Laws.**

PLCAA also exempts actions that assert a knowing violation of a "State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). This is known as the "predicate exception" because it exempts actions predicated on violations of relevant state or federal law. *See City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 351 (E.D.N.Y. 2007). PLCAA then provides two examples of actions that fall within the predicate exception:

> (I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
>
> (II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18;

15 U.S.C. § 7903(5)(A)(iii)(I)–(II).

The State's action is exempted from PLCAA's reach under the predicate exception.[4] As alleged in the Complaint and explained in more detail below, this action is predicated on Defendants' knowing violations of numerous statutes directly related to the sale and

---

[4] The State's negligence per se and negligent entrustment claims are also expressly exempted under 18 U.S.C. § 7093(5)(A)(ii).

marketing of firearms, including several statutes that fall within the illustrative examples
provided within the predicate exception:

- Minnesota state laws prohibiting transfer of firearms to persons who dealer
  knows or has reason to know made a false statement in connection with the
  transfer (Minn. Stat. § 624.7132, subd. 15(a)(2) and 15(a)(4));

- Minnesota state law prohibiting the purchase of a firearm on behalf of an
  ineligible person (Minn. Stat. § 624.7133);

- Federal laws prohibiting unlicensed persons from dealing in firearms (18
  U.S.C §§ 922(a)(1), 923(a));

- Federal laws and regulations prohibiting false statements in connection with
  the acquisition of firearms (18 U.S.C. § 922(a)(6); 27 C.F.R. § 478.21(a));
  and

- Federal laws prohibiting firearms dealers from making false entries or failing
  to make appropriate entries in required records (18 U.S.C. §§ 922(d)(11),
  922(m), 924(a)(1)(a) 924(a)(1)(D), 924(a)(3); 27 C.F.R. § 478.124(c)(1) and
  (c)(5)).

*See* Compl. ¶¶ 74–75, 84, 99, 111, 112. These are precisely the type of "State or Federal
statute[s] applicable to the sale or marketing" of firearms that fall within the predicate
exception. *See* 15 U.S.C. § 7903(5)(A)(iii).

The *Glock*, *Beretta*, and *Smith & Wesson* cases are directly distinguishable. These
cases revolved around the question of whether claims predicated only on laws with general
applicability that did not regulate the firearms industry in particular—California's public
nuisance and negligence statutes, New York's public nuisance law, and general federal
common-law claims—could qualify for PLCAA's predicate exception. *See Ileto v. Glock*,
565 F.3d 1126, 1130 (9th Cir. 2009) (explaining that plaintiff did not "allege that
Defendants violated any statute prohibiting manufacturers or sellers from aiding, abetting,

or conspiring with another person to sell or otherwise dispose of firearms to illegal buyers"); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 399–404 (2nd Cir. 2008); *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 2022 WL 4597526, at *14–15 (D. Mass. Sept. 30, 2022).[5]

In contrast, as shown above, the State predicates its action on violations of statutes that not only directly regulate the firearms industry (including Defendants and the individuals they aided-and-abetted) but are specifically included in PLCAA as examples of statutes that fall within the predicate exception. Courts have held that similar actions predicated on violations of the exact same statutes (18 U.S.C. §§ 922, 923, and 924) qualify for PLCAA's predicate exception. *See, e.g.*, *A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. at 353 ("Because the instant action alleges violations of several federal and state statutes by the defendants, it falls within the predicate exception of PLCAA."); *Beemiller*, 100 A.D.3d at 147–51 (reversing lower court's dismissal of complaint including negligence and public nuisance claims under PLCAA because plaintiffs "sufficiently alleged that defendants knowingly violated various federal and state statutes applicable to the sale or marketing of firearms within the meaning of the PLCAA's predicate exception"); *Jimenez Arms*, *Inc.*, Case No. 2016-CV00829, slip. op. at 3–5 (Maloney Decl., Ex. A) (concluding that the action fits within PLCAA's predicate exception based on allegations that defendants violated numerous regulatory violations); *Gander Mountain Co., Inc.*, 13 N.Y.S.3d at 784–

---

[5] General purpose laws may still qualify under PLCAA's predicate exception. For example, the Connecticut Supreme Court has held that the predicate exception applied to wrongful death claims predicated on violations of Connecticut's unfair trade practices law made by the parents of victims of the Sandy Hook shooting. *See Soto*, 202 A.3d at 325.

87 (N.Y. Sup. Ct. 2014) (denying a motion to dismiss numerous claims including negligence and public nuisance based on the argument that PLCAA preempted the claims because the plaintiffs "cited specific federal gun laws Gander allegedly violated in support of its general negligence claim in Count 1 and negligence *per se* claim in Count 5"). The State's action is predicated on "statutes that clearly can be said to regulate the firearms industry," and Congress intended that such claims be allowed to proceed despite PLCAA's general liability bar. *See Beretta*, 524 F.3d at 402.

### 2. The State Sufficiently Alleges Defendants' Knowledge of Straw Purchasing to Satisfy the Predicate Exception.

The State has sufficiently alleged Defendants' knowledge to satisfy the predicate exception with regard to the aiding-and-abetting claim. Although the predicate exception refers to the allegation of a firearm seller's "knowing[] violat[ion]," the examples provided by PLCAA show that actual knowledge is not required—i.e., a claim that a firearms seller had "reasonable cause to believe" that the *actual* buyer of the firearm was prohibited from possessing the firearm under federal law qualifies under the predicate exception.[6] *See* 15 U.S.C. 7903(5)(A)(iii)(II). This is precisely what is alleged in the Complaint: the behavior and red flags exhibited by two straw purchasers put Defendants on notice such that they knew, or at least had reasonable cause to believe, that the straw buyers were lying on their federal purchase forms and buying firearms for others who were prohibited from possessing firearms. Compl. ¶¶ 99–100.

---

[6] As demonstrated below, an aiding and abetting claim under Minnesota law does not require actual knowledge either.

## II.   THE STATE'S ALLEGATIONS SUFFICIENTLY PLEAD DEFENDANTS' BREACH OF THEIR COMMON LAW DUTY OF CARE.

The State's negligence claim (Compl. ¶¶ 70–79) need only satisfy the basic requirements for this claim under Minnesota law: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury." *Gradjelick v. Hance*, 646 N.W.2d 225, 230 (Minn. 2002). The Complaint plausibly alleges each of these elements. *See* Compl. ¶¶ 71–74.

Defendants focus on the Complaint's duty allegations, asserting that Defendants do not owe the alleged duties as a matter of law. *See* Def. Mem. at 15–16. As a matter of black-letter law, "general negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). The Complaint plausibly alleges exactly that by detailing how Defendants own conduct created the foreseeable risk of injury to the State: "Defendants transacted firearms business with straw purchasers and traffickers like Horton, Elwood, and others, even though Defendants knew, or consciously avoided knowing, that these individuals were engaged in unlicensed dealing, firearms trafficking, and/or straw purchasing," which "increased the risk of harm, including the risks of prohibited firearm possession, firearm injuries, and death." Compl. ¶¶ 72–73.

In prior cases involving negligence claims made by the State, Minnesota courts have rejected similar arguments regarding lack of duty for misconduct in the sale of lawful

products. [7] *See, e.g.*, *State v. Juul Labs, Inc.*, 2021 WL 2692131, at *6–7 (Minn. Dist. Ct. June 21, 2021); *State v. Philip Morris, Inc.,* No. C1-94-8565, 1995 WL 1937124, at *4–5 (Minn. Dist. Ct. May 19, 1995) ("When one has suffered a legal wrong, even if novel or unprecedented, a legal remedy shall be found."). The State is not asking this Court to expand Minnesota law (*cf.* Def. Mem. at 15); the State is asking this Court to apply traditional duty concepts to Defendants' misconduct. The fact that Minnesota courts have not yet had occasion to expressly recognize a specific duty of care by firearms dealers does not mean the general duty of care does not apply. Other states have recognized that common law negligence exists "where the prospective purchaser's manifest behavior or comportment have put the seller on notice that the purchaser, if possessed of a firearm, would foreseeably pose a danger to third persons." *See Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 846 (Tex. Ct. App. 1989) (collecting cases from Louisiana, Washington, and Florida, and holding that "[w]e are generally in accord with this principle"). Courts in Minnesota can do the same analysis under existing negligence caselaw.

---

[7] Curiously, Defendants also cite to *Labzda v. Purdue Pharma L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003), for the general proposition that companies have no duty to police the use of their lawful products. First, this is a dubious recitation of Florida law. *See In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 761 (N.D. Ohio 2020) (noting that *Labzda* is "trump[ed]" by Florida Supreme Court precedent). Furthermore, the State of Minnesota sued the same pharmaceutical company, Purdue Pharma, on a negligence theory related to Purdue's unlawful marketing of its lawful opioid products that was upheld by a Minnesota state district court when the company moved to dismiss. *See State v. Purdue Pharma L.P.*, No. 27-CV-18-10788, 2019 WL 11729023, at *4 (Minn. Dist. Ct. Jan. 4, 2019).

## III.    BOTH STATE AND FEDERAL LAWS PROVIDE A SUFFICIENT BASIS FOR DEFENDANTS' DUTIES UNDER NEGLIGENCE PER SE STANDARDS.

The State's negligence per se claim (Count II) alleges that Defendants owe a duty of care to Minnesotans under both the Minnesota Gun Control Act and the federal Gun Control Act,[8] and that Defendants breached that duty by selling firearms to persons they knew or should have known were straw purchasers. State Compl. ¶¶ 80–87.

"Negligence per se is a form of ordinary negligence that results from violation of a statute." *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981). "A per se negligence rule substitutes a statutory standard of care for the ordinary prudent person standard of care, such that a violation of a statute (or an ordinance or regulation adopted under statutory authority) is conclusive evidence of duty and breach." *Gradjelick v. Hance*, 646 N.W.2d 225, 231 n.3 (Minn. 2002). Thus, a negligence per se claim has three elements (rather than the four elements for negligence): (1) a violation of a statute; (2) an injury; and (3) proximate cause. The State has plausibly pleaded these required elements.

### A.    The State and Its Citizens Are Within the Class Meant to be Protected by Federal and State Gun Control Laws.

The "well settled" rule in Minnesota is that "breach of a statute gives rise to negligence per se if the persons harmed by that violation are within the intended protection of the statute and the harm suffered is of the type the legislation was intended to prevent." *Pacific Indem. Co. v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548, 558 (Minn. 1977).

---

[8] *See* page 14, *supra*, for a more detailed description of the specific provisions at issue. This includes regulations promulgated under the federal Gun Control Act.

Minnesota courts look to four elements drawn from the Restatement (Second) of Torts section 286 in making this determination:

> (1) the intent of the statute is to protect a class of which plaintiff is a member, but only if (2) the plaintiff's injury involves an invasion of the particular interest protected by the statute, (3) was caused by the particular hazard or form of harm against which the enactment was designed to give protection and (4) it was proximately caused by its violation.

*Johnson v. Farmers & Merchants State Bank of Balaton*, 320 N.W.2d 892, 897 (Minn. 1982). For a statutory violation to satisfy the duty and breach elements of a claim of negligence per se, the person harmed by the violation must be among those the legislature intended to protect, and the harm must be of the type the legislature intended to prevent. *Anderson v. Anoka Hennepin Ind. Sch. Dist. 11*, 678 N.W.2d 651, 662–63 (Minn. 2004).

The State's Complaint clearly meets these four elements. Defendants do not dispute that the injury alleged by the State impacts a class protected by these statutes. Instead, Defendants claim that the class protected by these statutes is too broad because they protect the public at large instead of a particular class. *See* Def. Mem. at 19–20. However, the primary case cited by Defendants, *Kronzer v. First Nat'l Bank of Minneapolis*, only mentions the argument raised by Defendants and does not base its ruling upon it. *See* 235 N.W.2d 189, 193 (Minn. 1975) ("We need not decide, however, the difficult question whether we would adopt Minn. Stat. § 481.02 as a standard of care in a proper civil case . . . ."). The only other case cited by Defendants is an unpublished Minnesota Court of Appeals opinion involving a city's compliance with a local ordinance regarding proper demolition of a building. *See Haynes v. Abdelwahed*, 1997 WL 406644, at *1–2 (Minn. Ct. App. July 22, 1997). Not only is this decision not precedential, Minn. Stat. § 480A.08,

subd. 3(c), but also the application of a demolition statute to a municipality's required duty of care in a personal injury action is obviously distinguishable from Defendants' duty of care as firearms dealers under firearms laws.

Furthermore, both the federal GCA and Minnesota GCA are intended to protect specific classes rather than the public at large. The purpose of Minnesota's GCA is to regulate the use of pistols (as opposed to "shotguns, rifles and other longguns") by non-law-abiding citizens. Minn. Stat. § 624.711 (Declaration of Policy). Similarly, the federal GCA is aimed at unlawful possession and licensed dealers. *See Huddleston v. United States*, 415 U.S. 814, 824-30 (1974) (discussing the legislative history of the federal GCA). Accordingly, Defendants' duty of care in a negligence per se claim is appropriately based on the federal and state Gun Control Acts.

**B.    The Existence of a Private Right of Action in Duty-Setting Statutes Is Not Relevant to the State's Negligence Per Se Claim.**

Defendants' argument that negligence per se claims require that the underlying law provide for a private cause of action (Def. Mem. at 17–18) contravenes established Minnesota law. Laws that set an appropriate standard for a negligence per se action "are often penal statutes that do not provide for a civil action." *Seim*, 306 N.W.2d at 810; *see also Kronzer* 235 N.W.2d at 192 ("Negligence per se based on violation of a penal statute is similar to actual negligence based on common-law principles. In both cases the failure to perform a legal duty constitutes negligence."). Similarly, a "long line of Minnesota cases establishes that violations of regulations or ordinances that are adopted pursuant to

statutory authority"—which rarely create private rights of action—"can result in negligence per se." *Alderman's Inc. v. Shanks*, 536 N.W.2d 4, 7 (Minn. 1995).

The cases cited by Defendant do not support their argument. Rather, these cases stand for the proposition that a statute can substitute for an already-existing common-law duty and cause of action. *See Elder v. Allstate Ins. Co.*, 341 F. Supp. 2d 1095, 1100 (D. Minn. 2004) ("[T]here must be an existing underlying common law cause of action."); *Valtakis v. Putnam*, 504 N.W.2d 264, 266 (Minn. Ct. App. 1993) ("[W]here no common-law duty existed before the statute was enacted . . . .")[9]; *Vind v. McGuire*, 2013 WL 6152312, at *4 (Minn. Ct. App. Nov. 25, 2013) (examining whether "common-law duty existed before the statute was enacted"). Defendants misstate the law in arguing that the State's negligence per se claim fails simply by virtue of the fact that the laws and regulations cited by the State in the Complaint do not contain an express private right of action.

Indeed, Defendants' argument would essentially nullify the negligence per se doctrine by forbidding all negligence per se claims based on penal statutes and most negligence per se claims based on regulations and ordinances, simply because the underlying laws and rules do not already provide a separate private right of action. And, if the statute already provides a separate private right of action, there would be no need to

---

[9] Defendants cite *Meyer v. Lindala*, 675 N.W.2d 635, 651 (Minn. Ct. App. 2004) (Def. Mem. at 17), which summarily references *Valtakis* for the proposition that Minnesota's Child Abuse Reporting Act could not be used as the basis for a negligence per se claim.

resort to common law claims in the first instance. This is not the law in Minnesota and should not be followed by this Court.

A claim for negligence per se based on Defendants' violations of the statutes referenced by the State is appropriate here because, as pleaded in the Complaint, Defendants already have an underlying common law duty to detect and prevent the sale of firearms to straw purchasers and are subject to existing common law causes of action for their misconduct. The State's negligence per se claim merely seeks the use of state and federal laws and regulations as supplemental standards for Defendants' duty that will inform Defendants' liability under the common law.

Defendants are further incorrect in asserting that the State's quasi-sovereign *parens patriae* standing "makes no difference" in this analysis. *See* Def. Mem. at 18, n.14. The Attorney General's *parens patriae* authority and common law powers distinguish it from the *private* litigants in *Elder*, *Valtakis*, and *Vind* whose claims depended on the inclusion or implication of *private* rights of action. Under the doctrine of *parens patriae*, a state may maintain a legal action on behalf of its citizens "where state citizens have been harmed" and "the state maintains a quasi-sovereign interest." *Standard Oil Co.*, 568 F. Supp. at 563. The Attorney General has "extensive common-law powers inherent in his office" not limited by statute, and may bring actions "as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights." *Slezak v. Ousdigian*, 110 N.W.2d 1, 5 (Minn. 1961).

Accordingly, this Court should allow the State's negligence per se claim to proceed.

IV.   THE STATE PLAUSIBLY ALLEGES DEFENDANTS' KNOWLEDGE AND
      SUBSTANTIAL ASSISTANCE FOR ITS AIDING AND ABETTING CLAIM.

Despite Defendants' arguments to the contrary (Def. Mem. at 20), the Minnesota

Supreme Court has expressly recognized a civil claim for aiding and abetting:

> A claim for aiding and abetting the tortious conduct of another has three basic
> elements:
>
> (1) the primary tort-feasor must commit a tort that causes an injury to the
>     plaintiff;
>
> (2) the defendant must know that the primary tort-feasor's conduct
>     constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tort-
>     feasor in the achievement of the breach.

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).[10]

The State's Complaint plausibly alleges all three elements, including knowledge

and substantial assistance.

### A.   The Complaint Plausibly Alleges Defendants' Knowledge.

The Complaint alleges that Defendants knew Horton and Elwood were engaged in

straw purchasing and that Defendants knew straw purchasing is unlawful:

- "Because Fleet Farm knew or consciously avoided knowing that these
  individuals were straw purchasing firearms, Fleet Farm aided and
  abetted their illegal and criminal conduct." Compl. ¶ 4.

- "Nevertheless, Fleet Farm continued to engage in straw purchase
  transactions even though Fleet Farm knew, or should have known, based
  on the circumstances of these transactions and Fleet Farm's training, that

---

[10] Defendants argue that aiding and abetting is not a claim under Minnesota law based on
*Zayed v. Associated Bank, N.A.* ("*Zayed II*"), 913 F.3d 709, 714 (8th Cir. 2019). If *Zayed
II* is interpreted as Defendants contend, however, *Zayed II* directly conflicts with *Witzman*.

these customers were not making bona fide purchases for themselves." *Id*. at ¶ 36.

- "Defendants knew or reasonably should have known that the individuals identified above were committing the tort of negligence per se by engaging in straw purchasing and/or unlicensed dealings in firearms to prohibited persons in violation of state and federal law . . . ." *Id*. at ¶ 99.

Defendants argue that these allegations are insufficient because of an Eight Circuit decision stating that—under Minnesota law—"actual knowledge" rather than "constructive knowledge" is required.[11] Def. Mem. at 21-22 (quoting *Zayed II*, 913 F.3d at 715).[12] Defendants also cite a New York decision for the proposition that an aiding and abetting tort claim requires "actual knowledge." Def. Mem. at 22 (quoting *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 507 (S.D.N.Y. 2013)). But only some jurisdictions, including New York, require "actual knowledge." *FedEx v. U.S. Dept. of Commerce*, 39 F.4th 756, 771 n.8 (D.C. Cir. 2022). Minnesota does not require actual knowledge.[13]

*Witzman* did not hold that "actual knowledge" was required. *See generally id.* Nor did *Witzman* hold that knowledge requires "more than awareness of the conduct in

---

[11] Defendants also argue that "to state an aiding-and-abetting theory, the complaint must allege with particularity that Fleet Farm had actual knowledge Horton and Elwood would negligently violate the GCA." Def. Mem. at 22. The State must allege that Defendants knew these purchasers were committing a tort—not specifically violating the GCA—which the State has done. Compl. ¶ 99.

[12] *Zayed II* based this statement on a decision from the United States District Court for the District of Minnesota rather than the Minnesota Supreme Court's *Witzman* decision. *See Zayed II*, 913 F.3d at 715 (citing *Varga v. U.S. Bank Nat. Ass'n*, 952 F.Supp.2d 850, 857 (D. Minn. 2013), *aff'd*, 764 F.3d 833 (8th Cir. 2014)). Further, *Zayed II* was before the Eighth Circuit after a ruling on a summary judgment motion and the conclusion of discovery—not after a ruling on a motion to dismiss challenging the sufficiency of allegations. *See* 913 F.3d at 715-19.

[13] Nonetheless, the State alleges both actual and constructive knowledge. *See* Compl. ¶¶ 4, 36, 99.

question, that it raised 'red flags,' or even that it amounted to gross negligence." *See* Def. Mem. at 22 (quoting *Zayed II*).[14] To the contrary, *Witzman* indicated that "constructive knowledge" could satisfy the "knowledge" requirement under certain circumstances. *Witzman*, 601 N.W.2d at 188.

Furthermore, *Witzman* held that the elements of knowledge and substantial assistance are evaluated "in tandem." *Witzman*, 601 N.W.2d at 188. Thus, "'where there is a minimal showing of substantial assistance, a greater showing of scienter is required.'" *Witzman*, 601 N.W.2d at 188 (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)); *see also FedEx*, 39 F.4th at 771 (referring to *Witzman* as "adopting a sliding-scale approach between actual and constructive knowledge"). *Witzman* further explained that "[w]hether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case." *Witzman*, 601 N.W.2d at 188.

Accordingly, *Witzman* shows that actual knowledge is not required under Minnesota law. It is black-letter law that the highest court of a state—not a federal court—is the final arbiter of state law. *West v. American Tel. & Tel. Co*., 311 U.S. 223, 236 (1940).

### B.   The Complaint Plausibly Alleges Defendants' Substantial Assistance.

The State has plausibly pled the requirement of substantial assistance for the State's aiding and abetting claim. Defendants wrongly state that "[t]o establish 'substantial assistance,' a plaintiff must allege the defendant provided 'something more than … routine professional services," and that "providing 'routine professional services' does not

---

[14] *Zayed II* based this statement on *Varga*, 952 F.Supp.2d at 857, not *Witzman*.

constitute 'substantial assistance.'" Def Mem. at 23 (quoting *Zayed v. Associated Bank, N.A.*,779 F.3d 727, 735 (8th Cir. 2015) ("*Zayed I*")). That is not the standard in this case.

When *Witzman* (which *Zayed I* was quoting) used the phrase "routine professional services," *Witzman* was only addressing the requirements for certain professionals—like lawyers and accountants—liable for aiding and abetting torts committed by their clients. 601 N.W.2d at 188-89 ("In addressing aiding and abetting liability in cases involving professionals, most courts have recognized that substantial assistance means something more than the provision of routine professional services." (internal quotation omitted)); *id*. at 186-86 (holding that, based on policy, an aiding and abetting liability claim against a professional has heightened requirements). Therefore, the heightened requirement of "something more than . . . routine professional services" for aiding and abetting claims against lawyers or accountants has no application to the question of a retailer's liability for selling firearms to likely straw purchasers.

Accordingly, the State has plausibly alleged that Defendants provided substantial assistance to the primary tortfeasors—Horton and Elwood—by selling 24 firearms to Horton and 13 firearms to Elwood. Compl. ¶¶ 37–61. Defendants' assistance was not only substantial—but actually essential—to Horton's and Elwood's unlawful sales of these firearms to others.[15]

---

[15] *Perez v. Costco Wholesale Corp*., 2015 WL 1034141, at *8 (S.D. Cal. Mar. 10, 2015), is inapposite. This case related to a potential claim against Costco for aiding and abetting a violation of California's Unfair Competition Law by selling foods containing trans fats, and the potential claim suffered from multiple infirmities.

V.      THE STATE PLAUSIBLY ALLEGES NEGLIGENT ENTRUSTMENT.

A.      The Complaint Plausibly Alleges That Defendants Entrusted Firearms to Individuals Likely to Use Firearms in a Manner Risking Harm Because of Their "Youth, Inexperience, or Otherwise."

The State has plausibly pled that the individuals to whom Defendants entrusted firearms—i.e., Horton and Elwood—were likely to use these firearms in a manner risking harm because of "youth, inexperience, or otherwise." *See* Restatement (Second) of Torts § 390 (1977); *Johnson*, 611 N.W.2d at 826. Defendants attempt to limit the scope of this tort claim by misrepresenting Minnesota law and the Restatement.

First, Defendants wrongly argue that "Minnesota law generally limits negligent entrustment to circumstances where property is entrusted to 'incompetent or inexperienced person[s].'" Def. Mem. at 24 (quoting *Axelson v. Williamson*, 324 N.W.2d 241, 243 (Minn. 1982)). *Axelson* does not support Defendants' argument. To the contrary, *Axelson* simply cites the Restatement, which refers to someone who is "likely" because of "youth, inexperience, or otherwise" to use personal property "in a manner involving unreasonable risk of physical harm." 324 N.W.2d at 243. A likely straw purchaser—someone who deliberately puts firearms in dangerous hands—fits squarely within this requirement.

Nor does the Restatement limit the tort of negligent entrustment only to entrustment to *incompetent* individuals, as Defendants suggest. *See* Def. Mem. at 24 (quoting Restatement (Second) of Torts § 390, cmt. c)). The part of the Restatement Defendants quote explains the circumstances under which property sellers can assert a viable defense of contributory negligence against property recipients that sue sellers for negligent entrustment, depending on the competence of the property recipient and the knowledge of

the seller. In other words, Comment c only pertains to determining sellers' direct liability to property recipients—Comment c does not mean that a claim of negligent entrustment brought by others who suffered harm is limited to situations where suppliers entrusted property to incompetent individuals.

Finally, Defendants' resort to canons of interpretation does not limit the meaning of "otherwise" in the Restatement. The word "otherwise" means "in a different way or manner," "in different circumstances," or "in other respects." *Otherwise Definition*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/otherwise (last visited Dec. 14, 2022). Accordingly, being a likely straw purchaser easily fits within the meaning of "otherwise," even though being a likely straw purchaser is *different* than being young or inexperienced. Further, canons of interpretation only apply when there is ambiguity in the first place, but even if "otherwise" were ambiguous (which it is not), the canon to avoid surplusage directs that every word should be given effect and that no words should be given an interpretation that is duplicative. *See, e.g.*, *Shire v. Rosemount, Inc.*, 875 N.W.2d 289, 294 n.4 (Minn. 2016).

Accordingly, the State is not trying to expand the claim of negligent entrustment, as Defendants wrongly contend, and the State has plausibly stated a claim under Minnesota law.[16]

---

[16] *Soto*, 202 A.3d at 282, does not support Defendants' negligent entrustment arguments. Unlike in this case, there were no allegations in *Soto* that defendants had any reason to know that a firearms purchaser was likely to use them in a manner risking harm, and the plaintiff was seeking to expand the negligent entrustment doctrine:

**B.      The Complaint Plausibly Alleges That Defendants Had Reason to Know That Horton and Elwood Were Likely to Use Firearms in a Manner Risking Harm.**

The State plausibly alleges that Defendants had reason to know that Horton and Elwood were likely to use the firearms that Defendants sold to them in a manner risking harm. Defendants attack the State's allegations only by mischaracterizing them.

The State does not allege that firearms dealers "have an independent duty to investigate a purchaser before completing a sale." Def. Mem. at 25-26; *see generally* Compl. Instead, the State alleges that Fleet Farm should not have completed sales to Horton and Elwood due to multiple blatant warning signs of straw purchasing. *See, e.g.*, Compl. ¶¶ 36, 43, 57. Accordingly, Defendants' argument that they had no duty to investigate is entirely beside the point. *See* Def. Mem. at 25-26 (quoting *Islam v. Creative Tours Micronesia, Inc.*, No. 92–16684, 1994 WL 477543, at *1 (9th Cir. 1994) (unpublished)[17]; *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1225-26 (D. Colo. 2015)). Indeed, "[t]he tort of negligent entrustment is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an

---

The rule that a cause of action for negligent entrustment will lie only when the entrustor knows or has reason to know that the direct entrustee is likely to use a dangerous instrumentality in an unsafe manner would bar the plaintiffs' negligent entrustment claims. Specifically, there is no allegation in this case that there was any reason to expect that Lanza's mother was likely to use the rifle in an unsafe manner. The plaintiffs, recognizing that they cannot prevail under this rule, invite us to adopt a different framework . . . .

*Id.* at 281.

[17] Defendants' citation of this unpublished Ninth Circuit decision appears to violate Ninth Circuit Rule 36-3.

improper or dangerous fashion." *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1064 (N.Y. 2001) (recognizing that "[t]he owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others").[18]

Nor does *Phillips* defeat the State's negligent entrustment claim. *See* Def. Mem. at 26. *Phillips* rejected allegations that the defendants knew or should have known that a purchaser was likely to use the property he purchased in a manner risking harm *based on only one fact*:

> The only fact that plaintiffs offer to suggest that defendants should have questioned Holmes is the amount of ammunition and other potentially dangerous materials that he purchased, but there is nothing inherently suspicious about large internet orders. Consumers often buy large quantities of goods over the internet for the convenience of one transaction and to secure a better price.

*Phillips*, 84 F. Supp. 3d at 1226.[19] In this case, the State has alleged numerous facts highlighting that Horton's and Elwood's purchases of firearms from Defendants constituted straw purchasing, including the frequency and timing of purchases, the quantities of purchases, the behavior of the straw purchasers inside the store, and the types of firearms purchased. Compl. ¶¶ 37–61.

---

[18] *Hamilton* rejected a negligent entrustment claim against firearms manufacturers (not dealers) but only based on the lack of evidence in that particular case. *Id*. at 1064.

[19] Defendants emphasize *Phillips*' statement that in that case—unlike in this case—there were no allegations that defendants violated state or federal law. Def. Mem. at 26 (quoting *Phillips*, 84 F. Supp. 1226). But this statement followed *Phillips*' explanation that the single fact of one bulk internet purchase was not inherently suspicious. *Phillips* did not hold that alleging a violation of state or federal law was necessary to state a negligent entrustment claim. Further, in this case the State does allege that Defendants violated state and federal law by selling guns to persons they knew or had reason to know were straw purchasers.

## VI.   DEFENDANTS' CONDUCT CONTRIBUTED TO THE CREATION OF A PUBLIC NUISANCE.

The State has plausibly alleged a claim for public nuisance. Liability for maintaining a public nuisance results if an intentional "act or failure to perform a legal duty" results in the "maint[enance] or [permission of] a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public," or the person is "guilty of any other act or omission declared by law to be a public nuisance." Minn. Stat. § 609.74; *see Doe 30*, 2014 WL 10936509, at *11, n.6 ("Plaintiffs Complaint states a plausible public nuisance claim under [section 609.74] . . . . It is plain from the cited authorities that the present statute codified Minnesota's common law on the subject."). The Minnesota Attorney General has authority to bring its public nuisance claims under section 609.74 pursuant to its broad statutory authority to investigate and bring enforcement actions to enjoin and remediate violations of law respecting "unlawful practices in business, commerce, or trade" under Minn. Stat. § 8.31, subd. 1. *See* Order on Motions to Dismiss, *State v. Juul Labs, Inc.*, No. 27-CV-19-19888, 2021 WL 2692131, at *3–4 (Minn. Dist. Ct. June 21, 2021).[20]

### A.   The Complaint Plausibly Alleges That Defendants Interfered with Public Rights and Endangered Public Health.

The State has properly alleged that Defendants' conduct created a public nuisance that interfered with public rights and endangered public health. Throughout the Complaint,

---

[20] Given this authority, Defendants' attempt to minimize the State's statutory authority by claiming that the State "appears to advance a common-law public nuisance claim" should be disregarded. Def. Mem. at 26.

the State alleges both specific detail on the known and potential future harm caused by the specific firearms negligently sold by Defendants (Compl. ¶¶ 45–49, 51, 60), and general detail on the harm caused in Minnesota by gun violence and gun trafficking writ large (Compl. ¶¶ 62–69). The Complaint ties this harm to Defendants by plausibly alleging that Defendants' misconduct foreseeably resulted in the transfer of firearms used in the commissions of crimes and was at least a "a substantial factor in creating, promoting, supporting, or supplying an illegal secondary market for firearms that contributed to unlawful possession of firearms and firearm violence in Minnesota." Compl. ¶ 107–08. The State further details Defendants' interference with public rights and endangerment of public health:

> Defendants' conduct is widespread and persistent, and has created, is creating, and will likely continue to create substantial ongoing harm to the State and its residents by unreasonably interfering with the right of the general public to life, safety, health, the use and enjoyment of property, the right to travel within Minnesota, and the right to attend school, all without fear of gun violence. The unlawful proliferation of firearms interferes with rights common to the general public, deprives Minnesota residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places, interferes with commerce, travel, and the quality of daily life, and endangers the health, welfare, peace, safety, well-being, convenience, and property of considerable numbers of residents of, and visitors to, Minnesota. These harms are felt throughout Minnesota and are borne disproportionately by vulnerable communities, including the Native American and Black communities.

Compl. ¶ 109.

Defendants argue that, in the absence of Minnesota caselaw holding otherwise, this Court should rely on caselaw from other jurisdictions suggesting that the sale of legal products is immune from a public nuisance claim. Def. Mem. at 26–27. Contrary to

Defendants' argument, Minnesota courts *have* directly addressed public nuisance claims similar to those brought by the State and held that the sale of otherwise legal products can form the basis of a public nuisance claim by the State. *Juul Labs, Inc.*, 2021 WL 2692131, at *4–5 (upholding public nuisance claim based on allegations that defendant's misconduct related to sales of vaping products contributed to the exacerbation of the vaping epidemic); Order Denying Motion to Dismiss, *Purdue Pharma L.P.*, 2019 WL 11729023, at *4 (upholding public nuisance claim against seller of legal opioids for misconduct that contributed to the opioid epidemic).

The foreign cases cited by Defendants are inapposite. Those three lawsuits were wide-ranging actions primarily focused on firearm *manufacturers* for industry-wide misconduct and involved state-specific policy decisions about the bounds of public nuisance law for those jurisdictions. *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1121 ("We, therefore, conclude that there are strong public policy reasons to defer to the [Illinois] legislature in the matter of regulating the manufacture, distribution, and sale of firearms."). The State's public nuisance claim, by contrast, is grounded in Minnesota law, including existing public nuisance caselaw, and has a much narrower focus on specific actions taken by one firearms *dealer* in selling to identified straw purchasers and known resulting harm.

Moreover, other jurisdictions have specifically upheld public nuisance claims against firearms dealers akin to the State's claim. *See, e.g., Ileto v. Glock Inc*., 349 F.3d 1191, 1211 n.26 (9th Cir. 2003) ("Plaintiff's nuisance claim, however, is not about the manufacture or distribution of a defective or properly functioning product. Notably,

34

plaintiffs do not allege a product defect but rather allege affirmative conduct on the part of

manufacturers and distributors that fosters an illegal secondary gun market that interfered

with the public right to safety."); *A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. at 304, 343–49

(holding that plaintiff properly pleaded statutory and common law public nuisance against

firearms dealers for facilitating straw purchases); *City of Boston v. Smith & Wesson Corp.*,

No. 199902590, 2000 WL 1473568, at *14 (Mass. Super. Ct. July 13, 2000) (denying

motion to dismiss public nuisance claim against gun manufacturer); *City of Gary v. Smith*

*& Wesson Corp.*, 801 N.E.2d 1222, 1241 (Ind. 2003) ("The City alleges that the dealer-

defendants participated in straw purchases . . . . Taken as true, these allegations are

sufficient to allege an unreasonable chain of distribution of handguns sufficient to give rise

to a public nuisance generated by all defendants."); *Beemiller, Inc.*, 100 A.D.3d at 152

(upholding public nuisance claim alleging that "defendants violated federal and state laws

by selling guns to a straw purchaser, who funneled the guns into the criminal gun market,

thereby posing a danger to the general public, and that plaintiff was injured by one of those

guns").

Defendants also rely on cherry-picked decisions from other jurisdictions to make a

dramatic slippery-slope argument that allowing the State's targeted public nuisance claim

to proceed would "'devour in one gulp the entire law of tort.'" (Def. Mem. at 27 (quoting

*Tioga Pub. Sch. Dist. V. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993)).[21] But

---

[21] Although it is an Eighth Circuit decision, *Tioga* is also unpersuasive because it relies on
North Dakota public nuisance law inapplicable in Minnesota. *See Tioga*, 984 F.2d at 918
("As a federal court sitting in diversity, this Court applies state substantive law . . . in this
case, the law of North Dakota.").

Defendants' argument is completely out of step with the current state of public nuisance law nationwide. Courts around the country have condoned public nuisance claims related to the sale of legal products in a variety of fields and contexts, all without Defendants' doomsaying coming to pass.[22]

### B. Defendants Controlled the Instrumentality of Public Nuisance Through Their Misconduct in Selling to Straw Purchasers.

Defendants' invocation of private nuisance cases related to control of the instrumentality that caused the nuisance are inapplicable to the State's public nuisance claims under section 609.74. *See* Def. Mem. at 27–28. Defendants rely upon cases involving private nuisance claims under Minnesota's private nuisance statute (Minn. Stat. § 561.01), *see Highview N. Apartments v. Ramsey County*, 323 N.W.2d 65, 70 (Minn. 1982),[23] and Minnesota's property-related nuisance laws (Minn. Stat. §§ 617.80–.87), *see*

---

[22] *See, e.g.*, *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 166-68 (Cal. Ct. App. 2017) (upholding lead paint manufacturers' liability "for creating a public nuisance as a result of their conduct in promoting lead paint for interior residential use while knowing of the hazard that such use would create"); *City & Cnty. of San Francisco v. Purdue Pharma L.P.,* No. 18-CV-07591-CRB, 2022 WL 3224463, at *58 (N.D. Cal. Aug. 10, 2022) ("Plaintiff's case against Walgreens is not based on dispensing controlled substances with known risks of harm—it is based on Walgreens' fifteen-year violation of federal regulations that were put in place to prevent the controlled substances that Walgreens dispenses from causing harm. Walgreens' conduct in dispensing opioids—not the opioids themselves—is the fundamental cause of the harm here" (citation omitted)); *In re Opioid Litig.*, 2018 WL 3115102, at *21–22; *Kentucky v. Endo*, 2018 WL 3635765, at *6 (Ky. Cir. Ct. July 10, 2018); *Massachusetts v. Purdue Pharma, L.P.*, 2019 WL 5495866, at *4–5 (Mass. Super. Ct. Sept. 17, 2019).

[23] This is the case relied upon by *Appletree Square 1 Ltd. Partnership v. W.R. Grace & Co.*, 815 F. Supp. 1266 (D. Minn. 1993), for the proposition that nuisance law requires property control.

*City of w. St. Paul v. Krengel*, 768 N.W.2d 352, 356 (Minn. 2009). Neither of these statutes are at issue in this action.

The Complaint alleges *public* nuisance claims under section 609.74, which are distinct from private nuisance claims and do not require that the nuisance be related to control of real property. *See, e.g.*, *State v. Guilford*, 219 N.W. 770, 772 (Minn. 1928) ("The courts have uniformly sustained the constitutionality of statutes conferring upon courts of equity power to restrain public nuisances although the acts constitute crime and the plaintiff's property rights are not involved" (citations omitted)); *State v. Sportsmen's Country Club,* 7 N.W.2d 495, 496 (Minn. 1943) (same); *Juul Labs, Inc.*, 2021 WL 2692131, at *5 (rejecting argument that abatement is unavailable in nuisance case not related to real property).

To the extent control is at issue, the State's Complaint adequately alleges Defendants' control of the instrumentality alleged to constitute a public nuisance. Defendants unquestionably had control of the firearms at issue at the point of sale, and Defendants made the choice to sell and entrust these firearms to straw purchasers despite blatant warning signs that the firearms would be misused and contribute to the public harm of illegal firearm possession and firearm violence. Compl. ¶¶ 107–109. Further, the State alleges that the instrumentality of the public nuisance is not merely the firearms themselves, but also includes the "illegal secondary market for firearms" that Defendants had a role in "creating, promoting, supporting, or supplying." Compl. at ¶ 108. These allegations are more than sufficient to state a plausible claim of public nuisance against Defendants. *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 (Ohio 2002)

(noting that plaintiff properly alleged that defendants "control the creation and supply of this illegal, secondary market for firearms" by alleging that defendants "created a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market").

## VII.   THE STATE'S COMPLAINT ALLEGES SUFFICIENT CAUSATION BETWEEN DEFENDANT'S CONDUCT AND PUBLIC HARM.

Defendants challenge the proximate cause elements underlying the State's tort claims.[24] The State's allegations are sufficient. Generally, Minnesota courts treat proximate cause as a fact-specific question not suitable for resolution at the pleading stage.[25] *See Lubbers v Anderson*, 539 N.W.2d 398, 402 (Minn. 1995) ( "Generally, proximate cause is a question of fact for the jury."); *see also Warren v. Dinter*, 926 N.W.2d 370, 380 (Minn. 2019) (holding that, "when duty depends on foreseeability, and the material facts regarding foreseeability are disputed, or there are differing reasonable inferences from undisputed facts (a 'close call')," the issue is for the jury).

---

[24] The State's public nuisance claim does *not* have a required element of proximate causation. Liability in a section 8.31 enforcement action brought by the State is triggered by violations alone. *See* Minn. Stat. 8.31, subd. 3 (providing for liability when a relevant law "has been or is being violated, or is about to be violated"); *see also State v. Juul Labs, Inc.*, No. 27-CV-19-19888, 2021 WL 2692131, at *3–4 (Minn. Dist. Ct. June 21, 2021) (holding that Attorney General may bring statutory public nuisance claim under Minn. Stat. § 8.31). The case cited by Defendants involved a private party seeking to bring a public nuisance claim, which requires a different showing that the nuisance "proximately caused . . . special and peculiar damages." *See Chairez v. AW Distributing, Inc.*, 2021 WL 1600494, at *9 (D. Minn. Apr. 23, 2021).

[25] Defendants wrongly invert *Lubbers* and relevant motion to dismiss standards by asserting that the State has failed to allege proximate cause simply if "reasonable minds" would not find it present. *See* Def. Mem. at 29.

Proximate cause is satisfied if "the injury was the natural and probable consequence" of the defendant's act. *Dellwo v. Pearson*, 107 N.W.2d 859, 861 (Minn. 1961) (quotation omitted). Proximate cause also requires "a showing that the defendant's 'conduct was a substantial factor in bringing about the injury.'" *Lubbers*, 539 N.W.2d at 401-02 (quoting *Flom v. Flom*, 291 N.W.2d 914, 917 (Minn. 1980)). "There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury." *Staub as Trustee of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 621 (Minn. 2021). Thus, a "but for" analysis is not the correct standard. *Lubbers*, 539 N.W.2d at 402 (stating that the Minnesota Supreme Court rejected a "but for" standard in *Harpster v. Hetherington*, 512 N.W.2d 585, 586 (Minn. 1994)). In sum, for there to be proximate cause, (1) an injury must be foreseeable, and (2) the defendant's act must be a substantial factor in the injury.

The State has plausibly alleged both foreseeability and that Defendants' conduct was a substantial factor in the State's injuries in this case. As alleged by the State, Defendants knew or should have known that they were selling guns to straw purchasers because the purchasers exhibited multiple hallmark red flags of straw purchasing:

- The number of firearms purchased by the straw purchasers within a relatively short time period—24 guns in four months and 13 guns in less than a year. Compl. ¶¶ 38, 40, 54, 56.

- Multiple purchases of multiple firearms on the same day, sometimes mere days apart. Compl. ¶¶ 39–41, 55–57.

- Repeat purchases of cheap small caliber handguns that are desirable for resale. Compl. ¶¶ 41, 57.

- Staggering visits to different retail locations to avoid federal reporting requirements. Compl. ¶¶ 36, 41.

- The use by at least one straw purchaser of the camera feature of his cellphone to take pictures or video of firearms, as captured by surveillance cameras in Defendants' store. Compl. ¶ 42.

- Short "time to crime" between Defendants' sale of the firearm and recovery of the firearm by police—sometimes as short as 34 days. Compl. ¶ 45, 46, 47, 48, 49, 51, 60.

- Defendants' continued sale of guns to straw purchasers after the firearms are recovered by police in connection with crimes and are presumably traced back to Fleet Farm stores Compl. ¶¶ 45, 46, 47, 48, 49.

Third parties did not break the causal chain here because the Complaint sufficiently alleges that it was foreseeable to Defendants that these guns would be distributed into the illicit secondary firearm market, end up in the possession of persons prohibited from possessing firearms, and be used in crimes. Compl. ¶¶ 72– 75, 89–93, 99–100, 107–08. Per the caselaw cited by Defendants, reasonably foreseeable criminal acts are not legally sufficient intervening causes. *Hilligoss v. Cross Cos.*, 228 N.W.2d 585, 586 (Minn. 1975); *see* Def. Mem. at 30. Nor did Defendants merely "furnish a condition" to "disconnected third persons" (Def. Mem. at 30)—Defendants repeatedly supplied obvious straw purchasers with firearms, in violation of their own duties, and thereby aided and abetted the straw purchasers' criminal conduct.[26] Such allegations plausibly allege proximate causation, particularly in the context of claims brought by a sovereign to protect the safety

---

[26] These facts distinguish Defendants, as retailers with direct contact with straw purchasers, from the pharmaceutical manufacturers and wholesalers further up the distribution chain in *Ashley County v. Pfizer, Inc. See* 552 F.3d 659, 670 (8th Cir. 2009) (relying on Arkansas caselaw "noting that the manufacturer had no control over its dealers" and emphasizing the "independence of the retailer" as "critical").

and health of its citizens. *See N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 496 (E.D.N.Y. 2003) ("[W]here the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases.").

Other courts have held that similar allegations regarding firearms dealer sales to straw purchasers and the foreseeability of subsequent gun trafficking and gun violence are sufficient for the pleading stage. *See, e.g.*, *Beemiller*, 100 A.D.3d at 152 (holding that the "intervening criminal" act of third party did "not necessarily sever the causal connection between the alleged negligence of defendants and plaintiff's injury" when plaintiff alleged that defendants knowingly participated in sale of handguns to a gun trafficking ring); *Knight v. Wal-Mart Stores, Inc.*, 889 F. Supp. 1532, 1541–42 (S.D. Ga. 1995) (recognizing that "[c]ases dealing with gun purchasers who then harm third parties hold that the gun seller may be held liable for foreseeable harm resulting from the sale, despite several intervening acts" and collecting cases). After all, "[o]ne who gives matches to a pyromaniac can hardly claim that it could not be exactly foreseen what or whom he might harm or in what strange manner or how long it might take him to light the fire." *K-Mart Enterprises of Florida, Inc. v. Keller*, 439 So. 2d 283, 287 (Fla. Ct. App. 1983).

The State has plausibly alleged the necessary causation elements of its claims for pleading purposes.

## CONCLUSION

For all the above reasons, the State respectfully requests that the Court deny Defendant's Motion to Dismiss in its entirety.

Dated:  December 14, 2022

KEITH ELLISON
Attorney General
State of Minnesota

**/s/ Eric J. Maloney**
ERIC J. MALONEY (#0396326)
Assistant Attorney General
JAMES W. CANADAY (#030234X)
Deputy Attorney General
JASON T. PLEGGENKUHLE (#0391772)
Assistant Attorney General
KATHERINE A. MOERKE (#0312277)
Assistant Attorney General


445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 757-1021
eric.maloney@ag.state.mn.us
james.canaday@ag.state.mn.us
jason.pleggenkuhle@ag.state.mn.us
katherine.moerke@ag.state.mn.us
*Attorneys for State of Minnesota*