## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>　　　　Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**STATE OF MINNESOTA'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY FROM DEFENDANTS** |

More than seven months after discovery began in this action, Fleet Farm has produced less than 7,000 documents and failed to answer several of the State's interrogatories. Fleet Farm resists providing multiple categories of documents and information based primarily on relevancy and proportionality objections. Fleet Farm should be compelled to provide this discovery given its relevance and the lack of undue burden.

First, Fleet Farm should be compelled to produce its firearms transactions records, including complete Acquisition and Disposition Logs ("A&D logs"). Despite Fleet Farm initially saying it would produce its firearms transactions records, Fleet Farm has yet to produce any A&D logs or any other records of firearm sales other than those related to identified straw purchasers. Fleet Farm's A&D logs are not only relevant but core evidence. The State's claims are based on Fleet Farm's unlawful sales of firearms to straw purchasers despite warning signs, including purchasing patterns, and the A&D logs will reflect purchasing patterns. Further, there is minimal burden involved in Fleet Farm producing

these electronic records. Fleet Farm does not need to collect, scan, or organize the information contained in the A&D logs—Fleet Farm just needs to turn them over. Finally, the Protective Order in this case fully addresses Fleet Farm's newfound "privacy" concern.

Second, Fleet Farm should be compelled to actually answer numerous interrogatories that Fleet Farm responded to by citing Federal Rule of Civil Procedure 33(d) and referring to "documents [Defendants] will be producing." At this point, Fleet Farm has still failed to specify documents or provide a narrative response with respect to one of these interrogatories. Moreover, the numerous documents that Fleet Farm specified with respect to four of these interrogatories do not satisfy Rule 33(d). This is because the documents are incomplete or do not address certain aspects of the interrogatory itself, such that "the burden of deriving or ascertaining the answer" is not "substantially the same for either party," even if the State could ascertain an answer at all.

Third, Fleet Farm should be compelled to provide discovery from the time period after the State filed suit on October 5, 2022. Post-complaint discovery is relevant to the State's substantive claims as well as the State's remedies. Fleet Farm should not be allowed to selectively produce post-complaint discovery that Fleet Farm considers favorable or anodyne while withholding other discovery based on a manufactured "cutoff" date.

Fourth, Fleet Farm should be compelled to produce internal communications about this lawsuit. Internal Fleet Farm communications about this lawsuit are relevant because they could reveal Fleet Farm employees' assessment of the credibility of the State's allegations or how Fleet Farm's policies and procedures compare to the claims in the suit. There is minimal burden involved—it should be easy for Fleet Farm to search for and

collect such communications. Fleet Farm's blanket refusal to do so is inconsistent with Fleet Farm's discovery obligations. Fleet Farm should not be permitted to withhold discovery that is likely to lead to relevant evidence even if such discovery may be unflattering.

Fifth, Fleet Farm should be compelled to provide discovery sufficient to show its legal identity and corporate structure. Such discovery is minimal, standard, and essential to appropriately request and fashion injunctive relief. The State identified the relevance of the information: as the party seeking injunctive relief, the State is entitled to discovery confirming it has identified the correct parties to enjoin and bind by the judgment in this action. Despite significant correspondence and a meet and confer addressing this issue, Fleet Farm has yet to rebut the State's showing of relevance or do anything but refuse to produce responsive discovery.

Sixth, Fleet Farm should be compelled to provide discovery about employee evaluations and disciplinary actions related to firearms sales, including documents and testimony. Such information is relevant because it shows how seriously Fleet Farm treated its duties as a federally licensed firearms dealer, as well as whether Fleet Farm knew or had reason to know its employees were selling firearms to straw purchasers and how Fleet Farm treated such violations. Indeed, an isolated email produced by Fleet Farm about an employee assisting a straw purchaser shows how such materials can be directly relevant. Fleet Farm argues that its Human Resources database is not user-friendly and makes complying with these requests an undue burden, but Fleet Farm's choice of software and lack of organization does not excuse Fleet Farm from providing relevant discovery.

Fact discovery must be completed by August 2, 2024. Pretrial Scheduling Order, ECF No. 41, at 1. It is time for Fleet Farm to comply with its discovery obligations and promptly provide relevant documents, information, and testimony.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 20, 2023, in accordance with Federal Rule of Civil Procedure 26(d)(1), the State served its First Set of Requests for Production and its First Set of Interrogatories on Fleet Farm following the parties' Rule 26(f) conference. Exs. 1, 2. Fleet Farm served written responses to the State's discovery requests on August 21, 2023. Exs. 3, 4. Fleet Farm provided narrative answers to only four of the State's fifteen interrogatories. To date, Fleet Farm has produced 6,910 documents.[1] The parties have exchanged correspondence and met and conferred multiple times about Fleet Farm's objections and discovery responses.

On January 29, 2024, the State served a Rule 30(b)(6) deposition notice on Fleet Farm. Ex. 5. On February 9, 2024, Fleet Farm served objections to the notice (Ex. 6), and the parties subsequently met and conferred about the objections.

This motion to compel addresses six discovery disputes: (1) Fleet Farm's refusal to produce firearms transactions records (RFPs Nos. 6 and 8); (2) Fleet Farm's deficient interrogatory answers citing Rule 33(d) (Interrogatory Nos. 5, 7, 9, 12, 14, and 15); (3) Fleet Farm's overarching objection to producing discovery from the time period after the

---

[1] Fleet Farm has produced documents on five occasions: (1) 159 documents on September 20, 2023; (2) 1,028 documents on December 18, 2023; (3) 965 documents on January 19, 2024; (4) 4,735 documents on February 18, 2024; and (5) 23 documents on February 26, 2024.

date of the Complaint; (4) Fleet Farm's refusal to produce communications about this lawsuit; (5) Fleet Farm's refusal to produce employee records related to firearms; and (6) Fleet Farm's refusal to produce information about its legal identity and corporate structure.

## I.   FLEET FARM REFUSES TO PRODUCE FIREARMS TRANSACTION RECORDS, INCLUDING COMPLETE A&D LOGS.

The State's Request for Production No. 6 sought all of Fleet Farm's "firearms transaction records, including acquisition and disposition records, since January 1, 2017." Ex. 1 at 4. The State's Request for Production No. 8 sought "[a]ll sales and transaction forms provided by Fleet Farm to the ATF or the BCA since January 1, 2017, including all Reports of Multiple Sale or Other Disposition of Pistols and Revolvers (Form 3310.4) and Firearms Transaction Records (Form 4473)." *Id.*

Fleet Farm's August 21, 2023, Responses and Objections indicated that, notwithstanding Fleet Farm's objections to RFP No. 6, Fleet Farm would produce three categories of firearms sales records: (1) Form 4473s, (2) Form 3310.4s, and (3) A&D logs:

> **RESPONSE:** In addition to the foregoing General Objections, Defendants object to Request No. 6 on the grounds that it is overly broad and unduly burdensome, and that the phrases "firearm transactions records" and "acquisition and disposition records" are vague and ambiguous. Defendants interpret these terms collectively as referring to the ATF Form 4473, the ATF Form 3310.4, and the ATF required Acquisition and Disposition (A&D) log.
>
> Subject to and without waiving these objections, *Defendants state that they will conduct a reasonable search and produce, at a reasonable time, ATF Form 4473s, ATF Form 3310.4s, and A&D logs from Fleet Farm retail stores in Minnesota and the Fleet Farm distribution center located in Chippewa Falls, Wisconsin, from the defined time period.*

Ex. 3 at 11 (emphasis added). Defendants also indicated that they would produce "ATF Form 4473 and ATF Form 3310.4s for attempted or completed firearm transactions during the defined time period" in response to RFP No. 8. *Id*. at 12. Fleet Farm has indicated that its completed Form 4473s and Form 3310.4s are in paper form but that its A&D logs are computerized.[2]

Notwithstanding Fleet Farm's initial acquiescence to the State's request, Fleet Farm subsequently reversed course and refused to produce all of these documents—i.e., Form 4473s, Form 3310.4s, and A&D logs—for the relevant time period in response to RFP No. 6. To date, Fleet Farm has not produced any A&D logs or any other records of firearm sales other than Form 4473s and Form 3310.4s related to Fleet Farm's sales to some identified straw purchasers.

The State and Fleet Farm exchanged numerous letters and had multiple meet-and-confer calls about Fleet Farm's responses to Request for Production Nos. 6 and 8. On October 27, 2023, Fleet Farm argued that producing all ATF Form 4473s was burdensome and not proportional, and proposed limiting production to "those instances in which 2 or more handguns were purchased at a Fleet Farm retail store in Minnesota by a single

---

[2] ATF regulations require A&D logs and permit the logs to be computerized. "Licensed firearms importers are required to maintain records of acquisition and disposition according to 27 CFR § 478.122. This record takes the form of a bound book in which entries are written; however, a licensee may apply for a variance to maintain the required records on a computer by filing a request under the provision of 27 CFR § 478.22." *Firearms – Guides – Importation & Verification of Firearms, Ammunition and Implements of War-Record Keeping Requirements*, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *available at* https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-and-implements-war-record.

purchaser within a five day period." Ex. 10 at 1. These are the same circumstances that require submitting a Form 3310.4 to the ATF: "Federal Firearms Licensees (FFLs) must use this form to report all transactions in which an unlicensed person (i.e., non-FFL holder) acquired any combination of two or more pistols or revolvers totaling two or more at one time or during five consecutive business days." Ex. 24 at 2. In Fleet Farm's October 27, 2023 correspondence, Fleet Farm said nothing about limiting the production of A&D logs or Form 3310.4s to the State. On November 1, 2023, the State rejected Fleet Farm's limitation and offered to inspect and scan all 4473s at individual Fleet Farm stores. The State also asked Fleet Farm to promptly produce all A&D logs and Form 3310.4s.

In a November 10, 2023, letter, Fleet Farm argued again that producing all ATF Form 4473s was burdensome and not proportional. Fleet Farm ignored the State's November 1 proposal to inspect and scan these records and repeated Fleet Farm's October 27 proposal. Ex. 11 at 5. Fleet Farm again said nothing about limiting the production of A&D logs or Form 3310.4s. On November 17, 2023, the State explained to Fleet Farm why the State is not willing to limit the production of Form 4473s as Fleet Farm proposed. The State made two new additional alternative compromise proposals to address Fleet Farm's arguments about burden and proportionality without needing to bring a motion to compel. Ex. 12 at 3.The State also stated that "[t]here appears to be no dispute between the parties about Fleet Farm's production of the latter two categories: Form 3310.4s and A&D logs. Accordingly, please let us know when Fleet Farm will produce these documents." *Id*. at 1.

On December 5, 2023, Fleet Farm rejected the State's proposals made on November 1 and November 17 and indicated that Fleet Farm was willing to meet and confer on December 20, 2023. During the December 20, 2023 call, Fleet Farm indicated that it was willing to produce A&D logs, but for the first time sought to limit the content of the A&D logs to correspond to Fleet Farm's production of a subset of Form 4473s. In other words, Fleet Farm delayed four months and then reneged on its promised production of A&D logs. Despite the State's three prior compromise proposals to narrow Fleet Farm's production of Form 4473s, Fleet Farm requested yet another compromise proposal from the State with respect to limiting not only Form 4473s but also the content of A&D logs.

On December 22, 2023, the State made yet another compromise proposal and requested a response by January 8, 2024. On January 24, 2024, Fleet Farm rejected the State's fourth compromise proposal.[3] Fleet Farm also, for the first time, suggested that the State's latest compromise proposal "does not adequately address the unique and substantial privacy interests implicated by Fleet Farm providing Plaintiff with documentation of thousands of law-abiding citizens' firearm purchases." Ex. 15 at 2. Fleet Farm waited six months after its original discovery responses to raise this "privacy" objection. On

---

[3] On January 24, 2024, Fleet Farm also wrongly stated that "Plaintiff has recognized that the customer information provided in Fleet Farm's A&D logs should be no broader than the Form 4473s produced in this case, and that it is appropriate for Fleet Farm to "redact personally identifying information (i.e., names, addresses, phone numbers, etc.) for all purchasers other than purchasers" whose Form 4473s are produced." Ex. 15 at 1; *see also* Ex. 16 at 1 ("Your letter also continues to mischaracterize what the State is seeking by focusing on individual ATF Forms 4473s and 3310.4s rather than Defendants' A&D logs, which are not burdensome to produce. . . . The State was only willing to limited redactions of A&D logs if this allowed the parties to reach a compromise without Court intervention.").

January 25, 2024, the State informed Fleet Farm that the State would proceed with a motion to compel discovery, including for complete A&D logs. Ex. 16 at 1.

## II.   FLEET FARM RESPONDED TO EIGHT INTERROGATORIES BY CITING FEDERAL RULE OF CIVIL PROCEDURE 33(D) AND IMPROPERLY REFERRING THE STATE TO "DOCUMENTS [DEFENDANTS] WILL BE PRODUCING."

Fleet Farm's August 21, 2023, Responses and Objections to Plaintiff's First Set of Interrogatories cited Federal Rule of Civil Procedure 33(d) and referred the State to "documents [Defendants] will be producing" in response to eight of the State's fifteen interrogatories (Nos. 5, 6, 7, 9, 11, 12, 14, and 15):

**INTERROGATORY NO. 5:**

Identify and describe Fleet Farm's policies and procedures related to the sale of firearms, straw purchaser awareness, detection, and/or prevention, compliance with state and federal firearms laws, or reporting suspicious behavior to law enforcement, and describe how Fleet Farm trained retail store employees regarding these policies and procedures. Your response should identify the period of time each policy or procedure was in place and describe what materials Fleet Farm created or distributed to educate employees or enforce these policies or procedures.

**RESPONSE:**

. . . Defendants refer Plaintiff to the documents referenced in their Initial Disclosures, as well as the documents they will be producing in response to Request for Production Nos. 19 and 20.

**INTERROGATORY NO. 6:**

Identify every Fleet Farm employee, agent, manager, director, or principal who has spoken in person, communicated with, or otherwise contacted Jerome Horton, Gabriel Lee Young-Duncan, Sarah Elwood, Jeffrey Jackson, or Geryiell Walker, and describe the date and location of each meeting, communication, or contact.

**RESPONSE:**

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production Nos. 12 through 14 and 16.

**INTERROGATORY NO. 7:**

Identify every Fleet Farm employee, agent, manager, director, or principal who has spoken in person, communicated with, or otherwise contacted the ATF, the BCA, or any other Minnesota law enforcement agency regarding a firearm sale at a Minnesota Store, and describe the date and location of each meeting, communication, or contact.

**RESPONSE**:

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production Nos. 9 through 11.

\*\*\*

**INTERROGATORY NO. 9:**

Describe every instance in which Fleet Farm investigated or audited its employees' compliance with Fleet Farm policies and procedures related to the sale of firearms, including whether Fleet Farm investigated its firearms sales to Jerome Horton or Sarah Elwood. For each investigation or audit identified, specify when it took place, which store(s) and/or personnel Fleet Farm investigated or audited, what conduct the investigation or audit reviewed, the findings of the investigation or audit, and the recommendation(s) of the investigation or audit, if any.

**RESPONSE**:

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production No. 12.

\*\*\*

**INTERROGATORY NO. 11:**

Identify every requested firearms sale in Minnesota that Fleet Farm decided not to complete and every person for whom Fleet Farm has limited or ceased firearms sales in Minnesota, including a description of the

circumstances, evidence, and internal decision-making process that led Fleet Farm to limit or cease sales in each instance.

**RESPONSE:**

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production Nos. 23 and 24.

**INTERROGATORY NO. 12:**

Identify every person that Fleet Farm has identified or suspected to be a straw purchaser related to Fleet Farm's sales of firearms in Minnesota.

**RESPONSE:**

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production No. 26.

*** 

**INTERROGATORY NO. 14:**

Provide all supporting information underlying Fleet Farm's public statement issued on October 5, 2022, in which Fleet Farm stated: "It's also worth noting that at the time of the tragic shooting in Saint Paul described in the Attorney General's complaint, we were told by the Bureau of Alcohol, Tobacco and Firearms that our team members had 'done nothing wrong' and had complied with all applicable gun laws." . . .

**RESPONSE:**

. . . Defendants refer Plaintiff to the documents they will be producing in response to Request for Production No. 17.

**INTERROGATORY NO. 15:**

Identify, by date and government agency, and describe any investigations, compliance inspections, warning letters or warning conferences, remedial trainings, presentations, inquiries, or contacts by any federal, state, or local government agency relating to your sale of firearms at your Minnesota Stores.

**RESPONSE:**

> . . . Defendants refer Plaintiff to the documents they will be producing
> in response to Request for Production Nos. 9 and 10.

Ex. 4 at 10–12, 13–14, 15–17, 18–19. None of Fleet Farm's responses to these eight interrogatories specified any documents. *See generally id.*

On September 18, 2023, the State told Fleet Farm that these eight interrogatory responses fail to comply with Federal Rule of Civil Procedure 33. Ex. 7 at 2–3. The State asked Fleet Farm to either provide narrative answers or produce documents and provide "sufficient detail to enable the interrogating party to locate and identify" documents to determine answers to these interrogatories.[4] *Id.* at 3. On September 21, 2023, the parties met and conferred. On September 25, 2023, the State provided case law to Fleet Farm supporting the State's position that the interrogatory answers did not satisfy Rule 33(d). Ex. 8 at 1–2.

On October 3, 2023, Fleet Farm refused to provide narrative answers but agreed "to identify by Bates number the specific records that Plaintiff should review to determine the answer." Ex. 9 at 3. Defendants further indicated that they "will provide this information in the cover letter transmitting the productions that contain the at-issue records, and those productions will occur in accordance with Defendants' obligations under the Scheduling Order governing this action." *Id.* at 3.

---

[4] The failure to specify documents was additionally problematic given that Fleet Farm refused to specify a reasonable time for production of documents, as required by Rule 34(b)(2)(B). Ex. 7 at 2.

Since then, Fleet Farm has identified documents corresponding to six of these interrogatories on four separate occasions and served an amended narrative response to Interrogatory No. 6. On December 18, 2023, Fleet Farm produced 1,028 documents and identified numerous documents by bates number with respect to three interrogatories: Nos. 5, 9, and 14. *See generally* Ex. 19. On January 19, 2024, Fleet Farm produced 965 documents and identified numerous documents by bates number with respect to four interrogatories, including the same three interrogatories as in Fleet Farm's December 28 letter: Nos. 5, 9, 14, and 15. *See generally* Ex. 20. On February 19, 2024, Fleet Farm produced 4,735 documents and identified numerous documents by bates number with respect to two of the same interrogatories as prior production letters—Nos. 5 and 9. *See generally* Ex. 21. On February 20, 2024, Fleet Farm served Amended Responses and Objections to Plaintiff's Interrogatory Nos. 2, 6, and 13, which included a narrative answer to Interrogatory No. 6. On February 26, 2024, the day before this memorandum was due, Fleet Farm produced 23 documents and again identified numerous documents by bates number with respect to one of the same interrogatories as three prior production letters— No. 5. *See generally* Ex. 22. Fleet Farm also identified one document with respect to Interrogatory Nos. 11 and 12—a spreadsheet identifying requested information.[5] *Id*. at 4.

---

[5] Based on Fleet Farm's identification of a spreadsheet with respect to Interrogatory Nos. 11 and 12 and Fleet Farm's narrative answer to Interrogatory No. 6, the State's Motion to Compel no longer encompasses these interrogatories.

To date, Fleet Farm has never identified documents from which the State can purportedly ascertain the answer to Interrogatory No. 7. Nor has Fleet Farm amended or supplemented its answers to Interrogatory Nos. 5, 7, 9, 14, and 15.

### III.   FLEET FARM REFUSES TO PROVIDE POST-COMPLAINT DISCOVERY.

The State's Requests for Production requested documents from on or after October 5, 2016. Ex. 1 at 2. Fleet Farm's Responses and Objections refused to produce documents from the time period beyond the date of the State's Complaint:

> Defendants object to Instruction No. 9 to the extent that it seeks to impose an open-ended discovery period. To the extent Defendants state that they will conduct a reasonable search and produce, at a reasonable time, certain categories of documents in response to the Requests, unless otherwise specified, Defendants will produce documents for the time period between October 5, 2016 and October 5, 2022.

Ex. 3 at 7.

Fleet Farm also objected to responding to interrogatories with any information beyond the date of the State's Complaint:

> Defendants object to Instruction No. 7 to the extent that it seeks to impose an open-ended discovery period. To the extent Defendants agree to provide documents or information in response to certain Interrogatories, unless otherwise specified, Defendants will produce documents or provide information for the time period between October 5, 2016, and October 5, 2022.

Ex. 4 at 5.

The State and Fleet Farm met and conferred about this issue but have failed to resolve this dispute. As the State has explained to Fleet Farm, the State's claims and claims for relief did not end when the State brought suit. *See, e.g.*, Ex. 17 at 1–2. At the meet and confer on December 20, 2023, the State proposed August 2, 2024, i.e., the end of fact

discovery per the Court's Pretrial Scheduling Order, as the end date for the relevant discovery period. Ex. 17 at 1. But Fleet Farm continues to insist that discovery should be cut off after October 5, 2022.

Fleet Farm similarly objected to the State's Rule 30(b)(6) deposition notice with respect to date. For example, Topic No. 2 seeks testimony about "Fleet Farm's policies, procedures, and practices regarding straw purchasing of firearms, including any changes made after Fleet Farm became aware of straw purchasing by Horton or Elwood or the commencement of this lawsuit." Ex. 5 at 8. Fleet Farm objected to providing responsive testimony based on the date of the State's Complaint:

> Defendants will make reasonable efforts to prepare a witness to testify regarding Fleet Farm's policies, procedures, and practices relating to monitoring for and preventing straw purchases, and whether those policies, procedures, and practices changed during the relevant time period. Subject to the Court's resolution of the parties' dispute regarding the appropriate temporal time period for discovery, Defendants do not agree to designate a Rule 30(b)(6) witness to testify regarding any changes to policies, procedures, and practices regarding straw purchasing of firearms made after October 5, 2022.

Ex. 6 at 9. Fleet Farm made nearly identical objections related to date regarding the State's Rule 30(b)(6) Deposition Topics about training (Topic No. 3) and occasions when Fleet Farm declined to proceed with a desired sale (Topic No. 8). *Id*. at 9–10, 13–14.

## IV.   FLEET FARM REFUSES TO PRODUCE COMMUNICATIONS ABOUT THIS LAWSUIT.

The State's Request for Production No. 30 sought "[a]ll communications made or received by any Fleet Farm employees, agent, manager, director, or principal regarding this lawsuit." Ex. 1 at 8. In Fleet Farm's August 21, 2023, Responses and Objections, Fleet

Farm refused to produce any responsive documents on multiple grounds, including relevance, being duplicative, and undue burden. Ex. 3 at 25–30.

On November 22, 2023, the State told Fleet Farm that none of its objections to Request for Production No. 30 "absolve [Fleet Farm] from a duty to produce." Ex. 13 at 5. In response, on December 5, 2023, Fleet Farm stated that, "[t]o the extent Fleet Farm personnel communicated about the fact of the litigation, rather than the substance of the litigation, such communications do not appear to have any relevance to the actual claims in this litigation." Ex. 14 at 11. Fleet Farm did not explain why Request for Production No. 30 would purportedly constitute an undue burden. During the parties' December 20, 2023, meet-and-confer call, Fleet Farm said that it would produce internal communications about the substance of the State's *claims* in response to other discovery requests, but Fleet Farm would not produce documents about the existence of the *lawsuit*. Ex. 17 at 4-5.

During the December 20, 2023, meet and confer, in an effort to compromise, the State proposed that pure transmittal communications sharing the existence of the lawsuit need not be produced. But the State also explained that, to the extent communications about the facts of the lawsuit exist, beyond mere transmittal communications, such communications are highly relevant due to the State's allegations of ongoing conduct and must be produced. Fleet Farm continued to assert that these communications are not relevant to the case. The State reiterated its compromise proposal in its January 26, 2024, letter, but Fleet Farm declined to engage any further. Ex. 17 at 4–5.

To date, Fleet Farm has not produced any internal communications regarding this lawsuit in response to Request for Production No. 30.

## V.       FLEET FARM REFUSES TO PROVIDE DISCOVERY ABOUT ITS LEGAL IDENTITY AND CORPORATE STRUCTURE.

The State served two requests for production and two interrogatories seeking information about Fleet Farm's legal identify and corporate structure. Request for Production No. 3 sought "[t]he governing documents for Fleet Farm . . . and all other documents sufficient to show Fleet Farm's legal identity, organization and ownership." Ex. 1 at 3. Additionally, in pertinent part, Request for Production No. 4 sought "documents sufficient to show . . . (b) the organizational structure of Fleet Farm in relation to any parents, sisters, subsidiaries, divisions, affiliates, merged or acquired predecessors, successors, assumed names, or any other affiliated entity or component." *Id*. at 3–4.

The State's Interrogatory No. 3 asked Fleet Farm to explain relationships among Fleet Farm business entities: "Describe the relationship between Defendants and identify all entities involved in Fleet Farm's corporate structure, including identifying all entities that have full or partially common ownership or management of any kind with Fleet Farm, and identifying all entities that own or operate Fleet Farm's Minnesota Stores." Ex. 2 at 3. The State's Interrogatory No. 4 asked Fleet Farm to describe its organizational structure: "Describe Fleet Farm's corporate structure and any changes to such corporate structure over time, including identifying your corporate departments, divisions, officers, directors, managers, members, partners, and board members for each year." *Id*. at 4.

Fleet Farm initially refused to produce documents in response to Request for Production No. 3 and part (b) of Request for Production No. 4, characterizing them as "overly broad and unduly burdensome, seek[ing] information irrelevant to the claims and

defenses in this suit, and . . . not reasonably calculated to lead to the discovery of admissible evidence." Ex. 3 at 8–9. Fleet Farm also refused to provide a narrative response to either Interrogatory No. 3 or Interrogatory No. 4. Ex. 4 at 8–9.

In its November 22, 2023, letter, the State emphasized that the corporate structure and legal identity of Fleet Farm are "foundational information" to the lawsuit that could be addressed with minimal burden by producing "readily available . . . corporate governing documents." Ex. 13 at 6, 13. In response, Fleet Farm, in conclusory fashion, asserted that the "general organizational structure of Fleet Farm has no potential relevance to any of the claims or defenses in this case, and absent demonstrating such relevance, general corporate-structure discovery is improper." Ex. 14 at 9 (internal citations omitted). To meaningfully address these arguments, during the meet-and-confer call between the parties on December 20, 2023, the State offered several reasons why the corporate structure and legal identity of Fleet Farm is relevant to the claims and defenses asserted in this action. In the State's January 26, 2023 letter summarizing that discussion, the State explained that "such information is relevant in that the State seeks injunctive relief and has an interest in confirming which parties would need to be bound by any injunctive relief granted in this action." Ex. 17 at 3.

Both during the meet and confer on December 20, 2023 and in Fleet Farm's subsequent February 2, 2024 letter, Fleet Farm failed to engage with the arguments brought forth by the State and simply affirmed its original position in the December, 5, 2023 letter: "Fleet Farm will not produce documents reflecting, or otherwise provide information

regarding, Fleet Farm's 'legal identity, organization and ownership' for the reasons previously identified and discussed." Ex. 18 at 2.

To date, Fleet Farm has failed to produce any documents responsive to RFP No. 3 and part (b) of RFP No. 4, answer Interrogatory Nos. 3 and 4, or meaningfully address the State's assertion that these responses are needed to ascertain the legal identity of parties potentially bound by the injunctive relief sought in this lawsuit.

**VI.    FLEET FARM REFUSES TO PRODUCE DOCUMENTS AND INFORMATION ABOUT EMPLOYEE EVALUATIONS AND DISCIPLINARY ACTIONS REGARDING FIREARMS SALES.**

The State served two requests for production and one interrogatory seeking information about Fleet Farm employee evaluations and disciplinary actions related to firearm sales. The State's Request for Production No. 21 sought "[a]ll documents related to any Fleet Farm employees, agent, manager, director, or principal against whom Fleet Farm has taken or is taking disciplinary action for violating any Fleet Farm policy or procedure related to the sale of firearms in Minnesota." Ex. 1 at 6. Similarly, the State's Request for Production No. 22 requested "[a]ll documents related to performance evaluations or promotions of Fleet Farm employees, agent, manager, director, or principal involved in the sale of firearms in Minnesota." *Id.* at 7. Fleet Farm refused entirely to produce documents responsive to either request, citing overbreadth, irrelevance, and undue burden. *Id.* at 20-21.

Interrogatory No. 8 asked Fleet Farm to identify specific disciplinary actions related to firearms sales:

> Identify every Fleet Farm employee, agent, manager, director, or principal against whom Fleet Farm has taken or is taking disciplinary action for violating any Fleet Farm policy or procedure related to the sale of firearms. For each person identified, describe all details related to that person's conduct, Fleet Farm's investigation into the conduct, and the ultimate disciplinary decision made by Fleet Farm.

Ex. 2 at 5. Fleet Farm refused to answer. Ex. 4 at 12–13.

On November 22, 2023, the State refuted Fleet Farm's objections, explaining that Request for Production Nos. 21 and 22 are relevant because disciplinary actions against employees for violations related to firearm sales could reveal "the extent to which [Fleet Farm] knew or had reason to know its firearms were being straw-purchased." Ex. 13 at 11. The State also noted that the requests are narrowly tailored to the sale of firearms in Minnesota. *Id.* On December 5, 2023, Fleet Farm responded by reiterating its position that Request for Production Nos. 21 and 22 and (Interrogatory No. 8) are irrelevant, but also argued that, even if the requests were relevant, "it is not possible for Fleet Farm to obtain such documents without an undue burden" due to Fleet Farm's human resources ("HR") software having "very limited search functionality." Ex. 14 at 11.

During the December 20, 2023, meet-and-confer call, the State noted that Request for Production No. 21 is already limited to disciplinary actions and offered to limit Request for Production No. 22 to evaluations for employees who had been disciplined for actions related to firearms. Fleet Farm maintained that, even with this limitation, responding would be unduly burdensome, due to the limited search functionality of Fleet Farm's HR database. The State proposed that Fleet Farm have their HR managers provide narrative responses to Interrogatory Nos. 8 and 9 to comply with Request for Production Nos. 21 and 22. Fleet

Farm insisted that would require HR to review every evaluation manually, which would impose an undue burden.

On January 26, 2024, the State reiterated its proposed compromises and suggested that, as an alternative to searching through the HR database, Fleet Farm "could communicate with HR managers throughout Fleet Farm and inquire about their knowledge of discipline related to firearms." Ex. 17 at 5. The State also noted that Fleet Farm's lack of a user-friendly HR database "does not excuse them from producing discovery relevant to claims in this case." *Id.* On February 2, 2024, Fleet Farm responded that the request "remain[s] unduly burdensome for the reasons previously explained." Ex. 18 at 3. Fleet Farm offered a compromise to "produce any records reflecting 'disciplinary actions' relating to firearm sales of any individual Plaintiff identifies to Fleet Farm as potentially being relevant to its claims, as well as any corresponding performance evaluations." *Id.* As demonstrated below, however, this compromise is not tenable. To date, Fleet Farm has failed to produce documents responsive to Request for Production Nos. 21 and 22 and to respond to Interrogatory No. 8.

The State's Rule 30(b)(6) deposition notice also seeks testimony about employee discipline: "Fleet Farm's auditing and employee discipline related to violations or potential violations of Fleet Farm policies or procedures relating to the sale of firearms, including the details of the conduct, Fleet Farm's investigation, and the outcome of the auditing or discipline process." Ex. 5 at 10 (Topic No. 4). Fleet Farm objected and refused to provide testimony about any specific instances of employee discipline: "Defendants do not agree to designate a Rule 30(b)(6) witness to testify as to specific audits of Fleet Farm's retail

stores or specific instances of employee discipline relating to firearm transactions." Ex. 6 at 10-11.

## ARGUMENT

The State asks the Court to compel Fleet Farm to produce documents, answer interrogatories, and provide Rule 30(b)(6) deposition testimony on certain topics. *See* Fed. R. Civ. P. 37(a)(3)(B). Fleet Farm objects to the discovery at issue on the grounds of relevancy and proportionality. As demonstrated below, the discovery the State seeks is both relevant and proportional. Fleet Farm should be compelled to produce it.

Parties are entitled to liberal discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "A discovery request is relevant unless the information sought can have no possible bearing on the claims or defenses of the case." *Lynch v. Experian Info. Sols., Inc.*, 569 F. Supp. 3d 959, 963 (D. Minn. 2021), *aff'd*, 581 F. Supp. 3d 1122 (D. Minn. 2022) (citing *Scheffler v. Molin*, No. CIV. 11-3279 (JNE/JJK), 2012 WL 3292894, at *6 (D. Minn. Aug. 10, 2012)). "While the standard of relevance in the context of discovery is broader than in the context of admissibility . . . [s]ome threshold showing of relevance must be made" before discovery is proper. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Here, the State has made more than a threshold showing of relevance.

With respect to proportionality, Rule 26 requires consideration of "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Nonetheless, "[t]he burden of showing undue burden and disproportionality is on the party resisting disclosure." *Lynch*, 569 F. Supp. 3d at 963 (citation omitted). And the

party resisting production cannot meet its burden with boilerplate objections. *Id.* "Routine, '[b]oilerplate objections, without more specific explanations for any refusal to provide information, are not consistent with the Federal Rules of Civil Procedure.'" *Stan Koch & Sons Trucking*, 2020 WL 2111349, at *3 (quoting *Lubrication Techs., Inc. v. Lee's Oil Serv., LLC*, Case No. 11-cv-2226 (DSD/LIB), 2012 WL 1633259, at *5 n.5 (D. Minn. Apr. 10, 2012)). Fleet Farm has not and cannot show undue burden.

I.   **FLEET FARM SHOULD BE COMPELLED TO PRODUCE FIREARMS TRANSACTIONS RECORDS, INCLUDING COMPLETE A&D LOGS AND ALL FORM 3310.4S (REQUEST FOR PRODUCTION NOS. 6 AND 8).**

Fleet Farm should be compelled to produce complete A&D logs and all Form 3310.4s. Fleet Farm's A&D logs are essential to the State's claims that Fleet Farm ignored signs of straw purchasing, including suspicious purchasing patterns. Moreover, there is minimal burden for Fleet Farm to produce these logs, which are electronic records that can easily be produced. Accordingly, it is more than proportional for Fleet Farm to produce complete A&D logs. Similarly, Fleet Farm's Forms 3310.4 are responsive and proportional.[6] Fleet Farm should be compelled to promptly produce all of these documents after unduly delaying this discovery for months. "It is not the court's role, nor that of opposing counsel, to drag a party kicking and screaming through the discovery process." *U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D. 667, 676 (M.D. Fla. 2008). The State remains willing to reasonably limit and/or postpone the production of Form 4473s

---

[6] Fleet Farm does not appear to object to producing all Form 3310.4s from the relevant time period.

consistent with the State's prior offers of compromise so long as Fleet Farm promptly produces complete A&D logs and all Form 3310.4s.[7]

### A.  Fleet Farm's Complete A&D Logs Are Relevant.

The State's allegations against Fleet Farm are based on Fleet Farm stores selling firearms despite suspicious signs of straw purchasing, including particular patterns of purchasing. Fleet Farm's A&D logs will demonstrate such patterns, including timing and quantities, for firearms Fleet Farm sold. Thus, Fleet Farm's A&D logs are directly relevant.

Fleet Farm's position that only multiple-firearm sales requiring Fleet Farm to complete a Form 3310.4 are relevant to the State's claims is exactly wrong.[8] The State alleges that Fleet Farm was negligent and otherwise liable *regardless* of whether Fleet Farm submitted Form 3310.4s to the ATF when required. Put another way, the State alleges that Fleet Farm should have detected and prevented firearm sales to straw purchasers even if submitting a Form 3310.4 was not required. For example, Form 3310.4 would not be required when sales took place over six or more days, were made at different Fleet Farm stores within a five-day period, or involved firearms other than pistols or revolvers.[9] The State alleges that Fleet Farm needed to do more than simply fill out the required paperwork

---

[7] The State also remains willing to minimize burden by handling the inspection and reproduction of these paper forms.

[8] Such a form is required for "all transactions in which an unlicensed person (i.e., non-FFL holder) acquired any combination of two or more pistols or revolvers totaling two or more at one time or during five consecutive business days." Ex. 24 (ATF Form 3310.4) at 2.

[9] Indeed, one of the two straw purchasers identified in the State's Complaint against Fleet Farm—Jerome Horton—did not limit his straw purchasing to pistols and revolvers. Compl., ECF No. 1.1, at 13-19 (alleging that Fleet Farm sold 24 firearms to Horton during a four-month period, including a rifle).

and then turn a blind eye. Accordingly, Fleet Farm should not be permitted to redact the content of A&D logs to only include sales requiring a Form 3310.4, as Fleet Farm seeks to do.

### B.   Producing Complete A&D Logs Is Proportional Given Their Relevance and Minimal Burden for Fleet Farm to Produce.

There is minimal burden for Fleet Farm to produce its A&D logs. Fleet Farm has told the State that the logs are electronic documents, which can easily be identified and produced. Fleet Farm has already created these logs—Fleet Farm can simply turn them over. Given the extreme relevance of the A&D logs and the minimal burden in producing complete logs, it is fully proportional for Fleet Farm to do so. *See* Fed. R. Civ. P. 26(b)(1).

The only theoretical burden in producing A&D logs comes from Fleet Farm's interest in redacting them. But Fleet Farm seeks to redact the logs not for any assertion of privilege but instead for relevance and privacy, which is unwarranted and unnecessary, as explained *infra*.

### C.   Fleet Farm Does Not Assert Any Privileges Warranting Redaction of A&D Logs.

Fleet Farm asserts no privileges that would warrant either withholding the A&D logs from production or redacting the logs. Instead, Fleet Farm resists production of complete A&D logs on the ground of purported "unique and substantial privacy interests implicated by Fleet Farm providing Plaintiff with documentation of thousands of law-abiding citizens' firearm purchases." Ex. 15 at 3. In support of this argument, Fleet Farm cited laws that may restrict certain retention of some data (*id*.), but none of these laws

support Fleet Farm's desire to withhold information Fleet Farm has in its possession from disclosure to the State in this case by redacting selected transactions from A&D logs.

Further, Fleet Farm's newfound privacy concern is adequately addressed by the protective order governing discovery in this action that the Court entered on August 21, 2023. ECF No. 49. Indeed, Fleet Farm and the State negotiated and fully agreed upon the terms of the Protective Order. *See* ECF Nos. 47 (Stipulation for Protective Order), 48 ([Proposed] Protective Order). Fleet Farm may designate A&D logs as confidential under the Protective Order. *See* ECF No. 49 at 2-3, ¶ 2. "A confidential document may be used only in, and for the purpose of, this action." *Id*. at 3, ¶ 3(a). Further, "[n]o person receiving a confidential document may reveal it, except to" limited and specified exceptions. *Id*. at 3, ¶ 3(b). Finally, the parties must return or destroy all confidential documents within 30 days after the termination of this action. *Id*. at 8, ¶ 8. There is no reason to expect the Attorney General's Office will not abide by these terms.

## II. FLEET FARM SHOULD BE COMPELLED TO PROVIDE ANSWERS TO INTERROGATORY NOS. 5, 7, 9, 12, 14, AND 15.

Defendants' Responses to Interrogatory Nos. 5, 7, 9, 12, 14, and 15 referring the State to "documents [Defendants] will be producing" do not comply with Federal Rule of Civil Procedure 33. Rule 33(d) allows a party to answer interrogatories via the production of business records but only if specific requirements are satisfied:

> Option to Produce Business Records. If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:

(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

(2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Fed. R. Civ. P. 33(d).

"To answer an interrogatory, a responding party has the duty to specify, by category and location, the records from which answers to interrogatories can be derived." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, No. 09-cv-1091 (JNE/JSM), 2012 WL 12895643, at *17 (D. Minn. Jan. 3, 2012). "Under the guise of Fed. R. Civ. P. 33(d) defendants may not simply refer generically to past or future production of documents. They must identify in their answers to the interrogatories specifically which documents contain the answer. Otherwise they must completely answer the interrogatories without referring to the documents." *Pulsecard, Inc. v. Discover Card Servs.*, 168 F.R.D. 295, 305 (D. Kan. 1996), *cited in Sylva Corp., Inc. v. Lewandowski*, No. 20-cv-184 (PJS/LIB), 2021 WL 5087267, at *7 (D. Minn. May 14, 2021), and *Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-cv-609, 2021 WL 5087362, at *6 (D. Minn. Jan. 5, 2021), and *Aviva Sports*, 2012 WL 12894846, at *10.

Numerous decisions from the District of Minnesota have granted motions to compel interrogatory answers when Rule 33(d) is not satisfied. Such decisions hold that "simply referring the interrogating party generally to large numbers of documents does not satisfy a party's obligations under Rule 33(d)" and that "[r]eferring to business records en masse, without specifying particular documents is an 'abuse of the option [provided by Rule

33(d)].'" *Speed RMG Partners*, 2021 WL 5087362, *6 (quoting *Schwendimann v. Arkwright Advanced Coating*, Inc., No. 11-820, 2015 WL 12781248, at *5 (D. Minn. Oct. 14, 2015)); *see also, e.g., Berry v. County*, No. 20-cv-2189 (WMW/JFD), 2023 WL 1777467, at *3–5 (D. Minn. Feb. 6, 2023) (granting motion to compel when defendants "did not specify the responsive documents in sufficient detail to enable Plaintiffs to locate and identify the documents as readily as the [defendant] could"); *Sylva Corp.*, 2021 WL 5087267, at *5–7 (holding that a party's agreement to produce certain documents and "purported innovation of Rule 33(d) is improper"); *Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, No. 9–cv–1091 (JNE/JSM), 2012 WL 12894846, *10 (D. Minn. May 11, 2012) (awarding sanctions for failure to answer an interrogatory under 33(d) and requiring a party to provide a narrative answer); *see also* Fed. R. Civ. P. 37(a)(3)(B)(iii) (providing that the Court may compel a discovery response if "a party fails to answer an interrogatory submitted under Rule 33").[10]

Here, despite purportedly answering in accordance with Rule 33(d), Fleet Farm has not specified records for two interrogatories—Nos. 7 and 12. Thus, Fleet Farm has not answered these interrogatories, let alone done so adequately, and should be compelled to do so immediately.

Fleet Farm's citation of documents for its other four interrogatory responses citing Rule 33(d)—Nos. 5, 9, 14, and 15—do not fare much better. The numerous documents Fleet Farm cited, including on multiple occasions, do not allow the state to ascertain the

---

[10] In response to Fleet Farm's request for authority supporting the State's position, the State provided all this authority to Fleet Farm five months ago. Ex. 8 at 1–2.

answers to the questions posed. For example, Interrogatory No. 5 asked about Fleet Farm's policies and procedures for firearms sales and straw purchasing and Fleet Farm's training of employees about these policies and procedures. Ex. 2 at 4. But the documents cited by Fleet Farm—PowerPoint presentations and other training documents—do not satisfy Rule 33(d) because the State is not able to ascertain when Fleet Farm trained employees and which employees were trained based on these citations without all of the information requested in this interrogatory. Moreover, Fleet Farm has now identified documents supposedly "responsive" to Interrogatory No. 5 on four different occasions, making it unclear when the State should supposedly be able to finally ascertain the answer to this interrogatory. *See* Exs. 19–22.

Likewise, Interrogatory No. 9 asked about when "Fleet Farm investigated or audited its employees' compliance with Fleet Farm policies and procedures." Ex. 2 at 5. Again, the random assortment of documents cited by Fleet Farm do not tell the State whether Fleet Farm has done any investigations or audits at all, let alone provide the information requested by the interrogatory including personnel, findings, and recommendations. Indeed, the documents Fleet Farm has identified with respect to Interrogatory No. 9 appear to relate primarily to Fleet Farm's actions regarding Horton and Elwood. Further, Fleet Farm has now identified documents supposedly "responsive" to Interrogatory No. 9 on three different occasions, also making it unclear when the State should supposedly be able to finally ascertain the answer to this interrogatory. *See* Exs. 19–21.

Accordingly, Fleet Farm should be compelled to promptly provide proper answers to Interrogatory Nos. 5, 7, 9, 12, 14, and 15 in accordance with Rule 33.

### III.   FLEET FARM SHOULD BE COMPELLED TO PROVIDE DISCOVERY FROM THE TIME PERIOD AFTER THE STATE BROUGHT THIS LAWSUIT ON OCTOBER 5, 2022.

The State's asserted claims against Fleet Farm are ongoing. There is no basis for Fleet Farm to manufacture the date of the State's complaint—which was filed nearly a year and a half ago—as a discovery cut-off date.

Indeed, even case law Fleet Farm has cited supports the State's proposition that "courts allow discovery of documents post-dating the filing of a complaint." *Ramos v. Banner Health*, No. 15-cv-2556, 2018 WL 4700707, at *3 (D. Colo Aug. 8, 2018). Likewise, *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc*., No. 15–cv–3183, 2016 WL 7042117, at *6 (D. Minn. July 25, 2016), does not support the position that discovery must be cut-off at the date of the complaint. Rather, this decision addressed a discovery dispute as to whether a party could "seek discovery of materials within the subject matter scope of relevance back to January 1, 2000, or only back to January 1, 2008." *Id.* Importantly, after deciding the appropriate start date, the Court ruled that the "temporal scope of relevance" would run "to the present"—precisely what the State seeks here. *Id.* at *7. Further, because the State asserts ongoing misconduct, the end date for responsive discovery must continue past the date of the Complaint.

The State understands that Fleet Farm's counsel cannot collect documents and ESI from Fleet Farm in perpetuity—that is why Courts schedule discovery end dates in lawsuits, which is August 2, 2024, in this case. Further, Fleet Farm is still in the process of producing documents and has a duty to supplement. To the extent Fleet Farm possesses

relevant documents and information from after the Complaint was filed, Fleet Farm should produce such documents and information.

Indeed, Fleet Farm has already produced documents from after the State filed this complaint such as licensing related documents. Fleet Farm should not be permitted to selectively produce documents Fleet Farm considers favorable or anodyne from after the lawsuit was filed while selectively withholding other documents.

## IV.    FLEET FARM SHOULD BE COMPELLED TO PRODUCE COMMUNICATIONS ABOUT THIS LAWSUIT (REQUEST FOR PRODUCTION NO. 30).

Internal Fleet Farm communications about this lawsuit are relevant and should be produced. These communications could "possibly bear[] on the claims or defenses" in this case by reflecting Fleet Farm employees' knowledge of the credibility of the State's allegations. *See Lynch*, 569 F. Supp. 3d at 963. Moreover, these communications could lead to the identification of valuable witnesses and additional evidence.

Just as the State is seeking other documents created on or after the filing of this action, the State seeks communications about the lawsuit because the Complaint alleges that Fleet Farm's "conduct is widespread and persistent, and has created, is creating, and will likely continue to create substantial ongoing harm to the State and its residents." ECF No. 1-1, Ex. A (Complaint) at 34. Because the State alleges that Fleet Farm's negligence in the sale of firearms is an ongoing problem, Fleet Farm's communications relating to the lawsuit are substantively related to the claims brought forth by the State, even though such communications, by definition, occurred after the State filed its Complaint. These types of communications might include, for example, documents complaining about the lawsuit or

speculating about the lawsuit's potential success or failure or documents discussing Fleet Farm's policies and procedures regarding straw purchasing in reference to the lawsuit. Therefore, the connection between Fleet Farm's internal communications about the lawsuit and the State's allegations about Fleet Farm's ongoing misconduct is more than sufficient to meet the State's burden of making a "threshold showing of relevance." *See Hofer*, 981 F.2d at 380.

Fleet Farm has not responded to the State's showing of relevance by arguing, let alone showing, that producing internal communications about this lawsuit would be overly burdensome or disproportionate to the State's claims. The scope of Request for Production No. 30 is proportional to the State's claims, and Fleet Farm should be compelled to produce all responsive internal communications about this lawsuit.

**V.   FLEET FARM SHOULD BE COMPELLED TO PRODUCE DOCUMENTS SUFFICIENT TO SHOW ITS LEGAL IDENTITY AND CORPORATE STRUCTURE (REQUEST FOR PRODUCTION NOS. 3 AND 4 AND INTERROGATORY NOS. 3 AND 4).**

Information and documents about Fleet Farm's corporate identity and structure are basic litigation information that Fleet Farm should produce. *See, e.g.*, *Burke v. Ability Ins. Co.*, 291 F.R.D. 343, 353 (D.S.D. 2013) (ordering corporate defendants to produce "documents that relate to defendants' business or corporate structure" as "relevant to this case as typical background discovery and to help establish the relationship between all defendants").

The State's Request for Production Nos. 3 and 4 merely seek the governing documents for the three Fleet Farm Defendants (No. 3) and organizational charts showing

the structure of the three Fleet Farm Defendants and related entities (No. 4(a) and (b)).[11]

These requests do not seek board minutes or confidential financial statements. Likewise, the State's Interrogatory Nos. 3 and 4 seek basic information about company relationships and organization. The State's need for this discovery is particularly acute in this case because Defendants are three related corporate entities with an unknown structural relationship amongst themselves and other Fleet Farm corporate entities. *See id.*

Furthermore, the State's Complaint alleges that "widespread and persistent" conduct by Fleet Farm in the negligent sale of firearms "has created, is creating, and will likely continue to create substantial ongoing harm to the State and its residents." ECF No. 1-1, Ex. A (Complaint) at 34. Thus, the State seeks injunctive relief to enjoin "Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota law[.]"). ECF No. 1-1, Ex. A (Complaint) at 36. For injunctive relief to be effective, the State must be able to correctly identify and bind those parties whose negligent actions would need to be enjoined. *See FTC v. Am. Future Sys.*, No. 2:20-CV-02266, 2022 WL 1437562, at *6 (E.D. Pa. Apr. 8, 2022) (finding that organizational discovery was "relevant to Plaintiffs' request for injunctive relief" and not unduly burdensome). This is a

---

[11] Fleet Farm has indicated it will produce "internal organizational charts for the three Fleet Farm entities named in the complaint," but has not yet done so to the State's knowledge. Ex. 18 at 2.

more-than-sufficient "threshold showing of relevance" warranting the State's discovery of Fleet Farm's legal identity and corporate structure. *See Hofer*, 981 F.2d at 380.

Instead of engaging with these relevance arguments, Fleet Farm has repeatedly sought to flip its burden to the State by continuing to ask the State to provide additional reasons that the discovery of Fleet Farm's legal identity and corporate structure is relevant. *See* Ex. 18 at 2 (returning to the conclusory argument that discovery of Fleet Farm's legal identity and corporate structure is not relevant). But it is Fleet Farm's burden, as the party resisting discovery, to show the information sought is unduly burdensome and disproportional to the needs of the case such that burden outweighs the relevancy of the information. *Lynch*, 569 F. Supp. 3d at 963. Given the relevancy of the requests to the State's petition for injunctive relief, documents showing Fleet Farm's legal identity and corporate structure are not disproportionate to the needs of the case.

Request for Production No. 3 and part (b) of Request for Production No. 4 ask for readily available documents that Fleet Farm likely maintains in the normal course of business. At the very least, there is almost no burden for Fleet Farm to produce a single document sufficient to show the legal identity of any of the three named defendants in this action (i.e., Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC), which Fleet Farm has yet to do. ECF No. 1-1, Ex. A (Complaint) at 3–4. Furthermore, it would be a minimal burden for Fleet Farm to search for and produce documents sufficient to show the existence of "parents, sisters, subsidiaries, divisions, affiliates, merged or acquired predecessors, successors, assumed names, or any other affiliated entity or component." This minimal burden is outweighed by the relevance of

identifying such parties in an action seeking injunctive relief to enjoin Fleet Farm's conduct causing ongoing harm in Minnesota.

Given Fleet Farm's insistence that the State has named the correct parties in the lawsuit,[12] it is reasonable to assume Fleet Farm has already done the work to identify and review any documents about legal identity and corporate structure. Therefore, there is almost no burden to produce such a limited scope of documents, and Fleet Farm should be compelled to respond to Request for Production No. 3 and part (b) of Request for Production No. 4.

## VI.   FLEET FARM SHOULD BE COMPELLED TO PROVIDE DISCOVERY ABOUT EMPLOYEE EVALUATIONS AND DISCIPLINE RELATED TO FIREARMS SALES (REQUEST FOR PRODUCTION NOS. 21 AND 22, INTERROGATORY NO. 8, AND RULE 30(B)(6) TOPIC NO. 4).

The Court should compel Fleet Farm to respond to Request for Production Nos. 21 and 22 and Interrogatory No. 8 because they seek information relevant to the claims in this lawsuit. Fleet Farm's disciplinary actions—or lack thereof—against employees for violations related to firearm sales are highly probative of a key issue in this action: the degree of care that Fleet Farm exercised toward its obligation to detect and prevent straw purchases of firearms. Ex. 13 at 11. Likewise, performance evaluations of Fleet Farm employees involved in the sale of firearms will demonstrate how Fleet Farm potentially rewarded these employees and Fleet Farm's knowledge of their practices and actions, including selling firearms to straw purchasers despite warning signs.

---

[12] Despite including the State's failure to join all necessary parties in the case as a defense (ECF No. 38 at 26), Fleet Farm has repeatedly conceded that the State has named the correct parties in this case. *See* Ex. 18 at 2; Ex. 3 at 8–9; Ex. 4 at 8–9.

Indeed, an email exchange included in Fleet Farm's limited production to date demonstrates how employee evaluations and disciplinary actions related to firearms sales are relevant. *See* Ex. 23. This email exchange discusses a Fleet Farm employee deliberately and knowingly assisting an illegal straw-purchase of a firearm. *Id.* Information about how Fleet Farm addressed the employee and conduct at issue would be relevant to the extent to which Fleet Farm permitted known employee misconduct enabling straw-purchasing to persist.

Moreover, Request for Production Nos. 21 and 22 are not overly broad. Request for Production No. 21 is narrowly tailored to disciplinary actions related to Minnesota firearm sales and the State has already offered to limit the scope of No. 22 to evaluations of employees who had been disciplined for actions related to firearms. The State has additionally proposed that Fleet Farm could provide such relevant discovery by instructing HR managers to provide narrative responses to Interrogatory Nos. 8 and 9. Ex. 17 at 5.

Fleet Farm's offered to limit Request for Production Nos. 21 and 22 to "any records reflecting 'disciplinary actions' relating to firearm sales of any individual Plaintiff identifies to Fleet Farm as potentially being relevant to its claims, as well as any corresponding performance evaluations." Ex. 18 at 3. But this offer inverts the rules of discovery by improperly placing the onus on the State to identify which employees may have misbehaved, when Fleet Farm is obviously in the best position to identify relevant individuals. This information is not readily available to the State but is easily accessible to Fleet Farm, weighing in the State's favor. *See* Fed. R. Civ. P. 26(b)(1) (explaining that

factors important to a court's proportionality analysis include "the parties' relative access to relevant information").

Fleet Farm's objections to Request for Production Nos. 21 and 22 are largely based on purported undue burden caused by supposed problems with the searchability of Fleet Farm's Human Resources database. Any burden, however, is due to Fleet Farm's poor recordkeeping, rather than the particulars of the requests, which the State has already agreed to narrow. Fleet Farm is "responsible for the creation of the conditions that contribute to the amount of work required to respond" to these requests. *Lynch*, 569 F. Supp. 3d at 964. As this Court noted in *Lynch*, allowing "a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules." *Id.* (quoting *Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73, 76 (D. Mass. 1976) (internal citation omitted)).[13] Further, Fleet Farm "is not a small business unfamiliar with the intricacies of litigation." *See Beseke v. Equifax Info. Servs., LLC*, No. 17-CV-4971 (DWF-KMM), 2018 WL 6040016, at *4 (D. Minn. Oct. 18, 2018) (denying Equifax's argument that its inadequate filing system created an undue burden, especially when Equifax was a sophisticated litigant). Fleet Farm's cumbersome HR database does not impose an undue

---

[13] *See also Batchelor v. City of Chicago*, No. 18-CV-8513, 2020 WL 13647794, at *9 (N.D. Ill. Nov. 17, 2020) ("Courts have rejected objections to voluminous productions based on unwieldy or disorganized storage and filing systems."); *Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 61 (D. Mass. 2005) ("[I]t is [defendant's] own record keeping policies which have contributed significantly to the burden imposed on it. Courts have been loathe to reward (and possibly encourage) poor record keeping by shielding companies with inefficient recording methods from discovery.").

burden and does not excuse Fleet Farm from producing discovery relevant to claims in this case.

## CONCLUSION

For the reasons demonstrated above, Fleet Farm should be compelled to produce documents responsive to Request for Production Nos. 3, 4, 6, 8, 21, 22, and 30, provide answers to Interrogatory Nos. 3, 4, 5, 7, 8, 9, 14, and 15, provide related Rule 30(b)(6) deposition testimony, and provide discovery from the time period after the State sued Fleet Farm. In accordance with Federal Rule of Civil Procedure 37(a)(5)(A), Defendants and their counsel should be ordered to pay the State's reasonable expenses incurred in making the motion, including attorney's fees.

Dated: February 27, 2024                    Respectfully submitted,

                                            **STATE OF MINNESOTA**

                                            KEITH ELLISON
                                            Attorney General
                                            State of Minnesota

                                            JAMES W. CANADAY (#030234X)
                                            Deputy Attorney General

                                            **/s/ Katherine A. Moerke**
                                            KATHERINE MOERKE (#0312277)
                                            ERIC J. MALONEY (#0396326)
                                            JASON PLEGGENKUHLE (#0391772)
                                            Assistant Attorneys General

                                            445 Minnesota Street, Suite 1200
                                            St. Paul, Minnesota 55101-2130
                                            katherine.moerke@ag.state.mn.us
                                            Telephone: (651) 728-7174

                                            **UNIVERSITY OF MINNESOTA GUN
                                            VIOLENCE PREVENTION CLINIC**

                                            MEGAN WALSH (#0394837)
                                            Special Assistant Attorney General

                                            ARIELLE HUGEL
                                            WILLIAM ROBERTS
                                            NICHOLAS TAYLOR
                                            Certified Student Attorneys

                                            University of Minnesota Law School
                                            190 Mondale Hall
                                            229 19th Avenue South
                                            Minneapolis, MN 55455
                                            Phone: 612-625-5515
                                            wals0270@umn.edu

                                            *Attorneys for State of Minnesota*