

Andrew Davis
DIRECT: 612.335.1556
OFFICE: 612.335.1500

Andrew.Davis@stinson.com

December 5, 2023

**<u>VIA EMAIL</u>**

| | |
|---|---|
| Katherine A. Moerke | Megan Walsh |
| Eric J. Maloney | Arielle Hugel |
| James W. Canaday | William Roberts |
| Jason T. Pleggenkuhle | Nick Taylor |
| Office of the Minnesota Attorney General | University of Minnesota Law School |
| 445 Minnesota Street, Suite 1200 | 190 Mondale Hall |
| St. Paul, MN 55101-2130 | 229 19th Avenue South |
| katherine.moerke@ag.state.mn.us | Minneapolis, MN 55455 |
| eric.maloney@ag.state.mn.us | wals0270@umn.edu |
| james.canaday@ag.state.mn.us | hugel004@umn.edu |
| jason.pleggenkuhle@ag.state.mn.us | robe2331@umn.edu |
| | tayl1110@umn.edu |

Re:     *State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD

Counsel,

On behalf of Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (together, "Fleet Farm"), I write in response to Plaintiff's November 17 and November 22, 2023 letters, which raise a number of items relating to Fleet Farm's August 21, 2023 discovery responses and the parties' ongoing discussions regarding the appropriate scope of production of ATF Form 4473s and 3310.4s. Of the times proposed in your November 22, 2023 letter, we are available to meet-and-confer regarding these items on December 20, at 3:00 p.m.

Before addressing the specific items raised in Plaintiff's letters, I first note that fact discovery in this case does not close until August 10, 2024—more than eight months from the date of this letter. *See* ECF Doc. 41 at 1. There is no substantial completion deadline in the scheduling order, and Plaintiff did not seek such a deadline. *See* ECF Doc. 39. Fleet Farm has been working diligently to investigate the claims in this case, gather the appropriate custodial files, and develop search terms to identify potentially responsive documents. Against this backdrop, there is no basis to suggest that Fleet Farm has been dilatory. If anything, Plaintiff's claimed delays in obtaining discovery are a direct result of its own inaction. Apart from two general issues raised in the parties' September and October 2023 letters (which are again addressed below), Plaintiff's November 22, 2023 letter is the first time Plaintiff has voiced any specific concerns with Fleet Farm's August 21, 2023 discovery responses. Having taken ***more than three months*** to enumerate specific concerns with Fleet Farm's discovery responses, any suggestion that Fleet Farm—and not Plaintiff—is responsible for any perceived delays in discovery is not well taken. Had Plaintiff raised its concerns


185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 2

in a timely manner, the parties could have met-and-conferred months ago, and no doubt would have made significant progress to address Plaintiff's concerns.

Likewise, it is peculiar to assert Fleet Farm soliciting input from Plaintiff regarding its planned search terms is a "deficienc[y]." *See* Pl.'s Nov. 22, 2023 Ltr. 1. The reason parties discuss search terms in the first instance is to minimize the risk of disputes later in the case and avoid burdening the Court. Again, as explained on multiple occasions, the Court's guidelines regarding electronic discovery explain that a party's "search methodology may benefit from input from one's opponent, and agreements on some or all of these issues can enhance efficiency and minimize disputes." Discussion of Electronic Discovery at Rule 26(f) Conference: A Guide for Practitioners, at 8 (Jan. 2021). Fleet Farm has separately responded to Plaintiff's suggested revisions and additions to the search terms, and has provided an updated list of search terms and an explanation of why Fleet Farm has incorporated some, but not all, of Plaintiff's proposed revisions and additions. Fleet Farm anticipates beginning its rolling production of documents by the end of December 2023.

Turning to the specific issues raised in Plaintiff's letters, we have attempted to address each issue in turn. Given the sheer number of issues raised in Plaintiff's letters, and the conclusory and circuitous manner in which those issues have been raised, it is difficult to determine whether we have addressed all of Plaintiff's concerns with Fleet Farm's discovery responses. If Plaintiff believes this letter does not address certain issues, please let us know by December 15, and we will be prepared to discuss those issues on December 20.

## I.     Plaintiff's General Concerns with Fleet Farm's Discovery Responses

Plaintiff's November 22, 2023 letter raises a handful of issues generally applicable to either Fleet Farm's discovery responses or the general process for discovery.

### A.     Date certain for document productions

As noted above, Fleet Farm will begin its rolling production of documents in January 2024, and will complete its production in accordance with the scheduling order. *See* ECF Doc. 41.

### B.     Production of documents "already in Plaintiff's possession, custody, or control"

Fleet Farm confirms it will produce all documents in its possession, custody, or control specified in its response to RFP Nos. 2, 5, 8, and 12: (1) non-privileged documents it may use to respond to Plaintiff's claims or in support of their defenses and which have not otherwise been produced by Fleet Farm, Plaintiff, or any third-party; (2) copies of its Minnesota stores' state and federal licenses (and supporting applications) to sell firearms for the years 2016 through 2023, including license renewals (and supporting applications); (3) certain ATF Form 4473s and 3310.4s (to be agreed upon) for firearm transactions during the defined time period; and (4) documents relating to Sarah Elwood's and/or Jerome Horton's purchase of firearms from its Minnesota stores.

### C.     Documents regarding non-Minnesota activity (General Objection No. 15)

Although Plaintiff purports to use its definition of "Minnesota Store" "to limit the scope of [its] discovery requests where applicable," Pl.'s Nov. 22, 2023 Ltr. 2, Plaintiff has only expressly limited the scope of ten RFPs to Minnesota (RFPs 5, 11, 15, and 21–27). But the complaint is unambiguous

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 3

that it concerns alleged conduct at Fleet Farm's Minnesota stores.  *See* ECF Doc. 1-1 ("Compl.") ¶ 13.  Accordingly, to the extent Fleet Farm believes other RFPs should be similarly limited to Minnesota, Fleet Farm has expressly noted that in its responses.  For example, whereas Fleet Farm has not limited its response to RFP No. 7 to only trace reports relating to Minnesota stores, it has limited its response to RFP No. 9 to, in relevant part, only communications with ATF regarding inspections or audits of Fleet Farm's Minnesota stores.

### D.    Fleet Farm's responses to Plaintiff's RFPs

Plaintiff contends it is not permissible to object to discovery for not being "reasonably calculated to lead to the discovery of admissible evidence," and that it does not know "whether Defendants have provided full and complete responses to its discovery requests."  Pl.'s Nov. 22, 2023 Ltr. 3.

***First***, Plaintiff is wrong to suggest it is improper to object to discovery for not being "reasonably calculated to lead to the discovery of admissible evidence."  True, the 2015 amendments to Rule 26 removed the "reasonably calculated" language, but numerous courts in the District of Minnesota continue to apply that language.  *E.g.*, *Schwab-Vollhaber-Lubratt, Inc. v. Carson Design & Mfg., Inc.*, 2022 WL 610967, at *1 (D. Minn. Feb. 2, 2022); *Yang v. Robert Half Int'l, Inc.*, 2021 WL 7909270, at *1 (D. Minn. Sept. 28, 2021); *Cardiovascular Sys., Inc v. Cardio Flow, Inc*, 2019 WL 10945114, at *2 (D. Minn. Nov. 11, 2019); *Elsherif v. Mayo Clinic*, 2019 WL 11901778, at *1 (D. Minn. July 19, 2019), *aff'd,* 2019 WL 11901771 (D. Minn. Aug. 28, 2019); *Beseke v. Equifax Info. Servs., LLC*, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018).

***Second***, in response to each RFP, Fleet Farm has specifically and unambiguously stated whether it will produce documents in response to the RFP, and, if applicable, the scope of documents it intends to produce.  If Plaintiff is confused about the scope of documents Fleet Farm has committed to produce in response to an RFP, please identify the RFP and specific confusion, and we will attempt to clarify.

### E.    Fleet Farm's invocation of Rule 33(d)

Fleet Farm's invocation of Rule 33(d) is well-trodden territory, and it is unclear what Plaintiff is asking in its November 22 letter.  Fleet Farm refers Plaintiff to its September 21 and October 3 letters for its position on this issue, and reiterates the invocation of Rule 33(d) was necessitated by Plaintiff's broad and unduly burdensome interrogatories, many of which are duplicative of RFPs and seek voluminous, itemized lists of broad categories of information.  In the spirit of compromise, Fleet Farm has already agreed to identify by Bates number the specific records Plaintiff should review to determine the answers to Interrogatory Nos. 7, 9, 12, and 14–15.  Fleet Farm will provide this information in the cover letter transmitting the productions containing the at-issue records, and those productions will occur in accordance with the scheduling order, as noted above.  *See* ECF Doc. 41.

As for Interrogatory Nos. 6, 11, and 13, again in the spirit of compromise, Fleet Farm will amend its responses in the manner discussed in section II.E below.

### F.    The relevant time period for discovery

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 4

The State's November 22 letter and prior correspondences relating to the time period for discovery conflate two issues: (1) defining the "relevant time period" for discovery; and (2) the parties' mutual supplementation obligations under Rule 26(e).  To be clear, irrespective of whether the relevant time period is defined as October 5, 2016 to October 5, 2022 (except where Plaintiff has elected to define the beginning of the relevant time period as January 1, 2017), or some other period, there is no dispute that Rule 26(e) imposes an obligation on both parties to supplement their discovery responses and document productions to the extent that, later in the litigation, they discover additional responsive documents *from the relevant time period*.

With this distinction in mind, it is crucial that both parties have a clear understanding of the relevant time period for discovery.  Courts recognize that, distinct from any supplementation obligations under Rule 26(e), the relevant time period should not be open-ended.  Instead, there should be a clear beginning *and end* to the relevant discovery period.  *E.g.*, *Ramos v. Banner Health*, 2018 WL 4700707, at *3 (D. Colo. Aug. 8, 2018); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 2016 WL 7042117, at *6 (D. Minn. July 25, 2016).  This is true in all cases, including those where the government alleges "ongoing conduct"—"some end date" to discovery "must be established; otherwise, discovery would never end."  *United States ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896, 906 (S.D. Ind. 2018).

To clarify, then, what is Plaintiff's position regarding the ***end date*** for the relevant time period for discovery?  As Plaintiff's November 22 letter recognized, Plaintiff's discovery requests defined the relevant time period as running "from October 5, 2016, ***through the date of your responses***, unless otherwise specifically indicated."  Fleet Farm's responses were served on August 21, 2023, so that would seemingly be Plaintiff's proposed "end date" for the relevant time period (which, again, is a distinct issue from the parties' mutual supplementation obligations).  Fleet Farm believes October 5, 2022, is the better end date for the relevant time period.  Defining the "end date" as the date the complaint was filed is consistent with the approach typically taken in litigation, and neither the complaint nor the record indicate Fleet Farm has engaged in any actions *after* the complaint was filed that are relevant to any claims or defenses.  Indeed, all of the purported straw purchases identified in the complaint occurred well before October 5, 2022.

Accordingly, Fleet Farm asks that Plaintiff either: (1) agree to define the "end date" for the relevant time period as October 5, 2022; or (2) provide the substantive rationale for why it believes the "end date" should either be August 21, 2023, or some other date.  Fleet Farm cannot meaningfully consider Plaintiff's position until the ambiguities regarding it have been clarified.

## II.    Plaintiff's Specific Concerns with Fleet Farm's Discovery Responses

For efficiency, Fleet Farm has organized Plaintiff's specific concerns with Fleet Farm's discovery responses into five categories.

### A.    Fleet Farm will only produce Form 4473s and 3310.4s with conceivable relevance to the claims in this case.

The scope of Fleet Farm's production of Form 4473s (and the corresponding Form 3310.4s) has been discussed in the parties' October 27, November 1, November 10, and November 17 correspondences.  In its November 10 letter, Fleet Farm explained the substantial burdens

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 5

associated with producing the approximately 150,000 Form 4473s maintained at its Minnesota retail stores reflecting transactions between January 1, 2017, and October 5, 2022, and that the vast majority of these forms have no conceivable relevance to the claims and defenses in this case. Fleet Farm then offered to produce all Form 4473s from this time period reflecting instances where an individual bought multiple handguns from one or more Fleet Farm retail stores in Minnesota within a five-business-day window. On November 17, Plaintiff rejected this proposal and proposed three alternatives: (1) allow Plaintiff to "inspect and scan Form 4473s at all individual Fleet Farm stores"; (2) produce "[a]ll Form 4473s for purchases where the same purchaser purchased multiple firearms from Fleet Farm retail stores from October 5, 2016 to the present"; or (3) "produce "[a]ll Form 4473s specifically identified by the State following the State's receipt and review of Fleet Farm's A&D logs." None of these proposals are workable.

To start, Plaintiff raises several arguments in its November 17 letter that are unsupported. Plaintiff begins its letter by stating it "anticipates that the workload of scanning these forms will not be onerous."[1] Pl.'s Nov. 17, 2023 Ltr. 1. Plaintiff does not recognize or respond to the fact that across Fleet Farm's 17 Minnesota retail stores, there are roughly 150,000 Form 4473s from the time period of January 1, 2017[2] through October 5, 2022—an average of roughly 9,000 forms per location. By any definition, the process of traveling to 17 separate locations throughout Minnesota and spending multiple days at each location carefully collecting, unstapling, scanning, and restapling more than one million pages of Form 4473s would be unduly burdensome, particularly given that—as discussed below—the vast majority are irrelevant to Plaintiff's claims.

Plaintiff also contends Fleet Farm's November 10 proposal would be insufficient because a five-day window for multiple purchases is purportedly too narrow, and Plaintiff contends long guns are "relevant to [its] claims." Pl.'s Nov. 17, 2023 Ltr. 3. The only support Plaintiff offers for its claim that a five-day window is too narrow is "some of the ATF Form 4473s for the straw purchasers identified in the State's complaint were for one-gun purchases for which Fleet Farm apparently did not complete a Form 3310.4." *Id.* As Plaintiff knows, Fleet Farm was not obligated to complete a Form 3310.4 for any of the purchases identified in Plaintiff's November 10 letter.[3] As for Plaintiff's

---

[1] Inexplicably, Plaintiff supports this argument by citing to a slide in a Fleet Farm presentation addressing "Old Files," seemingly suggesting this slide is indicative of the general volume and storage of Form 4473s. *See* Pl.'s Nov. 17, 2023 Ltr. 1–2 (citing FF_0000697). Plaintiff ignores that the prior slide in the same presentation, entitled "Main File," shows an entire file cabinet drawer of forms for the first ten months of 2019 alone. *See* FF_000000696. Plainly, any review and production of Form 4473s from Fleet Farm's Minnesota stores will be a time-consuming and cumbersome process.

[2] Plaintiff attempts to redefine the relevant time period for RFP Nos. 6 and 8 as commencing on October 5, 2016. *See* Pl.'s Nov. 17, 2023 Ltr. 3. These RFPs expressly define their relevant time period as beginning on January 1, 2017. Accordingly, Fleet Farm will not produce Form 4473s predating January 1, 2017.

[3] As the complaint makes clear, *see* Compl. ¶¶ 38, 54, the nine Form 4473s cited in Plaintiff's November 17 letter reflect purchases that did not involve multiple handguns and were *not* made within five business days of a previous handgun purchase from the same Fleet Farm store. *See* FF_0000034 (Elwood's June 20, 2020 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000246 (Horton's September 17, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000254 (Elwood's January 4, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000307 (Elwood's March 15, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000467 (Elwood's January 11, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000570 (Elwood's July 30, 2020 purchase of a single handgun from Fleet Farm's Brooklyn Parks store); FF_0000574 (Horton's September 18, 2021 purchase of a single handgun from Fleet Farm's

Katherine A. Moerke, et al.
December 5, 2023
Page 6

contention that long guns are "relevant to [its] claims," this is simply not true. Plaintiff appears to premise this contention entirely on the fact that "one of the firearms Fleet Farm sold to straw purchaser Gerome/Jerone [sic] Horton was a long gun." *Id.* Plaintiff does not respond to the fact that the complaint is focused exclusively on straw purchasing of **handguns**. *E.g.*, Compl. ¶¶ 1, 3–4, 25, 30–31, 35–37, 39, 41–42, 44–45, 47, 49, 55.

Turning to Plaintiff's alternative proposals, Fleet Farm appreciates Plaintiff's recognition of the burdensome nature of RFP No. 6, and of Form 4473s' limited relevance. *See* Pl.'s Nov. 17, 2023 Ltr. 3 (stating Form 4473s "on their own" "do not . . . indicate that the . . . ultimate buyers . . . were or were not law-abiding"). The forms' limited relevance confirms the necessity of crafting an appropriate protocol to gather and produce only those Form 4473s that may have conceivable relevance to Plaintiff's claims. None of Plaintiff's alternatively proposals are crafted with the necessary precision.

As for Plaintiff's offer to review and scan **all** Form 4473s themselves, this does not work because: (1) logistically, there is no good space within a Fleet Farm store (where the Form 4473s are required to be maintained) for Plaintiff to review and scan the Form 4473s; (2) Fleet Farm would need to incur significant expense by having an attorney on site to monitor Plaintiff's inspection and scanning process; (3) it would result in the production of countless irrelevant documents; and (4) it would compromise significant privacy interests by providing Plaintiff with additional documentation of tens of thousands of law-abiding citizens' firearm purchases over a nearly six-year period. Similarly, Plaintiff's offer to review Fleet Farm's A&D logs and then demand production of unspecified categories and quantities of Form 4473s would likely accomplish nothing more than delaying this dispute for several months, which will not be beneficial to either party.

Plaintiff's remaining proposal is to have Fleet Farm produce "[a]ll Form 4473s for purchases where the same purchaser purchased multiple firearms from Fleet Farm retail stores from October 5, 2016 to the present." Setting aside Plaintiff's attempt to rewrite the relevant time period for RFP No. 6, this proposal is untethered to the claims in this case and would be a fishing expedition. Plaintiff's case is about suspected straw purchasing—and specifically, suspected straw purchasing of multiple handguns. *E.g.*, Compl. ¶¶ 1, 3–4, 25, 30–31, 35–39, 41–42, 44–45, 47, 49, 55. But under this proposal, Fleet Farm would be obligated to produce, for example, Form 4473s for a law-abiding citizen who purchased a single handgun in January 2017, and then a single hunting rifle in September 2022. There is no conceivable basis for contending these types of transactions are indicative of a straw purchase, or are otherwise similar to transactions cited in the complaint.

As a general matter, Fleet Farm contests the appropriateness of using the aggregate number of firearms purchased by an individual over a multi-year period as a barometer for determining whether that individual may be a straw purchaser. That said, once again in the spirit of compromise, Fleet Farm is willing to produce all Form 4473s (and, where applicable, the corresponding Form

Blaine store); FF_0000614 (Elwood's May 1, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store); FF_0000713 (Horton's June 15, 2021 purchase of a single handgun from Fleet Farm's Brooklyn Park store).

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 7

3310.4s[4]) for purchasers who purchased thirteen or more handguns from one or more Fleet Farm store in Minnesota in the time period of January 1, 2017 through October 5, 2022. Because the complaint is focused on the conduct of Jerome Horton and Sarah Elwood—who purchased thirteen and twenty-four firearms, respectively, from Fleet Farm during the relevant time period, *see* Compl. ¶¶ 38, 54—Fleet Farm believes this proposal is a reasonable compromise that will provide Plaintiff with the Form 4473s (and 3310.4s) that have conceivable relevance to the actual claims in this case.

### B.    Fleet Farm has already agreed to respond to several of the RFPs and ROGs cited in Plaintiff's November 22 letter.

Plaintiff's November 22, 2023 letter raises concerns relating to certain discovery requests to which Fleet Farm has already agreed to respond in full.

- **FFL Licenses (RFP No. 5)**: Although this case is not about firearm licenses, Fleet Farm has agreed to produce copies of its Minnesota stores' state and federal licenses to sell firearms, any license renewals, and any corresponding applications for 2016 through 2023. To the extent "supporting materials" are materials included with a license or renewal application, they are encompassed by Fleet Farm's response. To the extent Plaintiff believes this response does not capture "supporting materials," please explain what Plaintiff believes constitute "supporting materials" to a license or renewal application and why Plaintiff believes such materials are relevant to the actual claims in this case.

- **Trace Reports (RFP No. 7)**: Plaintiff's assertion that Fleet Farm's response is limited to "one-sided requests from the ATF" is puzzling. Pl.'s Nov. 22, 2023 Ltr. 7. Fleet Farm has committed to produce "documents reflecting communications *between* [Fleet Farm] and ATF *relating to* requests that [Fleet Farm] run a trace on a specific firearm serial number during the defined time period." This commitment clearly encompasses all communications between Fleet Farm and ATF relating to trace reports, including, but not limited to, Fleet Farm's responses to trace requests.

- **Communications with Law Enforcement (RFP Nos. 9 through 11)**: Plaintiff's concern with Fleet Farm's response to RFPs seeking communications with law enforcement is also unclear. Plaintiff's November 22 letter contends communications with law enforcement are relevant if they relate to Fleet Farm's purported "awareness of the prevalence of sales to straw purchasers within its stores and potential red flags"—*i.e.*, communications relating to *firearm* transactions. Fleet Farm's responses are crystal clear: Fleet Farm is producing communications with law enforcement relating to its firearm sales practices or attempted or completed firearm transactions, firearm licenses and the renewal of the same, inspections or audits of Fleet Farm's Minnesota stores, and Fleet Farm's policies and procedures relating to firearm transactions.[5] These limitations are necessary because Fleet Farm does

---

[4] Plaintiff's November 17 letter also asks when Fleet Farm will produce its Form 3310.4s. *See* Pl.'s Nov. 17, 2023 Ltr. 1. As Plaintiff knows, Form 3310.4s are stored in hard copy alongside the applicable Form 4473s, so the applicable Form 3310.4s will be produced alongside the Form 4473s Fleet Farm is obligated to produce.

[5] Fleet Farm appreciates Plaintiff's offer to clarify the ambiguous phrase "Minnesota state or local law enforcement agency" during the meet-and-confer. *See* Pl.'s Nov. 22, 2023 Ltr. 8. Had Plaintiff clarified this phrase at any point in the past fourteen weeks, the parties would likely have already made significant progress in resolving this issue.

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 8

not just sell firearms, and communications with law enforcement unrelated to firearms have no relevance to the claims in this case, and certainly have no relevance to any purported "awareness of the prevalence of sales to straw purchasers" or "potential red flags." Pl.'s Nov. 22, 2023 Ltr. 8.

- **Fleet Farm's October 5, 2022 Public Statement (RFP Nos. 9, 17)**: Plaintiff sought all documents supporting or contradicting the statement that Fleet Farm was "told by [ATF] that our team members had 'done nothing wrong,'" including "any records of when and how *such statements*"—i.e., the ATF's statements—"were made." This request did not seek internal Fleet Farm communications regarding Fleet Farm's October 5, 2022 statement, it seeks only information about *ATF's* statements to Fleet Farm. Fleet Farm has agreed to produce documents reflecting communications with ATF regarding the October 10, 2021 shooting incident in St. Paul.

- **Witness Statements (RFP No. 29)**: Plaintiff sought all documents "relating to any statements taken from any witnesses relating to the incidents described in the State's complaint." To the extent any witness statements are in Fleet Farm's possession, they will necessarily be statements taken from Fleet Farm employees. Accordingly, subject to its asserted objections (including objections based on privilege and work product), Fleet Farm has agreed to produce "documents reflecting any interviews or statements taken from Fleet Farm employees relating to [the] firearm transactions described in Plaintiff's complaint." If Plaintiff believes there are additional categories of documents responsive to RFP No. 29 in Fleet Farm's possession, please specify those categories of documents and their purported relevance to the claims in this case.

- **Persons Overseeing Fleet Farm's Firearm Policies (ROG No. 2)**: Plaintiff now demands that Fleet Farm identify "all . . . employees and agents, including those outside of corporate leadership," that have "knowledge of *firearm* sales policies and procedures." Pl.'s Nov. 22, 2023 Ltr. 13 (cleaned up). But in relevant part, Interrogatory No. 2 seeks identification only of those individuals who had a role in "establishing, modifying, overseeing, and/or monitoring Fleet Farm's policies, procedures, or practices regarding firearm sales." The interrogatory does not ask for identification of all persons with *knowledge* of Fleet Farm's firearm sales policies, and those individuals who played a role in *establishing*, *modifying*, *overseeing*, and/or *monitoring* those policies are necessarily individuals in Fleet Farm's corporate leadership.

- **Persons to Whom Fleet Farm Declined to Sell Firearms (ROG No. 11)**: Interrogatory No. 11 seeks two broad categories of information: (1) every attempted firearm transaction that Fleet Farm "decided not to complete"; and (2) every person for whom Fleet Farm "has limited or ceased firearms sales in Minnesota." Both categories are wholly duplicative of RFP Nos. 23 and 24, to which Fleet Farm has already agreed to produce: (1) documents sufficient to identify instances in which an employee at a Minnesota store decided not to complete a firearm sale for reasons other than NICS sending a "Denied" message; and (2) documents reflecting the identities of persons to whom Fleet Farm has refused to sell firearms. Given Fleet Farm's diligence in monitoring for and restricting transactions from suspected straw purchasers or persons to whom it would otherwise be improper to sell a

Katherine A. Moerke, et al.
December 5, 2023
Page 9

firearm (*e.g.*, a potential customer who smells of alcohol), Fleet Farm anticipates the volume of information responsive to each category of information to be quite large, such that it would be overly burdensome and impractical for Fleet Farm to prepare a narrative response to Interrogatory No. 11. The section of Plaintiff's letter addressing Interrogatory No. 11 is titled "Fleet Farm's Communications with Law Enforcement," which suggests Plaintiff may be interested in different and more specific information in this interrogatory. If that is the case, please clarify the intended scope of Interrogatory No. 11, at which time Fleet Farm will assess whether it is feasible to prepare a narrative response, or whether it will remain necessary to invoke Rule 33(d) and identify the specific responsive documents in a forthcoming production.

**C.      Plaintiff has not—and cannot—explain why it is proper to seek discovery unrelated to Fleet Farm's handgun sales, policies, and procedures.**

Plaintiff's November 22 letter seeks to expand the scope of Fleet Farm's responses to myriad discovery requests to encompass documents and information unrelated to the subject matter of this case. Rule 26 is clear: "a party can only discover what is relevant to the ***actual*** claims or defenses that are at issue" in the case. *Rochester Drug Co-Op. v. Mylan Inc.*, 2022 WL 1598377, at *4 (D. Minn. May 20, 2022) (emphasis added); *see also, e.g.*, *Bepex Int'l, LLC v. Hosokawa Micron BV*, 2022 WL 3701406, at *2 (D. Minn. Feb. 8, 2022) (explaining the scope of discovery is limited to "only what is relevant to the actual claims or defenses that are at issue"). Put simply, relevancy is assessed "based on the claims asserted in the Complaint." *Rodriguez v. Riley*, 2020 WL 4747610, at *3 (D. Minn. Aug. 17, 2020). Accordingly, discovery unrelated to specific suspected straw purchasers, firearm transactions, firearm policies, firearm procedures, compliance with ATF guidelines, assistance with ATF firearm investigations, or communications regarding the same, is improper. Plaintiff's November 22 letter confirms the following discovery requests improperly seek information irrelevant to the claims or defenses at issue in this case:

- **Fleet Farm's General Corporate Structure (RFP Nos. 3 and 4; ROG Nos. 3 and 4)**: The only purported relevance for this information identified in Plaintiff's November 22 letter is understanding "how the hierarchical nature of Fleet Farm's management relates to oversight in the sale of firearms" and Fleet Farm's alleged "oversight in allowing straw purchases." Pl.'s Nov. 22 Ltr. 6, 13. This information is wholly captured by subpart (d) of Request for Production No. 4, which Fleet Farm responded to by referring Plaintiff to its response to Interrogatory No. 2.[6] The general organizational structure of Fleet Farm has no potential relevance to any of the claims or defenses in this case, and absent demonstrating such relevance, general corporate-structure discovery is improper. *E.g.*, *Crom, LLC v. Preload, LLC*, 2017 WL 2408126, at *2 (N.D. Fla. June 2, 2017); *Patient A v. Vt. Agency of Human Servs.*, 2016 WL 880036, at *2 (D. Vt. Mar. 1, 2016); *Sill v. State Farm Lloyds*, 2013 WL 12393984, at *9 (W.D. Tex. Apr. 8, 2013).

- **ATF Forms other than Forms 4473 and 3310.4 (RFP Nos. 6 and 8)**: The actual claims in this case concern only certain ATF Form 4473s and 3310.4s. These are the only forms

---

[6] In the spirit of compromise, Fleet Farm will amend its response to Interrogatory No. 2 to describe the hierarchical relationship between the identified individuals and job titles. *See* Pl.'s Nov. 22, 2023 Ltr. 6.

Katherine A. Moerke, et al.
December 5, 2023
Page 10

referenced in the complaint, and the only forms related to Fleet Farm's alleged conduct. *See* Compl. ¶¶ 21–22, 25–26, 30 & n.2, 52, 61. To the extent Plaintiff contends other forms are relevant, please identify those forms specifically and explain the basis for their purported relevance to the actual claims pleaded in this case.

- **Documents Related to Individual Straw Purchasers (RFP Nos. 12 through 14 and 18)**: Fleet Farm has agreed to produce all records relating to Sarah Elwood, Jerome Horton, Gabriel Lee Young-Duncan, Jeffrey Jackson, Geryiell Walker, and Wayne Danielson relating to any actual or attempted firearm transactions by those individuals from a Fleet Farm store in Minnesota. Plaintiff's November 22 letter provides no substantive explanation for why "communications related to those individuals" are relevant if they have no connection to firearms. *See* Pl.'s Nov. 22, 2023 Ltr. 8–9.

- **Fleet Farm's Data Retention Policies, Procedures, and Practices (RFP No. 16)**: Plaintiff asserts in conclusory terms that "[k]nowledge of [Fleet Farm's] data retention policies, procedures, and practices are sufficiently related to understanding their controls, policies, and oversight of the sale of firearms." Pl.'s Nov. 22, 2023 Ltr. 10. Plaintiff provides no explanation for how Fleet Farm's general data retention policies have any relevance to the *substance* of the actual claims in this case. As Fleet Farm's general retention policies are not at issue in this case, discovery into those policies is improper. *E.g.*, *Berry v. Cnty.*, 2023 WL 1777467, at *6 (D. Minn. Feb. 6, 2023); *Deneke v. Menard, Inc.*, 2022 WL 2237827, at *10 (D.S.D. June 22, 2022); *In re Jemsek Clinic, P.A.*, 2013 WL 3994666, at *7 (Bankr. W.D.N.C. Aug. 2, 2013); *In re Honeywell Int'l, Inc. Secs. Litig.*, 230 F.R.D. 293, 302 (S.D.N.Y. 2003). Indeed, the only recordings with any plausible relevance to the claims in this case are Fleet Farm's video recordings of firearm transactions, which is why Fleet Farm has agreed to detail its video-retention policy. *See infra* § II.E.

- **Training Policies (RFP Nos. 19, 20, and 28)**: As to RFP Nos. 19 and 20, Plaintiff offers no substantive support for the conclusory statement that training "outside the context of firearms transactions is wholly relevant to the claims and defenses in this lawsuit." Pl.'s Nov. 22, 2023 Ltr. 10. Fleet Farm has agreed to produce all "internal training materials related to firearm transactions that were used or in effect during the defined time period." This response is appropriate in scope, given that this case concerns "Fleet Farm's training" of its employees to recognize potential "warning signs of straw purchasing." Compl. ¶ 36. To the extent Plaintiff believes trainings unrelated to firearms are somehow relevant to the actual claims in this case, please identify the non-firearm trainings Plaintiff believes are relevant and explain the substantive basis for that belief. As to RFP No. 28, Fleet Farm's "understanding of its obligations to comply with federal and state law, cooperate with law enforcement, and report suspicious activity" *related to firearm transactions* will be reflected in its firearm training policies. *See* Pl.'s Nov. 22, 2023 Ltr. 10. To the extent RFP No. 28 seeks information regarding purported obligations unrelated to firearm transactions, Plaintiff has proffered no explanation for how such information is purportedly relevant to the actual claims in this case.

- **Internal Communications regarding the Litigation (RFP No. 30)**: Again here, Plaintiff offers no substantive support for its conclusory assertion that RFP No. 30 is "intimately

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 11

relevant to the lawsuit." Pl.'s Nov. 22, 2023 Ltr. 5. To the extent Fleet Farm personnel communicated about the fact of the litigation, rather than the substance of the litigation, such communications do not appear to have any relevance to the actual claims in this litigation. Please provide a substantive explanation for why Plaintiff believes "communications made or received by any Fleet Farm employees . . . regarding this lawsuit" not otherwise responsive to Plaintiff's RFPs are relevant.

- **Insurance Policies (RFP No. 31)**: Fleet Farm's understanding is that it does not have any insurance policies applicable to this action.

**D.      Fleet Farm will not produce employee evaluations given the undue burden associated with such productions.**

Fleet Farm objected to RFP Nos. 21 and 22 and ROG Nos. 8 and 9, in relevant part, on the basis that they are overly broad, overly burdensome, and seek irrelevant information. Plaintiff's November 22 letter does not explain with any specificity why disciplinary actions relating to the sale of firearms is relevant to the claims in this case, let alone why "*all* documents related to *any* Fleet Farm [personnel]" against whom disciplinary action was taken are relevant. Likewise, Plaintiff's letter does not meaningfully explain the purported relevance of "*all* documents related to the performance evaluations or promotions of Fleet Farm [personnel]" involved in firearm sales. Moreover, the phrase "related to the sale of firearms" is vague and ambiguous because a significant number of employees at each Fleet Farm store could be considered to have a job "related to the sale of firearms." For example, it is unclear from Plaintiff's request whether an employee who occasionally helps unload firearms or who is working the checkout counter when an individual purchases a firearm would be considered to have a job "related to the sale of firearms." And practically, even if Plaintiff made a valid relevancy showing, it is not possible for Fleet Farm to obtain such documents without an undue burden. Fleet Farm's HR documents, including employee evaluations, have been digitized (with many of the digital records being scans of hard-copy files), and the Ulti-Pro software that Fleet Farm utilizes has very limited search functionality. Most critically, Fleet Farm cannot search its records by keyword, and with limited, inapplicable exceptions[7] cannot filter the records by employee type. Put simply, Fleet Farm is not able to search its records to isolate employees responsible for, or disciplinary actions related to, firearm sales. Accordingly, to obtain the records sought by these discovery requests, Fleet Farm would need to manually review the entirety of every single current and former employee file over a six-year time period to isolate files that contain records relating to firearm-related disciplinary issues. By any definition, this process would impose an undue burden.

**E.      In the spirit of compromise, Fleet Farm will amend its responses to certain discovery requests.**

In the spirit of compromise, Fleet Farm will amend its responses to the following Requests for Production:

- **Request for Production No. 26**: After Fleet Farm produces documents sufficient to ascertain the identities of persons it has identified as suspected straw purchasers of firearms

---

[7] Fleet Farm can search its records by certain broad parameters, such as full-time/part-time or active/inactive.

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 12

and/or reported to ATF, Fleet Farm is willing to meet-and-confer with Plaintiff to discuss whether, and the extent to which and reason(s) why, Plaintiff believes any of these individuals are relevant to Plaintiff's claims, and whether targeted searches are warranted to identify additional internal communications (if any) discussing them.

- **Request for Production No. 27**:  Although Fleet Farm believes the scope of this Request is captured by Request for Production Nos. 7 through 10, to clarify, Fleet Farm will search for internal communications regarding any "closing conference," "discipline," or "audits" by ATF relating to its Minnesota stores' firearm transactions and related policies and procedures.

Turning to Plaintiff's interrogatories, for the reasons described above and in prior letters, a number of these are incredibly broad, such that Fleet Farm cannot reasonably prepare narrative responses. But in the spirit of compromise, in addition to the previously discussed amendment to its response to Interrogatory No. 2, Fleet Farm will amend its responses to Interrogatory Nos. 6, 11, and 13 as follows:

- **Interrogatory No. 6**:  Fleet Farm will amend its response to Interrogatory No. 6 to provide a list of Fleet Farm personnel who have "had contact or communication" with Jerome Horton, Gabriel Lee Young-Duncan, Sarah Elwood, Jeffrey Jackson, or Geryiell Walker.

- **Interrogatory No. 13**:  Fleet Farm will amend its response to Interrogatory No. 13 to detail the typical surveillance utilized at Fleet Farm's Minnesota stores and explain the general retention period for video surveillance in Fleet Farm's retail stores.

*       *       *

We look forward to discussing these items with you in more detail on December 20.  In light of the above responses, the number of issues raised, and in order to make a meet and confer as efficient as possible, following your review of this letter, we would appreciate if Plaintiff would identify in writing the specific issues it believes remain in dispute in advance of December 20.

185882044

Katherine A. Moerke, et al.
December 5, 2023
Page 13

Sincerely,

**Stinson LLP**

Andrew W. Davis

cc:     Todd Noteboom
        Andrew Leiendecker
        Zachary Hemenway
        Courtney Harrison
        Zachary Wright

185882044