## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>        Plaintiff,<br><br>   v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>        Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**FIRST AMENDED COMPLAINT** |

The State of Minnesota, by its Attorney General, Keith Ellison, brings this civil action to protect the public from Fleet Farm's illegal and negligent sale of firearms to straw purchasers, through which Fleet Farm aided and abetted criminals and contributed to gun trafficking in Minnesota.

## INTRODUCTION

1.      As gun trafficking and gun violence surged in Minnesota during the pandemic, firearms dealer Fleet Farm repeatedly sold handguns to straw purchasers—people who illegally purchase guns for others who cannot legally obtain them.  Fleet Farm sold at least 37 firearms to two straw purchasers over the course of 16 months.

2.      One of these guns was fired in a large-scale shootout in a St. Paul bar on October 10, 2021, that ended in the death of a 27-year-old woman and multiple injured and traumatized bystanders. Another gun Fleet Farm sold to this same straw purchaser was found by a six-year-old boy in front of his family's house on September 6, 2021, where the gun was likely discarded by suspects fleeing from another public shooting incident.  At least five more firearms that Fleet Farm sold to straw purchasers have been recovered from people who are not permitted to have them.

Most of the guns Fleet Farm sold to straw purchasers remain unrecovered, and these guns continue to pose an ongoing threat to the health and safety of Minnesotans.

3.     These straw purchasers used Minnesota firearms dealers to fuel their separate yet equally pernicious gun trafficking schemes.  These straw purchasers secured sought-after handguns from careless dealers like Fleet Farm and then resold those weapons to known criminals and into the black market.  Fleet Farm stood by and accepted the straw purchasers' money as they bought more and more weapons from Fleet Farm stores.

4.     Fleet Farm repeatedly sold multiple handguns to straw purchasers in single transactions or in multiple sales over very short periods of time.  By turning a blind eye to the flagrantly suspicious circumstances of the purchases made by straw purchasers, Fleet Farm violated federal and state laws and regulations.  Because Fleet Farm knew or consciously avoided knowing that these individuals were straw purchasing firearms, Fleet Farm aided and abetted their illegal and criminal conduct.

5.     Some of the harm resulting from Fleet Farm's negligence is already known.  In addition to the gun fired in the October 10, 2021, St. Paul shootout and the gun found by a young boy in his front yard on September 6, 2021, several more guns sold by Fleet Farm to these straw purchasers ended up at crime scenes and were recovered from persons legally prohibited from possessing firearms.  Still, most guns remain unaccounted for.  Fleet Farm's negligence has contributed, and will continue to contribute, to the irreparable harm to the health and well-being of Minnesotans caused by the ongoing gun trafficking crisis.

6.     The State of Minnesota, by its Attorney General, Keith Ellison, brings this civil enforcement action to stop Fleet Farm's unlawful practices, enforce Minnesota law, and hold Fleet Farm accountable for the harm its conduct has caused Minnesota.

2

**PARTIES**

7.      Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8 and has common law authority, including *parens patriae* authority, to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota's laws.

8.      Defendant Fleet Farm LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin.  Fleet Farm LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117.  According to federal court filings, Fleet Farm LLC is wholly owned by Fleet Farm Group, LLC.  In turn, Fleet Farm Group, LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is wholly owned by Fleet Farm Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.—a publicly traded private equity and investment banking firm.  Fleet Farm LLC was formerly known as Mills Fleet Farm LLC until its name was changed in February 2019.

9.      Defendant Fleet Farm Group LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin.  Fleet Farm Group LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117.  Fleet Farm Group LLC owns Fleet Farm LLC and, in Minnesota tax court records, Fleet Farm Group LLC held itself out as the tenant at the property addresses of the Fleet Farm stores in Brooklyn Park, Cambridge, Owatonna, Mankato, Hermantown, Blaine, Baxter, Willmar, Alexandria, Lakeville, Rochester, Oakdale, and Winona.  According to federal court filings, Fleet Farm Group LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is wholly

3

owned by Fleet Farm Holdco LLC, which is majority owned, indirectly, by investment vehicles managed by one or more subsidiaries of KKR & Co. Inc.—a publicly traded private equity and investment banking firm.  Fleet Farm Group LLC was formerly known as Mills Fleet Farm Group LLC until its name was changed in January 2019.

10.     Defendant Fleet Farm Wholesale Supply Co. LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin.  Fleet Farm Wholesale Supply Co. LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117.

11.     Fleet Farm Wholesale Supply Co. LLC is the named holder of all of Fleet Farm's federal firearms licenses in Minnesota.  Fleet Farm Wholesale Supply Co. LLC was formerly known as Fleet Wholesale Supply Co. LLC until its name was changed in February 2019.

12.     Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC will be collectively referred to as "Fleet Farm" or "Defendants" in this Complaint.

13.     Fleet Farm store locations in Minnesota hold the following FFL licenses authorizing their sales of firearms:

| Store City | Store Street Address | FFL Number |
|---|---|---|
| Alexandria | 310 50th Avenue West | 3-41-041-01-4F-08857 |
| Baxter | 14114 Dellwood Drive | 3-41-035-01-3H-19223 |
| Blaine | 10250 Lexington Avenue Northeast | 3-41-003-01-3G-02607 |
| Brooklyn Park | 8400 Lakeland Avenue North | 3-41-053-01-4C-20315 |
| Cambridge | 2324 Third Avenue Northeast | 3-41-059-01-2H-04306 |
| Carver | 1935 Levi Griffin Road | 3-41-091-01-4E-03811 |
| Fergus Falls | 2002 West Lincoln Avenue | 3-41-111-01-4F-08858 |
| Hastings | 875 General Sieben Drive | 3-41-037-01-5H-06640 |
| Hermantown | 4165 Loberg Avenue | 3-41-137-01-2G-05118 |
| Lakeville | 17070 Kenrick Avenue | 3-41-037-01-3F-21947 |
| Mankato | 1850 Premier Drive | 3-41-013-01-4D-04758 |
| Monticello | 320 Chelsea Road | 3-41-171-01-3G-05380 |
| Oakdale | 5635 Hadley Avenue North | 3-41-163-01-4L-34573 |
| Owatonna | 2121 West Bridge Street | 3-41-147-01-5A-01147 |

| Store City | Store Street Address | FFL Number |
|---|---|---|
| Rochester | 4891 Maine Avenue Southeast | 3-41-109-01-4A-16824 |
| Waite Park | 2630 Division Street | 3-41-145-01-4K-15235 |
| Winona | 920 East Highway 61 | 3-41-169-01-4F-22570 |

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to Minnesota

Statutes section 8.01 and common law, including the State's *parens patriae* authority.

15.     This Court has personal jurisdiction over Defendants because Defendants own and

use property in Minnesota, have purposefully and knowingly transacted business in Minnesota and

with Minnesota residents, and have committed acts in Minnesota causing injury to the Minnesota

public and in violation of Minnesota law.

16.     On October 5, 2022, the State of Minnesota brought this action in Minnesota State

Court. On October 26, 2022, Defendants removed this action to federal court. On November 7,

2022, the State moved to remand this action to Minnesota State Court. On June 27, 2023, the Court

denied the motion to remand and held "that this case falls under the small subset of cases where a

federal issue is so pervasively involved in the Complaint as to justify federal jurisdiction." Mem.

Op. & Order, ECF No. 36.

## FACTUAL ALLEGATIONS

### I.     AS LICENSED FEDERAL FIREARMS DEALERS, FLEET FARM STORES HAVE A DUTY UNDER MINNESOTA AND FEDERAL LAW TO PREVENT UNLAWFUL GUN PURCHASES.

17.     As licensed firearms dealers, Defendants have each violated, assisted the violation

of, and aided and abetted violations of firearm laws and regulations.

18.     Federal laws and regulations closely regulate commercial sales of firearms.  The

federal Gun Control Act of 1968 (18 U.S.C. §§ 921–931) created a nationwide licensing scheme

for firearm dealers.  The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is the

federal agency charged with enforcing these dealer-license provisions. Under the federal Gun Control Act, persons wishing to engage in the manufacturing, importing, or dealing in firearms must first obtain a license and become a federal firearms licensee ("FFL"), as Fleet Farm retail stores have done. A person is categorically prohibited from "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a federal firearms license. 18 U.S.C. §§ 922(a)(1), 923(a).

19.     Federal firearms laws carry a purpose: to prevent crime by keeping guns out of the hands of certain persons who have a heightened risk of misusing firearms, such as minors, persons with felony convictions, and domestic abusers. *See generally* 18 U.S.C. § 921 *et seq.* The Minnesota Gun Control Act also reflects this purpose, as it establishes categories of persons who are prohibited from possessing firearms (Minn. Stat. § 624.713) and requires purchasers to obtain a Minnesota permit—including a separate state-mandated background check—before buying a pistol or semiautomatic military-style assault weapon ("SAMSAW") from a firearms dealer (Minn. Stat. § 624.7131).

20.     Congress designed federal law to achieve this aim by channeling firearms commerce through firearms dealers. Regulating the distribution of firearms is intended to prevent trafficking and reduce access to firearms by persons prohibited from possessing them. Gun dealers and manufacturers are trained on how to spot traffickers and straw purchasers through multiple publications and programs sponsored by the ATF and the gun industry, including the "Don't Lie for the Other Guy" program, newsletters, reference guides, regulatory updates, and ATF seminars.

21.     Before transferring a firearm to any person who is not a licensed dealer, all firearms dealers, including Fleet Farm, must conduct a background check, examine the individual's

identification, and record the transaction on a firearms transaction record ("ATF Form 4473").  *See* 18 U.S.C. § 922(t)(1), 27 C.F.R. §§ 478.102, 478.124(a).

22.     Before completing a purchase of a firearm from all firearms dealers, including Fleet Farm, a buyer must fill out ATF Form 4473, which asks the following question with the following bolded warning:

> Are you the actual transferee/buyer of the firearm(s) listed on this form?  **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person.  If you are not the actual transferee/buyer, the dealer cannot transfer the firearm(s) to you.**

This warning puts the buyer on notice: the buyer is prohibited from buying a firearm on someone else's behalf while falsely claiming that the firearm is for the buyer—otherwise known as a straw purchase.  On ATF Form 4473, the buyer must certify that their answers on the form are true, correct, and complete.  The buyer violates federal law by filling out the form inaccurately.

23.     Congress strengthened federal prohibitions on straw purchasing by passing the Bipartisan Safer Communities Act in June 2022, which explicitly criminalizes straw purchasing in which any person knowingly purchases, or conspires to purchase, a firearm at the request or demand of another person, knowing or having reasonable cause to believe that the other person (or the ultimate end user) is ineligible to possess the firearm or intends to use the firearm to commit a felony, terrorism, or drug trafficking.  *See* 18 U.S.C. § 932(b).

24.     Minnesota law echoes this prohibition on straw purchasing.  In 2015, the Minnesota Gun Control Act was amended to include a new section explicitly criminalizing straw purchases:

> Any person who purchases or otherwise obtains a firearm on behalf of or for transfer to a person known to be ineligible to possess or purchase a firearm pursuant to federal or state law is guilty of a gross misdemeanor.

Minn. Stat. § 624.7133; *see also* Minn. Stat. § 624.7132, subd. 15(a)(4) (providing that a person who "makes a false statement in order to become a transferee of a pistol or [SAMSAW] knowing or having reason to know the statement is false" is guilty of a gross misdemeanor).

25.     Straw purchasers commonly falsely certify on ATF Form 4473 that they are purchasing firearms for themselves.  In addition to the information provided by purchasers on the form, there are red flags that indicate a straw purchase to firearms dealers, including the following:

- Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;

- Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns;

- Purchasing firearms with cash;

- The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;

- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;

- The buyer does not keep the firearms in their residence for their own use; and

- A short "time to crime"—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime.  The ATF has noted that the recovery of a crime gun within three years of its initial purchase "is considered a short time-to-crime and a significant trafficking indicator" that "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[1]

26.     Firearms dealers, including Fleet Farm, can refuse to sell a firearm to any buyer for nearly any reason, and a firearms dealer is prohibited from completing the sale if the dealer knows or *has reason to know* that the ATF Form 4473 is inaccurate.  Firearms dealers must also certify

---

[1] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives* (July 2004) (quotation omitted), *available at* https://perma.cc/B6AH-3FG6.

on the form that it is their "belief that it is not unlawful [ ] to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A."

27.     ATF Form 4473 makes clear that all firearms dealers must do more than simply run a background check.   The notices and instructions on the form explain that "[t]he transferor/firearms dealer of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction."   The form also explains that a gun dealer "must stop the transaction if there is reasonable cause to believe that the transferee/buyer is prohibited from receiving or possessing a firearm[.]"   The form contains a clear admonition:

> c, or d.  **Warning:** Any person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, 18 U.S.C. 922(d), even if the transferor/seller has complied with the Federal background check requirements.

28.     The Bipartisan Safer Communities Act reinforces this restriction by further prohibiting the transfer of a firearm if the firearms dealer knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony under federal law.  *See* 18 U.S.C. § 933(a)(1).

29.     Similarly, Minnesota law creates potential criminal liability for firearms dealers that have reason to believe they are selling to a straw purchaser.  Specifically, Minnesota Statutes section 624.7132, subdivision 15(a)(2) provides that a person is guilty of a gross misdemeanor if they transfer a pistol or SAMSAW weapon "to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement."

30.     Federal law regards the purchase of more than one handgun in a short period as a potential indication that the purchaser could be involved in trafficking.  Therefore, to monitor and

deter handgun trafficking, federal law requires a firearms dealer to report all transactions in which an unlicensed buyer purchases two or more handguns within five business days on ATF Form 3310.4. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a. Firearms dealers must transmit one copy of Form 3310.4 to the ATF, send another copy to a local law enforcement official (Chief Local Law Enforcement Official or "CLEO") designated to receive the form,[2] and then retain one copy of the ATF 3310.4 form and attach it to the ATF Form 4473 related to the firearms sale. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a.

31.     Federal rules require all firearms dealers to keep a record of all transactions with unlicensed persons in an acquisition and disposition book. 27 C.F.R. §§ 478.123(b), 478.125(e). A firearms dealer violates federal law by knowingly making false statements or misrepresentations, failing to make appropriate entries in, or failing to properly maintain, acquisition and disposition records, firearms transaction records, or reports of multiple sales of handguns. 18 U.S.C. §§ 922(m), 924(a)(3); *see also* 18 U.S.C. § 924(a)(1)(A).

32.     Federal law also enlists dealers and manufacturers in working to detect illegal transactions and trafficking after a firearm is used unlawfully. When a law enforcement agency recovers a firearm at a crime scene or in the course of a criminal investigation, the agency may request a trace report from ATF's National Tracing Center. The ATF represents that "[f]irearms tracing is only conducted at the request of a law enforcement agency engaged in a bona fide criminal investigation where a firearm has been used or is suspected to have been used in a crime."[3]

---

[2] The CLEO must destroy the ATF Form 3310.4 within 20 days of receipt and certify in writing to the ATF every six months that these forms were not disclosed and were properly destroyed. *See* 18 U.S.C. § 923(g)(3)(B).

[3] Bureau of Alcohol, Tobacco, Firearms, and Explosvies, *Firearms Trace Data – 2019*, https://perma.cc/P8P3-BGYS.

The National Tracing Center tracks the path of the firearm from its manufacturer through the distribution chain to the last retail sale transaction between a firearms dealer and purchaser. Because firearms dealers must provide information from their records about crime guns that the firearms dealer manufactured, distributed, or sold, *see* 18 U.S.C. § 923(g)(7); 27 C.F.R. § 478.25a, firearms dealers are on notice of which transactions, types of guns, and purchasers are potentially involved in criminal activity.

33.     Firearms dealers are required to know the federal firearms laws and regulations. ATF agents review the applicable laws and regulations with firearms dealers when they initially receive their license and during ATF audits.  At the conclusion of an audit, the ATF requires firearms dealers to certify acknowledgement of federal laws and regulations.  The acknowledgement form includes certification that the firearms dealer has reviewed laws and regulations regarding all of the following: (i) completing and maintaining firearm transaction records; (ii) conducting transfers between firearms dealers; (iii) engaging in the business of firearms dealing; and (iv) straw purchasing.

II.    **FLEET FARM KNEW OR SHOULD HAVE KNOWN IT WAS SELLING TO STRAW PURCHASERS WHO TRAFFICKED DOZENS OF FIREARMS, SOME OF WHICH HAVE BEEN USED TO INJURE MINNESOTANS AND MOST OF WHICH REMAIN UNRECOVERED.**

   A.    **Fleet Farm Is Owned by a Private Equity Firm and Operates Several Stores in Minnesota That Sell Firearms.**

34.     Fleet Farm is a retail store chain with 17 locations[4] in Minnesota that sell firearms and ammunition to the public.  Fleet Farm is headquartered in Wisconsin and operates stores throughout the upper Midwest.  Fleet Farm was founded by Minnesota natives Stewart Mills Sr., and his two sons as Fleet Wholesale Supply in 1955 in Marshfield, Wisconsin, and soon changed its name to Mills Fleet Farm as the chain expanded into Minnesota and throughout the upper

---

[4] Fleet Farm recently opened its 17th Minnesota store in Hastings on September 9, 2022.

Midwest.  Mills Fleet Farm was family owned until 2016, when it was sold to a private equity firm for a reported $1.2 billion.[5]  Fleet Farm dropped the "Mills" family name entirely in 2018.[6]

35.     Fleet Farm stores sell handguns, rifles, and shotguns, and also sell many varieties of ammunition for these firearms.  On its website, Fleet Farm lists 235 different handgun models for sale, including 130 different models of semi-automatic pistols and 125 different 9mm handgun models.

36.     As alleged above, every Fleet Farm retail store location in Minnesota holds an FFL license authorizing Fleet Farm's sale of firearms.  Fleet Farm has failed to meet its duties and obligations under federal and state law and regulations by selling numerous firearms to straw purchasers.  In doing so, Fleet Farm has disregarded well known and blatant warning signs of straw purchasing, including the following:  (1) multiple purchases of similar handguns (especially 9mm caliber); (2) buying sprees over concentrated periods of time; and (3) staggered visits to different Fleet Farm locations to elude multiple-sale reporting requirements.  These are all hallmark "red flags" of illegal gun trafficking by straw purchasers.  Nevertheless, Fleet Farm continued to engage in straw purchase transactions even though Fleet Farm knew, or should have known, based on the circumstances of these transactions and Fleet Farm's training, that these customers were not making bona fide purchases for themselves.  In doing so, Fleet Farm has profited from the unlawful sale of firearms to sham purchasers who then transferred these weapons to criminals and other prohibited and dangerous persons.

---

[5]  Pitchbook, *KKR closes challenging $1.2B Mills Fleet Farm deal* (Mar. 1, 2016), https://perma.cc/3ZWM-XS7F.

[6]  Archer Parquette, *The Real Story Behind Mills Fleet Farm and Blain's Farm & Fleet*, Milwaukee Magazine (July 19, 2022), https://perma.cc/M2FB-DFVL

B.   **Fleet Farm Sold 24 Firearms to Straw Purchaser Jerome Horton During a Four-Month Period in 2021, and These Firearms Caused Harm in the Wrong Hands.**

37.   From June 2021 through October 2021, Jerome Horton purchased 33 firearms from federally licensed firearm dealers in the Twin Cities area.   Affidavit of Special Agent Kylie Williamson, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). Horton resold several of the firearms he purchased to different people, and further claimed that some of his other purchased firearms were stolen from his stash location near a St. Paul strip club. *Id.*   Horton also tried to sell semiautomatic handguns with high-capacity magazines that could fit more than 15 rounds of ammunition in a clip.   Plea Agreement at 2, Dkt. No. 23, *United States v. Horton*, Case No. 22-CR-00006 (D. Minn. Mar. 3, 2022).

38.   Fleet Farm sold 24 firearms to Horton in the four-month span between mid-June 2021 and mid-October 2021.   Fleet Farm's sales to Horton are identified in the chart below, with multiple firearm purchases on the same day highlighted:

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|---|---|---|---|---|
| Fleet Farm | Brooklyn Park | 6/15/2021 | Taurus G2C 9mm | 1C020445 |
| Fleet Farm | Brooklyn Park | 7/4/2021 | Ruger Security 9 9mm | 38463707 |
| Fleet Farm | Brooklyn Park | 7/7/2021 | Glock 19 9mm | BTNX619 |
| Fleet Farm | Oakdale | 7/10/2021 | Glock G43X 9mm | BTTU573 |
| Fleet Farm | Blaine | 7/23/2021 | Beretta APX 9mm | A152030X |
| Fleet Farm | Oakdale | 7/24/2021 | FNH 503 9mm | CV016470 |
| Fleet Farm | Oakdale | 7/24/2021 | Springfield Armory XDS 9mm | BA456304 |
| Fleet Farm | Oakdale | 7/26/2021 | Glock 26 9mm | AFVB754 |
| Fleet Farm | Blaine | 7/27/2021 | Glock 43X 9mm | BTTU0778 |
| Fleet Farm | Blaine | 7/27/2021 | Stoeger STR-9C 9mm | T642921S02199 |
| Fleet Farm | Blaine | 7/31/2021 | Glock 45 9mm | BSTE309 |
| Fleet Farm | Blaine | 7/31/2021 | Mossberg MC2C 9mm | 017520MC |
| Fleet Farm | Blaine | 7/31/2021 | Ruger EC95 9mm | 45955269 |
| Fleet Farm | Blaine | 8/14/2021 | Glock 19X 9mm | BUCB186 |
| Fleet Farm | Brooklyn Park | 8/20/2021 | Glock G19 9mm | BSXE226 |

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|-------|----------|--------------------|-----------------------------|---------------|
| Fleet Farm | Lakeville | 8/31/2021 | Glock 26 9mm | AFVC844 |
| Fleet Farm | Lakeville | 8/31/2021 | Mossberg MC2C 9mm | 014211MC |
| Fleet Farm | Blaine | 9/13/2021 | Glock G17 9mm | BUGR628 |
| Fleet Farm | Brooklyn Park | 9/17/2021 | Ruger 57 5.7x28 | 64322362 |
| Fleet Farm | Blaine | 9/18/2021 | Glock G19 9mm | BUAS957 |
| Fleet Farm | Blaine | 9/26/2021 | Glock 26 9mm | AFSE457 |
| Fleet Farm | Blaine | 9/26/2021 | Radical Firearms RF-15 .556 | 21046140 |
| Fleet Farm | Brooklyn Park | 10/11/2021 | Taurus G3C 9mm | 1KA06796 |
| Fleet Farm | Oakdale | 10/17/2021 | Glock 26 9mm | AGBR071 |

39.     As shown in the chart above, Fleet Farm sold multiple guns at once—typically multiple handguns of the same caliber—to Horton on five different days.  Moreover, Fleet Farm sold multiple handguns to Horton in very short periods of time.  For instance, Fleet Farm sold Horton eight 9mm semiautomatic pistols in a one-week timespan between July 24 and July 31, 2021.  The timing of Fleet Farm's sales of guns to Horton is illustrated in the following timeline:



40.     The sheer volume of Horton's purchases put Fleet Farm on notice that he was not making bona fide purchases for himself but was instead straw purchasing firearms for others. Horton's purchases were also highly suspicious in additional ways.

41.     On five occasions, Fleet Farm sold Horton multiple handguns at once, and Fleet Farm also made multiple sales to Horton at the same location within five business days on several occasions. These sales required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking. The guns purchased were also nearly all the same caliber (9mm) of handgun—another red flag of straw purchasing. Horton also staggered purchasing single handguns within days or weeks of each other and from different Fleet Farm locations.

42.     Furthermore, the affidavit in support of the federal charges against Horton indicate that the ATF reviewed Fleet Farm surveillance video showing Horton "using the camera feature on his [phone] to either take photographs or video" in connection with Horton's October 17, 2021, purchase of a Glock 26 9mm handgun at Fleet Farm's Oakdale store. Affidavit of Special Agent Kylie Williamson at ¶ 14, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). The ATF agent testified that in her training and experience, this is a common indication of straw purchasing, as the straw purchaser wants to show available firearms to the third party intended recipient of the firearm without the intended recipient having to appear on surveillance cameras. *Id.*

43.     These highly suspicious behaviors put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms, and that he was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Horton anyway.

44.     After Fleet Farm sold guns to Horton, Horton trafficked these guns to criminals and prohibited persons.  Horton transferred six of these handguns to Gabriel Young-Duncan, who would then keep the firearms or further transfer them to other persons.  *See* Indictment, Dkt. No. 1, *U.S. v. Gabriel Lee Young-Duncan*, Case No. 22-CR-00004 (D. Minn. Jan. 18, 2022).  Young-Duncan was charged on January 18, 2022, and ultimately pleaded guilty in federal court to conspiracy to make false statements in the purchase of a firearm for his participation in Horton's straw purchasing scheme.  *See id.*  Young-Duncan is scheduled to be sentenced October 5, 2022.

45.     The guns Fleet Farm sold to Horton have caused harm to Minnesotans.  On August 13, 2021, the Glock 43X 9mm pistol that Fleet Farm sold to Horton on July 10, 2021, serial number BTTU573—which Horton then transferred to Young-Duncan—was allegedly discharged in public in the middle of Minneapolis and found by police in the possession of an individual without a permit to carry a handgun.  *See* Complaint, *State v. Douglas Jerome Sutton*, No. 27-CR-21-15330 (Henn. Cty. Dist. Ct. Aug. 16, 2021).  The individual told police he found the gun in an alleyway and shot it to see if it was operational so he could sell it.  This incident happened only 34 days after Fleet Farm sold the gun to Horton.  Fleet Farm sold 11 more handguns to Horton after Douglas Sutton's arrest.

46.     On September 6, 2021, the Glock 19 9mm pistol that Fleet Farm sold to Horton on July 7, 2021, serial number BTNX619, was found by a six-year-old boy in the front yard of his family's house in south Minneapolis.  After finding the gun, the six-year-old boy told his father that the gun "didn't look like a fake one," prompting the father to use a basket and a blue frisbee to cover up the gun and its ammunition magazine and then contact the police.  The gun was likely discarded there by suspects involved in an earlier Minneapolis public shooting incident who then raced through the neighborhood as they fled from the police.  The gun was recovered by police

only 61 days after Fleet Farm sold the gun to Horton. Fleet Farm sold seven more firearms to Horton after this gun was found.

47.     On September 26, 2021, the Glock 26 9mm pistol that Fleet Farm sold to Horton on July 26, 2021, serial number AFVB754—which Horton then transferred to Young-Duncan—was found by police in the possession of an individual without a permit to carry a handgun, Charles Toy. *See* Complaint*, State v. Charles Curtis Toy*, No. 27-CR-22-12594 (Henn. Cty. Dist. Ct. June 29, 2022). The Glock handgun was found fully loaded with an extended 28-round magazine. *Id.* Police recovered this weapon 62 days after Fleet Farm had sold the gun to Horton. Fleet Farm sold two handguns to Horton on the day of Charles Toy's arrest and then sold Horton two more handguns afterward in October 2021.

48.     On September 30, 2021, the Springfield Armory XDS 9mm pistol Fleet Farm sold to Horton on July 24, 2021, serial number BA456304, was found by police in the possession of a prohibited person with prior convictions for first-degree aggravated robbery and for aiding and abetting first-degree burglary. *See* Complaint*, State v. Shamar Jamareus Scott*, No. 27-CR-21-18321 (Henn. Cty. Dist. Ct. Oct. 1, 2021). The individual threw the firearm as he was fleeing from the police. Police recovered this weapon 68 days after Fleet Farm had sold the gun to Horton. Fleet Farm sold two more firearms to Horton after police recovered this gun.

49.     On October 10, 2021, the Mossberg MC2C 9mm semiautomatic pistol that Fleet Farm sold to Horton on July 31, 2021, serial number 017520MC—which Horton then transferred to Young-Duncan—was fired in the Seventh Street Truck Park shooting in St. Paul. This pistol was fired by Devondre Trevon Phillips, who has a prior felony conviction for aggravated first-degree robbery, which makes him ineligible to possess firearms or ammunition. Affidavit of Special Agent Kylie Williamson, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn.

Oct. 18, 2021); *see also* Amended Complaint, *State v. Devondre Trevon Phillips*, No. 62-CR-21-5805 (Ramsey Cty. Dist. Ct. May 26, 2022).  Phillips allegedly fired the pistol in this chaotic shootout at a St. Paul area bar where the exchange of gunfire between three different gunmen injured 14 people and killed a 27-year-old woman when a bullet penetrated her left lung and heart. Fleet Farm sold two more handguns to Horton after the Truck Park shooting.

50.     Jerome Horton was charged by information on January 18, 2022, and ultimately pleaded guilty in federal court to one count of making false statements in the course of purchasing a firearm.  Plea Agreement at 2, Dkt. No. 23, *United States v. Horton*, Case No. 22-CR-00006 (D. Minn. March 3, 2022).   In his March 3, 2022, plea agreement, Horton admitted to falsely representing himself as the end purchaser in connection with the purchase of all 33 firearms he bought in the Twin Cities area from June 2021 through October 2021.  *Id.*  Horton is scheduled to be sentenced on October 22, 2022.

51.     Even after the federal criminal actions against Horton and Young-Duncan, most of the guns Fleet Farm sold to Horton are still not recovered by law enforcement, are unaccounted for, and pose an ongoing danger to the health and safety of Minnesotans.  For instance, on July 26, 2022, the Taurus G2C 9mm pistol that Fleet Farm sold to Horton on June 15, 2021, serial number 1C020445, was recovered by police from a person prohibited from possessing firearms due to prior convictions for first-degree assault and aggravated robbery.  *See* Complaint, *State v. Jorge Olivares Jr.*, No. 27-CR-22-14776 (Henn. Cty. Dist. Ct. July 28, 2022).

52.     By engaging in the sale and transfer of firearms to Horton under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Horton in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement

in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false entries in records required to be kept by dealer); 18 U.S.C. § 923(a) (engaging in the business of dealing firearms without a license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. § 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. § 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

     **C.**     **Fleet Farm Sold 13 Guns to Straw Purchaser Sarah Elwood During a 12-Month Period in 2020 and 2021, and These Firearms Continue to Cause Harm in the Wrong Hands.**

53.     Starting in May 2020 through May 2021, Sarah Elwood, along with two co-conspirators, straw purchased 97 firearms from 9 different licensed gun dealers in Minnesota. Elwood regularly purchased firearms and sold them to third parties for a profit of about $100 per firearm. *See* Affidavit of Cory J. Shelton, Dkt. No. 1-1, *U.S. v. Sarah Jean Elwood*, Case. No. 21-CR-00147 (D. Minn. June 1, 2021). Elwood regularly sold firearms for cash to a co-conspirator, who then provided the guns to others in exchange for cash or discounts on high-potency, expensive marijuana. *Id.*; *see also* Plea Agreement, Dkt. No. 133, *U.S. v. Geryiell Lamont Walker*, Case No. 21-CR-00147 (D. Minn. Mar. 16, 2022). Elwood's co-conspirator told the ATF that he knew the

firearms purchased by Elwood were being trafficked for criminal activity and that he "did not care."  Affidavit of Cory J. Shelton at ¶ 37, Dkt. No. 1-1, *U.S. v. Sarah Jean Elwood*, Case. No. 21-CR-00147 (D. Minn. June 1, 2021).

54.    Fleet Farm sold 13 firearms to Elwood in the 12-month span from June 2020 to May 2021.  Fleet Farm's sales to Elwood are identified in the chart below, with purchases of multiple firearms on the same days highlighted:

| Store | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|-------|---------------------|------------------------------|---------------|
| Fleet Farm | 6/20/2020 | Century Arms TP9SF 9mm | 20BH09180 |
| Fleet Farm | 7/30/2020 | Taurus G2C 9mm | ABD463393 |
| Fleet Farm | 1/4/2021 | Taurus Spectrum 380 Auto | 1F033220 |
| Fleet Farm | 1/11/2021 | Taurus PT111G2A 9mm | ABH838724 |
| Fleet Farm | 1/31/2021 | Taurus Spectrum 380 Auto | 1F024926 |
| Fleet Farm | 1/31/2021 | Taurus Spectrum 380 Auto | 1F033065 |
| Fleet Farm | 3/15/2021 | Springfield XDS 9mm | BA181757 |
| Fleet Farm | 5/1/2021 | Ruger EC9S 9mm | 459-15215 |
| Fleet Farm | 5/1/2021 | Smith & Wesson M&P 9 Shield Plus 9mm | JFY6090 |
| Fleet Farm | 5/6/2021 | Glock 19 9mm | BTNN877 |
| Fleet Farm | 5/6/2021 | Ruger 5 7 5.7x28 | 642-13405 |
| Fleet Farm | 5/12/2021 | Glock 17 9mm | BTMG955 |
| Fleet Farm | 5/12/2021 | Ruger 5 7 5.7x28 | 642-12901 |

55.    As shown in the chart above, Fleet Farm sold multiple handguns in the same day to Elwood on four different occasions, including three days in which Fleet Farm sold her multiple handguns mere days apart in early May 2021 (May 1, May 6, and May 12).  The timing of Fleet Farm's sales of guns to Elwood is illustrated in the following timeline:



56.     The sheer volume of Elwood's purchases put Fleet Farm on notice that she was not making bona fide purchases for herself but was instead straw purchasing firearms for others. Elwood's purchases were also highly suspicious in additional ways.

57.     On four occasions, Fleet Farm sold Elwood multiple handguns at once, which required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking.  The majority of the firearms Fleet Farm sold to Elwood were 9mm caliber or similar small-caliber handguns—another red flag of straw purchasing.

58.     These highly suspicious behaviors put Fleet Farm on notice that Elwood was unlawfully trafficking, and that she was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Elwood anyway.

59.     On June 24, 2021, Elwood was indicted on federal charges for dealing in firearms without a license, conspiracy to make false statements during purchase of firearms, and making false statements during purchase of firearms.  Indictment, Dkt. No. 33, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. June 24, 2021).  Elwood ultimately pleaded guilty to one count

of making false statements during the purchase of firearms on December 28, 2021. *See* Plea Agreement and Sentencing Stipulations, Dkt. No. 97, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Dec. 28, 2021). As part of her plea agreement, Elwood admitted that the United States could prove that she straw purchased all of these 97 firearms for profit. *See* Plea Agreement and Sentencing Stipulations, Dkt. No. 97, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Dec. 28, 2021). On September 14, 2022, Elwood was sentenced to serve 18 months in prison based on her straw purchasing misconduct. *See* Amended Judgment, Dkt. No. 178, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Sept. 16, 2022).

60. Even after the federal criminal actions against Elwood and her two co-conspirators, 12 of the 13 guns Fleet Farm sold to Elwood are still not recovered by law enforcement, are unaccounted for, and pose an ongoing danger to the health and safety of Minnesotans. On July 7, 2021, Orlando Lanell Holden was caught by police with the Taurus Spectrum .380 caliber pistol that Fleet Farm sold to Elwood on January 4, 2021, serial number 1F033220, after allegedly using it to threaten someone in public. *See* Complaint, *State v. Holden*, No. 27-CR-21-16811 (Hennepin Cty. Dist. Ct. Sept. 8, 2021). Holden is ineligible to possess firearms due to a prior juvenile conviction for first-degree aggravated robbery and has been charged with second-degree assault and possession of a firearm by a prohibited person. *See id.* Police recovered this weapon 184 days after Fleet Farm sold it to Elwood.

61. By engaging in the sale and transfer of firearms to Elwood under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Elwood in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false

entries in records required to be kept by dealer); 18 U.S.C. § 923(a) (engaging in the business of dealing firearms without a license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. § 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. § 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

### III. MINNESOTA GUN TRAFFICKING AND GUN VIOLENCE ROSE DURING THE COVID-19 PANDEMIC WHEN FLEET FARM SOLD FIREARMS TO STRAW PURCHASERS.

62.     Of the different ways that firearms can get into the hands of criminals, "straw purchasing" is one of the most prevalent and concerning.  The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified straw purchasing as the most common channel for the diversion of firearms into the black market and illegal gun trafficking schemes, accounting for thousands of trafficked guns every year.[7]

---

[7] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* at xi, Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (June 2000), *available at* https://perma.cc/PYK2-SXSU.

63.     As described above, the ATF assists local law enforcement with criminal investigations by tracing firearms recovered by local police in connection with criminal investigations back to their first retail seller.  Data published by the ATF shows that more and more guns are being recovered by police in crimes and being traced back to firearms dealers in Minnesota.  4,605 firearms recovered in Minnesota were traced by the ATF to their first retail seller in 2021, including 3,417 pistols and 2,159 9mm caliber guns.[8]  These numbers are part of an upward trend of the number of crime guns in Minnesota traced by the ATF: 4,072 firearms were traced in 2020[9] and 4,112 firearms were traced in 2019.[10]

64.     One key indicator showing how illegal gun purchases lead to crime is the "time to crime" associated with the crime gun trace—i.e., how quickly the gun was used in, or connected to, a crime after being purchased.  The number of Minnesota crime guns with very short times to crime has grown exponentially in recent years.  The following chart shows how many crime guns were recovered by police in Minnesota and traced by the ATF within six months or less of retail purchase:

---

[8] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2021, https://perma.cc/P3K5-VFA4.

[9] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2020, https://perma.cc/HA2A-3V3X

[10] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Minnesota Data Source: Firearms Tracing System (2019), *available at* https://perma.cc/7VPN-49QG.

| Year | Time to Crime of Six Months or Less | Percentage of Crime Guns Recovered Within Six Months of Purchase |
|---|---|---|
| 2019[11] | 314 | 7.6% |
| 2020[12] | 593 | 14.6% |
| 2021[13] | 843 | 18.3% |

65.     From 2019 to 2021, this data shows a 168% increase in Minnesota crime guns being recovered with a time to crime of six months or less, with these firearms now constituting nearly 20% of all crime guns traced by the ATF in Minnesota.  National statistics similarly show a 90% increase from 2019 to 2020 in crime guns being recovered in 6 months or less[14]:

---

[11] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Minnesota Data Source: Firearms Tracing System (2019), *available at* https://perma.cc/7VPN-49QG.

[12] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2020, https://perma.cc/HA2A-3V3X

[13] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2021, https://perma.cc/P3K5-VFA4.

[14] Jeff Asher & Rob Arthur, *The Data Are Pointing to One Major Driver of America's Murder Spike*, The Atlantic (Jan. 10, 2022), https://perma.cc/95LY-3BDK.



66.     Although crime guns in Minnesota originate from all across the country, the majority of crime guns in Minnesota are purchased in Minnesota.  59% of crime guns recovered in Minnesota in 2021 were initially purchased in Minnesota.[15]  68% of crime guns recovered by the Minneapolis Police Department in 2022 were initially purchased in Minnesota, with 5% coming from Wisconsin and 2% or less from all other states.[16]

67.     The recent rise in crime guns and gun trafficking correlates to an increase in gun violence.  Minnesota gun deaths spiked to a 20-year high of 570 deaths in 2021, including 163 homicides and 390 suicides.[17]  The Minnesota homicide rate more than doubled between 2018 and

---

[15] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Trace Data: Minnesota – 2021*, https://perma.cc/P3K5-VFA4.

[16] City of Minneapolis, *2022 Gun Violence Overview* at 18, *available at* https://perma.cc/N8LS-CJFJ.

[17] Christopher Ingraham, *Minnesota gun deaths hit 20-year high*, Minnesota Reformer (Sept. 19, 2022), https://perma.cc/ZJ25-D68G; CDC WONDER, Provisional Mortality Statistics, 2018 through Last Month, https://wonder.cdc.gov/.

2021, with 80% of those homicides taking place in the seven-county Twin Cities metro area.[18] Gun suicides have particularly affected greater Minnesota, which has a gun suicide rate nearly twice that of the Twin Cities metro area.[19]

68.     Black and Native American communities in Minnesota are disproportionately impacted by gun violence.  Black Minnesotan males aged 15-34 have a firearm homicide rate that is *28 times higher* than White males of the same age group.[20]  Overall, Black Minnesotans are 12 times more likely to die by gun homicide than White Minnesotans, while Native Americans are 10 times more likely die by gun homicide.[21]

69.     Both nationwide and in Minnesota, firearm violence has increased so dramatically that firearm deaths became the leading cause of death among children in 2020, overtaking motor vehicle accidents, which had been the chief cause of child deaths for decades beforehand.[22] Firearms also cause a substantial number of injuries in Minnesota, with 811 Minnesotans on average being wounded by guns every year.[23]

---

[18] Christopher Ingraham, *Minnesota gun deaths hit 20-year high*, Minnesota Reformer (Sept. 19, 2022), https://perma.cc/ZJ25-D68G.

[19] *Id.*

[20] The Educational Fund to Stop Gun Violence, *Minnesota Gun Deaths: 2019*, https://perma.cc/3VYP-PDHS.

[21] Everytown, *Gun Violence in Minnesota* (last updated Feb. 2020), *available at* https://perma.cc/9CN6-8L7T.

[22] Dustin Jones, *Firearms overtook auto accidents as the leading cause of death in children*, National Public Radio (Apr. 22, 2022), https://perma.cc/5TAT-V6QZ; Everytown, *Gun Violence in Minnesota* (last updated Feb. 2020), *available at* https://perma.cc/9CN6-8L7T.

[23] EveryStat, https://everystat.org/.

## COUNT I
## NEGLIGENCE

70.     The State re-alleges all prior paragraphs of this Complaint.

71.     At all relevant times, Defendants owed the State of Minnesota and its citizens the general duty imposed on all persons and entities to not expose others to reasonably foreseeable risks of injury.  Defendants had a duty to exercise reasonable care in distributing and selling firearms and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.  A breach of such duty constitutes negligence.

72.     Defendants failed to exercise reasonable care and breached their duty to the State and its citizens by selling firearms they knew or should have known were destined for the illegal stream of commerce and into the hands of persons ineligible to possess a firearm.  Defendants' failure to abide by their duty to exercise such reasonable care increased the risk of harm, including the risks of prohibited firearm possession, firearm injuries, and death.

73.     Defendants transacted firearms business with straw purchasers and traffickers like Horton, Elwood, and others, even though Defendants knew, or consciously avoided knowing, that these individuals were engaged in unlicensed dealing, firearms trafficking, and/or straw purchasing.

74.     Defendants further breached their duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, numerous federal laws and regulations, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(a), and 924(a)(1)(D), 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

75.     Defendants further breached their duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, Minnesota law, including Minn. Stat. §§ 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

76.     Through the conduct described herein, Defendants have breached and continue to breach Defendants' duty of care to the State and its citizens.

77.     Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

78.     As a direct and proximate result of Defendants' negligent conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

79.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple instances of negligence under Minnesota law.

## COUNT II
## NEGLIGENCE PER SE

80.     The State re-alleges all prior paragraphs of this Complaint.

81.     Under the law, and due to Defendants' responsibilities as a federally licensed dealer of an especially dangerous product, Defendants owed a duty of care to Minnesota citizens and the State.  These laws include, but are not limited to, the provisions of the federal Gun Control Act (18 U.S.C §§ 921–931) and its implementing regulations (27 C.F.R. Part 478), and the Minnesota Gun Control Act (Minn. Stat. §§ 624.71–624.7192).

82.     The above laws and regulations are intended to curb firearm crime, prevent access to firearms by persons prohibited from possessing them, and protect public safety.  These laws and regulations were designed to prevent illegal dealing in firearms by directing firearms commerce through business licensed by the federal government.  These laws and regulations impose obligations on licensed dealers to further their purpose.

83.     The State and its residents are within the class of persons meant to be protected by these laws and regulations, and the injuries to the State and its citizens are of the nature that these laws and regulations were designed to prevent.

84.     Through the conduct described herein, Defendants have violated, and aided and abetted the violation of, the laws and regulations referenced above, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133.  In doing so, Defendants have breached and continue to breach their duty of care to the State and its citizens. Therefore, Defendants' breach of the laws and regulations referenced above constitute negligence per se for which Defendants are liable.

85.     Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

86.     As a direct and proximate result of Defendants' negligent conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

87.     Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of negligence per se under Minnesota law.

## COUNT III
## NEGLIGENT ENTRUSTMENT

88.     The State re-alleges all prior paragraphs of this Complaint.

89.     At the time that Defendants made one or more firearm sales to Horton, Elwood, and others, Defendants knew or reasonably should have known that these individuals were engaged in unlawful straw purchasing or unlicensed dealings in firearms to prohibited persons or for use in the commission of crimes.

90.     Defendants knew or reasonably should have known that these individuals' straw purchasing and/or unlicensed dealing in firearms created an unreasonable risk of harm to third parties, including the citizens of Minnesota and the State itself, because a foreseeable and likely consequence of those unlawful trafficking activities is gun violence resulting in serious injury or death, as well as criminal activity.

91.     Defendants had possession and control of the firearms that Defendants transferred or caused to be transferred to the straw purchasers.  Defendants knew or should have known that Defendants' employees or agents who transferred firearms or caused firearms to be transferred to these straw purchasers were obliged to use their judgment to refuse to transfer firearms to a transferee whom the employees and agents knew or should have known was involved in straw purchasing and/or unlicensed dealing in firearms.

92.     Defendants, by their employees and agents, knew or should have known that firearms transferred to traffickers and straw purchasers would likely be used in a manner involving an unreasonable risk of harm.

93.     Firearms negligently entrusted by Defendants to traffickers and straw purchasers have foreseeably been recovered in the possession of prohibited possessors or at crime scenes in Minnesota, and many others are still unaccounted for.

94.     Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

95.     As a direct and proximate result of Defendants' conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

96.     Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of negligent entrustment under Minnesota law.

## COUNT IV
## AIDING AND ABETTING

97.     The State re-alleges all prior paragraphs of this Complaint.

98.     The straw purchasers identified above each violated the law and thereby committed the tort of negligence per se each time the straw purchasers made false statements in the course of purchasing a firearm, as well as each time the straw purchasers sold, transferred, or otherwise engaged in unlicensed dealing of firearms to individuals who are prohibited from owning or possessing firearms.

99.     Defendants knew or reasonably should have known that the individuals identified above were committing the tort of negligence per se by engaging in straw purchasing and/or unlicensed dealings in firearms to prohibited persons in violation of state and federal law, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133.

100.    By selling multiple firearms to each of the straw purchasers identified above, Defendants substantially assisted these straw purchasers in committing the tort of negligence per se.

101.    Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

102.    As a direct and proximate result of Defendants' conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

103.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of aiding and abetting under Minnesota law.

## COUNT V
## PUBLIC NUISANCE

104.    The State re-alleges all prior paragraphs of this Complaint.

105.    Minnesota Statutes section 609.74 provides, in part:

Whoever by an act or failure to perform a legal duty intentionally does any of the following is guilty of maintaining a public nuisance, which is a misdemeanor:

(1) maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public; or

***

(3) is guilty of any other act or omission declared by law to be a public nuisance and for which no sentence is specifically provided.

106.    The State and its residents have a public right to be free from interference with public safety, health, comfort, or repose.  The State is empowered by equity and law to allege a claim, and seek redress for, a public nuisance.

107.    Through Defendants' conduct in selling firearms to individuals that they knew or should have known were engaged in straw purchasing and/or unlicensed dealing in firearms, Defendants have intentionally maintained or permitted, or were a substantial factor in maintaining or permitting, a public nuisance that has annoyed, injured, and endangered—and continues to unreasonably annoy, injure, and endanger—the common right of public health, comfort, or repose of considerable members of the public.

108.    Defendants' conduct foreseeably resulted in the illegal transfer of these firearms to criminals and other prohibited persons in Minnesota.  Some of the illegally transferred firearms have been used in the commission of crimes or recovered by the police, while other firearms remain unrecovered.  Defendants' conduct was, at the very least, a substantial factor in creating, promoting, supporting, or supplying an illegal secondary market for firearms that contributed to unlawful possession of firearms and firearm violence in Minnesota.  Without Defendants' conduct,

firearm possession, misuse, injury, and death would not have been so widespread, and at least some of the existing harm to Minnesotans caused by firearms would have been avoided.

109.    Defendants' conduct is widespread and persistent, and has created, is creating, and will likely continue to create substantial ongoing harm to the State and its residents by unreasonably interfering with the right of the general public to life, safety, health, the use and enjoyment of property, the right to travel within Minnesota, and the right to attend school, all without fear of gun violence.  The unlawful proliferation of firearms interferes with rights common to the general public, deprives Minnesota residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places, interferes with commerce, travel, and the quality of daily life, and endangers the health, welfare, peace, safety, well-being, convenience, and property of considerable numbers of residents of, and visitors to, Minnesota.  These harms are felt throughout Minnesota and are borne disproportionately by vulnerable communities, including the Native American and Black communities.

110.    The State has incurred and continues to incur substantial costs from investigating, monitoring, treating, policing, and remediating the misuse of firearms in Minnesota.  The nuisance created by Defendants' illegal conduct continues to this day and, absent abatement or other relief, will continue indefinitely.

111.    Defendants' conduct including knowingly violating and aiding and abetting the violation of numerous federal laws and regulations, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(a), 924(a)(1)(D), and 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

112.    Defendants' conduct also included knowingly violating and aiding and abetting the violation of Minnesota law, including Minnesota Statutes sections 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

113.    Defendants' conduct in maintaining or permitting a public nuisance has openly, publicly, repeatedly, continuously, persistently, and intentionally violated Minnesota law, as described throughout this Complaint.  Defendants' conduct is sufficiently pervasive that this conduct cannot be adequately addressed or remedied by resort to criminal enforcement of Minnesota Statutes section 609.74 or other criminal statutes.  Defendants' widespread interference with public rights and privileges, and resulting endangerment of public health, requires the State to seek injunctive and all other appropriate equitable relief against Defendants in order to abate this public nuisance and remedy the resultant harm, both retrospectively and prospectively.

## COUNT VI
## MINNESOTA GUN CONTROL ACT

114.    The State re-alleges all prior paragraphs of this Complaint.

115.    The Minnesota Gun Control Act prohibits federally licensed firearms dealers from, among other things, "transfer[ring] a pistol or semiautomatic military-style assault weapon to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement." Minn. Stat. § 624.7132, subd. 15(a)(2).

116.    Minnesota Statutes section 624.7132, subdivision 15(a)(2), is a Minnesota law "respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." Minn. Stat. § 8.31, subd. 1. Accordingly, the Minnesota Attorney General is empowered to enforce Minnesota Statutes section 624.7132, subdivision 15(a)(2) via Minnesota Statutes section 8.31. *See Findling v. Group Health Plan, Inc.*, 2023 WL 8441516, at *3–9 (Minn. Dec. 6, 2023).

117.    Defendants transferred firearms to straw purchasers who made false statements in order to become transferees—namely, that the straw purchasers were buying firearms for themselves when, in fact, the straw purchasers were buying firearms for others.

118.    For example, in every sale by Defendants to straw purchasers Jerome Horton and Sarah Elwood, the straw purchasers checked a box on Form 4473 Firearms Transaction Records, representing that they were the "actual transferee/buyer of the firearm(s) listed on this form." Representatives of Defendants ostensibly reviewed these representations, signed the sale forms, and transferred firearms to straw purchasers.

119.    As detailed *supra*, Defendants knew or had reason to know, based on the circumstances of the sales and the information known to Defendants, that straw purchasers were not purchasing for themselves and were buying firearms for others.

120.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple violations of Minnesota Statutes section 624.7132, subdivision 15(a)(2).

## REQUESTED RELIEF

WHEREFORE, the State of Minnesota, by its Attorney General, Keith Ellison, respectfully asks this Court to award judgment against Defendants, jointly and severally, as follows:

1.    Declaring that Defendants' acts described in this Complaint constitute negligence, negligence per se, negligent entrustment, aiding and abetting negligence per se, public nuisance, and violations of Minnesota Statutes section 624.7132, subd. 15(a)(2), under Minnesota law, and permanently enjoining Defendants and their employees, officers, directors, agents, servants, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from the violative acts, practices, and conduct;

2.      Awarding injunctive relief against Defendants requiring them to abate the public nuisance they have created and undertake actions to correct their misconduct and prevent future misconduct, including but not limited to:

a)      Ordering Defendants to submit to supervision by a court-appointed monitor, whose responsibilities shall include, but not be limited to, monitoring of Defendants' sales practices through observation, records monitoring, and random and repeated integrity-testing, and implementing corrective policies and procedures, with the costs of the monitor to be paid by Defendants;

b)      Ordering Defendants to require mandatory and ongoing training of all personnel involved in the sale of firearms by a court-approved training entity, with the costs of that training to be paid by Defendants;

c)      Ordering Defendants to retain all trace requests received by the ATF for a period of five years, to keep a record of all employees whose sales result in a trace request, and to conduct heightened screening (as determined by the monitor) of sales to individuals who have been the subject of trace requests from the ATF;

d)      Ordering Defendants to conduct heightened screening (as determined by the monitor) of sales to individuals that make multiple purchases of firearms from different store locations or within short, staggered periods of time;

e)      Ordering Defendants to take corrective action to identify and assist in recovering the remaining firearms that were sold to straw purchasers and others identified as transferees of firearms as stated herein.

3.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota law;

4.      Awarding judgment against Defendants, jointly and severally, for damages for injury sustained as a result of Defendants' repeated breaches of their duties in Minnesota;

5.      Ordering Defendants, jointly and severally, to disgorge all profits from Defendants' unlawful sales of firearms in Minnesota;

6.      Awarding judgment against Defendants, jointly and severally, for monetary relief, including but not limited to abatement, to the State pursuant to Minnesota law, the *parens patriae* doctrine, and the general equitable powers of this Court, as necessary to remedy the harm and injury to the State resulting from Defendants' acts and omissions described in this Complaint;

7.      Awarding judgment against Defendants, jointly and severally, for civil penalties pursuant to Minnesota Statutes section 8.31, subdivision 3, for each separate violation of Minnesota Statutes sections 609.74 and 624.7132;

8.      Awarding the State its costs, including costs of investigation, attorney fees, and expert consultant and expert witness fees, as authorized by Minnesota Statutes section 8.31, subd. 3a, for violations of Minnesota Statutes sections 609.74 and 624.7132; and

9.      Granting such further relief as provided by law or equity as the Court deems appropriate and just.

## JURY DEMAND

The State demands a jury trial for all issues pled herein triable by a jury.

Dated:  March 5, 2024                    Respectfully submitted,

                                         KEITH ELLISON
                                         Attorney General
                                         State of Minnesota

                                         JAMES W. CANADAY (#030234X)
                                         Deputy Attorney General

                                         **/s/ Eric J. Maloney**
                                         ERIC J. MALONEY (#0396326)
                                         Assistant Attorney General

                                         JASON PLEGGENKUHLE (#0391772)
                                         Assistant Attorney General

                                         KATHERINE MOERKE (#0312277)
                                         Assistant Attorney General

                                         445 Minnesota Street, Suite 1200
                                         St. Paul, Minnesota 55101-2130
                                         james.canaday@ag.state.mn.us
                                         Telephone: (651) 757-1421
                                         eric.maloney@ag.state.mn.us
                                         Telephone: (651) 757-1021
                                         jason.pleggenkuhle@ag.state.mn.us
                                         Telephone: (651) 757-1147
                                         katherine.moerke@ag.state.mn.us
                                         Telephone: (651) 757-1288

                                         *Attorneys for State of Minnesota*