## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison, <br><br>        Plaintiff, <br><br>   v. <br><br> Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC, <br><br>        Defendants. | Case No.: 0:22-cv-02694-JRT-JFD |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

## Tᴀʙʟᴇ ᴏꜰ Cᴏɴᴛᴇɴᴛs

Iɴᴛʀᴏᴅᴜᴄᴛɪᴏɴ ................................................................................................. 1

Bᴀᴄᴋɢʀᴏᴜɴᴅ .................................................................................................. 3

    I.    Plaintiff files an action against Fleet Farm regarding alleged negligent handgun sales ................................................................................. 3

    II.   Plaintiff serves wide-ranging discovery requests ............................... 4

        A.   The relevant period for discovery .............................................. 5

        B.   The scope of production of firearm transaction records ............................ 5

        C.   Fleet Farm's invocation of Fed. R. Civ. P. 33(d) in response to certain interrogatories ............................................................... 8

        D.   Internal communications regarding the fact of the lawsuit ..................... 10

        E.   Fleet Farm's general corporate and organizational structure .................. 10

        F.   Production of certain employee information ........................................... 11

    III.  Fleet Farm has worked diligently to produce documents responsive to Plaintiff's discovery requests .......................................................... 12

Aʀɢᴜᴍᴇɴᴛ ..................................................................................................... 14

    I.    The temporal scope of discovery should encompass the six-year period preceding the complaint's filing ....................................................... 15

        A.   The Court should define the temporal discovery period as ending on October 5, 2022 ..................................................................... 15

        B.   Plaintiff's proposed August 2, 2024 end date is impractical and unsupported ............................................................................ 19

    II.   Fleet Farm should only be required to produce firearm transaction records reflecting customers who purchased thirteen or more handguns during the temporal discovery period................................................................... 20

        A.   The vast majority of Form 4473s (and corresponding 3310.4s) have no relevance, and the Court should only permit discovery into purchasing patterns arguably analogous to Horton's and Elwood's ........ 21

        B.   Plaintiff's requested scope of production of Form 4473s would impose an undue burden .............................................................. 25

        C.   Plaintiff's requested production of Form 4473s does not account for customers' significant privacy interests ................................................ 26

D.  The scope of Fleet Farm's production of unredacted A&D logs should be commensurate with the scope of production of Form 4473s..................................................................................29

III.  Fleet Farm has complied with its obligations under Rule 33(d).....................32

IV.  Internal communications regarding the fact of the lawsuit, but not its substance, are irrelevant .............................................................................35

V.  Information regarding Fleet Farm's corporate structure is irrelevant .............36

VI.  Plaintiff's requests for employee evaluations and related information are overly broad and unduly burdensome................................................................37

CONCLUSION ....................................................................................................41

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ard v. Custom Tree Serv., Inc.*,
  2008 WL 11433202 (M.D. Fla. Jan. 8, 2008) ............................................................... 31

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
  2012 WL 12894846 (D. Minn. May 11, 2012) ............................................................ 33

*Bepex Int'l, LLC v. Hosokawa Micron BV*,
  2022 WL 3701406 (D. Minn. Feb. 8, 2022) ................................................................ 14

*Berry v. County*,
  2023 WL 1777467 (D. Minn. Feb. 6, 2023) ................................................................ 32

*Beseke v. Equifax Info. Servs., LLC*,
  2018 WL 6040016 (D. Minn. Oct. 18, 2018) .................................................... 39, 40

*Best Buy Stores, L.P. v. Devs. Diversified Realty Corp.*,
  247 F.R.D. 567 (D. Minn. 2007) ................................................................................. 39

*Burke v. Ability Ins. Co.*,
  291 F.R.D. 343 (D.S.D. 2013) .................................................................................... 37

*U.S. ex rel. Conroy v. Select Med. Corp.*,
  307 F. Supp. 3d 896 (S.D. Ind. 2018) ........................................................................ 15

*Crom, LLC v. Preload, LLC*,
  2017 WL 2408126 (N.D. Fla. June 2, 2017) .............................................................. 36

*Davis v. Cap. One, N.A.*,
  2023 WL 7214667 (E.D. Va. Oct. 13, 2023) .............................................................. 31

*U.S. ex rel. Dicken v. Nw. Eye Clinic, P.A.*,
  2018 WL 2980394 (D. Minn. June 14, 2018) ...................................................... 15, 17

*Druding v. Care Alts.*,
  2017 WL 11461795 (D.N.J. June 21, 2017) ............................................................... 16

*Edmond v. Univ. of Miami*,
  2009 WL 10667430 (S.D. Fla. Sept. 18, 2009) .......................................................... 16

*FTC v. Am. Future Sys.*,
    2022 WL 1437562 (E.D. Pa. Apr. 8, 2022) .................................................................. 37

*Giannerini v. Embry-Riddle Aeronautical Univ., Inc.*,
    2023 WL 8016049 (M.D. Fla. Nov. 20, 2023) .......................................................... 31

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*,
    2016 WL 7042117 (D. Minn. July 25, 2016) ...................................................... 15, 20

*Lynch v. Experian Info. Sols., Inc.*,
    569 F. Supp. 3d 959 (D. Minn. 2021) ......................................................................... 40

*MetroPCS v. A2Z Connection, LLC*,
    2020 WL 127550 (D. Nev. Jan. 10, 2020) ................................................................. 16

*Patient A v. Vt. Agency of Human Servs.*,
    2016 WL 880036 (D. Vt. Mar. 1, 2016) ..................................................................... 37

*Paul v. Winco Holdings, Inc.*,
    249 F.R.D. 643 (D. Idaho 2008) ................................................................................. 16

*Ramos v. Banner Health*,
    2018 WL 4700707 (D. Colo. Aug. 8, 2018) ........................................... 15, 16, 17, 19

*Rochester Drug Co-Op. v. Mylan Inc.*,
    2022 WL 1598377 (D. Minn. May 20, 2022) ...................................................... 14, 36

*Sill v. State Farm Lloyds*,
    2013 WL 12393984 (W.D. Tex. Apr. 8, 2013) .......................................................... 37

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
    2013 WL 4525226 (E.D. Pa. Aug. 27, 2013) ...................................................... 17, 18

*Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*,
    2021 WL 5087362 (D. Minn. Jan. 5, 2021) ............................................................... 32

*Stuart v. Cnty. of Riverside*,
    2023 WL 4826231 (C.D. Cal. June 15, 2023) ........................................................... 31

*Sylva Corp. v. Lewandowski*,
    2021 WL 5087267 (D. Minn. May 14, 2021) ............................................................ 32

*United States v. R&F Properties of Lake Cnty., Inc.*,
    433 F.3d 1349 (11th Cir. 2005) .................................................................................. 16

*Vaidyanathan v. Seagate US LLC*,
2010 WL 11469953 (D. Minn. Apr. 5, 2010) ........................................................ 31, 32

*Warren v. Credit Pros Int'l Corp.*,
2021 WL 3552254 (M.D. Fla. Apr. 26, 2021) .............................................................. 16

*Wartluft v. Milton Hershey Sch. & Sch. Tr.*,
2020 WL 1124771 (M.D. Pa. Mar. 6, 2020) ................................................................. 31

*Williston Basin Interstate Pipeline Co. v. Factory Mut. Ins. Co.*,
270 F.R.D. 456 (D.N.D. 2010) .................................................................................... 31

**Statutes**

18 U.S.C. § 923 ................................................................................................................ 25

Minn. Stat. § 624.7132 .................................................................................................... 28

**Court Rules**

Fed. R. Civ. P. 26 ............................................................................................................. 14

**Other Authorities**

27 C.F.R. § 478.121 ......................................................................................................... 25

27 C.F.R. § 478.129 ......................................................................................................... 25

28 C.F.R. § 25.9 .......................................................................................................... 27, 28

U.S. Gov't Accountability Off., GAO-16-552, *Firearms Data: ATF Did
Not Always Comply with the Appropriations Act Restriction and Should
Better Adhere to Its Policies* (June 2016), https://www.gao.gov/as-
sets/gao-16-552.pdf ........................................................................................................ 28

## INTRODUCTION

The parties are just beyond the halfway point of a 12-month fact-discovery period. As of today, Fleet Farm has made five document productions totaling 6,910 documents, comprising nearly 30,000 pages. These productions are the result of an extensive review of more than 32,000 documents for responsiveness. At the same time, Fleet Farm has responded to dozens of purported discovery deficiencies and participated in hours of meet-and-confer discussions with Plaintiff. Where appropriate, Fleet Farm has offered reasonable, tailored solutions to the issues Plaintiff raised, which have ultimately resolved many of the alleged deficiencies. Yet as this case has progressed, it has become apparent that Plaintiff is using discovery not as a tool to obtain relevant information, but as a mechanism to audit anything at Fleet Farm having to do with firearms, and to try to regulate Fleet Farm via the discovery process. As a result, it is fair to characterize Plaintiff's motion as a manufactured dispute, one stemming not from Fleet Farm's discovery conduct, but rather from Plaintiff's overreaching approach to discovery and unwillingness to tailor its discovery to the allegations in the complaint.

Specifically, Plaintiff's motion raises six issues relating to Fleet Farm's discovery efforts to date, and should be denied in its entirety because each issue seeks to compel information irrelevant to Plaintiff's actual claims, and many seek discovery that is disproportionate, is unduly burdensome, and/or implicates significant privacy interests.

*First*, the Court should define the temporal discovery period as encompassing October 5, 2016 through October 5, 2022. This period ends on the date Plaintiff filed its complaint, and captures the entire statute-of-limitations period.

- 1 -

**Second**, the Court should order Fleet Farm to produce only ATF Form 4473s (and corresponding Form 3310.4s) for customers who purchased thirteen or more handguns from Minnesota stores during the relevant period. These are the only customers with purchasing patterns conceivably analogous to those alleged in the complaint. Likewise, the Court should authorize Fleet Farm to produce Acquisition & Distribution ("A&D") logs in redacted form, so the only customers whose personal identifiable information ("PII") are disclosed to Plaintiff are those whose Form 4473s have been produced.

**Third**, Fleet Farm has fully complied with its obligations under Federal Rule of Civil Procedure 33(d) because it has identified responsive documents by pointing Plaintiff to specific Bates numbers. That Fleet Farm has identified a large number of documents responsive to certain interrogatories is simply a consequence of Plaintiff serving overly broad requests.

**Fourth**, Fleet Farm should not be compelled to produce communications about the *fact* of the litigation because those communications fall outside the appropriate temporal discovery period. And regardless, Plaintiff has not demonstrated why communications discussing the *fact* of the litigation—as opposed to discussing the **substance** underlying it—have any relevance.

**Fifth**, Fleet Farm should not be compelled to provide information and documents regarding its general corporate identity and structure because Plaintiff has not and cannot explain why such materials are relevant to the actual claims asserted.

**Sixth**, the Court should adopt Fleet Farm's proposed scope of production for employee evaluations and personnel files. The software platform Fleet Farm utilizes for

human-resources documents has limited search functionality, such that, as relevant here, Fleet Farm can only filter those records by individual employee name. Consequently, Fleet Farm has offered to produce any and all disciplinary actions related to firearm transactions (and accompanying employee evaluations) for individuals Plaintiff identifies as either having transferred firearms to suspected straw purchasers or otherwise having potential relevance to its claims. These individuals' identities are and will be readily ascertainable to Plaintiff, and Fleet Farm's proposal ensures Plaintiff will obtain any theoretically relevant files without imposing an undue burden on Fleet Farm.

<u>**BACKGROUND**</u>

**I.     Plaintiff files an action against Fleet Farm regarding alleged negligent handgun sales.**

Plaintiff seeks to hold Fleet Farm liable for "gun trafficking and gun violence" purportedly attributable to its alleged "s[ales] [of] handguns to straw purchasers—people who illegally purchase guns for others who cannot legally obtain them." ECF Doc. 79 ("Compl.") ¶ 1. Specifically, Plaintiff contends Fleet Farm violated federal laws relating to commercial firearm transactions by selling handguns to two individuals: Jerome Horton and Sarah Elwood. *Id.* ¶¶ 37-61. Fleet Farm sold twenty-three handguns and one long gun to Horton "between mid-June 2021 and mid-October 2021," and thirteen handguns to Elwood "from June 2020 to May 2021." *Id.* ¶¶ 37-38, 53-54.[1] According to Plaintiff, these sales were unlawful based on "[t]he sheer volume" of purchases, and because Horton and

---

[1] These are just a subset of the firearms that Horton and Elwood purchased from Minnesota-based FFLs. *See* Compl. ¶¶ 37, 53. Plaintiff has not named any of these other FFLs as defendants in this or any other litigation.

Elwood purchased "multiple handguns at once," made multiple purchases "at the same [Fleet Farm] location within five business days on several occasions," mostly purchased firearms that were "the same caliber of handgun," and Horton, on one occasion, "us[ed] the camera feature" on his phone to "take photographs or video" while purchasing a handgun. *Id.* ¶¶ 40-42, 55-56. Neither the complaint nor the record indicate Fleet Farm engaged in any conduct after October 2021—let alone after the complaint was filed— relevant to Plaintiff's claims. Nor does the complaint allege Fleet Farm engaged in any wrongful conduct relating to employee oversight or discipline.

Based solely on sales to Horton and Elwood, Plaintiff has asserted claims for negligence, negligence per se, negligent entrustment, aiding and abetting, public nuisance, and alleged violations of the Minnesota Gun Control Act ("MNGCA"). *Id.* ¶¶ 70-120.[2]

## II.   Plaintiff serves wide-ranging discovery requests.

On July 20, 2023, Plaintiff served thirty-one requests for production ("RFPs") and fifteen interrogatories. ECF Docs. 73-1, 73-2. Fleet Farm responded to these discovery requests on August 21. ECF Docs. 73-3, 77. Although Plaintiff purported to address "overarching deficiencies" with Fleet Farm's responses in a September 18 letter, ECF Doc. 73-7, it was not until November 22 that Plaintiff first enumerated specific concerns, *see* ECF Doc. 73-13. In that November 22 letter, Plaintiff asserted Fleet Farm's responses were deficient for twenty-eight reasons. *See id.* Fleet Farm responded on December 5, the

---

[2] Plaintiff's MNGCA claim was added by motion, ECF Doc. 61, which the Court granted on March 5, ECF Doc. 76. Fleet Farm is evaluating whether it will file objections to the Court's order pursuant to Local Rule 72.2(a).

parties held a meet-and-confer on December 20, and the parties engaged in further negotiations throughout January and into February 2024.  ECF Docs. 73-14, 73-15, 73-17, 73-18; Decl. of Andrew W. Davis ("Davis Decl."), Ex. A.  During these discussions, the parties ultimately resolved twenty-two of Plaintiff's concerns.  The relevant background for the six remaining concerns are detailed below.

### A.    The relevant period for discovery.

Plaintiff's discovery requests defined the relevant period as running "from October 5, 2016, through the date of your response, unless otherwise specifically indicated."  ECF Doc. 73-1 at 2.  Fleet Farm objected, stating "unless otherwise specified, [it] will produce documents for the time period between October 5, 2016 and October 5, 2022," the date the complaint was filed.  ECF Doc. 73-3 at 7.  At the parties' meet-and-confer, Plaintiff proposed "August 2, 2024, i.e., the end of fact discovery per the scheduling order, as the end date for the relevant discovery period," and Fleet Farm explained that deadline would be unworkable because if documents created in the days leading up to August 2 need to be produced, that would require substantial document production and other activities to occur *after* the close of fact discovery.  ECF Doc. 73-17 at 1-2.

### B.    The scope of production of firearm transaction records.

RFP No. 6 seeks "[a]ll firearms transaction records, including acquisition and disposition records, since January 1, 2017."  ECF Doc. 73-1 at 4.  In response, Fleet Farm stated it would "conduct a reasonable search and produce" ATF Form 4473s and 3310.4s

and Acquisition and Disposition ("A&D") logs[3] from Fleet Farm's retail stores in Minnesota and its distribution center from January 1, 2017, through October 5, 2022. ECF Doc. 73-3 at 11. Fleet Farm also explained it would "perform a reasonably diligent search of readily accessible documents," noted it "ha[s] not completed [its] discovery, investigation, or preparation for trial," and stated "information provided in response to these Requests is provided without prejudice to [its] right to make further objections." *Id.* at 3, 5.

Between October 2023 and January 2024, Fleet Farm continued to investigate Plaintiff's claims and the burdens associated with responding to Plaintiff's discovery, and concluded it would not be reasonable to collect, review, scan, and produce all Form 4473s reflecting transactions between January 1, 2017, and October 5, 2022, because: (1) the vast majority of Form 4473s were irrelevant as they concerned long guns (i.e., hunting rifles or shotguns) or reflected purchases by individuals who did not acquire numerous handguns within a concentrated period; (2) producing Form 4473s would be unduly burdensome because federal law requires the forms to remain on site, meaning any production will

---

[3] Form 4473s are required to be completed before any firearm transfer, and Form 3310.4s are automatically created to document instances where a person has acquired multiple handguns from the same FFL in either a single transaction or within five consecutive business days. Decl. of Michael Radl ("Radl Decl.") ¶¶ 4-9, Exs. A-B. Fleet Farm stores must maintain physical copies of both forms on their premises. *Id.* ¶¶ 8-10. A&D logs are electronic records of all firearms acquired and disposed of (i.e., sold or transferred) by an FFL, and include a description of the firearm received or disposed, the date the firearm was received and from whom it was received, and the date the firearm was disposed and the name and address of the person to whom it was disposed. *Id.* ¶¶ 11-12. All information contained in A&D logs regarding the transferee and transferred firearm is also reflected on the corresponding Form 4473. *Id.* ¶ 13.

require traveling to every Minnesota store to collect and scan hard-copy forms; and (3) producing all Form 4473s would implicate customers' privacy interests "by providing the Attorney General with a comprehensive list of law-abiding citizens' firearm purchases from a more than half-decade-long period."  ECF Doc. 73-11 at 3-5; ECF Doc. 73-14 at 4-7; ECF Doc. 73-15 at 2-3.  Consistent with its approach to the Form 4473s, Fleet Farm also indicated it will produce A&D logs redacting customers' information except for those whose Form 4473s are produced, again due to the irrelevance of that information and privacy concerns.  Davis Decl., Ex. A at 3.

Ultimately, Fleet Farm offered to produce Form 4473s (and any corresponding 3310.4s) for customers who purchased thirteen or more handguns between January 1, 2017 and October 5, 2022, and redacted copies of applicable A&D logs identifying those same purchases.  ECF Doc. 73-14 at 6-7; Davis Decl., Ex. A at 3.  Fleet Farm explained this proposal was tied to Plaintiff's actual claims, as Plaintiff asserted Elwood and Horton purchased, respectively, thirteen and twenty-four firearms from Fleet Farm stores during the relevant period.  *Id.* at 7.  On December 20, Plaintiff rejected this offer, indicating it believed a quantitative floor of "thirteen or more handguns" was too narrow.  ECF Doc. 73-15 at 2.  On December 22, Plaintiff proposed Fleet Farm produce "Form 4473s and Form 3310.4s" for "purchasers who purchased two or more firearms from any Fleet Farm stores within any 14-day period."  Davis Decl., Ex. A at 3.  Plaintiff also proposed Fleet Farm "produce[] all A&D logs in their entirety," but offered that Fleet Farm "may redact personally identifying information ... for all purchasers other than purchasers who purchased two or more firearms from any Fleet Farm stores within any 14-day period."  *Id.*

On January 24, 2024, Fleet Farm rejected Plaintiff's proposal, and reiterated its offer to produce Form 4473s and 3310.4s for customers who purchased thirteen or more handguns from Minnesota stores during the relevant period.  ECF Doc. 73-15 at 3.  Fleet Farm also noted its appreciation that Plaintiff recognized "it is appropriate for Fleet Farm to redact [PII] ... for all purchasers other than purchasers whose Form 4473s are produced." *Id.* at 1 (cleaned up).  The next day, Plaintiff rejected Fleet Farm's offer and reversed its position regarding redacted A&D logs, asserting it "was only willing to [agree to] limited redactions of A&D logs if this allowed the parties to reach a compromise without Court intervention."  ECF Doc. 73-16 at 1.

## C.    Fleet Farm's invocation of Fed. R. Civ. P. 33(d) in response to certain interrogatories.

Fleet Farm responded to nine of Plaintiff's interrogatories (Nos. 5-7, 9, and 11-15) by invoking Rule 33(d), referring Plaintiff to "documents they will be producing in response to" certain RFPs instead of providing narrative answers.  ECF Doc. 77 at 10-14, 16-19.  These interrogatories asked Fleet Farm to identify and describe, among other things: (1) every "polic[y] and procedure[] related to the sale of firearms"; (2) "every Fleet Farm [personnel] who has … communicated with[] or otherwise contacted" Horton, Elwood, or certain other identified persons; (3) "every Fleet Farm [personnel]" who has spoken with any law-enforcement agency "regarding a firearm sale at a Minnesota Store"; (4) "every instance in which Fleet Farm investigated or audited" employee compliance with firearm policies and procedures; (5) "every requested firearms sale in Minnesota that Fleet Farm decided not to complete"; (6) "every person that Fleet Farm has identified or

suspected to be a straw purchasers"; and (7) any "contacts" between law enforcement and Fleet Farm's Minnesota stores "related to [the] sale of firearms." *Id.*

After conferring with Plaintiff, Fleet Farm provided narrative responses to Interrogatory Nos. 6 and 13, *see* Davis Decl., Ex. F, and only the responses to Interrogatory Nos. 5, 7, 9, 14, and 15 remain disputed, *see* Pl.'s Br. 29.[4]  For these interrogatories, Fleet Farm referred Plaintiff to documents it would be producing in response to certain RFPs, described the categories of records that would be produced to answer each interrogatory, and explained it would "identify by Bates number the specific records that Plaintiff should review to determine the answer to [these] interrogatories."  ECF Doc. 73-9 at 2-3.  Fleet Farm also explained it invoked Rule 33(d) because these interrogatories are "broad and unduly burdensome … are duplicative of RFPs[,] and seek voluminous, itemized lists of broad categories of information."  ECF Doc. 73-14 at 3.

Consistent with Rule 33(d), Fleet Farm has included a cover letter with each production identifying by Bates number the specific documents Plaintiff should review to determine the answers to Interrogatory Nos. 5-6, 9, 11-12, and 14-15.  ECF Docs. 73-9 at 3, 73-19, 73-20, 73-21, 73-22.  As for Interrogatory No. 7, Fleet Farm explained "read literally," this interrogatory "would include every single interaction between Defendants' employees and a law enforcement agency relating to firearms," including "any and all

_____

[4] It is unclear whether Plaintiff contends Fleet Farm's answer to Interrogatory No. 12 is deficient.  Initially, Plaintiff states "[b]ased on Fleet Farm's identification of a spreadsheet with respect to Interrogatory Nos. 11 and 12 … the State's Motion to Compel no longer encompasses these interrogatories."  Pl.'s Br. 13 n.5.  But Plaintiff later includes Interrogatory No. 12 in the list of interrogatories it contends need to be answered by written narrative.  *See id.* at 29.

emails sent between Defendants and law enforcement." ECF Doc. 73-9 at 5. To satisfy Interrogatory No. 7, Fleet Farm offered to "provide a list of individuals in leadership positions at Fleet Farm … who had primary responsibility for communicating with law enforcement on issues relating to firearm sales." *Id.* Plaintiff never responded to this offer.

### D.   Internal communications regarding the fact of the lawsuit.

RFP No. 30 seeks "[a]ll communications made or received by any Fleet Farm [personnel] regarding this lawsuit." ECF Doc. 73-1 at 8. Fleet Farm objected on relevancy grounds, ECF Doc. 73-3 at 25-26, explaining "[t]o the extent Fleet Farm personnel communicated about the fact of the litigation, rather than the substance of the litigation," such communications are irrelevant, ECF Doc. 73-14 at 10-11. Plaintiff later confirmed "pure transmittal communications sharing the existence of the lawsuit need not be produced," but asserted "to the extent communications relate to the lawsuit beyond pure transmittal … and are non-privileged, such communications must be produced." ECF Doc. 73-17 at 4.

### E.   Fleet Farm's general corporate and organizational structure.

RFP Nos. 3 and 4 seek "[t]he governing documents for Fleet Farm" and "[o]rganizational charts or similar documents sufficient to show (a) the organizational structure of Fleet Farm, (b) the organizational structure of Fleet Farm in relation to any [related] entity or component, ... (c) the hierarchy of senior management personnel within Fleet Farm[,] [and] (d) the hierarchy of management personnel involved in the sale of firearms at Minnesota Stores." ECF Doc. 73-1 at 3-4. Interrogatory Nos. 3 and 4 ask Fleet Farm to describe "the relationship between Defendants and identify all entities involved in

Fleet Farm's corporate structure" and "Fleet Farm's corporate structure and any changes to such corporate structure over time, including identifying your corporate departments, divisions, officers, directors, managers, members, partners, and board members for each year." ECF Doc. 73-2 at 3-4. Fleet Farm objected to these requests, but provided Plaintiff "the list of individuals ... who held corporate leadership positions in ... the establishment, modification, oversight, and/or monitoring of [Fleet Farm]'s policies, procedures, and practices relating to firearm sales." ECF Doc. 73-3 at 9-10; ECF Doc. 77 at 6-8; Davis Decl., Ex. F.

Fleet Farm explained the only purported relevance of the information sought by these requests is understanding how "Fleet Farm's management relates to oversight in the sale of firearms," and this information is wholly captured by Fleet Farm's now-amended response to Interrogatory No. 2. ECF Doc. 73-14 at 9 (cleaned up). But in the spirit of compromise, Fleet Farm has amended its response to Interrogatory No. 2 to further describe "the hierarchical relationship between the identified individuals and job titles." *Id.* at 9 n.6; *see also* Davis Decl., Ex. F.

### F.     Production of certain employee information.

RFP Nos. 21 and 22 seek "[a]ll documents related to any Fleet Farm [personnel] against whom Fleet Farm has taken or is taking disciplinary action for violating any Fleet Farm policy or procedure related to the sale of firearms in Minnesota," and "[a]ll documents related to performance evaluations or promotions of Fleet Farm [personnel] involved in the sale of firearms in Minnesota." ECF Doc. 73-1 at 6-7. ROG No. 8 asks Fleet Farm to identify "every ... employee, agent, manager, director, or principal against

whom Fleet Farm has taken or is taking disciplinary action for violating any Fleet Farm policy or procedure related to the sale of firearms" and "describe all details related to that person's conduct, Fleet Farm's investigation into the conduct, and the ultimate disciplinary decision made by Fleet Farm." ECF Doc. 73-2 at 5. Fleet Farm objected that the requests were overly broad and sought irrelevant information, and it would be unduly burdensome to respond. ECF Doc. 73-3 at 20-21; ECF Doc. 77 at 12-13.

Specifically, Fleet Farm noted Plaintiff could not explain "why '***all*** documents related to ***any*** Fleet Farm [personnel]' against whom disciplinary action was taken are relevant," nor why "'***all*** documents related to the performance evaluations or promotions of Fleet Farm [personnel]' involved in firearm sales" are relevant. ECF Doc. 73-14 at 11. Fleet Farm also explained, as a practical matter, it could not obtain these materials "without an undue burden" because its human-resources records have been digitized on a system with "very limited search functionality." After conferring with Plaintiff, Fleet Farm offered "to produce any records reflecting 'disciplinary actions' relating to firearm sales of any individual Plaintiff identifies to Fleet Farm as potentially being relevant to its claims, as well as any corresponding performance evaluations," including but not limited to "such records (if they exist) for any of the individuals that sold firearms to Jerome Horton or Sarah Elwood." ECF Doc. 73-18 at 3. Plaintiff did not respond to this compromise offer.

## III. Fleet Farm has worked diligently to produce documents responsive to Plaintiff's discovery requests.

In its RFP responses, Fleet Farm confirmed it would "perform a reasonably diligent search of readily accessible documents in its possession," and offered to "meet and confer

regarding the specific parameters regarding" search terms.  ECF Doc. 73-3 at 3.  On September 18, 2023, in response to this statement, Plaintiff suggested it was a "deficienc[y]" for Fleet Farm to seek to "confer about a protocol for search criteria" before producing documents.  ECF Doc. 73-7 at 1.  On September 21, Fleet Farm explained "[w]ritten discovery responses routinely reference agreements to meet and confer as to the scope of discovery," and Fleet Farm's proposed "search term protocol is fully consistent with the Court's own guidance, which states that a party's 'search methodology may benefit from input from one's opponent, and agreements on some or all of these issues can enhance efficiency and minimize disputes.'"  Davis Decl., Ex. B at 1-2 (citation omitted). On October 3, Fleet Farm reiterated that discussing search terms and custodians "is a productive and advisable process, particularly in cases such as this one with asymmetrical discovery obligations and broad discovery requests."  ECF Doc. 73-9 at 5.

On October 24, Plaintiff asked Fleet Farm "when [it] will provide search terms and custodians … for input and discussion."  ECF Doc. 73-10 at 2.  Fleet Farm responded on November 7 with a list of proposed search terms and custodians.  Davis Decl., Ex. C.  A week later, Fleet Farm informed Plaintiff it "intend[ed] to begin review[ing] … documents for production as soon as practicable," and asked if Plaintiff had "reasonable suggestions … to the current set of search terms before the review gets underway."  *Id.* at 1.  The parties then exchanged a series of search terms over several weeks.  *Id.*, Exs. C-E; *id.* ¶ 11.  While search term and custodian discussions were ongoing, Fleet Farm began running search terms and reviewing for responsive documents, and conducted targeted collections of certain categories of responsive documents.  *Id.* ¶ 12.  This review is ongoing, and as of

today, 32,824 documents have been reviewed for responsiveness.  *Id.* ¶ 13.  To date, Fleet Farm has made five productions totaling 6,910 documents and nearly 30,000 pages, and presently anticipates its document production will be substantially complete by April.  *Id.* ¶ 14.[5]  Alongside each production and pursuant to Rule 33(d), Fleet Farm identified the Bates numbers for specific documents containing answers to certain interrogatories.  ECF Docs. 73-9 at 3, 73-19, 73-20, 73-21, 73-22.

<u>ARGUMENT</u>

Rule 26 authorizes discovery into nonprivileged matters "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, … the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Although Rule 26 is construed broadly, "'broadly' is not synonymous with 'limitless,'" and "a party can only discover what is relevant to the actual claims or defenses that are at issue."  *Rochester Drug Co-Op. v. Mylan Inc.*, 2022 WL 1598377, at *4 (D. Minn. May 20, 2022); *see also Bepex Int'l, LLC v. Hosokawa Micron BV*, 2022 WL 3701406, at *2 (D. Minn. Feb. 8, 2022) (discovery is limited to "only what is relevant to the actual claims or defenses that are at issue").  The party seeking discovery "has the burden of making a threshold showing that the information sought is relevant to the claims or defenses in the case."  *Rochester Drug Co-Op.*, 2022 WL 1598377, at *4.

---

[5] By contrast, Plaintiff has produced 248 documents totaling 2,160 pages, many of which are publicly available court submissions or news articles.  Davis Decl. ¶ 15.

I.   **The temporal scope of discovery should encompass the six-year period preceding the complaint's filing.**

The Court should define the "relevant time period" for discovery as October 5, 2016 to October 5, 2022 (except where Plaintiff has defined the beginning of the period as January 1, 2017).  An end date of October 5, 2022 is consistent with the approach generally taken by courts, and is appropriate in light of Plaintiff's actual claims.

A.   **The Court should define the temporal discovery period as ending on October 5, 2022.**

Plaintiff's allegations confirm the temporal discovery period should be defined as ending on October 5, 2022.  Courts recognize the temporal scope of discovery should not be open-ended: there must be a clear end date.  *E.g.*, *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 2016 WL 7042117, at *6 (D. Minn. July 25, 2016); *Ramos v. Banner Health*, 2018 WL 4700707, at *3 (D. Colo. Aug. 8, 2018).  A plaintiff may not conduct discovery "across an unlimited timeline, especially when the plaintiff has pleaded a specific and limited timeline in its complaint."  *U.S. ex rel. Dicken v. Nw. Eye Clinic, P.A.*, 2018 WL 2980394, at *3 (D. Minn. June 14, 2018).  "[S]ome end date" to discovery "must be established; otherwise, discovery would never end."  *U.S. ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896, 906 (S.D. Ind. 2018).

Accordingly, courts consistently hold the temporal scope of discovery should, at most, mirror the statute-of-limitations period and end when the complaint was filed.  *E.g.*, *Inline Packaging, LLC*, 2016 WL 7042117, at *6 (explaining "courts tend to allow discovery for a reasonable temporal period antedating the filing of a complaint and the

- 15 -

beginning of the pertinent statute of limitations").[6]  This remains true even where ongoing conduct is alleged.  *E.g.*, *United States v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) (holding in case alleging ongoing practice of submitting "false [billing] claims … into the undefined future," the temporal discovery period ran only "through the date of the original complaint"); *Druding v. Care Alts.*, 2017 WL 11461795, at *5 (D.N.J. June 21, 2017) (explaining where complaint "places no temporal constriction on when [the] alleged fraudulent conduct allegedly ended, the upper temporal limit for discovery in this action should be no later than" the date the initial complaint was filed).

Here, the Court should apply the general rule and hold the date the complaint was filed is the end date for the temporal discovery period.  This end date is reasonable in light of the timeline of specific allegations in the complaint.  Caselaw is clear that "[w]hen evaluating the temporal scope of discovery, the court's task is to balance the relevance of the information against the burden on the defendant."  *Ramos*, 2018 WL 4700707, at *3 (quotation omitted).  The specific allegations of Fleet Farm's purported wrongdoing span sixteen months: June 2020 to October 2021.  Compl. ¶¶ 38, 54.  Specifically, Plaintiff alleges Fleet Farm sold firearms to Jerome Horton "between mid-June 2021 and mid-October 2021" and to Sarah Elwood "in the 12-month span from June 2020 to May 2021."

---

[6] *See also Warren v. Credit Pros Int'l Corp.*, 2021 WL 3552254, at *8 (M.D. Fla. Apr. 26, 2021) (limiting discovery period to "the four years prior to the date of the original [c]omplaint"); *MetroPCS v. A2Z Connection, LLC*, 2020 WL 127550, at *2 (D. Nev. Jan. 10, 2020) (permitting "a five year look back from the date the complaint was filed"); *Edmond v. Univ. of Miami*, 2009 WL 10667430, at *3 (S.D. Fla. Sept. 18, 2009) (explaining discovery period being "the three-year period before the complaint was filed" was "supported by legal authority"); *Paul v. Winco Holdings, Inc.*, 249 F.R.D. 643, 654 (D. Idaho 2008) (setting end date for discovery period as date complaint was filed).

*Id.* ¶¶ 37-38, 53-54.  Neither the complaint nor the record suggest Fleet Farm engaged in any conduct after the complaint was filed relevant to Plaintiff's claims.  This absence is all the more telling given that in January 2024, Plaintiff filed a motion for leave to amend the complaint.  ECF Doc. 61.  This motion was granted on March 5, ECF Doc. 76, and Plaintiff's amended complaint does not add any factual allegations against Fleet Farm, let alone allegations regarding purported misconduct post-dating the complaint's filing, *see* ECF Doc. 79.  Despite the limited timeline of alleged misconduct, Fleet Farm is proposing a six-year discovery window, and discovery outside this window is unnecessary given the absence of any alleged misconduct after October 2021.  *E.g.*, *Dicken*, 2018 WL 2980394, at *2-3 (explaining proportionality is an "important overall constraint" to discovery, and concluding June 2014 was an appropriate end date for discovery where plaintiff did not allege any misconduct after that date).  Plaintiff does not even attempt to advance a non-conclusory argument for why Fleet Farm's post-October 2022 activities have any bearing on its claims.

Plaintiff's threadbare allegations of ongoing conduct do not warrant discovery through August 2024.  Courts are clear: discovery post-dating the complaint is appropriate only if that period is "relevant to the claims … and not a fishing expedition into other potential claims."  *Ramos*, 2018 WL 4700707, at *3.  And conclusory allegations of ongoing conduct are insufficient.  To illustrate, in *U.S. ex rel. Spay v. CVS Caremark Corp.*, the court explained "[t]he simple inclusion of a cursory allegation that the Defendants' conduct is ongoing ... does not automatically entitle Plaintiff to obtain expansive discovery to the present of all of Defendants' practices in order to uncover new ... claims."  2013 WL

- 17 -

4525226, at *3 (E.D. Pa. Aug. 27, 2013).  The court "decline[d] to allow such a fishing expedition into potential fraudulent claims beyond [the dates referenced in the complaint] absent some particularized pleading that any such claims occurred" and limited the scope of discovery to the period repeatedly referenced in the complaint.  *Id.* at *4.

Here, again, there is no plausible suggestion that Fleet Farm engaged in any misconduct after October *2021*, let alone after October 2022.  The straw purchasing alleged in the complaint occurred between June 2020 and October 2021, well before Fleet Farm's proposed temporal end date.  Despite not identifying a single instance of alleged misconduct after October 2021, Plaintiff alleges in conclusory terms that Fleet Farm has "breached and continue[s] to breach [its] duty of care to the State and its citizens," and seeks to enjoin it from "engaging in conduct in violation of Minnesota law."  Compl. ¶¶ 76, 84; *id.*, Requested Relief ¶ 3; *see also* Pl.'s Br. 30.  These are superficial allegations that cannot justify extending discovery nearly *two years* beyond the complaint's filing to encompass a nearly *eight-year* period.  Instead, consistent with the standard rule, the Court should define the temporal scope of discovery as ending on October 5, 2022, the date the complaint was filed.[7]

---

[7] Plaintiff makes much of Fleet Farm purportedly producing a small number of "licensing related documents" post-dating October 5, 2022.  Pl.'s Br. 31.  This is simply an illustration of the imperfections of the document gathering and production process, and is not to suggest Fleet Farm intends or believes it would be appropriate to use those documents as evidence in this case.

**B.**     **Plaintiff's proposed August 2, 2024 end date is impractical and unsupported.**

Beyond the fact that discovery into documents or information regarding post-October 5, 2022 activities is irrelevant, defining the "end date" for the temporal discovery period as commensurate with the fact-discovery deadline would create numerous practical impossibilities.  Imposing such a deadline would require both parties to collect, review, and produce numerous documents *after* the fact-discovery cutoff, violating the scheduling order's requirement that fact discovery "shall ... be completed on or before August 2, 2024."  ECF Doc. 41 at 1.  It would likely take multiple weeks to complete these final productions, particularly if Fleet Farm was required to produce certain firearm transaction records through August 2, 2024.[8]  Then, once these productions are complete, it is entirely possible Plaintiff will seek to re-depose Fleet Farm and its employees.  This may also interfere with the expert-discovery deadlines in the scheduling order, which contemplates initial reports being served in early September.  *Id.* at 2.  Plaintiff does not even attempt to address the practical consequences of its proposal, nor does Plaintiff offer a single authority supporting the proposition that the temporal cutoff for discovery should be tied to the fact-discovery deadline in this type of case.  *See* Pl.'s Br. 30-31.[9]

---

[8] As detailed below, the practical challenges associated with producing even a subset of its hard-copy ATF Form 4473s and 3310.4s make it difficult for Fleet Farm to start any production of such forms until the end of the temporal discovery period.  *Infra* § II.B.

[9] Plaintiff offers two cases in support of its time-period argument, but neither actually supports its position.  In *Ramos*, the court ordered production of only specific, limited categories of documents post-dating the complaint (meeting minutes from *prior* calendar years), and required only "quarterly Plan assert balances and Plan participation counts" be produced through the end of discovery because plaintiffs had shown those specific documents were "relevant to monetary relief."  2018 WL 4700707, at *3–6.  In *Inline*, the

II.     **Fleet Farm should only be required to produce firearm transaction records reflecting customers who purchased thirteen or more handguns during the temporal discovery period.**

Plaintiff seeks to compel Fleet Farm to produce all A&D logs in unredacted form, all Form 3310.4s, and an unspecified number of Form 4473s "consistent with … prior offers," which Fleet Farm interprets as Form 4473s for customers "who purchased two or more firearms from any Fleet Farm stores [in Minnesota] within any 14-day period" during the temporal discovery period.  Pl.'s Br. 23-26; Davis Decl., Ex. A at 3.  Notably absent from Plaintiff's brief is any discussion of why or how all of these Form 4473s and 3310.4s, and every single entry in Fleet Farm's A&D logs, are relevant to Plaintiff's actual claims.  Plaintiff's silence speaks volumes: there is simply no plausible argument that all of this information is relevant.  This is not a case about firearm purchases in general; a charitable reading of Plaintiff's complaint suggests it is concerned, at most, with individuals purchasing a large volume of handguns in short periods of time.

Accordingly, although Fleet Farm disputes whether the quantity of firearm purchases, standing alone, is ever sufficient evidence of an improper sale, it is willing to compromise and produce Form 4473s and 3310.4s and unredacted portions of its A&D logs to the extent they reflect purchasing patterns arguably analogous to those alleged in

_____

court defined the temporal scope of discovery as running from "January 1, 2002, to the present" because the case involved monopolization claims, and "caselaw indicates that what constitutes 'a reasonable temporal period' of discovery [for monopolization claims] is generally ***significantly greater*** than in cases involving other types of claims."  2016 WL 7042117, at *6 (emphasis added) (citation omitted).

- 20 -

the complaint.[10]   But considerations of relevancy, burden, and the significant privacy concerns implicated by this discovery, require that any production be focused on and limited to materials with some conceivable nexus to Plaintiff's actual claims.

### A.   The vast majority of Form 4473s (and corresponding 3310.4s) have no relevance, and the Court should only permit discovery into purchasing patterns arguably analogous to Horton's and Elwood's.

Plaintiff seeks the production of Form 4473s for "purchasers who purchased two or more firearms from any Fleet Farm stores within any 14-day period" during the relevant period, which would necessarily result in also producing every Form 3310.4 from the relevant period.  *See* Davis Decl., Ex. A at 3; Decl. of Michael Radl ("Radl Decl.") ¶ 9; Pl.'s Br. 23-24.  This request is overly broad and seeks irrelevant information.

*First*, Form 4473s contain little information plausibly relevant to Plaintiff's claims. Form 4473s will show the identity of the person seeking to acquire a firearm, the type of firearm, and whether NICS authorized the federal firearm licensee ("FFL") to "proceed" with the transfer.  *See* Radl Decl. ¶¶ 4–7; *id.*, Ex. A.[11]   Standing alone, it is unclear how a Form 4473 has any relevance to Plaintiff's claims.  In fact, Plaintiff has acknowledged the

---

[10] Although Plaintiff seeks to separate the production of Form 4473s from Form 3310.4s, *see* Pl.'s Br. 23, these documents must be produced simultaneously.  When a transaction triggers a Form 3310.4, Fleet Farm, pursuant to federal law, attaches the form to and stores it with the corresponding Form 4473.   Radl Decl. ¶¶ 10, 17.   Accordingly, when determining the appropriate scope of records to be produced in this action, the Court should begin by determining the appropriate scope of production of Form 4473s, as that will necessarily determine the appropriate scope of production of Form 3310.4s and the scope of A&D log entries to be produced in unredacted form.

[11] Fleet Farm's policy is to never transfer a firearm until the store has received a "Proceed" message from NICS.  Radl Decl. ¶ 7; *id.*, Ex. B.

limited utility of the Form 4473 to its claims, stating "an ATF Form 4473 itself does not indicate whether the purchaser was actually law-abiding or not."  ECF Doc. 73-12 at 3.

**Second**, Plaintiff's request would encompass Form 4473s concerning handguns **and** those concerning rifles and shotguns.  Roughly half the firearms sold by Fleet Farm between January 1, 2017 and October 5, 2022 were rifles or shotguns.  Radl Decl. ¶ 15. But the complaint makes clear the actual claims in this case center around Fleet Farm "s[elling] **handguns** to straw purchasers."  Compl. ¶ 1 (emphasis added); *see also, e.g.*, *id.* ¶ 3 (alleging "straw purchasers secured sought-after handguns from ... Fleet Farm"); *id.* ¶ 35 (alleging Fleet Farm "lists 235 different handgun models for sale" on its website); *id.* ¶ 41 (suggesting it was a "red flag of straw purchasing" that Horton purchased "nearly all the same caliber (9mm) of handgun"); *id.* ¶ 44 (alleging Horton "transferred six ... handguns … to Gabriel Young-Duncan").  Relevancy is determined by reference to the actual claims alleged. The complaint confirms the only conceivably relevant transactions are those involving handguns.  Plaintiff's brief does not even attempt to explain how rifle or shotgun sales have any bearing on Plaintiff's claims.[12]

**Third**, Plaintiff's request is overly broad because this case does not concern Fleet Farm's handgun sales generally.  It concerns sales of multiple handguns to the same person in specific concentrated periods.  *E.g.*, Compl. ¶ 4 (alleging Fleet Farm "sold multiple handguns to straw purchasers in single transactions or in multiple sales over very short

---

[12] True, Plaintiff alleges Horton purchased a single rifle alongside twenty-three handguns. *See* Compl. ¶ 38; Pl.'s Br. 24 n.9.  But none of the complaint's substantive allegations are based on that purchase—the complaint is focused exclusively on alleged straw purchasing of handguns.

periods of time"); *id.* ¶ 25 (identifying "[m]ultiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time" and "[m]ultiple handgun purchases" as purported "red flags" of a straw purchase); *id.* ¶ 31 (citing laws relating to "reports of multiple sales of handguns"); *id.* ¶ 36 (alleging Fleet Farm disregarded "multiple purchases of similar handguns" and "buying sprees over concentrated periods"); *id.* ¶ 38 (highlighting "multiple firearm purchases on the same day"); *id.* ¶ 39 (alleging Fleet Farm "sold multiple handguns to Horton in very short periods"); *id.* ¶ 41 (alleging Fleet Farm "made multiple sales to Horton ... within five business days on several occasions"); *id.* ¶ 54 (highlighting "multiple firearm purchases on the same days"); *id.* ¶ 55 (alleging Fleet Farm "sold multiple handguns in the same day to Elwood" and emphasizing "three days in which Fleet Farm sold her multiple handguns mere days apart").  And the alleged hallmarks of a potential straw purchaser do not include simply purchasing two firearms within a fourteen-day window once—as Plaintiff's proposal would suggest. Indeed, the ***only*** wrongful sales alleged in the complaint were to Horton and Elwood, who purchased from Fleet Farm stores in Minnesota, respectively, twenty-three handguns (and one rifle) in a four-month period and thirteen handguns in a one-year period.  Compl. ¶¶ 37-38, 53-54.

The appropriate scope of discovery into Form 4473s should be dictated by Plaintiff's actual claims.  Accordingly, taking these considerations together, the scope of Form 4473s to be produced should be similar to the purchasing patterns of Horton and Elwood—who purchased twenty-four and thirteen firearms from Fleet Farm stores over short periods.  *Id.*  Given these allegations, Fleet Farm should be required to produce Form

4473s (and 3310.4s) only for those customers who purchased **thirteen or more handguns from Fleet Farm's Minnesota stores during the relevant period**.[13]

By contrast, Plaintiff's proposal is unreasonably broad, encompassing a wide range of persons whose lawful purchases have no conceivable relevance.  For example, under Plaintiff's proposal, Fleet Farm would be required to produce Form 4473s for a customer who purchased a single hunting rifle on January 5, 2017, a single handgun on January 19, 2017, and no other firearms in the last seven years.  There is no conceivable basis for contending this type of transaction is indicative of a straw purchase or otherwise relevant to Plaintiff's claims.  Again, Plaintiff does not even attempt to explain why *all* instances of persons purchasing two firearms within a 14-day period are relevant, but contends obliquely that firearm transaction records may show "particular patterns of purchasing," including "timing and quantities[] for firearms Fleet Farm sold."  Pl.'s Br. 24.  But that is exactly why Fleet Farm has offered to produce all Form 4473s (and related 3310.4s) reflecting "particular patterns of purchasing" and "timing and quantities" tethered to the allegations in the complaint, for customers with even arguably analogous purchasing patterns to those alleged in the complaint.

---

[13] To be sure, this proposal, which reflects Fleet Farm's compromise position, remains overbroad, as Horton and Elwood completed their purchases in compressed periods (four and twelve months), rather than over a six-year period.  Compl. ¶¶ 38, 54. Accordingly, it will certainly sweep within it entirely lawful firearm purchases by law-abiding citizens.

**B.    Plaintiff's requested scope of production of Form 4473s would impose an undue burden.**

In addition to these relevancy issues, Plaintiff's requested scope of production of Form 4473s would impose an undue burden.  Fleet Farm has seventeen retail stores throughout Minnesota.  Radl Decl. ¶ 14.  Under federal law, each store is registered as a separate FFL and required to maintain copies of all Form 4473s (and 3310.4s) on site.  *Id.* ¶¶ 8-9, 14; 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.121(a).[14]  Between January 1, 2017 and October 5, 2022, Fleet Farm's Minnesota stores sold more than 150,000 firearms, and Fleet Farm's records indicate these transactions are documented on more than 140,000 Form 4473s.  Radl Decl. ¶ 15.  These forms are stored in filing cabinets at all seventeen Fleet Farm locations throughout Minnesota in hard copy and in chronological order.  *Id.* ¶ 16.  Accordingly, any effort to collect these forms will require travelling to all seventeen locations throughout Minnesota and carefully collecting, reviewing, segregating, unstapling, scanning, restapling, re-filing, and redacting each page of the Form 4473s (which are seven pages long) and corresponding Form 3310.4s (which are two pages long). *Id.*

Plaintiff's proposed scope of production—all Form 4473s for customers who purchased two or more firearms from Fleet Farm's Minnesota stores within a 14-day period during the temporal discovery period—does not account for the time and cost burdens associated with producing ***any*** forms.  The proposal is estimated to result in Fleet Farm

---

[14] The only exception is a Fleet Farm store may maintain paper forms more than twenty years old at a separate, offsite location.  Radl Decl. ¶ 8; 27 C.F.R. § 478.129(b).

producing more than 24,000 Form 4473s (assuming the relevant period is limited to January 1, 2017, through October 5, 2022), requiring it to collect, review, segregate, unstaple, scan, restaple, re-file, and redact more than 168,000 pages. *Id.* ¶ 19. By contrast, Fleet Farm's proposed collection of Form 4473s and 3310.4s for individuals who purchased thirteen or more handguns from its Minnesota stores between January 1, 2017 and October 5, 2022 is estimated to encompass more than 1,300 Form 4473s, or more than 9,000 pages. *Id.* ¶ 20. To be sure, Fleet Farm's proposal will still be burdensome, but it is significantly less burdensome and more proportional to require to it to scan and produce 9,000 pages of materials, rather than to scan and produce more than 168,000 pages of materials, the vast majority of which have no conceivable relevance. Notably, Plaintiff's brief does not even attempt to explain why its proposal would not impose an undue burden on Fleet Farm; in fact, it virtually ignores the issue. *See* Pl.'s Br. 24-26.[15]

### C.    Plaintiff's requested production of Form 4473s does not account for customers' significant privacy interests.

Further, Plaintiff's requested production of Form 4473s is improper because it would implicate and compromise the privacy interests of countless law-abiding customers. In requesting a broad scope of production of Form 4473s (and unredacted A&D logs, *infra* § II.D), Plaintiff is functionally asking for documents sufficient to build and maintain a comprehensive system for monitoring Minnesotan firearm owners, including their

---

[15] The closest Plaintiff comes is offering to "handl[e] the inspection and reproduction of the[] paper forms" itself. Pl.'s Br. 24 n.7. Fleet Farm has explained to Plaintiff this offer is unworkable because Fleet Farm would incur significant expense by having an attorney on site to monitor the process, it would result in producing countless irrelevant documents, and it would compromise significant privacy interests. ECF Doc. 73-14 at 6.

identities, home addresses, and the types and number of firearms they possess.  This would implicate significant privacy interests and clash with the clear policy expressed by federal and state law: it is inappropriate for law-enforcement officials like Plaintiff to obtain and retain information regarding law-abiding citizens' firearm purchases.

Starting with federal law, regulations impose clear limits on retention of PII related to authorized firearm transactions.  Although the FBI "maintain[s] an automated NICS Audit Log of all incoming and outgoing transactions that pass through the system," "[i]n cases of NICS Audit Log records relating to allowed transactions, all identifying information submitted by or on behalf of the transferee will be destroyed within 24 hours after the FFL receives communication of the determination that the transfer may proceed," and "[a]ll other information, except the [NICS Transaction Number] and date [of transfer], will be destroyed after not more than 90 days from the date of inquiry."  28 C.F.R. § 25.9(b), (b)(1)(iii).[16]  Notably, these obligations also apply to "state and local law enforcement units" serving as points of contact between FFLs and NICS, to the extent those authorities maintain records of "inquiry and response messages ... relating to the initiation and result of a check of the NICS" and "other records relating to the person or the transfer created as a result of a NICS check."  *Id.* § 25.9(d).

---

[16] "NICS denied transaction records" are maintained in the NICS Audit Log "for 10 years, after which time they will be transferred to an appropriate FBI-maintained electronic database," and "NICS Audit Log records relating to transactions in an open status, except the [NICS Transaction Number] and date [of transfer], will be destroyed after not more than 90 days from the date of inquiry."  28 C.F.R. § 25.9(b)(1)(i), (ii).

Further, under federal law, the information in the NICS Audit Log "pertaining to allowed transactions" may only be accessed and used "by the FBI ... for the purpose of conducting audits of the use and performance of the NICS."  *Id.* § 25.9(b)(2).[17]   And critically, information provided to NICS may not be used by any federal entity or person "to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons prohibited from receiving a firearm by 18 U.S.C. [§] 922(g) or (n) or by state law."  *Id.* § 25.9(b)(3).  Put differently, federal law prohibits the use of NICS data to establish a database tracking gun purchases by law-abiding citizens.  *See id.*  The rationale for this is unambiguous: federal law "balance[s] the law enforcement need for firearms retail purchaser information with the competing interest of protecting the privacy of firearms owners."   U.S. Gov't Accountability Off., GAO-16-552, *Firearms Data: ATF Did Not Always Comply with the Appropriations Act Restriction and Should Better Adhere to Its Policies* 2 (June 2016), https://www.gao.gov/assets/gao-16-552.pdf.  Additional limitations exist under Minnesota law, with the Minnesota Gun Control Act authorizing any individual to request "no record be maintained" identifying them as the transferee in an approved firearm transaction.  Minn. Stat. § 624.7132, subd. 10.  If such a request is made, "no government employee or agency," including Plaintiff, "shall maintain a record of the transfer that identifies the transferee."  *Id.*

---

[17] The only exceptions are: (1) if the information in the NICS Audit Log indicates "a violation or potential violation of law or regulation," that "may be shared with appropriate authorities"; and (2) the NICS Transaction Number and transaction date "may be shared with ATF in Individual FFL Audit Logs."  28 C.F.R. § 25.9(b)(2)(i), (ii).

These laws and policies demonstrate law-abiding citizens' firearm-ownership information is highly sensitive, and there are substantial limitations surrounding law enforcement's retention and use of such information. Accordingly, Plaintiff's request—which appears to encompass more than 24,000 firearm transactions—is improper and disproportionate because it implicates the privacy concerns of countless citizens whose firearm transactions are confidential and wholly irrelevant.[18]

### D.    The scope of Fleet Farm's production of unredacted A&D logs should be commensurate with the scope of production of Form 4473s.

As noted, in addition to ATF Form 4473s and 3310.4s, Plaintiff also seeks to compel the production of certain A&D logs in unredacted form.  *See* Pl.'s Br. 24-26.  Although Fleet Farm is willing to produce A&D logs, the Court should permit Fleet Farm to do so with certain redactions (detailed below) for four reasons.

*First*, the A&D logs are entirely duplicative of the Form 4473s.  Radl Decl. ¶ 13. The logs include a description of all firearms received or disposed, the date the firearm was received or disposed, and the name and address of the person to whom it was disposed.  *Id.* ¶¶ 11-12.  Critically, they contain no unique information—all information in the logs regarding the type of firearm sold and the person to whom it was sold is also reflected in Form 4473s.  *Id.* ¶¶ 12-13.  For this reason, Plaintiff previously recognized there was no

_____

[18] Plaintiff's requested production may also result in competitive harm to Fleet Farm, as law-abiding customers who become aware that their personal information will be provided to and tracked by the Minnesota Attorney General may choose to purchase firearms from another Minnesota FFL.

need for A&D logs produced in this matter to contain more customer information than what is disclosed through the Form 4473s.  Davis Decl., Ex. A at 3.

**Second**, because the A&D logs contain no unique information, there is no basis for Plaintiff to assert the scope of relevant information in the logs is broader than the scope of relevant Form 4473s.  For the same reasons discussed above, information in the A&D logs reflecting firearm transactions involving rifles or shotguns, or customers whose purchasing patterns are not analogous to the straw purchases alleged in the complaint, has no relevance.  *Supra* § II.A.  Again here, the relevant scope of firearm transactions is properly limited to individuals who purchased thirteen or more handguns during the relevant period, as this encompasses customers with purchasing patterns arguably analogous to those of Horton or Elwood.  But to the extent the Court orders a different scope of production for Form 4473s, there is no basis to order a broader production of unredacted A&D logs.

**Third**, Plaintiff ignores the significant privacy interests implicated by producing unredacted A&D logs.  If Plaintiff's request is granted, the Minnesota Attorney General will receive a record of numerous law-abiding Minnesotans' firearm purchases dating back to January 1, 2017.  This would compromise Minnesotans' privacy interests, *supra* § II.C, and cannot be reconciled with the clear federal and state policies protecting such information.

**Fourth**, it is entirely appropriate to redact PII that is irrelevant.[19]  When it comes to PII, courts "balance the privacy interests of non-party third persons, and the discovery

---

[19] Although Plaintiff points to the protective order as a reason redactions are unnecessary, *see* Pl.'s Br. 25-26, courts have concluded a protective order is insufficient to justify an

interests of a party litigant." *Vaidyanathan v. Seagate US LLC*, 2010 WL 11469953, at \*3 (D. Minn. Apr. 5, 2010) (cleaned up).  And PII may be redacted if it "does not bear on [Plaintiff's] claims." *Id.*; *see also Giannerini v. Embry-Riddle Aeronautical Univ., Inc.*, 2023 WL 8016049, at \*2-3 (M.D. Fla. Nov. 20, 2023) (authorizing "redaction of student identities" and "a redaction procedure for the identify of ... third-party employees"); *Davis v. Cap. One, N.A.*, 2023 WL 7214667, at \*4 (E.D. Va. Oct. 13, 2023) (authorizing redacting "any full names of Capital One customers … in addition to the phone number redactions already ordered"); *Wartluft v. Milton Hershey Sch. & Sch. Tr.*, 2020 WL 1124771, at \*7 (M.D. Pa. Mar. 6, 2020) (permitting redactions of "all names of nonparties," as well as "addresses[] and family information"); *Williston Basin Interstate Pipeline Co. v. Factory Mut. Ins. Co.*, 270 F.R.D. 456, 467 (D.N.D. 2010) (authorizing redacting "customer information as well as confidential information that is not relevant to any issues in the case"); *Ard v. Custom Tree Serv., Inc.*, 2008 WL 11433202, at \*4 (M.D. Fla. Jan. 8, 2008) (authorizing redacting "any sensitive information such as social security numbers, marital status, medical information, and credit history before turning over the[] files" in discovery). Here, as Fleet Farm will be redacting only PII for customers whose Form 4473s are not being produced, such redactions are appropriate because the redacted information will not

---

unredacted production if a plaintiff "ha[s] not provided any reason why the information sought is relevant." *Stuart v. Cnty. of Riverside*, 2023 WL 4826231, at \*4 (C.D. Cal. June 15, 2023).

bear on the claims or defenses in this case.[20]  *E.g.*, *Vaidyanathan*, 2010 WL 11469953, at

*3.

### III.   Fleet Farm has complied with its obligations under Rule 33(d).

As Plaintiff acknowledges, Rule 33(d) is satisfied where a responding party

"specif[ies], by category and location, the records from which answers to interrogatories

can be derived."  Pl.'s Br. 27 (citation omitted).  Fleet Farm has done just that by including

with each production an appendix identifying by Bates number the documents that answer

certain interrogatories.  And the cases Plaintiff cites confirm that identifying responsive

documents by specific Bates number is more than sufficient to satisfy Rule 33(d).  *E.g.*,

*Sylva Corp. v. Lewandowski*, 2021 WL 5087267, at *7 (D. Minn. May 14, 2021)

(concluding Rule 33(d) not satisfied because defendants did "not specifically identify any

of the documents from which their Answer can be derived," and ordering defendants to

identify responsive documents by Bates number).[21]  Despite Fleet Farm complying with

the text and spirit of Rule 33(d), Plaintiff maintains two objections.

---

[20] To be clear, Fleet Farm only seeks to redact customer information in the A&D logs for
customers whose Form 4473s are **not** produced.  And Fleet Farm will not redact the
portions of the A&D log describing the type of firearm acquired or disposed or the date it
was acquired or disposed.  So although certain customer information will be redacted, the
A&D logs will still allow the parties to determine the total number of firearms acquired or
transferred by Fleet Farm stores in Minnesota, and the date each firearm was acquired or
transferred.

[21] The only cases Plaintiff cites where a responding party was found to have not complied
with Rule 33(d) involve that party pointing the propounding party to an entire production
or a generic range of Bates numbers, or otherwise providing "unintelligible" responses.
*E.g.*, *Berry v. County*, 2023 WL 1777467, at *4 (D. Minn. Feb. 6, 2023) (Rule 33(d) not
satisfied because responding party "did not identify which of the 24,000 documents
produced … contained responsive information"); *Speed RMG Partners, LLC v. Arctic Cat
Sales Inc.*, 2021 WL 5087362 (D. Minn. Jan. 5, 2021) (Rule 33(d) not satisfied in part

***First***, Plaintiff asserts "Fleet Farm has not specified records for two interrogatories—Nos. 7 and 12." Pl.'s Br. 28. But Fleet Farm has specified records responsive to Interrogatory No. 12, as shown by an exhibit to Plaintiff's motion. ECF Doc. 73-22 at 5. As for Interrogatory No. 7, there is good reason Fleet Farm has not yet provided a comprehensive response—the interrogatory asks Fleet Farm to identify and describe ***every single interaction*** between any Fleet Farm employee and any law-enforcement agency regarding a firearm transaction at any time over a six-year window. ECF Doc. 73-2 at 4. Accordingly, Fleet Farm objected that the interrogatory is overly broad and unduly burdensome, but stated Plaintiff could obtain this information from documents produced in response to RFP Nos. 9 through 11, ECF Doc. 77 at 12, which broadly sought communications between Fleet Farm and law enforcement, ECF Doc. 73-3 at 12-14. Fleet Farm has since proposed answering this interrogatory by providing "a list of individuals in leadership positions … who had primary responsibility for communicating with law enforcement on issues relating to firearm sales." ECF Doc. 73-9 at 5. Plaintiff never responded to this offer, and if Plaintiff insists on receiving a list of documents reflecting ***every*** communication between Fleet Farm and law enforcement, Fleet Farm will identify that extensive list by Bates number after its document production is substantially complete.

***Second***, Plaintiff criticizes Fleet Farm for identifying too many specific documents in response to Interrogatory Nos. 5, 9, 14, and 15, and identifying responsive documents

---

because plaintiff provided narrative answers that were "evasive and unintelligible"); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 2012 WL 12894846, at *4, *12 (D. Minn. May 11, 2012) (Rule 33(d) not satisfied where defendant identified Bates numbers for 44,000 pages of documents).

across multiple productions.  *See* Pl.'s Br. 28-29.  But the volume of identified documents is a byproduct Plaintiff serving broad interrogatories.  To illustrate, it is unclear how Plaintiff expected Fleet Farm to respond to Interrogatory No. 5—seeking a description of ***all*** "policies and procedures related to the sale of firearms," ECF Doc. 73-2 at 4—without searching for, producing, and identifying such policies, which Fleet Farm has done. Likewise, Fleet Farm has responded to Interrogatory No. 15—seeking ***all*** "contacts" with Fleet Farm by any law-enforcement agency, ECF Doc. 73-2 at 7—by searching for, producing, and identifying all such "contacts."  For both interrogatories, it would not be reasonable or consistent with Rule 26 to expect Fleet Farm to draft narrative responses "describ[ing]" the hundreds (if not thousands) of training policies and "contacts" with law enforcement that have existed and occurred during the relevant period.  ECF Docs. 73-9, 73-19, 73-20, 73-21, 73-22.[22]  To the extent Plaintiff is frustrated with the large volume of responsive documents, respectfully, that is a problem of Plaintiff's making.

As for Interrogatory No. 14, it largely goes unmentioned by Plaintiff, and it is unclear exactly what is purportedly deficient about Fleet Farm's response.  The interrogatory asked Fleet Farm to provide "all supporting information" regarding its statement that around the time of October 2021 shooting in St. Paul, "we were told by [ATF] that our team members had done nothing wrong and had complied with all

---

[22] As for Interrogatory No. 9, Fleet Farm responded by referencing Plaintiff to documents produced in response to RFP No. 12, ECF Doc. 77 at 14, wherein Fleet Farm agreed to produce documents related to Horton and Elwood (including, if it existed, investigations or audits related to sales to those individuals), ECF Doc. 73-3 at 14-15.  That is why the documents identified in response to Interrogatory No. 9 "relate primarily to Fleet Farm's actions regarding Horton and Elwood."  Pl.'s Br. 29.

applicable gun laws."  ECF Doc. 73-2 at 6.  Fleet Farm identified seven documents containing responsive information, ECF Docs. 73-19, 73-20, including internal emails indicating on October 20, 2021, an ATF agent told Fleet Farm "the cooperation she received … was fantastic," she "was impressed by [the] organization," and "in no way did [Fleet Farm] do anything wrong by selling [Horton] the firearms" because "nothing in [Horton's] background … would have rendered a denied response," Davis Decl., Ex. G.

## IV.    Internal communications regarding the fact of the lawsuit, but not its substance, are irrelevant.

Plaintiff's request to have Fleet Farm produce "[i]nternal … communcations about this lawsuit" should be denied for two reasons.  Pl.'s Br. 31-32.  *First*, because the appropriate temporal discovery period is October 5, 2016, through October 5, 2022, *supra* § I, by definition any communications regarding the fact of the lawsuit will fall outside that period.  *Second*, communications regarding the *fact* of the litigation, rather than its *substance* (*e.g.*, communications that would be encompassed by Plaintiff's other discovery requests[23]) have no conceivable relevance to Plaintiff's claims.  And Plaintiff offers no authority supporting the notion that hypothetical internal communications "speculating about the lawsuit's potential success or failure" would be relevant.  Pl.'s Br. 32.

---

[23] By way of example, Plaintiff's hypothetical "documents discussing Fleet Farm's policies and procedures regarding straw purchasing in reference to the lawsuit," Pl.'s Br. 32—if created during the temporal discovery period—would be discoverable not because the document mentions the lawsuit, but because "Fleet Farm's policies and procedures regarding straw purchasing" are relevant to the claims and defenses and are encompassed by other discovery requests.

**V.      Information regarding Fleet Farm's corporate structure is irrelevant.**

Plaintiff also asks this Court to compel Fleet Farm to produce "[i]nformation and documents about [its] corporate identity and structure." Pl.'s Br. 32. Tellingly, virtually all of Plaintiff's argument focuses not on relevancy, but instead on whether producing these documents would impose an undue burden. *See id.* at 33-34. This puts the cart before the horse—Plaintiff bears the burden to "mak[e] a threshold showing that the information sought is relevant to the claims or defenses in the case." *Rochester Drug Co-Op.*, 2022 WL 1598377, at *4. And as to relevance, all Plaintiff offers is that "corporate identity and structure" documents are supposedly necessary to determine whether the injunctive relief it seeks will be effective. *See* Pl.'s Br. 33. This argument disregards the facts that: (1) as Plaintiff recognizes, Fleet Farm is not contending Plaintiff has failed to name the correct corporate entities in this case, *id.* at 35; and (2) Fleet Farm has filed a corporate disclosure statement identifying all of the named entities' parent companies, ECF Doc. 3.[24] Setting this aside, caselaw is clear there is no basis to demand production of "corporate structure" materials absent a relevancy showing. *E.g.*, *Crom, LLC v. Preload, LLC*, 2017 WL 2408126, at *2 (N.D. Fla. June 2, 2017) (rejecting corporate-structure discovery where

---

[24] Plaintiff makes much of Fleet Farm's defense that "Plaintiff has failed to join all necessary parties, including … ***other third parties*** whom Plaintiff alleges engaged in the unlawful sale or use of firearms in Minnesota." ECF Doc. 38 at 26 (emphasis added); *see also* Pl.'s Br. 35 n.12. Fleet Farm has explained on myriad occasions it is not contending Plaintiff named the wrong corporate entities. ECF Docs. 73-3 at 8-9, 77 at 8-9, 73-18 at 2. Instead, this defense speaks to the notion that from a causation standpoint, by choosing to cherry pick Fleet Farm as the only defendant in this case, Plaintiff has not named the numerous third parties whose actions may be the direct and substantial causes of the alleged harms it seeks to remedy.

information was "not relevant to the claims or defenses" and defendant had filed corporate

disclosure statement); *Patient A v. Vt. Agency of Human Servs.*, 2016 WL 880036, at *2

(D. Vt. Mar. 1, 2016) (concluding corporate-structure discovery was irrelevant to

malpractice and punitive-damages claims); *Sill v. State Farm Lloyds*, 2013 WL 12393984,

at *9 (W.D. Tex. Apr. 8, 2013) (concluding corporate-structure deposition topic was

improper because there was no indication "discovery pertaining to State Farm-related

entities … is relevant to any party's claim or defense" (cleaned up)).  No relevancy showing

has been made here.[25]

## VI.  Plaintiff's requests for employee evaluations and related information are overly broad and unduly burdensome.

Lastly, Plaintiff seeks to compel production of "disciplinary actions related to

Minnesota firearm sales" and "[performance] evaluations of employees who had been

disciplined for actions related to firearms."  Pl.'s Br. 36.  Here again, Fleet Farm is not

suggesting such information should be withheld in its entirety.  Instead, it suggests a

tailored approach given the questionable relevancy of and substantial burdens associated

with producing this information.

---

[25] The two cases offered by Plaintiff do not suggest otherwise, as both were premised on the requesting party making a specific relevancy showing.  *See FTC v. Am. Future Sys.*, 2022 WL 1437562, at *4–5 (E.D. Pa. Apr. 8, 2022) (permitting corporate-structure discovery where plaintiff argued information was relevant to determine whether defendant made structural changes in response to FTC investigation of alleged deceptive telemarketing practices to conceal those practices); *Burke v. Ability Ins. Co.*, 291 F.R.D. 343, 353 (D.S.D. 2013) (permitting corporate-structure discovery where defendants' liability turned on which related companies had contractual relationships with plaintiff).

To start, the relevancy of this information to Plaintiff's actual claims is unclear. This case is not about alleged negligent oversight of employees; rather, it is about whether Fleet Farm "violated federal and state laws and regulations" by transferring firearms to persons it supposedly "knew or consciously avoided knowing … were straw purchasing firearms." Compl. ¶ 4. Put differently, the actual claims and defenses turn on the adequacy of Fleet Farm's policies, not the oversight of its employees. Accordingly, Plaintiff's request to conduct a wholesale audit of disciplinary actions regarding firearm employees has, at best, a peripheral relationship to its actual claims. And in light of the substantial burdens associated with producing any employee evaluations or disciplinary actions, it is appropriate to develop a focused approach to the review and production of these materials.

Fleet Farm's human-resources documents, including employee evaluations and personnel files, have been digitized, with many records being scans of hard-copy files. *See* Decl. of Jill Leeser ("Leeser Decl.") ¶ 5. Fleet Farm utilizes the Ulti-Pro software as its Human Resources Information System, and this software has very limited search functionality, such that Fleet Farm cannot search these records by keyword or (with limited, inapplicable exceptions) employee "type." *Id.* ¶¶ 6-8. Fleet Farm can, however, filter its records by employee name, and then review an individual employee's file for certain categories of documents. *Id.* ¶ 7. Fleet Farm's records between October 5, 2016 and October 5, 2022 consist of more than 430,000 documents for its Minnesota employees, and more than 12,500 of these documents relate to persons holding job titles "likely to have a reasonable relation to firearms." *Id.* ¶¶ 9-10. This means that to collect the records of all employees with responsibilities "relating to firearm sales," Pl.'s Br. 36, Fleet Farm would

need to manually review every current and former employees' personnel files to determine whether an employee held a position "relating to firearm sales," and then isolate any files within that employee's records related to firearms. *See* Leeser Decl. ¶¶ 7-11. By any measure, reviewing all of these materials would be an unduly burdensome process, and courts recognize "[d]iscovery of relevant and nonprivileged ESI … is limited if the party from whom discovery is sought establishes that it is not reasonably accessible because of undue burden or cost." *Best Buy Stores, L.P. v. Devs. Diversified Realty Corp.*, 247 F.R.D. 567, 569 (D. Minn. 2007) (cleaned up).

One of Plaintiff's cases, *Beseke v. Equifax Information Services, LLC*, 2018 WL 6040016 (D. Minn. Oct. 18, 2018), is a textbook illustration of how this principle applies. True, as Plaintiff notes, *Beseke* granted the plaintiff's motion to compel production of ESI regarding "information related to similar lawsuits." *Id.* at \*1, \*4. But Plaintiff fails to mention *Beseke* **denied** the motion to compel production of consumer complaints because the defendant's database was only "designed to allow access to all of a single consumer's disputes … not to multiple consumers' disputes at the same time," and there was no standardized "code related specifically to" the type of customer complaint at issue, meaning "manual review of the search results would be necessary to determine which specific claims" were relevant. *Id.* at \*2. But "[n]ot everything" in the database was "unsearchable": one field of a certain consumer-dispute form was stored therein and searchable by a specific search. *Id.* "Against [that] complex factual backdrop," *Beseke* "limit[ed] discovery into Equifax's ESI" for consumer complaints because "creating a query, searching the entire [Equifax] database and then manually reviewing the results

would take countless hours, the cost of which would be exorbitant," meaning the documents were "not in a readily accessible format." *Id.* at *3-4.  Accordingly, the court limited discovery based on the search function that existed within the database to "a narrower set of materials" and a narrower "discovery window," and ordered the parties to "work together to ensure that the searches used are narrowly tailored to identify claims with substantial similarity to those" at issue in the case.  *Id.* at *4–5; *see also Lynch v. Experian Info. Sols., Inc.*, 569 F. Supp. 3d 959, 964 (D. Minn. 2021) (concluding despite defendant being "at least partly responsible for the creation of the conditions that contribute[d] to the amount of work required to respond to" certain discovery, it was appropriate to limit the discovery to a shorter period and narrower scope).

Notably, Fleet Farm has proposed a solution to the technical limitations of its Ulti-Pro software remarkably similar to the limitation adopted in *Beseke*.  To account for the fact that Fleet Farm's HR database can only, as relevant here, search by employee name, Fleet Farm has proposed to search for and produce relevant employee records for all employees who sold firearms to Horton or Elwood ***and*** any other employees Plaintiff identifies.  ECF Doc. 73-18 at 3.[26]  As Fleet Farm has explained to Plaintiff, the identities of employees involved in firearm transactions are noted on the Form 4473s, and are thus readily ascertainable to Plaintiff.  *See id.*  This proposal is a considered solution that

---

[26] For example, although Fleet Farm disputes whether the actions of a non-Minnesota-based employee are relevant to this case, under Fleet Farm's proposal, Plaintiff could ask it to review and produce files indicating whether Mark Jewell was disciplined in connection with the attempted straw purchase described in Plaintiff's Exhibit 23.  *See* ECF Doc. 73-23.

addresses the significant burdens associated with any production of personnel files, and also ensures Plaintiff may request any employee files with even attenuated relevance to its actual claims.  And although Plaintiff takes issue with Fleet Farm's proposal placing some of the burden on it, Plaintiff does not argue Fleet Farm's proposal would omit potentially relevant information.  *See* Pl.'s Br. 36.

The technical challenges presented by Fleet Farm's software support crafting a careful solution that balances Plaintiff's need for relevant information with the principles of burden and proportionality.  Fleet Farm submits that its proposal accomplished that balance, and should be adopted.

<u>CONCLUSION</u>

For all the foregoing reasons, Fleet Farm respectfully requests that the Court deny Plaintiff's Motion to Compel.

Dated:  March 5, 2024                          Respectfully submitted,

                                               */s/ Todd A. Noteboom*
                                               Todd A. Noteboom (#0240047)
                                               Andrew W. Davis (#0386634)
                                               Sharon R. Markowitz (#0392043)
                                               Andrew P. Leiendecker (#0399107)
                                               STINSON LLP
                                               50 South Sixth Street, Suite 2600
                                               Minneapolis, MN 55402
                                               (612) 335-1500
                                               todd.noteboom@stinson.com
                                               andrew.davis@stinson.com
                                               sharon.markowitz@stinson.com
                                               andrew.leiendecker@stinson.com

                                               **ATTORNEYS FOR DEFENDANTS**