UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of MN,
by its Attorney General, Keith Ellison,

                      Plaintiff,

vs.

Fleet Farm LLC, et al.,

                      Defendant.

Civil Action No. 22-CV-02694-JRT-JFD

**AFFIDAVIT OF ANDREW M. HATCH IN SUPPORT OF THE MODERN SPORTMAN'S MOTION TO QUASH SUBPOENA DUCES TECUM**

I, Andrew M. Hatch, Esq., hereby declare as follows:

1.      I am an attorney with the law firm of Smith Jadin Johnson, PLLC, and we represent The Modern Sportsman, a non-party to the above-titled matter. I submit this Declaration in support of The Modern Sportsman's Memorandum of Law in Support of its Motion to Quash Subpoena.

2.      That attached hereto and incorporated herein as Exhibit A is a true and correct copy of the Notice of Intent to Serve Subpoena Duces Tecum and Subpoena to The Modern Sportsman dated May 29, 2024;

3.      That attached hereto and incorporated herein as Exhibit B is a true and correct copy of correspondence from counsel for The Modern Sports to counsel for Defendant objecting to Defendant's subpoenas dated June 12, 2024;

4.      Counsel for Defendant Fleet Farm LLC and held a meet and confer on June 25, 2024, which was followed up with confirmation in writing. That attached hereto and

incorporated herein as Exhibit C is a true and correct copy of correspondence between counsel for Defendant and counsel for The Modern Sportsman dated June 26, 2024.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated: June 28, 2024        /s/ Andrew M. Hatch
                                   Andrew M. Hatch (#0403078)



Andrew Davis
**PARTNER**
DIRECT: 612.335.1556
OFFICE: 612.335.1500

andrew.davis@stinson.com

May 29, 2024

**VIA PERSONAL SERVICE**

The Modern Sportsman

3541 County Rd 42 W
Burnsville, MN 55306

5753 Egan Drive
Savage, MN 55378

Re:     *State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD

To Whom It May Concern:

Enclosed and served upon you pursuant to Federal Rules of Civil Procedure and Minnesota Rules of Civil Procedure, please find a subpoena *duces tecum* in the above-referenced matter (the "Subpoena").  The Subpoena seeks information relating to firearms policies, procedures, trainings, and other data, as well as information relating to the October 10, 2021 shooting incident at the Seventh Street Truck Park in St. Paul, Minnesota, and the named individuals in the Complaint in the above-referenced matter.

The Subpoena seeks production of the requested information on **June 28, 2024, at 5:30 p.m.**  If you have any questions or concerns, please contact me at your earliest convenience.

Sincerely,

**Stinson LLP**

Andrew Davis

Enclosure

cc:     Todd Noteboom
        Andrew Leiendecker
        Zachary Wright

50 South Sixth Street, Suite 2600, Minneapolis, MN 55402

STINSON LLP   \   STINSON.COM

189781105.1

EXHIBIT A - 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | |
|---|---|
| State of MN, by its Attorney General, Keith Ellison | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  22-CV-02694-JRT-JFD |
| Fleet Farm LLC, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

The Modern Sportsman

To: _____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Exhibit A

| Place: Stinson LLP, 50 South Sixth Street, Suite 2600 Minneapolis, MN 55402 | Date and Time: 06/28/2024 5:30 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  5.24.24

| CLERK OF COURT | | |
|---|---|---|
| | OR | *Ouln WD* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC  , who issues or requests this subpoena, are: Andrew W. Davis, Stinson LLP, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402; andrew.davis@stinson.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT A - 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 22-CV-02694-JRT-JFD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

EXHIBIT A - 3

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT A - 4

# EXHIBIT A

**EXHIBIT A**

Pursuant to the foregoing subpoena *duces tecum*, Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (together, "Fleet Farm") hereby request and demand that The Modern Sportsman produce for inspection and copying the requested documents, electronically stored information, and tangible things ("Requests") in accordance with the instructions and definitions set forth herein and in the subpoena.

**DEFINITIONS**

1.      "ATF" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

2.      "BCA" means the Minnesota Bureau of Criminal Apprehension.

3.      "Complaint" means the First Amended Complaint captioned *State of Minnesota by its Attorney General, Keith Ellison v. Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC*, a copy of which is attached at Exhibit B.

4.      "Document" means all written, graphic, or recorded matter of any kind or description, however created or rendered, including, but not limited to, written communications, letters, correspondence, facsimiles, email, text messages, instant messages, social media posts, memoranda, minutes, notes, films, audio or video recordings of any type, transcripts, contracts, agreements, purchase or sales orders, memoranda of telephone conversations of personal conversations, diaries, desk calendars, interoffice communications, reports, studies, bills, receipts, checks, checkbooks, statements, and invoices.

5.      "Policies" and "procedures" means all formal or informal rules, guidelines, guidance, advice, FAQs, scripts, handbooks, presentations, or training materials.

6.      "Relate," "related to," or "regarding" means referring, discussing, concerning, or pertaining in any way, directly or indirectly.

7.      "Your" or "you" means The Modern Sportsman.

189780792

EXHIBIT A - 6

## INSTRUCTIONS

1.      All Documents subject to this subpoena *duces tecum* should be immediately preserved.

2.      Preface each answer and response with the Request to which it is addressed. If you are unable to fully answer or respond, submit as much information as is available, explain why your answer or response is incomplete, and state the source or sources from which a complete answer or response may be obtained.

3.      You are instructed to produce all non-privileged Documents responsive to the Requests that are within your possession, custody, or control, or in the possession, custody, or control of any other person acting or purporting to act on your behalf.

4.      As a third party receiving a subpoena in this Action, you are entitled to the protections of the Protective Order, *see* ECF Doc. 49, attached hereto as Exhibit C.

5.      Unless otherwise agreed to, all documents, communications, electronically stored information, and tangible things shall be produced in compliance with the Order Governing the Production of Electronically Stored Information, *see* ECF Doc. 53, attached hereto as Exhibit D.

6.      If you assert any objection to any Request, you must state the reason for your objection. If you object to any Request in whole or in part on the basis of any claimed privilege or protection, identify the statement, communication, or subject matter for which you claim privilege or protection and set forth the factual basis on which you base your privilege or protection claim.

7.      If any document or data compilation relating to the subject matter of these requests is or has been discarded, destroyed, or redacted in whole or in part, please state: (a) the date of the discard, destruction, or redaction; (b) the reason for the discard, destruction, or redaction; and (c) the person(s) who discarded, destroyed, or redacted the document or data compilation.

8.      If there are no Documents or Communications responsive to a particular Request, please state so in writing.

9.      You are under a continuing duty to supplement your responses if you learn that a response you made is in some material respect incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

10.     The relevant time period covered by these Requests is from January 1, 2020, through October 1, 2023, unless otherwise specifically indicated.  If it is necessary to refer to a prior time to fully answer a Request, you should do so.

- 2 -

189780792

EXHIBIT A - 7

11.     Fleet Farm serves these Requests without prejudice to it right to serve additional subpoenas.

## DOCUMENTS AND TANGIBLE ITEMS REQUESTED

**REQUEST NO. 1.**  All documents reflecting Your policies and procedures relating to firearm transactions, including, but not limited to, those relating to monitoring for and preventing straw purchasing.

**REQUEST NO. 2.**  All documents related to Jerome Horton or Sarah Jean Elwood, the individuals identified in Paragraphs 37 through 61 of the Complaint.

**REQUEST NO. 3.**  All documents related to Gabriel Lee Young-Duncan, Jeffrey Jackson, Geryiell Walker, or Wayne Danielson.

**REQUEST NO. 4.**  All documents reflecting or relating to communications to or from ATF, the BCA, or any other Minnesota state or local law enforcement agency regarding Jerome Horton, Sarah Jean Elwood, or the October 10, 2021 shooting incident at the Seventh Street Truck Park in St. Paul, Minnesota.

**REQUEST NO. 5.**  All documents reflecting communications to or from the Office of the Minnesota Attorney General relating to Your sales of firearms to Jerome Horton or Sarah Jean Elwood, or to Your policies and procedures concerning firearm transactions, including, but not limited to, those relating to monitoring for and preventing straw purchasing.

189780792

EXHIBIT A - 8

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>Plaintiff,<br><br>v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**FIRST AMENDED COMPLAINT** |

The State of Minnesota, by its Attorney General, Keith Ellison, brings this civil action to protect the public from Fleet Farm's illegal and negligent sale of firearms to straw purchasers, through which Fleet Farm aided and abetted criminals and contributed to gun trafficking in Minnesota.

**INTRODUCTION**

1.      As gun trafficking and gun violence surged in Minnesota during the pandemic, firearms dealer Fleet Farm repeatedly sold handguns to straw purchasers—people who illegally purchase guns for others who cannot legally obtain them.  Fleet Farm sold at least 37 firearms to two straw purchasers over the course of 16 months.

2.      One of these guns was fired in a large-scale shootout in a St. Paul bar on October 10, 2021, that ended in the death of a 27-year-old woman and multiple injured and traumatized bystanders.  Another gun Fleet Farm sold to this same straw purchaser was found by a six-year-old boy in front of his family's house on September 6, 2021, where the gun was likely discarded by suspects fleeing from another public shooting incident.  At least five more firearms that Fleet Farm sold to straw purchasers have been recovered from people who are not permitted to have them.

EXHIBIT A - 10

Most of the guns Fleet Farm sold to straw purchasers remain unrecovered, and these guns continue to pose an ongoing threat to the health and safety of Minnesotans.

3.      These straw purchasers used Minnesota firearms dealers to fuel their separate yet equally pernicious gun trafficking schemes.  These straw purchasers secured sought-after handguns from careless dealers like Fleet Farm and then resold those weapons to known criminals and into the black market.  Fleet Farm stood by and accepted the straw purchasers' money as they bought more and more weapons from Fleet Farm stores.

4.      Fleet Farm repeatedly sold multiple handguns to straw purchasers in single transactions or in multiple sales over very short periods of time.  By turning a blind eye to the flagrantly suspicious circumstances of the purchases made by straw purchasers, Fleet Farm violated federal and state laws and regulations.  Because Fleet Farm knew or consciously avoided knowing that these individuals were straw purchasing firearms, Fleet Farm aided and abetted their illegal and criminal conduct.

5.      Some of the harm resulting from Fleet Farm's negligence is already known.  In addition to the gun fired in the October 10, 2021, St. Paul shootout and the gun found by a young boy in his front yard on September 6, 2021, several more guns sold by Fleet Farm to these straw purchasers ended up at crime scenes and were recovered from persons legally prohibited from possessing firearms.  Still, most guns remain unaccounted for.  Fleet Farm's negligence has contributed, and will continue to contribute, to the irreparable harm to the health and well-being of Minnesotans caused by the ongoing gun trafficking crisis.

6.      The State of Minnesota, by its Attorney General, Keith Ellison, brings this civil enforcement action to stop Fleet Farm's unlawful practices, enforce Minnesota law, and hold Fleet Farm accountable for the harm its conduct has caused Minnesota.

## PARTIES

7.      Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8 and has common law authority, including *parens patriae* authority, to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for—violations of Minnesota's laws.

8.      Defendant Fleet Farm LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin. Fleet Farm LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117. According to federal court filings, Fleet Farm LLC is wholly owned by Fleet Farm Group, LLC. In turn, Fleet Farm Group, LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is wholly owned by Fleet Farm Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.—a publicly traded private equity and investment banking firm. Fleet Farm LLC was formerly known as Mills Fleet Farm LLC until its name was changed in February 2019.

9.      Defendant Fleet Farm Group LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin. Fleet Farm Group LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117. Fleet Farm Group LLC owns Fleet Farm LLC and, in Minnesota tax court records, Fleet Farm Group LLC held itself out as the tenant at the property addresses of the Fleet Farm stores in Brooklyn Park, Cambridge, Owatonna, Mankato, Hermantown, Blaine, Baxter, Willmar, Alexandria, Lakeville, Rochester, Oakdale, and Winona. According to federal court filings, Fleet Farm Group LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is wholly

EXHIBIT A - 12

owned by Fleet Farm Holdco LLC, which is majority owned, indirectly, by investment vehicles managed by one or more subsidiaries of KKR & Co. Inc.—a publicly traded private equity and investment banking firm.  Fleet Farm Group LLC was formerly known as Mills Fleet Farm Group LLC until its name was changed in January 2019.

10.     Defendant Fleet Farm Wholesale Supply Co. LLC is a Delaware limited liability company with its principal place of business in Appleton, Wisconsin.  Fleet Farm Wholesale Supply Co. LLC is registered as a foreign limited liability company in Minnesota with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117.

11.     Fleet Farm Wholesale Supply Co. LLC is the named holder of all of Fleet Farm's federal firearms licenses in Minnesota.  Fleet Farm Wholesale Supply Co. LLC was formerly known as Fleet Wholesale Supply Co. LLC until its name was changed in February 2019.

12.     Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC will be collectively referred to as "Fleet Farm" or "Defendants" in this Complaint.

13.     Fleet Farm store locations in Minnesota hold the following FFL licenses authorizing their sales of firearms:

| Store City | Store Street Address | FFL Number |
|---|---|---|
| Alexandria | 310 50th Avenue West | 3-41-041-01-4F-08857 |
| Baxter | 14114 Dellwood Drive | 3-41-035-01-3H-19223 |
| Blaine | 10250 Lexington Avenue Northeast | 3-41-003-01-3G-02607 |
| Brooklyn Park | 8400 Lakeland Avenue North | 3-41-053-01-4C-20315 |
| Cambridge | 2324 Third Avenue Northeast | 3-41-059-01-2H-04306 |
| Carver | 1935 Levi Griffin Road | 3-41-091-01-4E-03811 |
| Fergus Falls | 2002 West Lincoln Avenue | 3-41-111-01-4F-08858 |
| Hastings | 875 General Sieben Drive | 3-41-037-01-5H-06640 |
| Hermantown | 4165 Loberg Avenue | 3-41-137-01-2G-05118 |
| Lakeville | 17070 Kenrick Avenue | 3-41-037-01-3F-21947 |
| Mankato | 1850 Premier Drive | 3-41-013-01-4D-04758 |
| Monticello | 320 Chelsea Road | 3-41-171-01-3G-05380 |
| Oakdale | 5635 Hadley Avenue North | 3-41-163-01-4L-34573 |
| Owatonna | 2121 West Bridge Street | 3-41-147-01-5A-01147 |

4

EXHIBIT A - 13

| Store City | Store Street Address | FFL Number |
|---|---|---|
| Rochester | 4891 Maine Avenue Southeast | 3-41-109-01-4A-16824 |
| Waite Park | 2630 Division Street | 3-41-145-01-4K-15235 |
| Winona | 920 East Highway 61 | 3-41-169-01-4F-22570 |

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to Minnesota Statutes section 8.01 and common law, including the State's *parens patriae* authority.

15.     This Court has personal jurisdiction over Defendants because Defendants own and use property in Minnesota, have purposefully and knowingly transacted business in Minnesota and with Minnesota residents, and have committed acts in Minnesota causing injury to the Minnesota public and in violation of Minnesota law.

16.     On October 5, 2022, the State of Minnesota brought this action in Minnesota State Court. On October 26, 2022, Defendants removed this action to federal court. On November 7, 2022, the State moved to remand this action to Minnesota State Court. On June 27, 2023, the Court denied the motion to remand and held "that this case falls under the small subset of cases where a federal issue is so pervasively involved in the Complaint as to justify federal jurisdiction." Mem. Op. & Order, ECF No. 36.

## FACTUAL ALLEGATIONS

I.     **AS LICENSED FEDERAL FIREARMS DEALERS, FLEET FARM STORES HAVE A DUTY UNDER MINNESOTA AND FEDERAL LAW TO PREVENT UNLAWFUL GUN PURCHASES.**

17.     As licensed firearms dealers, Defendants have each violated, assisted the violation of, and aided and abetted violations of firearm laws and regulations.

18.     Federal laws and regulations closely regulate commercial sales of firearms. The federal Gun Control Act of 1968 (18 U.S.C. §§ 921–931) created a nationwide licensing scheme for firearm dealers. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is the

5

federal agency charged with enforcing these dealer-license provisions.   Under the federal Gun

Control Act, persons wishing to engage in the manufacturing, importing, or dealing in firearms

must first obtain a license and become a federal firearms licensee ("FFL"), as Fleet Farm retail

stores have done.   A person is categorically prohibited from "engag[ing] in the business of

importing, manufacturing, or dealing in firearms" without a federal firearms license.   18 U.S.C.

§§ 922(a)(1), 923(a).

19.     Federal firearms laws carry a purpose: to prevent crime by keeping guns out of the

hands of certain persons who have a heightened risk of misusing firearms, such as minors, persons

with felony convictions, and domestic abusers.   *See generally* 18 U.S.C. § 921 *et seq.*   The

Minnesota Gun Control Act also reflects this purpose, as it establishes categories of persons who

are prohibited from possessing firearms (Minn. Stat. § 624.713) and requires purchasers to obtain

a Minnesota permit—including a separate state-mandated background check—before buying a

pistol or semiautomatic military-style assault weapon ("SAMSAW") from a firearms dealer

(Minn. Stat. § 624.7131).

20.     Congress designed federal law to achieve this aim by channeling firearms

commerce through firearms dealers.   Regulating the distribution of firearms is intended to prevent

trafficking and reduce access to firearms by persons prohibited from possessing them.   Gun dealers

and manufacturers are trained on how to spot traffickers and straw purchasers through multiple

publications and programs sponsored by the ATF and the gun industry, including the "Don't Lie

for the Other Guy" program, newsletters, reference guides, regulatory updates, and ATF seminars.

21.     Before transferring a firearm to any person who is not a licensed dealer, all firearms

dealers, including Fleet Farm, must conduct a background check, examine the individual's

identification, and record the transaction on a firearms transaction record ("ATF Form 4473"). *See* 18 U.S.C. § 922(t)(1), 27 C.F.R. §§ 478.102, 478.124(a).

22.    Before completing a purchase of a firearm from all firearms dealers, including Fleet Farm, a buyer must fill out ATF Form 4473, which asks the following question with the following bolded warning:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the dealer cannot transfer the firearm(s) to you.**

This warning puts the buyer on notice: the buyer is prohibited from buying a firearm on someone else's behalf while falsely claiming that the firearm is for the buyer—otherwise known as a straw purchase. On ATF Form 4473, the buyer must certify that their answers on the form are true, correct, and complete. The buyer violates federal law by filling out the form inaccurately.

23.    Congress strengthened federal prohibitions on straw purchasing by passing the Bipartisan Safer Communities Act in June 2022, which explicitly criminalizes straw purchasing in which any person knowingly purchases, or conspires to purchase, a firearm at the request or demand of another person, knowing or having reasonable cause to believe that the other person (or the ultimate end user) is ineligible to possess the firearm or intends to use the firearm to commit a felony, terrorism, or drug trafficking. *See* 18 U.S.C. § 932(b).

24.    Minnesota law echoes this prohibition on straw purchasing. In 2015, the Minnesota Gun Control Act was amended to include a new section explicitly criminalizing straw purchases:

> Any person who purchases or otherwise obtains a firearm on behalf of or for transfer to a person known to be ineligible to possess or purchase a firearm pursuant to federal or state law is guilty of a gross misdemeanor.

Minn. Stat. § 624.7133; *see also* Minn. Stat. § 624.7132, subd. 15(a)(4) (providing that a person who "makes a false statement in order to become a transferee of a pistol or [SAMSAW] knowing or having reason to know the statement is false" is guilty of a gross misdemeanor).

25.    Straw purchasers commonly falsely certify on ATF Form 4473 that they are purchasing firearms for themselves.  In addition to the information provided by purchasers on the form, there are red flags that indicate a straw purchase to firearms dealers, including the following:

- Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;

- Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns;

- Purchasing firearms with cash;

- The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;

- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;

- The buyer does not keep the firearms in their residence for their own use; and

- A short "time to crime"—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime.  The ATF has noted that the recovery of a crime gun within three years of its initial purchase "is considered a short time-to-crime and a significant trafficking indicator" that "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[1]

26.    Firearms dealers, including Fleet Farm, can refuse to sell a firearm to any buyer for nearly any reason, and a firearms dealer is prohibited from completing the sale if the dealer knows or *has reason to know* that the ATF Form 4473 is inaccurate.  Firearms dealers must also certify

---

[1] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives* (July 2004) (quotation omitted), *available at* https://perma.cc/B6AH-3FG6.

on the form that it is their "belief that it is not unlawful [ ] to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A."

27.    ATF Form 4473 makes clear that all firearms dealers must do more than simply run a background check.   The notices and instructions on the form explain that "[t]he transferor/firearms dealer of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction."  The form also explains that a gun dealer "must stop the transaction if there is reasonable cause to believe that the transferee/buyer is prohibited from receiving or possessing a firearm[.]"  The form contains a clear admonition:

> c, or d.  **Warning:**  Any person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, 18 U.S.C. 922(d), even if the transferor/seller has complied with the Federal background check requirements.

28.    The Bipartisan Safer Communities Act reinforces this restriction by further prohibiting the transfer of a firearm if the firearms dealer knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony under federal law. *See* 18 U.S.C. § 933(a)(1).

29.    Similarly, Minnesota law creates potential criminal liability for firearms dealers that have reason to believe they are selling to a straw purchaser.  Specifically, Minnesota Statutes section 624.7132, subdivision 15(a)(2) provides that a person is guilty of a gross misdemeanor if they transfer a pistol or SAMSAW weapon "to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement."

30.    Federal law regards the purchase of more than one handgun in a short period as a potential indication that the purchaser could be involved in trafficking.  Therefore, to monitor and

EXHIBIT A - 18

deter handgun trafficking, federal law requires a firearms dealer to report all transactions in which an unlicensed buyer purchases two or more handguns within five business days on ATF Form 3310.4. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a. Firearms dealers must transmit one copy of Form 3310.4 to the ATF, send another copy to a local law enforcement official (Chief Local Law Enforcement Official or "CLEO") designated to receive the form,[2] and then retain one copy of the ATF 3310.4 form and attach it to the ATF Form 4473 related to the firearms sale. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a.

31.     Federal rules require all firearms dealers to keep a record of all transactions with unlicensed persons in an acquisition and disposition book. 27 C.F.R. §§ 478.123(b), 478.125(e). A firearms dealer violates federal law by knowingly making false statements or misrepresentations, failing to make appropriate entries in, or failing to properly maintain, acquisition and disposition records, firearms transaction records, or reports of multiple sales of handguns. 18 U.S.C. §§ 922(m), 924(a)(3); *see also* 18 U.S.C. § 924(a)(1)(A).

32.     Federal law also enlists dealers and manufacturers in working to detect illegal transactions and trafficking after a firearm is used unlawfully. When a law enforcement agency recovers a firearm at a crime scene or in the course of a criminal investigation, the agency may request a trace report from ATF's National Tracing Center. The ATF represents that "[f]irearms tracing is only conducted at the request of a law enforcement agency engaged in a bona fide criminal investigation where a firearm has been used or is suspected to have been used in a crime."[3]

---

[2] The CLEO must destroy the ATF Form 3310.4 within 20 days of receipt and certify in writing to the ATF every six months that these forms were not disclosed and were properly destroyed. *See* 18 U.S.C. § 923(g)(3)(B).

[3] Bureau of Alcohol, Tobacco, Firearms, and Explosvies, *Firearms Trace Data – 2019*, https://perma.cc/P8P3-BGYS.

The National Tracing Center tracks the path of the firearm from its manufacturer through the distribution chain to the last retail sale transaction between a firearms dealer and purchaser. Because firearms dealers must provide information from their records about crime guns that the firearms dealer manufactured, distributed, or sold, *see* 18 U.S.C. § 923(g)(7); 27 C.F.R. § 478.25a, firearms dealers are on notice of which transactions, types of guns, and purchasers are potentially involved in criminal activity.

33.     Firearms dealers are required to know the federal firearms laws and regulations. ATF agents review the applicable laws and regulations with firearms dealers when they initially receive their license and during ATF audits. At the conclusion of an audit, the ATF requires firearms dealers to certify acknowledgement of federal laws and regulations. The acknowledgement form includes certification that the firearms dealer has reviewed laws and regulations regarding all of the following: (i) completing and maintaining firearm transaction records; (ii) conducting transfers between firearms dealers; (iii) engaging in the business of firearms dealing; and (iv) straw purchasing.

II.     **FLEET FARM KNEW OR SHOULD HAVE KNOWN IT WAS SELLING TO STRAW PURCHASERS WHO TRAFFICKED DOZENS OF FIREARMS, SOME OF WHICH HAVE BEEN USED TO INJURE MINNESOTANS AND MOST OF WHICH REMAIN UNRECOVERED.**

        A.     **Fleet Farm Is Owned by a Private Equity Firm and Operates Several Stores in Minnesota That Sell Firearms.**

34.     Fleet Farm is a retail store chain with 17 locations[4] in Minnesota that sell firearms and ammunition to the public. Fleet Farm is headquartered in Wisconsin and operates stores throughout the upper Midwest. Fleet Farm was founded by Minnesota natives Stewart Mills Sr., and his two sons as Fleet Wholesale Supply in 1955 in Marshfield, Wisconsin, and soon changed its name to Mills Fleet Farm as the chain expanded into Minnesota and throughout the upper

---

[4] Fleet Farm recently opened its 17th Minnesota store in Hastings on September 9, 2022.

11

Midwest.  Mills Fleet Farm was family owned until 2016, when it was sold to a private equity firm for a reported $1.2 billion.[5]  Fleet Farm dropped the "Mills" family name entirely in 2018.[6]

35.      Fleet Farm stores sell handguns, rifles, and shotguns, and also sell many varieties of ammunition for these firearms.  On its website, Fleet Farm lists 235 different handgun models for sale, including 130 different models of semi-automatic pistols and 125 different 9mm handgun models.

36.      As alleged above, every Fleet Farm retail store location in Minnesota holds an FFL license authorizing Fleet Farm's sale of firearms.  Fleet Farm has failed to meet its duties and obligations under federal and state law and regulations by selling numerous firearms to straw purchasers.  In doing so, Fleet Farm has disregarded well known and blatant warning signs of straw purchasing, including the following:  (1) multiple purchases of similar handguns (especially 9mm caliber); (2) buying sprees over concentrated periods of time; and (3) staggered visits to different Fleet Farm locations to elude multiple-sale reporting requirements.  These are all hallmark "red flags" of illegal gun trafficking by straw purchasers.  Nevertheless, Fleet Farm continued to engage in straw purchase transactions even though Fleet Farm knew, or should have known, based on the circumstances of these transactions and Fleet Farm's training, that these customers were not making bona fide purchases for themselves.  In doing so, Fleet Farm has profited from the unlawful sale of firearms to sham purchasers who then transferred these weapons to criminals and other prohibited and dangerous persons.

---

[5]  Pitchbook, *KKR closes challenging $1.2B Mills Fleet Farm deal* (Mar. 1, 2016), https://perma.cc/3ZWM-XS7F.

[6]  Archer Parquette, *The Real Story Behind Mills Fleet Farm and Blain's Farm & Fleet*, Milwaukee Magazine (July 19, 2022), https://perma.cc/M2FB-DFVL

**B.** **Fleet Farm Sold 24 Firearms to Straw Purchaser Jerome Horton During a Four-Month Period in 2021, and These Firearms Caused Harm in the Wrong Hands.**

37.      From June 2021 through October 2021, Jerome Horton purchased 33 firearms from federally licensed firearm dealers in the Twin Cities area.  Affidavit of Special Agent Kylie Williamson, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). Horton resold several of the firearms he purchased to different people, and further claimed that some of his other purchased firearms were stolen from his stash location near a St. Paul strip club. *Id.*  Horton also tried to sell semiautomatic handguns with high-capacity magazines that could fit more than 15 rounds of ammunition in a clip.  Plea Agreement at 2, Dkt. No. 23, *United States v. Horton*, Case No. 22-CR-00006 (D. Minn. Mar. 3, 2022).

38.      Fleet Farm sold 24 firearms to Horton in the four-month span between mid-June 2021 and mid-October 2021.  Fleet Farm's sales to Horton are identified in the chart below, with multiple firearm purchases on the same day highlighted:

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|-------|----------|---------------------|------------------------------|---------------|
| Fleet Farm | Brooklyn Park | 6/15/2021 | Taurus G2C 9mm | 1C020445 |
| Fleet Farm | Brooklyn Park | 7/4/2021 | Ruger Security 9 9mm | 38463707 |
| Fleet Farm | Brooklyn Park | 7/7/2021 | Glock 19 9mm | BTNX619 |
| Fleet Farm | Oakdale | 7/10/2021 | Glock G43X 9mm | BTTU573 |
| Fleet Farm | Blaine | 7/23/2021 | Beretta APX 9mm | A152030X |
| Fleet Farm | Oakdale | 7/24/2021 | FNH 503 9mm | CV016470 |
| Fleet Farm | Oakdale | 7/24/2021 | Springfield Armory XDS 9mm | BA456304 |
| Fleet Farm | Oakdale | 7/26/2021 | Glock 26 9mm | AFVB754 |
| Fleet Farm | Blaine | 7/27/2021 | Glock 43X 9mm | BTTU0778 |
| Fleet Farm | Blaine | 7/27/2021 | Stoeger STR-9C 9mm | T642921S02199 |
| Fleet Farm | Blaine | 7/31/2021 | Glock 45 9mm | BSTE309 |
| Fleet Farm | Blaine | 7/31/2021 | Mossberg MC2C 9mm | 017520MC |
| Fleet Farm | Blaine | 7/31/2021 | Ruger EC95 9mm | 45955269 |
| Fleet Farm | Blaine | 8/14/2021 | Glock 19X 9mm | BUCB186 |
| Fleet Farm | Brooklyn Park | 8/20/2021 | Glock G19 9mm | BSXE226 |

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|---|---|---|---|---|
| Fleet Farm | Lakeville | 8/31/2021 | Glock 26 9mm | AFVC844 |
| Fleet Farm | Lakeville | 8/31/2021 | Mossberg MC2C 9mm | 014211MC |
| Fleet Farm | Blaine | 9/13/2021 | Glock G17 9mm | BUGR628 |
| Fleet Farm | Brooklyn Park | 9/17/2021 | Ruger 57 5.7x28 | 64322362 |
| Fleet Farm | Blaine | 9/18/2021 | Glock G19 9mm | BUAS957 |
| Fleet Farm | Blaine | 9/26/2021 | Glock 26 9mm | AFSE457 |
| Fleet Farm | Blaine | 9/26/2021 | Radical Firearms RF-15 .556 | 21046140 |
| Fleet Farm | Brooklyn Park | 10/11/2021 | Taurus G3C 9mm | 1KA06796 |
| Fleet Farm | Oakdale | 10/17/2021 | Glock 26 9mm | AGBR071 |

39.     As shown in the chart above, Fleet Farm sold multiple guns at once—typically
multiple handguns of the same caliber—to Horton on five different days.  Moreover, Fleet Farm
sold multiple handguns to Horton in very short periods of time.  For instance, Fleet Farm sold
Horton eight 9mm semiautomatic pistols in a one-week timespan between July 24 and July 31,
2021.  The timing of Fleet Farm's sales of guns to Horton is illustrated in the following timeline:



40.     The sheer volume of Horton's purchases put Fleet Farm on notice that he was not making bona fide purchases for himself but was instead straw purchasing firearms for others. Horton's purchases were also highly suspicious in additional ways.

41.     On five occasions, Fleet Farm sold Horton multiple handguns at once, and Fleet Farm also made multiple sales to Horton at the same location within five business days on several occasions. These sales required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking. The guns purchased were also nearly all the same caliber (9mm) of handgun—another red flag of straw purchasing. Horton also staggered purchasing single handguns within days or weeks of each other and from different Fleet Farm locations.

42.     Furthermore, the affidavit in support of the federal charges against Horton indicate that the ATF reviewed Fleet Farm surveillance video showing Horton "using the camera feature on his [phone] to either take photographs or video" in connection with Horton's October 17, 2021, purchase of a Glock 26 9mm handgun at Fleet Farm's Oakdale store. Affidavit of Special Agent Kylie Williamson at ¶ 14, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). The ATF agent testified that in her training and experience, this is a common indication of straw purchasing, as the straw purchaser wants to show available firearms to the third party intended recipient of the firearm without the intended recipient having to appear on surveillance cameras. *Id.*

43.     These highly suspicious behaviors put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms, and that he was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Horton anyway.

44.     After Fleet Farm sold guns to Horton, Horton trafficked these guns to criminals and prohibited persons. Horton transferred six of these handguns to Gabriel Young-Duncan, who would then keep the firearms or further transfer them to other persons. *See* Indictment, Dkt. No. 1, *U.S. v. Gabriel Lee Young-Duncan*, Case No. 22-CR-00004 (D. Minn. Jan. 18, 2022). Young-Duncan was charged on January 18, 2022, and ultimately pleaded guilty in federal court to conspiracy to make false statements in the purchase of a firearm for his participation in Horton's straw purchasing scheme. *See id.* Young-Duncan is scheduled to be sentenced October 5, 2022.

45.     The guns Fleet Farm sold to Horton have caused harm to Minnesotans. On August 13, 2021, the Glock 43X 9mm pistol that Fleet Farm sold to Horton on July 10, 2021, serial number BTTU573—which Horton then transferred to Young-Duncan—was allegedly discharged in public in the middle of Minneapolis and found by police in the possession of an individual without a permit to carry a handgun. *See* Complaint, *State v. Douglas Jerome Sutton*, No. 27-CR-21-15330 (Henn. Cty. Dist. Ct. Aug. 16, 2021). The individual told police he found the gun in an alleyway and shot it to see if it was operational so he could sell it. This incident happened only 34 days after Fleet Farm sold the gun to Horton. Fleet Farm sold 11 more handguns to Horton after Douglas Sutton's arrest.

46.     On September 6, 2021, the Glock 19 9mm pistol that Fleet Farm sold to Horton on July 7, 2021, serial number BTNX619, was found by a six-year-old boy in the front yard of his family's house in south Minneapolis. After finding the gun, the six-year-old boy told his father that the gun "didn't look like a fake one," prompting the father to use a basket and a blue frisbee to cover up the gun and its ammunition magazine and then contact the police. The gun was likely discarded there by suspects involved in an earlier Minneapolis public shooting incident who then raced through the neighborhood as they fled from the police. The gun was recovered by police

only 61 days after Fleet Farm sold the gun to Horton.  Fleet Farm sold seven more firearms to Horton after this gun was found.

47.     On September 26, 2021, the Glock 26 9mm pistol that Fleet Farm sold to Horton on July 26, 2021, serial number AFVB754—which Horton then transferred to Young-Duncan—was found by police in the possession of an individual without a permit to carry a handgun, Charles Toy.  *See* Complaint*, State v. Charles Curtis Toy*, No. 27-CR-22-12594 (Henn. Cty. Dist. Ct. June 29, 2022).  The Glock handgun was found fully loaded with an extended 28-round magazine. *Id.*  Police recovered this weapon 62 days after Fleet Farm had sold the gun to Horton. Fleet Farm sold two handguns to Horton on the day of Charles Toy's arrest and then sold Horton two more handguns afterward in October 2021.

48.     On September 30, 2021, the Springfield Armory XDS 9mm pistol Fleet Farm sold to Horton on July 24, 2021, serial number BA456304, was found by police in the possession of a prohibited person with prior convictions for first-degree aggravated robbery and for aiding and abetting first-degree burglary.  *See* Complaint*, State v. Shamar Jamareus Scott*, No. 27-CR-21-18321 (Henn. Cty. Dist. Ct. Oct. 1, 2021).  The individual threw the firearm as he was fleeing from the police.  Police recovered this weapon 68 days after Fleet Farm had sold the gun to Horton. Fleet Farm sold two more firearms to Horton after police recovered this gun.

49.     On October 10, 2021, the Mossberg MC2C 9mm semiautomatic pistol that Fleet Farm sold to Horton on July 31, 2021, serial number 017520MC—which Horton then transferred to Young-Duncan—was fired in the Seventh Street Truck Park shooting in St. Paul.  This pistol was fired by Devondre Trevon Phillips, who has a prior felony conviction for aggravated first-degree robbery, which makes him ineligible to possess firearms or ammunition.  Affidavit of Special Agent Kylie Williamson, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn.

EXHIBIT A - 26

Oct. 18, 2021); *see also* Amended Complaint, *State v. Devondre Trevon Phillips*, No. 62-CR-21-5805 (Ramsey Cty. Dist. Ct. May 26, 2022). Phillips allegedly fired the pistol in this chaotic shootout at a St. Paul area bar where the exchange of gunfire between three different gunmen injured 14 people and killed a 27-year-old woman when a bullet penetrated her left lung and heart. Fleet Farm sold two more handguns to Horton after the Truck Park shooting.

50.     Jerome Horton was charged by information on January 18, 2022, and ultimately pleaded guilty in federal court to one count of making false statements in the course of purchasing a firearm. Plea Agreement at 2, Dkt. No. 23, *United States v. Horton*, Case No. 22-CR-00006 (D. Minn. March 3, 2022). In his March 3, 2022, plea agreement, Horton admitted to falsely representing himself as the end purchaser in connection with the purchase of all 33 firearms he bought in the Twin Cities area from June 2021 through October 2021. *Id.* Horton is scheduled to be sentenced on October 22, 2022.

51.     Even after the federal criminal actions against Horton and Young-Duncan, most of the guns Fleet Farm sold to Horton are still not recovered by law enforcement, are unaccounted for, and pose an ongoing danger to the health and safety of Minnesotans. For instance, on July 26, 2022, the Taurus G2C 9mm pistol that Fleet Farm sold to Horton on June 15, 2021, serial number 1C020445, was recovered by police from a person prohibited from possessing firearms due to prior convictions for first-degree assault and aggravated robbery. *See* Complaint, *State v. Jorge Olivares Jr.*, No. 27-CR-22-14776 (Henn. Cty. Dist. Ct. July 28, 2022).

52.     By engaging in the sale and transfer of firearms to Horton under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Horton in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement

18

in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false entries in records required to be kept by dealer); 18 U.S.C. § 923(a) (engaging in the business of dealing firearms without a license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. § 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. § 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

**C.    Fleet Farm Sold 13 Guns to Straw Purchaser Sarah Elwood During a 12-Month Period in 2020 and 2021, and These Firearms Continue to Cause Harm in the Wrong Hands.**

53.     Starting in May 2020 through May 2021, Sarah Elwood, along with two co-conspirators, straw purchased 97 firearms from 9 different licensed gun dealers in Minnesota. Elwood regularly purchased firearms and sold them to third parties for a profit of about $100 per firearm. *See* Affidavit of Cory J. Shelton, Dkt. No. 1-1, *U.S. v. Sarah Jean Elwood*, Case. No. 21-CR-00147 (D. Minn. June 1, 2021). Elwood regularly sold firearms for cash to a co-conspirator, who then provided the guns to others in exchange for cash or discounts on high-potency, expensive marijuana. *Id.*; *see also* Plea Agreement, Dkt. No. 133, *U.S. v. Geryiell Lamont Walker*, Case No. 21-CR-00147 (D. Minn. Mar. 16, 2022). Elwood's co-conspirator told the ATF that he knew the

firearms purchased by Elwood were being trafficked for criminal activity and that he "did not care." Affidavit of Cory J. Shelton at ¶ 37, Dkt. No. 1-1, *U.S. v. Sarah Jean Elwood*, Case. No. 21-CR-00147 (D. Minn. June 1, 2021).

54.    Fleet Farm sold 13 firearms to Elwood in the 12-month span from June 2020 to May 2021.  Fleet Farm's sales to Elwood are identified in the chart below, with purchases of multiple firearms on the same days highlighted:

| Store | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|---|---|---|---|
| Fleet Farm | 6/20/2020 | Century Arms TP9SF 9mm | 20BH09180 |
| Fleet Farm | 7/30/2020 | Taurus G2C 9mm | ABD463393 |
| Fleet Farm | 1/4/2021 | Taurus Spectrum 380 Auto | 1F033220 |
| Fleet Farm | 1/11/2021 | Taurus PT111G2A 9mm | ABH838724 |
| Fleet Farm | 1/31/2021 | Taurus Spectrum 380 Auto | 1F024926 |
| Fleet Farm | 1/31/2021 | Taurus Spectrum 380 Auto | 1F033065 |
| Fleet Farm | 3/15/2021 | Springfield XDS 9mm | BA181757 |
| Fleet Farm | 5/1/2021 | Ruger EC9S 9mm | 459-15215 |
| Fleet Farm | 5/1/2021 | Smith & Wesson M&P 9 Shield Plus 9mm | JFY6090 |
| Fleet Farm | 5/6/2021 | Glock 19 9mm | BTNN877 |
| Fleet Farm | 5/6/2021 | Ruger 5 7 5.7x28 | 642-13405 |
| Fleet Farm | 5/12/2021 | Glock 17 9mm | BTMG955 |
| Fleet Farm | 5/12/2021 | Ruger 5 7 5.7x28 | 642-12901 |

55.    As shown in the chart above, Fleet Farm sold multiple handguns in the same day to Elwood on four different occasions, including three days in which Fleet Farm sold her multiple handguns mere days apart in early May 2021 (May 1, May 6, and May 12).  The timing of Fleet Farm's sales of guns to Elwood is illustrated in the following timeline:

20



56.     The sheer volume of Elwood's purchases put Fleet Farm on notice that she was not making bona fide purchases for herself but was instead straw purchasing firearms for others. Elwood's purchases were also highly suspicious in additional ways.

57.     On four occasions, Fleet Farm sold Elwood multiple handguns at once, which required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking. The majority of the firearms Fleet Farm sold to Elwood were 9mm caliber or similar small-caliber handguns—another red flag of straw purchasing.

58.     These highly suspicious behaviors put Fleet Farm on notice that Elwood was unlawfully trafficking, and that she was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Elwood anyway.

59.     On June 24, 2021, Elwood was indicted on federal charges for dealing in firearms without a license, conspiracy to make false statements during purchase of firearms, and making false statements during purchase of firearms. Indictment, Dkt. No. 33, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. June 24, 2021). Elwood ultimately pleaded guilty to one count

of making false statements during the purchase of firearms on December 28, 2021. *See* Plea Agreement and Sentencing Stipulations, Dkt. No. 97, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Dec. 28, 2021). As part of her plea agreement, Elwood admitted that the United States could prove that she straw purchased all of these 97 firearms for profit. *See* Plea Agreement and Sentencing Stipulations, Dkt. No. 97, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Dec. 28, 2021). On September 14, 2022, Elwood was sentenced to serve 18 months in prison based on her straw purchasing misconduct. *See* Amended Judgment, Dkt. No. 178, *U.S. v. Sarah Jean Elwood*, Case No. 21-CR-00147 (D. Minn. Sept. 16, 2022).

60.     Even after the federal criminal actions against Elwood and her two co-conspirators, 12 of the 13 guns Fleet Farm sold to Elwood are still not recovered by law enforcement, are unaccounted for, and pose an ongoing danger to the health and safety of Minnesotans. On July 7, 2021, Orlando Lanell Holden was caught by police with the Taurus Spectrum .380 caliber pistol that Fleet Farm sold to Elwood on January 4, 2021, serial number 1F033220, after allegedly using it to threaten someone in public. *See* Complaint, *State v. Holden*, No. 27-CR-21-16811 (Hennepin Cty. Dist. Ct. Sept. 8, 2021). Holden is ineligible to possess firearms due to a prior juvenile conviction for first-degree aggravated robbery and has been charged with second-degree assault and possession of a firearm by a prohibited person. *See id.* Police recovered this weapon 184 days after Fleet Farm sold it to Elwood.

61.     By engaging in the sale and transfer of firearms to Elwood under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Elwood in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false

entries in records required to be kept by dealer); 18 U.S.C. § 923(a) (engaging in the business of dealing firearms without a license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. § 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. § 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

III.   **MINNESOTA GUN TRAFFICKING AND GUN VIOLENCE ROSE DURING THE COVID-19 PANDEMIC WHEN FLEET FARM SOLD FIREARMS TO STRAW PURCHASERS.**

62.   Of the different ways that firearms can get into the hands of criminals, "straw purchasing" is one of the most prevalent and concerning.  The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified straw purchasing as the most common channel for the diversion of firearms into the black market and illegal gun trafficking schemes, accounting for thousands of trafficked guns every year.[7]

---

[7] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* at xi, Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (June 2000), *available at* https://perma.cc/PYK2-SXSU.

63.    As described above, the ATF assists local law enforcement with criminal investigations by tracing firearms recovered by local police in connection with criminal investigations back to their first retail seller. Data published by the ATF shows that more and more guns are being recovered by police in crimes and being traced back to firearms dealers in Minnesota. 4,605 firearms recovered in Minnesota were traced by the ATF to their first retail seller in 2021, including 3,417 pistols and 2,159 9mm caliber guns.[8] These numbers are part of an upward trend of the number of crime guns in Minnesota traced by the ATF: 4,072 firearms were traced in 2020[9] and 4,112 firearms were traced in 2019.[10]

64.    One key indicator showing how illegal gun purchases lead to crime is the "time to crime" associated with the crime gun trace—i.e., how quickly the gun was used in, or connected to, a crime after being purchased. The number of Minnesota crime guns with very short times to crime has grown exponentially in recent years. The following chart shows how many crime guns were recovered by police in Minnesota and traced by the ATF within six months or less of retail purchase:

---

[8] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2021, https://perma.cc/P3K5-VFA4.

[9] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2020, https://perma.cc/HA2A-3V3X

[10] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Minnesota Data Source: Firearms Tracing System (2019), *available at* https://perma.cc/7VPN-49QG.

| Year | Time to Crime of Six Months or Less | Percentage of Crime Guns Recovered Within Six Months of Purchase |
|---|---|---|
| 2019[11] | 314 | 7.6% |
| 2020[12] | 593 | 14.6% |
| 2021[13] | 843 | 18.3% |

65.    From 2019 to 2021, this data shows a 168% increase in Minnesota crime guns being recovered with a time to crime of six months or less, with these firearms now constituting nearly 20% of all crime guns traced by the ATF in Minnesota.  National statistics similarly show a 90% increase from 2019 to 2020 in crime guns being recovered in 6 months or less[14]:

---

[11] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Minnesota Data Source: Firearms Tracing System (2019), *available at* https://perma.cc/7VPN-49QG.

[12] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2020, https://perma.cc/HA2A-3V3X

[13] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Firearms Trace Data: Minnesota – 2021, https://perma.cc/P3K5-VFA4.

[14] Jeff Asher & Rob Arthur, *The Data Are Pointing to One Major Driver of America's Murder Spike*, The Atlantic (Jan. 10, 2022), https://perma.cc/95LY-3BDK.

EXHIBIT A - 34



66.    Although crime guns in Minnesota originate from all across the country, the majority of crime guns in Minnesota are purchased in Minnesota.  59% of crime guns recovered in Minnesota in 2021 were initially purchased in Minnesota.[15]  68% of crime guns recovered by the Minneapolis Police Department in 2022 were initially purchased in Minnesota, with 5% coming from Wisconsin and 2% or less from all other states.[16]

67.    The recent rise in crime guns and gun trafficking correlates to an increase in gun violence.  Minnesota gun deaths spiked to a 20-year high of 570 deaths in 2021, including 163 homicides and 390 suicides.[17]  The Minnesota homicide rate more than doubled between 2018 and

---

[15] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Trace Data: Minnesota – 2021*, https://perma.cc/P3K5-VFA4.

[16] City of Minneapolis, *2022 Gun Violence Overview* at 18, *available at* https://perma.cc/N8LS-CJFJ.

[17] Christopher Ingraham, *Minnesota gun deaths hit 20-year high*, Minnesota Reformer (Sept. 19, 2022), https://perma.cc/ZJ25-D68G; CDC WONDER, Provisional Mortality Statistics, 2018 through Last Month, https://wonder.cdc.gov/.

2021, with 80% of those homicides taking place in the seven-county Twin Cities metro area.[18] Gun suicides have particularly affected greater Minnesota, which has a gun suicide rate nearly twice that of the Twin Cities metro area.[19]

68.    Black and Native American communities in Minnesota are disproportionately impacted by gun violence. Black Minnesotan males aged 15-34 have a firearm homicide rate that is *28 times higher* than White males of the same age group.[20] Overall, Black Minnesotans are 12 times more likely to die by gun homicide than White Minnesotans, while Native Americans are 10 times more likely die by gun homicide.[21]

69.    Both nationwide and in Minnesota, firearm violence has increased so dramatically that firearm deaths became the leading cause of death among children in 2020, overtaking motor vehicle accidents, which had been the chief cause of child deaths for decades beforehand.[22] Firearms also cause a substantial number of injuries in Minnesota, with 811 Minnesotans on average being wounded by guns every year.[23]

---

[18] Christopher Ingraham, *Minnesota gun deaths hit 20-year high*, Minnesota Reformer (Sept. 19, 2022), https://perma.cc/ZJ25-D68G.

[19] *Id.*

[20] The Educational Fund to Stop Gun Violence, *Minnesota Gun Deaths: 2019*, https://perma.cc/3VYP-PDHS.

[21] Everytown, *Gun Violence in Minnesota* (last updated Feb. 2020), *available at* https://perma.cc/9CN6-8L7T.

[22] Dustin Jones, *Firearms overtook auto accidents as the leading cause of death in children*, National Public Radio (Apr. 22, 2022), https://perma.cc/5TAT-V6QZ; Everytown, *Gun Violence in Minnesota* (last updated Feb. 2020), *available at* https://perma.cc/9CN6-8L7T.

[23] EveryStat, https://everystat.org/.

## COUNT I
## NEGLIGENCE

70.     The State re-alleges all prior paragraphs of this Complaint.

71.     At all relevant times, Defendants owed the State of Minnesota and its citizens the general duty imposed on all persons and entities to not expose others to reasonably foreseeable risks of injury. Defendants had a duty to exercise reasonable care in distributing and selling firearms and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. A breach of such duty constitutes negligence.

72.     Defendants failed to exercise reasonable care and breached their duty to the State and its citizens by selling firearms they knew or should have known were destined for the illegal stream of commerce and into the hands of persons ineligible to possess a firearm. Defendants' failure to abide by their duty to exercise such reasonable care increased the risk of harm, including the risks of prohibited firearm possession, firearm injuries, and death.

73.     Defendants transacted firearms business with straw purchasers and traffickers like Horton, Elwood, and others, even though Defendants knew, or consciously avoided knowing, that these individuals were engaged in unlicensed dealing, firearms trafficking, and/or straw purchasing.

74.     Defendants further breached their duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, numerous federal laws and regulations, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(a), and 924(a)(1)(D), 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

75.     Defendants further breached their duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, Minnesota law, including Minn. Stat. §§ 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

76.     Through the conduct described herein, Defendants have breached and continue to breach Defendants' duty of care to the State and its citizens.

77.     Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

78.     As a direct and proximate result of Defendants' negligent conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

79.     Defendants' conduct, practices, and actions described in this Complaint constitute multiple instances of negligence under Minnesota law.

## COUNT II
## NEGLIGENCE PER SE

80.     The State re-alleges all prior paragraphs of this Complaint.

81.     Under the law, and due to Defendants' responsibilities as a federally licensed dealer of an especially dangerous product, Defendants owed a duty of care to Minnesota citizens and the State.  These laws include, but are not limited to, the provisions of the federal Gun Control Act (18 U.S.C §§ 921–931) and its implementing regulations (27 C.F.R. Part 478), and the Minnesota Gun Control Act (Minn. Stat. §§ 624.71–624.7192).

82.     The above laws and regulations are intended to curb firearm crime, prevent access to firearms by persons prohibited from possessing them, and protect public safety.  These laws and regulations were designed to prevent illegal dealing in firearms by directing firearms commerce through business licensed by the federal government.   These laws and regulations impose obligations on licensed dealers to further their purpose.

EXHIBIT A - 38

83.     The State and its residents are within the class of persons meant to be protected by these laws and regulations, and the injuries to the State and its citizens are of the nature that these laws and regulations were designed to prevent.

84.     Through the conduct described herein, Defendants have violated, and aided and abetted the violation of, the laws and regulations referenced above, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133.  In doing so, Defendants have breached and continue to breach their duty of care to the State and its citizens. Therefore, Defendants' breach of the laws and regulations referenced above constitute negligence per se for which Defendants are liable.

85.     Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

86.     As a direct and proximate result of Defendants' negligent conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

87.     Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of negligence per se under Minnesota law.

## COUNT III
## NEGLIGENT ENTRUSTMENT

88.     The State re-alleges all prior paragraphs of this Complaint.

89.     At the time that Defendants made one or more firearm sales to Horton, Elwood, and others, Defendants knew or reasonably should have known that these individuals were engaged in unlawful straw purchasing or unlicensed dealings in firearms to prohibited persons or for use in the commission of crimes.

30

90.    Defendants knew or reasonably should have known that these individuals' straw purchasing and/or unlicensed dealing in firearms created an unreasonable risk of harm to third parties, including the citizens of Minnesota and the State itself, because a foreseeable and likely consequence of those unlawful trafficking activities is gun violence resulting in serious injury or death, as well as criminal activity.

91.    Defendants had possession and control of the firearms that Defendants transferred or caused to be transferred to the straw purchasers. Defendants knew or should have known that Defendants' employees or agents who transferred firearms or caused firearms to be transferred to these straw purchasers were obliged to use their judgment to refuse to transfer firearms to a transferee whom the employees and agents knew or should have known was involved in straw purchasing and/or unlicensed dealing in firearms.

92.    Defendants, by their employees and agents, knew or should have known that firearms transferred to traffickers and straw purchasers would likely be used in a manner involving an unreasonable risk of harm.

93.    Firearms negligently entrusted by Defendants to traffickers and straw purchasers have foreseeably been recovered in the possession of prohibited possessors or at crime scenes in Minnesota, and many others are still unaccounted for.

94.    Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

95.    As a direct and proximate result of Defendants' conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

96.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of negligent entrustment under Minnesota law.

## COUNT IV
## AIDING AND ABETTING

97.     The State re-alleges all prior paragraphs of this Complaint.

98.     The straw purchasers identified above each violated the law and thereby committed the tort of negligence per se each time the straw purchasers made false statements in the course of purchasing a firearm, as well as each time the straw purchasers sold, transferred, or otherwise engaged in unlicensed dealing of firearms to individuals who are prohibited from owning or possessing firearms.

99.     Defendants knew or reasonably should have known that the individuals identified above were committing the tort of negligence per se by engaging in straw purchasing and/or unlicensed dealings in firearms to prohibited persons in violation of state and federal law, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133.

100.    By selling multiple firearms to each of the straw purchasers identified above, Defendants substantially assisted these straw purchasers in committing the tort of negligence per se.

101.    Defendants are vicariously liable for the actions or inactions of Defendants' agents and/or employees while in the scope of their agency and/or employment.

102.    As a direct and proximate result of Defendants' conduct described herein, the State and its residents have suffered and will continue to suffer substantial injuries and damages.

103.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple instances of aiding and abetting under Minnesota law.

## COUNT V
## PUBLIC NUISANCE

104.    The State re-alleges all prior paragraphs of this Complaint.

EXHIBIT A - 41

105.    Minnesota Statutes section 609.74 provides, in part:

Whoever by an act or failure to perform a legal duty intentionally does any of the following is guilty of maintaining a public nuisance, which is a misdemeanor:

(1) maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public; or

***

(3) is guilty of any other act or omission declared by law to be a public nuisance and for which no sentence is specifically provided.

106.    The State and its residents have a public right to be free from interference with public safety, health, comfort, or repose.  The State is empowered by equity and law to allege a claim, and seek redress for, a public nuisance.

107.    Through Defendants' conduct in selling firearms to individuals that they knew or should have known were engaged in straw purchasing and/or unlicensed dealing in firearms, Defendants have intentionally maintained or permitted, or were a substantial factor in maintaining or permitting, a public nuisance that has annoyed, injured, and endangered—and continues to unreasonably annoy, injure, and endanger—the common right of public health, comfort, or repose of considerable members of the public.

108.    Defendants' conduct foreseeably resulted in the illegal transfer of these firearms to criminals and other prohibited persons in Minnesota.  Some of the illegally transferred firearms have been used in the commission of crimes or recovered by the police, while other firearms remain unrecovered.  Defendants' conduct was, at the very least, a substantial factor in creating, promoting, supporting, or supplying an illegal secondary market for firearms that contributed to unlawful possession of firearms and firearm violence in Minnesota.  Without Defendants' conduct,

firearm possession, misuse, injury, and death would not have been so widespread, and at least some of the existing harm to Minnesotans caused by firearms would have been avoided.

109.    Defendants' conduct is widespread and persistent, and has created, is creating, and will likely continue to create substantial ongoing harm to the State and its residents by unreasonably interfering with the right of the general public to life, safety, health, the use and enjoyment of property, the right to travel within Minnesota, and the right to attend school, all without fear of gun violence. The unlawful proliferation of firearms interferes with rights common to the general public, deprives Minnesota residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places, interferes with commerce, travel, and the quality of daily life, and endangers the health, welfare, peace, safety, well-being, convenience, and property of considerable numbers of residents of, and visitors to, Minnesota. These harms are felt throughout Minnesota and are borne disproportionately by vulnerable communities, including the Native American and Black communities.

110.    The State has incurred and continues to incur substantial costs from investigating, monitoring, treating, policing, and remediating the misuse of firearms in Minnesota. The nuisance created by Defendants' illegal conduct continues to this day and, absent abatement or other relief, will continue indefinitely.

111.    Defendants' conduct including knowingly violating and aiding and abetting the violation of numerous federal laws and regulations, including 18 U.S.C §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(a), 924(a)(1)(D), and 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

112.    Defendants' conduct also included knowingly violating and aiding and abetting the violation of Minnesota law, including Minnesota Statutes sections 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

113.    Defendants' conduct in maintaining or permitting a public nuisance has openly, publicly, repeatedly, continuously, persistently, and intentionally violated Minnesota law, as described throughout this Complaint. Defendants' conduct is sufficiently pervasive that this conduct cannot be adequately addressed or remedied by resort to criminal enforcement of Minnesota Statutes section 609.74 or other criminal statutes. Defendants' widespread interference with public rights and privileges, and resulting endangerment of public health, requires the State to seek injunctive and all other appropriate equitable relief against Defendants in order to abate this public nuisance and remedy the resultant harm, both retrospectively and prospectively.

## COUNT VI
## MINNESOTA GUN CONTROL ACT

114.    The State re-alleges all prior paragraphs of this Complaint.

115.    The Minnesota Gun Control Act prohibits federally licensed firearms dealers from, among other things, "transfer[ring] a pistol or semiautomatic military-style assault weapon to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement." Minn. Stat. § 624.7132, subd. 15(a)(2).

116.    Minnesota Statutes section 624.7132, subdivision 15(a)(2), is a Minnesota law "respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." Minn. Stat. § 8.31, subd. 1. Accordingly, the Minnesota Attorney General is empowered to enforce Minnesota Statutes section 624.7132, subdivision 15(a)(2) via Minnesota Statutes section 8.31. *See Findling v. Group Health Plan, Inc.*, 2023 WL 8441516, at *3–9 (Minn. Dec. 6, 2023).

35

117.   Defendants transferred firearms to straw purchasers who made false statements in order to become transferees—namely, that the straw purchasers were buying firearms for themselves when, in fact, the straw purchasers were buying firearms for others.

118.   For example, in every sale by Defendants to straw purchasers Jerome Horton and Sarah Elwood, the straw purchasers checked a box on Form 4473 Firearms Transaction Records, representing that they were the "actual transferee/buyer of the firearm(s) listed on this form." Representatives of Defendants ostensibly reviewed these representations, signed the sale forms, and transferred firearms to straw purchasers.

119.   As detailed *supra*, Defendants knew or had reason to know, based on the circumstances of the sales and the information known to Defendants, that straw purchasers were not purchasing for themselves and were buying firearms for others.

120.   Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple violations of Minnesota Statutes section 624.7132, subdivision 15(a)(2).

## REQUESTED RELIEF

WHEREFORE, the State of Minnesota, by its Attorney General, Keith Ellison, respectfully asks this Court to award judgment against Defendants, jointly and severally, as follows:

1.   Declaring that Defendants' acts described in this Complaint constitute negligence, negligence per se, negligent entrustment, aiding and abetting negligence per se, public nuisance, and violations of Minnesota Statutes section 624.7132, subd. 15(a)(2), under Minnesota law, and permanently enjoining Defendants and their employees, officers, directors, agents, servants, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from the violative acts, practices, and conduct;

2.      Awarding injunctive relief against Defendants requiring them to abate the public nuisance they have created and undertake actions to correct their misconduct and prevent future misconduct, including but not limited to:

a)      Ordering Defendants to submit to supervision by a court-appointed monitor, whose responsibilities shall include, but not be limited to, monitoring of Defendants' sales practices through observation, records monitoring, and random and repeated integrity-testing, and implementing corrective policies and procedures, with the costs of the monitor to be paid by Defendants;

b)      Ordering Defendants to require mandatory and ongoing training of all personnel involved in the sale of firearms by a court-approved training entity, with the costs of that training to be paid by Defendants;

c)      Ordering Defendants to retain all trace requests received by the ATF for a period of five years, to keep a record of all employees whose sales result in a trace request, and to conduct heightened screening (as determined by the monitor) of sales to individuals who have been the subject of trace requests from the ATF;

d)      Ordering Defendants to conduct heightened screening (as determined by the monitor) of sales to individuals that make multiple purchases of firearms from different store locations or within short, staggered periods of time;

e)      Ordering Defendants to take corrective action to identify and assist in recovering the remaining firearms that were sold to straw purchasers and others identified as transferees of firearms as stated herein.

EXHIBIT A - 46

3.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota law;

4.      Awarding judgment against Defendants, jointly and severally, for damages for injury sustained as a result of Defendants' repeated breaches of their duties in Minnesota;

5.      Ordering Defendants, jointly and severally, to disgorge all profits from Defendants' unlawful sales of firearms in Minnesota;

6.      Awarding judgment against Defendants, jointly and severally, for monetary relief, including but not limited to abatement, to the State pursuant to Minnesota law, the *parens patriae* doctrine, and the general equitable powers of this Court, as necessary to remedy the harm and injury to the State resulting from Defendants' acts and omissions described in this Complaint;

7.      Awarding judgment against Defendants, jointly and severally, for civil penalties pursuant to Minnesota Statutes section 8.31, subdivision 3, for each separate violation of Minnesota Statutes sections 609.74 and 624.7132;

8.      Awarding the State its costs, including costs of investigation, attorney fees, and expert consultant and expert witness fees, as authorized by Minnesota Statutes section 8.31, subd. 3a, for violations of Minnesota Statutes sections 609.74 and 624.7132; and

9.      Granting such further relief as provided by law or equity as the Court deems appropriate and just.

## JURY DEMAND

The State demands a jury trial for all issues pled herein triable by a jury.

EXHIBIT A - 47

Dated:  March 5, 2024

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

JAMES W. CANADAY (#030234X)
Deputy Attorney General

**/s/ Eric J. Maloney**
ERIC J. MALONEY (#0396326)
Assistant Attorney General

JASON PLEGGENKUHLE (#0391772)
Assistant Attorney General

KATHERINE MOERKE (#0312277)
Assistant Attorney General

445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
eric.maloney@ag.state.mn.us
Telephone: (651) 757-1021
jason.pleggenkuhle@ag.state.mn.us
Telephone: (651) 757-1147
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288

*Attorneys for State of Minnesota*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>                    Plaintiff,<br><br>        v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>                    Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br><br>**PROTECTIVE ORDER** |

Pursuant to the Stipulation for Protective Order (Dkt. No. 47) filed by Plaintiff State of Minnesota by its Attorney General, Keith Ellison, and Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC, **IT IS HEREBY ORDERED THAT**:

1.    **Definitions**. As used in this protective order:

    (a)    "attorney" means an attorney who has appeared in this action;

    (b)    "confidential document" means a document designated as confidential under this protective order;

    (c)    to "destroy" electronically stored information means to use commercially reasonable efforts to delete from all databases, applications, and file systems so that the information is not accessible without the use of specialized tools or techniques typically used by a forensic expert;

    (d)    "document" means information disclosed or produced in discovery, including at a deposition;

- 1 -

EXHIBIT A - 50

(e) "notice" or "notify" means written notice;

(f) "outside vendor" means messenger, copy, coding, and other clerical- or technical-services vendors not employed by a party or its attorneys;

(g) "party" means a party to this action;

(h) "protected document" means a document protected by the attorney-client privilege, attorney work product protection, deliberative process privilege, investigative files/law enforcement privilege, common interest doctrine, public officer privilege (Minn. Stat. § 595.02, subd. 1(e)), or any other privilege or protection.

2. **Designating a Document or Deposition as Confidential.**

(a) A party or non-party disclosing or producing a document may designate it as confidential if the party or non-party contends that it contains (1) confidential or proprietary information, i.e., trade secrets or other confidential research, development, or commercial information within the scope of Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, (2) information protected by the Minnesota Government Data Practices Act ("MGDPA"), including any "government data" classified as "not public," as those terms are defined in Minn. Stat. § 13.02, subds. 7 and 8a, or (3) information that is otherwise classified as nonpublic under federal or state law, including personally identifying information protected by law from disclosure.

(b) A party or non-party may designate a document as confidential by conspicuously marking each page with the word "confidential" and, if

produced electronically, identifying the protective designation of the document in a metadata field.

(c)   Deposition testimony may be designated as confidential:

    (i)   on the record at the deposition; or

    (ii)   within 21 days after receiving the deposition transcript, by notifying the parties and those who were present at the deposition.

(d)   If a witness is expected to testify as to confidential or proprietary information (including testimony concerning the contents of data classified as "not public" pursuant to the MGDPA), a party or non-party may request that the witness's deposition be taken in the presence of only those persons entitled to receive confidential documents.

**3.   Who May Receive a Confidential Document.**

(a)   A confidential document may be used only in, and for the purpose of, this action.

(b)   No person receiving a confidential document may reveal it, except to:

    (i)   the court and its staff;

    (ii)   an attorney or an attorney's partner, associate, or staff who is assisting with this action;

    (iii)   if received by counsel for the State, and only when required by law or when the information causes counsel for the State to believe, in good faith, that a crime has been committed, to any law enforcement

agency, provided that the State complies with the following prerequisites:

(A)     **Redactions.**  To the extent a document only partially contains information that is required by law to be disclosed to a law enforcement agency or causes counsel for the State to believe, in good faith, that a crime has been committed, counsel for the State may only disclose that specific information to a law enforcement agency, and must redact or otherwise withhold all other information contained in the document.

(B)     **Advance Notice to Defendants.**  At least five days prior to the disclosure of any document(s) to a law enforcement agency (or a shorter amount of time if there are exigent circumstances), the State must: (i) notify Defendants of the anticipated disclosure; (ii) provide Defendants with a copy of the document(s) to be disclosed and which reflects, where applicable, the redactions required in Subparagraph (A); and (iii) provide Defendants with an opportunity to object to the disclosure.

(C)     **Advance Notice Exception.**  Subparagraph (B) shall not apply if the State determines in good faith that advance notice to Defendants will interfere with a law enforcement investigation. If the State makes that determination, it may disclose a

- 4 -

EXHIBIT A - 53

document to a law enforcement agency without providing advance notice to Defendants, so long as the document is properly redacted pursuant to Subparagraph (A) and the State provides Defendants with a copy of the document promptly following its disclosure to law enforcement. Once disclosed to Defendants, Defendants shall have five days to object to the disclosure on the basis that additional redactions are needed, in which case the parties shall work in good faith to ensure the version of the document provided to the law enforcement agency is withdrawn and destroyed, and is replaced with a properly redacted version of document.

(iv)   an outside vendor retained in connection with this action whose duties and responsibilities require access to such materials;

(v)   a person shown on the face of the confidential document to have authored or received it other than through a violation of this protective order;

(vi)   a court reporter or videographer retained in connection with this action;

(vii)   a party provided that such information designated as confidential is divulged only to employees of the party whose assistance is necessary to conduct this litigation and provided that such employees first execute the Declaration of Confidentiality provided in **Exhibit A**;

- 5 -

EXHIBIT A - 54

(viii)   any deponent who executes the Declaration of Confidentiality provided in **Exhibit A**;

(ix)   any person (including an expert or consultant) who:

   (A)   is retained to assist a party or attorney with this action; and

   (B)   executes the Declaration of Confidentiality provided in **Exhibit A**; and

(x)   any additional persons as counsel of record in this action shall mutually consent to in writing or on the record, provided that each such person is first provided with a copy of this protective order and signs the Declaration of Confidentiality provided in **Exhibit A**.

(c)   If a confidential document is revealed to someone not entitled to receive it, the parties must make reasonable efforts to retrieve it.

4.   **Serving This Protective Order on a Non-Party.**   A party serving a subpoena on a non-party must simultaneously serve a copy of this protective order and of Local Rule 5.6.

5.   **Correcting an Error in Designation.**   A party or non-party who discloses or produces a confidential document not designated as confidential will, within 7 days after discovering the error, provide notice of the error and produce a copy of the document properly designated.  To the extent the information has been disclosed by the receiving party to anyone not authorized to receive confidential material, the receiving party must make reasonable efforts to retrieve the information promptly

- 6 -

EXHIBIT A - 55

and to avoid any further disclosure to anyone not authorized to receive confidential materials.

6. **Use of a Confidential Document in Court.**

   (a) **Filing.** This protective order does not authorize the filing of any document under seal. A confidential document may be filed under seal only in accordance with Local Rule 5.6.

   (b) **Presentation at a hearing or trial.** A party intending to present another party's or a non-party's confidential document at a hearing or trial must promptly notify the other party or the non-party so that the other party or the non-party may seek relief from the court.

7. **Changing a Confidential Document's Designation.**

   (a) The parties shall attempt to resolve informally disputes about the status or use of documents, information and other tangible things designated as confidential, including promptly identifying, upon request, the specific basis or bases for designation of such information.

   (b) **Document disclosed or produced by a party.** A confidential document disclosed or produced by a party remains confidential unless the parties agree to change its designation or the court orders otherwise.

   (c) **Document produced by a non-party.** A confidential document produced by a non-party remains confidential unless the non-party agrees to change its designation or the court orders otherwise after providing an opportunity for the non-party to be heard.

- 7 -

EXHIBIT A - 56

(d)  **Changing a designation by court order.**  A party who cannot obtain agreement to change a designation may move the court for an order changing the designation. If the motion affects a document produced by a non-party then, with respect to the motion, that non-party is entitled to the same notice and opportunity to be heard as a party. The party or nonparty who designated a document as confidential must show that the designation satisfies Fed. R. Civ. P. 26(c).

8.  **Handling a Confidential Document after Termination of Litigation.**

(a)  Within 30 days after the termination of this action (including any appeals), each party must:

(i)  return or destroy all confidential documents; and

(ii)  notify the disclosing or producing party or non-party in writing that the party has returned or destroyed all confidential documents within the 30-day period.

(b)  Notwithstanding paragraph 8(a), each attorney, and an attorney's partner, associate, or staff, may retain a copy of any confidential document submitted to the court, as well as correspondence or other attorney work product quoting or describing a confidential document, for professional liability and professional responsibility purposes or as required to comply with Minn. Stat. § 15.17.

- 8 -

EXHIBIT A - 57

9. **Inadvertent Disclosure or Production to a Party of a Protected Document.**

    (a)    **Notice**

        (i)    A party or non-party who discovers that it has inadvertently disclosed or produced a protected document must promptly notify the receiving party after discovering such inadvertent disclosure or production, and describe the basis of the claim of privilege or protection. If the party or non-party provides such notice and description, the privilege or protection is not waived.

        (ii)    A party who discovers that it may have received an inadvertently disclosed or produced protected document must promptly notify the disclosing or producing party or non-party.

    (b)    **Handling of Protected Document.** A party who is notified or discovers that it may have received a protected document must comply with Fed. R. Civ. P. 26(b)(5)(B).

10. **Limitations on Waiver of Privilege or Protection.**

    (a)    **Clawback per FRE 502(b) and (d).** This Order is entered, *inter alia,* pursuant to Federal Rule of Evidence 502(d). If any party that produces or otherwise discloses information in connection with this Litigation (a "Producing Party") and thereafter claims that such information is a protected document, the production or disclosure of such information shall not constitute or be deemed a waiver of any claim of privilege or protection that the Producing Party would otherwise be entitled to assert with respect to the

- 9 -

EXHIBIT A - 58

disclosed information or its subject matter in this proceeding or in any other federal or state proceeding, if (1) the disclosure is inadvertent; (2) the Producing Party took reasonable steps to prevent disclosure; and (3) the Producing Party took reasonable steps to rectify the error, including (if applicable) by following Federal Rule of Civil Procedure 26(b)(5)(B).

(b)   **Obligations Upon Assertion of Privilege or Protection.** When a Producing Party asserts a claim of privilege or protection as to produced document(s) pursuant to this section, the receiving party must delete the protected document(s) and all copies thereof, and must instruct its e-discovery vendor (if applicable) to accomplish this task. To the extent that it is not technologically feasible for a receiving party to destroy a clawed back protected document (for example, if the clawed back document is part of a production provided on read-only production media such that the clawed back document cannot be destroyed without destroying the entire production media), the parties will meet and confer as to an acceptable alternative approach. The Producing Party must preserve the information until the claim of privilege or protection is resolved, as required by Federal Rule of Civil Procedure 26(b)(5)(B).

(c)   **Receiving Party's Obligation.** A party who discovers that it may have received a produced protected document must promptly notify the disclosing or producing party. A party who is notified or discovers that it may have received a protected document must comply with Fed. R. Civ. P. 26(b)(5)(B).

- 10 -

EXHIBIT A - 59

11. **Security Precautions and Data Breaches.**

    (a)    Each party must make reasonable efforts to protect the confidentiality of any confidential document disclosed or produced to that party.

    (b)    A party who learns of a breach of confidentiality must promptly notify the disclosing or producing party or non-party of the scope and nature of that breach and make reasonable efforts to remedy the breach.

12. **Modification.**  Any party may move the court for a modification of the protective order, and nothing in this protective order shall be construed to prevent a party from seeking such further provisions enhancing or limiting confidentiality as may be appropriate.

13. **Survival of Obligations.**  The obligations imposed by this protective order survive the termination of this action.

**SO ORDERED.**

Dated: August 21, 2023

                                        *s/ John F. Docherty*
                                        JOHN F. DOCHERTY
                                        United States Magistrate Judge

**EXHIBIT A**
**DECLARATION OF NON-DISCLOSURE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>Plaintiff,<br><br>v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>Defendants. | Case No.: 0:22-cv-02694-JRT-JFD |

    I have read, and agree to be bound by, the protective order in the above-captioned action. As soon as my involvement with that action has ended, but not later than 30 days after the termination of that action (including any appeals), I will return or destroy any confidential document that I received, any copy of or excerpt from a confidential document, and any notes or other document that contains information from a confidential document. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
PRINT NAME HERE

_____
SIGN NAME HERE

_____
DATE

_____
COUNTY

_____
STATE

- 12 -

EXHIBIT A - 61



United States District Court
# DISTRICT OF MINNESOTA

## LR 5.6  FILING DOCUMENTS UNDER SEAL IN CIVIL CASES

**(a)**   **Application of Rule.**

(1)   A document may be filed under seal in a civil case only as provided by statute or rule, or with leave of court.

(2)   This rule does not require a party to file any document under seal, but sets forth the procedures used when a party seeks to file a document under seal.

(3)   This rule does not affect a party's obligation to redact personal identifiers under Federal Rule of Civil Procedure 5.2 or LR 5.5, or any statutory, contractual, or other obligation to keep information confidential.

**(b)**   **Electronic Filing Required.** All documents filed in a civil case — whether sealed or not — must be filed in compliance with the CIVIL ECF PROCEDURES GUIDE.

**(c)**   **What May Be Temporarily Sealed.** A party may file a document under temporary seal only if the document contains information that:

(1)   the filing party contends is confidential or proprietary;

(2)   has been designated as confidential or proprietary by another party, by a nonparty, or under a non-disclosure agreement or protective order; or

(3)   is otherwise entitled to protection from disclosure under a statute, rule, order, or other legal authority.

**(d)**   **Procedure for Filing Under Temporary Seal in Connection with LR 7.1 or LR 72.2.**

(1)   *Filing Under Temporary Seal.* A party seeking to file a document under seal in connection with a motion under LR 7.1 or an objection under LR 72.2 must first file the document under temporary seal. That party must file the temporarily sealed document separately so that the document is assigned its own docket number (e.g., ECF No. 15 or ECF No. 15-3).

(A)   Redacted Public Version.  A party filing a document under temporary seal must contemporaneously and publicly file:

(i)     a version of that document with the information described in LR 5.6(c) redacted; or

(ii)     a statement that the entire document is confidential or that redaction is impracticable.

(B)     Temporary Seal While Case is Pending.  Except as provided in LR 5.6(d)(1)(C), or as otherwise ordered by the court, a document filed under temporary seal remains under temporary seal until the latest of the following:

(i)     28 days after entry of the magistrate judge's order disposing of the joint motion regarding continued sealing under LR 5.6(d)(2);

(ii)     21 days after entry of the magistrate judge's order disposing of a motion for further consideration under LR 5.6(d)(3); or

(iii)     entry of the district judge's order disposing of an objection under LR 5.6(d)(4).

(C)     Temporary Seal upon Disposition of Case.  A document that is under temporary seal at the time that the case is disposed of – such as by remand, transfer, dismissal, or entry of judgment – will remain sealed unless the court orders otherwise.

(2)     *Joint Motion Regarding Continued Sealing.*  Within 21 days after the filing of the final memorandum authorized by LR 7.1 or response authorized by LR 72.2 in connection with the underlying motion or objection, the parties must file a completed Joint Motion Regarding Continued Sealing Form.

(A)     Joint Motion's Contents.  The joint motion must list by docket number each document filed under temporary seal in connection with the underlying motion or objection and, for each such document:

(i)     briefly describe the document;

(ii)     precisely identify:

a)     the information that the parties agree should remain sealed;

b)      the information that the parties agree should be unsealed; and

c)      the information about which the parties disagree;

(iii)    explain why the parties agree that the information should remain sealed or be unsealed or, if the parties disagree, briefly explain each party's position; and

(iv)    identify any nonparty who has designated the document or information in the document as confidential or proprietary.

(B)     Party to File Joint Motion.  Unless the parties agree or the magistrate judge orders otherwise, the party who filed the first document under temporary seal in connection with the underlying motion or objection must file the joint motion.

(C)     Order on Joint Motion.  The magistrate judge will ordinarily rule on the joint motion without oral argument.  A party or nonparty who objects to the order must file a motion for further consideration under LR 5.6(d)(3).

(D)     Notice to Nonparties.  If the magistrate judge orders the unsealing of information that a nonparty has designated as confidential or proprietary, the party who filed that information under temporary seal must, within 7 days after entry of the order, serve on the nonparty a copy of the document containing that information and the order.

(3)     *Motion for Further Consideration of Sealing.*  Within 28 days after entry of the magistrate judge's order disposing of a joint motion regarding continued sealing under LR 5.6(d)(2), a party or nonparty may file a motion for further consideration by the magistrate judge.  If the motion for further consideration relates to information that a nonparty has designated as confidential or proprietary, the movant must serve on that nonparty a copy of the motion and all documents filed in support of the motion.  The motion for further consideration is a nondispositive motion governed by LR 7.1(b).

(4)     *Objection to Order Disposing of Motion for Further Consideration of Sealing.*  A party or nonparty may object to a magistrate judge's order disposing of a motion for further consideration of sealing, but only if that party or nonparty filed or opposed the motion.  The objection is governed by LR 72.2(a).

EXHIBIT A - 64

**(e)**     **Procedure for Filing Other Documents Under Seal.**  A party who seeks leave of court to file a document under seal other than in connection with a motion under LR 7.1 or an objection under LR 72.2 must obtain direction from the court on the procedure to be followed.

[Adopted effective February 27, 2017; amended April 1, 2019]

**2018 Advisory Committee Note to LR 5.6**

These amendments clarify that the procedures of LR 5.6 also apply to objections under LR 72.2.

LR 5.6(d)(1) clarifies that the document filed under temporary seal must be filed as a separate document (e.g., ECF No. 15) or as a separate attachment (e.g., ECF No. 15-3) so that parties, nonparties, and the court can refer to it by a unique number.  Further guidance on the mechanics of filing documents under temporary seal may be found in the Civil ECF Procedures Guide.

LR 5.6(d)(1)(C) has been added to address what happens to a document that is under temporary seal upon the disposition of the case.  This situation will arise when a document is filed under temporary seal and the case is disposed of — such as by remand, transfer, dismissal, or entry of judgment — before the process described in LR 5.6(d)(2) has run its course.  LR 5.6(d)(1)(C) provides that, in that situation, the document will remain sealed unless a court orders otherwise.  Thus, if a magistrate judge orders a document to be unsealed, and the case is subsequently disposed of *before* the deadline in LR 5.6(d)(1)(B), the document will remain sealed even if no party has opposed the magistrate judge's order. But if a magistrate judge orders a document to be unsealed, and the case is disposed of *after* the deadline in LR 5.6(d)(1)(B), the document will be unsealed and will remain unsealed.  Parties should bear this in mind when, for example, they settle a case before the deadline in LR 5.6(d)(1)(B).  If the parties will not be able to finalize the settlement papers and obtain dismissal before that deadline, any party that seeks continued sealing must either continue with the process described in LR 5.6(d)(2) or move to extend the temporary seal until the case is dismissed.

LR 5.6(d)(2) makes clear that when only part of a document contains confidential information, the parties must identify precisely what information must remain sealed and what information may be disclosed.  The parties must do so either by specifying where the information is located in the document or by proposing redactions.  For example, if part of a document can be disclosed, the parties either must briefly describe what part can be disclosed and what part cannot be disclosed (e.g., "the email can be disclosed except for the second sentence of the third paragraph on the first page"), or must file proposed redactions illustrating what part of the document can be disclosed and what part cannot be disclosed. It is now permissible, and parties are encouraged, to file with the Joint Motion Regarding Continued Sealing proposed redactions of any document to allow the court to determine precisely what information must remain sealed and what information may be unsealed.  This provision is an exception to the statement in the 2017 Advisory Committee Note that the Joint Motion Regarding Continued Sealing form is the "only document that may be filed."  Proposed redactions must be filed under seal and in compliance with the Civil ECF Procedures Guide.  The procedure established by LR 5.6(d) does not apply to proposed redactions.

All other amendments are intended to be stylistic only.

**2017 Advisory Committee Note to LR 5.6**

LR 5.6 is a new rule regarding the filing of information under seal in civil cases.  The new rule addresses two problems with current practice:

First, the court has never established a uniform process for filing information under seal in civil cases. As a result, current practice is haphazard, varying from judge to judge and case to case. In fact, parties sometimes file information under seal in civil cases without seeking or receiving the permission of a judge.

Second, parties have been filing too much information under seal in civil cases, in part because of confusion over the difference between protective orders and sealing orders. As a general matter, the public does not have a right of access to information exchanged in discovery; thus, protective orders are often quite broad, covering entire documents or sets of documents produced during discovery, even when most or all of the contents are not particularly sensitive. But the public does have a qualified right of access to information that is filed with the court. Even if such information is covered by a protective order, that information should not be kept under seal unless a judge determines that a party or nonparty's need for confidentiality outweighs the public's right of access.

This rule is intended to reduce the amount of information that is sealed in civil cases and to ensure that no information is sealed without the permission of a judge.

**Subdivision (a).** LR 5.6(a) provides that a document may be filed under seal only as provided by statute or rule, or with leave of court. This rule does not *require* any party to file any information under seal. Rather, this rule simply provides the procedures that a party must follow when the party seeks to file information under seal to protect its own interests or to comply with a statutory, contractual, or other obligation to keep information confidential. The procedures set forth in this rule need not be followed by a party who is merely redacting personal identifiers in compliance with Fed. R. Civ. P. 5.2 or LR 5.5.

**Subdivision (b).** LR 5.6(b) provides that every document filed in a civil case—whether under seal or not—must be filed electronically and in compliance with the Civil ECF Procedures Guide. A document may not be filed in paper form unless such filing is authorized by the Guide.

**Subdivision (c).** LR 5.6(c)(1) provides that a party may not seek to file information under seal unless that information is "confidential." LR 5.6(c)(2) defines "confidential information."

**Subdivision (d).** LR 5.6(d) establishes a four-step procedure to determine whether information filed in connection with a motion under LR 7.1 will be sealed.

*Step One (LR 5.6(d)(1)).* A party who seeks to file a document under seal must first file the document under temporary seal. The document must be filed separately, so that parties, nonparties, and the court can refer to the document by its own docket number.

When a party files a document under temporary seal, the party must at the same time publicly file either (1) a version of that document with the confidential information redacted or (2) a statement that the entire document is confidential or that redaction is impracticable.

The redaction requirement should not pose an onerous burden in connection with most discovery disputes. LR 5.6(d)(1)(A) does not require redaction when "the entire document is confidential." LR 5.6(c)(2) defines "confidential information" to include information that "has been designated as confidential or proprietary . . . under a . . . protective order." Thus, if an entire document has been designated as confidential under a protective order (as is often the case), that document need not be redacted. A large share of discovery disputes involve such documents.

Outside of the context of discovery disputes, parties should only rarely file a statement that a document cannot be redacted. If a document reasonably can be redacted, the document must be redacted.

After a document is filed under temporary seal, LR 5.6(d)(1)(B) ensures that the document will remain under temporary seal until the court makes a final decision about whether the document should remain sealed.

*Step Two (LR 5.6(d)(2)).* After all memoranda and other documents pertaining to the underlying motion have been filed, all parties must together file a single Joint Motion Regarding Continued Sealing. The joint motion must be filed within 21 days after the filing of the final memorandum authorized by LR 7.1. The joint motion must be filed using the Joint Motion Regarding Continued Sealing Form, which is available on the court's website. That form is the only document that may be filed; no other filings, including the filings contemplated by LR 7.1, are required or permitted in connection with the joint motion. The party who first filed a document under temporary seal in connection with the LR 7.1 motion bears the responsibility for filing the joint motion.

The joint motion must address every document that has been filed under temporary seal, even if all parties agree that a document may be unsealed. The parties must do three things with respect to each temporarily sealed document: First, the parties must briefly describe the document (e.g., "09/23/2016 email from A. Jones to B. Smith"). Second, the parties must *briefly* explain why they agree that the document should remain sealed or be unsealed—or, if the parties disagree, the parties should *briefly* explain each party's position. (The parties should bear in mind that, before a final decision is made to seal or unseal a document, every party and affected nonparty will have an opportunity to fully brief the issue.) Third, the parties must identify any nonparty who has designated the document or information in the document as confidential or proprietary.

The magistrate judge will rule on the joint motion in an order that will specify whether and to what extent each document will remain sealed. The magistrate judge will almost always rule without oral argument, so the parties need not contact the magistrate judge to schedule a hearing. If the magistrate judge orders the unsealing of information that a nonparty has designated as confidential or proprietary, the party who filed that information under temporary seal must, within seven days after entry of the order, serve on the nonparty a copy of the document containing that information and the order. This will give the nonparty a chance to challenge the decision to unseal its information.

No party or nonparty may ask the district judge to review the magistrate judge's order. Instead, a party or nonparty who objects to the order must first file a motion for further consideration under LR 5.6(d)(3). An order disposing of a motion for further consideration is reviewable by the district judge.

*Step Three (LR 5.6(d)(3)).* After the magistrate judge rules on the joint motion, any party or any nonparty whose information has been ordered unsealed or who otherwise objects to the magistrate judge's ruling may file a motion for further consideration by the magistrate judge. The nonparty may file such a motion without intervening in the case under Fed. R. Civ. P. 24. If the motion for further consideration relates to information that a nonparty has designated as confidential or proprietary, the movant must serve on that nonparty a copy of the motion and all documents filed in support of the motion (unless, of course, the movant is the nonparty that designated the information as confidential or proprietary).

A motion for further consideration by the magistrate judge is a nondispositive motion governed by LR 7.1(b); it is not a motion for reconsideration under LR 7.1(j). At this point, any party or nonparty who objects to the unsealing (or sealing) of information will have a full opportunity to brief the issue.

*Step Four (LR 5.6(d)(4)).* After the magistrate judge disposes of the motion for further consideration, any party or nonparty who filed or opposed that motion may file an objection to the magistrate judge's order. Such an objection is governed by LR 72.2(a).

**Subdivision (e).** The procedure provided by LR 5.6(d) applies only when a party seeks leave to file under seal a document in connection with a motion under LR 7.1. That procedure does not apply when a party seeks leave to file a document under seal in another context, such as when a party seeks

leave to file a trial exhibit under seal.  In such circumstances, the party should seek direction from the judge about how the party should request the judge's permission to file the document under seal.

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>Plaintiff,<br><br>v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**ORDER REGARDING PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND PAPER DOCUMENTS** |

This Order Regarding Production Of Electronically Stored Information And Paper Documents ("ESI Protocol Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I.    GENERAL PROVISIONS

A.    **Applicability:** This ESI Protocol Order will govern the production of ESI and paper documents.

B.    **Limitations & Non-Waiver:** Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information. For the avoidance of doubt, a Party's compliance with this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

C.    **Authenticity and Admissibility:** Nothing in this ESI Protocol Order shall be construed to affect the authenticity or admissibility of any document or data. All objections to the authenticity or admissibility of any document or data are preserved and may be asserted at any time.

## II.    GENERAL PRODUCTION FORMAT PROTOCOLS

A.    **TIFFs:** Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each

EXHIBIT A - 70

image will have a file name that is the unique Bates number of that image, pursuant to ¶ II(E). Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape). The imaged Data shall retain all attributes of the native or hard-copy file, such as document breaks. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively." A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats.

B.   **Text Files:** Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page.

   1.   **OCR:** A producing Party may make paper documents available for inspection and copying/scanning in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, scan and OCR paper documents. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

   2.   **ESI:** Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available. For redacted documents, Parties shall provide OCR text in accordance with the specifications in Section II.B(1).

C.   **Production of Native Items:** The Parties agree that ESI shall be produced as TIFF images consistent with the format described in section II.A. with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto. The exception to this rule shall be spreadsheet-application files (e.g., MS Excel) and multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi), for which all ESI items shall be produced in native format upon reasonable request. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The corresponding load file shall include NativeFileLink information for each native file that is produced. Further, the Parties agree to meet and confer prior to producing native file types other than spreadsheet application files and multimedia audio/visual file types such as .wav, .mpeg and .avi.

D.  **Bates Numbering:**

1.  All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (ten-digits and 0-padded) across the entire production; (3) contain no special characters or embedded spaces, except hyphens or underscores; (4) be sequential within a given document; and (5) identify the producing Party.  To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

2.  The producing Party will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

E.  **Parent-Child Relationships:**  Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable.  For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable. To the extent possible, document families that contain responsive information should be produced in full regardless of whether one or more documents within the family are non-responsive. Privileged documents within a parent-child relationship that are withheld should be identified with a placeholder TIFF image and identified in the Party's privilege log, along with the family of documents for reference.

F.  **Linked Files and Collaborative Work Environments.** To the extent a producing party identifies links to other files within a responsive document, it will conduct a reasonable search for such files and attempt to add them to its document productions consistent with the final two sentences of this subsection.  A receiving party may also make reasonable and proportionate requests as to specific linked files it identifies within produced documents, and upon such requests, the producing party shall conduct a reasonable search for the document corresponding with the link. If the producing party's reasonable search is successful, it shall process and produce relevant documents corresponding with the link with reasonably available metadata. For documents produced pursuant to this Section, the producing party is not required to conduct any further search of documents corresponding with the links. The provisions of this Section apply to any type of document (including emails, presentations, spreadsheets, and other types of documents). For documents produced pursuant to this Section, the producing party shall produce DOC LINK metadata as defined in Sections D and E of this Appendix 1. Alternatively, for a document where an email has a

3

hyperlink to another document, the producing party may produce the email with the hyperlinked document as an attachment.

G.   **Load Files:** All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

H.   **Color:** Documents or ESI containing color need not be produced initially in color. However, if an original document or ESI item contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, then the requesting Party may, in good faith, request that the document or ESI item be produced in its original colors. For such documents, the requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in color. The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI). All requirements for productions stated in this ESI Protocol Order regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format. Requests that a document be produced in color for the reasons set forth in this ¶ II(I) will not be unreasonably denied by the producing Party. If a producing Party wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

I.   **Confidentiality Designations:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to any applicable federal, state, or common law (e.g., Personally Identifiable Information or Protected Health Information), or to the terms of a Protective Order entered by the Court in the Litigation or a confidentiality stipulation entered into by the Parties, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. This designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible. The designation should also be added to the native filename to the extent possible. Requesting parties shall ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form.

4

Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.

J.   **Production Media & Protocol:** A producing Party may produce documents via email, readily accessible computer or electronic media, including CD-ROM, DVD, or external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or SFTP. Any requesting Party that is unable to resolve any technical issues with the electronic production method used for a particular production may request that a producing Party provide a copy of that production using Production Media. The producing Party may encrypt Production Media and will provide a decryption key to the requesting Party in a communication separate from the production itself.

## III.   PAPER DOCUMENT PRODUCTION PROTOCOLS

A.   **Scanning:** A producing Party may make paper documents available for inspection and copying in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, OCR paper documents. Where OCR is used, the Parties agree that the following ¶¶ III(B)-(E) shall apply.

B.   **Coding Fields:** The following information shall be produced in the load file accompanying production of paper documents: (a) BegBates, (b) EndBates, (e) Custodian, (f) Confidentiality, and (g) Redacted (Y/N) or otherwise indicating that a redaction is present.

C.   **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The Parties will make reasonable efforts to unitize documents correctly.

1.   **Identification:** Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

## IV.   ESI METADATA FORMAT AND PROCESSING ISSUES

A.   **System Files:** ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at

5

the time of de-NISTing. Other file types may be added to the list of excluded files if they clearly do not have user-created content.

B.   **Metadata Fields and Processing:**

1.   **Time Zone:** To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., GMT), and the time zone used shall be disclosed to the requesting Party.

2.   Except as otherwise set forth in this ESI Protocol Order, ESI files shall be produced with the data fields set forth in Appendix 1 that can reasonably be extracted from a document.

3.   The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeLink fields, which should be populated regardless of whether the fields can be populated pursuant to an automated process.

C.   **Redaction:**

1.   The Parties agree that, where ESI items need to be redacted, they shall be produced solely in TIFF format with each redaction clearly indicated. Any metadata fields reasonably available and unnecessary to protect the privilege protected by the redaction shall be provided. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format and the Parties may meet and confer to evaluate effective approaches for implementing such redactions.

2.   If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content. If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D.   **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a

requesting Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

E.   **De-duplication:** A producing Party may de-duplicate any file globally (i.e., across Document Custodians, *see infra* ¶ V(B)(1)) at the "family" level (i.e., families should not be broken due to de-duplication). Each party may also de-duplicate emails in such a way as to eliminate earlier or incomplete chains of emails and therefore produce only the most complete iteration of an email chain. Additionally, all BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of horizontal/global de-duplication, must be identified in the BCC metadata field specified in Appendix 1 to the extent such metadata exists.

   1.   Duplicate electronic documents shall be identified by a commercially accepted industry standard (e.g., MD5 or SHA-1 hash values) for binary file content. All electronic documents bearing an identical value are a duplicate group. The producing Party is not obligated to extract or produce entirely duplicate ESI documents.

   2.   Duplicate messaging files shall be identified by a commercially accepted industry standard (e.g., MD5 hash values) for the email family, which includes the parent and email attachments. Duplicate messaging materials will be identified at a family level, including message and attachments. Email families bearing an identical value are considered a duplicate group.

F.   **Zero-byte Files:** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

G.   **Embedded Objects:** Microsoft Excel (.xls) spreadsheets embedded in Microsoft Word documents will be extracted as separate documents and treated like attachments to the document. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as

separate documents by a producing Party (e.g., such embedded objects will be produced within the document itself, rather than as separate attachments).

H.   **Compressed Files:** Compression file types (i.e., .CAB, .GZ, .TAR, .7Z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

I.   **Password-Protected, Encrypted, or Proprietary-Software Files:** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps to identify the relevant password so that the documents can be reviewed and produced if appropriate.

## V. CLAIMS OF PRIVILEGE AND REDACTIONS

A.   **Production of Privilege Logs:** Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.

B.   **Exclusions from Logging Potentially Privileged Documents:** The following categories of documents do not need to be contained on a producing Party's privilege log, unless good cause exists to require that a Party do so.

  1.   Any communications exclusively between a producing Party and its outside counsel, an agent of the producing Party's outside counsel other than the Party, any of the producing Party's non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), the producing Party's testifying experts in connection with specific litigation.

  2.   Any communications exclusively between attorneys in the Office of the Minnesota Attorney General or between attorneys in the Office of the Minnesota Attorney General and persons employed by or acting on behalf of the Office of the Minnesota Attorney General.

  3.   Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

  4.   With respect to the Office of the Minnesota Attorney General, any privileged materials or work product created by or specifically at the direction of

8

attorneys in the Office of the Minnesota Attorney General or persons employed by or acting on behalf of the Office of the Minnesota Attorney General.

5.    Any privileged documents or communications created after the filing of the Complaint.

## C.    Privilege Log Requirements:

1.    **Metadata Log:** To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information) and an indication of the privilege or protection being asserted.

   a.    Objective metadata includes the following (as applicable to the document types as shown in Appendix 1):

      i.    A unique privilege log identifier
      ii.    Custodian
      iii.    CustodianOther or CustodianAll (if applicable)
      iv.    File Name
      v.    Email Subject
      vi.    Author
      vii.    From
      viii.    To
      ix.    CC
      x.    BCC
      xi.    Date Sent
      xii.    Date Received
      xiii.    Date Created

   b.    In addition to the objective metadata fields, a Party must also include a field on its privilege log entitled "Attorney/Description of Privileged Material" if the basis for the privilege asserted is not apparent from the objective metadata (e.g., the name of the attorney will be provided if not included in the objective metadata). Further, for any document withheld for which there is no objective metadata, a Party must manually populate on its privilege log an author and date, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light

9

of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

    c.    With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information. In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field.

    d.    Should a receiving Party, in good faith, have reason to believe a particular entry on a metadata-generated privilege log is responsive and does not reflect privileged discoverable information, the receiving Party may request, and the producing Party will not unreasonably refuse to create, a privilege log for that entry in compliance with Federal Rule of Civil Procedure 26(b)(5).

    2.    **Email Chains:** If there is more than one branch of (i.e., more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical or if a Party has elected to use threading for review and/or production of emails. A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain consistent with ¶ VIII(D) below to the extent some portions are only partially privileged, except that any unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

D.    **Documents Redacted for Privilege:** Redacted documents need not be logged as long as (a) for emails, the objective metadata (i.e., to, from, cc, bcc, recipients, date, and time, unless the privilege or protection is contained in these fields) is not redacted, and the reason for the redaction, including the nature of the privilege asserted, is noted on the face of the document (for redacted documents where the subject matter is not decipherable as a result of redactions, a description of the contents of the document that is sufficient to understand the subject matter of the document may be requested); and (b) for non-email documents, the reason for the redaction is noted on the face of the document in the redacted area. The producing Party will undertake reasonable efforts to make limited, line-by-line redactions of privileged or work product information. After receipt of the production, the requesting Party may request in good faith that the producing Party create a privilege log for specific redacted documents, by Bates number.

E.    **Challenges to Privilege Claims:** Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identification number),

the particular documents that it believes require further explanation and the good-faith basis for such belief.

**VI.**     <u>**MISCELLANEOUS PROVISIONS**</u>

       A.     **Variations or Modifications:** Variations from this ESI Protocol Order may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing. In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification. Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention.

SO ORDERED.

Dated: <u>September 13, 2023</u>

                                     *s/ John F. Docherty*
                                     JOHN F. DOCHERTY
                                     United States Magistrate Judge

## Appendix 1: ESI Metadata and Coding Fields

| Field Name[1] | Populated For (Email, Edoc, Calendar, Contact, Cellphone, or All) | Field Description |
|---|---|---|
| BegBates | All | Control Numbers. |
| EndBates | All | Control Numbers. |
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family). |
| Custodian | All | Custodian name (ex. John Doe). |
| DupCust, CustodianOther, or CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the "Custodian" field. |
| LogicalPath | All ESI Items | The directory structure of the original file(s).  Any container name is included in the path. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeFile | All | Native File Link. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateMod | Email, Edoc | Date the document was modified. |
| TimeSent | Email | Time email was sent. |
| TimeZoneUsed | All | Time zone used to process data during document collection and processing. |
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the "To" line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the "CC" line of the email. |
| BCC | Email | All recipients that were included on the "BCC" line of the email. |

[1] Field Names can vary from system to system and even between different versions of systems. Thus, Parties are to be guided by these Field Names and Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol Order.

| Field Name[1] | Populated For (Email, Edoc, Calendar, Contact, Cellphone, or All) | Field Description |
|---|---|---|
| DateCreated | Edoc | Date the document was created. |
| FileName | Email, Edoc | File name of the edoc or email. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document properties. |
| DocExt | All | File extension of the document. |
| TextPath | All | Relative path to the document level text file. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, blank. |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y" |
| Privilege Asserted | All | To the extent a document has been withheld on the basis of privilege or redacted on the basis of privilege, the text pertaining to such assertion of privilege shall be included as a metadata field (e.g., "Redacted – Attorney Client Privileged" or "Withheld – Attorney Client Privileged") |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter. |
| Legend/Confidentiality | All | Indicates if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order. |



*INTEGRITY. HONESTY. TENACITY.*

WRITER'S DIRECT DIAL: (952) 373-4606
E-MAIL: AJADIN@SJJLAWFIRM.COM
REPLY TO: **Minnesota Office**
**WWW.SJJLAWFIRM.COM**

June 12, 2024

**SENT VIA EMAIL**

Stinson LLP                                   *Andrew.Davis@stinson.com*
ATTN: Andrew Davis
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402

Re:      *State of Minnesota v. Fleet Farm, LLC, et al.,*
         Case No. 0:22-cv-02694-JRT-JFD
         Subpoena Duces Tecum Response

Dear Mr. Davis:

This communication is in response to your May 29, 2024 letter and Subpoena Duces Tecum issued upon The Modern Sportsman. Enclosed please find a copy of The Modern Sportsman's Response and Objections.

As The Modern Sportsman is not a party to the lawsuit, please provide this office with courtesy copies of any filings or communications concerning this Subpoena or which require a response.

Please feel free to contact our office at any time should you have any questions or wish to discuss further.

                  Very truly yours,

                  SMITH JADIN JOHNSON, PLLC

                  Alexander M. Jadin
                  Attorney At Law

AMJ/AMH/nmk
Enc.

**COLORADO:** 1775 SHERMAN STREET, SUITE 2750, DENVER, CO 80203
**IOWA:** 1120 DEPOT LANE SE, SUITE 100, CEDAR RAPIDS, IA 52401
**MINNESOTA:** 7900 XERXES AVENUE SOUTH, SUITE 2020, BLOOMINGTON, MN 55431
**OHIO:** 470 BROAD STREET, SUITE 725, COLUMBUS, OH 43215

EXHIBIT B - 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of MN,
by its Attorney General, Keith Ellison,                 Civil Action No. 22-CV-02694-JRT-JFD

Plaintiff,

vs.                                    **THE MODERN SPORTMAN'S**
**RESPONSE TO**
Fleet Farm LLC, et al.,                          **SUBPOENA DUCES TECUM**

Defendant.

---

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 1: All documents reflecting Your policies and procedures relating to firearm transactions, including, but not limited to, those relating to monitoring for and preventing straw purchasing.**

RESPONSE: The Modern Sportsman ("TMS") objects as this request is unduly burdensome. TMS further objects to this request as requesting confidential and/or privileged information. Subject to and without waiving these objections, TMS states it is withholding employee and new hire training documents related to firearm transactions and preventive measures for straw purchasers.

**REQUEST NO. 2: All documents related to Jerome Horton or Sarah Jean Elwood, the individuals identified in Paragraphs 37 through 61 of the Complaint.**

RESPONSE: TMS objects as this request is unduly burdensome and states the information requested is same or similar to information which is equally available to the requesting party. TMS further objects to this request as requesting confidential and/or privileged information. Subject to and without waiving these objections,

1

EXHIBIT B - 2

TMS states it is withholding Sales Reports related to purchases made by Sarah Jean Elwood in the month of May 2021.

**REQUEST NO. 3: All documents related to Gabriel Lee Young-Duncan, Jeffrey Jackson, Geryiell Walker, or Wayne Danielson.**

RESPONSE: TMS objects as this request is unduly burdensome and states the information requested is same or similar to information which is equally available to the requesting party. TMS further objects to this request as requesting confidential and/or privileged information. Subject to and without waiving these objections, TMS states it has no documents responsive to this request.

**REQUEST NO. 4: All documents reflecting or relating to communications to or from ATF, the BCA, or any other Minnesota state local or law enforcement agency regarding Jerome Horton, Sarah Jean Elwood, or the October 10, 2021 shooting incident at the Seventh Street Truck Park in St. Paul, Minnesota.**

RESPONSE: TMS objects as this request is unduly burdensome. TMS further objects to this request as requesting confidential and/or privileged information. Subject to and without waiving these objections, TMS states it is withholding communications between ATF and TMS related to purchases made by Sarah Jean Elwood in the month of May 2021.

**REQUEST NO. 5: All documents reflecting communications to or from the Office of the Minnesota Attorney General relating to Your sales of firearms to Jerome Horton or Sarah Jean Elwood, or Your policies and procedures concerning firearm**

EXHIBIT B - 3

**transactions, including, but not limited to, those relating to monitoring for and preventing straw purchasing.**

RESPONSE: TMS objects as this request is unduly burdensome. TMS further objects to this request as requesting confidential and/or privileged information. Subject to and without waiving these objections, TMS states it has no documents responsive to this request.

**SMITH JADIN JOHNSON, PLLC**

Dated: June 12, 2024

/s/ Alexander Jadin
Alexander M. Jadin (#0387219)
7900 Xerxes Avenue, Suite 2020
Bloomington, MN 55431
Telephone: (952) 388-0289
Facsimile: (612) 235-7927
ajadin@sjjlawfirm.com
*Attorney for The Modern Sportsman*

EXHIBIT B - 4

**Andrew Hatch**

| | |
|---|---|
| **From:** | Wright, Zachary J. <zachary.wright@stinson.com> |
| **Sent:** | Wednesday, June 26, 2024 11:08 AM |
| **To:** | Andrew Hatch |
| **Subject:** | The Modern Sportsman Subpoena Response |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Andrew,

Thank you for speaking with me yesterday.

As discussed, the subpoena duces tecum Fleet Farm caused to be issued to The Modern Sportsman obligates Modern Sportsman to produce documents responsive to the subpoena's requests, including but not limited to its policies and procedures relating to firearm transactions and straw purchasing monitoring and prevention.  Modern Sportsman can designate produced documents as confidential under the Protective Order, which was served alongside the subpoena.  Based on our phone call yesterday, I understand you are going to discuss the Protective Order confidentiality designation with your client and get back to me.  Please let me know if that's incorrect.  I am happy to discuss further as needed.

Thanks,

Zach

**Zachary J. Wright**
Attorney
Pronouns: He/Him

STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Direct: 612.335.1752 \ Bio

Assistant: MPL.LSSTeam2@stinson.com \ 612.335.1966

STINSON.COM
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

EXHIBIT C - 1