**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>    Plaintiff,<br><br>    v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>    Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**DEFENDANTS' AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORY NOS. 5, 7, 9, 14, AND 15** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (together, "Fleet Farm" or "Defendants") hereby provide the following amended objections and responses to Interrogatory Nos. 5, 7, 9, 14, and 15 in Plaintiff State of Minnesota's July 20, 2023 First Set of Interrogatories to Defendants:

## GENERAL OBJECTIONS

Defendants incorporate by reference the General Objections asserted in their August 21, 2023 Responses and Objections to Plaintiff's First Set of Interrogatories.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 5:**

Identify and describe Fleet Farm's policies and procedures related to the sale of firearms, straw purchaser awareness, detection, and/or prevention, compliance with state and federal firearms laws, or reporting suspicious behavior to law enforcement, and describe how Fleet Farm trained retail store employees regarding these policies and procedures. Your response should identify the period of time each policy or procedure was in place and describe what materials Fleet Farm created or distributed to educate employees or enforce these policies or procedures.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

<u>**RESPONSE**</u>:

In addition to the foregoing General Objections, Defendants object to Interrogatory No. 5 on the grounds that it is compound, overly broad and unduly burdensome, and duplicative of Request for Production Nos. 19 and 20.  Defendants further object that the phrases "straw purchaser awareness, detection, and/or prevention" and "suspicious behavior" are vague and ambiguous.  Defendants also object to the extent Interrogatory No. 5 seeks Privileged Information.

Subject to and without waiving these objections, Fleet Farm states that it maintains numerous policies related to all aspects of firearms sales and compliance with federal and state laws.  Fleet Farm regularly provides training materials to its employees covering firearms sales and compliance with federal and state laws.  For example, Fleet Farm maintains multiple policies and trainings related specifically to compliance with federal and state regulations concerning firearms sales, including purchase eligibility and compliance with reporting requirements in ATF Forms 4473 and 3310.4.  *E.g.*, FF_0000001; FF_0000271; FF_0000375; FF_0000702; FF_0000738; FF_0003288; FF_0005950.  Additional Fleet Farm policies relating to firearm sales cover topics including completing firearms sales at a Fleet Farm cash register, firearms compliance audits, and firearm safety.  *E.g.*, FF_0003305; FF_0003424; and FF_0000741.

Over the relevant time period, Fleet Farm has maintained more than 50 formal training policies relating to different components of firearms sales and related procedures, which are administered to all employees authorized to engage in firearms transactions as part of Fleet Farm's firearms training program.  Fleet Farm also provides additional

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

training to firearms specialists.  *E.g.*, FF_0012774.  Specifically, before becoming authorized to sell firearms, Fleet Farm employees receive between 10 and 15 hours of firearm-specific training, including laws, regulations, and store policies relating to firearms sales.  Employees must take and pass quizzes after each training module, and must pass an additional firearms exam at the end of the training.  Firearms specialists receive additional trainings and take additional tests.  After receiving authorization to sell firearms, Fleet Farm continues to provide additional guidance and monitoring during the employee's first 30 days to ensure compliance with all applicable policies.

Along with these initial trainings, since early 2021, Fleet Farm began providing additional trainings to its employees on a quarterly basis to ensure employees maintain knowledge of Fleet Farm's firearm policies throughout the course of their employment. These quarterly trainings address straw purchase awareness and prevention, with rotating topics regarding compliance issues and/or new procedures or regulations.  During these quarterly trainings, Fleet Farm demonstrates and explains any new procedures or changes to the law, and all stores are given the opportunity to ask questions and seek clarification. *E.g.*, FF_0000012, FF_0002762.  All firearm specialists and Fleet Farm management are required to attend these quarterly trainings.  Fleet Farm offers four different options for attendance to ensure all employees are able to attend.  Fleet Farm also holds separate webinars for any major new procedures or any changes in the law that require in depth explanation or demonstration. *E.g.*, FF_0000079; FF_0000824.  Fleet Farm also frequently administers supplemental informal trainings to firearms employees.  *E.g.*, FF_0000955.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Finally, Fleet Farm ensures compliance with its policies by conducting regular audits of firearms practices at its stores and discussing audit performances at regular compliance meetings attended by Fleet Farm management. Fleet Farm conducts additional training when completing compliance audits at a Fleet Farm store. Following audits by ATF (of which there were only two at Fleet Farm's Minnesota stores during the relevant time period), ATF also works with Fleet Farm stores to ensure the store team understands applicable federal regulations concerning firearms.

Several of Fleet Farm's policies specifically focus on straw purchasing. *E.g.*, FF_0000419. These policies and trainings instruct employees on how to identify straw purchases and how to respond when they suspect a straw purchase. Fleet Farm trains its employees to recognize signs of potential straw purchases, including when "[t]he customer is observed receiving money from another customer before or during the firearm purchasing process"; "[c]onversation is overheard that indicates that the customer is purchasing the firearm for someone else"; "[a] friend is observed helping the customer complete the ATF Form 4473"; "[o]ne person is asking the questions regarding the firearm but the other steps forward to complete the 4473 form"; and "[t]he transaction feels wrong and deceitful." For example, to help detect potential straw purchases, employees are directed to "pay attention to body language," "ask questions," and "trust your 'gut.'" FF_0013156-373. Another training document notes that "[i]t is not feasible to lay out the universe of possible scenarios in which a straw purchase may take place. Each case depends on its own facts, and the analysis may shift depending upon any number of circumstances present." FF_0000955.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Fleet Farm also trains employees on its policies regarding specific steps to take when employees suspect a straw purchase.  Fleet Farm instructs employees that, "If you suspect a Straw Purchase, have the customer complete the ATF Form 4473, including obtaining their signature prior to refusing the sale.  A NICS/DOJ check should not be submitted."  Fleet Farm instructs its employees to next inform a manager, who will "inform the customer of the denied sale."  After denying the sale, Fleet Farm managers prepare and submit a Straw Purchase Alert documenting details about the attempted transaction and purchaser.  Straw Purchase Alerts are sent to Firearms Specialists at other Fleet Farm stores to prevent suspected straw purchasers from attempting another transaction at another store.

Other Fleet Farm trainings address straw purchasing as well. For example, straw purchasing is covered in comprehensive virtual trainings on each aspect of firearms sales. *E.g*., FF_0000133.  Additionally, straw purchasing is addressed via supplemental training provided through Fleet Farm's "Tuesday Tidbits" training program, which communicates various training topics to Fleet Farm employees on a weekly basis, including topics relating to identifying and preventing suspected straw purchases.  *E.g.,* FF_0000910; FF_0000955. Fleet Farm's policies relating to straw purchasing have been in place throughout the relevant time period.  Fleet Farm also requires each trained firearm team member to watch the National Shooting Sports Foundation's (in collaboration with ATF) "Don't Lie for the Other Guy" video.  *E.g.*, FF_0000920.

Additionally, Fleet Farm employees, including Mike Radl and Michelle Granato, regularly attended ATF seminars throughout the relevant time frame. Mr. Radl and Ms.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Granato have also attended industry compliance webinars and other industry conferences, such as the Orchid Firearms Industry Compliance conference.

**INTERROGATORY NO. 7:**

Identify every Fleet Farm employee, agent, manager, director, or principal who has spoken in person, communicated with, or otherwise contacted the ATF, the BCA, or any other Minnesota law enforcement agency regarding a firearm sale at a Minnesota Store, and describe the date and location of each meeting, communication, or contact.

**RESPONSE:**

In addition to the foregoing General Objections, Defendants object to Interrogatory No. 7 on the grounds that it is overly broad and unduly burdensome because discovery in this Action is in its early stages and no depositions have occurred. Defendants further object to Interrogatory No. 7 as overly broad, unduly burdensome, and not proportional to the needs of this Action because it asks Defendants to identify "every Fleet Farm employee, agent, manager, director, or principal" who "communicated" with or "contacted" certain government entities regarding firearm sales, without regarding to the degree of knowledge possessed by such persons or whether such persons have any substantive involvement with the allegations in this case. Defendants also object on the grounds that the Interrogatory is duplicative of Request for Production Nos. 9, 10, and 11, and the phrases "otherwise contacted" and "Minnesota law enforcement agency" are vague and ambiguous.

Subject to and without waiving these objections, Fleet Farm states that the employees primarily tasked with communicating with law enforcement agencies during the relevant time period were Michelle Granato and Mike Radl. Ms. Granato and Mr. Radl are also the primary contacts for ATF officials contacting Fleet Farm with trace requests

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

or requests for firearm acquisition records. Most often, Ms. Granato and Mr. Radl communicate directly with ATF officials seeking such information. At times, Ms. Granato or Mr. Radl direct Fleet Farm managers at the store level to provide requested information to ATF officials directly. Ms. Granato and Mr. Radl also serve as the primary points of contact for local and state law enforcement agencies. Additionally, ATF officials and local law enforcement sometimes contact Fleet Farm store-level managers or loss-prevention employees directly, by either email or phone. *E.g.*, FF_0005517.

Ms. Granato or Mr. Radl contact ATF officials for a variety of reasons, including identifying and correcting any inconsistencies in paperwork, responding to questions regarding compliance, responding to trace requests, assisting with investigations, providing follow-up information relating to previous communications, or alerting ATF to a suspicious sale. *E.g.,* FF_0022825; FF_0024796; FF_0001918; FF_0001974; and FF_0015176. On occasion, store-level employees may also make similar inquiries to ATF officials and local law enforcement.

**INTERROGATORY NO. 9:**

Describe every instance in which Fleet Farm investigated or audited its employees' compliance with Fleet Farm policies and procedures related to the sale of firearms, including whether Fleet Farm investigated its firearms sales to Jerome Horton or Sarah Elwood. For each investigation or audit identified, specify when it took place, which store(s) and/or personnel Fleet Farm investigated or audited, what conduct the investigation or audit reviewed, the findings of the investigation or audit, and the recommendation(s) of the investigation or audit, if any.

**RESPONSE:**

In addition to the foregoing General Objections, Defendants object to Interrogatory No. 9 on the grounds that it is overly broad and unduly burdensome, and seeks information

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

not proportional to the needs of this Action because it seeks identification of "every" Fleet Farm investigation or audit relating to firearm sales. Defendants also object to Interrogatory No. 9 on the grounds that it seeks information irrelevant to the claims and defenses in this suit, is not reasonably calculated to lead to the discovery of admissible evidence, and the phrases "investigated or audited" and "related to the sale of firearms" are vague and ambiguous. Defendants further object to Interrogatory No. 9 on the grounds that it is duplicative of Request for Production Nos. 12, 21, and 22, and to the extent it seeks Privileged Information.

Subject to and without waiving these objections, Fleet Farm states that it does not specifically audit individual employee compliance with all firearm sales procedures as a matter of course. Fleet Farm does conduct daily audits of completed ATF forms 4473 and 3310.4. Errors by employees in completing forms 4473 and 3310.4 are classified as either critical or non-critical, and both types of error are factors Fleet Farm considers in an employee's performance evaluation. Fleet Farm does conduct store-specific Firearm Compliance Inspections that include audits of observed sales practices by employees. *E.g.*, FF_0029148. In addition, all Fleet Farm employees, including employees authorized to participate in firearms sales, are subject to annual performance reviews and discipline for violations of Fleet Farm policies, including those related to firearms sales.

In addition to annual performance reviews, if Fleet Farm learns that an employee has violated a firearm sales policy, the issue is elevated to Mike Radl, Michelle Granato, or Derrick Hoernke for further review. When appropriate, Fleet Farm may notify law

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

enforcement, in the case of employee theft or other misconduct that may violate federal or state law.  *E.g.*, FF_0004052.

Regarding non-privileged investigations into firearms sales to Jerome Horton and Sarah Elwood, Fleet Farm refers Plaintiff to its response to Interrogatory No. 14. Additionally, after receiving ATF's request for Mr. Horton's records, Fleet Farm conducted searches for Mr. Horton's Fleet Rewards Loyalty and debit card information. Fleet Farm also reviewed all records reflecting Mr. Horton's purchases to ensure it had gathered all relevant information.  Fleet Farm provided these and additional records relating to Mr. Horton's purchases to ATF on October 18, 2021.  *E.g.*, FF_0001894; FF_0001473.  Fleet Farm also conducted its own internal investigation and did not find a policy violation by any Fleet Farm employee in connection with sales to Horton.

**INTERROGATORY NO. 14:**

Provide all supporting information underlying Fleet Farm's public statement issued on October 5, 2022, in which Fleet Farm stated: "It's also worth noting that at the time of the tragic shooting in Saint Paul described in the Attorney General's complaint, we were told by the Bureau of Alcohol, Tobacco and Firearms that our team members had 'done nothing wrong' and had complied with all applicable gun laws." Include the following information in your response: which Fleet Farm personnel were purportedly told by the ATF that Fleet Farm "team members had 'done nothing wrong'"; which ATF personnel purportedly told Fleet Farm that Fleet Farm "team members had 'done nothing wrong'"; when such individual or individuals at the ATF purportedly told Fleet Farm that Fleet Farm "team members had 'done nothing wrong,'" including identifying the date and circumstances of each conversation underlying Fleet Farm's statement; how the ATF purportedly told Fleet Farm that Fleet Farm "team members had 'done nothing wrong'" (e.g., face-to-face conversation, e-mail, telephone call, text, etc.); and the full content of each conversation between the ATF and Fleet Farm in which the ATF purportedly said Fleet Farm's team members had "done nothing wrong."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**RESPONSE:**

In addition to the foregoing General Objections, Defendants object to Interrogatory No. 14 on the grounds that it is compound, and is unduly burdensome to the extent it seeks "the full content of each conversation" between ATF and Fleet Farm. Defendants further object that Interrogatory No. 14 is duplicative of Request for Production No. 17.

Subject to and without waiving these objections, Fleet Farm states that on October 14, 2021, ATF agents Kylie Williamson and Elijah Carpenter emailed Michelle Granato regarding acquisition records for Jerome Horton. Agent Williamson stated: "As a part of an ongoing criminal investigation I'm wondering if you could query your records for purchases made by the individual listed below: Jerome Fletcher HORTON JR." Agent Williamson included a list of five purchases Mr. Horton made at various Fleet Farm stores in Minnesota, and stated: "The aforementioned purchases are associated with multiple sale reporting requirements. We are interested in obtaining records for these purchases as well as any other firearms purchased by Mr. HORTON."

Fleet Farm provided Agent Williamson the requested records via email on October 15, 2021. Agent Williamson replied: "This is great, thank you very much for your quick response—it is very much appreciated." FF_0001229–0001329. On October 20, 2021, Ms. Granato called Agent Williamson to inform her that Mr. Horton had made another firearm purchase on October 17, 2021 at Fleet Farm's Oakdale store. Immediately thereafter, Ms. Granato memorialized this conversation in an October 20, 2021 email to Derrick Hoernke and Mike Radl. Ms. Granato wrote that "Kylie [Williamson] informed me she was aware of that purchase because she was contacted by [a retail sales manager at

- 10 -

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the Oakdale store] seeking instruction on the transfer.  Jerome Horton background check came back as proceed and they wanted confirmation they should allow the transfer.  Kylie had the store get video she needed and told them to proceed with the transfer." Ms. Granato recounted that "Kylie also wanted us to know that the cooperation she received was fantastic" and that Agent Williamson "expressed that in no way did we do anything wrong by selling this individual the firearms.  There was nothing in his background that would have rendered a denied response."  FF_0001484.

**INTERROGATORY NO. 15:**

Identify, by date and government agency, and describe any investigations, compliance inspections, warning letters or warning conferences, remedial trainings, presentations, inquiries, or contacts by any federal, state, or local government agency relating to your sale of firearms at your Minnesota Stores.

**RESPONSE:**

In addition to the foregoing General Objections, Defendants object to Interrogatory No. 15 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of this Action or reasonably calculated to lead to the discovery of admissible evidence because it seeks information regarding "any investigations, compliance inspections, warning letters or warning conference, remedial trainings, presentations, inquiries, or contacts" by any government agency relating to firearm sales in general, irrespective of the reason for the particular government-agency contact and whether the contact was in regards to a subject relevant to the issues in this Action.  Defendants also object to the extent it seeks information already in Plaintiff's possession, custody, or

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

control, seeks information regarding active law-enforcement investigations, and on the ground that it is duplicative of Request for Production Nos. 9 and 10.

Subject to and without waiving these objections, Fleet Farm refers Plaintiff to Defendants' response to Interrogatory No. 7. Fleet Farm states further that, during the relevant time period, Fleet Farm records indicate that ATF conducted one audit of Minnesota Fleet Farm stores[1]: the Waite Park store was audited on July 10, 2018. Fleet Farm records indicate that during the relevant time period, Fleet Farm's Brooklyn Park, Blaine, Lakeville, and Oakdale stores received demand letters from ATF.[2] Each demand letter was an ATF Demand 2 letter, which is sent to an FFL who had 10 or more guns traced to them the previous calendar year with a "time-to-crime" of three years or less, and requires the FFL "to submit limited information regarding 'used' guns acquired the previous year, including the manufacturer/importer, model, caliber, or gauge and serial number along with the acquisition date." *See* ATF Fact Sheet February 2015, at *www.atf.gov/file/11046/download*. The Demand 2 letters requested information of firearms acquired from non-FFL holders. Because Fleet Farm does not sell used firearms, Fleet Farm responded to the Demand 2 letters but did not provide any substantive information to ATF. Fleet Farm responded to the Demand 2 letters. During the relevant time period, Fleet Farm's records indicate that its Minnesota stores received no Demand 1 letters and no Demand 3 letters. During the relevant time period, Fleet Farm is not aware that its

[1] Fleet Farm began maintaining records of ATF inspections in 2018.
[2] Fleet Farm began maintaining records of demand letters and responses in 2021.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Minnesota stores were the subject of any firearms-related investigations by state or local law enforcement.

**AS TO OBJECTIONS:**

Dated: May 23, 2024

*/s/ Andrew W. Davis*
Todd A. Noteboom (#0240047)
Andrew W. Davis (#0386634)
Sharon R. Markowitz (#0392043)
Andrew P. Leiendecker (#0399107)
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
todd.noteboom@stinson.com
andrew.davis@stinson.com
sharon.markowitz@stinson.com
andrew.leiendecker@stinson.com

**ATTORNEYS FOR DEFENDANTS**

## <u>VERIFICATION</u>

I am Derrick Hoernke, Director of Real Estate and Facilities at Fleet Farm Wholesale Supply Co. LLC. I am authorized to make this representation on behalf of Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (together, "Fleet Farm"). I have read Fleet Farm's Amended Responses to Interrogatory Nos. 5, 7, 9, 14, and 15 above and know the contents thereof. The Responses are true to the best of my current knowledge, recollection, information, and belief based on a reasonable investigation. I make no verification with respect to any objections stated within the Responses.

I declare under penalty of perjury that everything I have stated in this Verification is true and correct.

FLEET FARM LLC
FLEET FARM GROUP LLC
FLEET FARM WHOLESALE SUPPLY CO. LLC

DATED this 22 day of May, 2024.          By: _____

Director of Real Estate and Facilities

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via email on May 23, 2024.

*/s/ Andrew P. Leiendecker*
Andrew P. Leiendecker