# EXHIBIT I

Michelle Granato

**CONFIDENTIAL**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STATE OF MINNESOTA by its
Attorney General, Keith Ellison,

        Plaintiff,

            Case No. 0:22-cv-02694-JRT-JFD

vs.

FLEET FARM LLC, FLEET FARM GROUP
LLC, and FLEET FARM WHOLESALE
SUPPLY CO. LLC,

        Defendants.

**DEPOSITION OF MICHELLE GRANATO**

Deposition of MICHELLE GRANATO, taken before me at Henes & Associates, Appleton, Outagamie County, Wisconsin, on the 19th day of June, 2024, A.D., otherwise than as a witness on the trial, in a certain action now pending in the United States District Court, District of Minnesota, wherein the parties thereto are as set forth above.

- - - - - -

Jessica Koepsell, RPR, CRR

---

APPEARANCES

MR. ERIC MALONEY and MS. KATHERINE MOERKE, Assistant Attorneys General, State of Minnesota, of St. Paul, Minnesota, appeared on behalf of the Plaintiff.

STINSON, LLP, of Minneapolis, Minnesota; MR. ANDREW DAVIS of that firm appeared on behalf of the Defendants.

AJ PETERMAN was also present in person.

- - - - - -

INDEX TO EXAMINATION

| | PAGE |
|---|---|
| Examination by Mr. Maloney | 5 |
| Examination by Mr. Davis | 239 |
| Further Examination by Mr. Maloney | 242 |
| Further Examination by Mr. Davis | 245 |

- - - - - -

INDEX TO EXHIBITS

| EXHIBIT NUMBER | | PAGE MARKED |
|---|---|---|
| 48 | Document entitled Zone 2 Part-Time Team Member Firearms Training Quick Reference Guide | 52 |
| 49 | Documents entitled Firearm Procedures and Accountability Update dated 3/3/20 | 58 |
| 50 | Confidential B.O.L.O. Alert dated 3/22/21 | 86 |
| 51 | Confidential B.O.L.O. Alert dated 4/24/22 | 87 |
| 53 | E-mail dated 1/7/22 from Ms. Granato with the subject Manual Site Improvement | 91 |

---

| EXHIBIT NUMBER | | PAGE MARKED |
|---|---|---|
| 54 | Documents entitled Multiple Handgun Sales | 91 |
| 55 | Documents entitled All Store Quarterly Firearm Compliance Webinar | 97 |
| 58 | Video recording | 124 |
| 59 | E-mail dated 10/27/21 with attached Quarterly Firearm Compliance Webinar | 118 |
| 61 | Tuesday's Tidbit dated 11/2/21 | 145 |
| 62 | E-mail dated 2/18/21 concerning Conversation with Michelle Granato | 148 |
| 64 | E-mails from 1/2022 concerning Straw Purchase Alert - Zachary Michael St. John | 155 |
| 65 | E-mails dated 1/2022 concerning Straw Purchase Alert - Zachary Michael St. John | 162 |
| 67 | Tuesday's Tidbit dated May 10th | 164 |
| 68 | Tuesday's Tidbit from 8/8/23 | 167 |
| 69 | E-mail dated 10/14/21 from Ms. Williamson to Ms. Granato | 181 |
| 72 | E-mail chain from October of 2021 concerning ATF Active Investigation 3100 | 183 |
| 73 | E-mail chain dated 10/21/21 between Ms. Granato and Mr. Radl | 195 |
| 76 | E-mail dated 11/1/21 from Ms. Granato to Ms. Cartier concerning straw purchase | 212 |
| 77 | December of 2021 Tuesday's Tidbit | 214 |
| 79 | E-mail dated 2/22/22 from Mr. Hansen to Ms. Granato concerning Conversation with Michelle Granato | 217 |
| 80 | E-mails dated 6/14/21 concerning Straw Purchase | 170 |
| 81 | E-mail dated 8/4/22 from Mr. McAdams to Ms. Granato concerning Purchase History | 224 |
| 82 | Document entitled Fleet Farm Firearm ATF ACQ/DIS Detail Report Hermantown (S 3600) | 225 |

---

| EXHIBIT NUMBER | | PAGE MARKED |
|---|---|---|
| 88 | E-mails dated 6/27/22 concerning CFI Straw Purchase | 227 |
| 91 | E-mail dated 4/15/21 from Mr. Kurtzweil to Ms. Granato | 228 |
| 92 | E-mails from 2021 concerning Kent Kirkham | 230 |
| 102 | Packet of receipts and order forms | 186 |
| 103 | E-mail chain from November of 2021 concerning Quarterly Firearm Compliance Webinar - 11-2021.pdf; ATT20917 | 115 |
| 104 | E-mails dated 9/8/21 concerning 7 trace requests | 174 |

(Original exhibits placed with original transcript.)

- - - - - -

Michelle Granato

**CONFIDENTIAL**

Said MICHELLE GRANATO, having been first duly sworn by me to testify the truth, the whole truth, and nothing but the truth relative to said cause, in answer to oral interrogatories, deposed and made answer as follows:

- - - - - - -

(The examination began at 8:56 a.m. on June 19, 2024.)

- - - - - - -

EXAMINATION

BY MR. MALONEY.

Q   Good morning, Ms. Granato.  Can you please state your name for the record?

A   Michelle Granato.

MR. DAVIS:  Mr.  Maloney, could we go on the record first and designate the deposition as confidential?

MR. MALONEY:  Go ahead, Counsel.

MR. DAVIS:  As we discussed just before coming on the record this morning, consistent -- pursuant to the protective order that exists in this case, we will designate this deposition transcript as confidential.

MR. MALONEY:  Thank you.

BY MR. MALONEY:

Q   So, Ms. Granato, where do you work currently?

A   Fleet Farm.

Q   And what is your job there?

A   I am a firearms specialist.

Q   I'm going to start with some basic questions here.  Are you represented by a lawyer today?

A   Am I represented?  No.

Q   Do you have a lawyer here today on behalf of Fleet Farm?

A   Yes.

Q   And who is that?

A   Andrew.

Q   Andy Davis?

A   Andy Davis.

Q   Thank you.  And when did this representation begin by Mr. Davis?

A   Last week.

Q   Which day last week?

A   Last Tuesday.

Q   So I'm going to start with some ground rules here so that we can get through this deposition and make a clear record.  The first rule is that we both speak one at a time so that the court reporter can take our words down and we're not fighting over each other to be heard.  Does that sound good to you?

A   Yes.

Q   The second rule is that your counsel today, Mr. Davis, may object.  You will still need to answer, unless you are instructed not to by him.  Understand?

A   Yes.

Q   The third rule is that because we have a court reporter here who's taking down our words, we have to verbalize our answers, right?  So yes or no if it's a yes or no question.  No uh-huhs, uh-uhs.  You know, those are hard for her to take down.  So just make sure to verbalize all of your answers.  Does that make sense?

A   Yes.

Q   If I ask you a question and you don't understand it, don't try to answer it.  You can ask me to clarify or tell me that you don't understand it if you have any issues with that.  Does that make sense?

A   Yes.

Q   Last issue on this, is there any reason that you cannot testify truthfully today?

A   No.

Q   With the ground rules disposed of, I wanted to ask you if you've ever been deposed before.  Have you ever sat for a deposition in the past?

A   No.

Q   Have you ever testified at a trial before?

A   No.

Q   Have you ever given any testimony under oath before?

A   I am not sure if it was under oath.  I don't remember.

Q   What are you thinking of where you may have been under oath before?

A   I did attend an ATF hearing one time in January.

Q   Did you give testimony to the ATF?

A   I answered questions that they had, but I don't know that it was considered testimony.

Q   Okay.  What was the interview about?

A   It was in regards to some compliance --

Michelle Granato   **CONFIDENTIAL**

A   I don't think so.

Q   Okay.  Could this have been through Workplace?

A   No.  It wouldn't have been through -- it was either Zoom -- maybe it was Microsoft, part of the Microsoft e-mail suite.

Q   Could you turn to Page 3, the third page?  It's Bates number ending 12588.

A   Yes.

Q   If you go to about the middle of the page, a message you sent at 10:58 a.m., you say obviously they aren't closing them out.  I will create a tidbit that no one will read.  Were you referencing your Tuesday Tidbits there?

A   Yes.

Q   And this document, if you go back to the first page, is from February 18, 2021, right?

A   Yes.

Q   So were you concerned at this time that you were creating and circulating the Tuesday Tidbits but no one was reading them?

A   No.  I wasn't concerned that no one was reading them.  I was more concerned that it

149

wasn't reaching all of our team members.  But there were people that were participating and reading them.

Q   What drove your concern that not every team member was getting eyes on the Tuesday Tidbits?

A   It could have been that they would call and ask a question on something that I had just posted.  And so when I would ask them if they reviewed the tidbit, they would say I haven't had a chance yet.

Q   Anything else that prompted you to make the statement about people not reading tidbits?

A   No.

Q   You can set that aside.  So for this one, this is the already admitted Exhibit 20, which would be in your stack.  All right.  You're looking at Exhibit 20.  It's the All Store Quarterly Firearms Compliance Webinar from April '22; is that right?

A   Yes.

Q   Could you go to Slide 7, which I believe is on Bates number ending 520?  Are you there?

A   Yes.

Q   And in the slide it says, it's titled New

150

Compliance Tools, and then it says, Tuesday's Tidbits, moved to ThinkTime, will be assigned as task to ensure everyone reads them.

A   Yes.

Q   So you testified previously that Tuesday's Tidbits were on Workplace, but now they moved somewhere else, right?

A   They wanted to do it in ThinkTime, but the application that they were asking us to move it to wasn't the way that we wanted it to perform.  It's not really a social media type.  It's more of a task or generated type, and it was too hard to create them in ThinkTime.

Q   So you tried it in ThinkTime, as it says here, but didn't end up using that in the long term?

A   No.

Q   Where are they now?

A   They haven't -- we haven't done them in a while.

Q   Okay.  And the second bullet point here, will be assigned as tasked to ensure that everyone reads them, what kind of motivated

151

that need to have that kind of assignments for the Tuesday Tidbits?

MR. DAVIS:  Object to the form of the question.  Lack of foundation.  You can answer, if you know.

THE WITNESS:  Just based on, like I said, if I would question a store whether they read it, they would say, no, I haven't had the opportunity yet.  So we just wanted to ensure that everybody was aware that there was a tidbit that they should read.

BY MR. MALONEY:

Q   Okay.  You can put that aside.  This is another one in the existing stack, No. 46.  Do you have No. 46 in front of you?

A   I do.

Q   And this is an e-mail from Mike Radl to several recipients, including yourself, on November 29, 2021, correct?

A   Yes.

Q   Do you recall getting this e-mail from Mr. Radl?

A   I don't recall it, but it was sent.

Q   At the bottom of the first page, in the e-mail thread, there's an e-mail from Cory

152

Michelle Granato **CONFIDENTIAL**

Klebs. Do you know who Cory Klebs is?

A No, I don't.

Q If you turn to the top of the first page, his e-mail signature says that he's the operations manager at the Blaine Fleet Farm. Do you have any reason to dispute that that's his role?

A No.

Q So if you go back to the bottom of the first page, it looks like Cory Klebs was asking you or Mr. Radl, can you verify for us the procedure for straw purchases, if they have a wait period before they are allowed to make another sale, or are they banned from sales with Fleet Farm going forward, as a family member called and talked to Leif trying to get him to overturn the decision? Do you see that at the bottom of the page?

A Yes.

Q Now, during the relevant time period for this case, was there -- did Fleet Farm have a wait period in which someone who was flagged as a straw purchaser was unable to make a future purchase?

A There was no wait period that I was aware

*153*

of.

Q If there was no wait period, there was also a no-going-forward ban for that person from buying guns in the future, right?

MR. DAVIS: Object to the form of the question.

THE WITNESS: We wouldn't want to sell them at all. It would be a permanent thing.

BY MR. MALONEY:

Q But if you go up to Mr. Radl's response, the top third of the page, in the middle he says, now that customer could come back and purchase a completely different firearm, and we can legally sell to the customer if we feel the purchase isn't a straw purchase. So it is not black and white. Is that what it says there?

A Yes, that's what it says.

Q And, to your knowledge, does Mr. Radl's response reflect company policy on, you know, when a firearm can be sold to a straw purchaser after they are flagged as a straw purchaser?

A Well, I think in the line above it, he says,

*154*

basically we should not sell a specific firearm to that customer, period, no matter how much time has lapsed. So that would be our policy.

Q For that specific firearm that the straw purchaser tried to purchase, right?

A No. That's our policy.

Q But the sentence that I just read to you says that if it's a different firearm, you would basically reevaluate whether or not the customer -- that was also a straw purchase, right?

A We would reeval -- we would look at that situation, the circumstances surrounding that sale.

Q Okay. So there's no automatic ban at the company level that comes after being flagged as a straw purchaser, correct?

MR. DAVIS: Object to the form of the question.

THE WITNESS: Not that I'm aware of.

MR. MALONEY: Okay. Thank you. You can set that aside.

(Exhibit 64 marked.)

BY MR. MALONEY:

*155*

Q I'm handing you what's been marked as Exhibit 64. In the top -- this is an e-mail thread between you and Mr. Radl, correct?

A Yes.

Q And if you go to the second-to-last page, 2504, the first e-mail in this chain is a confidential straw purchase/decline sale alert, right?

A The last page?

Q If you're at the page ending 2504 about halfway down.

A Yes.

Q Okay. If you go, if you look underneath that, there's the No. 1, and then it says summary.

A Uh-huh.

Q It says, St. John answered yes to 21 i domestic violence and did not change his answer when prompted from a team member to double-check the form. Is that what it says there?

A Yes, it does.

Q And that 21 i, that's referencing a question on the Form 4473, right?

A Yes.

*156*

Michelle Granato

**CONFIDENTIAL**

Q   Do you know who that is?
A   No, I don't.
Q   Do you know that Mr. Williamson was fired by Fleet Farm in June 2021?
A   No, I do not.
        MR. MALONEY:  You can put that aside. I'm just about to do a new topic, so if you want a break, now might be a good time. It's up to you.
        MR. DAVIS:  We'll take a short one and be back in just a few minutes.
        (Recess was taken.)
BY MR. MALONEY:
Q   Welcome back, Ms. Granato.  We are back on the record.  I wanted to transition to a different straw purchaser than Sarah Elwood, Jerome Horton.  Do you know how many guns Fleet Farm sold to Jerome Horton?
A   I do not know right off the top of my head.
Q   If I told you 24, would you have any reason to dispute that number?
A   No.
Q   Okay.  And was -- when Fleet Farm became aware -- let's do it this way:  When the ATF reached out to Fleet Farm for information on

*177*

Jerome Horton, did you review the forms related to Jerome Horton's purchases from Fleet Farm?
A   Yes, I did review them.
Q   And did you look at them for all of the purchases by Jerome Horton or just a subset?
A   I looked at all the forms.
Q   Okay.  And in your review of those forms, did Fleet Farm complete and receive all the required Form 4473s for those purchases?
A   Yes.
Q   Did Fleet Farm complete and submit all required 3310 forms for those purchases?
A   There was one that was missing.
Q   Do you recall for which transaction or transactions that form was missing?
A   No, I don't.
Q   And, to your knowledge, did Fleet Farm ever alert the ATF that Horton was a possible straw buyer?
A   Not to my knowledge.
Q   But you know that the ATF did ask Fleet Farm for information about Horton's purchases, right?
A   Yes, I received an e-mail from ATF.

*178*

Q   When you were referencing the ATF's investigation earlier, was that referring to that e-mail or to something else?
A   No, it was referring to that e-mail from Kylie Williamson.
Q   Is there any other investigatory action by the ATF that you were referencing when you talk about the ATF investigation?
        MR. DAVIS:  Object to the form of the question.  Vague.  You can answer it, if you understand the question.
        THE WITNESS:  Can you repeat the question or rephrase it?
BY MR. MALONEY:
Q   Yeah.  To your knowledge, was there anything to the ATF's investigation into Jerome Horton and Fleet Farm beyond the e-mail that you received from Kylie Williamson about Jerome Horton?
A   No.  That was it.
Q   Are you aware of the shooting at the Seventh Street Truck Park Bar on October 10, 2021?
A   Could you repeat the question, please?
Q   Are you aware of a shooting at the Seventh Street Truck Park Bar on October 10, 2021?

*179*

A   I had heard about it on the news.
Q   What did you hear about it?
A   That there was a shooting at a bar.
Q   Did you hear that someone died in that shooting?
A   I think I might have heard it on the news as well, yes.
Q   And that there were multiple people injured from gunshots?
A   Yes.
Q   Did you know that a Fleet Farm gun, a gun sold by Fleet Farm, I should say, was used by one of the shooters at that incident?
        MR. DAVIS:  Object to the form of the question.  Not clear as to the time that you're asking the witness when her knowledge of the firearm was.  So are you saying at the time she learned of the shooting or sometime --
        MR. MALONEY:  I can ask both.
BY MR. MALONEY:
Q   Do you know sitting here today that a gun sold by Fleet Farm was used in that shooting?
A   Today I do.

*180*

Michelle Granato   **CONFIDENTIAL**

Q   And when did you find out that a gun sold by Fleet Farm was used in that shooting?

A   I don't recall exactly when I found out.

Q   Could it have been around the time that the ATF reached out to Fleet Farm about Jerome Horton's purchases?

A   It could have been.  I don't know if I made the connection at that point, but it could have been.

Q   What was your reaction when you learned that a Fleet Farm gun was involved in that shooting?

        MR. DAVIS:  Objection.  Vague.

        THE WITNESS:  I guess I was concerned.

BY MR. MALONEY:

Q   Why were you concerned?

A   Because as an FFL dealer, you never want to have something that you transferred be involved in a crime.  We want to keep our community safe.

        (Exhibit 69 marked.)

BY MR. MALONEY:

Q   I am handing you what's been marked as Exhibit 69.  Now, Ms. Granato, you are

181

referencing an e-mail from a Kylie Williamson at the ATF.  Is Exhibit 69 the e-mail that you were referencing?

A   Yes.

Q   This is from October 14, 2021; is that right?

A   Yes.

Q   And Kylie Williamson is asking you to trace several purchases of firearms made by Jerome Horton, right?

A   Yes.

Q   And, again, this was -- was this e-mail the first time that Fleet Farm -- let me ask you -- strike that.  So, again, I think you've already testified to this.  But the Fleet Farm -- Fleet Farm did not notify or tell the ATF that it suspected Jerome Horton was a straw purchaser, right?

        MR. DAVIS:  Object to the form of the question.  Assumes facts not in evidence.

        THE WITNESS:  No.  We -- I don't believe that we reported him.

BY MR. MALONEY:

Q   Are you aware of anyone at Fleet Farm who had suspicions about Horton before the ATF

182

sent this e-mail to Fleet Farm on October 14, 2021?

A   No.

Q   And that includes yourself?  You didn't have any suspicions about him prior to this date?

A   I didn't even know who Jerome Horton was.

        (Exhibit 72 marked.)

BY MR. MALONEY:

Q   Okay.  You can put that aside.  I hand you what's been marked as Exhibit 72.  So this is a long e-mail chain.  Probably the easiest way it digest this would be to go to the end.  If you go to the third-to-last page, 1476, the Bates number in the corner, at the bottom of Page 1476, there's an e-mail from you to several folks.  And this is you following up on the e-mail, the October 14th e-mail, from Kylie Williamson, right?

A   Are we talking about the very last?

Q   At the very bottom of 1476, yep.  Because then if you turn to Page 1477, you see that you copy and pasted the content from Agent Williamson's e-mail, right?

A   Right.

183

Q   So then if we go up in the e-mail thread here, you can see -- let's go to the top of Page 1474 in this e-mail thread.  That's an e-mail from Mike Radl to Derrick Hoernke.  And who is Derrick Hoernke?

A   I'm trying to follow.

        MR. DAVIS:  Which page?

        MR. MALONEY:  At the bottom of 1473, the first page, the top of 1474.  It spills over.

BY MR. MALONEY:

Q   And who is Derrick Hoernke again before we go into it?

A   At the time Derrick Hoernke was -- I don't know his exact title at that time.  But he was part of loss prevention or he was like a director of loss prevention.

Q   And he was Mr. Radl's boss, right?

A   Yes.

Q   Okay.  And he says, phone won't let me forward.  Can you forward BLN stuff to Michelle?  She will verify the 3310 sales were completed correctly.  That's what it says, right?

A   Yes.

184

Michelle Granato

CONFIDENTIAL

Q   Is BLN a reference to the Blaine store?

A   Yes.

Q   And then the next e-mail up in the chain, if you go to Page 1473, the first page, is your response.  And you say, thank you, I looked through them and noticed the e-mail confirmation for the 3310.4 multiple handgun form was missing.  When a 3310.4 is e-mailed to the ATF e-mail address, the store sporting goods account is cc on the e-mail as proof we sent it.  I contacted Leif, and they still had the e-mail, printed a copy for their records, and scanned a copy to me.  BLN is complete.  Is that what your e-mail said from October 21, 2021?

A   Yes.

Q   And this was you -- as Mr. Radl indicated in his e-mail, you reviewing the Blaine paperwork for Jerome Horton?

A   Right.

Q   Okay.  And did you check the other stores as well in addition to Blaine?

A   I checked every store.

Q   Do you recall which stores were involved?

A   Not right off the top.  I mean, I don't know

*185*

I would get them all, but I do know that Blaine and Oakdale were involved.

Q   How about Brooklyn Park?

A   Yes, they were involved.

Q   And Lakeville?

A   Yes.

Q   Okay.  And we've already discussed that in the course of doing this review, you found that one 3310.4 form was not completed, right?

A   Yes.

        (Exhibit 102 marked.)

BY MR. MALONEY:

Q   You can put that aside.  I'm going to show you Exhibit 102.  This is the big one and kind of hard to read.

        MR. DAVIS:  Are we done with 72?

        MR. MALONEY:  We are done with it, yes.

BY MR. MALONEY:

Q   Why don't you skim through 102, and then I'll ask you a question about it.

A   Okay.

Q   Do you recognize these documents?

A   I recognize the 4473 forms, the MDSE 31s,

*186*

and then the sales transactions that we provided to ATF.

Q   To your recollection, is this the document packet that you reviewed related to Jerome Horton's purchases at the Blaine Fleet Farm?

A   I would have looked at all the 4473 forms, and based on that, I would have looked for the 3310 form.

Q   Did you look at documents like this first page as well, the transaction information?

A   No.

Q   But would these have been in the packet of information that was sent to the ATF?

A   Yes.

Q   Okay.  Looking at this first page, what exactly is this document?  Is it a receipt?

A   It's a -- yeah, from the point-of-sale receipt.

Q   Okay.  And it has -- there's some highlighting on it.  Do you know where that highlighting may have come from?

A   No.

Q   Okay.  If you go down in the left column, about two-thirds of the way down the page, it says *cash* right there, and then two lines

*187*

lower it says, cash tendered $400.  Do you see that there?

A   Yes.

Q   Do you know if Jerome Horton paid cash for some of his firearm purchases from Fleet Farm?

A   I don't know.

Q   Does this document show Jerome Horton paying $400 in cash for a firearm?

A   It says, cash tendered $400.

Q   If you go up to where it says UPC number and then it has a highlight, under that it says, APX Centurion 9 millimeter blued, Quantity 1 at $379.99.  To your knowledge, is that a firearm?

A   Yes.  That would be the firearm.

Q   So does this first page of Exhibit 102 show Jerome Horton paying $400 in cash for a firearm?

        MR. DAVIS:  Objection.  Lack of foundation.

        THE WITNESS:  It says, cash tendered $400, but it also says debit, credit or credit, debit.

BY MR. MALONEY:

*188*

Michelle Granato

CONFIDENTIAL

Q   If you go up three lines, it says, total $432.76, right?

A   Right.

Q   Is it possible that Jerome Horton paid $400 in cash and then paid the rest on credit/debit?

A   Sure.

Q   Okay.  All right.  I want you to turn to -- I'll get you a page number -- 1244.  And this is a similar document showing the purchase, right?

A   Yes.

Q   The top third of the left column where it says UPC number, under that it says, STR-9C. Do you know, is that a firearm?

A   Just based on the description, no.

Q   Do you know what a Stoeger is --

A   No, I don't.

Q   -- as a brand of firearm?

A   No, I don't.

Q   The line under that, Quantity 1 at $349.99, is that the price range for a 9 millimeter pistol sold by Fleet Farm?

A   I couldn't tell you.

Q   Okay.  A few lines under that, the other

189

highlighted UPC number, it says, GLK 43X 9 millimeter PST.  Do you know if that's a firearm?

A   That I recognize as a firearm.

Q   What kind of a firearm is that?

A   It's a Glock 43.

Q   Okay.  And that's a 9 millimeter handgun?

A   Yes.

Q   Okay.  If you go down towards the bottom of the left column, you see there's a highlighting.  Just before that it says, button at 19:24:20.  It says cash, and then two lines lower it says, cash tendered.  Do you see that there?

A   Yes.

Q   Then actually below that it says, total tendered $910.55.  Do you see that?

A   Yes.

Q   All right.  If you go a few lines up, there's two lines that say, loyalty reward tendered, $5.  Do you see those two lines?

A   Yes.

Q   Does Fleet Farm have a loyalty rewards program?

A   Yes.

190

Q   And how does that program work?

A   I can't tell you how it works.  I am not involved with the point of sale in that process, but I know we have a loyalty account, a loyalty program.

Q   Does it give you cash off on purchases if you're a member of the program?

A   When you spend X amount of dollars, then you get -- you earn points.

Q   So is it fair to say, based on this document, that Jerome Horton purchased firearms here with $900.55 in cash and then $10 in Fleet Farm loyalty rewards?

A   Based on the receipt, yes.

Q   Okay.  Could you go to 1258 is the Bates number?  This is, again, a similar document, a purchase transaction receipt, right?

A   Uh-huh.

Q   The first UPC number that's highlighted, the line under that, it says it's an MC2c 9 millimeter with safety.  Is that a handgun?

A   Based on the description, I would say yes.

Q   Could it be a Mossberg handgun?

A   I don't know.

191

Q   And then a few lines under that we have a GLK 45 9 millimeter.  Is that a handgun?

A   Yes.

Q   That's a Glock 9 millimeter again?

A   Yes.

Q   And then at the bottom we have the word *cash* highlighted.  A few lines down it says, cash tendered $1,020, right?

A   Uh-huh.

Q   Under that it says total tender of $1,045, right?

A   Right.

Q   And then above the cash highlight there's one, two, three, four, five lines of loyalty reward tendered for $5, correct?

A   Yes.

Q   So is it fair to say for this transaction that the buyer paid $1,020 in cash and then $25 in loyalty rewards to purchase two handguns?

A   Yes.

Q   Could you turn to Page 1296?

A   Okay.

Q   Are you there?

A   Yes.

192

Michelle Granato

**CONFIDENTIAL**

Q    Okay.  Again, we have a highlighted UPC number in the left column about a third of the way down the page.  Under that it says, GLK 19 G3 9 millimeter.  Is that a handgun?

A    Yes.

Q    And, again, that's a Glock 9 millimeter?

A    Yes.

Q    And the next highlight on the page towards the bottom of the left column is cash is highlighted.  It says two lines below that, cash tendered $580, right?

A    I think it's $560.

Q    $560, thank you.  And then the total tender is $575?

A    Yes.

Q    And then above the cash highlight there's three lines of loyalty reward tendered of $5?

A    Yes.

Q    So, again, is it fair to say that this transaction involved someone paying $560 in cash and $15 in Fleet Farm loyalty rewards to purchase a Glock 9 millimeter?

A    Yes.

Q    Could you go to Page 1306?  And, again, this is the same type of purchase information, right?

A    Yes.

Q    The first highlighted UPC number in the upper left, the title -- the line under that says a GLK 26 G5 US 9 millimeter.  To your knowledge, is that a handgun?

A    Yes.

Q    And is that another Glock 9 millimeter?

A    Yes.

Q    And then the next highlighted UPC number is for an RAD RAD-15 RP PST 5.56.  Do you know if that's a firearm?

A    I don't know for sure.

Q    If given your knowledge of firearms, is a 5.56 typically a handgun or a different kind of firearm?

A    It's typically another type of firearm.

Q    A rifle?

A    It could be.

Q    Okay.  And, again, if you go down towards the bottom where the cash highlight is, just above that it says, total $1,392.60.  Two lines under that it says cash tendered of $1,400.  Do you see that there?

A    Yes, I do.

        (Exhibit 73 marked.)

BY MR. MALONEY:

Q    Okay.  You can put that aside.  All right.  I'm handing you what's been marked as Exhibit 73.  Taking a look at this, do you recognize this document?

A    Yes, I do.

Q    What is it?

A    It looks like a chat between Mike Radl and myself.

Q    And is this the same platform as the previous chat messages that we were looking at?

A    Yes.

Q    But we're still not sure which platform that could be?

A    Right.

Q    Okay.  And this is between you and Mike Radl, right?

A    Yes.

Q    The subject line says Kylie Williamson, is that right, at the top of Page 2468?

A    Yes.

Q    And she's the ATF agent that we were looking at the e-mails from previously?

A    Right, yes.

Q    The first line of the chat, Mike Radl at 12:15 p.m. says, well, the plane didn't crash, so that's good, I guess.  Do you see that there?

A    Yes, I do.

Q    What plane was Mr. Radl referring to that didn't crash?

        MR. DAVIS:  Objection.  Lack of foundation.  You can answer, if you know.

        THE WITNESS:  The one that he took to Rapid City, South Dakota.

BY MR. MALONEY:

Q    What was he going to Rapid City for?

A    I don't know the exact nature of his business.  Probably to do a compliance inspection or a safety inspection.

Q    Oh, so he was traveling for work, not for something else?

A    He was traveling, right.

Q    Okay.  And then you respond by saying, yep, a good start to the week.  Nothing going on here.  Do you see that there?

A    Yep.

*193*

*194*

*195*

*196*

Michelle Granato

CONFIDENTIAL

Q  I have a hard time reading sarcasm from text messages, but your phrase, nothing going on here, did you mean nothing was going on or was a lot going on?

A  I don't remember.

Q  So these chats were occurring on October 21, 2021; is that right?

A  Yes.

Q  Was this just after Fleet Farm learned about, you know, that the ATF was looking at its sales to Jerome Horton?

A  Yes.

Q  So in actuality at that point was nothing going on at Fleet Farm and for you in your job?

A  No.  I'm sure there was a lot going on.

Q  Okay.  So you think you may have been sarcastic there?

A  Could have been.

Q  About halfway down the second page, if you go to 2469, there's a chat from Mike Radl saying, can you e-mail the stores involved to ensure that if the ATF took the original 4473s and if they didn't make a copy of the form first, that they need to go into their

197

sent e-mail and print off scanned copy, make copy of the agent's business card, and attach to each of those forms with a note that the ATF has original for case.  I guess Blaine didn't photocopy any of them and just handed them over.  Do you see that there?

A  Yes.

Q  Is he referring to the ATF's request for Jerome Horton documents?

A  Yes.

Q  Okay.  And it looks like there was at least one store here, Blaine, that didn't make a copy and just gave over their originals?

A  Yes.

Q  Was that a problem?

A  No.  We wanted to make sure we had copies, though, for our records.

Q  Right.  And then the next message from Mike Radl is it looks like it's the next day.  We're going from 4:03 p.m. to 11:12 a.m.  He asks you, have you been able to confirm yet if all the 3310s are at least accounted for?  Is that what it says there?

A  Yes.

Q  And then you respond a minute later, just

198

got OAK, still waiting for BRP; is that right?

A  Yes.

Q  OAK is Oakdale?

A  Yes.

Q  And then BRP is Brooklyn Park?

A  Yes.

Q  Do you recall if you ever got the Brooklyn Park 3310s?

A  I -- yes.

Q  Okay.  And it looks like here you got the Oakdale 3310s, too, right?

A  I did get them.

Q  Does this help refresh your memory at all which store had the missing 3310 form that you referenced?

A  It looks like Oakdale.

Q  You think it was Oakdale?

A  It says, Oakdale missing 3310.4 for serial -- and then I gave the serial number.  No e-mail confirmation.  I have e-mailed Jeff Frank asking for them.

Q  You're reading from the second-to-last message --

A  Yes.

199

Q  -- towards the bottom of the page, right?

A  Yes.

Q  Where it says, OAK missing.  3310.4 for Serial No. AFVB754.  No e-mail confirmation.  I have e-mailed Jeff Frank asking for them.  No e-mail confirmation for either 3310.4.  These damn stores.

A  Yes.

Q  Did Oakdale ever correct the fact that at the time of purchase or sale it did not complete the 3310.4?  Like did it do it later on?

A  I don't remember.

Q  But at least at the time that you were looking at this information, Oakdale was still missing that 3310.4?

A  Yes.

Q  Okay.  What did you mean by these damn stores?

A  I think it was more frustration.

Q  About what?

A  We had covered printing the confirmation and printing the e-mail -- or the 3310.

Q  And you were frustrated that, notwithstanding your training, a store had

200

Michelle Granato   **CONFIDENTIAL**

failed to fill out a Form 3310.4, right?

A   Yes.

Q   About halfway down the next page, 2470, you say in capital letters, OMG, they gave ATF the originals without making copies, just shoot me.  What were you referencing there?

A   That was the store that gave the originals to the ATF.

Q   And we referenced that earlier, right?

A   Right.

Q   And Mike Radl responds by saying, RUFKM.  Do you know what that means?

A   Yes, I do.

Q   What does it mean?

A   Are you fucking kidding me?

Q   So Mike was a little frustrated, too, uh?

A   Uh-huh.

Q   A few messages down Mike Radl at 1:40 p.m., he says, sounds good, I just want D off my back.  Who is D?

A   I don't know who he's referring to, or I don't want to speculate.

Q   Could it be Derrick Hoernke?

A   Could be.

Q   On the next page, 2471, there's a message

201

from you at 1:46 p.m.  In the middle of it it says, CCB meeting at 2 o'clock for the manual sale multiple handgun verification CR.

A   Yes.

Q   What is a CR?

A   A change request.

Q   What's a change request?

A   We turn in a change request to our IT department when we're asking for program changes.

Q   So in this chat were you referencing having a meeting to put in a change request to change the manual sale multiple handgun verification process?

A   You would turn in a CR, and then you would attend the CCB meeting to basically plead your case.

Q   What's the CCB?

A   It's part of the IT structure.  I don't know exactly what it stands for.

Q   And I think we've already gone over that there were changes to the manual sale of multiple handgun verification process, right?

202

A   This was the start of it.

Q   So you were able to successfully plead your case?

A   Right.

Q   If you go towards the bottom of this page, there's a chat from you at 3:03 p.m.  My CR6360 multiple handgun manual sales alert was pushed too high, so that should help with the stores not looking up the customers.  And then Mike responds, good to hear.  Do you see that?

A   Yes.

Q   What was that in reference to?

A   The change request that I submitted being accepted and made a high priority.

Q   So you were excited about this CR being put into high priority, right?

A   Yes.

Q   And given the timing of these chat requests and the fact that you're dealing with the Jerome Horton issues at this time period, did Fleet Farm sales to Jerome Horton influence your decision to push for a change to this manual sale multiple handgun verification process?

203

A   No.

Q   Okay.  Do you recall what did motivate your request to change this process?

A   No, I don't recall what motivated, other than we're always trying to improve.

Q   Okay.  You can set this aside.  Pull out from that pile Exhibit 10.  Have you got it in front of you?

A   I do.

Q   All right.  Exhibit 10 is an e-mail from you to Derrick Hoernke and Mike Radl, correct?

A   Yes.

Q   And that's from October 20, 2021, at 3:40 p.m.?

A   Yes.

Q   The subject was Kylie Williamson, the ATF agent we've talked about, right?

A   Yes.

Q   Now, this e-mail is not from the ATF, correct?

A   No.

Q   They're not in this e-mail thread that we're looking at?

A   No, they're not.

Q   Okay.  And this e-mail is generally going

204

Michelle Granato

**CONFIDENTIAL**

through, you know, the process you've been doing to look at the Jerome Horton documents and get them over to the ATF, right?

A   This e-mail was a follow-up to a conversation I had had with Agent Williamson that day on the phone.  I had contacted her.

Q   And so you drafted this e-mail contemporaneously with your conversation with her?

A   I drafted this e-mail so that Derrick and Mike were aware of what we were doing in the investigation with Kylie.

Q   And Kylie in the third paragraph here says, Kylie also wanted us to know that the cooperation she received was fantastic and everything she requested was provided very quickly.  She was impressed by our organization in gathering the items not just at one store but every store involved.  Is that what you wrote?

A   Yes.

Q   And as you sit here today and think back on your phone call with Kylie, is that an accurate reflection of what was said in that phone call?

205

A   Yes, it is.

Q   Were Mike -- so Mike and Derrick received this e-mail, right?

A   Yes.

Q   Did this get sent around to anyone else at Fleet Farm besides those two?

A   Not that I'm aware of.

Q   Were Mike and Derrick pleased that you got this kind of response from the ATF about Fleet Farm's cooperation?

MR. DAVIS:  Objection.  Lack of foundation.

THE WITNESS:  I don't recall.

BY MR. MALONEY:

Q   Did either Mike or Derrick respond to this e-mail?

A   I don't recall.

Q   The next line in that third paragraph says, she, referencing Kylie Williamson, expressed that in no way did we do anything wrong by selling this individual the firearms.  There was nothing in his background that would have rendered a denied response.  Is that what it says?

A   Yes.

206

Q   As you sit here today, does that refresh your recollection of what was said in that conversation?

A   Yes.

Q   Including that Agent Williamson used the words *in no way did we do anything wrong*?

A   That's how she expressed in no way that we did anything wrong.

Q   Those were the exact words that she spoke to you on the telephone?

A   That sounds like how she would have said it, in no way that we did anything wrong.

Q   Just to be clear, I think we're dancing around it.  Is that your memory that those are her exact words?

A   Yes.

Q   Okay.  Now, that second sentence, there was nothing in his background that would have rendered a denied response.  What does a denied response refer to?

A   Background check.

Q   So she's saying that there's nothing in Jerome Horton's background that would have rendered a denied response?

A   Exactly.

207

Q   So, in other words, Agent Williamson is saying we didn't do anything wrong, referring to Fleet Farm?  She's referring to the fact that there was no -- that the background check was a proceed, yes?

MR. DAVIS:  Objection. Mischaracterizes the testimony.  You can answer if you understand the question.

THE WITNESS:  I don't understand the question.

BY MR. MALONEY:

Q   Let me try again.  The second sentence says, there's nothing in his background that would have rendered a denied response, right?

A   Yes.

Q   And that denied response refers to the fact that he passed a background check, right?

A   Correct.

Q   So this is saying that Fleet Farm did nothing wrong by selling this individual the firearms because he passed a background check, right?

A   Yes.

Q   But, again, as we've discussed previously, straw purchasers are able to pass a

208

Michelle Granato

**CONFIDENTIAL**

background check, right?

A    Yes.

Q    And that Fleet Farm trains its employees to watch for signs of straw purchasing and not simply rely on a proceed background check result before selling, right?

A    Yes.

Q    Okay.  You can put that aside.  Pull out No. 7 and 8 from that stack.  So if you look at No. 7, this is another e-mail in the e-mail thread we discussed a few times already.  It has the subject line, RE:  ATF active investigation 3100.  And the first e-mail is an e-mail from Derrick Hoernke to you; is that right?

A    Yes.

Q    Does this e-mail look familiar to you as you look at it?

A    It looks familiar.

Q    The e-mail from Derrick at the top of the first page says, I think we should have a few of these by location.  What is he referring to with *a few of these*?

A    I don't know what he's referring to.

Q    And then he says, we should make sure we

*209*

have copies of all the paperwork here at the SSC as well.  What is that referring to?

A    The 4473 forms we should have copies back at the corporate office.

Q    And then if you look at this e-mail, it says there's an attachment, dispose dates.xlsx. If you pull out Exhibit 8, do you recall seeing this document before?

A    I don't recall.

Q    In the top left corner, it says Jerome Fletcher, Jr., sales; do you see that?

A    Yes.

Q    Is that a reference to Jerome Horton?

     MR. DAVIS:  Objection.  Lack of foundation.

     THE WITNESS:  It could be.  I don't think I've ever seen this.

BY MR. MALONEY:

Q    If you go back to No. 7, this was sent to you by Derrick Hoernke on October 21, 2021, right?

A    Uh-huh.

Q    So going back to No. 8, do you see the purchases that are in the red square on No. 8?

*210*

A    Okay.  Yes.

Q    Looking at the purchases that are in the red square, do you have any idea why those would have been denoted with the red square?

A    No, I don't.

Q    Oh, and just so we're clear on the abbreviations, we've already talked about OAK is the Oakdale store, right?

A    Yes.

Q    BPR is Brooklyn Park?

A    Yes.

Q    BLN is Blaine?

A    Yes.

Q    And LKE would be Lakeville?

A    Yes.

Q    Okay.  From looking at the spreadsheet in the e-mail chain, who at Fleet Farm do you think would know why there's this highlighting on Exhibit 8?

A    I don't know.  I don't know who generated it.

Q    The e-mail is from Derrick Hoernke, so possibly Derrick Hoernke, right?

     MR. DAVIS:  Objection.  Calls for speculation.

*211*

     MR. MALONEY:  If you know.

     THE WITNESS:  I don't know.

     MR. MALONEY:  You can put those aside.

     (Exhibit 76 marked.)

BY MR. MALONEY:

Q    Handing you what's been marked Exhibit 76, this is an e-mail from you to -- I'm going to butcher this pronunciation -- Jana Cartier --

A    Yes.

Q    Cartier?

A    Cartier.

Q    -- Cartier on November 1, 2021; is that right?

A    Yes.

Q    Who is Jana Cartier?

A    She was an employee at Fleet Farm who had taken over the firearm compliance, so I would now report to her and Mike.

Q    When did she start at Fleet Farm?

A    I don't know.

Q    Was she a new hire from the outside, or did she get promoted from somewhere?

A    She was a new hire.

*212*

Michelle Granato

**CONFIDENTIAL**

Q   Does she still work there?
A   No.
Q   When did she leave?
A   I can't tell you.  I don't know.  I don't know exact.  HR would have that information.
Q   Did she hold the same position that Kevin McKown holds now?
A   I don't think so.
Q   So it was different than Kevin McKown's position, different than Mike Radl's position, and different than Derrick Hoernke's position, too?
        MR. DAVIS:  Objection.  Lack of foundation.
        MR. MALONEY:  If you know.
        THE WITNESS:  I don't know.
BY MR. MALONEY:
Q   Sorry if I missed it.  But she -- when Jana came in, she was your boss?
A   Mike was my boss, but we reported to her.
Q   Both you and Mike did?
A   Right.
Q   Okay.  Do you recall approximately how long you were reporting to her?
A   No.

213

Q   Okay.  Let's go to the e-mail.  You told Jana that the link will take you to the ATF weekly article concerning our Minnesota straw purchaser.  I thought you might be interested.  This is in reference to Jerome Horton, right?
A   Yes.
Q   Why did you think that Jana would be interested in an article about this straw buyer and the shooting tied to him?
A   Because she was overseeing us.  She was overseeing Mike and myself.
Q   And did you think or know prior to that Jana would have been unaware of this prior to you sending this e-mail?
A   I don't know.
Q   Okay.  Put that aside.  One last Tuesday Tidbit.
A   Oh, boy.  I have to get my magnifying glass.
        MR. DAVIS:  Get your glasses.
        (Exhibit 77 marked.)
BY MR. MALONEY:
Q   I've handed the witness what has been marked as Exhibit 77.  And, Ms. Granato, do you recognize this as a Tuesday Tidbit from

214

Q   December 28, 2021?
A   Yes.
Q   And just under where it says Tuesday's Tidbit it says, 2021, the good, the bad, and the ugly, right?
A   Yes.
Q   And under the ugly, the second bullet point says, we saw an increase in the number of traced firearms and straw purchases in 2021; is that right?
A   Yes.
Q   And is that your recollection sitting here today is that the number of traced firearms and straw purchases did go up in 2021?
A   Yes.
Q   And was that just because of Jerome Horton?
A   No.
Q   What else contributed to the number of traced firearms and straw purchases in 2021?
        MR. DAVIS:  Objection.  Lack of foundation.  You can answer, if you know.
        THE WITNESS:  I don't know exactly what caused that.
BY MR. MALONEY:
Q   Were there other straw purchasers that Fleet

215

Q   Farm was aware of in 2021?
A   I don't recall.
Q   To probe a little bit further, reading the sentence, we saw an increase in the number of traced firearms and straw purchases in 2021.  Why would you say that Jerome Horton would not contribute to those numbers for 2021?
        MR. DAVIS:  Objection.  Mischaracterizes the testimony.
        THE WITNESS:  Because I don't feel like that was the only reason.
BY MR. MALONEY:
Q   But you don't recall the other reason sitting here today?
A   No, I don't.
Q   Under the good in the second bullet point, it says, multiple handgun sales was an area we really needed to improve; is that right?
A   It was an area we really needed to improve.
Q   And then it goes on to say that with the IT and functionality upgrades that got put in place that that did improve that system, right?
A   Yes.

216

Michelle Granato

**CONFIDENTIAL**

(Exhibit 79 marked.)

BY MR. MALONEY:

Q    I think you can put that aside.  I hand you what's been marked as Exhibit 79.  It looks like this is a chat between Brad Hansen and yourself, yes?

A    Yes.

Q    Who is Brad Hansen?

A    Brad Hansen was regional LP, loss prevention.

Q    And you say was.  Is he no longer with Fleet Farm?

A    Correct.

Q    And which region did he oversee?

A    I think -- I don't know exactly what regions.

Q    Brad's first message says, I haven't been to the Oakdale office this week.  But do you know if you or Mike have shipped out the Jerome Horton information to the Oakdale office?
     So to go back to my question on the region, his region must have included at least Oakdale, right?

A    Right.

217

Q    Do you know what information he's referring to you or Mike shipping out about Jerome Horton?

A    It would have been whatever.  I just gave him what I had.  I don't know exactly what they're talking about there.  I don't recall.

Q    You don't recall what exactly the Jerome Horton info was?

A    No.

Q    And then the last sentence of that message says, I've contacted the stores to gather the video as well.  Do you see that there?

A    Yes.

Q    And is he referring to gathering the Jerome Horton surveillance videos from the stores?

A    I believe so.

Q    Do you know if Mr. Hansen actually did that?

A    I don't know.

Q    Did you play any role in helping to gather the surveillance videos for Jerome Horton?

A    No.

Q    Was that typically a loss prevention issue about the store videos?

A    Yes.

218

Q    You can put that aside.  In addition to all the materials and things we've already talked about, can you think of anything else that Fleet Farm has done after it learned about the -- its straw purchase sales to Jerome Horton and Sarah Elwood?

     MR. DAVIS:  Objection.  Vague.

     THE WITNESS:  Done as far as what?

BY MR. MALONEY:

Q    I guess we can start with, you know, any other changes to training materials that Fleet Farm has made after these -- those straw purchase sales?

     MR. DAVIS:  Object to the form of the question.

     THE WITNESS:  Our training is always evolving.  As things do in the compliance world, they evolve.

BY MR. MALONEY:

Q    So, to your knowledge, Fleet Farm has not made any specific changes to its training in response to those straw purchase sales?

     MR. DAVIS:  Object to the form of the question.  Mischaracterizes the testimony.

     THE WITNESS:  I am not sure what

219

you're asking.

BY MR. MALONEY:

Q    I'm asking if the sales to Jerome Horton and Sarah Elwood prompted any specific changes to Fleet Farm's training materials?

A    I am not sure directly, but it did change.  We've done more webinars, cover straw purchases.  We've added new parts to our alert system.

Q    And those changes are in part at least driven by Fleet Farm learning that it made sales to these two straw purchasers?

A    No.

Q    They're not?  So it's just a coincidence in timing that those changes have happened after Fleet Farm learned about these two straw purchases -- straw purchasers, rather?

     MR. DAVIS:  I'm going to object to the question on vagueness grounds as to the use of the word *changes*.

     THE WITNESS:  Our compliance department is always evolving and changing as the need arises.  So we're always looking at ways to improve our training, our systems to prevent any kind of bad purchases.

220