UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

State of Minnesota,                )   File No. 22-cv-2694
by its Attorney General, Keith     )           (JRT/JFD)
Ellison,                           )
                                   )
        Plaintiff,                 )   Saint Paul, Minnesota
                                   )   January 22, 2024
vs.                                )   1:00 p.m.
                                   )
Fleet Farm, LLC, et al,            )
                                   )
        Defendants.                )

------------------------------------------------------------

BEFORE THE HONORABLE JOHN F. DOCHERTY
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTIONS HEARING)**

APPEARANCES
 For the Plaintiff:         MINNESOTA ATTORNEY GENERAL'S
                            OFFICE
                            ERIC JOHN MALONEY, ASSISTANT AG
                            KATHERINE MOERKE, ASSISTANT AG
                            Bremer Tower, Suite 1100
                            445 Minnesota Street
                            St. Paul, Minnesota 55101-2128

 For the Defendant:         STINSON LLP
                            ANDREW LEIENDECKER, ESQ.
                            ANDREW W. DAVIS, ESQ.
                            50 South Sixth Street
                            Suite 2600
                            Minneapolis, Minnesota 55402

 Court Reporter:            CARLA R. BEBAULT, RMR, CRR, FCRR
                            316 North Robert Street
                            Suite 146 U.S. Courthouse
                            Saint Paul, Minnesota 55101

          Proceedings recorded by mechanical
stenography; transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  All right.  We're here this afternoon for a hearing on a motion to amend the complaint, State of Minnesota, by Keith Ellison, versus Fleet Farm and others.  Let's begin with appearances beginning with counsel for the state.

MR. MALONEY:  Good afternoon, Your Honor.  This is Assistant Attorney General Eric Maloney here on behalf of the State.  With me I have Assistant Attorney General Katherine Moerke.  Also in the audience we have Professor Megan Walsh, and students Arielle Hugel and Nicholas Taylor from the University of Minnesota Law School Gun Violence Prevention Clinic.

THE COURT:  Okay.  Welcome to all of you.

And for Fleet Farm.

MR. DAVIS:  Good afternoon, Your Honor.  Andrew Davis on behalf of Defendant Fleet Farm, and with me at counsel table Andrew Leiendecker, my colleague at Stinson.  And Mr. Leiendecker will be presenting argument on our opposition today.

THE COURT:  Okay.  Sounds good.

All right.  Mr. Maloney, do you want to, as the moving party, start us off?  Please come to the podium and I

would ask all counsel please speak into the microphones please. It's necessary for the recording. Thank you.

MR. MALONEY: Thank you, Your Honor. And good afternoon. Before I begin, I actually wanted to provide a handout, a demonstrative to the Court, if that would be acceptable?

THE COURT: All right. Have Fleet Farm's lawyers seen it?

MR. MALONEY: They have. Any objection?

THE COURT: Any objection?

MR. LEIENDECKER: No objection.

THE COURT: Okay. My understanding, Mr. Maloney, this isn't an exhibit that's going to be made part of the record. It's for us to follow along with. Is that accurate?

MR. MALONEY: That is accurate. It's just a demonstrative to help aid the argument.

THE COURT: All right. Thank you.

MR. MALONEY: Check one, two. Okay. I can do aisle two.

THE COURT: Those things are on flexible cranes. You can move them up and down. There's buttons on the podium to move it up and down.

MR. MALONEY: Okay. Please let me know if you have any issues hearing me.

THE COURT:  That's much better.

MR. MALONEY:  Okay.  Good afternoon.  May it please the Court, counsel.  The Court should grant the State's motion to amend today for four different reasons.

The first is the liberal amendment standard under Rule 15, leave freely given.  We have briefed that but it is a liberal amendment standard that governs in favor of allowing parties to freely amend pleadings within the boundaries of the rule.

THE COURT:  Right, and the boundaries of the rule include futility.

MR. MALONEY:  They do.

THE COURT:  Okay, which is what we're going to be talking about.

MR. MALONEY:  That's exactly right.  That's the only issue that's before the Court today.  You know, from defendant's response brief to the State's brief, that's the only issue that's at play today.

Now, why is the amendment not --

THE COURT:  Isn't there also an issue about the proper use of the public nuisance doctrine?

MR. MALONEY:  I think that's a different flavor of futility, so I guess there's two sub-issues within the futility issue but, yes, that is right.

THE COURT:  All right.

MR. MALONEY:  So the State's amendment to add the Minnesota Gun Control Act cause of action is not futile, and it's not futile for a few different reasons.

The first is the *Findling v. Group Health Plan, Inc.* case.  *Findling* held that Minnesota Statute section 8.31 applies to laws prohibiting unlawful conduct in business, commerce or trade.  This is on the handout that I sent around to everyone.  That's the kind of keystone of what *Findling* is looking at to figure out what laws fall under 8.31 and which laws don't.  The Minnesota Gun Control Act falls under this framework because it meets 8.31's requirements.  It prohibits unlawful conduct.  It regulates business, commerce or trade.

Furthermore, even under defendant's proposed interpretation --

THE COURT:  Well, just a minute.  I have a question about how the Minnesota Gun Control Act is a business law.

MR. MALONEY:  Sure.

THE COURT:  That laws covers all transfers of firearms by federally licensed firearms dealers.

MR. MALONEY:  Correct.

THE COURT:  So if I sell you a gun and I'm a federally licensed dealer and I don't check your background, I have violated the law.  But if I'm not in the business of

selling guns, how is this a business law?

MR. MALONEY:  So here Fleet Farm is in the business of selling guns.

THE COURT:  Well, I understand that.

MR. MALONEY:  Yeah.

THE COURT:  I understand that.  But if a law which extends to non-business contexts is used against Fleet Farm, then they are being subject to a law that does not regulate business and therefore the toolbox of 8.31, the civil investigative demands, subpoenas, all that stuff, isn't available.

MR. MALONEY:  So my understanding is that, you know, for private transactions that occur in Minnesota, you know, this law doesn't apply to non-federally licensed firearms dealers, right?

THE COURT:  Correct.

MR. MALONEY:  So I don't have the data on, you know, like what percentage of, you know, federally licensed firearms dealers don't operate in the business of selling guns, but I would think that that's a pretty coexistent pool of people.  If they secured a license --

THE COURT:  Well, does this depend upon the statistics, though?  Or do we start -- why would we turn to statistics if we can answer the question by looking at the plain text of the statute?  And the plain text of the

statute applies to non-commercial transactions.

MR. MALONEY:  But it applies to commercial transactions as well, and that's what's at issue in this case.

THE COURT:  But my question is if it sweeps in non-commercial transactions, then can you still fairly characterize it as a law that regulates business, commerce or trade?

And where I'm going with this is what is -- what is the intent here?  I mean, is this a business regulatory law or is this a firearms control law?  And looking at the law, it seems to me to be more of a firearms control law for the reasons that you and I have been talking about for the last few minutes.

MR. MALONEY:  I would argue that why can't it be both?  I mean, I think it is regulating the transfer of firearms, right?  The vast majority of this section -- I have it in front of me right now -- is about permitting requirements, what information has to be provided in connection with a transfer; it has provisions for, you know, when the police could disapprove a transfer, right?  And then a hearing could be held to figure out to appeal on that basis.

So yes.  I mean, it is -- it is an administrative statute that is governing the transfer of firearms.  But

here, I mean, when there are -- firearms are being bought and sold, that's also business, right?

So I think our contention is that yes, this is firearms control.  You know, yes, this is setting up what a federally licensed firearms dealer can and can't do.  But also it's regulating business.  It's the buying and selling of guns as business, commerce or trade.

THE COURT:  I don't have anything more to say about that.  Let's move on.

MR. MALONEY:  Understood.

Next, even under Fleet Farm's proposed interpretation of section 8.31, the Gun Control Act is a consumer protection statute.  So this is a thread that runs throughout defendant's briefing is, you know, characterizing section 8.31 as requiring this consumer protection -- I would call it a flavor, but a consumer protection bend to the laws, particularly under 8.31.  That's not in the statutory text.  That's not in *Findling*.  But even so, the Minnesota Gun Control Act, it protects consumers by, as we just talked about, by regulating firearm transfers, by setting restrictions and boundaries on which guns can be sold to whom.  That keeps people safe.  That's public safety.  That's public health.  That protects consumers.

THE COURT:  Well, the homicide statute also keeps the public safe, but is that really a consumer protection

law?

MR. MALONEY:  I would contend that it's not.

THE COURT:  Well, I think that's an easy answer, yes.

MR. MALONEY:  Yes.  And I think this statute is substantively different than the homicide statute.  It's different than if we talk about the *Milavetz* case later on.  It's different than the coercion statute that was at issue in *Milavetz*.

THE COURT:  Well, I mean, I agree with you.  But what you said I thought was to equate public safety with consumer protection.

MR. MALONEY:  Correct.

THE COURT:  And the law against first degree murder is a public safety measure but not a consumer protection matter, and I think we've agreed on that.  So if that equivalence does not hold, at least in that case, where does it hold?  What is -- how does consumer protection map onto public safety?  Is it perfect?  Is it imperfect?  And if it's imperfect, in what ways?

MR. MALONEY:  I guess let's start from like the proposition of talking about what are we talking about when we talk about consumer protection, right?  I guess that's kind of the hardest --

THE COURT:  I think that would be a good idea.

MR. MALONEY: So section 8.31 talks about business, commerce or trade.

THE COURT: Right.

MR. MALONEY: I mean, that's in the handout that we have. That's in the language that we have. That's all that it has.

In the *Findling* case, the *Findling* defendants, the kind of hospitals and health plans that were involved, they basically made the same argument that Fleet Farm makes today about consumer protection. They called it fraud. They call it fraud, they call it deception, they call it, you know, marketing conduct. They basically argued look at the statutes that are listed in section 8.31. Look at all the old case law that talks about section 8.31. The only laws that come in under section 8.31, they said, were consumer protection laws, right? Were fraud laws.

And the Minnesota Supreme Court in *Findling*, Justice Thissen said that's not the case. He said I'm looking at the plain language of the statute. I'm looking at the list of statutes that are in there and they're not all, you know, centered on fraud, right? They're not all just, you know, straight fraudulent marketing protection statutes. They're -- you know, there's one that talks about the kind of details of how telephone companies can advertise, or about certain currency exchanges and things

like that.

So what the *Findling* court said was, Look, our keystone is going to be the plain language of section 8.31. We're not going to graft on a -- you know, this law has to have the flavor of fraud requirement on top of the statute.

And I think that's what defendants are arguing is just a -- it's the same arguments I think that defendants in *Findling* made, just kind of restated over again.

THE COURT:  They've got that little bit better argument, though, don't they, because in *Findling* it was a matter of consumer-patients and their access to medical records.  Here, as I say, this law strikes me as a crime control law.

MR. MALONEY:  I would argue that the statute 6.24.7132, it's not -- there are criminal penalties attached to this, right, to the subdivision that we're talking about, but through and through it's not really a criminal statute. It's not the criminal code.  And the by and large of the statute is administrative in kind of regulating how firearms are bought and sold in the state.

THE COURT:  Are you in a position to give me a clear sort of bright line generally applicable rule that you're arguing for here today?

MR. MALONEY:  I can.  So if you refer to the handout.

THE COURT:  Um-hum.

MR. MALONEY:  This is what we are proposing is the bright line clear rule from the *Findling* case.  And this is the rule that says -- and I've broken this down into two different elements, right?  It's at the bottom half of the handout.  It's where the two kind of empty spaces are.  Two different elements.

One, does the law regulate unfair, discriminatory and other unlawful practices?  We contend that the Minnesota Gun Control Act does do that.

Two, does the law here, the Minnesota Gun Control Act, regulate business, commerce or trade?  It's as simple as that.  That's the test that *Findling* applied.  That was the Supreme Court's analysis in going through the Minnesota Health Records Act was to look at these two things and say, Yes, the Health Records Act, it is regulating both an unfair and an unlawful practice when it comes to health records and disclosure requirements and it's regulating business, commerce or trade because that is the relationship between, you know, patients and doctors and health companies fits within that definition.

THE COURT:  So, correct me if I'm wrong, but I'm looking at this as 8.31 gives the Attorney General's office a set of tools.  It's a toolbox.

MR. MALONEY:  It is.

THE COURT:  And it's got things like civil investigative demands and depositions upon -- I guess you can use a CID to compel a deposition.

MR. MALONEY:  Right.

THE COURT:  And that toolbox is available for some laws but not other laws.  Now, your position is it's available for any law that regulates unfair discriminatory -- or I think the one you're relying on is other unlawful practices.

MR. MALONEY:  Correct.

THE COURT:  Because I don't think you're saying this is unfair.  Gun sales are discriminatory.  Gun sales is just other unlawful.

MR. MALONEY:  Correct.

THE COURT:  You're selling to people that are barred under federal law.

But isn't it also true that 8.31 is available when the law explicitly provides for a private cause of action?  And so, for example, the state antitrust law, Chapter 325.

MR. MALONEY:  Yes.

THE COURT:  The Attorney General can enforce that with CIDs, followed up by a civil action or an injunctive action.  The Attorney General can also just charge people criminally with fixing prices.

The gun -- the Gun Control Act doesn't have a

civil remedy in it.

MR. MALONEY:  Correct.

THE COURT:  Okay.  So what's your answer to that?

MR. MALONEY:  That there are, you know, plenty of laws that are enforced.  I mean, daily our office has sued under them that don't have -- you know, that these other laws also do not have a civil right of action embedded within them to then come under section 8.31.

THE COURT:  Are you aware of any criminal statute that you enforce -- that your office enforces civilly even though it does not have a civil cause of action in it?

MR. MALONEY:  Yes.  It's cited in our brief and it's actually at issue in this case.  It's our public nuisance claim.

THE COURT:  All right.

MR. MALONEY:  That's in Chapter 6.09.  We enforced that in the *Juul* decision.  It's cited in our brief and it's -- it was, you know, we've pled it in this case and it was litigated and the Court upheld our public nuisance claim on a motion to dismiss in this litigation.

THE COURT:  All right.

MR. MALONEY:  And just to kind of clean up the section 8.31, you know, that's -- I haven't seen a case, and I don't believe that defendants pointed to one, which says for the purposes of figuring out which laws come under 8.31

and can be investigated and sued out by the AG or sued out by private plaintiffs, we're going to look at whether the underlying substantive statute has a cause of action attached to it.  I haven't seen a case that does that.

So I think that's how 8.31 works.  The fact of whether the underlying statute has like a direct cause of action embedded within it really doesn't matter for purposes of figuring out, you know, does it fall under 8.31 and then how do we enforce it under section 8.31.

THE COURT:  Let's talk about the *Milavetz* case because I think that goes to what we were just talking about.

Based on what I have been asking you, what more do you want to say about *Milavetz* that's not in your moving papers?

MR. MALONEY:  I have a few things to say, and actually I don't think our papers even mention *Milavetz*.

THE COURT:  They probably didn't.  I think that came from the other side.

MR. MALONEY:  Yeah, I guess I'll have to fill in some of the blanks here.  There's a few points to make, right?  I mean, the first are the obvious points.  This is a non-precedential case, unpublished.  It's 25 years old from the Court of Appeals.

You know, I won't go too deep on this point but,

you know, part of the importance of *Findling* -- you know, and this is part of what motivated my office to actually decide to amend here -- is that a lot of the pre-*Findling* case law on section 8.31, specifically on, like, which laws come in and how does that interact with the private AG part of section 8.31, that case law is a little -- it's muddled, I would say.  It's kind of scattered.  Different courts have done different analyses.  You know, this is an unpublished Court of Appeals panel that does an analysis that, you know, frankly, I think in our office's opinion, that analysis is just wrong, right?

For the reasons that we just laid out about how section 8.31 doesn't look at the underlying substantive statute and whether it has a direct cause of action in it, *Milavetz* says that that's what -- how section 8.31 works. That's not right.  *Findling* doesn't say that.  I haven't seen another case that does that same analysis.  8.31 doesn't say that we -- we do it that way.

So I think, you know, *Milavetz* is one of a few different cases that predate *Findling* that, you know, we would contend are essentially overruled by *Findling* and are going to render, you know, irrelevant and that *Findling* -- *Findling* is the North Star here when it comes to figuring out what section 8.31 -- you know, how it operates when you're figuring out which statutes come under it.  And I

think that *Milavetz*, to the extent that it's not on all fours with *Findling*, you know, has to yield to the Minnesota Supreme Court on this point.

And *Milavetz*, even like there's -- its -- its analysis of this issue is actually -- it's pretty brief. It's like two or three paragraphs. The *Milavetz* court at one point even says that, you know, section 8.31 -- I believe the quote is "references a nonexclusive list of laws, none of which is criminal in nature."

But as we showed in our brief, we didn't talk about *Milavetz*. We did talk about the statutes that are under 8.31 that are named in section 8.31. Several of those statutes have had criminal penalties. So I think that's just an example of the *Milavetz* court, you know, they didn't give this issue I think as much attention and thought as it required and I think didn't dig into, you know, what's actually needed to -- for a law to come in under section 8.31 or not.

Also, as I said earlier in the argument, the statute at issue in *Milavetz* was Minnesota's criminal coercion statute. Our argument would be that that statute is not on par with the Minnesota Gun Control Act.

THE COURT:  In what ways?

MR. MALONEY:  That they are substantively different statutes in that the Minnesota Gun Control Act is

regulating the relationship between firearm sellers, firearm buyers, and the general public, right?  The coercion statute is -- it's a criminal provision that is prohibiting or protecting people from person-to-person threats of violence or harm.  That does not tie-in to business commerce or trade, at least on its face.

THE COURT:  Do you want to save any of your time for rebuttal?

MR. MALONEY:  I think that before -- I guess I have kind of one last point to make on the Gun Control Act and then I want to talk briefly on the public nuisance claim and the remedies that we're seeking on that.

THE COURT:  All right.

MR. MALONEY:  One last point on our Gun Control Act claim, and I think Your Honor has somewhat hinted at this, but to the extent that there are concerns about a slippery slope here, that this is a floodgate opening, I think we would vehemently disagree with that.

I mean, at the first instance, we're not -- we're not injecting, you know, a new statute into the case really beyond the fact that we're kind of suing it under a different vehicle, but we already have the Gun Control Act in this case, right?  It was in our first complaint.  We, you know, have litigated around the Gun Control Act in terms of our damages *per se* claim.

THE COURT:  If I'm mischaracterizing it tell me, but I think the Gun Control Act is in the case now as a standard or as a criteria.  You're seeking to transition it to a direct cause of action.

MR. MALONEY:  Correct.

THE COURT:  Okay.

MR. MALONEY:  Correct.

THE COURT:  I just wanted to make sure.

MR. MALONEY:  No, and I think the only point I'm trying to make -- I'm not trying to hide the ball on kind of how it's in the case now.  I think the point to make is that, you know, we, already in the realm of, you know, this civil lawsuit that's already survived a motion to dismiss, are litigating a case that involves a criminal -- a criminal statute that is serving as a liability standard.  So, you know, this is not -- it's not like we're really injecting something into this case that was not already there.

Second, as I mentioned previously with the *Juul* decision from Minnesota state court, I mean, the worst has already comes to pass on this, right?  I mean, the *Juul* case from a few years ago, courts have already said that the AGO or that -- yeah, the AGO can enforce statutes that have criminal penalties, right?  We cited in our brief, I mean, several of the statutes that --

THE COURT:  Well, that's always been true.

MR. MALONEY:  Correct.

THE COURT:  Do you mean the AG can civilly enforce statutes that have criminal penalties?

MR. MALONEY:  Correct.  I'm saying civilly enforce statutes with criminal penalties via section 8.31.

THE COURT:  Okay.  Because what you said was the AG can enforce criminal statutes and, I mean, of course.

MR. MALONEY:  Yes.

THE COURT:  Okay.

MR. MALONEY:  And finally, you know, section 8.31, as we kind of walk through with the handout that we have, I mean, the *Findling* rule of looking at the plain language of section 8.31, seeing if it's tied to unfair discriminatory and other unlawful practices, and is it in business, commerce or trade, you know, that is a, you know, reasonable boundary and that will prohibit or prevent the AG from, you know, having this ability to bring any claim under 8.31 based on any and all criminal statutes.  I think that provides a kind of rational boundary that will set the line, right, of what's in.  Even if it's in the criminal realm, if it ties to those two criteria it will come in under an 8.31 claim.  If it doesn't, it won't.

One last point to make on an issue that we haven't talked about yet, which is part of our motion to amend, involves adding two claims for relief, one for civil

penalties, and the other for costs and fees under section 8.31.

So when it comes to the -- and it's where we're asking for that relief in relation to violations of the Gun Control Act and the public nuisance statute. So when it comes to the Gun Control Act, I think we can concede that, you know, whether we can assert a remedy for it will depend on whether it kind of survives as a cause of action in the case. It will be tied to that.

Now, public nuisance we've already pled in the case. The Court has already upheld the AG's public nuisance claim. We're now just seeking a remedy that is statutorily authorized under section 8.31 for violations of laws that fall under that statute which we contend includes public nuisance.

Like our Gun Control Act claim, the public nuisance law, 609.974, prohibits an unlawful practice endangering public health and safety, and it regulates business, commerce and trade. The buying and selling of guns, that's how the claim is set up. And that's what the *Juul* court found in Hennepin County District Court when, you know, it faced similar arguments about the viability of public nuisance under section 8.31.

And the court, even though this is pre-*Findling*, the District Court essentially did the *Findling* analysis of

looking at the plain language and said the State's public nuisance claim in the *Juul* case comes in.

And to the extent that defendants are trying to distinguish *Juul* or kind of point to the fact that it involved, you know, marketing and deception versus what's at issue in this case, there the claims are, if you kind of take a step back, really substantively remarkably similar, right?

And here the State is pleading that Fleet Farm created a public nuisance vicariously selling firearms to the wrong people.  In our *Juul* litigation the State's public nuisance claim was focused on how Juul sold its e-cigarette products to the wrong people, to minors.  So I think they actually are fairly similar.

With that I'll reserve the rest of my time for rebuttal unless the Court has any further questions.

THE COURT:  No.  Thank you.

Mr. Leiendecker, you're up.

MR. LEIENDECKER:  Thank you, Your Honor.

THE COURT:  And again, just adjust the podium and the mics so that you're talking into the mics, please.

MR. LEIENDECKER:  Thank you.  Good afternoon, Your Honor.  How's this?  Closer?  It's one of the pitfalls of being tall.

Good afternoon, Your Honor.  Andrew Leiendecker on

behalf of Fleet Farm.

Plaintiff's motion to amend should be denied as futile because neither the statutory text nor Minnesota case law permit the Attorney General to invoke Minnesota Statute section 8.31 in the two ways that plaintiff proposes here.

First, plaintiff's proposed claim under a provision of the Minnesota Gun Control Act is futile because that provision is unrelated to consumer protection and is purely criminal in nature placing it outside the scope of 8.31.

And second --

THE COURT:  Well, where is the line there?  If someone was selling adulterated products that carried with it the potential for sickness if consumed --

MR. LEIENDECKER:  Um-hum.

THE COURT:  -- would that be a public safety law that's therefore outside the scope of consumer protection?

MR. LEIENDECKER:  I think that's a closer call, Your Honor.  And I think it really speaks to what I think is the central question here which is how do we define what a consumer protection statute is.

THE COURT:  And that's what I'm trying to get at.

MR. LEIENDECKER:  Um-hum.

THE COURT:  Here we've got a statute that is designed to keep guns out of the hands of people who

shouldn't have guns because they don't use them for lawful purposes.  They use them to shoot people.  This seems to me to be a protection statute.  I don't know if it's consumer protection but, as you saw in my discussion with Mr. Maloney, trying to find the line between public safety and public protection is a bit dodgey.

MR. LEIENDECKER:  It certainly can be, Your Honor, and I think the key question -- and I can explain why this is the right question based on Minnesota case law -- but when it's when you look at the particular statute, whose interest is being protected.  If it is the consumer's interest in a transaction that's being protected, that's a consumer protection statute.  If it's somebody else's interest, it's not.  And here this provision of the Gun Control Act is not protecting the consumer attempting to purchase the firearm.  It's seeking to address a general public safety concern.

And so in the hypothetical you gave, Your Honor, where the product being sold is causing a -- potentially causing a harm to the consumer involved in that transaction, I think we're probably a lot closer to it being a consumer protection statute.  But here we're addressing -- the statute seeks to address a general public safety concern, and that's exactly what Judge Tunheim said in his motion to dismiss order, that this law, as well as the Federal Gun

Control Act, was, "designed to protect Minnesotans from gun violence."  It's not designed to protect the consumer in the transaction.

THE COURT:  All right.  Let's concede your point for the purposes of the next few minutes.  Where in 8.31 does it say consumer?  Because I looked for the word "consumer" in the statute, I looked for the word "consumer" in the *Findling* case, and I found it, but only in things like direct quotations or the title of statutes.  But from your brief it looked like *Findling* limited this to consumer protection and it just didn't.

MR. LEIENDECKER:  Yes.  So I think there are two sources we could look to.  And granted, the word "consumer" does not appear in section 8.31, but the two sources we can look to, I think, are the general statutory context of 8.31 and what types of laws are offered as illustrations of the scope of the statute.

THE COURT:  Well, I can see your second one because that's the statutory text.  But the first one, the statutory context, at least my understanding of statutory interpretation is I go to things like that only if the text of the statute is not clear.  I don't know why 8.31 is unclear in not having a limitation to consumer protection.

MR. LEIENDECKER:  Yeah.  And I think, Your Honor, I think the lack of clarity in the statute I think is

illustrated by --

THE COURT:  Oh, no, no, no, I think the statute is clear.  There is no consumer protection limitation in the statute.

MR. LEIENDECKER:  I think, Your Honor, that's true.  There's no textual limitation saying this is about consumer protection.  But what the statute is clear about is every single one of the enumerated statutes that are offered as illustrations of its scope are statutes that directly address consumer protection.  These are statutes that are regulating trade practices detrimental to labor.  They are seeking to prevent unfair and deceptive advertising or unconscionable acts in marketing of merchandise.  Prohibiting currency exchanges from charging unreasonable fees to consumers.

And when we look at how Minnesota courts have described what section 8.31 encompasses, although the precise phrase "consumer protection" may not be present in many of those cases, the types of statutes that they describe in terms of what section 8.31 is seeking to cover are all addressing interests that can be captured under that umbrella of consumer protection.

THE COURT:  Okay.  So is it your point that the Gun Control Act is designed to, what, create a safer society and therefore is not a consumer protection law?

MR. LEIENDECKER:  It's that the Gun Control Act, Your Honor, and this provision in particular, is seeking to address a general public safety concern.  It is not seeking to protect the consumer who is attempting to purchase the firearm.

THE COURT:  Okay.  With that, let's turn to the same law that I used with Mr. Maloney, the state antitrust law.  Now, there are different ideas about what the purpose of the antitrust laws are, but among those that are bruited about are protecting competition, promoting consumer welfare, and living in a society where entrepreneurship is readily available.  All of those seem just as amorphous to me as your posited amorphous objective of improving public safety.

MR. LEIENDECKER:  I hear that.

THE COURT:  And yet it's right there in subdivision (1) of 8.31.

MR. LEIENDECKER:  Yeah.  And I think, Your Honor, the key difference between the antitrust statute and the Minnesota Gun Control Act is that there is that clear economic interest being protected in the antitrust statutes. The antitrust laws, both federally and at the state level, recognize that one of the main benefits of protecting competition is that it protects consumers.  It keeps prices competitive, it keeps prices down.  And from a policy

standpoint, both federally and at the state level, we've made the determination that these types of antitrust regulations are important to protect the financial and economic interests of consumers.

By contrast, there are no such economic interests being protected by this statute. It's a public safety state. I think Your Honor said rightly it's a crime control law. It's not a consumer protection law.

And that's confirmed not just by the text of the statute and those -- the ten enumerated laws that illustrate its scope and show that it necessarily should be limited to consumer protection. It's also illustrated by how Minnesota courts have consistently explained the purpose and scope of the law and applied it and decided which statutes fall within or fall without, outside of the scope of the statute.

The Minnesota Supreme Court has explained on numerous occasions that the purpose of this statute is to empower both private plaintiffs and the Attorney General to investigate violations of the law regarding unfair and unlawful business practices, to stop false or deceptive advertising, to stop businesses from, quote, ripping off large numbers of citizens, and to prevent fraudulent representations and deceptive practices with regard to consumer products. The *Milavetz* case --

THE COURT: Okay. Before you move to *Milavetz* --

MR. LEIENDECKER:  Um-hum.

THE COURT:  -- what 8.31 says is unfair, discriminatory and other unlawful practices in business.

MR. LEIENDECKER:  Um-hum.

THE COURT:  If I am a federally licensed firearms dealer and I am selling guns and I am selling them to people who would flunk a background test, why is that not "other unlawful practices in business" and therefore within the scope of 8.31?

MR. LEIENDECKER:  A couple reasons, Your Honor.

I think the first is, as Your Honor notes, it's not enough for something to be an unlawful practice.  It has to be an unlawful practice in business, commerce or trade.

THE COURT:  Right.  And I'm selling you a gun and you are giving me money.

MR. LEIENDECKER:  Right.  The key here I think is *Findling.*  And if we look at page 10 of that decision in footnote 9, the Court -- and I'm happy to talk about *Findling* in more detail in a moment, but what the Court did in *Findling* in the first instance was conclude that the disclosure provision of the Minnesota Health Records Act was an unfair practice.

The Court then in this footnote entertains the question of:  "If we had concluded it was not a law regulating unfair practices would it have been an other

unlawful practice?"  And what the Court said -- and I'm just going to read the quote directly because I think it's important here, is:  "Proper application of the Ejusdem Generis canon would suggest that the disclosure --

THE COURT:  Could you spell that for the court reporter, please?

MR. LEIENDECKER:  Yes.  E-j-u-s-d-e-m space Generis.

THE COURT:  Okay.  And this is also just a general request that you slow down a wee bit.  Thank you.

MR. LEIENDECKER:  Of course.  What the Court says in this footnote quote is:  "This disclosure provision would be an unlawful practice sufficiently like more traditional unfair or discriminatory practices to fall within the scope of section 8.31 subdivision 1, a significant characteristic that unites unfair practices and discriminatory practices, is that such practices allow some participants in the marketplace the ability to take advantage of others in the marketplace based on their position of power."

So when we're looking at this phrase unlawful -- "unfair discriminatory or other unlawful practices," we have to think about how those phrases work together.  And what *Findling* says in this footnote is that we're talking about practices that are regulating the balance of powers in the marketplace.

And so if we're looking at is the Gun Control Act in this provision regulating the balance of power in the marketplace between the seller and a prospective buyer, the answer is no.  Is it serving an important public safety purpose?  Of course.  But it's not a consumer protection purpose.

THE COURT:  See, I think the place where you and I are diverging is fairly close to the root.  I am looking at a statute that seems to me to be clear on its face.  It covers "other unlawful practices in business," which I take to be buying and selling.

And I -- you know, if I felt the need to go to secondary sources, I think that you would have a very convincing argument.  The problem is I'm not seeing the need to go to secondary sources because the statute is so plainly clear on its face.

MR. LEIENDECKER:  Your Honor, I hear you on that and respectfully I think if we're looking at "unfair discriminatory or other unlawful practices," I think a lot of what this dispute has been is that there is a real disagreement over what is encompassed by that.  I think the state is advancing an interpretation that to some degree would bifurcate that phrase in half.  And, you know, it has to be unfair, discriminatory or unlawful, plus trade, business or commerce.  We're saying you have to read that

phrase in its entirety. It's violations of the law respecting unfair, discriminatory or other unlawful practices in business, commerce or trade.

And the way that we understand the universe of laws captured by that phrase is in part by looking to the rest of the text of the statute. We're not just looking at those words in isolation, and the rest of the statute gives us a detailed list of ten laws that are offered as illustrations of the types of laws.

And if we're looking at those laws, the question should be, when we're looking at the full scope of the statute, are nonenumerated statutes of the same general kind or class as those specifically enumerated, or are they something else?

And if we look at the case law offered in the State's briefs, if we look at Minnesota case law more generally, there is not a single example with the possible -- I'll talk about the public nuisance statute in a moment. But setting that aside and the *Juul* decision aside, there is not a single example of a Minnesota court concluding that a criminal statute that is unrelated to consumer protection, lacking a private cause of action, is encompassed by section 8.31. That case does not exist.

The cases that do exist, all to the extent they are concluding that a nonenumerated statute falls within

8.31, it's a statute that relates directly to consumer protection.  Be it Minnesota Deceptive Trade Practices Act is probably the classic example of this type of statute --

THE COURT:  Yes.

MR. LEIENDECKER:  -- that courts have concluded. It's not listed, but it is encompassed by 8.31 in part because, among other things, it addresses concerns about passing off goods and services.  The other statutes offered in plaintiff's brief are statutes governing the relationship between a lender and a buyer.  That's Chapter 56 of Minnesota law.  Prohibiting persons from charging usurious rates in business; and the Unfair Claim Practices Act, which specifically regulates advertising in connection with insurance policies.

The commonality amongst all of these laws is that they have a clear consumer protection hook.  They are seeking to prevent businesses from taking advantage of consumers.  They are seeking to maintain a balance of power in that transaction between the consumer and the business.

Your Honor, I'd like to turn to talk about *Findling* specifically now.

THE COURT:  Sure.

MR. LEIENDECKER:  And I think there's just a disagreement in terms of the impact that *Findling* had on the landscape of the law in Minnesota.  And the bottom line is

that there's really nothing in *Findling* that actually alters any of these general principles we have just been discussing.  I think that *Findling* really has kind of three key takeaways that are notable here.

THE COURT:  Well, when you talk about the things that we have just been discussing --

MR. LEIENDECKER:  Um-hum.

THE COURT:  -- it also has bearing on your efforts to graft consumer protection as a limitation on 8.31 by not using the word "consumer" from start to finish of the opinion.

MR. LEIENDECKER:  Certainly, and I think that is one of the, I think, three takeaways that I think are important here about the language that *Findling* used in analyzing the Minnesota Health Records Act and why that language just adds further support to this notion that when you look at Minnesota case law going back 20, 30, 40 years, as well as the full text and context of section 8.31, confirm, whether we want to call it consumer protection or laws that are otherwise designed to protect consumers or regulate that relationship between a consumer and a business, that's the driving purpose and focus of this law and the scope of its enforcement powers.

But before getting into that, one thing I just want to note on top is that, the *Findling* decision is

actually limited in scope. It's addressing what the Court in its own words described as the very narrow issue of whether an individual can bring a private right of action under 8.31 to compel a health care provider to disclose medical records within 30 days.

And I think, as Your Honor noted, we have different plaintiffs there. The plaintiffs there were patients who were seeking access to their medical records because they alleged that they had suffered serious medical complications following procedures they had received from their providers and they needed those records to assess suspected malpractice and presumably to obtain further treatment of their conditions.

It's a narrow fact and statute-specific decision, not one that was purporting to advance a sweeping expansion or re-contextualization of 8.31 or otherwise overrule prior cases. There's nothing in the language of *Findling* supporting that being the purpose of that decision.

The second point, Your Honor, to the extent that *Findling* detailed the scope of 8.31, I think what it does is reiterate that what 8.31 does is empower the Attorney General to bring an action to stop conduct that harms consumers. They quote that language in the decision. It's from the *Minnesota School of Business* case. It's quoted in *Findling*. That's the purpose of this statute.

This includes circumstances such as where a business is acting inequitably and unfairly towards consumers or otherwise violating a legal obligation related to consumer protection.

Following *Findling*, there really should be little doubt about the scope of 8.31. It's protecting a consumer. It's making sure that relationship between the consumer and the business is treated fairly and kept on a level playing field.

And that's really the third point which is consistent with these general principles. If we look at what the Court did in *Findling*, it was a close examination of the text of the HRA and its purpose to conclude that that provision fell within 8.31. And that detailed examination just confirms the clear differences between the HRA and the Gun Control Act provision at issue here.

The driving force behind that decision in *Findling* was that health records are highly personal, they have economic value, and they are often the sole documentation that a patient receives of the care they have received from a provider. Meaning that in the interest of fairness to that consumer, the patient, having access to that -- those records in a timely manner is crucial for them having control over their medical care.

And so based on that, the Court explained that the

HRA fell within the scope of 8.31 because what it's aiming to go do in this disclosure provision is to regulate the relationship between the patients, the consumer, and the health care providers, the business, to, quote, level the playing field and to prevent the provider from, quote, abusing power over the patients and their information.

Now here there's no basis to conclude that subdivision (15) of the GCA is aiming to level the playing field between the firearm seller and the prospective buyer, or that it's otherwise seeking to prevent a firearm seller from abusing any power they may have over a buyer in that commercial transaction.

If Your Honor has no further questions on the GCA portion of this -- of this motion, I'd like to just briefly discuss plaintiff's invocation of 8.31 as a basis for its public nuisance claim.

THE COURT:  Sure.

MR. LEIENDECKER:  Here the outcome should be the same.  The proposed amendment is futile because 8.31 doesn't empower the Attorney General to civilly enforce the state's criminal public nuance statute if the conduct underlying that claim is unrelated to consumer protection.  And there's just one example that we've got in plaintiff's briefs and today of 8 -- supporting the idea that 8.31 could be a proper basis for a criminal public nuisance claim, and

that's the Minnesota State District Court's order in the *Juul* litigation.

Now, in addition to being non-binding, the more important point is that this case is just not on point. The *Juul* litigation was directly seeking to address alleged violations of Minnesota's consumer protection laws and interests.

We look back at that complaint. It's a consumer protection case from top to bottom. The claims in that case included alleged violations of Minnesota's consumer fraud statute, the deceptive trade practices statute, the unlawful trade practices statute, the false statement in advertising statute, stemming from the defendant's alleged marketing practices relating to the sale of e-cigarettes and allegations that the defendants had targeted advertisements towards minors and that the advertisements had misrepresented various components of the products.

It's a pure consumer protection case. The entire case concerned alleged harms flowing from this alleged marketing scheme. And the public nuisance claim in that case was an extension of those statutory consumer protection claims alleging that the defendants created a public nuance through what the complaint described as "a deliberately deceptive marketing strategy to deceive consumers about the nicotine in its products and to target the youth."

So the alleged nuisance-causing activity in that case was the very same marketing campaign that the state contended also violated the consumer protection laws. And here, by contrast, the public nuisance claim that plaintiff asserts has absolutely nothing to do with consumer protection. The claims here center around the contention that Fleet Farm was negligent in allowing two individuals to purchase certain firearms because those individuals were straw purchasers and because a subset of the firearms sold to them were later found at crime scenes or on persons who were ineligible to possess firearms.

So unlike *Juul*, the alleged harm here is not to Fleet Farm's consumers, but is instead that Fleet Farm's conduct allegedly contributed to gun trafficking and an increase in gun violence in Minnesota. And also unlike *Juul* plaintiff does not and cannot allege that Fleet Farm engaged in any improper marketing strategies, deceived any members of the public, or engaged in any other conduct that implicates consumer protection concerns.

And this doesn't mean, obviously, that the public nuisance claim fails. We recognize that Judge Tunheim has already held that plaintiff has stated a plausible claim. But what it does mean is that plaintiff may not rely on section 8.31 as one of the bases for the claim, and thus they should not be permitted to recover civil penalties or

costs in connection with the claim.

THE COURT:  Understood.

MR. LEIENDECKER:  So in conclusion, Your Honor, plaintiff has asked this Court to endorse an interpretation of Minnesota Statute section 8.31 that is unprecedented in scope and unsupported by the statute's plain language and Minnesota case law.

The amendments proposed by plaintiffs in this case fall far beyond the scope of section 8.31 which empowers the Attorney General and private citizens to enforce statutes relating to consumer protection.

Here, we have a proposed claim that is unrelated to consumer protection and purely criminal in nature and the claim premised on conduct that is similarly unrelated to consumer protection.  And so for all these reasons Fleet Farm would respectfully ask that this Court deny plaintiff's motion to amend.  Thank you.

THE COURT:  All right.  Thank you, Mr. Leiendecker.

MR. LEIENDECKER:  Thank you.

THE COURT:  Mr. Maloney, if you want, I can give you a few minutes to rebut.  Of course your points have to be limited to the points that Mr. Leiendecker has said.

MR. MALONEY:  Yes, Your Honor.  I'll keep it very, very brief.  Just a few things to say in response to

Mr. Leiendecker.

So I think that the first thing to talk about is line drawing. Consumer protection, right? What does it mean?

In our estimation, you know, there really isn't a line between public safety and consumer protection, right? Protecting public safety protects consumers. And I think the best way to kind of illustrate this or to think about this --

THE COURT: Well, it does only insofar as all members of the public are also consumers.

MR. MALONEY: Correct. But that is -- that is a big focus of our cases, right? Via, you know, a typical classic consumer fraud claim that we would bring via our *Juul* litigation that was just talked about. You know, part of what the Attorney General's office does when it brings, you know, cases under the Consumer Fraud Statutes like this or, you know, cases more like the Fleet Farm case that are more in like the public nuisance realm, but what we always seek in those cases is injunctive relief, right?

And it's not an injunction just to say you have to start harming the specific individuals that, you know, that we contend you harmed in the past with your conduct, right? A big focus we have as a public law office is we want an injunction in place to prevent you from doing this conduct

in the future to anyone in the general public, right?

So even in our consumer fraud cases, you know, yes, those cases involved individual consumers that are harmed and we're protecting them, but a class of people we're also protecting is the general public.

And frankly, for our cases that is some of the most, kind of, public interest value we get from our cases --

THE COURT:  I'm having a great deal of difficulty following you, I'm sorry.

If you bring a case that says that, oh, I don't know, this stock was misleadingly marketed, your claim is that that not only is meant to make whole the people who were defrauded, but also is a public safety measure and therefore 8.31 is a public safety wide statute?  Is that the argument?

MR. MALONEY:  It's not.  I think I'm just trying to illustrate that, and again, to go back to the basics here, as Your Honor was saying and in questioning Fleet Farm counsel, 8.31 doesn't have a consumer protection requirement.  There's not one grafted onto it.  *Findling* said that we're not going to graft one onto it.

I'm just making this point in terms of I believe that the, you know, conception of consumer protection that's being brought forward by defendants here also encompasses

the claims that are brought by -- by plaintiff in this case. That, you know, the public nuisance claim, the gun control claim, to the extent that it's seeking to, you know, prohibit Fleet Farm from selling guns to certain persons which, you know, it's not authorized to sell them to under the law, you know, that that is public protection, that's public safety and that's consumer protection. I don't see the distinction between those things.

THE COURT: I don't see the consumer protection. I mean, where is that? If you bring an injunctive action against an unsafe motor carrier, for example, and as a result of that a truck does not hit me and kill me, is that consumer protection because from time to time I buy groceries? Or, I mean, what? How is that -- where is the consumer protection in these examples you're giving? Unless you're saying that this is America and under our economic system all members of the public are also consumers.

MR. MALONEY: I think it's about protecting -- I mean, there are victims of gun violence, right? And I guess that's -- I guess we're having this academic argument about -- or this kind of discussion about consumer protection, right? I think from our office's standpoint that, yes, I mean, people who are potential or actual victims of gun violence, potentially guns that are, yeah, bought and sold in violation of this provision, are people

that, you know, we would seek to protect with this case.

THE COURT:  Mr. Maloney, I don't want to make this -- I'm reluctant to take this step, but I used to work at the Attorney General's office.  I was in the criminal division.  I did homicide cases.  I never ever, ever, ever thought that I was working on the case of a dead consumer. I don't know what else to say.  I know that's not a very legal argument.  But I'm really, really, really struggling to see where you're going with what you're saying and I'm not getting it.

MR. MALONEY:  Sure.  And I think, like I said, the only point that I'm making is that to the extent that the Gun Control Act and the public nuisance law, right, are prohibiting unlawful practices in business, commerce or trade, that 8.31 applies.  And, you know, even if we're not seeing eye-to-eye on, you know, what is consumer protection, what's within it, what's without it, that's not a requirement that's in 8.31.  It's not a requirement that's in *Findling*.

THE COURT:  But it is true that it has never ever been extended by a Minnesota court beyond the consumer protection statute dealing with economic protection rather than physical safety.

MR. MALONEY:  So I guess we're distinguishing the *Juul* decision then, which I talked about previously.  So

yes, if the *Juul* opinion does not fit within that criteria, then no.

But I would say this.  That, you know, I think the line between, you know, economic interest, financial harm and physical harm, is not a completely bright line, right?  I mean, there are certainly physical harms and things that people endure and suffer that are also financial harms.

I think in terms of, you know, for a good deal of my time at the Attorney General's office, I have worked on the opoid litigation, right?

THE COURT:  Um-hum.

MR. MALONEY:  And those are cases where yes, marketing was involved.  At lot of it was kind of business conduct.  But at the end of the day what really harmed individuals and people in that case was addiction.  Death, right?  It wasn't financial harm.  I mean, sure, some people, they spent money on their drugs and opioids and money was involved, but that case was really centered on protecting public health, right?  Stopping overdoses.

And there was a huge financial cost to that for the State of Minnesota, right?  Just like there's a big financial cost to gun violence to the State of Minnesota.

So I view this as, you know, it's not part of a line to say, Well, that claim doesn't -- you know, the state isn't seeking to recover the amounts that straw buyers, you

know, gave to Fleet Farm, so it's not a case about financial harm. I would disagree. I think it is.

THE COURT: All right. Thank you.

MR. MALONEY: Thank you.

THE COURT: All right. Thank you all. This motion has been extraordinarily well briefed and well argued. It's under advisement and an order will issue in due course.

Thank you. Court's adjourned.

MR. MALONEY: Thank you, Your Honor.

MR. LEIENDECKER: Thank you, Your Honor.

(Court adjourned at 1:58 p.m.)

\*        \*        \*

I, Carla R. Bebault, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by:   s/Carla R. Bebault
                Carla Bebault, RMR, CRR, FCRR