# EXHIBIT A

**Expert Report of Joseph Bisbee**
*State of Minnesota by Its Attorney General, Keith Ellison v. Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC*, **Case No.: 0:22-cv-02694-JRT-JFD**

On or about June 26, 2024, I was retained by the State of Minnesota to provide my expert opinion on the firearms transactions at issue in this matter and Defendants' conduct regarding these transactions.

**Experience, Qualifications, and Compensation:**

I am the principal officer of Armed With Knowledge (AWK), a business aimed at education and outreach about firearms issues. AWK focusses on public education, policy development, strategies to reduce firearms related violent crime and expert consulting.

Prior to creating AWK, I served as a special agent for more than 25 years with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). From my training and experience with ATF, particularly regarding firearms trafficking, I am familiar with how felons and other prohibited persons obtain firearms through straw purchases, including red flags and warning signs of possible straw purchases. I am also familiar with extensive efforts by ATF and the firearms industry to educate and train Federal Firearms Licensees (FFLs) on the importance of spotting and stopping straw purchases.

I have been involved in hundreds of investigations into illegal firearms trafficking, including straw purchasing, and have been the case agent on numerous investigations involving organized groups illegally acquiring and disposing of firearms. These investigations have involved thousands of firearms. All of these cases involved the trafficking of firearms from the legal marketplace to the illegal marketplace, both domestically and internationally. These cases involved numerous trafficking schemes, but many involved multiple sales and a short time-to-crime. Time-to-crime refers to the time between when a firearm is sold at the retail level and the firearm is recovered by law enforcement after being involved in a crime. A short time-to-crime is a significant indicator of illegal firearms trafficking. Thus, I have experience and knowledge in the indicators of trafficking and how criminals obtain and traffic firearms.

When working to identify individuals involved in the illegal trafficking of firearms, I relied on a number of firearms trafficking indicators. One in particular is commonly referred to as a "multiple sale." This act of purchasing more than one handgun from a licensed retail gun dealer within five consecutive business days triggered a notification to ATF. This notification is done via ATF Form 3310.4. The presence of this indicator provides important data about possible straw purchasing and a wealth of information used to aid in identifying illegal trafficking.

Further details about my experience investigating firearms issues and my work with ATF can be found in my attached CV/Qualifications sheet (Appendix A), which is being disclosed along with this report.

During the past four years, I have testified as an expert witness in depositions in the following cases:
- 8/30/2021, City of Kansas City vs. Jimenez Arms, Circuit Court of Jackson County. Missouri, 2016-CV00829
- 2/9/2023, Madden vs. P&S Security, District Court of Rice County, Kansas, 2021-CV-000011
- 5/12/2023, State of California vs. Polymer 80, Los Angeles County Superior Court, 2021 ST CV 06257

1

I have not testified as an expert witness at a trial during the past 4 years.

I am being compensated for my work in this matter at the rate of $150 per hour for research, review, reporting, and consultation, and the rate of $250 per hour for deposition and trial services and travel time.

**Firearms Licensing and Sales and ATF Form 4473:**

Prior to analyzing the firearms transactions at issue in this matter, it is important to consider firearms licensing and the firearms sale process in general. Companies or persons wishing to engage in the business of dealing in firearms must be licensed by ATF. As part of this process, ATF informs licensees of legal requirements, paperwork requirements, and other regulations surrounding the acquisition and disposition of firearms. This oversight is not a one-time occurrence but repeats at various intervals. Included in the requirements is information related to the completion of ATF Form 4473.[1] This form is required to be completed when an individual purchases a firearm from a licensed dealer.

The importance of accurately completing ATF Form 4473 cannot be overstated. The form is essential in tracing a firearm if it is later found to have been used in a crime. Since there is no national firearms registry in the United States (for traditional Title I firearms), the only way to determine who bought a firearm from a licensed dealer is through a firearms trace. In a firearms trace, ATF tracks the history of a gun from manufacturer (or importer), through wholesalers and retailers, to a first retail purchaser. The information about a first retail purchaser is gleaned from the ATF Form 4473. This gives law enforcement a starting point during firearms investigations, especially those related to firearms involved in violent crimes.

ATF Form 4473 is also used to determine if the purchaser is eligible to acquire a firearm. This determination is made not only from identifying information provided, but also through answers to several qualifying questions (Section B of Form 4473). Form 4473 itself provides detailed information about the process and specifically stresses the importance of the actual purchaser completing the form, as well as legal ramifications for those not providing accurate information (Notices, Instructions, and Definitions).

With very few exceptions, purchasing a firearm for someone else is illegal under Minnesota and federal law.  The act of illegally purchasing a firearm for someone else is known as a straw purchase. Straw purchases are felonies under federal law carrying penalties ranging from 10 to 25 years imprisonment. Although sometimes wrongly dismissed as mere "paperwork violations," straw purchases are serious offenses that allow prohibited persons to obtain firearms from retail dealers. Straw purchasing is a common way for criminals to access and illegally traffic firearms.

**FFL Duties and Responsibilities to Prevent Straw Purchasing:**

ATF instruct FFLs through programs such as "Don't Lie for the Other Guy" that "(s)traw purchasing undermines laws designed to prevent gun violence…and allow(s) individuals who are prohibited from

---

[1] https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.

2

owning firearms…to bypass background checks and obtain weapons."[2] ATF stresses to FFLs that "(s)traw purchased firearms often end up in the hands of criminals and are used in violent crimes, including homicides, robberies, and gang-related activities."[3] Further, ATF tells FFLs that "(b)y giving dangerous individuals…access (to) firearms, straw purchasing contributes to overall gun violence," and "places a legal and economic burden on society through the broader impacts of gun violence on healthcare costs, loss of productivity and impact on public resources."[4]

Many licensees are also members of, or use resources available from, professional associations that support firearms dealers. These associations provide additional training and guidance on legal issues such as straw purchases. One such organization is the National Shooting Sports Foundation (NSSF) and the "Don't Lie for the Other Guy" campaign that NSSF operates in partnership with ATF. This national campaign has educated and trained licensees to better identify straw purchases for more than 23 years. Along with these resources, ATF is available for guidance and consultation on firearms issues.

FFLs bear a heightened level of responsibility in identifying straw purchasers and recognizing straw purchase/firearms trafficking indicators.[5] As stated in training materials distributed by NSSF and utilized by Fleet Farm, firearms retailers are the first line of defense in preventing straw purchases.[6] Fleet Farm's employees involved with firearms transactions concur they bear an enhanced level of responsibility in ensuring lawful sales. As affirmed by Michelle Granato, one of Fleet Farm's Corporate-level employees responsible for firearms compliance, straw purchased guns can end up in illegal commerce and be used by criminals to commit crimes.[7] It is important to prevent straw purchases in order to prevent straw purchased guns from being used in crimes.[8] Additionally, Ms. Granato concurs that preventing straw purchases is important for community safety.[9] Kevin McKown, Fleet Farm's new Director of Firearms Compliance, testified on behalf of Fleet Farm that FFLs are the first line of defense in detecting straw purchases,[10] and that FFLs can prevent straw purchases.[11]

ATF forms demonstrate the important obligations of FFLs to prevent straw purchases and recognize straw purchasing indicators, as the firearm purchaser is not the only one responsible for providing accurate information on ATF Form 4473. Because the licensee is the entity that completes retail sales of firearms, it is critical that the licensee takes the necessary steps to ensure the actual purchaser is the one who completes the ATF Form 4473, and if approved, is the one who is sold the firearm. As documented on the ATF Form 4473, "(t)he information and certification on this form are designed so that a person licensed under 18 U.S.C. 923 may determine if he/she may lawfully sell or deliver a firearm

---

[2] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Don't Lie for the Other Guy*, https://www.atf.gov/firearms/dont-lie-other-guy (last updated July 31, 2024).

[3] *Id.*

[4] *Id.*

[5] I use the terms "indicators," "warning signs," and "red flags" interchangeably throughout this report to refer to factual circumstances indicating that a firearm sale transaction is possibly an illegal straw purchase and, thus, should raise suspicions and warrant more investigation by an FFL at the point of sale (as well as law enforcement).

[6] Fleet Farm Training Video, FF_0000207.

[7] Granato Deposition, p. 42, lines 13-16.

[8] Granato Deposition, p. 43, lines 14-17.

[9] Granato Deposition, p. 129, lines 22 to 24.

[10] McKown Deposition, p. 41, lines 15 to 16.

[11] McKown Deposition, p. 42, line 3.

to the person…" completing the form.[12] The form further notifies the licensed gun dealer that they "must determine the lawfulness of the transaction."[13] Additionally, ATF Form 4473 warns licensed gun dealers that "(a)ny person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law…even if the transferor/seller has complied with Federal background check requirements."[14]



Another responsibility entrusted with licensed gun dealers is the identification and reporting of multiple firearms sales via ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers.[19] When an FFL sells two or more handguns to a buyer within five consecutive business days, the FFL is required to report these sales to ATF on Form 3310.4. This reporting requirement has expanded for certain states to now include some long guns. When the ATF collects Forms 3310.4 and the data provided by these forms, this is the only circumstance when ATF is allowed to maintain a database of gun purchases. This is allowed because of the importance of tracking multiple sales in order to prevent gun trafficking, including via straw purchases.

**Warning Signs of Straw Purchasing:**

When a firearms sales transaction requires an FFL to submit Form 3310.4 to ATF, that is a warning sign to the FFL of a possible straw purchase. And when a customer seeking to purchase a firearm has made past purchases requiring the submission of Form 3310.4 to ATF, this is an additional and heightened warning sign to the FFL. Based on my training, experience, and participation in numerous firearms trafficking investigations, I know that a multiple sale of firearms is a firearms trafficking indicator, including straw buying. I have also reviewed numerous publications and reports supporting the belief that the existence of a multiple sale is a strong firearms trafficking indicator. One study says that multiple sales "appear to account for roughly a quarter of guns used in crime and a number of studies provide indirect indications that guns sold in these transactions are more likely to be trafficked and used

---

[12] Firearms Transaction Record (Notices, Definitions, and Instructions).

[13] Firearms Transaction Record (Notices, Definitions, and Instructions).

[14] Firearms Transaction Record (Notices, Definitions, and Instructions).

[15] FF_0000012-33 p. 6.

[16] Granato Deposition, p. 141-43; Deposition Ex. 58 (FF0000216) time stamp 26:28.

[17] Granato Deposition, p. 141-43; Deposition Ex. 58 (FF0000216) time stamp 26:28.

[18] Granato Deposition, p. 141-43; Deposition Ex. 58 (FF0000216) time stamp 26:28.

[19] https://www.atf.gov/firearms/docs/form/report-multiple-sale-or-other-disposition-pistols-and-revolvers-atf-form-33104/download.

in crime."[20] Researchers have also found that "restricting purchases of handguns to 1 per month is an effective way to disrupt the illegal movement of guns across state lines."[21] Finally, "ATF has identified multiple sales or purchases of firearms by a nonlicensee as a 'significant indicator' of firearms trafficking."[22]



Based on my experience, additional common indicators, or "red flags," of straw purchasing or trafficking are: (i) repeat customers buying multiple guns; (ii) purchasing guns from different retail dealers in a

---

[20] *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, Christopher S. Kopek, Journal of Quantitative Criminology, Volume 30, Number 2, June 2014.

[21] *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, Douglas Weil and Rebecca Knox, JAMA, June 12, 1996, Vol. 275, No. 22,

[22] Government Accountability Office Report, Firearms Trafficking, U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges, June 2009.

[23] FF_0000012-33 p. 6.

short period of time; (iii) purchasing multiple identical or similar guns, particularly small-caliber (9mm) handguns; (iv) when customers are shopping for guns in a group or in pairs; (v) when a customer uses a cell phone to communicate with others in the course of a firearm purchase; (vi) when a customer otherwise acts suspiciously or gives suspicious or evasive answers to questions posed by a salesperson; and (vii) when guns sold to a customer are recovered by law enforcement, especially when the gun is recovered in a short time frame.

Such indicators are highlighted on Orchid Advisor's website, a company that assists FFLs with compliance issues.[24] According to Mr. Radl, he attended several firearm industry conferences hosted by Orchid in which they provided information on firearms regulations, procedures and straw purchases.[25]

Combined with the other factors, cash purchases can also be an indicator of straw purchasing because the straw purchaser will often be handed cash by the actual recipient of the gun (sometimes outside of the store and sometimes inside the store) and will rarely want to use his or her own credit card to buy guns that are not intended for him or her.

These delineated indicators of straw purchases are supported by numerous documents related to this case. ATF Special Agent Corey Shelton swore in his affidavit in support of federal criminal charges against straw purchaser Sarah Elwood that "straw purchasers often purchase numerous firearms at one time from an FFL, or one firearm at a time at multiple FFLs…in a short period of time."[26] Agent Shelton added "it is not common for individuals to purchase multiple firearms of the same make, model and caliber in a short period of time unless they intended to straw purchase them."[27] In ATF Special Agent Kylie Williamson's affidavit in support of federal criminal charges against straw buyer Jerome Horton, Agent Williamson discussed Mr. Horton's use of his cell phone during a firearms transaction and explained that "it is common for straw purchasers of firearms to take photographs or video of available firearms to show to a third party intended recipient of the firearm."[28] Agent Williamson added that "individuals who are involved in firearms trafficking and/or straw purchasing often pay for the items in cash and bring other individuals with them when purchasing firearms in an attempt to make sure they are purchasing the correct firearm(s)."[29] Fleet Farm should have been fully aware of these warning signs of straw purchasing—both in general and with respect to Fleet Farm's sales of firearms to Mr. Horton and Ms. Elwood.

On March 24, 2020, the Oshkosh, WI Fleet Farm location reported they denied a suspected straw purchase because the customer was using her phone in furtherance of the transaction. Further, on March 28, 2020, the Delevan, WI Fleet Farm location reported they denied a suspected straw purchase

---

[24] https://orchidadvisors.com/tips-for-preventing-firearm-straw-purchases/.

[25] Radl Deposition. p. 31, lines 1-5.

[26] *United States of America v. (1) Sarah Jane Elwood, (2) Jeffrey Paul Jackson, and (3) Geryiell Lamont Walker*, United States District Court for District of Minnesota, No. 0:21-cr-00147-ADM-TNL, ECF No. 1 (June 1, 2021), p. 15.

[27] *United States of America v. (1) Sarah Jane Elwood, (2) Jeffrey Paul Jackson, and (3) Geryiell Lamont Walker*, United States District Court for District of Minnesota, No. 0:21-cr-00147-ADM-TNL, ECF No. 1 (June 1, 2021), p. 15.

[28] *United States of America v. Jerome Fletcher Horton, Jr.*, United States District Court for District of Minnesota, No. 21-MJ-764 HB, ECF No. 1 (October 18, 2021), p. 8.

[29] *United States of America v. Jerome Fletcher Horton, Jr.*, United States District Court for District of Minnesota, No. 21-MJ-764 HB, ECF No. 1 (October 18, 2021), p. 9.

because the customer made several previous firearms purchases in a short time frame while accompanied to the store with different people. Branden Sierakowski, a Fleet Farm employee who sold four firearms to both straw purchasers (Mr. Horton and Ms. Elwood) in two sales transactions described later in this report, acknowledged that a customer using their phone in furtherance of a firearms transaction could be a sign of a straw purchase.[30] Mr. Sierakowski also admitted that making a multiple purchase of firearms can also be a sign of a straw purchase[31] Gary Hallfielder, a Fleet Farm employee who sold three firearms to one of the straw purchasers (Mr. Horton) in two sales transactions described later in this report, also acknowledged that a customer using their phone in furtherance of a firearms transaction would be a sign of a straw purchase.[32] Mr. Hallfielder added that making multiple purchases of the same gun in a short period of time was a "red flag."[33]

In sum, all of the following are warning signs of a possible straw purchase of firearms, which FFLs have a duty to prevent:

- repeat customers coming back to buy multiple firearms;
- multiple sales of the same or similar firearm, especially 9mm handguns;
- sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310);
- prior history of sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310);
- using multiple retail locations–even of the same company—to acquire firearms;
- being accompanied by other individuals who may remain throughout the purchase process, or who suddenly leave;
- customer using a cell phone in relation to the transaction;
- customer otherwise acting suspicious or giving suspicious or evasive responses to questions posed by a salesperson;
- paying cash for the firearms; and
- selling a firearm that, within a short time frame, is later traced by law enforcement in connection with a crime.

**Fleet Farm's Firearms Compliance Structure and Procedures:**

Fleet Farm maintains the appearance of a robust approach to fulfilling their obligations of preventing criminals from accessing firearms. Fleet Farm witnesses testified that Fleet Farm's policy is that only certain employees can sell firearms, and only after they have received the proper training. Fleet Farm employs a Firearms Specialist (Michelle Granato) and a Safety and Firearms Compliance Manager (Mike Radl). After Fleet Farm made the firearm sales to straw purchasers at issue in this action, and after the State sued Fleet Farm, Fleet Farm added a Director of Firearms Compliance (Kevin McKown).

Ms. Granato is responsible for conducting compliance audits, developing training materials, assisting ATF with firearm trace requests, and being a resource for stores who have problems or questions.[34] Ms. Granato has no formal training in firearms compliance and is primarily "self-taught."[35]

---

[30] Sierakowksi Deposition, p. 55, lines 5-15.

[31] Sierakowski Deposition, p. 56, lines 4-6.

[32] Hallfielder Deposition, p. 34, lines 12-17.

[33] Hallfielder Deposition, p. 40, lines 16-24.

[34] Granato deposition, p. 13, line 21 through p. 14, line 3.

[35] Granato deposition, p. 11, line 8.

Mr. Radl is responsible for ensuring individual stores and the corporate office are complying with the responsibilities of being licensed firearms dealers, as well as developing and delivering training to employees.[36] Mr. Radl does not have an educational background focused on firearms compliance and has limited formal training in firearms compliance.[37]



---

[36] Radl deposition, p. 12, lines 12-21.

[37] Radl deposition, p. 11, line 14.

[38] Radl deposition, p. 20, lines 12-24.

[39] Radl deposition, p. 22 line 18, through p. 23 line 8.

[40] Granato deposition, p. 25, lines 5-6.

[41] Radl deposition ,p. 25. Line 20.

[42] Deposition Exhibit 39 (FF_0000910), Granato Tuesdays Tidbit, October 2019.

[43] Fleet Farm Training Video, Exhibit FF_0000207.

[44] Granato deposition, p. 19, lines 5-9, p. 23, line 3 to p. 24, line 5.

[45] Deposition Ex. 58 (FF0000216) time stamp 23:24.

[46] Granato deposition, p. 110 ("Q: Okay. And, again, it's only -- at this time, at least, only LPR management could generate a Straw Purchase Alert?" A: Yes.").

[47] Granato deposition, p. 23.

---

[48] Klebs Deposition, p.48, lines 13-21.

[49] Klebs Deposition, p. 77-79.

[50] Granato Deposition, p. 83-84.

[51] Granato Deposition, p. 162-63 ("Q: But you're saying here that sometimes there are team members who don't look in Lotus, right? It's not done for every sale? A: Right.); Deposition Ex. 64 ("Besides, how many team members look in Lotus for every sale?"); Granato Deposition p. 82 ("But they [Fleet Farm employees] also had access to the alert database *if they wanted to go in and search for one*." (emphasis added)).

[52] Granato Deposition, p. 163 ("The training was that they would look in Lotus Notes when they thought they had a straw purchase.").

[53] Deposition Ex. 58 (FF0000216) time stamp 35:34.

[54] Deposition Ex. 58 (FF0000216) time stamp 35:34; FF_0013479-96 (Firearm Procedures and Accountability Update, March 3rd, 2020), slide 3.

[55] Fleet Farm Training Video, Exhibit FF_0000207.

[56] McKown Deposition, p. 59, lines 4-11.

[57] Hoernke Deposition, p. 78, line 22 through p. 79, line 6.



**Fleet Farm's Sales of Firearms to Straw Buyer Jerome Horton and Warning Signs of Straw Buying:**

As detailed below, between June 15, 2021, and October 17, 2021, Fleet Farm stores sold 24 firearms, 22 of which were 9mm pistols, to straw purchaser Jerome Horton. These transactions included five instances where a multiple sales form was required and *should have* been completed and submitted to ATF by Fleet Farm. These sales had multiple warning signs that should have been apparent to Fleet Farm personnel. But Fleet Farm never denied a firearms sale to Mr. Horton, and no "Straw Purchase Alert" or BOLO about Mr. Horton was ever generated or circulated at Fleet Farm.

On June 15, 2021, Mr. Horton purchased a Taurus 9mm pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Isaac Nelson was the sales associate completing the sale. Mr. Horton was accompanied

---

[58] ATF0000802-81, p. 15.

[59] Deposition Exhibit 4 (ATF0000130-32), p. 2.

[60] Klebs Deposition, p. 40.

[61] Nordquist Deposition, p. 43, lines 5-6; Hallfielder Deposition, p. 121, line 23.

[62] Granato Deposition p. 133, lines 7-13; Fleet Farm All Store Quarterly Firearm Compliance Webinar, November 9, 2021 and November 10, 2021, FF_0000016-33, p. FF_0000016.

[63] Granato Deposition, p. 26, lines 12-15.

[64] Radl Deposition, p. 27, lines 2-4.

[65] Deposition Exhibit 112 (FF_0001331, FF_0002752-55).

by another individual during this transaction. Mr. Horton advised an associate he needed to purchase the firearm from Fleet Farm because he was denied by other licensed gun dealers due to the address on his pistol purchase permit not matching the address on his identification, but would not have that same problem at Fleet Farm.[66]

On July 4, 2021, Mr. Horton purchased a Ruger 9mm pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Brigitte Rudnick was the sales associate completing the sale. Mr. Horton was accompanied by another individual during this transaction.[67]

On July 7, 2021, Mr. Horton purchased a Glock 9mm pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Greg Johnson was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction[68] and, based on Fleet Farm surveillance video, appears to have paid for the firearm with cash.[69] This sale triggered a multiple sales report sent to law enforcement by Fleet Farm.[70]

On July 10, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Oakdale, Minnesota. Gary Hallfielder was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction, and ATF evidence shows that he was utilizing his cell phone during the sale.[71] This firearm was recovered by law enforcement on August 13, 2021.[72] Although this sale was within the five business day requirement for reporting a multiple sale at an FFL, this sale occurred at a separately licensed Fleet Farm store and did not require Fleet Farm to complete a Form 3310 multiple sale form.

On July 23, 2021, Mr. Horton purchased a Beretta 9mm pistol from the Fleet Farm store in Blaine, Minnesota. Greg Carrick was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction.[73] Of the $432.76 sale, Mr. Horton paid with $400.00 in cash.[74] (Mr. Horton paid for the remaining $32.76 with a card.[75])

On July 24, 2021, Mr. Horton purchased an additional two 9mm pistols (Springfield and FN) from the Fleet Farm store in Oakdale, Minnesota. Gary Hallfielder, who had also completed the July 10, 2021 sale, completed this sale. During this transaction, Mr. Horton was utilizing his cell phone to communicate with at least one individual in the parking lot of the store.[76] This transaction on its own meets the requirements of a multiple sale, and Fleet Farm submitted a multiple sale form to law enforcement.[77] The reporting would not have included the July 23, 2021, firearm sale since that transaction occurred at

---

[66] ATF0002403-83 at ATF0002408.

[67] ATF0002403-83 at ATF0002411.

[68] ATF0002403-83 at ATF0002412.

[69] FF_0037754 (video).

[70] FF_0075714.

[71] ATF0002403-83 at ATF0002413-15.

[72] ATF0002403-83 at ATF0002413.

[73] ATF0002403-83 at ATF0002416.

[74] Deposition Exhibit 102 (F0001234-319).

[75] Deposition Exhibit 102 (F0001234-319).

[76] ATF0002403-83 at ATF0002417.

[77] FF_0000127-32.

a separately licensed Fleet Farm store; however, Fleet Farm would have been privy to the information about the July 23, 2021 sale if Fleet Farm had tracked firearm sales across different stores.

On July 26, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Oakdale, Minnesota. Lloyd Law was the sales associate completing this sale. This firearm was recovered by law enforcement on 9/26/2021.[78] Fleet Farm's July 26, 2021 sale to Mr. Horton required the submission of a multiple sale form (Form 3310.4) to ATF but Fleet Farm failed to timely submit a Form 3310.4 to ATF.[79] Fleet Farm discovered that Fleet Farm had not submitted the required Form 3310.4 only after the ATF told Fleet Farm that Jerome Horton was a straw buyer in October 2021. Ultimately, Fleet Farm generated the Form 3310.4 required by the July 26, 2021 sale on October 21, 2021.[80]

On July 27, 2021, Mr. Horton purchased an additional two 9mm pistols (Glock and Stoeger) from the Fleet Farm store in Blaine, Minnesota. Branden Sierakowski was the sales associate completing this sale. Mr. Horton was accompanied by another individual during the transaction and utilized cash, along with a $10 loyalty reward, to pay the $910.54 final sale.[81] This transaction on its own meets the requirements of a multiple sale, and Fleet Farm reported it to law enforcement.[82] The reporting would not have included the July 26, 2021, firearm sale since that transaction occurred at a separately licensed Fleet Farm store; however, Fleet Farm would have been privy to the information if Fleet Farm had tracked firearm sales across different stores.

On July 31, 2021, Mr. Horton purchased an additional three 9mm pistols (Ruger, Mossberg and Glock) from the Fleet Farm store in Blaine, Minnesota. Bret Nordquist was the sales associate completing this sale. Mr. Horton was accompanied by another individual during the transaction and utilized $1,020.00 in cash, along with $25.00 in loyalty rewards, for payment.[83] During this transaction, Mr. Horton was using his cell phone, even while interacting with the Fleet Farm sales associate.[84] One of the pistols was recovered by law enforcement after being involved in a shooting on October 10, 2021.[85] Fleet Farm reported this multiple sale of firearms to law enforcement.[86]



[78] ATF0002403-83.

[79] Granato Deposition, p. 195-201; Ex. 73.

[80] FF_0000234-37 at FF_0000237 (Form 3310.4 dated October 21, 2021).

[81] ATF0002403-83 at ATF0002419-20; FF Surveillance FF_0037712; Deposition Exhibit 102 (FF_0001234-319).

[82] FF_0000331-40.

[83] FF_0037718 (Video); Deposition Exhibit 102 (FF_0001234-319).

[84] FF_0037717 (Video).

[85] ATF0002403-83 at ATF0002423-24.

[86] FF_0000331-40 at FF_0000337-39.

[87] FF_0075711-12.

[88] FF_0075711-12; Klebs Deposition, p. 161-63.

On August 14, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Blaine, Minnesota. Zach Lohse was the sales associate completing this sale. During this transaction, Mr. Horton was utilizing his cell phone to communicate with an associate. A review of this communication revealed that Mr. Horton was nervous because the police were in the store.[91] Just prior to completing the purchase, Mr. Horton advises his associate via text that he was "sweatin like a mf."[92]

On August 20, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Matt Benson was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction,[93] and, based on Fleet Farm surveillance video, appears to have paid cash for the firearm.[94]

On August 31, 2021, Mr. Horton purchased two additional 9mm pistols (Mossberg and Glock) from the Fleet Farm store in Lakeville, Minnesota, paying cash for them. Logan Oja was the sales associate completing the sale. Mr. Horton initially entered the store with another individual, but it appears the second individual was not present during the firearms transaction.[95] Mr. Horton was utilizing his cell phone during the transaction and texted an associate to be on the look out for police.[96] He indicated he was nervous as the sales associate was taking "too long" to complete the sale.[97] This transaction would have again required Fleet Farm to contact law enforcement and report a multiple sale of firearms, which Fleet Farm did.[98]

On September 13, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Blaine, Minnesota. Jeremy Rehbein was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction and appeared to be utilizing his cell phone during the sale.[99] Mr. Horton used $580.00 in cash to complete the purchase.[100]

On September 17, 2021, Mr. Horton purchased a Ruger 5.7x28 caliber pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Leetee Xiong was the sales associate completing the sale. Mr. Horton was accompanied by another individual during the transaction and appeared to be utilizing his cell phone during the sale.[101]

---

[89] FF_0075711-12; FF_0076301; FF_0076302-07; FF_0076308-13.

[90] FF_0075711-12; Klebs Deposition, p. 169-71.

[91] ATF0002403-83 at ATF0002429.

[92] ATF0001772.

[93] ATF0002403-83 at ATF0002434.

[94] FF0037756 (Video).

[95] ATF0002403-83 at ATF0002443-45.

[96] ATF0002403-83 at ATF0002443-45.

[97] ATF0001622.

[98] FF_0075766-73 at FF_0075772-73.

[99] ATF0002403-83 at ATF0002459-60.

[100] Deposition Exhibit 102 (FF_0001234-319).

[101] ATF0002403-83 at ATF0002463.

On September 18, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Blaine, Minnesota. Zach Lohse also completed this sale. Mr. Horton was accompanied by another individual during the transaction.[102] Mr. Horton used $560.00 in cash to complete the purchase.[103] While this sale was day after the September 17, 2021, sale, it occurred at a separately licensed Fleet Farm store. Therefore, although Fleet Farm maintained the information regarding a suspicious purchase and could have acted on it had Fleet Farm tracked firearm sales across different stores, a Form 3310.4 was not required.

On September 26, 2021, Mr. Horton purchased another Glock 9mm pistol and a 5.56mm caliber pistol (Radical Firearms) from the Fleet Farm store in Blaine, Minnesota. Jerome Riley was the sales associate completing this sale. Mr. Horton was accompanied by another individual during the transaction.[104] Mr. Horton used $1,400.00 in cash to complete the purchase.[105] This transaction would have again required Fleet Farm to contact law enforcement and report a multiple sale of firearms, which Fleet Farm apparently did.[106]

On October 11, 2021, Mr. Horton purchased another Taurus 9mm pistol from the Fleet Farm store in Brooklyn Park, Minnesota. Cory Peloquin was the sales associate completing this sale. Based on surveillance footage, it appears he paid cash for this firearm.[107]

On October 17, 2021, Mr. Horton purchased another Glock 9mm pistol from the Fleet Farm store in Oakdale, Minnesota. Cindy McKree was the sales associate completing this sale. ATF evidence shows Mr. Horton was utilizing his cell phone during the transaction,[108] and, based on Fleet Farm surveillance footage, appeared to pay cash for the firearm.[109]

**Fleet Farm's Sales of Firearms to Straw Buyer Sarah Elwood and Warning Signs of Straw Buying:**

Between June 20, 2020, and May 12, 2021, Fleet Farm stores sold 13 firearms, 8 of which were 9mm pistols, to Sarah Elwood. These transactions included four instances where a multiple sales form was triggered. These sales had multiple warning signs that should have been apparent to Fleet Farm personnel. But Fleet Farm never denied a firearms sale to Ms. Elwood, and no "Straw Purchase Alert" or BOLO about Ms. Elwood was ever generated or circulated at Fleet Farm.

On June 20, 2020, Fleet Farm sold Ms. Elwood a Century Arms 9mm pistol. This transaction was completed by sales associate Greg Johnson at the Brooklyn Park store.

On July 30, 2020, sales associate Lori Jo Lamprecht sold her a Taurus 9mm pistol, also at the Brooklyn Park store.

---

[102] ATF0002403-83 at ATF0002465.

[103] Deposition Exhibit 102 (FF_0001234-319).

[104] ATF0002403-83 at ATF0002470.

[105] Deposition Exhibit 102 (FF_0001234-319).

[106] FF_0000479-88 at FF_0000487-88 (3310.4 Form without email to ATF).

[107] FF_0037736 (Video).

[108] ATF0002403-83 at ATF0002481.

[109] FF_0037733 (Video).

On January 4, 2021, Fleet Farm sales associate Mike Williamson sold Ms. Elwood a Taurus .380 caliber pistol at the Brooklyn Park store.

And on January 11, 2021, Mr. Williamson and Matt Yeager sold Ms. Elwood another Taurus 9mm pistol at the Brooklyn Park Fleet Farm store.

On January 31, 2021, Fleet Farm allowed Ms. Elwood to make a multiple purchase of two Taurus Spectrum .380 caliber pistols from the Blaine location. Branden Sierakowski was the sales associate completing the sale. Fleet Farm apparently reported the sale to law enforcement as a multiple sale.[110]

On March 15, 2021, Fleet Farm sold Ms. Elwood a Springfield 9mm pistol. This transaction occurred at the Brooklyn Park store and was completed by sales associate Matt Yeager.

On May 1, 2021, also at the Brooklyn Park Fleet Farm location, Mike Williamson again sold Ms. Elwood a Ruger 9mm pistol. Also on this date, but at the Lakeville Fleet Farm store—approximately 35 miles from the Brooklyn Park location—sales associate Michael Crepeau sold Ms. Elwood a Smith and Wesson 9mm pistol. Although these transactions occurred on the same day, a Form 3310.4 was not required because the sales took place at two separately licensed locations. However Fleet Farm would be privy to this information if Fleet Farm had been paying attention to the purchase of multiple handguns from multiple store locations.

On May 6, 2021, Fleet Farm sold Ms. Elwood a Glock 9mm pistol and a Ruger 5.7x28 caliber pistol. This transaction occurred at the Blaine Fleet Farm store and was completed by sales associate Matthew Kubiak. Fleet Farm reported this multiple firearm sale to law enforcement.[111]

On May 12, 2021—in an almost identical transaction less than a week later—the Blaine Fleet Farm location again sold a Glock 9mm pistol and another Ruger 5.7x28 caliber pistol to Ms. Elwood. Zach Lohse was the sales associate completing this transaction. Fleet Farm again reported this multiple firearm sale to law enforcement.[112]

Based upon a description of the scheme employed by the co-conspirators involved in the Elwood straw buying and firearms trafficking operation, the actual purchaser of the firearms would often go into the gun dealer first to identify which guns he wanted before sending Ms. Elwood in to purchase those guns.[113] Additionally, it appears likely that Ms. Elwood maintained communication with the actual purchaser via text message during at least some of the illegal purchases.[114] Thus, Fleet Farm should have been able to observe this conduct, and detect and prevent Ms. Elwood's straw purchases.

---

[110] FF_0000201-06 at FF_0000205-06 (3310.4 Form without email to ATF).

[111] FF_0014673-78 at FF_0014673-74 (3310.4 Form without email to ATF).

[112] FF_0000056-61 at FF_0000060-61(3310.4 Form without email to ATF).

[113] Geryiell Walker Plea Agreement, Crim. No. 21-147(3), U.S. District Court, District of Minnesota, U.S. v. Walker.

[114] ATF0002865-70.

**Analysis of Fleet Farm's Sales to Straw Buyers Mr. Horton and Ms. Elwood and Fleet Farm's Efforts to Prevent Straw Purchases:**

As previously described, almost all of the firearm sales by Fleet Farm to Mr. Horton and Ms. Elwood displayed potential straw purchase/firearms trafficking indicators—i.e., red flags, or warning signs, of straw buying. Fleet Farm knew or should have known these indicators. Moreover, Fleet Farm staff had allegedly been trained to remain alert for such indicators.

As shown above, Fleet Farm's sales of firearms to Mr. Horton and Ms. Elwood included the following warning signs of straw buying:

- repeat customers coming back to buy multiple firearms;[115]
- a transaction requiring a Form 3310.4;
- prior transactions that required a Form 3310.4;
- multiple sales of the same or similar firearm, especially 9mm handguns;[116]
- using multiple Fleet Farm retail locations to acquire firearms;[117]
- customer using a cell phone in relation to the transaction;[118]
- customer accompanied by other individuals during transaction;
- suspicious customer behavior, such as being nervous and sweating; and
- paying cash for the firearm(s).[119]

Although each Fleet Farm store is a separately licensed FFL, these stores operate under a corporate umbrella and ultimately one "leader." Thus, although Form 3310.4s were not required for some of Fleet Farm's firearm sales to Mr. Horton and Ms. Elwood, because they were made at different Fleet Farm stores, Fleet Farm was overall singularly responsible for all the transactions. This is bolstered by Fleet Farm's corporate control of employees and Fleet Farm's policy that all firearms questions be funneled strictly through the corporate office. Fleet Farm should have been tracking firearm sales across stores—including when Form 3310.4s were required for sales—to fulfill Fleet Farm's obligation of ensuring that firearm sales were lawful and were not illegal straw purchases. Fleet Farm's failure to do so contributed to Fleet Farm's failure to identify warning signs and allow Mr. Horton and Ms. Elwood to continue purchasing firearms illegally as straw buyers.

The fact that straw buyers choose to purchase firearms from FFLs that are lacking in compliance is significant. Based on my training and experience, I know criminals select targets that fulfill their illegal agenda while minimizing their risk of being caught. Specifically, straw buyers deliberately choose to buy firearms from FFLs where the buyers think they are more likely to get away with a straw purchase. In this case, we do not need to speculate why Mr. Horton selected Fleet Farm. Around the time of his first purchase, Mr. Horton told an associate that he had to buy firearm(s) from Fleet Farm because at least two other FFLs would not accept his pistol purchase card due to the address not matching his identification.[120]

---

[115] Granato Deposition, p. 25, line 5.
[116] Deposition Exhibit 67 (FF_0000936).
[117] Radl Deposition, p. 30, lines 4-7.
[118] FF_0000207 (Video).
[119] Radl Deposition, p. 162, lines 12-17.
[120] ATF0001520-92 at ATF0001525.

16

A failing audit at one of the Fleet Farm stores that sold guns to Mr. Horton and Ms. Elwood is additional evidence that Fleet Farm's firearms compliance program was inadequate, contributing to missed warning signs of likely straw purchasing. In looking further at the Brooklyn Park Fleet Farm location, the site of the first three firearm sales to Mr. Horton and where Ms. Elwood purchased six of her 13 firearms, this Fleet Farm store location was subject to an internal re-audit on May 6, 2021, during an active purchase period for Ms. Elwood and approximately one month prior to the first purchase made from Fleet Farm by Mr. Horton. The re-audit revealed a score of 64.41%, which was considered "Poor." Noted in the report is a failing grade for management administering appropriate discipline for employees who have repeated firearms compliance errors, with a comment "(c)ritical errors need immediate corrective action."[121]

Ms. Granato testified that Fleet Farm sales associates need to pay close attention for warning signs and consider all the circumstances of the firearms transaction,[122] as there can be one, several, or no warning signs present during a straw purchase.[123] However, it is questionable whether Fleet Farm firearm compliance personnel believe those Fleet Farm employees actually involved in firearm sales can fulfill their obligations of paying attention and ensuring a lawful sale. During an April 23, 2020, discussion between Mr. Radl and Brad Hansen, Fleet Farm Loss Prevention Manager, in relation to firearms compliance issues at Fleet Farm stores, Mr. Radl stated, "its out of hand". Mr. Hansen agreed and replied that "(m)anagers aren't overseeing it well enough."[124] This discussion occurred after the March 2020, Firearm Procedures and Accountability Update stressing that the time for Fleet Farm employees to improve compliance with the responsibility to ensure lawful firearms transactions was "now."[125] And to try to improve compliance, an error tracking and progressive discipline process was developed.[126]

However, it does not appear that improvement was realized. ████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

The only employee associated with firearm sales at issue in this matter seemingly held accountable for firearms compliance issues was Mike Williamson, a Fleet Farm employee who sold three firearms to Ms. Elwood. Shortly after the last sale to Ms. Elwood, Mr. Williamson was terminated from Fleet Farm for "(e)ndless compliance issues with firearms", and a "(t)errible attitude". The termination notice further cited Mr. Williamson's unwillingness to change behaviors.[129]

---

[121] Deposition Exhibit 22 (FF_0036147-54).

[122] Granato Deposition, p. 132, line 21 through p. 133, line 4.

[123] Granato Deposition, p. 133, lines 7-13.

[124] Deposition Exhibits Exhibit 93.

[125] FF_0013479-96 (Firearm Procedures and Accountability Update, March 3rd, 2020), slide 4.

[126] FF_0013479-96 (Firearm Procedures and Accountability Update, March 3rd, 2020), slide 12.

[127] FF_0000860-72 (All Store Quarterly Firearm Compliance Webinar, February 3rd, 2021), slide 1 (speaking notes).

[128] FF_0000860-72 (All Store Quarterly Firearm Compliance Webinar, February 3rd, 2021), slide 9.

[129] Depo Exhibit 30 (FF_0041266).

Even after Mr. Horton's and Ms. Elwood's straw purchasing activity came to light, Ms. Granato questioned whether Fleet Farm firearm sales employees utilize all available resources to ensure lawful sales.[130] She also placed little faith in employees' ability to correctly identify suspicious behavior.[131]

This lack of faith appears well-founded. Mr. Sierakowski, a Fleet Farm employee who sold two firearms to Ms. Elwood and two firearms to Mr. Horton, testified that he felt it was primarily the responsibility of NICS and local law enforcement to stop straw purchases.[132] Mr. Sierakowski also testified that he does "not recall" whether employees selling firearms at Fleet Farm are the first line of defense against straw purchases.[133] Mr. Sierakowski further testified that he does not check customer purchase history during a sale, even though purchase history would show possible warning signs of a potential straw purchase.[134]

Mr. Nordqist, a sales associate who sold three firearms to Mr. Horton, also did not know if FFLs and firearms sales associates are the first line of defense against straw purchases.[135] Mr. Nordqist also did not know if he did/would ask questions in relation to a person wanting to purchase multiple handguns.[136] This was also true for Mr. Hallfielder, who also sold three firearms to Mr. Horton. Mr. Hallfielder stated it was important for firearms sales associates to ask questions of customers.[137] However, he does not remember if he asked Mr. Horton any questions.[138]



---

[130] Deposition Exhibit 65 (FF_0002624-28) (Ms. Granato asking Mr. Radl whether "Are you going to trust the team members to determine who gets entered into a data base because they thought it was suspicious?").

[131] Deposition Exhibit 65 (FF_0002624-28).

[132] Sierakowksi Deposition, p. 67, line 23 to p. 68, line 12.

[133] Sierakowski Deposition, p. 69, lines 5-10.

[134] Sierakowski Deposition, p. 64, lines 4-6.

[135] Nordquist Deposition, p. 66, lines 4-11.

[136] Nordquist Deposition, p. 43, lines 5-6.

[137] Hallfielder Deposition, p. 173, lines 3-6.

[138] Hallfielder Deposition, p. 121, lines 19-23.

[139] FF_0000207 (Video), timestamps 27:15 and 30:04.

[140] FF_0013156-373 at FF_0013273.

[141] FF_0028208 (Video of All Store Quarterly Firearm Compliance Webinar, November 9, 2021 and November 10, 2021).



Ultimately, there appears to be a disconnect between the stated goals of Fleet Farm firearms compliance employees—i.e., Mike Radl and Michelle Granato and now Kevin McKown—and the actions taken by them. They indicate a desire to identify and stop suspicious purchases, but utilize a cumbersome, multi-step process to report possible straw purchases.[143] They also do not want employees reaching out to ATF for assistance, but require them to contact corporate personnel.[144] And, even after Mr. Horton and Ms. Elwood's illegal activity was identified to Fleet Farm by ATF, Mr. Radl asked ATF to decide if a "possible straw purchaser" (as described by Mr. Radl), who exhibited multiple warning signs of firearms trafficking, should be denied any future sales.[145] Additionally alarming is the revelation of a Fleet Farm team lead willingly facilitating a straw purchase on September 2, 2021.[146]

In my opinion, Fleet Farm firearms compliance was ultra-focused on physical security and paperwork accuracy rather than the legality of firearms sales. This resulted in a permissive culture in relation to suspicious firearms transactions including straw purchases. Fleet Farm failed to adequately recognize and train Fleet Farm employees who sold firearms that the presence of multiple warning signs of a straw purchase was a sufficient basis to deny a desired firearms sale. █████████████████

As I have

---

[142] FF_0028208 (Video of All Store Quarterly Firearm Compliance Webinar, November 9, 2021 and November 10, 2021).

[143] Deposition Ex. 58 (FF0000216) time stamp 23:24.

[144] Deposition Ex. 58 (FF0000216) time stamp 35:34.

[145] Deposition Exhibit 84 (FF_0002141-42).

[146] Deposition Exhibit 86 (FF_0002715-21).

[147] Klebs Deposition, p. 44, line 20 through p. 45, line 4.

[148] Radl Deposition, p. 25, lines 1-5.

[149] Klebs Deposition, p. 164.

[150] Klebs Deposition, p. 166-68.

discussed, however, there were ample and sufficient warning signs such that Fleet Farm should have known that Mr. Horton was a straw buyer, including on July 31, 2021. Fleet Farm should have stopped the sale that day, and Fleet Farm should not have made any more sales of firearms to Mr. Horton.

In sum, Fleet Farm failed to ensure the sale of firearms to Ms. Elwood and Mr. Horton were lawful ████

████████████████████████████████████████████████████████████████████████████

████ Fleet Farm should have known that Mr. Horton and Ms. Elwood were straw buyers because of substantial and observable warning signs. But the evidence of Mr. Klebs' concerns and communications to Fleet Farm firearms compliance personnel

---

[151] Deposition Ex. 58 (FF0000216) time stamp 35:14.
[152] Deposition Ex. 58 (FF0000216) time stamp 34:55.
[153] Deposition Ex. 58 (FF0000216) time stamp 33:01.
[154] Sierakowski Deposition, p.193, lines 2-5.
[155] FF_0075711-12.
[156] FF_0075711-12.
[157] FF_0076301, FF_0076302, FF_0076308.
[158] FF_0075711-12.
[159] Klebs Deposition, p. 169-71.
[160] Granato Deposition, p. 262-68.

definitely demonstrate that Fleet Farm knew or should have known that Mr. Horton was a straw buyer—and Fleet Farm should have stopped selling firearms to him, absolutely no later than on July 31, 2021 and thereafter. If Fleet Farm had done so, it is unlikely that a firearm sold by Fleet Farm would have been used during the October 2021 mass shooting at a St. Paul bar.

**Remedial Actions Fleet Farm Should Undertake:**

Given Fleet Farm's duties as a firearm seller encompassing several FFLs, and Fleet Farm's failure to prevent suspicious sales to straw buyers Jerome Horton and Sarah Elwood, along with systematic failures and limitations in Fleet Farm's firearms compliance training and systems, Fleet Farm should undertake the following remedial actions:

- **Improve firearms transaction system:** Fleet Farm should improve its firearms compliance procedures by implementing a software system that tracks all prior sales of firearms, corporate wide, and alerts the Fleet Farm salesperson at the point of sale of the entire purchase history at all Fleet Farm stores before a firearm is sold, including flagging all prior 3310.4 Forms for all Fleet Farm stores.
- **Improve suspicious activity alert system:** Fleet Farm should utilize a suspicious activity alert system that is automatically and easily accessed at the point of sale. Ms. Granato testified that, in 2023, after Fleet Farm's firearm sales to straw buyers Sarah Elwood and Jerome Horton, Fleet Farm implemented a new firearms sales system that automatically flags straw purchase alerts.[161] It is unclear exactly how the new system works, however, and whether the system is available, easy to use, and effective. In addition, with respect to the generation of alerts, individual stores should have expanded availability to generate alerts without having to clear all alerts through the corporate headquarters first, which involves unnecessary hurdles and delays.
- **Improve firearms transaction training:** Fleet Farm should utilize subject matter experts to train firearms sales staff (both when onboarding and through ongoing training) on proper sales procedures and implement standard operating procedures that includes engaging customers in conversation about the transaction, i.e. asking questions.
- **Improve employee discipline:** Fleet Farm should utilize their error tracking system to identify sales associates who consistently fail to follow standard operating procedures and should not be authorized to sell firearms. This system needs the commitment and support of management, who should also be held accountable for errors not addressed.

**Conclusion and Summary of Opinions:**

Based on my review of the documents listed below and the basis and reasons for my opinions described above, along with my training and experience, I present the following opinions on this matter:

1. Fleet Farm entrusted firearms compliance to individuals with little training and experience. This translated to incomplete training being provided to firearms sales personnel and insufficient oversight of firearm sales, both at the corporate and at the store level.
2. Much of the training provided by Fleet Farm firearms compliance personnel and the corporate culture was ultra-focused on physical security and paperwork rather than the legality of firearms sales. This resulted in a permissive culture in relation to suspicious firearms transactions including straw purchases.

---

[161] Granato Deposition, p. 21-23.

3. Fleet Farm stores failed to deny straw purchases even when obvious and multiple signs of straw purchases were present, including during Fleet Farm's sales to Mr. Horton and Ms. Elwood.
4. Fleet Farm has and had a duty of ensuring that firearms sales were lawful and were not straw purchases.
5. Fleet Farm stores did not fulfill their duty of ensuring the firearms sales to Mr. Horton and Ms. Elwood were lawful and were not straw purchases.
6. Fleet Farm failed to exercise appropriate care as an FFL to ensure that the firearms sales to Mr. Horton and Ms. Elwood were lawful.
7. Fleet Farm knew or should have known that Jerome Horton was a likely straw buyer.
8. Fleet Farm knew or should have known that Sarah Elwood was a likely straw buyer.
9. Due to Fleet Farm's failure to prevent straw purchases by Mr. Horton and Ms. Elwood, numerous more firearms are now circulating within the criminal element, which means that more crimes involving these firearms are likely.
10. Fleet Farm should be required to improve its firearms compliance, including improving Fleet Farm's firearms transaction system, Fleet Farm's suspicious activity alert system, Fleet Farm's firearms transaction training, and employee discipline with respect to firearms sales.

I hold these opinions to a reasonable degree of professional certainty. I also reserve the right to assess additional information as it is presented.

**Materials Reviewed:**

In order to determine if the licensee in this instance fulfilled their obligation of ensuring a legal firearm transaction occurred, I reviewed the materials cited within this report and the materials identified in Appendix B.

Date: 10/4/2024

Joseph Bisbee

22

**Appendix A**

**QUALIFICATIONS OF JOSEPH L. BISBEE**
2212 Queen Anne Avenue N, #745
Seattle, Washington  98109

1) I was employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) between September 1989 and March 2015.  During this time I held the positions of special agent, project officer, assistant country attaché, and group supervisor.

2) Between September 1989 and April 1995, I was assigned to the Youngstown, Ohio Field Office.  The majority of my investigations related to firearms violations, including the identification and investigation of firearms traffickers operating between Ohio and such market areas as Detroit, Michigan; Philadelphia, Pennsylvania; and others.

3) In April 1995, I was promoted to the Firearms Enforcement Branch, Bureau Headquarters (BHQ) as a project officer. During this time, I was an active participant in the development and implementation of firearms related investigative programs within ATF.  I also met with high ranking Bureau and Treasury representatives regarding monitored cases and conducted training sessions on firearms trafficking related issues.  In 1998, BHQ asked me to lead the ATF/US Customs, Country Assessment for Barbados in relation to their capabilities in addressing firearms related violent crime as well as investigations of illegal firearms.

4) Between November 1997 and February 2001, I was assigned to ATF's Washington Group II Field Office.  This office is devoted to the investigation of firearms trafficking violations.  During this period, I conducted numerous domestic illegal firearms trafficking investigations and because of my expertise in this area, was selected by BHQ to be the case agent on a sensitive investigation involving the attempted assassination of the Police Commissioner of Japan.

5) Between February 2001 and January 2004, I was assigned to the US Consulate in Vancouver, B.C., Canada, as ATF's Assistant Country Attaché.  In this position I was tasked with coordinating international firearms trafficking investigations as well as providing training to Canadian law enforcement on firearms related matters.  In 2002, BHQ assigned me to be the US representative to the Trafficking in Small Arms Working Group in relation to the G-8 Summit in Alberta, Canada.

6) Between January 2004 and September 2012, I returned to ATF's Washington Group II Field Office and again focused on illegal firearms trafficking investigations.  I have been the case agent on numerous investigations in which hundreds of firearms have been identified as illegally moving between source States such as Ohio, West Virginia, Kentucky, North Carolina, and others; and market areas including the Washington, D.C. metropolitan region.  As a result of my experience in the firearms trafficking arena, the March 2008 issue of the Washingtonian Magazine profiled me as "the top federal gun-hunter in DC".  Also, in 2010, BHQ asked that I be the ATF investigative representative for the El Salvador Country Assessment.  I utilized information gathered from meetings with numerous law enforcement, military, and government leaders to recommend ways El Salvador can improve its efforts in addressing firearms crime.

7) In September 2012, I was promoted to the Seattle Field Division as the Group Supervisor for the ATF Violent Gang Task Force.  This Group focuses on armed violent criminals and criminal

**Appendix A**

organizations utilizing firearms illegally.  Many of the investigations I oversaw involved the illegal trafficking of firearms to criminal street gangs and Mexican Drug Trafficking Organizations in which Washington was the source State.

8) I have received instruction in both general and specific courses in pursuing firearms trafficking investigations.  This training includes study at the Federal Law Enforcement Training Center with successful completion of Criminal Investigator School and New Agent Training, which dealt with ATF specific instruction.  I also attended and successfully completed ATF Firearms Interstate Nexus School and Advanced Interstate Nexus School, which provided specific instruction on determining the origin and movement of firearms and ammunition.

9) I have been an instructor on firearms related investigative activity to local law enforcement officers in the State of Ohio; the International Law Enforcement Academies in Budapest, Hungary and Gaborone, Botswana; the Vancouver, B.C., Police Department; the Royal Canadian Mounted Police; and many others, as well as providing instruction at ATF's International Firearms Trafficking Conferences.  I was asked to prepare and present a case study on one of my firearms trafficking investigations to the FBI's National Academy for State and Local Law Enforcement.  I have also provided firearms trafficking training to new agents at ATF's National Academy in Glynco, Georgia.

10) I have previously testified as an expert witness in the areas of determining the origin and movement of firearms, illicit prices of illegally trafficked firearms, firearm trafficking indicators, and other issues related to illegal firearms trafficking.

11) I am currently the Principal Officer for Armed with Knowledge, a business dedicated to educating the public on firearms issues and providing assistance on policy development and investigations to government, law enforcement and related organizations.

Appendix B

**Materials Considered by Joseph L. Bisbee**

**Production Numbers, Deposition Exhibit Numbers, or Description**
10.5.22 Young-Duncan sentencing
2024-08-02 Supplemental Answers to First Set of Interrogatories
AFT0001490
AFT0001493-AFT0001494
AFT0001496
AFT0001503
AFT0001505
AFT0001507-AFT0001510
AFT0001513-ATF0001520
ATF- 0000130 - 0000132
ATF000027-000003
ATF0001039 - ATF0001041
ATF0001109- ATF0001112
ATF0001213 - ATF0001218
ATF0001444
ATF0001450
ATF0001453
ATF0001455
ATF0001458
ATF0001461-ATF0001463
ATF0001469-ATF0001485
ATF0001487
ATF0001593-ATF0001788
ATF0001862-ATF0002079
ATF0002081-ATF0002337
ATF0002339
ATF0002342
ATF0002345
ATF0002347
ATF0002351
ATF0002353
ATF0002355
ATF0002357-AFT0002358
ATF0002360-ATF0002363
ATF0002365
ATF0002368
ATF0002370-ATF0002371
ATF0002373
ATF0002377-ATF0002379
ATF0002382
ATF0002384

Appendix B

ATF0002387
ATF0002390
ATF0002393
ATF0002395
ATF00023996
ATF0002401
ATF0002403
ATF0002484-AFT0002486
ATF0002488
ATF0002490-ATF0002492
ATF0002494-ATF0002495
ATF0002521-ATF0002532
ATF0002534
ATF0002560
ATF0002562-ATF0002563
ATF0002565-ATF0002567
ATF0002569
ATF0002572-ATF0002576
ATF0002579-AFT0002580
ATF0002586-ATF0002588
ATF0002622
ATF0002625-ATF0002626
ATF0002630
ATF0002632-AFT0002634
ATF0002636-AFT0002641
ATF0002648
ATF00026728
ATF0002681
ATF0002691
ATF0002705-ATF0002723
ATF0002725-ATF0002726
ATF0002732-ATF0002739
ATF0002741
ATF0002743
ATF0002746-ATF0002856
ATF0002858
ATF0002860
ATF0002862
ATF0002864-ATF0002865
ATF0002871-ATF0002876
ATF0002883-ATF0002888
ATF0002894
ATF0002897-ATF0002904
ATF0002923-ATF0002930

Appendix B

ATF0002950
ATF0002954-ATF0002955
ATF0002962-ATF0002963
ATF0002969
ATF0002972-ATF0002979
ATF0002997
ATF0003017
ATF0003036
ATF0003068
ATF0003087-ATF0003089
ATF0003108-ATF0003110
ATF0003118-ATF0003120
ATF0003132
ATF0003136
ATF0003152
ATF0003163
ATF0003166
ATF0003168-ATF0003169
ATF0003188-ATF0003192
ATF0003199-ATF0003203
ATF0003205
ATF0003207
ATF0003209-ATF0003215
ATF0003222
ATF0003224
ATF0003233
ATF0003243-ATF0003246
ATF0003256
ATF0003264-ATF0003266
ATF0003273
ATF0003280
ATF0003283
ATF0003290
ATF0003292-ATF0003300
ATF0003302-ATF0003303
ATF0003305-ATF0003306
ATF0003314-ATF0003325
ATF0003337
ATF0003343-ATF0003364
ATF0003379-ATF0003380
ATF0003382-ATF0003383
Exhibit 1
Exhibit 102
Exhibit 102

Appendix B

Exhibit 102

Exhibit 102 - 103

Exhibit 11

Exhibit 11

Exhibit 11

Exhibit 11

Exhibit 115

Exhibit 119

Exhibit 119

Exhibit 125

Exhibit 125 - 140

Exhibit 126

Exhibit 127

Exhibit 128

Exhibit 129

Exhibit 130

Exhibit 131

Exhibit 131

Exhibit 132

Exhibit 133

Exhibit 134

Exhibit 135

Exhibit 136

Exhibit 137

Exhibit 138

Exhibit 139

Exhibit 140

Exhibit 140 - 150

Exhibit 141 - 142

Exhibit 142

Exhibit 142

Exhibit 142

Exhibit 144

Exhibit 144

Exhibit 144

Exhibit 144

Exhibit 148

Exhibit 148

Exhibit 151

Exhibit 151

Exhibit 153

Exhibit 153 - 154

Exhibit 153 - 157

Exhibit 154

Appendix B

Exhibit 155
Exhibit 156
Exhibit 156
Exhibit 156
Exhibit 156 - 157
Exhibit 156 - Exhibit 163
Exhibit 157
Exhibit 164 (PART A & PART B)
Exhibit 169
Exhibit 181
Exhibit 181
Exhibit 184 - 189
Exhibit 188
Exhibit 188
Exhibit 191
Exhibit 191
Exhibit 193
Exhibit 193

Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 24
Exhibit 35
Exhibit 44
Exhibit 44
Exhibit 46
Exhibit 46
Exhibit 55
Exhibit 55
Exhibit 55
Exhibit 55
Exhibit 55
Exhibit 78
Exhibit 78 - 79
Exhibit 79
Exhibit 8
Exhibit 86
Exhibit 86
Exhibit 93
Exhibit 93

Appendix B

FF_0000001
FF_0000001 - FF_0000007
FF_0000012
FF_0000012 - FF_0000033
FF_0000034
FF_0000056
FF_0000101
FF_0000133
FF_0000201
FF_0000207
FF_0000216
FF_0000216, FF_0002761 - FF_0002783
FF_0000228
FF_0000254
FF_0000307
FF_0000311
FF_00004419
FF_0000445
FF_0000467
FF_0000514
FF_0000514 - FF_0000526
FF_0000570
FF_0000614
FF_0000694
FF_0000741
FF_0000860
FF_0000887 - FF_0000888
FF_0000906
FF_0000910
FF_0000910, FF_0000955, FF_0005145 - FF_0005146
FF_0000920
FF_0000922
FF_0000934
FF_0000934, FF_0012586 - FF_0012594
FF_0000936
FF_0000936, FF_0000922 - FF_0000923
FF_0000966
FF_0000972
FF_0000976
FF_0000980
FF_0001011 - FF_0001012
FF_0001017
FF_0001041 - FF_0001046
FF_0001051

Appendix B

FF_0001051 - FF_0001071
FF_0001072
FF_0001077
FF_0001080
FF_0001109 - FF_0001110
FF_0001115
FF_0001119
FF_0001124
FF_0001140
FF_0001146
FF_0001229 - FF_0001233
FF_0001331
FF_0001331 - FF_0002755
FF_0001355 - FF_0001359
FF_0001467 - FF_0001468
FF_0001467 - FF_0001472
FF_0001473 - FF_001478
FF_0001484
FF_0001485 - FF_0001486
FF_0001487 - FF_0001495
FF_0001498
FF_0001561 - FF0001565
FF_0001764 - FF_0001776
FF_0001877 - FF_0001892
FF_0001893
FF_0001894 - FF_0001909
FF_0001914 - FF_0001917
FF_0001918, FF_0013076 - FF_0013077
FF_0002033 - FF_0002036
FF_0002150 - FF0002152
FF_0002229, FF_0002352, FF_0002556 - FF_0002558
FF_0002315
FF_0002416 - FF_0002419
FF_0002468 - FF_0002472
FF_0002523, FF_0002501 - FF_0002505
FF_0002524 - FF_0002525
FF_0002559 - FF_0002560
FF_0002582
FF_0002582 - FF_0002583
FF_0002584
FF_0002624 - FF_0002628
FF_0002636 - FF_0002638
FF_0002639 - FF0002643
FF_0002715 - FF_0002721

Appendix B

FF_0002729 - FF_0002730
FF_0002751 - FF_0002752
FF_0002761 - FF_0002762
FF_0002897
FF_0003145 - FF_0003146
FF_0003264 - FF_0003265
FF_0005269
FF_0005272 - FF_0005276
FF_0005326
FF_0005326 - FF_0005327
FF_0005328
FF_0005328 - FF_0005333
FF_0005376 - FF_0005385
FF_0005386 - FF_0005387
FF_0005391 - FF_0005394
FF_0005401
FF_0005439 - FF_0005441
FF_0005452
FF_0005581
FF_0005586
FF_0005592
FF_0005605
FF_0005628 - FF_0005631
FF_0005676 - FF_0005677
FF_0005857
FF_0005857 - FF_0005866
FF_0005861
FF_0005867 - FF_0005868
FF_0005949 - FF_0005950
FF_0012039, FF_0001182, FF_0005986 - FF_0005988
FF_0012244 - FF_0012246
FF_0012249 - FF_0012251
FF_0012279
FF_0012291
FF_0012343 - FF_0012344
FF_0012365
FF_0012408 - FF_0012409
FF_0012411
FF_0012429
FF_0012429 - FF_0012430
FF_0012431
FF_0012433
FF_0012435
FF_0012461

Appendix B

FF_0012464
FF_0012473
FF_0012532
FF_0012538 - FF_0012539
FF_0012538, FF_0013713, FF_0000888, FF_0000965, FF_0001173, FF_0002897 -
FF_0002898
FF_0012540 - FF_0012544
FF_0012579 - FF_0012580
FF_0012595
FF_0012774
FF_0013026 - FF_0013027
FF_0013149
FF_0013152 - FF_0013154
FF_0013156
FF_0013374
FF_0013418
FF_0013421
FF_0013424 - FF_0013425
FF_0013427 - FF_0013431
FF_0013430, FF_0013479 - FF_0013496
FF_0013434 - FF_0013435
FF_0013441
FF_0013474
FF_0013479
FF_0013497
FF_0013501
FF_0013503 - FF_0013505
FF_0013520
FF_0013535
FF_0013540
FF_0013556
FF_0013578
FF_0013584 - FF_0013585
FF_0013595
FF_0013656
FF_0013702 - FF0013703
FF_0013704
FF_0013715 - FF_0013716
FF_0013737, FF_0013736, FF_0005996, FF_0002141 - FF_0002142
FF_0014673
FF_0017552
FF_0017563
FF_0018900
FF_0018900 - FF_0018904

Appendix B

FF_0018902
FF_0018905
FF_0018908
FF_0018911
FF_0018915
FF_0018918
FF_0018924
FF_0020409, FF_0002509 - FF_0002512
FF_0022353 - FF0022365
FF_0022391 - FF_0022404
FF_0027369 - FF_0027370
FF_0027370 - FF_0027381
FF_0028186
FF_0028188
FF_0028198
FF_0028208
FF_0028297
FF_0028487, FF_0039235 - 0039237
FF_0029982 - FF_0029982
FF_0035130 - FF_0035131
FF_0036147 - FF_0036154
FF_0036200 - FF_0036201
FF_0036963 - FF_0036970
FF_0037061 - FF_0037065
FF_0037709 - FF_0037765
FF_0039357
FF_0039974
FF_0040868
FF_0040868, FF_0001234 - 0001319
FF_0041041 - FF_0041042
FF_0041070 - FF_0041071
FF_0041137 - FF_0041138
FF_0041231, FF_0041235, FF_0041281, FF_0041250-FF0041251
FF_0041236, FF0041200, FF_0000419 - FF_0000426
FF_00412646, FF_0041264-FF_0041265
FF_0041267 - FF_0041276
FF_0041312
FF_0041316 - FF_0041326
FF_0075711
FF_0076301-FF_0076302
FF_0076308
FF_0076420
First Amended Complaint
Granato Deposition Transcript

Appendix B

Granato Deposition Transcript

Hallfielder Depostion  Transcript

Hansen Deposition Transcript

Hansen Deposition Transcript

Hoernke Deposition Transcript

Horton - Defendant's Sentencing Petition

Horton Docket 21-MJ-764

Horton Docket 22-CR-00006

Kevin McKown Deposition Transcript

Klebs Deposition Transcript

Michael Radl Deposition Transcript

Michelle Granato Deposition Transcript

Nordquist Deposition Transcript

Sierakowski Deposition Transcript

U.S. Position on Sentencing

US v Elwood - Indictment

US v Elwood - Sentencing Order (amended)

US v Horton - Complaint and Affidavit

US v Horton - Information

US v Horton - Plea Agreement

US v Young-Duncan - Indictment

US v Young-Duncan - Plea Hearing

USA v. Elwood - Elwood Plea Agreement

USA v. Elwood - Walker Plea Agreement

USA v. Elwood, et. al. - Jackson Plea Agreement

USA v. Elwood, Jackson, Walker - Complaint

USA v. Jerome Fletcher Horton, Jr. - Complaint and Affidavit