# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

_____

State of Minnesota by its        )
Attorney General, Keith          )
Ellison,                         )
                                 )
              Plaintiff,         )
                                 )
vs.                              )No. 0:22-cv-02694-JRT-JFD
                                 )
Fleet Farm LLC, Fleet Farm       )
Group LLC, and Fleet Farm        )
Wholesale Supply Co. LLC,        )
                                 )
              Defendants.        )
_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

JOSEPH BISBEE

_____

8:53 A.M.

THURSDAY, FEBRUARY 6, 2025

1111 THIRD AVENUE, SUITE 3000

SEATTLE, WASHINGTON

Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR
WA CCR #2157; OR CSR #20-0477; CA CSR #14435
Job Number 7109667

interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. NOTEBOOM:  Todd Noteboom with the Stinson law firm on behalf of the Fleet Farm defendants.

MR. LEIENDECKER:  Andrew Leiendecker from Stinson, also on behalf of Fleet Farm.

MR. MALONEY:  Eric Maloney, assistant attorney general for the Minnesota Attorney General's Office, on behalf of the State of Minnesota, by and through its attorney general, Keith Ellison.

MS. MOERKE:  Katherine Moerke, also on behalf on -- behalf of the State of Minnesota.

THE COURT REPORTER:  With that, I'll swear in the witness.

JOSEPH BISBEE,
sworn as a witness by the Certified Court Reporter, testified as follows:

THE COURT REPORTER:  Thank you.

Please proceed.

occasion during their inspections.

Q.   And so let's take just a step back here for a second, because I think it may be helpful, certainly to me, to understand a little better how things work at ATF, at least in your experience.

My understanding is that there are eight or so separate directorates within ATF.

Does that sound right to you?

MR. MALONEY:  Object to form.  Beyond the scope as well.

A.   I guess if you would designate what you consider a directorate.  That's not the way I recall us calling any division or -- so what are you referring to?

Q.   (BY MR. NOTEBOOM)  For example, the Office of Public and Governmental Affairs.  You've heard of that?

A.   Yes.

Q.   Okay.  The Office of Strategic Intelligence and Information, have you heard of that?

A.   Yes.

Q.   The Office of Science and Technology.  You've heard of that?

A.   Yes.

Q.   The Office of Management?

A.   Yes.

Q.   Office of Enforcement Programs and Services?

Page 32

A.   Possibly.

Q.   And the Office of Field Operations?

A.   Yes.

Q.   And it was in the Office of Field Operations that you worked; correct?

A.   Yes.  The names changed over the course of my career, but yes.

Q.   And there are some others, but those are examples of what I was referring to with respect to the eight different directorates inside ATF.

Is that generally consistent with your understanding of how ATF was organized?

MR. MALONEY:  Object to form.  Vague. Compound.

A.   There's different sections of ATF, yes.

Q.   (BY MR. NOTEBOOM)  Okay.  And Office of Field Operations is one of them?

A.   Yes.

Q.   And while the name of "Office of Field Operations" may have changed some, that is generally the part of ATF that you worked in during your entire tenure at ATF.

Do I have that right?

A.   No.

Q.   Where else did you work while at ATF?

Page 33

A.   I worked for the firearms enforcement division, and I worked for the international affairs division.

Q.   And what was the firearms enforcement division responsible for?

A.   We were responsible for monitoring sensitive high-profile cases, responsible for responding to congressional inquiries.  We were responsible for developing and implementing the firearms trafficking program.  We were responsible for training the field divisions on firearms trafficking programming.  I was responsible for the stolen firearms program.

I'm trying to recall what else we did there. That's what I can remember at this point.

Q.   The responsibility for inspections being done of FFLs was not part of the firearms enforcement division; correct?

A.   Correct.

Q.   So during your time in the firearms enforcement division, that wouldn't have been a responsibility you had; correct?

A.   To conduct inspections?

Q.   Or in other ways participate in inspections that were being conducted of FFLs; correct?

MR. MALONEY:  Object to form.

Page 34

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And with respect to the international work that you were doing at ATF, the last part of your answer, I assume the same is true, and that is that you weren't involved in inspections of FFLs as part of your responsibilities there; true?

A.   I was not involved in inspections, but my work did touch on -- well, I was working as a liaison with the Canadian government, Canadian officials on firearms trafficking as one of my -- one of my responsibilities.

And so those cross-border or firearms trafficking cases would eventually -- in cases would lead back to FFLs within the United States, which could then lead to either a criminal investigation or a regulatory inspection or both.

Q.   So as part of your work in that capacity with respect to criminal investigations that may have flown -- followed from that work, there may have been times where you were engaging with FFLs; is that accurate?

A.   Yes, either myself or I was involved with other ATF personnel that would be involved with that.

Q.   But similar to what you testified to with respect to your time in the firearms enforcement division, a regular part of your job duties and

Page 35

responsibilities weren't inspecting FFLs for regulatory compliance; correct?

MR. MALONEY:  Object to form.  Ambiguous.

A.    Correct.

Q.    (BY MR. NOTEBOOM)  And a regular part of your job responsibilities, either when you were in the international division or the firearms enforcement division, wasn't reviewing FFLs' policies and procedures relating to firearm sales to make sure they were compliant, were they?

MR. MALONEY:  Object to form.  Ambiguous.

A.    Well, during my time in the firearms enforcement division and in developing the firearms trafficking -- not myself, but assisting with developing the firearms trafficking programs that ATF used back then and still uses much of it today, there would be a component of -- the FFL component.  So that part was involved, but I was not doing compliance inspections myself.

Q.    (BY MR. NOTEBOOM)  When you say "there was an FFL component involved," what do you mean?

A.    Well, in developing the firearms trafficking programs, part of that is identifying how criminals get firearms, and criminals get firearms from FFLs, and so it's that component.  Identifying the ways that

Page 36

criminals access firearms.

Q.   All right.   Other than your work in those two roles, with the firearms enforcement division and with the international trafficking responsibilities you've just described, all of your other time at ATF, if I understand it, was in the Office of Field Operations; is that correct?

A.   Yes.   Yes.

Q.   Okay.   And my understanding, within the Office of Field Operations, is that that directorate or that -- what's the terminology you use to describe those different divisions or directorates of ATF?

A.   That's a good question.   Like I say, it changes.   So, for me, it was divisions.   I think now they might call them directorates.

Q.   Okay.   Well, I'm going to use divisions today, because I understand that's the terminology you're accustomed to, but just for clarity for purposes of my questions, I'm referring to what I understand the terminology today is, which is directorates.

Do you understand?

A.   Yes.

Q.   All right.   So within the division of the Office of Field Operations, my understanding is that that division is really broken into two parts.   And one

Page 37

part is ATF's criminal enforcement division, and the other is the industry operations division.

Do I have that right?

MR. MALONEY:  Object to form.

A.    Yes.  That's a -- ATF is split between regulatory and law enforcement.  I don't know if that split is under the Office of Field Operations or if it's separate from that.

But there is -- there is a split between sworn law enforcement agents and regulatory personnel.

Q.    (BY MR. NOTEBOOM)  Okay.  So that distinction existed.  You're just not clear whether it was specific to Office of Field Operations or if it was a broader distinction that ATF drew; correct?

A.    It's a broader distinction, but regulatory enforcement is -- has positions within the Office of Field Operations; they also have positions outside of the Office of Field Operations.

Q.    Right.

And during all of your time in the Office of Field Operations, as I understand it from your description of your experience at ATF, you were working on the criminal enforcement side of the Office of Field Operations.

Do I have that right?

Page 38

A.   Yes.  I was a special agent my entire time.

Q.   That's what I understood.

And at no time did you work in the industry operations side of things at ATF; correct?

A.   At no time was I a regulatory enforcement personnel.

Q.   Okay.  As best you understand it, what did the regulatory enforcement personnel have responsibility for?

MR. MALONEY:  Objection.  Overbroad.

A.   So they're responsible with licensing and regulating the firearms -- back when I started -- alcohol, tobacco, and explosives industries.

So responsible for licensing and then regulating those industries.

Q.   (BY MR. NOTEBOOM)  So if an FFL is going to apply to become an FFL in the first instance, it is the industry operations side of things at ATF that would make those kinds of determinations; is that fair?

MR. MALONEY:  Objection.  Assumes facts not in evidence.  Foundation.

A.   Yes.  They would process those applications and do the necessary contacts.

Q.   (BY MR. NOTEBOOM)  And in terms of ongoing inspections that would be done of FFLs once they are

Page 39

licensed, it would also be in the regulatory side of things at ATF that those types of inspections would occur; correct?

MR. MALONEY:  Object to form.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And in terms of regular work and looking at the policies and procedures that an FFL may have in place, to the extent ATF is doing that, that's happening in the industry operations division, not in the criminal enforcement division; correct?

MR. MALONEY:  Object to form.  Compound.

A.   Not necessarily.  Again, as a special agent and as a special agent that focused on firearms trafficking, we would, again, look at how criminals access firearms.  And so if they're accessing them from an FFL, we would be looking at:  "How are they accomplishing that?"

So we would be looking at the -- so in a way, we would be looking at those policies and procedures of FFLs and how was that happening, how were criminals getting the firearms.

Q.   (BY MR. NOTEBOOM)  Describe in some more detail, please, how you would do that in your experience.

MR. MALONEY:  Object to form.  Overbroad.

Page 41

MR. MALONEY:  Object to form.

A.    We would frequently be in contact with FFLs.

Q.    (BY MR. NOTEBOOM)  And as part of that, is it your testimony that you would be reviewing their policies and procedures with respect to straw purchasing?

A.    Yes.  Yes.  We would talk -- I mean, reviewing it, not as in -- well, reviewing as in dealing with the FFL in trying to help them address that problem.

Q.    Okay.  So I want to drill into that for just a second, because I think we may be talking past each other and I just want to make sure we're not.

So what I'm hearing you say is that as part of that work with respect to gun trafficking, there would be instances where you would engage with FFLs to talk with them about that concern; is that fair?

A.    Yes.

Q.    And as part of those discussions with FFLs, you would talk about ways that they might do things differently with respect to their policies and procedures?

A.    Yes.

Q.    And that was based on, from a criminal enforcement side, issues that you were seeing in the field that you thought FFLs should be aware of; is that

Page 42

fair?

A.   Yes.

Q.   Okay.  But what you weren't doing, at least as a common practice, as I understand it, was doing comprehensive reviews of the policies and procedures that an FFL had in place with respect to gun sales; fair?

MR. MALONEY:  Object to form.  Misstates prior testimony.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And what you weren't doing, as a general matter, would be reviewing the training modules that an FFL would have in place to train its sales personnel responsible for selling firearms; correct?

A.   Correct.

Q.   And what you wouldn't do, as a general matter, in the line of work you had with ATF would be to conduct inspections of the FFLs to make sure that they were compliant with everything that ATF expected them to be compliant with; is that correct?

MR. MALONEY:  Object to form.  Vague.

A.   I would not conduct inspections, but I would accompany regulatory personnel on occasion when they were conducting inspections.

Page 43

Q.   (BY MR. NOTEBOOM)  Okay.  In a typical year, how often do you think that would have happened?

A.   It was infrequently, but I can't tell you a number.

Q.   One of the things that the industry operations division does, with some regularity, is conduct trainings of FFLs with respect to gun safety; correct?

A.   Gun safety?

Q.   Gun compliance.

MR. MALONEY:  Object to form.  Vague.

A.   Industry operations conducts training for FFLs.

Q.   (BY MR. NOTEBOOM)  And that training covers a broad spectrum of issues that relate to the sale of firearms; correct?

A.   Yes.

Q.   And one of those issues is straw purchasing, as you understand it; correct?

A.   Yes.

Q.   And, again, all of that is happening in the industry operations side as opposed to the criminal enforcement side where you worked; correct?

A.   No.

Q.   I thought you just testified that that kind of training happened on the industry operations side.

Page 44

Did I mishear you?

A.   No.  I said industry operations conducts training for FFLs in relation to issues such as straw purchasing.  But law enforcement personnel participate in those trainings as well.

Q.   Okay.  How often did you participate, during your time at ATF, in trainings of FFLs with respect to straw purchasing?

A.   I -- if I did, it was very rare as far as participating with regulatory personnel on their organized trainings.

Q.   And as I understand it from your testimony in other matters, you didn't prepare any training materials yourself relating to straw purchasing that were used by ATF with FFLs; correct?

MR. MALONEY:  Objection. Foundation. Assumes facts not in evidence.

A.   So specific -- is your question specific to training materials that I prepared or produced that were the -- the specific audience was licensed gun dealers?

Q.   (BY MR. NOTEBOOM)  It is.

A.   No, I did not create any specific training where the audience was licensed gun dealers.

Q.   Okay.  And you're qualifying your answer to licensed gun dealers.

Page 48

A.    Yes.  It's a criminal investigator school --

Q.    Investigator school.

A.    -- in Glynco, Georgia, which is where the federal law enforcement training center is.

Q.    And what was the focus of your training there?

A.    That is basic criminal investigator training.

Q.    So that wouldn't be focused on the sale of firearms in particular, that was more general training on how to be a criminal investigator?

MR. MALONEY:  Objection.  Compound.

A.    Correct.

Q.    (BY MR. NOTEBOOM)  And the next thing you mentioned was new agent training for ATF; correct?

A.    Correct.

Q.    And what did that involve?

A.    That was ATF-specific training, so it would involve the issues that -- the core, I guess, function of ATF, which is alcohol, tobacco, firearms, and explosives.

Q.    Okay.  And was the training that you took broad?  And by "broad" I mean for anybody that was coming into ATF?

A.    Correct.

Q.    So to the extent that there are eight or so different divisions inside ATF -- and we talked about

Page 49

some of those earlier -- this would be training that would apply to all of those divisions; is that fair?

A.   It was training for any ATF special agent.

Q.   And would that include training that was specific to people that were going to work on the regulatory side of things, doing FFL investigations in particular?

A.   It was not training for regulatory personnel, but it did involve training on FFL criminal investigations.

Q.   Okay.  Was there separate training that was done for the regulatory personnel at ATF, to your knowledge?

A.   Yes.

Q.   And you didn't participate in that; is that correct?

A.   That's correct.

Q.   And do you know what that training involved?

MR. MALONEY:  Objection.  Foundation.

A.   No, I don't.

Q.   (BY MR. NOTEBOOM)  Okay.  As a general matter, do you have an understanding that it relates to the kind of work that ATF investigators on the regulatory side would have to do day-to-day in their jobs?

MR. MALONEY:  Objection.  Vague.  Assumes

Page 57

you were investigating a particular crime or a suspected crime, was straw purchasing involved and who was involved in connection with that straw purchase; correct?

MR. MALONEY:  Object to form.  Compound. Vague.  Ambiguous.

A.   I'm sorry, that seemed to have a lot of -- that question had a lot of points to it.  So if you could split that up a little bit so that I can answer it better.

Q.   (BY MR. NOTEBOOM)  Yeah.

The focus of your work as a special agent at ATF was less on training FFLs on how to prevent a straw purchase from happening and more on the investigation, either after a straw purchase had occurred or where you were suspicious that a straw purchase may have occurred?

MR. MALONEY:  Object to form.

A.   Correct.  But it's not mutually exclusive where we could also provide the FFL back information on how to prevent future straw purchases.

Q.   (BY MR. NOTEBOOM)  And you say you could do that.  Do you remember instances where you did do that?

A.   I remember doing that.  I can't give you specific instances.

Q.   So from time to time, as part of your criminal

Page 71

MR. MALONEY:  Object to form.

A.  Yes, it's part -- it's part of it, yes.

Q.  (BY MR. NOTEBOOM)  And since founding Armed with Knowledge, is it through that entity that you do your expert work?  Have you been -- is it Armed with Knowledge that was -- strike that.

Is it Armed with Knowledge that has the engagement with the State of Minnesota in this matter as opposed to you personally?

MR. MALONEY:  Object to form.  Compound.

A.  Yeah, I don't know how the contract is -- I don't know how the contract is worded.  I don't recall.

Q.  (BY MR. NOTEBOOM)  What was your purpose in setting up Armed with Knowledge?

A.  Well, the purpose was to try to work in helping reduce firearms-related violent crime, work with other law enforcement agencies or organizations, provide some information back to the public on firearms issues, because I find a lot of people don't quite understand them very well.

So that -- I mean, that was the purpose.

Q.  And I've read that on your website.

Part of what you've been doing through Armed with Knowledge is to provide expert testimony in lawsuits; correct?

Page 72

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.   Yes.

Q.   (BY MR. NOTEBOOM)  In addition to the expert work that you're doing, what other sources of revenue does Armed with Knowledge have?

A.   Currently, no other sources.

Q.   So the only work that you're doing now, at least for compensation purposes, is expert services?

MR. MALONEY:  Object to form.  Misstates prior testimony.

A.   Currently.

Q.   (BY MR. NOTEBOOM)  In the past, have you been retained -- has Armed with Knowledge been retained for work other than expert testimony?

A.   Yes.

Q.   Describe that, please.

A.   It would be more kind of security consulting for retail.

Q.   What do you mean by "security consulting"?

A.   It would be reviewing a company's physical security and then -- and also kind of more in relation to organized retail theft and stuff like that, and providing recommendations on how they can improve their processes, whether that's physical or whether that's

Page 73

through kind of their employees.

And then also safety plans for employees.  And responding to active-shooter situations and things like that.

Q.   Has Armed with Knowledge been retained by any retail client to provide services relating to straw purchase prevention?

A.   No.

Q.   So other than expert work and the security consulting work that you've just described, has Armed with Knowledge performed any other services since its founding?

A.   Yes.

MR. MALONEY:  Object to form.

A.   Yes.

Q.   (BY MR. NOTEBOOM)  Please describe them.

A.   Done community outreach and then also -- well, consulted with some agencies that didn't materialize into anything, but consulting with some agencies on strategies to reduce firearms-related violent crime. And I think that's probably it.

Q.   Which agencies have you consulted with?

A.   Seattle Police Department.

Q.   And was Armed with Knowledge retained by the Seattle Police Department?

Page 74

A.    No.

Q.    So, essentially, it was just you talking with the Seattle Police Department about violent crime?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.    No.  Consulting with the Seattle Police Department on opportunities for them to implement some strategies that would help reduce violent crime.  It did not materialize.

And just stepping back, as well as consulting with the NFL on some firearms issues with them, but that did not materialize either.

Q.    (BY MR. NOTEBOOM)  And when you say both with respect to your work for the Washington Police Department and the NFL that it did not materialize, what do you mean?

A.    They opted not to enter into an agreement.

Q.    Okay.  So when you say "consulting with each of them," were these preliminary discussions about the possibility of them engaging Armed with Knowledge, and each of them decided not to do so?

MR. MALONEY:  Object to form.  Compound.

A.    Correct.

Q.    (BY MR. NOTEBOOM)  One of the things I heard you say that Armed with Knowledge has done is community

Page 75

outreach; correct?

A.   Yes.

Q.   What do you mean by that?

A.   Again, organizing, meeting with community members to educate them on firearms issues.

Q.   And what do you mean by community members?

A.   Anybody.  So open to anybody who wanted to learn more about firearms issues.

Q.   And since the founding of Armed with Knowledge, can you describe for me the community outreach work you have done?

A.   Just that, having meetings or -- meetings.  So one time with a large group, and then another with some other organizations to talk about gun issues.  But mainly it was the one large group, community outreach, to educate them on firearms issues.

Q.   And what do you mean by "firearms issues"?

A.   So mainly trying to give people an understanding of what a firearm actually is, especially when it comes to, like, describing an assault weapon, and what that means, and kind of how -- I'm trying to remember what was all in that training.  But mainly it was helping them understand firearms themselves and how that relates to either implementing or addressing or enforcing laws, laws that are currently available.

Page 76

Q.   And have you been retained -- has Armed with Knowledge been retained to provide those services, or is this something that you're doing because it's part of the mission of Armed with Knowledge?

MR. MALONEY:  Object to form.  Compound.

A.   Not retained.  It was -- it was my thought at community outreach.

Q.   (BY MR. NOTEBOOM)  And I gather from the testimony you've just given, though, that none of the community outreach work that you're doing involves either the assessment of or training of FFLs with respect to straw purchasing practices; correct?

MR. MALONEY:  Object to form.  Vague.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  You haven't been retained -- or Armed with Knowledge hasn't been retained to advise an FFL on the best practices for selling firearms, for example?

MR. MALONEY:  Object to form.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And, similarly, Armed with Knowledge, during the entire time that it's been in existence, hadn't been retained by an FFL to advise on the best practices for monitoring for straw purchases at the point of sale; correct?

Page 77

MR. MALONEY:  Object to form.  Vague.

A.    Correct.

Q.    (BY MR. NOTEBOOM)  So your website talked about -- and your Appendix A to your report talks about policy developments as some of the work that Armed with Knowledge does.

Is that really the community outreach work that you've described today?

MR. MALONEY:  Object to form.  Compound. Assumes facts not in evidence.

A.    No.

Q.    (BY MR. NOTEBOOM)  What do you mean by "policy development"?

A.    That would be strategies to reduce firearms-related violent crime.

Q.    And as I understand it from your testimony, you have been approached by the Washington Police Department and by the NFL to provide that kind of work, but each declined to retain Armed with Knowledge's services; correct?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.    I've consulted with them, and they have not chosen to pursue an agreement.

Q.    (BY MR. NOTEBOOM)  And I'm not trying to fight

Page 200

not in a position to compare the training that Fleet Farm does of its employees as to red flags with the training that other FFLs do with respect to straw purchase red flags with their employees?

MR. MALONEY:  Same objection.

A.  No, I think I am in a position to evaluate that.

Q.  (BY MR. NOTEBOOM)  Okay.  Have you focused on that for stores for FFLs in the state of Minnesota?

A.  I've reviewed some information that Minnesota FFLs provide to their staff, but not their -- not complete training programs.

Q.  Well, how does Fleet Farm's training with respect to red flags of straw purchases compare with the training done by Bill's?

A.  Mainly it's that the indicators that are presented and indicators that are provided to the clerks to keep an eye out for.  So Fleet Farm does train their employees to look for indicators.

Q.  Do you know what Bill's does?

A.  They have a list of indicators that they use.

Q.  Okay.  How does their training compare to Fleet Farm's?  Have you evaluated it?

A.  No.

Q.  Have you looked at Cabela's to see how their

training compares to Fleet Farm's?

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.  No.

Q.  (BY MR. NOTEBOOM)  The Frontiersman gun shop in Golden Valley, Minnesota, have you looked at its training policies, to the extent they have any, on red flags of straw purchases?

MR. MALONEY:  Objection.  Foundation.

A.  Not their entire training program, no.

Q.  (BY MR. NOTEBOOM)  Okay.  So in terms of whether Fleet Farm's training with respect to red flags of straw purchases is at the top end of the spectrum of FFLs in Minnesota or somewhere else, you don't know, do you?

MR. MALONEY:  Objection. Vague.  Improper hypothetical.

A.  I guess I'm not in a position to rank their training program, no.

Q.  (BY MR. NOTEBOOM)  Because your primary objective with respect to this matter was to simply look at the training that Fleet Farm had done of its employees; correct?

MR. MALONEY:  Objection.  Misstates prior testimony.

Page 202

A.   No.   My objective was to look at the transactions to determine if they knew or had reasonable cause to believe that they allowed straw purchases. Part of that would be to look at their training.

Q.   (BY MR. NOTEBOOM)   Okay.   And as part of that review of our training, you didn't compare our training of our employees against the training that's being used by other FFLs in Minnesota during the relevant period, did you?

MR. MALONEY:   Objection.   Assumes facts not in evidence.   Misstates testimony.

A.   Correct.

Q.   (BY MR. NOTEBOOM)   Still on page 6 in the large full paragraph near the -- I guess in the middle of the page, you talk about ATF Special Agent Kylie Williamson.

Do you see that?

A.   Yes, I see her referenced a couple times.

(Exhibit Number 6 marked for identification.)

Q.   (BY MR. NOTEBOOM)   Handing you what's been marked as Exhibit 6.   Do you see that this is the criminal complaint filed in the United States District Court for the District of Minnesota against Mr. Horton?

A.   Yes.

Q.   This is one of the documents that you reviewed

Page 204

Do I have that right?

A.   Yes.

Q.   Agent Williamson does not make that observation regarding any of Horton's other transactions at Fleet Farm stores; correct?

MR. MALONEY:  Objection.  Assumes facts not in evidence.  Foundation.

A.   Agent Williamson does not delineate that in this criminal complaint.

Q.   (BY MR. NOTEBOOM)  Right.

She only refers to that transaction and does not make that observation about any others; correct?

MR. MALONEY:  Same objection.

A.   In this criminal complaint, yes.

Q.   (BY MR. NOTEBOOM)  Well, are you aware of somewhere else where she does that?

A.   I don't know.  She may.

Q.   Are you aware of any?

A.   No.

Q.   Okay.  In your opinion, sir, was it wrong for Fleet Farm to sell Jerome Horton a firearm on October 17, 2021?

MR. MALONEY:  Objection.  Improper hypothetical.

A.   It's my understanding that they were working

Page 205

with ATF on that date.

Q.   (BY MR. NOTEBOOM)   It's not an answer to my question.

A.   Well, if they were -- if they were selling that firearm at the request of ATF in furtherance of an investigation, then -- then the sale was -- how do I put it?  They weren't -- they weren't engaging in knowing a straw purchase was happening.  They were doing it at the request of law enforcement.

And my understanding is, is they were doing that at the request of law enforcement.

Q.   And so, in your opinion, it was not wrong or improper for Fleet Farm to sell Mr. Horton a firearm on October 17, 2021, for the reasons you've just said; correct?

A.   If they --

MR. MALONEY:  Object to form.

A.   If they were doing it at the request of law enforcement.

Q.   (BY MR. NOTEBOOM)   Which is your understanding?

MR. MALONEY:  Same objection.

A.   That's my understanding.

Q.   (BY MR. NOTEBOOM)   You've seen documents that reflect that that's true, haven't you?

A.   Yes.

Q.   You've testified earlier that you've looked at some of the CCTV footage, and I think you said all of the CCTV footage that was made available to you relating to the transactions at issue in your report; correct?

A.   Yes, all of those that are in the attachment to my report.

Q.   And in any of those, I gather you did not observe Mr. Horton using the camera feature on his video to either take photographs or videos, did you, sir?

MR. MALONEY:   Objection.  Mischaracterizes his report.  Assumes facts not in evidence.

A.   I saw Mr. Horton utilize his phone, but I don't know what exactly he was doing.

Q.   (BY MR. NOTEBOOM)  You didn't observe Mr. Horton, from any of the video footage you reviewed, using his phone to send any photographs or videos during any of the transactions, did you?

MR. MALONEY:   Same objection.

A.   I saw him utilizing his phone during the transaction.  I don't know what he was doing.

Q.   (BY MR. NOTEBOOM)  In any of the video footage you observed, did you observe any of the persons that were with Mr. Horton attempting to make sure that Horton was purchasing the correct firearm?

Page 209

A.   So in relation to Mr. Horton, I'd say the -- at the very latest, the July 31st, 2021, transaction should not have been completed.  And by reviewing Mr. Radl's comments, you could even say no later than July 27th.

But I would say that there was indicators present prior to that where they -- there was indicators present that could have stopped sales earlier than that. They also could have, and probably should have, not sold the first firearm to Mr. Horton because his pistol purchase permit didn't match his identification.  And, according to Mr. Horton, he had to go to Fleet Farm because other FFLs wouldn't accept that because the addresses did not match.

So you could say that they should have not consummated the first sale.

Q.   I'm not asking about what other people could say.  I'm asking about what you say and what your opinion is.

Do you believe the first sale on June 15, 2021, was improper?

A.   If the addresses did not match, then that sale should not have been consummated.

Q.   And if the addresses were the same, but one specified an apartment number and one did not, in your

A.    That's not what I said.

Q.    I'm asking an open-ended question, sir.  I'm just asking you --

A.    See, you're asking two different questions.  You're asking which ones should have been stopped and which -- and then which ones were improper.

They were all improper.  They were all straw purchases.

Q.    And I -- you know what, I appreciate that clarification.  So let's use different terminology just to make sure you and I aren't talking past each other.

My question is:  In your opinion, how many transactions, from your review of the record here involving sales to Mr. Horton, should have been stopped?

And am I correct to understand your testimony to be that, at the very latest, the July 31st transaction and those that followed should have been stopped?

MR. MALONEY:  Objection.  Compound.  Misstates prior testimony.

A.    Based on -- so I say July 31st at the very latest.  However, Mr. -- according to Mr. Radl's comments, I would even say July 27th and thereafter at the latest.

I would also just include, again, that there

A.   No -- sorry.

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   No.  There's multiple indicators present. Combined with Mr. Radl's statement, I will say July 27th and thereafter should not have happened.

Q.   (BY MR. NOTEBOOM)  Based on your understanding that Mr. Radl believed that mistakes were made in connection with the July 27th, 2021, sale; correct?

A.   Taken in a whole, his comments with the indicators and the history of the sales, yes.

Q.   Let's turn, just quickly, to Ms. Elwood's transactions.  And by that, I mean the sales of firearms to Ms. Elwood.

How many improper sales -- strike that.

Which sales to Ms. Elwood do you believe Fleet Farm should have stopped?

MR. MALONEY:  Object to form.

A.   I believe the May 12th, 2021, transaction should not have been allowed to proceed.  Again, information -- or indicators were present prior to that, and it's possible that prior sales should have been denied.

And if -- I believe there's information that was available at the corporate level that could provide

Page 216

information where prior sales should have been stopped. But based on what the clerks knew at the time, May 12th should not have happened.

Q.   (BY MR. NOTEBOOM)   Okay.

MR. NOTEBOOM:   Can we go off the record, please.

MR. MALONEY:   Sure.

MR. NOTEBOOM:   I'd just like to just take a five-minute break.   I'm going to see if we can expedite some things here.

THE VIDEOGRAPHER:   We'll go off the record at 3:04.

(Brief break taken.)

THE VIDEOGRAPHER:   We are back on the record at 3:18.

Q.   (BY MR. NOTEBOOM)   Mr. Bisbee, are you aware that in the course of this litigation that Fleet Farm was ordered to produce to the State of Minnesota filtered acquisition and disposition logs reflecting all handgun -- I'm sorry, reflecting all handgun purchases for customers who purchased four or more handguns within any 14-day period between October of 2016 and October of 2023?   You're aware of that?

MR. MALONEY:   Objection.   Foundation.

A.   I'm aware of some purchase records that were

Page 261

MR. MALONEY:  Objection.  Misstates testimony.

A.   As well as a Fleet Farm manager in the compliance -- firearms compliance management chain.

Q.   (BY MR. NOTEBOOM)  And you haven't evaluated what sorts of straw purchase alert systems any other FFLs have in place in the state of Minnesota then or now, have you?

A.   In the state of Minnesota, no.

Q.   All right.

MR. MALONEY:  We're at about an hour, Counsel, since our last break, if this would be a good time for a break?

MR. NOTEBOOM:  Just a minute.  Just a minute.

Q.   (BY MR. NOTEBOOM)  Was it standard practice for an FFL in the state of Minnesota, during the period at issue in your report, to have any straw purchase alert system in place?

MR. MALONEY:  Object to form.

A.   Was it standard practice?

Q.   (BY MR. NOTEBOOM)  Correct.

A.   I don't know.

MR. NOTEBOOM:  We can take a break.

THE VIDEOGRAPHER:  Going off the record at 4:19.

(Brief break taken.)

Page 262

THE VIDEOGRAPHER:  We are back on the record at 4:30.

Q.   (BY MR. NOTEBOOM)  Mr. Bisbee, I'd ask you to -- you can set the document in front of you aside, and I would ask you to get Exhibit 1, a copy of your expert report, back in front of you, and when you do, to turn to page 21.

A.   Okay.

Q.   And in this final section of your report, sir, you opine on four remedial actions, as you call them, that you believe Fleet Farm should undertake; is that right?

A.   Yes.

Q.   And the first of these remedial actions is to "improve firearms transaction system"; correct?

A.   Yes.

Q.   What, in your opinion, is deficient about Fleet Farm's current firearms transaction system?

A.   Well, as stated in that bullet point, they should -- if they want to identify and prevent straw purchases -- implement a software system that tracks all prior sales of firearms corporate-wide and alerts the salesperson at the point of sale about the purchase history of that person before the firearm is sold.  And that would include flagging all prior multiple purchases

Page 263

from all Fleet Farm stores.

Q.   Is -- to the best of your knowledge, sir, is that a change to our system that is required by ATF?

A.   No.

Q.   To the best of your knowledge, sir, is that a change that is required by any law or regulation or requirement in the state of Minnesota?

A.   No.

Q.   Do you know whether that kind of a system, as you've just described it, is being utilized today widely in the FFL industry in the state of Minnesota?

MR. MALONEY:  Objection.  Vague.

A.   I don't know.

Q.   (BY MR. NOTEBOOM)  Do you know of any other FFL in the state of Minnesota that is using the type of system that you propose Fleet Farm utilize here?

A.   I don't know.

Q.   Now, you've reviewed Mike Radl's deposition testimony in this case; correct?

A.   Yes.

Q.   And do you recall in his testimony -- we can get it out if we need to.  But do you recall in his testimony that he explained that -- at least since the start of 2022, that Fleet Farm has already implemented a system that allows corporate-level employees to monitor

Page 265

that testimony from Mr. Radl about some of the enhancements that have been made to the Fleet Farm system at least since early 2022.

MR. MALONEY:  Objection.  Compound.

A.   I recall a system that you're talking about. As far as what they were doing with that information, I don't recall exactly.

Q.   (BY MR. NOTEBOOM)  Okay.  And that system is not available to FFL salespeople at the point of sale, at least not today.  That's your understanding?

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And so I just want to understand kind of what your first remedial measure proposal actually means in practice.

Is the only remedial action that you're suggesting that Fleet Farm should make to the system it put in place in 2022 is to make that available at the point of sale?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   No.  It would be the entire purchase history, not just multiple sales.

Q.   (BY MR. NOTEBOOM)  So that a Fleet Farm

criteria.

Then the other thing -- in looking over what I put in there, the other thing is right now the alerts have to be cleared through corporate headquarters.  And that's -- it should be something that they have the ability to put in because putting in the alerts at the store level would be more -- would be more timely.

Q.   Are any of those changes that you recommend making in connection with this second remedial measure -- to the best of your understanding, sir, are they required by ATF?

A.   No.

Q.   Okay.  Are any of them, to the best of your understanding, sir, required by the State of Minnesota?

A.   No.

Q.   And I gather from your earlier testimony, you don't have an understanding of whether any other FFLs in the state of Minnesota are doing this now, do you?

A.   Correct, I do not.

Q.   And so the basis for your recommendation here is really just because you think it would be better; correct?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   Well, my basis is that it would improve the

tool that they say they have to help them identify straw purchases and ensure that they're making lawful sales.

Q.    (BY MR. NOTEBOOM)  In other words, you think it's -- my point is that it is Mr. Bisbee's opinion, as opposed to something that either ATF is recommending or something that you've read in other literature or something that you've seen in a peer-reviewed journal article or something else; this is something that you have come up with on your own that you think would be better?

MR. MALONEY:  Objection.  Asked and answered. Misstates prior testimony.

A.    No.  Again, Fleet Farm says they already have this system.  So it's not like I created it.  I'm just saying that, for the system to be effective, it needs to be improved.  And in order for it to work, it needs to be accessible and available, and you need to be able to find information about the person in the system without having to go through a three-ring binder that's in chronological order.

Q.    (BY MR. NOTEBOOM)  Okay.  And that's your testimony, even though it's not required by the ATF, it's not required by the State of Minnesota to your knowledge, you're not aware of any other FFL that is doing it in the state of Minnesota; correct?

MR. MALONEY:  Objection.  Asked and answered.

A.  Correct.

Q.  (BY MR. NOTEBOOM)  And I know you've reviewed Ms. Granato's deposition testimony in this case.  You've referred me to that already, sir; correct?

A.  I've reviewed Ms. Granato's deposition testimony, yes.

Q.  Yeah.  And do you recall Ms. Granato testifying in her deposition that around August of 2023 Fleet Farm salespersons were able to send straw purchase alerts themselves?

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.  I don't -- I don't recall that, but I don't have anything right now off the top of my head to refute that either.

Q.  (BY MR. NOTEBOOM)  So if I'll represent to you, sir, that that's what she testified to at pages 84 and 85 in her deposition, does that satisfy what you think the company needs to be doing, based on a change it made in August of 2023, or do you think additional changes need to be made?

MR. MALONEY:  Object to form.  Compound. Assumes facts not in evidence.

A.  No.  Like I said, that's a part of my

we didn't really cover it, but that corporate culture.

So if you want to instill that corporate culture from the start, it would be better for it to come from the source, from the top, as opposed to filtered through a train-the-trainer concept.

Q.   (BY MR. NOTEBOOM)  And I think I know the answer to this, but I'm going to ask it anyway.

Are you aware of any requirement that that sort of direct training from the corporate headquarters occur with respect to new firearms sale personnel that's mandated by either ATF or the State of Minnesota?

A.   No, it's not.  I think the answer is no.

Q.   Okay.  And are you aware of any training that has come out from ATF or guidance that's come out from ATF that suggests that, in a larger corporation like Fleet Farm, training is best performed at a corporate level as opposed to having training of new firearms personnel being done at a store?

MR. MALONEY:  Object to form.

A.   I'm not aware.  It's not a requirement.

Q.   (BY MR. NOTEBOOM)  And you're not aware of any training that would suggest that that's a best practice, are you?

A.   Correct.

Q.   And, you know, somewhere in your report I --

Page 273

at least as I read it, you seem to take some issue with Ms. Granato's background and training.

Did I understand your opinions correctly?

A.   I just pointed out her background and training, or lack thereof.

Q.   Do you believe that her background makes her unqualified to be performing training of firearms personnel?

A.   I think what I pointed out is she had limited training and experience.

Q.   If I'm recalling correctly, what you said is she had no formal training; correct?

Do you remember saying that?

MR. MALONEY:  Assumes facts not in evidence.

A.   That sounds right.

Q.   (BY MR. NOTEBOOM)  What do you mean by "formal training"?

A.   I was just relaying what she presented in her deposition.

Q.   Okay.  Is there some sort of formal training that ATF recommends that someone who is in firearms compliance have before they take that position on?

A.   No.

Q.   Okay.  So was this more of you noting it in your report as opposed to criticizing Fleet Farm in some

the person did not change the answer.  There was a -- there was some discussion about, if they misunderstood, could they go to another store -- or should that person be put into the alert system so they can't buy a gun anywhere.  And I believe Ms. Granato indicated, "Well, maybe it was a mistake, that person can go to another store and answer the questions so-called correctly so that they can buy a gun."

So there was some concerns there.

And there was another -- I thought of another instance and now I'm blanking on it.

Oh, there -- well, it's a little bit different, so I'll just -- I'll stick with that one.

Q.   It's really that incident that comes to mind?

A.   That incident comes to mind.  Again --

Q.   With respect to her training and background, though, there's nothing that you're aware of, either in ATF requirements or the Minnesota State requirements, that would require someone in a compliance capacity like Ms. Granato to have formal education in order to be qualified for their job; correct?

A.   ATF does not mandate what Fleet Farm would require for that position.

Q.   Are you aware of any formal training that actually is available out there for someone that wants

Page 278

Farm should implement that it hasn't already?

A.    That's all I can think of right now.

Q.    All right.  Let's move on to remedial -- the fourth bullet point on page 21 of your report, sir, which is your last suggested remedial action, which is "improving employee discipline."

A.    Yes.

Q.    What, in your opinion, sir, is deficient about Fleet Farm's current employee discipline procedures?

A.    Well, according to the information that I reviewed, Fleet Farm saw that they had a problem with employees not -- or employees being engaged in firearms compliance issues.  There were several documents I reviewed indicating that they even were committing serious violations.  There was concerns about how it would affect their license to sell firearms.

At some point, they implemented an error tracking system to try to help identify the problem employees and then be able to focus on the problems that they had and improve their ability to follow the directions.

Unfortunately, based on the information I reviewed, it sounds like that error tracking system was not used and that management just didn't -- just didn't use it.

Page 279

Q.   What information are you referring to that suggests that it wasn't used?

A.   I believe that was, I think, from one of the depositions, but I can't recall which firearms compliance manager it was.  But there was an indication that it wasn't being used.

I also know there was an email exchange between Mr. Radl and -- I can't remember if it was Mr. Hoernke or -- I can't remember who it was an email exchange with, but they were discussing how there was a problem with employees in regards to the compliance and that management wasn't addressing the problem.

Q.   Anything else?

A.   That's all I can think of right now.

Q.   And with respect to your recommended changes regarding employee discipline, are any of those changes required, sir, by ATF, to your knowledge?

A.   No.

Q.   Are any of them required by Minnesota law or regulation to the best of your understanding, sir?

A.   No.

Q.   Part of the suggested change is that "Fleet Farm should utilize their error tracking system to identify sales associates who consistently fail to follow standard operating procedures and should not be

Page 291

positive thing for a firearms retailer to be doing?

A.   Yes.

Q.   Taking stock of how they're doing and making sure that their systems are working?

MR. MALONEY:  Object to form.

A.   Yes.

Q.   (BY MR. NOTEBOOM)  Do you know how common it is for FFLs to do formal compliance audits like this of their stores?

MR. MALONEY:  Objection.  Foundation.

A.   I know in -- it's common.

Q.   (BY MR. NOTEBOOM)  Do you know, as a percentage of all FFLs in Minnesota, how many are doing formal audits like this?

A.   No.

Q.   Okay.  Do you know if it's half?

A.   I do not know.

MR. MALONEY:  Objection.  Calls for speculation.

Q.   (BY MR. NOTEBOOM)  There's nothing in this document, sir, which I know you've reviewed before -- there's nothing in this document indicating that the Brooklyn Park store missed warning signs of likely straw purchasing, is there?

MR. MALONEY:  Objection.  Foundation.  Vague.