## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>Plaintiff,<br><br>v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>Defendants. | Case No.: 0:22-cv-02694-JRT-JFD<br><br>**STATE OF MINNESOTA'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF GARY KLECK** |

In a lawsuit about Fleet Farm's liability for selling dozens of handguns to straw purchasers and the tragic consequences of those firearm sales, Fleet Farm now seeks to introduce the testimony of firearms industry expert Gary Kleck to conjure a false dispute in this case over the propriety of regulating firearms in general.

Fleet Farm wants to have Professor Kleck testify that straw-purchased handguns are rarely used in crimes across the country, that the 37 guns sold by Fleet Farm are not a "significant cause" of gun trafficking or gun crime in Minnesota, and that sales of multiple guns are generally not "suspect." These topics are not at issue in this case, are not relevant to this lawsuit, and illustrate that Prof. Kleck's testimony would not only be unhelpful to the jury in this case, but also unfairly prejudicial and confusing.

Moreover, Prof. Kleck's opinions are unreliable and methodologically unsound. Prof. Kleck bases each of his opinions on very few cherry-picked and outdated data sources while ignoring other sources of information that contradict his desired result. Prof. Kleck

1

then proceeds to make unreasonable assumptions and unfounded calculations in order to twist pre-selected information to fit his opinion.

Because Prof. Kleck's opinions fail to satisfy the basic requirements of Rule 702, the Court should exclude his expert testimony in its entirety.

## BACKGROUND

Gary Kleck is a retired professor of criminology and criminal justice at Florida State University. His career and research have "focused on the impact of firearms and gun control on violence." Kleck Rep. at 2. Since the early 1980s, Prof. Kleck has been retained as an expert witness in more than 20 different firearms-related cases. Kleck Dep. at 29:20–30:6; 31:7-11. Prof. Kleck typically is retained by parties opposing governmental entities seeking to restrict or regulate firearms—in his own words, he is "frequently [skeptical] about the impact of gun control," so if a party is "challenging gun control, [he] would be a relevant witness." Kleck Dep. at 35:11–36:3; *see also* Kleck Dep. at 42:15-24 (testifying that his expert testimony has, "[f]or the most part," been against firearms regulations or gun control measures).

Prof. Kleck is primarily known for his research, publications, and testimony about "defensive gun use"—the use of a firearm to protect oneself or others from violence, assault, or other crime. Prof. Kleck's work in this area, including his calculation that there are as many as 2.5 million occurrences of defensive gun use annually, have been challenged by other academics. *See* Rand Corp., *The Challenges of Defining and Measuring Defensive Gun Use* (Mar. 2, 2018), https://www.rand.org/research/gun-policy/analysis/essays/defensive-gun-use.html (concluding that Prof. Kleck's defensive

gun use calculation is "not plausible"); *see also* Jennifer Mascia, *How Often Are Guns Used for Self-Defense?*, The Trace (June 3, 2022) ("Academics largely rely on the National Crime Victimization Survey (NCVS), a twice-yearly poll of crime victims conducted by the federal government, while gun rights activists point to a series of telephone surveys conducted in the early 1990s by a criminologist and self-described 'gun control skeptic' named Gary Kleck."). In 2018, Prof. Kleck testified in New Jersey federal court that his current defensive gun use estimate is now "approximately half of that 1993 estimate," and that his current estimate is a "guess for which [he] had no data at all." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507 (PGS) (LHG), 2018 WL 4688345, at *8 (D.N.J. Sept. 28, 2018).

Prof. Kleck's opinions have been excluded under *Daubert* and Federal Rule of Evidence 702 before. In a case in Maryland federal court regarding the issuance of a pamphlet to gun sellers regarding suicide risk, Prof. Kleck was retained by an organization challenging the pamphlets under the First Amendment. *Maryland Shall Issue, Inc. v. Anne Arundel County Maryland*, 662 F.Supp.3d 557, 578 (D. Md. 2023). The district court held that Prof. Kleck's opinions were not relevant because Prof. Kleck wrongly based his opinion on examining the "causal connection" between firearms and suicide, when the pamphlets merely informed the public that firearms are one of many risk factors for suicide and did not claim causality. *Id.* at 578–79. The Fourth Circuit Court of Appeals upheld Prof. Kleck's exclusion on appeal. *See Maryland Shall Issue, Inc. v. Anne Arundel County Maryland*, 91 F.4th 238, 251–52 (4th Cir. 2024).

Professor Kleck is substantially different than the other testifying experts in this case. Both parties plan to call other experts in this case who are either former ATF employees and/or have substantial experience identifying straw purchase warning signs in the firearms retailing space. In contrast, Prof. Kleck's background as an academic does not include any of that experience or training. Prof. Kleck has no training on identifying suspicious gun sales and the warning signs of straw purchasing, and no practical work experience in preventing suspicious gun sales. Kleck Dep. at 64:1–4; 216:7–12. None of the books authored by Prof. Kleck discussed straw purchasing, and out of the extensive list of other publications and presentations Prof. Kleck has done, only a few involved any discussion of straw purchasing—typically in the larger context of gun trafficking—and did not examine straw purchase warning signs. *See* Kleck Dep. at 15:7–25:14.

Fleet Farm provided Prof. Kleck's written report to the State on October 4, 2024, which details the three opinions that Prof. Kleck would offer in this case. *See* Declaration of Eric J. Maloney in Support of Motion to Exclude Expert Testimony of Gary Kleck, Ex. 1 ("Kleck Rep."). The State deposed Prof. Kleck on January 24, 2025. *See* Declaration of Eric J. Maloney in Support of Motion to Exclude Expert Testimony of Gary Kleck, Ex. 2 ("Kleck Dep.").

## A.    Professor Kleck's First Opinion

Prof. Kleck's first opinion is that straw purchases are "a negligible source of guns used to commit crimes":

> Straw purchases of handguns from FFLs are at best a negligible source of
> guns used to commit crimes. There is no reliable and relevant evidence

4

showing that straw purchases provide a significant source of guns used to commit crimes.

Kleck Rep. at 4 (italics omitted). Prof. Kleck appears to render this opinion in order to critique Paragraph 62 of the State's Complaint and, by extension, an ATF report cited in a footnote accompanying the paragraph. *See* Kleck Dep. at 94:1–96:17. Paragraph 62 reads:

> Of the different ways that firearms can get into the hands of criminals, 'straw purchasing' is one of the most prevalent and concerning. The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified straw purchasing as the most common channel for the diversion of firearms into the black market and illegal gun trafficking schemes, accounting for thousands of trafficked guns every year."[1]

ECF Doc. No. 79.

Prof. Kleck believes that the State wrongly cited the ATF report to illustrate the linkage between crime and *all* guns that are straw purchased, when the report merely shows how often straw-purchased guns are involved in ATF investigations. Prof. Kleck then goes on to use numbers from three distinct surveys to find the total number of firearms "acquired by criminals," and compare that against ATF investigative data to conclude that only a relatively small portion (0.699%-2.2%) of straw-purchased firearms are "acquired by criminals."[2] Kleck Rep. at 7–8.

---

[1] The Complaint then cites *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* at xi, Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (June 2000), available at https://perma.cc/PYK2-SXSU.

[2] While the summary of this opinion purports to focus on "guns used to commit crimes," Prof. Kleck instead uses data showing "firearms acquired by criminals" in calculating this percentage. *See generally* Kleck Rep. at 4–9. At his deposition, Prof. Kleck acknowledged that "firearms acquired by criminals" is "a number much larger than the number used to commit violent crimes," but that he used it for "illustrative purposes." Kleck Dep. at 114:3-21. Prof. Kleck ultimately claimed that his opinion is actually about "guns used to commit crimes" and that he "couldn't say" whether straw purchases of handguns from FFLs

## B.    Professor Kleck's Second Opinion

Prof. Kleck's second opinion is that straw purchases from Fleet Farm are not a "significant cause" of "gun trafficking or gun crime":

> The straw purchases of Horton and Elwood cannot be shown to be a significant cause of the alleged increase in gun trafficking or gun crime in Minnesota. Further, there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve straw purchasing.

Kleck Rep. at 9. Prof. Kleck begins this section with two paragraphs on a topic not disclosed in the opinion itself: he undertakes to "calculate" the percentage of guns "used to commit" violent crimes on an annual basis against "all the guns acquired by criminals." Kleck Rep. at 9–10. He does so by utilizing the "total volume of firearms acquired by criminals each year" from data he used in his first opinion, multiplying that number by ten, and then dividing that against another source of crime victimization data showing the number of "gun-involved crimes." *Id.* According to Prof. Kleck, this results in a 2.5%-8% rate at which guns acquired by criminals are then used in crimes—ostensibly meaning, in his words, that "97.5% or more of the guns acquired by criminals would *not* be used to commit a violent crime." Kleck Rep. at 10.

Prof. Kleck then turns to Minnesota data. Relying on Minnesota Department of Public Safety data, Prof. Kleck chooses a total number of violent crimes committed with firearms in Minnesota, which he then divides by the 37 firearms sold by Fleet Farm to Jerome Horton and Sarah Elwood to conclude that "at most, 0.234%–just 1 in 428–of the

---

contribute "no more than a negligible share . . . of all guns acquired by criminals." Kleck Dep. at 115:1-18.

violent crimes committed in Minnesota" are attributable to the firearms that Fleet Farm sold to Horton and Elwood. Kleck Rep. at 10 (emphasis omitted). Prof. Kleck's opinion does not mention or address the crimes, violent or otherwise, that the State alleges have already been committed with this group of Fleet Farm straw-purchased firearms.

Prof. Kleck then opines that "there is no reason to believe that any of the persons who purchased these 37 guns could not have acquired firearms from other sources other than a straw purchaser." Kleck Rep. at 11. He bases this opinion on three sources involving "[i]nterviews with criminals" that he claims show that "most of those who had acquired guns had multiple sources that they could have used to acquire guns." *Id.* In his words, "it is possible that none of those who acquired these guns became armed with firearms only because of the actions of straw purchasers." *Id.* (emphasis omitted).

### C.      Professor Kleck's Third Opinion

Prof. Kleck's third and final opinion is that multiple gun sales "are not suspect":

> Sales of multiple guns at the same time are not suspect and rarely involve guns later used to commit crimes. Rather, multiple gun sales are routine and commonplace, and guns sold in multiples are no more likely to later be used in crimes than guns sold one at a time.

Kleck Rep. at 11 (emphasis omitted). Prof. Kleck claims that, while "dozens of guns in one transaction" is suspicious, smaller-quantity multiple-gun sales are "commonplace" and are "no more likely to be later be used in crime." Kleck Rep. at 11–13. Prof. Kleck bases this opinion on one 2005 study that measured single-gun sales against multiple sales, which

7

Prof. Kleck asserts found that 3.7% of single-sale handguns were recovered by law enforcement, while 3.3% of multiple-sale handguns were recovered. Kleck Rep. at 12.

Prof. Kleck then uses this data to further opine that "[t]he sales referenced in the Complaint do not indicate a suspicious purchasing pattern," and that "there is no basis for Fleet Farm employees to be suspicious of firearm customers solely because customers may purchase more than one gun in a single transaction." Kleck Rep. at 13.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible only under the following circumstances:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 imposes a "basic gatekeeping obligation" on trial judges to ensure that "all expert testimony" is "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (quotation marks omitted)). As the proponent of Prof. Kleck's testimony, Fleet

Farm bears the burden of "prov[ing] its admissibility by a preponderance of the evidence." *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); *see also* Fed. R. Evid. 702 (requiring "the proponent" to demonstrate[] to the court that it is more likely than not that all four prongs are satisfied). Rule 702's aim is to "separate[] expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

To establish relevancy under Rule 702, Fleet Farm must prove that the "expert testimony proffered in the case is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) (quotation marks omitted)). Simply put, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (internal citations and quotations omitted). This relevancy inquiry, referred to as "helpfulness" or "fit," "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Rule 702 further requires that an expert's testimony be "based on sufficient facts or data, be the "product of reliable principles and methods," and reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). To satisfy Rule 702, "the expert opinion itself—not just one of its several premises—must be 'based on sufficient facts.'" *Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 609 (8th Cir. 2020). Expert evidence may be excluded if "there is simply too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), or if the expert testimony is "speculative, unsupported by sufficient facts, or contrary to the

facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006); *see also Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) ("Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.") (internal citations and quotations omitted).

## ARGUMENT

All three of Prof. Kleck's proffered opinions are irrelevant and unreliable under Rule 702. Prof. Kleck's first opinion is irrelevant because it describes the entire population of guns used to commit crimes, but the State's claims pertain only to guns Fleet Farm sold to two known straw purchasers. This opinion is also unreliable in its reliance on data that is outdated, contradicted, and underinclusive, which Prof. Kleck then uses to unreasonably extrapolate to an opinion that does not fit the data.

Prof. Kleck's second opinion is irrelevant because Prof. Kleck himself admits that he did not consider the specific sales to Horton and Elwood in reaching his conclusion, despite those sales being the purported focus of his opinion. Prof. Kleck then utilizes unreliable methodology in unreasonably comparing Fleet Farm's sales to Minnesota crime violence data.

Finally, Prof. Kleck's third opinion is irrelevant for ignoring the facts of this case and trying to prove a larger point about the lack of suspiciousness in multiple-gun sales. This opinion is also unreliable for resting solely on a decades-old study that actually held that multiple-gun sales were a valid indicator of gun trafficking that should be relied upon by law enforcement. The remainder of the content of Prof. Kleck's third opinion is based on his own self-proclaimed "common sense" and "anecdot[es]," which are unreliable and

demonstrate the unmoored basis for his third opinion. Kleck Dep. at 221:14-15; 253:12-20.

Prof. Kleck's opinions must be excluded as irrelevant and resting upon unreliable, insufficient, and flawed data and methods.

I.     **PROF. KLECK'S FIRST OPINION IS WRONG, IRRELEVANT, AND BASED ON FAULTY METHODOLOGY.**

A.     **Prof. Kleck Ignores the Facts of This Case in Asserting That Straw Purchased Guns Are a "Negligible Source of Guns Used to Commit Crimes."**

As an initial matter, Prof. Kleck's first opinion is incorrect on its face. Straw purchases are not "at best a negligible source of guns used to commit crimes"—instead, every straw purchase is a crime, meaning that straw-purchased guns are therefore always used to commit crimes and necessarily acquired by criminals. *See, e.g.*, 18 U.S.C. §§ 922(a)(6), 924(a)(2), and 932(b); Minn. Stat. §§ 624.7132, subd. 15, and 624.7141. Prof. Kleck acknowledged that straw purchases are crimes in his deposition. Kleck Dep. at 78:17–79:19. Prof. Kleck then clarified that he intended his opinion to reference "violent crimes" that would later be committed with straw-purchased guns, notwithstanding that his report does not use the word "violent" at all or specify that his opinion is referring to crimes subsequent to the criminal straw purchase.[3] Kleck Dep. at 79:20-23; 82:2-16. These are significant qualifications that appear nowhere in his written opinion and were haphazardly explained by Prof. Kleck in his deposition. *See generally* Kleck Dep. at 80–83 (claiming

---

[3] Prof. Kleck has not amended or supplemented his report and testified that he does not plan to do so. Kleck Dep. at 156:20–157:3.

that using the words "violent crimes" in his report was "unnecessary" and stating, without evidence, that the connection between nonviolent crime and straw-purchased guns "doesn't exist as a concept"). Prof. Kleck's opinion is, at best, misleading and vague in trying to sever the connection between straw purchased guns and "crimes," violent or otherwise.

More importantly, this opinion has nothing to do with the facts at issue in this case. Apparently, Prof. Kleck wants to refute one paragraph of the State's Complaint, which alleged that straw-purchased firearms are "one of the most prevalent and concerning" ways that "firearms get into the hands of criminals." ECF Doc No. 79, ¶ 62. Prof. Kleck claims that this mistakenly correlates how often straw-purchased firearms are involved in ATF investigations with how often those firearms are actually "acquired by criminals." Kleck Rep. at 5. He then proceeds to analyze a very large set of national crime survey data and use ATF investigative data (which he had just previously criticized) to construct his own calculation of how often straw-purchased guns are generally "acquired by criminals." *See* Kleck Rep. at 7–8.

The State will not be seeking to prove the *general* prevalence of straw purchasing and its connection to future crime at trial in this case. Instead, the State will prove Fleet Farm's role and knowledge in selling firearms to two straw buyers, and the consequences of those sales, which undisputedly involve straw-purchased guns being acquired by criminals and used in crimes. Prof. Kleck's testimony is of no assistance to the jury when all parties involved in this case will agree that the 37 firearms Fleet Farm sold to Jerome Horton and Sarah Elwood were straw purchased, that Jerome Horton and Sarah Elwood were convicted of crimes in connection with those purchases, and that some of the firearms

sold by Fleet Farm have been used in crimes or recovered by law enforcement in connection with crimes. Moreover, because the State is no longer seeking compensatory damages on behalf of the State or an abatement fund/payment in this case, Prof. Kleck's opinion has no bearing on the remedies here either and is now essentially moot.

Prof. Kleck knows that this case is not about the general population of firearms, yet rendered a general opinion anyway:

> Q: But to your knowledge, does this case involve the entire population of straw purchased handguns?
> . . . . .
> [Prof. Kleck]: No. No. As far as I can tell from the Complaint, it pertains only to guns straw purchased from various Fleet Farm stores.
> . . . .
> Q: One of which was used in a violent crime, right?
> [Prof. Kleck]: Correct.

Kleck Dep. at 106:13–19. Prof. Kleck should not be allowed, in front of a jury, to construct and then "defeat" a strawman to combat a hypothetical, academic claim about the connection between straw purchasing and future crime that the State will not be asserting at trial. The general frequency or likelihood of a straw-purchased firearm later being used in a crime is simply not at issue in this case.

Because Prof. Kleck's first opinion describes "the entire population of guns used to commit crimes," while the state's claims pertain "only to guns straw purchased from various Fleet Farm stores," his opinion is not "relevant to the task at hand." Kleck Dep. at 106:4-8, 17-18; *see Daubert*, 509 U.S. at 597.

**B.    Prof. Kleck Unreasonably Extrapolates Incompatible Data Sources to Reach His Opinion that Straw-Purchased Guns Are Rarely Used to Commit Crimes.**

Prof. Kleck also spends the bulk of his first opinion minimizing the value of the ATF report cited by the State in its Complaint for the proposition that straw purchasing is "one of the most prevalent ways that firearms can get into the hands of criminals" and that straw purchasing is" the most common channel for the diversion of firearms into the black market." *See* Kleck Rep. at 5; Am. Compl. ¶ 62. But what the AGO pled was factual, uncontroversial, and taken straight from published ATF reporting on ATF's own investigations. The ATF report says that straw purchasing was "the most common channel in trafficking investigations," with "almost half" of all ATF firearm trafficking investigations involving straw purchasing. Declaration of Eric J. Maloney in Support of Motion to Exclude Expert Testimony of Gary Kleck, Ex. 3 at xi. Prof. Kleck's main critique of the State's use of this report is his unsupported claim that, because this information comes from investigations, it is not a data point that can be applied to the general population of straw-purchased firearms. Prof. Kleck will later contradict his own critique *in this same opinion* by relying upon similar ATF investigative data to support his biased calculations.

Prof. Kleck next proceeds to string together a few different cherry-picked data points to reach his own analysis of how often straw purchasing is utilized by criminals. Prof. Kleck does so by taking the average number of firearms solen under the National Crime Victimization Survey (NCVS),[4] and multiplying that by the proportion of stolen

---

[4] The NCVS is an annual survey of "a nationally representative sample of about 240,000 persons in about 150,000 households," who are "interviewed on the frequency,

firearms shown in general surveys of criminals, as taken from both an early 1980s survey of prison inmates[5] and a U.S. Census Bureau national survey of inmates. Kleck Rep. at 7. Using these sources, Kleck estimates a total number of firearms stolen each year of between 779,375 to nearly 2.5 million firearms, with 55% of those being handguns.[6] Kleck Rep. at 7. Prof. Kleck then divides these numbers against the number of trafficked guns investigated by the ATF that involved straw purchasing (17,434) to reach his ultimate conclusion: that as many as 2.2%, to as few as 0.699%, of guns acquired by criminals come from straw purchases. Kleck Rep. at 7–8.

This analysis is patently unsound at each step of the way. For the first step, Prof. Kleck is taking relatively recent crime data from the NCVS and multiplying that number based on the proportion of crimes involving stolen firearms found in two completely different surveys of inmates, one of which is more than 40 years old and yielded a very different multiplier than more recent U.S. Census Bureau data (32% vs. 10%). Prof. Kleck then takes the numbers he has stitched together from this analysis and divides them against yet *another* completely different data source—the raw number of straw-purchased handguns involved in ATF investigations. Although Prof. Kleck earlier in his report made

---

characteristics, and consequences of criminal victimization in the United States." Bureau of Justice Statistics, *National Crime Victimization Survey*, https://bjs.ojp.gov/programs/ncvs (last visited April 2, 2025).

[5] *See* Kleck Dep. at 138:4-140:3 Prof. Kleck did not rely on a 2008 edition of the book that contained the survey, which describes straw purchasing from FFLs as "obvious and frequently used avenues for [proscribed] classes to obtain guns." Kleck Dep. at 119:4-120:6.

[6] Prof. Kleck acknowledged his report did not cite a source for the 55% figure and claimed that it generally came from "NCVS data." Kleck Dep. at 132:22–133:13

much ado about the ATF's investigative data being underinclusive and not generally applicable to firearms at large, Kleck Rep. at 5–7, he then makes that same mistake himself by dividing the ATF's raw investigative numbers against the total number of firearms acquired by criminals to reach his percentage conclusions.

Prof. Kleck acknowledged this problem by testifying that "we'd love to have a count of guns straw purchased that did pertain to any and all acquisitions by criminals all year, we just don't have that data." Kleck Dep. at 192:12-15. Prof. Kleck admitted that there "could . . . be more straw purchases" than what he calculated but asserted that the "incompleteness of the data is just one caveat that you have to apply to the conclusion." Kleck Dep. 180:5-18. Prof. Kleck's report and testimony ultimately failed to specify what impact, if any, this massive caveat would have on his opinion. Indeed, he does not apply any metric or adjustment to the analysis supporting his unreliable opinion to account for this enormous data discrepancy.

In sum, Prof. Kleck is unreasonably comparing apples to oranges by pulling together different numbers from different data sources and treating them as if they can be compared against each other in a reliable and usable fashion. This completely fails under the *Daubert* standard: none of this analysis can be tested, has been subject to peer review, has a known or possible rate of error, or is generally accepted in the field. *See Daubert*, 509 U.S. at 593–94. In essence, Prof. Kleck is constructing a "house of cards" and would ultimately ask the jury to trust his unsupported "ipse dixit." *See In re Wholesale Grocery Prods. Antitr. Lit.*, 946 F.3d 995, 1002 (8th Cir. 2019).

In addition, Prof. Kleck chose not to address several contradictory studies in his report.[7] Prof. Kleck admitted at his deposition that he had not considered a more recent survey of inmates that found that a smaller proportion of inmates obtained their firearms via theft. *See* Kleck Dep. at 145:23–148:25. Prof. Kleck also admitted it was possible that straw purchasing could have been involved in the 25% of inmates who received firearms from other individuals and the 43% who obtained firearms from the black market, as shown in the survey. Kleck Dep. at 150:8–151:13. But Prof. Kleck's report does not mention or analyze this survey, because Prof. Kleck claimed it simply "didn't come to mind" as he was drafting his report. Kleck Dep. at 149:13–150:1.

This is not the only contrary data source ignored by Prof. Kleck. He failed to consider a 2013 survey of U.S. firearms retailers that estimated that 34,000 straw purchases occur annually—almost twice the number that Prof. Kleck relied on from the ATF's investigative data. *See* Kleck Dep. at 165:11–167:20. Prof. Kleck also did not consider a 2012 study of ATF data that found that 41.3% of ATF investigations involved straw-purchased firearms and were the most commonly identified trafficking pathway. Kleck Dep. at 123:24–126:19. Prof. Kleck characterized this article as "very poor" because the "[r]esearchers draw conclusion that don't follow from their evidence," but could not point to where that occurred in the article. Kleck Dep. at 125:2–17.

Prof. Kleck's report also asserts that the "rarity of ATF revocation of dealer licenses" is also an "indication of how unimportant straw purchasing firearms from FFLs

---

[7] In general, Prof. Kleck testified that he "didn't have to" look for new data in creating his report because he was "already familiar with" the information. Kleck Dep. at 149:13–18.

is as a source of criminal firearms." Kleck Rep. at 8. But Prof. Kleck provides no additional context or support for his assertion that this fact supports his opinion and even admitted that he did not look at other actions taken by the ATF against FFLs related to straw purchasing conduct in forming his opinion. Kleck Dep. 176:17-178:10.

The data Prof. Kleck used to reach his first opinion is outdated, underinclusive, and was extrapolated multiple times to reach his desired result. Federal Rule of Evidence 702 requires expert testimony be based on sufficient facts or data, the product of reliable principles and methods, and reliably applied to the facts of the case. None of these prongs are met here.

## II.   PROF. KLECK'S SECOND OPINION THAT STRAW PURCHASES FROM FLEET FARM ARE NOT A "SIGNIFICANT CAUSE" OF "GUN TRAFFICKING OR GUN CRIME" IS NOT RELEVANT TO THIS CASE AND BASED ON UNRELIABLE METHODOLOGY.

### A.   Prof. Kleck Fails to Connect His Opinion About the Straw-Purchased Guns Sold by Fleet Farm to the Actual Facts of This Case.

Just like Prof. Kleck's first opinion, his second opinion fails to engage with the actual facts of the case. Prof. Kleck claims to be disproving the link between Fleet Farm's sales to Horton and Elwood and the "alleged increase in gun trafficking or gun crime in Minnesota" by comparing those sales against aggregate national and statewide data. Kleck Rep. at 9–11. Prof. Kleck testified that this opinion is relevant because the state was "arguing that the misconduct or negligence of Fleet Farm in making those straw purchases or straw sales had contributed to violence in Minnesota in gun trafficking and gun crime." Kleck Dep. at 185:9-14.

But his report does not engage with the fact that every handgun sold by Fleet Farm to Horton and Elwood from Fleet Farm is *necessarily* increasing gun trafficking in Minnesota, because straw purchasing itself is a form of gun trafficking, as Kleck admitted. *See* Kleck Dep. at 186:8-15 (agreeing that every handgun sold to Horton and Elwood was the subject of gun trafficking). Similarly, his report does not mention that at least one of the handguns sold by Fleet Farm to Horton was used in a horrific mass-shooting incident that Prof. Kleck agrees meets his characterization of a "violent crime." Kleck Dep. at 102:2–4; *see also* Kleck Dep. at 206:2–10 (acknowledging that he did not consider the Truck Park shooting in his analysis). Prof. Kleck's opinion wholly lacks relevancy by failing to engage with these basic facts of the case.

In defense of his opinion, Prof. Kleck asserts that he was focused on how "significant" the Fleet Farm sales were in increasing gun trafficking and violent crime. Kleck Dep. at 187:6-10. But the State's case is not focused on how "significant" the impact of Fleet Farm's sales were on gun trafficking and violent crime in comparison to statewide or national data. As mentioned above, the State is not seeking proprietary damages for spending by the State to combat gun trafficking and violent crime in general, nor is the State seeking the relief of an abatement fund in this case. Although Prof. Kleck's opinion might arguably have had relevance if those issues were in controversy, this case will not be about comparing the impact of Fleet Farm's negligent actions to the statewide or national rates of gun trafficking and violent gun crimes.

Finally, Prof. Kleck makes the odd claim that "there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by

other means that did not involve straw purchasing." Kleck Rep. at 9. His source for this opinion is not an actual examination of the evidence in this case; instead, he relies on three sets of prior surveys of criminals that he says reveal "that most of those who had acquired guns had multiple sources that they could have used to acquire guns." Kleck Rep. at 11.

This opinion is unsupported, subjective speculative, and has zero relevance to this case. Prof. Kleck testified that he has no "personal additional knowledge about the unique circumstances of these purchasers that would have made them more likely to pursue other means of getting the guns if they hadn't bought them from Fleet Farm." Kleck Dep. at 210:6-11. Prof. Kleck's opinion will also mislead or confuse a jury into thinking that the State is required to prove that Fleet Farm's sales were the only method by which the straw purchasers could have obtained their firearms, which is plainly inconsistent with the law and constitutes an impermissible legal conclusion. *See In re Acceptance Ins. Companies Securities Litig.*, 423 F.3d 899, 905 (8th Cir. 2005) ("When the expert opinions are little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements.").

Thus, Prof. Kleck's second opinion will not "help the trier of fact to understand the evidence or to determine a fact in issue" because Prof. Kleck will not tell a jury anything about whether Fleet Farm is liable for its straw sales to Horton and Elwood. Fed. R. Evid. 702(a). There is no "valid scientific connection to the pertinent inquiry" because Prof. Kleck himself admits that he did not consider the specific sales to Horton and Elwood in reaching his conclusion. Kleck Dep. at 206:8-10; *Daubert*, 597 U.S. at 591-92.

**B.    Prof. Kleck Does Not Base His Second Opinion on Sufficient Facts or Reliable Methodology.**

Another fundamental flaw of Prof. Kleck's second opinion is that he is calculating the hypothetical chance that Fleet Farm's firearms will be used in violent crimes, while ignoring the facts that at least one of Fleet Farm's firearms was *actually* used in a violent mass shooting. Prof. Kleck's report does not describe or analyze the facts that one of the 37 firearms straw purchased by Horton and Elwood was used in a violent crime, and that other firearms recovered by law enforcement in connection with other crimes. Kleck Dep. at 205:20-206:10. Prof. Kleck instead claimed that "a single case wouldn't have any bearing on [his] opinions." Kleck Dep. at 206:8-10. But he is wrong. To the extent he is purporting to analyze the risk that Fleet Farm firearms are trafficked and used in crimes, the single best data points would be the real-world facts about what happened to those firearms. Instead, Prof. Kleck puts on blinders and relies on empty statistical analysis to support his predetermined opinion.

Prof. Kleck's second opinion also expands the apples-to-oranges comparison problems from his first opinion. He first claims that only a small percentage of "guns acquired annually by criminals" are used to "commit a violent crime." Kleck Rep. at 9–10. He supports this by using his previous, flawed calculation of guns acquired by criminals every year from his first opinion, multiplying it by 10 to supposedly capture the 10-year period in which "all guns used to commit violent crimes in 2022 had been acquired," and then dividing that against NCVS data that shows there are 623,015 violent crime incidents with firearms annually. *Id.*

This calculation is meaningless. As an initial matter, Prof. Kleck is again extrapolating different data sources to reach unreasonable and unreliable conclusions. And, in the process of doing so, he artificially inflates the number of guns acquired by criminals—thereby lowering the proportion of guns *used* by those criminals in his analysis—without specifying what methodology or precedent he relies on for this calculation. Kleck Dep. at 197:2-17 (admitting that he does not cite a source in his report for his 10-year lookback and has never before analyzed "the fraction of all guns acquired that would be used to commit a violent crime").

Prof. Kleck then conducts a completely new analysis of Minnesota-specific information by dividing the number of sales by Fleet Farm to straw purchasers (37) against the number of violent crimes committed with firearms "for 2021-2023" in Minnesota (15,840). Kleck Rep. at 10. Prof. Kleck claims that this leads to a 1 in 428 proportion—0.234%—of crimes committed in Minnesota with firearms straw purchased from Fleet Farm stores. *Id.* But it is entirely unclear from Prof. Kleck's report whether his Minnesota number is the annual average or the total number of violent crimes in that time period and why it would be appropriate to compare the straw purchases from Fleet Farm (which took place between June 2020 and October 2021) against this data set.

The latter piece of Prof. Kleck's second opinion—that the ultimate recipients of the straw-purchased guns would have gotten them from another source in lieu of Fleet Farm's sales—is also wholly unsupported and speculative. Prof. Kleck has no "personal additional knowledge about the unique circumstances of these purchasers that would have made them more likely to pursue other means of getting the guns if they hadn't bought them from Fleet

Farm." Kleck Dep. at 210:6-11. Citing in his report to general surveys of criminals attesting that they have multiple avenues to obtain firearms is sorely insufficient to enable Dr. Kleck to offer this baseless legal conclusion at trial. *See* Kleck Rep. at 11.

Prof. Kleck's second opinion does not meet any of the reliability prongs under Rule 702. Prof. Kleck did not use any of the actual facts in this case to form his opinion. Without specifying what methodology he was using and while admitting he had never done this analysis before, Prof. Kleck unreasonably extrapolated to make irrelevant and unreliable points about the use of guns in crime generally and how Fleet Farm's sales compare to a set of Minnesota crime data from a different time period. Dr. Kleck's second opinion should be excluded by the Court.

### III. PROF. KLECK'S THIRD OPINION THAT MULTIPLE GUN SALES "ARE NOT SUSPECT" IS NOT RELEVANT TO THIS CASE AND UNSUPPORTED BY KLECK'S OWN SOURCE.

Prof. Kleck's third opinion, once again, suffers from the defect of not engaging with the facts of this case. How "routine" or "commonplace" multiple-gun sales are, or the probability of guns being sold in multiple-gun sales being later used in a crime, have little bearing on the facts of this case when we know that this case actually did involve several multiple-gun sales by Fleet Farm and that those guns were later used in crimes.

Furthermore, this opinion is so speculative, unfounded, and subjective that it completely lacks any reliability. Prof. Kleck partially bases his opinion of how "commonplace" multiple sales are on a single data point from an early 1990s study of gun sales in Maryland, which found that 27% of guns sold in Maryland in that timeframe were sold as part of a multiple sale. *See* Kleck Rep. at 12 (citing a 2005 journal article by

Cristopher Koper). Prof. Kleck later admitted that he also bases his opinion that "[it] is common for individuals to purchase more than one firearm at a time" on "partly the same kind of anecdotal information that folks making the contrary argument do." Kleck. Dep. 252:19-253:23. For Prof. Kleck to extrapolate one data point from more than thirty years ago and his "anecdotal information" to make a broader argument about how "routine" multiple gun sales are would not only be irrelevant and unreliable but also would risk unfairly prejudicing and confusing the jury. *See* Kleck Dep. at 217:5–9 ("I'm qualified to say how common multiple gun sales are. And the answer is, they're very, very common."). In Prof. Kleck's own words, "anecdotal evidence" is "not very reliable." Kleck Dep. at 63:13–17.

Prof. Kleck's assessment of the suspiciousness of multiple gun sales is also irrelevant and unreliable. Prof. Kleck's sole scholarly basis for analyzing how "suspect" multiple-gun sales are is another piece of information from the same single study of Maryland gun sales from more than 30 years ago. *See* Kleck Rep. at 12. The study found that 3.7% of handguns sold in single sales were later recovered by law enforcement, as opposed to 3.3% of handguns sold in multiple-gun sales. *Id.* This is Prof. Kleck's only citation in support of his claim that "there is no factual basis for Fleet Farm employees or other gun store employees to believe that guns sold in multiples are more likely to be used in crime and to be suspect for that reason." *Id.* at 12–13; *see* Kleck Dep. at 229:4-8 ("Q: Is there any other data that you're relying on, besides the two sets of numbers from the Koper study that we just walked through? [Kleck]: No, they're sufficient by themselves to make the point I was making.").

There is another problem with Prof. Kleck's reliance on this study: even its author does not agree with Prof. Kleck. The first sentence of the article, in its "Research Summary," says that "[t]he simultaneous or rapid purchase of multiple guns, which is referred to as a multiple sale, is a potential indicator of gun trafficking." Maloney Decl., Ex. 4. at 749. After analyzing the data in the study, the author concludes that multiple sales are indeed a warning sign of gun trafficking:

> [T]he study supports the validity of multiple sales as a gun trafficking indicator. This suggests that federal reporting requirements for multiple sales are prudent, and that investigators should continue to emphasize these sales in gun trafficking investigations.

*Id.* at 770. Prof. Kleck did not address these contrary conclusions in his report. He testified that he thought it would be "wasted space" to have addressed in his report because Koper's use of the term "potential indicator" is a "meaningless statement." Kleck Dep. at 231:20–232:23. Without any support in even the thin slice of academic literature cited by Prof. Kleck, his opinion on the suspiciousness of multiple-sale guns is not a reliable analysis that should be presented to the jury in this case.

The remainder of Prof. Kleck's third opinion is wholly unsupported and speculative. Prof. Kleck opines that multiple gun sales become suspicious only when sold in "multiple dozens." Kleck Rep. at 11. Prof. Kleck cites no source for this proposition. When asked, Prof. Kleck testified that he based this statement on his view that the ATF publicizes its investigation of large-scale trafficking operations of "dozens or even hundreds of guns trafficked" in order to "impress people" and does not do so for smaller trafficking cases. Kleck Dep. at 220:7–221:10. When asked if he had any other sources for his claim that

"dozens" of firearms are required to render the purchase suspect, Prof. Kleck merely pointed to "common sense." Kleck Dep. at 221:8-15.

In the last paragraph of Prof. Kleck's report, he concludes that "[t]he sales referenced in the Complaint do not indicate a suspicious purchasing pattern."[8] Kleck Rep. at 13. Prof. Kleck revealed his biased and unsupported viewpoint underlying this and his other two opinions when questioned about this sentence: his core belief is that there are no actual indicators of straw purchasing. When asked whether sales of multiple guns of the same caliber are a warning sign of a possible straw purchase, Prof. Kleck asserted that it was an "unvalidated" indicator with "no affirmative evidence," which he characterized as "folk wisdom" that is "uncritically accepted by people in the firearms[] enforcement community." Kleck Dep. at 217:14–218:2. When asked whether there are *any* indicators of straw purchasing, Prof. Kleck testified that because ATF and NSSF (a firearms industry trade association) have never "validated" their assessment of indicators, they have no "empirical foundation" to support those indicators beyond "folklore among law enforcement personnel."[9] Kleck Dep. at 224:14-225:20. It is especially ironic that Prof.

---

[8] Prof. Kleck later admitted that he actually has no opinion on "the full array of possible suspicious attributes of the transactions involving the straw purchasers," and was only opining on "the very narrow topic of the fact that they bought multiple guns at one time." Kleck Dep. at 227:3-25.

[9] Ultimately, Prof. Kleck did agree that multiple gun sales, like anything else, "can be a potential indicator." Kleck Dep. 231:6-232:23. Prof. Kleck later qualified this by saying that there are no indicators of actual gun trafficking "that we can actually rely on," and that there are only "alleged indicators." Kleck Dep. 238:16-20.

Kleck criticizes the ATF and NSSF for supposedly lacking "empirical foundation" when in reality, Prof. Kleck's own opinions are the ones that lack "empirical foundation."

Prof. Kleck's viewpoint seems especially irrelevant and unreliable given that Fleet Farm's own employees and Fleet Farm's other two proffered expert witnesses almost certainly disagree with Kleck about the viability and validity of using straw purchase warning signs, including multiple-gun sales. Fleet Farm created and held a company-wide training that, while using the exact details of Horton's purchasing patterns, trained employees that his multiple purchases were suspicious and that employees should have identified the warning signs and taken action. Likewise, Fleet Farm's other two experts in this case—Andrew Graham and William Napier—are both NSSF consultants who appear on an NSSF presentation that instructs firearm dealers on warning signs, including that multiple-gun sales of similar firearms indicate a possible straw purchase and are therefore suspicious. *See* Declaration of Eric J. Maloney in Support of Motion to Exclude Expert Testimony of Gary Kleck, Ex. 5 at 17, 27.

In sum, Prof. Kleck makes circular arguments about a lack of empirical foundation for identifying indicators of straw purchasing while conveying no real conclusion and instead engaging in rank speculation and conjecture himself. Kleck Dep. at 252:19-253:23; 221:8-15. Because Prof. Kleck's misleading and roundabout theories have no "valid scientific connection to the pertinent inquiry," they would not help a trier of fact and are irrelevant. *Daubert*, 597 U.S. at 591-92. Just as "evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night," Prof. Kleck's opinion that

multiple gun sales are commonplace will not assist the trier of fact in determining whether multiple gun sales were a warning sign of a straw purchase in the cases of Horton and Elwood. *Id.*

Prof. Kleck's third opinion is also based in part on "common sense" and "anecdot[es]" that are unreliable and biased speculation at best. Kleck Dep. at 221:8-15, 252:19-253:23. These ungrounded sources for his third opinion are not the "knowledge, skill, experience, training, or education" required by Rule 702. Kleck Dep. at 252:19-253:23; 221:8-15. Prof. Kleck's reliance on the outdated 2005 Koper study requires an analytical leap about multiple-sale gun statistics in Maryland in the 1990s that cannot be reliably applied to this case. Kleck Dep. at 222:6-12. Prof. Kleck ignores contrary authority, including cherry picking from the sources he cites. Kleck Dep. at 231:6-232:23. A critique of a *lack* of empirical evidence cannot form the basis for a reliable expert opinion that the opposite is true.

\* \* \*

Prof. Kleck's opinions in this case resemble the same types of factual leaps that resulted in his prior exclusion in the *Maryland Shall Issue* case. 662 F. Supp. 3d at 578 (excluding Prof. Kleck as a gun rights group's expert because his opinion was rendered irrelevant when he based his opinion off a misreading of the pamphlet at issue), *aff'd*, 91 F. 4th 238 (4th Cir. 2024). This case is about *actual* instances of firearms dealer misconduct, straw purchases, and firearms violence and crime. Prof. Kleck's opinions and theories about the general causal connections between firearms and violence are

interesting, but ultimately not at issue in this case and would certainly not be helpful to the jury here.

And even if his opinions were relevant here, Prof. Kleck's methodologies are extremely unreliable. Plucking select statistics from one or two cherry-picked sources and then smashing together different sets of survey data to create supposed percentages with universal applicability is not enough for the Court to open the Rule 702 gate. The Rules of Evidence demand more of an expert witness than what Prof. Kleck has outlined in his report and deposition. For all of Prof. Kleck's opinions, there is "simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co.*, 522 U.S. at 146.

## CONCLUSION

For the reasons demonstrated above, the State's Motion to Exclude the Testimony of Gary Kleck should be granted.

Dated:  April 4, 2025

KEITH ELLISON
Attorney General
State of Minnesota

JAMES W. CANADAY (#030234X)
Deputy Attorney General

**/s/ Eric J. Maloney**

ERIC J. MALONEY (#0396326)
JASON PLEGGENKUHLE (#0391772)
KATHERINE MOERKE (#0312277)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
eric.maloney@ag.state.mn.us
Telephone: (651) 757-1021
jason.pleggenkuhle@ag.state.mn.us
Telephone: (651) 757-1147
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288

**UNIVERSITY OF MINNESOTA GUN
VIOLENCE PREVENTION CLINIC**

MEGAN WALSH (#0394837)
Special Assistant Attorney General

CALLAN SHOWERS
ARIELLE HUGEL
WILLIAM ROBERTS
Certified Student Attorneys

University of Minnesota Law School
190 Mondale Hall
229 19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-5515
wals0270@umn.edu

*Attorneys for State of Minnesota*