UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CASE NO. 0:22-cv-02694-JRT-JFD

State of Minnesota by its Attorney General, Keith Ellison,

Plaintiff,

vs.

Fleet Farm, LLC, Fleet Farm Group, LLC, and Fleet Farm Wholesale Supply Co, LLC,

Defendants.

_____________________________________/

# DEPOSITION OF

# PROFESSOR GARY KLECK

VOLUME 1 (Pages 1 - 259)

Friday, January 24, 2025

8:00 a.m. - 2:54 p.m.

415 North Monroe Street
Tallahassee, Florida 32301

STENOGRAPHICALLY REPORTED BY:

KIMBERLY S. BARTHOLOMEW
Professional Stenographer



Exhibit 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

OFFICE OF MINNESOTA ATTORNEY GENERAL
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101
(651)757-1021
BY: ERIC J. MALONEY, ASSISTANT
ATTORNEY GENERAL
KATHERINE MOERKE, ASSISTANT
ATTORNEY GENERAL
eric.maloney@ag.state.mn.us
katherine.moerke@ag.state.mn.us

ON BEHALF OF THE DEFENDANTS:

STINSON, LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 335-1500
BY: ANDREW DAVIS, ESQUIRE
ZACHARY WRIGHT, ESQUIRE
andrew.davis@stinson.com
zachary.wright@stinson.com

ALSO PRESENT:

Zachary Wright, Esquire
Counsel for Professor Kleck

# I N D E X


| WITNESS | PAGE |
|---|---|
| Professor Gary Kleck | |
| Direct Examination by Mr. Eric Maloney | 4 |


# E X H I B I T S

(Exhibits 118 and Retained by Counsel)


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 211 | Report and CV of Professor Kleck | 14 |
| Exhibit 12 | Firearms Transaction Record | 84 |
| Exhibit 9 | First Amended Complaint | 93 |
| Exhibit 212 | Following the Gun, June, 2000 | 107 |
| Exhibit 224 | E-Book Armed and Considered Dangerous | 118 |
| Exhibit 213 | Interpreting the Empirical Evidence | 123 |
| Exhibit 214 | Trends/Patterns in Firearm Violence | 130 |
| Exhibit 225 | Annual Firearm Thefts | 134 |
| Exhibit 217 | Survey of Prison Inmates, 2016 | 145 |
| Exhibit 218 | Firearm Trafficking Channels | 160 |
| Exhibit 215 | Article, Illegally Buy Guns | 165 |
| Exhibit 220 | Koper Report | 221 |
| Exhibit 221 | Article, Effects on Limiting Handgun Purchases | 242 |
| Exhibit 157 | Criminal Complaint | 250 |

| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| None | | |

| | |
|---|---|
| CERTIFICATE OF OATH | 256 |
| CERTIFICATE OF REPORTER | 257 |
| READ LETTER | 258 |
| ERRATA SHEET | 259 |

Proceedings began at 8:00 a.m.

THE STENOGRAPHER: Please raise your right hand.

Do you swear or affirm, that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

Thereupon,

GARY KLECK

having been first duly sworn or affirmed, as hereinafter certified, testified as follows:

DIRECT EXAMINATION

BY MR. MALONEY:

Q All right. Good morning, Professor Kleck. Thank you for accommodating our change in schedule due to the weather circumstances down here.

Before we get started, could you please state your name for the record?

A Gary Kleck.

Q I'm going to go over some ground rules. I am assuming that this is not your first deposition. But I wanted to kind of lay out some ground rules for the back and forth today.

The first thing is, as you noticed and you just met her, we have a court reporter here in the room

today. So we're going to have to speak one at a time so that we have a clear record. So I ask that if I'm speaking, you wait until I'm finish. I'll give you that same courtesy when you're answering, just so we're not talking over each other and making a confusing record.

Does that make sense?

A It does.

Q You have counsel here today. I see Mr. Andy Davis is here. He may object to some of my questions. Unless he instructs you not to answer, you still need to answer my question after he objects.

Does that make sense?

A Yes.

Q Because we have a court reporter who is taking down the things we're saying verbally, we have to actually, you know, say yes or no answers to questions.

So like visual indicators, like shaking your head or nodding your head, or saying uh-huh or huh-uh, it's hard to take down for the court reporter. So I ask that you say yes or no, or things of that nature in response to my questions.

Does that make sense?

A Yes.

Q If you have any issues understanding a question that I ask, let me know, and I can help

clarify. We can get you to the answer.
Do you have any memory issues that could affect your testimony today?
A No.
Q And is there any reason that you would be unable to testify truthfully today?
A No.
Q All right. Professor Kleck, how did you prepare for this deposition?
A I reread my expert report. I reread Mr. Bisbee's rebuttal report. I had Zoom conversations with the two attorneys that are here today.
Q Did you look at any other documents besides your own report and Joe Bisbee's expert rebuttal report?
A I looked at the Christopher Cooper article that I cited in my report.
Q Any other articles that you looked at?
A No.
Q Did you look at any documents from Fleet Farm?
A No.
Q You said that you met with counsel from the Stinson Law Firm. Do you recall which dates you met with them on?
A Monday and yesterday and the day before that.
Q And was it the two gentlemen who are in the

room with us today?
A Yes, it is.
Q Okay. And what are their names?
A Andy Davis and --
Q Apologies for the memory test. I'll help you out. And Zach Wright, yes?
A And Zach Wright, yes.
Q About how many hours in total would you estimate that you all met for?
A I would say about 17 hours.
Q So besides meeting with counsel and reviewing the documents that we discussed, did you do anything else to prepare for the deposition?
A No.
Q Did you talk to anyone else?
A No.
Q Okay. Professor Kleck, how old are you?
A Seventy-three.
Q And where were you born and raised?
A I was born in Elmhurst, Illinois, and raised in Lombard, Illinois. Elmhurst was the hospital where I was born at.
Q Okay. Could you walk me through your educational background. From college forward, let's say.

A Okay. I got a bachelor's degree in 1973 at the University of Illinois. A master's degree also from Illinois in 1975. And a Ph.D. in 1979 also from Illinois.

Q And what was -- I guess let's start with your bachelor's degree. What was your major in?

A Sociology.

Q And what about for graduate school?

A Sociology.

Q I can guess for the Ph.D., but what was your Ph.D. concentration?

A Sociology.

Q Okay. Pretty consistent, huh.

Did you have a special -- I guess we'll focus on your Ph.D. program. Did you have a special area of focus inside of sociology during the Ph.D. program?

A Yes, it was criminology.

Q And what is criminology?

A Criminology is the scientific study of the causes and consequences of crime and of the effort to reduce crime.

Q And in general, so I guess that's a big level overview of criminology. In practical terms, does that involve research, and what kind of research?

MR. DAVIS: Objection; vague; compound.

A Yes, it involves research.
BY MR. MALONEY:
Q How?
A You test propositions that may or may not be true, and so you expose the hypothesis to some observation of the empirical world.
Q And what types of observation of the empirical world do you rely on as criminologist.
A Often it's some form of correlation or association between two phenomenons.
Q I'm thinking in terms of specifically what kinds of empirical data are used in a more concrete sense?
A I can tell you the types I use.
Q Sure.
A I use official crime statistics as generated by law enforcement agencies. I use census data that describe areas, both in connection with what they are like apart from their level of crime. I use survey data generated by the Bureau of the Census on victimization experiences of the U.S. population. And I use survey data that I have generated myself, in particular concerning defense of gun use.
Q For purposes of this case, did you use any of your own generated data?

A In a sense what I -- numbers that I computed for the expert report were my own research, so... But not preexisting research, it's what I did for this report.

Q So when you're talking about numbers that you generated, you're using other third-party sources to then generate a number based on, you know, multiplying or dividing or, you know, somehow having those numbers interact.

But did you use any of your own survey data for this report?

A No.

Q Okay. Or any other data that you've collected empirically as a part of this report?

A No.

Q Okay. And I think you talked about, besides your own data, three kinds of data, right? There was survey data, there was census data, and remind me what the first type was?

A Official crime statistics.

Q Official crime statistics. And where do official crime statistics come from?

A The FBI compiles accounts of crimes and arrests from local law enforcement agencies.

Q And is that done by reporting from the local

agencies to the FBI?
MR. DAVIS: Objection; lack of foundation.
BY MR. MALONEY:
Q If you know.
A Yes.
Q Among at least these three types of data, in your opinion, is one of them better than the other?
MR. DAVIS: Objection; vague.
A No. They're each useful for different purposes.
BY MR. MALONEY:
Q So your Ph.D. program, you said your concentration was criminology, yes; is that right?
A Yes.
Q Did you have a more specific focus inside of criminology?
A I would say violence.
Q What was your Ph.D. thesis on?
A It was on the effect of gun ownership rates and the use of capital punishment on the homicide rate.
Q Was that the first time that you had done an academic work that involved firearms?
A Yes.
Q After you received your Ph.D., where did you work after that?

A Florida State University.
Q Is that where you work now?
A I'm retired, but when I retired I was working for Florida State.
Q So did you spend essentially your entire career at Florida State?
A Yes.
Q And were you a professor at Florida State?
A Yes.
Q So as a professor at FSU, what was your -- we'll start here.
What classes did you teach when you were an active professor at FSU?
A For undergrad classes I taught the overview of criminology, the introductory course that covers the entire field. And for graduate courses in one way or another they were research methods courses for the most part, with a few exceptions. So they would cover topics like statistics, causal inference, the strengths and weaknesses of different kinds of information. And how to evaluate other people's research to assess its quality, relevant quality.
Q And aside from teaching, what was your -- or, I guess, what were your areas of research when you were a professor?

A Guns and violence certainly was the primary area, but also formal social control, the impact of legal punishment on crime, for example.

Q In your CV, it cited quite a few publications that you had. So is it fair to say at least the majority of your publications were focused on firearms in some way?

MR. DAVIS: Objection.

A Yes.

BY MR. MALONEY:

Q Possibly even the vast majority?

A I don't know what that means. But certainly the majority.

Q Seventy-five percent?

A Possibly. But I'm not really sure about that. I never calculated the fraction that way.

Q I want to ask you a question on the specifics of some of your publications. Would it be helpful to have your CV in front of you if I asked a few questions about them?

A Yes.

(Plaintiff's Exhibit 211 was marked for identification.)

BY MR. MALONEY:

Q I'm going to show you -- or hand you what's

been marked as Exhibit 211.
A (Views document.)
Q So I believe if you scroll to like the back, whatever, two-thirds of the way through is where your CV is, and then there are publications and presented papers in your CV.
Looking at this list, and then I guess off the top of your head as well, do you have any publications that focus on straw purchasing? I'll give you a second to look through the list.
MR. DAVIS: Counsel, are you referring to every listed publication in the CV or are we focused on --
MR. MALONEY: I can go category by category.
BY MR. MALONEY:
Q Let's look at -- if you start on page four of your CV, Professor Kleck, where it says, Publications and then Books. And let me know when you're there.
A I'm there.
Q Okay. So just on page four, this list of books. These are one, two, three, four, five, the six books that you've published; is that right?
A Yes.
Q Did any of those books focus on straw purchasing?

A No.
Q Let's go to the next page. The second category says, Articles in Peer-Reviewed Journals. Do you see that there?
A Yes.
Q And then that list goes on for one, two, three, four, five pages. Could you look through that list and then let me know if any of those article focused on straw purchasing?
A Two of the articles address it, although, I wouldn't say focused on it.
Q Could you point me to which articles?
A On page 7, 1999, the St. Louis University Public Law Review.
Q And just for the record, that article is entitled, "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals," is that right?
A Yes.
Q What is BATF gun trace data?
A BATF stands for Bureau of Alcohol, Tobacco and Firearms. It is the principle of federal agency that enforces firearms laws.
Gun trace data is information concerning the tracking of gun transfers that can be done by ATF from

the point of manufacture to the point of its first retail sale.

Q Do you recall how this article discusses or involves straw purchasing?

A Straw purchasing is a part of the purported organized gun trafficking that I was exploring. And the essence of the article is that there really is virtually no significant organized gun trafficking; and, thus, virtually no significant straw purchasing as part of that supplying of guns to criminals.

Q So this article, at least in part, examined the link between straw purchasing and what guns are supplied to criminals; is that right?

A No.

Q No, it did not?

A No.

Q Did this article examine the warning signs of straw purchasing?

MR. DAVIS: Objection; vague.

A No.

BY MR. MALONEY:

Q Do you have any experience with the warning signs of straw purchasing?

A I read the available ATF information on it.

Q What available ATF information have you read?

A I wouldn't be able to tell you now without going through a list of ATF publications.

Q Did you look at any of those publications in the time since you've been retained as an expert in this matter?

A I believe I did.

Q And do you recall which ones that you have looked at?

A No.

Q And they weren't disclosed in your report, right?

MR. DAVIS: Objection; mischaracterizes the record.

BY MR. MALONEY:

Q We can go through the sources at the end if that's more helpful. But off the top of your head do you recall listing any ATF resources on warning signs in your report?

A They wouldn't be in the report, they would be in the references for this article and the other one I was going to allude to.

Q But your testimony was that if we go back to the 1999 St. Louis University Public Law Review article, that article did not discuss straw purchase warning signs, correct?

A That is correct.
Q Okay. And let's go, just so we kind of tie this off, the other article in this section that involves straw purchasing, could we navigate to that?
A The UCLA Law Review article, that's on page 9.
Q Okay. Page 9. Looking for UCLA.
A No, it's on page 7. 2009, with Shun-Yung Wang. "The myth of big-time gun trafficking and the overinterpretation of gun tracing data," in the UCLA Law Review.
Q And how did that article involve straw purchasing?
A In the same way the 1999 article did, that is, it discusses the evidence concerning whether there is big-time gun trafficking or high-volume gun trafficking. And also gets into the issue of how trace data is misinterpreted or overinterpreted regarding what we know about gun trafficking, which encompasses straw purchasing as a key alleged component of trafficking.
Q So fair to say that this article was focused on the prevalence of how often big-time gun trafficking occurs?
A Certainly, that --
Q Did it discuss or consider the linkage between that trafficking and crime?

A Yes.
Q And how did -- how does straw purchasing play into that analysis?
MR. DAVIS: Objection; vague.
A It plays into it in the sense that it's alleged to be a key component of how gun trafficking operates.
BY MR. MALONEY:
Q What do you mean by that?
A I mean, ATF doctrine says that one of the major ways that gun traffickers acquire a supply of guns to sell is through the use of straw purchases.
Q Do you agree with ATF doctrine that that's the case of straw purchasing in gun trafficking?
A No.
Q You don't agree with the ATF?
A That's right, I don't agree.
Q Why is that?
A Because the evidence they cite in favor of that conclusion is irrelevant for the most part, or it's bias. And it tends to exaggerate the degree to which any kind of gun trafficking activity is involved.
Q And what you just said, was this covered in this 2009 UCLA Law Review article?
A Yes.

Q Was it also covered in the 1999 St. Louis University Public Law Review article?
A Yes.
Q Okay. Any other articles in this section of articles and peer-reviewed journals between pages 5 and 9 that involve straw purchasing?
A Not as a central topic.
Q Would you turn to page 10? Could you look at this other Published Articles list? And I'll ask you the same question, if any of these articles involve straw purchasing?
A No.
Q Can you turn to page 11? It looks like page 11 through 13 has a section entitled Book Chapters. Are these books to which you contributed a chapter or more?
A Yes.
Q Could you go through that list of Book Chapters and let me know if any of those involve straw purchasing?
A Not as a central topic.
Q And let's look at one more category. Skip a few pages to 15. That's a category that's entitled Presented Papers. Do you see that there?
A Yes.
Q Can you go through the list of Presented

Papers and let me know if any of those involve straw purchasing?
A Yes.
Q Point me to what you're looking at where you had a presented paper that involved straw purchasing?
A Page 18, 2006, with Shun-Yang Kevin Wang. "Organized gun trafficking, crime guns and crime rates."
Q This is from the American Society of Criminology in Los Angeles; is that right?
A Yes.
Q And that was the same author of the article you pointed out earlier, correct?
A Yes.
Q The 2009 article in the UCLA Law Review?
A Yes.
Q Was this the same topic as the UCLA Law Review article?
A Partially, yes.
Q And did this presentation cover straw purchasing in a similar way to the 2009 Law Review article?
MR. DAVIS: Objection; vague.
A Not that one, no. I don't think.
BY MR. MALONEY:
Q So how did this 2006 presentation with

Shun-Yang cover straw purchasing or involve straw purchasing?

A No, I'm saying no, it did not.

Q It did not involve straw purchasing?

A Not in the same way that the UCLA Law Review article did.

Q So if it was -- if it covered or involved straw purchasing in a different way, in what way did the presentation involve straw purchasing?

A Well, the 2006 article didn't address it at all. The one that addresses it is the 2007 article in that same chapter, in that same section.

Q Oh, so we have been looking at -- I'm on page 18, yes. You had pointed me to the 2006 presentation, "Organized gun trafficking, crime guns and crime rates." Is that right?

A Yes. I don't think that concerns -- I don't recall that concerning straw purchasing. The 2007 article, the one the next year at the meetings in the American Society of Criminology, that one did.

Q And that was entitled, "The myth of big-time gun trafficking"?

A Yes.

Q And do you recall how that presentation involves straw purchasing?

A It again uses some variety of information largely derived from ATF to support the proposition that there is no significant big-time gun trafficking; and, thus, no significant straw purchasing.
Q Because in discussing or thinking about gun trafficking, straw purchasing is one method of gun trafficking, correct?
MR. DAVIS: Objection; vague.
A It is regarded by ATF and many gun control supporters as an important component of gun trafficking.
BY MR. MALONEY:
Q Do you consider straw purchasing to be a component of gun trafficking?
A A component? Yeah, on the rare occasions gun trafficking occurs. An important component? No.
Q Let's take out the frequency piece of it. I mean, in the abstract, straw purchasing is a form of gun trafficking, yes?
A Yes.
Q Okay. Any other presentations in the section that we're looking at that involve straw purchasing?
A The 2011 presentation at UCLA Law Review symposium.
Q And that was entitled, "The myth of big-time gun trafficking?

A Yes.
Q Which was the same as the 2007 presentation?
A Yes.
Q Same title, I should say?
A Yes.
Q And was it the same content?
A It's heavily overlapping.
Q And was it the same content with regards to straw purchasing?
A I really couldn't tell you that specific piece of information.
Q Any other presentations in this list that involves straw purchasing?
A I don't think so.
Q Could you turn back for me to page 14 of your CV? And look at the bottom section. It says, research funding. Do you see that?
A Yes.
Q And it lists two grants here, one from the U.S. Sentencing Commission and the other from the Charles E. Culpeper Foundation; is that right?
A Yes.
Q Were there any other grants or research funding that you've received as part of your work at FSU?

A No.
Q So have you ever received a research funding or grants from the firearms industry?
MR. DAVIS: Objection; asked and answered.
A No.
BY MR. MALONEY:
Q Okay. You mentioned to me that you're now retired from your professorship at FSU?
A Yes.
Q When did you retire?
A 2016.
Q So about I guess we're going on about nine years ago?
A Almost nine.
Q And why did you retire?
A I'd reached of age of 65 and had done all the work I needed to do.
Q Makes sense to me. Do you still actively teach?
A No.
Q Do you still actively do any research?
A Yes.
Q What types of research are you doing since you've retired?
A The most recent published research was on the

effect of gun ownership rates on suicide rates.
Q When was that published? I see we're scrolling through your CV, so we can get some precision on that.
A 2022.
Q We're looking at the bottom of page 20 of your CV?
A Page 9.
Q I'm on the wrong page. Yes, I see it right there at the bottom of page 9, 2022. "The cross-national association of gun ownership rates and suicide rates: An analysis of 192 nations." Is that right?
A Yes.
Q And are you still working on new articles or publications even today?
A Yes.
Q What kind of research are you doing right now?
A I'm doing critiques of published research by other authors. I'm responding to criticisms of my research by other authors.
Q In what subject matter areas are you working on those things in?
A Firearms and its use in self-defense is a lot of where the rebuttals of criticisms occur. And on a

somewhat related topic, the issue of whether or not criminals who are wounded seek medical care; and, thus, would show up in statistics on people treated for gunshot wounds.

Q Does any of that current work involve straw purchasing?

A No.

Q Does it involve gun trafficking at all?

A No.

Q Have you had any other employer since you finished your Ph.D. program, apart from FSU?

A No.

Q Where did you work before -- I guess, let's say from the time that you graduated high school until you became a professor at FSU, did you have any employers in that period?

A Yes.

Q Where did you work?

A During the summers I worked at a freight house loading and unloading boxcars and 18-wheelers. During the academic year, I was either a teaching assistant or research assistant at the University of Illinois.

Q Let's say even before you went to college, at any point in your life kind of before you were a professor at FSU, did you ever work in retail sales?

A No.
Q Fair to say you've never worked in firearms retailing?
A That is correct.
Q Okay. And I think this is clear, but you've never worked for law enforcement?
A That is correct.
Q Have you ever worked for any company that's in the firearms industry?
A No.
Q Have you ever worked for the National Rifle Association?
MR. DAVIS: Objection; asked and answered.
A No.
BY MR. MALONEY:
Q Or the National Sports Shooting Foundation?
MR. DAVIS: Same objection.
A No.
BY MR. MALONEY:
Q Professor, have you ever served as an expert witness before?
A Yes.
Q Can you give a number from your memory of how many times you've served as an expert witness, or how many matters I guess you've done expert work?

A Over 20, but beyond that I wouldn't be able to be more precise.
Q So we'll say more than 20. Do you know when was the first time you were hired to serve as an expert witness in a case?
A Sometime in the early '80s, I would say.
Q And we discussed earlier that you got your Ph.D. in '79, right?
A Yes.
Q And you became a professor shortly after that?
A Yes.
Q So is it fair to say that for nearly your entire career in academics that you've been serving as an expert witness in litigation?
MR. DAVIS: Objection.
A Well, except for the first five years or so, and only intermittently. Some years not at all, so...
BY MR. MALONEY:
Q Would you ever have multiple cases at once?
A Yes.
Q So having worked on that many cases, I think I know the answer to this, but have you ever sat for a deposition before?
A Yes.
Q Do you know how many times?

A Probably in excess of 20, again.
Q So it sounds like for maybe not all but for most of the cases in which you are retained as an expert witness, you would have sat for deposition in those matters?
A Yes.
Q Actually, let's back up and talk about the entire slate of cases in which you've been retained as an expert witness. Did all of those cases involve firearms in some aspect?
A Yes.
Q Did any of those other cases, besides this matter, involve straw purchasing?
A Probably not, but I couldn't swear that I'm certain about that.
Q Let's be sure. Let's go through at least the partial list of the matters you've worked on.
Turn to I believe it's the first few pages of your report. Yeah, go to the bottom of page three. The heading entitled Legal Cases in Which I Have Served as an Expert Witness. Do you see that there?
A I do.
Q And the first sentence here says, "In the past ten years, I have been deposed and/or testified in trial in the following matters," and it lists cases, right?

A Yes.
Q So we've talked about, you know, you having served as an expert on more than 20 cases. This would not be a complete list, because it only covers the last decade, right?
A Yes.
Q Could you look at the list of cases from the last decade and let me know if any of these cases on this list that you look at involve straw purchasing?
A I wouldn't be able to tell you, because I don't really recall the detail of what matters are addressed from these cases.
Q Looking at this list on pages 3 and 4 doesn't help refresh your memory of what the matters involved?
A No.
Q But at least both from your memory and this list, nothing jumps out to you as having involved straw purchasing as you look at this; is that right?
A That would be correct.
Q And looking at this list of cases, and checking that against your memory, do you believe that this list is complete and accurate of all the cases in the last ten years that you were deposed or testified at trial for?
A I believe so. I tried to make it as complete

as possible.

Q What did you do to make sure this list was complete and accurate?

A I went through my files on consulting.

Q Anything else?

A No.

Q We've talked about your deposition history. Have you testified in court before?

A Yes.

Q About how many times do you think you've testified in court before?

A Twice since 2013. At least once before then.

Q Let's start with the case before then. What case before 2013 did you testify at trial for?

A I couldn't tell you.

Q And for the two cases since 2013, are either of them on this list on pages 3 and 4?

A Yes, both of them are.

Q I think we can look at it and figure it out. It looks like one is the Cook et al v. Hickenlooper case; is that right?

A Correct.

Q And what is the other matter?

A Association of New Jersey Rifle and Pistol Clubs, Inc., et al v. Grewel et al.

Q Thank you. I see that right there.
And did either of those cases, the Cook case or the New Jersey case involve straw purchasing?
A I couldn't tell you for sure. Again, I really don't recall the details from the dozens of cases I've been involved in.
Q Have you ever been retained for a matter in the State of Minnesota?
A Certainly not since 2013. But I couldn't swear to the period prior to 2013.
Q So you're looking at this list on pages 3 and 4, and none of these cases were in the Minnesota courts, correct?
A Correct.
Q And you're saying that it's possible that you were in a case that involved a Minnesota court before 2013, but you're not certain?
A That's correct.
Q Okay. Looking at this list of cases, let's start with the Heller case. Which party in that case retained you as an expert witness?
A Heller.
Q And Heller was --
A The plaintiff I guess is the term.
Q And what was Heller suing the District of

Columbia for?

A I don't know.

Q What was the subject matter of your testimony in the Heller case?

A I don't remember.

Q The Cook et al v. Hickenlooper case, who hired you in that case?

A I'm guessing Cook et al, since, I guess, they're in the position of the plaintiffs. But that's about all I can tell you.

Q Is that a common circumstance for you, that you would be hired by a plaintiff suing a governmental body regarding firearms?

A I'd say that's frequently the case.

Q Why is that?

MR. DAVIS: Objection; lack of foundation.

A Because those are the parties that regard my expertise as relevant.

BY MR. MALONEY:

Q In what way would those parties, you know, gauge your expertise as relevant because they're suing the governmental entity regarding firearms?

MR. DAVIS: Objection; vague; lack of foundation.

A Broadly speaking, if they've read my published

research, they would know that I'm frequently sceptical about the impact of gun control. So if they're challenging gun control, I would be a relevant witness.

BY MR. MALONEY:

Q As we go down the list, I mean, I guess we don't have to belabor this too much. They are a list of cases here, Wilson V. Cook County, Kolbe v. O'Malley, D. Md. from Maryland.

I mean, these next two cases, is it a similar circumstance where you were retained by a plaintiff, they were suing a governmental entity?

A I'm not sure about the Wilson v. Cook County. At one point I was employed by the City of Chicago who were being sued, and I was advising on their behalf. And then that case never resulted in a deposition or trial. I mean, it was simply a consultation.

Whether or not this is an overlapping case, I don't know. It is Cook County, which is where Chicago is located. But I really couldn't tell you for sure.

Q When you're working with the City of Chicago, I guess what expertise were you providing to them? Like, why did they hire you to advise them for that case?

MR. DAVIS: Objection; compound, vague.

A It had to do with a gun accident, I think, a

gun accident involving a Chicago police officer. And so it was the issue of how guns were stored, that connection with the occurrence of firearms accidents. That was the issue at hand.

BY MR. MALONEY:

Q Have any other governmental entities in the United States hired you as an expert witness in a matter, apart from the City of Chicago?

A None occur to me right now.

Q Let's skip down to Barbara Schlifer Commemorative Clinic v. HMQ Canada, let's skip that case. Then go down to Friedman v. City of Highland Park. Who retained you in that matter?

A I assume Friedman.

Q Why do you assume Friedman?

A Because they're in the position of the plaintiff.

Q And they're in the position of the plaintiff challenging a governmental entity?

A Yes.

Q And it's -- I mean, I guess I'll ask you. They were challenging a governmental entity on what basis?

A I don't know.

Q Is your assumption that it was regarding some

type of law or regulation involving firearms?
MR. DAVIS: Objection; calls for speculation.
A I'd only be guessing. I really don't know.
BY MR. MALONEY:
Q What's your best guess?
MR. DAVIS: Same objection.
A Well, as best guess, it had something to do with some kind of gun regulation by Highland Park, or perhaps the enforcement of a regulation.
BY MR. MALONEY:
Q The next case, Tracy Rifle and Pistol v. Harris and the Eastern District of California. Do you recall who retained you in that matter?
A I believe Tracy Rifle and Pistol.
Q And who is Tracy Rifle and Pistol?
A I really don't remember. Some kind of gun-related organization, but I couldn't tell you exactly.
Q In your expert witness work, have you been retained by gun-related organizations in the past, like Tracy Rifle and Pistol?
A Yes.
Q Do you recall what any of those organization's names were that have retained you?
A Yeah. Besides Tracy Rifle and Pistol, there

was also Association of New Jersey Rifle and Pistol Clubs, Inc. And then there was NRA v. Swearingen in 2020.

Q So when I asked you earlier about the NRA, and you said you've never worked for the NRA, but you've been retained by the NRA in litigation; is that right?

A Yes.

Q How about the next case job, Maryland Shell Issue. Is that some kind -- what organization is Maryland Shell Issue?

MR. DAVIS: Objection; lack of foundation.

A I can only guess that it was an advocacy group that supports Shell Issue carry laws, but that's just a guess.

BY MR. MALONEY:

Q Are they the party that retained you as an expert witness in that litigation?

A Probably.

Q Do you recall what the nature of your testimony was in that case?

A No.

Q The next case down -- actually, let's stay on the Maryland Shell Issue case. It notes here that you were deposed on that case on Zoom in September of '22; is that right?

A Yes.
Q Do you recall if you were excluded as an expert in that case?
A No.
Q Have you ever been excluded as an expert in a case?
A I don't remember.
Q Is it possible?
A Sure, it's possible.
Q But you don't remember ever being subject to exclusion as an expert?
MR. DAVIS: Objection; asked and answered.
A No.
BY MR. MALONEY:
Q Do you recall even, aside from having been excluded, having been the subject of an exclusion motion?
A Again, I don't know. I don't remember.
Q If you had been excluded as an expert in a case, would the hiring, you know, the party that hired you, communicate with you regarding your exclusion?
MR. DAVIS: Objection; vague; compound; lack of foundation.
A It's possible.

BY MR. MALONEY:
Q It's possible, but you don't remember ever having that communication with the party who hired you as an expert witness?
A No.
Q Now, let's talk about this last case on page 4, the Oregon Firearms Federation case.
Were you hired by the Oregon Firearms Federation in that case?
A Most certainly.
Q And it looks like you were deposed for that case January, 2023; is that right?
A Yes.
Q What is the Oregon Firearms Federation?
A Just some gun owners organization. Beyond that, I couldn't tell you anything specific.
Q Do you recall what the issue in the case was?
A No.
Q Do you recall what the nature of your testimony in that case was?
A No.
Q And this is the most recent deposition that you've sat for as an expert witness?
A Yes, I believe so.
Q Okay. But you don't recall what your

testimony was about two years ago?
A No. I would have to consult my files to know that.
Q So you didn't review any of your past depositions in the time since you've been retained as an expert witness in this case?
A That's correct, I have not.
Q Okay. So having gone through all of this, both your memory and this list, is it fair to say you have never testified in a firearms case on behalf of someone suing a member of the firearms industry?
MR. DAVIS: Object to form.
A I don't believe so.
BY MR. MALONEY:
Q And is it fair to say that of the -- I think our best estimate was about more than 20 times that you've been hired as an expert witness?
A Yes.
Q You've been an expert testifying against, you know, firearms regulations or gun control measures; is that right?
MR. DAVIS: Objection; mischaracterizes the testimony.
A For the most part.

BY MR. MALONEY:

Q What about the other parts that aren't the most part?

A In the Chicago case, it was not challenging a gun control measure.

Q Any other cases you can think of in that vein?

A Not as I sit here, no.

Q Do you own any guns, Professor Kleck?

A Yes.

Q How many guns do you own?

A Two.

Q And what kind of guns are they?

A One is a revolver and one is a semiautomatic pistol.

Q A handgun?

A A handgun.

Q And what do you own those two firearms for?

MR. DAVIS: Objection; vague.

A These days primarily for recreational purposes; and, secondary, for self-defense should the issue arise. Originally, though, I acquired the guns for research reasons.

BY MR. MALONEY:

Q What were you going to research with those firearms?

A When I first started researching guns and violence, I had never owned a gun. I thought it was incumbent on me to be familiar with the handling of firearms.

And so I explored things like, you know, how fast can you shoot; how do you reload; what are the possible dangers of handling a gun, and so forth.

And most recently -- I still had a research purpose, I did field tests with a friend of mine on how fast you can reload a semiautomatic pistol; how fast you can change magazines, because that's relative to the issue of large capacity magazine bans.

Q So when did you first buy these firearms?

A I would say circa '79 on the revolver, and maybe early '80s, mid '80s on the semiautomatic pistol. That's really a guess, though.

Q As you talk about the kind of research you're doing and kind of getting familiar with the firearms, did you take lessons --

A No.

Q -- to learn how to use them?

A No.

Q How did you learn?

A From friends.

Q And where would you, if you were kind of

testing them out by shooting them, where would you go do that?

A Go to a firing range.

MR. DAVIS: Could we go off the record for a second?

MR. MALONEY: Sure.

(Break taken from 9:11 a.m. to 9:20 a.m.)

BY MR. MALONEY:

Q All right. Welcome back, Professor Kleck. We're back on the record after our first morning break here.

I wanted to go back -- actually, let's talk about this. You've been retained as an expert in the Fleet Farm matter, yes?

A Yes.

Q When did you first hear about this case?

A Sometime earlier this year when the lawyers -- not this year, I guess it's last year, 2024, when the lawyers called me up.

Q So that was the first time you had heard about this case is when Fleet Farm counsel contacted you?

A That's correct.

Q And do you have any more specificity as to when in 2024 that was?

A No, I would have to consult my notes to know

that.
Q Is it in your report?
A No.
Q Okay. And after that first conversation with Fleet Farm counsel, were you retained by Fleet Farm shortly thereafter?
A Yes. I would say shortly thereafter, sure.
Q And do you recall when the date of your retention was?
A No.
Q When did you begin working on your expert report for this case?
A Again, sometime in 2024.
Q Do you have any more specific time that you can give us as to when you started working on your report, besides sometime in 2024?
A No, not without consulting my notes that are at home.
Q When did you begin reviewing materials from that matter?
A Well, again, that would be the same date you just asked about.
Q The same date that you started working on the report would be the same day you started reviewing materials; is that right?

A Yes, I would consider that a component part of preparing the report.
Q In reviewing materials, you list -- if you go to the last page of Exhibit 211, your report, behind appendix B there is a list of citations here. It's the very last page of the document on the back. Do you see that list of cites there?
A Yes.
Q Are these the list of sources that you relied on for your report?
A They would be all the ones that I cited in the report, yes.
Q Did you rely on other materials besides the sources cited here?
A Yes, I read the Complaint in the case.
Q The Complaint is cited in this list, right?
A Is it? (Views document.)
Q If you go --
A Oh, no, no.
Q Do you see it there --
A Oh, yes, yes, I see it. Yes, State of Minnesota.
Q The third to the last item on the page; do you see it there?
A Yes.

Q So now, having known that the Complaint is on this list, any other materials that you looked at besides what is on this page that you reviewed in preparing your report?
A Not that I remember.
Q Did you look at any documents from Fleet Farm?
A Not that I recall.
Q So Fleet Farm didn't provide you any of its internal training documents?
A No.
MR. DAVIS: Objection; asked and answered.
A No.
BY MR. MALONEY:
Q Is it fair to say that your knowledge of the facts of this case, then, come only from the State's First Amended Complaint?
MR. DAVIS: Object to form.
A Yes.
BY MR. MALONEY:
Q Did you ask Fleet Farm if you could look at their internal documents?
MR. DAVIS: Object to form.
A I think I might have asked the lawyers whether they could look at some information that might be provided by Fleet Farm.

BY MR. MALONEY:

Q So you weren't looking for that information for yourself, but you were telling the lawyers to look at some Fleet Farm information?

A To see if Fleet Farm had it, yeah.

Q What type of information were you looking to get from Fleet Farm for them?

MR. DAVIS: I'm going to object to this question, Counsel, as going to work product communications between Professor Kleck in his capacity as a testifying expert and counsel for Fleet Farm.

MR. MALONEY: I think to the extent that he is discussing with you all materials -- I guess, let me back up, and I can try to ask a few questions to see exactly what happened here.

BY MR. MALONEY:

Q So were you asking for these materials for your use in preparing your report?

A Yes.

Q Can you give any more specificity as to what materials you were seeking for your use in your report from Fleet Farm?

MR. DAVIS: I'm going to instruct the witness not to answer the question as invading work product

protected communications related to drafting the report and strategy around drafting the report.

MR. MALONEY: I think it's highly relevant to this case if he sought documents and either didn't get them or thought he didn't need them as to what is in his report or not.

MR. DAVIS: Same objection.

MR. MALONEY: Are you instructing the witness not to answer?

MR. DAVIS: Yes.

BY MR. MALONEY:

Q Without disclosing the materials that you asked for, did you receive them from Fleet Farm?

A No.

Q Was the reason that you didn't receive them because Fleet Farm didn't provide them?

A I assume so.

Q In your opinion, did that hinder or at all inhibit your ability to render your opinion in this report?

MR. DAVIS: Object to form.

A No, it just would have been a nice addition.

BY MR. MALONEY:

Q A nice addition in what way?

A It would have provided local Minneapolis area

specific information.

Q Were there any other -- so specific local Minneapolis information about what?

A About gun sales.

Q About Fleet Farm's gun sales?

A Yes.

Q What detail about Fleet Farm's gun sales?

MR. DAVIS: I'm going to instruct the witness not to answer.

Again, you're going beyond the scope, Mr. Maloney, and invading communications that are work product in nature.

MR. MALONEY: I understand the work product objection. I don't think -- we are certainly within scope as far as relevance goes.

MR. DAVIS: I didn't object on relevance, I objected on work product.

MR. MALONEY: You also said outside of scope. I think we are well within scope.

BY MR. MALONEY:

Q So regarding information about Fleet Farm's gun sales, how would that have factored into your report, if you had that information?

A It would have been specific to Fleet Farm and not just about the gun industry in general.

Q Would you have used those numbers in the calculations that are in your report?

MR. DAVIS: Objection; calls for a hypothetical.

A Could you repeat the question, please?

MR. MALONEY: Could you read it back?

(The requested portion was read.)

MR. DAVIS: Same objection; calls for a hypothetical.

A No.

BY MR. MALONEY:

Q Why not?

MR. DAVIS: Same objection.

A Because I had other purposes in mind.

BY MR. MALONEY:

Q What purposes did you have in mind?

MR. DAVIS: I'm going to object to this question again as calling for work product. You're invading the expert's communication, strategy, working with counsel in preparing a draft of this report.

I'm going to instruct him not to answer.

MR. MALONEY: Andy, I'm asking what purpose he has in mind for use of information in his report. I don't think that invades attorney work product at

all.

MR. DAVIS: Same objection. I'm going to instruct the witness not to answer.

BY MR. MALONEY:

Q Going back to your report. Did you write the first draft of your report?

A Yes.

Q Do you have any estimation of how many drafts were done of that report?

A Probably around five.

Q Did the counsel you're work with at the Stinson Law Firm that represent Fleet Farm, did they create any of these drafts?

A No.

Q Did those counsel edit drafts that they received from you?

A They made comments on it.

Q So, Professor Kleck, we've gone through some of your background and your qualifications. In your opinion, what qualifies you to be an expert witness in this case?

MR. DAVIS: Object to the form of the question.

A My knowledge of firearms trafficking.

BY MR. MALONEY:
Q And we've established that you had a few articles that touched on firearms trafficking. But in your opinion, what firearms trafficking expertise do you have that qualifies you to be an expert in this case?
A The familiarity with ATF enforcement activity, and in particular, with firearms tracing and its limitations. And my study of how gun trafficking works, to the extent that it does exist.
Q Because part of your opinions from past articles that we've already walked through is that, you know, gun trafficking, kind of large scale gun trafficking, is, I don't want to put words in your mouth, but is not a significant problem, in your opinion?
MR. DAVIS: Object to the form of the question.
A I wouldn't phrase it as to seriousness of the problem. I would say that trafficking contributes a very small share of the guns that are used in crime.
BY MR. MALONEY:
Q And in your opinion, that includes how straw purchasing contributes to crime as well, because straw purchasing is gun trafficking, right?
A Yes, it's a part of gun trafficking.

Q And you testified earlier that you disagree with the ATF that gun trafficking is a significant -- or that straw purchasing is a significant component of gun trafficking, right?

A Yes.

Q Have you ever communicated your disagreement to the ATF on that front?

MR. DAVIS: Object to form.

A No.

BY MR. MALONEY:

Q Why not?

A I don't have much communication to ATF other than to request information.

Q I actually want to know. So I should note for the record that you laughed in response to my question.

What's so comical about you reaching out to the ATF to let them know that, you know, you disagree with their assessment of the kind of seriousness of the problem of straw purchasing?

A I guess they really don't -- wouldn't care about my opinion.

Q Why not?

MR. DAVIS: Objection; lack of foundation; calls for speculation.

A Yeah, I could only guess. I could only

speculate.
BY MR. MALONEY:
Q What's your best guess as to why the ATF wouldn't care about your thoughts on this?
MR. DAVIS: Same objection.
A They have their bureaucratic priorities; and, you know, they're an agency in the business of going after straw purchasing. And so it would be against their organizational interests to say that straw purchasing is of little significance; and, therefore, their enforcement activities are of little significance.
Q But you base your opinion on your analysis of the statistical data regarding -- I mean, we'll go through a number of things. But your opinion is grounded in data, right?
A Yes.
Q But you think that even though your opinion is kind of based in statistical data, that backs up your opinion that even then the ATF would not take it seriously?
MR. DAVIS: Object to form.
A I would be only guessing what the feelings of leaders of the ATF believe.
BY MR. MALONEY:
Q You said that straw buying is a bureaucratic

interest of the ATF, right?
A No, I don't recall saying that.
Q Is it an interest of the ATF -- you know, I guess I should say, preventing straw buying is a focus of the ATF, right?
A I would say it's a focus, sure.
Q And, I guess, what informs your opinion, you know, that it is kind of this interest and focus of the ATF, that straw purchasing is?
A Reading ATF documents.
Q Anything else that inform them?
A No.
Q Do you disagree with the ATF's focus on preventing straw purchasing?
MR. DAVIS: Objection; mischaracterizes the record.
A I don't have any particularly strong views on that. I've never done any assessment of the ATF as an organization. I'm merely interested in the significance of various channels of guns to criminals, some of which the ATF attempts to regulate.
BY MR. MALONEY:
Q Do you think it's worthwhile for the ATF to take measures to prevent straw purchasing?
MR. DAVIS: Objection; vague.

A Well, it's certainly sensical that they attempt to enforce the law, that's their job. And so it's against the law to engage in straw purchasing. So, yeah, certainly they should enforce that law.
BY MR. MALONEY:
Q Right, because a straw purchase is a crime, correct?
A It is.
Q Do you think it's worthwhile for FFLs, for firearms retailers to seek to prevent straw purchasing?
MR. DAVIS: Objection; vague.
A What do you mean is it worth their while?
BY MR. MALONEY:
Q In the sense of, you know, of the things that FFLs could do, the time, resources, personnel that they could dedicate to any of their activities as a firearms retailer, is it worth their time, effort and resources to take actions to prevent straw purchasing?
A I wouldn't be in a position to say.
Q Why not?
A Well, I don't know how much resources ATF devotes specifically to suppressing straw purchasing. I know that's part of their duty as enforcers of federal firearms law, but that's about all I know.
Q But your testimony is that you can't say

whether retailers should dedicate, you know, time, resources and employees to prevent straw purchasing?

A Well, they should certainly block it if they know about it.

Q Anything else that they should be doing?

MR. DAVIS: Objection; calls for speculation; vague.

A Well, this goes well beyond the parameters of my report. But, yeah, just as an interested party or, you know, sort of a neutral party, I could speculate about all sorts of things they might devote their activities to.

BY MR. MALONEY:

Q Well, let's focus on you said that they should block it if they know about it, right?

A Yes.

Q The "if they know about it," part, are you familiar with what are called the warning signs of straw buying?

A Yes.

Q That's terminology that you've heard before?

A Yes.

Q And I think you previously testified that you had seen some of those warning signs in ATF documentation; is that right?

A Yes.
Q Have you seen those warning signs anywhere else?
A Possibly, I don't recall.
Q Any documentation from the firearms industry that you can recall seeing that had warning signs of straw buying?
A Yeah. I think the National Shooting Sports Foundation certainly discusses it in some of their publications.
Q Any other sources that you can think of with those warning signs?
A Not as I sit here.
Q Okay. And would you consider yourself an expert in those warning signs?
A I really don't understand the question.
Q Do you have any particular expertise in knowing and interpreting those warning signs?
A Again, I honestly don't understand the question.
Q Have you ever are -- besides looking at that documentation, have you ever gone to a training on warning signs of straw purchasing?
A No.
Q And I think you already testified to this, but

you've never worked in law enforcement, correct?
A Correct.
Q You've never investigated a straw purchasing case as a law enforcement officer?
A Correct.
Q Before this report, have you ever done any analysis of a fact scenario to see whether or not signs of straw purchasing were present in that scenario?
A Could you repeat the question?
Q Yes. Prior to this report have you ever analyzed a fact scenario to ascertain whether or not signs of straw purchasing were present in that fact scenario?
A No, I don't think so.
Q And do you view what you did in this report as analyzing some straw purchase warning signs?
A Well, I'm confused as to how to answer the question. Let me try this:
No, except that I'm not aware of any affirmative evidence that any of those warning signs are in fact valid, meaning, they actually predict or help identify straw purchases.
Q Your opinion is that the straw purchase warning signs -- and we're talking about the straw purchase warning signs that you see in ATF

documentation, yes?
A Yes.
Q And the warnings signs you've seen in NSSF documentation, yes?
A Yes.
Q You're not aware of any evidence that those warning signs are valid?
A That's correct. My position would be that they're validity is essentially untested.
Q Do you know if there is a way to test their validity?
A Yes.
Q And what way would that be?
A You would identify cases in which it was known that a straw purchase had occurred, often by law enforcement investigation and other transactions where no such thing was known, and you would compare them with respect to each of the purported indicators of straw purchasing.
Q But you're not aware of that kind of a study having been done in the past?
A That is correct.
Q So without that kind of a study, you would have concerns about the validity of the straw purchase warning signs that are in ATF and NSSF documentation?

MR. DAVIS: Object to form.
A That is correct.
BY MR. MALONEY:
Q So I think I asked this earlier, and maybe our conversation has helped you to understand the question.
So just to be clear, you know, given your background and the research you've done, you do not have expertise in the warning signs of straw buying, correct?
A Well, other than the -- I guess I can be an expert on the absence of any affirmative evidence that these are valid indicators. So that's sort of a negative expertise.
Q Because, again, you think that there's no evidence to support the ATF and NSSF warning signs of straw buying?
A There's anecdotal evidence, and that's not very reliable.
Q In your opinion as a criminologist, you want more than anecdotal evidence?
A Yes, I want the kind of test that I just outlined. And it would be easy to do it, but ATF is not, to my knowledge.
Q And you testified earlier as well that you've never worked for a firearms retailer, right?
A That's correct.

Q So you don't have any kind of hands-on experience working with a retailer to prevent straw purchasing at the retail level, right?
A That is correct.
Q Your expert report, if you look at page 4, it's Exhibit 211.
Under compensation it notes that you're being compensated at $500 per hour; is that right?
A Yes.
Q Do you know off the top of your head how much the firm has paid you so far?
A No.
Q Do you have any estimate?
A I would say over 2,000, but beyond that I'd be guessing.
Q Well, you testified previously that you prepared for this deposition, it was close to 20 hours of preparation, right?
A Yeah.
Q So I'm not great at math, but I think if you do the math on that it will be well over $2,000, correct?
A Your arithmetic is correct, but the underlying reasoning is not correct.
Q Why is that?

A Because some of that work was done since January 1, and I submit my invoices on a monthly basis. So any work, such as prep for the deposition, wouldn't be included in the January invoice, which has not submitted yet.

Q So the issue is in my use of language of what you've been paid so far versus what you will be paid in the near future, correct?

MR. DAVIS: Object to form.

A I think the answer to that is yes.

BY MR. MALONEY:

Q Are you aware that Fleet Farm has two other expert witnesses?

A I believe I was aware of that.

Q How did you learn about the two other expert witnesses?

A In the Bisbee report, I think the other two are mentioned.

Q Do you recall what their names are, the other two expert witnesses?

A No.

Q Okay. One of them is named Andrew Graham. Does that ring a bell?

A Yeah, a little bit. Sort of.

Q Did you know him prior to this case, Andrew

Graham?
A No.
Q In the course of this case -- or I guess at any time prior, have you ever communicated with him?
A No.
Q You mentioned seeing him -- you saw his name in the Joe Bisbee rebuttal report, yes?
A Yes.
Q Did you review Andrew Graham's primary report in this case?
A No.
Q The other expert is William Napier. Does that name ring a bell?
A Only in that I saw it in the Bisbee report.
Q That's the first time you had seen his name before?
A Correct.
Q So since you saw his name in that report, have you had any communications with him?
A No.
Q Did you review his expert report in this case?
A No.
Q So you didn't review their reports, so I suppose just based on what you saw in the Bisbee rebuttal report, do you have any knowledge of whether

your opinion in this matter are consistent with their opinions?
MR. DAVIS: Object to form.
A I have no knowledge one way or the other.
BY MR. MALONEY:
Q Would it concern you if your opinions are inconsistent with theirs?
MR. DAVIS: Object to form.
A No.
BY MR. MALONEY:
Q Why not?
A I'm confident of my conclusions.
Q Regardless of what they say, you're confident in what your report says?
A Yes, because they're not experts in the areas that I am.
Q Do you know what areas they are experts in?
A No, only that they're not experts in the areas I work with. They're never appeared in the scholarly literature.
Q You're not familiar with them from your other criminology work as having shown up at conferences or in academic literature?
A That's correct.
Q Do you know if either of them are experts on

preventing straw purchasing?

A No.

Q Do you know if either of them are experts on recognizing straw purchase warning signs?

A No.

Q So let's go to the Summary of Opinions in your report. We're still on Exhibit 211, page 4.

You list three opinions here, right?

A Yes.

Q Let's start here. When you're retained on these cases, started to review this matter, you know, I guess when did you first form these opinions from reviewing this matter?

MR. DAVIS: Object to the form of the question.

A Well, the Opinion 1 wouldn't have been formed in connection with this case in particular. It would be a conclusion, which I had already arrived.

But Opinion 2, of course, refers specifically to the two straw purchasers involved in this case. And, of course, I had never heard of them before.

And, let's see. Again, Opinion 3 I would have already arrived at prior to, you know, examining any materials specific to this case.

Q So I think we'll get into kind of what the

nucleus was of how these got formed. But let's actually start here.

When you're hired as an expert on a case, what's your methodology for reviewing the matter and then drafting your report?

MR. DAVIS: Objection; vague.

A I usually start by reading the Complaint, which tends to lay out the issues involved in the case fairly clearly.

And sometimes the lawyers who have invited me to participate in the case will suggest areas of my expertise that pertain to the issues in the case. And so I might review information or research that I had done previously that might be relevant to the case.

BY MR. MALONEY:

Q What happens next?

A I would say next, I guess I would write an initial draft of an expert report.

Q Maybe if you'd go into more detail on this. So you talked about reading the complaints, you know, thinking about where your expertise fits in. And you said previously as well that this first opinion here, this is -- I guess would you call it a kind of preconceived opinion that you had prior to this case?

MR. DAVIS: Object to form.

A I don't know exactly what preconceived means, but it's certainly a conclusion that I had already arrived at based on research in the past.
BY MR. MALONEY:
Q So is it fair to say that you didn't do a new analysis to reach the opinion for this matter, you already held this opinion prior to this case?
MR. DAVIS: Object to form.
A That's correct.
BY MR. MALONEY:
Q And I want to ask specifically about the methodology that you use in reaching opinions like this. Because you already said for this case that you read the Complaint but no other case documents that relate to Sarah Elwood or Jerome Horton, right?
A Unless there's something in the Bisbee report that pertain to them, otherwise, no.
Q So, I guess, walk me through in a general sense, you know, these three opinions that you have here. What do you do to reach those opinions in terms of, you know, looking at data and analyzing how that data, you know, leads to the conclusions that you reached?
MR. DAVIS: Objection; vague; compound.
A Well, to take Opinion 1, much of what we know

about how guns get into the hands of criminals comes from criminals themselves. Go to the horse's mouth and ask them.

And so there have been surveys of incarcerated criminals where they were asked, how did they get their guns. And the general pattern in that research is that FFLs have hardly anything to do with how criminals get a hold of guns. They certainly aren't involved in thefts, because very few thefts are thefts from FFLs. There is no straw purchasing involved in, you know, a criminal just buying a gun from a friend or family member.

So examining what we already know about how criminal get guns, it indicates that nothing to do with FFLs, and certainly not straw purchases. It has much to do with how they acquire guns.

Q So let's take a step back. So you talked about using data from, you know, surveys of inmates, of incarcerated persons, yes?

A Yes.

Q For purposes of this case, did you look for any new sources of data for any of the data categories you were looking at?

A No.

Q How did you find the data that you did use?

A It was published in books, such as Armed and

Considered Dangerous.

Q I guess, how did you know where to look for it, like what sources to use?

A Well, I had already read these books.

Q So you drew on your past experience kind of knowing these data sources to then use them for this report?

A Yes. Well, not just for this report. But, yes, later on for use in this report.

Q And you're confident in the data sources you chose for this report?

A Yes.

Q Were there any sources of data that you considered or looked at but chose not to include?

A In the report you mean --

Q Correct.

A -- included in the report? Possibly. I mean, you know, it might be sufficient to make the points I was making in the report to cite some sources and not bother citing other supportive sources. So I --

Q So you considered -- oh, go ahead.

A So I couldn't tell you if there was additional sources that I did not include in the report.

Q Do you recall what any of those additional sources were?

A No.

Q But you're testifying that it's possible there were additional sources you considered but didn't include, right?

A It is possible.

Q Did you review any sources that contradicted or varied the data in the sources that you did include?

A Well, I had also previously read many ATF documents, some of which asserted that straw purchasing was important as a source of guns for criminals.

But what my reading of those documents indicated is that there was very little hard evidence that straw purchases were common, and common enough to claim a significant share of the guns that went into criminal's hands.

Q Besides ATF documents, were there any other sources that you considered but ultimately didn't include?

MR. DAVIS: Object to the form of the question.

A Not that I can recall right now.

BY MR. MALONEY:

Q I guess just to put a bow on this. I mean, did you do a look for data beyond the sources that you were already familiar with from your previous work?

A No.
Q The three opinions listed in the middle of page 4 here, from your first draft of this report to now, have these opinions changed at any point?
A No. I would have always held to those opinions, even from the beginning.
Q Why is that?
MR. DAVIS: Object to form.
A Because it's what the evidence supports.
BY MR. MALONEY:
Q And particularly, you said that this first opinion, this was your opinion even prior to being retained for this case, correct?
A Correct.
Q How about -- we'll skip the second opinion, because that pertains to Jerome Horton and Sarah Elwood, yes?
A Yes.
Q The third opinion, "Sales of multiple guns at the same time are not suspect and rarely involve guns later used to commit crimes."
Was this an opinion you held prior to the case?
A Yes.
Q For the first and third opinions that are

listed here, have you ever published an article or given a speech or done any kind of publication on either of these opinions?

A No, except that publications that say that illegal gun trafficking is of little significance, it necessarily implies that straw purchases by confederates of traffickers are unimportant since that's a subset of gun trafficking, so...

I have published articles that say illegal gun trafficking or organized gun trafficking is unimportant as a source of guns to criminals, which means, any subset of that gun trafficking activity must also be unimportant. That would include straw purchases.

Q So you would consider the articles you've written about the relative impact of gun trafficking to include what's your first opinion -- the first opinion in this report that covers the impact of straw purchasing; is that right?

MR. DAVIS: Object to form.

A You lost me.

BY MR. MALONEY:

Q I'm trying to summarize what you just said.

So is your testimony that the previous articles you're written about the relatively minor impact, I think in your -- how you have characterized

the articles of gun trafficking, that that would include your first opinion from this case about the impact of straw purchasing?

A Yes.

Q Okay. Would that -- would those also include your third opinion on multiple gun sales?

A That it was an opinion I previously had?

Q Correct.

A Yes.

Q So those, the articles you've written about gun trafficking, also talk about the fact that, you know, quoting from this third opinion, that multiple gun sales are routine and common place and are not suspect?

MR. DAVIS: Objection; mischaracterizes his testimony.

A No.

BY MR. MALONEY:

Q This third opinion, have you ever published anything or given a speech with this opinion about multiple gun sales?

A Published, no. Given a speech about it, about that among other things, yes, probably.

BY MR. MALONEY:

Q Do you recall on the list of speeches we went through which one you gave that you --

A The one at the UCLA seminar or forum, or whatever it was.

Q Which was titled, or the subject matter was about gun trafficking, right?

A Correct.

Q But you would have talked about multiple gun sales at that presentation?

A I believe so, yes.

Q And at that presentation you gave this opinion that multiple gun sales are not suspect and rarely involve guns later used to commit crimes?

A Not in so many words. I just would have said that that's a part of or alleged to be a part of gun trafficking. And that gun trafficking as a whole, organized gun trafficking or high involve gun trafficking, is of no importance in supplying guns to criminals.

Q And before you gave that speech, had you done the underlying research that is in this report to give that opinion at the earlier presentation?

A Well, it's not my research that's the basis for that opinion.

Q I guess, had you done your analysis of other's research that led you to that opinion before that presentation?

A Yes. Well, probably. The sequencing is not easy for me to recall, but, probably.

Q I'm going to direct you to the first opinion on page 1 here, which reads, "Straw purchases of handguns from FFLs," sorry, we're on the middle of page 4, first opinion.

"Straw purchases of handguns from FFLs contribute no more than a negligible share of guns used to commit crimes. There is no reliable and relevant evidence showing that straw purchases are a significant source of guns used to commit crimes."

Is that what it says there?

A Yes.

Q Do you still hold this opinion today as you sit here?

A Yes.

Q So I want to clarify something with you that I think will help us from a language sense. I think you've already testified, straw purchasing in and of itself is a crime, correct?

A Yes.

Q It's a crime under federal law?

A Yes.

Q It's a crime under Minnesota law?

A I think so, yes.

Q You don't know for sure?
A I'm just assuming so about Minnesota. It's a federal law that also applies in Minnesota, so...
Q So to the extent that, you know, the first sentence of this opinion says that "Straw purchases of handguns from FFLs contribute no more than a negligible share of guns used to commit crimes." I mean, as kind of a -- as a tautology, a straw purchase of a handgun is a crime, right?
A Yes. But it's not a gun used to commit a crime.
Q But it is a gun that's involved in the crime of a straw purchase, right?
A Yes.
Q So when you, in this first sentence of this opinion are saying, you know, guns used to commit crimes, you mean crimes other than straw purchasing; is that right?
A Yes.
Q Do you have any specific categories of crimes in mind or do you mean any crime beyond a straw purchase?
A In particular, violent crimes.
Q Oh, so we're not even -- you're not focused on nonviolent crimes in this opinion, you're focused on

violent crimes?
A Yeah. The phrase commit crimes really doesn't make sense in connection with other crimes besides violent crimes.
Q Is there a reason why you didn't use the words violent crimes in your opinion?
MR. DAVIS: Object to form.
A Not that I recall.
BY MR. MALONEY:
Q Do you know if you used --
A I mean, it's sort of unnecessary really. I mean, if committing crime necessarily implies we're talking about violent crimes, then it wouldn't be necessary for me to belabor the issue by using the phrase violent crimes.
Q You don't think that a common sense reading of the words commit crimes would include committing nonviolent crimes in this context?
MR. DAVIS: Objection; speculation.
A No, it would not make sense.
BY MR. MALONEY:
Q Why is that?
A Because you're not committing anything. If you merely steal a gun, for example, in nonviolent crimes, guns are not used to commit the crime. They may

be the object of the crime, as when they're stolen in a burglary, for example, but they're not used to commit the crime.

Q Let's take an example. You don't think that a felon found in possession of a firearm, you know, a prohibited person who is found with a firearm by police is committing a crime?

A He's not using a gun to commit the crime. His mere possession of the gun is a crime.

Q How about someone who has a firearm in public and shoots it in the air and is committing a public disturbance; is that the use of a firearm to commit a crime?

A I would say that's a borderline case.

Q Why is it borderline?

A Well, of course, it might entail violence. I mean, if you're shooting the bullet into the air and it might land on a person. It either would or could physically harm a person, which would make it a violent crime. So that individual firing the gun into the air in that sense would be committing a crime with a gun.

Q You just mentioned harming a person. Is that your conception of whether a crime is violent or not is whether a person is harmed?

A No. It's if there is an attempt, successful

or not, to harm a person.

Q So just to be clear, to look at -- I think it covers both sentences of your opinion to the extent they talk about guns to commit crimes. You're only opining as to whether these guns are used to commit violent crimes, correct?

A Yes, it would certainly be true if the statement was confined to violent crimes.

Q So that's true for both of these sentences, right? Both about that "Straw purchases of handguns from FFLs contribute no more than a negligible share of guns used to commit crimes," your testimony today is that you are opining only as to guns used to commit violent crimes?

A Yes. I would have no probably if that opinion was expanded by including the word violent before crime.

Q What if it was expanded to cover -- to say the word nonviolent?

A Well, it would still be true, but it's sort of trivially true.

Q What does that mean, "trivially true"?

A Because there's really no sense in which a gun can be used to commit a nonviolent crime. It's redundant.

Q But do you -- your analysis in this opinion in

this section underlying your opinion, you weren't -- did you analysis the linkage between straw purchases of handguns and nonviolent crime?

A I have no idea what that question could even mean. I don't know what -- how could you investigate something that is -- doesn't exist as a concept.

Q I mean, the concept of nonviolent crime does exist, correct?

A It does.

Q Did your analysis cover the linkage between straw purchasing and the involvement of straw purchase guns in nonviolent crime?

A It did not. And even looking back on it now, there is no earthly reason why I would want to do that.

Q Okay. And the same with your second sentence of your opinion, "There is no reliable and relevant evidence showing that straw purchases are a significant source of guns used to commit crimes."

Fair to say, same as the first sentence that you were looking at violent crimes --

A Yes.

Q -- correct?

Okay. But again, you were not analyzing nonviolent crimes?

A That's correct.

Q Okay. Are you familiar with ATF forms that are involved in firearm purchases?
A Some of them.
Q Let's put one in front of you just so that we're on the same page about them.
(Plaintiff's Exhibit 12 was marked for identification.)
BY MR. MALONEY:
Q All right. This has been marked as Exhibit 12.
A (Views document.)
Q So if you look in the bottom right corner, Professor Kleck, it's very small, it's very hard to see. It says, ATF Form 4473. Do you see that down in the bottom right corner? Way down there.
A Yes.
Q Are you familiar with an ATF Form 4473?
A Yes.
Q Are you aware from your previous knowledge of this form that it asks firearm purchasers to certify that they are the actual buyer?
A Yes.
Q And it asks FFLs, you know, the person or entities that are selling the firearm, to certify that it is lawful for them to transfer to the buyer, right?

A Yes.
Q If you look at page 6. This font is a little small, so it's hard to see. The right column, you go just a little bit, about halfway down. It's under question 27, NICS Background Checks. The second paragraph under that there is a bold warning. Let me know when you're there.
A Okay. Got it.
Q You got it? Okay. It says, "Warning: Any person who transfers a firearm to any person knowing or having reasonable cause to believe the sale or disposition to such person is prohibited violates the law, 18 USC '922(d), even if the transferor/seller has complied with the federal background check requirements."
Do you see that there?
A I do.
Q Have you ever seen this language before in this warning sentence?
A Yes.
Q Do you agree with that statement, that any person who does a transfer of this knowledge with reasonable cause to believe that the sale is to a prohibited person violates the law, even if the background check is passed?

MR. DAVIS: Object to form; calls for a legal conclusion.

A My layman's understanding of it is yes.

BY MR. MALONEY:

Q Do you think that, you know, FFLs, entities that are selling firearms, that it's an important responsibility for them to ensure that they're not making a sale or disposition that violates the law?

A Yes.

Q Why is that important?

A Because it's one way to block potentially dangerous people from acquiring firearms.

Q And fair to say that the form is set up this way and has these certifications because, as we already discussed, straw purchasing is illegal under federal law, right?

A Yes.

Q Did you review this form in making your report?

A No.

Q When do you think is the last time you looked at a Form 4473?

A Gosh, years ago, I would say. But beyond that I couldn't be more precise.

Q And speaking of federal law, have you ever

looked at federal statutes that prohibit straw purchasing?

A Yes.

Q And why did you do that?

A I wanted to make sure I understood what exactly was forbidden regarding straw purchasing.

Q Did you do that for the purposes of this matter?

A No.

Q So did you do that prior to this case?

A Yes.

Q Do you recall when you did that?

A It certainly would have been prior to that 1999 St. Louis Law Review article.

Q Which would put that date at 1990 or earlier that you would have looked at those statutes?

A '99 or earlier.

Q 1999, sorry. So in your memory, have you looked at those statutes since '99?

A Not that I recall.

Q I mean, this case involves straw purchasing. Was there any specific reason in your mind as to why you didn't go back to look at those statutes to refresh your memory on them for this case?

A No.

MR. DAVIS: Object to form.

BY MR. MALONEY:

Q And I asked you about Minnesota law earlier. I guess I'll ask you once again.

Do you know if straw purchasing is illegal under Minnesota law?

A I don't know for a fact, no.

Q Did you look at any Minnesota statutes or rules in preparing your report?

A No.

Q Have you ever looked at Minnesota statutes or rules?

A No.

Q I don't blame you. Most people haven't, so...

Could you turn in your report to page 7. You can put aside Exhibit 12.

I just wanted to cement the point. So we had talked about the fact that your opinion in your words, you're focused on your analysis that, you know, no more than a negligible share of guns that are straw purchased are used to commit crimes, correct?

A Correct.

Q And we discussed that your analysis is focused on violent crimes, right?

A Correct.

Q We had talked about in a technical sense, every straw purchased gun is in and of itself a crime, right?
A The purchase of it is a crime, yes.
Q Aren't each of those guns crime guns?
MR. DAVIS: Object to form; vague.
A I would say that would be an odd way to refer to them. I mean, you know, we don't really refer to stolen cars as theft vehicles. I mean, they're the object of the theft, so... In this case I would say that would be odd terminology.
BY MR. MALONEY:
Q But they are guns that are used in a crime to the extent they are straw purchased guns, they're involved in the crime, right?
A Again, it's bending the language to say they're used. They are the objects of theft, possession, or whatever.
Q When you say bending, am I bending your language or someone else's language?
MR. DAVIS: Object to form.
A You're bending your language.
BY MR. MALONEY:
Q Sure. You say at the top of page 7, the first full paragraph in the middle, you're talking about

stolen firearms and you say -- do you see the sentence that starts with this figure? It's about halfway down, the first paragraph. "This figure can be estimated" --

A Oh, yes, I see it.

Q Do you see that?

So this sentence reads, "This figure can be estimated by using known numbers of firearms stolen, (one hundred percent of which go directly to criminals, by definition)." I'm not going to read the whole sentence. I just wanted to focus on this part in parenthesis.

You're saying one hundred percent of firearms that are stolen, by definition, go directly to criminals, right?

A Yes, I'm saying it's true by definition, because if you stole a gun that makes you a criminal.

Q The same thing with a straw purchase, right?

A Certainly.

Q One hundred percent of straw purchased guns go to criminals, yes?

A Yes.

Q Okay.

A Well, wait a minute. Go to? They're transferred by criminals, because anybody who is doing the transfer; but, they may go to somebody who isn't a

criminal.

Q You don't think that the recipient of a straw purchased gun is a criminal?

A Well, once somebody straw purchases it, the gun can go from person to person. It may go to somebody else who is other than the intended recipient of the initial straw purchase.

Q But isn't the ultimate recipient of the firearm involved in a straw purchase a criminal, just like the straw buyer is a criminal?

MR. DAVIS: Objection; calls for speculation.

A Not the ultimate recipient. The person to whom the straw purchaser sells the gun, yes.

BY MR. MALONEY:

Q You're saying that the person -- that there could be people after that person who buys it from the straw purchaser that would not be criminals?

A That's correct.

Q Wouldn't those people afterwards be buying -- would be involved in trafficking, they would be buying a trafficked firearm?

A You're going into legal issues that I'm not an expert on.

Q I mean, they'd be buying a firearm off the -- it would be a black market firearm, right?

MR. DAVIS: Object to form.

A Yes, but I'm not sure as to whether or not it's a crime if the person is unaware of that fact.

BY MR. MALONEY:

Q And just to put a button on something in talking about, you know, crime and violent crime versus nonviolent crime, your report does not cover the distinction between nonviolent and violent crimes in this section, correct?

MR. DAVIS: Professor Kleck, feel free to take the time to review the full Opinion 1.

A When you say in this section, what section are you referring to?

BY MR. MALONEY:

Q I'm talking about under Opinion 1, right, because you had clarified that your ultimate opinion for Opinion 1 that you're referencing violent crimes and talking about guns used to commit crimes.

But your analysis under the first opinion does not lay out a distinction between violent and nonviolent crimes, correct?

A If you're referring to discussion of number of guns stolen, then, yes, there is no distinction made between guns that are stolen and might ultimately be used in violent crimes versus those that are stolen and

never used in violent crimes.
Q I'm talking about the entire opinion, you know, all the analysis that you're doing here, you don't lay out a distinction between violent and nonviolent crimes, right?
A No, except that I regard it as sort of imply or self-evident that the only sense in which guns can be used to commit crimes rather than be the object of crime is if they're used to aid in the act of violence.
Q But do you know if the numbers that you're using in this section are explicitly based on firearms used in violent crimes?
A You'd have to specific which numbers you're talking about?
Q Do you give a definition of violent crime at any point in this report?
A No.
Q Have you ever done that in your literature --
A Yes.
Q -- that you've written, yes?
A Yes.
Q Why not do it here?
A Like a thousand other things that might be useful, it just didn't occur to me.
(Plaintiff's Exhibit 9 was marked for

identification.

BY MR. MALONEY:

Q I'm going to hand you what has been marked as Exhibit 9.

A (Views document.)

Q And we've talked about this a times already. If you look at the first page, this is the first Amended Complaint in this matter, yes?

A Yes.

Q You previously testified that you read this after you were retained for this case?

A Yes.

Q Can you turn to it's paragraph 62 on page 23?

A Okay.

Q And this paragraph reads, "Of the different ways that firearms can get into the hands of criminals, 'straw purchasing' is one of the most prevalent and concerning. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has identified straw purchasing as the most common channel for the diversion of firearms into the black market and illegal gun trafficking schemes, accounting for thousands of trafficked guns every year."

Is that what it says there?

A It is what it says.

Q And then there's a citation in that footnote number 7 to Following the Gun report from ATF, right?

A Yes.

Q So you cite this paragraph. If you go to your report, Exhibit 211, on page 5, correct? At the top of page 5.

A Yes.

Q Is it fair to say that this, the presence of this paragraph in the First Amended Complaint is why you rendered this first opinion in this case?

MR. DAVIS: Object to form.

A Yes, I was pointing out an inaccuracy in the Complaint.

BY MR. MALONEY:

Q Can you point to anything else in the Complaint that would have, you know, informed or led to why you rendered the first opinion in this case?

MR. DAVIS: Objection; vague.

A In a negative sense. I mean, I went through the rest of the Complaint and never found anything that was relevant to the issue of how common straw purchases is as a result as a way of guns getting into the hands of criminals.

BY MR. MALONEY:

Q So is it fair to say that this paragraph 62 is

the sole link that you identified between your opinion and this matter?

MR. DAVIS: Object to the form of the question. Calls for speculation.

A I don't understand the question.

BY MR. MALONEY:

Q So your opinion about, you know, the link between how often straw purchased guns are used in crimes, in violent crimes, are you aware of anything else besides Exhibit 62 in the State's First Amended Complaint that relates to your opinion?

MR. DAVIS: Object to form.

A Again, only in the sense, you know, in a negative sense in the fact that the rest of the report has nothing that is relevant to the issue of how prevalent straw purchasing is as part of gun trafficking or as a way of guns getting into the hands of criminals.

BY MR. MALONEY:

Q Are you aware that other portions of this Complaint talk about crimes that were committed with straw purchased guns?

A Yes.

Q If you go to paragraph 45 of the Complaint. Let me know when you're there.

A I'm there.

Q It talks about a gun that -- I'll start in the middle of the sentence, that second sentence in paragraph 45.

A gun that was, "Allegedly discharged in public in the middle of Minneapolis and found by police in the possession of an individual without a permit to carry a handgun."

Do you see that there?

A Yes.

Q That's a crime committed with a straw purchased gun, correct?

MR. DAVIS: Object to form.

A Yes.

BY MR. MALONEY:

Q If you go to paragraph 46. The first sentence reads, "On September 6th, 2021, the Glock 19 9mm pistol that Fleet Farm sold to Horton on July 7th, 2021, serial number BTNX619, was found by a six-year old boy in the front yard of his family house in south Minneapolis."

Skipping a sentence, it says, "The gun was likely discarded there by suspects involved in an earlier Minneapolis public shooting incident who then raced through the neighborhood as they fled from the police."

Do you see that there?

A I do.
Q Would you consider that a crime committed with a gun that was straw purchased?
A No.
Q Why not?
A Because all we know from this is that the person -- somebody dropped the gun and then it was found by someone else, and that's not by itself a crime, to my knowledge.
Q It's not a crime to discard a gun in someone's front yard?
MR. DAVIS: Objection; calls for legal conclusion.
A I'm a lay person, and I don't really know whether that's the case or not.
BY MR. MALONEY:
Q Does it concern you that a six-year old boy found a discarded gun in his front yard?
A It does.
Q Go to paragraph 47. The second half of the first sentence says that one of the guns Fleet Farm sold to Horton was, "Found by police in the possession of an individual without a permit to carry a handgun."
Do you see that there?
A I do.

Q Is that a crime committed with a handgun that was straw purchased from Fleet Farm?

MR. DAVIS: Objection; calls for legal conclusion.

A Again, I would say it's a stretch to say that the gun is used to commit a crime in that sense, and the mere possession of it is a crime, it constitutes a crime.

BY MR. MALONEY:

Q If you go to paragraph 48. It talks about another firearm that was, "Found by police in the possession of a prohibited person with prior convictions for first degree aggravated robbery and for aiding and abetting first degree burglary."

Do you see that there?

A I do.

Q Is this another gun that was, you know, used in the commission of a crime that was straw purchased from Fleet Farm?

MR. DAVIS: Same objection.

A My answer would be the same with regard to paragraph 47. That is to say, it's probably a distortion of the language to say the person committed a crime with the gun. They just abandoned the gun, threw the firearm away --

BY MR. MALONEY:
Q Do you know that for either instances, that they through it away?
A -- and that this person was presumably ineligible to possess the gun. I'm only reading what's in the paragraph. The individual threw the firearm as he was fleeing from the police.
Q Is that true for paragraph 47?
MR. DAVIS: Object to form.
A That he threw it away? No, that's not true of paragraph 47.
BY MR. MALONEY:
Q So, I guess, your issue is just with the commissions committed language, right? Both of these individuals are in possession of firearms, and their possession of those firearm is a crime, right?
A Correct.
Q And they are in possession of firearms that were straw purchased from Fleet Farm?
A Correct.
Q Paragraph 49 talks about a Mossberg handgun that at the end of the first sentence was, "Fired in the Seventh Street Truck Park shooting in St. Paul."
Do you see that there?
A I do.

Q If you go to the last sentence of that paragraph on the next page it says that, "Phillips allegedly fired the pistol in this chaotic shootout at a St. Paul area bar where the exchange of gunfire between three different gunmen injured 14 people and killed a 27-year old woman when a bullet penetrated her left lung and heart." And then the next sentence reads, "Fleet Farm sold two more handguns to Horton after the Truck Park shooting."
Do you see that there?
A I do.
Q In this circumstance, is this a straw purchase firearm used in the commission of a crime?
A I can't tell from the information provided.
Q Why not?
A Well, there's three shooters, three gunmen, so presumably who individuals who possessed guns, other than this Phillips. And so it might have been one of the other two gunmen using another gun other than the straw purchased gun to injure the people and kill the 27-year old woman.
Q If he fired the pistol but didn't actually make contact with anyone, is that not still a violent crime?
A It's still a violent crime, it's just not

necessarily the killing.

Q So this pistol was used in the commission of a violent crime, correct?

A It was.

MR. DAVIS: Off the record for a second.

MR. MALONEY: Sure.

(Break taken from 10:33 a.m. to 10:33 a.m.)

BY MR. MALONEY:

Q So just to go back to your opinion, let's go back to page 5 of your report. I guess page 4. Opinion number 1, "Straw purchases of handguns from FFLs contribute no more than a negligible share of guns used to commit crimes."

That's the first sentence, right?

A Yes.

Q But when you read the Complaint and you read about these instances of crimes that occurred with these Fleet Farm handguns, right?

A Could you repeat the question, please?

Q When you read the Complaint you said that -- you know, we just went through about four different paragraphs of the Complaint, right?

A Yes.

Q Do you recall reading these paragraphs when you reviewed the Complaint when you were retained for

this case?
A Yes.
Q So you're aware of the instances of crime that are alleged in the Complaint involving handgun straw purchases from Fleet Farm, yes?
A Yes.
Q But your opinion is in the abstract, that straw purchases are no more than a negligible share of guns used to commit crimes, which in your opinion is violent crimes, right?
A That's correct.
Q But in this case with these guns from Fleet Farm, these guns were used to commit violent crimes, right?
MR. DAVIS: Objection; argumentative.
A Well, again, there's one that might have been used to commit a violent crime. So I even don't know that guns, plural, is appropriate.
BY MR. MALONEY:
Q So at least one gun was used to commit a violent crime, right?
A Yes.
Q Can you square your opinion with the fact that there was at least one gun that was actually used in a violent crime?

A Easily.
Q How?
A Because a single anecdote doesn't in any way undercut an assertion that pertains to guns used to commit crime as a whole.
Q This is a rare occurrence that doesn't upset your ultimate analysis of the data, right?
A It's a single case. It could scarily be rarer than a single case.
Q But from your reading of the Complaint and your knowledge of this matter, isn't this matter about this incident and these sales, not the broader hypothetical?
MR. DAVIS: Object to the form of the question; calls for speculation. Beyond the scope of his expert report.
A Yeah, I mean, you know, certainly the case concerns a limited number of sales by one particular company's gun stores and involving a very limited number of individuals who have committed crimes of various sorts. So, yeah, that's true. But it doesn't really have any bearing on my opinion.
BY MR. MALONEY:
Q But how does your opinion -- does your opinion come into play if we already know what happened with the

guns, that at least one of them was used to commit a violent crime?

MR. DAVIS: Objection; vague.

A Well, it doesn't undercut the opinion in any way, certainly.

BY MR. MALONEY:

Q But does your opinion -- does your opinion really have any relevance or bearing on that fact if we already know what happens, right?

MR. DAVIS: Objection; calls for legal conclusion; calls for speculation.

A Well, my opinion has nothing to do with that one case one way or the other. It's not based on that one case nor does that one case alter my conclusion.

BY MR. MALONEY:

Q Your opinion, it's predictive, right?

A No.

Q It's not?

A No. It's descriptive.

Q But you're seeking to render an opinion as to kind of predict or show the causal link of what happens when a handgun is straw purchased?

MR. DAVIS: Objection; mischaracterizes the report; mischaracterizes his opinion.

A No.

BY MR. MALONEY:

Q How am I wrong?

A Because the opinion has nothing to do with that. Basically, what I'm describing is the entire population of guns used to commit crimes and at no point do I proffer the opinion that no handgun has ever been -- no straw purchased handgun has ever been used to commit a violent crime.

If I had rendered that opinion, then, of course, the information in the Complaint would contradict it. But, of course, at no point do I offer that opinion.

Q But, to your knowledge, does this case involve the entire population of straw purchased handguns?

MR. DAVIS: Objection; vague.

A No. No. As far as I can tell from the Complaint, it pertains only to guns straw purchased from various Fleet Farm stores.

BY MR. MALONEY:

Q One of which was used in a violent crime, right?

A Correct.

MR. MALONEY: Okay. We can go on break.

MR. DAVIS: Thanks.

(Break taken from 10:38 a.m. to 10:46 a.m.)

BY MR. MALONEY:
Q All right. Welcome back, Professor Kleck.
I wanted to have you look at -- so we had looked at the First Amended Complaint, Exhibit 9. I pointed you to that footnote, which involved the ATF publication Following the Gun, right?
A Yes.
Q And you have in your report pages -- I want to say 5 and 6 for sure you're discussing this ATF report Following the Gun, and fair to say you're critiquing it, yes?
A Yes.
(Plaintiff's Exhibit 212 was marked for identification.)
BY MR. MALONEY:
Q All right. I'm going to hand you what has been marked as Exhibit 212.
A (Views document.)
Q The front page says, Following the Gun from June of 2000, right?
A Yes.
Q Can you go to page xi. It's hard to see. I had a hard time seeing it. It's on the top left-hand corner.
A I've got it.

Q If you see at the top, the second paragraph there, where it says straw purchasers. Do you see that?
A I do.
Q So it says, "Straw purchasers. Straw purchasing was the most common channel in trafficking investigations. Almost half of all trafficking investigations involved straw purchasers. Therefore, although the average number of firearms trafficked per straw purchase investigation was relatively small, 37 firearms, there were nearly 26,000 firearms associated with these investigations."
Do you see that there?
A I do.
Q And in your discussion -- I guess, let's start here. You were familiar with this report prior to being retained for this case; is that right?
A Yes.
Q And had you analyzed and critiqued it prior to this case?
A Possibly. I don't really recall whether I published anything to that effect. But, probably, yeah.
Q And you said that this first opinion was based on analyses and review that you had done prior to this case, right, the first opinion in your report?
A Correct.

Q And that first opinion is critiquing this ATF report, right?
A It does, yes.
Q And is it fair to say that your kind of critique or analysis of this report is that the straw purchase numbers in the paragraph that I just read to you only come from ATF investigative data, right?
A Yes.
Q And in your opinion, what does it mean that these numbers that the ATF is providing of straw purchased firearms and trafficked firearms come only from investigations?
A I'm sorry, you have to repeat that question. I didn't understand it.
Q You focus a lot in your report on the fact that these numbers only come from investigations, right?
A Yes.
Q Why is that important?
A Well, because they're irrelevant to the issue of how widespread straw purchasing is as a means of criminals acquiring guns.
Q Can you explain why ATF investigative data of how many firearms they see that are straw purchased in their investigations is irrelevant?
A Yes. Because only a tiny handful of all

transfers of firearms are investigated in a trafficking investigation. And the handful that are investigated are not representative of the whole set of transfers of firearms. They're indeed not even supposed to be representative.

Q So is it your opinion that the ATF's experience with their firearms' investigations and how often they see straw purchased firearms is completely irrelevant to figuring out how often straw purchasing actually happens?

MR. DAVIS: Objection; vague; compound.

A It is irrelevant if you're asking about how often it occurs in general, how often straw purchases as a whole occur. What it does apply to is how often straw purchases is involved in the cases that ATF investigated.

BY MR. MALONEY:

Q And it's your opinion as well that certainly from this dataset that you would not be able to ascertain how many of those straw purchased firearms are then used in violent crimes, using your framework, right?

A You could not, no.

Q Why not?

A Because that's not what this report addresses.

It's only interested in, you know, the data pertaining to ATF trafficking investigations and enforcement of federal gun laws.

Q So is your opinion that the frequency of how often straw purchased guns are involved in ATF investigations has no bearing on how often guns are trafficked in general?

A Yeah, they're two distinct issues.

Q I'm going to have you look at -- pull up your report. If you'd look at page 5. Actually, I'm going to read you two sentences. The last sentence of the paragraph, of the first paragraph. I think this is going to repeat what I just questioned you on.

It starts with, it reports. Do you see that?

A I do.

Q "It reports the share of ATF investigations," in italics, "of gun trafficking that somehow involved straw purchasing, and the share of firearms linked with ATF investigations, again in italics, "that involve straw purchasing not," in italics, "the share of all guns acquired or used by criminals that somehow involved straw purchasing."

The next sentence says, 'This distinction is critical since it would be perfectly feasible that, for example, 90 percent of firearms linked with ATF

investigations," in italics, "had been straw purchased even if only one or two percent of all guns acquired by criminals involved straw purchasing."

Do you see that there?

A I do.

Q I wanted to ask that second sentence about giving this example of 90 percent of firearms linked with ATF investigations were straw purchased, but then only one or two percent of, you know, guns that are acquired by criminals involve straw purchasing.

Did that -- do you have a source for that hypothetical?

MR. DAVIS: Object to form.

A My imagination.

BY MR. MALONEY:

Q What --

A It being a hypothetical, it comes out of my imagination.

Q What led you to pick those numbers?

A Just because the first number is a very large percentage and the second number or range of numbers is very small one.

Q In your opinion, is that a realistic hypothetical?

A The point it makes is realistic, but the

specific figures, of course, being just hypothetical, they're not intended to be, you know, reflective of reality. They're just intended to communicate a conceptual point.

Q And what's the conceptual point that you were trying to make?

A That no matter how common straw purchasing might be connected with ATF investigations, it tells us nothing about how often straw purchases are involved in guns being acquired by criminals.

Q The last half of that second sentence says, "Even if only one or two percent of all guns acquired by criminals involve straw purchasing," what do you mean by "guns acquired by criminals"?

A I'm not sure I could explain that any further. Just criminals get them.

Q But is that the same -- oh, go ahead.

A Just guns that criminals got somehow or other.

Q Is that because this opinion is overall focused on guns used to commit crimes, right? That's the summary of your opinion is focused on guns used to commit crimes, right?

A Certainly Opinion 1 was, yes.

Q And this paragraph, this sentence we're looking at right now is under Opinion 1, yes? If you go

back to the bottom of 4 you see number 1?
A Yes. Yes, it was.
Q Yeah. So when you're talking now the language that you use here in the middle of page 5 is, guns acquired by criminals. Is that different than guns used to commit crimes?
A Definitely.
Q How is it different?
A Because the vast majority of guns acquired by criminals are not used to commit violent crimes.
Q How is "Guns acquired by criminals" different than "Guns used to commit crimes" in terms of the statistical analysis that you're doing?
A As I say, it's going to be a much larger -- the number acquired will be a number much larger than the number used to commit violent crimes.
Q So, I guess, why use guns acquired by criminals for your example instead of guns used to commit crimes?
A It served the illustrative purpose that I was making. It served to illustrate the point I was making, which is that what we know about characteristics associated with ATF investigations are not going to be representative of any larger number of firearms transfers, including acquisition of guns by criminals.

Q But in the end your opinion is ultimately focused on guns used in violent crimes and not guns acquired by criminals, right?
A Yes.
Q For instance, if I replaced the last -- go back to page 40, your first opinion. If I replaced the last part of that sentence with straw purchases of handguns from FFLs contribute no more than a negligible share of guns -- of all guns acquired by criminals; in your opinion would that still be true?
A That would be a different statement and not the statement I was making in the report.
Q Correct. So, in your opinion, would that different statement be true?
A It would still be true -- well, I don't know about no more than a negligible. The share of all guns acquired that way would be somewhat larger. Whether it reaches beyond negligible, I couldn't say.
Q If you go to page 6 of your report. Sorry, page 7. The top of page 7. That first full paragraph. The first clause of that sentence said, "Leaving aside this irrelevant source of information."
Do you see that there?
A Yes.
Q Do you know what sources of information you're

referencing in that clause?
A I don't understand the question.
Q Yeah. Leaving aside this irrelevant source of information, are you referencing ATF documentation?
A No.
Q What are you referencing?
A Oh, I'm sorry, not in that paragraph, but later on I cite ATF data.
Q The paragraph prior your discussing -- this is a continued discussion of Exhibit 212, the Following the Gun report, yes?
A Yes.
Q So at the top of 7, when you say, "Leaving aside this irrelevant source of information," I believe you're referencing the Following the Gun report, yes?
A Yes.
Q In your opinion, what makes this report irrelevant?
A Because it doesn't tell us anything about what share of guns acquired by criminals as a whole or acquired specifically for the purpose of committing violent crimes were acquired via straw purchasing. It only describes the attributes of transfers that ATF investigated.
Q So in analyzing the ATF report, did you look

at any other sources of information to assess the claims made by the ATF?

A Yes.

Q And is one of those things that you looked at the Armed and Considered Dangerous book?

A Yes.

Q And that's by -- I believe the authors are Wright and Rossi, correct?

A Yes.

Q The book is from 1986?

A Right.

Q Have you read the updated editions of the book?

A Yes.

Q Do you know when the newest edition is from?

A You mean what year?

Q Correct.

A No, I couldn't say.

Q Does 2008 sound right?

A I wouldn't know.

Q Okay. I'm going to show you, and this is going to be awkward, so I'm going to ask for everyone's forbearance on this.

We have the Wright and Rossi book only in eBook form. So I don't know if we want to do a

placeholder exhibit for this.

MR. MALONEY: I'll show it to you, Andy, and the witness on the screen.

Yeah, just give me a blank page and we can mark it. So this will be 224.

(Plaintiff's Exhibit 224 was marked for identification.)

MR. DAVIS: Eric, you're saying you have this as an eBook?

MR. MALONEY: I only have the eBook version. I think at some point we'll get a hard copy, but what we have today is the eBook version.

BY MR. MALONEY:

Q So, Professor Kleck, I'm showing you an excerpt from the latest edition of the Wright and Rossi book, Armed and Considered Dangerous.

Let me scroll up actually. I'll show you the very top here. It's the introduction to the Aldine transaction edition. Do you recall ever having read this introduction before?

A Possibly. It would have been a while ago.

Q Okay. So there's a portion of this introduction about two-thirds of the way through. I just want to get the title here. It has the section title of Illegal Methods of Gun Acquisition by Juvenile

and Adult Offenders.

That's what it says there, right?

A Yeah.

Q And in the third paragraph here, about halfway through it says, "Another is the so-called straw purchase where someone who is legally eligible to buy a gun, does so, then gives it -- gives or sells it to someone who is not. ATF 2000. Estimates suggest that straw purchases might account for as many as 46 percent of the firearms used by juveniles, confiscated by police, and subsequently traced. These secondary markets, including straw purchasers and private citizens who sell their firearms without a federal firearms license (FFL) are obvious and frequently used avenues for prescribed classes to obtain guns." And then it goes on from there.

Have you seen this language before in the Wright and Rossi book in the newest edition?

A Yes.

Q What's your opinion of, you know, their kind of updated analysis here of straw purchasing?

MR. DAVIS: Object to form.

A Although I greatly admire Wright and Rossi, they're just mistaken here. They've misinterpreted that ATF document in the exact same way the authors of the

Complaint for this case misinterpreted it. It doesn't in fact say what they claim it says. It does not in any way pertain to the percent of firearms used by juveniles, confiscated by police, and subsequently traced. It's simply a mischaracterization. They've misread it.

Q Do you believe that secondary markets are obvious and frequently used avenues for prescribed classes to obtain guns?

A Yes.

Q Okay. Do you see the last sentence here, "ATF 2000." That ATF 2000 reference, that's a reference to Following the Gun; is that right? If you know.

A I assume so, yes. I mean, I can't see -- I assume that's what ATF 2000 is, Following the Gun.

Q "So that the (ATF 2000) reports that 89 percent of crime guns seized by the police and traced through their system were not purchased directly by the offender from a licensed gun dealer, which is about the same figure reported in ACD."

Do you see that there?

A Yes.

Q Does that have significance to you that that high of a percentage of crime guns were not purchased directly from an FFL?

MR. DAVIS: Object to form.
A It does.
BY MR. MALONEY:
Q I mean, that category of guns would include straw purchased guns, correct?
A Not the 89 percent. The remaining 11 percent.
Q No, because the 89 percent -- well, let's start here. A straw purchase gun is not purchased directly by the offender from the licensed gun dealer, correct?
A Right. But we don't know what they're referring to. I mean, it's not just straw purchased guns, it could be a lot of other ways where they were not purchased directly by the offender from a licensed gun dealer.
Q Sure. But that 89 percent that's included there would include straw purchased firearms, they would follow from the 89 percent?
A Sure, as possibly a miniscule subset of that, sure.
Q And you had indicated that you've seen this section before. Do you have any other opinions on it, apart from disagreeing with the analysis of the ATF report?
MR. DAVIS: Object to form.

A Well, again, I wouldn't, you know, know the entire section by memory. I'm only looking at the portion you have shown me.

BY MR. MALONEY:

Q I mean, having read this introduction and, you know, knowing how -- that this is the opinion of the authors in more recent times, does that at all change sure opinion on the facts or kind of on your use of other data from this book?

A No.

Q Why not?

A Well, it confirms the general view that I previously -- well, that Wright and Rossi had previously conveyed and that I have conveyed, which is, virtually all the movement of guns into criminals' hands is through the secondary market and not via direct purchases from federal firearms licensees.

Q But, again, when we talk about direct purchases, that's not straw purchase, right? A straw purchase is not a direct purchase by an offender?

A If they don't yet have a disqualifying conviction, yeah, it could be. I mean, there's a first time for every criminal, the first time they get convicted. And prior to that, they would often be eligible to legally acquire a firearm. They would pass

a background check.

Q Do you agree in the middle here it talks about secondary markets, and that buyers and sellers avoid the inconveniences of criminal record checks, sales records, waiting periods and the like, although it cost more? Do you agree with the analysis of the secondary firearm market there?

A Yeah, the first part of that sentence, right up to the point where it says, although one study.

Q So you don't agree with them talking about the one study about there being a premium in the secondary firearm market?

A Well, there's a premium, it's this claim that it's, what, four or five times -- three to five times higher than legal markets, no. That's not what surveys of criminals indicate when they report what they paid. It's not, you know, like five times the legal price for guns.

Q All right. I think for now I'm going to take this down, and I want to show you something else.

(Plaintiff's Exhibit 213 was marked for identification.)

BY MR. MALONEY:

Q I'm going to hand you what has been marked as Exhibit 213. This copy has a slight bend in it, but it

should work.

A (Views document.)

Q This is an article, the first author is listed as Anthony Braga. There is four or five authors. And it's entitled, Interpreting the Empirical Evidence on Illegal Gun Market Dynamics.

Do you see that there?

A I do.

Q Are you familiar with this article?

A I read it in detail a while back. I mean, it's been 12 years since it was published.

Q Yeah, it's from -- if you go just above the title, it's hard to see, but there's a copyright of 2012 of this article.

A Right.

Q Did you review it at the time that it came out?

A Yes, or shortly thereafter.

Q Did you review this article in the time since you've been retained for this matter?

A No.

Q Why not?

MR. DAVIS: Object to form.

A It didn't occur to me that it would be relevant.

BY MR. MALONEY:
Q Do you recall from, you know, when you reviewed this article, at the time that you did, having an opinion on it?
A Yes.
Q What was your opinion?
A It was a very poor article.
Q Why is that?
A Researchers draw conclusions that don't follow from their evidence.
Q Can you think of any examples from this article where they were doing that in a way that you thought was deficient?
MR. DAVIS: Objection; vague.
A I would have to closely read it again. You know, if you gave me half an hour to read through it, I would be able to tell you.
BY MR. MALONEY:
Q Can you turn to page 782 at the top. Are you there?
A Yes.
Q And then at the bottom do you see where it says Table 1, gun trafficking pathways identified in ATF investigations?
A Yes.

Q I guess this kind of answers this question, but do you know what data source this article relied on to draw its conclusions?
A Records of ATF investigations.
Q Similar to Following the Gun, right?
A Yes.
Q And if you look at that Table 1, the top line under source says, "Firearms diverted by straw purchaser or straw purchasing ring, right?
A Yes.
Q And that says number 1,078, and percent 41.3.
Do you see that there?
A Yes.
Q So is it fair to say that, you know, Braga, et al, in looking at the set of ATF data that they had, held that straw purchases were the most commonly identified trafficking pathway; is that right?
A They identified it as the most common pathway in connection with cases investigated by ATF, yes.
Q But you don't agree with their analysis to the extent they extend conclusions about that percentage or raw number beyond the scope of ATF investigations?
A Yes, only a tiny fraction of gun transfers are investigated by ATF. And the ones that are investigated are not representative of the full set of gun transfers.

Q You don't think it has any bearing on the general frequency of straw purchasing that nearly half of ATF investigations involve straw purchasing?

MR. DAVIS: Object to form.

A None whatsoever.

BY MR. MALONEY:

Q Okay. And again, you didn't review this article since you've been retained on this case, right?

A Correct.

Q So just to be clear, it's not something that you looked at and then rejected, you just didn't look at it?

A I hadn't looked at it since I began involvement in this case.

MR. DAVIS: Counsel, I'm going to object to the use of both of these documents, Exhibit 244 and Exhibit 213 as not having been produced in this case at any point. They don't bear Bates labels; and, to my knowledge, they weren't produced along with Mr. Bisbee's rebuttal report.

BY MR. MALONEY:

Q Can you go back to your report? I believe it's Exhibit 211. Actually, go to page 7. I had you on the wrong page here.

Is it fair to say in your report after, you

know, you have gone through the ATF Following the Gun report and your critiques of that, what did you seek to do, in your opinion, to attain the actual number of firearms or percentage of firearms that are straw purchased and then used in violent crimes?

A I merely cite, I'm not sure I acquired it, but I merely cite ATF's own data on how many guns they believe were straw purchased in a given year.

Q Well, let's actually back up. I think you do get there eventually. But you start by looking at the annual volume of firearms thefts; isn't that right?

A Yes.

Q Why did you do that? Why was that kind of step one in your analysis?

A Because it's part of a way of finding out total number of guns acquired. If we know number acquired via theft and we know what percent of all guns were acquired via theft, then we can figure the total number acquired.

Q I guess, why use thefts and not other methods of firearm acquisition by criminals?

A Because it's what we have good data on.

Q So that's your opinion, that the data that you cite on firearm thefts is good data?

A That, and the fact that it's independent of

enforcement activities, it's independent of ATF. I mean, we know it from a source that relies on the statements of crime victims themselves who had a gun stolen.

Q And why do this analysis as opposed to using a different source that estimates the number of straw purchased guns every year?

MR. DAVIS: Objection; vague; compound.

A Well, that's not what I was using this source for. I was using this source to first establish total number of guns acquired by criminals.

BY MR. MALONEY:

Q And in your opinion, you needed to start with the number of firearm thefts every year, and then extrapolate that to reach the total number of guns used by criminals every year, right?

A No, number acquired.

Q Oh, so you were focused on guns acquired by criminals?

A That's correct.

Q But we've established that that's a different dataset than guns used by criminals in violent crimes, right?

MR. DAVIS: Object to form.

A It's a different number, certainly.

BY MR. MALONEY:
Q Your opinion was on guns used in violent crimes, right?
A Opinion 1, yes.
Q And we're looking at Opinion 1 right now, correct, on page 7?
A Yes.
Q Okay. So let's start here. I'm handing you what has been marked as Exhibit 214.
(Plaintiff's Exhibit 214 was marked for identification.)
BY MR. MALONEY:
Q This is a U.S. Department of Justice, Bureau of Justice Statistics report from April, 2022 on the Trends and Patterns in Firearm Violence from 1993 to 2018; is that right?
A Yes. (Views document.)
Q And this is cited in your report?
A I believe so.
Q This is in the middle of page 7, when you talk about National Crime Victimization Survey data from 2014 to 2018, that comes from this report, right, Exhibit 214?
A Which number are you referring to in my report?

Q If you look at the second full paragraph on page 7.
A Right.
Q You talk about the National Crime Victimization Survey -- actually, on Exhibit 214, turn to page 9. And do you see the box on the bottom of page 9 with text next to Figure 3?
A Wait a minute.
Q In Exhibit 214.
A Sorry. All right.
Q I'm having you juggle two documents at once, so I will try to be as clear as I can.
Are you on page 9 of Exhibit 214?
A I am.
Q Okay. Do you see the bottom box with the graph that's Figure 3, and then text to the left of that?
A Yes.
Q So the second paragraph, second sentence in that box says, "About 1.2 million firearms, an annual average of 249,400, were stolen during violent property and personal larceny victimization during this five-year period (not shown)."
Do you see that there?
A I'm not sure. It's in the text to the left?

Q Yes.
A And it's the second paragraph?
Q The second paragraph. The last sentence of the second paragraph.
A I see where you are now.
Q Okay. Should I read it back to you or did you --
A No, I got it.
Q Okay. So looking at this paragraph, then looking at the second paragraph of your report, the second full paragraph on page 7 of your report, the second sentence says, "These data indicate that there were an average of 249,000 firearms stolen per year." Is that right?
A Yes.
Q Did you pull that number from page 9 of Exhibit 214, that text that I just read to you?
A Yes.
Q Is there any other source for that 249,000 number?
A No.
Q You go on to say in your report that about 55 percent were handguns?
A Yes.
Q Where does the 55 percent come from?

A Well, it also came from NCVS data, not from this report. But which report it did come from I couldn't tell you at this point.

Q Does your report cite a source for that 55 percent?

A No.

Q And you don't recall it sitting here today?

A Well, I mean, that's right. I mean, let me back up. Yes. I couldn't tell you the source, other than it's NCVS.

Q And your memory is that that source says that 55 percent of stolen firearms per year are handguns?

A Correct.

Q Okay. So as we're going through your first opinion here, is it safe to say that this number, 249,000, this is like the first number that you're beginning your analysis with, right, and forming your first opinion?

A Yes.

Q I want to go through with you -- this is more just to help me understand your analysis. I'm going to actually write out on a piece of paper the different numbers we're talking about. I think it will help your testimony as well.

MR. MALONEY: Could you mark this as 225.

(Plaintiff's Exhibit 225 was marked for identification.)

MR. MALONEY: This will be a demonstrative, basically.

BY MR. MALONEY:

Q So we're going to start here, Professor Kleck. Let's see. The first number we're talking about here, I want you to agree with me as I go through this, is annual volume of firearm thefts, right, from the NCVS? That's what we're talking about?

A Yes.

Q What is the National Crime Victimization Survey?

A It's a survey more or less continuously conducted by the U.S. Census Bureau in which they ask representative samples of households and question everybody age 12 and up within the household as to criminal victimization.

Q And it's survey data that comes from -- you know, surveys sent to households not from law enforcement?

A That's correct.

Q Is this considered a reliable survey?

A It's considered an outstanding survey.

Q Why is that?

A It's done by the greatest survey organization on the planet, the U.S. Bureau of the Census.

Q And this is data that you've relied on in other academic and research projects that you've worked on?

A Yes.

Q Have you used this specific number before, this annual number of firearms stolen in other work that you've had?

A Yes, or the equivalent number pertaining to a different time period, but also NCVS based.

Q So we've talked about NCVS data. I'm going to write down right now, I believe the first number we're talking about is annual firearm thefts, right?

A Right.

Q And the number that you provide in your report is 249,000, right?

A Correct.

Q How about looking at Exhibit 214. The number was 249,400, right? If you look on page 9.

A Yes.

Q Is there a reason why you rounded down in the number?

A No.

Q Do you think that difference in 400 firearms

or so per year affect your analysis?
A No, it does not.
Q Okay. So this is what I have so far. So that's the first number we're starting with, right?
A Got you.
Q Annual firearm thefts, 249,000, NCVS?
A Right.
Q Okay. Then if you go down in your report, what number did you look for next in analyzing this issue?
A What fraction of all guns acquired by criminals were acquired by the criminal personally stealing the gun.
Q And why were you looking for that number?
A Because that's a number that will allow you to extrapolate the number stolen to the total number acquired.
Q So, basically, you were going to take whatever percentage you found here and multiple the number we were talking about, the annual firearm thefts by it, to get the total number of, what, guns acquired by criminals every year?
A No, not exactly.
Q Okay. Where did I go wrong?
A Well, you wouldn't be multiplying that

percentage times anything. Basically, you'd have to divide 100 percent by the percent of guns that are stolen -- that are acquired via theft to get a ratio of total guns acquired over just guns stolen. And that is on page 7 in the middle of the last complete paragraph. And that number equals 3.125.

Q So that is discussing -- that's a number you pulled from the Wright and Rossi book, the Armed and Considered Dangerous, yes?

A The 32 percent, yes.

Q Yes, which I showed you the eBook version as Exhibit 224.

Now, here, this is -- I guess for both this Wright and Rossi number, and then we'll talk about the other number from the U.S. Census Bureau Inmate Survey, these are both studies or surveys that are looking at what percentage of guns that criminals have that were acquired by theft, right?

A Sort of. I mean, it's the -- I think in both cases it's the last gun they acquired prior to their incarceration.

Q Do you know if all -- if for both of those datasets, if all of those guns were used in violent crimes?

A I know that all of them were not.

Q How do you know that?
A Because that's among the questions that were asked by the surveyors.
Q Like, for instance, in the Wright and Rossi book, was that a survey of inmates, how they acquired that data?
A Yes.
Q Do you know the details of how they did that survey?
MR. DAVIS: Objection; vague.
A Yes.
BY MR. MALONEY:
Q How is that?
MR. DAVIS: Objection; vague.
A They got access through State Departments of Corrections to survey prison inmates. And then they interviewed the inmates, usually not in their cells but in some sort of, you know, cafeteria or other conference room sort of setting, and they were asked about guns in general. Whether they've used them in crime, how they used them, and also how they acquired them. Which means, the researchers knew both what the criminals had used the guns for and how they acquired them.
BY MR. MALONEY:
Q Do you know from which prisoners they

interviewed that -- I guess I should say here, they did not interview only prisoners that had committed violent crimes, right?

A Correct.

Q They interviewed the entire prison population or representatives subset?

A The entirety of those that they could get access to.

Q Which included nonviolent and violent offenders, yes?

A Correct.

Q And that interview process and that survey that Wright and Rossi did, they did that across I think ten states; is that right?

A I believe so.

Q And do you know what year they did that survey?

A Circa '81 or so.

Q Maybe 1982, somewhere in that vicinity?

A Maybe, yeah.

Q So at this point, that's a 43-year old dataset, right?

A It is.

Q I guess in your opinion and experience, is that, given the age of that dataset, is it still a

reliable set of data that you can use in your work?
A Well, it's not a matter of reliable or unreliable, it's a source of information. It's valuable for the details it provides of criminal acquisition of guns. But it would be better if it were done yesterday.
Q Did you do any adjustments or accounting in your analysis for the fact that it is 43-years old?
A No.
Q You just used the numbers right from the book?
A Yes.
Q And just to be clear, since we're talking about how Wright and Rossi did the survey, you know, their analysis of -- just to back up one second too.
They're looking at guns acquired by criminals, period, not just guns acquired by violent criminals, right?
A Correct.
Q And since they're interviewing incarcerated persons, they're only getting data from criminals that were caught and convicted, right?
A Correct.
Q So they're not capturing if there are criminals who were not caught and convicted that would change these numbers, they're not capturing that in their survey, right?

A Well, they wouldn't necessarily change these numbers. But certainly they only covered those who were caught and convicted.
Q But we just don't know, because this dataset doesn't include, you know, nonincarcerated criminals, right?
A That is correct.
Q You then in the third sentence of this third paragraph on page 7 of your report, if you go back to your report, you talk about the more recent National Survey of Inmates by the Census Bureau, right?
A Right.
Q You said that the Census Bureau, you like how they do their surveys?
A Yes.
Q You don't cite -- there's no citation in this sentence. Do you know what your source was for this information about the U.S. Census Bureau?
A Yeah, I'd be able to find it easily enough if I had access to my notes. I've used it in multiple publications. But they've periodically done surveys of probability samples of state imprison inmates, and that was the most recent available.
Q Do you know when it was done?
A I couldn't tell you as I sit here.

Q You said it was recent. Do you have any idea how recent it was?
A I said it was more recent.
Q Okay. So it could have been done in 1983, right?
A I'm pretty sure it's after 2000, but I wouldn't swear to anything more precise than that.
Q It's not cited in text here. Is that survey in your reliance materials, the last page of your report?
A No. It should have been in the list of references, but it was not, evidently.
Q Do you know the name of the survey that was done?
A No, I'd be guessing. I would be reluctant to rely on my memory.
Q From your memory of looking at the U.S. Census Bureau data, is their study more or less reliable than the Wright and Rossi study?
A Well, it's a mixed bag. The Census Bureau knows better than anybody on the planet how to do surveys. On the other hand, they have the handicap of being a government entity, which means, when the prisoners were talking to them, they were talking to the government. And that probably handicaps the ability of

the interviewers to get at the truth, in particular in connection with what might put the criminals at legal jeopardy.

Q So we haven't talked about this yet, but the number -- if you go back to page 7 of your report. Wright and Rossi are looking at the percentage of felons most recently acquired guns that were acquired by theft, right?

A Correct.

Q And the number from the Wright and Rossi book is 32 percent, right?

A Right.

Q And the number from this National Survey of the U.S. Census Bureau, which we don't have a citation for, is 10 percent; is that right?

A Correct.

Q What do you make of the disparity in those two numbers?

MR. DAVIS: Objection; vague; calls for speculation.

A Well, the most obvious plausible explanation for the difference is that felons sitting in prison are reluctant to admit to government agents to yet another crime that the authorities don't yet know about, which would include a gun theft.

So my suspension is, my speculation is, that the Census Bureau does not capture nearly as many instances of felons acquiring guns via thefts as they should have.

Q You think that their 10 percent number on the survey is low?

A Yeah.

Q So looking at these two different numbers with that wide of a gap, is there a reason why you cite both and don't just use one of them?

A Because I can't be certain about either source.

Q Why not split the difference and use the average?

MR. DAVIS: Object to form.

A Because we don't know that the truth lies halfway between them. In fact, we don't for certain know that it's between them at all. It could be higher than the large number or lower than the lower number.

But it strengthens my conclusions to say that regardless of which source of information you use, you still come to the exact same conclusion, that is, that only a tiny number of guns known to have been straw purchased, they constitute a tiny fraction of all guns acquired.

BY MR. MALONEY:
Q And we talked about, you know, this first number, 32 percent came from 1982 or '81, an early '80s survey, yes?
A Yes.
Q The 10 percent was more recent. I mean, do you have any knowledge of whether criminals methods of acquiring guns has changed with the passage of time since 1982?
MR. DAVIS: Objection; vague.
A No, I don't know of any information that could reliably tell us that.
BY MR. MALONEY:
Q It's possible, right, though, that how frequently criminals get guns and the methods by which they do so has changed with the passage of time?
MR. DAVIS: Objection; speculate.
A What we can speculate is limited only by the human imagination.
BY MR. MALONEY:
Q That's true for a lot of things, right?
A Yes.
Q I'm going to show you something. Let's go to this is Exhibit 217.
(Plaintiff's Exhibit 217 was marked for

identification.)

BY MR. MALONEY:

Q Can you look through this and let me know if there's a possibility that this is the Census Bureau survey data that you were talking about of prison inmates?

A (Views document.) It could well be.

Q Finish going through it, and then I will ask you again.

A (Views document.) It could well be from that survey, although, not from this particular document.

Q Looking at this document now, can you find that the 10 percent number here, that 10 percent of guns acquired by criminals were acquired by theft?

MR. DAVIS: Object to form.

A Okay. Could you repeat the question?

BY MR. MALONEY:

Q Yes. Having looked through Exhibit 217, which let's clarify this, too.

This is a Department of Justice, Bureau of Justice Statistics, special report from January, 2019, on the Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates from 2016, yes?

A Yes.

Q And having looked through this report, did you

find any support for the number that's in your report, that 10 percent of guns acquired by criminals were acquired by theft?

A No, because this report, although it's based on I think the same survey to which I was referring, it's asking about a different subset of the inmates rather than pertaining...

Q What do you mean by that, "A different subset of the inmates"?

A Yeah, let me amend my answer. I don't think this is based on the exact same -- there's a series of Census Bureau surveys of prison inmates of which this is one, but I don't think it's the one from which I derived that 10 percent figure. I think it's from an earlier one.

Q So this would be a more recent survey data than the survey from which you pulled the 10 percent number?

MR. DAVIS: Objection; speculation.

A I think so.

BY MR. MALONEY:

Q Can you turn to page 7 of this report. Are you there right now?

A I am.

Q At the top right, that top-right column,

titled Method, source, and process used to obtain the firearm. The last sentence of the paragraph under that says, "Another 7 percent of state and 5 percent of federal prisoners stole the firearm, and 7 percent of state and 8 percent of federal prisoners reported that they obtained the firearm at the location of the crime."
Is that what it says there?
A Yes.
Q So from looking -- from what I just read you, it's fair to say that this report and this set of survey data is saying that, at least for the federal prisoners that were interviewed for this survey, 7 percent of state and 5 percent of federal prisoners acquired their firearm by theft, yes?
A Yeah, I'm not sure where they get the 7 percent and 8 percent. I'm not seeing that.
Q Well, it's 7 percent and 5 percent, right?
A 7 percent and 5 percent? Yeah, I'm not seeing that. I guess they're rounding the numbers. So I see the 6.6 percent of state prisoners and 4.7 percent of federal prisoners.
Q And so both of those numbers, they would be even lower than the 10 percent number that you had from that other Census Bureau survey, yes?
A That's correct.

Q Did you look at this report or this data in forming your opinion in your report?
A No.
Q Why not?
MR. DAVIS: Object to form.
A I'm kind of dumb-founded as to an explanation of why I did not do something. I mean, I don't really know how to answer that.
BY MR. MALONEY:
Q Is this your first time seeing this data?
A Probably not. But I probably didn't recollect it at the time I prepared my report.
Q And you testified earlier that you didn't -- in the process of being retained and working on the report in this matter, you didn't go and seek out new data, is that right, or data you were unfamiliar with?
A Did I say that? Yeah. I mean, I didn't have to because this I was already familiar with.
Q This report we're looking at right now, you were familiar with?
A Yeah, I'm pretty sure I had seen this report before, but at the time I was preparing the report it didn't come to mind. And it wouldn't have changed any of my views. Indeed, it tends to reinforce my assertion about the Census Bureau being handicap by the fact that

it's a government agency.

Q How does this report lead you to that opinion?

MR. DAVIS: Objection; vague.

A It makes it difficult for an inmate to admit to having acquired a gun via theft, because he can't do that without confessing to yet another crime.

BY MR. MALONEY:

Q Can you look at there's Table 5 underneath the text we were looking at --

A Got it.

Q -- in the middle of the page? Thank you.

Could you look at, oh, it's kind of the second bolded category under source and method to obtain firearm. It says, obtained from individual.

Do you see that there?

A I do.

Q So this data is essentially saying that for all prisoners at the state and federal level, 25 percent, a quarter of them, obtained firearms from another individual, right?

A Yes.

Q The next bolded category says, off the street/underground market, and that says that 43 percent --

A Yeah.

Q -- of those prisoners acquired by that method?
A Yes.
Q So both obtained from individual and off-the-street underground market, both of those methods of obtaining firearms could include straw purchased firearms, right?
MR. DAVIS: Objection; calls for speculation.
A Anything is possible.
BY MR. MALONEY:
Q I'm saying from a categorical standpoint of what those two categories include, it could include straw purchased firearms, right?
A It might.
Q You can put that aside.
MR. DAVIS: Can we go off the record for a moment.
(Lunch break taken from 12:23 p.m. to 12:43 p.m.)
BY MR. MALONEY:
Q Welcome back, Professor Kleck, from lunch. I want to dive right in.
I'm showing you this is Exhibit 225, this demonstrative that I've been working on. This is, on the left side, is your annual fire and theft number, 249,000, right?

A Right.

Q The right side is percentages of criminals' guns by theft. Sorry, theft got a little cut off there. But we have the 32 percent number from Wright and Rossi, the 10 percent number from the Census Bureau, right?

A Right.

Q So these are numbers that you're relying on in your report?

A Yes.

Q And in your report, you're using the numbers on the right, these percentage numbers from these two surveys to -- I think you called it a ratio, to create a ratio that you then multiplied against the number on the left, correct?

A Yes.

Q And if you look at page 7 of your report. That ratio for the Wright and Rossi study, this is the 32 percent number, the ratio you have in your report is 3.125x, right? 3.125 times?

A Right.

Q I'll write that here.

And then even I could do the math on this. For the 10 percent number, that's a ten X ratio, that's ten times multiplier, right?

A Right.

Q And your report says, so I want to show you 225 to make sure I got it right, right? For the 32 percent, 3.125; for the 10 percent, 10x, right?

A Right.

Q And your report says that when you multiple this number on the left, the 249, times these ratios, you got a range from 779,375 to 2,494,000 handguns -- or guns, right?

THE STENOGRAPHER: Could you state that number again, please?

MR. MALONEY: Sorry.

BY MR. MALONEY:

Q So your report says that when you multiplied this number on the left times the ratios in the middle, that you found a range between 779,375 firearms to 2,494,000 firearms, correct?

A Correct.

Q Now, and I guess just to be clear based on the sources that you've based this math on, those two numbers that we just cited, that is your estimate of all guns acquired by criminals, correct?

A By all methods, yes.

Q By all methods. So that includes nonviolent and violent criminals?

A Yes.

Q Which, again, is not -- the summary of your opinion was in your testimony today focused on violent crime, but this number is focused on all crime, yes?
A Well, all criminals, yeah.
Q Okay. And I wanted to, just for the record, go through, we got an email from your counsel last night, that laid out some of this math. So I wanted to go through that with you.
Since you finished your report, have you reran this multiplication of these numbers?
A Yeah, the numbers are very slightly off by a fraction of 1 percent.
Q Do you know why that happened, that the numbers were off by 1 percent?
A I could only speculate. I thought maybe, you know, it was just a transcription error as you move a number from one page to another page. That's possible. Although, now you bring up the exact number found in one of those BJS reports, it wasn't 249,000, it was 249,400. So that's possible as a source of the error.
Q It's possible that you multiplied based on the 249,400 number?
A Yes, right, to get a slightly higher number.
Q Okay. Well, in your opinion, then, I mean, we have your report number is in front of us. I mean,

would you like to amend those numbers sitting here today with, you know, your calculation of what the multiplication should be?

A Yeah, if I could do the multiplication right now.

Q Yeah, I mean, we can pull up the calculator and do it right now. So what we have written here is --

A If I could use the one on my cellphone?

Q Sure, we can do that too.

We have 249,000, yes, times 3.125. Maybe you can check my math, Professor Kleck. So by my math, that gives us 778,125.

A Right. But if we then make it 249,400. Let's see what that does. That's where I got the number from. See, that was just a typo where I said 249,000 when in fact the number I used was 249,400, which was the correct number.

Q Well, I've got you sitting today on the record. Which numbers would you like to use?

A I would like to use the numbers that you see there, except that the numbers stolen would be amended to 249,400.

Q Okay.

A So you'd put a 4 --

Q So we're going to change Exhibit 225 here.

And instead of the 249,000 number from your report text, we're just going to cross that out, and we're going to write 249,400, yes?

A Correct.

Q Okay. So you can look at 225, that's the number that we're going to use now, right?

A Right.

Q And if we use this 249,400 number, then I believe that's going to reflect the numbers that are in your report as drafted?

A Again, the number that appears in the report is correct. You just have to change a zero to a 4 where there was sort of a typo or transcription error in the second complete paragraph.

Q Okay. So you want to use the numbers from your report. Let's put those on here.

A Yeah, from that point on the numbers are going to be correct. It's just that one number, 249,000, that was wrong. Mystery solved.

Q Do you have any plans, Professor Kleck, to amend your report to reflect these new numbers?

MR. DAVIS: Object to the form of the question.

That's really a question that should be directed to counsel and not to the expert witness.

BY MR. MALONEY:
Q If you know, do you have any plans?
A I do not.
Q Okay. So let me put on here, then, so now we have -- so if you're taking the annual firearm theft number times these percentages or times these ratios, how would you characterize that resulting total?
A Yes, total number of guns acquired by criminals per year.
Q We have 779,375 to 2,494,000.
Okay. So is this a fair kind of summary so far of what your report is laid out in terms of the math?
A Yes.
Q And the numbers that we're talking about to reach this number, the NCVS survey data and then these two surveys, I mean, these all come from different time periods, right?
A Yes.
Q And they come from different, you know, survey pools of people being surveyed?
A Yes.
Q And you're comfortable even given those facts with kind of multiplying one against the other?
MR. DAVIS: Objection; vague.

A I'm not sure I understand the question.
BY MR. MALONEY:
Q You know, given that they're different surveys, different pools of people, different time periods, even given those facts, you're comfortable doing this kind of math calculation with the two different datasets?
MR. DAVIS: Same objection.
A Yeah, partly because it's the principle of triangulation, if you try different methods that are substantially different but arrive at the same conclusion, you're more confident about that conclusion.
And in this case, they're different in the sense that you point out, you know, different pools of prison inmates and the different time periods covered. Yet you still come up ultimately with the conclusion that, boy, criminals get a whole lot of guns each year and, therefore, the number that they use in crimes is really tiny. And, therefore, the fraction that are acquired, or known to be acquired by straw purchases is really, really small.
Q Are you aware of any other data sources that you have looked at or could have looked at to ascertain the total number of guns acquired by criminals per year?
A No.

Q You're not aware of any other sources?
MR. DAVIS: Objection.
A No.
BY MR. MALONEY:
Q So is the fact that you're not aware of any other sources why you undertook to pull these numbers and do this multiplication?
MR. DAVIS: Objection; vague.
A It was the most plausible way as far as I was concerned. But, yeah, you could always just guess or you could ask a police officer, what do you think is the number. I mean, there's other "methods." But this is the most reliable one that I can think of.
BY MR. MALONEY:
Q Is this a calculation done in the past?
A I don't know. I don't recall doing it in the past. I might have, but I don't recall one way or another.
Q But to your memory, this is something new that you were doing for this case; is that right?
A Possibly, yeah.
Q And in your opinion, these two numbers, the 779,375 to about 2.5 million numbers, those are, in your opinion, the best estimate that you could reach of the total number of guns acquired by criminals per year in

the U.S.?
A Yes.
Q If we could leave this here. I'm going to hand you Exhibit 218.
(Plaintiff's Exhibit 218 was marked for identification.)
BY MR. MALONEY:
Q Go to your report before I have you look at this. If you look at, let's see, page 8 of your report. So, I guess, first of all, what you're doing at the bottom of page 7 and the top of page 8, the next step in your analysis is to attempt to ascertain how many firearms are straw purchased every year, correct?
A Well, what fraction of all guns acquired were straw purchased.
Q But in order to reach that number, you are first seeking to get the number of how many guns per year are trafficked by straw purchasing, right?
A It's not what I do first. We've already covered the part where I estimate total number of guns acquired. That was first step one.
And then in this step, I simply compare that to the number known to have been straw purchased based on ATF data.
Q Okay. So I'm going to let you go to 225.

We're going to call this part of step one.

A (Views document.)

Q So your testimony is that step two is, if you look at the top of page 8, it talks about that first whole sentence, "ATF data covering the nation for 2017 to 2021 indicate" -- we can skip to the next sentence.

"In 2018, the most recent year for which we have gun theft data, 37.9 percent of trafficked guns uncovered in ATF investigations involved straw purchasing, implying about 17,434 guns trafficked per year via straw purchasing," right?

A Yes.

Q And you reached that number by taking the 37.9 percent and applying that to 46,000 firearms trafficked per year from the ATF report?

A Yes.

Q And this ATF report, you cite the source here, ATF 2022. Do you know what report that is?

A Yes. It's the Bureau of Alcohol, Tobacco and Firearms, 2022. National Firearms, Commerce and Trafficking Assessment, Part 3. Firearm Trafficking Channels and Methods Used.

Q Do you know what the ATF's data source is for that report?

A Their records of trafficking investigations.

Q So just like the ATF filing the gun report that we talked about earlier, this report similarly is just using investigative data?

A Yes.

Q And earlier your report, I think and your testimony as well, you critiqued the ATF Following the Gun report, or at least critiqued its value, because it only used investigative data, right?

A Yes.

Q But in your report now we're using this different ATF report that's just investigative data to plug into your formula for the number of annual straw trafficked guns, right?

A Yes.

MR. DAVIS: Vague.

A Yes.

BY MR. MALONEY:

Q So what you're doing in your report is using the number of guns involved in straw purchasing as witnessed in ATF investigations, and you're using that in your report as the number of guns that are trafficked per year, period, or trafficked by straw purchasing per year, period?

MR. DAVIS: Objection; vague.

A No. I'm using it as the number known to have

been trafficked via straw purchasing.

BY MR. MALONEY:

Q But the number, you know, the raw number that comes from the ATF is just from investigations, right?

A As I understand it, yes.

Q But in your report and in your testimony today, we're using that as the same number as, you know, that's the overall number of all guns that are straw purchased, whether investigated or not by the ATF?

MR. DAVIS: Object to form.

A No. As I say, it's the number known to have been straw purchased. It's not -- in fact, I emphasized that it's not necessarily the totaled number straw purchased, period, but it's the number known to have been straw purchased.

BY MR. MALONEY:

Q And it's the number that you use in your report to make your calculations, right?

A Correct.

Q Did you look at any other numbers that could have informed your calculations on the annual number of guns that are straw purchased?

A No.

Q Before we move on from that, Professor Kleck, an obvious question. I mean, we're talking about ATF

investigative data. I mean, it's logical that ATF investigative data would only cover some fraction of the amount of guns that are straw purchased every year, right?

MR. DAVIS: Objection; vague; compound.

A Could you repeat the question, please?

BY MR. MALONEY:

Q It's likely that the number of guns every year that are straw purchased is larger than just the number of straw purchased guns that are involved in ATF investigations, correct?

A Yes.

Q Did you address that possibility in your report that the ATF number may be under-inclusive?

A Yes.

Q How?

A Well, I have text on page 8 that says, "It's very likely that some straw purchases went undiscovered by ATF."

Q And then you finish by saying, "But any idea as to their number would have to be based on sheer speculation."

A Yes.

Q So you're acknowledging that your number is under-inclusive, but you're not going to put forward a

larger number because of your concerns about speculating beyond the number that the ATF has, correct?

MR. DAVIS: Objection; vague; compound; mischaracterizes witness testimony.

A Well, certainly I don't want to just substitute guesswork for evidence. So, yeah, I rely on the evidence that we have.

(Plaintiff's Exhibit 215 was marked for identification.)

BY MR. MALONEY:

Q So I'm going to hand you what's marked as Exhibit 215.

A (Views document.)

Q And look at the top of the page here. It's an article that's entitled, Ten of Thousands Try to Illegally Buy Guns from Dealers Annually, Study Finds.

Do you see that?

A Yes.

Q And if you go to the second page, there's a quote there on the third paragraph from Dr. Garen J. Wintemute.

Do you see that there?

A Yes.

Q Do you know Dr. Wintemute.

A Yes.

Q How do you know him?
A I've met him at conferences and I've read many of his studies.
Q In fact, you, at one point in your report, cite one of his studies, right?
A Yes.
Q And this article talks about, if you look at the bottom of page two, it says, "The researchers extrapolated these rates -- actually, let's back up.
The paragraph prior talks about Wintemute's team mailing surveys to 1,600 gun dealers, pawn brokers and gunsmiths, right?
A Right.
Q Are you familiar with the survey that Wintemute did?
A No.
Q You're not?
A Well, not unless it's another survey that doesn't sound much like this. He did a survey which was via telephone and not by mail of gun dealers. And so this is an accurate description. I'm not familiar with the mail survey.
Q The next paragraph says that, "The researchers extrapolated those rates across the nearly 10,000 U.S. gun dealers and estimated that about 34,000 straw

purchases and about 34,000 attempted undocumented purchases were attempted nationally during that span."

Do you see that there?

A I do.

Q Are you aware of the study that Wintemute did?

A No.

Q Did you consider this number or this study in forming your opinions in this case?

MR. DAVIS: Objection; asked and answered.

I'm also going to point out, Counsel, this is a document that has not been produced in this litigation. There is no Bates number. It was not produced as part of Mr. Bisbee's rebuttal.

A Could you repeat the question, please?

BY MR. MALONEY:

Q Sure. I mean, it's probably logical to assume that if you were not familiar with this Wintemute study that you didn't consider it in forming your opinions in this case, right?

A Right. And given my cursory reading of it now, I wouldn't have, because it seems to be an estimate of attempted straw purchases and not straw purchases at all, which is what my report address. So it certainly wouldn't have been pertinent to estimate the total number of actual number of straw purchases.

Q Where do you see that here that it involves attempted straw purchases?

A There's the qualifying remark in parentheses, "(Those figures only reflect the instances where the retailers realized they were dealing with straw buyers, so the actual number of bogus buyers is likely higher.)"

Well, that means, yeah, it didn't go through. It was an attempt.

Q But just to be clear, you didn't consider this study or any of this evidence in forming your opinions?

MR. DAVIS: Objection; asked and answered.

A That is correct, I did not.

BY MR. MALONEY:

Q And these are numbers that, you know, what you're pulling for your report from the ATF reports on their investigative data, you could have used this type of a study, this study from Wintemute, to be another data point on annual numbers of straw purchases, right?

MR. DAVIS: Objection; speculation.

A No, I could not have.

BY MR. MALONEY:

Q Why not?

A Because it doesn't refer to the subject at hand. It doesn't refer to straw purchases. It refers to attempts at straw purchases, which apparently, as far

as we can tell from this, all unsuccessful. That is, they did not result in a straw purchase.

Q Do you think that a researcher could estimate the annual number of straw purchases by looking at attempted straw purchases or straw purchases stopped by FFLs?

MR. DAVIS: Objection; foundation; compound.

A No.

BY MR. MALONEY:

Q Why not?

A Certainly no method that I could think of.

Q Why not?

A Well, because we don't know what the success rate is of straw purchase attempts. To know that you would have to know both the number that got through, that succeeded as straw purchases and the attempts in the same study. And we don't have that here.

I mean, by implication the number of actual completed straw purchases was zero, because this is what, you know, dealers are admitting to.

Q That's your takeaway from this study, is that the number of completed straw purchases is zero?

A No.

Q Okay.

A But it might have been zero amongst the

transactions that these dealers are willing to talk about.

Q Let's go back to the ATF document. You can put aside the article on the Wintemute study.

So at the top of page 8 you looked at ATF data that covered four years and took an average of those four years -- I guess those five years, 2017 to 2021, and took the average of that, 230,000, to get 46,000 firearms trafficked per year; is that right?

A Yes.

Q And then you took 2018 data that said that 37.9 percent of trafficked guns are involved in straw purchasing and multiplied that against the 46,000 to get 17,434; is that right?

A Yes.

Q Okay. So I'm going to write down 46,000 times 37.9 percent, 17,434.

Okay. I'm showing you Exhibit 225. Is that right, that was the second step of your analysis?

A That's correct.

Q Okay. So we have this number of total crime guns annually; we have this number of straw purchased guns. What did you do next?

A Correction, those are not crime guns, those are guns acquired by criminals, the vast majority of

which were not used to commit crimes.
Q You don't consider a gun acquired by a criminal a crime gun?
A No, that is a misleading way of describing it.
Q Because, in your opinion, a crime gun is a gun that is literally used in the course of a violent crime, right?
A Yes.
Q Okay.
A I think that's what 99 percent of the American public would think you were talking about if you said gun crime.
Q Ninety-nine percent, do you have a source for that?
A You could put in the transcript the witness laughed out loud. No, that was just -- that was an overstatement for humorous purposes.
Q So what happens, what did you do next? You got these two numbers. What did you do with these two numbers?
A Well, then I treated that gun -- that number as the number of known guns, straw purchased, and I compared that with the total volume of guns acquired by criminals from all sources.
So they're both numbers that refer to criminal

gun acquisition -- acquisitions of guns by criminals, but one is specific to straw purchasing as a method, and the other encompasses all methods.

Q But again, this number was only pulled from investigative data, but for your purposes, you're using it in a more global sense to run against this number?

MR. DAVIS: Objection; vague; compound.

A I'm using it only as my best estimate of the number of guns that were known to have been straw purchased.

BY MR. MALONEY:

Q And was your next step essentially just dividing this number by these two numbers?

A That is correct.

Q And when you did that, what would you call the resulting percentage from dividing the two numbers?

A The percent of all guns acquired by criminals that were known to have been straw purchased.

Q And that number was?

A 2.2 percent, the resulting percentage.

Q 0.699 percent to 2.2 percent?

A Yeah.

Q And in your opinion, the .699 percent to the point 2.2 percent, what does that number mean?

A It is the fraction of all guns acquired by

criminals that we know to have been acquired via straw purchasing.

Q And how does that number inform your overall opinion on "That straw purchases of handguns from FFLs contribute no more than a negligible share of guns used to commit crimes"?

A That's the conclusion it supports. It supports the notion that only a tiny fraction of all guns acquired by criminals are known to have been straw purchased.

Q So assuming that your math is right and that we're using the right data sources, your opinion is that these are miniscule negligible fractions?

A Yes.

Q And even if we use your numbers here, I mean, we're assuming there are at least, if not more, 17,434 straw purchases per year, right?

A Could be more, yes.

Q So aside from whether that's a small fraction or not, in the abstract is that a small number, in your opinion?

MR. DAVIS: Objection; vague; calls for speculation.

A I have no opinion on whether that's large or small. Percentages, though, you know, you have some

lower limit and some upper limit. You can't go below zero or above one hundred. So the percentages they come up with are pretty close to zero. So, yes, I'm perfectly happy to describe them as very small or miniscule, or whatever.

Q At the bottom of page 8, you have a paragraph talking about ATF revocations of dealer licenses; isn't that right?

A Yes.

Q How much experience do you have with the ATF's enforcement and revocation structure when it comes to FFL licenses?

A What I read in their reports. For example, the aforementioned Following the Gun. But more recent reports, including the National Firearms, Commerce and Trafficking Assessment as well. And that's where, you know, enforcement activities, including revocation activities, are discussed.

Q Do you know in your -- I think it's the second to last sentence, the bottom of 8, you talk about even after the Biden administration initiated an enhanced regulatory enforcement policy in 2021. Do you know what that policy is?

A They jacked up the number of inspections of FFL's premises among other things. And so they

presumably increased the likelihood of detecting violations.

Q Did you look at a source or kind of a reference material to look at what that policy is, or was?

A Which policy are we talking about?

Q The enhanced regulatory enforcement policy in 2021.

A Yeah, there was, I think, you know, a public news release on that, a press release, which laid out the change in policy. And so, yeah, I did read that.

Q Did you look at -- did you look at that source in forming your opinions for this report in this case?

A Which source are we talking about now?

Q The source that you just discussed that informed the enhanced regulatory enforcement policy?

A Well, yeah, I've read the report of active firearm licenses, license state-by-state statistics. But that wasn't specifically aimed at the issue of revocation practices.

Q You didn't cite to that source that you're referencing in your report, right?

A Yeah, not with reference to the issue of the change in enforcement policy.

Q Are you aware if this policy could result in

enforcement outcomes other than revocations of FFL licenses?

A Yes.

Q And what outcomes are those?

MR. DAVIS: Objection; calls for speculation.

A The dealer could be warned, for example. And, of course, there's always the possibility that nothing at all happens, you know, because it was considered sufficient for the agency to move on.

Q And the data that you're citing in your report, does that cover ATF enforcements against FFLs, other than revocations.

A No.

Q If you go up a sentence here, I guess it's the middle of the second sentence at the bottom of page 8. It says -- I guess I'll read the whole sentence.

"For a dealer to knowingly or negligently cooperate with straw purchasers working with gun traffickers would be a serious offense and would certainly warrant revocation, yet ATF data indicate that any kind of FFL misconduct, including knowing or negligent cooperation with straw purchasing, that was serious enough to warrant revocation or its equivalent is extremely rare."

That's what that sentence reads as, yes?

A It does.
Q What does or its equivalent mean?
A Well, its equivalent could be where, you know, the dealer knows that ATF has them dead to rights on some serious violation and they're going to revoke them. They could voluntarily give up their license. So that's the equivalent. I mean, either way with revocation or giving up a license, they no longer have a license to deal in guns.
Q Does the data that you cite in this paragraph talk about FFLs who voluntarily surrendered licenses?
A Yes.
Q As you talk about here, FFLs who voluntarily ceased operations, right?
A Yes.
Q Is there any other forms or outcomes of ATF enforcement actions in this space that would be equivalent, in your opinion, to a revocation?
MR. DAVIS: Object to form.
A No, I'm not aware of anything that's equivalent, no.
BY MR. MALONEY:
Q Isn't it true that there are other forms of enforcement or outcomes that the ATF could have pursued that, you know, would indicate issues with FFLs

regarding straw purchasing that wouldn't be reflected just in revocations or voluntary cessation?

A Yes.

MR. DAVIS: Objection; vague; compound; calls for speculation.

BY MR. MALONEY:

Q And those other forms and outcomes are not -- the numbers of those are not covered in your report, right?

A No.

Q Okay. So to wrap up, if we could put kind of a bow on Opinion 1 here, I mean, in Opinion 1, you are focused in the math that we're doing here in Exhibit 225 on known straw purchases, correct?

A Yes.

Q And it's straw purchases known through ATF investigative data?

A Yes.

Q So with keeping that fact in mind, you know, that we have an under-inclusive set of known straw purchases that are, you know, being divided against here, you know, how are you able to conclude that this number of straw purchases in total is a small, negligible number?

MR. DAVIS: Objection; vague.

A The percentage is pretty close to zero.

BY MR. MALONEY:

Q But I'm talking about even apart from the math, drawing the conclusion from this knowing that the number of straw purchases is under-inclusive, doesn't that at least somewhat temper your conclusion that, you know, the percentage overall is a small percent if there could be more?

MR. DAVIS: Objection; argumentative.

A It would be sheer speculation on my part if I were to say there's a much larger number of straw purchases occurring, other than what we know about. That's what the data pertained to, so that's what we know about.

BY MR. MALONEY:

Q So I guess just to be clear, you know, your opinion on this number is that at least to the extent that you're comparing the number of, you know, straw purchases from ATF investigations against total guns acquired by criminals that you were able to calculate, that's a negligible share, but -- I guess I'll stop there. That that is a negligible share, correct?

A Yes.

Q But, you know, are you actually able to extrapolate that to all straw purchases, period, with

any confidence?
MR. DAVIS: Object to form.
A I don't know what your question means.
BY MR. MALONEY:
Q I mean, the numbers that we have right here are just for ATF investigative data, right?
A Oh, I see. If you're, again, just asking the question, could there be more straw purchases, yes. As I said in the text.
Q But does that have any bearing on your conclusion, then, about how negligible straw purchases are in terms of guns acquired by criminals?
A No. It's just one -- this incompleteness of the data is just one caveat that you have to apply to the conclusion. And the conclusion is still a conclusion that pertains to guns known to have been straw purchased. They're a tiny fraction of all guns acquired by criminals. That conclusion is not in any way challenged or cast into --
Q Can you go back to page 4, and look at the summary of Opinion 1? Are you there?
A Yes.
Q So Opinion 1 starts by saying, "Straw purchases of handguns from FFLs," right?
A Yes.

Q But the data that we just walked through, that we just talked about, you are analyzing known straw purchases of handguns from FFLs involved in ATF investigations, right?

A That's the data in which I based the opinion, but the opinion is more extensive than that.

Q So your opinion is that you can take that ATF dataset, but you would conclude and apply the numbers that you reached to all straw purchases of handguns from all FFLs in the U.S.?

MR. DAVIS: Objection; mischaracterizes the report.

A You have to draw conclusions on the basis of the information that's available, not based on your own speculation and imagination.

And so, yes, I'm trying to draw a conclusion or state an opinion about straw purchases as a whole, but I'm limited in terms of what data I have on how often those occur.

BY MR. MALONEY:

Q And the last piece of this first sentence, it's a piece we talked about this a lot, that used to commit crimes language. The data that we just looked at, though, these were the total number of guns acquired by criminals that we talked about, that's broader than

guns used to commit crimes, correct?

A Absolutely.

Q So why does your opinion say, guns used to commit crimes when your analysis uses guns acquired by criminals?

MR. DAVIS: Object to form.

A Well, because, again, we'd have to go into the realm of speculation to say anything about straw purchases with respect to just those people who later used the guns to commit a violent crime.

BY MR. MALONEY:

Q I'm talking less about the realm of speculation and more of just the disconnect between the opinion talks about guns used to commit crimes, which you've clarified means a violent crime, and your formulate which doesn't -- isn't limited to guns used in violent crimes?

MR. DAVIS: Objection. Is there a question pending? I didn't hear a question.

A Again, I don't understand what your question is.

BY MR. MALONEY:

Q Why would your opinion talk about guns used to commit crimes when your formula underlying your opinion doesn't use the number of guns used to commit crimes, it

uses guns acquired by criminal?
MR. DAVIS: Object to form.
A Because you have to use the information that's available, and the information available did not make the fine distinctions I might wish were I to have designed the data gathering.
BY MR. MALONEY:
Q Well, if the data doesn't make the fine distinctions that you wish, then are you still confident that you're able to talk about guns used to commit crimes as opposed to having your opinion be based on guns acquired by criminals?
MR. DAVIS: Object to form.
A Yes.
BY MR. MALONEY:
Q Why is that?
MR. DAVIS: Same objection.
A You can double or triple those percentages that were straw purchased claiming that that applied -- speculating that that applies to just the guns used to commit violent crime, and it's still a tiny fraction. So it doesn't have to be precisely accurate in order for my conclusion to be correct.
BY MR. MALONEY:
Q Okay. So you've gone through your opinion on

some of these sources and talked about some of the language here.
You know, looking back at your summary and then looking at Exhibit 225, do you stand by the language that you used in your summary of Opinion 1?
A Yeah. I can elaborate on that by saying, you know, the second sentence in that opinion basically makes it clear I'm alluding to the absence of reliable and relevant evidence. So I'm talking about actual evidence, not any evidence I might imagine or speculate up. There's no reliable or relevant evidence indicating straw purchases are an important source of guns used in crime, violent or otherwise. And, yeah, the opinion remains unchallenged.
Q Let's go on to Opinion 2. Opinion 2 reads that -- and we're still on page 4 of that Summary of Opinions.
"The straw purchases of Jerome Horton and Sarah Elwood cannot be shown to be a significant cause of the alleged increase in gun trafficking or gun crime in Minnesota. Further, there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve strong purchasing."
Is that what the summary of your second

opinion reads as in your report on page 4?
A Yes.
Q And you still agree with that opinion sitting here today?
A Yes.
Q How is this opinion relevant to the case?
MR. DAVIS: Object to the form of the question; calls for legal conclusion.
A My reading of the Complaint said it was relevant, because they were arguing that the misconduct or negligence of Fleet Farm in making those straw purchases or straw sales had contributed to violence in Minnesota in gun trafficking and gun crime. So this directly addresses that assertion.
BY MR. MALONEY:
Q So every -- having read the Complaint, and I know you're not, you know, familiar with the Fleet Farm -- the other Fleet Farm documents. But are you aware that every gun purchased by Jerome Horton and Sarah Elwood from Fleet Farm was straw purchased?
A I don't know that one way or the other. I just know they did straw purchase guns.
Q Let's say this: Is it safe to assume that every gun straw purchased by Jerome Horton and Sarah Elwood from Fleet Farm was trafficked?

A Well, see, again, I don't know that there were no guns where they purchased them for themselves and they were really using their own money and they were keeping the guns, and they were a natural purchase. So I don't know that one way or the another. I only know that they did straw purchase in the sense that they were making purchases on behalf of other people.

Q Let's assume that Jerome Horton and Sarah Elwood didn't keep any of the guns that they purchased, they went on to the actual buyers, right?

A Okay.

Q So assuming that, every one of the guns purchased by Jerome Horton and Sarah Elwood were the subject of gun trafficking, right?

A Yes.

Q So your opinion talks about how those purchases cannot be shown to be a significant cause of the alleged increase in gun trafficking in Minnesota. I mean, if each of those purchases was an instance of gun trafficking, they did contribute to the increase of gun trafficking in Minnesota, right?

MR. DAVIS: Objection; mischaracterizes his testimony.

A Well, we don't know what the total volume of gun trafficking in Minnesota is, which is obviously

crucial in judging whether or not thirty-something guns trafficked by Horton and Elwood is a significant share. It might be as miniscule as the share of guns acquired by criminals that come via strong purchase. All we know is the number they straw purchased.

So, yeah, they were all involved in gun trafficking, perhaps in a very minor, low volume way. But whether that's a significant cause of an increase in gun trafficking in Minnesota, there's no basis for knowing that.

Q Would you agree with me that these purchases contributed to the increase in gun trafficking, and you may disagree on how significant that increase was?

A No, not even -- I wouldn't even agree with that limited assertion, because for all we know, they're just filling a niche that would have been filled by other people. You know, they had a demand for guns among people who are ineligible to receive them, and they were reacting to that demand. But had they not be involved in the straw purchasing, others would have. So there might have been the same amount of gun trafficking, except not involving Horton and Elwood .

Q Help me understand that. So your opinion is that Horton and Elwood's purchases may not have contributed to the increase in gun trafficking because

the increase in gun trafficking hypothetically would have happened anyway?

A Well, there's two parts to it. Others may well have done the exact same gun trafficking via straw purchasing. And also, the total volume of gun trafficking may be far more enormous such that thirty-something guns trafficked would be a negligible share.

Q Let's put aside that significant piece of how this squares up against the total amount of gun trafficking, and just focus on if it's an increase or not.

I mean, we're -- the hypothetical that you're talking about where other things could have happened, you know, that could have been gun trafficking didn't happen in this case, right?

MR. DAVIS: Object to form.

A Well, by definition I'm talking about the alternative to these two individuals being involved in trafficking. I'm saying others can do the same thing. These instances of straw purchasing don't require much of anything in the way of skill or knowledge. They just misrepresent themselves as the true purchasers of the gun, and that's all. Other people could have done precisely the gun trafficking.

And the reason why it would have been the same

amount of gun trafficking is because the demand was the same. They didn't determine the deman, rather, they knew perhaps thirty-something people who couldn't get a gun legally and wanted one, and were willing to pay for it.

Q Would you turn to page 9. It's the last paragraph on the page, it's the first paragraph under Opinion 2. You talk about violent crimes in this paragraph, right?

A Yes.

Q We've talked about violent crimes before, but now you're explicitly saying it in your report, violent crimes.

What do you mean by violent crimes as written in your report?

A Assault, homicides, robberies and rapes in this case.

Q Is it different in this case than in other cases?

A Well, again, we have to work with the data we have. And so, you know, there might be other kinds of violent crimes that don't get captured in the NCVS, so I'm just dealing with what they have.

Q So fair to say in this first paragraph that you're doing an analysis of what percentage of firearms

acquired by criminals each year are used to commit violent crimes?

A Yes.

Q And as we talked about previously, the summary of your first opinion was referencing violent crimes and talking about guns used to commit crimes, right?

A Yes.

Q Why not use the number that you're, you know, undertaking to find here to compare to straw purchases, if this is the number of guns used in violent crimes every year?

MR. DAVIS: Object to form.

A Well, I think in either case I'm referring to the same category of crimes, violent crimes.

BY MR. MALONEY:

Q You said it would be speculation if you would try to winnow down -- I'm pointing now at Exhibit 225 -- the number you used of, you know, percentage of straw purchases divided against all firearms acquired by criminals, that if you tried to narrow it to violent crimes it would be too speculative?

A What's Exhibit 225?

Q It's right in front of you. Right here.

A Oh, that thing. Okay. Then please repeat the question.

Q Sure. I mean, what you're doing at the top of Opinion 2 here in this first paragraph is, you're doing a calculation to ascertain the number of guns used in violent crimes every year, right?

A Yes.

Q I guess my question is to the extent the summary of your first opinion is centered on violent crimes, why not use this number from Opinion 2 to get the share of straw purchases against guns used in violent crimes versus all crimes that you use in the actual opinion?

MR. DAVIS: Object to form; compound.

A That would be inappropriate, because then the numerator and the denominator wouldn't correspond. I mean, you would be using a denominator that pertains specifically to violent crimes, but you wouldn't be using a numerator of guns straw purchased that were used to commit violent crimes. They wouldn't both pertain to the same thing. So the ratio would be meaningless.

BY MR. MALONEY:

Q As it stands, this denominator and numerator are different anyways, right, if we're only talking about investigative guns versus all guns acquired by criminals?

MR. DAVIS: Object to form.

A I don't understand the question.
BY MR. MALONEY:
Q This universe of guns, the total number of guns acquired by criminals --
A Right.
Q -- isn't limited to guns involved in ATF investigations, right?
A Right.
Q So we have the same conflict between the numerator and denominator with your current analysis, don't we?
A Right. And we'd love to have a count of guns straw purchased that did pertain to any and all acquisitions by criminals all year, we just don't have the data.
Q So to go back to Opinion 2, this first paragraph where you are doing the calculation to ascertain how many guns are used each year to commit violent crimes, like, why did you do that calculation in regards to this case?
MR. DAVIS: Object to form.
A Because the Complaint makes the assertion that the guns that were straw purchased from those Fleet Farm stores could have made a significant contribution to gun crime in Minnesota, or at least in the metropolitan area

of Minneapolis. And the data here are relevant in that they show what a tiny fraction of all guns acquired by criminals are later used in violent crimes. So presumably the same thing applies to criminals in Minnesota that it does elsewhere.

Q We've already established from looking at the Complaint that one of the guns that Fleet Farm sold was used in a mass shooting, right?

A Uh-huh.

Q Doesn't that somewhat negate the hypothetical question of could the guns be used in a violent crime when one of them was?

MR. DAVIS: Objection; argumentative; mischaracterizes the opinion of the expert.

A Well, I didn't address the hypothetical issue. I dealt with real information about real cases. And, yeah, we do know about one real case where a straw purchased gun was used to commit a violent crime.

But this tells us nothing about whether this is something that's likely to be common place or that it's going to characterize a large fraction of straw purchases, either in Minnesota or anywhere else.

And so, you know, you don't draw conclusions from anecdotes, from single possibly unique cases.

Q So your conclusion drawing from knowing the

fact that one of the guns was used in a mass shooting is that, we know it happened to one of the guns, but that doesn't give us any way to predict what happens with the other 36; is that right?

MR. DAVIS: Objection; argumentative; calls for speculation; mischaracterizes the opinion.

A It doesn't establish whether or not it's common in general. It only establishes that, yes, it occurred once. And, of course, almost anybody in the world would have been willing to concede that in the first place, even without the evidence.

I mean, of course, any gun acquired in any way from anybody, legally or illegally, conceivably might be used to commit a violent crime.

Q Stepping back to the abstract question of how many guns used by criminals cause violent crimes? I mean, we're talking about in the scope of this case at least one of these Fleet Farm guns was used to commit a violent crime, right?

A Right.

THE WITNESS: Could I step over there and get some coffee?

MR. MALONEY: We can go off the record. Go ahead, yeah.

(Break taken from 1:19 p.m. to 1:22 p.m.)

BY MR. MALONEY:

Q So at the top of page 10, you're doing an analysis of the guns used to commit violent crimes in 2022; isn't that right?

A Say that again.

Q You're analyzing the number of guns used to commit violent crimes in 2022, right?

A Yes, yes.

Q And based on the prior paragraph, you're estimating that number is around 623,000, yes?

A Yes.

Q And you're comparing the 623,000 number against the number of guns acquired by criminals via all methods every year, which is around 780,000, yes?

A For an average per year. But then apply that to a longer period of time. The criminals wouldn't have all acquired all of their guns just in the year preceding.

Q And then a few sentences down you reach -- you reach an 8 percent number, right, that -- I'll read the sentence that starts, Assuming all firearms.

A Yes.

Q "Assuming all firearms used to commit violent crimes in 2022 were acquired in the preceding 10 years, the upper-limit estimate of 623,015 guns used to commit

violent crimes represents just 8 percent of the guns acquired by criminals in the previous 10 years."

A Yes.

Q Is that what that says?

A Yes.

Q Why a ten-year look-back for this analysis?

A Well, I was trying to be generous to the opposing view. The opposing view would be that, you know, a very high fraction of guns acquired by criminals get used in violent crimes. So, strictly speaking, there's lots of guns used by criminals to commit violent crimes that are older than 10 years, that were acquired by the criminal more than 10 years in the past.

So the total number of guns acquired that could have been used in a violent crime in 2021 is almost certainly going to be considerably larger than the number I came up with based just on a ten-year period. It didn't have to be 10 years, I could have done 8 or 12, you know. It's the fact that the number ends in zero and makes the arithmetic simpler that accounts for the 10.

But, strictly speaking, I could have made it a much longer period of time, because many guns used in crime are much older than 10 years old, and so they were acquired much further in the past than just the past 10

years.
Q Do you have a source for the proposition that 10 years or longer that, you know, guns that are used in violent crimes could have been acquired, you know, years beforehand?
A Nothing that is cited here, but sources I've cited in other publications. ATF trace data would certainly indicate to that.
Q Thank you. Is this an analysis that you've done before?
A Which?
Q This analysis, this first paragraph on page 10?
A What, the fraction of all guns acquired that would be used to commit a violent crime?
Q Correct.
A Not that I recall.
Q And toward the later half of this paragraph, you, then, compare your estimate of guns involved in violent crimes to the higher estimate, the 2.5 million estimate, and reach a conclusion that guns used to commit violent crimes would constitute just 2.5 percent of all the guns acquired by criminals?
A Right, in that 10-year period.
Q But if you compare the numbers that you're

talking about per year on a per-year basis, we're talking about 623,000 in 2015 guns used to commit violent crimes annually against 780,000ish guns acquired by criminals every year, right?

MR. DAVIS: Object to form.

A That wouldn't be meaningful. I mean, you know, it's an apples and oranges comparison.

BY MR. MALONEY:

Q Why?

A Because you're not comparing the number used to commit violent crimes with the pool of guns acquired that could have been used in violent crime. Instead, you're just arbitrarily limiting it to the number acquired within a single one-year period. So it just doesn't mean anything, that's all.

Q But isn't the number of guns acquired by criminals via all methods, where did you get that number from, 779,375?

A We just went through that earlier.

Q That's this number right here?

A Yes.

Q And again, those are from -- this is based on, you know, we have various sources for this data. But this is extrapolation at least partially based on NCVS data, right?

A On gun thefts, yes.
Q And then incarcerated persons, right?
A Correct.
Q So when we're talking about crime guns acquired, to the extent we're multiplying with these numbers from the inmate surveys, I mean, these aren't guns just acquired by criminals, they're guns acquired by convicted criminals, right?
A Right. But also in that question you said crime guns. And, no, they're not all, in fact, probably most are not crime guns. But, yes, they are guns acquired by criminals.
Q So to the extent they're guns acquired by criminals, and we're comparing that against guns used to commit violent crimes, I guess I'm just trying to square how, you know, I guess, what would be misleading or incorrect in using the annual averages and comparing them against the other to figure out, you know, what percent of guns acquired by criminals are violent crime -- are guns used in violent crimes, as opposed to using a 10-year or more, you know, period of guns to compare against?
MR. DAVIS: Objection; vague; compound; asked and answered.
A Because that method would not permit you to

arrive at the conclusion you're trying to arrive at, which is, what's the risk of a gun acquired by a criminal eventually being used to commit a violent crime.

The problem with what you propose is that it limits the pool of guns that might be used to commit a violent crime to only those that are acquired in the last year. And that doesn't make any sense at all.

Of course, a much larger pool of guns are available, and indeed are used to commit violent crimes going back many years. And the source of that assertion would be ATF trace data, which indicate lots of guns were first sold at retail many years before the crime in which the gun was recovered by law enforcement.

Q Isn't your report assuming, though, that for this -- you know, it's a 10-year look-back, a longer look-back at the total number of guns acquired by criminals, that could then be used in a violent crime for a given year?

Isn't that assuming that, if you use these numbers, that as you're extrapolating out -- I'm pointing to Exhibit 225, the total number of guns acquired by criminals per year, aren't you then assuming that in the past 10 years, zero of these guns have been used for a violent crime until the current year?

MR. DAVIS: Object to form.
A No.
BY MR. MALONEY:
Q You're not?
A No.
Q Why not?
A I don't know why they would be. I mean, there's no earthly reason for that to be true.
Q Well, if you're comparing, you're getting an eight percent number here, right, because you're comparing, you know, the 7.8 million number against 623,000 guns involved in a violent crime per year. But the 7.8 million number, that's assuming that literally zero of those guns are used in a violent crime before that year, right?
A No.
Q How am I wrong?
A That's just not true.
Q How is it not true?
A I'm not quite sure how to explain that it's not true. I mean, some guns could be used immediately, you know, the minute the guy walks out of the gun store he commits a crime with it, so...
Q Wouldn't that, then, reduce the pool, you know, the 7.8 million number? So that the 8 percent

number would be higher because...

I guess my question is, is your pool over-representative or over-inclusive because it's assuming that that full pool of ten years of guns is what you're comparing, you know, the one year of guns used in a violent crime to?

A It's not much of an assumption. I mean, it's basically true by definition. Any gun could be used from a crime, including those first sold in the very same year that we're alleging they were used in a violent crime. They could be old guns; they could be new guns.

So the pool of guns that could be used to commit a violent crime should not be limited to just one year. In fact, it probably shouldn't be limited to the preceding 10 years, but I was just trying to be generous to the opposing view showing that my conclusion is correct, even if you are generous to the view that is not correct.

Q And I guess your overall point here is just that even if all the guns acquired by criminals, in your opinion, a small number of them are used to commit crimes, violent crimes; is that your point?

A I didn't hear a question in there. What was your question?

Q I just asked if the point that you're trying to make, this top paragraph on page 10, is that of guns acquired by criminals, only a small number of them are used to commit violent crimes?

A Yes.

MR. DAVIS: Could we go off the record?

MR. MALONEY: Yes.

(Break taken from 1:33 p.m. to 1:43 p.m.)

BY MR. MALONEY:

Q Welcome back, Professor Kleck. You still have your report in front of you, correct?

A Yes.

Q All right. Let's have you look at the second full paragraph on page 10, where you begin talking about Minnesota data, right?

A Yes.

Q And your conclusion after pulling some Minnesota data and then looking at the -- you say it's 37 firearms that Fleet Farm sold to Jerome Horton and Sarah Elwood, right?

A Yes.

Q And then you are dividing that 37 against a total number of around 16,000 for Minnesota violent crimes firearm number. And your calculation is .234 percent, correct?

A Yes.
Q So the 37 guns sold by Fleet Farm to Jerome Horton and Sarah Elwood, one in 428 of them would be used to commit a violent crime. That's your analysis, right?
A Could have -- could have been.
Q Because you're doing a hypothetical analysis based on aggregate data, right?
MR. DAVIS: Object to form.
A It's based on the hypothetical that every single one of the 37 guns that they straw purchased were used to commit a violent crime, including those we don't know about.
BY MR. MALONEY:
Q No, you're saying the odds are that 1 in 428 would be involved in a violent crime; isn't that your opinion?
MR. DAVIS: Objection; mischaracterizes the report?
A At a maximum, given the most charitable reading to the data, that at most 1 in 428 violent crimes were committed with these guns that hypothetically might have been -- no, that were straw purchased by Horton and Elwood.

BY MR. MALONEY:

Q But we know, based on our discussion and based on the First Amended Complaint, that at least 1 in 37 of these guns was used to commit a violent crime, right?

A Correct.

Q How do you square that with your opinion that the number is 1 in 428?

MR. DAVIS: Object to form; mischaracterizes the report.

A I've gone beyond just that one. I've tentatively, hypothetically assumed that all of the 37 guns that they straw purchased were later used to commit a violent crime, even though there's no evidence that that's the case.

But even if it were true, it still would be just 1 in 428 of all the violent crimes committed with firearms in Minnesota it would have been attributable to those 37.

BY MR. MALONEY:

Q You say you've gone beyond the one gun that was used in a violent crime. Does your report reflect that one of the guns was used in a violent crime?

MR. DAVIS: Object to form.

A I'm not sure. Earlier drafts might have. I'm not sure that this one does. I don't recall one way or

the another whether this draft does.
Q Can you point me to where in your report it talks about one of the guns being used for a violent crime?
A No.
Q So that was not a factor in your analysis, right?
A Whether I mentioned it or not, it wouldn't have been a factor. A single case wouldn't have any bearing on my opinions.
Q In your opinion. Are guns, as in this case that are straw purchased, are those guns at a higher risk to be used in a violent crime than other guns?
A I didn't express any opinion one way or the other.
Q Do you have an opinion on that?
A Yeah. I assume it's more likely, basically, because they're illegally acquired.
Q Why would it be more likely if they're illegally acquired?
MR. DAVIS: Object to form.
A Because they're by definition acquired by people more likely to commit a crime.
BY MR. MALONEY:
Q But that opinion that you just expressed about

the likelihood of straw purchase guns being more likely to be used in a violent crime, that's not reflected in your report, right?

A Well, I charitably assume all of them hypothetically could be used in a violent crime, and it still wouldn't constitute more than a tiny, tiny fraction of 1 percent of all the violent crimes committed with firearms in Minnesota.

Q So you're saying that even if, let's assume every single gun that Jerome Horton and Sarah Elwood purchased from Fleet Farm, 37 guns, your opinion is that that would be not a significant contribution to violent crime in Minnesota?

A Yes. Well, I mean, to be more specific, it wouldn't generate a measurable increase in crime over what it would have been without those straw purchased guns hypothetically being used to commit violent crimes.

Q What do you mean by "measurable increase"?

A Well, crime statistics are limited as to their precision. And no violent crime rate, probably not even a homicide rate, is measured in less than a percentage point accuracy.

And so you'd have to have, I don't know, a change of more than a couple of percent before you were confident that, yes, that was a real change, rather than

a reflection of flaws in official crime statistics, you know, rather than, for example, a few more or fewer citizen victims reporting their crimes to the police.

Q So even if it's in relative terms to how much crime occurs in Minnesota, how much violent crime occurs, it wouldn't change the percentages, it would be an increase to raw totals, right?

A Well, we wouldn't be confident that it was an increase in total number of violent crimes, because we have -- we don't have sufficient confidence in the precision of crime statistics to believe in the reliability of very, very tiny shifts in the crime rate.

Q If 37 guns sold by Fleet Farm are used to commit 37 additional violent crimes, that is 37 additional violent crimes in Minnesota, right?

A Right.

Q Okay. At the top of page 11, you have a paragraph here discussing whether or not the persons who purchased the 37 guns could have acquired them from a different source, right?

A Right.

Q Can you tell me why you analyze this issue for this case?

MR. DAVIS: Objection; vague; calls for speculation.

A Because my understanding from the Complaint was that the State of Minnesota was asserting that the 37 straw purchases of guns from Fleet Farm could have caused an increase in crime.

But that wouldn't be the case if criminals -- every one of the criminals who acquired a gun via straw purchasing could have acquired it from another source. That means, the number of people who acquired guns wouldn't be changed and, therefore, there would be no reason to expect an effect on the crime rate.

Q With regards to this case, I mean, how do you know that's the case with the two straw purchasers that are involved in this matter?

MR. DAVIS: Objection; vague.

A Well, they're human beings who exist in the United States, which is a wash in guns for a country where there is well over 300 million guns in private hands, where at least half of the households have guns. So it would be really unusual if you found somebody who could only get a gun via straw purchasing.

In fact, the fact that somebody is willing to engage in an illegal act, like straw purchasing, really broadens the way they could acquire guns. You know, they could not only buy guns through relatively legitimate means, but they show they're willing to buy

them or acquire them through illegitimate means.
So, yeah, it's basically easy for people to get ahold of guns. And so I have no reason to think that those who want guns from these two straw purchasers were any different in that respect.
Q But you don't have any kind of personal or additional knowledge about the unique circumstances of these purchasers that would have made them more likely to pursue other means of getting the guns, if they hadn't bought them from Fleet Farm?
A That's correct.
Q And are you an expert in gun trafficking?
A I'm not sure what that means, but I know a lot about it.
Q Are you an expert in the ways that, you know, besides straw purchasing from Fleet Farm, that these two buyers could have acquired guns?
MR. DAVIS: Objection; vague.
A Again, I know a lot about it.
BY MR. MALONEY:
Q Would you consider yourself an expert in it?
MR. DAVIS: Same objection.
A Yeah, I just think that label is somewhat arbitrary. I know a lot about it, that's all I'm willing to claim.

BY MR. MALONEY:
Q And what's the source of your knowledge?
MR. DAVIS: Objection; vague.
A Reading everything that ATF had to say about it; reading everything that academics in publications had to say about it.
BY MR. MALONEY:
Q And is that the sources you decided, is that the basis on which your form your opinion that these two straw buyers could have and would have acquired their firearms from some other method if it hadn't been through Fleet Farm?
A I'm just assuming they're basically like other criminals. And other criminals, as indicated in surveys of criminals, have a variety of access, a variety of sources from which they can acquire guns.
So unless these people were peculiar, unusual exceptions to that realization, yeah, they had other sources of guns that they could have used.
Q But you would agree that in this case, regardless of what other sources they had, they did purchase their guns from Fleet Farm, correct?
MR. DAVIS: Objection; foundation.
A Well, certainly.

BY MR. MALONEY:
Q If you're still on page 11, look at paragraph 3, the summary that you have there. And it reads, "Sales of multiple guns at the same time are not suspect and rarely involve guns later used to commit crimes. Rather, multiple gun sales are routine and commonplace, and guns sold in multiples are no more likely to later be used in crimes than guns sold one at a time."
Is that what your opinion reads as on page 11 of your report?
A It does.
Q And sitting here today, do you still agree with that summary of your opinion?
A I do.
Q And from your review of the Complaint in this case, how is this opinion relevant to the matter?
MR. DAVIS: Object to form; vague; calls for speculation; calls for legal conclusion.
A My reading of the Complaint is that, you know, Minnesota, the State of Minnesota was arguing that somehow employees of Fleet Farm should have known that they were being asked to do straw purchases. And that one of the indicators that it might be a straw purchase is the fact that the purchasers were acquiring more than one gun at a time in the same day and in the same store.

BY MR. MALONEY:
Q And in your opinion, that's not an indication or warning sign of a possible straw purchase, right?
MR. DAVIS: Object to form.
A It's certainly not likely to be. There's no rational reason for it. But that doesn't mean there aren't people who would claim that. And certainly ATF has claimed that. And for whatever reason, the NSSF has echoed that.
But there's no rational basis for thinking sales of multiple guns at the same time, of two or three, are suspect. And certainly no rational foundation for the claim they're more likely to later be used to commit crimes.
BY MR. MALONEY:
Q So do you agree with the fact that the ATF warns or puts out guidance that sales of multiple guns can be a warning sign of a straw purchase?
A They do indeed.
Q Do you agree with that guidance, based on your review of the evidence?
MR. DAVIS: Object to form.
A No.
BY MR. MALONEY:
Q How about the fact that the NSSF issues

similar guidance, you don't agree with that either?

MR. DAVIS: Object to form.

A I don't object to their -- if they're asserting that purchases of multiple guns are an indication of straw purchasing, then, no, I don't. But I may agree with them saying that, whether it's true or not.

BY MR. MALONEY:

Q What do you mean by that, that you would agree with -- I guess, how would you square that, you know, you might not agree with there being data to support it, but you would agree with them saying it?

A Well, as I mentioned in the report, you know, one can speculate other reasons why NSSF would have echoed ATF's claims. I mean, that's the government agency that regulates them. And so it doesn't do it to alienate the federal government's regulatory agency. So the fewer points of conflict, the better. So, you know, it helps them with ATF to say, yes, ATF is right, selling multiple guns might be a problem.

Q So in your opinion or analysis, the NSSF guidance that multiple -- purchases of multiple guns may be a warning sign of a straw purchase, it's not grounded in data, it is out of deference to the ATF?

MR. DAVIS: Objection.

A It's a speculation, but it's a better -- it's more consistent with what we know than the assertion that, yeah, it's a fact that multiple sale guns are more likely to be used in crime later on, or likely to be part of a straw purchase, because there is no factual foundation for that. So there has to be another explanation. And my speculation is it may serve ATF's -- I'm sorry, NSSF's interest in terms of their relation with ATF to assert the same things ATF does.

Q The first sentence of the summary of your opinion talks about, it says, "Sales of multiple guns at the same time are not suspect." What do you mean by the work "suspect"?

A Well, in this context it would mean that there's something about them that indicates they're likely to be involved in criminal activity. And more specifically, that they're likely to be connected to a straw purchase, or some other illegal gun acquisition.

Q Do you consider yourself an expert on suspicious gun sales?

MR. DAVIS: Object to form.

A I'm not quite sure what you're asking. I really don't understand how to answer that.

BY MR. MALONEY:

Q In your opinion, what is a suspicious gun

sale?

MR. DAVIS: Object to form.

A Well, it's a gun that the participants, the salespersons may well suspect it involves criminal activity, whether it in fact does so or not.

BY MR. MALONEY:

Q Have you ever received training on identifying suspicious gun sales?

A No.

Q Do you have, you know, any practical work experience on preventing suspicious gun sales?

A No.

Q And you testified previously that the only documentation you've seen, at least when it comes to straw purchase warning signs, are ATF documentation; is that right?

MR. DAVIS: Objection; mischaracterizes prior testimony.

A No, I also mentioned NSSF publications in addition to the ATF documents.

BY MR. MALONEY:

Q So you've seen ATF and NSSF documentation; is that fair?

A Correct.

Q So given the experience and the review of

documents that I just walked you through, is your opinion that you're qualified to talk about whether or not a multiple gun sale is suspect?

MR. DAVIS: Object to form.

A I'm qualified to say how common multiple gun sales are. And the answer is, they're very, very common. And thus I suspect what the average person would infer from that is, there's nothing very suspect about it, something that happens that often.

BY MR. MALONEY:

Q You talked about what the average person would infer. Is that also what you infer from the data?

A Yes.

Q We talked about purchasing multiple guns. Is purchasing multiple guns of the same caliber a warning sign of a possible straw purchase?

MR. DAVIS: Object to form.

A Well, my response would be the same as in connection with every other alleged warning sign of a suspicious transaction that's been put forward by ATF, which is, that it's unvalidated. There's no affirmative evidence that that's in fact likely to be an indicator of a gun that is either a part of a straw purchase or it's likely to be later used to commit a crime.

It's just one of those things that's sort of

the folk wisdom out there and it's uncritically accepted by people in the firearms, enforcement community.

Q So that's your opinion is that the ATF and NSSF guidance about being suspicious of purchases of multiple guns of the same caliber is folk wisdom?

MR. DAVIS: Object to form; beyond the scope of the report.

A Well, I'm not sure what relevance it has to this particular case, because, you know, when there's only two guns purchased at a time, which was characteristic of all but one of the guns acquired by the straw purchasers in this case, you know, there's nothing extraordinary about two guns, both being 9 mm, both being 38 caliber, or whatever. I mean, it's not a lot of coincidence for two guns to have the same caliber.

Maybe if you were buying 50 or 100 guns all of the same caliber, it might be more suspicious. But that's not in fact the case. This is, you know, purely imaginary, hypothetical possibility of my large numbers of guns of the same caliber.

Q Let's talk about that. So the bottom of page 11, the last paragraph. The second sentence says, "This might seem plausible if one were referring to purchases of, say, dozens of guns in one transaction, but the

Fleet Farm sales in question did not involve numbers of guns even remotely that large."

Is that what it says there?

A It does.

Q Is that what you were just referencing in your previous answer about the number of guns sold versus, you know, 50 to 100 guns?

A Yes.

Q In your opinion, what are dozens of guns? How many guns is that?

MR. DAVIS: Object to form.

A That would be 24 or more.

BY MR. MALONEY:

Q I guess, do you have, you know, based on what you've talked about with your review of some of the ATF and NSSF literature, I guess, at what point is the threshold crossed where the number of guns purchased becomes suspect, in your opinion?

MR. DAVIS: Objection; calls for speculation.

A It's a mistake to think of it in binary terms, it's not either or. There's no magic point at which it becomes suspicious. It just becomes more suspicious as it reaches very large number of guns acquired with the same caliber.

BY MR. MALONEY:

Q And in your opinion, when you're talking about very large numbers, we're talking more than ten, right?

A It could be more than ten. Although, when I said dozens, that means 24 or more, because it's multiple dozens. Multiple units of 12, so...

Q What informs your opinion on the relevance of, you know, having a number that large of a size?

MR. DAVIS: Object to form; calls for speculation; calls for legal conclusion.

A Well, for example, when ATF wants to impress people with the number of firearms traffickers out there, they don't cite cases in which, as far as they know, a trafficker sold only two or three guns in the entire course of their legal business.

Rather, they cite cases where there are dozens or even hundreds of guns trafficked. So by ATF's judgment, that's a substantial number worthy of bringing it to the attention of the public.

Q But does that mean that it's only those types of kind of large scale trafficking operations that the ATF considers suspect?

MR. DAVIS: Objection; lack of foundation; calls for speculation.

A No, quite the contrary. Most of the

trafficking operations they investigate involve even fewer guns. It's just that they would much prefer to be investigating large scale trafficking operations. And when they do come across one, they trumpet it to the skies with their press releases or they boast of having busted a trafficking ring that was responsible for many, many guns being illegally sold.

It's just that ATF is rarely able to actually come across such operations, presumably because there are hardly any in existence in the world.

Q Is there any other basis for your assertion about, you know, dozens of guns and the size of the transaction, rendering it suspect?

A No, other than common sense, I guess. If that's a basis.

Q Let's talk about, if you turn to the next page of your report. And I'm going to give you an exhibit. You cite to a study by Koper, correct?

A Correct.

(Plaintiff's Exhibit 220 was marked for identification.)

BY MR. MALONEY:

Q And I'm handing you what has been marked as Exhibit 220.

A (Views document.)

Q Well, I guess it's the second page of the document, but it's the first page of the study. This is an article by Christopher Koper that you cite in your report?
A It is.
Q And the Koper article, it's from 2005, but the article is looking at police recoveries of firearms in, I think, Maryland, yes?
A Yes.
Q And the dataset that the article is looking at is older, right, it's between 1990 and 1996?
A I think so, yes.
Q And in your report, if you look at the top of page 12, sorry to make you jump back and forth between documents. But if you go to your report --
A Okay.
Q -- which is Exhibit 211.
If you look at the first paragraph about the third sentence, you are citing statistics from the Koper study. And then you say "In short, it is commonplace for guns to be sold in multiples and there is, therefore, no reason for gun store employees to perceive attempts to buy multiple guns at the same time as noteworthy or for such attempts to stand out as suspicious, absent other suspicious indicators."

That's what you say there, right?
A That is.
Q And you're basing -- the opinion that I just read to you is based on your analysis of the data from this Koper study, right?
A I wouldn't dignify it with a label and analysis. I simply read the numbers.
Q And this is -- in your opinion of the numbers from the Koper study lead to your opinion here, right, about gun store employees should not perceive attempts to buy multiple guns as noteworthy, right?
A Well, I report what Koper reported. I simply repeat that 27 percent of handguns are sold in multiples and, therefore, it's not unusual. So on that basis alone, that is to say, absent other suspicious indicators, there would be no reason for a gun store employee to regard the attempt to buy multiple guns as suspicious.
Q Well, Koper is not opining on what gun store employees should be doing, right?
MR. DAVIS: Object to form; argumentative.
A I don't know that that was his intention at all, no.
BY MR. MALONEY:
Q Besides the Koper study, did anything else

inform the opinion that I just read to you about what gun store employees should perceive as noteworthy or should look for or stand out as suspicious?

A Well, as I say, there's publications by both ATF and NSSF to where they assert that certain other attributes of transactions should, which is what you asked about, should be, you know, indicators of something suspicious going on.

My point here is much more narrow than that. It's simply that the purchase of multiple guns by itself would be routine and not particularly a basis for being suspicious.

Q In your opinion, what are other suspicious indicators?

MR. DAVIS: Object to form.

A I don't have any opinions about what, in fact, are other indicators of an illegal transaction going on. But I can tell you what ATF and NSSF assert are suspicious indicators.

BY MR. MALONEY:

Q Based on what you said previously about the guidance from ATF and NSSF, would you agree with their assessment of other suspicious indicators?

A No --

MR. DAVIS: Object to form.

A No, because they've never validated them. They easily could have. They could have shown that those indicators, alleged indicators, in fact were related to what eventually was discovered as an honest to God straw purchase, because somebody got caught and presumably convicted.

And to compare them with other transactions that did not involve straw purchasing, they could have done that, but to my knowledge never did.

And so, you know, ATF really has no empirical foundation, other than, as I say, you know, folklore among enforcement personnel.

I think what they do is, it's a logical error. They start with the fact that on the rare occasions guns are trafficked, then frequently the transactions have attributes A, B and C. But then what they infer from that is, if you knew a transaction had attribute A, B or C, then it's likely to be trafficked. That's a logical error. It doesn't follow. I think it's called affirming the consequent.

Q Do you know if any other suspicious indicators were present at Fleet Farm during Fleet Farm sales to Jerome Horton or Sarah Elwood?

MR. DAVIS: Objection; calls for speculation.

A Yeah, I don't -- there's nothing in the report

and it's beyond the scope of my report what the attributes were of those particular transactions. I have offered no opinion on that.

Q So there could be, there might not be, you're not aware if there were other suspicious indicators?

MR. DAVIS: Same objection.

A I have no opinion, that's correct.

BY MR. MALONEY:

Q If you turn to the next page in your conclusion. The first sentence in your conclusion makes a somewhat similar statement about, "The sales referenced in the Complaint do not indicate a suspicious purchasing pattern."

What do you mean by "suspicious purchasing pattern"?

A A pattern that employees should have been regarded as illegal or likely to be illegal.

Q Do you know what a suspicious -- in your opinion and experience, how would you identify a suspicious purchasing matter?

MR. DAVIS: Object to form; calls for speculation.

A Well, again, I don't have any opinion on how one would go about that. I only have an opinion that it doesn't become suspect or suspicious solely on the basis

of the fact that multiple guns are sold.

BY MR. MALONEY:

Q But this sentence is referencing more, it goes beyond just a multiple sale, right? You were saying, "The sales referenced in the Complaint do not indicate a suspicious purchasing pattern, full stop, right?

MR. DAVIS: Objection; mischaracterizes the report; and argumentative.

A Well, yeah, I don't have any opinion on it, because I don't know anything about the full array of possible suspicious attributes of the transactions involving the straw purchasers. I was only addressing the very narrow topic of the fact that they bought multiple guns at one time. And I did that because it's what the Complaint emphases.

BY MR. MALONEY:

Q Is it fair to say that your opinion in this first sentence, "The sales referenced in the Complaint do not indicate a suspicious purchasing pattern, is limited to insofar as the sales were sales of, you know, multiple handguns?

A Yes.

Q Do you discuss purchasing patterns anywhere else in your report?

A I don't think so.

Q I want to take you back. Let's go back to the Koper study for a second. It looks like you're relying on in your report on page 12 kind of two different numbers from the Koper study.
If you go to page 12 of your report, the first paragraph talks about -- and again, the Koper study was handguns sold by licensed gun dealers in Maryland in this seven-year time period in the early '90s, right?
A Right.
Q They found that of a set of handguns sold by licensed gun dealers in that seven-year period, 27 percent of them were sold as part of a multiple gun sale, right?
A Right.
Q And you're pulling that right from the Koper study?
A Correct.
Q The second piece and the last paragraph at the bottom of 12, you're giving some percentages.
During that same time period and that same set of handguns, 3.7 percent of single-sale handguns had been recovered by law enforcement, while a slightly lower number, 3.3 percent of multiple-sale handguns had been recovered, right?
A Right.

Q And this is the data that you're basing your opinion in this section on, correct?
A Yes.
Q Is there any other data that you're relying on, besides the two sets of numbers from the Koper study that we just walked through?
A No, they're sufficient by themselves to make the point I was making.
Q Did you look at any other data sources on multiple gun sales to further inform your opinion?
A Well, I've read other academic articles that tried to make an assertion like that, but none that had any relevant evidence. And so nothing that merited reporting -- mentioning in the report.
Q You didn't see any other studies that had different data or different conclusions that you considered, but then chose not to use?
MR. DAVIS: Objection; asked and answered.
A Certainly nothing that's superior to what Koper had, which is something, you know, that goes beyond a few anecdotes or just cases based on what was investigated by the ATF or other agencies.
The beauty of the Koper data is that it covered basically all of the dealer sales of handguns for a long period in an entire state. So it's not a

selected subset of the guns sold in that state, it's all of them, as far as we know.

Q Are there any issues comparing Maryland firearms data to, you know, what the on-the-ground experience is in Minnesota?

MR. DAVIS: Objection; calls for speculation.

A I have no basis for knowing that handgun sales are fundamentally different in Minnesota compared to other states, including Maryland.

BY MR. MALONEY:

Q Do you have a basis for knowing that they're similar?

A I have no basis one way or the other. It would be sheer speculation. You've got to go with the information you have, not with guesses about information you don't have.

Q How about the fact that the data in the study is, you know, 30 or more years old. Does that impact your analysis at all?

A In the absence of any reason to believe it's different today, that multiple handgun sales have changed in their frequency, no. I mean, I have no foundation for believing it's any different in 2025 than it was back in 1996.

Q If you have the Koper study up, could you go

to the very -- it's the second page of the document, but the first page of the study. It's page 749.

A Okay.

Q Do you see it right there?

A Yes.

Q If you look at Research Summary, I'm going to read the first sentence to you. It says, "The simultaneous or rapid purchase of multiple guns, which is referred to as a multiple sale, is a potential indicator of gun trafficking." Do you see that there?

A I do.

Q This, again, is the study that you cite multiple times in your report, right?

A Correct.

Q Do you agree with Mr. Koper?

A Well, as he's phrased it, he is a potential indicator. Of course, anything can be a potential indicator. It's an utterly meaningless statement, and you wonder why he wasted the print on it.

Q So you agree with him that multiple gun sales are a potential indicator?

A No.

Q Why not?

A Well, let me back up. Is it an actual indicator? There's no reason to believe that. You

know, what evidence we have indicates, no, it's not an actual indicator. Is it a potential indicator? Well, that's what I was saying is a meaningless statement. Anything can be a potential indicator of gun trafficking.

If a buyer is wearing high-top shoes, I suppose it's a potential indicator for gun trafficking, there's just no earthly basis in evidence for believing that.

Q Did you reread this article in drafting your report?

A I did.

Q Did you read the sentence that I just read to you when you went back through it?

A I did.

Q Is there a reason why you didn't address this in your report?

MR. DAVIS: Object to form.

A There's thousands of things I could have wasted space on, but, you know, pointing out a purely logical point like that, that anything could be a potential indicator, I did not waste the text on pointing out that kind of thing.

BY MR. MALONEY:

Q And this is the author of the study that you

cite in support of your proposition that multiple gun sales are not an indicator of gun trafficking that says they are a potential indicator.

A Right.

Q That's more than just a random proposition, right?

MR. DAVIS: Object to form.

A It's certainly not -- it's not a random proposition.

BY MR. MALONEY:

Q It has direct relevance to your opinion, right?

A It certainly does.

Q But you didn't address it in your report?

MR. DAVIS: Object to form; mischaracterizes the report.

A Well, again, I thought I already answered that. I didn't address it in the report, because there's no earthly reason to do so. It's not like it is contrary information that indicates, well, yeah, multiple sales are an indicator of gun trafficking, because that's not even what Koper is claiming there in that sentence.

BY MR. MALONEY:

Q Can you go to 753 in the Koper article? Look

at the first full paragraph on the page. The second sentence where is says, "Moreover, handguns... Do you see that?

A Yes.

Q All right. So it says there, "Moreover, handguns linked to multiple sales were over twice as common (51 percent) among handguns with an obliterated serial number, an obvious flag for potential trafficking."

Do you recall reading that when you reviewed the Koper article for your report?

A Yes.

Q What do you make of that data point about how common -- how multiple -- guns involved in multiple sales are twice as common to have an obliterated serial number?

A Well, the first thing that stands out about that is, Koper doesn't make any claim about how common obliterated serial numbers are. If they're in fact really rare, then who cares if they're more common among multiple sales of guns.

And the other thing is, he once again uses this ambiguous phrasing, flag for potential trafficking. Well, it's either an indicator of trafficking or it's not. I mean, the guns were later used -- they were

later trafficked or they weren't. I don't know what potential trafficking is. I know what actual trafficking is.

You know, it turns out when you really parse out the exact wording, the statement doesn't state anything, it doesn't really mean anything.

Q Why not address this in your report?

MR. DAVIS: Object to form; argumentative.

A It's yet another irrelevancy that, you know, you don't waste space on irrelevancies. You pay attention to what you actually know.

One thing I know about obliterated serial numbers is, frequently the reason why the serial number was obliterated, it's not because a trafficker possessed it, it's because a gun thief obliterated it. He stole a gun and he doesn't want it to be traced. He doesn't want to make it easier for the cops to trace the gun, so he obliterated the serial number, or tries to anyway.

Q So your opinion is that the sentence in this fact about multiple sales being twice as common to have obliterated serial numbers, that's just not relevant to your report?

MR. DAVIS: Objection; asked and answered.

A Yeah, it's not what he said regarding "potential trafficking" is definitely not relevant to my

report, which concerned actual trafficking, not potential trafficking, whatever that means.

Q I mean, we're talking about in your report it's discussing warning signs, right?

MR. DAVIS: Object to form; mischaracterizes the report.

A It indicates one alleged warning sign, and it turns out, no, it's not a warning sign at all.

BY MR. MALONEY:

Q But your opinion is that it's not even a warning sign of potential trafficking, right?

A I don't even know what that means, so I don't have an opinion on that.

Q Would you agree that the language that Koper uses, the obvious flag for potential trafficking, means that at the very least it raises the likelihood that the gun could be trafficked?

MR. DAVIS: Objection; lack of foundation; calls for speculation as to what Koper means.

A Well, I honestly don't know what he meant by that. He is trying to hint at that possibly by using some deliberately vague wording.

But as to what you could legitimately interpret from his words, I don't think you can really interpret this as an assertion that multiple sales are

an indicator of actual trafficking.
BY MR. MALONEY:
Q So reading this sentence today doesn't affect your opinion about the multiple sales in this case and whether or not those multiple sales were suspect?
A Well, my assertion was that based also on Koper, but his actual data rather than his rather vague, subjective statements was that handguns sold in multiples are no more likely later to be used in a crime. As to whether they're suspect or is in some vague way, I don't recall.
Q I mean, this isn't a subjective statement. I mean, Koper is citing hard data here, right, that handguns from multiple sales are twice as likely to have an obliterated serial number?
MR. DAVIS: Objection; foundation; argumentative.
A Right. But the point is, he doesn't actually then go and say it's an actual indicator of actual trafficking. And certainly he does not say, because it would be contradicted by his own data, that the reason the multiple sales ought to be seen as more suspicious is because those guns are later used in crime, and he knows that's not true.

BY MR. MALONEY:
Q What is an actual indicator of actual trafficking?
A Well, something that would invalidate it and it would be shown to be connected to gun trafficking, rather than just a matter of law enforcement folklore.
Q But in your opinion, are there any of the warning signs that you've seen by ATF or NSSF, do any of those warning signs meet those criteria that you just laid out?
A I don't know, because their validity has not been checked.
Q So if their validity has not been checked, they don't meet the mark, right?
A That's right.
Q So, to that extent, there are really no indicators of actual trafficking, right?
MR. DAVIS: Object to form.
A None that we can actually rely on. There is just alleged indicators.
BY MR. MALONEY:
Q Would you go to page 763, the Koper article.
A Okay.
Q The first full paragraph, and I'll read it to you. It starts by saying, "Adjusting for these factors

reveals that handguns sold in multiple sales had survival times 22 percent shorter than those of other handguns (Table 3, Model A) which is to say that handguns sold in multiple sales were more likely to be used in crime."

Do you see that on the page?

A I see that.

Q Do you recall reading that sentence when you went back and reviewed the Koper article?

A I do indeed.

Q Is that sentence relevant to your opinion?

MR. DAVIS: Object to form.

A Well, it's relevant, but it wouldn't alter my conclusion.

BY MR. MALONEY:

Q Why not?

A Certainly I -- first of all, I didn't make any conclusion about survival times. This is a subtle change in subject matter. He starts out talking simply about whether or not guns were used in crime. And now he is talking about survival times, which has to do with how quickly they were used in crime, or at least assumed to be involved in crime based on the fact that they were recovered by law enforcement. So it's a change in subject that he's talking about.

Secondly, he's no longer talking about all of the Maryland handguns sold by the FFLs. He has now subdivided the data into datasets that he thinks support his preferred conclusions.

Q So do you agree with Koper that based on his analysis of survival times that handguns sold in multiple sales were more likely to be used in crime?

A Well, that's not actually what he concludes, because he says, adjusting for these factors, blah-blah-blah.

Well, he has now got some abstract concept, not the likelihood of the handguns being used in crime, but some subtle, vague, amorphis concept of risk that after you adjust for other factors, are guns sold in multiples more likely to have this shorter survival time.

And so, he has changed the subject, he has changed the set of guns he is talking about, and he seems to be dredging through the data looking for a subset of the data or some way of analyzing the data that still supports his preferred conclusion, the one that's summarized in the concluding paragraphs.

Q Did you address this in your report?

A No.

Q Why not?

A Again, it's an irrelevancy. I mean, what I cited was what was relevant, that is, Koper's own data that shows the likelihood that multiple-sales handguns were or were not more likely to be later used in crime than single-sale guns. And his data indicates that's not true. That's what his actual data indicates as opposed to the spin he tries to put on the results by subdividing the data down to subsets that, you know, give him an answer more to his liking, or changing the subject as to what he is supposedly studying.

Q Even if you consider that sentence not relevant, why not address in your report how it's not relevant and why you have various issues with his analysis?

MR. DAVIS: Objection; argumentative; asked and answered.

A Well, there's no upper limit on the number of false conclusions that are out there in the literature pertaining to any given firearms-related assertion.

So I could literally have a report ten times as long as mine and I still wouldn't have addressed all of the false conclusions based on flawed analysis.

So, no, in the interest of the fact that we all live only a short time, and only have a short time to read reports like this; in that light, no, I couldn't

dispose of every single irrelevant or inaccurate conclusion drawn from evidence that, in fact, did not support it.

Q You can put that aside. And I'm going to hand you what has been marked as Exhibit 221.

(Plaintiff's Exhibit 221 was marked for identification.)

A (Views document.)

BY MR. MALONEY:

Q Take a look at the top of 221. It is an article from Douglas S. Well, the Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms.

Do you see that there?

A I do.

Q Are you familiar with this article?

A Yes.

Q How is that?

A I've read it before.

Q Did you read it since you've been retained for this matter?

A No.

Q When do you think you read it?

A When?

Q Yeah.

A I have no idea. Probably shortly after it was

published in 1996, but I couldn't swear to that.
Q And what do you recall about this article?
MR. DAVIS: Object to form.
A It's junk science.
BY MR. MALONEY:
Q Why is that?
A Well, first of all, the senior author works for the Center to Prevent Handgun Violence. He's basically a gun control advocate. And the research shows it. I mean, this is advocacy in other forms. It's junk science in the sense that bad research was used to support a predetermined conclusion.
Q What in this article is bad science?
A All of it. I mean, there is no relevant evidence that actually would allow you to judge the impact of gun control policies involving licensing, registration, and blah-blah-blah. You know, his conclusion doesn't really follow from any of the rather crude findings that he arrives at.
Q If you look at the bottom of -- go to it's the second page of the article, 1760, the middle column.
A Okay.
Q The last sentence on that page. It says that, "The likelihood that a traced gun recovered anywhere in the nature was acquired in Virginia relative to another

southeastern state, for firearms purchased after the 1-gun-a-month law took effect compared with guns purchased prior to enactment of the law, was reduced 36 percent."

Do you see that there?

A Yes, I see it.

Q What's your opinion of that conclusion --

A Well, he doesn't have any basis for it. It was reduced is clearly an implication of causation. He is not just saying it went down 36 percent, it says, it was reduced 36 percent, meaning, there was some action taken to produce that result. And he thinks that it's, you know, the passage of something as trivial as 1-gun-a-month law.

And as to whether or not that follows, well, hasn't the slightest idea what was attributable to that change. He certainly doesn't -- in general he doesn't know whether it was the result of a deliberate effort rather than something occurring outside the control of policy-makers.

But he certainly doesn't -- if it were the result of some deliberate effort, he certainly doesn't have any basis for attributing it to the passage of that little, minor law.

Q So you don't dispute that traces went down,

you dispute what caused the traces to go down, correct?

MR. DAVIS: Object to form; calls for speculation; lack of foundation.

This is not a document that's been marked in evidence in this case.

A Well, my position is that there isn't anything to be concluded from this kind of information one way or the other.

BY MR. MALONEY:

Q Can you go up to the next column at the top of the page, the last sentence in that first paragraph. Do you see where it says, "For gun traces originating"?

A Yes.

Q So it reads, "For gun traces originating in the northeast, the likelihood that a gun would be traced to Virginia relative to gun dealers elsewhere in the southeast for guns purchased after the 1-gun-a-month law took effect when compared with guns purchased prior to the law's effective date was reduced 66 percent."

Do you see that there?

A I see it.

Q What's your opinion of that sentence?

MR. DAVIS: Objection; lack of foundation; calls for speculation.

A He has no basis for that conclusion, in

particular, he is repeating the completely unsupported assertion that it was reduced 66 percent, rather than just it happened to go down for reasons we don't know, which would have been the more honest way of describing it.

And, secondly, this amounts to what researchers would call sort of a statistical anecdote. Yeah, there's numbers involved, but it really just pertains to one state in one time period. And we're supposed to attribute significance to that rather than him looking across the board at all states with and without the 1-gun-a-month law and assessing the impact of the law that way.

So, you know, you can get any result you like if you basically dredge through the data looking for a subset that supports your position. And in this case, they chose to focus on what happened in Virginia when they passed their 1-gun-a-month law.

We have no idea why there was that change of a reduction in guns going into the northeast that came from Virginia.

Q So part of your critique of this study is that it's a study looking at one state in one time period, right?

A That would be part of it.

Q Isn't that the same problem with the Koper study?

MR. DAVIS: Object to form.

A Not at all. In that case, the unit of analysis is the gun, and there were, I think, like 180,000 guns. It was about as far from being a single-case analysis as you could get.

But in this case, the unit of analysis is states, and they've got exactly one state that passed this law, and then they observed whether or not guns moved to the northeast.

Q But they're looking at data from multiple states, right, as far as guns traced after the law was passed?

MR. DAVIS: Object to form; lack of foundation.

A I'm only referring to the paragraph you directed me to.

BY MR. MALONEY:

Q Correct. And so that one sentence that I read was about New York State only, correct?

MR. DAVIS: Object to form. The document says what it says. It's beyond the scope of his report.

A I don't know that it's limited to New York. Its traces originated in the northeast, not just New

York. And whether the guns could be traced to Virginia as being the point of first retail sale.

BY MR. MALONEY:

Q And you didn't reference this article in your report, right?

A I certainly did not.

Q Why not?

A Because it's junk science.

Q And you didn't include this article to refute its findings in your report, right?

A No, I wouldn't need to. No serious scholar would take this research seriously.

MR. DAVIS: Eric, can we go off the record?

MR. MALONEY: Sure.

(Break taken from 2:40 p.m. to 2:46 p.m.)

BY MR. MALONEY:

Q Welcome back, Professor Kleck. Just a few more questions for you.

I want to go back to 221, that exhibit. And you were referring to this exhibit as junk science, right?

A Yes.

Q And you were talking about -- I don't know, is it both authors or one of these two authors in your opinion is a gun control advocate?

A They seem to be indicating they're both affiliated with Center to Prevent Handgun Violence. They don't distinguish between Wile v. Knox (phonetic).
Q Yeah. Do you consider yourself to be an anti-gun control advocate?
MR. DAVIS: Object to form; argumentative; vague.
A No.
BY MR. MALONEY:
Q Why not?
MR. DAVIS: Same objection.
A Because I don't advocate for anything. In fact, let me amend that. What I do advocate for are gun controls that work. And based on my own research and the research of others, which does not include 1-gun-a-month laws, by the way.
Q So it's your opinion that gun control advocates advocate for a lot of gun control measures that you think do not work?
MR. DAVIS: Object to form; calls for speculation; vague; beyond the scope of your opinion.
A Correct.
BY MR. MALONEY:
Q All right. I'm going to hand you another

exhibit here. You can hand that one aside. This has been previously market as Exhibit 157.

(Plaintiff's Exhibit 157 was marked for identification.)

A (Views document.)

BY MR. MALONEY:

Q If you look on the first page, it has a case caption heading for the United States of America v. Jerome Fletcher Horton, Jr.; isn't that right?

A Yes.

Q And it's entitled Criminal Complaint?

A Yes.

Q If you'll turn to the next page. That page is entitled, Affidavit of Kylie Williamson; is that right?

A Yes.

Q Have you ever, from looking at these first two pages, have you ever seen this document before?

A No.

Q If you read that first sentence of the Affidavit of Kylie Williamson, it says, "I'm employed as a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and am thus an investigative or law enforcement officer of the United States within the meaning of," and then it cites a portion of the U.S. Code.

Have you ever heard the name Kylie WIlliamson before?

A No.

Q I will represent to you that she is a special agent with the ATF.

If you go to paragraph 18 of the Affidavit, which is on page 9. Are you there at paragraph 18?

A I am.

Q Paragraph 18 reads, "Based on my training and experienced, straw purchasers often purchase numerous firearms at one time, or one firearm at a time, with multiple one-firearm transactions completed in a short period of time."

Do you see that there?

A I do.

Q Do you agree with Agent Williamson's assessment of what straw purchasers often do in the course of making straw purchases?

A I have no reason to doubt it.

MR. DAVIS: Object to form.

BY MR. MALONEY:

Q How does it compare to your opinion, though?

MR. DAVIS: Same objection; vague.

A It's incomplete, because you can say the exact same thing about people who are not straw purchasers.

They, too, often purchase numerous guns at one time or one firearm at a time with multiple one-firearm transactions completed in a sort period of time.

In other words, she failed to make the key comparison.

Q So would you disagree with Agent Williamson's assessment that this -- that that is a behavior unique to straw purchasers of purchasing numerous firearms at one time or one-firearm at a time with multiple one-firearm transactions in a short period of time?

MR. DAVIS: Object to the form of the question; beyond the scope of the opinion.

A She doesn't say it's unique. She just sort of leaves it there and, you know, a careless reader might well infer that, but she doesn't say that.

BY MR. MALONEY:

Q Could you go down to paragraph 20?

A Got it.

Q That reads, "Based on my training and experience, the firearms Horton purchased are not collector firearms. It is not common for individuals to purchase more than one firearm at a time, or in a short period of time, unless they are collectors."

Do you see that on paragraph 20?

A I do.

Q Do you agree with that statement?
A No.
MR. DAVIS: Object to form.
BY MR. MALONEY:
Q Why not?
A It's false. It is common for individuals to purchase more than one firearm at a time. And in a short period of time, that is, a single visit to a gun store. Even if they're not collectors.
BY MR. MALONEY:
Q How do you know that?
A Well, partly the same kind of anecdotal information that folks making the contrary argument do. Certainly, hearing about actual cases where a husband and wife went into the gun store, and it's the husband who is asking all the questions, but the wife signs off, gets a gun, and he decides he is going to get a gun, too. So she buys it, two guns at the same time. But she is not a collector, and there is nothing suspicious about what they're doing.
They're not straw purchasers. They're just two individuals, a married couple, each buying a gun. And, yeah, it might well be the same caliber.
Q So do you value the anecdotal evidence that you've heard or experienced over the experience of an

ATF firearms investigator?

MR. DAVIS: Object to form; argumentative; calls for speculation; vague.

A No. What I most value is the data from Koper, which concern all of the handguns sold by licensed gun dealers in Maryland over a substantial period of time. And they showed that lots of individuals purchased more than one firearm at a time, in a short period of time.

BY MR. MALONEY:

Q Even Koper held that multiple sales of firearms are an indicator of suspicious activity, right?

MR. DAVIS: Objection; mischaracterizes the report.

A He drew that conclusion regardless of the fact that his own evidence indicates that they're wrong.

BY MR. MALONEY:

Q So you agree with Koper's evidence but not his conclusions?

MR. DAVIS: Object to form.

A Yes, that's precisely the way I would read the study.

MR. MALONEY: That's all that I have, Professor Kleck. Thank you very much.

THE WITNESS: Okey dokey.

MR. DAVIS: We'll read and sign the

transcript.

THE STENOGRAPHER: Do you need to order the transcript?

MR. MALONEY: Just a standard turnaround for us.

THE STENOGRAPHER: Do you need a copy of the transcript?

MR. DAVIS: Yes, we do.

I would like to designate this transcript as confidential. We can go back on the record.

THE STENOGRAPHER: I'm still on the record.

MR. DAVIS: We will designate this transcript as confidential and pursue a protective order in this case.

(The deposition was concluded at 2:54 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF LEON )

I, the undersigned authority, certify that Professor Gary Kleck, the above-named witness personally appeared before me and was duly sworn this 24th day of January, 2025.

IDENTIFICATION: Driver's License produced.

SIGNED AND SEALED this 24th day of January, 2025.

KIMBERLY BARTHOLOMEW
Professional Court Reporter
Kimesuu@aol.com
Commission #HH226140
Expires: February 23, 2026

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF LEON )

I, KIMBERLY S. BARTHOLOMEW, Professional Court Reporter, certify that I was authorized and did stenographically report the foregoing deposition of PROFESSOR GARY KLECK ; that a review of the transcript was requested; that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 255 are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 24th day of February, 2025.

KIMBERLY BARTHOLOMEW
Professional Court Reporter

February 24, 2025

PROFESSOR GARY KLECK
c/o Andrew Davis, Esquire
andrew.davis@stinson.com

RE: State of Minnesota v. Fleet Farm, LLC
Case No. 0:22-cv-02694-JRT-JFD

Dear Professor Gary Kleck:

Please take notice that on the 24th day of January, 2025, you gave your deposition in the above cause. At that time you did not waive your signature.

The above-addressed attorney has ordered a copy of the transcript and will make arrangements with you to read their copy. Please execute the Errata Sheet, which can be found at the back of the transcript, and have it returned to us for distribution to all parties.

If you do not read and sign the transcript within thirty (30) days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature now, please sign your name to the blank at the bottom of this letter and return to the address listed below.

Very truly yours,

Kimberly S. Bartholomew,
Professional Court Reporter
Shaddix & Associates
7400 Lyndale Avenue So, Suite 190
Richfield, Minnesota 55423

I do hereby waive my signature.

______________________________
PROFESSOR GARY KLECK

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re: State of Minnesota v. Fleet Farm, LLC
Case No.: 0:22-cv-02694-JRT-JFD
PROFESSOR GARY KLECK
January 24, 2025

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing transcript of my deposition and I hereby swear that my testimony therein was true at the time it was given and is now true and correct, including any corrections and/or amendments listed above.

_____ ______________________________

Date PROFESSOR GARY KLECK

**$**

**$2,000 (1)** 64:21
**$500 (1)** 64:8

**A**

**abandoned (1)** 99:24
**abetting (1)** 99:14
**ability (2)** 50:19;142:25
**able (11)** 18:1;30:1;32:10;110:19;125:17;141:19;178:22;179:20,24;183:10;221:8
**above (2)** 124:12;174:2
**absence (3)** 63:10;184:8;230:20
**absent (2)** 222:25;223:15
**Absolutely (1)** 182:2
**abstract (5)** 24:17;103:7;173:20;194:15;240:11
**academic (5)** 12:22;28:21;67:23;135:4;229:11
**academics (2)** 30:13;211:5
**accepted (1)** 218:1
**access (4)** 138:15;139:8;141:20;211:15
**accident (2)** 36:25;37:1
**accidents (1)** 37:3
**accommodating (1)** 5:15
**account (1)** 119:9
**accounting (2)** 94:22;140:6
**accounts (2)** 11:23;196:21
**accuracy (1)** 207:22
**accurate (4)** 32:22;33:3;166:21;183:22
**ACD (1)** 120:20
**acknowledging (1)** 164:24
**acquire (6)** 20:11;71:15;122:25;209:23;210:1;211:16
**acquired (117)** 43:21;111:21;112:2,10;113:10,12,14;114:5,9,11,15,17;115:3,9,17;116:20,21,22;128:6,16,17,18,19;129:11,17,18;136:11,12,17,21;137:3,4,18,20;138:5,21,23;140:14,15;143:7,7;144:25;146:14,14;147:2,3;148:13;150:5;151:1;153:21;157:8;158:20,20,24;159:25;160:14,21;170:25;171:2,23;172:17,25;173:1,9;179:20;180:12,18;181:24;182:4;183:1,12;187:3;190:1,19;191:23;192:4;193:2;194:12;195:13,17,24;196:2,9,12,14,25;197:4,14,23;198:3,11,14,16;199:5,7,7,12,13,19;200:2,7,17,23;202:21;203:3;206:18,20,22;208:19;209:6,7,8;210:17;211:10;218:11;219:23;243:25
**acquiring (5)** 86:12;109:21;144:3;145:8;212:24
**acquisition (6)** 114:25;118:25;128:21;140:4;172:1;215:18
**acquisitions (2)** 172:1;192:14
**across (5)** 139:13;166:24;221:4,9;246:11
**act (2)** 93:9;209:22
**action (1)** 244:11
**actions (2)** 58:18;177:17
**active (2)** 13:13;175:17
**actively (2)** 26:18,21
**activities (6)** 56:11;58:16;59:12;129:1;174:17,18
**activity (6)** 20:22;54:6;75:12;215:16;216:5;254:11
**actual (21)** 84:21;128:3;167:25;168:6;169:18;184:9;186:10;191:11;231:24;232:2;235:2;236:1;237:1,7,19,19;238:2,2,17;241:6;253:14
**actually (24)** 6:16;31:7;39:22;45:12;55:14;61:21;69:1;101:22;103:24;110:10;111:10;118:17;127:23;128:9;131:5;133:22;166:9;179:24;221:8;235:11;237:18;238:19;240:8;243:15
**addition (3)** 50:22,24;216:20
**additional (6)** 72:22,24;73:3;208:14,15;210:7
**address (11)** 16:10;23:10;164:13;167:23;193:15;232:16;233:14,18;235:7;240:23;241:12
**addressed (2)** 32:12;241:21
**addresses (3)** 23:11;110:25;185:14
**addressing (1)** 227:12
**adjust (1)** 240:14
**Adjusting (2)** 238:25;240:9
**adjustments (1)** 140:6
**administration (1)** 174:21
**admire (1)** 119:23
**admit (2)** 143:23;150:4
**admitting (1)** 169:20
**Adult (1)** 119:1
**advise (1)** 36:22
**advising (1)** 36:14
**advocacy (2)** 39:12;243:10
**advocate (6)** 243:9;248:25;249:5,12,13,18
**advocates (1)** 249:18
**affect (3)** 7:3;136:1;237:3
**Affidavit (3)** 250:14,20;251:6
**affiliated (1)** 249:2
**affirm (1)** 5:4
**affirmative (3)** 61:20;63:10;217:21
**affirmed (1)** 5:10
**affirming (1)** 225:20
**aforementioned (1)** 174:14
**afterwards (1)** 91:19
**again (41)** 24:1;31:1;34:4;40:18;46:13,21;51:10;52:18;60:19;63:13;68:22;83:23;88:4;89:16;96:13;99:5;103:16;111:19;122:1,18;125:15;127:7;146:9;153:10;154:1;156:11;172:4;180:7;182:7,20;186:1;189:20;195:5;198:22;210:19;226:23;228:6;231:12;233:17;234:22;241:1
**against (21)** 32:21;42:19;56:8;58:3;152:13;157:24;170:13;172:6;176:11;178:21;179:19;188:9;190:19;191:9;195:13;198:3;199:14,18,22;201:11;203:22
**age (3)** 26:16;134:17;139:25
**agencies (4)** 10:17;11:24;12:1;229:22
**agency (6)** 16:22;56:7;150:1;176:9;214:16,17
**agent (4)** 250:21;251:5,16;252:6
**agents (1)** 143:23
**aggravated (1)** 99:13
**aggregate (1)** 204:8
**ago (4)** 26:13;42:1;86:23;118:21
**agree (29)** 20:13,16,17;85:21;123:2,6,10;126:20;134:8;185:3;187:11,14;211:20;212:12;213:16,20;214:1,6,10,11,12;224:22;231:15,20;236:14;240:5;251:16;253:1;254:17
**ahead (3)** 72:21;113:17;194:24
**ahold (1)** 210:3
**aid (1)** 93:9
**aiding (1)** 99:13
**aimed (1)** 175:19
**air (3)** 81:11,17,20
**al (6)** 33:20,25,25;35:6,8;126:15
**Alcohol (4)** 16:21;94:18;161:19;250:21
**Aldine (1)** 118:18
**alienate (1)** 214:17
**alleged (10)** 19:19;20:6;77:13;103:4;184:20;186:18;217:19;225:3;236:7;238:20
**Allegedly (2)** 97:4;101:3
**alleging (1)** 202:10
**allow (2)** 136:15;243:15
**allude (1)** 18:21
**alluding (1)** 184:8
**Almost (4)** 26:14;108:6;194:9;196:16
**alone (1)** 223:15
**along (1)** 127:19
**alter (2)** 105:14;239:13
**alternative (1)** 188:18
**although (9)** 16:10;108:8;119:23;123:5,9;146:11;147:4;154:18;

220:4
**always (3)**
74:5;159:10;176:7
**ambiguous (1)**
234:23
**amend (4)**
147:10;155:1;
156:21;249:13
**Amended (7)**
48:16;94:7;95:9;
96:10;107:4;155:21;
205:3
**America (1)**
250:8
**American (3)**
22:8;23:20;171:10
**Among (8)**
12:6;76:22;138:2;
174:25;187:18;
225:12;234:7,20
**amongst (1)**
169:25
**amorphis (1)**
240:13
**amount (4)**
164:3;187:21;
188:9;189:1
**amounts (1)**
246:6
**analyses (1)**
108:23
**analysis (49)**
20:3;27:12;56:12;
61:7;70:6;77:23;
82:25;83:2,10;88:19,
23;92:19;93:3;104:7;
109:5;114:13;119:21;
121:23;123:6;126:20;
128:14;129:5;133:17,
21;136:1;140:7,13;
160:12;170:19;182:4;
189:25;192:10;195:3;
196:6;197:9,12;
204:4,7;206:6;
214:21;223:4,7;
230:19;240:6;241:14,
22;247:5,7,8
**analyze (1)**
208:22
**analyzed (2)**
61:11;108:18
**analyzing (8)**
61:16;70:21;83:23;
116:25;136:9;181:2;
195:6;240:20
**and/or (1)**
31:24
**Andrew (3)**
65:22,25;66:9
**Andy (4)**
6:8;8:4;52:23;
118:2
**anecdotal (4)**
63:16,19;253:12,24
**anecdote (2)**
104:3;246:7
**anecdotes (2)**
193:24;229:21
**Angeles (1)**
22:9
**annual (14)**
128:11;131:20;
134:9;135:8,14;
136:6,20;151:24;
157:5;162:12;163:21;
168:18;169:4;199:17
**Annually (3)**
165:16;170:22;
198:3
**answered (11)**
26:4;29:13;40:12;
48:11;167:9;168:11;
199:24;229:18;
233:17;235:23;
241:16
**Anthony (1)**
124:4
**anti-gun (1)**
249:5
**anyways (1)**
191:22
**apart (5)**
10:19;28:11;37:8;
121:23;179:3
**Apologies (1)**
8:5
**apparently (1)**
168:25
**appeared (1)**
67:19
**appears (1)**
156:11
**appendix (1)**
47:5
**apples (1)**
198:7
**applied (1)**
183:19
**applies (3)**
79:3;183:20;193:4
**apply (4)**
110:14;180:14;
181:8;195:15
**applying (1)**
161:14
**appropriate (1)**
103:18
**April (1)**
130:14
**arbitrarily (1)**
198:13
**arbitrary (1)**
210:24
**area (5)**
9:15;14:2;50:25;
101:4;192:25
**areas (7)**
10:18;13:24;27:22;
67:15,17,18;69:11
**arguing (2)**
185:10;212:20
**argument (1)**
253:13
**argumentative (11)**
103:15;179:9;
193:13;194:5;223:21;
227:8;235:8;237:17;
241:15;249:6;254:2
**arise (1)**
43:21
**arithmetic (2)**
64:23;196:20
**Armed (4)**
71:25;117:5;
118:16;137:8
**around (5)**
50:2;53:10;195:10,
14;203:23
**array (1)**
227:10
**arrests (1)**
11:24
**arrive (3)**
158:11;200:1,1
**arrived (3)**
68:18,23;70:3
**arrives (1)**
243:19
**article (55)**
7:15;16:8,15;17:3,
7,11,17;18:20,23,24;
19:3,5,11,13,20;
20:24;21:2;22:11,14,
17,21;23:6,10,11,19;
75:1;87:14;124:3,9,
14,19;125:3,7,12;
126:2;127:8;165:15;
166:7;170:4;222:3,6,
7,10;232:10;233:25;
234:11;238:22;239:9;
242:11,15;243:2,13,
21;248:4,9
**articles (17)**
7:17;16:3,10,12;
21:4,5,9,10;27:15;
54:3,11;75:9,14,24;
76:1,10;229:11
**ascertain (6)**
61:11;110:20;
158:23;160:12;191:3;
192:18
**aside (12)**
13:23;40:15;88:16;
115:21;116:3,14;
151:14;170:4;173:19;
188:8;242:4;250:1
**aspect (1)**
31:10
**Assault (1)**
189:16
**assert (3)**
215:9;224:5,18
**asserted (1)**
73:9
**asserting (2)**
209:2;214:4
**assertion (13)**
104:4;149:24;
185:14;187:15;
192:22;200:11;215:2;
221:11;229:12;
236:25;237:6;241:19;
246:2
**assess (2)**
13:21;117:1
**assessing (1)**
246:12
**assessment (7)**
55:18;57:18;
161:21;174:16;
224:23;251:17;252:7
**assistant (2)**
28:21,22
**associated (2)**
108:10;114:23
**association (5)**
10:10;27:11;29:12;
33:24;39:1
**assume (11)**
37:14,15;50:17;
120:14,15;167:16;
185:23;186:8;206:17;
207:4,9
**assumed (2)**
205:11;239:22
**assuming (13)**
5:21;79:2;173:11,
16;186:12;195:21,23;
200:15,20,23;201:13;
202:4;211:13
**assumption (2)**
37:25;202:7
**ATF (136)**
16:25;17:24,25;
18:2,17;20:10,13,16;
24:2,9;54:6;55:2,7,12,
17;56:3,19,23;57:1,3,
5,9,10,18,21,23;
58:21;59:24;61:25;
62:25;63:14,21;73:8,
16;84:1,14,17;94:19;
95:2;107:5,9;109:1,7,
10,22;110:15;111:2,5,
16,19,25;112:8;
113:8;114:23;116:4,
8,23,25;117:2;119:8,
25;120:11,12,15,16;
121:23;125:23;126:4,
15,19,22,24;127:3;
128:1;129:1;160:24;
161:5,9,15,17,18;
162:1,6,11,20;163:4,
9,25;164:1,10,14,19;
165:2;168:15;170:3,
5;174:7;176:11,20;
177:4,16,24;178:16;
179:19;180:6;181:3,
7;192:6;197:7;
200:12;211:4;213:7,
16;214:19,19,24;
215:9,9;216:15,20,22;
217:20;218:3;219:15;
220:11,22;221:8;
224:5,18,22;225:10;
229:22;238:8;250:22;
251:5;254:1
**ATF's (8)**
57:13;110:6;128:7;
161:23;174:10;
214:15;215:8;220:17
**attain (1)**
128:3
**attempt (5)**
58:2;81:25;160:12;
168:8;223:17
**attempted (5)**
167:1,2,22;168:2;
169:5
**attempts (7)**
57:21;168:25;
169:14,16;222:23,24;
223:10
**attention (2)**
220:19;235:11
**attorney (1)**
52:25
**attorneys (1)**
7:12
**attributable (2)**
205:17;244:16
**attribute (2)**
225:17;246:10
**attributes (5)**
116:23;224:6;
225:16;226:2;227:11
**attributing (1)**
244:23
**author (4)**
22:11;124:3;
232:25;243:7
**authorities (1)**
143:24
**authors (8)**
27:20,21;117:7;
119:25;122:7;124:4;
248:24,24
**available (7)**
17:24,25;141:23;
181:14;183:4,4;
200:10
**avenues (2)**
119:14;120:8
**average (9)**
108:8;131:21;
132:13;144:14;170:6,

8;195:15;217:7,11
**averages (1)** 199:17
**avoid (1)** 123:3
**aware (17)** 61:19;62:6,20; 65:12,14;84:19;96:9, 19;103:3;158:22; 159:1,5;167:5; 175:25;177:20; 185:19;226:5
**away (3)** 99:25;100:3,10
**awkward (1)** 117:22

## B

**bachelor's (2)** 9:1,6
**back (47)** 5:22;15:3;18:22; 25:15;31:7;45:9,10, 12;47:6;49:15;52:6; 53:5;71:16;83:13; 87:23;102:9,10; 107:2;114:1;115:6; 124:10;127:22;128:9; 132:6;133:9;140:13; 141:9;143:5;151:20; 166:9;170:3;180:20; 184:3;192:16;194:15; 200:11;203:10; 222:14;228:1,1; 230:24;231:24; 232:14;239:9;248:17, 19;255:10
**background (7)** 8:24;53:19;63:7; 85:5,14,25;123:1
**backs (1)** 56:18
**bad (2)** 243:11,13
**bag (1)** 142:20
**bans (1)** 44:12
**bar (1)** 101:4
**Barbara (1)** 37:10
**base (1)** 56:12
**based (38)** 11:7;56:18;66:24; 70:3;93:11;105:13; 108:22;135:11;147:4, 11;153:18,19;154:21; 160:23;164:21;181:5, 14;183:11;195:9; 196:17;198:22,24; 204:8,10;205:2,2; 213:20;219:14;223:4; 224:21;229:21;237:6; 239:23;240:5;241:22; 249:14;251:9;252:19
**Basically (12)** 106:4;134:4; 136:18;137:1;184:7; 202:8;206:17;210:2; 211:13;229:24;243:9; 246:15
**basing (2)** 223:3;229:1
**basis (20)** 37:23;65:2;77:21; 181:13;187:9;198:1; 211:9;213:10;221:11, 15;223:14;224:11; 226:25;230:7,11,13; 232:8;244:8,23; 245:25
**Bates (2)** 127:18;167:12
**BATF (3)** 16:16,20,21
**bear (1)** 127:18
**bearing (6)** 104:22;105:8; 111:6;127:1;180:10; 206:10
**beauty (1)** 229:23
**became (2)** 28:15;30:10
**become (1)** 226:25
**becomes (3)** 219:18,22,22
**beforehand (1)** 197:5
**began (2)** 5:1;127:13
**begin (3)** 46:11,19;203:14
**beginning (2)** 74:6;133:17
**behalf (3)** 36:14;42:10;186:7
**behavior (1)** 252:7
**behind (1)** 47:4
**beings (1)** 209:15
**belabor (2)** 36:6;80:14
**believing (2)** 230:23;232:8
**bell (2)** 65:23;66:13
**below (1)** 174:1
**bend (1)** 123:25
**bending (4)** 89:16,19,19,22
**besides (15)** 7:13;8:11;11:16; 31:12;38:25;46:16; 47:13;48:3;60:21; 73:16;80:3;96:10; 210:16;223:25;229:5
**best (6)** 38:5,7;42:16;56:3; 159:24;172:8
**better (5)** 12:7;140:5;142:21; 214:18;215:1
**beyond (21)** 30:1;41:15;51:10; 59:8;64:14;73:24; 79:21;86:23;104:15; 115:18;126:22;165:2; 205:10,20;218:6; 226:1;227:4;229:21; 247:23;249:21; 252:12
**bias (1)** 20:21
**Biden (1)** 174:21
**big (1)** 9:22
**big-time (6)** 19:8,15,21;23:21; 24:3,24
**binary (1)** 219:20
**Bisbee (5)** 65:17;66:7,14,24; 70:16
**Bisbee's (4)** 7:11,14;127:20; 167:13
**bit (2)** 65:24;85:4
**BJS (1)** 154:19
**black (2)** 91:25;94:21
**blah-blah-blah (2)** 240:10;243:17
**blame (1)** 88:14
**blank (1)** 118:4
**block (3)** 59:3,15;86:11
**board (1)** 246:11
**boast (1)** 221:5
**body (1)** 35:13
**bogus (1)** 168:6
**bold (1)** 85:6
**bolded (2)** 150:13,22
**Book (13)** 21:14,17;117:5,10, 13,24;118:16;119:18; 122:9;137:8;138:5; 140:9;143:10
**Books (7)** 15:18,21,22,24; 21:15;71:25;72:4
**borderline (2)** 81:14,15
**born (3)** 8:19,20,22
**both (26)** 10:18;32:16;33:18; 42:9;82:3,9,10; 100:14;127:16; 137:13,16,19,22; 138:22;144:9;148:22; 151:3,4;169:15; 171:25;191:18; 218:13,14;224:4; 248:24;249:1
**bother (1)** 72:20
**bottom (18)** 25:16;27:6,10; 31:19;84:12,15; 114:1;125:22;131:6, 15;160:11;166:8; 174:6,20;176:15; 218:22;228:19; 243:20
**bought (2)** 210:10;227:13
**bow (2)** 73:23;178:12
**box (3)** 131:6,15,20
**boxcars (1)** 28:20
**boy (3)** 97:18;98:17;158:17
**Braga (2)** 124:4;126:14
**Break (9)** 45:7,10;102:7; 106:23,25;151:17; 194:25;203:8;248:15
**bring (1)** 154:18
**bringing (1)** 220:18
**broadens (1)** 209:23
**broader (2)** 104:12;181:25
**Broadly (1)** 35:25
**brokers (1)** 166:11
**BTNX619 (1)** 97:18
**bullet (2)** 81:17;101:6
**Bureau (22)** 10:20;16:21;94:18; 130:13;134:15;135:2; 137:15;141:11,13,18; 142:18,20;143:14; 144:2;146:4,20; 147:12;148:24; 149:25;152:5;161:19; 250:21
**bureaucratic (2)** 56:6,25
**burglary (2)** 81:2;99:14
**business (2)** 56:7;220:15
**busted (1)** 221:6
**button (1)** 92:5
**buy (8)** 44:13;119:6; 165:16;209:24,25; 222:23;223:11,17
**buyer (4)** 84:21,25;91:10; 232:6
**buyers (6)** 123:3;168:5,6; 186:10;210:17; 211:10
**buying (12)** 56:25;57:4;59:19; 60:7;63:8,15;71:11; 91:19,20,24;218:17; 253:22
**buys (2)** 91:16;253:18

## C

**cafeteria (1)** 138:18
**calculate (1)** 179:20
**calculated (1)** 14:16
**calculation (7)** 155:2;158:6; 159:15;191:3;192:17, 19;203:24
**calculations (3)** 52:2;163:18,21
**calculator (1)** 155:6
**caliber (8)** 217:15;218:5,14, 16,18,21;219:24;

253:23
**California (1)** 38:12
**call (4)** 69:23;161:1; 172:15;246:7
**called (4)** 45:19;59:18; 152:12;225:19
**calling (1)** 52:18
**calls (35)** 38:2;52:3,8;55:24; 59:6;86:1;91:11;96:4; 98:12;99:3;104:15; 105:10,11;143:19; 151:7;173:22;176:5; 178:4;185:8;194:5; 208:24;212:17,18; 219:19;220:9,10,24; 225:24;226:21;230:6; 236:19;245:2,24; 249:20;254:3
**came (5)** 124:16;133:1; 145:3;196:17;246:20
**can (85)** 6:25;7:1;9:10; 10:14;15:14;16:25; 18:15;21:13,25;27:3; 29:23;33:19;35:10; 39:12;43:6;44:6,10, 11;46:15;49:15,21; 60:6,11;63:9;73:21; 82:23;88:16;90:3,6; 91:5;93:7;94:13,16; 95:15;103:23;106:16, 23;107:22;109:22; 118:4;125:11,19; 127:22;128:18; 131:12;140:1;145:18; 146:3,12;147:22; 150:8;151:14,15; 155:6,9,11;156:5; 159:13;161:6;169:1; 170:3;180:20;181:7; 183:18;184:6;188:19; 194:23;206:2;208:22; 211:16;213:18; 214:14;224:18; 231:17;232:4;233:25; 236:24;238:19;242:4; 245:10;246:14; 248:13;250:1;251:24; 255:10
**Canada (1)** 37:11
**capacity (2)** 44:12;49:11
**capital (1)** 12:20
**caption (1)** 250:8
**capture (1)** 144:2
**captured (1)** 189:22
**capturing (2)** 140:22,24
**care (3)** 28:2;55:20;56:4
**career (2)** 13:6;30:13
**careless (1)** 252:14
**cares (1)** 234:20
**carry (3)** 39:13;97:7;98:23
**cars (1)** 89:9
**case (123)** 10:24;20:14;30:5; 33:13,14,21;34:2,3, 16,20,20;35:4,6,7,14; 36:15,17,23;37:12; 38:11;39:8,20,22,23, 24;40:3,6,20;41:6,7,9, 12,17,20;42:6,10; 43:4;45:16,21;46:12; 47:15;48:15;50:4; 53:21;54:5;61:4; 65:25;66:3,10,21; 68:17,20,24;69:3,8, 11,12,14,24;70:7,13, 14;71:20;74:13,23; 76:2;81:14;87:10,21, 24;89:10;94:11; 95:10,17;98:15; 103:1,12;104:8,9,17; 105:13,14,14;106:13; 108:16,19,24;120:1; 127:8,14,18;158:13; 159:20;167:8,19; 175:13;185:6;188:15; 189:17,18;190:13; 192:20;193:17; 194:17;205:14;206:9, 11;208:23;209:5,11, 12;211:20;212:16; 218:9,12,19;237:4; 245:5;246:16;247:4, 8;250:7;255:14
**cases (34)** 30:19,21;31:3,8,9, 12,20,25;32:3,7,8,12, 20,22;33:16;34:2,5, 12,19;36:7,9;43:6; 62:14;68:11;110:15; 126:19;137:20; 189:19;193:16,24; 220:13,16;229:21; 253:14
**cast (1)** 180:19
**categorical (1)** 151:10
**categories (3)** 71:21;79:20;151:11
**category (9)** 15:14,14;16:3; 21:21,22;121:4; 150:13,22;190:14
**caught (4)** 140:20,23;141:3; 225:5
**causal (2)** 13:19;105:21
**causation (1)** 244:9
**cause (6)** 85:11,23;184:19; 186:17;187:8;194:16
**caused (2)** 209:4;245:1
**causes (1)** 9:20
**caveat (1)** 180:14
**ceased (1)** 177:14
**cellphone (1)** 155:8
**cells (1)** 138:17
**cement (1)** 88:17
**census (18)** 10:17,20;11:18; 134:15;135:2;137:15; 141:11,13,18;142:17, 20;143:14;144:2; 146:4;147:12;148:24; 149:25;152:5
**Center (2)** 243:8;249:2
**centered (1)** 191:7
**central (2)** 21:7,20
**certain (5)** 31:15;34:17; 144:11,17;224:5
**certainly (42)** 14:1,12;19:23;34:9; 41:10;51:14;58:1,4; 59:3;60:9;70:2;71:8, 14;82:7;87:13;90:18; 104:17;105:5;110:18; 113:23;129:25;141:2; 165:5;167:23;169:11; 176:20;196:16;197:8; 211:24;213:5,7,12; 229:19;233:8,13; 237:20;239:17; 244:17,21,22;248:6; 253:14
**certifications (1)** 86:14
**certified (1)** 5:11
**certify (2)** 84:20,24
**cessation (1)** 178:2
**challenged (1)** 180:19
**challenging (4)** 36:3;37:19,22;43:4
**change (16)** 5:15;44:11;122:7; 140:24;141:1;155:25; 156:12;175:11,24; 207:24,25;208:6; 239:19,24;244:17; 246:19
**changed (8)** 74:4;145:8,16; 149:23;209:9;230:22; 240:17,18
**changing (1)** 241:9
**channel (2)** 94:20;108:5
**channels (2)** 57:20;161:22
**chaotic (1)** 101:3
**chapter (2)** 21:15;23:12
**Chapters (2)** 21:14,18
**characteristic (1)** 218:11
**characteristics (1)** 114:22
**characterize (2)** 157:7;193:21
**characterized (1)** 75:25
**charitable (1)** 204:20
**charitably (1)** 207:4
**Charles (1)** 25:21
**check (4)** 85:14,25;123:1; 155:11
**checked (2)** 238:12,13
**checking (1)** 32:21
**Checks (2)** 85:5;123:4
**Chicago (6)** 36:13,18,20;37:1,8; 43:4
**chose (4)** 72:11,14;229:17; 246:17
**Christopher (2)** 7:15;222:3
**circa (2)** 44:14;139:18
**circumstance (3)** 35:11;36:10;101:12
**circumstances (2)** 5:16;210:7
**citation (3)** 95:1;141:16;143:14
**citations (1)** 47:5
**cite (20)** 20:19;72:19;95:4; 116:8;128:6,7,24; 133:4;141:16;144:9; 161:17;166:5;175:21; 177:10;220:13,16; 221:18;222:3;231:12; 233:1
**cited (11)** 7:16;14:4;47:11,14, 16;130:18;142:8; 153:20;197:6,7;241:2
**cites (2)** 47:7;250:24
**citing (4)** 72:20;176:10; 222:19;237:13
**citizen (1)** 208:3
**citizens (1)** 119:12
**City (4)** 36:13,20;37:8,12
**claim (7)** 73:14;120:2; 123:13;210:25;213:7, 13;234:18
**claimed (1)** 213:8
**claiming (2)** 183:19;233:22
**claims (2)** 117:1;214:15
**clarified (2)** 92:16;182:15
**clarify (3)** 7:1;78:17;146:19
**classes (4)** 13:12,14;119:15; 120:9
**clause (2)** 115:21;116:1
**clear (11)** 6:2;29:5;63:6;82:2; 127:10;131:12; 140:11;153:18;168:9; 179:16;184:8
**clearly (2)** 69:9;244:9
**Clinic (1)** 37:11
**close (3)**

64:17;174:3;179:1
**closely (1)** 125:15
**Clubs (2)** 33:25;39:2
**Code (1)** 250:25
**coffee (1)** 194:22
**coincidence (1)** 218:15
**collected (1)** 11:13
**collector (2)** 252:21;253:19
**collectors (2)** 252:23;253:9
**college (2)** 8:24;28:23
**Columbia (1)** 35:1
**column (4)** 85:3;147:25; 243:21;245:10
**comfortable (2)** 157:23;158:5
**comical (1)** 55:16
**Commemorative (1)** 37:11
**comments (1)** 53:17
**Commerce (2)** 161:20;174:15
**Commission (4)** 25:20;99:18; 101:13;102:2
**commissions (1)** 100:14
**commit (83)** 74:21;77:11;78:9, 11;79:7,10,16;80:2, 17,25;81:2,8,12;82:4, 5,12,13,23;83:18; 88:21;92:18;93:8; 99:6;102:13;103:9, 13,17,20;104:5; 105:1;106:5,8; 113:20,22;114:6,10, 12,16,19;171:1; 173:6;181:23;182:1, 4,10,14,24,25;183:10, 21;190:1,6;191:18; 192:18;193:18; 194:14,18;195:3,7,23, 25;196:11;197:15,22; 198:2,11;199:15; 200:3,6,10;202:14,22; 203:4;204:4,12; 205:4,12;206:23; 207:17;208:14;212:5; 213:14;217:24
**commits (1)** 201:23
**committed (11)** 96:20;97:10;98:2; 99:1,23;100:14; 104:20;139:2;204:22; 205:16;207:8
**committing (7)** 80:12,17,23;81:7, 11,21;116:21
**common (23)** 35:11;73:13,13; 76:13;80:16;94:20; 95:21;108:5;113:7; 126:18;193:20;194:8; 217:5,7;221:14; 234:7,14,15,18,20; 235:20;252:21;253:6
**commonly (1)** 126:16
**commonplace (2)** 212:6;222:20
**communicate (2)** 40:21;113:3
**communicated (2)** 55:6;66:4
**communication (3)** 41:3;52:19;55:12
**communications (4)** 49:10;50:1;51:11; 66:19
**community (1)** 218:2
**company (1)** 29:8
**company's (1)** 104:19
**compare (8)** 62:17;160:22; 190:9;197:19,25; 199:22;225:7;251:22
**compared (4)** 171:23;230:8; 244:2;245:18
**comparing (9)** 179:18;195:12; 198:10;199:14,17; 201:9,11;202:5;230:3
**comparison (2)** 198:7;252:5
**compensated (1)** 64:8
**compensation (1)** 64:7
**compiles (1)** 11:23
**Complaint (37)** 47:15,16;48:1,16; 69:7;70:14;94:8;95:9, 13,16,20;96:11,20,23; 102:16,20,22,25; 103:4;104:10;106:10, 17;107:4;120:1; 185:9,16;192:22; 193:7;205:3;209:1; 212:15,19;226:12; 227:5,15,18;250:11
**complaints (1)** 69:20
**complete (6)** 32:4,22,25;33:3; 137:5;156:14
**completed (4)** 169:19,22;251:12; 252:3
**completely (2)** 110:8;246:1
**complied (1)** 85:14
**component (8)** 19:19;20:6;24:10, 13,14,15;47:1;55:3
**compound (13)** 9:25;36:24;40:22; 70:24;110:11;129:8; 164:5;165:3;169:7; 172:7;178:4;191:12; 199:23
**computed (1)** 11:1
**concede (1)** 194:10
**conceivably (1)** 194:13
**concentration (2)** 9:11;12:13
**concept (4)** 83:6,7;240:11,13
**conception (1)** 81:23
**conceptual (2)** 113:4,5
**concern (3)** 67:6;98:17;254:5
**concerned (2)** 159:10;236:1
**concerning (5)** 10:23;16:24;19:14; 23:18;94:18
**concerns (4)** 23:17;62:24; 104:18;165:1
**conclude (2)** 178:22;181:8
**concluded (2)** 245:7;255:15
**concludes (1)** 240:8
**concluding (1)** 240:22
**conclusion (41)** 20:20;68:18;70:2; 86:2;98:13;99:4; 105:11,14;144:22; 158:12,12,16;173:7; 179:4,6;180:11,15,15, 16,18;181:16;183:23; 185:8;193:25;197:21; 200:1;202:17;203:17; 212:18;220:10; 226:10,10;239:14,18; 240:21;242:2;243:12, 18;244:7;245:25; 254:14
**conclusions (13)** 67:12;70:22;125:9; 126:3,21;144:20; 181:13;193:23; 229:16;240:4;241:18, 22;254:18
**concrete (1)** 10:12
**conducted (1)** 134:15
**confederates (1)** 75:6
**conference (1)** 138:18
**conferences (2)** 67:22;166:2
**confessing (1)** 150:6
**confidence (2)** 180:1;208:10
**confident (7)** 67:12,13;72:10; 158:12;183:9;207:25; 208:8
**confidential (2)** 255:10,13
**confined (1)** 82:8
**confirms (1)** 122:12
**confiscated (2)** 119:10;120:4
**conflict (2)** 192:9;214:18
**confused (1)** 61:17
**confusing (1)** 6:5
**connected (3)** 113:8;215:17;238:5
**connection (7)** 10:18;37:3;68:17; 80:3;126:19;143:2; 217:19
**consequences (1)** 9:20
**consequent (1)** 225:20
**consider (14)** 19:24;24:12;47:1; 60:14;75:14;98:2; 167:7,18;168:9; 171:2;210:21;215:19; 241:11;249:4
**considerably (1)** 196:16
**Considered (12)** 72:1,14,21;73:3,17; 117:5;118:16;134:23, 24;137:9;176:8; 229:17
**considers (1)** 220:22
**consistent (3)** 9:13;67:1;215:2
**constitute (3)** 144:24;197:22; 207:6
**constitutes (1)** 99:7
**consult (2)** 42:2;45:25
**consultation (1)** 36:16
**consulting (2)** 33:4;46:17
**contact (1)** 101:23
**contacted (1)** 45:21
**content (2)** 25:6,8
**context (2)** 80:18;215:14
**continued (1)** 116:10
**continuously (1)** 134:14
**contradict (1)** 106:11
**contradicted (2)** 73:6;237:21
**contrary (3)** 220:25;233:20; 253:13
**contribute (7)** 78:8;79:6;82:11; 102:12;115:8;173:5; 186:20
**contributed (4)** 21:15;185:12; 187:12,25
**contributes (2)** 54:19,23
**contribution (2)** 192:24;207:12
**control (13)** 14:2;24:9;36:2,3; 42:20;43:5;243:9,16; 244:19;248:25;249:5, 17,18
**controls (1)** 249:14
**conversation (2)** 46:4;63:5
**conversations (1)** 7:11
**conveyed (2)** 122:14,14

**convicted (6)** 122:24;140:20,23;141:3;199:8;225:6
**conviction (1)** 122:22
**convictions (1)** 99:12
**Cook (7)** 33:20;34:2;35:6,8;36:7,12,18
**Cooper (1)** 7:15
**cooperate (1)** 176:18
**cooperation (1)** 176:22
**cops (1)** 235:17
**copy (3)** 118:11;123:25;255:6
**copyright (1)** 124:13
**corner (3)** 84:12,15;107:24
**Correction (1)** 170:24
**Corrections (1)** 138:16
**correlation (1)** 10:9
**correspond (1)** 191:14
**cost (1)** 123:5
**counsel (15)** 6:8;7:21;8:11;15:11;45:21;46:5;49:9,11;52:20;53:11,15;127:15;154:6;156:25;167:10
**count (1)** 192:12
**country (1)** 209:16
**County (3)** 36:7,12,18
**couple (2)** 207:24;253:22
**course (16)** 13:15;66:3;68:19,21;81:16;106:10,11;113:1;171:6;176:7;194:9,12;200:9;220:15;231:17;251:18
**courses (2)** 13:16,17
**court (6)** 5:25;6:14,19;33:8,11;34:16
**courtesy (1)** 6:4
**courts (1)** 34:12
**cover (8)** 13:18;22:19;23:1;82:17;83:10;92:7;164:2;176:11
**covered (9)** 20:23;21:1;23:7;141:2;158:15;160:20;170:6;178:8;229:24
**covering (1)** 161:5
**covers (4)** 13:15;32:4;75:17;82:3
**create (2)** 53:13;152:12
**crime (156)** 9:20,21;10:16,19;11:20,21,22;14:3;19:25;22:7,7;23:15,15;54:20,23;58:6;78:20,22,24;79:9,11,12,21;80:12,25;81:1,3,7,8,9,13,20,21,23;82:16,23;83:3,7,12;89:2,4,5,13,15;92:3,6,6,7;93:8,15;97:10;98:2,8,10;99:1,6,7,8,18,24;100:16;101:13,24,25;102:3;103:3,17,21,25;104:5;105:2;106:8,20;120:17,24;129:3;130:21;131:4;134:12;138:20;143:24;148:6;150:6;154:3,3;170:21,24;171:3,5,6,12;182:10,15;183:21;184:13,20;185:13;192:25;193:11,18;194:14,19;196:15,24;197:15;198:12;199:4,10,11,20;200:4,7,13,18,25;201:12,14,23;202:6,9,11,14;204:4,12,16;205:4,13,21,22;206:4,13,23;207:2,5,13,15,19,20;208:1,5,5,11,12;209:4,10;215:4;217:24;237:10,23;239:5,20,22,23;240:7,12;241:4
**crimes (127)** 11:23;74:21;77:11;78:9,11;79:7,17,17,20,23,25;80:1,2,3,4,6,13,15,17,18,25;82:4,6,8,12,14;83:18,20,24;88:21,24;92:8,17,18,21,25;93:1,5,8,12;96:9,9,20;102:13,17;103:9,10,13;104:20;106:5;110:21;113:20,22;114:6,10,12,16,19;115:2;116:22;128:5;129:22;130:3;137:24;139:3;146:22;158:18;171:1;173:6;181:23;182:1,4,14,17,24,25;183:11;189:8,11,13,14,22;190:2,5,6,10,14,14,21;191:4,8,10,10,16,18;192:19;193:3;194:16;195:3,7,24;196:1,10,12;197:4,20,22;198:3,11;199:15,20;200:10;202:23,23;203:4,24;204:22;205:16;207:7,17;208:3,9,14,15;212:5,8;213:14
**criminal (20)** 71:10,13;90:16;91:1,3,9,10;122:23;123:4;134:18;136:12;140:4;171:3,25;183:1;196:13;200:3;215:16;216:4;250:11
**criminals (107)** 16:17;17:10,13;28:2;57:20;71:1,2,5,7;73:10;75:11;77:17;90:8,14,20,24;91:17;94:16;95:23;96:17;109:21;111:21;112:3,10;113:10,13,14,16,18;114:5,10,11,18,25;115:3,9;116:20;123:16;128:21;129:11,16,19,22;136:12,22;137:17;138:22;140:14,15,19,23;141:5;143:2;145:7,15;146:14;147:2;153:21,24;154:4;157:9;158:17,24;159:25;170:25;171:24;172:1,17;173:1,9;179:20;180:12,18;181:25;182:5;183:12;187:4;190:1,20;191:24;192:4,14;193:3,4;194:16;195:13,16;196:2,9,11;197:23;198:4,17;199:7,8,12,14,19;200:18,23;202:21;203:3;209:5,6;211:14,14,15
**criminals' (2)** 122:15;152:2
**criminal's (1)** 73:15
**criminologist (2)** 10:8;63:18
**criminology (10)** 9:17,18,19,23;12:13,16;13:15;22:9;23:20;67:22
**criteria (1)** 238:9
**critical (1)** 111:24
**criticisms (2)** 27:20,25
**critique (2)** 109:5;246:22
**critiqued (3)** 108:18;162:6,7
**critiques (2)** 27:19;128:2
**critiquing (2)** 107:10;109:1
**cross (1)** 156:2
**crossed (1)** 219:17
**cross-national (1)** 27:11
**crucial (1)** 187:1
**crude (1)** 243:19
**Culpeper (1)** 25:21
**current (3)** 28:5;192:10;200:25
**cursory (1)** 167:20
**cut (1)** 152:3
**CV (9)** 14:4,19;15:4,6,12,17;25:16;27:3,7

## D

**Dangerous (5)** 72:1;86:12;117:5;118:16;137:9
**dangers (1)** 44:7
**data (128)** 10:12,17,19,22,25;11:10,13,17,17,18,18;12:6;16:16,20,24;19:9,16;56:13,15,18;70:21,22;71:17,21,21,24;72:6,10,13;73:7,24;104:7;109:7,22;111:1;116:8;122:9;126:2,15;128:7,22,23,24;130:21;132:12;133:1;134:19;135:3,12;138:6;140:1,19;142:18;146:5;147:16;148:11;149:1,10,16,16;150:17;157:16;158:22;160:24;161:5,8,23;162:3,8,11;164:1,2;168:16,18;170:5,11;172:5;173:12;176:10,20;177:10;178:17;179:13;180:6,14;181:1,5,18,23;183:6,8;189:20;192:15;193:1;197:7;198:23,25;200:12;203:15,18;204:8,21;214:11,24;217:12;223:4;229:1,4,9,16,23;230:4,17;234:13;237:7,13,21;240:3,19,20,20;241:2,5,6,8;246:15;247:12;254:4
**dataset (7)** 110:19;129:22;139:22,25;141:4;181:8;222:10
**datasets (3)** 137:23;158:7;240:3
**date (5)** 46:8,21,23;87:15;245:19
**dates (1)** 7:22
**Davis (223)** 6:9;8:4;9:25;12:2,8;14:8;15:11;17:19;18:12;20:4;22:22;24:8;26:4;29:13,17;30:15;35:16,23;36:24;38:2,6;39:11;40:12,22;42:12,22;43:18;45:4;48:11,17,22;49:8,24;50:7,10,21;51:8,16;52:3,8,13,17;53:2,22;54:16;55:8,23;56:5,21;57:15,25;58:11;59:6;63:1;65:9;67:3,8;68:14;69:6,25;70:8,24;73:19;74:8;75:19;76:14;80:7,19;86:1;88:1;89:6,21;91:11;92:1,10;95:11,18;96:3,12;97:12;98:12;99:3,20;100:9;102:5;103:15;104:14;105:3,10,23;106:15,24;110:11;112:13;118:8;119:22;121:1,25;124:23;125:14;127:4,15;129:8,24;138:10,14;143:19;144:15;145:10,17;146:15;147:19;149:5;150:3;151:7,15;156:22;157:25;158:8;159:2,8;162:15,24;163:10;

164:5;165:3;167:9;168:11,19;169:7;172:7;173:22;176:5;177:19;178:4,25;179:9;180:2;181:11;182:6,18;183:2,13,17;185:7;186:22;188:16;190:12;191:12,25;192:21;193:13;194:5;198:5;199:23;201:1;203:6;204:9,18;205:8,23;206:21;208:24;209:14;210:18,22;211:3,23;212:17;213:4,22;214:2,25;215:21;216:2,17;217:4,17;218:6;219:11,19;220:9,23;223:21;224:15,25;225:24;226:6,21;227:7;229:18;230:6;232:18;233:7,15;235:8,23;236:5,18;237:16;238:18;239:12;241:15;243:3;245:2,23;247:3,15,22;248:13;249:6,11,20;251:20,23;252:11;253:3;254:2,12,19,25;255:8,12
**day (3)** 7:24;46:24;212:25
**days (1)** 43:19
**dead (1)** 177:4
**deal (1)** 177:9
**dealer (8)** 120:19;121:9,15;174:7;176:6,17;177:4;229:24
**Dealers (10)** 165:16;166:11,20,25;169:20;170:1;228:7,11;245:16;254:6
**dealing (2)** 168:5;189:23
**dealt (1)** 193:16
**decade (2)** 32:5,8
**decided (1)** 211:8
**decides (1)** 253:17
**dedicate (2)** 58:16;59:1
**defense (1)** 10:23
**deference (1)** 214:24
**deficient (1)** 125:13
**Definitely (2)** 114:7;235:25
**definition (7)** 90:9,13,15;93:15;188:17;202:8;206:22
**degree (6)** 9:1,2,6;20:21;99:13,14
**deliberate (2)** 244:18,22
**deliberately (1)** 236:22
**deman (1)** 189:2
**demand (3)** 187:17,19;189:1
**demonstrative (2)** 134:3;151:23
**denominator (4)** 191:14,15,21;192:10
**Department (2)** 130:13;146:20
**Departments (1)** 138:15
**deposed (4)** 31:24;32:23;39:24;41:11
**deposition (11)** 5:21;7:9;8:13;30:23;31:4;33:7;36:15;41:22;64:17;65:3;255:15
**depositions (1)** 42:5
**derived (2)** 24:2;147:13
**describe (2)** 10:18;174:4
**describes (1)** 116:23
**describing (3)** 106:4;171:4;246:4
**description (1)** 166:21
**descriptive (1)** 105:19
**designate (2)** 255:9,12
**designed (1)** 183:6
**detail (4)** 32:11;51:7;69:19;124:10
**details (3)** 34:5;138:8;140:4
**detecting (1)** 175:1
**determine (1)** 189:2
**devote (1)** 59:11
**devotes (1)** 58:22
**difference (3)** 135:25;143:22;144:13
**different (41)** 12:9;13:20;23:8;94:15;101:5;102:21;114:5,8,11;115:11,14;129:6,21,25;133:22;135:11;144:8;147:6,8;157:17,20;158:3,4,4,7,10,11,13,14,15;162:11;189:18;191:22;208:20;210:5;228:3;229:16,16;230:8,21,23
**difficult (1)** 150:4
**dignify (1)** 223:6
**DIRECT (6)** 5:12;78:3;122:16,18,20;233:11
**directed (2)** 156:25;247:18
**directly (7)** 90:8,13;120:18,25;121:9,14;185:14
**disagree (5)** 55:1,17;57:13;187:13;252:6
**disagreeing (1)** 121:23
**disagreement (1)** 55:6
**discard (1)** 98:10
**discarded (2)** 97:21;98:18
**discharged (1)** 97:4
**disclosed (1)** 18:10
**disclosing (1)** 50:12
**disconnect (1)** 182:13
**discovered (1)** 225:4
**discuss (3)** 18:24;19:24;227:23
**discussed (6)** 8:12;30:7;86:15;88:23;174:18;175:15
**discusses (3)** 17:3;19:14;60:9
**discussing (7)** 24:5;49:14;107:9;116:9;137:7;208:18;236:4
**discussion (4)** 92:22;108:14;116:10;205:2
**disparity (1)** 143:17
**dispose (1)** 242:1
**disposition (2)** 85:12;86:8
**dispute (2)** 244:25;245:1
**disqualifying (1)** 122:21
**distinct (1)** 111:8
**distinction (5)** 92:8,20,23;93:4;111:23
**distinctions (2)** 183:5,9
**distinguish (1)** 249:3
**distortion (1)** 99:23
**District (2)** 34:25;38:12
**disturbance (1)** 81:12
**dive (1)** 151:21
**diversion (1)** 94:20
**diverted (1)** 126:8
**divide (1)** 137:2
**divided (2)** 178:21;190:19
**dividing (4)** 11:8;172:13,16;203:22
**doctrine (2)** 20:10,13
**document (25)** 15:2;47:6,17;84:11;94:5;107:18;119:25;124:2;130:17;146:7,10,11,12;161:2;165:13;167:11;170:3;221:25;222:2;231:1;242:8;245:4;247:22;250:5,17
**documentation (10)** 59:25;60:5,22;62:1,4,25;116:4;216:14,15,22
**documents (18)** 7:13,19;8:12;48:6,9,21;50:4;57:10;70:14;73:9,11,16;127:16;131:11;185:18;216:20;217:1;222:15
**dokey (1)** 254:24
**done (29)** 11:25;12:21;16:25;26:16;29:25;53:9;57:18;61:6;62:21;63:7;65:1;69:14;75:2;77:18,23;93:18;108:23;135:1;140:5;141:21,24;142:4,14;159:15;188:4,23;196:19;197:10;225:9
**double (1)** 183:18
**doubt (1)** 251:19
**Douglas (1)** 242:11
**down (24)** 5:16;6:15,19;36:5;37:10,12;39:22;84:14,15;85:4;90:2;123:20;135:13,22;136:8;170:16;190:17;195:19;241:8;244:10,25;245:1;246:3;252:17
**dozens (7)** 34:5;218:25;219:9;220:5,6,16;221:12
**Dr (2)** 165:20,24
**draft (5)** 52:20;53:6;69:18;74:3;206:1
**drafted (1)** 156:10
**drafting (4)** 50:1,2;69:5;232:10
**drafts (4)** 53:8,13,15;205:24
**draw (5)** 125:9;126:3;181:13,16;193:23
**drawing (2)** 179:4;193:25
**drawn (1)** 242:2
**dredge (1)** 246:15
**dredging (1)** 240:19
**drew (2)** 72:5;254:14
**dropped (1)** 98:7
**due (1)** 5:15
**duly (1)** 5:10
**dumb-founded (1)** 149:6
**during (8)**

9:16;28:19,20;131:21,22;167:2;225:22;228:20
**duty (1)**
58:23
**Dynamics (1)**
124:6

**E**

**earlier (18)**
22:12;30:7;39:4;45:17;55:1;63:4,23;77:20;87:15,17;88:3;97:22;147:14;149:13;162:2,5;198:19;205:24
**early (4)**
30:6;44:15;145:3;228:8
**earthly (4)**
83:14;201:8;232:8;233:19
**easier (1)**
235:17
**Easily (3)**
104:1;141:19;225:2
**Eastern (1)**
38:12
**easy (3)**
63:21;78:2;210:2
**eBook (5)**
117:25;118:9,10,12;137:11
**echoed (2)**
213:9;214:15
**edit (1)**
53:15
**edition (4)**
117:15;118:15,19;119:18
**editions (1)**
117:12
**educational (1)**
8:24
**effect (6)**
12:19;27:1;108:21;209:10;244:2;245:18
**effective (1)**
245:19
**Effects (1)**
242:11
**effort (4)**
9:20;58:17;244:18,22
**eight (1)**
201:10
**either (17)**
28:21;33:16;34:2;50:4;67:25;68:3;75:2;81:18;100:2;144:11;177:7;190:13;193:22;214:1;217:23;219:21;234:24
**elaborate (1)**
184:6
**eligible (2)**
119:6;122:25
**Elmhurst (2)**
8:20,21
**else (14)**
8:13,15;33:5;57:11;59:5;60:3;91:6;95:15;96:10;98:8;123:20;193:22;223:25;227:24
**else's (1)**
89:20
**elsewhere (2)**
193:5;245:16
**Elwood (14)**
70:15;74:16;184:19;185:20,25;186:9,13;187:2,22;203:20;204:3,24;207:10;225:23
**Elwood's (1)**
187:24
**email (1)**
154:6
**emphases (1)**
227:15
**emphasized (1)**
163:12
**empirical (5)**
10:6,7,12;124:5;225:10
**empirically (1)**
11:14
**employed (2)**
36:13;250:20
**employee (1)**
223:17
**employees (7)**
59:2;212:21;222:22;223:10,20;224:2;226:16
**employer (1)**
28:10
**employers (1)**
28:16
**enactment (1)**
244:3
**encompasses (2)**
19:18;172:3
**end (3)**
18:15;100:22;115:1
**ends (1)**
196:20
**enforce (2)**
58:2,4
**enforcement (28)**
10:17;11:24;29:6;38:9;54:6;56:11;61:1,4;62:16;111:2;129:1;134:21;174:11,17,22;175:7,16,24;176:1;177:17,24;200:14;218:2;225:12;228:22;238:6;239:24;250:23
**enforcements (1)**
176:11
**enforcers (1)**
58:23
**enforces (1)**
16:23
**engage (2)**
58:3;209:22
**enhanced (3)**
174:21;175:7,16
**enormous (1)**
188:6
**enough (3)**
73:13;141:19;176:23
**ensure (1)**
86:7
**entail (1)**
81:16
**entire (11)**
13:5,16;30:13;31:8;93:2;106:4,14;122:2;139:5;220:15;229:25
**entirety (1)**
139:7
**entities (3)**
37:6;84:24;86:5
**entitled (10)**
16:16;21:14,22;23:21;24:24;31:20;124:5;165:15;250:11,14
**entity (5)**
35:22;36:11;37:19,22;142:23
**equals (1)**
137:6
**equivalent (7)**
135:10;176:23;177:2,3,7,18,21
**Eric (2)**
118:8;248:13
**error (5)**
154:16,20;156:13;225:13,19
**essence (1)**
17:7
**essentially (4)**
13:5;62:9;150:17;172:12
**establish (2)**
129:10;194:7
**established (3)**
54:2;129:21;193:6
**establishes (1)**
194:8
**estimate (14)**
8:9;42:16;64:13;153:20;159:24;160:20;167:21,24;169:3;172:8;195:25;197:19,20,21
**estimated (3)**
90:3,7;166:25
**Estimates (2)**
119:8;129:6
**estimating (1)**
195:10
**estimation (1)**
53:8
**et (6)**
33:20,25,25;35:6,8;126:14
**evaluate (1)**
13:21
**even (43)**
14:11;27:16;28:23;40:15;56:17,19;74:6,12;79:24;83:4,13;85:13,24;103:17;110:4;112:2;113:12;148:23;152:22;157:23;158:5;173:15;174:20;179:3;187:14,14;194:11;202:18,21;205:13,15;207:9,20;208:4;219:2;220:17;221:1;233:22;236:10,12;241:11;253:9;254:10
**eventually (3)**
128:10;200:3;225:4
**everybody (1)**
134:17
**everyone's (1)**
117:22
**evidence (35)**
19:14;20:19;61:20;62:6;63:10,14,16,19;73:12;74:9;78:10;83:17;124:5;125:10;165:6,7;168:10;184:9,10,10,11,21;194:11;205:13;213:21;217:22;229:13;232:1,8;242:2;243:15;245:5;253:24;254:15,17
**evidently (1)**
142:12
**exact (7)**
119:25;144:22;147:11;154:18;188:4;235:5;251:24
**exactly (6)**
38:18;49:16;70:1;87:6;136:23;247:9
**exaggerate (1)**
20:21
**EXAMINATION (1)**
5:12
**examine (1)**
17:17
**examined (1)**
17:11
**examining (2)**
68:23;71:12
**example (11)**
14:3;80:24;81:2,4;111:25;112:7;114:18;174:13;176:6;208:2;220:11
**examples (1)**
125:11
**except (6)**
30:16;61:19;75:4;93:6;155:21;187:22
**exceptions (2)**
13:18;211:18
**excerpt (1)**
118:15
**excess (1)**
31:1
**exchange (1)**
101:4
**excluded (4)**
40:2,5,16,19
**exclusion (3)**
40:11,16,21
**Exhibit (59)**
14:22;15:1;47:4;64:6;68:7;84:6,9;88:16;93:25;94:4;95:5;96:10;107:4,13,17;116:10;118:1,6;123:21,25;127:16,17,23;130:9,10,22;131:5,9,13;132:17;134:1;135:19;137:12;145:24,25;146:18;151:22;155:25;160:4,5;165:8,12;170:18;178:13;184:4;190:17,22;200:22;221:17,20,24;222:17;242:5,6;248:19,20;250:1,2,3
**exist (4)**
54:9;83:6,8;209:15
**existence (1)**
221:10
**expanded (2)**
82:16,17
**expect (1)**
209:10
**experience (12)**
17:22;64:2;72:5;110:7;139:24;174:10;216:11,25;226:19;230:5;252:20;253:25
**experienced (2)**
251:10;253:25
**experiences (1)**
10:21
**expert (49)**
7:10,14;11:2;18:4;

29:20,24,25;30:4,14;31:3,9,21;32:3;34:21;37:7;38:19;39:17;40:3,5,11,19;41:4,23;42:6,17,19;45:13;46:11;49:11;53:20;54:5;60:15;63:10;64:5;65:13,15,20;66:12,21;69:3,18;91:23;104:16;156:25;193:14;210:12,15,21;215:19
**expertise (9)** 35:18,21;36:21;54:4;60:17;63:8,12;69:12,21
**experts (5)** 67:15,17,18,25;68:3
**expert's (1)** 52:19
**explain (3)** 109:22;113:15;201:20
**explanation (3)** 143:21;149:6;215:7
**explicitly (2)** 93:11;189:12
**explored (1)** 44:5
**exploring (1)** 17:6
**Explosives (2)** 94:19;250:22
**expose (1)** 10:5
**express (1)** 206:14
**expressed (1)** 206:25
**extend (1)** 126:21
**extensive (1)** 181:6
**extent (11)** 49:13;54:9;79:4;82:3;89:14;126:21;179:17;191:6;199:5,13;238:16
**extraordinary (1)** 218:13
**extrapolate (3)** 129:15;136:16;179:25
**extrapolated (2)** 166:9,24
**extrapolating (1)** 200:21
**extrapolation (1)** 198:24
**extremely (1)** 176:24

**F**

**fact (48)** 61:7,11,12,21;76:11;88:7,18;92:3;96:14;103:23;105:8;109:15;120:2;128:25;140:7;144:17;149:25;155:16;159:5;163:12;166:4;178:19;194:1;196:19;199:10;202:15;209:21,21;212:24;213:16,25;215:3;216:5;217:22;218:19;224:16;225:3,14;227:1,13;230:17;234:19;235:20;239:23;241:23;242:2;249:13;254:14
**factor (2)** 206:6,9
**factored (1)** 51:22
**factors (3)** 238:25;240:9,14
**facts (4)** 48:15;122:8;157:23;158:5
**factual (1)** 215:5
**failed (1)** 252:4
**fair (21)** 14:5;19:20;29:2;30:12;42:9,15;48:14;70:5;83:19;86:13;95:8,25;107:10;109:4;126:14;127:25;148:10;157:11;189:24;216:23;227:17
**fairly (1)** 69:9
**false (3)** 241:18,22;253:6
**familiar (16)** 44:3,18;59:18;67:21;73:25;84:1,17;108:15;124:9;149:18,20;166:14,21;167:17;185:17;242:15
**familiarity (1)** 54:6
**family (2)** 71:11;97:19
**far (13)** 51:15;64:11;65:7;106:16;136:3;157:12;159:9;168:25;188:6;220:13;230:2;247:6,13
**Farm (50)** 7:19;45:14,21;46:5,5;48:6,8,20,25;49:4,5,7,12,23;50:13,16;51:24;53:12;65:12;97:17;98:21;99:2,19;100:19;101:8;102:18;103:5,13;106:18;185:11,18,18,20,25;192:23;193:7;194:18;203:19;204:2;207:11;208:13;209:3;210:10,16;211:12,22;212:21;219:1;225:22,22
**Farm's (3)** 51:5,7,21
**fast (3)** 44:6,10,10
**favor (1)** 20:19
**FBI (2)** 11:23;12:1
**feasible (1)** 111:24
**federal (18)** 16:22;58:23;78:22;79:3;85:14;86:15,25;87:1;111:3;119:13;122:17;148:4,5,11,13,21;150:18;214:17
**Federation (3)** 41:7,9,14
**feel (1)** 92:10
**feelings (1)** 56:22
**felon (1)** 81:5
**felons (3)** 143:6,22;144:3
**few (12)** 13:18;14:4,19;21:22;31:18;49:15;54:2;71:9;195:19;208:2;229:21;248:17
**fewer (3)** 208:2;214:18;221:2
**FFL (5)** 119:14;120:25;174:12;176:1,21
**FFLs (23)** 58:9,15;71:7,9,14;78:5,7;79:6;82:11;84:23;86:5;102:11;115:8;169:6;173:4;176:11;177:11,13,25;180:24;181:3,10;240:2
**FFL's (1)** 174:25
**field (2)** 13:16;44:9
**figure (10)** 33:19;90:2,3,6;120:20;128:18;131:7,16;147:14;199:18
**figures (2)** 113:1;168:4
**figuring (1)** 110:9
**files (2)** 33:4;42:2
**filing (1)** 162:1
**filled (1)** 187:16
**filling (1)** 187:16
**find (5)** 71:24;141:19;146:12;147:1;190:9
**finding (1)** 128:15
**findings (2)** 243:19;248:10
**Finds (1)** 165:16
**fine (2)** 183:5,8
**finish (3)** 6:3;146:8;164:20
**finished (2)** 28:11;154:9
**fire (1)** 151:24
**firearm (42)** 81:5,6,10,12;84:2,20,24;85:10;91:9,21,24,25;99:11,25;100:6,16;101:13;122:25;123:6,12;128:21,24;129:14;130:15;134:9;135:14;136:6,20;148:2,4,6,14;150:14;157:5;161:21;175:18;203:24;251:11;252:2,22;253:7;254:8
**firearms (107)** 12:22;14:6;16:22,23;26:3;27:24;29:2,9;31:10;35:13,22;37:3;38:1;41:7,8,14;42:10,11,20;43:17,25;44:4,13,18;53:24;54:3,4,7;58:10,16,24;60:5;63:24;86:6,12;90:1,7,12;93:11;94:16,18,20;100:15,18;108:8,10,10;109:11,11,23;110:1,4,8,20;111:18,25;112:7;114:24;119:10,13,13;120:3;121:17;122:17;126:8;128:4,4,11;131:20;132:13;133:12;135:8,25;146:22;150:19;151:5,6,12;153:15,16;160:13;161:14,20,20;170:9;174:15;189:25;190:19;195:21,23;203:19;205:17;207:8;211:11;218:2;220:12;222:7;230:4;242:12;244:1;250:22;251:11;252:8,20,21;254:1,11
**firearms' (1)** 110:7
**firearms-related (1)** 241:19
**Fired (3)** 100:22;101:3,22
**firing (2)** 45:3;81:20
**Firm (3)** 7:22;53:12;64:11
**first (104)** 5:10,21,24;11:19;12:21;17:1;30:4,16;31:18,23;44:1,13;45:10,16,20;46:4;48:16;53:6;66:15;68:12;69:22;74:3,11,25;75:16,16;76:2;78:3,6;79:4,15;83:19;89:24;90:3;92:19;94:7,7;95:9,10,17;96:10;97:15;98:21;99:13,14;100:22;102:14;107:4;108:22,24;109:1;111:12;112:20;115:6,20,21;122:22,23;123:8;124:3;129:10;133:14,16,18;134:7;135:13;136:4;145:2;149:10;160:10,17,19,21;161:4;181:21;189:7,24;190:5;191:2,7;192:16;194:11;197:12;200:13;202:9;205:3;215:10;222:2,18;226:10;227:18;228:5;231:2,7;234:1,17;238:24;239:17;243:7;245:11;248:2;250:7,16,19
**fits (1)** 69:21
**five (9)** 15:21;16:7;30:16;53:10;123:14,14,17;124:4;170:7
**five-year (1)** 131:22
**flag (3)** 234:8,23;236:15
**flawed (1)** 241:22
**flaws (1)** 208:1

**fled (1)** 97:23
**fleeing (1)** 100:7
**Fleet (53)** 7:19;45:14,21;46:5, 5;48:6,8,20,25;49:4,5, 7,12,23;50:13,16; 51:5,7,21,24;53:12; 65:12;97:17;98:21; 99:2,19;100:19; 101:7;102:18;103:5, 12;106:18;185:11,17, 18,20,25;192:23; 193:7;194:18;203:19; 204:2;207:11;208:13; 209:3;210:10,16; 211:12,22;212:21; 219:1;225:22,22
**Fletcher (1)** 250:9
**Florida (4)** 13:1,4,6,8
**focus (14)** 9:14,16;12:15;15:9, 24;57:4,6,8,13;59:14; 90:10;109:15;188:10; 246:17
**focused (16)** 14:6;15:13;16:9,11; 19:20;79:24,25; 88:19,23;113:20,21; 115:2;129:18;154:2, 3;178:13
**folk (2)** 218:1,5
**folklore (2)** 225:11;238:6
**folks (1)** 253:13
**follow (4)** 121:18;125:9; 225:19;243:18
**following (13)** 31:25;95:2;107:6, 10,19;116:10,15; 120:13,15;126:5; 128:1;162:6;174:14
**follows (2)** 5:11;244:15
**font (1)** 85:2
**footnote (2)** 95:1;107:5
**forbearance (1)** 117:23
**forbidden (1)** 87:6
**form (104)** 10:9;24:17;42:12; 48:17,22;50:21; 53:22;54:16;55:8; 56:21;63:1;65:9;67:3, 8;68:12,14;69:25; 70:8;73:19;74:8; 75:19;80:7;84:14,17, 20;86:1,13,18,22; 88:1;89:6,21;92:1; 95:11;96:3,12;97:12; 100:9;104:14;112:13; 117:25;119:22;121:1, 25;124:23;127:4; 129:24;144:15; 146:15;149:5;156:22; 163:10;177:19;180:2; 182:6;183:2,13; 185:7;188:16;190:12; 191:12,25;192:21; 198:5;201:1;204:9; 205:8,23;206:21; 211:9;212:17;213:4, 22;214:2;215:21; 216:2;217:4,17; 218:6;219:11;220:9; 223:21;224:15,25; 226:21;232:18;233:7, 15;235:8;236:5; 238:18;239:12;243:3; 245:2;247:3,15,22; 249:6,20;251:20; 252:11;253:3;254:2, 19
**formal (1)** 14:2
**formed (2)** 68:16;69:1
**forming (6)** 133:17;149:2; 167:8,18;168:10; 175:13
**forms (5)** 84:1;177:16,23; 178:7;243:10
**formula (2)** 162:12;182:24
**formulate (1)** 182:16
**forth (3)** 5:23;44:7;222:14
**forum (1)** 77:1
**forward (3)** 8:24;164:25;217:20
**found (14)** 81:5,6;95:20;97:5, 18;98:7,18,22;99:11; 136:19;153:15; 154:18;209:19; 228:10
**foundation (21)** 12:2;25:21;29:16; 35:16,24;39:11; 40:23;55:23;60:9; 169:7;211:23;213:13; 215:6;220:23;225:11; 230:23;236:18; 237:16;245:3,23; 247:16
**four (9)** 15:16,20,21;16:7; 102:21;123:14;124:4; 170:6,7
**fraction (18)** 14:16;126:23; 136:11;144:24; 154:12;158:19; 160:14;164:2;172:25; 173:8,19;180:17; 183:21;193:2,21; 196:9;197:14;207:7
**fractions (1)** 173:13
**framework (1)** 110:21
**free (1)** 92:10
**freight (1)** 28:19
**frequency (4)** 24:16;111:4;127:2; 230:22
**frequently (7)** 35:14;36:1;119:14; 120:8;145:15;225:15; 235:13
**Friedman (3)** 37:12,14,15
**friend (2)** 44:9;71:11
**friends (1)** 44:24
**front (10)** 14:19;55:7;84:4; 97:19;98:11,18; 107:19;154:25; 190:23;203:11
**FSU (7)** 13:10,13;25:25; 26:8;28:11,15,25
**full (12)** 89:25;92:11; 115:20;126:25;131:1; 132:11;202:4;203:14; 227:6,10;234:1; 238:24
**fundamentally (1)** 230:8
**funding (3)** 25:17,24;26:2
**further (4)** 113:15;184:21; 196:25;229:10
**future (1)** 65:8

## G

**gap (1)** 144:9
**Garen (1)** 165:20
**GARY (2)** 5:9,19
**gathering (1)** 183:6
**gauge (1)** 35:21
**gave (4)** 76:25;77:9,18; 125:16
**general (11)** 9:22;51:25;70:18; 71:6;110:13;111:7; 122:12;127:2;138:20; 194:8;244:17
**generate (2)** 11:7;207:15
**generated (5)** 10:16,20,22,25; 11:6
**generous (3)** 196:7;202:16,18
**gentlemen (1)** 7:25
**gets (2)** 19:16;253:17
**given (14)** 63:6;75:1;76:19,21; 128:8;139:25;157:23; 158:3,5;167:20; 200:19;204:20; 216:25;241:19
**gives (3)** 119:7,7;155:12
**giving (3)** 112:7;177:8;228:19
**global (1)** 172:6
**Glock (1)** 97:16
**God (2)** 5:6;225:5
**goes (6)** 16:6;51:15;59:8; 119:16;227:3;229:20
**Good (3)** 5:14;128:22,24
**Gosh (1)** 86:23
**government (5)** 142:23,25;143:23; 150:1;214:15
**governmental (6)** 35:12,22;36:11; 37:6,19,22
**government's (1)** 214:17
**graduate (2)** 9:8;13:16
**graduated (1)** 28:14
**Graham (2)** 65:22;66:1
**Graham's (1)** 66:9
**grants (3)** 25:19,23;26:3
**graph (1)** 131:16
**great (1)** 64:20
**greatest (1)** 135:1
**greatly (1)** 119:23
**Grewel (1)** 33:25
**ground (2)** 5:20,22
**grounded (2)** 56:15;214:23
**group (1)** 39:12
**guess (64)** 9:5,10,14,22;13:24; 15:7;26:12;28:13; 29:25;34:24;35:8; 36:5,21;37:21;38:5,7; 39:12,14;44:16; 45:18;49:14;55:20, 25;56:3;57:4,7;63:9; 66:3;68:12;69:17,23; 70:18;72:2;73:23; 77:23;88:4;100:13; 102:10;108:14; 114:17;126:1;128:20; 137:13;139:1,24; 148:19;153:18; 159:10;160:10;170:7; 176:14,16;179:16,21; 191:6;199:15,16; 202:2,20;214:10; 219:14,16;221:14; 222:1
**guesses (1)** 230:15
**guessing (5)** 35:8;38:3;56:22; 64:15;142:15
**guesswork (1)** 165:6
**guidance (6)** 213:17,20;214:1, 22;218:4;224:22
**gun (238)** 10:23;12:19;16:16, 17,20,24,25;17:6,8; 19:8,9,15,15,18,21; 20:6,11,14,22;22:7; 23:15,22;24:3,5,6,9, 10,13,14,17,25;27:1, 11;28:8;36:2,3,25; 37:1;38:8;41:15; 42:20;43:5;44:2,7; 51:4,5,7,22,25;54:8,

12,12,24,25;55:2,3;71:11;75:5,8,9,10,12,15;76:1,6,11,12,20;77:4,6,10,13,14,15,15;79:10,12;80:24;81:8,9,20,21;82:22;89:2;90:16;91:3,5,13;94:21;95:2;96:16;97:1,4,11,20;98:3,7,10,18;99:6,17,24,24;100:5;101:19,20;103:20,24;104:19;107:6,10,19;111:3,17;116:11,15;118:25;119:7;120:13,15,19;121:8,9,15;124:6;125:23;126:5,23,25;128:1;129:3;136:13;137:20;143:25;150:5;161:8;162:1,7;166:11,20,25;171:2,3,5,5,12,21;172:1;174:14;176:18;184:20,20;185:13,13,19,24;186:14,18,19,20,25;187:6,9,12,21,25;188:1,4,5,9,14,23,24;189:1,4;192:24;193:18;194:12;199:1;200:2,14;201:22;202:8;205:20;207:10;209:6,20;210:12;212:6,25;215:18,20,25;216:3,8,11;217:3,5,23;222:22;223:10,16,19;224:2;228:7,11,12;229:10;231:10,20;232:4,7;233:1,2,21;235:15,16,17;236:17;238:5;243:9,16,24;245:12,14,15,16;247:5;248:25;249:13,17,18;253:8,15,17,17,22;254:5

**gunfire (1)**
101:4

**gunmen (3)**
101:5,16,19

**gun-related (2)**
38:17,20

**Guns (348)**
14:1;16:17;17:10,12;20:11;22:7;23:15;37:2;43:8,10,12,21;44:1;54:20;57:20;71:1,6,8,13,15;73:10,14;74:19,20;75:11;77:11,16;78:8,11;79:7,16;80:25;82:4,5,12,13;83:12,18;88:20;89:5,5,13,14;90:19;92:18,23,24;93:7;94:22;95:22;96:8,17,21;98:21;101:17;102:12;103:9,12,13,18;104:4;105:1;106:5,17;109:21;111:5,6,21;112:2,9;113:10,12,14,18,20,21;114:4,5,9,11,12,17,18,25;115:2,2,9,9,16;116:20;119:15;120:9,17,24;121:4,5,13;122:15;123:18;128:7,16,17;129:7,11,15,18,22;130:2;136:11,21;137:2,4,4,17,23;138:19,23;140:5,14,15;143:7;144:3,23,24;145:8,15;146:13;147:2;152:3;153:8,21;157:8;158:17,24;159:25;160:14,17,20;161:8,10;162:13,19,21;163:8,22;164:3,8,10;165:16;170:12,22,23,24,25;171:22,23;172:1,9,17,25;173:5,9;177:9;179:19;180:12,16,17;181:24;182:1,3,4,10,14,16,23,25;183:1,10,12,20;184:12,22,23;185:22;186:2,4,9,12;187:1,3,17;188:7;190:6,10;191:3,9,17,23,23;192:3,4,6,12,18,23;193:2,7,11;194:1,2,16,18;195:3,6,13,17,25;196:1,9,11,14,23;197:3,14,19,21,23;198:2,3,11,16;199:4,7,7,10,11,11,13,14,19,20,21;200:6,9,12,17,22,24;201:12,14,21;202:4,5,11,12,13,21;203:2;204:2,11,22;205:4,12,22;206:3,11,12,13;207:1,11,17;208:13,19;209:3,8,16,17,18,23,24;210:3,4,9,17;211:16,19,22;212:4,5,7,8;213:11,17;214:4,20,22;215:3,11;217:14,15;218:5,10,11,13,15,17,21,25;219:2,6,7,9,10,17,23;220:14,17;221:2,7,12;222:21,23;223:11,17;224:10;225:14;227:1,14;230:1;231:8;234:14,21,25;237:23;239:20;240:14,18;241:5;244:2;245:17,18;246:20;247:6,10,13;248:1;252:1;253:18

**gunshot (1)**
28:4

**gunsmiths (1)**
166:12

**guy (1)**
201:22

## H

**half (7)**
98:20;108:6;113:11;125:16;127:2;197:18;209:18

**halfway (4)**
85:4;90:2;119:4;144:17

**hand (13)**
5:3;14:25;37:4;94:3;107:16;123:24;142:22;160:4;165:11;168:24;242:4;249:25;250:1

**handful (2)**
109:25;110:2

**handgun (16)**
43:15,16;79:8;97:7;98:23;99:1;100:21;103:4;105:22;106:6,7;230:7,21;242:12;243:8;249:2

**handguns (38)**
78:5,7;79:6;82:10;83:3;101:8;102:11,18;106:14;115:8;132:23;133:12;153:7;173:4;180:24;181:3,9;223:13;227:21;228:7,10,21,21,23;229:24;234:2,6,7;237:8,14;239:1,3,4;240:2,6,12;241:3;254:5

**handicap (2)**
142:22;149:25

**handicaps (1)**
142:25

**handing (2)**
130:8;221:23

**handling (2)**
44:3,7

**hands (7)**
71:1;73:15;94:16;95:22;96:17;122:15;209:18

**hands-on (1)**
64:1

**happen (1)**
188:15

**happened (8)**
49:16;104:25;154:13;188:2,13;194:2;246:3,17

**happens (8)**
69:16;105:9,21;110:10;171:18;176:8;194:3;217:9

**happy (1)**
174:4

**hard (9)**
6:19;73:12;84:13;85:3;107:22,23;118:11;124:13;237:13

**hardly (2)**
71:7;221:10

**harm (2)**
81:19;82:1

**harmed (1)**
81:24

**harming (1)**
81:22

**Harris (1)**
38:12

**head (5)**
6:18,18;15:8;18:16;64:10

**heading (2)**
31:20;250:8

**hear (3)**
45:16;182:19;202:24

**heard (5)**
45:20;59:21;68:21;251:1;253:25

**hearing (1)**
253:14

**heart (1)**
101:7

**heavily (1)**
25:7

**held (5)**
70:7;74:5,22;126:16;254:10

**Heller (5)**
34:20,22,23,25;35:4

**help (9)**
5:6;6:25;8:5;32:14;61:21;78:18;133:21,23;187:23

**helped (1)**
63:5

**helpful (2)**
14:18;18:16

**helps (1)**
214:19

**hereinafter (1)**
5:10

**Hickenlooper (2)**
33:20;35:6

**high (4)**
28:14;77:15;120:24;196:9

**higher (7)**
123:15;144:18;154:23;168:6;197:20;202:1;206:12

**Highland (2)**
37:12;38:8

**highly (1)**
50:3

**high-top (1)**
232:6

**high-volume (1)**
19:15

**hinder (1)**
50:18

**hint (1)**
236:21

**hire (1)**
36:22

**hired (9)**
30:4;35:6,12;37:7;40:20;41:3,8;42:17;69:3

**hiring (1)**
40:20

**history (1)**
33:7

**HMQ (1)**
37:11

**hold (2)**
71:8;78:14

**home (1)**
46:18

**homicide (2)**
12:20;207:21

**homicides (1)**
189:16

**honest (2)**
225:4;246:4

**honestly (2)**
60:19;236:20

**horse's (1)**
71:2

**Horton (20)**
70:15;74:16;97:17;98:22;101:8;184:18;185:19,24;186:8,13;187:2,22,24;203:19;204:3,24;207:10;225:23;250:9;252:20

**hospital (1)**
8:21

**hour (2)**
64:8;125:16

**hours (3)**
8:8,10;64:17

**house (2)**
28:19;97:19

**household (1)**
134:17

**households (3)**
134:16,20;209:18

**huh (1)**
9:13

**huh-uh (1)**

6:18
**human (2)** 145:19;209:15
**humorous (1)** 171:17
**hundred (4)** 90:8,12,19;174:2
**hundreds (1)** 220:17
**husband (2)** 253:14,15
**hypothesis (1)** 10:5
**hypothetical (13)** 52:4,9;104:13;112:12,17,24;113:1;188:12;193:10,15;204:7,10;218:20
**hypothetically (5)** 188:1;204:23;205:11;207:5,17

## I

**idea (6)** 83:4;142:1;164:20;242:25;244:16;246:19
**identification (14)** 14:23;84:7;94:1;107:14;118:7;123:22;130:11;134:2;146:1;160:6;165:9;221:21;242:7;250:4
**identified (5)** 94:19;96:1;125:23;126:17,18
**identify (3)** 61:22;62:14;226:19
**identifying (1)** 216:7
**illegal (12)** 75:5,9;86:15;88:5;94:21;118:25;124:6;209:22;215:18;224:17;226:17,17
**Illegally (5)** 165:16;194:13;206:18,20;221:7
**illegitimate (1)** 210:1
**Illinois (6)** 8:20,21;9:2,3,4;28:22
**illustrate (1)** 114:21
**illustrative (1)** 114:20
**imaginary (1)** 218:20
**imagination (4)** 112:14,18;145:19;181:15
**imagine (1)** 184:10
**immediately (1)** 201:21
**impact (9)** 14:2;36:2;75:15,17,25;76:2;230:18;243:16;246:12
**implication (2)** 169:18;244:9
**implies (2)** 75:6;80:12
**imply (1)** 93:6
**implying (1)** 161:10
**importance (1)** 77:16
**important (7)** 24:10,15;73:10;86:6,10;109:18;184:12
**impress (1)** 220:11
**imprison (1)** 141:22
**inaccuracy (1)** 95:12
**inaccurate (1)** 242:1
**inappropriate (1)** 191:13
**Inc (2)** 33:25;39:2
**incarcerated (4)** 71:4,18;140:18;199:2
**incarceration (1)** 137:21
**incident (2)** 97:22;104:12
**include (19)** 72:14,23;73:4,7,18;75:13,16;76:1,5;80:17;121:4,17;141:5;143:25;151:5,11,11;248:9;249:15
**included (4)** 65:4;72:17;121:16;139:9
**includes (2)** 54:22;153:23
**including (9)** 82:16;114:25;119:12;174:15,17;176:21;202:9;204:12;230:9
**incomplete (1)** 251:24
**incompleteness (1)** 180:13
**inconsistent (1)** 67:7
**inconveniences (1)** 123:4
**incorrect (1)** 199:17
**increase (14)** 184:20;186:18,20;187:8,12,13,25;188:1,10;207:15,18;208:7,9;209:4
**increased (1)** 175:1
**incumbent (1)** 44:3
**indeed (5)** 110:4;149:24;200:10;213:19;239:10
**independent (2)** 128:25;129:1
**indicate (10)** 123:16;132:12;161:6;176:20;177:25;197:8;200:12;226:12;227:5,19
**indicated (3)** 73:12;121:21;211:14
**indicates (8)** 71:13;215:15;232:1;233:20;236:7;241:5,6;254:15
**indicating (2)** 184:11;249:1
**indication (2)** 213:2;214:5
**indicator (19)** 217:22;231:10,17,18,21,25;232:2,2,4,7,22;233:2,3,21;234:24;237:1,19;238:2;254:11
**indicators (17)** 6:17;62:18;63:11;212:23;222:25;223:16;224:7,14,17,19,23;225:3,3,21;226:5;238:17,20
**individual (7)** 81:20;97:6;98:23;100:6;150:14,20;151:3
**individuals (8)** 100:15;101:17;104:20;188:18;252:21;253:6,22;254:7
**industry (5)** 26:3;29:9;42:11;51:25;60:5
**ineligible (2)** 100:5;187:18
**infer (5)** 217:8,12,12;225:16;252:15
**inference (1)** 13:19
**inform (4)** 57:11;173:3;224:1;229:10
**information (37)** 13:20;16:24;17:24,25;24:1;25:11;48:24;49:2,4,6;51:1,3,21,23;52:24;55:13;69:13;101:14;106:10;115:22,25;116:4,14;117:1;140:3;141:18;144:21;145:11;181:14;183:3,4;193:16;230:15,15;233:20;245:7;253:13
**informed (3)** 95:16;163:21;175:16
**informs (2)** 57:7;220:7
**inhibit (1)** 50:19
**initial (2)** 69:18;91:7
**initiated (1)** 174:21
**injure (1)** 101:20
**injured (1)** 101:5
**Inmate (3)** 137:15;150:4;199:6
**inmates (12)** 71:17;138:5,16,17;141:11,22;146:6,23;147:6,9,12;158:15
**inside (2)** 9:16;12:15
**insofar (1)** 227:20
**inspections (1)** 174:24
**instance (3)** 115:5;138:4;186:19
**instances (6)** 100:2;102:17;103:3;144:3;168:4;188:20
**instead (3)** 114:18;156:1;198:12
**instruct (4)** 49:24;51:8;52:22;53:3
**instructing (1)** 50:8
**instructs (1)** 6:10
**intended (3)** 91:6;113:2,3
**intention (1)** 223:22
**interact (1)** 11:9
**interest (5)** 57:1,3,8;215:8;241:23
**interested (3)** 57:19;59:9;111:1
**interests (1)** 56:9
**intermittently (1)** 30:17
**internal (2)** 48:9,21
**interpret (2)** 236:24,25
**interpreting (2)** 60:18;124:5
**Interstate (1)** 242:12
**interview (2)** 139:2,12
**interviewed (4)** 138:17;139:1,5;148:12
**interviewers (1)** 143:1
**interviewing (1)** 140:18
**into (23)** 19:16;20:3,5;51:22;68:25;69:19;71:1;73:14;81:17,20;91:22;94:16,21;95:22;96:17;104:25;122:15;162:12;180:19;182:7;240:3;246:20;253:15
**introduction (4)** 118:18,20,23;122:5
**introductory (1)** 13:15
**invades (1)** 52:25
**invading (3)** 49:25;51:11;52:19
**invalidate (1)** 238:4
**investigate (2)** 83:5;221:1
**investigated (10)** 61:3;110:1,2,16;116:24;126:19,24,24;163:9;229:22
**investigating (1)** 221:3
**investigation (3)** 62:16;108:9;110:2
**investigations (27)** 108:6,7,11;109:12,16,24;110:7;111:2,6,16,19;112:1,8;113:8;

114:23;125:24;126:4,22;127:3;161:9,25;162:20;163:4;164:11;179:19;181:4;192:7
**investigative (13)** 109:7,22;162:3,8,11;164:1,2;168:16;172:5;178:17;180:6;191:23;250:23
**investigator (1)** 254:1
**invited (1)** 69:10
**invoice (1)** 65:4
**invoices (1)** 65:2
**involve (29)** 9:24;19:11;21:6,10,18;22:1;23:1,4,9;24:21;28:5,8;31:9,13;32:9;34:3;74:20;77:11,15;106:13;111:19;112:10;113:13;127:3;184:24;212:5;219:1;221:1;225:8
**involved (44)** 12:22;20:22;22:5;23:7;32:14,17;34:6,16;68:20;69:8;71:8,10;79:12;84:2;89:15;91:9,20;97:21;107:5;108:7;110:15;111:5,17,21;112:3;113:9;146:22;161:9;162:19;164:10;170:12;181:3;187:6,20;188:18;192:6;197:19;201:12;204:16;209:13;215:16;234:14;239:23;246:8
**involvement (2)** 83:11;127:14
**involves (8)** 10:1;17:4;19:4;23:25;25:13;87:21;168:1;216:4
**involving (7)** 37:1;38:1;103:4;104:19;187:22;227:12;243:16
**irrelevancies (1)** 235:10
**irrelevancy (2)** 235:9;241:1
**irrelevant (10)** 20:20;109:19,24;110:9,12;115:22;116:3,14,18;242:1
**issue (22)** 19:16;28:1;37:2,4;39:9,10,13,23;41:17;43:21;44:12;65:6;80:14;95:21;96:15;100:13;109:19;136:10;175:19,23;193:15;208:22
**issues (10)** 6:24;7:2;69:8,12;91:22;111:8;177:25;213:25;230:3;241:13
**italics (4)** 111:17,19,20;112:1
**item (1)** 47:23

## J

**jacked (1)** 174:24
**January (4)** 41:12;65:2,4;146:21
**jeopardy (1)** 143:3
**Jerome (12)** 70:15;74:16;184:18;185:19,24;186:8,13;203:19;204:2;207:10;225:23;250:9
**Jersey (3)** 33:24;34:3;39:1
**job (2)** 39:8;58:2
**Joe (2)** 7:14;66:7
**Journals (2)** 16:3;21:5
**Jr (1)** 250:9
**judge (1)** 243:15
**judging (1)** 187:1
**judgment (1)** 220:18
**juggle (1)** 131:11
**July (1)** 97:17
**jump (1)** 222:14
**jumps (1)** 32:17
**June (1)** 107:20
**junk (4)** 243:4,11;248:8,20
**Justice (4)** 130:13,14;146:20,21
**Juvenile (1)** 118:25
**juveniles (2)** 119:10;120:4

## K

**keep (1)** 186:9
**keeping (2)** 178:19;186:4
**Kevin (1)** 22:6
**key (3)** 19:19;20:6;252:4
**kill (1)** 101:20
**killed (1)** 101:5
**killing (1)** 102:1
**kind (46)** 5:22;9:24;19:2;20:22;27:18;28:24;38:8,16;39:9;43:12;44:17,18,25;54:12;55:18;56:18;57:8;62:20,23;63:20;64:1;68:25;69:23;72:5;75:2;79:7;105:21;109:4;119:20;122:8;126:1;128:13;149:6;150:12;157:11,24;158:6;175:3;176:21;178:11;210:6;220:21;228:3;232:23;245:7;253:12
**kinds (4)** 10:12;11:17;13:20;189:21
**KLECK (22)** 5:9,14,19;7:8;8:17;15:17;43:8;45:9;49:10;53:18;84:13;92:10;107:2;118:14;134:6;151:20;155:11;156:20;163:24;203:10;248:17;254:23
**knew (3)** 138:22;189:3;225:17
**knowing (10)** 60:18;72:6;85:10;122:6;176:21;179:4;187:10;193:25;230:7,11
**knowingly (1)** 176:17
**knowledge (16)** 48:14;53:24;63:22;66:25;67:4;84:19;85:22;98:9;104:11;106:13;127:19;145:7;188:21;210:7;211:2;225:9
**known (20)** 48:1;62:14,17;90:7;144:23;158:20;160:23;162:25;163:11,14;171:22;172:9,18;173:9;178:14,16,20;180:16;181:2;212:21
**knows (3)** 142:21;177:4;237:24
**Knox (1)** 249:3
**Kolbe (1)** 36:7
**Koper (32)** 221:18;222:3,6,19;223:5,9,12,19,25;228:2,4,6,15;229:5,20,23;230:25;231:15;233:22,25;234:11,18;236:14,19;237:7,13;238:22;239:9;240:5;247:1;254:4,10
**Koper's (2)** 241:2;254:17
**Kylie (3)** 250:14,20;251:1

## L

**label (2)** 210:23;223:6
**labels (1)** 127:18
**lack (11)** 12:2;35:16,23;39:11;40:22;55:23;220:23;236:18;245:3,23;247:15
**laid (4)** 154:7;157:12;175:10;238:10
**land (1)** 81:18
**language (15)** 65:6;78:18;85:18;89:16,20,20,22;99:23;100:14;114:3;119:17;181:23;184:2,5;236:14
**larceny (1)** 131:22
**large (13)** 44:12;54:12;112:20;144:19;173:24;193:21;218:20;219:2,23;220:3,8,21;221:3
**largely (1)** 24:2
**larger (9)** 114:14,15,24;115:17;164:9;165:1;179:11;196:16;200:9
**last (29)** 32:4,8,23;41:6;45:18;47:4,6,23;86:21;101:1;111:11;113:11;115:5,7;120:11;132:3;137:5,20;142:9;148:2;154:6;174:20;181:21;189:6;200:8;218:23;228:18;243:23;245:11
**later (18)** 72:9;74:21;77:11;116:8;182:9;193:3;197:18;205:12;212:5,7;213:13;215:4;217:24;234:25;235:1;237:9,23;241:4
**latest (1)** 118:15
**laughed (2)** 55:15;171:16
**Law (51)** 7:22;10:17;11:24;16:14;18:23;19:5,9;20:24;21:2;22:14,16,20;23:5;24:22;29:6;38:1;53:12;58:2,3,4,24;61:1,4;62:15;78:22,24;79:3;85:13,24;86:8,16,25;87:14;88:3,6;134:20;200:14;228:22;238:6;239:24;244:2,3,14,24;245:17;246:12,13,18;247:10,13;250:23
**lawful (1)** 84:25
**laws (4)** 16:23;39:13;111:3;249:16
**law's (1)** 245:19
**lawyers (5)** 45:17,19;48:23;49:3;69:10
**lay (5)** 5:22;69:8;92:20;93:4;98:14
**layman's (1)** 86:3
**lead (2)** 150:2;223:9
**leaders (1)** 56:23
**leads (1)** 70:22
**learn (3)** 44:21,23;65:15
**least (22)** 12:6;14:5;17:11;

31:16;32:16;33:12; 103:20,24;105:1; 148:11;162:7;173:16; 179:6,17;192:25; 194:18;198:24;205:3; 209:18;216:14; 236:16;239:22
**leave (1)** 160:3
**leaves (1)** 252:14
**Leaving (3)** 115:21;116:3,13
**led (3)** 77:24;95:16;112:19
**left (7)** 101:6;131:16,25; 151:24;152:14;153:6, 14
**left-hand (1)** 107:23
**legal (14)** 14:3;31:20;86:1; 91:22;98:12;99:3; 105:10;123:15,17; 143:2;185:8;212:18; 220:10,15
**legally (4)** 119:6;122:25; 189:4;194:13
**legitimate (1)** 209:25
**legitimately (1)** 236:23
**less (4)** 134:14;142:18; 182:12;207:21
**lessons (1)** 44:19
**level (4)** 9:22;10:19;64:3; 150:18
**license (5)** 119:14;175:18; 177:6,8,8
**licensed (6)** 120:19;121:9,14; 228:7,11;254:5
**licensees (1)** 122:17
**licenses (5)** 174:7,12;175:18; 176:2;177:11
**licensing (1)** 243:16
**lies (1)** 144:16
**life (1)** 28:24
**light (1)** 241:25
**likelihood (7)** 175:1;207:1; 236:16;240:12;241:3; 243:24;245:15
**likely (27)** 97:21;164:8,18; 168:6;193:20;206:17, 19,23;207:1;210:8; 212:7;213:5,13; 215:4,4,16,17;217:22, 24;225:18;226:17; 237:9,14;239:4; 240:7,15;241:4
**liking (1)** 241:9
**limit (3)** 174:1,1;241:17
**limitations (1)** 54:8
**limited (12)** 104:18,19;145:18; 181:18;182:16; 187:15;192:6;202:14, 15;207:19;227:20; 247:24
**limiting (2)** 198:13;242:11
**limits (1)** 200:6
**line (1)** 126:7
**link (4)** 17:12;96:1,7; 105:21
**linkage (3)** 19:24;83:2,10
**linked (4)** 111:18,25;112:7; 234:6
**list (34)** 15:7,10,20;16:6,8; 18:2;21:9,17,25; 25:12;31:17;32:4,7,9, 13,17,20,22;33:2,17; 34:11,19;36:5,6;42:9; 47:3,5,7,9,16;48:2; 68:8;76:24;142:11
**listed (4)** 15:12;74:2;75:1; 124:3
**listing (1)** 18:17
**lists (2)** 25:19;31:25
**literally (3)** 171:6;201:13; 241:20
**literature (5)** 67:20,23;93:18; 219:16;241:18
**litigation (4)** 30:14;39:6,17; 167:12
**little (9)** 56:10,11;65:24; 73:12;75:5;85:2,4; 152:3;244:24
**live (1)** 241:24
**loading (1)** 28:20
**local (4)** 11:24,25;50:25; 51:2
**located (1)** 36:19
**location (1)** 148:6
**logical (5)** 164:1;167:16; 225:13,18;232:21
**Lombard (1)** 8:21
**long (2)** 229:25;241:21
**longer (6)** 177:8;195:16; 196:23;197:3;200:16; 240:1
**look (64)** 7:13,19;15:10,16; 16:7;18:3;21:8,21; 25:16;32:7,9,18; 33:19;48:6,20,24; 49:3;64:5;71:20;72:2; 73:24;82:2;84:12; 85:2;87:23;88:8;94:7; 107:3;111:9,10; 116:25;126:7;127:11; 131:1;135:20;136:9; 146:3;149:1;150:8, 12;152:16;156:5; 160:8,9;161:4; 163:20;165:14;166:7; 175:3,4,12,12;180:20; 203:13;212:2;222:13, 18;224:3;229:9; 231:6;233:25;242:10; 243:20;250:7
**look-back (3)** 196:6;200:16,17
**looked (20)** 7:15,17;18:8;48:2; 72:14;86:21;87:1,16, 19;88:11;107:4; 117:4;127:11,13; 146:18,25;158:23,23; 170:5;181:23
**Looking (48)** 15:7;19:6;22:4; 23:13;24:21;27:6; 32:13,20;34:11,19; 49:2,6;60:21;70:21; 71:22;83:13,20; 113:25;122:2;126:15; 128:10;130:5;132:9, 10;135:19;136:14; 137:16;140:14; 142:17;143:6;144:8; 146:12;148:9;149:19; 150:9;169:4;184:3,4; 193:6;203:18;222:7, 10;240:19;246:11,15, 23;247:12;250:16
**looks (4)** 21:13;33:20;41:11; 228:2
**Los (1)** 22:9
**lost (1)** 75:20
**lot (11)** 27:24;109:15; 121:13;145:21; 158:17;181:22; 210:13,19,24;218:15; 249:18
**lots (3)** 196:11;200:12; 254:7
**loud (1)** 171:16
**Louis (4)** 16:13;18:23;21:1; 87:14
**love (1)** 192:12
**low (2)** 144:6;187:7
**lower (5)** 144:19,19;148:23; 174:1;228:23
**Lunch (2)** 151:17,20
**lung (1)** 101:6

**M**

**magazine (1)** 44:12
**magazines (1)** 44:11
**magic (1)** 219:21
**mail (2)** 166:20,22
**mailing (1)** 166:11
**major (2)** 9:6;20:11
**majority (5)** 14:6,11,13;114:9; 170:25
**Makes (9)** 26:18;90:16; 112:25;116:17;150:4; 184:8;192:22;196:20; 226:10
**making (12)** 6:5;72:19;86:8,18; 114:21,21;115:12; 185:11;186:7;229:8; 251:18;253:13
**MALONEY (219)** 5:13;10:2;12:3,11; 14:10,24;15:14,15; 17:21;18:14;20:8; 22:24;24:11;26:6; 29:15,19;30:18; 35:19;36:4;37:5;38:4, 10;39:15;40:14;41:1; 42:14;43:1,23;45:6,8; 48:13,19;49:1,13,17; 50:3,8,11,23;51:11, 13,18,20;52:6,11,15, 23;53:4;54:1,21; 55:10;56:2,24;57:22; 58:5,13;59:13;63:3; 65:11;67:5,10;69:15; 70:4,10;73:22;74:10; 75:21;76:17,23;80:9, 21;84:8;86:4;88:2; 89:12,23;91:14;92:4, 14;94:2;95:14,24; 96:6,18;97:14;98:16; 99:9;100:1,12;102:6, 8;103:19;104:23; 105:6,15;106:1,19,23; 107:1,15;110:17; 112:15;118:2,10,13; 121:3;122:4;123:23; 125:1,18;127:6,21; 129:12;130:1,12; 133:25;134:3,5; 138:12,24;145:1,13, 20;146:2,17;147:21; 149:9;150:7;151:9, 19;153:11,12;157:1; 158:2;159:4,14; 160:7;162:17;163:2, 16;164:7;165:10; 167:15;168:13,21; 169:9;172:11;177:22; 178:6;179:2,15; 180:4;181:20;182:11, 22;183:7,15,24; 185:15;190:15; 191:20;192:2;194:23; 195:1;198:8;201:3; 203:7,9;204:14; 205:1,19;206:24; 210:20;211:1,7; 212:1;213:1,15,24; 214:8;215:24;216:6, 21;217:10;219:13; 220:1;221:22;223:24; 224:20;226:8;227:2, 16;230:10;232:24; 233:10,24;236:9; 237:2;238:1,21; 239:15;242:9;243:5; 245:9;247:19;248:3, 14,16;249:9,24;

250:6;251:21;252:16;253:4,10;254:9,16,22;255:4
**manufacture (1)** 17:1
**many (27)** 8:8;24:9;29:24,25;30:21,25;33:10;43:10;53:8;73:8;77:12;109:23;110:20;119:9;128:7;144:2;160:12,17;166:2;192:18;194:16;196:23;200:11,13;219:10;221:6,7
**mark (3)** 118:5;133:25;238:14
**marked (24)** 14:22;15:1;84:6,9;93:25;94:3;107:13,17;118:6;123:21,24;130:9,10;134:1;145:25;160:5;165:8,11;221:20,23;242:5,6;245:4;250:3
**market (9)** 91:25;94:21;122:16;123:7,12;124:6;150:23;151:4;250:2
**markets (4)** 119:12;120:7;123:3,15
**married (1)** 253:22
**Maryland (10)** 36:8;39:8,10,23;222:8;228:7;230:3,9;240:2;254:6
**mass (2)** 193:8;194:1
**master's (1)** 9:2
**material (1)** 175:4
**materials (11)** 46:19,25;47:3,13;48:2;49:14,18,22;50:12;68:24;142:9
**math (12)** 64:20,21;152:22;153:19;154:7;155:11,11;157:13;158:6;173:11;178:13;179:4
**matter (32)** 18:5;27:22;31:13;33:23;34:7;35:3;37:8,13;38:13;45:14;46:20;67:1;68:11,13;69:4;70:6;77:3;87:8;94:8;96:2;104:11,11;113:7;124:20;140:2;149:15;209:13;212:16;226:20;238:6;239:19;242:20
**matters (6)** 29:25;31:5,17,25;32:11,14
**maximum (1)** 204:20
**may (15)** 6:9;10:4,4;80:25;90:25;91:5;164:14;187:13,24;188:3,6;214:6,22;215:7;216:4
**maybe (9)** 31:2;44:15;63:4;69:19;139:19,20;154:15;155:10;218:17
**Md (1)** 36:8
**mean (92)** 20:9,10;24:17;36:5,9,16;37:21;56:13;58:12;72:15,17;73:23;79:7,17,21;80:11,12;81:17;82:21;83:5,7;87:21;89:8,9;91:24;95:19;104:17;109:9;113:13;117:16;120:14;121:4,12;122:5,22;124:10;129:2;133:8,8;137:19;145:6;147:8;149:7,17;154:24,25;155:6;157:17;159:12;163:25;164:1;167:16;169:18;172:24;173:15;177:2,7;178:12;180:5;186:19;188:12;189:14;191:1,15;194:12,17;198:6,15;199:6;201:7,21;202:7;207:14,18;209:11;213:6;214:9,15;215:12,14;218:14;220:20;226:14;230:22;234:25;235:6;236:3;237:12,13;241:1;243:10,14
**meaning (3)** 61:21;244:11;250:24
**meaningful (1)** 198:6
**meaningless (3)** 191:19;231:18;232:3
**means (20)** 14:12;70:1;75:11;109:20;138:22;142:23;168:7;180:3;182:15;184:23;209:8,25;210:1,9,13;220:5;236:2,12,15,19
**meant (1)** 236:20
**measurable (2)** 207:15,18
**measure (1)** 43:5
**measured (1)** 207:21
**measures (3)** 42:20;57:24;249:18
**medical (1)** 28:2
**meet (2)** 238:9,14
**meeting (1)** 8:11
**meetings (1)** 23:19
**member (2)** 42:11;71:11
**memory (14)** 7:2;8:5;29:23;32:14,16,21;42:9;87:18,24;122:2;133:11;142:16,17;159:19
**mentioned (7)** 26:7;65:18;66:6;81:22;206:8;214:13;216:19
**mentioning (1)** 229:14
**mere (2)** 81:9;99:7
**merely (4)** 57:19;80:24;128:6,7
**merited (1)** 229:13
**met (5)** 5:25;7:21,22;8:9;166:2
**method (8)** 24:6;148:1;150:13;151:1;169:11;172:2;199:25;211:11
**methodology (2)** 69:4;70:12
**methods (14)** 13:17;118:25;128:20;145:7,15;151:4;153:22,23;158:10;159:12;161:22;172:3;195:14;198:17
**metropolitan (1)** 192:25
**mid (1)** 44:15
**middle (13)** 74:2;78:5;89:25;97:2,5;114:4;123:2;130:20;137:5;150:11;153:14;176:15;243:21
**might (35)** 48:23,24;59:11;69:13,14;72:18;81:16,18;92:24;93:23;101:18;103:16;113:8;119:9;143:2;151:13;159:17;169:25;183:5;184:10;187:3,21;189:21;194:13;200:6;204:23;205:24;212:23;214:11,20;218:18,24;226:4;252:14;253:23
**million (7)** 131:20;159:23;197:20;201:11,13,25;209:17
**mind (7)** 52:14,16,24;79:21;87:22;149:23;178:19
**mine (2)** 44:9;241:21
**miniscule (4)** 121:19;173:13;174:5;187:3
**Minneapolis (6)** 50:25;51:3;97:5,19,22;193:1
**Minnesota (33)** 34:8,12,16;47:22;78:24;79:2,3;88:3,6,8,11;184:21;185:13;186:18,21,25;187:9;192:25;193:5,22;203:15,18,23;205:17;207:8,13;208:5,15;209:2;212:20,20;230:5,8
**minor (3)** 75:24;187:7;244:24
**minute (3)** 90:23;131:8;201:22
**mischaracterization (1)** 120:5
**mischaracterizes (18)** 18:12;42:22;57:15;76:14;105:23,24;165:4;181:11;186:22;193:14;194:6;204:18;205:8;216:17;227:7;233:15;236:5;254:12
**misconduct (2)** 176:21;185:10
**misinterpreted (3)** 19:17;119:24;120:1
**misleading (2)** 171:4;199:16
**misread (1)** 120:6
**misrepresent (1)** 188:22
**mistake (1)** 219:20
**mistaken (1)** 119:24
**mixed (1)** 142:20
**mm (1)** 218:13
**Model (1)** 239:3
**moment (1)** 151:16
**Monday (1)** 7:24
**money (1)** 186:3
**monthly (1)** 65:2
**more (85)** 10:12;12:15;18:16;21:15,21;30:2,3;32:3;42:16;45:23;46:14;49:21;63:19;69:19;78:8;79:6;82:11;86:24;88:19;101:8;102:12;103:8;115:8,16;122:7;123:5;133:20;134:14;141:10;142:3,7,18;145:6;147:16;158:12;172:6;173:5,16,18;174:14;179:8;180:8;181:6;182:13;188:6;196:13;199:21;206:17,19,23;207:1,6,14,24;208:2;210:8;212:7,24;213:13;215:2,3,16;218:18;219:12,22;220:3,4,5;224:9;227:3;230:18;233:5;234:20;237:9,22;239:4;240:7,15;241:4,9;246:4;248:18;252:22;253:7;254:7
**Moreover (2)** 234:2,5
**morning (2)** 5:14;45:10
**Mossberg (1)** 100:21
**most (26)** 13:17;20:20;26:25;31:3;41:10,22;42:24;43:3;44:8;88:14;94:17,20;108:5;126:16,18;141:23;143:7,21;159:9,13;161:7;199:11;204:20,21;220:25;254:4
**motion (1)** 40:17

**mouth (2)**
54:14;71:2
**move (3)**
154:16;163:24;176:9
**moved (1)**
247:11
**movement (1)**
122:15
**much (22)**
36:6;55:12;58:21;64:10;70:25;71:14;114:14,15;166:19;174:10;179:11;188:20;196:23,24,25;200:9;202:7;208:4,5;221:2;224:9;254:23
**multiple (62)**
30:19;74:19;76:6,12,20;77:6,10;136:19;141:20;153:5;212:4,6;213:11,17;214:4,20,22,22;215:3,11;217:3,5,14,15;218:5;220:6,6;222:23;223:11,17;224:10;227:1,4,14,21;228:12;229:10;230:21;231:8,9,13,20;233:1,21;234:6,14,14,21;235:20;236:25;237:4,5,14,22;239:1,4;240:7;247:12;251:12;252:2,9;254:10
**multiples (5)**
212:7;222:21;223:13;237:9;240:15
**multiple-sale (1)**
228:23
**multiple-sales (1)**
241:3
**multiplication (4)**
154:10;155:3,4;159:7
**multiplied (4)**
152:13;153:13;154:21;170:13
**multiplier (1)**
152:24
**multiplying (4)**
11:7;136:25;157:24;199:5
**must (1)**
75:12
**myself (1)**
10:22
**Mystery (1)**
156:19
**myth (3)**
19:8;23:21;24:24

## N

**name (7)**
5:18;66:6,13,15,18;142:13;251:1
**named (1)**
65:22
**names (3)**
8:3;38:24;65:19
**Napier (1)**
66:12
**narrow (3)**
190:20;224:9;227:13
**nation (1)**
161:5
**National (10)**
29:11,16;60:8;130:21;131:4;134:12;141:10;143:13;161:20;174:15
**nationally (1)**
167:2
**nations (1)**
27:12
**natural (1)**
186:4
**nature (5)**
6:20;39:19;41:19;51:12;243:25
**navigate (1)**
19:4
**NCVS (9)**
133:1,10;134:9;135:11,12;136:6;157:16;189:22;198:24
**near (1)**
65:8
**nearly (5)**
30:12;108:10;127:2;144:2;166:24
**necessarily (5)**
75:6;80:12;102:1;141:1;163:13
**necessary (1)**
80:14
**need (5)**
6:10;50:5;248:11;255:2,6
**needed (2)**
26:17;129:13
**negate (1)**
193:10
**negative (3)**
63:12;95:19;96:14
**negligence (1)**
185:11
**negligent (1)**
176:22
**negligently (1)**
176:17
**negligible (16)**
78:8;79:6;82:11;88:20;102:12;103:8;115:8,16,18;173:5,13;178:24;179:21,22;180:11;188:7
**neighborhood (1)**
97:23
**neutral (1)**
59:10
**new (13)**
27:15;33:24;34:3;39:1;70:5;71:21;149:15;156:21;159:19;202:12;247:21,24,25
**newest (2)**
117:15;119:18
**news (1)**
175:10
**next (24)**
16:2;23:19;36:9;38:11;39:8,22;69:16,17;101:2,7;111:23;131:7;136:9;150:22;160:11;161:6;166:23;170:23;171:18;172:12;221:16;226:9;245:10;250:13
**nice (2)**
50:22,24
**niche (1)**
187:16
**NICS (1)**
85:5
**night (1)**
154:7
**nine (2)**
26:12,14
**Ninety-nine (1)**
171:13
**nodding (1)**
6:18
**none (5)**
34:12;37:9;127:5;229:12;238:19
**nonincarcerated (1)**
141:5
**nonviolent (15)**
79:25;80:18,24;82:18,23;83:3,7,12,24;92:7,8,20;93:4;139:9;153:23
**nor (1)**
105:14
**northeast (4)**
245:15;246:20;247:11,25
**note (1)**
55:14
**notes (5)**
39:23;45:25;46:17;64:7;141:20
**noteworthy (3)**
222:24;223:11;224:2
**noticed (1)**
5:24
**notion (1)**
173:8
**NRA (4)**
39:2,4,5,6
**NSSF (15)**
62:3,25;63:14;213:8,25;214:14,21;216:19,22;218:4;219:16;224:5,18,22;238:8
**NSSF's (1)**
215:8
**nucleus (1)**
69:1
**number (198)**
11:7;29:23;56:14;92:22;95:2;97:18;102:11;104:18,19;108:8;112:20,21;114:1,15,15,16,24;126:11,22;128:3,16,16,19;129:6,11,14,15,17,25;130:24;132:16,20;133:15,16;134:7;135:7,8,10,13,16,19,23;136:4,9,14,15,16,16,19,21;137:6,7,14,15;143:5,10,13;144:5,19,19,23;145:3;146:13;147:1,18;148:23;151:24;152:4,5,13,18,23;153:6,9,14;154:3,17,18,22,23,25;155:14,16,17;156:1,6,8,11,18;157:6,8,16;158:18,24;159:12,25;160:16,17,20,23;161:13;162:12,19,21,25;163:3,3,7,8,11,13,14,17,21;164:8,9,14,21,24;165:1,2;167:7,12,25,25;168:6;169:4,15,18,22;170:21,22;171:21,22;172:4,6,9,13,19,24;173:3,20;174:24;178:23,24;179:5,11,17,18;181:24;182:25;187:5;190:8,10,18;191:3,8;192:3;195:6,10,12,13,20;196:14,17,19;198:10,13,16,17,20;200:17,22;201:10,11,13,25;202:1,22;203:3,23,24;205:7;208:9;209:8;219:6,17,23;220:8,12,18;228:23;234:8,16;235:13,18;237:15;241:17
**numbers (65)**
11:1,5,8;52:1;90:7;93:10,13;109:6,10,16;112:19,21;133:23;140:9,24;141:2;143:18;144:8;148:19,22;152:7,10,11;153:20;154:10,11,14;155:1,19,20,21;156:9,15,17,21;157:15;159:6,22,23;163:20;168:14,18;171:19,20,25;172:13,16;173:15;178:8;180:5;181:8;197:25;199:6;200:21;218:20;219:1;220:3;223:7,8;228:4;229:5;234:19;235:13,21;246:8
**numerator (4)**
191:14,17,21;192:10
**numerous (3)**
251:10;252:1,8

## O

**object (102)**
6:9;42:12;48:17,22;49:8;50:21;51:16;52:17;53:22;54:16;55:8;56:21;63:1;65:9;67:3,8;68:14;69:25;70:8;73:19;74:8;75:19;80:7;81:1;86:1;88:1;89:6,10,21;92:1;93:8;95:11;96:3,12;97:12;100:9;104:14;112:13;119:22;121:1,25;124:23;127:4,15;129:24;144:15;146:15;149:5;156:22;163:10;177:19;180:2;182:6;183:2,13;185:7;188:16;190:12;191:12,25;192:21;198:5;201:1;204:9;205:8,23;206:21;212:17;213:4,22;214:2,3;215:21;216:2;217:4,17;218:6;219:11;220:9;223:21;224:15,25;226:21;232:18;233:7,15;235:8;236:5;238:18;239:12;243:3;245:2;247:3,15,22;249:6,20;251:20;252:11;253:3;254:2,19
**objected (1)**

51:17
**Objection (109)**
9:25;12:2,8;14:8;17:19;18:12;20:4;22:22;24:8;26:4;29:13,17;30:15;35:16,23;36:24;38:2,6;39:11;40:12,22;42:22;43:18;48:11;50:7;51:14;52:3,8,13;53:2;55:23;56:5;57:15,25;58:11;59:6;69:6;70:24;76:14;80:19;91:11;95:18;98:12;99:3,20;103:15;105:3,10,23;106:15;110:11;125:14;129:8;138:10,14;143:19;145:10,17;147:19;150:3;151:7;157:25;158:8;159:2,8;162:24;164:5;165:3;167:9;168:11,19;169:7;172:7;173:22;176:5;178:4,25;179:9;181:11;182:18;183:17;186:22;193:13;194:5;199:23;204:18;208:24;209:14;210:18,22;211:3,23;214:25;216:17;219:19;220:23;225:24;226:6;227:7;229:18;230:6;235:23;236:18;237:16;241:15;245:23;249:11;251:23;254:12
**objects (2)**
6:11;89:17
**obliterated (9)**
234:7,15,19;235:12,14,15,18,21;237:15
**observation (2)**
10:6,7
**observed (1)**
247:10
**obtain (4)**
119:15;120:9;148:1;150:13
**obtained (5)**
148:6;150:14,19;151:3;184:23
**obtaining (1)**
151:5
**obvious (6)**
119:14;120:8;143:21;163:25;234:8;236:15
**obviously (1)**
186:25
**occasions (2)**
24:14;225:14
**occur (6)**
27:25;37:9;93:24;110:14;124:24;181:19
**occurred (3)**
62:15;102:17;194:9
**occurrence (2)**
37:3;104:6
**occurring (2)**
179:12;244:19
**occurs (5)**
19:22;24:15;110:13;208:5,6
**odd (2)**
89:7,11
**odds (1)**
204:15
**off (16)**
15:7;18:16;19:3;45:4;64:10;91:24;102:5;150:22;151:15;152:3;154:11,14;194:23;203:6;248:13;253:16
**offender (4)**
120:19;121:9,14;122:20
**Offenders (2)**
119:1;139:10
**offense (1)**
176:19
**offer (1)**
106:11
**offered (1)**
226:3
**officer (4)**
37:1;61:4;159:11;250:23
**official (5)**
10:16;11:20,21,22;208:1
**off-the-street (1)**
151:4
**Often (18)**
10:9;19:21;62:15;96:8;110:8,9,13,13,14;111:5,6;113:9;122:24;181:19;217:9;251:10,17;252:1
**Okey (1)**
254:24
**old (10)**
8:17;97:18;98:17;101:6,21;139:21;140:7;196:24;202:11;230:18
**older (3)**
196:12,24;222:11
**O'Malley (1)**
36:7
**once (7)**
30:19;33:12;88:4;91:4;131:11;194:9;234:22
**one (122)**
6:1;12:7;13:16;15:21;16:6;18:20;20:10;21:21;22:23;23:11,19,20;24:6;25:19;33:20;36:13;43:13,13;65:22;67:4;76:25;77:1;84:4;86:11;90:8,12,19;94:17;98:21;101:18;103:16,20,24;104:18;105:1,13,13,14,14;106:20;112:2,9,22;113:12;117:4;123:9,11;128:14;140:13;144:10;147:13,13,15;154:17,18;155:8;156:18;157:24;159:13,17;160:21;161:1;166:4,5;172:2;174:2;180:13,14;185:21;186:5,12;189:4;193:7,12,17;194:1,2,18;202:5,14;204:3,11;205:10,20,22,25,25;206:3,14;209:6;212:8,23,25;214:14;217:25;218:11,24,25;221:4;226:24;227:14;230:13;235:12;236:7;240:21;245:7;246:9,9,23,23;247:9,20;248:24;250:1;251:11,11;252:1,2,9,22;253:7;254:8
**one-firearm (4)**
251:12;252:2,9,10
**ones (3)**
18:7;47:11;126:24
**one-year (1)**
198:14
**only (58)**
30:17;32:4;38:3;39:12;48:15;55:25,25;56:22;66:14;67:18;82:4,13;93:7;96:13;100:5;106:17;109:7,11,16,25;111:1;112:2,9;113:12;116:23;117:24;118:10;122:2;126:23;139:2;140:19;141:2;144:23;145:18;154:15;162:8;164:2;168:4;172:4,8;173:8;186:5;191:22;194:8;200:7;203:3;209:20,24;216:13;218:10;220:14,20;226:24;227:12;241:24,24;247:17,21
**on-the-ground (1)**
230:4
**operates (1)**
20:7
**operations (5)**
177:14;220:21;221:1,3,9
**opining (3)**
82:4,13;223:19
**opinion (212)**
12:7;50:18,19;53:20;54:4,15,22;55:21;56:12,14,17,19;57:7;61:23;63:18;67:1;68:16,19,22;69:22,24;70:6,7,25;74:12,12,15,19,22;75:16,16;76:2,6,7,12,18,19;77:9,20,22,24;78:3,6,14;79:5,16,25;80:6;82:3,15,25;83:1,16;88:18;92:11,15,16,17,19;93:2;95:10,17;96:1,7,11;102:9,10;103:7,9,23;104:22,24,24;105:4,7,7,12,16,20,24;106:3,6,9,12;108:22,24;109:1,9;110:6,18;111:4;112:23;113:19,21,23,25;115:1,6,10,13;116:17;119:20;122:6,8;125:4,6;128:3,23;129:13;130:2,4,5;133:15,18;139:24;149:2;150:2;154:2,24;159:22,24;171:5;172:23;173:4,12,21,24;177:18;178:12,12;179:17;180:21,23;181:5,6,7,17;182:3,14,23,24;183:11,25;184:5,7,13,15,15;185:1,3,6;186:16;187:23;189:8;190:5;191:2,7,8,11;192:16;193:14;194:6;202:22;204:17;205:6;206:11,14,16,25;207:11;211:9;212:9,13,16;213:2;214:21;215:11,25;217:2;218:3;219:9,18;220:2,7;223:3,8,9;224:1,13;226:3,7,19,23,24;227:9,17;229:2,10;233:11;235:19;236:10,13;237:4;238:7;239:11;244:7;245:22;248:25;249:17,22;251:22;252:12
**opinions (22)**
54:10;67:2,6;68:6,8,12;70:12,19,20;74:2,4,6,25;75:3;121:22;167:8,18;168:10;175:13;184:17;206:10;224:16
**opposed (4)**
129:5;183:11;199:20;241:7
**opposing (3)**
196:8,8;202:17
**oranges (1)**
198:7
**order (4)**
160:16;183:22;255:2,13
**Oregon (3)**
41:7,8,14
**organization (5)**
38:17;39:9;41:15;57:19;135:1
**organizational (1)**
56:9
**organizations (1)**
38:20
**organization's (1)**
38:23
**organized (7)**
16:16;17:6,8;22:7;23:15;75:10;77:15
**Originally (1)**
43:21
**originated (1)**
247:25
**originating (2)**
245:12,14
**others (4)**
187:20;188:3,19;249:15
**other's (1)**
77:23
**otherwise (2)**
70:17;184:13
**ought (1)**
237:22
**out (43)**
5:22;8:6;22:12;24:16;32:17;33:19;45:1;55:16;69:8;92:20;93:4;95:12;110:9;112:17;124:17;128:15;133:22;149:15;154:7;156:2;157:12;158:14;167:10;171:16;175:10;199:18;200:21;201:22;213:17;214:24;218:1;220:12;222:24;224:3;232:20,23;234:17;

235:4,5;236:8;
238:10;239:19;
241:18
**outcomes (5)**
176:1,4;177:16,24;
178:7
**outlined (1)**
63:21
**outside (2)**
51:18;244:19
**outstanding (1)**
134:24
**over (12)**
5:20;6:5;30:1;
64:14,21;137:4;
194:21;207:15;
209:17;234:6;253:25;
254:6
**overall (5)**
113:19;163:8;
173:3;179:7;202:20
**over-inclusive (1)**
202:3
**overinterpretation (1)**
19:9
**overinterpreted (1)**
19:17
**overlapping (2)**
25:7;36:17
**over-representative (1)**
202:3
**overstatement (1)**
171:17
**overview (2)**
9:23;13:14
**own (15)**
7:14;10:25;11:2,10,
17;43:8,10,17;128:7;
181:14;186:3;237:21;
241:2;249:14;254:15
**owned (1)**
44:2
**owners (1)**
41:15
**ownership (3)**
12:19;27:1,11

## P

**page (113)**
15:16,20;16:2,13;
19:5,6,7;21:8,13,13;
22:6;23:13;25:15;
27:6,8,9,10;31:19;
41:6;47:4,6,23;48:3;
64:5;68:7;74:3;78:4,
5;84:5;85:2;88:15;
89:24;94:7,13;95:5,6;
101:2;102:10,10;
107:19,22;111:10;
114:4;115:6,19,20,20;
118:4;125:19;127:23,
24;130:6,20;131:2,6,
6,13;132:11,16;
135:20;137:5;141:9;
142:9;143:5;147:22;
150:11;152:16;
154:17,17;160:9,11,
11;161:4;164:17;
165:14,19;166:8;
170:5;174:6;176:15;
180:20;184:16;185:1;
189:6,7;195:2;
197:12;203:2,14;
208:17;212:2,9;
218:22;221:16;222:1,
2,14;226:9;228:3,5;
231:1,2,2;234:1;
238:22;239:6;243:21,
23;245:11;250:7,13,
13;251:7
**pages (9)**
16:7;21:5,22;31:18;
32:13;33:17;34:11;
107:8;250:17
**paid (4)**
64:11;65:7,7;
123:16
**paper (2)**
22:5;133:22
**papers (3)**
15:5;21:23;22:1
**paragraph (71)**
85:6;89:25;90:3;
94:13,15;95:4,9,25;
96:23;97:3,15;98:20;
99:10,22;100:6,8,11,
21;101:2;108:1;
109:6;111:12,12;
113:24;115:20;116:7,
9;119:4;131:1,19;
132:2,3,4,9,10,11;
137:5;141:9;148:2;
156:14;165:20;
166:10,23;174:6;
177:10;189:7,7,9,24;
191:2;192:17;195:9;
197:12,18;203:2,14;
208:18;212:2;218:23;
222:18;228:6,18;
234:1;238:24;245:11;
247:17;251:6,7,9;
252:17,24
**paragraphs (3)**
102:22,24;240:22
**parameters (1)**
59:8
**parentheses (1)**
168:3
**parenthesis (1)**
90:11
**Park (4)**
37:13;38:8;100:23;
101:9
**parse (1)**
235:4
**part (31)**
11:14;13:18;17:5,9,
11;20:20;25:24;
42:24;43:3;47:1;
54:10,25;58:23;
59:17;77:13,13;
90:10;96:16;115:7;
123:8;128:15;160:20;
161:1,21;167:13;
179:10;215:5;217:23;
228:12;246:22,25
**partial (1)**
31:17
**Partially (2)**
22:18;198:24
**participants (1)**
216:3
**participate (1)**
69:11
**particular (11)**
10:22;54:7;60:17;
68:17;79:23;104:18;
143:1;146:11;218:9;
226:2;246:1
**particularly (3)**
57:17;74:11;224:11
**parties (2)**
35:17,20
**partly (2)**
158:9;253:12
**parts (2)**
43:2;188:3
**party (6)**
34:20;39:16;40:20;
41:3;59:9,10
**pass (1)**
122:25
**passage (4)**
145:8,16;244:13,23
**passed (4)**
85:25;246:18;
247:9,14
**past (13)**
31:23;38:20;42:4;
54:10;62:21;70:3;
72:5;159:15,17;
196:13,25,25;200:24
**pathway (2)**
126:17,18
**pathways (1)**
125:23
**pattern (6)**
71:6;226:13,15,16;
227:6,19
**Patterns (2)**
130:15;227:23
**Paul (2)**
100:23;101:4
**pawn (1)**
166:11
**pay (2)**
189:4;235:10
**peculiar (1)**
211:17
**Peer-Reviewed (2)**
16:3;21:5
**pending (1)**
182:19
**penetrated (1)**
101:6
**people (23)**
28:3;86:12;88:14;
91:16,19;101:5,20;
157:21;158:4;182:9;
186:7;187:17,18;
188:23;189:3;206:23;
209:8;210:2;211:17;
213:7;218:2;220:12;
251:25
**people's (1)**
13:21
**per (19)**
64:8;108:8;132:13;
133:12;136:1;157:9;
158:24;159:25;
160:17;161:10,15;
162:22,22;170:9;
173:17;195:15;198:1;
200:23;201:12
**perceive (3)**
222:22;223:10;
224:2
**percent (94)**
14:14;90:8,12,19;
111:25;112:2,7,9;
113:12;119:9;120:3,
17;121:6,6,7,16,18;
126:11;128:17;
132:23,25;133:5,12;
137:2,2,10;143:11,15;
144:5;145:3,6;
146:13,13;147:2,14,
17;148:3,3,4,5,12,13,
16,16,17,17,18,18,20,
20,23;150:19,24;
152:4,5,18,23;153:3,
3;154:12,14;161:8,
14;170:12,17;171:10,
13;172:17,20,21,21,
23,24;179:7;195:20;
196:1;197:22;199:19;
201:10,25;203:25;
207:7,24;223:13;
228:12,21,23;234:7;
239:2;244:4,10,11;
245:19;246:2
**percentage (16)**
112:21;120:24;
126:21;128:4;136:19;
137:1,17;143:6;
152:11;172:16,20;
179:1,7;189:25;
190:18;207:21
**percentages (7)**
152:2;157:6;
173:25;174:2;183:18;
208:6;228:19
**perfectly (2)**
111:24;174:4
**perhaps (3)**
38:9;187:7;189:3
**period (28)**
28:16;34:10;
131:23;135:11;
140:15;162:22,23;
163:14;179:25;
195:16;196:18,23;
197:24;198:14;
199:21;228:8,11,20;
229:25;246:9,23;
251:13;252:3,10,23;
253:8;254:6,8
**periodically (1)**
141:21
**periods (4)**
123:5;157:18;
158:5,15
**permit (3)**
97:6;98:23;199:25
**person (25)**
81:6,18,19,22,24;
82:1;84:23;85:10,10,
12,22,24;91:5,5,12,
15,16;92:3;98:7,14;
99:12,23;100:4;
217:7,11
**personal (2)**
131:22;210:6
**personally (1)**
136:12
**personnel (2)**
58:15;225:12
**persons (4)**
71:18;140:19;
199:2;208:18
**pertain (5)**
69:12;70:17;120:3;
191:18;192:13
**pertained (1)**
179:13
**pertaining (4)**
111:1;135:10;
147:7;241:19
**pertains (6)**
74:16;104:4;
106:17;180:16;
191:15;246:9
**pertinent (1)**
167:24
**per-year (1)**
198:1
**PhD (10)**
9:3,10,11,15,16;
12:12,18,24;28:11;
30:8
**phenomenons (1)**
10:10
**Phillips (2)**
101:2,18

**phonetic (1)** 249:3
**phrase (3)** 54:18;80:2,15
**phrased (1)** 231:16
**phrasing (1)** 234:23
**physically (1)** 81:19
**pick (1)** 112:19
**piece (7)** 24:16;25:10;133:22;181:21,22;188:8;228:18
**Pistol (14)** 33:24;38:11,14,15,21,25;39:1;43:14;44:10,15;97:16;101:3,22;102:2
**place (3)** 76:13;193:20;194:11
**placeholder (1)** 118:1
**plaintiff (5)** 34:24;35:12;36:10;37:17,18
**plaintiffs (1)** 35:9
**Plaintiff's (14)** 14:22;84:6;93:25;107:13;118:6;123:21;130:10;134:1;145:25;160:5;165:8;221:20;242:6;250:3
**planet (2)** 135:2;142:21
**plans (2)** 156:20;157:2
**plausible (3)** 143:21;159:9;218:24
**play (2)** 20:2;104:25
**plays (1)** 20:5
**Please (8)** 5:2,17;52:5;102:19;153:10;164:6;167:14;190:24
**plug (1)** 162:12
**plural (1)** 103:18
**pm (9)** 151:17,18;194:25,25;203:8,8;248:15,15;255:15
**point (40)** 16:12;17:1,1;22:4;28:24;36:13;74:4;88:17;93:16;95:15;106:5,11;112:25;113:4,5;114:21;118:11;123:9;127:18;133:3;139:21;156:17;158:14;166:4;167:10;168:18;172:24;202:20,23;203:1;206:2;207:22;219:16,21;224:9;229:8;232:21;234:13;237:18;248:2
**pointed (3)** 22:12;23:14;107:5
**pointing (5)** 95:12;190:17;200:22;232:20,23
**points (2)** 72:18;214:18
**police (13)** 37:1;81:6;97:5,24;98:22;99:11;100:7;119:11;120:4,17;159:11;208:3;222:7
**policies (1)** 243:16
**policy (9)** 174:22,23;175:4,6,7,11,16,24,25
**policy-makers (1)** 244:20
**pool (7)** 198:11;200:6,9;201:24;202:2,4,13
**pools (3)** 157:21;158:4,14
**poor (1)** 125:7
**population (4)** 10:21;106:5,14;139:5
**portion (4)** 52:7;118:22;122:3;250:25
**portions (1)** 96:19
**position (7)** 35:9;37:16,18;58:19;62:8;245:6;246:16
**possess (1)** 100:5
**possessed (2)** 101:17;235:14
**possession (10)** 81:5,9;89:18;97:6;98:22;99:7,12;100:15,16,18
**possibility (4)** 146:4;164:13;176:7;218:20
**possible (17)** 33:1;34:15;40:8,9,24;41:2;44:7;73:2,5;145:14;151:8;154:17,20,21;213:3;217:16;227:11
**Possibly (10)** 14:11,15;60:4;72:17;108:20;118:21;121:19;159:21;193:24;236:21
**potential (16)** 231:9,16,17,21;232:2,4,7,22;233:3;234:8,23;235:2,25;236:2,11,15
**potentially (1)** 86:11
**practical (2)** 9:23;216:10
**practices (1)** 175:20
**preceding (3)** 195:18,24;202:16
**precise (3)** 30:2;86:24;142:7
**precisely (3)** 183:22;188:24;254:20
**precision (3)** 27:3;207:20;208:11
**preconceived (2)** 69:24;70:1
**predetermined (1)** 243:12
**predict (3)** 61:21;105:21;194:3
**predictive (1)** 105:16
**preexisting (1)** 11:3
**prefer (1)** 221:2
**preferred (2)** 240:4,21
**premises (1)** 174:25
**premium (2)** 123:11,13
**prep (1)** 65:3
**preparation (1)** 64:18
**prepare (2)** 7:9;8:13
**prepared (2)** 64:17;149:12
**preparing (6)** 47:2;48:4;49:19;52:20;88:9;149:22
**prescribed (2)** 119:15;120:8
**presence (1)** 95:8
**present (3)** 61:8,12;225:22
**presentation (11)** 22:19,25;23:9,14,24;24:22;25:2;77:7,9,20,25
**presentations (2)** 24:20;25:12
**presented (4)** 15:5;21:23,25;22:5
**press (2)** 175:10;221:5
**presumably (6)** 100:4;101:17;175:1;193:4;221:9;225:6
**Pretty (5)** 9:13;142:6;149:21;174:3;179:1
**prevalence (1)** 19:21
**prevalent (2)** 94:17;96:16
**prevent (7)** 57:24;58:10,18;59:2;64:2;243:8;249:2
**preventing (4)** 57:4,14;68:1;216:11
**previous (5)** 73:25;75:23;84:19;196:2;219:6
**previously (13)** 59:23;64:16;69:14,22;73:8;76:7;94:10;122:13,13;190:4;216:13;224:21;250:2
**price (1)** 123:17
**primarily (1)** 43:19
**primary (2)** 14:1;66:9
**principle (2)** 16:22;158:9
**print (1)** 231:19
**prior (23)** 34:10;61:10;65:25;66:4;68:23;69:24;70:7;74:12,22;87:10,13;99:12;108:15,18,23;116:9;122:24;137:20;166:10;195:9;216:17;244:3;245:18
**priorities (1)** 56:6
**prison (7)** 138:16;139:5;143:22;146:5,23;147:12;158:15
**prisoners (11)** 138:25;139:2;142:24;148:4,5,11,13,20,21;150:18;151:1
**private (2)** 119:12;209:17
**probability (1)** 141:22
**Probably (18)** 31:1,14;39:18;53:10;76:22;78:1,2;82:15;99:22;108:21;142:25;149:11,11;167:16;199:10;202:15;207:20;242:25
**problem (6)** 54:14,19;55:19;200:5;214:20;247:1
**Proceedings (1)** 5:1
**process (3)** 139:12;148:1;149:14
**produce (1)** 244:12
**produced (4)** 127:17,19;167:11,13
**product (7)** 49:9,25;51:12,13,17;52:18,25
**Professor (28)** 5:14;7:8;8:17;13:8,10,13,25;15:17;28:15,25;29:20;30:10;43:8;45:9;49:10;53:18;84:13;92:10;107:2;118:14;134:6;151:20;155:11;156:20;163:24;203:10;248:17;254:23
**professorship (1)** 26:8
**proffer (1)** 106:6
**program (4)** 9:15,16;12:12;28:11
**prohibit (1)** 87:1
**prohibited (4)** 81:6;85:12,24;99:12
**projects (1)** 135:4
**property (1)** 131:21
**propose (1)** 200:5
**proposition (5)** 24:2;197:2;233:1,5,9
**propositions (1)** 10:4

**protected (1)**
50:1
**protective (1)**
255:13
**provide (3)**
48:8;50:16;135:16
**provided (3)**
48:25;50:25;101:14
**provides (1)**
140:4
**providing (2)**
36:21;109:10
**Public (10)**
16:14;18:23;21:2;81:10,11;97:5,22;171:11;175:9;220:19
**publication (3)**
15:12;75:2;107:6
**publications (16)**
14:4,6,18;15:5,8,17;18:2,3;27:16;60:10;75:4;141:21;197:7;211:5;216:19;224:4
**published (14)**
15:22;21:9;26:25;27:2,19;35:25;71:25;75:1,9;76:18,21;108:21;124:11;243:1
**pull (4)**
111:9;132:16;155:6;159:6
**pulled (3)**
137:8;147:17;172:4
**pulling (3)**
168:15;203:17;228:15
**punishment (2)**
12:20;14:3
**purchase (48)**
18:24;58:6;61:16,23,25;62:15,24;68:4;79:8,13,22;83:11;89:4;90:17;91:7,9;101:12;108:9;109:6;119:6;121:8;122:19,20,20;169:2,14;185:22;186:4,6;187:4;207:1;211:22;212:23;213:3,18;214:23;215:5,18;216:15;217:16,23;224:10;225:5;231:8;251:10;252:1,22;253:7
**purchased (81)**
88:20;89:2,14;90:19;91:3;96:8,21;97:11;98:3;99:2,18;100:19;101:20;105:22;106:7,14,17;109:11,23;110:8,20;111:5;112:1,8;120:18,24;121:5,8,12,14,17;128:5,8;129:7;144:24;151:5,12;160:13,15,23;163:9,12,14,15,22;164:3,9,10;170:22;171:22;172:10,18;173:10;180:17;183:19;185:19,20,24;186:2,9,13;187:5;191:17;192:13,23;193:18;204:11,24;205:12;206:12;207:11,16;208:19;218:10;219:17;244:1,3;245:17,18;252:20;254:7
**purchaser (3)**
91:13,17;126:8
**purchasers (19)**
68:20;84:20;108:2,4,7;119:12;176:18;188:22;209:12;210:4,8;212:24;218:12;227:12;251:10,17,25;252:8;253:21
**purchases (81)**
20:12;61:22;71:14;73:13;75:6,13;78:4,7,10;79:5;82:10;83:2,17;84:2;91:4;95:21;102:11;103:5,8;110:13,15;113:9;115:7;119:9;122:17,19;126:16;158:20;164:18;167:1,2,22,22,25;168:2,18,24,25;169:4,5,5,16,19,22;173:4,17;178:14,16,21,23;179:5,12,19,25;180:8,11,24;181:3,9,17;182:9;184:12,18;185:12;186:7,17,19;187:11,24;190:9,19;191:9;193:22;209:3;212:22;214:4,22;218:4,24;242:12;251:18
**purchasing (119)**
15:9,25;16:9;17:4,5,9,12,18,23;19:4,12,19;20:2,14;21:6,11,19;22:2,5,20;23:1,2,4,8,9,18,25;24:4,6,12,17,21;25:9,13;28:6;31:13;32:9,18;34:3;54:23,24;55:3,19;56:8,10;57:9,14,24;58:3,10,18,22;59:2;60:23;61:3,8,12;62:19;64:3;68:1;71:10;73:9;75:18;76:3;78:19;79:17;83:11;86:15;87:2,6,21;88:5;94:19;96:16;108:5;109:20;110:9;111:18,20,22;112:3,10;113:7,13;116:22;119:21;126:9;127:2,3;160:18;161:10,11;162:19,22;163:1;170:13;172:2;173:2;176:22;178:1;184:24;187:20;188:5,20;209:7,20,22;210:16;214:5;217:14,15;225:8;226:13,14,20;227:6,19,23;252:8
**purchasing' (1)**
94:17
**purely (2)**
218:19;232:20
**purported (2)**
17:5;62:18
**purpose (4)**
44:9;52:23;114:20;116:21
**purposes (9)**
10:24;12:10;43:20;52:14,16;71:20;87:7;171:17;172:5
**pursue (2)**
210:9;255:13
**pursued (1)**
177:24
**put (19)**
54:13;73:23;84:4;87:15;88:16;92:5;143:2;151:14;155:24;156:16;157:4;164:25;170:4;171:15;178:11;188:8;217:20;241:7;242:4
**puts (1)**
213:17

**Q**

**qualifications (1)**
53:19
**qualified (2)**
217:2,5
**qualifies (2)**
53:20;54:5
**qualifying (1)**
168:3
**quality (2)**
13:22,22
**quarter (1)**
150:19
**quickly (1)**
239:22
**quite (4)**
14:4;201:20;215:22;220:25
**quote (1)**
165:20
**quoting (1)**
76:12

**R**

**raced (1)**
97:23
**raise (1)**
5:2
**raised (2)**
8:19,20
**raises (1)**
236:16
**random (2)**
233:5,8
**range (4)**
45:3;112:21;153:7,15
**rapes (1)**
189:16
**rapid (1)**
231:8
**rare (5)**
24:14;104:6;176:24;225:14;234:20
**rarely (4)**
74:20;77:10;212:5;221:8
**rarer (1)**
104:8
**rate (6)**
12:20;169:14;207:20,21;208:12;209:10
**rates (9)**
12:19;22:7;23:15;27:1,1,11,12;166:9,24
**rather (14)**
93:8;147:7;189:2;207:25;208:2;212:6;220:16;237:7,7;238:6;243:18;244:19;246:2,10
**ratio (7)**
137:3;152:12,13,17,18,23;191:19
**rational (3)**
213:6,10,12
**ratios (3)**
153:6,14;157:6
**raw (3)**
126:22;163:3;208:7
**reach (9)**
70:6,20;129:15;157:16;159:24;160:16;195:19,20;197:21
**reached (4)**
26:16;70:23;161:13;181:9
**reaches (2)**
115:18;219:23
**reaching (2)**
55:16;70:12
**reacting (1)**
187:19
**read (48)**
17:24,25;35:25;47:15;52:6,7;70:13;72:4;73:8;90:9;94:10;102:16,16,20;109:6;111:11;117:12;118:19;122:5;124:10;125:15,16;132:6,17;148:9;166:2;174:13;175:11,17;176:16;185:16;195:20;223:4,7;224:1;229:11;231:7;232:13,13;238:24;241:25;242:18,19,22;247:20;250:19;254:20,25
**reader (1)**
252:14
**Reading (17)**
57:10;69:7,20;73:11;80:16;100:5;102:24;104:10;167:20;185:9;204:21;211:4,5;212:19;234:10;237:3;239:8
**reads (13)**
78:4;90:6;94:15;97:16;101:7;176:25;184:15;185:1;212:3,9;245:14;251:9;252:19
**real (4)**
193:16,16,17;207:25
**realistic (2)**
112:23,25
**reality (1)**
113:3
**realization (1)**
211:18
**realized (1)**
168:5
**really (36)**
14:15;17:7;25:10;32:11;34:4;36:19;38:3,16;44:16;55:20;60:16;80:2,11;82:22;89:8;98:14;104:21;105:8;108:20;149:7;156:24;158:19,21,21;186:3;209:19,22;215:23;225:10;234:20;235:4,6;236:24;238:16;243:18;246:8
**realm (2)**
182:8,12
**reason (22)**

7:5;50:15;80:5;83:14;87:22;135:22;144:9;188:25;201:8;209:10;210:3;213:6,8;222:22;223:16;230:20;231:25;232:16;233:19;235:13;237:21;251:19
**reasonable (2)** 85:11,23
**reasoning (1)** 64:24
**reasons (3)** 43:22;214:14;246:3
**rebuttal (6)** 7:11,14;66:7,25;127:20;167:13
**rebuttals (1)** 27:25
**recall (42)** 7:22;17:3;18:7,17;23:18,24;32:11;34:5;38:13,23;39:19;40:2,15;41:17,19,25;46:8;48:7;57:2;60:4,6;65:19;72:24;73:21;76:24;78:2;80:8;87:12,20;102:24;108:20;118:19;125:2;133:7;159:16,17;197:17;205:25;234:10;237:11;239:8;243:2
**receive (3)** 50:13,15;187:18
**received (5)** 12:24;25:24;26:2;53:16;216:7
**recent (12)** 26:25;41:22;122:7;141:10,23;142:1,2,3;145:6;147:16;161:7;174:14
**recently (2)** 44:8;143:7
**recipient (4)** 91:2,6,8,12
**recipients (1)** 184:22
**recognizing (1)** 68:4
**recollect (1)** 149:11
**record (19)** 5:18;6:2,5;16:15;18:13;45:4,10;55:15;57:16;102:5;123:4;151:15;154:5;155:19;194:23;203:6;248:13;255:10,11
**records (3)** 123:4;126:4;161:25
**recovered (5)** 200:14;228:22,24;239:24;243:24
**recoveries (1)** 222:7
**recreational (1)** 43:19
**reduce (2)** 9:21;201:24
**reduced (5)** 244:3,9,11;245:19;246:2
**reduction (1)** 246:20
**redundant (1)** 82:24
**refer (5)** 89:7,8;168:23,24;171:25
**reference (5)** 120:12,12;175:4,23;248:4
**referenced (3)** 226:12;227:5,18
**references (2)** 18:20;142:12
**referencing (9)** 92:17;116:1,4,6,15;175:22;190:5;219:5;227:3
**referred (1)** 231:9
**referring (10)** 15:11;92:13,22;121:12;130:24;147:5;190:13;218:24;247:17;248:20
**refers (2)** 68:19;168:24
**reflect (4)** 156:9,21;168:4;205:21
**reflected (2)** 178:1;207:2
**reflection (1)** 208:1
**reflective (1)** 113:2
**refresh (2)** 32:14;87:23
**refute (1)** 248:9
**regard (4)** 35:17;93:6;99:21;223:17
**regarded (2)** 24:9;226:17
**regarding (10)** 19:17;35:13,22;37:25;40:21;51:21;56:13;87:6;178:1;235:24
**Regardless (4)** 67:13;144:21;211:21;254:14
**regards (3)** 25:8;192:20;209:11
**registration (1)** 243:17
**regulate (1)** 57:21
**regulates (1)** 214:16
**regulation (3)** 38:1,8,9
**regulations (1)** 42:20
**regulatory (4)** 174:22;175:7,16;214:17
**reinforce (1)** 149:24
**rejected (1)** 127:11
**relate (1)** 70:14
**related (3)** 28:1;50:1;225:4
**relates (1)** 96:11
**relation (1)** 215:9
**relative (5)** 44:11;75:15;208:4;243:25;245:16
**relatively (3)** 75:24;108:9;209:24
**release (2)** 175:10,10
**releases (1)** 221:5
**relevance (6)** 51:15,16;105:8;218:8;220:7;233:11
**relevant (26)** 13:22;35:18,21;36:3;50:3;69:14;78:9;83:16;95:21;96:15;124:25;184:9,11;185:6,10;193:1;212:16;229:13;235:21,25;239:11,13;241:2,12,13;243:14
**reliability (1)** 208:12
**reliable (10)** 63:17;78:9;83:16;134:23;140:1,2;142:18;159:13;184:8,11
**reliably (1)** 145:12
**reliance (1)** 142:9
**relied (3)** 47:9;126:2;135:3
**relies (1)** 129:2
**reload (2)** 44:6,10
**reluctant (2)** 142:15;143:23
**rely (5)** 10:8;47:13;142:16;165:6;238:19
**relying (3)** 152:7;228:2;229:4
**remaining (1)** 121:6
**remains (1)** 184:14
**remark (1)** 168:3
**remember (7)** 35:5;38:16;40:7,10,18;41:2;48:5
**remind (1)** 11:18
**remotely (1)** 219:2
**render (2)** 50:19;105:20
**rendered (3)** 95:10,17;106:9
**rendering (1)** 221:13
**repeat (10)** 52:5;61:9;102:19;109:13;111:13;146:16;164:6;167:14;190:24;223:13
**repeating (1)** 246:1
**replaced (2)** 115:5,6
**report (210)** 7:10,11,14,14,16;11:2,4,11,14;18:10,18,19;31:19;46:2,12,16,24;47:2,4,10,12;48:4;49:19,22;50:2,2,6,20;51:23;52:2,21,24;53:5,6,9;59:9;61:6,10,15;64:5;65:17;66:7,9,14,18,21,25;67:14;68:7;69:5,18;70:16;72:7,8,9,11,15,17,19,23;74:3;75:17;77:19;86:19;88:9,15;92:7;93:16;95:2,5;96:14;102:10;104:16;105:24;107:8,9;108:15,24;109:2,5,15;110:25;111:10;115:12,19;116:11,15,17,25;121:24;123:16;127:20,22,25;128:2;130:14,18,22,25;132:10,11,22;133:2,2,4;135:16;136:8;141:9,10;142:10;143:5;146:21,25;147:1,4,22;148:10;149:1,2,12,15,19,21,22;150:2;152:8,10,16,18;153:1,5,13;154:9,25;156:1,10,11,16,21;157:12;160:8,9;161:15,17,18,24;162:1,2,5,7,10,11,18,21;163:6,18;164:14;166:4;167:23;168:15;175:13,17,22;176:11;178:8;181:12;185:1;189:12,15;200:15;203:11;204:19;205:9,21;206:2;207:3;212:10;214:13;218:7;221:17;222:4,13,15;223:12;225:25;226:1;227:8,24;228:3,5;229:14;231:13;232:11,17;233:14,16,18;234:11;235:7,22;236:1,3,6;240:23;241:12,20;247:23;248:5,10;254:13
**reported (3)** 120:20;148:5;223:12
**reporter (3)** 5:25;6:14,19
**reporting (3)** 11:25;208:3;229:14
**reports (9)** 66:23;111:14,16;120:16;154:19;168:15;174:13,15;241:25
**represent (2)** 53:12;251:4
**representative (5)** 110:3,5;114:24;126:25;134:16
**representatives (1)** 139:6
**represents (1)** 196:1
**request (1)** 55:13
**requested (1)** 52:7
**require (1)** 188:20
**requirements (1)** 85:15
**reran (1)** 154:9
**reread (3)** 7:10,10;232:10
**research (37)**

9:24,24;10:1;11:2, 3;13:17,21,24;25:16, 23;26:2,21,23,25; 27:18,19,21;28:22; 36:1;43:22,24;44:8, 17;63:7;69:13;70:3; 71:6;77:19,21,24; 135:4;231:6;243:9, 11;248:12;249:14,15
**researcher (1)** 169:3
**Researchers (5)** 125:9;138:22; 166:8,23;246:7
**researching (1)** 44:1
**resources (5)** 18:17;58:15,17,21; 59:2
**respect (3)** 62:18;182:9;210:5
**responding (1)** 27:20
**response (3)** 6:21;55:15;217:18
**responsibility (1)** 86:7
**responsible (1)** 221:6
**rest (2)** 95:20;96:14
**result (7)** 95:22;169:2; 175:25;244:12,18,22; 246:14
**resulted (1)** 36:15
**resulting (3)** 157:7;172:16,20
**results (1)** 241:7
**retail (5)** 17:2;28:25;64:3; 200:13;248:2
**retailer (3)** 58:17;63:24;64:2
**retailers (3)** 58:10;59:1;168:5
**retailing (1)** 29:3
**retained (24)** 18:4;31:3,8;34:7, 21;36:10;37:13; 38:13,20,24;39:6,16; 42:5;45:13;46:5; 68:10;74:13;94:11; 102:25;108:16; 124:20;127:8;149:14; 242:19
**retention (1)** 46:9
**retire (2)** 26:10,15
**retired (4)** 13:3,3;26:8,24
**reveals (1)** 239:1
**Review (29)** 16:14;18:23;19:5, 10;20:24;21:2;22:14, 16,20;23:5;24:22; 42:4;66:9,21,23; 68:11;69:13;73:6; 86:18;87:14;92:11; 108:23;124:16,19; 127:7;212:15;213:21; 216:25;219:15
**reviewed (5)** 48:3;102:25;125:3; 234:10;239:9
**reviewing (6)** 8:11;46:19,24;47:3; 68:13;69:4
**revocation (7)** 174:11,17;175:20; 176:20,23;177:7,18
**revocations (4)** 174:7;176:1,12; 178:2
**revoke (1)** 177:5
**revolver (2)** 43:13;44:14
**Rifle (8)** 29:11;33:24;38:11, 14,15,21,25;39:1
**right (288)** 5:2,14;7:8;11:17; 12:13;15:22;16:18; 17:13;18:11;20:17; 22:9;23:16;25:21; 27:9,13,18;30:8; 31:25;32:5,18;33:21; 34:1;37:9;39:6,25; 41:12;42:21;45:9; 46:25;47:16;54:24; 55:4;56:15;57:1,5; 58:6;59:15,25;63:24; 64:3,8,18;68:8;70:15; 73:4,21;75:18;77:4; 79:9,13,18;82:10; 84:9,12,15,25;85:3; 86:16;88:24;89:3,15; 90:14,17;91:25; 92:15;93:5;95:2; 100:14,16;102:14,18, 22;103:10,14,21; 104:7;105:9,16; 106:21;107:2,6,16,20; 108:16,24;109:2,7,16; 110:22;113:20,22,25; 115:3;117:11,19; 119:2;120:13;121:11; 122:19;123:8,19; 124:15;126:5,9,17; 127:8;128:11;129:16, 23;130:3,5,16,22; 131:3,10;132:14; 133:8,17;134:9; 135:13,14,15,17,20; 136:4,7;137:18; 139:3,14,22;140:9,16, 20,25;141:6,11,12; 142:5;143:8,11,12,15; 145:14,21;147:23,25; 148:17;149:16,19; 150:20;151:6,12,21, 25;152:1,2,5,6,11,19, 20,24,25;153:2,2,3,4, 8;154:23;155:4,7,13; 156:6,7;157:18; 159:20;160:18; 161:11;162:8,13; 163:4,18;164:4; 166:5,12,13;167:19, 20;168:18;170:9,14, 19;171:7;173:11,12, 17;174:8;175:22; 177:14;178:9;180:5, 6,24;181:4;186:10,14, 21;188:15;189:9; 190:6,23,23;191:4,22; 192:5,7,8,12;193:8; 194:4,19,20;195:4,7, 20;197:24;198:4,20, 25;199:2,8,9;201:10, 15;203:13,15,20; 204:5,8;205:4;206:7; 207:3;208:7,15,16,20, 21;213:3;214:19; 216:16;220:3;222:11; 223:1,5,9,11,20; 227:4,6;228:8,9,13, 14,15,24,25;231:4,13; 233:4,6,12;234:5; 236:4,11;237:13,18; 238:14,15,17;246:24; 247:13;248:5,10,21; 249:25;250:9,14; 254:11
**rights (1)** 177:4
**ring (4)** 65:23;66:13;126:9; 221:6
**risk (3)** 200:2;206:13; 240:13
**robberies (1)** 189:16
**robbery (1)** 99:13
**role (1)** 16:16
**room (3)** 5:25;8:1;138:19
**Rossi (16)** 117:8,24;118:15; 119:18,23;122:13; 137:8,14;138:4; 139:13;140:12; 142:19;143:6,10; 152:4,17
**rounded (1)** 135:22
**rounding (1)** 148:19
**routine (3)** 76:13;212:6;224:11
**rules (4)** 5:20,22;88:9,12
**run (1)** 172:6

**S**

**safe (2)** 133:15;185:23
**sale (11)** 17:2;85:11,23;86:8; 215:3;216:1;217:3; 227:4;228:13;231:9; 248:2
**sales (51)** 28:25;51:4,5,7,22; 74:19;76:6,13,20; 77:7,10;104:12,18; 123:4;185:12;212:4, 6;213:11,17;215:11, 20;216:8,11;217:6; 219:1;225:22;226:11; 227:5,18,20,20; 229:10,24;230:7,21; 231:20;233:2,21; 234:6,15,21;235:20; 236:25;237:4,5,14,22; 239:1,4;240:7;254:10
**salespersons (1)** 216:4
**same (75)** 6:4;19:13;21:10; 22:11,16;23:5,12,12; 25:2,4,6,8;29:17; 38:6;46:21,23,24; 50:7;52:8,13;53:2; 56:5;74:20;83:15,19; 84:5;90:17;99:20,21; 113:17;119:25; 120:20;144:22;147:5, 11;158:8,11;163:7; 169:17;183:17; 187:21;188:4,19,25; 189:2;190:14;191:19; 192:9;193:4;202:10; 210:22;212:4,25,25; 213:11;215:9,12; 217:15,18;218:5,15, 18,21;219:24;222:23; 226:6;228:20,20; 247:1;249:11;251:23, 25;253:12,18,23
**samples (2)** 134:16;141:22
**Sarah (11)** 70:15;74:16; 184:19;185:20,24; 186:8,13;203:20; 204:3;207:10;225:23
**sat (3)** 30:22;31:4;41:23
**saw (4)** 66:6,14,18,24
**saying (26)** 6:15,18;23:3;34:15; 57:2;79:16;90:12,15; 91:15;118:8;148:11; 150:17;151:10; 164:20;180:23;184:6; 188:19;189:12; 204:15;207:9;214:6, 12;227:4;232:3; 238:25;244:10
**scale (3)** 54:12;220:21;221:3
**scarily (1)** 104:8
**scenario (4)** 61:7,8,11,13
**sceptical (1)** 36:1
**schedule (1)** 5:15
**schemes (1)** 94:22
**Schlifer (1)** 37:10
**scholar (1)** 248:11
**scholarly (1)** 67:19
**school (2)** 9:8;28:14
**science (5)** 243:4,11,13;248:8, 20
**scientific (1)** 9:19
**scope (12)** 51:10,15,18,19; 104:15;126:22; 194:17;218:6;226:1; 247:23;249:21; 252:12
**screen (1)** 118:3
**scroll (2)** 15:3;118:17
**scrolling (1)** 27:3
**second (39)** 15:9;16:2;45:5; 74:15;83:15;85:5; 97:2;98:20;102:5; 108:1;112:6,21; 113:11;131:1,19,19;

132:2,3,4,10,11,12;140:13;150:12;156:14;165:19;170:19;174:19;176:15;184:7,25;203:13;218:23;222:1;228:2,18;231:1;234:1;243:21
**secondary (7)** 43:20;119:11;120:7;122:16;123:3,6,11
**Secondly (2)** 240:1;246:6
**section (15)** 19:3;21:4,14;23:12;24:20;25:16;83:1;92:9,12,12;93:11;118:24;121:22;122:2;229:2
**seeing (6)** 60:6;66:6;107:23;148:16,18;149:10
**seek (4)** 28:2;58:10;128:2;149:15
**seeking (3)** 49:22;105:20;160:17
**seem (2)** 218:24;249:1
**seems (2)** 167:21;240:19
**seized (1)** 120:17
**selected (1)** 230:1
**self-defense (2)** 27:24;43:20
**self-evident (1)** 93:7
**sell (2)** 20:12;119:13
**sellers (1)** 123:3
**selling (3)** 84:24;86:6;214:20
**sells (2)** 91:13;119:7
**semiautomatic (3)** 43:13;44:10,15
**seminar (1)** 77:1
**senior (1)** 243:7
**sense (27)** 6:6,12,22;10:13;11:1;20:5;26:18;58:14;70:19;78:18;80:3,16,20;81:21;82:22;89:1;93:7;95:19;96:13,14;99:6;158:14;172:6;186:6;200:8;221:14;243:11
**sensical (1)** 58:1
**sent (1)** 134:20
**sentence (63)** 31:23;79:5,15;83:15,19;85:19;90:1,6,10;97:2,2,15,20;98:21;100:22;101:1,7;102:14;111:11,23;112:6;113:11,24;115:7,21;120:11;123:8;131:19;132:3,12;141:8,17;148:2;161:5,6;174:20;176:14,15,16,25;181:21;184:7;195:21;215:10;218:23;222:19;226:10;227:3,18;231:7;232:13;233:23;234:2;235:19;237:3;239:8,11;241:11;243:23;245:11,22;247:20;250:19
**sentences (4)** 82:3,9;111:11;195:19
**Sentencing (1)** 25:20
**September (2)** 39:24;97:16
**sequencing (1)** 78:1
**serial (9)** 97:17;234:8,15,19;235:12,13,18,21;237:15
**series (1)** 147:11
**serious (4)** 176:19,23;177:5;248:11
**seriously (2)** 56:20;248:12
**seriousness (2)** 54:18;55:18
**serve (2)** 30:4;215:7
**served (6)** 29:20,24;31:20;32:3;114:20,21
**serving (1)** 30:13
**set (10)** 86:13;110:3;126:15,25;140:1;148:10;178:20;228:10,20;240:18
**sets (1)** 229:5
**setting (1)** 138:19
**Seventh (1)** 100:23
**Seventy-five (1)** 14:14
**Seventy-three (1)** 8:18
**seven-year (2)** 228:8,11
**shaking (1)** 6:17
**share (21)** 54:20;73:14;78:8;79:7;82:11;88:20;102:12;103:8;111:16,18,20;115:9,16;116:20;173:5;179:21,22;187:2,3;188:7;191:9
**sheer (3)** 164:21;179:10;230:14
**Shell (4)** 39:8,10,13,23
**shifts (1)** 208:12
**shoes (1)** 232:6
**shoot (1)** 44:6
**shooters (1)** 101:16
**Shooting (9)** 29:16;45:1;60:8;81:17;97:22;100:23;101:9;193:8;194:1
**shootout (1)** 101:3
**shoots (1)** 81:11
**short (8)** 222:20;241:24,24;251:12;252:10,22;253:8;254:8
**shorter (2)** 239:2;240:15
**shortly (5)** 30:10;46:6,7;124:18;242:25
**show (11)** 14:25;28:3;105:21;117:21;118:2,17;123:20;145:23;153:1;193:2;209:25
**showed (2)** 137:11;254:7
**showing (6)** 78:10;83:17;118:14;151:22;170:18;202:17
**shown (7)** 67:22;122:3;131:23;184:19;186:17;225:2;238:5
**shows (2)** 241:3;243:10
**Shun-Yang (2)** 22:6;23:1
**Shun-Yung (1)** 19:7
**side (2)** 151:24;152:2
**sign (9)** 213:3,18;214:23;217:16,19;236:7,8,11;254:25
**significance (6)** 56:10,11;57:19;75:5;120:23;246:10
**significant (18)** 17:8,9;24:3,4;54:14;55:2,3;73:14;78:10;83:17;184:19;186:17;187:2,8,13;188:8;192:24;207:12
**signs (29)** 17:17,23;18:17,25;59:18,24;60:2,6,12,15,18,23;61:7,12,16,20,24,25;62:3,7,25;63:8,14;68:4;216:15;236:4;238:8,9;253:16
**similar (6)** 22:20;36:9;126:5;214:1;226:11;230:12
**similarly (1)** 162:2
**simpler (1)** 196:20
**simply (7)** 36:16;120:5;160:22;223:7,12;224:10;239:19
**simultaneous (1)** 231:8
**single (10)** 104:3,8,9;193:24;198:14;204:11;206:9;207:10;242:1;253:8
**single-case (1)** 247:7
**single-sale (2)** 228:21;241:5
**sit (4)** 43:7;60:13;78:15;141:25
**sitting (6)** 133:7;143:22;155:1,18;185:3;212:12
**six (1)** 15:21
**six-year (2)** 97:18;98:17
**size (2)** 220:8;221:12
**skies (1)** 221:5
**skill (1)** 188:21
**Skip (5)** 21:21;37:10,11;74:15;161:6
**Skipping (1)** 97:20
**slate (1)** 31:8
**slight (1)** 123:25
**slightest (1)** 244:16
**slightly (3)** 154:11,23;228:22
**small (14)** 54:20;84:13;85:3;108:9;112:22;158:21;173:19,20,25;174:4;178:23;179:7;202:22;203:3
**so-called (1)** 119:5
**social (1)** 14:2
**Society (2)** 22:8;23:20
**Sociology (4)** 9:7,9,12,16
**sold (28)** 97:17;98:21;101:8;193:7;200:13;202:9;203:19;204:2;208:13;212:7,8;219:6;220:14;221:7;222:21;223:13;227:1;228:7,10,12;230:1;237:8;239:1,4;240:2,6,14;254:5
**sole (1)** 96:1
**solely (1)** 226:25
**solved (1)** 156:19
**somebody (7)** 90:25;91:4,5;98:7;209:19,21;225:5
**somehow (5)** 11:8;111:17,21;113:18;212:21
**someone (6)** 42:11;81:10;89:20;98:8;119:6,8
**someone's (1)** 98:10
**Sometime (4)** 30:6;45:17;46:13,16
**sometimes (1)** 69:10

**somewhat (6)**
28:1;115:17;179:6;193:10;210:23;226:11
**somewhere (1)**
139:19
**sorry (10)**
78:5;87:18;109:13;115:19;116:7;131:10;152:3;153:11;215:8;222:14
**sort (14)**
59:10;63:11;65:24;80:11;82:19;93:6;137:19;138:18,19;156:13;217:25;246:7;252:3,13
**sorts (2)**
59:11;104:21
**sought (1)**
50:4
**sound (2)**
117:19;166:19
**sounds (1)**
31:2
**source (40)**
73:10;75:11;78:11;83:18;112:11;115:22;116:3,14;126:2,8;129:2,6,9,10;132:19;133:4,9,11;140:3;141:17;144:12,21;146:22;148:1;150:13;154:20;161:17,23;171:13;175:3,12,14,15,21;184:12;197:2;200:11;208:20;209:7;211:2
**sources (36)**
11:6;18:15;47:9,14;60:11;71:21;72:3,6,10,13,19,20,23,25;73:3,6,7,17,24;115:25;117:1;153:19;158:22;159:1,6;171:24;173:12;184:1,23;197:6;198:23;211:8,16,19,21;229:9
**south (1)**
97:19
**southeast (1)**
245:17
**southeastern (1)**
244:1
**space (3)**
177:17;232:20;235:10
**span (1)**
167:2
**speak (1)**
6:1
**speaking (5)**
6:3;35:25;86:25;196:10,22
**special (5)**
9:14,15;146:21;250:21;251:4
**specific (15)**
12:15;25:10;41:16;46:14;51:1,2,24;68:24;79:20;87:22;93:13;113:1;135:7;172:2;207:14
**specifically (8)**
10:11;58:22;68:19;70:11;116:21;175:19;191:16;215:17
**specificity (2)**
45:23;49:21
**specifics (1)**
14:17
**speculate (7)**
56:1;59:10;145:17,18;154:15;184:10;214:14
**speculating (2)**
165:1;183:20
**speculation (39)**
38:2;55:24;59:6;80:19;91:11;96:4;104:15;105:11;143:20;144:1;147:19;151:7;164:22;168:19;173:23;176:5;178:5;179:10;181:15;182:8,13;190:16;194:6;208:25;212:18;215:1,7;219:19;220:10,24;225:24;226:22;230:6,14;236:19;245:3,24;249:21;254:3
**speculative (1)**
190:21
**speech (4)**
75:2;76:19,21;77:18
**speeches (1)**
76:24
**spend (1)**
13:5
**spin (1)**
241:7
**split (1)**
144:13
**Sports (2)**
29:16;60:8
**square (4)**
103:23;199:15;205:6;214:10
**squares (1)**
188:9
**St (6)**
16:13;18:23;21:1;87:14;100:23;101:4
**stand (3)**
184:4;222:24;224:3
**standard (1)**
255:4
**standpoint (1)**
151:10
**stands (3)**
16:21;191:21;234:17
**start (16)**
9:5;13:11;15:16;33:13;34:20;68:10;69:2,7;97:1;108:14;121:8;128:10;129:13;130:8;134:6;225:14
**started (6)**
5:17;44:1;46:15,23,24;68:11
**starting (1)**
136:4
**starts (6)**
90:2;111:14;180:23;195:21;238:25;239:19
**state (26)**
5:17;13:1,4,6,8;34:8;47:21;138:15;141:22;148:3,5,13,20;150:18;153:9;181:17;209:2;212:20;229:25;230:1;235:5;244:1;246:9,23;247:9,21
**state-by-state (1)**
175:18
**statement (11)**
82:8;85:21;115:11,12,14;226:11;231:18;232:3;235:5;237:12;253:1
**statements (2)**
129:3;237:8
**States (9)**
37:7;139:14;209:16;230:9;246:11;247:9,13;250:8,24
**State's (2)**
48:15;96:10
**statistical (4)**
56:13,18;114:13;246:7
**statistics (13)**
10:16;11:20,21,22;13:19;28:3;130:14;146:21;175:18;207:19;208:1,11;222:19
**statutes (6)**
87:1,16,19,23;88:8,11
**stay (1)**
39:22
**steal (1)**
80:24
**stealing (1)**
136:13
**STENOGRAPHER (5)**
5:2;153:9;255:2,6,11
**step (10)**
71:16;128:14;160:11,21,22;161:1,3;170:19;172:12;194:21
**Stepping (1)**
194:15
**still (28)**
6:10;26:18,21;27:15;44:8;68:7;78:14;82:19;101:23,25;115:10,15;139:25;144:22;158:16;180:15;183:9,21;184:16;185:3;203:10;205:15;207:6;212:2,12;240:21;241:21;255:11
**Stinson (2)**
7:22;53:12
**stole (3)**
90:16;148:4;235:15
**stolen (17)**
81:1;89:9;90:1,7,13;92:23,24,25;129:4;131:21;132:13;133:12;135:8;136:16;137:3,4;155:21
**stop (2)**
179:21;227:6
**stopped (1)**
169:5
**store (9)**
201:22;212:25;222:22;223:10,16,19;224:2;253:9,15
**stored (1)**
37:2
**stores (3)**
104:19;106:18;192:24
**strategy (2)**
50:2;52:19
**straw (306)**
15:9,24;16:9;17:4,5,9,12,18,23;18:24;19:4,11,18;20:2,12,14;21:6,11,18;22:1,5,19;23:1,1,4,8,9,18,25;24:4,6,12,17,21;25:9,13;28:5;31:13;32:9,17;34:3;54:22,23;55:3,19;56:8,9,25;57:4,9,14,24;58:3,6,10,18,22;59:2,18;60:7,23;61:3,8,12,16,22,23,24;62:15,18,24;63:8,15;64:2;68:1,4,20;71:10,14;73:9,13;75:6,13,17;76:3;78:4,7,10,19;79:5,8,13,17,21;82:10;83:2,11,11,17;86:15;87:1,6,21;88:5,20;89:2,14;90:17,19;91:2,4,7,9,10,13,17;94:17,19;95:21;96:8,16,21;97:10;98:3;99:2,18;100:19;101:12,20;102:11;103:4,8;105:22;106:7,14,17;108:2,4,4,7,9;109:5,10,20,23;110:8,9,13,14,20;111:5,18,20,22;112:1,3,8,10;113:7,9,13;115:7;116:22;119:5,9,12,21;121:5,8,12,17;122:19,19;126:8,9,16;127:2,3;128:4,8;129:6;144:23;151:5,12;158:20;160:13,15,18,23;161:9,11;162:12,19,22;163:1,8,12,13,15,22;164:3,9,10,18;166:25;167:22,22,25;168:2,5,18,24,25;169:2,4,5,5,14,16,19,22;170:12,22;171:22;172:2,9,18;173:1,4,9,17;176:18,22;178:1,14,16,20,23;179:5,11,18,25;180:8,11,17,23;181:2,9,17;182:8;183:19;184:12,18;185:11,12,20,22,24;186:6;187:5,20;188:4,20;190:9,18;191:9,17;192:13,23;193:17,21;204:11,23;205:12;206:12;207:1,16;209:3,6,12,20,22;210:4,16;211:10;212:22,23;213:3,18;214:5,23;215:5,18;216:15;217:16,23;218:12;225:5,8;227:12;251:10,17,18,25;252:8;253:21
**Street (1)**
100:23
**street/underground (1)**
150:23
**strengthens (1)**
144:20
**strengths (1)**
13:19
**stretch (1)**
99:5
**strictly (2)**
196:10,22
**strong (3)**
57:17;184:24;187:4

**structure (1)** 174:11
**studies (4)** 137:16;166:3,5; 229:15
**study (39)** 9:19;54:8;62:20,23; 123:9,11;142:18,19; 152:17;165:16;167:5, 7,17;168:10,17,17; 169:17,21;170:4; 221:18;222:2,20; 223:5,9,25;228:2,4,6, 16;229:5;230:17,25; 231:2,12;232:25; 246:22,23;247:2; 254:21
**studying (1)** 241:10
**subdivided (1)** 240:3
**subdividing (1)** 241:8
**subject (11)** 27:22;35:3;40:10, 16;77:3;168:23; 186:14;239:19,25; 240:17;241:10
**subjective (2)** 237:8,12
**submit (1)** 65:2
**submitted (1)** 65:5
**subsequently (2)** 119:11;120:4
**subset (9)** 75:7,12;121:19; 139:6;147:6,8;230:1; 240:20;246:16
**subsets (1)** 241:8
**substantial (2)** 220:18;254:6
**substantially (1)** 158:11
**substitute (1)** 165:6
**subtle (2)** 239:18;240:13
**succeeded (1)** 169:16
**success (1)** 169:13
**successful (1)** 81:25
**sued (1)** 36:14
**sufficient (4)** 72:18;176:9; 208:10;229:7
**suggest (2)** 69:11;119:8
**suicide (2)** 27:1,12
**suing (5)** 34:25;35:12,21; 36:11;42:11
**summarize (1)** 75:22
**summarized (1)** 240:22
**Summary (15)** 68:6;113:21;154:1; 157:11;180:21;184:3, 5,16,25;190:4;191:7; 212:3,13;215:10; 231:6
**summers (1)** 28:19
**superior (1)** 229:19
**supplied (1)** 17:13
**supply (1)** 20:11
**supplying (3)** 16:17;17:10;77:16
**support (8)** 24:2;63:14;147:1; 214:12;233:1;240:3; 242:3;243:12
**supporters (1)** 24:10
**supportive (1)** 72:20
**supports (6)** 39:13;74:9;173:7,8; 240:21;246:16
**suppose (2)** 66:24;232:7
**supposed (2)** 110:4;246:10
**supposedly (1)** 241:10
**suppressing (1)** 58:22
**Sure (39)** 10:15;14:15;31:16; 33:2;34:4;36:12,19; 40:9;45:6;46:7;57:6; 79:1;87:5;89:24;92:2; 102:6;107:9;113:15; 121:16,19,20;122:8; 128:6;131:25;142:6; 148:15;149:21;153:2; 155:9;158:1;167:16; 191:1;201:20;205:24, 25;210:13;215:22; 218:8;248:14
**surrendered (1)** 177:11
**survey (41)** 10:19,21;11:10,18; 130:21;131:5;134:13, 14,19,23,24;135:1; 137:15;138:5,9,16; 139:12,17;140:12,25; 141:11;142:8,13; 143:13;144:6;145:4; 146:5,11,23;147:5,16, 17;148:10,12,24; 157:16,20;166:14,18, 19,22
**surveyed (1)** 157:21
**surveyors (1)** 138:3
**surveys (15)** 71:4,17;123:15; 134:20;137:16; 141:14,21;142:22; 147:12;152:12; 157:17;158:4;166:11; 199:6;211:14
**survival (5)** 239:2,18,21;240:6, 15
**suspect (17)** 74:20;76:13;77:10; 212:4;213:12;215:12, 13;216:4;217:3,7,8; 219:18;220:22; 221:13;226:25;237:5, 10
**suspects (1)** 97:21
**suspension (1)** 144:1
**suspicious (32)** 215:20,25;216:8, 11;217:20;218:4,18; 219:22,22;222:25,25; 223:15,18;224:3,8,12, 13,19,23;225:21; 226:5,12,14,18,20,25; 227:6,11,19;237:22; 253:19;254:11
**swear (5)** 5:4;31:14;34:10; 142:7;243:1
**Swearingen (1)** 39:2
**sworn (1)** 5:10
**symposium (1)** 24:23
**system (1)** 120:18

**T**

**Table (4)** 125:23;126:7; 150:8;239:3
**takeaway (1)** 169:21
**talk (23)** 8:15;31:7;41:6; 44:17;45:12;76:11; 82:4;96:20;122:18; 130:20;131:4;137:14; 141:10;170:1;174:20; 177:11,13;182:23; 183:10;189:8;217:2; 218:22;221:16
**talked (22)** 11:16;32:2;33:7; 69:20;71:16;77:6; 88:18;89:1;94:6; 135:12;143:4;145:2; 162:2;181:2,22,25; 184:1;189:11;190:4; 217:11,14;219:15
**talking (48)** 6:5;11:5;61:24; 80:13;89:25;92:6,15, 18;93:2,14;114:3; 123:10;133:23;134:7, 10;135:14;136:20; 140:11;142:24,24; 146:5;157:15;163:25; 171:11;174:7;175:6, 14;179:3;182:12; 184:9;188:13,17; 190:6;191:22;194:17; 198:1,2;199:4; 203:14;220:2,3; 236:3;239:19,21,25; 240:1,18;248:23
**talks (12)** 97:1;99:10;100:21; 123:2;161:4;166:7, 10;182:14;186:16; 206:3;215:11;228:6
**taught (1)** 13:14
**tautology (1)** 79:8
**teach (2)** 13:12;26:19
**teaching (2)** 13:23;28:21
**team (1)** 166:11
**technical (1)** 89:1
**telephone (1)** 166:20
**telling (1)** 49:3
**tells (2)** 113:8;193:19
**temper (1)** 179:6
**ten (10)** 31:24;32:23; 139:14;152:23,24; 165:15;202:4;220:3, 4;241:20
**tends (3)** 20:21;69:8;149:24
**tentatively (1)** 205:11
**ten-year (2)** 196:6,17
**term (1)** 34:24
**terminology (2)** 59:21;89:11
**terms (10)** 9:23;10:11;70:20; 114:12;157:12; 180:12;181:18;208:4; 215:8;219:20
**test (4)** 8:5;10:4;62:10; 63:20
**testified (15)** 5:11;31:24;32:23; 33:8,11;42:10;55:1; 59:23;60:25;63:23; 64:16;78:19;94:10; 149:13;216:13
**testify (2)** 7:6;33:14
**testifying (3)** 42:19;49:11;73:2
**testimony (20)** 5:4;7:3;18:22;35:3; 39:20;41:20;42:1,23; 58:25;75:23;76:15; 82:12;133:24;154:2; 161:3;162:6;163:6; 165:4;186:23;216:18
**testing (1)** 45:1
**tests (1)** 44:9
**Thanks (1)** 106:24
**theft (18)** 89:9,10,17;128:17, 18;137:3,18;143:7, 25;146:14;147:3; 148:14;150:5;151:24; 152:3,3;157:5;161:8
**thefts (13)** 71:8,9,9;128:11,20, 24;129:14;134:9; 135:14;136:6,20; 144:3;199:1
**theirs (1)** 67:7
**thereafter (3)** 46:6,7;124:18
**therefore (7)** 56:10;108:7; 158:18,19;209:9; 222:22;223:14
**Thereupon (1)** 5:8
**thesis (1)** 12:18
**thief (1)**

235:15
**thinking (4)** 10:11;24:5;69:21; 213:10
**third (11)** 47:23;74:19,25; 76:6,12,18;119:4; 141:8,8;165:20; 222:19
**third-party (1)** 11:6
**thirty- (1)** 188:6
**thirty-something (2)** 187:1;189:3
**though (9)** 43:21;44:16;56:17; 145:14;173:25; 181:24;200:15; 205:13;251:22
**thought (5)** 44:2;50:5;125:13; 154:15;233:17
**thoughts (1)** 56:4
**thousand (1)** 93:23
**thousands (3)** 94:22;165:15; 232:19
**three (14)** 11:17;12:6;15:21; 16:7;31:19;68:8; 70:19;74:2;101:5,16, 16;123:14;213:12; 220:14
**threshold (1)** 219:17
**threw (3)** 99:24;100:6,10
**thus (5)** 17:8;24:4;28:2; 217:7;250:22
**tie (1)** 19:2
**times (24)** 29:24;30:25;33:10; 42:16;94:6;122:7; 123:14,14,17;137:1; 152:19,24;153:6,14; 155:10;157:6,6; 170:16;231:13;239:2, 18,21;240:6;241:20
**tiny (12)** 109:25;126:23; 144:23,24;158:19; 173:8;180:17;183:21; 193:2;207:6,6;208:12
**title (4)** 25:4;118:24,25; 124:13
**titled (2)** 77:3;148:1
**Tobacco (4)** 16:21;94:18; 161:19;250:21
**today (20)** 5:23;6:1,8;7:3,6,12; 8:1;27:16;78:14; 82:12;118:12;133:7; 154:2;155:1,18; 163:7;185:4;212:12; 230:21;237:3
**took (5)** 170:6,8,11;244:2; 245:18
**top (24)** 15:8;18:16;64:10; 89:24;95:5;107:23; 108:1;115:20;116:13; 118:18;125:19;126:7; 147:25;160:11;161:4; 165:14;170:5;191:1; 195:2;203:2;208:17; 222:13;242:10; 245:10
**topic (5)** 21:7,20;22:16;28:1; 227:13
**topics (1)** 13:18
**top-right (1)** 147:25
**total (28)** 8:8;128:16,18; 129:10,15;136:16,21; 137:4;157:7,8; 158:24;159:25; 160:20;167:24; 170:21;171:23; 178:23;179:19; 181:24;186:24;188:5, 9;192:3;196:14; 200:17,22;203:23; 208:9
**totaled (1)** 163:13
**totals (1)** 208:7
**touched (1)** 54:3
**toward (1)** 197:18
**trace (7)** 16:16,20,24;19:16; 197:7;200:12;235:17
**traced (8)** 119:11;120:5,17; 235:16;243:24; 245:15;247:13;248:1
**traces (5)** 244:25;245:1,12, 14;247:25
**tracing (2)** 19:9;54:7
**tracking (1)** 16:25
**Tracy (5)** 38:11,14,15,21,25
**trafficked (23)** 91:21;94:22;108:8; 109:11;111:7;160:18; 161:8,10,15;162:13, 21,22;163:1;170:9, 12;185:25;187:2; 188:7;220:17;225:15, 18;235:1;236:17
**trafficker (2)** 220:14;235:14
**traffickers (4)** 20:11;75:7;176:19; 220:12
**trafficking (108)** 16:17;17:6,8;19:8, 15,15,18,19,21,25; 20:6,14,22;22:7; 23:15,22;24:3,6,7,10, 13,15,18,25;28:8; 53:24;54:3,4,8,12,13, 19,24,25;55:2,4;75:5, 8,10,10,12,15;76:1, 11;77:4,14,14,15,16; 91:20;94:21;96:16; 108:5,6;110:1;111:2, 17;125:23;126:17; 161:21,21,25;174:16; 184:20;185:13; 186:14,18,20,21,25; 187:7,9,12,22,25; 188:1,4,6,10,14,19, 24;189:1;210:12; 220:21;221:1,3,6; 231:10;232:5,7; 233:2,21;234:9,23,24; 235:2,3,25;236:1,2, 11,15;237:1,20;238:3, 5,17
**training (5)** 48:9;60:22;216:7; 251:9;252:19
**transaction (6)** 118:19;217:20; 218:25;221:13; 224:17;225:17
**transactions (10)** 62:16;170:1;224:6; 225:7,15;226:2; 227:11;251:12;252:3, 10
**transcript (6)** 171:15;255:1,3,7,9, 12
**transcription (2)** 154:16;156:13
**transfer (4)** 84:25;85:22;90:25; 242:12
**transferor/seller (1)** 85:13
**transferred (1)** 90:24
**transfers (8)** 16:25;85:10;110:1, 3;114:25;116:23; 126:23,25
**treated (2)** 28:3;171:21
**Trends (1)** 130:15
**trial (4)** 31:24;32:24;33:14; 36:16
**triangulation (1)** 158:10
**tried (3)** 32:25;190:20; 229:12
**tries (2)** 235:18;241:7
**triple (1)** 183:18
**trivial (1)** 244:13
**trivially (2)** 82:20,21
**Truck (2)** 100:23;101:8
**true (25)** 10:5;82:7,9,19,20, 21;90:15;100:8,10; 104:21;115:10,14,15; 145:21;177:23; 188:22;201:8,18,19, 21;202:8;205:15; 214:6;237:24;241:6
**trumpet (1)** 221:4
**truth (5)** 5:5,6,6;143:1; 144:16
**truthfully (1)** 7:6
**try (6)** 49:15;61:18; 131:12;158:10; 165:15;190:17
**trying (9)** 75:22;113:6; 181:16;196:7;199:15; 200:1;202:16;203:1; 236:21
**turn (13)** 21:8,13;25:15; 31:18;88:15;94:13; 125:19;131:5;147:22; 189:6;221:16;226:9; 250:13
**turnaround (1)** 255:4
**turns (2)** 235:4;236:8
**Twice (5)** 33:12;234:6,15; 235:20;237:14
**two (56)** 7:12,25;10:10; 15:21;16:6,10;25:19; 33:16;36:9;42:1; 43:11,17;65:12,15,17, 20;68:20;101:8,19; 111:8,11;112:2,9; 113:12;131:11; 143:17;144:8;151:11; 152:11;153:19; 157:17;158:6;159:22; 161:3;166:8;171:19, 19;172:13,16;188:3, 18;209:12;210:4,16; 211:9;213:11;218:10, 13,15;220:14;228:3; 229:5;248:24;250:16; 253:18,22
**two-thirds (2)** 15:4;118:23
**type (4)** 11:19;38:1;49:6; 168:16
**types (5)** 10:7,14;12:6;26:23; 220:20
**typo (2)** 155:15;156:13

**U**

**UCLA (9)** 19:5,6,9;20:24; 22:14,16;23:5;24:22; 77:1
**ultimate (5)** 91:8,12;92:16; 104:7;184:22
**ultimately (4)** 73:17;92:24;115:1; 158:16
**unable (1)** 7:6
**unaware (1)** 92:3
**unchallenged (1)** 184:14
**uncovered (1)** 161:9
**uncritically (1)** 218:1
**Under (14)** 64:7;78:22,24;85:4, 6;86:15;88:6;92:15, 19;113:25;126:8; 148:2;150:13;189:7
**undercut (2)** 104:4;105:4
**undergrad (1)** 13:14
**underground (1)**

151:4
**under-inclusive (4)**
164:14,25;178:20;179:5
**underlying (4)**
64:23;77:19;83:1;182:24
**underneath (1)**
150:8
**understood (1)**
87:5
**undertaking (1)**
190:9
**undertook (1)**
159:6
**undiscovered (1)**
164:18
**undocumented (1)**
167:1
**unfamiliar (1)**
149:16
**unimportant (3)**
75:7,10,13
**unique (4)**
193:24;210:7;252:7,13
**unit (2)**
247:4,8
**United (4)**
37:7;209:16;250:8,23
**units (1)**
220:6
**universe (1)**
192:3
**University (6)**
9:2;13:1;16:13;18:23;21:2;28:22
**Unless (5)**
6:10;70:16;166:18;211:17;252:23
**unloading (1)**
28:20
**unnecessary (1)**
80:11
**unreliable (1)**
140:3
**unsuccessful (1)**
169:1
**unsupported (1)**
246:1
**untested (1)**
62:9
**unusual (3)**
209:19;211:17;223:14
**unvalidated (1)**
217:21
**up (30)**
28:3;31:7;45:19;49:15;56:18;67:22;86:13;111:9;118:17;123:9;128:9;133:9;134:17;140:13;154:18;155:6;158:16;166:9;174:3,24;176:14;177:6,8;178:11;184:11;188:9;196:17;230:25;231:24;245:10
**updated (2)**
117:12;119:21
**upper (2)**
174:1;241:17
**upper-limit (1)**
195:25
**upset (1)**
104:6
**USC (1)**
85:13
**use (49)**
10:14,16,17,19,21,23,24;11:10;12:20;20:12;27:24;44:21;49:19,22;52:24;65:6;70:12;71:24;72:3,6,9;80:5;81:12;114:4,17;122:8;127:16;128:20;140:1;144:10,13,21;146:22;155:8,19,20;156:6,8,15;158:18;163:17;173:15;182:25;183:3;190:8;191:8,10;200:20;229:17
**used (161)**
10:12;52:1;54:20;74:21;77:11;78:8,11;79:7,10,16;80:10,25;81:2;82:5,12,13,23;83:18;88:21;89:13,17;92:18,25;93:1,8,9,12;96:8;99:6,17;101:13;102:2,12;103:9,13,17,20,24;104:4;105:1;106:5,7,20;110:21;111:21;113:20,21;114:5,10,12,16,18;115:2;119:10,14;120:3,8;128:5;129:15,22;130:2;135:7;137:23;138:20,21,23;140:9;141:20;148:1;155:16;161:22;162:8;168:16;171:1,6;173:5;181:22;182:1,3,10,14,16,23,25;183:10,20;184:5,12;190:1,6,10,18;191:3,9,17;192:18;193:3,8,11,18;194:1,14,16,18;195:3,6,23,25;196:10,11,15,23;197:3,15,21;198:2,10,12;199:14,20;200:3,6,10,18,25;201:14,21;202:6,8,10,13,22;203:4;204:4,12;205:4,12,21,22;206:3,13;207:2,5,17;208:13;211:19;212:5,8;213:14;215:4;217:24;234:25;237:9,23;239:5,20,22;240:7,12;241:4;243:12
**useful (2)**
12:9;93:24
**uses (5)**
24:1;182:4;183:1;234:22;236:15
**using (27)**
11:6;71:17;80:14;81:8;90:7;93:11;101:19;110:21;129:5,9,10;152:10;162:3,10,18,20,25;163:7;172:5,8;173:12;186:3;191:15,17;199:17,21;236:21
**usually (2)**
69:7;138:17
**utterly (1)**
231:18

**V**

**vague (51)**
9:25;12:8;17:19;20:4;22:22;24:8;35:23;36:24;40:22;43:18;57:25;58:11;59:7;69:6;70:24;89:6;95:18;105:3;106:15;110:11;125:14;129:8;138:10,14;143:19;145:10;150:3;157:25;159:8;162:15,24;164:5;165:3;172:7;173:22;178:4,25;199:23;208:24;209:14;210:18;211:3;212:17;236:22;237:7,11;240:13;249:7,21;251:23;254:3
**valid (3)**
61:21;62:7;63:11
**validated (1)**
225:1
**validity (5)**
62:9,11,24;238:11,13
**valuable (1)**
140:3
**value (3)**
162:7;253:24;254:4
**varied (1)**
73:7
**variety (3)**
24:1;211:15,15
**various (5)**
57:20;104:20;106:18;198:23;241:13
**vast (3)**
14:11;114:9;170:25
**vehicles (1)**
89:9
**vein (1)**
43:6
**verbally (1)**
6:15
**version (3)**
118:10,12;137:11
**versus (6)**
65:7;92:6,25;191:10,23;219:6
**via (17)**
116:22;122:16;128:17,18;137:3;144:3;150:5;161:11;163:1;166:20;173:1;187:4;188:4;195:13;198:17;209:6,20
**vicinity (1)**
139:19
**victimization (6)**
10:20;130:21;131:5,22;134:12,18
**victims (2)**
129:3;208:3
**view (6)**
61:15;122:12;196:8,8;202:17,18
**Views (16)**
15:2;47:17;57:17;84:11;94:5;107:18;124:2;130:17;146:7,10;149:24;161:2;165:13;221:25;242:8;250:5
**violates (3)**
85:12,24;86:8
**violation (1)**
177:5
**violations (1)**
175:2
**violence (9)**
12:17;14:1;44:2;81:16;93:9;130:15;185:12;243:8;249:2
**violent (129)**
79:23;80:1,4,6,13,15;81:19,23;82:5,8,14,16;83:20;88:24;92:6,8,17,20,25;93:1,4,12,15;96:9;101:23,25;102:3;103:10,13,17,21,25;105:2;106:8,20;110:21;114:10,16;115:2;116:22;128:5;129:22;130:2;131:21;137:23;139:2,9;140:15;153:24;154:2;171:6;182:10,15,17;183:21;184:13;189:8,11,12,14,22;190:2,5,10,14,20;191:4,7,10,16,18;192:19;193:3,11,18;194:14,16,19;195:3,7,23;196:1,10,11,15;197:4,15,20,22;198:3,11,12;199:15,19,20;200:3,7,10,18,25;201:12,14;202:6,11,14,23;203:4,23;204:4,12,16,21;205:4,13,16,21,22;206:3,13;207:2,5,7,12,17,20;208:5,9,14,15
**Virginia (5)**
243:25;245:16;246:17,21;248:1
**virtually (3)**
17:7,9;122:14
**visit (1)**
253:8
**visual (1)**
6:17
**volume (6)**
128:11;134:9;171:23;186:24;187:7;188:5
**voluntarily (3)**
177:6,11,13
**voluntary (1)**
178:2

**W**

**wait (3)**
6:3;90:23;131:8
**waiting (1)**
123:5
**walk (2)**
8:23;70:18
**walked (4)**
54:11;181:1;217:1;229:6
**walks (1)**
201:22
**Wang (2)**
19:8;22:6
**wants (1)**
220:11
**warned (1)**
176:6
**warning (36)**
17:17,22;18:17,24;59:18,24;60:2,6,12,15,18,23;61:16,20,24,25;62:7,25;63:8,14;68:4;85:6,9,19;213:3,18;214:23;216:15;217:15,19;236:4,7,8,11;238:8,9

**warnings (1)** 62:3
**warns (1)** 213:17
**warrant (2)** 176:20,23
**wash (1)** 209:16
**waste (2)** 232:22;235:10
**wasted (2)** 231:19;232:20
**way (51)** 13:16;14:7,16;15:4;19:13;22:20;23:5,8,8;35:20;50:24;62:10,13;67:4;84:15;86:11,14;89:7;95:22;96:17;104:3;105:5,13;115:17;118:23;119:25;120:3;125:12;128:15;159:9,17;171:4;177:7;180:19;185:21;186:5;187:7;188:21;194:3,12;205:25;206:14;209:23;230:13;237:11;240:20;245:7;246:4,13;249:16;254:20
**ways (4)** 20:11;94:16;121:13;210:15
**weaknesses (1)** 13:20
**wearing (1)** 232:6
**weather (1)** 5:16
**Welcome (5)** 45:9;107:2;151:20;203:10;248:17
**weren't (5)** 18:10;49:2;83:1;127:19;235:1
**what's (15)** 14:25;38:5;55:16;56:3;69:4;75:16;100:5;113:5;119:20;165:11;190:22;200:2;211:2;244:7;245:22
**whatsoever (1)** 127:5
**whole (11)** 5:5;77:14;90:9;104:5;110:3,14;116:20;158:17;161:5;176:16;181:17
**wide (1)** 144:9
**widespread (1)** 109:20
**wife (2)** 253:15,16
**Wile (1)** 249:3
**William (1)** 66:12
**Williamson (3)** 250:14,20;251:1
**Williamson's (2)** 251:16;252:6
**willing (6)** 170:1;189:4;194:10;209:21,25;210:25
**Wilson (2)** 36:7,12
**winnow (1)** 190:17
**Wintemute (7)** 165:21,24;166:15;167:5,17;168:17;170:4
**Wintemute's (1)** 166:10
**wisdom (2)** 218:1,5
**wish (2)** 183:5,9
**within (5)** 51:15,19;134:17;198:14;250:24
**without (11)** 18:1;46:17;50:12;62:23;97:6;98:23;119:13;150:6;194:11;207:16;246:12
**WITNESS (28)** 5:7;29:21,24;30:5,14;31:4,9,21;34:21;36:3;37:7;38:19;39:17;41:4,23;42:6,17;49:24;50:8;51:8;53:3,20;118:3;156:25;165:4;171:15;194:21;254:24
**witnessed (1)** 162:20
**witnesses (3)** 65:13,16,20
**woman (2)** 101:6,21
**wonder (1)** 231:19
**word (2)** 82:16,18
**wording (2)** 235:5;236:22
**words (7)** 54:13;77:12;80:5,17;88:18;236:24;252:4
**work (32)** 12:22,25;13:2;25:24;26:17;28:5,13,18,25;29:25;38:19;49:9,25;51:12,13,17;52:18,25;53:11;65:1,3;67:19,22;73:25;124:1;135:8;140:1;189:20;215:13;216:10;249:14,19
**worked (11)** 28:19;29:2,6,8,11;30:21;31:17;39:5;61:1;63:24;135:4
**working (12)** 13:3;27:15,22;36:20;46:11,15,23;52:20;64:2;149:14;151:23;176:18
**works (2)** 54:8;243:7
**world (4)** 10:6,8;194:10;221:10
**worth (2)** 58:12,17
**worthwhile (2)** 57:23;58:9
**worthy (1)** 220:18
**wounded (1)** 28:2
**wounds (1)** 28:4
**wrap (1)** 178:11
**Wright (18)** 8:6,7;117:8,24;118:15;119:18,23;122:13;137:8,14;138:4;139:13;140:12;142:19;143:6,10;152:4,17
**write (7)** 53:5;69:17;133:22;135:13;152:21;156:3;170:16
**written (6)** 75:15,24;76:10;93:20;155:7;189:14
**wrong (7)** 27:9;106:2;127:24;136:24;156:19;201:17;254:15

**X**

**xi (1)** 107:22

**Y**

**yard (3)** 97:19;98:11,18
**year (50)** 23:19;28:21;45:17,18,18;94:23;117:16;128:8;129:7,14,16;132:13;133:12;136:1,22;139:16;157:9;158:17,24;159:25;160:13,18;161:7,11,15;162:22,23;164:3,8;170:9;173:17;190:1,11;191:4;192:14,18;195:14,15,17;198:1,4;200:8,19,23,25;201:12,15;202:5,10,15
**years (26)** 26:13;30:16,17;31:24;32:23;42:1;86:23;124:11;170:6,7,7;195:24;196:2,12,13,18,24;197:1,3,4;200:11,13,24;202:4,16;230:18
**yesterday (2)** 7:24;140:5
**York (3)** 247:21,24;248:1

**Z**

**Zach (2)** 8:6,7
**zero (10)** 156:12;169:19,22,25;174:2,3;179:1;196:20;200:24;201:14
**Zoom (2)** 7:11;39:24

**0**

**0.699 (1)** 172:21

**1**

**1 (28)** 65:2;68:16;70:25;78:4;92:11,15,17;102:11;113:23,25;114:1;125:23;126:7;130:4,5;154:12,14;178:12,12;180:21,23;184:5;204:15,21;205:3,7,16;207:7
**1,078 (1)** 126:11
**1,600 (1)** 166:11
**1.2 (1)** 131:20
**1:19 (1)** 194:25
**1:22 (1)** 194:25
**1:33 (1)** 203:8
**1:43 (1)** 203:8
**10 (28)** 21:8;143:15;144:5;145:6;146:13,13;147:2,14,17;148:23;152:5,23;153:3;195:2,24;196:2,12,13,18,21,24,25;197:3,13;200:24;202:16;203:2,14
**10,000 (1)** 166:24
**10:33 (2)** 102:7,7
**10:38 (1)** 106:25
**10:46 (1)** 106:25
**100 (3)** 137:2;218:17;219:7
**10x (1)** 153:3
**10-year (3)** 197:24;199:21;200:16
**11 (7)** 21:13,14;121:6;208:17;212:2,9;218:23
**12 (11)** 84:6,10;88:16;124:11;134:17;196:19;220:6;222:14;228:3,5,19
**12:23 (1)** 151:17
**12:43 (1)** 151:18
**13 (1)** 21:14
**14 (2)** 25:15;101:5
**15 (1)** 21:22
**157 (2)** 250:2,3
**16,000 (1)** 203:23
**17 (1)** 8:10
**17,434 (4)** 161:10;170:14,17;173:16
**1760 (1)** 243:21
**18 (6)** 22:6;23:14;85:13;251:6,7,9
**180,000 (1)**

247:6
**18-wheelers (1)** 28:20
**19 (1)** 97:16
**192 (1)** 27:12
**1973 (1)** 9:1
**1975 (1)** 9:3
**1979 (1)** 9:3
**1982 (3)** 139:19;145:3,9
**1983 (1)** 142:4
**1986 (1)** 117:10
**1990 (2)** 87:15;222:11
**1993 (1)** 130:15
**1996 (3)** 222:11;230:24;243:1
**1999 (6)** 16:13;18:23;19:13;21:1;87:14,18
**1-gun-a-month (6)** 244:2,14;245:17;246:12,18;249:16

## 2

**2 (7)** 68:19;184:15,15;189:8;191:2,8;192:16
**2,000 (1)** 64:14
**2,494,000 (3)** 153:7,16;157:10
**2.2 (3)** 172:20,21,24
**2.5 (3)** 159:23;197:20,22
**2:40 (1)** 248:15
**2:46 (1)** 248:15
**2:54 (1)** 255:15
**20 (9)** 27:6;30:1,3;31:1;32:3;42:16;64:17;252:17,24
**2000 (7)** 107:20;119:8;120:12,12,15,16;142:6
**2005 (1)** 222:6
**2006 (4)** 22:6,25;23:10,14
**2007 (3)** 23:11,18;25:2
**2008 (1)** 117:19
**2009 (4)** 19:7;20:24;22:14,20
**2011 (1)** 24:22
**2012 (1)** 124:13
**2013 (6)** 33:12,14,16;34:9,10,17
**2014 (1)** 130:21
**2015 (1)** 198:2
**2016 (2)** 26:11;146:23
**2017 (2)** 161:5;170:7
**2018 (4)** 130:16,22;161:7;170:11
**2019 (1)** 146:21
**2020 (1)** 39:3
**2021 (7)** 97:16,17;161:6;170:7;174:22;175:8;196:15
**2022 (8)** 27:5,10;130:14;161:18,20;195:4,7,24
**2023 (1)** 41:12
**2024 (4)** 45:18,24;46:13,16
**2025 (1)** 230:23
**211 (8)** 14:22;15:1;47:4;64:6;68:7;95:5;127:23;222:17
**212 (3)** 107:13,17;116:10
**213 (3)** 123:21,25;127:17
**214 (8)** 130:9,10,23;131:5,9,13;132:17;135:19
**215 (2)** 165:8,12
**217 (3)** 145:24,25;146:18
**218 (2)** 160:4,5
**22 (2)** 39:24;239:2
**220 (2)** 221:20,24
**221 (4)** 242:5,6,10;248:19
**224 (3)** 118:5,6;137:12
**225 (13)** 133:25;134:1;151:22;153:2;155:25;156:5;160:25;170:18;178:13;184:4;190:17,22;200:22
**23 (1)** 94:13
**230,000 (1)** 170:8
**234 (1)** 203:25
**24 (2)** 219:12;220:5
**244 (1)** 127:16
**249 (1)** 153:6
**249,000 (11)** 132:13,19;133:16;135:17;136:6;151:25;154:19;155:10,15;156:1,18
**249,400 (9)** 131:21;135:20;154:19,22;155:13,16,22;156:3,8
**25 (1)** 150:19
**26,000 (1)** 108:10
**27 (3)** 85:5;223:13;228:12
**27-year (2)** 101:6,21

## 3

**3 (9)** 32:13;33:17;34:11;68:22;131:7,16;161:21;212:3;239:3
**3.125 (4)** 137:6;152:19;153:3;155:10
**3.125x (1)** 152:19
**3.3 (1)** 228:23
**3.7 (1)** 228:21
**30 (1)** 230:18
**300 (1)** 209:17
**32 (6)** 137:10;143:11;145:3;152:4,18;153:2
**34,000 (2)** 166:25;167:1
**36 (4)** 194:4;244:3,10,11
**37 (14)** 108:9;203:19,22;204:2,11;205:3,11,18;207:11;208:13,14,14,19;209:3
**37.9 (4)** 161:8,14;170:12,17
**38 (1)** 218:14

## 4

**4 (15)** 32:13;33:17;34:12;41:7;64:5;68:7;74:3;78:6;102:10;114:1;155:24;156:12;180:20;184:16;185:1
**4.7 (1)** 148:20
**40 (1)** 115:6
**400 (1)** 135:25
**41.3 (1)** 126:11
**428 (5)** 204:3,15,21;205:7,16
**43 (1)** 150:23
**43-year (1)** 139:21
**43-years (1)** 140:7
**4473 (3)** 84:14,17;86:22
**45 (2)** 96:23;97:3
**46 (2)** 97:15;119:9
**46,000 (4)** 161:14;170:8,13,16
**47 (4)** 98:20;99:22;100:8,11
**48 (1)** 99:10
**49 (1)** 100:21

## 5

**5 (12)** 21:5;95:5,6;102:10;107:9;111:10;114:4;148:3,13,17,18;150:8
**50 (2)** 218:17;219:7
**51 (1)** 234:7
**55 (4)** 132:22,25;133:4,12

## 6

**6 (3)** 85:2;107:9;115:19
**6.6 (1)** 148:20
**62 (3)** 94:13;95:25;96:10
**623,000 (4)** 195:10,12;198:2;201:12
**623,015 (1)** 195:25
**65 (1)** 26:16
**66 (2)** 245:19;246:2
**699 (1)** 172:23
**6th (1)** 97:16

## 7

**7 (25)** 16:13;19:7;88:15;89:24;95:2;115:20,20;116:13;127:23;130:6,20;131:2;132:11;137:5;141:9;143:5;147:22;148:3,4,12,16,17,18;152:16;160:11
**7.8 (3)** 201:11,13,25
**749 (1)** 231:2
**753 (1)** 233:25
**763 (1)** 238:22
**778,125 (1)** 155:12
**779,375 (5)** 153:7,15;157:10;159:23;198:18
**780,000 (1)** 195:14
**780,000ish (1)** 198:3
**782 (1)** 125:19
**79 (2)** 30:8;44:14
**7th (1)** 97:17

**8**

**8 (14)**
148:5,16;160:9,11;161:4;164:17;170:5;174:6,20;176:15;195:20;196:1,19;201:25
**8:00 (1)**
5:1
**80s (4)**
30:6;44:15,15;145:3
**81 (2)**
139:18;145:3
**89 (5)**
120:16;121:6,7,16,18

**9**

**9 (16)**
19:5,6;21:6;27:8,10;93:25;94:4;107:4;131:6,7,13;132:16;135:20;189:6;218:13;251:7
**9:11 (1)**
45:7
**9:20 (1)**
45:7
**90 (2)**
111:25;112:7
**90s (1)**
228:8
**922d (1)**
85:13
**99 (3)**
87:17,19;171:10
**9mm (1)**
97:16