EXHIBIT
220

HEINONLINE

DATE DOWNLOADED: Tue Oct 29 13:38:17 2024
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Christopher S. Koper, Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent, 4 CRIMINOLOGY & PUB. POL'y 749 (November 2005).

ALWD 7th ed.
Christopher S. Koper, Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent, 4 Criminology & Pub. Pol'y 749 (2005).

APA 7th ed.
Koper, C. S. (2005). Purchase of multiple firearms as risk factor for criminal gun use: implications for gun policy and enforcemcent. Criminology & Public Policy, 4(4), 749-778.

Chicago 17th ed.
Christopher S. Koper, "Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent," Criminology & Public Policy 4, no. 4 (November 2005): 749-778

McGill Guide 9th ed.
Christopher S. Koper, "Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent" (2005) 4:4 Criminology & Pub Pol'y 749.

AGLC 4th ed.
Christopher S. Koper, 'Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent' (2005) 4(4) Criminology & Public Policy 749

MLA 9th ed.
Koper, Christopher S. "Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent." Criminology & Public Policy, vol. 4, no. 4, November 2005, pp. 749-778. HeinOnline.

OSCOLA 4th ed.
Christopher S. Koper, 'Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcemcent' (2005) 4 Criminology & Pub Pol'y 749 Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Provided by:
Provided by:<br>Minnesota Attorney General Library

# PURCHASE OF MULTIPLE FIREARMS AS A RISK FACTOR FOR CRIMINAL GUN USE: IMPLICATIONS FOR GUN POLICY AND ENFORCEMENT

CHRISTOPHER S. KOPER*
University of Pennsylvania

***Research Summary:***
*The simultaneous or rapid purchase of multiple guns, which is referred to as a multiple sale, is a potential indicator of gun trafficking. This study examines the role of multiple sales in supplying criminals, using longitudinal analysis of the sale and subsequent police recovery of guns sold in Maryland during the early to mid-1990s. Guns sold in multiple sales accounted for 25% of guns later recovered and had an elevated risk of recovery outside of Maryland, particularly in neighboring Washington, D.C., where handguns are banned.*

***Policy Implications:***
*Federal regulations requiring gun dealers to report multiple sales are prudent, and law enforcement should emphasize these sales in gun trafficking investigations. A 1996 Maryland law restricting handgun buyers to one purchase per month may have produced modest reductions in the flow of guns to criminals in Maryland and particularly in Washington, D.C.*

KEYWORDS: Guns, Gun Control, One-Gun-A-Month, Crime Prevention

## INTRODUCTION

Despite the recent drop in gun violence, criminal misuse of firearms continues to be one of America's most serious crime problems. In 2003, there were roughly 11,000 murders with firearms (calculated from Federal

* The Smith Richardson Foundation and the Jerry Lee Center of Criminology, University of Pennsylvania, provided funding for this research. Data acquisition was also supported by Grant 97-IJ-CX-0053 from the National Institute of Justice (U.S. Department of Justice) to Northeastern University. The author thanks the Maryland State Police (especially Lieutenant Jack Simpson) and Glenn Pierce for assistance with data acquisition and David Huffer for data management support. The author also thanks Jeff Roth, Charles Wellford, and anonymous reviewers of *Criminology & Public Policy* for helpful comments on earlier versions of this paper. The views expressed are those of the author and should not be attributed to the trustees of the University of Pennsylvania, the Smith Richardson Foundation, or any other aforementioned persons and organizations.

Bureau of Investigation, 2004:19) and another 367,000 nonfatal violent crimes with guns (Catalano, 2004:10). By some estimates, the total costs of gun violence in the United States, including medical, criminal justice, and other government and private costs, could be as high as $80 billion per year (Cook and Ludwig, 2000).

Furthermore, the recent downturn in gun crime does not seem to have been driven in any large way by a reduction in the availability of guns to offenders. Although the number of gun homicides plummeted by 41% from 1993 to 1999, for example, the percentage of homicides committed with guns declined by a modest 6%, from 69.6% to 65.2% (Federal Bureau of Investigation, 1994; 2000). Similarly, the percentage of robberies committed with guns declined by only 6% (from 42.4% to 39.9%) in police statistics and 14% (from 25.1% to 21.5%) in victimization surveys during this same period (Federal Bureau of Investigation, 1994, 2000; Maguire and Pastore, 1995:236, 2001:198). Hence, reducing the availability of guns to criminals remains an important policy concern.

The simultaneous or rapid purchase of multiple guns by one individual, which is commonly referred to as a multiple sale, provides an obvious means by which illegal gun traffickers, working alone or with other buyers, can accumulate many firearms in a short period for sale in illegal markets. Accordingly, federal regulations require licensed gun dealers to notify the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) whenever they sell multiple handguns to any one individual within five consecutive business days (ATF, 1995a:59), thereby enabling authorities to monitor these sales for illegal trafficking. In addition, a few states, including South Carolina, Virginia, Maryland, and California, have responded to this problem by enacting one-gun-a-month (OGM) laws that restrict handgun buyers (and sometimes buyers of other designated weapons) to one purchase every 30 days (ATF, 1998, 2003; Vernick and Hepburn, 2003). However, there has been very little research examining the link between multiple sales and gun crime. This study investigates that link using data on gun sales in the state of Maryland and subsequent recoveries of those guns by police.

## GUN MARKETS, MULTIPLE SALES, AND GUN TRAFFICKING

### GUN MARKETS AND CRIMINAL GUN ACQUISITION

Firearms are distributed in markets commonly referred to as primary and secondary markets (Cook et al., 1995). Primary markets include transactions by federally licensed gun dealers. Licensed dealers are required to follow federal and state background check procedures to verify the eligibility of purchasers, observe any legally required waiting period before

making transfers, maintain records of gun acquisitions and dispositions, and report multiple sales and losses due to theft to federal authorities.

Secondary markets encompass secondhand gun transactions made by nonlicensed individuals.[1] Secondary market participants are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers). However, secondary transfers are not subject to federal record-keeping and background check requirements, thus making the secondary market largely unregulated and, consequently, a better source of guns for criminal users.[2] In the secondary market, ineligible buyers may obtain guns (through collusion or misrepresentation) from a variety of legitimate and illegitimate gun owners: relatives, friends, and other associates; fences and other street dealers; drug dealers and addicts; and persons selling through classified ads or at gun shows (e.g., see Beck et al., 1993; Harlow, 2001; Sheley and Wright, 1993; Wright and Rossi, 1986). Of course, ineligible purchasers may also steal guns; approximately 600,000 guns are stolen each year from private owners, dealers, and common carriers (ATF, 2000a:27–28; Cook and Ludwig, 1996:29–30).

Although secondary market transactions and theft seem to be the predominate sources for the supply of firearms to criminals, illicit diversion from the primary market is also an important channel (e.g., see Braga et al., 2002).[3] This diversion occurs in several ways (besides theft). Some prohibited buyers obtain guns directly from dealers by using false identification. There are also corrupt retailers who engage in illegal sales, either by selling directly to prohibited users or by colluding with unlicensed street dealers (e.g., see ATF, 2000b; Wachtel, 1998).

Another mechanism—and one that is central to this study—involves the activities of "straw purchasers," lawfully eligible gun buyers who purchase guns for illegal users and traffickers or to make illicit sales themselves. Straw purchasers include small-scale actors who make one-time or occasional purchases as well as rings of buyers who traffic large numbers of firearms through systematic, repetitive operations. The full extent of straw purchasing cannot be determined from available data,[4] but it seems to be a

1. Persons who make only occasional sales of firearms from their personal collection are not required to obtain a federal firearms license (ATF, 2000a:11).

2. Some states require that secondary market participants conduct transactions through licensed dealers or law enforcement authorities (Vernick and Hepburn, 2003). Even in these states, however, it is not clear how well these laws are enforced.

3. Of course, some people who commit crimes with firearms are legally eligible buyers at the time they acquire their guns. Nationally, about 11% of crime guns are recovered from their original purchasers (ATF, 2000c:8).

4. In a recent national survey of prison inmates, 14% of gun offenders reported that they obtained the gun used in their conviction offense from a retail outlet, 40% indicated that a family member or friend was the source, 39% cited a "street" or "illegal" source (including theft, drug dealers, and fences), and 7% reported using "other"

fairly common supply mechanism for criminals and juveniles. A survey of juveniles incarcerated in four states, for instance, revealed that one third had asked someone, most commonly a family member or friend, to buy a gun for them at a retail outlet at some point in the past (Sheley and Wright, 1993:6). Another rough indicator is the share of crime guns that are new but that have changed hands at least once. To illustrate, approximately one quarter of guns confiscated by police are less than three years old, and most of these are recovered from persons other than the original buyers (Cook and Braga, 2001:294–295), all of which implies that many of these guns were diverted from the primary market via straw purchasing and other means.

Straw purchasers move several thousand guns into criminal channels each year based on just those cases known to federal authorities. Nearly half of federal gun trafficking investigations from July 1996 to December 1998 involved straw purchasers who had diverted an average of 37 guns per case and a total of nearly 26,000 guns (ATF, 2000b:12–13). Case studies also suggest that larger, repetitive straw purchasing operations, which are particularly relevant to this discussion (see below), divert a considerable number of guns to the street markets from which roughly 25% to 40% of offenders obtain firearms and to the interstate flow of guns into areas with strict gun laws and lower levels of gun ownership (ATF, 2000b; Kennedy et al., 1996:174; Wachtel, 1998; but see Kleck, 1999 for a skeptical view on the importance of large-scale trafficking operations to the criminal gun supply).[5, 6]

## MULTIPLE SALES AND THE CRIMINAL GUN SUPPLY

Multiple sales facilitate large-scale gun trafficking by straw purchasers, which is why federal authorities monitor them and a few states prohibit them.[7] However, there has been very little direct investigation of the role

sources (Harlow, 2001:6). Such data tell us nothing, however, about the role of small- or large-scale straw purchasers as direct or indirect sources for these offenders. Many acquisitions from dealers and from family and friends may have involved straw purchases. And as noted below, some guns obtained through street sources may have been originally supplied through straw purchasing.

5. The estimate that 25% to 40% of offenders obtain guns from street sources is based on surveys of adult and juvenile gun offenders showing the percentages that acquire firearms directly from fences, drug dealers, "street" sources, or the "black market" (e.g., see Beck et al., 1993:19; Harlow, 2001:6; Sheley and Wright, 1993:6; Wright and Rossi, 1986:183).

6. For extensive reviews of gun markets, see Braga et al. (2002), Cook et al. (1995), Kleck (1999), Koper and Reuter (1996), National Research Council (2005:72–101), and Pierce et al. (2003).

7. Analysis of multiple sales reports prompted 13% of ATF's gun trafficking investigations during the late 1990s (ATF, 2000b:8–9).

of multiple sales in supplying criminal offenders. Two key questions with implications for the use of multiple sales as a trafficking indicator and for the efficacy of OGM laws are whether guns purchased in multiple sales are more likely than other guns to be used in crime and whether they provide a substantial share of crime guns. Multiple sales are probably fairly common, considering that three quarters of gun owners possess more than one gun (Cook and Ludwig, 1996:15).[8] Yet many who purchase guns in multiple sales are likely to be low-risk buyers (e.g., gun collectors), so the risk that guns sold in multiple sales are used in crime is likely to vary across different groups of buyers.

An ATF study that linked multiple sales directly to crime guns found that multiple sales accounted for 22% of a subsample of handguns recovered by police in 32 cities (ATF, 2000c:40). Moreover, handguns linked to multiple sales were over twice as common (51%) among handguns with an obliterated serial number, an obvious flag for potential trafficking. Nonetheless, the study was based on only the 5% of recovered handguns (and 4% of all recovered guns) successfully traced to a retail sale that occurred within the prior year,[9] and the link between multiple sales and obliterated serial numbers was not as strong in a later sample (ATF, 2002a:52).[10] And because the study examined only guns used in crime, it provides no basis for comparing the risks that handguns sold in single and multiple sales are used in crime. Information on multiple sales and crime from other sources is fragmentary but suggestive of a link.[11]

---

8. On a related note, Californians who purchased more than one handgun during 1999 (before the state's OGM law) accounted for about half of all handgun sales in the state that year (Violence Prevention Research Program, 2002:62).

9. The full study was based on 49,832 handguns (and 64,637 total guns) reported to the ATF by the 32 cities during 1999 (p. 11). The multiple sales analysis was based on 2,378 successfully traced handguns that were sold at retail for the first time in 1999 and recovered that same year (p. 40).

10. In the later study (based on data from 2000), multiple sales accounted for 20% of all recovered handguns and 27% of recovered handguns with an obliterated serial number. This multiple sale analysis was also based on a small subset of guns both sold and recovered within a one-year period.

11. For example, ATF inspections of Chicago-area gun retailers during the 1970s showed that half of multiple sales involved some form of federal violation in contrast to only 1% of randomly selected transactions (Zimring, 1975:192). A study of guns recovered from persons under the age of 25 in California during 1998 and 1999 revealed that about half of the guns linked to purchasers associated with more than one recovered gun were purchased in multiple sales (Wintemute et al., 2004). Firearms linked to these purchasers accounted for only 6% of crime guns with identified purchasers, but they moved into criminal channels more quickly; the median time from retail sale to recovery was just over two years for these guns but was almost six-and-a-half years for the full sample. Finally, a recent national study found that guns sold by dealers making higher numbers of multiple sales are recovered by police more quickly than guns sold by dealers making fewer multiple sales (Pierce et al., 2003, 2004). The study did not

There are also a few studies of OGM laws that provide insight into whether and how prohibition of multiple sales disrupts the criminal gun supply. In sum, there are indications these laws affect the interstate flow of guns, particularly that from states with lenient gun controls to those with more restrictive gun laws (Weil and Knox, 1996), but there is scant evidence they actually reduce gun crime (Coggeshall, 2001; Lott and Whitley, 2001; Webster et al., 2002). This implies that systematic straw purchasing via multiple sales plays a small-to-modest role in supplying illegal gun markets and one that is readily substitutable from other sources. However, various subtleties in these studies cloud interpretation of the findings. A few general points are that the studies lacked data on multiple sales (thus making it difficult to judge the scope of multiple sales trafficking in each jurisdiction) and did not systematically examine the full range of the laws' possible intrastate and interstate effects on both gun trafficking and gun crime.[12]

---

reveal whether guns sold in multiple sales were more likely to be used in crime or whether they moved into criminal channels more quickly, but some findings suggested that multiple sales were correlated weakly to moderately with other gun trafficking indicators.

12. In brief, one study of Virginia's 1993 OGM law suggests that it substantially reduced the flow of guns from Virginia to other states, particularly Northeastern states with stringent gun controls, but the study did not examine whether the law reduced gun crime in Virginia or elsewhere (Weil and Knox, 1996). Another study of crime and gun laws in Virginia reported that the state's OGM law had no impact on homicides in Virginia during its first year (Coggeshall, 2001).

In Maryland, gun homicides declined significantly in the two years after implementation of that state's OGM law in 1996 (Webster et al., 2002). Attribution of this trend to the OGM law is problematic, however, because the law was passed simultaneously with other state gun control measures, most notably new restrictions on secondhand gun transfers. Further, non-firearm homicides dropped after the law by more than did firearm homicides. The reduction in non-gun homicides was not statistically significant, but it implies that factors other than the OGM law may have caused the decline in gun homicides. Impacts elsewhere were not examined.

Finally, a state-level study of gun laws and crime from 1977 to 1998 reported that OGM laws failed on average to reduce homicides (and may have increased them) in OGM states and in their neighboring states (Lott and Whitley, 2001; also see Lott, 2003:164–168). (The study also examined other violent crimes, but I have focused on homicides because most homicides are committed with firearms.) This study included South Carolina, which has had an OGM law since 1975 (Vernick and Hepburn, 2003). (The other OGM laws in effect for portions of the study period were those in Virginia and Maryland.) However, South Carolina did not conduct background checks on gun buyers until required by federal law in 1994, which raises questions about enforcement of its OGM law before that time. (A system for background checks and maintenance of sales records for at least 30 days is a prerequisite for effective administration of an OGM law if policy makers wish to prevent these sales rather than react to them after

To provide a more direct assessment of the role of multiple sales in supplying crime guns, this study presents longitudinal analyses of the sale and subsequent criminal use of guns sold in single and multiple sales in the state of Maryland over several years. I examine the contribution of multiple sales to the criminal gun supply from Maryland and test the predictive validity of multiple sales as a crime gun indicator. I then consider the implications of the findings for the investigation of gun trafficking and the efficacy of OGM laws.

## STUDY SETTING

The state of Maryland had a population of approximately 4.8 million in 1990, which grew to nearly 5.3 million by 2000. Maryland is one of the most densely populated states in the nation, with 87% of its population residing in the metropolitan area of Baltimore, the state's largest city (which has over 650,000 residents), and the suburbs of Washington, D.C., a city of more than 570,000 persons that borders the state (see Figure 1).

FIGURE 1. AVERAGE VIOLENT CRIME RATES (PER 10,000 PERSONS) IN MARYLAND COUNTIES AND THE DISTRICT OF COLUMBIA, 1995–1999




the fact. Otherwise, gun dealers have no way of knowing whether a given buyer has made purchases from other dealers within the past 30 days.)

Also, the analysis of interstate effects in this study did not include an assessment of gun trafficking patterns to determine which neighboring or non-neighboring states were most likely to have been affected (the estimate was based on the weighted average across the three OGM states and their neighbors). Trafficking from Virginia into Washington, D.C., for example, was probably more problematic than trafficking from Virginia into its other neighbors (North Carolina, West Virginia, Tennessee, and Kentucky). And as mentioned, some research implies that Virginia's OGM law may have affected gun crime in non-neighboring states in the Northeast (Weil and Knox, 1996).

Despite relatively stringent gun controls (see discussion below), Maryland had comparatively high rates of violence throughout the 1990s. Maryland's crime rate is driven largely by crime in Baltimore, which had the third highest murder rate among the nation's largest cities in 1998 (Maguire and Pastore, 2000:288) and, unlike many other big cities, experienced little decline in its homicide rate during the 1990s. Guns are plentiful in Baltimore, where police seize in the neighborhood of 4,000 a year (ATF, 1999a, 2000d, 2002b). Other large, high-crime jurisdictions in the state include Baltimore County, a suburban county surrounding Baltimore city, and Prince George's County, a suburban county bordering Washington, D.C. (see Figure 1). From 1995 to 1999, three quarters of the violent crimes in Maryland occurred in Baltimore city, Baltimore County, or Prince George's County.

Maryland's proximity to Washington, D.C. (hereafter, D.C.) also has implications for gun markets in the state. Despite having a handgun ban in place since the mid-1970s, D.C. has high levels of gun violence. During the 1990s, police in D.C. recovered 2,000 to 3,000 guns annually (ATF, 1999a, 2000e; Wilber, 2004), and the city's murder rate ranked first or near the top among the nation's largest cities (e.g., see Maguire and Pastore, 1995:320, 2000:288, 2001:301). D.C.'s stringent gun controls, high levels of violence, and proximity make it a likely destination for gun trafficking out of Maryland, from which it gets 20% to 30% of its crime guns (ATF, 1997, 1999a, 2000e, 2002c).

Maryland has licensed handgun dealers and required background checks and a seven-day waiting period for handgun buyers since the 1960s (Vernick and Hepburn, 2003), all of which gave rise to the gun sales database described below. The state also instituted background checks for sales of military-style assault weapons (as defined by state law) in 1989, followed by a later state ban on assault pistols. Since 1990, moreover, the state has prohibited sales of many, although not all, of the inexpensive, low-quality, and easily concealable handgun models commonly referred to as "Saturday night specials" (SNS). Finally, in October 1996, Maryland implemented OGM restrictions for handgun purchases, among other gun control measures.

Although this study focuses on sales made before Maryland's OGM law (see below), the restrictions existing before 1996 may have discouraged large-scale, repetitive gun trafficking in the state even before the OGM law. This could bias the results conservatively, lessening the difference in criminal use between guns sold in single and multiple sales. Accordingly, generalization of the results to other areas must be done cautiously, an issue to which I return later.

## DATA AND MEASURES

### MARYLAND GUN SALES DATA

The Maryland State Police (MSP) maintain a registry of all handgun sales by gun dealers in the state. This analysis is based on records of 180,246 sales made in Maryland from 1990 through September 1996, before the imposition of Maryland's OGM law.[13] For each sale, the following data were extracted: characteristics of the firearm (e.g., type, manufacturer, model, serial number); the buyer's identification, demographics, and residence; the dealer's identification; and the date of the sale.

In the analysis below, the term *multiple sale* refers to the purchase of two or more handguns by the same person from any dealer(s) within a 30-day period.[14] By this criterion, 27% of the handguns sold during the study period were purchased in a multiple sale (see Table 1). This definition is consistent with the logic of OGM laws, and it captures the activities of purchasers who may have spread multiple buys over several dealers and/or days to avoid federal reporting requirements. Nonetheless, 82% of the guns purchased in multiple sales as defined herein also met the federal definition of a multiple sale (i.e., the purchase of more than one handgun from the same dealer within five business days[15]), in almost all cases involving same-day, same-dealer purchases.

### CRIME GUN DATA

To determine if and when handguns sold in Maryland were subsequently recovered by police, the Maryland sales records were linked to a national database on approximately one million guns recovered by law enforcement agencies and reported to the ATF for investigative tracing from 1990 through March 2000. A gun trace is an investigation that tracks the sales history of a gun from its manufacture through its first point of retail sale by a licensed dealer. Upon request, the ATF traces guns seized

13. The database contains records of 199,300 sales for this period. However, 9% of the records were omitted from the analysis due to insufficient information about the firearms (particularly gun make and serial number, which, as described below, were necessary for determining which guns were later used in crime). Less than 1% of the records were excluded for other miscellaneous problems.

A small percentage of guns in the analysis (less than 4%) are assault rifles (state law requires registration of all assault weapon sales) or voluntarily registered rifles and shotguns. (Ambiguities or inconsistencies in the coding of weapon types made it difficult to differentiate these guns from certain types of handguns.)

14. More specifically, a purchase was counted as a multiple sale if the buyer made any other purchases on the same day, during the prior 30 days, or during the subsequent 30 days.

15. This was approximated based on purchases from the same dealer within any five consecutive calendar days.

TABLE 1. POLICE RECOVERIES OF GUNS SOLD IN MARYLAND BY TYPE OF SALE (N = 180,246 GUNS SOLD IN MARYLAND, 1990–SEPTEMBER 1996)

| | Single Sale | Multiple Sale |
|---|---|---|
| Sales | | |
| Number sold | 130,885 | 49,361 |
| As a percentage of all sales | 72.6% | 27.4% |
| Recoveries* | | |
| Number recovered | 4,851 | 1,612 |
| Percentage recovered | 3.7% | 3.3% |
| As a percentage of all recoveries | 75.1% | 24.9% |

* Based on recoveries anywhere in the nation as of March 2000.

by law enforcement as a service to federal, state, and local authorities. To initiate a trace, law enforcement agencies must provide the ATF with detailed information about the firearm, such as make, model, serial number, and caliber.[16]

Although the ATF tracing data provide the only available national sample of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they have limitations for research purposes (e.g., see Cook and Braga, 2001; Kleck, 1999; National Research Council, 2005:37–40). Guns reported to the ATF for tracing represent a nonrandom subset of guns used in crime. For one thing, law enforcement agencies do not seize all guns used in crime, although the guns that they do recover are generally considered to be a reasonable sample of crime guns (Brill, 1977; Cook and Braga, 2001). Moreover, gun tracing is voluntary; hence, some law enforcement agencies trace all recovered guns as a matter of policy, whereas others trace guns only when needed for specific investigations, if at all. These patterns have not been studied systematically but undoubtedly vary widely based on a range of organizational and contextual factors, thus introducing additional bias of an unknown degree into the sample of traced guns.[17]

16. Note that the Maryland data, rather than the ATF trace results, were used to determine if and when the crime guns were sold in Maryland. The ATF trace results identify the first retail dealer that sold the gun, who may differ from the Maryland dealer who most recently sold the gun. Also, the ATF tracing results are sometimes incomplete due to factors like the failure of dealers to submit their sales records to the ATF when they go out of business (e.g., see ATF, 1999a).

17. Factors influencing tracing practices might include, for instance, the types of firearms confiscated (e.g., see Kleck, 1997:112,141), the availability of state or local gun registration data, knowledge of the ATF's tracing capabilities and procedures, the types of investigations being conducted, participation in federal/state/local law enforcement task forces, and the stringency of state and local gun laws.

As of the mid-1990s, it seemed that law enforcement agencies requested traces for about one quarter of gun homicides but only 1% of gun robberies and gun assaults known to police (calculated from ATF, 1995b and Federal Bureau of Investigation, 1995:13,18,26,29,31,32). However, gun tracing became increasingly common during the 1990s due to a renewed federal emphasis on gun trafficking investigations and dealer regulation, improvements in the tracing process, and ATF promotional efforts and special initiatives that greatly increased tracing among state and local police agencies (ATF, 2000a:19–21; Cook and Braga, 2001). The ATF received approximately 200,000 trace requests in 1999 (ATF 2000a:25), up from 83,359 in 1994 and only 37,181 in 1990 (ATF, 1995b). As part of the ATF's Youth Crime Gun Interdiction Initiative (YCGII), 17 major cities have been requesting traces on all confiscated firearms since at least 1996 (ATF, 1997). By 2000 (the end of this study period), the effort had been expanded to 50 cities and metropolitan areas, most of which had successfully implemented comprehensive tracing (see http://www.atf.gov/firearms/ycgii/2000/index.htm). Furthermore, six states (including Maryland) were instituting or had successfully achieved comprehensive statewide tracing by the end of the 1990s (ATF, 2000c:51).

Although these developments have arguably made tracing data more representative of crime guns in general and enhanced their utility for policy research (e.g., see Cook and Braga, 2001; Pierce et al., 2003, 2004), the variation in gun tracing across places and over time may bias analyses based on national tracing data. Therefore, separate analyses were conducted based on recoveries in Baltimore and D.C. . The police departments in these cities have been tracing guns comprehensively since 1994 (both departments have been participating in the ATF's YCGII since its inception), providing complete data on guns recovered in these jurisdictions for a significant portion of the study period. Hence, the Baltimore and D.C. analyses will show whether trafficking indicators developed from national tracing data can be validated using more representative samples of crime guns (for a similar approach, see Pierce et al., 2003, 2004).

Furthermore, they will provide insights into the workings of local gun markets, which provide a large if not predominant share of the criminal supply in most places. Nationally, about half of traced guns are recovered within 25 miles of where they were purchased (ATF, 2002a:43–44); currently, this figure is 63% for Baltimore (ATF, 2002b:17) and 44% for D.C. (ATF, 2002c:17).[18]

18. Crime guns from out-of-state and distant locations are more common in jurisdictions with more restrictive gun controls (such as New York, Massachusetts, and Washington, D.C.), which is likely due in part to higher levels of interstate gun trafficking in such jurisdictions.

Finally, contrasts of the Baltimore and D.C. results will yield insights into differences between interstate and intrastate gun markets. Due to the restrictions on the legal supply of handguns in D.C., it seems likely that trafficking guns from Maryland into D.C. is more profitable than trafficking guns within Maryland. Therefore, we can hypothesize that multiple sales were more strongly related to gun use in D.C. than in Baltimore.

## ANALYSIS AND RESULTS

### ANALYSES WITH NATIONAL CRIME GUN DATA

Linking the Maryland and ATF databases on gun make, serial number, and caliber indicated that 3.6% of the guns sold in Maryland from 1990 through September 1996 (6,463 of 180,246) had been recovered by law enforcement and reported to the ATF as of March 2000. Table 1 reveals that 25% of the guns recovered by police were sold in multiple sales. However, the percentage of multiple sales recovered (3.3%) was somewhat smaller than that for single sales (3.7%), which suggests that guns sold in multiple sales had a lower risk of being used in crime.

To examine the issue more rigorously, survival analysis techniques (Allison, 1995) were used to analyze the time from the sale of a handgun in Maryland until its recovery by police or the end of the study period, whichever came first.[19] Follow-up time varied from 1 to 3,733 days (i.e., up to approximately 10 years) across the population.

### Multiple Sales and the Risk of Criminal Use: Life Table Results

Table 2 presents results from a life table analysis comparing the probabilities that handguns sold in single and multiple sales were recovered within various follow-up periods. For example, estimates in the bottom row of Table 2 suggest that 4% to 5% of guns were recovered within ten years of sale, regardless of transaction type.[20] Note, however, that

---

19. In the latter case, an observation is censored, meaning that we know only that the gun was not recovered in the time that elapsed between its sale and the end of the study period. Survival analysis techniques were developed specifically for the analysis of censored data.

Also note that the MSP database includes dealers' sales of used guns. Therefore, in contrast to other ATF tracing studies that have calculated time from sale to recovery (commonly referred to as "time to crime") based on a gun's first retail sale, this study uses a more refined calculation of time to recovery based on a gun's most recent sale in Maryland (it is possible, however, that some crime guns passed through the hands of dealers in other states after being sold in Maryland but before being recovered).

20. In the life table method, the analyst groups the event times into intervals of a chosen length—in this application, one year—and calculates $S_t$, which is the probability that the case "survived" (i.e., did not experience the event of interest) to the start of

these are minimum estimates because police do not trace all recovered guns.

TABLE 2. CUMULATIVE PROBABILITY THAT GUNS SOLD IN MARYLAND WERE RECOVERED BY POLICE AND REPORTED TO THE ATF BY FOLLOW-UP TIME AND TYPE OF SALE (LIFE TABLE ESTIMATES, N = 180,246 GUNS SOLD IN MARYLAND, 1990–SEPTEMBER 1996)

| Follow-Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0084 | 0.0094 | +12% |
| 2 years | 0.0152 | 0.0158 | +4% |
| 3 years | 0.0209 | 0.0203 | –3% |
| 4 years | 0.0264 | 0.0254 | –4% |
| 5 years | 0.0312 | 0.0286 | –8% |
| 6 years | 0.0352 | 0.0317 | –10% |
| 7 years | 0.0389 | 0.0348 | –11% |
| 8 years | 0.0418 | 0.0377 | –10% |
| 9 years | 0.0449 | 0.0397 | –12% |
| 10 years | 0.0469 | 0.0407 | –13% |

NOTE: Based on recoveries anywhere in the nation as of March 2000. Differences significant at $p < 0.01$.

The results suggest that handguns sold in multiple sales were roughly 4% to 12% more likely to be used in crime than other guns during the first two years after sale, but the pattern reversed thereafter. By year ten, guns sold in multiple sales were 13% less likely to have been used in crime than other guns.

interval t. For each interval, the value of $S_t$ is based on the probabilities of events occurring in prior intervals. For example, the probability of surviving to the third interval or beyond would be the product of $(1 - q_1)(1 - q_2)$, where $q_1$ and $q_2$ represent the probabilities of events occurring during intervals 1 and 2, respectively. For a given interval, the probability of an event (conditional on survival to the start of the interval) is denoted as $q = d / (n - m/2)$, where d equals the number of events occurring during the interval, n refers to the sample at risk at the start of the interval (i.e., the number of cases that have not experienced an event or been censored by the start of the interval), and m is the number of cases censored during the interval (Teachman, 1983:270). For further discussion of the life table method, see Allison (1995) and Teachman (1983).

The values presented in Table 2 are based on $1 - S_t$. For example, the probability that a handgun sold in a single sale survived (i.e., was not recovered by police) to the start of year 2 was 0.9916. Conversely, the probability that the gun was recovered by the start of year 2 was 1 – 0.9916, or 0.0084, which is presented in Table 2 as the probability that the gun was recovered within 1 year.

### Adjusting for Buyer Characteristics and Other Factors: Multivariate Results

The life table results provide mixed support at best for the hypothesized link between multiple sales and gun trafficking. However, preliminary analysis also revealed that multiple sales were associated with other factors, such as buyer demographics, that could have confounded the relationship between multiple sales and criminal gun use. For example, older gun buyers and white gun buyers were more likely to purchase guns in multiple sales, but the guns they purchased were less likely to be used in crime.

To control for such factors, we next examine a series of multivariate accelerated failure time (AFT) models that test the effect of multiple sales on the time until a gun's recovery by police.[21] As shown in Table 3, the models control for the age (and age-squared), race (categorized as white, black, and other/unknown), and sex of the buyer. Year of sale is included

21. AFT models take the form, $\log T = a + b_1x_1 + b_2x_2 + \ldots + b_nx_n + ce$, where T is the survival time (in this case, the time until a gun was recovered or the observation period ended), a is an intercept term, $b_1$ through $b_n$ are coefficients representing the effects of covariates $x_1$ through $x_n$, and ce is an error term whose distribution varies for different types of AFT models (Allison, 1995:61–110). The distribution of the error term is related to assumptions about the unobserved rate at which events occur, also called the hazard rate. Common AFT models, also known as parametric survival models, include the exponential model, which assumes a hazard rate that is constant over time; the Weibull model, which assumes a hazard rate that increases or decreases monotonically; the log-normal model, which assumes a hazard that rises to a peak and then declines over time; and the gamma model, which, in its generalized form, allows the hazard rate to take on a wide variety of shapes. Several of these models are nested within others; in which case, their fits can be formally tested against one another using a log-likelihood ratio test. The AFT models discussed in this article were estimated assuming various distributions for the hazard rate. Those presented in the text are the ones that produced the best fit as measured by the log-likelihood statistic. However, assumptions about the hazard rate had little effect on inferences regarding multiple sales.

It is also possible to estimate semiparametric models (commonly known as Cox proportional hazard models) that do not require assumptions about the underlying hazard rate. Nonetheless, I employed parametric AFT models because statistical software for estimating these models can accommodate left censoring, which is present in these data. Left censoring refers to instances in which it is known that an event occurred before time t, but the exact timing of the event is unknown. In this application, some recovered guns have a known tracing date but an unknown recovery date (in these cases, the tracing date is an upper limit on the gun's survival time). In the national analysis, approximately one third of the gun recoveries are left censored cases. This is much less problematic, however, for the analyses of recoveries in Baltimore and D.C. .; only 9.8% of the Baltimore recoveries and 11.8% of the D.C. recoveries are left censored cases. Alternative analyses that substituted tracing dates for missing recovery dates (thus

to control for changes over time in both crime rates and gun tracing practices.[22] Finally, indicators for the buyer's county of residence (not shown in Table 3) account for time-stable differences in crime rates and proximity to high crime areas between Maryland's 24 counties.

Adjusting for these factors reveals that handguns sold in multiple sales had survival times 22% shorter than those of other handguns (Table 3, Model A), which is to say that handguns sold in multiple sales were more likely to be used in crime.[23] Model B (Table 3) replaces the multiple sale dichotomy with variables for the number of guns purchased and that number squared.[24] This shows that each additional gun purchased shortened time to recovery by approximately 11%, but the effect leveled off at about 16 guns.[25]

Turning to the other covariates, handguns purchased by young buyers,[26] males, and nonwhites were more likely to be used in crime, as were those purchased during 1995 or 1996 (this finding likely reflects greater utilization of gun tracing during 1995 and 1996, particularly by police in Baltimore and D.C., where most of the crime guns were recovered). Although not shown in Table 3, the buyer's county of residence also affected the likelihood that guns were used in crime. Most notably, handguns purchased by buyers in Baltimore city, Baltimore County, and Prince George's County had an elevated risk of being used in crime.

---

ignoring left censoring) yielded substantive findings virtually identical to those presented in the text for both the national and the local tests.

Another advantage to parametric models is that they enable one to draw inferences about the shape of the hazard rate, which has implications for theory and policy. Although I do not highlight the issue in this article, the hazard of gun recovery was highest in the early years after a gun's sale, thus providing empirical confirmation of the "new guns" hypothesis (Zimring, 1976), which states that criminals make disproportionate use of newer firearms, and yielding further insight into the role of primary market diversion in supplying criminals.

22. The year indicators also control for random censoring, which occurs when observations are censored for reasons not under the investigator's control (Allison, 1995:12). In this application, the observations have a fixed end date but random entry dates. Consequently, guns sold during the earlier years have longer potential follow-up periods.

23. The effect size is calculated by exponentiating the coefficient for multiple sales, subtracting one, and multiplying by 100.

24. Note that this count captures purchases made simultaneously as well those made during both the prior 30 days and the subsequent 30 days.

25. This plateau point is calculated as $b1/(-2 * b2)$, where b1 is the coefficient for the number of guns and b2 is the coefficient for the number of guns squared.

26. The coefficients for age and age-squared indicate that time to recovery increased with age up until age 59, at which point the effect leveled off.

TABLE 3. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY BY POLICE (N = 180,246 GUNS SOLD 1990–SEPTEMBER 1996)

| | Model A | | Model B | |
|---|---|---|---|---|
| | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | –0.255 | 21.07*** | — | — |
| Number of guns | — | — | –0.112 | 21.38*** |
| Number of guns (squared) | — | — | 0.003 | 13.85*** |
| Age | 0.246 | 472.09*** | 0.244 | 466.00*** |
| Age (squared) | –0.002 | 270.40*** | –0.002 | 264.31*** |
| Male | 0.421 | 35.92*** | 0.420 | 35.70*** |
| White | 1.083 | 48.07*** | 1.077 | 47.54*** |
| Black | –2.022 | 163.74*** | –2.025 | 164.14*** |
| Sale in 1990 | 0.822 | 60.74*** | 0.822 | 60.65*** |
| Sale in 1991 | 0.304 | 9.33*** | 0.308 | 9.55*** |
| Sale in 1992 | 0.271 | 7.95*** | 0.271 | 7.94*** |
| Sale in 1993 | 0.261 | 7.47*** | 0.255 | 7.12*** |
| Sale in 1994 | 0.178 | 3.63* | 0.178 | 3.63* |
| Sale in 1995 | –0.086 | 0.78 | –0.085 | 0.77 |
| Intercept | 8.934 | 358.27*** | 9.057 | 366.62*** |
| Hazard distribution | Gamma | | Gamma | |
| Log likelihood | –30,073.62 | | –30,072.56 | |
| Right censored cases | 173,783 | | 173,783 | |
| Left censored cases | 2,272 | | 2,272 | |

NOTE: Based on recoveries anywhere in the nation as of March 2000. Race effects interpreted relative to "other" and year effects relative to 1996. Coefficients for buyer's county of residence not shown.
$*p \leq 0.10$; $***p \leq 0.01$.

## ANALYSES WITH LOCAL CRIME GUN DATA

The national results suggest that multiple sales are a risk factor for criminal gun use. As noted, however, results with national tracing data could be biased by variation in tracing practices between law enforcement agencies and over time. If, for example, police departments without comprehensive tracing policies are more likely to trace guns they suspect are linked to gun trafficking, then the preceding results may overstate the risk that guns sold in multiple sales are used in crime. In the next sections, therefore, we examine whether handguns sold in multiple sales were more likely to be used in crime in Baltimore and D.C. . Because police in these cities began comprehensive gun tracing in 1994, the models below are based on 82,811 guns sold from 1994 through September 1996, with follow-

up periods extending from 1994 through March 2000.[27] Approximately 3.4% of the guns sold during that period were recovered and traced as of March 2000, with Baltimore and D.C. recoveries accounting for 51% and 17% of the traces, respectively. Based on life table estimates (not shown), the probability of recovery in Baltimore within five years was 1.9% for single sales and 1.5% for multiple sales. (I focus on recoveries within five years because most of the guns had less than six years of potential follow-up time.) The corresponding probabilities for recoveries in D.C. were 0.6% and 0.5%, respectively. However, because the national analysis revealed confounding influences from buyer demographics and other factors, I concentrate on multivariate results in the sections below.

### Multiple Sales and Crime Guns in Baltimore: Multivariate Results

Table 4 presents results from competing risks AFT models predicting recoveries in Baltimore.[28] As in the national analysis, the Baltimore models control for buyer demographics, year of sale, and buyer jurisdiction. But due to the smaller sample size for this analysis, the latter was measured with an abbreviated set of four indicators representing Baltimore city, Baltimore County (which surrounds Baltimore city), other counties in the Baltimore metropolitan area, and counties in the D.C. metropolitan area (guns purchased elsewhere are treated as the reference group).[29]

Whether measuring multiple sales as a dichotomy or as the number of guns purchased, handguns sold in multiple sales were no more likely to be recovered by police in Baltimore than were other firearms (Table 4, Models A and B). This may indicate that the multiple sale effect found in the national analysis is an artifact of biases in national tracing data. On the other hand, it could also imply that trafficking through multiple sales was not particularly important to the illicit gun market within Maryland due to the availability of various other supply channels (e.g., single-sale straw purchases, secondhand sales, thefts).

27. A supplemental analysis linking only the 1994-September 1996 sales to the national crime gun data also yielded a significant multiple sales effect.

28. In competing risks models, event types other than the one of interest are treated as censored cases. Here, recoveries in Baltimore are the events of interest, and those elsewhere are modeled as censored cases. In the D.C. models described below, recoveries in D.C. are the events of interest.

29. Gun sales in several counties resulted in very few or no recoveries in Baltimore or D.C., thus necessitating a recode of the geographic variables. Note also that the race variable was collapsed into a white/nonwhite dichotomy.

TABLE 4. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME COMPETING RISKS MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY IN BALTIMORE (N = 82,811 GUNS SOLD 1994–SEPTEMBER 1996)

| | Model A | | Model B | |
|---|---|---|---|---|
| | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | –0.010 | 0.01 | — | — |
| Number of guns | — | — | –0.041 | 0.44 |
| Number of guns (squared) | — | — | 0.008 | 1.81 |
| Age | 0.173 | 99.14*** | 0.177 | 100.51*** |
| Age (squared) | –0.002 | 53.27*** | –0.002 | 54.18*** |
| Male | 0.359 | 11.04*** | 0.402 | 12.31*** |
| Nonwhite | –2.285 | 457.71*** | –2.298 | 495.89*** |
| Sale in 1994 | 0.069 | 0.50 | 0.037 | 0.14 |
| Sale in 1995 | –0.145 | 2.03 | –0.169 | 2.57 |
| Baltimore City resident | –4.218 | 176.04*** | –4.077 | 205.57*** |
| Baltimore County resident | –3.165 | 105.80*** | –2.915 | 110.85*** |
| Other Baltimore MSA resident | –1.893 | 37.47*** | –1.731 | 39.44*** |
| Washington, D.C. MSA resident | 1.244 | 12.17*** | 1.185 | 14.27*** |
| Intercept | 11.818 | 623.04*** | 11.882 | 651.39*** |
| Hazard distribution | Weibull | | Gamma | |
| Log-likelihood | –7,059.44 | | –7,044.91 | |
| Right censored cases | 81,386 | | 81,386 | |
| Left censored cases | 139 | | 139 | |

NOTE: Based on recoveries as of March 2000. Year effects interpreted relative to 1996 and geographic effects relative to rural (non-MSA) areas.
*** $p \leq 0.01$.

### Multiple Sales and Crime Guns in Washington, D.C.: Multivariate Results

To shed light on these ambiguities, Table 5 presents competing risks models predicting recoveries in Washington, D.C., a likely destination for interstate gun trafficking out of Maryland. The D.C. models have the same covariates as the Baltimore models, with the exception that the jurisdiction variables have been changed to reflect the geography of the D.C. area. Separate geographic indicators are included for Prince George's and Montgomery counties, the two counties that share a border with D.C., whereas two additional indicators represent all other counties in the D.C. and Baltimore metropolitan areas, respectively.

In general, handguns were recovered in D.C. 31% more quickly if they were sold in multiple sales (Table 5, Model A), an effect larger than that in the national analysis. Time to recovery (or as it is often called, time to crime) accelerated by about 12% for each additional gun purchased in a

TABLE 5. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME COMPETING RISKS MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY IN WASHINGTON, D.C. (N = 82,811 GUNS SOLD 1994–SEPTEMBER 1996)

| | Model A | | Model B | |
|---|---|---|---|---|
| | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | –0.366 | 5.10** | — | — |
| Number of guns | — | — | –0.128 | 7.33*** |
| Number of guns (squared) | — | — | 0.002 | 1.99 |
| Age | 0.247 | 30.03*** | 0.230 | 24.84*** |
| Age (squared) | –0.002 | 10.59*** | –0.002 | 7.69*** |
| Male | 0.050 | 0.05 | 0.104 | 0.20 |
| Nonwhite | –2.874 | 144.97*** | –2.808 | 140.12*** |
| Sale in 1994 | 0.033 | 0.03 | 0.116 | 0.36 |
| Sale in 1995 | –0.033 | 0.03 | –0.014 | 0.00 |
| Prince George's County resident | –4.539 | 43.16*** | –4.494 | 42.48*** |
| Montgomery County resident | –2.676 | 14.86*** | –2.690 | 15.08*** |
| Other D.C. MSA resident | –2.161 | 8.38*** | –2.103 | 7.97*** |
| Baltimore MSA resident | –0.223 | 0.11 | –0.229 | 0.11 |
| Intercept | 13.431 | 151.06*** | 150.65 | 150.65*** |
| Hazard distribution | Weibull | | Weibull | |
| Log likelihood | –2,700.43 | | –2,692.78 | |
| Right censored cases | 82,344 | | 82,344 | |
| Left censored cases | 55 | | 55 | |

NOTE: Based on recoveries as of March 2000. Year effects interpreted relative to 1996 and geographic effects relative to rural (non-MSA) areas.
**$p \leq 0.05$; *** $p \leq 0.01$.

multiple sale (Table 5, Model B). These results confirm that the purchase of handguns in a multiple sale in Maryland was a risk factor for criminal gun use, but they suggest the effect was primarily due to interstate rather than intrastate trafficking.

*Predicted Probabilities of Recovery in Washington, D.C.* To further illustrate the link between multiple sales in Maryland and gun crime in D.C., I used the results of Model A in Table 5 to generate predicted probabilities of recovery in D.C. by transaction type (single, multiple) and years of follow-up for guns purchased by selected types of buyers. Table 6 displays predictions for a fairly typical Maryland gun buyer in the D.C. metropolitan area (based on modal characteristics of buyers during the 1994–September 1996 period). Guns purchased by these buyers had roughly a 0.2% to 0.3% chance of being recovered in D.C. within five years. Although these probabilities are quite small, they also reveal that guns sold in multiple sales were 24% to 29% more likely to have been used in crime at each year of follow-up.

TABLE 6. CUMULATIVE PROBABILITY THAT GUNS PURCHASED IN MARYLAND BY "TYPICAL" GUN BUYERS WERE RECOVERED IN WASHINGTON, D.C., BY FOLLOW-UP TIME AND TYPE OF SALE

| Follow-Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Sales Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0007 | 0.0009 | +29% |
| 2 years | 0.0012 | 0.0015 | +25% |
| 3 years | 0.0015 | 0.0019 | +27% |
| 4 years | 0.0018 | 0.0023 | +28% |
| 5 years | 0.0021 | 0.0026 | +24% |

NOTE: Typical gun buyer = 35-year old, white male residing in Montgomery County who bought in 1994. Predictions were generated from the results of Model A in Table 5.

TABLE 7. CUMULATIVE PROBABILITY THAT GUNS PURCHASED IN MARYLAND BY "HIGH-RISK" GUN BUYERS WERE RECOVERED IN WASHINGTON, D.C., BY FOLLOW-UP TIME AND TYPE OF SALE

| Follow Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Sales Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0550 | 0.0690 | +25% |
| 2 years | 0.0843 | 0.1053 | +25% |
| 3 years | 0.1079 | 0.1343 | +24% |
| 4 years | 0.1281 | 0.1591 | +24% |
| 5 years | 0.1463 | 0.1811 | +24% |

NOTE: High-risk buyer = 21-year-old, nonwhite male residing in Prince George's County who bought in 1995. Predictions were generated from the results of Model A in Table 5.

Table 7 presents predictions for guns purchased by selected high-risk buyers (i.e., buyers whose demographic characteristics and area of residence put their guns at high relative risk of being used in crime in D.C. according to the results of Model A in Table 5). Recovery probabilities were much higher for these guns, illustrating the effects of buyer demographics and residence. Handguns purchased by these buyers in single sales had a nearly 15% chance of being recovered in D.C. within 5 years. This figure rose to about 18% for handguns purchased in multiple sales, an increase of 24%.[30]

30. This is a very elementary illustration of how transaction type affected the likelihood of recovery. More dramatic effects might be uncovered by considering possible interactions between transaction type and buyer characteristics and incorporating other

## DISCUSSION AND CONCLUSIONS

### GENERAL FINDINGS AND CAVEATS

This study of the sale and subsequent criminal use of handguns sold in Maryland during the early and mid-1990s supports the suspected link between multiple sales and gun trafficking. Guns sold in multiple sales accounted for about one quarter of crime guns and, more importantly, were at elevated risk for criminal use. The latter finding was primarily an interstate phenomenon; guns sold in multiple sales in Maryland before the state's OGM law were roughly 25% more likely than those sold in single sales to be recovered by police in the neighboring jurisdiction of Washington, D.C., where gun controls are very restrictive, but no more likely to be recovered in Baltimore, which is Maryland's primary urban center. Hence, multiple sales in Maryland were a risk factor for interstate but not intrastate gun trafficking. These results are consistent with the view of some analysts that the criminal gun supply is more dependent on larger, ongoing trafficking operations in jurisdictions with stricter gun controls (e.g., Braga et al., 2002).

This study is based on multiple sales as reported by primary market (i.e., retail) gun dealers. It cannot address multiple sales in the secondary market or covert multiple sales made by corrupt dealers in the primary market.[31] Furthermore, the study is based on crime guns that could be matched to sales records based on make and serial number. If guns sold in multiple sales are more likely to have obliterated serial numbers, as suggested by some research (ATF, 2000c:40), then these results may understate the risk that these guns are diverted to criminal channels. (Other limitations to the data were discussed earlier.)

We must also be cautious about generalizing these findings to other states. Gun control measures in Maryland, particularly its waiting period on handgun sales and ban on many SNS firearms, may have discouraged repetitive trafficking from retail sources even before the state's OGM law.[32] On the other hand, it is not particularly difficult to buy a gun from a dealer in Maryland—one need only pass a background check and wait a week—and the state's proximity to a major city with a handgun ban (D.C.)

factors like the number and types of guns sold. I discuss some of these issues briefly in the next section.

31. I have focused on multiple sales in the primary market because they are regulated more closely and because my data correspond to primary market sales. However, secondary market multiple sales at gun shows and elsewhere also undoubtedly contribute to the gun trafficking problem (ATF, 1999b, 2000b).

32. The low prices of SNS guns and the ease with which they can be concealed seem to make them particularly attractive to criminals and juvenile possessors (e.g., see Kennedy et al., 1996; Wintemute, 1994; Wintemute et al., 1998).

may have provided an incentive for trafficking. In other jurisdictions, multiple sales could prove to be a stronger risk factor for intrastate gun trafficking and possibly a stronger or weaker one for interstate trafficking.

## IMPLICATIONS FOR GUN ENFORCEMENT AND POLICY

Notwithstanding these caveats, the study supports the validity of multiple sales as a gun trafficking indicator. This suggests that federal reporting requirements for multiple sales are prudent, and that investigators should continue to emphasize these sales in gun trafficking investigations.[33] Information on multiples sales should be particularly useful to interjurisdictional (federal–state–local) task forces examining the supply sources of local illicit gun markets.

Trafficking indicators based on multiple sales can also be refined in various ways. As reported, for instance, the number of guns sold in a multiple sale influences the likelihood that those guns will be used in crime. In addition, a supplemental analysis of D.C. recoveries (not shown) revealed that the association between multiple sales and recovery by police was stronger for the few SNS-type models still sold in Maryland. Therefore, more precise trafficking indicators could likely be developed based on the number and type(s) of guns sold in a multiple sale.[34]

This research also supports the efficacy of OGM laws as a method for disrupting gun trafficking, particularly trafficking across state lines (also see Virginia State Crime Commission, 1996; Weil and Knox, 1996). Beyond this, the study facilitates some tentative speculation about the effects of Maryland's OGM law on the illegal gun supply and gun violence inside and outside the state.

An OGM law should disrupt straw purchasing operations, thereby reducing the flow of guns from the primary market into criminal channels.[35] According to economic reasoning (e.g., see Cook and Leitzel, 1996), this should raise prices in the secondary market. Besides disrupting gun trafficking, the law might also reduce primary market sales more generally among persons who buy without criminal intent but who are more likely to resell guns in the secondary market.[36] This is more speculative

33. Even if multiple sales are not at elevated risk for criminal use in a given jurisdiction, it may still be cost effective for law enforcement to emphasize these sales in gun trafficking investigations, provided that multiple sales are not at a significantly lower risk of criminal use.

34. A sale involving ten SNS-type handguns, for instance, is likely to be a higher risk transaction than one involving two expensive handguns.

35. To illustrate, OGM laws should force traffickers to lower their business volume, recruit more straw purchasers, or find guns from other sources, all of which may entail greater expenses and/or risks.

36. This may not be an explicit objective of legislators passing such laws (Virginia's

but, if true, could aggravate shortages of guns available through theft or sale on the secondary market, exerting even more upward pressure on street prices. In principle, this combination of restricted supplies and higher prices should reduce criminal gun acquisitions and gun crime.

Whether, when, and by how much these forces reduce gun crime will depend on how readily prohibited buyers can substitute other sources for those affected by the law (e.g., see National Research Council, 2005:72–101).[37] For example, increases in single straw purchases and the use of fake identification to buy guns from dealers might offset some of the law's impact on the diversion of guns from the primary market. Another key factor is the share of the secondary market that is supplied through multiple sales, which will determine the magnitude of the supply shift in that market. These factors are likely to vary across jurisdictions depending on other gun laws and levels of gun ownership.

Having said this, we can place reasonable upper limits on the net effects of the Maryland OGM law within the state and in D.C. by noting that guns sold in multiple sales in Maryland accounted for approximately 14% of Baltimore's crime guns and 7% of D.C.'s before the law.[38] The data in this study are not sufficient to determine what share of these multiple sale crime guns were provided through trafficking rather than through a process of gradual diffusion, but we can reasonably infer that this share was higher in D.C. . We can also speculate that substitution of other supply sources is more difficult in D.C. due to its handgun ban and greater reliance on systematic trafficking. It is conceivable, therefore, that the net effect of the law on illegal gun acquisition has been greater in D.C. than in Maryland. Nonetheless, a disruption in this modest segment of D.C.'s gun market may have been overcome by more diversions of single retail sales from Maryland, trafficking from other states, thefts, and other sources.[39]

Additional information on the effects of the Maryland OGM law is

---

OGM law, for example, was clearly inspired by concerns about interstate gun trafficking—see Virginia State Crime Commission, 1996), but it is a potential byproduct that must be considered.

37. If an OGM law applies only to handguns, one must also consider the possibility that some offenders will substitute long guns.

38. Guns sold in Maryland accounted for roughly 57% of Baltimore's crime guns around the time of the law (ATF, 1997), and the data analyzed here show that 25% of this Maryland supply came from multiple sales. We can thus infer that 57% x 25% = 14% of Baltimore's crime guns originated from multiple sales in Maryland. In D.C., 25% of crime guns came from Maryland (ATF, 1997), and 28% of those guns were linked to multiple sales. These figures imply that multiple sales in Maryland provided roughly 7% of D.C.'s crime guns.

39. Another consideration, however, is that the combination of OGM restrictions in Maryland and Virginia has likely produced a larger cumulative impact on the D.C. gun supply. In general, we can probably expect the effects of OGM restrictions to rise

sparse. Handgun sales in Maryland dropped over 20% in the year after the state's OGM law, and gun homicides fell 10% to 11% in the two years after the law (on the latter point, see Webster et al., 2002). These changes may have been due at least in part to a general decline in handgun sales and crime in the state, as well as to the effects of other gun control measures that were passed simultaneously with the OGM law (including restrictions on secondhand sales of handguns and a state provision explicitly banning straw purchases).[40] There has been no longer term study of the issue, but the percentage of guns recovered by police in Baltimore and D.C. that were originally sold in Maryland had not declined (or, in the case of D.C., had not declined in a consistent manner) as of 2000 (ATF, 1997, 1999a, 2000d, 2000e, 2002b, 2002c).[41]

Developing a more complete understanding of the impacts of this and other OGM laws will require further study of gun tracing data and crime rates, of course, but should also ideally include investigation of intermediate effects on the price and quantity of guns available through various intrastate and interstate channels. Studies of gun trafficking investigations, interviews with convicted gun traffickers and other gun offenders, and ethnographic research on illegal gun acquisition might help achieve the latter.

To conclude, this study has examined one suspected risk factor for criminal gun use, in the process testing a key assumption underlying one form of gun control. This research complements other recent efforts to develop improved indicators of gun trafficking (Pierce et al., 2003, 2004; Wintemute, 2000). But unlike prior studies of crime guns, this study used longitudinal analysis of the sale and subsequent criminal use of representative samples of handguns sold at retail, thus permitting a more refined assessment of the risks that guns purchased in different types of transactions and by different types of buyers are used in crime. Further research along these lines could also be applied to the study of other suspected risk factors—i.e., characteristics of firearms, sellers, buyers, and sales transactions that may influence the likelihood that guns sold in retail (or secondhand) transactions are subsequently used in crime. For example, what are the characteristics of gun dealers whose sales are at highest relative risk of

with the number of states adhering to them because this limits displacement of trafficking operations. On a related note, federal OGM legislation has been proposed (Jacobs, 2002) but does not seem likely to be passed anytime in the near future.

40. Handgun sales declined 26% from 1994 to 1995, 6% from 1995 to 1996, 21% from 1996 to 1997, and 7% from 1997 to 1998 (analyses not shown). Also see the discussion of research on Maryland's OGM law in footnote 12.

41. Such figures should be interpreted very cautiously because the share of guns traced to a source state can vary substantially from year to year as a result of improvements in tracing, changes in tracing procedures (particularly recent changes pertaining to the tracing of older firearms), and other factors.

resulting in crime gun recoveries? Are these high-risk dealers also the ones who are linked to the highest numbers of crime guns? Also, are some types of firearms—differentiated on characteristics such as price, size, caliber, firing mechanism, ammunition capacity, and age—more likely to be trafficked to criminals? And how do multiple sales operate in tandem with these factors and others (such as community characteristics) to influence the risk that guns are used in crime?[42] Such research could be used to improve the effectiveness and fairness of law enforcement and regulatory efforts to identify networks diverting guns into criminal channels and to inform debates on the efficacy of various gun control policies such as OGM laws, regulation of gun dealers, gun bans, and others.

## REFERENCES

Allison, Paul D.
1995 Survival Analysis Using the SAS System: A Practical Guide. Cary, N.C.: SAS Institute, Inc.

Beck, Allen, Darrell Gilliard, Lawrence Greenfeld, Caroline Harlow, Thomas Hester, Louis Jankowski, Tracy Snell, James Stephan, and Danielle Morton
1993 Survey of State Prison Inmates, 1991. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. NCJ-136949.

Braga, Anthony, A., Philip J. Cook, David M. Kennedy, and Mark H. Moore
2002 The Illegal Supply of Firearms. In Michael Tonry (ed.), Crime and Justice: A Review of Research. Vol. 29. Chicago, Ill.: The University of Chicago.

Brill, Steven
1977 Firearm Abuse: A Research and Policy Report. Washington, D.C.: Police Foundation.

Bureau of Alcohol, Tobacco, and Firearms
1995a Federal Firearms Regulations Reference Guide. Washington, D.C.: U.S. Department of the Treasury.
1995b The National Tracing Center 1994 Yearend Report. Washington, D.C.: U.S. Department of the Treasury.
1997 Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities. Washington, D.C.: U.S. Department of the Treasury.
1998 State Laws and Published Ordinances—Firearms. 21st ed. Washington, D.C.: U.S. Department of the Treasury.
1999a Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities. Washington, D.C.: U.S. Department of the Treasury.
1999b Gun Shows: Brady Checks and Crime Gun Traces. Washington, D.C.: U.S. Department of the Treasury.
2000a Commerce in Firearms in the United States. Washington, D.C.: U.S. Department of the Treasury.
2000b Following the Gun: Enforcing Federal Firearms Laws Against Firearms Traffickers. Washington, D.C.: U.S. Department of the Treasury.

42. To the author's knowledge, however, only a few states maintain the types of gun sales and registration records necessary to conduct this type of research.

2000c Crime Gun Trace Reports (1999): National Report. Washington, D.C.: U.S. Department of the Treasury.

2000d Crime Gun Trace Reports (1999): Baltimore. Washington, D.C.: U.S. Department of the Treasury.

2000e Crime Gun Trace Reports (1999): Washington, D.C. Washington, D.C.: U.S. Department of the Treasury.

2002a Crime Gun Trace Reports (2000): National Report. Washington, D.C.: U.S. Department of the Treasury.

2002b Crime Gun Trace Reports (2000): Baltimore. Washington, D.C.: U.S. Department of the Treasury.

2002c Crime Gun Trace Reports (2000): Washington, D.C. Washington, D.C.: U.S. Department of the Treasury.

2003 State Laws and Published Ordinances—Firearms. 24th ed. Washington, D.C.: U.S. Department of the Treasury.

Catalano, Shannan M.

2004 Criminal Victimization, 2003. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. NCJ-205455.

Coggeshall, Mark B.

2001 Keeping Guns Out of the Wrong Hands: Effects of Gun Control on Homicide in Virginia. Master's Thesis. College Park, Md.: Department of Criminology and Criminal Justice, University of Maryland.

Cook, Philip J. and Anthony A. Braga

2001 Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. Arizona Law Review 43:277–309.

Cook, Philip J. and James A. Leitzel

1996 "Perversity, futility, and jeopardy": An economic analysis of the attack on gun control. Law and Contemporary Problems 59:91–118.

Cook, Philip J. and Jens Ludwig

1996 Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use. Washington, D.C.: Police Foundation.

2000 Gun Violence: The Real Costs. New York: Oxford University Press.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole

1995 Regulating gun markets. The Journal of Criminal Law and Criminology 86:59–92.

Federal Bureau of Investigation

1994 Crime in the United States 1993. Washington, D.C.: U.S. Department of Justice.

1995 Crime in the United States 1994. Washington, D.C.: U.S. Department of Justice.

2000 Crime in the United States 1999. Washington, D.C.: U.S. Department of Justice.

2004 Crime in the United States 2003. Washington, D.C.: U.S. Department of Justice.

Harlow, Caroline W.

2001 Firearm Use by Offenders. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. NCJ-189369, revised Feb. 4, 2002.

Jacobs, James B.

2002 Can Gun Control Work? New York: Oxford University Press.

Kleck, Gary
1997 Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter.
1999 BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. Saint Louis University Public Law Review 18:23–45.

Kennedy, David M., Anne M. Piehl, and Anthony A. Braga
1996 Youth violence in Boston: Gun Markets, Serious youth offenders, and a use-reduction strategy. Law and Contemporary Problems 59:147–196.

Koper, Christopher S. and Peter Reuter
1996 Suppressing illegal gun markets: Lessons from drug enforcement. Law and Contemporary Problems 59:119–146.

Lott, John R., Jr.
2003 The Bias Against Guns: Why Almost Everything You've Heard About Gun Control is Wrong. Washington, D.C.: Regnery Publishing.

Lott, John R., Jr. and John E. Whitley
2001 Safe-storage gun laws: Accidental deaths, suicides, and crime. Journal of Law and Economics 64:659–689.

Maguire, Kathleen and Ann L. Pastore (eds.)
1995 Sourcebook of Criminal Justice Statistics—1994. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.
2000 Sourcebook of Criminal Justice Statistics—1999. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.
2001 Sourcebook of Criminal Justice Statistics—2000. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.

National Research Council (Charles F. Wellford, John V. Pepper, and Carol V. Petrie, eds.)
2005 Firearms and Violence: A Critical Review. Washington, D.C.: The National Academies Press.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt, Jr., and Christopher S. Koper
2004 Characteristics and dynamics of illegal firearms markets: Implications for a supply-side enforcement strategy. Justice Quarterly 21:391–422.

Pierce, Glenn L.. Anthony A. Braga, Christopher Koper, Jack McDevitt, David Carlson, Jeffrey Roth, Alan Saiz, Raymond Hyatt, and Roberta E. Griffith
2003 The Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies. Final Report to the National Institute of Justice. Boston: College of Criminal Justice, Northeastern University.

Sheley, Joseph F. and James D. Wright
1993 Gun Acquisition and Possession in Selected Juvenile Samples. Washington, D.C.: National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. NCJ-145326.

Teachman, Jay D.
1983 Analyzing social processes: Life tables and proportional hazards models. Social Science Research 12:263–301.

Vernick, Jon S. and Lisa M. Hepburn
2003 State and federal gun laws: Trends for 1970-99. In Jens Ludwig and Philip J. Cook (eds.), Evaluating Gun Policy: Effects on Crime and Violence. Washington, D.C.: Brookings Institution Press.

Violence Prevention Research Program
2002 Handgun Commerce in California, 1999. Sacramento: University of California, Davis.

Virginia State Crime Commission
1996 Study of Virginia's Law on Handgun Purchase Limits. Richmond: Commonwealth of Virginia. House Document 28.

Wachtel, Julius
1998 Sources of crime guns in Los Angeles, California. Policing: An International Journal of Police Strategies and Management 21:220–239.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn
2002 Effects of Maryland's law banning "Saturday night special" handguns on homicides. American Journal of Epidemiology 155:406–412.

Weil, Douglas S. and Rebecca C. Knox
1996 Effects of limiting handgun purchases on interstate transfer of firearms. JAMA 275:1759–1761.

Wilber, Del Q.
2004 D.C. police sweeping the street for guns. The Washington Post (July 4):C6.

Wintemute, Garen J.
1994 Ring of Fire: The Handgun Makers of Southern California. Sacramento: Violence Prevention Research Program, University of California, Davis.
2000 Relationship between illegal use of handguns and handgun sales volume. JAMA 284:566–567.

Wintemute, Garen J., Carrie A. Parham, Mona A. Wright, James J. Beaumont, and Christiana M. Drake
1998 Weapons of choice: Previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. The Journal of Trauma: Injury, Infection, and Critical Care 44:155–160.

Wintemute, Garen J., Michael P. Romero, Mona A. Wright, and Kevin M. Grassel
2004 The life cycle of crime guns: A description based on guns recovered from young people in California. Annals of Emergency Medicine 43:733–742.

Wright, James D. and Peter H. Rossi
1986 Armed and Considered Dangerous: A Survey of Felons and Their Firearms. New York: Aldine de Gruyter.

Zimring, Franklin E.
1975 Firearms and federal law: The Gun Control Act of 1968. Journal of Legal Studies 4:133–198.
1976 Street crime and new guns: Some implications for firearms control. Journal of Criminal Justice 4:95–107.

Christopher S. Koper is a Senior Research Associate with the Jerry Lee Center of Criminology and a scholar-in-residence with the Firearm and Injury Center at Penn. He holds a Ph.D. in criminology and criminal justice from the University of Maryland and has worked for the Urban Institute, the Crime Control Institute, the University of Maryland, the Police Foundation, and the National Institute of Justice. Dr. Koper has written articles and reports on a variety of topics, including firearms, policing, white collar crime, and research methods. He recently completed a study of the federal assault weapons ban for the U.S. Department of Justice and is currently studying gun markets, police interventions to reduce gun violence, and juvenile crime trends.