# EXHIBIT S

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

----------------------------------------------------------

State of Minnesota by its
Attorney General, Keith Ellison,

Plaintiff,

vs                          CASE NO:  0:22-CV-02694-JRT-JFD

Fleet Farm LLC, Fleet Farm
Group LLC, and Fleet Farm
Wholesale Supply Co. LLC,

Defendants,

----------------------------------------------------------

CONFIDENTIAL

Deposition of

Cory Klebs

September 5, 2024

9:08 a.m. - 4:57 p.m.

Taken by:  Jackie Young, RPR

P R O C E E D I N G S

(Statute 486 was complied with by the court reporter)

CORY KLEBS,

having been first duly sworn,

testified as follows:

BY MS. MOERKE:

Q   Good morning.

A   Good morning.

Q   My name is Katherine Moerke.  I'm an attorney for the State of Minnesota.

A   Okay.

Q   I work at the Attorney General's Office.

A   Okay.

Q   Nice to meet you.

A   Nice to meet you.

Q   Would you please state your full name for the record?

A   Cory Daniel Klebs.

Q   Where do you live, Mr. Klebs?

A   Elk River.

Q   And where do you work?

A   Particle Control, Incorporated.

Q   What is Particle Control, Incorporated?

A   It is a grain and food -- food processing

Q   Do you know the term straw buyer?  I think we used it earlier today.

A   Do you mean a straw purchaser?

Q   Yes.  Do you know straw purchaser?

A   Yes.

Q   What's a straw purchaser?

A   A straw purchaser is somebody that is buying a firearm that is not intended for them, purchasing it for somebody else.

Q   Is straw purchasing legal?

A   No, it is not.

Q   How is straw purchasing prevented?

        MR. LEIENDECKER:  Objection; vague, calls for speculation.

A   Can you rephrase?

Q   Did Fleet Farm try to prevent straw purchasing?

A   Yes, they did.

        MR. LEIENDECKER:  Same objection.

Q   How did Fleet Farm try to prevent straw purchasing?

        MR. LEIENDECKER:  Objection to the extent it calls for speculation, vague as to time.

A   They had online-based trainings and on-the-job training to be able to sell firearms and also cosign on firearms.

Q   I'm going to switch gears for a little while and

answered.

A    The other warning sign is multiple firearms or transactions, multiple transactions as well.

Q    And were you trained by Fleet Farm that multiple firearms in one transaction was a warning sign of a straw purchase?

A    I --  From the best of my knowledge, yes.

Q    And -- and you understood that it was?

A    Yes.

Q    So during a firearm sale at Fleet Farm, there was the primary sales person and the person double-checking; right?

A    Correct.

Q    Were both of those individuals supposed to look out for straw purchasing?

A    Yes, they are.

Q    Did you do any audits related to firearms in your work at Fleet Farm?

A    I believe I have, yes.

Q    What kind of audits?

A    All 4473 forms, once they were disposed of, would also go through a third check by a member of management over that area to ensure that everything was disposed of properly and everything on the paperwork that they had access to was filled out

Q   Were you involved in a restructuring when Fleet Farm was sold from the family to -- to other owners?

A   No.

MR. LEIENDECKER:  Objection; vague.

Q   Sorry.  Did you say no?

A   I said no.

Q   Are you --  Do you know when that happened?

A   That was before my employment with them.

Q   So that's why you weren't involved?

A   (Shakes head.)

MR. LEIENDECKER:  Objection.

Q   Did you know about straw purchasing before you started working at Fleet Farm?

A   No, I did not.

Q   And you -- you talked about learning about straw purchasing, being trained at Fleet Farm; correct?

A   That is correct.

Q   How were you trained?

MR. LEIENDECKER:  Objection; vague.

A   There were computer-based trainings that we had to undergo before we could even be allowed behind the firearms counter to learn from other team members that were certified to sell firearms at the time.

Q   Do you remember any other trainings besides computer-based trainings?

Q   And then the title says firearms etiquette.  Do you see that?

A   Yes, I do.

Q   And then the completion date is June 21, 2016.  Do you see that?

A   Yes, I do.

Q   And if you go to the top of the next page, there are six more lines with your name; right?

A   That is correct.

Q   That lists six more courses; correct?

A   That is correct.

Q   And then the same date of June 21, 2016?

A   Correct.

Q   Does this correspond with your memory that when you started at Fleet Farm, you did a series of firearms training?

A   Yes.

Q   What's firearms etiquette?  I'm just talking about the first training.

            MR. LEIENDECKER:  Objection; calls for speculation.

A   I believe it's changed over the years, but specifically to the 2016 timeframe when I took the courses, it was outlining just proper handling of firearms and how to show it to customers or

# EXHIBIT T

CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STATE OF MINNESOTA by its
Attorney General, Keith Ellison,

        Plaintiff,

            Case No. 0:22-cv-02694-JRT-JFD

vs.

FLEET FARM LLC, FLEET FARM GROUP
LLC, and FLEET FARM WHOLESALE
SUPPLY CO. LLC,

        Defendants.

**DEPOSITION OF MICHAEL P. RADL**

Deposition of MICHAEL P. RADL, taken before me at Henes & Associates Reporting Service, Inc., Appleton, Outagamie County, Wisconsin, on the 20th day of June, 2024, A.D., otherwise than as a witness on the trial, in a certain action now pending in United States District Court, District of Minnesota, wherein the parties thereto are as set forth above.

- - - - - -

HENES & ASSOCIATES REPORTING SERVICE, INC.
www.henesreporting.com  920-733-1835  henes@henesreporting.com

CONFIDENTIAL

Said MICHAEL P. RADL, having been first duly sworn by me to testify the truth, the whole truth, and nothing but the truth relative to said cause, in answer to oral interrogatories, deposed and made answer as follows:

- - - - - - -

(The examination began at 8:53 a.m. on June 20, 2024.)

(Exhibits were premarked.)

- - - - - - -

EXAMINATION

BY MS. MOERKE:

Q    Good morning.

A    Good morning.

Q    My name is Katherine Moerke.  I'm an attorney for the State of Minnesota.

A    Okay.

Q    Would you please state your name for the record?

A    Michael Patrick Radl, R A D L.

Q    Where do you work, Mr. Radl?

A    Fleet Farm.

Q    When you say you work for Fleet Farm, is there a specific entity that you work for?

3

CONFIDENTIAL

Q    In 2020 and 2021 did different Fleet Farm stores communicate with each other about possible straw buyers?

A    Yes.

Q    How did they communicate?

A    Typically they would send what's called a Firearms Sales Or Declined Sales Alert that would go out to all stores.  Stores would also frequently call each other, neighboring stores, to alert them -- if they feel that somebody attempted a straw purchase and they declined them at their store, they would call a neighboring store to alert them that they be on the lookout -- I'm sending out an alert, but just want you to know, as well, so kind of an immediate heads-up, especially with stores that are very close to each other.

Q    What are Fleet Farm employees supposed to do if they observe multiple red flags of straw buying?

A    They just should take that into account when dealing with the individual who is purchasing the gun; to gather their -- what we and the ATF refer to as a gut feeling in

*26*

CONFIDENTIAL

A    They were allowed to be used.

Q    Do you know approximately what percent of sales were made with forms completed manually?

         MR. DAVIS:  Object to the form of the question, calls for speculation.

A    My guess, based on my experience and being out in the stores, I would say it was 1%.

Q    So your understanding, based on your experience traveling to stores, is that the vast majority of sales were completed filling out the 4473 electronically?

A    Correct.

Q    In 2020 and 2021 did Fleet Farm monitor the purchase of multiple firearms as a possible warning sign of a straw buyer?

A    At store level they did, yes, with the use of 3310 and just getting to know their clientele.

Q    Other than at the store level, was anything done company-wide --

A    Just the continued training we gave to all stores of watching for the red flags, which would include multiple sales to the same customer.

*28*

CONFIDENTIAL

Q    So company-wide, Fleet Farm was training employees at the store level; right?

A    Correct.

Q    But company-wide, Fleet Farm was not monitoring and evaluating multiple gun purchases to identify possible straw buyers?

A    Correct.

Q    Does Fleet Farm do that now?

A    We do.

Q    When did that change?

A    I believe it was at the start of 2022.

Q    Why did that change?

A    Because we got the technology to allow us to run reporting to look for that.  We obviously learned from the learnings of the Horton case, once we knew it was an actual straw purchase, confirmed and charged out, case, then we knew -- well, even though it's not required, or ATF doesn't suggest the corporate big box to monitor that, we worked with our IT department to develop that kind of technology, in hopes of identifying those people that are traveling to multiple Fleet Farm locations.

Q    And one of the reasons for that is because

*29*

CONFIDENTIAL

A    I would have to guess as to what I believe that definition is.

Q    Is it a term you're familiar with, crime gun?

A    Not necessarily.

Q    Please flip to the page that says 816 at the bottom, and this says, "Straw Purchases, What Can You Do"; right?

A    Correct.

Q    And then there are three tips?

A    Yes.

Q    Did Fleet Farm do all of these things in 2020 and 2021?

A    Yes.

Q    How did Fleet Farm do the second tip, which is, "Keep a log of recent denials and attempted purchases to compare with new sales"?

A    That would be sending out the sales alert, which goes into a database.

Q    So the sales alert was an email; right?

A    It was an email notification when a new one was entered into the database, but it was a database.

Q    Who received the email notification?

*33*

CONFIDENTIAL

A   It would be the sporting goods department at all stores, the loss prevention department at all stores, management at all stores, Michelle and myself, and there might be a few other corporate people that were on that email list.

Q   Was the email notification also printed?

A   Some stores did print them.

Q   And some did not?

A   Correct.

Q   So an employee involved with a sale of firearms at a Fleet Farm store would see those notifications, if that employee read the email, but would not see those notifications if the employee did not read the email; is that right?

A   Can you state that one more time?

Q   Would an employee have to read the email to get the notification?

A   Yes.

Q   Did all employees read those emails?

        MR. DAVIS:  Object to form, lack of foundation.

A   I would hope so, but I can't say for sure because I was not there.

*34*

CONFIDENTIAL

pretty much all the time we would never hear back from the ATF on any outcomes of our referrals.

Q   You've been referring to "we."  Who was responsible for deciding whether or not to contact the ATF?

A   Sure.  So the stores would reach out to us, meaning Michelle or I, then we would look into the customer's purchase history across the company.  We would look on other like social media accounts of a customer to see if there's anything suspicious that would help identify or confirm if a straw sale was possible or if there's any signs of criminal activity on the side of the customer who attempted the purchase.  Then at that point we would review -- I would review with my supervisor at the time and we would discuss it with legal, and then we would get the approval to submit a referral.

Q   Did you and Michelle need signoff from legal before you could contact the ATF?

        MR. DAVIS:  Object to the form of the question.

A   They wanted us to, and at times we didn't if

CONFIDENTIAL

right?

MR. DAVIS:  Object to the form of the question.

A    They always had the alert to go back to review as many times as they wanted, but at this time the system did not conduct an automatic check, as it was not available at that time to do so.

Q    So before the system had an automatic check, the only way the straw purchase alert could influence a subsequent purchase is if the employee either remembered it or used the database to look it up; right?

A    Correct.

Q    Would you go forward two pages to the document, or the page, with 426 at the bottom?

A    Yes.

Q    The last paragraph says, "Only LP and management are authorized to send alerts." Is that correct?

A    Correct.

Q    Correct today?

A    No.

Q    Was that correct in 2020?

63

CONFIDENTIAL

A    Yes.

Q    When did it change?

A    When we upgraded our system and went to a new platform, operating platform, so I believe that was in 2022 or 2023.

Q    So this last sentence, "Only LP and management are authorized to send alerts," was correct in the past, but is no longer correct?

A    The word "authorized" would -- should be more of a "has the ability" or -- they had access to send alerts, whereas, due to the technology at the time, the employee themselves did not have access to create or send an alert from their terminal.

Q    So you're saying it wasn't that the employee was prohibited in doing so by a policy, but rather by the technology?

A    Correct.

Q    Would you look at Exhibit 50, please?  What is Exhibit 50?

A    This is a confidential B.O.L.O. alert.

Q    What's a B.O.L.O. alert?

A    A B.O.L.O. alert, B.O.L.O. stands for be on the look-out.  So this alert type was used

64

CONFIDENTIAL

for many different incidents, ranging from loss prevention issues, like shoplifters, to straw purchase, suspected straw purchase attempts.

Q    How was the B.O.L.O. alert different than a straw purchase alert?

A    A straw purchase alert, during this time frame, when it's issued by the store level, it goes to corporate to review for accuracy, and then it is approved and sent out to the stores; whereas a B.O.L.O. alert was an option that was created to immediately send alerts to stores and bypass the requirement of having somebody at corporate send it out. So stores were instructed, for any kind of incident at store level, that they felt required the immediate communication of the incident to other locations, would use this format of an alert.

Q    So stores could send the B.O.L.O. alert without going through corporate?

A    Correct.

Q    But the straw purchase alert, prior to the change in the system, had to go through corporate?

65

CONFIDENTIAL

should raise suspicions; right?

A   If there are other red flags associated with the transaction, or the interaction, yes.

Q   So Page 5 of this November of 2021 presentation, and it was referring to the 3310.4 form; right?

A   Correct.

Q   Prior to November 2021 was the 3310.4 form addressed in straw buying training?

A   Yes.

Q   How was it addressed?

A   During in-person trainings and during our webinars we would discuss many red flags, including the 3310, or the fact that somebody is buying multiple handguns at one time or close together.

Q   Were there Power Points that addressed the 3310.4 form prior to this one?

A   I would have to look at all of them to see. I know the ATF doesn't have it on there, so I don't recall if ours has it on there.

Q   So it wouldn't surprise you if the Fleet Farm training materials that you prepared before November 2021 did not address the 3310.4 as an alert of a possible straw

*84*

CONFIDENTIAL

buyer; right?

A   It's possible it wasn't put on there, but it was most likely addressed verbally, because we didn't read these during our webinars. We didn't read these verbatim. This wasn't a script. Each of these points is meant to spur discussion overall about the subject, kind of like when the ATF presents their presentation, a lot of information they give to us is not on the presentation itself, but it's discussed verbally to attendees of that training or webinar.

Q   Would you go to the next page, please?

A   Sure.

Q   And the heading of this is "Suspicious Sales Activity - 3310 Form"; right?

A   Yes.

Q   And then there are pictures of two different 3310 forms; right?

A   I believe so, yes.

Q   Do you know where these are from?

A   I do now, yes.

Q   When you say you do now, what do you mean?

A   Because of the Jerome Horton case. If these were shown to me prior to that, I would have

85

CONFIDENTIAL

A    Sure.

Q    You were referring to an automated report when certain number of threshold sales were made.  What was the number of threshold sales?

A    I believe it was two or more firearms that were purchased.

Q    So the threshold was based on the number of guns, like the 3310 form; right?

A    Correct.

Q    But not necessarily limited to a certain time period, like the 3310?

A    It showed the last -- the report, it shows every seven days, the past seven-day activity.

Q    And that's a change that was implemented to help you and Ms. Granato and now Mr. McKown try to identify possibly straw buyers?

A    And also look for customer traveling between stores, which could be an indicator of suspicious activity, such as straw purchasing.

Q    So we talked -- one of the first things we talked about this morning was the red flags of straw buying.  Do you remember that?

127

# EXHIBIT U

CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STATE OF MINNESOTA by its
Attorney General, Keith Ellison,

        Plaintiff,

                Case No. 0:22-cv-02694-JRT-JFD
vs.

FLEET FARM LLC, FLEET FARM GROUP
LLC, and FLEET FARM WHOLESALE
SUPPLY CO. LLC,

        Defendants.

**DEPOSITION OF KEVIN McKOWN**

Deposition of KEVIN McKOWN, taken before me at Henes & Associates Reporting Service, Inc., Appleton, Outagamie County, Wisconsin, on the 13th day of June, 2024, A.D., otherwise than as a witness on the trial, in a certain action now pending in United States District Court, District of Minnesota, wherein the parties thereto are as set forth above.

- - - - - -

1

CONFIDENTIAL

Said KEVIN McKOWN, having been first duly sworn by me to testify the truth, the whole truth, and nothing but the truth relative to said cause, in answer to oral interrogatories, deposed and made answer as follows:

- - - - - - -

(The examination began at 8:57 a.m. on June 13, 2024.)

- - - - - - -

EXAMINATION

BY MS. MOERKE:

Q    Good morning.

A    Good morning.

Q    My name is Katherine Moerke.  I'm an attorney for the State of Minnesota in this lawsuit.  Would you please state your name for the record?

A    Kevin McKown.

Q    How do you spell your last name?

A    M C K O W N.

Q    And you pronounce it McKown?

A    Correct.

Q    Where do you work?

A    Fleet Farm.

*5*

CONFIDENTIAL

purchase?

MR. NOTEBOOM:  Object to the form.

A    At their store solely, yes.

Q    What did Fleet Farm do to prevent sales to straw purchasers during the relevant time period?

A    They used training, they used a sales alert system to help them deter straw sales, signage.

Q    Anything else?

A    That's all I can think of.

Q    What is a sales alert system?

A    We have a sales alert system that an associate, once they stop a sale, they can enter the information of the purchase.

Q    Where are they entering information about a purchaser?

A    Into the computer alert system, so it's into a computer.

Q    Does the computer alert system have a name?

A    Yes.  It just left me.  I think just a sales alert system.

Q    And you're talking in the present tense.  Is this the same system that was in place during the relevant time period, the sales

42

CONFIDENTIAL

alert system?

A    Yes.

Q    You haven't changed that at all since you joined Fleet Farm?

A    No.

Q    The computer alert system, do you know if it's Lotus Notes?

A    I just wrote that down, yes.  Sorry.

MR. NOTEBOOM:  And I'm going to caution the witness, these are the exhibits in the deposition and you're not going to want to write on the exhibits.  So lets --

THE WITNESS:  Not do that again, sorry.

Q    So the sales alert system, if an associate stops a sale, they record information in the computer system; right?

A    Yes.

Q    And is that a sale that's not completed, for any number of reasons, that gets put in the alert system?

A    Yes and no.  If it's a simple change of mind, did not want, it would not be put in the system.

Q    Would it include suspected straw buyers?

*43*

CONFIDENTIAL

A    Yes.

Q    What else might it include?

A    A possible alert on a suicide, somebody wants to buy a gun to harm themselves or harm other people, items like that.

Q    What if a customer fills out a form and indicates they're a felon or someone else who cannot possess a firearm, would that be put into the sales alert system?

A    Yes.

Q    Once information on a sale that was stopped by an associate is entered into the sales alert system, how are other Fleet Farm employees actually alerted?

A    In the time frame, it would have been an email-type scenario, and they would have made a copy of that and placed it in a book.

Q    Was the email automatically generated when someone entered information about a stopped sale in the sales alert system?

A    Yes.

Q    Who did that email go to?

A    It went to different addresses at all the stores.

Q    Would it go to all people who are authorized

44

CONFIDENTIAL

to sell firearms?

A    I believe it would have gone to the sporting goods email, which the team members can look at.

Q    If someone tried to buy a firearm, but Fleet Farm did not sell it, and that information was entered in the system and that person came back again, would anything happen to stop the sale the second time?

MR. NOTEBOOM:  Object to the form, incomplete hypothetical, and improper hypothetical to a 30(b)(6) witness.

You can answer.

A    Can you repeat it.

MS. MOERKE:  Read that back.

(Requested portion read by reporter.)

A    (Continued)  As long as they went through the training and they looked in the book at that time, they would have stopped the sale.

Q    When you say they, you mean the salesperson at Fleet Farm?

A    Yes.

Q    What's the book?

A    That would have been the book that they put these alerts in.

45

CONFIDENTIAL

straw sale, but what Fleet Farm did was investigate and then sometimes tell the ATF, sometimes not; is that right?

A   Correct.

Q   We talked about the sales alert system that existed in the relevant time period but changed to become more automatic in 2021; is that fair?

A   Yes.

Q   Did that sales alert go beyond the store in question?

A   You mean did it get facilitated out to other stores?

Q   Yes.

A   Yes.

Q   How?

A   Via email.

Q   And you said that there was a record of the sales alert two ways, there was the email and then there was the book.  If one store emailed an alert to another store, did the other store -- was that store responsible for printing and putting it in the book?

A   Yes.

Q   Do you know if that consistently happened

*56*

CONFIDENTIAL

during the relevant time period?

A    Yes.

Q    So the sales alert system was -- was it disseminated to all Fleet Farm stores?

A    There was in the early beginnings a way to go to just some stores, but from what I'm aware of, most of the time it went to all stores.

Q    So in general, not a limitation by geography or something else?

A    No.

Q    What are warning signs that someone trying to buy a firearm might be a straw buyer?

A    In our training we talked about cash going from one person to the other, we talked about someone disinterested in a firearm, we talked about a family member trying to buy another firearm for someone in their family, we talked about gifting, items like that.

Q    Are there any other warning signs that someone may be a straw buyer?

A    There may be.  I don't have anything in front of me to really go through, but if we get the training out, we could look at it.

Q    There's no other warning signs of being a

57

CONFIDENTIAL

Q   And what is your understanding, sir?

A   I did speak with Mike Radl about it, and he confirmed that the modules of training that we use were started back in that time frame.

Q   Prior to 2021?

A   Correct.

Q   Ms. Moerke also asked you a number of questions about the way that our straw purchase alert system has worked both this morning and this afternoon.  Do you remember those?

A   Yes.

Q   And I just want to confirm, because I found at least some of the questions this afternoon to be a bit hard to follow, Fleet Farm's policies at all times during the relevant period was to train its people, when they believed there was a possible straw purchase, ultimately to stop that sale, and in connection with management in the store, make sure that that individual's name was input into the Lotus Notes database; correct?

A   Correct.

Q   And at all times during the relevant period,

226

CONFIDENTIAL

once someone's name was entered into the Lotus Notes database, a straw purchase alert would automatically be sent to other Fleet Farm stores; correct?

A    Correct.

Q    Ms. Moerke also asked you some questions about Exhibit 42 -- I'm sorry, Exhibit 41, and I'm going to lean over and just show you my copy here.  For the record, Exhibit 41 is a series of emails that, at least on the first page at the top, show Jennifer Modrow writing to Mr. Radl, and the date of that first email on this page is 11/7/2020.  Do you see that?

A    Yes.

Q    Ms. Moerke asked you a number of questions about this particular correspondence and the trace request for a Mr. Horton.  Do you see that?

A    Yes.

Q    When we look in the bottom right-hand corner of this document, you can see on the face of that the Mr. Horton that this document refers to is not the Mr. Horton at issue in this lawsuit, is it?

227

# EXHIBIT V

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-147(1) (ADM/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | PLEA AGREEMENT AND |
| v. | ) | SENTENCING STIPULATIONS |
| | ) | |
| SARAH JEAN ELWOOD, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America and the defendant, SARAH JEAN ELWOOD, agree

to resolve this case on the following terms and conditions. This plea agreement binds only

the defendant and the United States Attorney's Office for the District of Minnesota; it does

not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**. The defendant agrees to plead guilty to Count 5 of the Indictment,

and to admit to the relevant offense conduct alleged in Count 2. In exchange, the United

States agrees to move to dismiss Counts 1, 2, 3, and 4, as they pertain to the defendant, at

the time of sentencing. Count 5 charges the defendant with making false statements during

the purchase of firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

2. **Factual Basis**. The defendant agrees to the following facts and further

agrees that, were this case to go to trial, the United States would prove the following facts

beyond a reasonable doubt:

      a.     From approximately May 2020 through May 2021, the defendant
conspired with her co-defendants and others to buy dozens of firearms from
federally licensed firearms dealers, while knowingly making false and fictitious oral
and written statements that were intended or likely to deceive those dealers
regarding a fact material to the lawfulness of the sales. Specifically, the defendant

Page 1 of 12

AGO0000207

and others, including her co-defendants, agreed to a scheme through which she would purchase multiple firearms on behalf of others who would provide the funds to buy the guns plus an additional $100 fee for each gun she purchased. In purchasing the firearms, the defendant would knowingly misrepresent to the dealer both orally and in writing that she was the actual purchaser, when in fact she and her co-defendants knew that others were the actual purchasers of the firearms, as arranged by the defendant and her co-defendants. The defendant and her co-defendants straw purchased approximately 97 firearms in total (as listed in Paragraph 9 below), in over 60 transactions, through this agreed-upon arrangement, including about 62 firearms during May 2021 alone.

b.      As part of the scheme, on or about May 30, 2021, the defendant and others, including her co-defendants, made arrangements to meet and purchase specific firearms from Bills Gun Shop and Range, a federally licensed firearms dealer within the meaning of United States Code, Title 18, Chapter 44, located in Circle Pines, Anoka County, Minnesota ("Bills"), in exchange for cash, including the $100 premium per firearm, and other items of value. The defendant and others, including her co-defendants, met and traveled together to Bills.

c.      When they arrived at Bills, co-defendant Walker and another person went into Bills and looked at and handled various firearms and accessories, including a high-capacity magazine, but did not make any purchases. Co-defendant Walker and the other person then again met with the defendant and co-defendant Jackson outside of Bills. The defendant then entered Bills and as arranged purchased three firearms, namely, an AR-15 semiautomatic pistol, a Ruger 9mm semiautomatic pistol, and a Taurus 9mm semiautomatic pistol, three boxes of ammunition, and a 100-round AR-15 high-capacity magazine. As part of the arrangement and scheme, the defendant filled out the necessary paperwork with the licensed dealer, including the ATF Form 4473, and falsely certified that she was the actual purchaser, when co-defendant Walker and others were in fact the actual purchasers of the firearms and accessories, as arranged by co-defendant Jackson.

d.      During a recorded, post-Miranda statement, the defendant admitted that she and co-defendant Jackson had been regularly purchasing firearms for a few months (on an almost daily basis), and had been regularly selling them to others, including co-defendant Walker, for a profit of $100 per firearm. She said that some of the buyers would give her and co-defendant Jackson money up front for the firearms purchases.

e.      The defendant stated that she and co-defendant Jackson had known co-defendant Walker for about two months. She admitted that co-defendant Jackson coordinated almost all the meets and sales of the firearms through co-defendant Walker. She explained that because she had a permit to purchase, she made the purchases, and co-defendant Jackson set up the deals.

Page 2 of 12

AGO0000208

f.       The defendant stated that co-defendant Walker was her primary customer, having purchased at least 40 to 45 firearms from her and co-defendant Jackson over the last couple of months. She stated that co-defendant Walker would always pay cash for the firearms and that co-defendant Walker told her that he was selling the firearms to other people, but she did not know who. The defendant admitted that she saw co-defendant Walker taking orders over the phone for specific firearms.

g.       The defendant admitted that as part of the usual routine, after co-defendant Jackson made arrangements with co-defendant Walker, they would make the purchases and either put the firearms in the trunk or hold onto them immediately after the purchase. Co-defendant Walker would then direct her and co-defendant Jackson where to drive, and on the drive over, co-defendant Walker would pay for the firearms, including the $100 fee for each firearm. The defendant and co-defendant Jackson usually would then drop off co-defendant Walker at the same intersection they had picked him up.

h.       The defendant explained that based on the arrangement for the afternoon of May 30, co-defendant Walker was going to purchase the Ruger for $500, and the other person was going to purchase the other two firearms for $1,000. When they arrived at Bill's gun shop, co-defendant Walker and the other person went in the store first to select the firearms they wanted and then exited the store. The defendant then entered the store and purchased the firearms, ammunition, and accessories, falsely averring both orally and in writing that she was the actual purchaser when in fact co-defendant Walker and others were the actual purchasers of the firearms, ammunition, and accessories.

i.       The defendant admits and agrees that she acted voluntarily, that she knew she was not the actual lawful purchaser of the firearms, ammunition, and accessories, that she falsely represented both orally and in writing that she was the actual purchaser of the firearms, ammunition, and accessories, and that she knew the scheme of arranged straw purchases and sales of firearms for profit with her co-defendants violated the law.

3.       **Waiver of Pretrial Motions**. The defendant understands and agrees that she has certain rights to file pretrial motions in this case. As part of this plea agreement, and based upon the concessions of the United States contained herein, the defendant knowingly, willingly and voluntarily agrees to give up the right to file any additional pretrial motions and to withdraw any pretrial motions she may have already filed.

AGO0000209

4. **Statutory Penalties**. The parties agree that Count 5 carries the following statutory penalties.

    a. a maximum term of 10 years' imprisonment, a Class C felony. (18 U.S.C. §§ 922(a)(6), 924(a)(2), and 3559(a)(3));

    b. a supervised-release term of not more than 3 years. (18 U.S.C. §§ 3559(a)(3) and 3583(b)(2));

    c. a fine of up to $250,000. (18 U.S.C. §§ 924(a)(2) and 3571(b)(3)); and

    d. a mandatory special assessment of $100. (18 U.S.C. § 3013(a)(2)(A)).

5. **Guidelines Calculations**. The parties acknowledge the defendant will be sentenced in accordance with Title 18, Chapter 227 (18 U.S.C. §§ 3551 – 3586) and with reference to the advisory United States Sentencing Guidelines. The parties also acknowledge the Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following Guidelines calculations. Notwithstanding the following stipulations, nothing in this plea agreement prevents the parties from bringing to the attention of the Court and the Probation Office all information in their possession regarding the offense(s), including relevant conduct, and the defendant's background.

    a. **Base Offense Level**. The parties agree that because the offense involved a semiautomatic firearm capable of accepting a large capacity magazine, and the defendant was a prohibited person at the time of the offense, the base offense level is 20. USSG § 2K2.1(a)(4)(B).

    b. **Specific Offense Characteristics**. The parties agree that because the offense involved between 25 and 99 firearms, the base offense level is increased by 6 levels. USSG § 2K2.1(b)(1)(C). The parties further agree that because the defendant engaged in the trafficking of firearms, the base offense level is further increased by 4 levels. USSG § 2K2.1(b)(5). The

AGO0000210

parties agree that no other specific offense characteristics or adjustments apply in this case.

c.    **Chapter Three Adjustments**.  The parties agree that, other than as provided for in paragraph d. below for acceptance of responsibility, no other Chapter Three adjustments apply.

d.    **Acceptance of Responsibility**.  The parties agree that if and only if the defendant:  (1) provides full, complete and truthful disclosures to the United States Probation and Pretrial Service Office, including providing complete, accurate and truthful financial information; (2) testifies truthfully during the change-of-plea and sentencing hearings; (3) complies with this agreement; and (4) undertakes no act inconsistent with acceptance of responsibility before the time of sentencing, the United States will recommend that the defendant receive a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a), and will move for an additional one-level reduction under § 3E1.1(b).  The defendant understands that any reduction for acceptance of responsibility shall be determined by the Court in its discretion.

After applying all adjustments, the parties agree that the total adjusted offense level is 27 (20+6+4-3).

e.    **Criminal History Category**.  Based on the facts and circumstances known to the parties, the parties believe that the defendant's criminal history category is I.  This is not a stipulation, but rather a belief based on an assessment of the information currently known to the parties.  The parties agree that the defendant's actual criminal history will be determined by the Court based on the information presented in the Presentence Report and by the arguments made by the parties at the time of sentencing.

f.    **Guidelines Range**.  If the total adjusted offense level is 27, and the criminal history category is I, then the advisory Guidelines range is 70 to 87 months' imprisonment.

The parties acknowledge and agree that if the defendant's total offense level or criminal history category is different than that listed above, the defendant's advisory Guidelines range will be lower or higher than that listed above, and either such circumstance will not provide either party with a basis to withdraw from this plea agreement.

Page 5 of 12

AGO0000211

g.  **Fine Range**.  If the total adjusted offense level is 27, the applicable fine range is $25,000 to $250,000.  USSG §§ 5E1.2(c)(3); 21 U.S.C. § 841(b)(1)(A).

h.  **Special Assessments**.  The Guidelines require payment of a special assessment in the amount of $100.00 for each count of conviction, for a total of $100.00.  USSG § 5E1.3.  The defendant understands and agrees that this special assessment is due and payable at sentencing.

i.  **Supervised Release**.  The Guidelines require a term of supervised release of at least 1 year but not more than 3 years.  USSG § 5D1.2(a)(2); 18 U.S.C. § 3583(b)(2).

6.  **Discretion of the Court**.  The foregoing stipulations bind the parties but not the Court.  The parties understand the Sentencing Guidelines are advisory and their application is a matter falling solely within the Court's discretion.  The Court will make its own determination regarding the applicable Guidelines' factors and the defendant's criminal history category.  The Court may also depart from the applicable Guidelines.  If the Court determines the applicable Guidelines calculations or the defendant's criminal history category are different from that stated above, neither party may withdraw from this agreement on that basis, and the defendant will be sentenced pursuant to the Court's determinations.

7.  **Sentencing Recommendation and Departures**.  The parties reserve the right to make departure motions and to oppose any such motions made by the opposing party.  The parties also reserve the right to argue for a sentence outside the applicable Guidelines range.

8.  **Revocation of Supervised Release**.  The defendant understands that if the defendant were to violate any supervised release condition while on supervised release, the

AGO0000212

Court could revoke the defendant's supervised release, and the defendant could be sentenced to an additional term of imprisonment up to the statutory maximum set forth in 18 U.S.C. § 3583(e)(3). *See* USSG §§ 7B1.4, 7B1.5. The defendant also understands that as part of any revocation, the Court may include a requirement that the defendant be placed on an additional term of supervised release after imprisonment, as set forth in 18 U.S.C. § 3583(h).

9. **Forfeitures**. The defendant agrees to forfeit to the United States, pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c), any firearm or ammunition involved in the offense conduct described in Count 2 including, but not limited to, the following firearms and associated accessories and ammunition: (1) FMK 9C1 G2 9mm, bearing serial number BTT0628, (2) Ruger LCP 380 Auto, bearing serial number 372294242, (3) Bersa Thunder 380 380 ACP, bearing serial number K05664, (4) Springfield XD9 9mm, bearing serial number AT204930, (5) Walther Arms PPS 9mm, bearing serial number AX9584, (6) Smith & Wesson M&P 15-22 22, bearing serial number DFS1108, (7) Century Arms TP9SF 9mm, bearing serial number 20BH09180, (8) Smith & Wesson Bodyguard 380 Auto, bearing serial number KFU9590, (9) Beretta Nano 9mm, bearing serial number NU164741, (10) Beretta Nano 9mm, bearing serial number NU164738, (11) Smith & Wesson Bodyguard 380 Auto, bearing serial number KHN5379, (12) Taurus G2C 9mm, bearing serial number ABD463393, (13) Smith & Wesson M&P 9 Shield 9mm, bearing serial number JFC3902, (14) Taurus G3C 9mm, bearing serial number ABG711104, (15) SCCY CPX-2 9mm, bearing serial number 951556, (16) Bersa BP9CC 9mm, bearing serial number K23044, (17) Sarsilmaz B6 9mm, bearing serial number

AGO0000213

T1102-17E13963, (18) Springfield XD Defender 9mm, bearing serial number BY475673, (19) Taurus Spectrum 380 Auto, bearing serial number 1F033220, (20) Taurus PT111G2A 9mm, bearing serial number ABH838724, (21) Glock 43X 9mm, bearing serial number BPEN020, (22) Taurus Spectrum 380 ACP, bearing serial number 1F024926, (23) Taurus Spectrum 380 Auto, bearing serial number 1F033065, (24) SCCY CPX-2 9mm, bearing serial number 126399, (25) Springfield XDS 9mm, bearing serial number BA181757, (26) Walther Arms CCP 9mm, bearing serial number WK189441, (27) Glock 43 9mm, bearing serial number AFLC219, (28) Taurus G3C 9mm, bearing serial number ACB590615, (29) Springfield XDM Elite 9mm, bearing serial number BA228357, (30) Ruger LCP 380 Auto, bearing serial number 372431109, (31) Ruger Security 9 9mm, bearing serial number 384-29927, (32) Heckler & Koch VP9 Tactical 9mm, bearing serial number 224-316280, (33) Girsan MC28SAT 9mm, bearing serial number T6368-20AV12009, (34) FN 503 9mm, bearing serial number CV016628, (35) Glock 44 22, bearing serial number AFGC876, (36) Ruger EC9S 9mm, bearing serial number 459-15215, (37) Smith & Wesson M&P 9 Shield Plus 9mm, bearing serial number JFY6090, (38) FN Five-Seven 5.7x28, bearing serial number 386402164, (39) Glock 19 9mm, bearing serial number BTNN877, (40) Ruger 5 7 5.7x28, bearing serial number 642-13405, (41) Glock 48 9mm, bearing serial number AFML592, (42) Glock 48 9mm, bearing serial number BSNU334, (43) Glock 41 45, bearing serial number AFLX128, (44) Glock 19 9mm, bearing serial number BTED415, (45) Glock 19 9mm, bearing serial number AFKM784, (46) Springfield Hellcat 9mm, bearing serial number BA241781, (47) Glock 19 9mm, bearing serial number AFMK782, (48) Taurus G2C 9mm, bearing serial number ACD780274, (49) Taurus G2C

AGO0000214

9mm, bearing serial number ACD780224, (50) Glock 19 9mm, bearing serial number AFDP856, (51) Glock 26 9mm, bearing serial number AEZU085, (52) Glock 19 9mm, bearing serial number AFDP854, (53) Glock 22 .357 Sig, bearing serial number PTB537, (54) Glock 17 9mm, bearing serial number BTMG955, (55) Ruger 5 7 5.7x28, bearing serial number 642-12901, (56) Taurus G3 9mm, bearing serial number ACD781457, (57) Glock 26 9mm, bearing serial number AEXF244, (58) Glock 27 40, bearing serial number BTSS412, (59) Glock 23 40 S&W, bearing serial number BTHV443, (60) Glock 26 9mm, bearing serial number BSMB786, (61) SCCY CPX-2 9mm, bearing serial number C124715, (62) SCCY CPX-2 9mm, bearing serial number C124587, (63) Glock 19 9mm, bearing serial number BTCV605, (64) Glock 22 40 S&W, bearing serial number BTEN439, (65) Ruger EC9S 9mm, bearing serial number 459-19331, (66) Glock 44 22, bearing serial number AFHY163, (67) Glock 19 9mm, bearing serial number YBT114, (68) Glock 19 9mm, bearing serial number FMC403, (69) Smith & Wesson Shield 9 9mm, bearing serial number JMD3016, (70) Pioneer AK47 Hellpup 7.62x39mm, bearing serial number PAC1149857, (71) Glock 22 40 S&W, bearing serial number BTSF753, (72) Glock 44 22, bearing serial number AFFX088, (73) Glock 22 40 S&W, bearing serial number BTSF754, (74) Glock 43 9mm, bearing serial number ANFL774, (75) Ruger EC9S 9mm, bearing serial number 456-50360, (76) Ruger 5 7 5.7x28, bearing serial number 642-19475, (77) Smith & Wesson M&P Bodyguard 380 Auto, bearing serial number KCL9221, (78) Glock 17 9mm, bearing serial number BTAR800, (79) Glock 23 40 S&W, bearing serial number BTET747, (80) Glock 19 9mm, bearing serial number AFHH020, (81) Glock 19 9mm, bearing serial number BPPB175, (82) Glock 17 9mm, bearing serial number

AGO0000215

BTAR803, (83) Glock 43 9mm, bearing serial number AFGL788, (84) Glock 46 9mm, bearing serial number BTAF782, (85) Glock 17 9mm, bearing serial number BTBM124, (86) Glock 19 9mm, bearing serial number AFHH040, (87) Girsan Regard MC 9mm, bearing serial number T6368-20A18050, (88) Springfield XD-9 9mm, bearing serial number BA307871, (89) Glock 30s 45, bearing serial number BSMK362, (90) Glock 27 40, bearing serial number BTAB035, (91) Glock 30 45, bearing serial number BRZM708, (92) Glock 19 9mm, bearing serial number AFNV693, (93) APF AR-15 5.56 NATO, bearing serial number AM002879, (94) Ruger Security 9 9mm, bearing serial number 38453958, (95) Taurus G2C 9mm, bearing serial number 1C046481, (96) 3 boxes of .223-caliber ammunition, (97) a 100-round high-capacity AR-15 magazine, (98) Glock 26 9mm, bearing serial number BTEX477, and (99) Glock 43 9mm, bearing serial number AFRF437.

The defendant agrees that the United States may, at its option, forfeit such property through civil, criminal or administrative proceedings, waives any deadline or statute of limitations for the initiation of any such proceedings, and abandons any interest he may have in the property. The defendant waives all statutory and constitutional defenses to the forfeiture and consents to the destruction of the firearms, ammunition, and associated accessories. The defendant agrees that the firearms, ammunition, and related accessories are subject to forfeiture because they were involved in knowing violations of federal law.

10. **Waiver of Freedom of Information Act and Privacy Act**. In exchange for the concessions of the United States made herein, the defendant agrees to waive all rights to obtain, directly or through others, information about the investigation and prosecution

AGO0000216

of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A.

11. **<u>Waiver of Appeal and Postconviction Petition</u>**. The parties are expressly aware that Title 18, United States Code, Section 3742, affords them the right to appeal the sentence imposed in this case. Acknowledging this right, and in exchange for the concessions made as part of this agreement, the parties hereby waive all rights conferred by Title 18, United States Code, Section 3742, to appeal the sentence imposed or the basis of conviction on any ground, <u>except</u> the defendant may appeal the sentence imposed if it is greater than 87 months, and the United States may appeal the sentence imposed if it is less than 70 months. The defendant also understands her rights to file a collateral postconviction civil petition contesting the legality of her conviction or sentence and, except for a claim of ineffective assistance of counsel, the defendant knowingly and voluntarily waives all rights to contest the defendant's conviction or sentence in any collateral postconviction civil proceeding, including one pursuant to Title 28, United States Code, Section 2255. The defendant has discussed these rights with the defendant's counsel and understands the rights being waived.

AGO0000217

12.    **Complete Agreement**.  This, along with any agreement signed by the parties before entry of plea, is the entire agreement and understanding between the United States and the defendant.

Dated:  DECEMBER 28, 2021          CHARLES J. KOVATS, JR.
                                   Acting United States Attorney


                                   _____
                                   BY: BENJAMIN BEJAR
                                   Assistant United States Attorney


Dated:  12-28-21                   _____
                                   SARAH JEAN ELWOOD
                                   Defendant


Dated:  12/28/21                   _____
                                   PATRICK G. LEACH, ESQ.
                                   Attorney for Defendant

AGO0000218

# EXHIBIT W

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No.: 22-006 (DWF)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | PLEA AGREEMENT |
| v. | ) | AND SENTENCING |
| | ) | STIPULATIONS |
| JEROME FLETCHER HORTON, JR., | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America and Jerome Fletcher Horton, Jr., (hereinafter referred to as "Defendant") agree to resolve this case on the terms and conditions that follow. This plea agreement binds only the Defendant and the United States Attorney's Office for the District of Minnesota. This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1.  **Charges.** The Defendant agrees to plead guilty to Count 1 of the Information, which charges the Defendant with false statement during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

2.  **Factual Basis.** The Defendant agrees to the following facts and further agrees that, were this matter to go to trial, the United States would prove the following facts beyond a reasonable doubt:

On July 31, 2021, the Defendant purchased a Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 017520MC. The Defendant purchased the firearm from Fleet Farm, a federally licensed dealer of firearms within the meaning of

AGO0000261

Chapter 44, Title 18 of the United States Code, in Blaine, Minnesota. When the Defendant purchased the firearm, the Defendant executed a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Form 4473 in connection with the purchase of the firearm. On this form, the Defendant stated he was the actual buyer of the firearm. In fact, the Defendant was not the actual buyer of the firearm, but was buying it for another individual, with the intent to transfer it to that individual. The Defendant had reason to believe the person to whom the Defendant transferred the firearm was prohibited from possessing firearms.

An ATF special agent checked with other federally licensed dealers of firearms, in and around the Twin Cities metropolitan area, and reviewed other documents and records. The agent determined that the Defendant purchased a total of at least 33 firearms from June 15, 2021, through October 17, 2021.

The ATF agent also searched the Defendant's phone and social media account pursuant to search warrants, and found that the Defendant had attempted to transfer semiautomatic firearms with attached magazines that could accept more than 15 rounds of ammunition.

The Defendant stipulates and agrees that on July 31, 2021, he knowingly and voluntarily made a false written statement to Fleet Farm, a federally licensed dealer of firearms. This false statement was made in connection with the acquisition of a firearm, and was intended and likely to deceive Fleet Farm about a fact material to the lawfulness of the sale of the firearm.

The Defendant further stipulates that he purchased 32 additional firearms from federally licensed dealers of firearms in and around the Twin Cities area, and made similar

2

AGO0000262

false statements in connection with the purchase of all of them.

3. **Statutory Penalties.** The parties agree that Count 1 of the Information carries statutory penalties of:

> a. a maximum term of imprisonment of 10 years;
>
> b. a supervised release term of up to three years;
>
> c. a fine of up to $250,000; and
>
> d. a mandatory special assessment of $100.00.

4. **Revocation of Supervised Release.** The Defendant understands that if he were to violate any condition of supervised release, the Defendant could be sentenced to an additional term of imprisonment up to the length of the original supervised release term, subject to the statutory maximums set forth in 18 U.S.C. § 3583.

5. **Guideline Calculations.** The parties acknowledge that the Defendant will be sentenced in accordance with 18 U.S.C. § 3551, *et seq.* Nothing in this plea agreement should be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing. The parties also acknowledge that the Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following guideline calculations:

> a. Base Offense Level. The parties agree that, because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine, and the Defendant violated 18 U.S.C. § 922(a)(6) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm to a prohibited person, the base offense level for Count 1 of the Information is **20**. U.S.S.G. § 2K2.1(a)(4)(B).

3

AGO0000263

b.      Specific Offense Characteristics.  The parties agree that, because the offense involved between 25 and 99, the base offense level should be increased by **6** levels.  U.S.S.G. § 2K2.1(b)(1)(C).  The parties agree that no other specific offense characteristics apply.

c.      Chapter 3 Adjustments.  The parties agree that, other than credit for acceptance of responsibility, no Chapter 3 adjustments apply.

d.      Acceptance of Responsibility.   The United States agrees to recommend that the Defendant receive a **3**-level reduction for acceptance of responsibility and to make any appropriate motions with the Court.  However, the Defendant understands and agrees that this recommendation is conditioned upon the following:  (i) the Defendant testifies truthfully during the change of plea hearing, (ii) the Defendant cooperates with the Probation Office in the preparation of the Pre-sentence Report, and (iii) the Defendant commits no further acts inconsistent with acceptance of responsibility.  U.S.S.G. § 3E1.1.  The parties agree that other than as provided for herein no other Chapter 3 adjustments apply.

e.      Criminal History Category.  Based on information available at this time, the parties believe that the Defendant's criminal history category is **I**.  This does not constitute a stipulation, but a belief based on an assessment of the information currently known.  The Defendant's actual criminal history and related status (which might impact the Defendant's adjusted offense level) will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing.

f.      Guideline Range.  If the adjusted offense level is **23**, and the criminal history category is **I**, the Sentencing Guidelines range is **46** to **57** months' imprisonment.

g.      Fine.  If the adjusted offense level is **23**, the applicable fine range is **$20,000** to **$200,000**.  U.S.S.G. § 5E1.2(c)(3).

h.      Supervised Release.  The Sentencing Guidelines call for a term of supervised release of between one and three years for Count 1.  U.S.S.G. § 5D1.2.

i.      Sentencing Recommendation and Departures.  The parties reserve the right to make departure motions and to oppose any such motions made by the opposing party.  The parties also reserve the right to argue for a sentence outside the advisory guidelines range.

AGO0000264

6. **Discretion of the Court**. The foregoing stipulations are binding on the parties, but do not bind the Court. The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable guideline factors and the applicable criminal history category. The Court may also depart from the applicable Guidelines. If the Court determines that the applicable guideline calculations or the Defendant's criminal history category is different from that stated above, the parties may not withdraw from this agreement, and the Defendant will be sentenced pursuant to the Court's determinations.

7. **Special Assessments**. The Sentencing Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the Defendant is convicted. U.S.S.G. § 5E1.3. The Defendant agrees to pay the special assessment prior to sentencing.

8. **Forfeiture**. The Defendant agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), any firearm with accessories and any ammunition involved in the Defendant's violation of Title 18, United States Code, Section 922, including specifically but not limited to the Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 017520MC, together with ammunition, as well as the following firearms, together with ammunition: a Taurus model G2C 9mm semiautomatic pistol bearing serial number 1C020445; a Ruger model Security-9 9mm semiautomatic pistol bearing serial number 38463707; a Glock model 19 9mm semiautomatic pistol bearing serial number BTNX619;

5

AGO0000265

a Glock model G43X 9mm semiautomatic pistol bearing serial number BTTU573; a Beretta model APX 9mm semiautomatic pistol bearing serial number A152030X; a Springfield Armory model XDS 9mm semiautomatic pistol bearing serial number BA456304; a FNH model 503 9mm semiautomatic pistol bearing serial number CV016470; a Glock model 26 9mm semiautomatic pistol bearing serial number AFVB754; a Glock model 43X 9mm semiautomatic pistol bearing serial number BTTU0778; a Stoeger model STR-9C 9mm semiautomatic pistol bearing serial number T642921S02199; a Ruger model EC95 9mm semiautomatic pistol bearing serial number 45955269; a Glock model 45 9mm semiautomatic pistol bearing serial number BSTE309; a Glock model 19X 9mm semiautomatic pistol bearing serial number BUCB186; a Glock model G19 9mm semiautomatic pistol bearing serial number BSXE226; a Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 014211MC; a Glock model 26 9mm semiautomatic pistol bearing serial number AFVC844; a Glock model 23 .40 caliber semiautomatic pistol bearing serial number BUGF388; a Glock model 21 .45 caliber semiautomatic pistol bearing serial number AFUV823; a Glock model 19 9mm semiautomatic pistol bearing serial number BUBY049; a Glock model G17 9mm semiautomatic pistol bearing serial number BUGR628; a Glock model 30 .45 caliber semiautomatic pistol bearing serial number BTEW814; a Ruger model 57 5.7x28 caliber semiautomatic pistol bearing serial number 64322362; a Glock model G19 9mm semiautomatic pistol bearing serial number BUAS957; a Radical Firearms model RF-15 .556 caliber semiautomatic pistol bearing serial number 21046140; a Glock model 26 9mm semiautomatic pistol bearing serial number AFSE457; a Glock model 19 9mm

6

AGO0000266

semiautomatic pistol bearing serial number AFYL242; a Glock model 43X 9mm semiautomatic pistol bearing serial number BUHT553; a Glock model 26 9mm semiautomatic pistol bearing serial number SBU095; a SAR-Iraola Salaverria model B6C 9mm semiautomatic pistol bearing serial number T110221G50080; a Taurus model G3C 9mm semiautomatic pistol bearing serial number 1KA06796; a Taurus model G2C 9mm semiautomatic pistol bearing serial number 1C073052; and a Glock model 26 9mm semiautomatic pistol bearing serial number AGBR071.

The Defendant further agrees that, pursuant to Fed. R. Crim. P. 32.2(b)(2) and (3), the Court may enter a Preliminary Order of Forfeiture for the above-described forfeitable property immediately upon the entry of the Defendant's guilty plea, which order will be final as to the Defendant immediately upon filing of the Preliminary Order of Forfeiture. The order of forfeiture shall be made a part of the Defendant's sentence and included in the Judgment.

The Defendant also agrees that the United States may forfeit any and all other property subject to forfeiture as a result of the Defendant's plea by any means provided by law.

7

AGO0000267

9.    **Complete Agreement.**  This, along with any agreement signed by the parties before the entry of the plea, is the entire agreement and understanding between the United States and the Defendant.

Dated: 3/03/2022                                        CHARLES J. KOVATS, JR.
                                                        Acting United States Attorney


                                                        BY: THOMAS CALHOUN-LOPEZ
                                                        Assistant United States Attorney


Dated: 3 - 3 - 22


                                                        JEROME FLETCHER HORTON, JR.
                                                        Defendant


Dated: 3 - 3 - 22


                                                        KEALA C. EDE
                                                        Counsel for Defendant

8

AGO0000268

# EXHIBIT X

STATE OF MINNESOTA

COUNTY OF RAMSEY

**Filed in District Court**
**State of Minnesota**
Date & Time: Jun 7 2022 10:53 AM

DISTRICT COURT

SECOND JUDICIAL DISTRICT

COURT FILE NO.: 62-CR-21-5805
PROSECUTOR FILE NO.:0620444842

**State of Minnesota,**

              **Plaintiff,**

v

**Devondre Trevon Phillips**
**(DOB: ▮▮▮▮ 1992)**
**12865 Mojave Rd.**
**Las Vegas, NV 89104**

              **Defendant.**

**FELONY**
**CRIMINAL COMPLAINT**
☐ **Summons** ☐ **Warrant**
☐ **Order of Detention**

☒ **Amended**
☐ **Certified Juvenile**
☐ **EJJ**

The Complainant, being duly sworn, makes complaint to the above-named Court and states that there is probable cause to believe that the Defendant committed the following offense(s):

## COUNT I

**Charge: Murder - 2nd Degree - Without Intent - While Committing a Felony**
Minnesota Statute: 609.19.2(1)
Maximum Sentence: 40 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, caused the death of MW without intent to effect the death, while committing or attempting to commit a felony.

AGO0000322

## COUNT II

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of JH with intent to effect the death of JH.

## COUNT III

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of MT with intent to effect the death of MT or another.

## COUNT IV

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about):10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of NG with intent to effect the death of NG or another.

AGO0000323

## COUNT V

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about):10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of IW with intent to effect the death of IW or another.

## COUNT VI

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about):10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of EW with intent to effect the death of EW or another.

## COUNT VII

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about):10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of AW with intent to effect the death of AW or another.

## COUNT VIII

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of KP with intent to effect the death of KP or another.

## COUNT IX

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of CA with intent to effect the death of CA or another.

## COUNT X

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of CK with intent to effect the death of CK or another.

AGO0000325

## COUNT XI

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of WR with intent to effect the death of WR or another.

## COUNT XII

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of TC with intent to effect the death of TC or another.

## COUNT XIII

**Charge: Attempted Murder - 2nd Degree - With Intent-Not Premeditated**
Minnesota Statute: 609.19.1(1), with reference to: 609.17.1
Maximum Sentence: 20 years
Offense Level: Felony

Offense Date (on or about): 10/10/2021

Control #(ICR#): 21212281

Charge Description: On or about October 10, 2021, in the County of Ramsey, Minnesota, the defendant, Devondre Trevon Phillips, did attempt to cause the death of SB with intent to effect the death of SB or another.

AGO0000326

## STATEMENT OF PROBABLE CAUSE

The Complainant states that the following facts establish probable cause:

At around 12:15 AM on October 10, 2021, officers were sent to the Truck Park located at 214 Seventh Street, St. Paul, Ramsey County on a shooting.

Officers arrived to a chaotic scene – multiple people with gunshot wounds were being tended to by others. Spent shell casings and bullet fragments were all over the bar floor. Twelve gunshot victims were either taken to or driven to different hospitals once the scene was secure

Officers found a man carrying MW (DOB: ████1994) over his shoulder. MW had a gunshot wound to her back. MW was limp and not moving. Officers convinced the man to lay MW on the ground so they could attempt to provide medical attention to her. Officers located a faint pulse that disappeared after a few seconds. Medics loaded MW in an ambulance where she was pronounced dead by medics at 12:26 AM.

Witnesses described seeing three separate shooters to police. Officers realized that two of the people receiving medical attention for gunshot wounds matched descriptions of the shooters: **DEVONDRE TREVON PHILLIPS (DOB: ████1992)** and **TERRY LORENZO BROWN (DOB: ████1988)**.

Several witnesses told police that they disarmed Brown as he lay on the bar's floor. One witness told police he repeatedly punched Brown's face. Brown asked the witness why he was hitting him. The witness replied, "Drop the fucking gun." A different witness grabbed the handgun from Brown, ran outside with it, and put it on the ground. A security guard stood over the KAHR Arms 9mm handgun Brown had fired until a police officer collected it. Brown told a security guard, "Don't let the police get the gun…the light-skinned guy shot me first."

Phillips was taken to Regions Hospital and was identified by a Nevada identification. By the time Phillips came out of surgery officers had reviewed surveillance video from the bar and determined that he was one of the shooters.

Brown was taken to Hennepin County Medical Center.

Surveillance video caught the incident. Phillips was in the bar talking to two women when JH (DOB: ████1988) approached. JH appeared to be upset, and he directed one of the women to walk with him towards the end of the bar. Phillips stopped talking to the other woman and walked towards the rest of his group.

Brown entered the bar. JH and a Black male with long dreadlocks reentered the bar. JH, Brown, and the man with the long dreadlocks spoke to one another while looking in Phillips' direction. Phillips moved to a part of the bar and had his back to the wall. JH walked directly up to Phillips. The man with the long dreadlocks tried to catch up to JH. Brown remained about 15 feet away watching the interaction between JH and Phillips. Phillips shot JH in the abdominal area. Phillips walked towards the door as JH clutched his stomach. The man with the long dreadlocks worked his way to a corner of the bar. Phillips raised the gun and fired at Brown while moving towards the door. Phillips was in between Brown and MW when he fired. Brown fired back at Phillips.

MW and people with her fell to the ground and tried to cover each other up. MW's back was exposed in the direction from which Brown fired at Phillips while on his back. An apparent defect on her shirt appeared near MW's left shoulder area. Phillips crouched and returned fire. Phillips fell. Phillips and Brown continued to shoot at one another. Brown tried to stand but he immediately fell due to his broken right leg. Phillips scurried out of the

AGO0000327

door. A bar patron jumped on and repeatedly punched Brown. Another bar patron ran up, grabbed Brown's gun, and ran outside with it.

Once outside the bar, Phillips hobbled down the street to a Honda Civic and got inside it. Phillips exited the Civic, fell into the street, and remained there until people and an officer rendered aid to him. The man with the long dreadlocks produced a firearm and fired it once. The man with the long dreadlocks helped JH out of the bar and disappeared.

A search warrant was executed on the Honda Civic Phillips entered. A handgun was recovered from the Civic.

JH was admitted at Regions Hospital with two gunshot wounds to his stomach. JH told investigators he went to the bar with Brown. He said he messes with the woman Phillips was talking to at the bar, but he denied he was upset over it. JH claimed he only said, "What's up?" to Phillips.

MT (DOB: ▮▮▮▮1992) was treated and discharged from Regions Hospital with a gunshot wound to his ankle area. Doctors elected to leave the bullet in his foot.

NG (DOB: ▮▮▮▮1995) was treated and discharged from Regions Hospital with a gunshot wound to his forearm.

IW (DOB: ▮▮▮▮1991) was admitted to HCMC with a gunshot wound to his ankle.

EW (DOB: ▮▮▮▮1994) was admitted to HCMC with a gunshot wound to his arm.

AW (DOB: ▮▮▮▮1988) was admitted to HCMC with a gunshot wound to her foot.

KP (DOB: ▮▮▮▮1990) was admitted to HCMC with a gunshot wound to her hand.

CA (DOB: ▮▮▮▮1999) was admitted to HCMC with a gunshot wound that grazed her stomach area.

CK (DOB: ▮▮▮▮1995) was admitted to HCMC with a gunshot wound to her arm.

WR (DOB: ▮▮▮▮1984) was treated and discharged from United Hospital with a gunshot wound to his foot.

TC (DOB: ▮▮▮▮1999) was treated and discharged from United Hospital with a gunshot wound to her lower leg.

SB (DOB: ▮▮▮▮1999) was treated and discharged from United Hospital with a gunshot wound to her leg.

Brown was advised of his constitutional rights and agreed to speak to investigators. Brown said he saw a man who is a relative of the woman he is dating. Brown and the other man are in a beef due to allegations of domestic abuse between Brown and his girlfriend. The other man, Phillips, walked up and shot at Brown. Brown pulled out the gun he carried and returned fire. Both Brown and Phillips were hit and fell to the floor. Brown and Phillips continued to fire at each other while on the floor. Brown said Phillips shot at him first. Brown admitted he is ineligible to possess a firearm.

Phillips was advised of his constitutional rights and agreed to speak to investigators. Phillips said he just got back to Minnesota from Las Vegas. His nephew picked him up from the airport and they went to the Truck Park. Phillips said he was in the bar between 30-60 minutes when the shooting started. Phillips crawled out of the bar and passed out. Philips said he was not part of the shooting and didn't know who was involved.

Phillips was told investigators knew he was involved in the shooting as it was captured on surveillance cameras. Phillips said he felt he was targeted but he didn't know by whom or why. Investigators told Phillips that it appeared people were coming after him. Phillips agreed. Phillips was told he had a gun and fired it. When asked if he was defending himself, Phillips said he had no memory of that. Phillips said he remembered a lot of shots, pain, and lights. Phillips did not remember having a gun. Phillips said he had been shot five times – his femur was broken and an artery in his leg was severed.

Phillips has a prior adjudication for aggravated robbery in the first degree that makes him ineligible to possess firearms or ammunition.

Brown has 5 prior felony convictions: aggravated robbery in the first degree, simple robbery, VOCSL 5, and 2 DANCO violations. The robbery and drug convictions make Brown ineligible to possess firearms or ammunition.

Aggravated robbery in the first degree and simple robbery are violent crimes pursuant to Minnesota Statute 609.1095, subd. 1(d).

On October 10, 2021, the Ramsey County Medical Examiner's Office conducted an autopsy on MW. MW had a gunshot wound to her back that penetrated her left lung and heart. The cause of MW's death is a gunshot wound to the back. The manner of MW's death is homicide.

Brown and Phillips both remain hospitalized.

**NOTICE:** Pursuant to Minnesota Statute 609.49, subd. 1 (a) A person charged with or convicted of a felony and released from custody, with or without bail or recognizance, who intentionally fails to appear when required after having been notified that a failure to appear for a court appearance is a criminal offense, or after having been released on an order or condition that the release personally appear when required with respect to the charge or conviction, is guilty of a crime for failure to appear and may be sentenced to not more than one-half of the maximum term of imprisonment or fine, or both, provided for the underlying crime for which the person failed to appear, but this maximum sentence shall, in no case, be less than a term of imprisonment of one year and one day or a fine of $1,500, or both.

AGO0000329

Complainant requests that Defendant, subject to bail or conditions of release, be:
(1) arrested or that other lawful steps be taken to obtain Defendant's appearance in court; or
(2) detained, if already in custody, pending further proceedings; and that said Defendant otherwise be dealt with according to law.

**COMPLAINANT'S NAME:**                    **COMPLAINANT'S SIGNATURE:**

Nelson Rhodus                              ___/s/ Nelson Rhodus_____

Subscribed and sworn to before the undersigned this 26th day of May, 2022.

**NAME/TITLE:**                            **SIGNATURE:**

__Ka Ying Yang_____             ____/s/  Ka Ying Yang_____
  Notary Public, State of Minnesota
  My Commission Expires January 31, 2025.

---

Being authorized to prosecute the offenses charged, I approve this complaint.

Date: May 26, 2022                         **PROSECUTING ATTORNEY'S SIGNATURE:**

                                           ___/s/ Nelson Rhodus_____
                                           Name: Nelson Rhodus

                                           Assistant Ramsey County Attorney
                                           345 Wabasha Street North, Suite 120
                                           St. Paul, MN 55102
                                           651-266-3222/KY
                                           Attorney Registration #0391897

AGO0000330

## FINDING OF PROBABLE CAUSE

From the above sworn facts, and any supporting affidavits or supplemental sworn testimony, I, the Issuing Officer, have determined that probable cause exists to support, subject to bail or conditions of release where applicable, Defendant's arrest or other lawful steps be taken to obtain Defendant's appearance in court, or Defendant's detention, if already in custody, pending further proceedings. Defendant is therefore charged with the above-stated offense.

## ☐SUMMONS

THEREFORE YOU, THE ABOVE-NAMED DEFENDANT, ARE HEREBY SUMMONED to appear on the ____ day of _____, 20___ at _____ before the above-named court at _____ to answer this complaint.

IF YOU FAIL TO APPEAR in response to this SUMMONS, a WARRANT FOR YOUR ARREST shall be issued.

## ☐ WARRANT
### ☐ *Execute in MN Only*    ☐ *Execute Nationwide*    ☐ *Execute in Border States*

To the Sheriff of the above-named county; or other person authorized to execute this warrant: I hereby order, in the name of the State of Minnesota, that the above-named Defendant be apprehended and arrested without delay and brought promptly before the above-named court (if in session), and if not, before a Judge or Judicial Officer of such court without unnecessary delay, and in any event not later than 36 hours after the arrest or as soon as such Judge or Judicial Officer is available to be dealt with according to law.

## ☒ ORDER OF DETENTION

Since the above-named Defendant is already in custody, I hereby order, subject to bail or conditions of release, that the above-named Defendant continue to be detained pending further proceedings.

**Bail:**
**Conditions of Release:**

This complaint, duly subscribed and sworn to, is issued by the undersigned Judicial Officer this _____ day of _____, 20_____.

**JUDICIAL OFFICER:**          **SIGNATURE:**
**NAME:**
**TITLE:**                     Lamas, Carolina
                               2022.05.26 14:20:16 -05'00'

Sworn testimony has been given before the Judicial Officer by the following witnesses:

| COUNTY OF RAMSEY<br>STATE OF MINNESOTA | *Clerk's Signature or File Stamp:* |
|---|---|
| **STATE OF MINNESOTA**<br><br>                Plaintiff,<br><br>    vs.<br><br>**DEVONDRE TREVON PHILLIPS**<br><br>                Defendant. | *RETURN OF SERVICE*<br>*I hereby Certify and Return that I have served a copy of this* ***AMENDED*** *COMPLAINT upon the Defendant herein named.*<br><br>Signature of Authorized Service Agent:<br><br>_____ |

AGO0000331

**RESPONDENT DATA / CHARGE SHEET – ATTACHMENT A**

| DEFENDANT NAME: | **DEVONDRE TREVON PHILLIPS** | DOB: ███/1992 |
|---|---|---|

Defendant alias name(s):                                                   Alias DOB(s):

Defendant last known address:
**12865 Mojave Rd.**
**Las Vegas, NV 89104**

State ID:                          MN10DJ1202
Fingerprint ID:
FBI ID:                            872102JD9
St. Paul PD ID:                    21212281
Offender ID:

---

**OTHER DEFENDANT / CASE IDENTIFIERS:**

Fingerprinted?          ☐ No        ☐ Yes

Handgun permit?         ☐ No        ☐ Yes  (Issuing Agency:          )

Location of violation:

**IF DRIVING OFFENSE:**

Driver's License                                          Issuing State: :

License Plate        Number:                              Issuing State:

Accident Type:       ☐ No injury/no damage               ☐ Property Damage
*check all that apply*
                     ☐ Personal Injury                   ☐ Fatality

Blood Alcohol Concentration (BAC):

AGO0000332

## STATUTE AND OFFENSE GRID

| Cnt Nbr | Statute Type | Offense Date(s) | Statute Nbrs and Descriptions | Offense Level | MOC | GOC | Controlling Agencies | Case Numbers |
|---|---|---|---|---|---|---|---|---|
| 1 | Charge | 10/10/2021 | 609.19.2(1) Murder-2nd Degree-Without Intent-While Committing a Felony | Felony | H2813 | | MN0620900 | 21212281 |
| 2 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 3 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 4 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 5 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 6 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 7 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 8 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 9 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 10 | Charge | 10/10/2021 | 609.19.1(1) Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
| | Modifier | 10/10/2021 | 609.17.1 Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |

AGO0000333

| 11 | Charge | 10/10/2021 | 609.19.1(1)<br>Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
|----|--------|------------|---|---|---|---|---|---|
|  | Modifier | 10/10/2021 | 609.17.1<br>Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 12 | Charge | 10/10/2021 | 609.19.1(1)<br>Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
|  | Modifier | 10/10/2021 | 609.17.1<br>Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |
| 13 | Charge | 10/10/2021 | 609.19.1(1)<br>Murder - 2nd Degree - With Intent-Not Premeditated | Felony | H2813 | A | MN0620900 | 21212281 |
|  | Modifier | 10/10/2021 | 609.17.1<br>Anticipatory Crimes-Attempts | No-Level | H2813 | A | MN0620900 | 21212281 |



# EXHIBIT Y

This is how a gun used in a mass shooting came to the Twin Cities.

AGO0000150



RAMSEY COUNTY DISTRICT COURT

The Mossberg 9mm pistol that Devondre Phillips fired repeatedly inside the Truck Park bar on Oct. 10, 2021. It will remain stored in an evidence locker until at least after Phillips serves his sentence for attempted murder, and then it will be destroyed.

# THE LIFE OF A GUN

This Mossberg MC2c pistol travelled from Texas before it hit the black market, ending up at a 2021 St. Paul mass shooting.

By **Stephen Montemayor (https://www.startribune.com/stephen-montemayor/6370444/)** · Photos by **Leila Navidi (https://www.startribune.com/leila-navidi/6370416/)**
**July 14, 2023** Star Tribune • First in a series

## EAGLE PASS, TEXAS

A handgun used in one of the worst mass shootings in St. Paul history began its journey to Minnesota from here, in a sprawling blue factory near the Rio Grande.

Like every Mossberg MC2c pistol, No. 017520MC wears its birthplace stamped along its 4-inch barrel. Its maker, best known for shotguns, bet this new line of 9mm handguns would help the century-old family business break into the booming self-defense market.

AGO0000151

"Trouble is unpredictable," O.F. Mossberg & Sons Inc. cautioned while announcing the pistol. "It arrives without warning, when and where you least expect it. So be prepared."

Safety is exactly what the final owner of 017520MC said he wanted when he sent a volley of bullets into a crowded St. Paul bar (https://www.startribune.com/one-killed-14-wounded-in-shooting-inside-st-paul-bar-early-sunday/600105334/) . By the time police arrived, a young woman lay dead and more than a dozen gunshot victims were pleading for help.

---

**LOADED**

An occasional series examining the rising levels of gun violence in Minnesota, the proliferation of legally purchased handguns used in crimes and the technological advances that make them more deadly than ever.

---

The story of this pistol's short, violent life, compiled from hours of interviews, hundreds of pages of court documents and review of surveillance and police body camera footage, is like that of thousands of legally purchased handguns that turn up in crimes across Minnesota each year.

Though assault-style rifles have captured the attention of lawmakers and gun control advocates, 017520MC is far more representative of what's behind the steady rise of bloodshed sweeping across the country. Handguns, first bought legally, are most frequently the firearm of choice in the surging rate of gun homicides in Minnesota and nationally.

Of the nearly 300 fatal shootings in Minnesota between 2021 and 2022, vastly more were specifically attributed to handguns than rifles or shotguns. And people injured but not killed by gunfire is at historic levels around the state — up 176% last year from 2019.

Police in Minnesota continue to retrieve a record number of guns from crime scenes. And pistols, mostly 9mm, are nearly always the gun they find.

AGO0000152





LEILA NAVIDI, STAR TRIBUNE

The border fence with Mexico can be seen at top just beyond the Maverick Arms plant in Eagle Pass, Texas. Guns are plentiful on the Texas side of the border.

**THREE FLAGS —** Mexico, United States and Texas — fly in front of the sprawling Maverick Arms plant, which faces a craggy hillside bluff and is backed up near a tall, rust-colored border fence.

The steady hum of production droned one recent evening, and flatbed trucks tore out of surrounding lots. Just outside the industrial park, families gathered at youth soccer and baseball fields to watch their kids play in the muggy night. Traffic stood still on the bridge into the U.S., and migrants waded through river waters in search of asylum.

Neither man-made nor geological barriers can separate the shared culture of Eagle Pass, which is 97% Latino, from its Mexican sibling, Piedras Negras.

AGO0000153

But a single sign at a bridge checkpoint marks a clear distinction.



"NOTICE: Guns are illegal in Mexico."

Guns are plentiful on the Texas side of this divide. They've been churned out around the clock for more than 30 years, ever since Mossberg started producing firearms in this city of 29,000.

"That was a turning point for Eagle Pass," said Morris Libson Jr., who leads the Eagle Pass Maverick County Economic Development Alliance.

Today, nearly all of O.F. Mossberg & Sons' guns are made in Eagle Pass. The Connecticut-based company joined an ongoing trend of gun makers moving their business from blue states to places perceived as more friendly to their interests. The state of Texas even chipped in $300,000 toward the company's last expansion.

"Investing in Texas was an easy decision," Mossberg CEO Iver Mossberg said at the time, noting that the state "honors and respects the Second Amendment and the firearm freedoms it guarantees for our customers."

Through a spokesperson, O.F. Mossberg & Sons declined to comment for this article.

Within this barbed wire-enclosed building, Mossberg in 2019 made its first pistol in a century: the MC1. The MC2c followed about a year later, billed as a bigger, higher-capacity version capable of firing up to 17 bullets — more than double its predecessor.

Gun merchants in the city say residents have been stocking up on pistols since the onset of the COVID-19 pandemic and amid anxieties about illegal immigration. Nationally, FBI background checks for gun sales soared to an all-time high of 39.7 million in 2020 and have remained above 30 million each year since — well above pre-pandemic highs. Last year, more than 57% of background checks associated with a specific gun transfer were for handguns.

"Everyone has a gun here in a border town," said Justin Salinas, who opened WarTribe Armory shortly after returning home from the Army.

Yet every Mossberg pistol produced in Eagle Pass leaves the city. Neither the MC2c nor any other Mossberg handgun was on shelves at the Academy sporting goods chain earlier this year. A sales associate there said he hadn't even heard of the pistol. Neither had Salinas.

AGO0000154

In the Twin Cities, the line's sales have remained relatively low compared with the bigger pistol brands at stores such as Kory Krause's Frontiersman Sports in St. Louis Park.

"They are not a bad gun, just that they are not very popular in our market," Krause said.

But their compact size, capacity and price appealed to customers whose criminal histories barred them from buying the guns legally. Associates without criminal records instead did the gun-shopping, turning a profit in the process.





AGO0000155



LEILA NAVIDI, STAR TRIBUNE

A bridge over the Rio Grande, at top, joins Piedras Negras, Mexico, and Eagle Pass, Texas. At center, a giant Mexican flag flying in Piedras Negras can be seen from almost anywhere in downtown Eagle Pass. At WarTribe Armory, above, business is brisk. "Everyone has a gun here in a border town," says owner Justin Salinas, right, with sales associated Eddie Hernandez.

**BACK IN MINNESOTA**, Jerome Horton Jr. crisscrossed the metro area during the summer and fall of 2021, on a shopping spree for handguns. He bought 33 in all, spanning multiple brands but all the same caliber. Two dozen of the guns, including 017520MC, were purchased at Fleet Farm stores in Blaine and Lakeville.

The 26-year-old Minneapolis man paid cash, around $400 or more per pistol. Surveillance cameras and sales clerks sometimes observed him on the phone, debating what to buy with others who waited outside the store.



Minnesota imposes no limit on the number of pistols or semiautomatic military-style assault weapons that can be acquired by residents with valid permits. But anyone who obtains a gun on behalf of someone ineligible to possess one can face federal or state charges.

Horton was not buying them for himself. He was working with Gabriel Young-Duncan, 27 of St. Paul, to funnel his guns to buyers with criminal histories. The practice, known as straw buying, can be

AGO0000156

lucrative. The original seller can make a profit of $100 or more for each gun they divert to the black market.

Police later linked some of the pistols Horton bought to other crimes around the metro area, and a 6-year-old found one discarded in his family's north Minneapolis front yard. Most of the guns remain unaccounted for.



LEILA NAVIDI, STAR TRIBUNE

A straw buyer bought 017520MC at a Fleet Farm in Blaine.

Straw buyers cannot know "what type or what level of chaos and misery that those firearms are going to inflict on communities," said Assistant U.S. Attorney Thomas Calhoun-Lopez, who prosecuted Horton and Young-Duncan.

## FATAL SHOOTINGS IN MINNESOTA

Gun homicides in Minnesota have surged to record levels since 2020, reaching rates and volumes not seen since the 1990s.

Minneapolis        St. Paul        Rest of Minnesota

AGO0000157



YUQING LIU, STAR TRIBUNE

*Numbers include murders and non-negligent homicides, mostly involving handguns. 2022 numbers from outside the Twin Cities are preliminary.*

**DEVONDRE PHILLIPS' PLANE** touched down in the Twin Cities just before 10 p.m. His cousin waited for him outside the terminal that warm October night and suggested they grab a drink before heading home. He soon navigated to St. Paul's W. 7th Street, which is lined with popular bars and restaurants.

AGO0000158



Phillips, who split his time between Las Vegas and his native St. Paul, had cut short his previous visit to his hometown that summer. An argument with his cousin's boyfriend, Terry Brown, escalated quickly. The conflict started when Phillips intervened in an argument between his cousin and Brown. They exchanged words before taking their dispute outside. Brown drew his gun. Phillips also had a gun, but was disarmed by another man.

"Why did you carry a gun that summer?" defense attorney John Lesch later asked Phillips before a jury.

"I figured it would be better safe than sorry," Phillips said, citing an uptick in violence in his family's neighborhood.

No shots were fired that night, but Phillips said he started receiving threatening messages in the following days. He abruptly left for Las Vegas after someone shot at his car. When he returned several months later, he was unarmed.

But not for long.

Walking to the bar on W. 7th, Phillips noticed an old friend from high school and stepped aside to chat.

The friend, whom Phillips said he knew as "Mo," was surprised to see Phillips. He'd heard of the summer altercations and asked if his buddy was armed.

"No, I'm not," Phillips replied.

Mo told him that he happened to be getting rid of something Phillips might want: a 9mm pistol. Phillips handed over $600 and became 017520MC's newest owner. He later admitted in court that he knew the gun was fully loaded as soon as he gripped it. He chambered a round and tucked the gun in his waistband before rejoining his group as they walked into the crowded Truck Park bar.

AGO0000159



LEILA NAVIDI, STAR TRIBUNE

Gun violence transformed the Truck Park bar, shown in May, from a fun night out to a crime scene. Handguns, first bought legally, are most frequently the firearm of choice in the surging rate of gun homicides in Minnesota and nationally. And injury due to gunfire in the state is up 176% last year from 2019.

ANDREA WEATHERSBY spent more than a year depressed and shut in after her mother died in a car crash. But Weathersby, a 34-year-old hairstylist from St. Paul, said yes when her sister asked her to come to the Truck Park bar.

"I was out trying to get myself used to being around people again," she said.

She felt safe, she said, upon seeing security staff. She danced and laughed with her boyfriend and her sister near the bar.

Not far away, Phillips locked eyes with Brown, Allen Walker and Jeffrey Hoffman — the same three men whose threats and altercations prompted his earlier retreat to Las Vegas.

At 12:16 a.m., Phillips stationed himself in a corner near the bar's indoor food truck and soda machine. Hoffman approached.

Phillips later claimed Hoffman told him, "Caught ya. You're dead." Hoffman said he merely said, "What's up?"

Surveillance footage from the bar doesn't capture what was said, but within 5 seconds, Phillips fired two rounds from 017520MC into Hoffman's body.

The clap of those first shots sent nearly all of the roughly 100 people inside the bar ducking to the ground or scrambling for cover. Several leapt over the bar and others jumped through a front window to escape.

AGO0000160

Phillips walked toward Brown, who raised his own pistol. They fired at each other from just feet apart. Both men hit their targets: A broken right leg sent Brown crumpling to the floor under his own weight. Phillips was crawling by the time he reached the exit, his femur shattered and leg bleeding from a severed artery.

But the guns fired by Phillips and Brown did not discriminate. In a span of 10 seconds, they shot another 13 people.

Marquisha "Kiki" Wiley, a 27-year-old vet technician, died almost instantly after a bullet fired by Brown pierced her heart and lung.

Others struck by 017520MC included a man shot in the Achilles tendon as he tried to find cover behind the bar area. One bullet went through two friends' legs; only one knew she'd been hit. The other only realized she'd been shot when she arrived at the hospital with her friend.

Two other people were shot in the right arm, including a man who later lost an artery. One young woman had a bullet fragment removed from her arm at the hospital.



PROVIDED

The floor of the Truck Park bar on West 7th was strewn with blood and bullet casings after the shootout in October 2021.



**WEATHERSBY REMEMBERS** being dragged to the ground before she heard the shots. Bodies fell and glasses crashed. Drinks splashed all over her.

She was in Phillips' line of fire as he shot his way out of the bar. When a bullet from his gun hit her, it felt like a hammer crashing down on her foot.

AGO0000161

Weathersby braced for more bullets as panic set in. She felt trapped and couldn't peel the bodies away to escape. In those frantic moments, she thought another patron was using her as a human shield. More than a year later, seeing footage of the shooting during Phillips' trial, Weathersby realized the man used his body to shield hers. He absorbed a round in the leg and survived.

Weathersby soon broke away and stumbled out of the bar, crying out for her sister and boyfriend. She saw Wiley's body, and others who had been wounded.

She knew she had to call the police, but her panic didn't allow her to remember the number. She tried 311 and 411 before finally dialing 911.

A police squad car arrived 3 minutes after the first shot rang out.

"Do you guys see anybody with a gun?" St. Paul Police officer Joshua Needham asked.

"I can't breathe!" Weathersby shouted as her sister applied pressure.

"Stay put, I have to figure out who else has been shot," Needham said.

Moments after the last shots rang out, a patron pounced on Brown, pummeling and trying to disarm him before security intervened.

Outside the bar, Phillips rose to one leg and hopped toward a Honda Civic. He briefly crawled inside before tumbling backward on the street in a futile attempt to stand. When police found him, bystanders were trying to stop the blood gushing from his leg.

**IT DIDN'T TAKE LONG** for police to find 017520MC. The butt of the pistol, red with blood, poked out from a pouch behind the passenger seat of the car, which police had ordered towed.

St. Paul investigators swabbed for DNA samples, collected fingerprints and test-fired the gun to compare ballistic evidence. They found no link to previous shootings.

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) traced 017520MC's lifespan from Eagle Pass, Texas, to Blaine and to Horton, the gun's original purchaser. They discovered that Horton had purchased it and two other 9mm pistols from the Blaine Fleet Farm on the same day.

Days later, ATF agents talked to an employee at Frontiersman Sports in St. Louis Park, who said that Horton had been there that day to buy more guns. Staff at the store suspected that he was a straw purchaser: He had parked his car to avoid surveillance cameras, used a learner's permit instead of a driver's license and made multiple purchases of firearms over two days, paying in cash. When he left the store, Horton waved gun boxes in the air to people waiting outside.

AGO0000162

Horton returned to that store hours after a federal agent spoke with its staff, trying to buy another gun. The salesperson intentionally stalled.

When agents searched Horton's home four days later, he admitted to selling firearms to several people. He told agents that he assumed the buyers agreed to pay extra because they "can't get their gun licenses." Young-Duncan later admitted to receiving 017520MC from Horton before passing it along to another, unidentified person.

For two months, the pistol was as anonymous in the streets of St. Paul as it was when it left Eagle Pass. It found infamy within an hour of its final purchase.





AGO0000163



LEILA NAVIDI, STAR TRIBUNE

Todd Guerrero and Beth Wiley, above, the parents of two of the shooting victims, spoke in court in June as Devondre Phillips, at top left, was sentenced. Wiley wore a shirt with an image of her slain daughter holding a sign that read, "No more silence, end gun violence." Phillips was sentenced to 29 years in prison for eight counts of attempted murder.

**HORTON AND YOUNG-DUNCAN** both pleaded guilty to their charges. They are scheduled to be released next year from the federal prison camp in Duluth, and they are now forever barred from owning firearms.

A Ramsey County jury in February convicted Phillips (https://www.startribune.com/jury-convicts-man-of-eight-counts-of-attempted-murder-in-mass-shooting-at-st-pauls-truck-park/600250422/) of eight counts of attempted second degree murder for his role in the October 2021 shooting. In June, a Ramsey County judge sentenced Phillips to 29 years in state prison for eight counts of attempted murder. Wiley's mother spoke before his sentencing, wearing a shirt with an image of Kiki holding a sign that read, "No more silence, end gun violence."

Before jurors convicted Phillips, Assistant Ramsey County Attorney Treye Kettwick used Phillips' own words to describe what 017520MC meant to him when he brought it with him into the bar: "If you've got a fully loaded Mossberg 9mm in your waistband, you don't have to live in fear."

Brown awaits an Aug. 8 sentencing after a jury convicted him of murder (https://www.startribune.com/shooters-in-2021-west-7th-street-bar-st-paul-one-person-killed-more-than-a-dozen-wounded/600282676/) in June for Wiley's death and other charges stemming from the shootout.

AGO0000164

Minnesota Attorney General Keith Ellison is suing Fleet Farm, alleging that it was negligent in failing to identify and curb Horton's suspicious, frequent gun purchases. The lawsuit is still in its early stages, but Ellison called the case an important step toward choking off the supply of firearms to criminals.

"There's blood on their hands, in my opinion, and they should stand judgment and be held responsible and do better in the future," Ellison said of Fleet Farm.

Fleet Farm did not respond to requests for comment.

**THE BULLET FIRED INTO WEATHERSBY** lodged in her ankle, cracking it in two. She still can't stand up for long stretches of time, and now does much of her hairstyling while seated. She also repositioned her workstation so she never has her back to a window.

She struggles with crowds, particularly of young men. She'll be out to eat with her boyfriend or children and break down in tears, telling them, "They're about to shoot in here," or "I'm about to get shot."

"I don't think I'm ever going to be the same," she said.

No. 017520MC, dried blood still covering its black frame, will remain stored in the bowels of St. Paul's police headquarters until at least after Phillips' appeals process is done. When it finally leaves the evidence locker, it will be melted down and recycled.

*Star Tribune staff writer Jeff Hargarten contributed to this story.*



RENÉE JONES SCHNEIDER, STAR TRIBUNE

The day after the shooting in October 2021, signs of mayhem littered the scene outside the Truck Park bar in St. Paul.

AGO0000165

**Stephen Montemayor** covers federal courts and law enforcement. He previously covered Minnesota politics and government.

stephen.montemayor@startribune.com    612-673-1755    smontemayor

**Stephen Montemayor** covers federal courts and law enforcement. He previously covered Minnesota politics and government.

stephen.montemayor@startribune.com    612-673-1755    smontemayor

AGO0000166

# EXHIBIT Z

TCL

AO 91 (Rev. 11/11) Criminal Complaint                                                                    2021R00440

# UNITED STATES DISTRICT COURT
for the

District of Minnesota

UNITED STATES OF AMERICA

v.                                                              Case No.  21-MJ-764 HB

JEROME FLETCHER HORTON, JR.

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge

and belief.  On or about July 31, 2021, in Anoka County, in the State and District of Minnesota, defendant,

in connection with the acquisition of a firearm, namely, a Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 017520MC, from Fleet Farm, a federally licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, knowingly made a false and fictitious written statement to Fleet Farm, which statement was intended and likely to deceive Fleet Farm as to a fact material to the lawfulness of such sale of the said firearm to the defendant under Chapter 44 of Title 18, in that the defendant executed a Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473 in connection with the purchase of the said firearm, on which form the defendant indicated that he was the actual buyer of the firearm, when in fact the defendant was not the actual buyer of the firearm, and the defendant then knew he was not the actual buyer of the firearm;

in violation of Title 18, United States Code, Sections 922(a)(6) and 924(a)(2).

I further state that I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives and that this

complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:    ☒Yes    ☐ No

_____
*Complainant's signature*

SUBSCRIBED and SWORN before me
by reliable electronic means via FaceTime, Zoom,
and email pursuant to Fed. R. Crim. P. 41(d)(3).

Kylie Williamson
ATF Special Agent
_____
*Printed name and title*

Date:  Oct. 18, 2021

_____
*Judge's Signature*

City and State:  St. Paul, MN

Hildy Bowbeer
United States Magistrate Judge
_____
*Printed Name and Title*

AGO0001903

STATE OF MINNESOTA      )

                         )     ss.    AFFIDAVIT OF KYLIE WILLIAMSON

COUNTY OF RAMSEY     )

1.     I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and am thus an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I have been employed as a Special Agent by the ATF since August of 2007. Prior to that, I was employed by ATF for two years as an Industry Operations Investigator. I am currently assigned to the Saint Paul Field Office. In my capacity as a Special Agent with the ATF, I have participated in numerous criminal investigations of individuals and entities related to violations of Federal Laws, particularly those under Titles 18 and 21 of the United States Code. I have received on-going training related to criminal investigations, gang investigations, drug trafficking, money laundering, undercover operations, Title III wiretaps, as well as electronic and physical surveillance procedures. I work with various law enforcement agencies and drug task forces throughout the state of Minnesota and have supervised, led, and/or otherwise been a part of hundreds of arrests and search warrants during my years as a law enforcement officer.

2.     This affidavit is submitted for the limited purpose of establishing probable cause in support of issuing a complaint and arrest warrant for Jerome Fletcher HORTON, Jr. (hereinafter "HORTON") for false statement during the purchase of a firearm, in violation of Title 18, United States Code, Section 922(a)(6).

3.     This affidavit is based on my personal knowledge, as well as information I

AGO0001904

have learned from other law enforcement officers and the review of reports, written materials, and recordings. This affidavit does not include all of the details I have learned regarding this investigation. Rather, it only includes information believed to be sufficient to establish probable cause.

## PROBABLE CAUSE

4. On October 10, 2021, men opened fire within the Seventh Street Truck Park, a bar located at 214 West Seventh Street in St. Paul, Minnesota. A 27-year-old woman named Marquisha Wiley was killed in the gunfire exchange, and 14 others were injured.

5. Investigators of the St. Paul Police Department identified a suspect in the shooting: a man with the initials D.T.P., who had been shot in the incident. Investigators obtained surveillance video that showed D.T.P. appearing to possess and discharge a firearm within the Seventh Street Truck Park bar. Video showed D.T.P. leave the bar, still in apparent possession of his firearm, and get into the back of a vehicle after the shooting. Video then showed D.T.P. exit the vehicle; he no longer appeared to possess a firearm. Video did not show anyone else getting in or out of the vehicle during this timeframe. Investigators recovered from the vehicle a Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 017520MC. The recovered firearm appeared to have fresh blood on it, and no other firearms were recovered from the vehicle. Investigators recovered numerous 9mm discharged cartridge casings inside of the bar, which were consistent with the caliber of the firearm recovered from the vehicle.

6. On October 11, 2021, I facilitated an urgent trace on the firearm, and learned that it was one of three 9mm semiautomatic pistols purchased by HORTON on July 31,

AGO0001905

2021, documented on an ATF Multiple Sales Report. The firearms were purchased from Fleet Farm in Blaine, Minnesota.

7. When HORTON purchased the Mossberg model MC2C 9mm semiautomatic pistol bearing serial number 017520MC, he submitted an ATF Form 4473. On this form, HORTON indicated that he was the actual buyer of the firearm.

8. In my training and experience, I know that the actual buyer of the firearm is a material fact to an FFL. An FFL will not sell a firearm to a prohibited person (e.g., someone with a prior felony conviction), so the actual buyer of the firearm is a fact upon which the sale will depend.

9. A review of Multiple Sales Reports submitted by various Federal Firearms Licensees (FFLs) in and around the Twin Cities metropolitan area, as well as other documents and records, revealed that HORTON had purchased 33 firearms from June 15, 2021, through October 17, 2021. A table of HORTON's firearms purchases follows.

| # | Firearm | Caliber | SN | Date of Purchase | FFL |
|---|---------|---------|-----|------------------|-----|
| 1 | Taurus model G2C | 9mm | 1C020445 | 6/15/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 2 | Ruger model Security-9 | 9mm | 38463707 | 7/04/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 3 | Glock model 19 | 9mm | BTNX619 | 7/07/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 4 | Glock model G43X | 9mm | BTTU573 | 7/10/2021 | Fleet Farm, 5635 Hadley Avenue North, Oakdale, MN |

3

AGO0001906

| # | Firearm | Caliber | SN | Date of Purchase | FFL |
|---|---------|---------|----|--------|-----|
| 5 | Beretta model APX | 9mm | A152030X | 7/23/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 6 | Springfield Armory model XDS | 9mm | BA456304 | 7/24/2021 | Fleet Farm, 5635 Hadley Avenue North, Oakdale, MN |
| 7 | FNH model 503 | 9mm | CV016470 | 7/24/2021 | Fleet Farm, 5635 Hadley Avenue North, Oakdale, MN |
| 8 | Glock model 26 | 9mm | AFVB754 | 7/26/2021 | Fleet Farm, 5635 Hadley Avenue North, Oakdale, MN |
| 9 | Glock model 43X | 9mm | BTTU0778 | 7/27/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 10 | Stoeger model STR-9C | 9mm | T642921S02199 | 7/27/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 11 | Ruger model EC95 | 9mm | 45955269 | 7/31/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 12 | Mossberg model MC2C | 9mm | 017520MC | 7/31/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 13 | Glock model 45 | 9mm | BSTE309 | 7/31/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 14 | Glock model 19X | 9mm | BUCB186 | 8/14/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 15 | Glock model G19 | 9mm | BSXE226 | 8/20/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 16 | Mossberg model MC2C | 9mm | 014211MC | 8/31/2021 | Fleet Farm, 17070 Kenrick Avenue, Lakeville, MN |
| 17 | Glock model 26 | 9mm | AFVC844 | 8/31/2021 | Fleet Farm, 17070 Kenrick Avenue, Lakeville, MN |

4

AGO0001907

| # | Firearm | Caliber | SN | Date of Purchase | FFL |
|---|---------|---------|-----|------------------|-----|
| 18 | Glock model 23 | .40 | BUGF388 | 9/08/2021 | DKMags Inc., 443 Old Highway 8 NW #102, New Brighton, MN |
| 19 | Glock model 21 | .45 | AFUV823 | 9/10/2021 | DKMags Inc., 443 Old Highway 8 NW #102, New Brighton, MN |
| 20 | Glock model 19 | 9mm | BUBY049 | 9/10/2021 | DKMags Inc., 443 Old Highway 8 NW #102, New Brighton, MN |
| 21 | Glock model G17 | 9mm | BUGR628 | 9/13/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 22 | Glock model 30 | .45 | BTEW814 | 9/17/2021 | DKMags Inc., 443 Old Highway 8 NW #102, New Brighton, MN |
| 23 | Ruger model 57 | 5.7x28 | 64322362 | 9/17/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 24 | Glock model G19 | 9mm | BUAS957 | 9/18/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 25 | Radical Firearms model RF-15 | .556 | 21046140 | 9/26/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 26 | Glock model 26 | 9mm | AFSE457 | 9/26/2021 | Fleet Farm, 10250 Lexington Avenue NE, Blaine, MN |
| 27 | Glock model 19 | 9mm | AFYL242 | 9/27/2021 | Frontiersman Sports, 6925 Wayzata Blvd., St. Louis Park, MN |
| 28 | Glock model 43X | 9mm | BUHT553 | 9/29/2021 | Frontiersman Sports, 6925 Wayzata Blvd., St. Louis Park, MN |

5

AGO0001908

| # | Firearm | Caliber | SN | Date of Purchase | FFL |
|---|---------|---------|-----|------------------|-----|
| 29 | Glock model 26 | 9mm | SBU095 | 9/29/2021 | Frontiersman Sports, 6925 Wayzata Blvd., St. Louis Park, MN |
| 30 | SAR-Iraola Salaverria model B6C | 9mm | T110221G50080 | 10/01/2021 | Frontiersman Sports, 6925 Wayzata Blvd., St. Louis Park, MN |
| 31 | Taurus model G3C | 9mm | 1KA06796 | 10/11/2021 | Fleet Farm, 8400 Lakeland Avenue North, Brooklyn Park, MN |
| 32 | Taurus model G2C | 9mm | 1C073052 | 10/14/2021 | Frontiersman Sports, 6925 Wayzata Blvd., St. Louis Park, MN |
| 33 | Glock model 26 | 9mm | AGBR071 | 10/17/2021 | Fleet Farm, 5635 Hadley Avenue North, Oakdale, MN |

10. Surveillance video from these purchases indicates that in several of the purchases, other people accompanied HORTON to the purchase of the firearm, which can be an indication of straw purchasing.

11. On October 14, 2021, I spoke to an employee of Frontiersman Sports in St. Louis Park. The employee confirmed that HORTON had purchased firearms on more than one occasion, including the Taurus model G2C HORTON purchased earlier that day. The employee informed me that one of his co-workers had recorded the license plate of the vehicle in which HORTON had arrived due to suspicions regarding straw purchasing.

12. On October 15, 2021, I went to Frontiersman Sports in St. Louis Park. Employees provided me with ATF Forms 4473 for firearms HORTON had purchased on four different occasions. An employee also provided still photographs captured during each purchase, as well hand-written notes the employee had made related to HORTON's

6

AGO0001909

purchase of two pistols on September 29, 2021. The notes indicated the following:

    a.  HORTON's purchase was a suspected straw purchase.

    b.  HORTON's vehicle parked in a nearby Jacuzzi business parking lot to avoid Frontiersman's surveillance cameras.

    c.  HORTON presented a learner's permit as opposed to a driver's license.

    d.  HORTON had made multiple purchase of firearms over two days.

    e.  While HORTON was inside the store, he received a phone call and stated "I'm still in the store."

    f.  HORTON paid cash and used small denominations for a total of $1,160.

    g.  As HORTON walked toward the Jacuzzi business parking lot, HORTON waived the gun boxes in the air to people waiting outside.



Fig. 1: a screen shot from surveillance video by the Frontiersman Sports employee surveillance, showing HORTON waiving the gun boxes to people waiting outside.

7

13.     On the evening of October 15, 2021, a representative from Frontiersman Sports contacted Special Agent Williamson to inform her that HORTON had just been in the store, and had attempted to purchase another firearm. The salesperson told HORTON that the purchase would have to be delayed until October 21, 2021, and did not transfer the firearm.

14.     I have reviewed surveillance video of HORTON's purchase from FFL of his most recent firearm, on October 17, 2021. In the video, it appears that HORTON is using the camera feature on his video to either take photographs or videos. In my training and experience, it is common for straw purchasers of firearms to take photographs or video of available firearms to show to a third party intended recipient of the firearm, so that the third party recipient can select the firearm and avoid scrutiny by the FFL, and can avoid appearing on surveillance cameras.

15.     On October 19, 2021, other law enforcements agents and I executed a federal warrant authorized by this Court to search the residence HORTON indicated on ATF Forms 4473. No firearms were found. In my training and experience, this is an indication of straw purchasing, since people who own multiple firearms typically keep at least one in their residence.

16.     Also on October 19, 2021, another ATF special agent and I interviewed HORTON after a rights advisement and waiver. HORTON denied engaging in straw purchasing, but admitted to having sold seven firearms to four different people. HORTON claimed that between 10 and 15 firearms were stolen when an abandoned vehicle he had kept the firearms in was broken into. When asked why people would pay HORTON more

8

AGO0001911

than the retail cost of the firearms, HORTON said he assumed it was because the buyers "can't get their gun licenses," or words to that effect. Later in the interview, HORTON admitted that firearms had not in fact been stolen from a vehicle. He claimed they had been taken from a location he had stashed them on the west side of the Lamplighter Lounge, a strip club near the intersection of Rice and Larpenteur streets in St. Paul.

17. Fleet Farm, DKMags, and Frontiersman Sports are all Federal Firearms Licensees (FFLs). For each of the firearm purchases described in paragraph 16, above, HORTON would have had to complete an ATF Form 4473. In all the ATF Forms 4473 I have reviewed, HORTON certified that he was the "actual" buyer of the firearms.

18. Based on my training and experience, straw purchasers often purchase numerous firearms at one time, or one firearm at a time, with multiple one-firearm transactions completed in a short period of time.

19. Based on my training and experience, straw purchasers often purchase firearms and sell them very shortly after purchase, selling to individuals both known and unknown to them.

20. Based on my training and experience, the firearms HORTON purchased are not collector firearms. It is not common for individuals to purchase more than one firearm at a time, or in a short period of time, unless they are collectors.

21. Based on my training and experience, individuals who are involved in firearms trafficking and/or straw purchasing often pay for the items in cash and bring other individuals with them when purchasing firearms in an attempt to make sure they are purchasing the correct firearm(s).

9

AGO0001912

22.     Based on the information set forth above, there is probable cause to believe that the Defendant, Jerome Fletcher HORTON, Jr., violated Title 18, United States Code, Section 922(a)(6), by making a false statement in the purchase of a firearm.

Further your Affiant sayeth not.

Kylie Williamson
Special Agent, ATF

SUBSCRIBED and SWORN before me
by reliable electronic means via FaceTime and
email pursuant to Fed. R. Crim. P. 41(d)(3) on
October 19, 2021:

HILDY BOWBEER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MINNESOTA

10

AGO0001913

# EXHIBIT AA

# EXHIBIT A

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF RAMSEY                            SECOND JUDICIAL DISTRICT

                                                    PERSONAL INJURY

Beth Wiley and Kevin Wiley, Co-Trustees )        Court File No. _____
for the Next-of Kin of Marquisha Wiley, )
decedent, Chassity Ashford, Sherron )
Ashford Wayne Germond, Nicholas )
Guerrero, Danielle Hernandez, Charisma )
Kyles, Jordan Larson, Keeshara Perry, )
Paris Pollard, Latosha Skinner, Estan )
Tyler, Andrea Weathersby, Ernest )
Whitmore, and Kevaughn Wiley, )
                                        )
Plaintiffs,                             )        **COMPLAINT**
v.                                      )

Fleet Farm LLC (f/k/a Mills Fleet Farm
LLC), Fleet Farm Group LLC (f/k/a Mills
Fleet Farm Group LLC), and Fleet Farm
Wholesale Supply Co. LLC (f/k/a Fleet
Wholesale Supply Co. LLC), and Truck
Yard – SP LLC (d/b/a Seventh Street
Truck Park),

            Defendants.

For their Complaint[1] against Defendants FLEET FARM LLC (f/k/a Mills Fleet Farm LL), FLEET FARM GROUP, LLC (f/k/a Mills Fleet Farm Group LLC, and FLEET FARM WHOLESALE SUPPLY CO. LLC (f/k/a Fleet Wholesale Supply Co. LLC), and TRUCK YARD – SP LLC (d/b/a Seventh Street Truck Park), Plaintiffs BETH WILEY and KEVIN WILEY, Co-Trustees for the Next-of Kin of MARQUISHA WILEY, decedent, CHASSITY ASHFORD, SHERRON ASHFORD, WAYNE GERMOND, NICHOLAS GUERRERO,

[1] Some of Plaintiffs' allegations against Fleet Farm Defendants are the same or similar to those asserted by the State of Minnesota in the matter before the United States District

4

DANIELLE HERNANDEZ, CHARISMA KYLES, JORDAN LARSON, KEESHARA PERRY, PARIS POLLARD, LATOSHA SKINNER, ESTAN TYLER, ANDREA WEATHERSBY, ERNEST WHITMORE, AND KEVAUGHN WILEY (collectively, "PLAINTIFFS") hereby state and allege upon knowledge, information, and belief as follows:

## PARTIES

1. Plaintiffs BETH WILEY and KEVIN WILEY were appointed as co-trustees for the present action against Defendants on March 29, 2022, by Ramsey County District Court Judge Sara Grewing (62-CV-22-499).

2. Plaintiffs BETH WILEY and KEVIN WILEY are the surviving parents of MARQUISHA WILEY, decedent, who died on October 10, 2021, as a result of the wrongful acts or omissions of Defendants, their employees, representatives, agents, and assigns; and that a cause of action therefore exists pursuant to Minn. Stat. § 573.02.

3. Plaintiff CHASSITY ASHFORD, at all times material hereto, was a resident of Hennepin County, Minnesota.

4. Plaintiff SHERRON ASHFORD, at all times material hereto, was a resident of Hennepin County, Minnesota.

5. Plaintiff WAYNE GERMOND, at all times material hereto, was a resident of Dakota County, Minnesota.

6. Plaintiff NICHOLAS GUERRERO, at all times material hereto, was a resident of Ramsey County, Minnesota.

7. Plaintiff DANIELLE HERNANDEZ, at all times material hereto, was a

Court for the District of Minnesota, Case No. LLC 22-cv-2694 (JRT/JFD).

resident of Dakota County, Minnesota.

8. Plaintiff CHARISMA KYLES, at all times material hereto, was a resident of Dakota County, Minnesota.

9. Plaintiff JORDAN LARSON, at all times material hereto, was a resident of Dakota County, Minnesota.

10. Plaintiff KEESHARA PERRY, at all times material hereto, was a resident of Ramsey County, Minnesota.

11. Plaintiff PARIS POLLARD, at all times material hereto, was a resident of Ramsey County, Minnesota.

12. Plaintiff LATOSHA SKINNER, at all times material hereto, was a resident of Ramsey County, Minnesota.

13. Plaintiff ESTAN TYLER, at all times material hereto, was a resident of Ramsey County, Minnesota.

14. Plaintiff ANDREA WEATHERSBY, at all times material hereto, was a resident of Ramsey County, Minnesota.

15. Plaintiff ERNEST WHITMORE, at all times material hereto, was a resident of Ramsey County, Minnesota.

16. Plaintiff KEVAUGHN WILEY, at all times material hereto, was a resident of Dakota County, Minnesota.

17. Defendant FLEET FARM LLC is a foreign limited liability company, organized and existing under the laws of Delaware, with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117; that FLEET FARM LLC is wholly owned by Fleet Farm Group, LLC; that Fleet Farm Group, LLC is wholly owned by Fleet

6

Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.—a public traded private equity and investment banking firm.

18. Defendant FLEET FARM GROUP, LLC is a foreign limited liability company with its principal place of business located in Appleton, Wisconsin; that FLEET FARM GROUP, LLC has a registered office of 1010 Dale Street North, St. Paul, Minnesota 55117; that FLEET FARM GROUP, LLC owns Fleet Farm LLC and holds itself out as the tenant at the property addresses of Fleet Farm stores in Brooklyn Park, Cambridge, Owatonna, Mankato, Hermantown, Blaine, Baxter, Willmar, Alexandria, Lakeville, Rochester, Oakdale, and Winona; and that FLEET FARM GROUP, LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.— a public traded private equity and investment banking firm.

19. Defendant FLEET FARM WHOLESALE SUPPLY CO. LLC is a foreign limited liability company with its principal place of business in Appleton, Wisconsin; that FLEET FARM WHOLESALE SUPPLY CO. LLC has a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117; and that FLEET FARM WHOLESALE SUPPLY CO. LLC is the named holder of all of Fleet Farm's federal firearms licenses.

20. Defendants FLEET FARM LLC, FLEET FARM GROUP, LLC, and FLEET FARM WHOLESALE SUPPLY CO. are collectively referred to herein as "FLEET FARM."

21. Defendant TRUCK YARD – SP LLC, is a foreign limited liability company organized and existing under the laws of Nevada. At all times material hereto, TRUCK YARD – SP LLC owned, operated, managed, maintained, or controlled a bar known as

7

Seventh Street Truck Park, located at 214 7th Street West, St. Paul, Minnesota 55102.

22. Defendant TRUCK YARD – SP LLC is referred to herein as "TRUCK YARD."

23. At all times material hereto, TRUCK YARD was responsible and vicariously liable for the acts and omissions of its employees, agents, representatives, and/or servants, including but not limited to, any property management companies and security guard companies TRUCK YARD hired or retained to operate, maintain, control or manage Seventh Street Truck Park, or provide security services within or outside of Seventh Street Truck Park.

## FACTUAL ALLEGATIONS

### I. SEVENTH STREET TRUCK PARK SHOOTING

24. At all relevant times, TRUCK YARD operated a bar – Seventh Street Truck Park - located along an area of West Seventh Street in downtown St. Paul known for its nightlife and high foot-traffic.

25. Seventh Street Truck Park bar served alcohol and played loud music into the morning hours, cultivating a "night club" like culture of late-night drinking.

26. The building in which TRUCK YARD operates the bar has large garage-like doors that open the bar to the sidewalk of West Seventh Street, allowing large crowds to accumulate and move freely in and out of the bar.

27. On information and belief, TRUCK YARD advertised that there would be a DJ on site every Friday and Saturday night in the months of September and October of 2021.

28. On information and belief, in the weeks leading up to the subject incident,

Seventh Street Truck Park was regularly drawing large crowds on weekend evenings that poured out onto the street along West Seventh Street.

29. In the year preceding the gun fight that took place on October 9, 2021, Seventh Street Truck Park had multiple calls for service to the Saint Paul Police Department for violent and criminal incidents at its location:

### Saint Paul Police Department

Search Filter=> Date Range Column: ALL Date, Date Range Type: Exact From 4/1/2021 12:00:00 AM To 10/11/2021 11:59:00 PM
LocationFilter: SearchType: All,HouseNumber: From: 214,StreetSearchType: Street,StreetName: [?]

| ID | CN | CALLDATE | PRIMARYRMSOFFENSE | INCIDENTADDRESS | CITATIONADDRESS | CADADDRESS | PARTICIPANTADDRESS |
|---|---|---|---|---|---|---|---|
| 1 | | 20206229 09/26/2020 11:58 | DRUGS-POSS OF METHAMPHETAMINE | | | 214 7 ST W | |
| 2 | | 21054075 03/17/2021 18:42 | AGG ASSAULT-W/FIST,FEET,ETC | | | 214 7 ST W | |
| 3 | | 21068411 04/03/2021 22:26 | DISTURBANCE-FIGHTS | | | 214 7 ST W | |
| 4 | | 21078090 04/17/2021 21:21 | ASS-ASSIST FIRE/AMBULANCE | | | 214 7 ST W | |
| 5 | | 21080933 04/22/2021 15:14 | ASS-ASSIST CITIZEN CALLS, ALL | | | 214 7 ST W | |
| 6 | | 21091578 05/07/2021 19:38 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 7 | | 21092439 05/08/2021 23:41 | OTHER ASSAULTS | | | 214 7 ST W | |
| 8 | | 21092489 05/09/2021 00:42 | DISTURBANCE-DISTURBANCE CALLS | | | 214 7 ST W | |
| 9 | | 21093669 05/10/2021 19:34 | TRAFFIC-STOP/ADVISE | | | 214 7 ST W | |
| 10 | | 21097259 05/15/2021 00:07 | ASSAULT-OTHER ASSAULTS,ALL | | | 214 7 ST W | |
| 11 | | 21101343 05/20/2021 17:15 | POLICE VISIT-PROACTIVE POLICE VISIT | | | 214 7 ST W | |
| 12 | | 21114151 06/06/2021 01:01 | AGG ASSAULT-W/OTHER DANGEROUS WEAPONS | | | 214 7 ST W | |
| 13 | | 21118762 06/11/2021 20:39 | DISTURBANCE-SUSPICIOUS PERSON, CAR, ACTIVITY | | | 214 7 ST W | |
| 14 | | 21120030 06/13/2021 15:39 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 15 | | 21141950 07/11/2021 19:03 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 16 | | 21145808 07/16/2021 18:55 | INVESTIGATE-AND ALL OTHER | | | 214 7 ST W | |
| 17 | | 21145622 07/17/2021 20:01 | HARASSMENT-PHONE CALLS | | | 214 7 ST W | |
| 18 | | 21166651 08/12/2021 18:41 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 19 | | 21166631 08/12/2021 21:09 | DISTURBANCE-SUSPICIOUS PERSON, CAR, ACTIVITY | | | 214 7 ST W | |
| 20 | | 21168337 08/15/2021 00:02 | DISTURBANCE-FIGHTS | | | 214 7 ST W | |
| 21 | | 21168607 08/15/2021 14:19 | AGG ASSAULT-W/KNIFE,CUTTING INSTRUMENT,ETC | 214 7 ST W ,ST PAUL | | 214 7 ST W | |
| 22 | | 21169169 08/16/2021 11:56 | AGG ASSAULT-W/FIST,FEET,ETC | 214 7 ST W Apt S-9410 ,ST PAUL | | 214 7 ST W Apt S-9410 | |
| 23 | | 21188664 09/09/2021 19:40 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 24 | | 21188940 09/09/2021 22:23 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 25 | | 21192974 09/15/2021 03:08 | ALARMS | | | 214 7 ST W | |
| 26 | | 21195200 09/17/2021 23:47 | CRIMINAL DAMAGE TO PROPERTY | | | 214 7 ST W | |
| 27 | | 21196476 09/19/2021 19:01 | ASSAULT-OTHER ASSAULTS,ALL | 214 7 ST W ,ST PAUL | | 214 7 ST W | |
| 28 | | 21207086 10/2/2021 22:32 | ASS-ASSIST FIRE/AMBULANCE | | | 214 7 ST W | |
| 29 | | 21207199 10/3/2021 2:32 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 30 | | 21207211 10/3/2021 2:51 | OTHER ASSAULTS | | | 214 7 ST W | |
| 31 | | 21209113 10/5/2021 19:38 | ASSAULT-OTHER ASSAULTS,ALL | 214 7 ST W Apt 212 ,ST PAUL | | 202 7 ST W Apt 212 | |
| 32 | | 21212281 10/10/2021 0:17 | DEATH-INVESTIGATION OF A DEATH | 214 7TH ST W ,ST PAUL | | 214 7 ST W | |
| 33 | | 21814624 07/25/2021 16:17 | FRAUD-UNAUTHORIZED USE OF CREDIT CARD | | | 214 7 ST W | |
| 34 | | 21816870 10/11/2021 16:36 | LOST MISS PROP-LOST/MISSING PROPERTY | 214 7 ST W ,SAINT PAUL | | 214 7 ST W | |
| 35 | 620907943811 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 36 | 620907944139 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 37 | 620907944348 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 38 | 620907985914 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |

30. On the evening of October 8, 2021, the day before the gun fight at Seventh Street Truck Park, Ramsey County Sherriff Bob Fletcher, during his "Live on Patrol #181" YouTube channel, made the following predictions regarding the crowd overflowing outside of the Seventh Street Truck Park bar:

- "We've never had any shots fired here. I hope we never do, but with this volume, at some point it's going to happen right? It's become a very popular

9

place..."; and

- "They have no idea how fast things can go downhill. Let me make a prediction. I think they'll go downhill before winter. When I say that, I mean fired guns."

31. On October 9, 2021, TRUCK YARD neither posted a sign banning guns in their premises nor personally informed entrants that guns were prohibited in the premises and demanded compliance, despite having the opportunity to do so pursuant to Minnesota law.[2]

32. On or about October 9, 2021, PLAINTIFFS were lawful invitees at Seventh Street Truck Park.

33. At least two armed individuals, Devondre Trevon Phillips ("Phillips") and Terry Brown ("Brown"), were allowed to enter Seventh Street Truck Park.

34. On October 9, 2021, into the morning of October 10, 2021, there was a disc jockey playing loud music and a very large crowd present in the TRUCK YARD bar for the event promoted by TRUCK YARD.

35. Shortly after midnight, gunfire was exchanged between Phillips and Brown. As a result of the gun fight, many patrons were struck by stray bullets, including Plaintiffs CHASSITY ASHFORD, SHERRON ASHFORD, NICHOLAS GUERRERO, CHARISMA KYLES, KEESHARA PERRY, LATOSHA SKINNER, PARIS POLLARD, ANDREA

---

[2] Minn. Stat. §624.714 subd.17 creates the ability for private establishments to make a "reasonable request" that firearms not be brought into a privately owned establishment. A posted request must be "prominent" and "conspicuous" as defined under Minn. Stat. §624.714, subd. 17(b)(2-3) and must contain the following language pursuant to Minn. Stat. §624.714, subd. 17(b)(1)(i): "(IDENTITY OF OWNER OPERATOR) BANS GUNS IN THESE PREMISES." In the alternative, pursuant to Minn. Stat. §624.714, subd. 17(b)(1)(ii) "the requester or the requester's agent personally informs the person that

10

WEATHERSBY, ERNEST WHITMORE, and MARQUISHA WILEY, thereby resulting in severe injuries and the death of MARQUISHA WILEY.

36. On February 9, 2023, Phillips was convicted in Ramsey County District Court on 8 counts of attempted second-degree murder for his part in the subject gun fight. On June 23, 2023, Phillips was sentenced to 346 months in prison.

37. On June 14, 2023, Brown was convicted in Ramsey County District Court of one count of intentional second-degree murder and four counts of attempted second-degree murder for his part in the subject gun fight. He was also convicted of being an ineligible person in possession of a firearm. On August 8, 2022, Brown was sentenced to 441 months in prison.

## II. AS LICENSED FEDERAL FIREARMS DEALERS, FLEET FARM STORES HAVE A DUTY UNDER FEDERAL AND MINNESOTA LAW TO PREVENT UNLAWFUL GUN PURCHASES.

38. FLEET FARM is a retail store chain that sells firearms and ammunition to the public. There are 17 FLEET FARM locations in Minnesota. As licensed firearm dealers, FLEET FARM stores are required to comply with federal and state firearms laws and regulations.

39. Federal laws and regulations regulate commercial sales of firearms. The federal Gun Control Act of 1968 (18 U.S.C. §§ 921—931) created a nationwide licensing scheme for firearm dealers. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is the federal agency charged with enforcing these dealer-license provisions. Under the federal Gun Control Act, persons wishing to engage in the manufacturing, importing, or dealing in firearms must first obtain a license and become a federal firearms licensee ("FFL"), as FLEET FARM stores have done. A person is categorically prohibited

---

guns are prohibited in the premises and demands compliance."

from "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a federal firearms license. 18 U.S.C. §§ 922(a)(1), 923(a).

40. Federal firearms laws serve to prevent crime by keeping guns out of the hands of certain persons who have a heightened risk of misusing firearms, such as minors, persons with felony convictions, and domestic abusers. *See generally* 18 U.S.C. §§ 921 *et seq.* The Minnesota Gun Control Act similarly reflects this purpose by establishing categories of persons who are prohibited from possessing firearms (Minn. Stat. § 624.713) and requires purchasers to obtain a Minnesota permit—including a separate state-mandated background check—before purchasing a pistol or semiautomatic military-style assault weapon ("SAMSAW") from a firearms dealer (Minn. Stat. § 624.7131).

41. Congress designed federal law to achieve this aim by channeling firearms commerce through firearms dealers. Regulating the distribution of firearms is intended to prevent trafficking and reduce access to firearms by persons prohibited from possessing them. Gun dealers and manufactures are trained on how to spot traffickers and straw purchasers through multiple publications and programs sponsored by the ATF and the gun industry, including the "Don't Lie for the Other Guy" program, newsletters, reference guides, regulatory updates, and ATF seminars.

42. Before transferring a firearm to any person who is not a licensed dealer, all firearms dealers, including FLEET FARM, must conduct a background check, examine the individual's identification, and record the transaction on a firearms transaction record ("ATF Form 4473"). *See* 18 U.S.C. § 922(t)(1), 27 C.F.R. §§ 478.102, 478.124(a).

43. Before completing a purchase of a firearm from all firearms dealers,

12

including FLEET FARM, a buyer must fill out ATF Form 4473, which asks the following question with the following bolded warning:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the dealer cannot transfer the firearm(s) to you.**

This warning puts the buyer on notice: the buyer is prohibited from buying a firearm on someone else's behalf while falsely claiming the firearm is for the buyer—otherwise known as a straw purchase. On ATF Form 4473, the buyer must certify that their answers on the form are true, correct, and complete. The buyer violates federal law by filling out the form inaccurately.

44. Congress strengthened federal prohibitions on straw purchasing by passing the Bipartisan Safer Communities Act in June 2022, which explicitly criminalizes straw purchasing in which any person knowingly purchases, or conspires to purchase, a firearm at the request or demand of another person, knowing or having reasonable cause to believe that the other person ( or the ultimate end user) is ineligible to possess the firearm or intends to use the firearm to commit a felony, terrorism, or drug trafficking. *See* 18 U.S.C. § 932(b).

45. Minnesota law echoes this prohibition on straw purchasing. In 2015, the Minnesota Gun Control Act was amended to include a new section explicitly criminalizing straw purchases:

> Any person who purchases or otherwise obtains a firearm on behalf of or for transfer to a person known to be ineligible to possesses or purchase a firearm pursuant to federal or state law is guilty of a gross misdemeanor.

Minn. Stat. § 624.7133; *see also* Minn. Stat. § 624.7132, subd. 15(a)(4) (providing that a

13

person who "makes a false statement in order to become a transferee of a pistol or [SAMSAW] knowing or having reason to know the statement is false" is guilty of a gross misdemeanor).

46. Straw purchasers commonly falsely certify on ATF Form 4473 that they are purchasing firearms for themselves. In addition to the information provided by purchasers on the form, there are red flags that indicate a straw purchase to firearms dealers, including the following:

- Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;

- Multiple handgun purchases, particularly 9mm caliber handguns as there are the most frequently recovered crime guns;

- Purchasing firearms with cash;

- The buyer in accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;

- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;

- The buyer does not keep the firearms in their residence for their own use; and

- A short "time to crime"—the time between the purchase of a firearm and the recovery of the firearm by police in connection with a crime. The ATF has noted that the recovery of a crime gun within three years of its initial purchase "is considered a short time-to-crime and a significant trafficking indicator" that "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[3]

47. Firearms dealers, including FLEET FARM, can refuse to sell a firearm to any buyer for nearly any reason, and a firearms dealer is prohibited from completing the

---

[3] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives* (July 2004) (quotations omitted), *available at* https://perma.cc/B6AH-3FG6.

14

sale if the dealer knows or *has reason to know* the ATF Form 4473 is inaccurate. Firearms dealers must also certify on the form that it is their "belief that it is not unlawful [ ] to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A."

48. ATF Form 4473 makes clear that all firearms dealers must do more than simply run a background check. The notices and instructions on the form explain that "[t]he transferor/firearms dealer of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction." The form also explains that a gun dealer "must stop the transaction if there is reasonable cause to believe that the transferee/buyer is prohibited from receiving or possessing a firearm[.]" The form contains a clear admonition:

> c, or d. **Warning:** Any person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, 18 U.S.C. 922(d), even if the transferor/seller has complied with the Federal background check requirements.

49. The Bipartisan Safer Communities Act reinforces this restriction by further prohibiting the transfer of a firearm if the firearms dealer knows or has reasonable cause to believe the use, carrying, or possession of a firearm by the recipient would constitute a felony under federal law. *See* U.S.C. § 933(a)(1).

50. Similarly, Minnesota law creates potential criminal liability for firearms dealers that have reason to believe they are selling to a straw purchaser. Specifically, Minn. Stat. § 624.7132, subd. 15(a)(2) provides that a person is guilty of a gross misdemeanor if they transfer a pistol or SAMSAW weapon "to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to

know the transferee has made the false statement."

51.     Federal law regards the purchase of more than one handgun in a short period of time as a potential indication that the purchaser could be involved in trafficking. Therefore, to monitor and deter handgun trafficking, federal law requires a firearms dealer to report all transactions in which an unlicensed buyer purchases two or more handguns within five business days on ATF Form 3310.4. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. § 478.126a. Firearms dealers must transmit one copy of Form 3310.4 to the ATF, send another copy to a local law enforcement official (Chief Local Law Enforcement Official or "CLEO") designated to receive the form, and then retain one copy of the ATF 3310.4 form and attach it to the ATF Form 4473 related to the firearms sale. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. 478.126a.

52.     Federal rules require all firearms dealers to keep a record of all transactions with unlicensed persons in an acquisition and disposition book. 27 C.F.R. §§ 478.123(b), 478.125(e). A firearms dealer violates federal law by knowingly making false statements or misrepresentations, failing to make appropriate entries in, or failing to properly maintain, acquisition and disposition records, firearms transaction records, or reports of multiple sales of handguns. 18 U.S.C. §§ 922(m), 924(a)(3); *see also* 18 U.S.C. § 924(a)(1)(A).

53.     Federal law also enlists dealers and manufacturers in working to detect illegal transactions and trafficking after a firearm is used unlawfully. When a law enforcement agency recovers a firearm at a crime scene or in the course of a criminal investigation, the agency may request a trace report from ATF's National Tracing Center. The ATF represents that "[f]irearms tracing is only conducted at the request of a law

16

enforcement agency engaged in a bona fide criminal investigation where a firearm has been used or is suspected to have been used in a crime."[4] The National Tracing Center tracks the path of the firearm from its manufacturer through the distribution chain to the last retail sale transaction between a firearms dealer and purchaser. Because firearms dealers most provide information from their records about crime guns that the firearms dealers manufactured, distributed, or sold, *see* 18 U.S.C. § 923(g)(7); 27 C.F.R. § 478.25a, firearms dealers are on notice of which transactions, types of guns, and purchasers are potentially involved in criminal activity.

54. Firearms dealers are required to know the federal firearms laws and regulations. ATF agents review the applicable law and regulations with firearms dealers when they initially receive their license and during ATF audits. At the conclusion of an audit, the ATF requires firearms dealers to certify acknowledgment of federal laws and regulations. The acknowledgement form includes certification that the firearms dealer has reviewed laws and regulations regarding all of the following: (i) completing and maintaining firearm transaction records; (ii) conducting transfers between firearms dealers; (iii) engaging in the business of firearms dealing; and (iv) straw purchasing.

III. **FLEET FARM SOLD A FIREARM USED IN THE GUN FIGHT GIVING RISE TO THIS ACTION TO A STRAW PURCHASER AND KNEW OR SHOULD HAVE KNOWN IT WAS SELLING THAT FIREARM TO A STRAW PURCHASER.**

55. Between the four-month span of mid-June 2021 and mid-October 2021, Fleet Farm sold 24 firearms to Jerome Horton ("Horton"). Horton resold several of the firearms he purchased to different people. The sales are identified in the chart below, with multiple firearm purchases on the same day highlighted:

---

[4] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Trace Data – 2019,*

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|---|---|---|---|---|
| Fleet Farm | Brooklyn Park | 6/15/2021 | Taurus G2C 9mm | 1C020445 |
| Fleet Farm | Brooklyn Park | 7/4/2021 | Ruger Security 9 9mm | 38463707 |
| Fleet Farm | Brooklyn Park | 7/7/2021 | Glock 19 9mm | BTNX619 |
| Fleet Farm | Oakdale | 7/10/2021 | Glock G43X 9mm | BTTU573 |
| Fleet Farm | Blaine | 7/23/2021 | Beretta APX 9mm | A152030X |
| Fleet Farm | Oakdale | 7/24/2021 | FNH 503 9mm | CV016470 |
| Fleet Farm | Oakdale | 7/24/2021 | Springfield Armory XDS 9mm | BA456304 |
| Fleet Farm | Oakdale | 7/26/2021 | Glock 26 9mm | AFVB754 |
| Fleet Farm | Blaine | 7/27/2021 | Glock 43X 9mm | BTTU0778 |
| Fleet Farm | Blaine | 7/27/2021 | Stoeger STR-9C 9mm | T642921S02199 |
| Fleet Farm | Blaine | 7/31/2021 | Glock 45 9mm | BSTE309 |
| Fleet Farm | Blaine | 7/31/2021 | Mossberg MC2C 9mm | 107520MC |
| Fleet Farm | Blaine | 7/31/2021 | Ruger EC95 9mm | 45955269 |
| Fleet Farm | Blaine | 8/14/2021 | Glock 19X 9mm | BUCB186 |
| Fleet Farm | Brooklyn Park | 8/20/2021 | Glock G19 9mm | BSXE226 |
| Fleet Farm | Lakeville | 8/31/2021 | Glock 26 9mm | AFVC844 |
| Fleet Farm | Lakeville | 8/31/2021 | Mossberg MC2C 9mm | 014211MC |
| Fleet Farm | Blaine | 9/13/2021 | Glock G17 9mm | BUGR628 |
| Fleet Farm | Brooklyn Park | 9/17/2021 | Ruger 57 5.7x28 | 64322362 |

https://perma.cc/P8P3-BGYS.

| Fleet Farm | Blaine | 9/18/2021 | Glock G19 9mm | BUAS957 |
|---|---|---|---|---|
| Fleet Farm | Blaine | 9/26/2021 | Glock 26 9mm | AFSE457 |
| Fleet Farm | Blaine | 9/26/2021 | Radical Firearms RF-15 .556 | 21046140 |
| Fleet Farm | Brooklyn Park | 10/11/2021 | Taurus G3C 9mm | 1KA06796 |
| Fleet Farm | Oakdale | 10/17/2021 | Glock 26 9mm | AGBR071 |

56. As shown in the chart above, Fleet Farm sold Horton multiple guns as part of the same transaction—typically handguns of the same caliber—on five different days. Between July 24, and July 31, 2021, a one-week timespan, Fleet Farm sold Horton eight 9mm semiautomatic pistols.

57. The sheer volume of Horton's purchases put Fleet Farm on notice he was not making bona fide purchases for himself but was instead straw purchasing firearms for others.

58. Horton's purchases were also highly suspicious considering that on five occasions, Fleet Farm sold Horton multiple handguns as part of the same transaction, and Fleet Farm made multiple sales to Horton at the same location within five business days on several occasions. These sales required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking. Moreover, the firearms purchased were also nearly all the same caliber (9mm) of handgun—another red flag of straw purchasing. Horton also staggered purchasing single handguns within days or weeks of each other and from different Fleet Farm locations.

59. Furthermore, the affidavit in support of the federal charges against Horton indicate that the ATF reviewed Fleet Farm surveillance video showing Horton "using the

camera feature on his [phone] to either take photographs or video" in connection with Horton's October 17, 2021, purchase of a Glock 26 9mm handgun at Fleet Farm's Oakdale store. Affidavit of Special Agent Kylie Williamson at ¶ 14, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). The ATF agent testified that in her training and experience, this is a common indication of straw purchasing, as the straw purchaser wants to show available firearms to the third party intended recipient of the firearm without the intended recipient having to appear on surveillance cameras. *Id.*

60. Hortons' highly suspicious behaviors put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms, and that he was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Horton anyway.

61. After Fleet Farm sold guns to Horton, Horton trafficked these guns to criminals and prohibited persons. Specifically, Horton transferred six of these handguns to Gabriel Young-Duncan, who would then keep the firearms or further transfer them to other persons. *See* Indictment, Dkt. No. 1, *U.S. v. Gabriel Lee Young-Duncan*, Case No. 22-CR-00004 (D. Minn. Jan. 18, 2022). Young-Duncan was charged on January 18, 2022, and ultimately pleaded guilty in federal court to conspiracy to make false statements in the purchase of a firearm for his participation in Horton's straw purchasing scheme. *See id.*

62. The guns Fleet Farm sold to Horton have caused harm to Plaintiffs. On October 10, 2021, the Mossberg MC2C 9mm semiautomatic pistol that Fleet Farm sold to Horton on July 31, 2021, serial number 017520MC—which Horton then transferred to Young-Duncan—was fired at the Truck Park gun fight giving rise to this action. The pistol

was fired by Phillips, who had a prior felony conviction for aggravated first-degree robbery, which makes him ineligible to possess firearms or ammunition. Affidavit of Special Agent Kylie Williamson, Dkt. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021); see also Amended Complaint, *State v. Devondre Trevon Phillips*, No. 62-CR-21-5805 (Ramsey Cty. Dist. Ct. May 26, 2022). Phillips fired the pistol in the Truck Park gun fight, which included one other gunman, Brown. As bystanders to the gun fight, PLAINTIFFS were severely injured, and MARQUISHA WILEY was killed when a bullet penetrated her left lung and heart.

63.     On May 25, 2022, Young-Duncan pleaded guilty in U.S. District Court, District of Minnesota, to conspiring to make false statements to buy guns and on October 5, 2022, he was sentenced to 40 months in prison, to be followed by three years of supervised release, for his part in the straw purchase scheme.

64.     In March 2022, Horton pleaded guilty in U.S. District Court, District of Minnesota, to one count of false statements in the purchase of firearms and on October 25, 2022, Horton was sentenced to 25 months in prison for his part in the straw purchase scheme.

65.     By engaging in the sale and transfer of firearms to Horton under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Horton in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false entries in records required to be kept by dealer); 18 U.S.C. §923(a) (engaging in the business of dealing firearms without a

21

license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

### COUNT I: NEGLIGENCE AGAINST TRUCK YARD

66. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 65 as though set forth herein and further state:

67. At all material times, TRUCK YARD owed a duty to the invitees of Seventh Street Truck Park to exercise reasonable and ordinary care to keep and maintain Seventh Street Truck Park and its common areas in a reasonably safe condition.

68. At all material times, TRUCK YARD knew, or in the exercise of reasonable care should have known, of the likelihood that an individual would attempt to enter Seventh Street Truck Park carrying a weapon or firearm, and that based on the nature of Seventh Street Truck Park's business, shootings, assaults, attacks, altercations and/or

22

other crimes were likely to occur.

69.     Moreover, at all material times, TRUCK YARD knew, or in the exercise of reasonable care should have known, that prior to the date of the subject incident, other violent and non-violent criminal acts including but not limited to, shootings, assaults, attacks, and/or altercations had or were reasonably likely to be perpetrated on invitees to Seventh Street Truck Park unless TRUCK YARD took steps to provide proper security for such individuals.

70.     Based on the foregoing, the risk of harm to PLAINTIFFS, which did occur, was foreseeable.

### NEGLIGENT PERFORMANCE OF AN ASSUMED DUTY

71.     At all relevant times, TRUCK YARD undertook a duty to provide security on the premises.

72.     In undertaking the duty to provide security, TRUCK YARD was obligated to perform that duty with reasonable care.

73.     Given the foreseeable risk of gun violence to its patrons, TRUCK YARD owed a duty to take reasonable steps to deter violent crime, including gun violence on its premises.

74.     TRUCK YARD breached its duty to exercise reasonable care for the safety and protection of invitees of the subject premises, including PLAINTIFFS, and acted in a careless and negligent manner through the following acts or omissions:

    a.     Failing to provide adequate security for invitees and the public;

    b.     Failing to warn invitees and the public of the nature and character of its premises when it knew or in the exercise of reasonable care should have

known that other criminal incidents had occurred on the subject premises and areas adjacent thereto prior to the date of the subject incident;

c. Failing to have adequate procedures governing the search and inspection of patrons prior to entry into Seventh Street Truck Park or, alternatively, having procedures governing the search and inspection of patrons prior to entry into Seventh Street Truck Park and failing to implement them and/or implementing them in a careless and negligent manner.

d. Failing to police, patrol, guard, deter, and otherwise provide adequate protection for invitees and the public;

e. Failing to hire or retain adequate security personnel to patrol and/or monitor the premises;

f. Failing to have a sufficient number of security personnel in visible areas to deter crime and protect invitees and the public;

g. Failing to hire and/or retain competent security personnel to protect invitees and the public;

h. Failing to properly train security personnel to be reasonably skillful, competent, and/or qualified to exercise appropriate and proper security measures so they could protect invitees and the public;

i. Failing to implement adequate security policies, security measures, and security procedures necessary to protect invitees and the public;

j. Failing to adequately provide an overall security plan that would meet the known industry standards and customs for safety within the subject premises and its common areas; and

24

k.      Failing to ban guns on its premises pursuant to Minn. Stat. §624.714, subd. 17.

75.     That PLAINTIFFS as patrons of TRUCK YARD were foreseeable victims of the risk of gun violence on its premises.

76.     That such negligent and other fault conduct by TRUCK YARD directly caused injuries and damages to PLAINTIFFS.

77.     As a direct and proximate result of TRUCK YARD's negligence, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

**TRUCK YARD'S OWN CONDUCT CREATED FORESEEABLE RISK**

78.     TRUCK YARD promoted events resulting in increasingly large crowds that its staff and security could not manage.

79.     TRUCK YARD invited and allowed patrons to carry weapons on its premises.

80.     As evidenced by the prior police calls to the premises and the statements of the Ramsey County Sheriff just the day before the incident, gun violence occurring at TRUCK YARD was a foreseeable risk.

81.     Through its own conduct, TRUCK YARD created or expanded the risk of gun violence at its bar.

82.     That PLAINTIFFS as patrons of TRUCK YARD were foreseeable victims of the risk of gun violence at TRUCK YARD

83.     That such negligent and other fault conduct by TRUCK YARD directly caused injuries and damages to PLAINTIFFS.

25

84. As a direct and proximate result of TRUCK YARD's negligence, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

## COUNT II: NEGLIENCE AGAINST FLEET FARM

85. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 84 as though set forth herein and further state:

86. At all times materials hereto, FLEET FARM owed PLAINTIFFS the general duty imposed on all persons and entities to not expose others to reasonably foreseeable risks of injury. FLEET FARM had a duty to exercise reasonable care in distributing and selling firearms and to refrain from engaging in activity creating reasonably foreseeable risks of injury to others. A breach of said duty constitutes negligence.

87. FLEET FARM failed to exercise reasonable care and breached their duty to PLAINTIFFS by selling firearms they knew or should have known were destined for the illegal stream of commerce and into the hands of persons ineligible to possess a firearm, such as Phillips. FLEET FARM's failure to abide by their duty to exercise such reasonable harm increased the risk of harm, including the risks of prohibited firearm possession, firearm injuries, and death.

88. FLEET FARM engaged in the business of selling firearms to straw purchasers and traffickers, including Horton, even though FLEET FARM knew, or consciously avoided knowing, Horton was engaged in unlicensed dealing, firearms trafficking, and/or straw purchasing.

89. FLEET FARM further breached its duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, numerous federal laws and

26

regulations, including 18 U.S.C. §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(A), and 924(a)(1)(D), 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

90.    FLEET FARM further breached its duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, Minnesota law, including Minn. Stat. §§ 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

91.    FLEET FARM is vicariously liable for the actions or inactions of its employees and/or agents while in the scope of their employment and/or agency.

92.    As a direct and proximate result of FLEET FARM's negligent conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

### COUNT III: NEGLIGENCE PER SE AGAINST FLEET FARM

93.    PLAINTIFFS hereby incorporate and re-allege paragraphs 1 through 92 as though set forth herein and further states:

94.    Under the law, and due to FLEET FARM's responsibilities as a federally licensed dealer of an especially dangerous product, FLEET FARM owed a duty of care to PLAINTIFFS. These laws include, but are not limited to, the provisions of the federal Gun Control Act (18 U.S.C. §§ 921-931) and its implementing regulations (27 C.F.R. Part 478), and the Minnesota Gun Control Act (Minn. Stat. §§ 624.71-624.7192).

95.    The above laws and regulations are intended to curb firearm crime, prevent access to firearms by persons prohibited from possessing them, and protect public safety. These laws and regulations were designed to prevent illegal dealing in firearms by

27

directing firearms commerce through businesses licensed by the federal government. These laws and regulations impose obligations on licensed dealers to further their purpose.

96.    PLAINTIFFS are within the class of persons meant to be protected by these laws and regulations, and the injuries to the PLAINTIFFS are of the nature that these laws and regulations were designed to prevent.

97.    Through the conduct described herein, FLEET FARM has violated and aided and abetted the violation of the laws and regulations referenced above, including 18 U.S.C. §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd. 15(a)(4), and 624.7133. In doing so, FLEET FARM has breached its duty of care to PLAINTIFFS. Therefore, FLEET FARM's breach of the laws and regulations referenced above constitutes negligence per se for which FLEET FARM is liable.

98.    FLEET FARM is vicariously liable for the actions or inactions of its agents and/or employees while they are acting in the scope of their agency and/or employment.

99.    As a direct and proximate result of FLEET FARM's negligent and unlawful conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

**COUNT IV: NEGLIGENT ENTRUSTMENT AGAINST FLEET FARM**

100.    PLAINTIFFS hereby incorporate and re-allege paragraphs 1 through 99 as though set forth herein and further state:

101.    At the time that FLEET FARM made the firearms sale to Horton, FLEET

28

FARM knew or reasonably should have known that Horton was engaged in unlawful straw purchasing or unlicensed dealings in firearms to prohibited persons or for use in the commission of crimes.

102. FLEET FARM knew or reasonably should have known that Horton's straw purchasing and/or unlicensed dealing in firearms created an unreasonable risk of harm to third parties, including PLAINTIFFS, because a foreseeable and likely consequence of those unlawful trafficking activities is gun violence resulting in serious injury or death.

103. FLEET FARM had possession and control of the firearms that FLEET FARM transferred or caused to be transferred to straw purchaser Horton. FLEET FARM knew or should have known that its employees or agents who transferred firearms or caused firearms to be transferred to Horton were obliged to use their judgment to refuse to transfer firearms to a transferee (Horton) whom the employees and agents knew or should have known was involved in straw purchasing and/or unlicensed dealing in firearms.

104. FLEET FARM, by their employees and agents, knew or should have known that firearms transferred to traffickers and straw purchasers would likely be used in a manner involving an unreasonable risk of harm.

105. A firearm negligently entrusted by FLEET FARM to Horton has foreseeably been recovered in the possession of a prohibited possessor (PHILLIPS) and been determined to have been used in the commission of crimes at Seventh Street Truck Park on October 10, 2021.

106. FLEET FARM is vicariously liable for the actions or inactions of its agents and/or employees while acting in the scope of their agency and/or employment.

107.  As a direct and proximate result of FLEET FARM's conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $50,000.00, including statutory interest accrued, for an award of their costs and disbursements, and for such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

**TEWKSBURY & KERFELD, P.A.**

Date: __10/8/2024__     By: __/s/ Peter E. Lind__
                        Peter E. Lind (#063368)
                        Zachary R. Zellner (#0402292)
                        88 South Tenth Street, Suite 300
                        Minneapolis, MN 55403
                        (612) 334-3399
                        plind@tkz.com
                        *Attorneys for Plaintiffs*

**LORD + HEINLEIN LAW OFFICE**

Date: __10/8/2024__     By: __/s/ Melissa M. Heinlein__
                        Melissa M. Heinlein (#0393119)
                        Priscilla A. Lord (#0123754)
                        309 Clifton Avenue
                        Minneapolis, MN 55403
                        (612) 333-5673
                        melissa@mnlordlaw.com
                        priscilla@mnlordlaw.com
                        *Attorneys for Plaintiffs*

30

**TSR INJURY LAW**

Date: 10/8/2024

By: /s/ Nathan H. Bjerke

Nathan H. Bjerke (#026670X)
Lyndsey R. Jorgensen (#0395456)
8300 Norman Center Drive, Suite 1275
Bloomington, MN 55437
(952) 832-5800
Nate@TSRInjuryLaw.com
Lyndsey@TSRInjuryLaw.com
*Attorneys for Plaintiffs*

## ACKNOWLEDGMENT REQUIRED BY
## MINN. STAT. § 549.211, SUBD. 2

I hereby acknowledge that, pursuant to Minn. Stat. § 549.211 (2), costs

disbursements and reasonable attorney and witness fees may be awarded to the

opposing party or parties in this litigation if this Court should find I acted in bad faith,

asserted a claim or defense that is frivolous and that is costly to the other party, asserted

an unfounded position solely to delay the ordinary course of the proceedings or to

harass, or committed a fraud upon the Court.

**TEWKSBURY & KERFELD, P.A.**

Date: 10/8/2024

By: /s/ Peter E. Lind
Peter E. Lind (#063368)
Zachary R. Zellner (#0402292)
88 South Tenth Street, Suite 300
Minneapolis, MN 55403
(612) 334-3399
plind@tkz.com
*Attorneys for Plaintiffs*

**LORD + HEINLEIN LAW OFFICE**

Date: 10/8/2024

By: /s/ Melissa M. Heinlein
Melissa M. Heinlein (#0393119)
Priscilla A. Lord (#0123754)
309 Clifton Avenue
Minneapolis, MN 55403
(612) 333-5673
melissa@mnlordlaw.com
priscilla@mnlordlaw.com
*Attorneys for Plaintiffs*

32

**TSR INJURY LAW**

Date: 10/8/2024

By: /s/ Nathan H. Bjerke
Nathan H. Bjerke (#026670X)
Lyndsey R. Jorgensen (#0395456)
8300 Norman Center Drive, Suite 1275
Bloomington, MN 55437
(952) 832-5800
Nate@TSRInjuryLaw.com
Lyndsey@TSRInjuryLaw.com
*Attorneys for Plaintiffs*

33

# EXHIBIT BB

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison, | Case No.: 0:22-cv-02694-JRT-JFD |
| Plaintiff, | **STATE OF MINNESOTA'S SUPPLEMENTAL INITIAL DISCLOSURES** |
| v. | |
| Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC, | |
| Defendants. | |

In accordance with Federal Rule of Civil Procedure Rule 26(a)(1)(A) and the Court's Pretrial Scheduling Order (ECF No. 41), the State of Minnesota provides the following Supplemental Initial Disclosures.

**(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment:**

Defendant's current and/or former owners, managers, employees, agents, contractors, and other representatives are likely to have discoverable information related to Defendant's operations, practices, and records related to the subject matter of the Complaint.

Certain government agencies, including the Bureau of Alcohol, Tobacco, Firearms, and Explosives and the Brooklyn Center, Minneapolis and St. Paul Police Departments, are also likely to have discoverable information related to straw

- 1 -

purchasing of firearms at Defendants' stores and crimes committed with the firearms sold by Fleet Farm to straw purchasers and other consequences from such sales.

Straw purchasers and others identified in the Complaint may also have discoverable information related to the subject matter of the Complaint.

| Name | Address | Telephone Number |
|------|---------|------------------|
| Sarah Elwood | Unknown. The Federal Bureau of Prisons Inmate Locator website indicates she was released from prison on August 1, 2023. | Unknown. |
| Jerome Fletcher Horton | Currently incarcerated at the FCI (Federal Correctional Institution) in Milan, Michigan | N.A. |
| Gabriel Young-Duncan | Currently incarcerated at the FPC (Federal Prison Camp) in Duluth, Minnesota | N.A. |

Discovery is ongoing. The State will supplement these disclosures as appropriate.

**August 1, 2024 Supplementation:** Victims of the mass shooting in October 2021 at the Truck Park bar in St. Paul and their family members and friends are likely to have discoverable information related to straw purchasing of firearms at Defendants' stores and crimes committed with the firearms sold by Fleet Farm to

straw purchasers and other consequences from such sales, including the following individuals:

| Name | Address | Telephone Number |
|------|---------|------------------|
| Charisma Kyles | 4070 Amethyst Lane, Eagan, MN 55122 | (952) 594-5342 |
| Wayne Germond | 4070 Amethyst Lane, Eagan, MN 55122 | (651) 356-1728 |
| Nicholas Guerrero | 2474 Hamline Avenue North, St. Paul, MN 55113 | (651) 644-5627 |
| Danielle Hernandez | 933 South Smith Avenue South, St. Paul, MN 55102 | (651) 707-3667 |
| Leticia Hernandez | 349 Sidney St. East, St. Paul, MN 55107 | (651) 470-8769 |
| Estan Tyler | 1052 Breen Street, St. Paul, MN 55106 | (651) 206-3295 |
| Andrea Weathersby | 1546 Chambert Street, St. Paul, MN 55106 | (651) 785-6798 |
| Ernest Whitmore | 421 Blair Avenue, St. Paul, MN 55103 | (612) 743-4204 |
| Beth and Kevin Wiley | 633 10th Avenue North, South St. Paul, MN 55075 | (651) 226-7661 |
| Kevaughn Wiley | 633 10th Avenue North, South St. Paul, MN 55075 | (651) 263-8806 |

Family members who discovered a firearm purchased from Fleet Farm in their yard in Minneapolis in 2021, as alleged in the State's Complaint, are likely to have discoverable information related to straw purchasing of firearms at Defendants' stores and crimes committed with the firearms sold by Fleet Farm to straw purchasers and other consequences from such sales:

- 3 -

| Name | Address | Telephone Number |
|---|---|---|
| Michael, Sara, Adelaine, and Olin Norseng | 4304 11th Avenue South, Minneapolis, MN 55408 | (347) 564-4977 |

**(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment:**

The State possesses the following documents, electronically stored information, and tangible things: publicly available documents and information about criminal cases involving the straw purchases identified in the Complaint and about gun violence, including court records, police reports, news articles, and studies and reports.

Discovery is ongoing. The State will supplement these disclosures as appropriate.

**(iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered:**

In addition to injunctive and declaratory relief, the State seeks disgorgement, restitution, and abatement. The State will seek further information from Defendants and others to compute these remedies. The State will also seek costs.

Discovery is ongoing. The State will supplement these disclosures as appropriate.

**(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment:**

The State is not aware of any such documents. Discovery is ongoing. The State will supplement these disclosures as appropriate.

Dated:  August 1, 2024

KEITH ELLISON
Attorney General
State of Minnesota

JAMES W. CANADAY (#030234X)
Deputy Attorney General

**/s/ Eric J. Maloney**
ERIC J. MALONEY (#0396326)
KATHERINE MOERKE (#0312277)
JASON PLEGGENKUHLE (#0391772)
Assistant Attorneys General

445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
eric.maloney@ag.state.mn.us
Telephone: (651) 757-1021
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
jason.pleggenkuhle@ag.state.mn.us
Telephone: (651) 757-1147

**UNIVERSITY OF MINNESOTA GUN
VIOLENCE PREVENTION CLINIC**

MEGAN WALSH (#0394837)
Special Assistant Attorney General

University of Minnesota Law School
190 Mondale Hall
229 19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-5515
wals0270@umn.edu

*Attorneys for State of Minnesota*

- 6 -

**CERTIFICATE OF SERVICE**

I certify that, on August 1, 2024, I served the State of Minnesota's Supplemental Initial Disclosures on Defendants via email to counsel for Defendants.

<u>/s/ Eric J. Maloney</u>