# EXHIBIT R

**Rebuttal Expert Report of Joseph Bisbee**
**State of Minnesota by Its Attorney General, Keith Ellison v. Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC, Case No.: 0:22-cv-02694-JRT-JFD**

On October 8, 2024, I received reports from expert witnesses retained by Fleet Farm opining on issues that are the same or similar to the issues on which I provided a report for the State of Minnesota. In reviewing these reports, attributed to Andrew Graham, Gary Kleck, and William Napier, I find several of their opinions to be flawed or not be supported by the facts of this case.

**Experience, Qualifications, and Compensation**

My experience, qualifications, prior testimony, and compensation are set forth in my initial expert report dated October 4, 2024.

**Rebuttal to Report of Andrew Graham**

**Graham's Opinion No. 1:**

Mr. Graham begins his first opinion with the incomplete statement that between October 5, 2016, and October 1, 2023, "ATF instructed FFLs to monitor for the following potential 'indicators' of a possible straw purchase: (1) '[a]ttempted purchase after a denial is issued, usually by family member or friend'; (2) '[t]wo customers, one looks at gun and asks the questions- the other wants to complete the paperwork'; (3) '[e]xchanges of cash in or near storefront'; (4) '[t]he customer acts uncomfortable or seems unfamiliar with the product'; and (5) '[c]onversations of customers while shopping, with you, with their friends or on their cell phones.'"[1]

In my opinion, Mr. Graham's first opinion needs additional context as it implies these are the only straw purchase warning signs ATF instructed FFLs to monitor. While the list of five indicators Mr. Graham references are warning signs of a possible straw purchase, they are not the only red flags ATF instructed FFLs to monitor during this time frame. As Mr. Graham concedes later in his report, "ATF has addressed (and informed FFLs regarding) straw purchasing, and potential 'indicators' of straw purchasing, through four primary methods: (1) newsletters and other informal publications; (2) on-site inspections (i.e., original qualification inspection and compliance inspections); (3) teaming with the National Shooting Sports Foundation (NSSF) to promote resources associated with the 'Don't Lie for the Other Guy' program; and (4) regular training seminars that are offered to FFLs by ATF field divisions."[2]

Additionally, ATF, through its partnership with the NSSF Don't Lie for the Other Guy campaign, instructed FFLs to do the following to prevent straw purchases:

- "Make sure there is genuine interest and questions from the customer about the firearm being considered for purchase.
- The salesperson should be convinced of the reason and intended lawful purpose the customer has for acquiring the firearm.

---

[1] Fleet Farm's Rule 26(a)(2) Designation and Disclosure of Initial Expert Witnesses, Ex. A, Expert Report of Andrew Graham ("Graham Report"), at 5.
[2] Graham Report at 13–14.

1

- The purchaser should not typically be referencing a note, picture or description when asking to purchase a gun.
- Be alert to someone asking to purchase a firearm that may have been the subject of a recent NICS denial or delay. Be alert to similar last names and addresses in this scenario as well.
- Be alert to who is paying for the firearm versus who is completing the Form 4473 and NICS.
- Be cognizant to couples shopping together in which one person selects the firearm and the second person completes the Form 4473. This often involves a married couple in which one person may be a prohibited person. Don't accept excuses such as, 'I forgot my wallet, so my girlfriend is purchasing it for me.'
- Be suspicious of uneducated customers attempting to purchase more than one handgun at a time with little inquiry about the firearms."[3]

The Don't Lie for the Other Guy campaign also identifies purchases of multiple handguns requiring the submission of an ATF Form 3310.4 to be a warning sign. As seen in a scenario from the Don't Lie for the Other Guy video utilized by Fleet Farm, NSSF presents a scenario and describes several "clues" of a possible straw purchase being present: use of a cell phone, the request to purchase multiple pistols, and paying in cash.[4]

Mr. Graham also mentions that FFLs receive information on spotting and stopping straw purchases through on-site inspections.[5] In Fiscal Year 2022, ATF had 816 Industry Operations Investigators who conducted 6,979 firearm compliance inspections.[6] According to the NSSF, "(e)ach year ATF reports that the failure to timely and properly file multiple-handgun reports is among one of the most common violations found during inspections of retailers.  ATF considers this a serious matter because it can potentially adversely impact public safety by hindering the ability of law enforcement to identify and respond to possible criminal activity."[7] Surely Fleet Farm was made aware of the significance of multiple sales, and multiple-sale reports, during interactions with the ATF.

Mr. Graham also fails to mention that FFLs should ask customers questions during the purchase process and should keep a log of recent denials and attempted purchases to compare with new sales.[8] ATF advises that, if the sale does not feel right, the FFL should not risk their reputation and should deny the sale.[9] ATF further recommends that FFLs should contact ATF if they encounter suspicious purchase activity or may have completed a straw sale.[10] As mentioned in my initial report, Fleet Farm instructed its employees to not contact ATF during these situations, but required these notifications to be routed through the corporate office.[11] Further, Fleet Farm did not contact ATF after Mr. Klebs notified Ms. Granato of the suspected July 31, 2021 straw purchase by Mr. Horton.[12]

---

[3] National Sports Shooting Foundation, *Beware the Straw Purchase!* (Apr. 23, 2018), https://www.nssf.org/articles/beware-the-straw-purchase/.
[4] FF_0000207.
[5] Graham Report at 13–14.
[6] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Fact Sheet - Facts and Figures for Fiscal Year 2022* (last updated Jan. 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022
[7] National Sports Shooting Foundation, *Compliance: Timely Submission of Multiple Handgun Sales Reports*, https://www.nssf.org/retailers/compliance-timely-submission-multiple-handgun-sales-reports/.
[8] ATF0000004–ATF0000075, at ATF0000073.
[9] *Id.*
[10] *Id.*
[11] Expert Report of Joseph Bisbee ("Bisbee Report") at 8.
[12] *Id.* at 12–13.

Additionally, Mr. Graham concedes that "[u]ltimately, ATF recognizes that monitoring for indicia of straw purchasing is a holistic, context-specific endeavor."[13] The ATF training Mr. Graham cites acknowledges this: "If it does not feel right, do not make the sale."[14]

Nevertheless, many of the straw purchase transactions that occurred at Fleet Farm stores involving Mr. Horton and Ms. Elwood had two of Mr. Graham's five points present. On a number of occasions during Mr. Horton's illegal acquisition of firearms from Fleet Farm, he advised co-conspirators that he was nervous and "sweating like a mf."[15] As detailed in my initial report, Mr. Horton also utilized his cell phone during at least eight of his firearms transactions at Fleet Farm.[16] Further, Ms. Elwood was reportedly in contact with at least one of her co-conspirators via text message during at least some of her illegal purchases from Fleet Farm.[17]

**Graham's Opinion No. 2:**

Mr. Graham's second opinion is that "(t)he potential indicia of a possible straw purchase identified in paragraph 25 of the First Amended Complaint, and which the Plaintiff attributes to ATF, are inaccurate."[18]

As a seasoned firearms trafficking investigator who has led, participated, and/or supervised hundreds of straw purchase investigations, as well as being recognized as an expert in straw purchase investigations in U.S. District Court, I find Mr. Graham's assertion to be false. Here are the indicia listed in the First Amended Complaint:

- "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;
- Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns;
- Purchasing firearms with cash;
- The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;
- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;
- The buyer does not keep the firearms in their residence for their own use; and
- A short "time to crime"—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime. The ATF has noted that the recovery of a crime gun within three years of its initial purchase "is considered a short time-to-crime and a significant trafficking indicator" that "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[19]

---

[13] Graham Report at 53

[14] ATF0000004–ATF0000075, at ATF0000073.

[15] ATF0001772.

[16] Bisbee Report at 10–14.

[17] ATF0002865–70.

[18] Graham Report at 5.

[19] First Amended Complaint, *State v. Fleet Farm et al.*, Doc No. 79 at ¶ 25 (D. Minn. March 5, 2024).

As described in my initial report, each of these are valid indicia of potential straw purchases.[20]

**Graham's Opinion No. 3:**

Mr. Graham's third opinion is that "Fleet Farm's training policies and procedures relating to monitoring for and preventing straw purchasing (were) consistent with ATF instructions throughout the relevant time period (and) much of Fleet Farm's policies and procedures (went) above and beyond ATF instructions." Mr. Graham continues, "(n)ot only is there no evidence of Fleet Farm failing to adhere to or implement procedures or guidelines required by ATF, Fleet Farm's policies and procedures for preventing straw purchasing have exceeded the standards established by the Gun Control Act, ATF regulations, and ATF procedures and guidelines."[21] I disagree with this opinion. For the reasons set forth in my initial report, I disagree that Fleet Farm's policies and procedures to prevent straw buying are adequate.[22] And, ATF provides guidance to FFLs on preventing straw buying, but ATF does not require specific steps to be included in FFL policies and procedures. For that reason, I do not agree that Fleet Farm's policies and procedures for preventing straw purchasing went above and beyond ATF guidance because there is not an ATF list of specified steps to compare against Fleet Farm's policies and procedures.

**Graham's Opinion No. 4:**

Mr. Graham alleges in his fourth opinion that "Fleet Farm has robust recordkeeping, communication, and software systems in place to prevent straw purchasing and to share information regarding straw purchasers companywide."[23]

As I explained in my initial report, during 2020 and 2021 when Fleet Farm sold numerous firearms to straw buyers Jerome Horton and Sarah Elwood, Fleet Farm's recordkeeping, communication, and software systems related to straw purchasing had significant problems.[24] Further, Mr. Graham's fourth opinion is contradicted by Fleet Farm's own employees. Ms. Granato testified that Fleet Farm did not monitor multiple purchasers buying from different Fleet Farm stores until after Ms. Elwood and Mr. Horton were arrested by ATF.[25] Mr. Radl testified that Fleet Farm stores could not send out Straw Purchase Alerts, but needed to route them through the corporate office for review and dissemination approval[26]—surely not ideal in the timely sharing of information. According to Mr. McKown, the straw sales alert system was housed in a three-ring binder in each store, with the alerts filed in chronological order as opposed to alphabetical order.[27] Locating a suspected straw purchaser in this type of filing system would require the Fleet Farm firearms sales associate to memorize the contents of a three-ring binder or page through each file of alerts that were kept indefinitely.[28] Mr. Sierakowski testified that he does not check a buyers past firearms purchase history before selling a firearm,[29] an action that provides relevant information in assessing whether a transaction could be a straw purchase. According to Mr. Klebs, if a suspected straw purchase was stopped, a "BOLO" alert would be generated and sent to other

---

[20] Bisbee Report at 4–7.
[21] Graham Report at 5.
[22] Bisbee Report at 7-10.
[23] Graham Report at 5.
[24] Bisbee Report at 7–10.
[25] Granato Deposition at 30.
[26] Radl Deposition at 65.
[27] McKown Deposition at 76–77.
[28] McKown Deposition at 77.
[29] Sierakowski Deposition at 64.

Fleet Farm stores. However, he continued that if the subject of the BOLO alert attempted a future purchase, their name would not be flagged in the computer system during the sale.[30] Mr. Klebs also testified that Fleet Farm firearms sales specialists were not required to read BOLO or straw purchase alerts.[31]

**Graham's Opinion No. 5:**

Mr. Graham next opines that "certain Fleet Farm stores hav(ing) received Demand Letter 2s is not indicative of any compliance issues relating to monitoring for or preventing straw purchasing."[32] The Demand Letter program involves information on certain firearms acquired by an FFL be sent to ATF due to the FFL being involved in an elevated number of short time-to-crime, crime gun traces within a specified time period.[33] When ATF notifies an FFL they are being required to participate in the program, ATF advises the FFL that "time-to-crime" is the period of time it takes for a firearm to move from the retail dealer to a crime scene.[34] ATF further advised Fleet Farm in March 2016 that the Demand Letter 2 Program was necessary because Fleet Farm had an "unusually high number of traces…with a relatively short 'time-to-crime.'"[35] ATF informed Fleet Farm that participation in the program assists "ATF in combatting illegal firearms trafficking."[36]

Therefore, ATF's inclusion of Fleet Farm in the Demand Letter 2 Program put Fleet Farm on notice of the importance of ensuring that Fleet Farm firearm sales were not being utilized by firearm traffickers, including straw purchasers, and should have had Fleet Farm work to reduce the number of crime gun traces with short time-to-crime.

**Graham's Opinion No. 6:**

Mr. Graham's sixth opinion is that "(t)he renewal of Fleet Farm store licenses indicates those stores have complied with the Gun Control Act and ATF regulations."[37]

Fleet Farm, like every FFL, is required to certify that the person completing the ATF Form 4473 is in fact the actual purchaser of the firearm (27 CFR 478.124). As stated in my initial report, Fleet Farm knew, or should have known, that Mr. Horton and Ms. Elwood falsely completed numerous ATF Forms 4473 alleging they were the actual purchasers of several firearms when in fact they were straw purchasing firearms for others.[38] The fact that Fleet Farm continues to maintain valid FFLs ultimately does not have any bearing on if Fleet Farm knew or should have known Fleet Farm stores were allowing Mr. Horton and Ms. Elwood to engage in straw purchases.

The renewal of Fleet Farm's store licenses does not mean that Fleet Farm has fully complied with the Gun Control Act and ATF regulations, because the lack of accountability for FFLs violating federal laws

---

[30] Klebs Deposition at 47.

[31] *Id.* at 48.

[32] Graham Report at 5.

[33] Bureau of Alcohol. Tobacco, Firearms, and Explosives, *National Tracing Center* (last reviewed Sept. 19, 2024), https://www.atf.gov/firearms/national-tracing-center

[34] ATF 0000984–ATF0001007, at ATF0000993.

[35] *Id.*

[36] *Id.* at ATF0000995.

[37] Graham Report at 5.

[38] Bisbee Report at 16–21.

and regulations is public knowledge. According to an April 2023 Inspector General report, the "ATF completed 111,077 compliance inspections between October 1, 2010, and February 1, 2022, and recommended revocation of 589 licenses, or 0.53 percent."[39] The report concluded that "analysis of the inspection data failed to reveal any discernible pattern for when revocations were sought based on the number and significance of violations identified."[40] The report also "compared specific violations with subsequent administrative actions and could not find any distinct patterns for ATF's resulting actions, even for violations for which ATF policy suggests revocation. For example, among inspections that identified violations that ATF policy outlines as more likely to result in license revocation, such as discovery of a firearm with an obliterated serial number in an FFL's inventory, we found that ATF has not consistently pursued administrative action as documented in ATF policy."[41] The report "(f)urther … determined that there were 214 FFLs with repeat violations of having sold a firearm to a prohibited person, resulting in the recommendation for revocation in 15 of these instances despite ATF policy suggesting that revocation is the appropriate outcome for repeat revocable violations."[42] The report added that "ATF should conduct a comprehensive review of its inspections results to help ensure more consistent application of administrative actions, appropriate outcomes in its adjudication decisions, and that FFLs are appropriately held accountable for violations of firearms regulations."[43]

As documented in a USA Today article from May 2021, "(r)eporters spent more than a year analyzing documents from nearly 2,000 gun dealer inspections that uncovered violations from 2015 to 2017. The reports showed some dealers outright flouting the rules, selling weapons to convicted felons and domestic abusers, lying to investigators and fudging records to mask their unlawful conduct. In many cases when the ATF caught dealers breaking the law, the agency issued warnings, sometimes repeatedly, and allowed the stores to operate for months or years. Others are still selling guns to this day." I was interviewed for this article and stated, "There's really no teeth to the laws, and gun dealers know that … (FFLs) see that nobody gets prosecuted, that nobody gets held accountable, and that sends the signal that they can fudge things a little more and get away with it."[44] I can attest that the lack of accountability for FFLs violating laws and regulations frustrates ATF personnel tasked with investigating firearms trafficking, including straw purchasing.

**Graham's Opinion No. 7:**

Mr. Graham's seventh and final opinion is that "there is no indication that any Fleet Farm employees knew or should have known that Horton or Elwood were straw purchasers at the time they purchased firearms from Fleet Farm."[45]

---

[39] U.S. Department of Justice, Office of the Inspector General, *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees* at ii, (Apr. 20, 2023), https://oig.justice.gov/reports/audit-bureau-alcohol-tobacco-firearms-and-explosives-risk-based-inspection-selection.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] USA Today, *After repeated ATF warnings, gun dealers can count on the agency to back off; sometimes firearms flow to criminals* (May 26, 2021), https://www.usatoday.com/in-depth/news/investigations/2021/05/26/gun-dealers-let-off-hook-when-atf-inspections-find-violations/7210266002/.

[45] Graham Report at 6.

My initial report opines that Fleet Farm employees should have known that Horton and Elwood were straw purchasers at the time of purchase.[46] I do believe it is worth noting two specific instances in which Fleet Farm employees themselves indicated they knew or should have known Mr. Horton was engaged in straw purchasing:

- During Fleet Farm's July 31, 2021 sale of three 9mm handguns to Mr. Horton, Fleet Farm store operations manager Cory Klebs was concerned that Mr. Horton was a straw buyer.[47] He went to the effort of contacting another Fleet Farm manager, who was not at work, on his personal cell phone to ask "if there were any updated company policies that I may have missed about a limit of how many firearms could be purchased in any given time period."[48] Mr. Klebs obviously felt the sale did not feel right and also reported his concerns to Ms. Granato, asking whether Fleet Farm should keep selling more firearms to Mr. Horton.[49] Ms. Granato never responded.[50]

- During the Fleet Farm All Store Quarterly Firearm Compliance Webinar in November 2021, Ms. Granato utilized the actual multiple sales forms from Mr. Horton's straw purchases on July 23, 27, and 31, 2021, to advise employees that multiple warning signs were present during these transactions, namely, purchasing multiple firearms in a short time span, making a multiple purchase of firearms on the same day, and making multiple purchase of 9mm handguns.[51] Ms. Granato stated "it appears to be pretty obvious what is going on here."[52] During this same presentation, Mr. Radl stated that any firearms sales specialist who participated in the July 31, 2021, sale to Mr. Horton should have said "whoa, something is up here," and their "radar should be up."[53]

***

In reviewing the remainder of Mr. Graham's report, I take issue with the following opinions and assertions:

**Form 3310.4:**

Mr. Graham states that "the purpose of Form 3310.4 is to allow ATF's National Tracing Center and law enforcement officials the ability to cross-reference and analyze multiple handgun sale data, firearm theft Loss data, and firearm trace data with other crime gun trace information vital to identifying trafficking patterns."[54]

It is true that Form 3310.4 is required and used by the ATF to identify trafficking. But it is the FFL that completes the Form 3310.4, so the FFL plainly has notice that a purchase required the completion of the form, and the FFL has knowledge of its contents. The fact that a firearm sale requires the completion of

---

[46] Bisbee Report at 16–21.

[47] FF_0075711–12.

[48] FF_0075711-12; Klebs Deposition at 161–63.

[49] FF_0075711-12; FF_0076301; FF_0076302-07; FF_0076308-13.

[50] FF_0075711–12; Klebs Deposition at 169–71.

[51] FF_0000216, 34:20.

[52] FF_0000216, 34:55.

[53] FF_0000216, 33:02.

[54] Graham Report at 13.

this form—i.e., an additional requirement as part of the sale—should heighten the FFL's awareness of possible gun trafficking, including straw purchases.

Mr. Graham also states that "[t]he (3310.4) form serves as an important indicator in the detection of illegal firearms trafficking … **but is generally not used by federal agencies as a tool to detect straw purchasing**."[55]

Mr. Graham cites a National Tracing Center Fact Sheet as his source.[56] The National Tracing Center Fact Sheet does not say that multiple sales data is generally not used by federal agencies as a tool to detect straw purchasing, as Graham claims.[57] Moreover, I do not see how the Fact Sheet even supports his statement because straw purchasing *is* a type of firearms trafficking. The definition of firearms trafficking includes a person moving a firearm from the legal marketplace to an individual whose possession of such firearm would constitute a felony (18 U.S.C. section 933). Straw purchases are felonies in and of themselves (18 U.S.C. section 922(a)(6) and/or 18 U.S.C. section 924(a)(1)(A)), and the ultimate recipient of the straw purchased firearm is part of a conspiracy, which also is a felony (18 U.S.C. section 371).

Second, as a former special agent who spent more than 25 years working for ATF, with the majority of that time focused on identifying and investigating illegal firearms trafficking, I can attest that ATF uses multiple sale information to assist in detecting straw purchasing. This practice is supported by several studies. According to a 1996 GAO report, "federal firearms licensees have been required by regulation … to report all transactions in which an unlicensed person has acquired two or more pistols and/or revolvers at one time … during any 5 consecutive business days (called a multiple sale). The purpose of the multiple sale reporting requirement regulation was to enable ATF to "monitor and deter illegal interstate commerce in pistols and revolvers by unlicensed persons."[58] According to ATF, that purpose has remained unchanged since 1975.[59] "In addition to using multiple sale reports for tracing purposes, ATF also provides multiple sale report data to its criminal enforcement field divisions through Project Lead for use in developing investigative leads, such as leads on firearms traffickers, straw purchasers, and federal firearms licensees who appear to be engaged in suspicious activity."[60] A 2008 study notes that "ATF… analyzes multiple-sale data for suspicious purchasing patterns suggestive of gun trafficking."[61] A June 2000 report noted that between July 1996 and December 1998, "13 percent of (ATF's firearms trafficking) investigations were initiated after reviewing multiple … sales records."[62]

---

[55] Graham Report at 13 (emphasis added).

[56] *Id.*

[57] Bureau of Alcohol, Tobacco, Firearms, and Explosives National Tracing Center, *Fact Sheet*, https://www.atf.gov/resource-center/docs/undefined/ntc-fact-sheet-may-2023/download.

[58] Government Accountability Office, *Federal Firearms Licensee Data: ATF's Compliance with Statutory Restrictions*, at 11 (Sept. 1996), *available at* https://www.gao.gov/assets/ggd-96-174.pdf.

[59] *Id.*

[60] *Id.* at 11–12.

[61] RAND Corporation, *Strategies for Disrupting Illegal Firearm Markets: A Case Study of Los Angeles*, at 7 (2008), *available at* https://www.ojp.gov/pdffiles1/nij/grants/241135.pdf.

[62] Bureau of Alcohol, Tobacco, and Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, at 8 (June 2000), *available at* https://www.hsdl.org/c/view?docid=1622.

**Straw Purchase Indicators—Multiple Firearms, Cash, and Time-to-Crime:**

Mr. Graham claims that it "is an overstatement to suggest that ATF always considers multiple firearm purchases within a specific period of time to be an indicator of straw purchasing."[63] Yet Mr. Graham himself opines that, when "HORTON had made multiple purchases of firearms over two days" at Frontiersman Sports (as noted by a store employee), this was a circumstance that, along with other circumstances, indicated a straw purchase and "a transaction that should (not) be completed under ATF guidelines."[64]

Mr. Graham also fails to mention that Mr. Horton also made similarly suspicious multiple purchases of firearms within a few days at Fleet Farm stores during three separate time periods:

- on July 4 and July 7, 2021 (both at the Brooklyn Park Fleet Farm store) and on July 10, 2021 (at the Oakdale Fleet Farm store);
- on July 23, 2021 (at the Blaine Fleet Farm store), on July 24 and July 26, 2021 (both at the Oakdale Fleet Farm store), and on July 27 and July 31, 2021 (both at the Blaine Fleet Farm store); and
- on September 13, 2021 (at the Blaine Fleet Farm store), on September 17, 2021 (at the Brooklyn Park Fleet Farm store), and on September 18, 2021 (at the Blaine Fleet Farm store).

Mr. Graham also states that "ATF seminars do not identify multiple firearm purchases as a potential indicator of a possible straw purchase."[65] Without a cite to his source, I am unclear to what Mr. Graham is referring. During my 25-year career with ATF, I conducted numerous training sessions and seminars related to firearms trafficking throughout the United States, Canada, Europe, and Africa. In almost all sessions I can remember, trainers and participants touted the benefits of analyzing multiple sales information in developing firearms trafficking leads including the identification of straw purchasers.

Mr. Graham next says that "purchasing firearms with cash is not an indicator of a possible straw purchase."[66] My experience in  straw purchase investigations contradicts this point,[67] and several documents contained in the record contradict this point as well. In ATF Special Agent Kylie Williamson's affidavit in support of federal criminal charges against straw buyer Jerome Horton, Agent Williamson stated that "individuals who are involved in firearms trafficking and/or straw purchasing often pay for the items in cash."[68] Mr. Radl even trained Fleet Farm firearm sales specialists that purchasing firearms with cash is a warning sign of a possible straw purchase.[69] Finally, Graham himself opines that, when "HORTON paid cash and used small denominations for a total of $1,160" at Frontiersman Sports (as noted by a store employee), this was a circumstance that, along with other circumstances, indicated a straw purchase.[70]

---

[63] Graham Report at 19.

[64] *Id.* at 67.

[65] *Id.* at 19.

[66] *Id.* at 19–20.

[67] Bisbee Report at 4-7.

[68] Affidavit of Kylie Willamson, *United States of America v. Jerome Fletcher Horton, Jr.*, No. 21-MJ-764 HB, ECF No. 1-1 at 9 (D. Minn. October 18, 2021).

[69] Radl Deposition at 162:14-17; Depo. Ex. 101 (FF_0040868).

[70] Graham Report at 67.

In "Bullet Point # 7", Mr. Graham states a short time to crime "is not an indicia of a possible straw purchase for an FFL" because "(a)n FFL would not have access to the information."[71] He also states that a short time to crime "is an investigative tool used to identify persons and last known possessors of a traced crime gun." This is completely inaccurate. A firearms trace is an investigative tool used to identify the first retail purchaser of a gun. Law enforcement may or may not know the last known possessor of a traced crime gun before submitting the trace. In my experience as an ATF case agent, supervisor, trainer, and international representative in regard to firearms trafficking, a short time to crime is intelligence that can be used to identify illegal firearms traffickers, including straw purchasers. And as I noted regarding Mr. Graham's "Opinion #5," Fleet Farm was aware that ATF tracks crime gun traces with short time-to-crime in an effort to combat illegal firearms trafficking, which includes straw purchasing.

Further, Fleet Farm did have access to this information. Ms. Granato stated that she generally would be the Fleet Farm official who responded to ATF trace requests.[72] While Fleet Farm may not be privy to what type of crime the firearm was involved in, or the specific date of recovery, Fleet Farm would know the date ATF was making the trace request and the date that Fleet Farm sold the firearm. Further, Fleet Farm was surely aware of the importance of short time to crime as they were subject to ATF's Demand Letter 2 Program, as I detail above.

**Mr. Graham's Analysis of Fleet Farm Sales to Horton and Elwood:**

After reviewing the ATF Form 4473s, ATF Form 3310.4s, video surveillance footage, transcripts of depositions, communications between ATF and Fleet Farm employees, and the "aggregative timeline of [Mr. Horton's and Ms. Elwood's] purchases," Mr. Graham concludes that "there was no possible way a Fleet Farm *counter employee* would have been aware or have knowledge that either Horton or Elwood was committing a "straw purchase."[73] In my opinion, and as shown in my initial report, Fleet Farm counter employees should have known Mr. Horton and Ms. Elwood were straw buyers.[74] Further, Mr. Klebs was suspicious that Horton was a straw buyer on July 31, 2021.[75]

Mr. Graham discusses the July 26, 2021, firearms transaction in which Mr. Horton purchased a Glock 9mm pistol from the Fleet Farm store in Oakdale.[76] This occurred two days after Mr. Horton purchased a Springfield 9mm pistol and an FN 9mm pistol from the same store. Regarding the July 24, 2021, multiple purchase completed by Mr. Horton, Mr. Graham stated that he "reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales."[77] In relation to the July 26, 2021, transaction, Mr. Graham states "Fleet Farm personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality."[78] Mr. Graham concludes that in his "professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions."[79] However, Mr. Graham fails to notice or analyze the

---

[71] Graham Report at 21.
[72] Granato Deposition, page 176:11–12.
[73] Graham Report at 39–40. While I disagree with this assertion based on my analysis of the transactions as outlined in my initial report, I can only assume that Mr. Graham is not including Mr. Klebs, Ms. Granato, and Mr. Radl, all of whom were not "counter employees," in his assessment.
[74] Bisbee Report at 16–21.
[75] *Id.* at 12–13.
[76] Graham Report at 46.
[77] *Id.* at 45.
[78] *Id. a*t 46.
[79] *Id.*

fact that the ATF Form 3310.4 that was required to be completed for the July 26, 2021, transaction was not submitted to ATF until October 21, 2021, after ATF told Fleet Farm that Mr. Horton was a straw purchaser.[80] According to instructions located on Form 3310.4, FFLs are required to send the notification to the "ATF National Tracing Center no later than the close of business on the day that the multiple sale" occurred.[81] In short, because Fleet Farm did not timely submit the 3310.4 Form, Mr. Graham is incorrect that Fleet Farm did not violate ATF regulations.

Mr. Graham indicates that the Blaine Store Incident Report, relating to Mr. Horton's July 31, 2021, straw purchase of three handguns, "reflects Klebs doing his due diligence to confirm that the sale was proper and that no indicators of a possible straw purchase were present."[82] Graham continues that "this transaction did not violate … any of Fleet Farm's policies and training relating to straw purchasing."[83] On the contrary, Mr. Klebs specifically stated in the incident report that the July 31, 2021, transaction involved "3 handguns," adding that the sale was "flagged in the system for having a previous ATF form 3310 issued on 7/27/2021."[84] Mr. Klebs commented, "I found this odd…"[85] Mr. Klebs specifically states that he asked the firearms sales specialist if he thought the transaction could be a "straw purchase."[86]

As Mr. Klebs later testified in his deposition, Fleet Farm trained him that multiple firearms transactions and multiple sales of firearms on one occasion were warning signs of possible straw purchases.[87] These indicators were present during Mr. Horton's July 31, 2021, purchase.[88] Fleet Farm employees were also trained that if the sale did not feel right, they should trust their gut and deny the sale.[89] However, according to Mr. Klebs, Fleet Farm actually trained that the employee "could" deny the sale as opposed to "should" deny the sale.[90] In my opinion, on July 31, 2021, Mr. Klebs did in fact identify a number of straw purchase warning signs, but was looking for confirmation to turn his "could" deny the sale to "should" deny the sale by questioning the sales associate, and contacting an off-duty manager on his personal phone for additional support. Ultimately, Mr. Klebs emailed Ms. Granato after the sale, in the apparent hope that she would deny future sales, but Ms. Granato never answered his email.[91] Unfortunately, as described in my initial report, the culture at Fleet Farm was that employees defaulted to making a firearm sale even when straw purchase warning signs were present because they felt they needed definitive proof of a straw purchase to deny a sale.[92] Mr. Klebs' evidence and testimony about the July 31, 2021 transaction is a clear example of this misguided culture.

Mr. Graham delineates some of the factors present when Ms. Elwood purchased a Ruger 9mm pistol from the Fleet Farm store in Brooklyn Park and a Smith and Wesson 9mm pistol from the Fleet Farm

---

[80] Bisbee Report at 12.

[81] ATF Form 3310.4, *Report of Multiple Sale or Other Disposition of Pistols and Revolvers*, https://www.atf.gov/firearms/docs/form/report-multiple-sale-or-other-disposition-pistols-and-revolvers-atf-form-33104/download.

[82] Graham Report at 48.

[83] *Id.*

[84] Bisbee Report at 19.

[85] *Id.* at 19–20.

[86] FF_0075711–12; Klebs Deposition at 161–63.

[87] Klebs Deposition at 30:2-7.

[88] Bisbee Report at 12–13, 19–20.

[89] Radl Deposition at 210:6-7.

[90] Klebs Deposition at 44:24–45:4.

[91] FF_0075711–12; Klebs Deposition at 169–71.

[92] Bisbee Report at 19.

store in Lakeville on May 1, 2021.[93] Mr. Graham opines that there were no straw purchase indicators present at each sale.[94] Mr. Graham previously stated in his "Opinion 4" that "Fleet Farm has robust recordkeeping, communication, and software systems in place to prevent straw purchasing."[95] Obviously, this statement is not accurate. If this had actually been the case, Fleet Farm would have noticed that Ms. Elwood purchased two firearms on the same day from Fleet Farm stores that were approximately 35 miles away from each other and taken appropriate action.

In my opinion, Mr. Graham makes a mistake by separately analyzing each individual firearm sale to Mr. Horton and Ms. Elwood, as opposed to addressing the overall pattern of sales and compounding issues. When discussing straw purchase warning signs, it is important to note that multiple signs during one transaction, as well as cumulative signs over several transactions, increase the probability that an individual is engaging in straw purchases (i.e. the sum is greater than the parts). Mr. Graham's analysis is fundamentally flawed based on his analysis of each individual Fleet Farm sale to Ms. Elwood and Mr. Horton in isolation and without context. Along with the warning signs present during individual transactions that I delineated in my initial report, the patterns of Fleet Farm's sales to Mr. Horton and Ms. Elwood should have caused Fleet Farm to know that they were straw buyers.

***Frontiersman Sports Straw Purchase Transaction:***

Finally, Mr. Graham states that seven red flags of a straw purchase were present during Mr. Horton's September 29, 2021, purchase of two pistols from another FFL in Minnesota, Frontiersman Sports.[96] Mr. Graham identifies the red flags as:

- "HORTON's purchase was a suspected straw purchase."
- "HORTON's vehicle parked in a nearby Jacuzzi business parking lot to avoid Frontiersman's surveillance cameras."
- "HORTON presented a learner's permit as opposed to a driver's license."
- "HORTON had made multiple purchases of firearms over two days."
- "While HORTON was inside the store, he received a phone call and stated 'I'm still in the store.'"
- "HORTON paid cash and used small denominations for a total of $1,160."
- "As HORTON walked toward the Jacuzzi business parking lot, HORTON waived the gun boxes in the air to people waiting outside."[97]

Mr. Graham opines that, "(i)f all seven of these circumstances are observed during a transaction, this is not a transaction that should be completed under ATF guidelines."[98] Mr. Graham suggests that these specific and unique warning signs must be present for an FFL to deny a firearms sale. The rigidity of this opinion is contradictory to his statement on page 13 of his report in which he rightly asserts, "ATF regulations do not articulate the types of conduct that FFLs should monitor for to detect potential straw purchasing activity."[99] The fact is, FFLs are required to ensure the lawfulness of the sale of the firearm. ATF and industry professional associations do not provide absolute, exclusive lists of straw purchase

---

[93] Graham Report at 62–63.
[94] *Id.* at 63.
[95] *Id.* at 5.
[96] *Id.* at 66–67.
[97] *Id.* at 67.
[98] *Id.*
[99] *Id.* at 13.

warning signs, but provide varied training and numerous resources to help FFLs spot red flags of straw purchasing to fulfill their duty of ensuring lawful sales.[100]

Mr. Graham then attempts to contrast the Frontiersman Sports September 29, 2021 sale of two pistols to Mr. Horton with Fleet Farm firearm sales to Mr. Horton and Ms. Elwood: "[T]he record does not indicate that any of these circumstances were present during any of the transactions at Fleet Farm stores, let alone all seven of them during the same transaction."[101] Mr. Graham is wrong. Four of these circumstances were present during Fleet Farm's sales to Mr. Horton: (1) Mr. Horton made multiple purchases of guns from Fleet Farm stores within a few days on three separate occasions; (2) Mr. Horton used his phone while shopping for firearms at Fleet Farm stores; (3) Mr. Horton paid in cash; and (4) Mr. Klebs suspected Horton was a straw buyer. Also, as explained in my initial report, additional warning signs besides these four were also present.[102] Likewise, some of these circumstances were present during Fleet Farm's sales to Ms. Elwood—she purchased firearms from two different Fleet Farm stores on the *same* day and she made multiple purchases of firearms over short periods of time on several occasions at Fleet Farm stores.

---

[100] Bisbee Report at 2–7.
[101] Graham Report at 67.
[102] Bisbee Report at 10–21.

13

**Rebuttal to Report of Gary Kleck**

**Kleck's Opinion No. 1:**

Mr. Kleck's first opinion is that "(s)traw purchases of handguns from FFLs are at best a negligible source of guns used to commit crimes. There is no reliable and relevant evidence showing that straw purchases provide a significant source of guns used to commit crimes."[103] He supports this position with selective research on how criminals obtain firearms.

Mr. Kleck claims that "(o)ne indication of how unimportant straw purchasing firearms from FFLs is as a source of criminal firearms is the rarity of ATF revocation of dealer licenses for this kind of violation."[104] But in my experience investigating trafficking as an ATF special agent, including straw purchasing, straw purchasing from FFLs is a significant way that criminals acquire firearms. And the ATF does not revoke FFL licenses for most violations by FFLs, let alone all violations by FFLs. As I detailed above, a 2023 Inspector General report and a 2021 USA Today article describe the ATF's reticence to revoke FFL licenses. For these reasons, I disagree with Mr. Kleck's opinion that straw purchasing firearms is relatively unimportant and with his opinion that the number of ATF revocations supports this viewpoint.

**Kleck's Opinion No. 3:**

Mr. Kleck's third opinion is that "(s)ales of multiple guns at the same time are not suspect."[105] Mr. Kleck says that, although "(p)ersons unfamiliar with the lawful firearms business might think that even sales of just two or three guns at the same time are suspect," his opinion is that "multiple sales of guns are commonplace."[106] This opinion is refuted by my training and experience, and also by multiple studies and publications, including a study cited by Mr. Kleck in support of his position.

Mr. Kleck references Christopher Koper's 2005 study, Purchase of Multiple Firearms as a Risk Factor For Criminal Gun Use: Implications For Gun Policy and Enforcement, to support Mr. Kleck's opinions that purchasing multiple firearms at the same time is commonplace and firearms involved in multiple sales were less likely to be used in a crime.[107] But Mr. Koper summarized his study by saying, "(t)he simultaneous or rapid purchase of multiple guns, which is referred to as a multiple sale, is a potential indicator of gun trafficking."[108] Mr. Koper's study also indicates that "(g)uns sold in multiple sales accounted for 25% of guns later recovered (in crimes)" and were twice as likely to be found with obliterated serial numbers, "an obvious flag for potential trafficking."[109] In his study, Mr. Koper also stated, "Federal regulations requiring gun dealers to report multiple sales are prudent, and law enforcement should emphasize these sales in gun trafficking investigations."[110]

---

[103] Fleet Farm's Rule 26(a)(2) Designation and Disclosure of Initial Expert Witnesses, Ex. B, Expert Report of Gary Kleck ("Kleck Report"), at 4.
[104] *Id.* at 8.
[105] *Id.* at 11.
[106] *Id.* at 12.
[107] *Id.*
[108] Christopher Koper, *Purchase of Multiple Firearms as a Risk Factor For Criminal Gun Use: Implications For Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749, 749 (Nov. 2005).
[109] *Id.* at 749, 753.
[110] *Id.* at 749, 770.

Mr. Kleck selectively uses Mr. Koper's study to say "handguns sold in batches were actually slightly *less* likely to be later used in crime than handguns sold one at a time. Thus, there is no factual basis for Fleet Farm employees or other gun store employees to believe that guns sold in multiples are more likely to later be used in crime and to be suspect for that reason."[111] However, that is not what Mr. Koper concludes in his report. On the contrary, Mr. Koper states that "handguns sold in multiple sales had survival times 22% shorter than those of other handguns, which is to say that handguns sold in multiple sales were more likely to be used in crime."[112]

Mr. Koper's conclusions are echoed in other studies, including a 1996 JAMA Brief Report titled "Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms." This report concluded "that restricting handgun purchases to 1 per month is an effective means of disrupting the illegal interstate transfer of firearms."[113] Further, a November 2010 Inspector General report found that "while reports of multiple sales of handguns produce timely, actionable investigative leads for ATF, the lack of a reporting requirement for multiple sales of long guns – which have become the cartels' weapons of choice – hinders ATF's ability to disrupt the flow of illegal weapons into Mexico."[114] Lastly, the ATF website expressly states that 3310.4 forms are "an important indicator" in detecting gun trafficking: "FFLs are required by statute to report to ATF the sale of two or more handguns to the same purchaser within five consecutive business days. These reports, when cross-referenced with crime gun trace information, serve as an important indicator in the detection of illegal firearms trafficking."[115]

**Kleck's Opinion Regarding Fleet Farm's Sales to Jerome Horton and Sarah Elwood:**

On page 13, Mr. Kleck concludes his report by opining that "(t)he sales referenced in the Complaint do not indicate a suspicious purchasing pattern." This is contradicted by the numerous warning signs that, as I opined in my initial report, showed a suspicious purchasing pattern, based on my training and experience as a firearms trafficking investigator.[116]

Mr. Kleck's conclusory opinion is also contradicted by Fleet Farm's own training. Mr. Horton's actual purchases were used as an example of a suspicious purchase pattern by Fleet Farm. During a Fleet Farm All Store Quarterly Firearm Compliance Webinar in November 2021, Ms. Granato utilized the actual multiple sales form from Mr. Horton's straw purchases on July 23, 27, and 31, 2021, to advise employees that multiple warning signs were present during these transactions, namely, purchasing multiple firearms in a short time span, making a multiple purchase of firearms on the same day, and making multiple purchase of 9mm handguns.[117] Ms. Granato even said "it appears to be pretty obvious what is going on here."[118] During this same presentation, Mr. Radl stated that any firearms sales specialist who participated in the July 31, 2021, sale to Mr. Horton should have said "whoa, something is up here," and

---

[111] Kleck Report at 12–13.

[112] Christopher Koper, *Purchase of Multiple Firearms as a Risk Factor For Criminal Gun Use: Implications For Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749, 763 (Nov. 2005).

[113] Douglas Weil and Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759–61 (1996).

[114] U.S. Department of Justice, Office of the Inspector General, *Review of ATF's Project Gunrunner* at iv (Nov. 2010), https://oig.justice.gov/reports/ATF/e1101.pdf.

[115] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *National Tracing Center* (last reviewed Sept. 19, 2024), https://www.atf.gov/firearms/national-tracing-center.

[116] Bisbee Report at 10–21.

[117] FF_0000216, 34:20.

[118] FF_0000216, 34:55.

their "radar should be up."[119] Clearly, this training by Fleet Farm's firearms compliance personnel is directly contradictory to Mr. Kleck's conclusion.

Fleet Farm employees similarly recognized that purchasing multiple guns is a straw purchase warning sign. As described in my initial report, Branden Sierakowski, a Fleet Farm employee who sold four firearms to both straw purchasers (Mr. Horton and Ms. Elwood) in two sales transactions, admitted that purchasing multiple firearms can be a sign of a straw purchase.[120] Gary Hallfielder, a Fleet Farm employee who sold three firearms to one of the straw purchasers (Mr. Horton) in two sales transactions, also acknowledged that making multiple purchases of the same gun in a short period of time was a "red flag."[121]

---

[119] FF_0000216, 33:02.
[120] Sierakowski Deposition at 56:4–6.
[121] Hallfielder Deposition at 40:16-24.

**Rebuttal to Report of William Napier**

Mr. Napier submits three opinions related to this matter, two of which (Mr. Napier's Opinion Nos. 1 and 2) relate to policies and procedures in conducting firearms transactions as a federally licensed firearms dealer. His third opinion is that "Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms." I find flaws with all three opinions.

**Napier's Opinion No. 1:**

Mr. Napier's first opinion is that "Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard."[122]

### *ATF and NSSF*

In support of Mr. Napier's opinion, he rightly states that FFLs are required "to monitor for and take steps to prevent possible straw purchases," and that FFLs accomplish this by "relying on various programs, including in-house training, ATF documents and seminars, and third party programs such as NSSF webinars, as well as maintaining relationships with law enforcement."[123] Mr. Napier then highlights numerous warning signs of potential straw purchases attributed to ATF and NSSF:

- "[T]he customer acts uncomfortable or seems unfamiliar with the product."[124]
- "[C]onversations of customers while shopping, with you, with their friends or on their cell phones."[125]
- "[P]urchaser comes in with list of firearms or is on the phone being directed what to buy."[126]
- "Be suspicious of uneducated customers attempting to purchase more than one handgun at a time with little inquiry about the firearms."[127]
- "Nervousness. Questioning the need for Form 4473. Or tight-lipped."[128]
- "Lack of knowledge about firearms or familiarity with the firearm they want to buy after being questioned by sale associates."[129]
- "Evasive when asked questions by staff."[130]
- "Bulk or repetitive purchase of the same or similar firearms, especially non-collectible models."[131]
- "No previous purchases, but now a frequent buyer."[132]

---

[122] Fleet Farm's Rule 26(a)(2) Designation and Disclosure of Initial Expert Witnesses, Ex. C, Expert Report of William Napier ("Napier Report"), at 4.
[123] *Id.*
[124] *Id.* at 5 (quotation marks omitted).
[125] *Id.* (quotation marks omitted).
[126] *Id.* at 5 (quotation marks omitted).
[127] *Id.* at 6 (quotation marks omitted).
[128] *Id.* at 7 (quotation marks omitted).
[129] *Id.* (quotation marks omitted).
[130] *Id.* (quotation marks omitted).
[131] *Id.* (quotation marks omitted).
[132] *Id.* (quotation marks omitted).

- "Buying multiple firearms with large amounts of cash."[133]
- "Buyer conversing with another person while completing Form 4473, particularly if the other person is in another section of the store."[134]
- "Scouting of firearms by the straw buyer with the actual purchaser, who then departs the store."[135]
- "Taking/sending cell phone pictures of firearms to persons unknown to the FFL."[136]
- "Talking on a cell phone while looking at firearms."[137]

Regarding these warning signs, Mr. Napier correctly highlights ATF guidance to "'[a]sk customer questions such as why are you buying this gun, what are you going to use it for' and '[k]eep a log of recent denials and attempted purchases to compare with new sales.'"[138] He also notes similar training from the NSSF, including that FFLs should "[m]ake sure there is genuine interest and questions from the customer about the firearm being considered for purchase," that "[t]he salesperson should be convinced of the reason and intended lawful purpose the customer has for acquiring the firearm," and that FFL salespeople should ask questions of the buyer if they have "any doubts about the legality of any firearms sale."[139]

Despite acknowledging these recognized warning signs, and despite the presence of many of these recognized warning signs during Fleet Farm's sales to Mr. Horton and Ms. Elwood, Mr. Napier wrongly opines later in his report that "there is no indication that Fleet Farm was aware of, participated in, had knowledge of the straw purchases being perpetrated" and that "the straw purchasers did not exhibit indicia of straw purchasing during the transaction that should have resulted in a refused sale,"[140] as discussed below.

### Other Minnesota FFLs

Mr. Napier then performs a perfunctory review of other Minnesota FFLs in relation to their policies and procedures regarding potential straw purchases, ultimately claiming that "none of these policies come close to the depth or volume of policies provided by Fleet Farm."[141] Mr. Napier consistently uses the term "industry standard" in his report, claiming Fleet Farm meets and/or exceeds this standard. As I have stated in my initial report, as well as this report, however, Fleet Farm does not utilize all best practices for its firearms sales policies and procedures, and many policies and procedures Fleet Farm has in place are not routinely applied or used.[142] Mr. Napier's opinion misses an important point: regardless of the strength of Fleet Farm policy in theory, Fleet Farm employees failed to consider and act upon the numerous warning signs during firearms sales to Ms. Elwood and Mr. Horton.

---

[133] *Id.* (quotation marks omitted).
[134] *Id.* (quotation marks omitted).
[135] *Id.* (quotation marks omitted).
[136] *Id.* (quotation marks omitted).
[137] *Id.* (quotation marks omitted).
[138] *Id.* at 5.
[139] *Id.* at 6–8 (quotation marks omitted).
[140] *Id*. at 43-44.
[141] *Id.* at 9–14.
[142] Bisbee Report at 7–10, 16–21.

18

Despite describing other FFL policies as "consistent with, and reflective of, the industry standard," Mr. Napier is particularly critical of Bill's Gun Shop for adopting the "MN Attorney General identified INDICATORS," saying they "are not accurate in describing the industry standard for monitoring for and preventing straw purchase."[143] Yet all of the indicators Bill's Gun Shop specifies correspond with indicators by other FFLs that Mr. Napier endorses:

| "MN Attorney General identified INDICATORS" (as adopted by Bill's Gun Shop) | Other Minnesota FFLs |
|---|---|
| • "look for multi-sales and cross-store purchases"[144] <br><br> • "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber"[145] <br><br> • "Multiple handgun purchases, particularly 9mm caliber handguns"[146] | • "Bulk or repeat purchase of the same firearm" (DKMags)[147] <br> • "Trying to avoid a Multisale report" (DKMags)[148] <br> • "Multiple handgun purchases in a short period of time, especially 9mm caliber pistols" (Frontiersman Sports)[149] <br> • "Is buying multiple firearms, especially of the same or similar type/model" (Sportsman's Guide)[150] <br> • "Has purchased one or more firearms recently" (Sportsman's Guide)[151] |
| • "Purchasing firearms with cash"[152] | • "Cash transactions" (Sportsman's Guide, LLC)[153] |
| • "The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves"[154] <br><br> • "The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase"[155] | • "Is communicating with other individuals not present via phone, text or photos" (Sportsman's Guide, LLC)[156] <br> • "Is accompanied by one or more individuals who then suddenly leave" (Sportsman's Guide, LLC)[157] |

---

[143] Napier Report at 14.
[144] *Id.* at 10.
[145] *Id.* at 10.
[146] *Id.* at 10.
[147] *Id.* at 11.
[148] *Id.* at 11.
[149] *Id.* at 12.
[150] *Id.* at 13.
[151] *Id.* at 13.
[152] *Id.* at 10.
[153] *Id.* at 13.
[154] *Id.* at 10.
[155] *Id.* at 10.
[156] *Id.* at 13.
[157] *Id.* at 13.

*"MN Attorney General identified INDICATORS"*

As shown, Mr. Napier references warning signs of possible straw purchasing from multiple sources as the industry standard: ATF, NSSF, and other Minnesota FFLs. Mr. Napier then takes issue with the warning signs identified by the State of Minnesota in the complaint in this lawsuit. But these warning signs all correspond with each other. This is a fundamental flaw in Mr. Napier's opinion.

First, Mr. Napier critiques what he terms "Red Flag" #1, claiming that "an FFL would need more information before forming an opinion on whether the purchase of multiple handguns is an indicator of a possible straw purchase."[158] Here, Mr. Napier is conflating indicators of a possible straw purchase with definitive proof of a straw purchase. As previously stated, and referenced in this report and my initial report, multiple sales of firearms is a recognized *indicator* of firearms trafficking (which includes straw purchases). An indicator is a thing that suggests or shows something.  None of the guidance referenced in my report indicates an FFL would need to have proof of a straw purchase before denying the sale. Again, it is the FFL's responsibility, after taking into account the totality of the circumstances surrounding the firearms transaction, including the presence of or absence of straw purchasing indicators, to determine if the transfer of the firearm to the customer is lawful. In addition, Mr. Napier has cited with approval the guidance from ATF and NSSF and the policies of other Minnesota FFLs that purchasing multiple guns is a warning sign—i.e., an indicator—of a possible straw purchase. Finally, Fleet Farm's own training—which Mr. Napier praises—instructed Fleet Farm employees that multiple sales and Form 3310.4s are warning signs of possible straw purchasers.[159]

Mr. Napier makes the same argument about what he terms "Red Flag" #2, saying "(a)n FFL would need more information before forming an opinion on whether the purchase of multiple 9mm caliber handguns is an indicator of a possible straw purchase."[160] Regarding his repeated assertion that FFLs "would need more information," I reiterate my position as explained in the previous paragraph discussing "Red Flag" #1. But it is important to also note that according to ATF firearms tracing statistics from calendar year 2022, ATF traced 500,426 crime guns.[161] Of this number, almost half, or 227,830 were 9mm firearms.[162] The second most traced caliber was .40 caliber, accounting for 50,494 crime gun traces.[163] This shows that the 9mm caliber firearm is the most traced crime gun, outpacing the next closest caliber by more than four times. This is a warning sign of a possible straw purchase. And again, policies of other Minnesota FFLs that Mr. Napier cites with approval in his report identify purchasing multiple 9mm handguns as a warning sign.[164]

According to Mr. Napier in his review of "Red Flag" #3, "the notion that purchasing firearms with cash is an indicator of a possible straw purchase is a misconception, and is not something that ATF or NSSF recognizes as being a potential indicator."[165] However, this is not true. In ATF Special Agent Kylie Williamson's affidavit in support of federal criminal charges against straw buyer Jerome Horton, Agent

---

[158] *Id.* at 18–19.

[159] *Id*. at 26.

[160] *Id.* at 19.

[161] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Trace Data—2022: Top Calibers Recovered and Traced in the United States and Territories* (last reviewed Oct. 11, 2023), https://www.atf.gov/resource-center/docs/report/top-calibers-recovered-and-traced-united-states-and-territories-cy-2022/download.

[162] *Id.*

[163] *Id.*

[164] Napier Report at 10, 12.

[165] *Id.* at 19.

Williamson stated "individuals who are involved in firearms trafficking and/or straw purchasing often pay for the items in cash."[166] Additionally, the NSSF trains retailers via on-line courses that purchasing firearms "using or always us[ing] cash" is one of the "possible indicators of a straw purchase."[167] Earlier in his report, Mr. Napier himself identified NSSF training that cash transactions are "possible indicators of a straw purchase."[168] Also, the warning signs recognized by other Minnesota FFLs that Mr. Napier endorses indicate that purchasing with cash is a warning sign.[169]

Mr. Napier continues to contradict himself in his analysis of "Red Flag" #4, stating that "(t)here is nothing illegal about a person accompanying a prospective purchaser of a firearm and leaving the store before the sale is complete. If a buyer is accompanied to a store by another individual, that alone is not an indicator of a possible straw purchase."[170] As I explained above, generally speaking, none of the straw purchase warning signs are illegal in and of themselves. They are merely indicators: actions or events that, taken individually, should raise the awareness of the FFL to the possibility of a straw purchase, and considered in totality should assist the FFL in determining if the sale of the firearm is lawful.

Previously in his report, Mr. Napier identified several indicia of a possible straw purchase attributed to ATF and NSSF, calling them the "industry standard on how to monitor for and prevent straw purchases."[171] Included in his warning signs of a possible straw purchase are the following indicators involving prospective purchasers accompanied by others:

- "[t]wo customers, one looks at gun and asks the question ... the other wants to complete the paperwork"[172]
- "Be alert to who is paying for the firearm versus who is completing the Form 4473 and NICS."[173]
- "Be cognizant to couples shopping together in which one person selects the firearm and the second person completes the Form 4473."[174]
- "Another person seen passing cash to the 'buyer.'"[175]
- "Buyer conversing with another person while completing Form 4473, particularly if the other person is in another section of the store."[176]
- "Scouting of firearms by the straw buyer with the actual purchaser, who then departs the store."[177]

All of the above "industry standard" warning signs cited with approval by Mr. Napier correspond to the warning sign that "the buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves" that he instead critiques. Indeed, in reviewing Fleet Farm's

---

[166] Affidavit of Kylie Willamson, *United States of America v. Jerome Fletcher Horton, Jr.*, No. 21-MJ-764 HB, ECF No. 1-1 at 9 (D. Minn. October 18, 2021).

[167] National Sports Shooting Foundation, *Straw Purchases: Tactics to Help Avoid Them and What to Do if You Think You Made One*, at 26:05, https://www.pathlms.com/nssf/courses/63943/video_presentations/298581.

[168] Napier Report at 7.

[169] *Id.* at 10, 13.

[170] *Id.* at 20.

[171] *Id.* at 5–7.

[172] *Id.* at 5.

[173] *Id.* at 6.

[174] *Id.* at 6.

[175] *Id.* at 7.

[176] *Id.* at 7.

[177] *Id.* at 7.

21

training later in his report, Mr. Napier again recognizes that the presence of other individuals while the buyer is filling out the Form 4473 is an indicator of a possible straw purchase.[178]

Under "Red Flag" #5, Mr. Napier begins by implying that general cell phone usage in relation to firearms purchases is not an indicator of a possible straw purchase.[179] However, he then states that "if an FFL observed a phone communication between an individual and a third party that gave them reason to believe the individual may be shopping for another person, that would be an indicator of a possible straw purchase, and it would be appropriate for the FFL to then assess the totality of the circumstances to determine whether they are facing a possible straw purchase scenario."[180] Mr. Napier also cites warning signs from ATF and NSSF and FFLs with approval that address cell phone use. Thus, Mr. Napier concedes that using a cell phone while shopping for firearms can be a warning sign—i.e., something that increases the risk that the shopper is a straw buyer such that further investigation is warranted. This perspective is relevant for all straw purchase warning signs—warning signs are signals to the FFL to aid in determining if further information is needed to ascertain the lawfulness of the sale of the firearm or if circumstances already exist indicating the sale should not be consummated.

Mr. Napier later agrees that a short time-to-crime is a red flag (Red Flag #7) but claims that "(t)his "red flag" has no application in the context of a firearm sale."[181] This is completely false. The fact that a prospective firearms purchaser was identified as a previous purchaser of a crime gun, especially if the trace revealed a short time-to-crime, is a warning sign an FFL should consider. And while Fleet Farm may not be privy to what type of crime the firearm was involved in, or the specific date of recovery, Fleet Farm would know the date ATF was making the trace request and the date that Fleet Farm sold the firearm. Further, Fleet Farm was surely aware of the importance of short time to crime as Fleet Farm was subject to ATF's Demand Letter 2 Program—a program Fleet Farm was flagged for due to having a number of traces returned with short time to crimes, as described in more detail above.

### *"Government-Administered Screening Programs"*

Mr. Napier makes an additional "observation" seeming to deflect responsibility of identifying straw purchasers to "government-administered screening programs" that I disagree with.[182] Mr. Napier submits that, prior to an FFL transferring a firearm, the FFL will "trust and rely heavily on government-administered screening programs."[183] These programs include:

- "the customer presenting a valid state-issue permit to purchase or permit to carry"
- "the customer correctly completing and signing the ATF Form 4473"
- "the generation and submission of the ATF Form 3310.4 multiple handgun sales report to law enforcement (where applicable)"
- "the receipt of an FBI NICS background check to confirm the customer is eligible to purchase the firearm(s)"[184]

---

[178] *Id.* at 22, 26–27.
[179] *Id.* at 20.
[180] *Id.*
[181] *Id.* at 21.
[182] *Id.* at 18.
[183] *Id.*
[184] *Id.*

Mr. Napier concludes that "an FFL will have received at least two independent confirmations from government entities that the customer is allowed to purchase a firearm."[185] Mr. Napier's opinions in this paragraph are of significant concern to me.

All of the "government-administered screening programs" cited by Mr. Napier determine if the person completing the ATF Form 4473 is eligible to receive a firearm. It is the FFL's responsibility to determine if the person completing the ATF Form 4473 is the *actual* purchaser of the firearm. Based on my experience, FFLs utilize the pretense that since someone passed a "background check," they can complete the sale without further scrutiny.

In this case, Brandon Sierakowski, a Fleet Farm employee who sold two firearms to Ms. Elwood and two firearms to Mr. Horton, testified in his deposition that he felt it was primarily the responsibility of NICS and local law enforcement to stop straw purchases.[186] NICS, the National Instant Criminal Background Check System, runs a criminal history check along with checks of other prohibiting factors, to determine if the person identified on the ATF Form 4473 is legally allowed to possess a firearm. NICS has no way of knowing if the person completing the ATF Form 4473 is the actual purchaser of the firearm or if they are a straw purchaser. This only reinforces the fact that it is the FFL who is responsible for ensuring the person completing the ATF Form 4473 is the *actual* purchaser of the firearm. Mr. Napier's opinions here are highly problematic. Unfortunately, Mr. Napier's opinions also correspond with Fleet Farm's policies and practices when Fleet Farm sold firearms to Mr. Horton and Ms. Elwood.

### *Fleet Farm Policies and Procedures*

In analyzing Fleet Farm's straw purchasing prevention policies and procedures, Mr. Napier opines that Fleet Farm maintains a "robust and comprehensive training (program), and in particular its training relating to monitoring for and preventing possible straw purchases, represents an industry best practice approach to firearm transactions."[187] Fleet Farm's guidance about straw purchasing compared with guidance from other FFLs in Mr. Napier's own report shows that Fleet Farm's training was not "an industry best practice." Moreover, it is apparent that Fleet Farm's guidance related to preventing straw purchases was not applied during all firearms transactions, especially those involving Ms. Elwood and Mr. Horton.

Mr. Napier highlights Fleet Farm's Straw Purchase Alert system, saying it "allows store employees to search 'LP Alerts' to 'view alerts from other locations' and search by last name 'to see if there were any prior alerts sent out for an individual.'"[188] However, this is a perfect example of the difference between having a policy and ensuring the policy is appropriately utilized by employees. Ms. Granato testified that such alerts were in a Lotus Notes database—if a Fleet Farm employee chose to search for them.[189] But it is unclear whether all Fleet Farm employees who sold firearms even had access to the Lotus Notes database.[190] Moreover, whether Fleet Farm employees had access or not, Fleet Farm documents and deposition testimony show that Fleet Farm employees selling firearms did not routinely or regularly use

---

[185] *Id.*

[186] Sierakowksi Deposition at 67:23–68:12.

[187] *Id.* at 25.

[188] *Id.* at 24.

[189] Granato Deposition at 83–84.

[190] *Id.*

the database system to search for straw purchase alerts during a firearm sale transaction, as I explained in my initial report.[191]

It also appears to me that Fleet Farm employees responsible for firearms compliance—i.e., Mike Radl and Michelle Granato--knew Fleet Farm policies and procedures were not being followed or applied effectively by Fleet Farm employees selling firearms. For example, this can be seen in the March 2020 Firearm Procedures and Accountability Update, which stressed that the time for Fleet Farm employees to improve compliance with the responsibility to ensure lawful firearms transactions was "now."[192] And to try to improve compliance, an error tracking and progressive discipline process was developed.[193] However, it does not appear that improvement was realized. During a February 2021 All Store Quarterly Firearm Compliance Webinar, there was a noted increase in compliance concerns, some being described as extremely serious.[194] Fleet Farm also implemented an error tracking sheet to increase accountability.[195] This was followed by an April 2021 All Store Quarterly Firearm Compliance Webinar, which documented common errors of stores not using the error tracking log and management not following-up on errors.[196]

Mr. Napier identifies another conflicting opinion in praising Fleet Farm's training. He identifies a November 2021 training PowerPoint presentation conducted by Fleet Farm's compliance personnel, Mike Radl and Michelle Granato, which explained that "[s]traw purchases can come to light" by: (i) "Team Member recogniz[ing] the customer as being a frequent purchaser," and (ii) "3310.4 Multiple Handgun form alert[ing] you to large or multiple handgun transfers with in 5 consecutive days."[197] This Fleet Farm training presentation also advised that the Form 3310.4 "can provide information on potential handgun straw purchases."[198] I find this Fleet Farm training to be in stark contrast to Mr. Napier's critique of "Red Flag" #1, where he states, "(b)ased on my professional experience and judgment, purchasing multiple firearms in a single transaction by itself does not indicate a possible straw purchase."[199] And, of course, this training was presented after Fleet Farm's sales to straw buyers Mr. Horton and Ms. Elwood. Indeed, this training relies on Mr. Horton's actual sales to train on the importance of multiple sales being a red flag of a possible straw purchase.

**Napier's Opinion No. 2:**

Mr. Napier then presents his second opinion: "Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard."[200] I addressed my review of Fleet Farm's lack of effectiveness in ensuring employee compliance with firearm policies and procedures in my initial report and above.[201]

---

[191] Bisbee Report at 7-10; Granato Deposition at 162-63.

[192] FF_0013479-96, at FF_0013482.

[193] FF_0013479-96, at FF_0013490.

[194] FF_0000860-72, at FF_0000860.

[195] FF_0000860-72, at FF_0000868.

[196] FF_0000445–FF_0000466, at FF_0000447.

[197] Napier Report at 26.

[198] *Id.*

[199] *Id.* at 19.

[200] *Id.* at 34.

[201] Bisbee Report at 7–10, 16–21.

Regarding Fleet Farm's policies and procedures for auditing firearm sales, this is irrelevant to evaluating Fleet Farm's compliance with its duty to detect and prevent straw purchases. As I stated in my initial report, Fleet Farm firearms compliance appeared ultra-focused on physical security and paperwork accuracy rather than the legality of firearms sales.[202] This resulted in a permissive culture in relation to suspicious firearms transactions including straw purchases.[203] The fact that Fleet Farm conducts regular inventories of firearms to assess whether the information on the ATF Form 4473 matches the A&D book does not relate to policies or procedures for spotting and stopping straw purchases.

**Napier's Opinion No. 3:**

Mr. Napier completes his report with his third opinion, that "Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms."[204] Mr. Napier believes Horton and Elwood "did not exhibit indicia of straw purchasing during the transaction that should have resulted in a refused sale."[205] He even goes as far to say that "there is ***nothing*** in Horton's written records or the video recordings of Horton's transactions that should have alerted Fleet Farm to the possibility that Horton was engaging in straw purchasing."[206] This opinion combines two issues that I will address separately.

First, throughout Mr. Napier's report he references the term "industry standard." In assessing the first part of his Opinion #3, it is important to review Mr. Napier's definition of "industry standard". According to Mr. Napier, "(t)he industry standard for monitoring for and preventing possible straw purchases may be gleaned from ATF training materials, NSSF guidelines and training materials, and the straw purchase prevention policies that have been implemented by other Minnesota-based FFLs."[207] As further detailed in my initial report, I have already established that many of the following warning signs, found in "ATF training materials, NSSF guidelines and training materials, and the straw purchase prevention policies that have been implemented by other Minnesota-based FFLs," were present during Fleet Farm's firearms sales to Mr. Horton and Ms. Elwood, including the following:

- "[c]onversations of customers while shopping, with you, with their friends or on their cell phones."[208]
- "uneducated customers attempting to purchase more than one handgun at a time with little inquiry about the firearms."[209]
- "Nervousness. Questioning the need for Form 4473. Or tight-lipped."[210]
- "Bulk or repetitive purchase of the same or similar firearms, especially non-collectible models."[211]
- "Purchases made with brand new identification documents."[212]

---

[202]*Id.* at 19.

[203] *Id.*

[204] Napier Report at 39.

[205] *Id.* at 44.

[206] *Id.* at 42.

[207] *Id.* at 4.

[208] *Id.* at 5.

[209] *Id. at* 6.

[210] *Id.* at 7.

[211] *Id.*

[212] *Id.*

- "No previous purchases, but now a frequent buyer."[213]
- "Buyer conversing with another person while completing Form 4473, particularly if the other person is in another section of the store."[214]
- "Scouting of firearms by the straw buyer with the actual purchaser, who then departs the store."[215]
- "Taking/sending cell phone pictures of firearms to persons unknown to the FFL."[216]
- "Talking on a cell phone while looking at firearms."[217]
- "multi-sales and cross-store purchases"[218]
- "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber"[219]
- "Multiple handgun purchases, particularly 9mm caliber handguns"[220]
- "Purchasing firearms with cash"[221]
- "The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves"[222]
- "The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase"[223]
- "Bulk or repeat purchase of the same firearm"[224]
- "Trying to avoid a Multisale report"[225]
- "Cash use"[226]
- "The buyer may have nervous body language or tone of voice"[227]
- "Is communicating with other individuals not present via phone, text or photos"[228]

With so many warning signs present, I disagree with Mr. Napier's opinion that the firearms sales to Mr. Horton and Ms. Elwood did not violate industry standards.

Mr. Napier attempts to shift the focus from Fleet Farm assessing whether the sales were lawful given straw purchase warning signs, and instead focuses on the completion of the paperwork.[229] Merely completing the ATF Form 4473 with passable responses and passing a background check does not make a sale lawful. These steps are necessary but not sufficient. An FFL must also certify, after taking into account the totality of the circumstances surrounding the sale, that they believe the person completing

---

[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] *Id.*
[218] *Id.* at 10.
[219] *Id.*
[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] *Id.*
[224] *Id.* at 11.
[225] *Id.*
[226] *Id.*
[227] *Id.* at 13.
[228] *Id.*
[229] *Id.* at 39.

the form is being truthful, and is the actual purchaser of the firearm, which requires FFLs to watch for warning signs of a possible straw purchase—not just ensure that the paperwork is complete.

Another "industry standard" practice that Fleet Farm failed to follow is asking questions of Mr. Horton and Ms. Elwood in relation to their firearm acquisitions. Asking questions is crucial because doing so can reveal red flags that may otherwise be concealed. ATF training materials utilized by Fleet Farm addresses the need to ask questions,[230] stating that asking questions can prevent straw purchases.[231] According to Mr. McKown, Fleet Farm trains employees that asking questions during a firearms transaction aids in determining the lawfulness of the transaction.[232] Mr. Hoernke also testified that firearms sales associates were trained to ask probing questions of customers in order to determine the customers intent.[233] Nonetheless, a "Firearm Training Checklist" distributed by Mr. Radl does not list asking questions of a customer at all, even though the checklist contains a section on straw sales.[234]

And the evidence in this case shows that Fleet Farm employees did not consistently ask questions to evaluate the lawfulness of a firearms transaction. Indeed, Mr. Klebs testified that asking questions of a suspected straw buyer was not required.[235] Fleet Farm employees who made sales to Mr. Horton and/or Ms. Elwood indicated that asking questions was a good practice but could not remember if they asked questions of Ms. Elwood and Mr. Horton and could not identify any standard questions or any standard procedure.[236]

In addition to this, Fleet Farm compliance personnel testified that they trained employees to trust their gut, and Ms. Granato stated the policy was, "(i)f they have a gut feeling that something isn't right, we (Fleet Farm) tell them to refuse the sale."[237] It is apparent that Mr. Klebs felt the July 31, 2021, Fleet Farms firearms sale to Mr. Horton was suspicious. Mr. Klebs even contacted another Fleet Farm manager, Hunter Coil, who was not at work, on his personal cell phone to ask "if there were any updated company policies that I may have missed about a limit of how many firearms could be purchased in any given time period."[238] In an email that same day, Mr. Klebs reported his concerns to Michelle Granato and asked whether Fleet Farm should keep selling more firearms to Horton.[239] Ms. Granato never responded to Mr. Klebs' email and question.[240] And Fleet Farm stores continued to sell several more firearms to Mr. Horton. Mr. Klebs later testified that he was shocked when he learned Fleet Farm continued to sell firearms to Mr. Horton.[241] In short, Mr. Klebs had "a gut feeling that something isn't right," but still didn't feel like he could or should stop the sale of firearms to Mr. Horton on July 31, 2021.

Mr. Napier's report next asserts that ATF agent Williamson provided a "written response" to Fleet Farm exonerating Fleet Farm's actions in its firearms sales to Mr. Horton.[242] I have not seen proof of such a

---

[230] ATF0000800-82, at ATF0000816.

[231] Deposition Exhibit 4, ATF0000130-32, at ATF0000131.

[232] McKown Deposition at 59:4-11.

[233] Hoernke Deposition at 78:22–79:6.

[234] Deposition Exhibit 112, FF_0001331, FF_0002752-55.

[235] Klebs Deposition at 40.

[236] Nordquist Deposition at 43:5-6; Hallfielder Deposition at 121:23.

[237] Granato Deposition at 37:2-4.

[238] FF_0075711-12; Klebs Deposition at 161-63.

[239] FF_0075711-12; FF_0076301; FF_0076302-07; FF_0076308-13.

[240] FF_0075711-12; Klebs Deposition at 169–71.

[241] Klebs Deposition at 216:9-19.

[242] Napier Report at 42.

27

"written response." What I have seen is an email generated by Ms. Granato, providing her interpretation of a conversation she had with ATF agent Williamson.[243] It is this email written by Ms. Granato that Mr. Napier quotes in his report—not any writing from ATF. Ms. Granato's email, sent on 10/20/2021 at approximately 3:40pm, praising the work of the firearms compliance staff at Fleet Farm, was sent to her boss, Mr. Radl, and his boss, Mr. Hoernke.[244] This email was sent approximately one hour and 15 minutes after Mr. Radl sent an email to Mr. Hansen, Mr. Hoernke, and Mr. Bongard talking about a news article and saying Mr. Radl was hoping that a gun store employee who told the media they suspected Mr. Horton of straw purchasing was not a Fleet Farm employee.[245]

Regardless of the actual conversation ATF agent Williamson had with Ms. Granato, there was no way for ATF agent Williamson to know the entirety of the role Fleet Farm had with respect to the ATF's straw purchasing investigation because she only learned of Mr. Horton's existence on 10/11/2021.[246] Further, Mr. Napier suggests that any positive feedback to an FFL from ATF is unusual: "[I]n a lot of cases the ATF will not provide feedback on ongoing cases, give advice such as whether to proceed with a firearm transfer, or comment on the FFL's operations. Here, in contrast, it is notable that the ATF agent praised Fleet Farm for its cooperation in the investigation."[247] Based on my experience, however, it would not be uncommon for an ATF agent to compliment an FFL during a straw purchase investigation because FFL employees possess valuable information that aids in furtherance of these cases. It is much easier to further the investigation with civil discourse as opposed to an antagonistic relationship.

It also appears to me that Mr. Napier relies heavily on this non-existent written exoneration from ATF agent Williamson to Fleet Farm in forming his opinions in this case. Mr. Napier states that "(t)he written response from the ATF agent is above and beyond what I have typically seen (in these types of cases)."[248] Mr. Napier also says that, "in my experience, a statement from ATF to Fleet Farm that 'in no way did [Fleet Farm] do anything wrong by selling this individual the firearms' confirms my own analysis (that) there is nothing...that should have alerted Fleet Farm to the possibility that Horton was engaging in straw purchasing."[249] Mr. Napier's reliance on Ms. Granato's subjective account of her exchange with ATF agent Williamson is a significant flaw in his reasoning.

### Materials Reviewed

Materials I considered in forming my opinions are set forth in my initial expert report dated October 4, 2024. Additional materials I considered in forming my rebuttal opinions are identified above and in Appendix 1 to this report.

Date: 11/1/2024

Joseph Bisbee

---

[243] FF_0001484.

[244] Id.

[245] FF_0001330.

[246] Affidavit of Kylie Willamson, *United States of America v. Jerome Fletcher Horton, Jr.*, No. 21-MJ-764 HB, ECF No. 1-1 at 2–3 (D. Minn. October 18, 2021).

[247] Napier Report at 42.

[248] Id.

[249] Id.

Appendix 1

**Additional Materials Considered by Joseph L. Bisbee for November 1, 2024 Rebuttal Report**

**Production Numbers, Deposition Exhibit Numbers, or Description**
AGO0000207
AGO0000261
AGO0001903
ATF0000001
ATF0000003
ATF0000004
ATF0000076
ATF0000130
ATF0000172
ATF0000344
ATF0000384
ATF0000458
ATF0000544
ATF0000660
ATF0000691
ATF0000800
ATF0000961
ATF0000984
ATF0001067
ATF0001107
ATF000l1113
BGS0000005
Court Memorandum Opinion and Order Denying Plaintiff's Motion to Remand and Denying Defendant's
Court Order Re Motion to Compel Response - 07/29/2024
Declaration of Zachary J Wright in Support of Defendants' Motion to Compel - 07/12/2024
DKM0000012
FF_0000008
FF_0000012
FF_0000034
FF_0000049
FF_0000056
FF_0000101
FF_0000127
FF_0000201
FF_0000207
FF_0000208
FF_0000234
FF_0000238
FF_0000246
FF_0000254
FF_0000259

Appendix 1

FF_0000307
FF_0000311
FF_0000331
FF_0000363
FF_0000438
FF_0000467
FF_0000471
FF_0000479
FF_0000570
FF_0000574
FF_0000581
FF_0000588
FF_0000607
FF_0000614
FF_0000713
FF_0000860
FF_0000898
FF_0000906
FF_0000910
FF_0000922
FF_0000936
FF_0000955
FF_0001484
FF_0001485
FF_0001497
FF_0001499
FF_0001507
FF_0001514
FF_0001520
FF_0001531
FF_0001542
FF_0001547
FF_0001554
FF_0001781
FF_0001882
FF_0002315
FF_0002644
FF_0002730
FF_0002871
FF_0003424
FF_0003449
FF_0003450
FF_0005605
FF_0005654

Appendix 1

FF_0005711
FF_0005715
FF_0005730
FF_0005734
FF_0005745
FF_0005748
FF_0005754
FF_0005760
FF_0005769
FF_0005775
FF_0005790
FF_0005798
FF_0005802
FF_0005816
FF_0005820
FF_0005831
FF_0005944
FF_0013785
FF_0013793
FF_0013829
FF_0013856
FF_0013858
FF_0013860
FF_0013890
FF_0013893
FF_0013895
FF_0013896
FF_0013971
FF_0013972
FF_0013974
FF_0013977
FF_0014056
FF_0014058
FF_0014073
FF_0014087
FF_0014112
FF_0014155
FF_0014156
FF_0014167
FF_0014194
FF_0014233
FF_0014257
FF_0014262
FF_0014278

Appendix 1

FF_0014283
FF_0014345
FF_0014350
FF_0014352
FF_0014354
FF_0014373
FF_0014443
FF_0014453
FF_0014483
FF_0014484
FF_0014497
FF_0014574
FF_0014586
FF_0014641
FF_0014656
FF_0014671
FF_0014673
FF_0022785
FF_0024411
FF_0027663
FF_0027665
FF_0027681
FF_0027685
FF_0027688
FF_0027705
FF_0027987
FF_0027991
FF_0029069
FF_0029318
FF_0029543
FF_0029551
FF_0029555
FF_0029612
FF_0031753
FF_0032623
FF_0034514
FF_0035424
FF_0035701
FF_0035710
FF_0035899
FF_0036009
FF_0036010
FF_0036011
FF_0036343

Appendix 1

FF_0036416
FF_0036419
FF_0036479
FF_0036513
FF_0037002
FF_0037514
FF_0037517
FF_0037694
FF_0037695
FF_0037696
FF_0037697
FF_0037698
FF_0037699
FF_0037700
FF_0037701
FF_0037702
FF_0037703
FF_0037704
FF_0037705
FF_0037706
FF_0037707
FF_0037708
FF_0037709
FF_0037710
FF_0037711
FF_0037712
FF_0037713
FF_0037714
FF_0037715
FF_0037716
FF_0037717
FF_0037718
FF_0037719
FF_0037720
FF_0037721
FF_0037722
FF_0037723
FF_0037724
FF_0037725
FF_0037726
FF_0037727
FF_0037728
FF_0037729
FF_0037730

Appendix 1

FF_0037731
FF_0037732
FF_0037733
FF_0037734
FF_0037735
FF_0037736
FF_0037737
FF_0037738
FF_0037739
FF_0037740
FF_0037741
FF_0037742
FF_0037743
FF_0037744
FF_0037745
FF_0037746
FF_0037747
FF_0037748
FF_0037749
FF_0037750
FF_0037751
FF_0037752
FF_0037753
FF_0037754
FF_0037755
FF_0037756
FF_0037757
FF_0037758
FF_0037759
FF_0037760
FF_0037761
FF_0037762
FF_0037763
FF_0037764
FF_0037765
FF_0039242
FF_0039254
FF_0039263
FF_0039268
FF_0039273
FF_0039275
FF_0039278
FF_0040770
FF_0040797

Appendix 1

FF_0040813

FF_0040832

FF_0040898

FF_0041016

FF_0041024

FF_0041030

FF_0041058

FF_0042289

FF_0075708

FF_0075710

FF_0075711

FF_0075713

FF_0075792

FF_0075793

FF_0075794

FF_0076414

Fleet Farm's Amended Responses and Objections to Interrogatory Nos. 5, 7, 9, 14, and 15 - 08/23/2024

Fleet Farm's Amended Responses and Objections to ROG Nos. 2, 6, and 13 - 02/17/2024

Fleet Farm's Initial Disclosures - 08/10/2023

Fleet Farm's Responses and Objections to Plaintiff's First Set of Interrogatories - 08/21/2023

Fleet Farm's Supplemental Responses and Objections to Interrogatory Nos. 2 and 6 - 08/14/2024

FS0000001

RF0000001

SG0000004

State of Minnesota Initial Disclosures - 08/10/2023

State of Minnesota Memorandum in Support of Defendants' Motion to Compel - 07/12/2024

State of Minnesota Response to Fleet Farm's First Set of Interrogatories - 12/04/2023

State of Minnesota Supplemental Responses to Defendants' First Set of Interrogatories - 08/02/2024

TMS0000001