## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison,<br><br>        Plaintiff,<br><br>    v.<br><br>Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,<br><br>        Defendants. | Case No.: 0:22-cv-02694-JRT-JFD |

## FLEET FARM'S OPPOSITION TO MOTION TO EXCLUDE EXPERT TESTIMONY OF GARY KLECK

## T<small>ABLE OF</small> C<small>ONTENTS</small>

I<small>NTRODUCTION</small>.................................................................................................. 1

B<small>ACKGROUND</small> ................................................................................................ 2

   I.   The State asserted broad claims against Fleet Farm ........................................ 2

   II.  Fleet Farm offers Dr. Gary Kleck to provide expert statistical analysis on three topics directly relevant to the State's claims .............................. 6

A<small>RGUMENT</small> ...................................................................................................... 11

   I.   Each of Dr. Kleck's opinions is relevant to the State's claims........................ 11

        A.   Dr. Kleck's first opinion is relevant to the State's pleaded theory that Fleet Farm caused certain societal harms ................................ 12

        B.   Dr. Kleck's unrebutted second opinion is relevant to the State's causation theories against Fleet Farm........................................ 13

        C.   Dr. Kleck's third opinion is relevant to the State's claim that Fleet Farm "knew or should have known" Elwood and Horton were straw purchasing........................................................................ 15

   II.  Dr. Kleck's opinions have adequate factual bases and are reliable ................. 17

        A.   Dr. Kleck's first opinion reflects a reliable statistical analysis, and does not ignore purportedly contradictory sources ................... 17

        B.   Dr. Kleck's unrebutted second opinion is based on sufficient facts and a reliable statistical analysis............................................ 22

        C.   Dr. Kleck's third opinion is reliable and has an adequate foundation ................................................................................ 25

C<small>ONCLUSION</small> .................................................................................................. 27

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advance Brands, LLC v. Alkar-Rapidpak, Inc.*,
  2011 WL 2144481 (N.D. Iowa May 31, 2011) ........................................................... 13

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) ............................................................................ 20

*Dangaard v. Instagram, LLC*,
  2024 WL 4281400 (N.D. Cal. Sept. 23, 2024) ........................................................... 20

*Hangarter v. Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ..................................................................................... 20

*Huggins v. Stryker Corp.*,
  932 F. Supp. 2d 972 (D. Minn. 2013) ........................................................................ 17

*Jones v. City of Faribault*,
  2021 WL 638039 (D. Minn. Feb. 18, 2021) ......................................................... 19, 24

*Mack v. Viking Ski Shop, Inc.*,
  19 N.E.3d 1013 (Ill. App. Ct. 2014) ......................................................................... 15

*McDougall v. CRC Indus., Inc.*,
  2023 WL 5515827 (D. Minn. Aug. 25, 2023) ........................................................... 12

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
  662 F. Supp. 3d 557 (D. Md. 2023), *aff'd* 91 F.4th 238 (4th Cir. 2024) ..................... 11

*Minnesota v. Fleet Farm LLC*,
  679 F. Supp. 3d 825 (D. Minn. 2023) .......................................................................... 3

*Murphy v. Wheelock*,
  2019 WL 3719035 (D. Minn. Aug. 7, 2019) .............................................................. 20

*Musket Corp. v. Star Fuel of Okla., LLC*,
  2012 WL 4758082 (W.D. Okla. Oct. 5, 2012) ........................................................... 20

*Newport v. United States*,
  2025 WL 579188 (E.D. Cal. Feb. 21, 2025) ............................................................... 14

*Osborne v. Twin Town Bowl, Inc.*,
 749 N.W.2d 367 (Minn. 2008) ................................................................. 12, 14

*Estate of Pesante ex rel. Pesante v. Geneva Med. Grp., LLP*,
 2002 WL 398517 (N.Y. Super. Ct. Mar. 11, 2002) ....................................... 14

*In re Pork Antitrust Litig.*,
 2024 WL 2060386 (D. Minn. May 8, 2024) ............................................ 11, 12

*Reichel v. Wendland Utz, LTD*,
 11 N.W.3d 602 (Minn. 2024) ...................................................................... 15

*Romero-Lorenzo v. Koehn*,
 665 F. Supp. 3d 1056 (D. Ariz. 2023) ........................................................ 20

*Rygwall v. ACR Homes, Inc.*,
 6 N.W.3d 416 (Minn. 2024) ........................................................................ 15

*Seals v. Children's Healthcare*,
 2024 WL 5355335 (Minn. Dist. Ct. Sept. 13, 2024) ..................................... 15

*SECURA Ins. Co. v. Deere & Co.*,
 674 F. Supp. 3d 603 (D. Minn. 2023) .......................................................... 20

*United States v. Vesey*,
 338 F.3d 913 (8th Cir. 2003) ...................................................................... 19

*Wendt v. Charter Commc'ns, LLC*,
 2014 WL 12712352 (D. Minn. Oct. 31, 2014) ............................................. 12

*Williams v. Tidgwell*,
 2017 WL 6062897 (D. Minn. July 26, 2017) ............................................... 13

*Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*,
 649 F. Supp. 3d 780 (D. Minn. 2023) .................................................... 17, 24

**Statutes**

Minn. Stat. § 609.74 ......................................................................................... 3

**Court Rules**

Fed. R. Evid. 702 ............................................................................................ 17

## INTRODUCTION

The State of Minnesota's motion to exclude Dr. Gary Kleck is remarkable, insofar as it concedes that much of the State's initial legal theory against Fleet Farm was wrong. In contrast to its complaint, which asserted Fleet Farm—and Fleet Farm alone—was responsible for causing a gun trafficking epidemic in Minnesota, the State now acknowledges, as it must, that:

- Its "claims [now] pertain only to guns Fleet Farm sold to two known straw purchasers";

- It "will not be seeking to prove the *general* prevalence of straw purchasing and its connection to future crime at trial in this case";

- It is "no longer seeking compensatory damages … or an abatement fund"; and

- Its case no longer concerns "how 'significant' the impact of Fleet Farm's sales were [sic] on gun trafficking and violent crime" statewide.

ECF Doc. 187 ("State's Br.") at 10, 12-13, 19. According to the State, although it does not dispute Dr. Kleck is qualified to offer the opinions in his expert report, its abandonment of much of its legal theory against Fleet Farm somehow renders his opinions irrelevant. The State also contends certain of Dr. Kleck's opinions lack an adequate foundation or reliability. Neither argument is a valid basis for excluding Dr. Kleck's opinions.

*First*, each of Dr. Kleck's opinions is directly relevant to a central legal question in this case. In brief, Dr. Kleck's first opinion is "[t]here is no reliable and relevant evidence showing that straw purchases provide a significant source of guns used to commit crimes." ECF Doc. 190-1 ("Kleck Report") at 4. This opinion is directly relevant to the State's pleaded theory that straw purchases from Fleet Farm stores caused an increase in "crime

guns and gun trafficking" or "gun violence" in Minnesota. ECF Doc. 79 ("Compl.") ¶¶ 62-69.[1] Dr. Kleck's second opinion is that "[t]he straw purchases of Horton and Elwood cannot be shown to be a significant cause of the alleged increase in gun trafficking or gun crime in Minnesota," and "there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources." Kleck Report at 9. This opinion speaks directly to the problems with the State's causation theory, as explained in Fleet Farm's summary judgment papers. *See* ECF Doc. 200 at 17-18. And Dr. Kleck's third opinion is that, statistically, "multiple gun sales are routine and commonplace" and "guns sold in multiples are no more likely to later be used in crimes than guns sold one at a time." Kleck Report at 11. This opinion is directly relevant to whether Fleet Farm "should have known" Elwood or Horton were straw purchasing from its stores.

*Second*, the State challenges the foundation and reliability of Dr. Kleck's opinions, but its arguments amount to little more than quibbles with the weight to afford certain opinions. The State's disagreement with Dr. Kleck's analysis is not a valid basis for exclusion under Rule 702.

## BACKGROUND

### I.    The State asserted broad claims against Fleet Farm.

The operative complaint asserts a broad set of claims against Fleet Farm. As relevant here, the State contends that "gun trafficking and gun violence surged in Minnesota during the pandemic," that Fleet Farm "repeatedly sold handguns to straw

---

[1] The State appears to have disavowed this pleaded theory, but as of today, it remains in the case.

purchasers," and that these handguns "pose an ongoing threat to the health and safety of Minnesotans." Compl. ¶¶ 1-2. The complaint alleges that, by way of example, Fleet Farm sold firearms to two convicted straw purchasers, Sarah Elwood and Jerome Horton, and that one firearm purchased by Horton was ultimately used by a non-party in a gunfight. *See id.* ¶¶ 34-61.

The State then devotes five pages of its complaint to alleging that "Minnesota Gun Trafficking and Gun Violence Rose During the COVID-19 Pandemic When Fleet Farm Sold Firearms to Straw Purchasers." *Id.* ¶¶ 62-69. Specifically, the State alleges that "[o]f the different ways that firearms can get into the hands of criminals, 'straw purchasing' is one of the most prevalent and concerning," that there is "an upward trend of the number of crime guns in Minnesota traced by the ATF," and that "[t]he number of Minnesota crime guns with very short times to crime has grown exponentially in recent years." *Id.* ¶¶ 62-64. The State contends that between 2019 and 2021, there was "a 168% increase in Minnesota crime guns being recovered with a time to crime of six months or less," and "the majority of crime guns in Minnesota are purchased in Minnesota." *Id.* ¶¶ 65-66. This "rise in crime guns and gun trafficking," the State asserts, "correlates to an increase in gun violence" in Minnesota. *Id.* ¶¶ 67-69.

Based largely on these allegations, the State advances, among other claims, a claim under Minnesota's criminal public-nuisance statute, Minn. Stat. § 609.74. *Id.* ¶¶ 104-13; *see also Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 844 (D. Minn. 2023) (concluding the State's public-nuisance claim survived motion to dismiss based on allegations that "Fleet Farm's conduct contributes to the rise in gun crimes and that

between 2019 and 2021 there was a 168% increase in guns being recovered as part of a crime within six months from purchase"). Here, the State asserts Fleet Farm's conduct "w[as] a ***substantial factor*** in maintaining or permitting[] a public nuisance that has annoyed, injured, and endangered … the common right of public health … of ***considerable*** members of the public." Compl. ¶ 107 (emphases added). The State's asserted "nuisance" is the alleged "illegal secondary market for firearms that contributed to unlawful possession of firearms and firearm violence" and "unlawful proliferation of firearms" in Minnesota, and the State claims that "[w]ithout [Fleet Farm's] conduct, firearm possession, misuse, injury, and death would not have been so widespread." *Id.* ¶¶ 108-09. According to the State, Fleet Farm's conduct amounted to "pervasive" and "widespread interference with public rights and privileges." *Id.* ¶ 113.[2]

As detailed in Fleet Farm's summary judgment papers, discovery has established these contentions have no evidentiary support. *See* ECF Doc. 200. There is no evidence of widespread straw purchasing from Fleet Farm's stores, and the State has confirmed Elwood and Horton are the ***only*** individuals who successfully straw purchased from Fleet Farm's Minnesota stores. *See id.* at 4-5, 7. And the State's own expert agrees Fleet Farm never "willfully" or "knowingly" allowed a straw purchase to occur. *See id.* at 7; ECF

---

[2] The State has reiterated the broad nature of its claims against Fleet Farm throughout this case, asserting its "claims are not limited to the two straw purchasers identified in the complaint … or so-called analogous purchasing patterns," and that it was "alleg[ing] ongoing claims of negligence and other torts based on selling guns to straw purchasers" such that "[t]he nature of [its] claims are not limited to the facts of Horton and Elwood." ECF Doc. 90 at 6:2-4, 23:21-24, 25:25-26:2.

Doc. 205-4 at 133. In short, the State's initial theory of the case was wrong, and the State concedes this in its motion, admitting:

- "[T]he State's claims [now] pertain only to guns Fleet Farm sold to two known straw purchasers";

- It "will not be seeking to prove the *general* prevalence of straw purchasing and its connection to future crime at trial in this case";

- Its claims are limited to "Fleet Farm's role and knowledge[3] in selling firearms to two straw buyers, and the consequences of those sales";

- It "is no longer seeking compensatory damages on behalf of the State or an abatement fund/payment in this case";

- It is not asserting any "connection between straw purchasing and future crime";

- It will not present evidence regarding "[t]he general frequency or likelihood of a straw-purchased firearm later being used in a crime";

- It is no longer "focused on how 'significant' the impact of Fleet Farm's sales were [sic] on gun trafficking and violent crime" statewide; and

- Its case does not concern "the probability of guns being sold in multiple-gun sales being later used in a crime."

State's Br. 10, 12-13, 19, 23.

But the State has refused to formally narrow its claims to reflect these realities.[4] Today, the State's case still contains allegations of widespread societal harms purportedly caused by Fleet Farm's alleged conduct. *See* Compl. ¶¶ 1-2, 62-69, 108-13.

---

[3] The State does not acknowledge that ***its own expert*** believes that Fleet Farm never "willfully" or "knowingly" allowed a straw purchase to occur. ECF Doc. 205-4 at 133.

[4] As detailed in Fleet Farm's opposition to the State's motion for summary judgment on certain affirmative defenses, the State recently rejected a proposed joint stipulation wherein, among other things, the State would formally disavow any effort to recover the "damages" or "monetary relief" pleaded in paragraphs 4 and 6 of its Requested Relief.

II.    **Fleet Farm offers Dr. Gary Kleck to provide expert statistical analysis on three topics directly relevant to the State's claims.**

Fleet Farm offers three experts in this case: (1) Andrew Graham, a former ATF Deputy Assistant Director of Industry Operations, to testify regarding ATF regulations and guidance concerning straw-purchase detection and prevention; (2) William Napier, an expert on industry practices and standards regarding straw-purchase detection and prevention, and Fleet Farm's compliance with the same; and (3) Dr. Gary Kleck, an Emeritus Professor of Criminology & Criminal Justice at Florida State University, *see* Kleck Report at 2.   Dr. Kleck holds a doctorate in sociology, has spent his career researching "the impact of firearms and gun control on violence," and has published countless books, reviews, and scholarly research articles on the subject.  *See id.*  Dr. Kleck has also "taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology."  *Id.* at 3.  In his expert report, Dr. Kleck offers three opinions driven by statistical analyses.

*First*, Dr. Kleck opines that straw-purchased handguns are "at best a negligible source of guns" used to commit violent crimes and "[t]here is no reliable and relevant evidence showing that straw purchases provide a significant source of guns used to commit crimes."   Kleck Report at 4; *see also* ECF Doc. 190-2 ("Kleck Tr.") at 79:20-80:15 (confirming his first opinion addresses "violent crimes," and explaining "[t]he phrase commit crimes really doesn't make sense in connection with other crimes besides violent

crimes").[5]  This opinion speaks primarily to the section of the State's complaint titled "Minnesota Gun Trafficking and Gun Violence Rose During the COVID-19 Pandemic When Fleet Farm Sold Firearms to Straw Purchasers," which purports to detail the "increase in Minnesota crime guns being recovered with a time to crime of six months or less," "recent rise in crime guns and gun trafficking," and "increase in gun violence," and attribute these increases to Fleet Farm's alleged conduct.  Compl. ¶¶ 62-69.  Dr. Kleck explains it would be error to attribute these increases to Fleet Farm because, among other reasons, "guns known to have been straw purchased claim a negligible share of the firearms acquired by criminals."  Kleck Report at 9.

As part of this opinion, Dr. Kleck explains the source offered by the State to claim that straw purchasing is "the most common channel for the diversion of firearms into the black market" is flawed, as it "does not address the relative prevalence of different modes of criminal gun acquisition, nor was it intended to do so."  *Id.* at 5.  Dr. Kleck explains "data on ATF investigations … cannot be … used to assess the prevalence of a given channel or source of crime guns" because ATF "does not analyze representative samples of crime guns, or the channels used to move guns from legal sources to criminals," and does not otherwise "ensure that they [are] analyzing a ***representative sample*** of crime guns or the channels through which they move . . . to criminals."  *Id.* at 5-6 (emphasis added).

---

[5] The State asserts this clarification was "haphazardly explained by [Dr.] Kleck in his deposition."  State's Br. 11.  Not so.  The State fails to mention that its counsel questioned Dr. Kleck regarding the distinction between "violent" and "nonviolent" crime for more than a dozen pages of the deposition transcript, and that counsel indicated his clear understanding that "[Dr. Kleck's] analysis is focused on violent crimes."  Kleck Tr. 78:17-88:25, 92:5-93:24, 189:6-190:14.

Instead, ATF investigatory data "necessarily reflect[s] how 'discoverable' potential channels or sources of crime guns are." *Id.* at 6. Dr. Kleck thus concludes the State lacks the foundation to assert "straw purchasing of guns from FFLs is one of 'the most prevalent ways that firearms can get into the hands of criminals.'" *Id.* at 6 (citing Compl. ¶ 62). And Dr. Kleck explains his own statistical analysis indicates the percentage of guns "known to have been straw-purchased" is between 0.699% and 2.2% of all "guns acquired by criminals per year." *Id.* at 7-8.

**Second**, Dr. Kleck opines "[t]he straw purchases of Horton and Elwood cannot be shown to be a significant cause of the alleged increase in gun trafficking or gun crime in Minnesota," and "there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve straw purchasing." *Id.* at 9. In support of this opinion, Dr. Kleck explains the most recent available data indicates there were "15,840 violent crimes committed with firearms in Minnesota" from 2021 to 2023, and even assuming "every single one of the[] 37 guns [sold to Elwood and Horton] was used to commit a violent crime, all of them in Minnesota," those firearms "would have claimed, at most, 0.234% – *just 1 in 428* – of the violent crimes committed with firearms in Minnesota" over that period. *Id.* at 10 (emphasis in original). Dr. Kleck opines "[t]his is far too small a share of the state's violent firearm crime problem to have had any detectable impact on the violent crime rate." *Id.*; *see also* Kleck Tr. 205:10-18, 207:14-17 (explaining his opinion that "hypothetically assum[ing] that all of the 37 guns [Elwood and Horton] straw purchased were later used to commit a violent crime,"

that "wouldn't generate a measureable increase in crime [in Minnesota] over what it would have been without those straw purchased guns").[6]

Dr. Kleck also relies on scholarly articles to explain "there is no reason to believe that any of the persons who purchased the[] 37 guns [from Horton and Elwood] could not have acquired firearms from other sources other than a straw purchaser," as "most [criminals] who ha[ve] acquired guns ha[ve] multiple sources that they [can use] to acquire guns." Kleck Report at 11. "Put another way," Dr. Kleck explains, "it is possible that **none** of those who acquired these guns [from Horton and Elwood] became armed with firearms **only because of** the actions of straw purchasers." *Id.* (second emphasis added); *see also* Kleck Tr. 209:5-210:5, 211:13-19 (explaining "every … criminal[] who acquired a gun via straw purchasing could have acquired it from another source," and "it's …easy for people to get ahold of guns," so there is "no reason to think that those who want[ed] guns from these two straw purchasers" could not have obtained them from other sources).

The State's sole expert, former ATF special agent Joseph Bisbee, does not dispute any aspect of Dr. Kleck's second opinion. *See* ECF Doc. 205-5 at 15-17.

**Third**, Dr. Kleck opines that, from a statistical standpoint, "multiple gun sales are routine and commonplace" occurrences and "rarely involve guns later used to commit

---

[6] In this portion of his opinion, Dr. Kleck also explains, generally speaking, crime statistics indicate "just 2.5% of all the guns acquired by criminals" are ultimately "used to commit violent crimes." Kleck Report at 10. Dr. Kleck calculated this figure by dividing the average number of violent crimes in a year by the approximate number of firearms acquired by criminals over the previous ten years. *See id.* at 10-11. Dr. Kleck explained that he used a ten-year lookback period because "[m]any of the guns used to commit violent crimes in 2022 were acquired in some year prior to 2022." *Id.* at 10.

crimes," and "guns sold in multiples are no more likely to later be used in crimes than guns sold one at a time." Kleck Report at 11. Here, Dr. Kleck explains roughly one-quarter of all firearm transactions involve multiple guns, so "there is … no reason for gun store employees to perceive attempts to buy multiple guns at the same time as noteworthy or for such attempts to stand out as suspicious, *absent other suspicious indicators*." *Id.* at 12 (emphasis added). Dr. Kleck also explained there is no statistically significant difference between incidences of "single-sale handguns" and "multiple-sale handguns" being recovered by law enforcement. *See id.* In fact, data indicates "handguns sold in batches were actually slightly *less* likely to be later used in crime than handguns sold one at a time." *Id.* (emphasis in original). Accordingly, Dr. Kleck opines "[t]he sales referenced in the Complaint"—*i.e.*, the sales to Elwood and Horton—"do not indicate a suspicious purchasing pattern" because "there is no basis for Fleet Farm employees to be suspicious of firearm customers *solely* because customers may purchase more than one gun in a single transaction." *Id.* at 13 (emphasis added). On this last point, *the State's expert appears to agree. See* Decl. of Andrew W. Davis ("Davis Decl."), Ex. E at 180:1-181:20 (agreeing "if someone came in and purchased two guns in a single transaction" and then "came back … a week later and purchased two more," "without any more facts," that "would not necessarily cause the sale to be stopped").

At his deposition, Dr. Kleck confirmed that, among other things, this opinion speaks to whether "employees of Fleet Farm should have known that they were being asked [by Horton and Elwood] to do straw purchases," and that statistically speaking, "there's no rational basis for thinking sales of multiple guns at the same time, of two or three, are

suspect" or are "more likely to later be used to commit crime."  Kleck Tr. 212:19-213:14;
*see also id.* at 217:21-24 (testifying that statistically "[t]here's no affirmative evidence that
[purchasing multiple guns of the same caliber is] in fact likely to be an indicator of a gun
that is either a part of a straw purchase or [is] likely to be later used to commit a crime").[7]

### ARGUMENT

The State does not challenge Dr. Kleck's qualifications.  Nor does it offer any expert
testimony of its own to rebut most of Dr. Kleck's report, including the entirety of his second
opinion.  Instead, the State argues each of Dr. Kleck's opinions is irrelevant and either
lacks an adequate foundation or is unreliable.  These arguments fail because, at best, the
issues raised in the State's motion may be addressed at trial, on cross-examination.[8]

**I.    Each of Dr. Kleck's opinions is relevant to the State's claims.**

Expert testimony is admissible if it is "relevant to the task at hand."  *In re Pork
Antitrust Litig.*, 2024 WL 2060386, at *6 (D. Minn. May 8, 2024) (quotation omitted).  An

---

[7] To be clear, despite the State's unsupported assertion to the contrary, Dr. Kleck is not
opining on "the propriety of regulating firearms in general."  State's Br. 1.

[8] The State notes Dr. Kleck's testimony has been excluded one time (out of more than
twenty instances of offering expert testimony, *see* Kleck Tr. 29:23-30:2).  *See* State's Br.
3, 28-29 (citing *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 662 F. Supp. 3d 557 (D. Md.
2023), *aff'd* 91 F.4th 238 (4th Cir. 2024)).  *Maryland Shall Issue* concerned a First
Amendment challenge to a county ordinance "requiring gun shop owners to provide
literature to firearms customers regarding suicide prevention and nonviolent conflict
resolution."  662 F. Supp. 3d at 563.  Dr. Kleck's report addressed "one specific statement"
in the challenged literature, explaining that he interpreted the literature's "listing access to
firearms as a 'risk factor' [as] infer[ring] that it is a *causal* factor," and opining that causal
inference was inaccurate.  *Id.* at 578-79.  In excluding Dr. Kleck's opinion, the court did
not question his qualifications and did not address the soundness of his causal analysis.
*See id.*  Instead, it concluded the challenged literature "specifically avoids making any
causal accusation," rendering Dr. Kleck's causation analysis irrelevant.  *Id.* at 578.
*Maryland Shall Issue* has no bearing on the issues presented in the State's motion.

- 11 -

opinion is relevant if it is "sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute." *Id.* (quotation omitted). At the Rule 702 stage, the relevancy inquiry "is a flexible one," *McDougall v. CRC Indus., Inc.*, 2023 WL 5515827, at *13 (D. Minn. Aug. 25, 2023), and is a "low standard," *Wendt v. Charter Commc'ns, LLC*, 2014 WL 12712352, at *1 (D. Minn. Oct. 31, 2014).

A.    **Dr. Kleck's first opinion is relevant to the State's pleaded theory that Fleet Farm caused certain societal harms.**

Dr. Kleck's first opinion is straw-purchased handguns are "at best a negligible source of guns" used to commit violent crimes and "[t]here is no reliable and relevant evidence showing that straw purchases provide a significant source of guns used to commit crimes." Kleck Report at 4. This opinion is relevant to the theory of general societal harm pleaded in the complaint. If the State argues at trial that Fleet Farm is responsible for any "increase in Minnesota crime guns being recovered with a time to crime of six months or less," "recent rise in crime guns and gun trafficking," or "increase in gun violence," Compl. ¶¶ 62-69, Fleet Farm is entitled to present expert testimony that its alleged sales to straw purchasers cannot be considered a statistically significant contributor to such harms. If Fleet Farm's sales are not a significant factor contributing to these harms, definitionally, it cannot be held liable for these harms. *E.g.*, *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 372 (Minn. 2008) (holding proximate cause is lacking if defendant's conduct was not a "substantial factor" in causing the alleged harm); *see also* ECF Doc. 200 at 16-17.

The State has ostensibly abandoned the theory of general societal harm and public-nuisance pleaded in the complaint. *See* State's Br. 12 (representing it "will not be seeking

to prove the *general* prevalence of straw purchasing and its connection to future crime at trial"), *id.* at 13 (representing it is not asserting any "connection between straw purchasing and future crime"), *id.* (conceding it will not present evidence regarding "[t]he general frequency or likelihood of a straw-purchased firearm later being used in a crime"), *and id.* at 19 (conceding its case no longer "focuse[s] on how 'significant' the impact of Fleet Farm's sales were [sic] on gun trafficking and violent crime" statewide).   But until the State's case is **formally** narrowed—by Court Order or stipulation—such that the State may not (1) introduce any evidence of alleged harm other than harm it contends was caused by criminals using handguns first purchased by Elwood or Horton, or (2) recover for the alleged nuisance pleaded in the complaint, Dr. Kleck's first opinion remains relevant.

Accordingly, this Court should deny the State's motion as to Dr. Kleck's first opinion or—at minimum—defer a decision on relevance until after the State has completed the presentation of its case-in-chief at trial.  *E.g.*, *Williams v. Tidgwell*, 2017 WL 6062897, at *2 (D. Minn. July 26, 2017) (deferring decision on admissibility of "specific testimony" of expert "until it is presented at trial"); *Advance Brands, LLC v. Alkar-Rapidpak, Inc.*, 2011 WL 2144481, at *5 (N.D. Iowa May 31, 2011) (reserving ruling on motion "because the court will be in a better position to determine the admissibility of [the expert]'s testimony regarding specific issues as those issues arise at trial").

### B.  Dr. Kleck's unrebutted second opinion is relevant to the State's causation theories against Fleet Farm.

Dr. Kleck's second opinion contains two parts: (1) "[t]he straw purchases of Horton and Elwood cannot be shown to be a significant cause of the alleged increase in gun

- 13 -

trafficking or gun crime in Minnesota"; and (2) "there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve straw purchasing." Kleck Report at 9. This opinion is relevant to the question of causation.

**First**, as noted above, the State's case has narrowed to focus only on certain sales to Elwood and Horton. *Supra* pp. 3-4; *see also* State's Br. 10 (conceding "the State's claims [now] pertain only to guns Fleet Farm sold to two known straw purchasers"). But to the extent the State continues to assert that, notwithstanding this narrowing, Fleet Farm is responsible for causing any increase in gun trafficking or gun violence in Minnesota, Dr. Kleck's testimony rebuts such an assertion, so is directly relevant to the question of causation. *E.g.*, *Osborne*, 749 N.W.2d at 372. Indeed, there is no evidence in the record disputing this opinion, which provides a basis for granting summary judgment for lack of proximate causation. *See* ECF Doc. 200 at 17; *see also, e.g.*, *Newport v. United States*, 2025 WL 579188, at *5 (E.D. Cal. Feb. 21, 2025) (granting summary judgment where unrebutted expert testimony established defendant's alleged conduct was "not a substantial factor in causing Plaintiff's alleged injuries"); *Estate of Pesante ex rel. Pesante v. Geneva Med. Grp., LLP*, 2002 WL 398517, at *5 (N.Y. Super. Ct. Mar. 11, 2002) (granting summary judgment where unrebutted expert testimony established defendants' conduct was not "a substantial factor in bringing about" decedent's injuries).

**Second**, to the extent the State's claims are now limited to alleged harms resulting from the Truck Yard gunfight, Dr. Kleck's testimony remains relevant to the causation question. Under Minnesota law, a defendant is not a proximate cause of a harm "if the

harm would have occurred even without the negligent act." *Reichel v. Wendland Utz, LTD*, 11 N.W.3d 602, 613 (Minn. 2024) (quoting *George v. Est. of Baker*, 724 N.W.2d 1, 11 (Minn. 2006)). And it is the State's burden to prove "the harm would not have occurred without the negligent act." *Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416, 429 (Minn. 2024). Dr. Kleck's unrebutted testimony that "there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve straw purchasing" from Fleet Farm is directly relevant to assessing whether the State can meet its burden. This unrebutted testimony also provides a basis for granting summary judgment for Fleet Farm for lack of proximate causation. *See* ECF Doc. 200 at 18; *see also, e.g.*, *Seals v. Children's Healthcare*, 2024 WL 5355335, at *6-7 (Minn. Dist. Ct. Sept. 13, 2024) (granting summary judgment for lack of causation where plaintiff could not "convince the jury, without speculation, that the harm would not have occurred without the negligent act" (cleaned up)); *Mack v. Viking Ski Shop, Inc.*, 19 N.E.3d 1013, 1019 (Ill. App. Ct. 2014) (granting summary judgment where plaintiff "fail[ed] to establish that *but for* defendant's negligence … [the] injury would not have occurred").

### C.   Dr. Kleck's third opinion is relevant to the State's claim that Fleet Farm "knew or should have known" Elwood and Horton were straw purchasing.

Dr. Kleck's third opinion is that, statistically, "multiple gun sales are routine and commonplace" occurrences and "rarely involve guns later used to commit crimes," and "guns sold in multiples are no more likely to later be used in crimes than guns sold one at a time." Kleck Report at 11. This opinion speaks to a core issue in this case: whether Fleet Farm "should have known" Elwood or Horton were straw purchasing during their

transactions.[9]  Indeed, a key question in this case is whether a person seeking to purchase multiple handguns in a single transaction is, ***standing alone***, reason to suspect a straw purchase and deny a sale.  Fleet Farm has offered expert testimony that "the volume of firearms purchased, in a single transaction or over a period of time, is not, standing alone, an indicator of possible straw purchasing."  *See* Davis Decl., Ex. A at 17 (emphasis added); *see also id.*, Ex. B at 19, 66; *id.*, Ex. C at 3; *id.*, Ex. D at 1-2; *see also* Ex. E at 180:1-181:20 (the State's expert agreeing).[10]  Dr. Kleck's third opinion will help the factfinder understand ***why*** this is the case—*i.e.*, that one reason purchasing multiple handguns is not alone reason to deny a sale is because, statistically, a handgun purchased as part of a multiple-handgun transaction is "no more likely to later be used in crimes than" a handgun purchased as part of a single-handgun transaction.  Kleck Report at 11.  Specifically, this opinion will aid the factfinder in assessing: (1) whether Fleet Farm was appropriately training its employees on how to monitor for and prevent straw purchases; (2) whether Fleet Farm had a basis to stop any of the sales to Elwood and Horton; and (3) specifically, whether Fleet Farm had a basis to stop sales where the ***sole*** alleged red flag of straw purchasing is that the transaction involved multiple handguns, *e.g.*, ECF Doc. 206 at 16.

---

[9] Although the State's complaint asserts Fleet Farm "***knew*** or should have known" Elwood and Horton were straw purchasing (*see* Compl. ¶¶ 36, 72-73, 89-90, 99, 107, 119 (emphasis added)), the State's own expert has confirmed Fleet Farm did not "willfully [or] knowingly allow[] a straw purchase" to occur, ECF Doc. 205-4 at 133.

[10] At all relevant times, Fleet Farm trained its employees that seeking to purchase multiple handguns is one warning sign of a potential straw purchase.  *E.g.*, ECF Doc. 203-20 at 6, 8; ECF Doc. 203-21 at 9; ECF Doc. 205-6 at 5, 7, 12, 20-21.

**II.    Dr. Kleck's opinions have adequate factual bases and are reliable.**

Rule 702 provides that expert testimony is admissible where it "is the product of reliable principles and methods" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d).  The State attempts to challenge the reliability of Dr. Kleck's opinions by disputing certain of his statistical analyses, and whether certain of his opinions have adequate support.  *See* State's Br. 14-18, 21-23, 23-28.  The State offers ***zero*** authority supporting the notion that these challenges are reason to exclude Dr. Kleck's testimony in its entirety.  Nor could it, as "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 994-95 (D. Minn. 2013).  The State's quibbles with Dr. Kleck's opinions are quintessential credibility arguments that do not provide a basis for exclusion.  *E.g.*, *Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 649 F. Supp. 3d 780, 800 (D. Minn. 2023) ("Because any purported flaws in [expert]'s analysis can be addressed through cross-examination and the presentation of contrary evidence, exclusion of [expert]'s opinions is unwarranted.").

**A.    Dr. Kleck's first opinion reflects a reliable statistical analysis, and does not ignore purportedly contradictory sources.**

The State argues that Dr. Kleck's first opinion lacks an adequate factual basis and reliability because the State: (1) disagrees with Dr. Kleck's criticisms of an ATF report cited in the complaint, (2) disagrees with Dr. Kleck's statistical analysis of the *de minimis* percentage of guns acquired by criminals through straw purchasing, and (3) wrongly

believes Dr. Kleck did not consider purportedly contradictory articles in forming his opinion. *See* State's Br. 14-18. These arguments fall flat because, at best, they speak to the weight the factfinder may decide to afford Dr. Kleck's testimony, not admissibility.

*First*, the State disputes Dr. Kleck's assessment of the ATF report cited in paragraph 62 of its complaint, contending "what the AGO pled" from the report "was factual, uncontroversial, and taken straight from published ATF reporting on ATF's own investigations." *Id.* at 14. By the State's own admission, this is an attack on the factual basis for Dr. Kleck's opinion, which is properly left for trial. And Dr. Kleck's report and deposition testimony confirm any such attack would be misguided, as there is good reason to question the State's use of the ATF report. Specifically, Dr. Kleck explained it was erroneous for the State to cite the ATF report to contend "straw purchasing [is] the most common channel for the diversion of firearms into the black market and illegal gun trafficking schemes," Compl. ¶ 62, because the report disclaims that the "sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime." Kleck Report at 5. Dr. Kleck then testified that the frequency of how often straw-purchased guns are involved in ATF investigations and how often guns are trafficked in general "are two distinct issues." Kleck Tr. 110:18-111:8. Put simply: "[N]o matter how common straw purchasing might be connected with ATF investigations, it tells us nothing about how often straw purchases are involved in guns being acquired by criminals." *Id.* at 113:7-10. The State may disagree with Dr. Kleck's assessment, but this is the textbook example of an issue to be explored on cross-examination.

The State also argues Dr. Kleck's opinion should be excluded because he purportedly uses data from the ATF report in the same way he opines the State cannot. *See* State's Br. 14. This is incorrect. As explained above, Dr. Kleck opines that data from the ATF report is not representative of all firearm purchases, so it cannot be used to determine the prevalence of straw purchasing outside the narrow context of ATF investigations. Because ATF data cannot be used for this purpose, Dr. Kleck instead relies on data from numerous non-ATF sources to estimate "the total number of firearms acquired by criminal via *all* channels." Kleck Report at 7 (emphasis in original). He then compares that total to the narrower category of firearms obtained by criminals "as a result of straw purchasing," and uses the ATF data here because "[t]he only numbers of straw-purchased guns we know of for sure are those uncovered in investigations by ATF or other law enforcement agencies." *Id.* at 7-8. Dr. Kleck has used this data appropriately: to calculate the representative share of straw-purchased firearms amongst all trafficked firearms.[11]

**Second**, the State challenges the veracity of Dr. Kleck's statistical analysis. *See* State's Br. 15. The State has not presented any expert testimony contradicting the analysis, but asserts Dr. Kleck somehow erred by using data points from different sources to calculate that between 0.699% and 2.2% of guns acquired by criminals were obtained through straw purchasing. *See id.* at 15-16. This type of methodological challenge is improper, as myriad cases have held criticisms of an expert's statistical analysis goes to weight, not admissibility. *E.g.*, *Jones v. City of Faribault*, 2021 WL 638039, at *4 (D.

---

[11] Even if Dr. Kleck did contradict himself, that is a credibility issue, not an admissibility issue. *E.g.*, *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003).

Minn. Feb. 18, 2021) ("As the Court has previously instructed, if the City feels that Plaintiffs' experts could have used different statistical methods or that their factual basis for the analysis was insufficient, it may attack those insufficiencies on cross-examination."); *see also Romero-Lorenzo v. Koehn*, 665 F. Supp. 3d 1056, 1062-63 (D. Ariz. 2023) (denying motion to exclude and explaining disputes regarding "the soundness of some experts' methodologies …. are more properly addressed at trial"); *Musket Corp. v. Star Fuel of Okla., LLC*, 2012 WL 4758082, at *3 (W.D. Okla. Oct. 5, 2012) (explaining any alleged "shortcomings in the facts and data relied upon by [the expert], or the principles and methods used … in forming his opinions go to the weight, and not the admissibility, of [the] opinions").[12]

**Third**, the State attacks the sources Dr. Kleck relies on to form his opinion, and his purported failure to consider three specific sources. *See* State Br. 14-17. These are, again, quintessential credibility arguments for trial. *E.g.*, *Murphy v. Wheelock*, 2019 WL 3719035, at *9 (D. Minn. Aug. 7, 2019) (denying motion to exclude where movant argued

---

[12] The State confuses the issues by contending "none of [Dr. Kleck's] analysis can be tested, has been subject to peer review, has a known or possible rate of error, or is generally accepted in the field." State's Br. 16. These *Daubert* factors need to be evaluated only in connection with "scientific testimony." *SECURA Ins. Co. v. Deere & Co.*, 674 F. Supp. 3d 603, 620 n.12 (D. Minn. 2023). "[A]n expert is not bound by the *Daubert* factors in cases involving non-scientific testimony." *Dangaard v. Instagram, LLC*, 2024 WL 4281400, at *9 (N.D. Cal. Sept. 23, 2024); *see also, e.g.*, *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D.N.J. 2004) ("[T]he *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony." (quotation omitted)). In this case, "the *Daubert* factors … simply are not applicable to [Dr. Kleck's] testimony, whose reliability depends heavily on the **knowledge and experience** of [Dr. Kleck], rather than the methodology or theory behind it." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quotation omitted). And as noted above, the State has not disputed Dr. Kleck's qualifications.

expert "relied on unreliable data," because movant "may test the credibility of [expert]'s opinions on cross examination"). And the State fails to mention that it questioned Dr. Kleck extensively at his deposition about all of the alleged contradictory sources, and Dr. Kleck explained he was aware of these authorities, and that they did not impact his opinion.

To start, the State argues Dr. Kleck should have considered "a more recent survey of inmates that found that a smaller proportion of inmates obtained their firearms via theft" than the survey he cited. *See* State's Br. 17. Far from ignoring this survey, Dr. Kleck explained at his deposition that he was "already familiar" with it, and "it wouldn't have changed any of [his] views." Kleck Tr. 147:6, 149:18-24. Dr. Kleck explained that, if anything, the survey "tend[ed] to reinforce [his] assertion" that Census Bureau surveys may be under inclusive, as it is "difficult for an inmate to admit to having acquired a gun via theft, because he can't do that without confessing to yet another crime." *Id.* at 149:24, 150:4-6. The State may disagree, but that is a matter for cross-examination.

The State also argues Dr. Kleck's opinion should be excluded because his report does not cite "a 2013 survey of U.S. firearms retailers that estimated that 34,000 straw purchases occur annually." State's Br. 17. In his deposition, Dr. Kleck explained he was not familiar with the survey, but based on his "cursory reading of it" during the deposition, the survey would not have changed his opinion because its contents were not "pertinent to estimat[ing] the total number of actual straw purchases." Kleck Tr. 167:5-25. In fact, the survey itself contained this exact caveat, which Dr. Kleck pointed out to the State. *Id.* at 168:3-8 (quoting article explaining the survey "only reflect[s] the instances where the

retailers realized they were dealing with straw buyers"); *see also* Davis Decl., Ex. F at 2. Here again, at most, the State has identified a potential cross-examination topic.

Lastly, the State argues Dr. Kleck should have considered "a 2012 study of ATF data that found that 41.3% of ATF investigations involved straw-purchased firearms." State's Br. 17. Once again, in his deposition Dr. Kleck explained precisely why this study did not inform his opinion: it relied on "[r]ecords of ATF investigations" to reach the "41.3" percent number, so suffered from the same flaw as the ATF report cited by the State. Kleck Tr. 126:4-25, 128:7-9*; see also supra* pp. 18-19. Again, the State may disagree with Dr. Kleck's rationale for not relying on this study, but on its best day that issue speaks to weight, not admissibility.

### B. Dr. Kleck's unrebutted second opinion is based on sufficient facts and a reliable statistical analysis.

The State challenges both portions of Dr. Kleck's unrebutted second opinion without citing a ***single*** supporting authority.

***First***, the State challenges Dr. Kleck's statistical analysis, which concludes that ***assuming*** all of Elwood's and Horton's straw-purchased firearms from Fleet Farm were "used to commit a violent crime … in Minnesota," Minnesota Department of Public Safety data indicates that this would have amounted to "at most, 0.234%—***just 1 in 428***—of the violent crimes committed with firearms in Minnesota" from 2021 through 2023. Kleck Report at 10 (emphasis in original).[13]

---

[13] The State's assertion that Dr. Kleck "ignor[es] the facts that at least one of Fleet Farm's firearms was actually used" during the Truck Yard gunfight, State's Br. 21, misses the purpose of his analysis, which does not examine the likelihood that any one of the firearms

To begin, the State asserts Dr. Kleck does not explain whether this 1-in-428 conclusion "is the annual average or the total number of violent crimes" from 2021 through 2023. State's Br. 22. Not so. Plainly, Dr. Kleck's analysis refers to the percentage of total violent crimes committed in Minnesota from 2021 through 2023 because, as the State recognizes, *see id.*, that is the date range for the data on which he relies, *see* Kleck Report at 10. If the State still has questions regarding this portion of Dr. Kleck's analysis, such questions can be asked on cross-examination.[14]

The State also critiques Dr. Kleck's use of a ten-year lookback period to assess that 2.5% of firearms acquired by criminals are used to commit violent crimes. *See* Kleck Report at 10; State's Br. 21. The State does not contend Dr. Kleck's calculations are incorrect, but suggests he should have used different underlying data. *See* State's Br. 21-22. Dr. Kleck has explained he used a ten-year period because based on his experience and prior research, "[m]any of the guns used to commit violent crimes in 2022 were acquired in some year prior to 2022." Kleck Report at 10; Kleck Tr. 197:6-8 (explaining the proposition comes from "sources I've cited in other publications" and "ATF trace data would certainly indicate" as much). Indeed, when asked at his deposition about the lookback period, Dr. Kleck explained limiting "the pool of guns acquired that could have

---

straw purchased by Elwood or Horton may be used in a violent crime. *E.g.*, Kleck Tr. 205:2-207:8, 240:5-22, 243:23-244:24 (repeatedly rejecting the "likelihood" characterization the State advances in its brief). That the State misunderstands Dr. Kleck's opinion, or disagrees with it, is no basis for exclusion.

[14] The State could also answer its questions with simple arithmetic: 37 (the number of firearms purchased by Elwood and Horton) divided by 15,840 (the total number of violent crimes in Minnesota from 2021 through 2023) equals 0.0023358—or 0.234%.

been used in violent crimes ... to the number acquired within a single one-year period"—
as the State proposed—"doesn't make any sense" because ATF trace data indicates that "a
much larger pool of guns are available, and indeed are used to commit violent crimes."
Kleck Tr. 198:11-14, 199:25-200:15.    Here again, that the State and Dr. Kleck have
different views on the best data for a statistical analysis does not bear on admissibility.[15]
*E.g.*, *Willis Elec. Co.*, 649 F. Supp. 3d at 800; *Jones*, 2021 WL 638039, at *3.

 **Second**, the State argues Dr. Kleck's opinion "that the ultimate recipients of the
straw-purchased guns would have gotten them from another source in lieu of Fleet Farm's
sales ... [is] wholly unsupported and speculative" because he cited to "general surveys of
criminals" to support his analysis.  State's Br. 22-23.  The Court should reject this factual-
basis attack.  Dr. Kleck relied on three different sources to support this opinion, which the
State acknowledges, but disagrees with.  *See* Kleck Report at 11.  When challenged directly
on this opinion at his deposition, Dr. Kleck explained he had "no reason to think that those
who want guns from these two straw purchasers" could not have obtained them through
other means, and this opinion was grounded in his "[r]eading everything that ATF had to
say" and "everything that academics in publications had to say" about firearms trafficking.
Kleck Tr. 210:3-211:6.  The State simply disagrees with Dr. Kleck's opinion, which is not
a basis to exclude his testimony.

---

[15] This calculation also has no bearing on Dr. Kleck's conclusion regarding the *de minimis*
role Elwood's and Horton's straw-purchasing activities may have had on crime statistics
in Minnesota.

### C.    Dr. Kleck's third opinion is reliable and has an adequate foundation.

Lastly, the State seeks to exclude Dr. Kleck's third opinion because, in a familiar refrain, it disagrees with the weight afforded certain studies and with the conclusion that attempting to purchase multiple handguns is not, standing alone, indicative of a straw purchase. *See* State's Br. 23-28. Again here, the State does not cite a single case suggesting any of its arguments are a proper basis for excluding Dr. Kleck's testimony. *See id.*

***First***, the State argues Dr. Kleck's conclusion that multiple sales are commonplace is unreliable because it is based on "a single data point from an early 1990s study of gun sales in Maryland" by Christopher Koper, which found that 27% of guns sold in Maryland in that timeframe were sold as part of a multiple sale." *Id.* at 23-24. The State further criticizes Dr. Kleck's reliance on the Koper study to "support … his claim" that "there is no factual basis for Fleet Farm employees or other gun store employees to believe that guns sold in multiples are more likely to be used in crime and to be suspect for that reason." *Id.* at 24; *see also* Kleck Report at 12-13. At his deposition, Dr. Kleck explained why he relied on Koper's data: "[he's] read other academic articles," but "[c]ertainly nothing that's superior to what Koper had, which ... covered basically all of the dealer sales of handguns for a long period in an entire state," so "it's not a selected subset of the guns sold in that state, it's all of them, as far as we know." Kleck Tr. 229:11, 19-25-230:2. Yet again, the State takes issue with the ***weight*** that Dr. Kleck is affording certain data. That is not a Rule 702 argument.[16]

---

[16] The State's assertion that Dr. Kleck testified this opinion is based "partly" on "anecdotal information," State's Br. 24, misconstrues the record. Dr. Kleck's statement about

The State also attempts to make much of the fact that Dr. Kleck does not agree with Koper's ultimate conclusions, and suggests this is a "problem with [his] reliance on th[e] study." State's Br. 25. This is another distraction. Dr. Kleck testified at length in his deposition about the Koper report, and **repeatedly** explained that he agreed with the data in the report, but disagreed with Koper's ultimate conclusions. *See* Kleck Tr. 222:17-223:23, 241:1-10, 254:17-21. The State does not and cannot offer any support for the proposition that an expert's opinion should be excluded if the expert agrees with some, but not all, of one of the sources cited in their report.

**Second**, the State challenges the basis for Dr. Kleck's opinion that "[s]ales of multiple guns at the same time are not suspect," such that Fleet Farm's sales to Elwood and Horton "do not indicate a suspicious purchasing pattern." *See* State's Br. 25-28; *see also* Kleck Report at 7. Again here, the State begins by misconstruing Dr. Kleck's opinion, asserting he "opines that multiple gun sales become suspicious only when sold in 'multiple dozens.'" State's Br. 25. That is exactly what Dr. Kleck does **not** claim, and the State knows that. In his deposition, Dr. Kleck testified that suspiciousness is a matter of degree: "It's a mistake to think of it in binary terms, it's not either or. There's no magic point at which it becomes suspicious. It just becomes more suspicious as it reaches very large

---

"anecdotal evidence" was made in connection with a discussion of an affidavit submitted in Jerome Horton's criminal case. *See* Kleck Tr. 252:19-253:23. And the State fails to mention that **the next question** in the deposition was whether Dr. Kleck "value[d] the anecdotal evidence that [he's] heard or experienced over the experience of an ATF firearms investigator," to which Dr. Kleck responded: "No. **What I most value is the data from Koper**, which concern all of the handguns sold by licensed gun dealers in Maryland over a substantial period of time. And they showed that lots of individuals purchased more than one firearm at a time, in a short period of time." *Id.* at 253:24-254:8 (emphasis added).

number of guns acquired with the same caliber." Kleck Tr. 219:20-24. In fact, after Dr. Kleck described a "very large number" as one that "could be more than ten" or "dozens," the State asked him whether "it's only those types of kind of large scale trafficking operations that the ATF considers suspect," to which Dr. Kleck answered: "No, quite the contrary. Most of the trafficking operations [ATF] investigate[s] involve even fewer guns." *Id.* at 220:2-221:2.

As detailed above, Dr. Kleck's ***actual*** opinion is although "[p]ersons unfamiliar with the lawful firearms business might think that even sales of just two or three guns at the same time are suspect," that is not borne out by data, and "multiple-gun sales are a routine part of the activities of retail gun stores." Kleck Report at 12. Based on data and his decades of experience, Dr. Kleck then opines "there is no basis for Fleet Farm employees to be suspicious of firearm customers ***solely*** because customers may purchase more than one gun in a single transaction." *Id.* at 13 (emphasis added). Not only is this opinion well-sourced by data and Dr. Kleck's experience, it is ***shared by the State's expert***. *See* Davis Decl., Ex. E at 180:1-181:20. Clearly, the State disagrees with Dr. Kleck's opinion that sales of multiple guns of the same caliber are not, standing alone, a warning sign of a possible straw purchase. The State is free to explore that disagreement on cross-examination, but it provides no basis for excluding Dr. Kleck's opinion.

## CONCLUSION

For the foregoing reasons, this Court should deny the State's Motion to Exclude Expert Testimony of Gary Kleck.

Dated:  April 25, 2025

Respectfully submitted,

*/s/ Todd A. Noteboom*
Todd A. Noteboom (#0240047)
Andrew W. Davis (#0386634)
Sharon R. Markowitz (#0392043)
Andrew P. Leiendecker (#0399107)
Zachary J. Wright (#0402945)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
todd.noteboom@stinson.com
andrew.davis@stinson.com
sharon.markowitz@stinson.com
andrew.leiendecker@stinson.com
zachary.wright@stinson.com

**ATTORNEYS FOR DEFENDANTS**