# EXHIBIT A

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Expert Report of William B. Napier, LPC**

*State of Minnesota v. Fleet Farm LLC, et al.*, **Case No. 0:22-cv-02694-JRT-JFD**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Personal Background and Qualifications

My background and qualifications are provided on my curriculum vitae, attached to this report as **Appendix A**. In short, I am the President of Napier Consulting, LLC, and have more than 20 years of experience as a security analyst and an ATF compliance consultant, with responsibility for ATF compliance, firearms-related security, and investigations. I have conducted several hundred compliance visits at licensed manufacturers, distributors, facilities, and gun dealers of all sizes and shapes, and have presented at dozens of conferences, seminars, and webinars to educate industry actors on regulations they must comply with as a condition of their license as well as best industry practices for firearm sales.

Over the years, I have worked with small and growing retail chains, as well as Fortune 500 companies, and have visited hundreds of Federal Firearm Licensees (FFLs) ranging from small shops to large retail chains. In many of these visits, I have examined internal policies related to the operations of these businesses, and, where appropriate, have provided guidance and recommendations to FFLs for how to improve their operations. My experience working with FFLs has afforded me the opportunity to readily identify trend lines for appropriate, industry standard business practices, as well as industry leading approaches to firearm policies and procedures.

I am a regular guest speaker for groups such as the National Shooting Sports Foundation's (NSSF) SHOT Show, National Retail Federation (NRF), Retail Industry Leaders Association (RILA), Retail Technology (RETECH), ASIS International, and The Loss Prevention Foundation, and my byline and name have appeared in various retail-related magazine articles on such topics as emerging security technology, return fraud, physical security, and leadership.

Additionally, I have served for over 20 years in municipal law enforcement. I have volunteered as a hunter education instructor in Nebraska and served on the ASIS International Retail Loss Prevention Council as a member of its Critical Infrastructure Working Group. I have

1

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

testified before the United States House of Representatives' Rules Subcommittee on the Legislative and Budget Process regarding "Tools to Combat Gun Trafficking and Reduce Gun Violence in Our Communities."[1] I am currently involved with The Loss Prevention Research Council at the University of Florida, and am a member of the University's Violent Crime Working Group. I have also been granted emeritus status on the board of directors for The Loss Prevention Foundation, and am Loss Prevention Certified (LPC).

Further, I have been active for the past 10 years as a consultant to the firearms industry, assisting firearm manufacturers, distributors, and retail locations, from small, independent stores to the largest chain stores. I conduct ATF "mock" inspections, providing pre-build new location, mature businesses, and post incident security risk assessments. I have conducted multiple webinars on ATF compliance and FFL security as well as co-presented at FFL education seminars with the ATF and FBI. I have also opined as an expert witness regarding straw purchase activity, customer firearms purchase habits, duty to report firearm transactions, video usage by retailers, and ATF trace requests in *Cindy Coxie, et al. v. Academy, Ltd.*, Consolidated Case No. 2018-CP-42-04297, which was pending in the Court of Common Pleas, Seventh Judicial Circuit County of Spartanburg, State of South Carolina. I have authored or co-authored the following publications in the past 10 years:

- *Our Store Has a Disaster Preparedness Plan – or Do We?*, NSSF – The Firearm Industry Trade Association (February 11, 2015), https://www.nssf.org/articles/our-store-has-a-disaster-preparedness-plan-or-do-we/

- *Employee Theft – Discovering It, Stopping It, Preventing It*, NSSF – The Firearm Industry Trade Association (February 26, 2015), https://www.nssf.org/articles/employee-theft-discovering-it-stopping-it-preventing-it/

---

[1] https://www.congress.gov/event/117th-congress/house-event/114896/text

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- *Crime is Down, So We Can Relax, Right?*, NSSF – The Firearm Industry Trade Association (March 3, 2015), https://www.nssf.org/articles/crime-is-down-so-we-can-relax-right/

- *In-Store Firearm Carry – Much More Than a Belt and Holster*, NSSF – The Firearm Industry Trade Association (March 24, 2015), https://www.nssf.org/articles/in-store-firearm-carry-much-more-than-a-belt-and-holster-2/

- *'Boss, Can I Carry While I'm Working?'*, Insurance Thought Leadership (April 23, 2015), https://www.insurancethoughtleadership.com/commercial-lines/boss-can-i-carry-while-im-working

- *One Man's Trash is Another Man's … Crime Spree*, NSSF – The Firearm Industry Trade Association (May 14, 2015), https://www.nssf.org/articles/one-mans-trash-is-another-mans-crime-spree/

- *The Keys to the Vault*, NSSF – The Firearm Industry Trade Association (June 4, 2015), https://www.nssf.org/articles/the-keys-to-the-vault/

- *Firearm Inventory Counts and Reconciliation – Compliance Secret No. 1*, NSSF – The Firearm Industry Trade Association (June 17, 2015), https://www.nssf.org/articles/firearm-inventory-counts-and-reconciliation/

- *NSSF Debuts Security Audit Program*, The Shooting Industry; San Diego, Vol. 61, Iss. 8 (August 2016), https://www.proquest.com/docview/1814143635?sourcetype=Trade%20Journals

- *Helpful Hints for Successfully Completing ATF Form 4473*, NSSF – The Firearm Industry Trade Association, https://www.nssf.org/retailers/compliance-hints-successfully-completing-atf-form-4473/

In my analysis of this matter, I considered the materials listed in **Appendix B** to this report. I am over 18 years of age. I am being compensated at a rate of $250.00 per hour for my time on this matter. My compensation is not contingent on the results of my analysis or the substance of my testimony.

## Summary of Opinions

As explained in more detail in the following section, I have formed the following opinions regarding the at-issue conduct in this matter:

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

1.        Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.

2.        Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.

3.        Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms.

## Analysis and Opinions

**Opinion #1: Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.**

A.        <u>The industry standard for monitoring for and preventing straw purchases</u>.

The federal firearm licensee (FFL) industry standard requires FFLs to monitor for and take steps to prevent possible straw purchases, relying on various programs, including in-house training, ATF documents and seminars, and third party programs such as NSSF webinars, as well as maintaining relationships with law enforcement. The industry standard for monitoring for and preventing possible straw purchases may be gleaned from ATF training materials, NSSF guidelines and training materials, and the straw purchase prevention policies that have been implemented by other Minnesota-based FFLs.

1.        *ATF training materials*

One of the key sources of the FFL industry standard for monitoring for and preventing straw purchases is ATF training materials regarding straw purchasing.[2] The ATF provides FFLs with online materials regarding straw purchasing, newsletters addressing various issues facing the

---

[2] ATF0000001; ATF0000004; ATF0000076; ATF0000130; ATF0000172; ATF0000344; ATF0000384; ATF0000458; ATF0000544; ATF0000691; ATF0000800

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

firearms industry (including, but not limited to, straw purchasing), and in-person training for FFLs through local ATF field divisions.

Specifically, ATF trains FFLs to monitor for the following indicia of a possible straw purchase: (i) "[a]ttempted purchase after a denial is issued, usually by family member or friend"; (ii) "[t]wo customers, one looks at gun and asks the question ... the other wants to complete the paperwork"; (iii) "[e]xchanges of cash in or near storefront"; (iv) "[t]he customer acts uncomfortable or seems unfamiliar with the product"; (v) "[s]omeone has a shopping list of firearms to fulfill, but no knowledge about them"; and (vi) "[c]onversations of customers while shopping, with you, with their friends or on their cell phones."[3] ATF further advises FFLs of various "scenarios" that may constitute a straw purchase: (i) "[p]erson interested in firearm is different than buyer"; (ii) "[d]enied/delayed background check, different person attempts to acquire for denied individual"; (iii) "[p]urchaser comes in with list of firearms or is on the phone being directed what to buy"; (iv) "[b]uyer tells you they are buying for someone else"; and (v) "[p]erson who bought firearm online different than person in front of you."[4] ATF also advises FFLs to "[a]sk customer questions such as why are you buying this gun, what are you going to use it for" and "[k]eep a log of recent denials and attempted purchases to compare with new sales."[5]

Based on my experience, the aforementioned indicia of possible straw purchases have provided the foundation for the FFL industry standard on how to monitor for and prevent straw purchases.

---

[3] ATF0000072; ATF000131; ATF0000230; ATF0000381; ATF0000454; ATF0000573; ATF0000815
[4] ATF0000811 – ATF0000815
[5] ATF0000073; ATF0000131; ATF0000231; ATF0000382; ATF0000455; ATF0000816

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> 2.   *NSSF guidelines and training materials*

NSSF is "the firearms industry's trade association," and among many other things, NSSF provides guidance to FFLs on subjects such as firearm safety, shooting, hunting, research, and government initiatives.[6] As relevant here, NSSF has partnered with the ATF to develop materials and provide outreach to FFLs (via both webinars and in-person training) on a variety of issues facing the firearm industry.

Among other things, NSSF provides training sessions and guidance to FFLs on best practices for selling firearms, including how to monitor for and prevent straw purchases. NSSF has directed FFLs to be cognizant of the following circumstances surrounding a sale[7]:

- "Make sure there is genuine interest and questions from the customer about the firearm being considered for purchase."

- "The salesperson should be convinced of the reason and intended lawful purpose the customer has for acquiring the firearm."

- "The purchaser should not typically be referencing a note, picture or description when asking to purchase a gun."

- "Be alert to someone asking to purchase a firearm that may have been the subject of a recent NICS denial or delay. Be alert to similar last names and addresses in this scenario as well."

- "Be alert to who is paying for the firearm versus who is completing the Form 4473 and NICS."

- "Be cognizant to couples shopping together in which one person selects the firearm and the second person completes the Form 4473. This often involves a married couple in which one person may be a prohibited person. Don't accept excuses such as, 'I forgot my wallet, so my girlfriend is purchasing it for me.'"

- "Be suspicious of uneducated customers attempting to purchase more than one handgun at a time with little inquiry about the firearms."

---

[6] https://www.nssf.org/
[7] https://www.nssf.org/articles/beware-the-straw-purchase/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Similarly, NSSF's current "SHOT University Online" training identifies the following as "possible indicators of a straw purchase"[8]:

- "Nervousness. Questioning the need for Form 4473. Or tight-lipped."

- "Lack of knowledge about firearms or familiarity with the firearm they want to buy after being questioned by sale associates."

- "Evasive when asked questions by staff."

- "Bulk or repetitive purchase of the same or similar firearms, especially non-collectible models."

- "Purchases made with brand new identification documents."

- "No previous purchases, but now a frequent buyer."

- "Buying multiple firearms with large amounts of cash."

- "Another person seen passing cash to the 'buyer.'"

- "Buyer conversing with another person while completing Form 4473, particularly if the other person is in another section of the store."

- "Persons attempting to conceal conversations inside of shop."

- "Scouting of firearms by the straw buyer with the actual purchaser, who then departs the store."

- "Taking/sending cell phone pictures of firearms to persons unknown to the FFL."

- "Talking on a cell phone while looking at firearms."

- "Reluctance of the apparent buyer to complete Form 4473."

And if an FFL employee has "any doubts about the legality of any firearms sale," NSSF recommends that they ask questions of the buyer, such as: "Now tell me, who are you buying this

---

[8] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association, https://cdn.fs.pathlms.com/fKOEajVSTtmz9BZB1cyn?_gl=1*1yomeqz*_ga*MjA2MjA1NzU1 OC4xNzI2NjE5MDM0*_ga_2KEDL6GGQS*MTcyNjYxOTAzNC4xLjAuMTcyNjYxOTAzN C4wLjAuMA..&_ga=2.215812375.1466964818.1726619035-2062057558.1726619034

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

firearm for today?"; "What is it about this firearm that you like?"; "What other models have you considered?"; and "How do you plan to use it?"[9]

NSSF also "recommend[s] that FFLs keep track of denied persons, their addresses and the firearm on denied transactions for about a week or longer and that sales associates review it prior to making a firearms transfer," and advises as follows if a straw purchase is suspected[10]:

## If a Straw Purchase Attempt is Suspected

- Ask questions of the purchaser.
- Sales associates must be totally empowered to trust their instincts. If it doesn't 'feel' right, it probably isn't.
- If possible, get Section B of Form 4473 completed by the would-be straw purchaser before shutting the sale down.
- Also, if possible, get a telephone number.
- Maintain complete records of the attempt. If the store maintains a 'no sale' list add the person to that list.
- Employees should be trained to report the attempt to management or ownership ASAP.
- FFLs that have good rapport with local competitors, report what happened to them. If they tried one store, they probably would try others.
- After conferring with your attorney, you may want to refer the attempted straw purchase to your local ATF LE office.

NSSF.ORG

24

NSSF
The Firearm Industry
Trade Association

Additionally, NSSF's "Don't Lie for the Other Guy Program" exists to provide training and education to FFLs "to help employees ... recognize attempted straw purchases," and provides "videos" and "store materials" to FFLs with the "goal ... to eliminate actual transfers to straw purchasers to the greatest extent possible."[11]

---

[9] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association

[10] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association

[11] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association; https://www.nssf.org/articles/tag/dont-lie-for-the-other-guy/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

3.    *Policies from other Minnesota-based FFLs*

I have also reviewed the straw purchase prevention policies that have been produced in this action by Bill's Gun Shop, DKMags, Inc., Frontiersman Sports, The Modern Sportsman, and The Sportsman's Warehouse. These FFLs' straw purchase prevention policies are illustrative of the types of straw purchase policies that are implemented in the FFL industry. Notably, none of these policies come close to the depth or volume of policies provided by Fleet Farm.

In the relevant portions of these policies, FFLs are seen advising their employees to monitor for the following indicia of a possible straw purchase.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Bill's Gun Shop[12]



---

[12] BGS000005

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

<u>DKMags, Inc.</u>[13]



---

[13] DKM0000012

11

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Frontiersman Sports[14]



**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

The Modern Sportsman[15]



Sportman's Guide, LLC[16]



And some FFLs, such as Realm Firearms, "do[] not have any policies or procedures related to monitoring or preventing straw purchasing," and instead simply contact law enforcement "if there are any people who set off any red flags."[17]

---

[15] TMS0000090
[16] SG0000004
[17] RF0000001

13

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

As among these other Minnesota-based FFLs, DKMags, Inc., Frontiersman Sports, The Modern Sportsman, and The Sportsman's Warehouse have straw purchase prevention policies that are consistent with, and reflective of, the industry standard, both in terms of the topics addressed by the policies and the format in which the policies are presented (*e.g.*, one or two pages of discussion in either a standalone document, or as part of a broader policy manual). ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ And as for Realm Firearms, it is not necessarily surprising, but certainly deficient in light of the industry standard for an FFL to have no straw purchase policies whatsoever.[18] As will be detailed below, on pages 21 through 33, Fleet Farm's straw purchase policies and guidelines stand in stark contrast to all of these policies. Fleet Farm's policies emphasize more potential indicia of straw purchasing, the policies themselves are more detailed, and Fleet Farm employs a system of continuing training and education that goes well beyond the standard industry practice. In short, Fleet Farm's approach to monitoring for and preventing straw purchasing reflects an industry best practice approach.

*       *       *

In addition to these ATF and NSSF training materials and FFL policies, based on my experience and knowledge from conducting hundreds of compliance inspections at various FFL

---

[18] In addition to Realm Sports, my understanding is that the U.S. District Court overseeing this matter has ordered Capra's Sporting Goods to produce to Fleet Farm "[a]ll documents reflecting Your policies and procedures relating to firearm transactions, including ... those relating to monitoring for and preventing straw purchasing." Dkt. 117, pp. 2–3; Dkt. 118, Ex. A; Dkt. 130. My understanding is also that, as of the date of my report, Capra's has not produced any such documents to Fleet Farm.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

businesses, including firearm manufacturers, distributors, and retail locations from small, independent FFLs to large-format chain stores, I have made the following observations regarding the standard industry practices for monitoring for and preventing possible straw purchases:

- The firearms industry, as reflected in ATF and NSSF guidelines, does not expect that FFLs will be 100% successful in preventing all possible straw purchases. FFLs rely on government programs such as the execution of ATF Form 4473 by the customer, execution of ATF Form 3310.4, FBI NICS or state POC background checks, and state permit to purchase programs to determine lawful transfers of firearms. In addition, there are programs, such as NSSF's Don't Lie for the Other Guy, to educate and train FFLs how to spot and stop a possible straw purchase. Even with all of these precautions, the industry does not expect an FFL to have 100% success in preventing straw purchases, which by their very nature are intended to deceive the FFL.

- No two FFLs have the exact same approach to monitoring for and preventing straw purchases, and there is no "magic word" requirement for how FFLs teach their employees to monitor for and prevent straw purchasing. FFLs will utilize what works best for their environment to train their staff on how to detect and respond to possible straw purchase attempts.

- No two straw purchase scenarios are the same, and whether a purchase is a possible straw purchase always depends on all of the circumstances. The FFL salesclerk (*i.e.*, the employee behind the counter who is engaging in the transaction with the customer) has to carefully weigh what they observe from the customer while looking for any and all potential indicators, weighing the totality of the circumstances and trying to distinguish unlawful behavior from innocent behavior before declaring a possible straw purchase attempt. And it is

15

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

important that the salesclerk be empowered to deny a sale based on his or her own judgment and experience.

- Whether a customer is potentially engaged in straw purchasing depends on all of the circumstances. There is no single indicator that establishes a straw purchase is about to occur.

- For example, regarding paying with cash, there are customers who prefer to use cash in lieu of a credit card for numerous reasons (such as a customer who is distrustful of banks or credit card companies and wishes to use cash or a customer who simply likes to carry and use cash). I have personally witnessed numerous individuals complete legitimate firearms transactions with large amounts of cash, and there is nothing illegal or prohibited about using cash to purchase a firearm.

- Regarding using a cell phone to take photographs, customers take photographs for many reasons. Experience has shown we live in a digital world, and that people constantly use their hand-held devices to take pictures and constantly share their exploits. In fact, according to The Association of Advancing Automation, picture taking by use of cell phones has increased steadily since 2000.[19] Therefore, my expertise and experience has taught me the mere use of a cell phone to take and share pictures is not by itself necessarily indicative of a straw purchase.

- The volume of firearms a customer purchases over time is not, alone, an indicator of a possible straw purchase. For example, many individuals enjoy collecting firearms and will

---

[19] *The Evolution of Camera Phones*, Association for Advancing Automation (February 2, 2016), https://www.automate.org/vision/blogs/the-evolution-of-camera-phones#:~:text=Camera%20phones%20are%20ubiquitous%2C%20but,in%20South%20Korea%20in%202000.&text=The%20Samsung%20SCH%2DV200%20was,35%20megapixel%20photo%20resolution

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

buy several in a single transaction, and a family member (parent or grandparent) may buy several of the same type of firearm as a bona fide gift for family members. Likewise, I have observed that during periods of civil disobedience, rioting, and government-mandated restrictions, some customers make the decision to buy firearms and ammunition in larger quantities. I have also witnessed increased sales of multiple firearms to the same person right before new gun legislation goes into effect. What is more, different states have different laws regarding the total number of firearms an individual may purchase within a certain time period. California, Connecticut, Maryland, New Jersey, and Virginia have imposed caps on the number of firearms an individual may purchase within a certain time period, but Minnesota has not imposed any such cap.[20] All of this is to say that the volume of firearms purchased, in a single transaction or over a period of time, is not, standing alone, an indicator of possible straw purchasing.

- FFLs develop and maintain their own program to monitor transactions for possible straw purchase attempts. There is no regulation or requirement to keep a log of possible straw purchase attempts. Some FFLs use a handwritten log of the name and address of a person attempting a straw purchase. Some FFLs shut down the sale before the ATF Form 4473 is completed and do not record the name or address of the person attempting a straw purchase. Some FFLs put a tag on the firearm that a person attempted to straw purchase to alert other salesclerks; however, this method doesn't work for a larger retail store that displays several of the same firearm. Other FFLs share the information verbally among staff. If the FFL has other company stores in the area, the FFL may call and alert them of the straw purchase attempt.

---

[20] Cal. Penal Code § 27535; Conn. Gen. Stat. § 29-33(f); Md. Code Ann., Pub. Safety § 5-128(b); N.J. Stat. Ann. § 2C:58-2(a)(7); Va. Code Ann. § 18.2-308.2:2(R)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- FFLs trust and rely heavily on government-administered screening programs to assist them in making decisions before making the lawful transfers of firearms. These programs include: (i) the customer presenting a valid state-issue permit to purchase or permit to carry (or another state-equivalent permit); (ii) the customer correctly completing and signing the ATF Form 4473; (iii) the generation and submission of the ATF Form 3310.4 multiple handgun sales report to law enforcement (where applicable); and (iv) the receipt of an FBI NICS background check to confirm the customer is eligible to purchase the firearm(s). Put differently, before any firearm sale is made, an FFL will have received at least two independent confirmations from government entities that the customer is allowed to purchase a firearm: (i) the state- or municipality-issued permit, and (ii) the "proceed" message following the NICS background check.

- FFLs get varying responses from law enforcement, including from ATF, after notifying them of a possible straw purchase or receiving a trace request. It is extremely rare for law enforcement to provide any post notification or updates on any investigation or criminal charges.

I have also reviewed the "red flags" of straw purchasing identified in paragraph 25 of Plaintiff's First Amended Complaint.[21] In my professional opinion, the "red flags" detailed in this paragraph are either inaccurate, overly simplistic, or not applicable in the context of a firearm transaction for the following reasons:

- **"Red Flag" #1:** "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber."[22]

---

[21] Dkt. 79 ¶ 25
[22] Dkt. 79 ¶ 25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Based on my professional experience and judgment, purchasing multiple firearms in a single transaction by itself does not indicate a possible straw purchase. A person may decide to purchase multiple firearms to be given as bona fide gifts (such as a grandfather buying several grandsons rifles for Christmas), or because they are a collector who likes certain models of handguns (and may wish to have several handguns with consecutive serial numbers), or because they might feel that when new firearm-restrictive laws are set to become effective it could be their last chance to obtain certain firearms. There is also nothing unusual about a person wanting to purchase multiple firearms of the same model for personal defense (for example, purchasing multiple firearms to store in secure locations around their property, purchasing multiple firearms so that they may have firearms at multiple locations such as a cabin or second home, or purchasing multiple firearms so they store one of the firearms at a shooting range). In short, an FFL would need more information before forming an opinion on whether the purchase of multiple handguns is an indicator of a possible straw purchase.

- **"Red Flag" #2:** "Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns."[23]

   Based on my professional experience and judgment, buying multiple handguns of a certain caliber of firearm is not in and of itself indicative of a possible straw purchase attempt. Many individuals purchase firearms based on availability of ammunition, as well as the cost of ammunition, and are known to replace or collect 9mm handguns in particular due to its lack of recoil compared to other types of handguns (for example, .40 caliber handguns tend to have a harsher recoil as compared to 9mm handguns). An FFL would need more information before forming an opinion on whether the purchase of multiple 9mm caliber handguns is an indicator of a possible straw purchase.

- **"Red Flag" #3:** "Purchasing firearms with cash."[24]

   Based on my professional experience and judgment, the notion that purchasing firearms with cash is an indicator of a possible straw purchase is a misconception, and is not something that ATF or NSSF recognizes as being a potential indicator. This is for good reason, because I have personally witnessed many firearm transactions paid for by cash by people who do not use credit cards, people who have a windfall and have cash on their person, or people who simply use cash because they can. There is nothing illegal or per se suspicious about purchasing firearms with cash. Instead, what ATF and NSSF tell us is that a cash purchase may become suspicious if a store clerk observes a *transfer of cash* between a second person and the buyer of the firearm.

- **"Red Flag" #4:** "The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves."[25]

---

[23] Dkt. 79 ¶ 25

[24] Dkt. 79 ¶ 25

[25] Dkt. 79 ¶ 25

19

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Based on my professional experience and judgment, when persons are making large dollar purchases, such as firearms, they often bring a friend to share the excitement, gain their friend's approval, or lean on the friend for expertise (if, for example, the buyer is new to the sport, and wants advice from a friend on what type of firearm to buy). As for a person "leav[ing] before the transaction," a person accompanying the buyer may leave a store for a multitude of reasons. Notably, the purchase process for a firearm can take more time than a standard retail purchase, given the paperwork and background check involved. There is nothing illegal about a person accompanying a prospective purchaser of a firearm and leaving the store before the sale is complete. If a buyer is accompanied to a store by another individual, that alone is not an indicator of a possible straw purchase.

- **"Red Flag" #5:** "The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase."[26]

  Cell phone usage is a part of everyday life. I've observed persons seeking approval from others before making a purchase, asking for advice before making a purchase, a novice asking a friend about the differences between different types of firearms or firearm features, as well as some persons wanting to share in the excitement with (or brag to) a friend about their new firearm. Of course, if an FFL observed a phone communication between an individual and a third party that gave them reason to believe the individual may be shopping for another person, that would be an indicator of a possible straw purchase, and it would be appropriate for the FFL to then assess the totality of the circumstances to determine whether they are facing a possible straw purchase scenario.

- **"Red Flag" #6:** "The buyer does not keep the firearms in their residence for their own use."[27]

  An FFL would have no basis for knowing where or how a buyer stores their firearms. Regardless, in my experience, where a firearm is being stored is not, by itself, an indicator of a possible straw purchase. My experience has taught me that some firearm owners keep firearms in a myriad of places (for example, in their boat, in their car, in their camper, at their lake house, at their office, at their cabin, or at a shooting range). Some buyers may give a firearm to a trusted friend so that the friend can add accessories to the firearm (such as scopes, slings, accessories). Some buyers may loan a firearm to a friend for sport shooting, hunting, target practice, or varmint removal at a farm. As long as the buyer reasonably believes the person they are giving the firearm to is not prohibited from possessing the firearm, this type of practice is perfectly legal (and recognized by NSSF).[28]

---

[26] Dkt. 79 ¶ 25
[27] Dkt. 79 ¶ 25
[28] https://www.nssf.org/articles/giving-a-firearm-as-a-gift-some-reminders-from-nssf/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- **"Red Flag" #7:** "A short 'time to crime'—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime."[29]

    This "red flag" has no application in the context of a firearm sale. By definition, even assuming a firearm is being purchased by a straw purchaser, at the time the firearm is sold, there is no way to know what, if any, "time to crime" may be later associated with that firearm. This "red flag" is describing an ATF investigatory tool, rather than an indicator of a possible straw purchase that an FFL should be on the lookout for at the time of a firearm transaction.

B.    <u>Fleet Farm's policies and procedures for monitoring for and preventing straw purchases</u>.

1.    *Fleet Farm's initial training*

Fleet Farm utilizes an extensive series of training modules to ensure employees are properly educated about the company's firearm policies before being authorized to sell firearms.[30] Employees are required to complete the entire firearms training course before they are authorized to sell or have access to firearms.[31] Fleet Farm also has an extensive certification test after completing the training course.[32]

On the issue of straw purchasing, there are three key components to Fleet Farm's initial training. ***First***, Fleet Farm's module training includes a module dedicated to "Straw Purchases"[33]:

---

[29] Dkt. 79 ¶ 25

[30] FF_0001497; FF_0001499; FF_0001507; FF_0001514; FF_0001520; FF_0001531; FF_0001542; FF_0001547; FF_0001554; FF_0005711; FF_0005715; FF_0005730; FF_0005734; FF_0005745; FF_0005748; FF_0005754; FF_0005760; FF_0005769; FF_0005775; FF_0005790; FF_0005798; FF_0005802; FF_0005816; FF_0005820; FF_0005831

[31] FF_0032630

[32] FF_0003449 – FF_0003539; Michelle Granato Deposition Transcript at 56-57

[33] FF_0001507

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



In this training, Fleet Farm explains that "[i]t is a federal offense for a customer to purchase a firearm for another person who is not eligible to own/posses[s] a firearm," ████████████ ████████████████████████████████:

- ████████████████████████████████████████████ ████████████████████

- ████████████████████████████████████████████████ ████████████

- ████████████████████████████████████████

- ████████████████████████████████████████████████ ████████████

- ██████████████████████████████████

---

34 FF_0001508

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

And throughout the relevant time period, Fleet Farm has explained to its employees that another indicia of a possible straw purchase, to be assessed in the overall context of the transaction, is a customer seeking to purchase multiple handguns in the same transaction.[35]



And Fleet Farm stores utilize "Straw Purchase Alerts," which are emailed across Fleet Farm stores to notify all stores of possible straw purchase attempts[37]:

---

[35] Michael Radl Deposition Transcript at 16, 28, 84–85; Cory Klebs Deposition Transcript at 30, 59
[36] FF_0001510
[37] FF_0001511

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In addition to circulating Straw Purchase Alerts by email, Fleet Farm's software allows store employees to search "LP Alerts" to "view alerts from other locations" and search by last name "to see if there were any prior alerts sent out for an individual."[38]

*Second*, in the "Background Check" module, Fleet Farm instructs its employees that: (i) "[i]f any of the questions [on the ATF Form 4473] were answered as disqualifying and not corrected, the background check MUST not be submitted and the sale is immediately declined"; (ii) "Fleet Farm doesn't transfer on a delay response using the Brady 3 day transfer rule"; and (iii) "[a] *'Proceed' is required for all transfers*"[39]:

---

[38] FF_0001512 – FF_0001513
[39] FF_0005736; FF_0005738

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



This "Proceed" requirement is also reflected in Fleet Farm's "Policies and Guidelines" for "Sales

and Handling of Firearms"[40]:

> 5. <u>Sales</u>. Firearms will not be transferred to a customer without a "Proceed" status from NICS. Team Members may not submit a background check on themselves, a family member, or a resident of their household

*Third*, Fleet Farm uses the NSSF's "Don't Lie for the Other Guy" training video as part of

its training,[41] and also uses other "Don't Lie" materials in its stores.[42]

As I explain on pages 31 through 33 below, Fleet Farm's robust and comprehensive

training, and in particular its training relating to monitoring for and preventing possible straw

purchases, represents an industry best practice approach to firearm transactions.

---

[40] FF_0005605

[41] FF_0000207; Kevin McKown Deposition Transcript at 47

[42] Kevin McKown Deposition Transcript at 47; FF_0040805

25

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2.      *Quarterly Seminars and "Tuesday Tidbits"*

Beginning in 2021, Fleet Farm also provided ongoing education and training to its employees regarding its firearm policies, including ongoing training on how to monitor for and prevent possible straw purchases.[43] Through these trainings, Fleet Farm refreshed its employees' education on the following indicators of a possible straw purchase:

**November 2021[44]**



**November 2022[45]**

---

[43] FF_0000860; FF_0002730; FF_0036479; FF_0000012; FF_0032623; FF_0040797; FF_0040813; FF_0040898; FF_0040832; FF_0040770

[44] FF_0000012

[45] FF_0040797

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



**April 2023**[46]



**August 2023**

During this seminar, Fleet Farm largely reiterated the training from April 2023 regarding "Straw

Purchase Awareness":

---

[46] FF_0040813

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



Fleet Farm provided this same "Straw Purchase Awareness" guidance to its employees during the November 2023 quarterly training.[47]

In addition to the quarterly trainings, for multiple years Fleet Farm shared "Tuesday Tidbits" with its employees, which was another method for providing employees with ongoing education on firearm compliance and training. Several of these "Tuesday Tidbits" focused on straw purchasing,[48] and trained Fleet Farm employees regarding the following:

- [49]

- ███████████████████████████████████████

---

[47] FF_0040770

[48] FF_0000898; FF_0000906; FF_0000910; FF_0000922; FF_0000936; FF_0000955

[49] FF_0000898

[50] FF_0000906; FF_0000910

28

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



---

[51] FF_0000922

[52] FF_0000936

[53] FF_0000955

- ███████████████████████████████████████
  ████████████████████████████

As I explain on pages 31 through 33 below, Fleet Farm's quarterly trainings and Tuesday Tidbits are part of what render its straw purchase awareness policies the industry best practice approach, and the guidance they provide regarding indicators of a possible straw purchase are consistent with, and often exceed, the industry standard for how employees should go about monitoring for potential straw purchases.

### 3. Straw Purchase Alerts

As described above, Fleet Farm provides various pathways for its employees to monitor for and turn down suspicious sales. Specifically, through the Lotus Notes application, Fleet Farm's Loss Prevention and Management were able to send "Straw Purchase Alert" emails across its stores whenever a store suspected that an individual had attempted a straw purchase.[55] And for more than a decade, Fleet Farm has maintained an "Alert Database" of prior suspected straw purchasers, which is searchable by numerous criteria, including last name, "to see if there were any prior alerts sent out for" a prospective customer.[56] Stores would also send "Be on the Lookout" alerts if an employee observed suspicious activity, but "didn't have customer information to put into the Straw Purchase Alert."[57] More recently, Fleet Farm updated this system and switched over to the "Orion" platform, through which an automatic alert will issue if a prospective customer's name "matches the name of a Firearm Sales Alert that was issued within the past 1 year."[58]

[54] FF_0000955
[55] FF_0001507; FF_0040837; Michelle Granato Deposition Transcript at 19, 23–24; Kevin McKown Deposition Transcript at 42-45; Michael Radl Deposition Transcript at 33–34
[56] FF_0001507; FF_0000019; Michelle Granato Deposition Transcript at 44–45; Kevin McKown Deposition Transcripts at 45–49, 56–57, 75–76; Michael Radl Deposition Transcript at 36
[57] Michelle Granato Deposition Transcript at 87
[58] FF_0040836; Michelle Granato Deposition Transcript at 21–23; Kevin McKown Deposition Transcript at 56; Michael Radl Deposition Transcript at 37

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

C.    Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases meet, and in many instances exceed, the industry standard.

In reviewing Fleet Farm's policies and procedures, it is important to bear in mind that retail leadership, in all industries, must balance multiple responsibilities throughout the day, including but not limited to: opening the store; determining staffing; dealing with employee call off from work, turnover, and new hire orientation; dealing with employee and customer issues; and adhering to multiple regulations and government agencies such as local zoning, Department of Weights and Measures, Department of Labor, OSHA, and ATF. One method I have observed successfully utilized in the FFL industry is a standardized and systematic approach to monitoring for and preventing straw purchases that is supported by company leadership. Fleet Farm exemplifies this standardized and systematic approach in its actions.

In this case, Fleet Farm has a highly engaged compliance staff that oversees and directs firearms policy and procedures across the enterprise. In addition, as detailed below, Fleet Farm FFL's have robust internal auditing programs relating to firearm paperwork and inventory. This is an industry best practice approach based on my observations over time at multiple other FFLs.

Fleet Farm has a robust and comprehensive written training that is updated as laws change and/or implementation is needed. The training covers manual and electronic sales. This is an industry best practice approach.

Fleet Farm requires successful training completion and passing a certification test as proof of knowledge for gun counter staff. This is an industry best practice approach.

Fleet Farm trains its employees on all of the industry recognized indicia of a possible straw purchase, by utilizing ATF and NSSF's Don't Lie For the Other Guy[59] Program and signage at

---

[59] FF_0000207

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

their gun counter, ATF newsletters,[60] ATF Webinars, and ATF in-person training. Fleet Farm's trainings also incorporate NSSF's guidance on potential indicia of a possible straw purchase. And several of the indicia identified by Fleet Farm are not required by the industry standard, and are examples of Fleet Farm training on straw purchase awareness in a way that exceeds the industry standard. Specifically, ██████████████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████ is not included in the ATF or NSSF materials establishing the industry standard for how to monitor for and prevent straw purchasing. Further, Fleet Farm shares this information across multiple media options[61] in order to capture and further educate as many staff members as possible. This is above and beyond what I see as standard industry practice as this method of further education for staff is neither required by regulations or present in ATF or NSSF materials.

Fleet Farm provides quarterly webinars on firearms related subjects, including straw purchase avoidance. This is an industry best practice approach, and is an example of Fleet Farm going well above and beyond the industry standard.

Fleet Farm further provides email updates via Tuesday Tidbits from the compliance leadership team describing emerging trends, issues, and compliance; this email is printed out and placed into a binder for gun counter staff to refer to as well. This is an industry best practice approach, and is an example of Fleet Farm going well above and beyond the industry standard.

Fleet Farm maintains an internal acquisition and disposition system known as SOM. Gun counter staff use this system to record and dispose of firearm transfers. Gun counter staff can use

---

[60] ATF0000344
[61] FF_0032623; FF_0000922

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

this system to look up transactions by name of customer at the request of law enforcement as part of a trace request investigation or the original customer who made the purchase and had a loss and needs the serial number for reporting to law enforcement. Using electronic record keeping and gun sale management in a high volume retail environment is an industry best practice approach. And, in my opinion, the volume of instances where a Fleet Farm store has denied a sale for being a possible straw purchase or otherwise suspicious is another demonstration of how Fleet Farm's policies and procedures have been effective in preventing possible straw purchases.[62]

Fleet Farm has a straw purchase alert system into which gun counter staff can immediately enter information about straw purchase attempts and report the same to company loss prevention staff. This is an industry best practice approach.

Fleet Farm also uses training resources, such as ATF seminars and NSSF guidance described in this report, that are not required by regulation. The use of these resources to supplement Fleet Farm's internal training and policies is an industry best practice approach.

*    *    *

In summary, Fleet Farm meets and exceeds the industry standard for transferring firearms, as well as monitoring for and preventing possible straw purchases. Furthermore, Fleet Farm provides best in industry training, tools, and support for gun counter employees to be successful in their role.

---

[62] FF_0042289

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opinion #2: Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.**

  A. <u>The industry standard for auditing firearm sales and ensuring employee compliance with firearm policies and procedures</u>.

On the topic of auditing, it is standard practice for FFLs to require a second set of eyes for reviewing firearm-related paperwork, including the ATF Forms 4473 and 3310.4 and A&D book entries, to ensure compliance with internal policies as well as federal recordkeeping and reporting requirements. It is also standard industry practice for FFLs to implement certain additional auditing programs, including monthly reviews of firearm-related paperwork and firearm inventory counts with varying frequencies.

On the topic of employee discipline, disciplinary practices vary significantly amongst FFLs, but as a general matter, small, independent FFLs tend to have less formal disciplinary procedures, while larger FFLs and chain stores tend to have progressive discipline policies, whereby an employee may be subject to a series of escalating disciplinary activities for violating firearm policies, up to and including possible termination.

During my hundreds of visits to FFLs and discussions with them regarding how to audit and ensure compliance with ATF regulations, I, consistent with these standard practices, often recommend that FFLs implement certain industry standard steps, including:

- Auditing paperwork and processes related to firearm transfers, such as reviews of the Firearm Acquisition and Disposition (A&D) record, government forms, filing procedures, inventory audits, counting of firearms on hand, and matching ATF forms to the A&D record to ensure proper documentation.

- Establishing a consistently applied disciplinary process for advising employees of errors committed and the consequences. Each FFL has different needs based on the size of its business. For example, a small one-person FFL typically does not have a written process; however, larger FFLs will have a written process and partner with their Human Resources department to write, train, and execute applicable gun counter process policies.

34

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

In summary, an FFL that implements a second set of eyes on firearm-related paperwork, conducts regular auditing programs relating to that paperwork and its firearm inventory, and enforces a progressive disciplinary policy is operating in accordance with the industry standard for auditing firearm sales and ensuring employee compliance with firearm transaction policies.

      B.      <u>Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures.</u>

Fleet Farm deploys extensive internal measures to audit firearm sales and safety, and to ensure that its employees operate in compliance with its firearm policies and procedures, which in my view are best in class.

Beginning with auditing, Fleet Farm requires its stores and employees to perform daily, weekly, quarterly, and annual firearm audits, as described in Fleet Farm's "Policies and Guidelines" for "Sales and Handling of Firearms"[63]:



This is also reflected in Fleet Farm's quarterly trainings:

---

[63] FF_0005605

35

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



Specifically, Fleet Farm's ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Fleet Farm's ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

---

[64] FF_0000102-FF_0000103; FF_0000108-FF_0000117; FF_0024411; Michelle Granato Deposition Transcript at 70-71; Kevin McKown Deposition Transcript at 114-15, 119
[65] FF_0000104; FF_0000118-FF_0000125; Michelle Granato Deposition Transcript at 63, 71-72; Kevin McKown Deposition Transcript at 119

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Fleet Farm's ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Fleet Farm also conducts ████████████████████████████████

████████████████████████████████████████████████████

Turning to employee discipline, in relation to firearm sales, Fleet Farm has developed a set of "guidelines" that identify "Critical and Non-Critical" errors relating to ATF Form 4473s and/or firearm audits.[68] Fleet Farm has an extensive list of critical errors, including: (i) "[t]ransferring a firearm to a customer without an ATF 4473"; (ii) "[t]ransferring a firearm to a customer without a background check being contemplated where required"; (iii) "[t]ransferring a firearm to a customer on a 'Denied' or 'Delayed' transaction without a 'Proceed' response"; (iv) "[t]ransferring a firearm to a customer with an answer to questions [on the ATF Form 4473] that indicate the customer was a prohibited person"; (v) "[t]ransferring a firearm to a customer willfully knowing that the transaction is a 'Straw Purchase'"; (vi) "[c]ompleting any portion of Section A [of the ATF Form 4473] for a customer"; and (vii) "[f]ailing to have form double-checked prior to transfer."[69] Fleet Farm provides that "[a]ccountability for a Critical error is generally progressive in nature unless the error was deemed intentional and/or the error was intentionally covered up, then the error is subject to discipline up to and including termination based on the offense."[70] Fleet Farm stores

---

[66] FF_0000105; FF_0000126; Michelle Granato Deposition Transcript at 72; Kevin McKown Deposition Transcript at 119-20

[67] Kevin McKown Deposition Transcript at 120-21

[68] FF_0002871

[69] FF_0002871

[70] FF_0002872; *see also* Kevin McKown Deposition Transcripts at 135-37, 142-43

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

utilize an "ATF 4473 and Firearm Auditing Error Tracking Sheet" to log instances of employees committing critical or non-critical errors.[71] And records in this case illustrate that Fleet Farm disciplines its employees for violating its firearm policies.[72]

> C.   Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures meet, and in many instances exceed, the industry standard.

Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its policies and procedures meet, and in many instances exceed, the industry standard. Specifically, for auditing, Fleet Farm uses electronic record keeping processes and has a robust written audit program to identify and correct errors and educate staff on key findings. And it utilizes a series of auditing processes to ensure that firearm-related paperwork is properly completed and maintained, and that firearm inventories remain secure and accurate. These auditing processes are wholly consistent with industry standard, and are more robust than those implemented by many FFLs. In my expert opinion, Fleet Farm appears to never stop reviewing their processes and firearms transactions, learning about industry regulations, sharing the learning with gun counter staff, upgrading or updating their approach, and embracing technology to assist with execution of processes. In this regard, Fleet Farm stands out in my opinion as responsive and always striving to have its FFLs operating as "best in class" in the firearms industry.

As for employee discipline, Fleet Farm has a robust disciplinary program to identify and address gun counter staff errors. Fleet Farm's progressive discipline policy establishes levels of errors and the expected action to be taken, and in cases of staff members who are not able to correct behavior, the process can end in termination of employment for the staff member. In fact, records in this case reflect that Fleet Farm employees were notified of errors that were identified, those

---

[71] FF_0002315
[72] FF_0041016; FF_0041024 FF_0041030; FF_0041058

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

employees were required to discuss the standards for acceptable performance, and, depending on the frequency and severity of the offense, employee discipline ranged from managers meeting, to verbal or written warnings, to termination of employment.[73] These records demonstrate a robust diligence and discipline practice at Fleet Farm.[74] To put it simply, Fleet Farm's approach to employee discipline is an industry best practice approach on how an FFL should handle performance at the gun counter by employees.

**Opinion #3: Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms**

I have reviewed all of the ATF Form 4473s and, where applicable, ATF Form 3310.4s for Fleet Farm's sales to Sarah Elwood and Jerome Horton.[75] In my expert opinion, each of these forms was completed properly, and it appears that NICS instructed Fleet Farm to "Proceed" with each of the sales to Horton and Elwood.

I have also reviewed other records surrounding these transactions. Specifically, I reviewed all of the available video footage of sales to Jerome Horton.[76] This video footage does not show any conduct by Horton that should have resulted in the Fleet Farm employee refusing to complete

---

[73] 0041016; FF_0041024 FF_0041030; FF_0041058

[74] FF_0041016; FF_0041024 FF_0041030; FF_0041058

[75] FF_0000008; FF_0000034; FF_0000049; FF_0000056; FF_0000127; FF_0000201; FF_0000208; FF_0000234; FF_0000238; FF_0000246; FF_0000254; FF_0000259; FF_0000307; FF_0000311; FF_0000331; FF_0000363; FF_0000438; FF_0000467; FF_0000471; FF_0000479; FF_0000570; FF_0000574; FF_0000581; FF_0000588; FF_0000607; FF_0000614; FF_0000713; FF_0014673

[76] FF_0037709; FF_0037710; FF_0037711; FF_0037712; FF_0037713; FF_0037714; FF_0037715; FF_0037716; FF_0037717; FF_0037718; FF_0037719; FF_0037720; FF_0037721; FF_0037722; FF_0037723; FF_0037724; FF_0037725; FF_0037726; FF_0037727; FF_0037728; FF_0037729; FF_0037730; FF_0037731; FF_0037732; FF_0037733; FF_0037734; FF_0037735; FF_0037736; FF_0037737; FF_0037738; FF_0037739; FF_0037740; FF_0037741; FF_0037742; FF_0037743; FF_0037744; FF_0037745; FF_0037746; FF_0037747; FF_0037748; FF_0037749; FF_0037750; FF_0037751; FF_0037752; FF_0037753; FF_0037754; FF_0037755; FF_0037756; FF_0037757; FF_0037758; FF_0037759; FF_0037760; FF_0037761; FF_0037762; FF_0037763; FF_0037764; FF_0037765

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the sale. Throughout these videos, Horton appears poised and not anxious while waiting for the transactions to be completed. There were no indications of delays or denials from NICS (as confirmed by the ATF Form 4473s themselves, which indicate that Fleet Farm received a "Proceed" message before completing each transaction). As for the presence of individuals alongside Horton in certain videos, quite often customers are excited about buying a new firearm and will bring a friend or relative along. Without hearing Horton's conversations or seeing more video footage (which I understand does not exist, due to Fleet Farm's standard retention policies), it is impossible to deduce why Horton was accompanied by others during certain transfers of firearms. And again, the mere fact that Horton was accompanied by others during certain transfers is not, by itself, an indicator of a possible straw purchase. Lastly, Horton purchased accessories from Fleet Farm during several transactions.[77] In my experience, straw purchasers and/or firearm traffickers are often solely interested in purchasing the firearm(s) and getting out of the store as quickly as possible.

I also reviewed the incident report that Fleet Farm employee Cory Klebs prepared roughly half a year after the July 31, 2021 sale of three firearms to Horton, which recounts his recollection of that sale.[78] In Mr. Klebs' notes from this incident report,[79] Klebs detailed looking at Horton's required completed government documents not once but twice, rechecking company policy with another member of management, asking the gun counter staff member if there were any concerns, and authorizing the transaction to proceed after being satisfied that there were no concerns with

---

[77] FF_0001781; FF_0001821

[78] FF_0075711

[79] It is not standard practice for FFLs to maintain records similar to Fleet Farm's "incident reports." I am impressed with Fleet Farm maintaining a repository of "incident reports," as this provides the company with a central point to keep notes and update documentation on specific incidents that occur in a large retail store. From a recordkeeping standpoint, this is another example of Fleet Farm operating above the industry standard.

the transaction, and then afterwards – although there was no basis to prevent this transfer from taking place – sending a recap to Fleet Farm's corporate office for additional scrutiny.[80] The steps that Klebs describes in this incident report are above and beyond what I see at other FFLs, both in terms of the act of documenting and updating notes on incidents, as well as in terms of the lengths of steps detailed in the report that Klebs undertook to ensure a firearm transfer is lawful and to assess the circumstances for indicators of a possible straw purchase attempt.

Additionally, Klebs testified that during this sale, he "was involved in the double-check" and "went through and . . . ask[ed] him if he was the actual purchaser of the firearm and why he was purchasing so many .9 millimeters at the same time."[81] Horton told Klebs that he was the actual buyer, and that "he was trying to start up a collection."[82] Klebs was "satisfied with his answers," and at the time of the sale, neither Klebs nor Fleet Farm gun counter employee Bret Nordquist believed Horton's transaction to be a potential straw purchase.[83] This is a best in class approach for how an employee should go about examining a transaction for indicators of a possible straw purchase, and goes beyond what ATF and NSSF recommends.

In addition to these records, my conclusion that Fleet Farm's sales to Horton and Elwood did not violate industry standard or Fleet Farm's own policies is supported by ATF communications to Fleet Farm and Horton and Elwood's plea agreements.

On October 14, 2021, ATF Special Agent Kylie Williamson contacted Fleet Farm to request records for Horton's firearm purchases from Fleet Farm stores, including "any available records regarding the method of payment and any available surveillance video associated with any

---

[80] FF_0075711
[81] Cory Klebs Deposition Transcript at 40
[82] Cory Klebs Deposition Transcript at 41
[83] Cory Klebs Deposition Transcript at 41-42, 167, 177, 215

41

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

firearms related purchases."[84] Fleet Farm provided Agent Williamson with "all of the paperwork we have" one day later,[85] and also provided all available videos of the transactions.[86] And on October 20, 2021, Agent Williamson told Fleet Farm "that the cooperation she received was fantastic and everything she requested was provided very quickly," "[s]he was impressed by our organization in gathering the items not just at one store but every store involved," and "[s]he expressed that in no way did [Fleet Farm] do anything wrong by selling this individual the firearms" because "[t]here was nothing in his background that would have rendered a denied response."[87] The written response from the ATF agent is above and beyond what I have typically seen. In my experience FFLs generally experience anxiety when interacting with a federal agency such as the ATF and in a lot of cases the ATF will not provide feedback on ongoing cases, give advice such as whether to proceed with a firearm transfer, or comment on the FFL's operations. Here, in contrast, it is notable that the ATF agent praised Fleet Farm for its cooperation in the investigation. And in my experience, a statement from ATF to Fleet Farm that "in no way did [Fleet Farm] do anything wrong by selling this individual the firearms" confirms my own analysis of Fleet Farm's sales to Horton: there is nothing in Horton's written records or the video recordings of Horton's transactions that should have alerted Fleet Farm to the possibility that Horton was engaging in straw purchasing.

Horton and Elwood were charged with straw purchasing in federal court, and both pleaded guilty. In Horton's Plea Agreement, he "stipulate[d] and agree[d] that on July 31, 2021, he knowingly and voluntarily made a false written statement to Fleet Farm . . . . This false statement

---

[84] FF_0001485

[85] FF_0002644

[86] FF_0075713; FF_0076414

[87] FF_0001484

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

was made in connection with the acquisition of a firearm, and *was intended and likely to deceive Fleet Farm* about a fact material to the lawfulness of the sale of the firearm."[88] He "further stipulate[d] that he purchased 32 additional firearms from [FFLs] . . . and made similar false statements in connection with the purchase of all of them."[89] And in Elwood's Plea Agreement, she agreed that she "conspired . . . to buy dozens of firearms from [FFLs], while knowingly making false and fictitious oral and written statements that *were intended or likely to deceive those dealers* regarding a fact material to the lawfulness of the sale," particularly by "knowingly misrepresent[ing] to the dealer both orally and in writing that she was the actual purchaser" of the firearms.[90]

In reviewing Horton and Elwood's federal plea agreements, there is no indication that Fleet Farm was aware of, participated in, had knowledge of the straw purchases being perpetrated. On the contrary, Horton and Elwood accepted responsibility for their actions, and acknowledged that they were successful in perpetrating their straw purchasing crime by making false statements at several different FFLs. That both Horton and Elwood were able to deceive this many different FFLs indicates to me that they were very adept at deception, and further supports the conclusion that Fleet Farm did not know or have reason to know Horton or Elwood were engaging in straw purchasing when they visited Fleet Farm's stores. Again, the industry standard does not expect an FFL to be 100% successful in preventing all straw purchases. This is certainly the case where, as here, straw purchases have occurred, but the circumstances surrounding those purchases show that (i) the FFL had robust policies in place for monitoring for and preventing straw purchases, (ii)

---

[88] AGO0000262
[89] AGO0000262 – AGO0000263
[90] AGO0000207 – AGO0000208

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

those policies were followed as to those purchases, and (iii) the straw purchasers did not exhibit indicia of straw purchasing during the transaction that should have resulted in a refused sale.

In fact, the conduct of the other FFLs that sold firearms to Horton stand in stark contrast to Fleet Farm, and confirm that Fleet Farm did not have reason to suspect Horton of straw purchasing at the time of his transactions at their stores. In ATF Special Agent Kylie Williamson's affidavit in support of the criminal complaint against Horton,[91] Agent Williamson described two transactions that Horton made at the Frontiersman Sports in St. Louis Park:

**Transaction #1[92]**

> 11.    On October 14, 2021, I spoke to an employee of Frontiersman Sports in St. Louis Park. The employee confirmed that HORTON had purchased firearms on more than one occasion, including the Taurus model G2C HORTON purchased earlier that day. The employee informed me that one of his co-workers had recorded the license plate of the vehicle in which HORTON had arrived due to suspicions regarding straw purchasing.

Under Fleet Farm's straw purchase policies, described above, this transaction would not have been allowed because the Frontiersman Sports employee reported having "suspicions regarding straw purchasing" at the time of the transaction, and the indicia of a straw purchase described here do not appear anywhere in the record for Fleet Farm's sales to Horton or Elwood.

---

[91] ATF0001903
[92] AGO0001909

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Transaction #2**[93]

12. On October 15, 2021, I went to Frontiersman Sports in St. Louis Park. Employees provided me with ATF Forms 4473 for firearms HORTON had purchased on four different occasions. An employee also provided still photographs captured during each purchase, as well hand-written notes the employee had made related to HORTON's

purchase of two pistols on September 29, 2021. The notes indicated the following:

    a. HORTON's purchase was a suspected straw purchase.

    b. HORTON's vehicle parked in a nearby Jacuzzi business parking lot to avoid Frontiersman's surveillance cameras.

    c. HORTON presented a learner's permit as opposed to a driver's license.

    d. HORTON had made multiple purchase of firearms over two days.

    e. While HORTON was inside the store, he received a phone call and stated "I'm still in the store."

    f. HORTON paid cash and used small denominations for a total of $1,160.

    g. As HORTON walked toward the Jacuzzi business parking lot, HORTON waived the gun boxes in the air to people waiting outside.



Fig. 1: a screen shot from surveillance video by the Frontiersman Sports employee surveillance, showing HORTON waiving the gun boxes to people waiting outside.

---

[93] AGO0001909-AGO0001910

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Here again, based on all the observations described in Frontiersman Sports' note, this transaction would not have been allowed under Fleet Farm's policies, and the indicia of a straw purchase described here do not appear anywhere in the record for Fleet Farm's sales to Horton or Elwood.

\*        \*        \*

Based on my professional experience, including decades in the firearms business and my observations of hundreds of other FFLs, my expert opinion is that Fleet Farm operates a "best in class" approach and execution of processes relating to firearm sales, including its adherence to government regulations, holistic training on how to examine firearm transactions for indicia of a possible straw purchase attempt, and its extensive onboarding training and ongoing training for gun counter staff regarding the sale of firearms. Fleet Farm's programs result in their FFLs operating in a manner that exceeds the industry standard for monitoring for and preventing straw purchases, as well as the programs that have been implemented by many of the other large retail FFL chains. So, I will end where I began this opinion with the following, summary observations:

1. Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.

2. Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.

3. Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Dated: OCTOBER 3, 2024

William B. Napier

**Appendix A**

# William B. Napier, LPC

lpcbill@gmail.com
308-249-0131

*Napier Consulting, LLC*                                              *2014 - Present*
*President*

Provide world class professional and "C" suite executive consulting services to the retail industry. Share post visit executive summary with suggested action items on ATF compliance, operations and security practices for retail, distributors, and manufactures. Educate industry leadership on cost effective retail operations solutions, loss prevention and security best practices from start up through mature programs.

Lead training and conduct public speaking engagements for major industry trade group, National Shooting Sports Foundation (NSSF). Liaison with Alcohol Tobacco and Firearms (ATF) on behalf of industry trade group and Federal Firearms Licensees. Develop, distribute, then educate industry on relevant programs. Conduct analysis of emerging trends with industry-wide reporting.

Testified before the United States House of Representatives' Rules Subcommittee on the Legislative and Budget Process regarding "Tools to Combat Gun Trafficking and Reduce Gun Violence in Our Communities." Opined as an expert witness regarding straw purchase activity, customer firearms purchase habits, duty to report firearm transactions, video usage by retailers, and ATF trace requests.

*Cabela's, Sidney, Nebraska*                                              *2005 – 2013*
*Operations Senior Manager Corporate Asset Protection*

Built and led the decentralized asset protection team for this Omni-channel, multi-national specialty retailer with sales of more than 3 billion dollars and over 12,000 team members. Planned and managed "enterprise-wide" investigations, loss reduction culture using exception-based reporting, analytical and problem solving as well as root cause analysis. Established best practice review, and ROI modeling.

- Collaborated to develop effective audit program at all levels of the company.
- Developed a successful crisis management plan through companywide partnerships to mitigate risk and loss to the company during critical incidents and emergency response, with annual program testing.
- Established and maintained liaisons with law enforcement.
- Built and implemented aviation department security plan.
- Initiated, conducted, and managed numerous in-depth investigations at all levels of the organization.
- Developed and managed comprehensive executive protection program.
- Built a team that analyzed statistical data to determine risk.

- Approved and managed third party vendors for installation of innovative technology physical security systems such as burglar alarm, CCTV, and card access.
- Collaborated with IT development and implementation teams to integrate security systems into enterprise IT plan.
- Built and operated enterprise-wide regulatory initiatives program.
- Provided executive leadership to developed talent and highly engaged decentralized team.
- Effectively communicated recommendations and findings at all levels of the organization.
- Planned, developed, and managed expense and capital budgets above $10 million with proven ROI.

1

## *Reserve Police Sergeant*
*Lawrence Indiana Police Department*
*Muncie Indiana Police Department*

Provided law enforcement service to citizens of community, led teams of officers.

- Uniform patrol duties enforcing local and state laws.
- Plain clothes, executive and witness protection, juvenile and adult criminal investigations.
- Specialized training on impaired driving enforcement, recognized by MADD for results.

- Supervised team of officers.
- Provided certified law enforcement training to officers.
- Engaged in off duty security at major concert venues and professional sporting events.

## *Continuing Education*
- Maintain business relevance at related seminars, conferences, workshops.

- Law enforcement classes, seminars, workshops, certifications, more than 600 training hours.

## *Professional Certifications*
- Loss Prevention Certified (LPC), The Loss Prevention Foundation
- Wicklander-Zulawski and Associates interviewing and interrogation.

- Lean Six Sigma Yellow Belt
- LEOSA Firearms Qualification

## *Relevant Affiliations that Maintain Cutting Edge and Give Back to Industry*
- The Loss Prevention Foundation – Emeritus - Board of Directors
- Former member - ASIS International Retail Asset Protection Council, Learning and Strategy Committee

- LPRC (Loss Prevention Research Council) - University of Florida

## *Global Impact to Industry*
- Published in business magazines NRF Stores, Loss Prevention Magazine, Apparel Magazine, Security Director News, SHOT Business, SHOT Show Television and Security Magazine.
- Guest speaker for The Loss Prevention Foundation, National Retail Federation, ASIS, and National Shooting Sports Foundation.
- Presentations at ATF, FBI Seminars across the country.
- Former Hunter Education Instructor – Nebraska.

www.linkedin.com/in/bill-napier-lpc-8505508

**Appendix B**

| AGO0000207 | FF_0000259 |
|---|---|
| AGO0000261 | FF_0000307 |
| AGO0001903 | FF_0000311 |
| ATF0000001 | FF_0000331 |
| ATF0000004 | FF_0000363 |
| ATF0000076 | FF_0000438 |
| ATF0000130 | FF_0000467 |
| ATF0000172 | FF_0000471 |
| ATF0000344 | FF_0000479 |
| ATF0000384 | FF_0000570 |
| ATF0000458 | FF_0000574 |
| ATF0000544 | FF_0000581 |
| ATF0000691 | FF_0000588 |
| ATF0000800 | FF_0000607 |
| BGS0000005 | FF_0000614 |
| DKM0000012 | FF_0000713 |
| FF_0000008 | FF_0000860 |
| FF_0000012 | FF_0000898 |
| FF_0000034 | FF_0000906 |
| FF_0000049 | FF_0000910 |
| FF_0000056 | FF_0000922 |
| FF_0000101 | FF_0000936 |
| FF_0000127 | FF_0000955 |
| FF_0000201 | FF_0001484 |
| FF_0000207 | FF_0001485 |
| FF_0000208 | FF_0001497 |
| FF_0000234 | FF_0001499 |
| FF_0000238 | FF_0001507 |
| FF_0000246 | FF_0001514 |
| FF_0000254 | FF_0001520 |

| | |
|---|---|
| FF_0001531 | FF_0032623 |
| FF_0001542 | FF_0035424 |
| FF_0001547 | FF_0035701 |
| FF_0001554 | FF_0035710 |
| FF_0001781 | FF_0036479 |
| FF_0001882 | FF_0036513 |
| FF_0002315 | FF_0037709 |
| FF_0002730 | FF_0037710 |
| FF_0002871 | FF_0037711 |
| FF_0003424 | FF_0037712 |
| FF_0003449 | FF_0037713 |
| FF_0003450 | FF_0037714 |
| FF_0005654 | FF_0037715 |
| FF_0005711 | FF_0037716 |
| FF_0005715 | FF_0037717 |
| FF_0005730 | FF_0037718 |
| FF_0005734 | FF_0037719 |
| FF_0005745 | FF_0037720 |
| FF_0005748 | FF_0037721 |
| FF_0005754 | FF_0037722 |
| FF_0005760 | FF_0037723 |
| FF_0005769 | FF_0037724 |
| FF_0005775 | FF_0037725 |
| FF_0005790 | FF_0037726 |
| FF_0005798 | FF_0037727 |
| FF_0005802 | FF_0037728 |
| FF_0005816 | FF_0037729 |
| FF_0005820 | FF_0037730 |
| FF_0005831 | FF_0037731 |
| FF_0014673 | FF_0037732 |
| FF_0024411 | FF_0037733 |

| | |
|---|---|
| FF_0037734 | FF_0037761 |
| FF_0037735 | FF_0037762 |
| FF_0037736 | FF_0037763 |
| FF_0037737 | FF_0037764 |
| FF_0037738 | FF_0037765 |
| FF_0037739 | FF_0040770 |
| FF_0037740 | FF_0040797 |
| FF_0037741 | FF_0040813 |
| FF_0037742 | FF_0040832 |
| FF_0037743 | FF_0040898 |
| FF_0037744 | FF_0041016 |
| FF_0037745 | FF_0041024 |
| FF_0037746 | FF_0041030 |
| FF_0037747 | FF_0041058 |
| FF_0037748 | FF_0042289 |
| FF_0037749 | FF_0075711 |
| FF_0037750 | FF_0075713 |
| FF_0037751 | FF_0076414 |
| FF_0037752 | FS0000001 |
| FF_0037753 | RF0000001 |
| FF_0037754 | SG0000004 |
| FF_0037755 | TMS0000089 |
| FF_0037756 | 2024/06/13 Deposition Transcript of Kevin McKown pps. 1 - 8, 17 - 20, 29 - 80, 89 - 152, 169 - 172, 185 - 202, 225 - 228. |
| FF_0037757 | 2024/06/19 Deposition Transcript of Michelle Granato pps. 1 - 8, 17 - 136, 145 - 148, 169 - 188, 201 - 224, 233 - 244. |
| FF_0037758 | 2024/06/20 Deposition Transcript of Mike Radl pps. 1 - 4, 13 - 68, 77 - 92, 125 - 128, 233 - 136. |
| FF_0037759 | 2024/06/29 Deposition Transcript of Derrick Hoernke pps. 1 - 4, 25 - 68, 77 - 92, 113 - 120, 161 - 176. |
| FF_0037760 | 2024/07/17 Deposition Transcript of Brad Hansen pps. 1 - 8, 25 - 56, 89 - 92, 101 - 104. |

3

| |
|---|
| 2024/07/24 Deposition Transcript of Branden Sierakowski pps. 1 - 12, 17 - 64, 81 - 104, 141 - 144, 161 - 164. |
| 2024/07/30 Deposition Transcript of Bret Nordquist pps. 5 - 8, 157 - 160. |
| 2024/09/05 Deposition Transcript of Cory Klebs pps. 1 - 8, 29 - 32, 37 - 48, 53 - 60, 181 - 212. |
| 2023/06/27 Fleet Farm_MN AG 2023.06.27 [ECF 36] Memorandum Opinion and Order Denying Plaintiff's Motion to Remand and Denying Defendant's Motion to Dismiss |
| 2023/08/10 State of Minnesota v. Fleet Farm LLC, et al. - State's Initial Disclosures |
| 2023/08/10 State of Minnesota v. Fleet Farm LLC, et al. - Fleet Farm's Initial Disclosures |
| 2023/08/21 Fleet Farm's Responses and Objections to Plaintiff's First Set of Interrogatories |
| 2023/12/04 Minnesota Response to Fleet Farm's First Set of Interrogatories |
| 2024/02/17 State v. Fleet Farm LLC, et al. - Defs.' Amended Responses and Objections to Plaintiff's Interrogatory Nos. 2, 6, and 13 |
| 2024/03/05 Fleet Farm_MN AG 2024.03.05 [ECF 79] First Amended Complaint |
| 2024/07/12 Fleet Farm_MN AG [ECF 117] Fleet Farm Mem. ISO Motion to Compel |
| 2024/07/12 Fleet Farm_MN AG [ECF 118] Wright Declaration in Support of Motion to Compel and Exhibits |
| 2024/07/29 Fleet Farm_MN AG [ECF 130] Order on Motion to Compel |
| https://www.nssf.org/articles/beware-the-straw-purchase/ |
| Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One, NSSF – The Firearm Industry Trade Association |
| https://www.nssf.org/articles/tag/dont-lie-for-the-other-guy/ |
| The Evolution of Camera Phones, Association for Advancing Automation (February 2, 2016) |
| https://www.nssf.org/articles/giving-a-firearm-as-a-gift-some-reminders-from-nssf/ |

4

# EXHIBIT B

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Expert Report of Andrew Graham**

*State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## INTRODUCTION

This matter relates to Fleet Farm's policies and procedures regarding monitoring for and preventing possible straw purchasers from acquiring firearms from Fleet Farm stores, and specifically concerns Fleet Farm's sales to two individuals who have pleaded guilty in federal court to straw purchasing, Jerome Horton and Sarah Elwood.

My understanding is that Plaintiff State of Minnesota, by its Attorney General, Keith Ellison, alleges that Fleet Farm had inadequate policies and procedures relating to monitoring for and preventing possible straw purchases, and was negligent in selling certain firearms to Horton and Elwood. For the reasons detailed in this report, my expert opinion is that the Plaintiff is mistaken as to both of these allegations. Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchasing are entirely consistent with, and in many instances go well above and beyond, ATF policies and guidelines for preventing straw purchasing. And nothing about Fleet Farm's sales to Horton and Elwood violate any federal law, ATF regulation, or ATF policy or guideline relating to monitoring for and preventing straw purchasing.

## QUALIFICATIONS AND COMPENSATION

I was appointed as the Deputy Assistant Director, Enforcement Programs and Services (EPS), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), in May 2020 until retirement in December 2022. Prior to this appointment, I served six years as the Deputy Assistant Director, Industry Operations, Field Operations, from August 2014 – May 2020. My 37-year career with the ATF includes selection as the first Director of Industry Operations (DIO) of the Denver Field Division, the Bureau's 24th field division and, in 2004, I was appointed as the Area Supervisor in Denver, under the Phoenix Field Division, with oversight of regulatory operations in Colorado, Wyoming, and Utah.

In January 2000, I was assigned to ATF's National Academy to oversee new investigator training (Industry Operations Investigator Basic Training). As the senior Program Manager, I had oversight of this training program for four years. I began my career with ATF in 1985, while still enlisted in the United States Air Force (Air National Guardsman), entered public service as an intern with the National Firearms Act Branch in Washington, D.C., and in 1986 joined the ATF professional ranks as an Inspector. I executed the ATF's regulatory mission under both Treasury and the Department of Justice for 14 years in Tennessee, Alabama, and Mississippi. My military service includes the United States Air Force (USAF), the District of Columbia Air National Guard, and Tennessee Air National Guard for nine years while serving as a field inspector in Nashville, Tennessee.

I attended George Mason University as a Business Administration major and received continuing executive education through the Department of Justice Executive Core Review Board, Harvard Kennedy School of Executive Education.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

My career encompassed various positions within the ATF, ranging from Regulatory Field Inspector under the Treasury Department (1986-2000) and Field Industry Operations Investigator (IOI), Area Supervisor-Phoenix Field Division, DIO-Denver Field Division, Deputy Assistant Director-HQ Field Operations (national oversight), Deputy Assistant Director – Enforcement Programs Services (national oversight) under the Department of Justice (2000-2022).  I am a 14-year veteran of conducting compliance inspections, enforcing the Code of Federal Regulations (CFR) under the 1968 Gun Control Act (GCA), and pursuing ATF's Federal Firearms Administrative Action Policy and Procedures over federal firearm licensees' (FFLs) businesses.

In executing compliance inspections and administering the CFR, I assessed FFLs' business operations, accurately completed required GCA records to identify violations, and determined their impact on public safety, compliance with record keeping requirements, and impact on crime gun traces.  The scope of these inspections was to ensure that FFLs were obtaining and transferring firearms through legal commerce and not diverting them to support criminal activity.  My job was to determine operational compliance with the CFR, identify falsification of records, and determine if the FFL's activity was a risk to public or obstructed successful firearm traces.

As a Training/Program Manager assigned to the ATF National Academy from 2000 – 2004, I supervised the Industry Operations program, intake, and training of several hundred new hires.  I taught and supervised compliance inspection techniques, ranging from FBI NICS or Point of Sale background checks to falsifying GCA records, resulting in violations and license revocation.

Late in 2004, I was promoted to the first-line Area Supervisor position in Denver, Colorado under the Phoenix Field Division.  I led a team of 20 IOIs located throughout Colorado, Wyoming, and Utah who conducted on-site firearm application and compliance inspections.  Working hand in hand with division counsel, I helped IOIs refine and develop their findings of hidden ownership or sham applications, which resulted in advancing the case up the chain of command to the DIO for review and consent to proceed with denial.  With regards to relating the administrative action policy to FFL revocations and other administrative actions such as warning letters or warning conferences, I worked with division counsel to assist in the refinement of inspection results and final recommendations.  In applying the ATF's administrative action policy, which included warning letters, warning conferences, and revocations, I evaluated evidence, such as completed Form 4473 transaction records, bound book entries, background check results, and a plethora of other evidence to confirm willful violations before pushing the case forward to the DIO and SAC for review.

In late 2006, ATF established a 24th field division in Colorado.  Field offices and personnel from the St. Paul and Phoenix divisions were realigned to create a division office in Denver.  I was appointed to the DIO position and had oversight of all regulatory inspections conducted in Colorado, Wyoming, Montana, and Utah.  As part of the senior division management team, I was responsible for applying ATF's administrative action policy to compliance inspections of

2

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

approximately 8700 active FFLs, located between the 4 states.  During my tenure as DIO (July 2006 – October 2014), I presided over 250+ administrative actions that included application denials, revocation of FFLs, and alternate action cases, wherein FFLs had the opportunity to remediate operations.

In October 2014, I was appointed to serve as Deputy Assistant Director over the ATF's regulatory enforcement directorate, Industry Operations located in Headquarters, Washington, DC.  I was part of ATF's executive management team and advisor on regulatory operations to ATF's Director.  I worked directly with Chief Counsel's office and regional Associate Chief Counsel(s) to monitor, evaluate, and apply ATF's administrative action policy to FFLs found violating the GCA. This involved evaluating monitored cases submitted from all 25 field division offices under Notices of Revocation and Notices of Denial.

The Administrative Action Policy was evaluated and modified twice during my term as Deputy Assistant Director to streamline efficiencies of the policy and provide the DIO, Area Supervisor, and field IOI latitude and or discretion in managing regulatory matters, i.e., correctable record-keeping errors versus licensees operating in blatant disregard of a known legal obligation with proposed alternate actions, such as Area Supervisor or DIO-led warning conferences in lieu of revocation where good cause, absent criminal activity, was present.

Throughout my seven-year term as Deputy Assistant Director, I presented and discussed the ATF's inspection policies before the Department of Justice, field division outreach venues, and industry engagements at the national level to establish perspective as a regulator, and assisted industry members with understanding their responsibilities prescribed by the GCA.

In May 2020, I was assigned to the Deputy Assistant Director position to head up the ATF's Enforcement Programs and Services (EPS) directorate.  In this directorate, I managed operations and policy associated with ATF's National Tracing Center, Firearms Ammunition Technology Division, Firearms & Explosives Licensing Center, National Firearms Act Division, Office of Regulatory Affairs, Firearm Explosive Industry Division, and Firearm Explosive Legal Division (FELD).

My oversight on operations associated with the National Tracing Center was to maintain consistent processes and memoranda of understanding associated with federal, state, local, and foreign law enforcement agencies regarding the tracing of crime guns and suspected crime guns through the distribution chain to the first retail purchaser.  Activities included policy revision allowing state and local law enforcement and firearm manufacturers automated e-Trace or electronic trace capabilities access to streamline the firearm trace process for both regulator and user.

The Firearms Ammunition Technology Division is ATF's technology authority relating to firearms and their classification under federal law in response to law enforcement agencies, industry tests, evaluations, and classifications, while providing services to the firearm industry.  My focus in this

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

capacity was to ensure guidance was consistently provided to all within the parameters of the GCA and all presiding ATF ruling effecting commerce and GCA policies.  Overseeing operations at the National Firearms Act branch (NFA) required policy development on the importation of restricted post-1986 machine guns and the ATF's enhancement efforts of electronic submission of all NFA transfer forms associated with law enforcement and tax paid transfers.  This division processes all applications to make, export, transport, and register NFA firearms (short barrel rifles, short barrel shotguns, silencers, destructive devices, machine guns etc.).  I was responsible for implementation and support deployment between two internal divisions established for managing government entities and industry support branch with NFA weapons falling under tax paid or tax exemption transfers associated with this national registry.

ATF's firearm and explosive licensing center is charged with timely processing applications for firearms and explosive licensure associated with Importation, Manufacturing, and Dealing with regulated industries.  My responsibility was coordinating congressionally mandated requirements on timely issuance of firearm licenses and timely renewals of all explosive licenses with ATF's 25 field division offices.  License and permit maintenance in the licensing database required monitoring relative to pending administrative or criminal actions, which impacted ATF's field operations and inspection process.  Both licensing centers are at the center of all external communications with field division representatives, and I was positioned to keep this process flowing, servicing our taxpayers.

The Office of Regulatory Affairs and Firearm Explosive Industry Processing division serves to publish, develop, and provide guidance on proposed rulemaking and ATF policy that impacts industry and all 25 ATF field divisions.  In my capacity as Deputy, I was integrated in this process, review and development of each initiative, Newsletters, Open guidance letters, and new proposed rules (NPRM), spearheaded by each division chief.

I have not previously opined as an expert witness.  I have testified before a United States House of Representatives Committee on the Judiciary Select Subcommittee on May 22, 2024.[1]

Attached, as Appendix A, is a true and correct copy of my curriculum vitae.  Attached, as Appendix B, is a list of the materials I reviewed in connection with preparing this report.  I am over 18 years of age.  I am being compensated at a rate of $300 per hour for my time on this matter.  My compensation is not contingent on the results of my analysis or the substance of my testimony

## SUMMARY OF OPINIONS

I was retained by Stinson LLP on behalf of Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (together, "Fleet Farm") to assess Fleet Farm's policies and procedures relating to firearm sales and monitoring for and preventing straw purchasing, as

---

[1] Graham Testimony.pdf (house.gov)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

well as Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood.  Based on my review of the documents cited in this report, the transcripts of certain depositions taken in this matter, and publicly available publications from ATF, I have reached the opinions listed below:

**Opinion 1**:  During the relevant time period in this matter,[2] ATF instructed FFLs to monitor for the following potential "indicators" of a possible straw purchase: (1) "[a]ttempted purchase after a denial is issued, usually by family member or friend"; (2) "[t]wo customers, one looks at gun and asks the questions- the other wants to complete the paperwork"; (3) "[e]xchanges of cash in or near storefront"; (4) "[t]he customer acts uncomfortable or seems unfamiliar with the product"; and (5) "[c]onversations of customers while shopping, with you, with their friends or on their cell phones."  Because straw purchasing is by definition intentionally deceitful, and because FFLs are not acting as law enforcement agencies, ATF does not expect FFLs to be 100% successful in identifying and preventing possible straw purchases.

**Opinion 2**:  The potential indicia of a possible straw purchase identified in paragraph 25 of the First Amended Complaint, and which the Plaintiff attributes to ATF, are inaccurate.

**Opinion 3**:  Not only were Fleet Farm's training policies and procedures relating to monitoring for and preventing straw purchasing consistent with ATF instructions throughout the relevant time period, much of Fleet Farm's policies and procedures goes above and beyond ATF instructions. Not only is there no evidence of Fleet Farm failing to adhere to or implement procedures or guidelines required by ATF, Fleet Farm's policies and procedures for preventing straw purchasing have exceeded the standards established by the Gun Control Act, ATF regulations, and ATF procedures and guidelines.

**Opinion 4**:  Fleet Farm has robust recordkeeping, communication, and software systems in place to prevent straw purchasing and to share information regarding straw purchasers companywide, and these systems go above and beyond ATF requirements.

**Opinion 5**:  That certain Fleet Farm stores have received Demand Letter 2s is not indicative of any compliance issues relating to monitoring for or preventing straw purchasing.

**Opinion 6**:  The renewal of Fleet Farm store licenses indicates those stores have complied with the Gun Control Act and ATF regulations.

**Opinion 7**:  Fleet Farm's sales to Jerome Horton and Sarah Elwood did not violate the Gun Control Act or ATF regulations and guidelines relating to firearm transactions or preventing straw

---

[2] I have been directed to consider the time period of October 5, 2016 through October 1, 2023, for purposes of my report.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

purchases, and there is no indication that any Fleet Farm employees knew or should have known that Horton or Elwood were straw purchasers at the time they purchased firearms from Fleet Farm.

<u>**RELEVANT BACKGROUND AND CONTEXT**</u>

**I.      ATF's general policies, procedures, and oversight of federal firearm licensees.**

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) is a law enforcement agency within the Department of Justice (DOJ) that, among other things, is responsible for overseeing federal firearm licensees (FFLs) and investigating and preventing the unlawful use, manufacture, sale, and possession of firearms.  ATF's oversight and regulation of FFLs includes on-site inspections to determine an applicant's eligibility to possess a federal firearms license, and continuing inspections and monitoring of FFLs to ensure compliance with ATF regulations and guidelines.

ATF's National Tracing Center (NTC) is the country's only crime gun tracing facility that assists domestic and international law enforcement agencies in solving firearm crime, detecting firearms trafficking, and tracking the intrastate, interstate, and international movement of crime guns. The ATF National Tracing Center is authorized to trace a firearm for a law enforcement agency involved in a bona fide criminal investigation. Tracing begins when a law enforcement agency discovers a firearm at a crime scene and seeks to learn the origin or background of that firearm in order to develop investigative leads. This is a systematic process tracking the movement of a firearm from its manufacturer or its importer and introduction into U.S. commerce through the distribution chain, *e.g.*, wholesaler/retailer to identify an unlicensed purchaser. That information can help link a suspect to a firearm in a criminal investigation and identify potential traffickers.

The ATF policies and procedures relevant to my opinions are described below.

**A.      ATF requirements for a business to obtain a federal firearm license.**

27 C.F.R. § 478.41 and 27 C.F.R. § 478.47 outline the general licensing requirements that an applicant must satisfy before they are licensed to engage in business as an FFL.

A business seeking a federal firearms license submits an Application for Federal Firearms License, known as an ATF Form 7 (5310.12)/7CR (5310.16) ("Form 7").[3]  Each Form 7 must designate at least one "Responsible Person," defined, "in the case of a Corporation, Partnership, or Association," as "any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms."[4]  Form 7s are submitted under penalty of perjury,

---

[3] https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016/download
[4] *Id.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

with photographs of the Responsible Person and FBI FD 258 fingerprint cards, and must be accompanied by an application fee.  Currently, a corporation submitting a Form 7 must pay a licensing fee of $200.00.[5]

On receipt of a completed application and fee from a corporation, partnership, or association, the Federal Firearms Licensing Center ("FFLC") performs an electronic background check on all "Responsible Person(s)" identified on the Form 7.[6]  After the initial background check is completed, ATF conducts an on-site inspection of the applicant.[7]  During this inspection, an ATF Industry Operations Investigator ("IOI") will interview the applicant or Responsible Person(s), and will inquire about business operations and the applicants' knowledge of firearms to determine whether the applicant is suitable for a federal firearms license.  The IOIs will also verify that any and all associated Responsible Persons have been disclosed on the Form 7, and that no prohibitions exist that would bar the applicant from possessing, transporting, or using firearms.

Additionally, the IOI will evaluate the physical premises to ensure it meets local zoning and state ordinances, including HOA requirements, and will also assess the applicant's plans for their physical inventory and overnight storage of inventoried firearms.  The IOIs will then counsel and provide guidance to the applicant on the requirements of regulated business operations as described by Chapter 44, Subpart – F (Conduct of Business, including FBI NICS or State POC background checks)[8] and Chapter 44, Subpart H (Record keeping requirements to ensure firearms traceability).[9]  A synopsis of this regulatory review is memorialized in an Acknowledgment of Federal Firearms Regulation Form at the conclusion of either an application inspection or compliance inspection.[10]  This form captures the IOI's explanation of rules and procedures, and the licensee is required to sign the form understanding their obligation of regulatory requirements.  This Acknowledgement includes a basic description of "straw purchases," emphasizing 27 CFR § 478.128's Falsification of Records provision and the persons prohibited by law from possessing firearms under 18 U.S.C. § 922(g).  During an application or compliance inspection, the IOI will reference to the FFL indicators of a possible straw purchase that the FFL should be on the lookout for, as described in this report.  Additionally, during these settings, the IOI explains the ATF forms completion process, including completion and timely submission of qualified multiple handgun sale purchases on ATF Form 3310.4.

After this on-site interview and evaluation, the IOIs will make a recommendation to the local first-line supervisor (Area Supervisor) on whether to issue the license.[11]  If the IOI recommends issuing

---

[5] 27 C.F.R. § 478.42 (License Fee) and 27 C.F.R § 478.47 (Original License)
[6] https://www.atf.gov/firearms/apply-license; 27 CFR 478.47
[7] *Id.*
[8] 27 C.F.R. §§ 478.91–.104
[9] 27 C.F.R. §§ 478.121, .124, .125e
[10] FF_0002825; FF_0014502
[11] 27 C.F.R. § 478.41 (General Licensing)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

a license and the Area Supervisor agrees, this will initiate a notification to the FFLC Chief to issue the firearm license.

### B.    Process for renewing a federal firearm license.

A federal firearm license is valid for three years.  ATF automatically mails a Renewal Application, known as an ATF Form 8 Part II, "to the 'mailing address' on the license approximately 90 days prior to the expiration of the license."[12]

27 C.F.R. § 478.45 details the general process for renewing a firearms license.  To summarize, an FFL is required to timely submit the Form 8 Part II and a $90.00 renewal fee prior to the expiration of its license.  The renewal application is sent to the Chief of the FFLC for review and processing.

To process the renewal application, the FFLC queries the ATF Firearms Licensing System ("FLS") database to determine if the FFL has been subjected to any administrative actions or criminal investigations.  Among other things, the FFLC will evaluate: (1) whether the FFL's business operations during the prior three-year term of licensing complied with the GCA; (2) whether the licensee has been compliant with ATF's recordkeeping requirements; (3) whether the FFL has complied with the Federal Bureau of Investigation's National Instant Criminal Background Check System ("NICS") or Point of Contact ("POC") background check requirements; (4) whether the FFL has engaged in any business that is not authorized by the license; and (5) whether the FFL has any pending ATF violations, administrative actions, or criminal activity.

As part of this analysis, the FFLC will contact the local ATF field office to solicit their input on any pending actions associated with the FFL, and to determine if the field office knows of any other reason to deny the renewal application, such as the FFL being under ATF Criminal Investigation or subject to any pending Regulatory Enforcement Action or pending Report of Violations for Notice of Revocation.  If ATF suspects an FFL of violating the GCA or ATF regulations or policies, or otherwise engaging in improper firearm sales, standard ATF practice would be to deny that FFL's license renewal application or send the renewal application to the affected field division for an on-site renewal inspection.

### C.    ATF rules, regulations, and guidance relating to firearm sales.

ATF rules, regulations, and guidance impose a number of requirements on an FFL when engaging in a firearm transaction, including recordkeeping and reporting requirements.  These include: (1) completing an ATF Form 4473 for all firearm transactions; (2) completing an ATF Form 3310.4 for certain handgun transactions involving multiple dispositions; and (3) Acquisition and Disposition recordkeeping requirements relating to the retention of both forms.

---

[12] https://www.atf.gov/firearms/how-renew-federal-firearms-license-ffl

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 1.    The role of the Form 4473 in monitoring gun sales.

ATF regulations provide that an FFL "shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record."[13]  This "firearms transaction record" is called an ATF Form 4473 (Form 4473).[14]  The Form 4473 is "designed so that a person licensed under 18 U.S.C. § 923 may determine if he/she may lawfully sell or deliver a firearm to the [transferee], and to alert the transferee of certain restrictions on the receipt and possession of firearms."[15]  As detailed below, the Form 4473 also serves to ensure that law enforcement is aware of all potential firearm transactions before that transaction occurs, and to allow law enforcement to fulfill its obligation of reviewing a potential transaction and authorizing an FFL to proceed with a transaction.  The Form 4473 contains five sections.

First, Section A requires the FFL to provide details regarding the firearm(s) to be transferred, including the manufacturer and importer (if any), the model, the serial number, the type of firearm, and the caliber or gauge, as well as the total number of firearms to be transferred.  The FFL must also indicate if "any part of this transaction is a pawn redemption," and if "any part of this transaction is to facilitate a private party transfer."[16]

| Section A - Must Be Completed By Transferor/Seller Before Transferee/Buyer Completes Section B | | | | |
|---|---|---|---|---|
| 1. Manufacturer and Importer (if any), or Privately Made Firearm (PMF) (If the Manufacturer and Importer are different, include both.) | 2. Model (if designated) | 3. Serial Number | 4. Type | 5. Caliber or Gauge |
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 6. Total Number of Firearms to be Transferred (Please spell total number e.g., one, two, etc.  Do not use numerals.) | | 7. Check if any part of this transaction is a pawn redemption.  Record Line Number(s) From Question 1: | | ☐ |
| | | 8. Check if any part of this transaction is to facilitate a private party transfer. | | ☐ |

Second, Section B requires the transferee to provide their full name, current address, place of birth, height and weight, sex, birth date, social security number (described as "optional, but will help prevent misidentification"), unique personal identification number or appeals management database identification (if applicable), ethnicity, race, country of citizenship, and U.S.-issued alien or admission number (if applicable).  The transferee is also required to answer a series of "yes" or "no" questions to determine whether they are disqualified from purchasing a firearm pursuant to federal law:

---

[13] 27 C.F.R. § 478.124(a)

[14] https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download

[15] *Id.*

[16] *Id.*

9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 21. Answer the following questions by checking or marking either the "yes" or "no" box to the right of the questions: | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of all of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearm(s) to you.** Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer 21.a. and may proceed to question 21.b. | ☐ | ☐ |
| b. Do you intend to sell or otherwise dispose of any firearm listed on this form and any continuation sheet(s) in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | ☐ | ☐ |
| c. Are you under indictment or information in any court for a **felony**, or any other crime for which the judge could imprison you for more than one year, or are you a current member of the military who has been charged with violation(s) of the Uniform Code of Military Justice and whose charge(s) have been referred to a general court-martial? | ☐ | ☐ |
| d. Have you ever been convicted in any court, including a military court, of a **felony**, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? | ☐ | ☐ |
| e. Are you a fugitive from justice? | ☐ | ☐ |

Previous Editions Are Obsolete

Page 1 of 7                    STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9)
Revised August 2023

| | Yes | No |
|---|---|---|
| f. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning:** The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside. | ☐ | ☐ |
| g. Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? | ☐ | ☐ |
| h. Have you ever been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☐ |
| i. Are you subject to a court order, including a Military Protection Order issued by a military judge or magistrate, restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? | ☐ | ☐ |
| j. Have you ever been convicted in any court of a misdemeanor crime of domestic violence, or are you or have you ever been a member of the military and been convicted of a crime that included, as an element, the use of force against a person as identified in the instructions? | ☐ | ☐ |
| k. Have you ever renounced your United States citizenship? | ☐ | ☐ |
| l. Are you an alien **illegally** or **unlawfully** in the United States? | ☐ | ☐ |
| m.1. Are you an alien who has been admitted to the United States under a nonimmigrant visa? | ☐ | ☐ |
| m.2. If you answered "Yes" to question 21.m.1, do you fall within any of the exceptions stated in the instructions? | ☐ | ☐ |
| n. Do you intend to sell or dispose of any firearm(s) listed on this form or any continuation sheet(s) to any person described in questions 21(b)-(l) or to a person described in question 21.m.1 who does not fall within a nonimmigrant alien exception? | ☐ | ☐ |

The transferee is then required to certify under penalty of perjury that their answers in Section B "are true, correct, and complete":

> I certify that my answers in Section B are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 21.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 21.b. through 21.l. as well as 21.n. is prohibited from receiving, possessing, or purchasing a firearm. I understand that a person who answers "yes" to question 21.m.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 21.m.2. and provides the documentation required in 26.d. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale to predominantly earn a profit without a Federal firearms license is a violation of Federal law.

| 22. Transferee's/Buyer's Signature | 23. Certification Date | | |
|---|---|---|---|
| | Month | Day | Year |

Third, Section C requires the FFL to indicate, among other things, the category of firearm(s) to be transferred (handgun, long gun, or other firearm), whether the "sale or transfer is at a qualifying gun show or event," and (as discussed in more detail below) the NICS transmission number and whether NICS provided a "Proceed," "Denied," "Cancelled," or "Delayed" response.[17] The FFL is also required to document the type of identification used by the transferee to show their legal age to possess certain types of firearms, and their place of residence.

---

[17] *Id.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Section C - Must Be Completed By Transferor/Seller Prior To The Transfer Of The Firearm(s) | |
|---|---|
| 24. Category of firearm(s) to be transferred (check or mark all that apply): <br><br> ☐ Handgun  ☐ Long Gun (i.e., rifle or shotgun)  ☐ Other Firearm (e.g., frame, receiver, etc.) | 25. If sale or transfer is at a qualifying gun show or event: <br><br> Name of Function: _____  County: _____ <br> Address: _____ <br> City, State, ZIP Code: _____ |

26.a. Identification (e.g., Virginia driver's license (VA DL) or other valid government-issued photo identification including military ID.)

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification (if any) | | |
|---|---|---|---|---|
| | | Month | Day | Year |

26.b. Supplemental Government Issued Documentation (if identification document does not show current residence address or legal name)

26.c. Official Military Orders Establishing Permanent Change of Station (PCS):

| PCS Base, City and State: | PCS Effective Date: | PCS Order Number (if any): |
|---|---|---|

26.d. Exception to the Nonimmigrant Alien Prohibition: If the transferee/buyer answered "yes" to 21.m.2. record the type of documentation showing the exception to the prohibition and attach a copy to this ATF Form 4473:

**Notice**: If transferee/buyer is under 21, a waiting period of up to 10 days may apply where notification from NICS is received within 3 business days to further investigate a possible disqualifying juvenile record. A NICS check is only valid for 30 calendar days from the date recorded in question 27.a.

| 27.a. Date the transferee's/buyer's identifying information in Section B was transmitted to NICS or the appropriate State agency: <br><br> Month  Day  Year | 27.b. The NICS or State transaction number (if provided) was: |
|---|---|

27.c. The response initially provided by NICS or the appropriate State agency was:  ☐ Proceed  ☐ Denied  ☐ Cancelled

☐ Delayed. The firearm(s) may be transferred on _____ (date) if time period is not extended by NICS or the appropriate State agency, and State law allows (optional).

Page 2 of 7          STAPLE IF PAGES BECOME SEPARATED          ATF Form 4473 (5300.9) Revised August 2023

Fourth, if the firearm(s) transfer occurs on a different day than the date the transferee completed Section B, described above, Section D requires the transferee to re-certify that their "responses in Section B of this form are still true, correct, and complete."[18]

Fifth, the FFL must provide their "[t]rade/corporate name and address . . . and Federal-Firearm License Number," indicate the date of the transfer, and certify the following:

**The Individual Transferring The Firearm(s) Must Complete Questions 34-36.**
**For Denied/Cancelled Transactions, The Individual Who Completed Section C Must Complete Questions 34-35.**

I certify that: (1) I have read and understand the Notices, Instructions, and Definitions on this ATF Form 4473; (2) the information recorded in Sections A, C and E is true, correct, and complete; and (3) this entire transaction record has been completed at the licensed business premises ("licensed premises" includes business temporarily conducted from a qualifying gun show or event in the same State in which the licensed premises is located) unless this transaction has met the requirements of 18 U.S.C. § 922(c). Unless this transaction has been denied or cancelled by NICS or State agency, I further certify on the basis of — (1) the transferee's/buyer's responses in Section B (and Section D, if applicable); (2) the verification of the identification recorded in question 26 (and the re-verification at the time of transfer, if Section D was completed); and (3) State or local law applicable to the firearms business — it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section B. If this transaction required a NICS check, I further certify that this firearm(s) transfer is within 30 days from the date of NICS contact.

| 34. Transferor's/Seller's Name (please print) | 35. Transferor's/Seller's Signature | 36. Date Transferred | | |
|---|---|---|---|---|
| | | Month | Day | Year |

Unless a transaction is exempt pursuant to 27 C.F.R. § 478.102(d), before completing a firearm sale, an FFL must use the information the transferee provided on the Form 4473 to initiate, depending on the jurisdiction, either a NICS or Point of Contact (POC) background check to

---

[18] *Id.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

determine if receipt of a firearm by the purchaser would violate federal or state law.[19]   In Minnesota, FFLs are required to submit this information to FBI NICS.[20]

After submitting the transferee's information to NICS, the FFL is required to wait until NICS advises the FFL on whether its national background check system "finds any information that the transfer to, or receipt by, the transferee is prohibited by law."[21]   NICS will respond to the FFL with one of four messages: "Proceed"; "Denied"; "Cancelled"; or "Delayed."   If NICS provides a "Proceed" response, "the transaction may proceed" immediately.[22]   If NICS provides a "Denied" or "Cancelled" response, the FFL "is prohibited from transferring the firearm to the transferee."[23] And if NICS provides a "Delayed" response, the FFL "is prohibited from transferring firearms to the transferee . . . unless 3 business days have elapsed and, before the transfer, NICS . . . has not advised the [FFL] that the transfer to, or receipt or possession by, the transferee . . . would be in violation of law."[24]   What this means is that, in the ordinary course, an FFL is not permitted to complete a firearm transfer until *after* it has received affirmative authorization from the FBI to proceed with the transaction.

When the transaction is complete, whether NICS or the applicable POC provides a "Proceed," "Denied," "Cancelled," or "Delayed" response, the FFL is required to permanently maintain a copy of the completed ATF Form 4473 on their premises.[25]   The only exceptions to this rule are that FFLs may store paper copies of forms off-site if the forms reflect transactions that occurred more than 20 years ago,[26] and ATF recently issued a ruling that permits FFLs to "retain electronically completed Forms 4473 in an electronic format" if certain requirements are met.[27]

When conducting a criminal investigation into a traced crime firearm (or a firearm's disposition), ATF may use Form 4473s to identify additional investigative leads because the form contains a holistic description of the crime gun, along with data on the last known purchaser.

### 2.    The role of the Form 3310.4 in monitoring gun sales.

ATF regulations separately require FFLs to "prepare a report of multiple sales or other disposition whenever [it] sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totaling two

---

[19] 18 U.S.C. § 922(t)

[20] 27 C.F.R. § 478.102

[21] https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download

[22] *Id.*

[23] *Id.*

[24] *Id.*; 27 C.F.R. § 478.102(a)

[25] 27 C.F.R. § 478.129(b)

[26] https://www.atf.gov/firearms/qa/how-long-are-licensees-required-maintain-atf-forms-4473#:~:text=Licensees%20shall%20retain%20each%20Form,for%20inspection%20under%20this%20part.

[27] https://www.atf.gov/firearms/docs/ruling/2022-01-electronic-storage-forms-4473pdf/download

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

or more, to an unlicensed person." 27 C.F.R. § 478.126a. This is known as an ATF Form 3310.4 (Report of Multiple Sale or Other Disposition of Pistols and Revolvers) (Form 3310.4).

The purpose of Form 3310.4 is to allow ATF's National Tracing Center and law enforcement officials the ability to cross-reference and analyze multiple handgun sale data, firearm theft Loss data, and firearm trace data with other crime gun trace information vital to identifying trafficking patterns. The form serves as an important indicator in the detection of illegal firearms trafficking and can also allow successful tracing of older firearms, but is generally not used by federal agencies as a tool to detect straw purchasing.[28] As a result of analyzing multiple handgun sale data, if ATF identifies a trafficker or persons engaging in the business of firearm sales without a firearms license, at the field division level, they will engage that person. ATF will serve a notice to cease and desist this activity until they obtain a federal firearms license to engage in business. A Form 7 application for a firearms license is provided as part of the cease and desist advisory.

The CFR requires a licensee to submit a Form 3310.4 to ATF and the Chief Law Enforcement Office (CLEO) with the following information: (1) the date; (2) the FFL's license number, name, and address; (3) the "pistols and revolvers" that were "disposed of to the same unlicensed person at one time or during any five consecutive business days"; (4) the transferee's name, residential address, sex, ethnicity, race, identification number, form of identification, date of birth, and place of birth; (5) the identity of the state or local law enforcement to whom the FFL will be sending a copy of the Form 3310.4; and (6) the name of the employee that completed the Form 3310.4.[29]

The Form 3310.4 is required to be sent to the ATF National Tracing Center "no later than the close of business on the day that the multiple sale or other disposition occurs" by email, fax, or mail.[30] It is also required to be sent to the CLEO, who is "a local or State official designated to receive this form" (typically either a police chief or sheriff).[31] And the FFL must also retain one copy of each Form 3310.4, and keep that form attached to the corresponding Form 4473.[32]

### D.    ATF rules and guidelines relating to monitoring for straw purchasers.

ATF regulations do not articulate the types of conduct that FFLs should monitor for to detect potential straw purchasing activity. But ATF has addressed (and informed FFLs regarding) straw purchasing, and potential "indicators"[33] of straw purchasing, through four primary methods: (1) newsletters and other informal publications; (2) on-site inspections (i.e., original qualification

---

[28] https://www.atf.gov/resource-center/docs/undefined/ntc-fact-sheet-may-2023/download
[29] https://www.atf.gov/firearms/docs/form/report-multiple-sale-or-other-disposition-pistols-and-revolvers-atf-form-33104/download
[30] *Id.*
[31] *Id.*
[32] 27 C.F.R. § 478.126a
[33] ATF typically uses the term "indicator" rather than "red flag" to describe the circumstances that might be indicative of a possible straw purchase.

13

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

inspection and compliance inspections); (3) teaming with the National Shooting Sports Foundation (NSSF) to promote resources associated with the "Don't Lie for the Other Guy" program; and (4) regular training seminars that are offered to FFLs by ATF field divisions.

First, ATF has published FFL Newsletters that outline scenarios to illustrate the types of actions that may be indicative of a straw purchase.  In June 2021, ATF published a newsletter that explained "a straw purchase occurs when the actual buyer uses another person . . . to execute the Form 4473 purporting to show that the straw purchaser is the actual purchaser of the firearm."[34] Typically, the ATF explained, "the actual purchaser is within one of the prohibited categories of persons who may not lawfully acquire firearms, such as a felon, or a resident of a State other than that in which the licensee's business premises is located," or "wishes to conceal their identity."[35] ATF advises that "[a] straw purchase can occur through oral statements as well as written statements," but explains "[i]t is not feasible to lay out the universe of possible scenarios in which a straw purchase may take place" because "[e]ach case depends upon its own facts, and the analysis may shift depending upon any number of circumstances present."[36]  But various ATF FFL newsletters have identified the following as potential indicators of a possible straw purchase:

- A buyer being "reluctant to undergo a background check"[37]

- A buyer who is "unfamiliar with the firearm being purchased"[38]

- A buyer who is "in communication with a third party via phone during the purchase"[39]

ATF also advises that to "reduce the risk of straw purchasing," FFLs should "[e]ducat[e] employees to recognize and respond to red flags indicating a possible straw purchase."[40]

ATF's statement that "[i]t is not feasible to lay out the universe of possible scenarios in which a straw purchase may take place" is a reflection of ATF's understanding that, even with well-trained employees, it is not realistic to expect FFLs to prevent *all* straw purchases.  Indeed, ATF does not expect FFLs to be 100% successful in preventing straw purchases because straw purchasing is by definition intentionally deceitful and because FFLs are not acting as deputized members of law enforcement agencies.  Rather, ATF seeks to provide FFLs with awareness of potential indicators of a possible straw purchase by providing situational examples of hypothetical straw purchases.

---

[34] https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-ffl-newsletter-june-2021/download
[35] *Id.*
[36] *Id.*
[37] https://www.atf.gov/firearms/dont-lie-other-guy
[38] *Id.*
[39] *Id.*
[40] https://www.atf.gov/firearms/dont-lie-other-guy

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

For this reason, when a straw purchase occurs, it is described as an illegal straw purchase, rather than an illegal sale.[41]

Second, ATF may conduct firearm compliance inspections with a "focus" on, among other things, "[d]etect[ing] and prevent[ing] the possibility of firearms being obtained by prohibited persons and straw purchasers."[42]  During onsite inspections of FFLs, IOIs are required to, among other things, "[v]erify that the licensee is not allowing 'straw purchases' when the transferee was denied by NICS," "[e]nsure the licensee is familiar with straw purchases and the prohibited person restrictions," and "[r]eview ATF Fs 4473 and ATF Fs 3310.4 . . . to identify any unreported multiple sales and multiple handgun sale patterns."[43]

Third, since 2000, ATF has partnered with the National Shooting Sports Foundation ("NSSF") to sponsor their "Don't Lie for the Other Guy Program."  During an inspection an IOI will reference the NSSF Don't Lie for the Other Guy program.  If the licensee is unfamiliar with it, the IOI will refer the licensee to the NSSF point of contact webpage (or NSSF service number) to receive a "Don't Lie" kit.  This kit includes a "Don't Lie" poster, rubber countertop placemat bearing the "Don't lie" indica and a video demonstrating a  few "straw purchase" scenarios.  As a general matter, ATF advises FFLs to "[p]ost 'Don't Lie for the Other Guy' signs" and consult the www.dontlie.org training materials.[44]  But although ATF suggests that FFLs use "Don't Lie for the Other Guy" materials, it is not an ATF requirement, and there is nothing in the CFR that requires the use of the materials.

Fourth, throughout the relevant time period for this case, ATF field divisions were required to hold regular Federal Firearms Licensee Educational Seminars for FFLs, at least three times per year.[45]  These seminars are prepared by each ATF division, but ATF utilizes a centralized process to ensure that the seminars are consistent with the CFR, which includes ATF division counsel having an opportunity to review the seminars.  Among other things, these seminars provided guidance to FFLs on what, in ATF's view, constituted the best practices for monitoring and preventing possible straw purchases and general compliance firearm business operations.  Specifically, ATF trained FFLs to monitor for the following five potential "indicators" of a possible straw purchase:

- "Attempted purchase after a denial is issued, usually by family member or friend."[46]

---

[41]

https://www.dontlie.org/faq.cfm#:~:text=A%20straw%20purchase%20is%20an,the%20firearm%20for%20him%2Fher.  atf.gov/firearms/identify-prohibited-persons/straw-purchases

[42] ATF0001298

[43] ATF0001317–ATF0001318

[44] ATF0000131; ATF0000382

[45] ATF0000001

[46] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815

15

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- "Two customers, one looks at a gun and asks the questions- the other wants to complete the paperwork."[47]

- "Exchanges of cash in or near the storefront."[48]  ATF training focuses on the *exchange* of cash.  From an ATF perspective, the mere use of cash to pay for a firearm (or firearms) is not alone considered an indicia of a possible straw purchase.

- "The customer acts uncomfortable or seems unfamiliar with the product."[49]

- "Conversations of customers while shopping, with you, with their friends or on their cell phones."[50]

Although not contained in seminar materials, on at least one occasion ATF has also identified the following as potential indicia of a possible straw purchase: (1) a prior NICS denial, and (2) multiple firearm purchases of the same make and caliber.[51]

ATF also suggests that FFLs take certain steps to help monitor for and prevent straw purchases, including to "[a]sk customer questions such as why are you buying this gun, what are you going to use it for etc." and to "[k]eep a log of recent denials and attempted purchases to compare with new sales."[52]  This latter point is best understood as a strong suggestion because there is no ATF rule or regulation requirement that FFLs maintain an independent log of "recent denials," separate from the requirement that FFLs maintain an Acquisition & Disposition bound book and retain filed copies of ATF Form 4473s reflecting "denied" sales.

Ultimately, ATF recognizes that monitoring for indicia of straw purchasing is a holistic, context-specific endeavor: "If it does not feel right, do not make the sale."[53]

ATF will also provide seminars for specific companies on request.  For example, in March 2019, ATF presented at the Fleet Farm Firearms Conference, and, in addition to the potential indicia of a possible straw purchase described above, [54] trained on five possible straw-purchase "scenarios":

---

[47] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815; ATF0000573 ("One person is physically handling the firearms, but someone else is filling out the forms")

[48] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815

[49] ATF0000072; ATF0000131; ATF0000230; ATF0000381; ATF0000454; ATF0000815; ATF0000573 ("Someone has a shopping list of firearms to fulfill, but no knowledge about them"); ATF0000668 ("Ask yourself, does the buyer appear to know anything about firearms.")

[50] ATF0000072; ATF0000131; ATF0000230; ATF0000381; ATF0000454; ATF0000815

[51] *See* ATF0000131.  I understand that ATF produced ATF0000131 in response to a document subpoena served by Fleet Farm in this case.  I had never seen this document in my time at ATF, and am unaware of whether, or under what circumstances, it is used.

[52] ATF0000073 ATF Seminar Material August 2017; ATF0000131; ATF0000231; ATF0000382; ATF0000455; ATF0000816; ATF0000668 ("Ask the potential buyer questions such as: --Is this firearm for you?")

[53] ATF0000073; ATF0000231; ATF0000455; ATF0000817

[54] ATF0000815–ATF0000816 (ATF Seminar Material)

16

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**





17

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**





**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Each of these scenarios shows obvious indicators of a straw purchase.

I have reviewed the First Amended Complaint filed in this action, and specifically the list of claimed "red flags" contained in paragraph 25. Some, but not all, of the "red flags" listed in paragraph 25 are ATF-recognized potential indicia of a possible straw purchase, and others are over simplified:

- **Bullet Point #1**: "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber."[55]

  o **Opinion**: It is an overstatement to suggest that ATF always considers multiple firearm purchases within a specific period of time to be an indicator of straw purchasing. In contrast to the law in certain states,[56] there is no federal or Minnesota law limiting the number of firearms that an individual may purchase during a single transaction or during a certain time period. ATF seminars do not identify multiple firearm purchases as a potential indicator of a possible straw purchase, and if an FFL has any policy in place instructing employees to be cognizant of multiple handgun transactions in a single transaction or in a short amount of time, such a policy would go above and beyond what ATF instructs and requires.

- **Bullet Point #2**: "Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns."[57]

  o **Opinion**: ATF seminars do not identify multiple firearm (or handgun) purchases as a potential indicator of a possible straw purchase, and if an FFL has any policy in place instructing employees to be cognizant of multiple handgun transactions in the same transaction or in a short amount of time, such a policy would go above and beyond what ATF instructs and requires. ATF has recognized purchasing multiple firearms *of the same make and caliber* as a potential indicator of a possible straw purchase.[58]

- **Bullet Point #3**: "Purchasing firearms with cash."[59]

---

[55] First Amended Complaint ¶ 25
[56] Cal. Penal Code § 27535; Conn. Gen. Stat. § 29-33(f); Md. Code Ann., Pub. Safety § 5-128(b); N.J. Stat. Ann. § 2C:58-2(a)(7); Va. Code Ann. § 18.2-308.2:2(R)
[57] First Amended Complaint ¶ 25
[58] ATF0000131
[59] First Amended Complaint ¶ 25

19

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- o **Opinion**: This is not an accurate characterization of ATF guidelines or policies. It is not unusual for firearms to be purchased with cash, and the fact that a customer is purchasing firearms with cash is not an indicator of a possible straw purchase. Instead, ATF guidelines state that the use of cash may be an indicator of a possible straw purchase only if there has been an *exchange* of cash between a third party and the person attempting to purchase the firearms.[60]

- **Bullet Point #4**: "The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves."[61]

  - o **Opinion**: Pursuant to ATF guidelines, that a buyer is accompanied to an FFL by another person is not per se an indicator of a possible straw purchase. There must be some additional circumstance demonstrating suspicious activity, such as "[o]ne person . . . physically handling the firearms, but someone else is filling out the forms."[62]

- **Bullet Point #5**: "The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase."[63]

  - o **Opinion**: Similar to Bullet Point #3, Bullet Point #5 is inaccurate to the extent it suggests the mere use of a phone during a firearm transaction is an indicia of a possible straw purchase. ATF guidelines instruct FFLs only that "[c]onversations of customers . . . on their cell phones" may give rise to an indicia of a possible straw purchase.[64] This guidance assumes, of course, that the FFL employee is able to hear or observe what the customer is saying on or doing with their cell phone.

- **Bullet Point #6**: "The buyer does not keep the firearms in their residence for their own use."[65]

  - o **Opinion**: This is not an indicia of a possible straw purchase for an FFL, as there would be no way for an FFL to know where or how the customer stores their firearms. There are also no ATF guidelines suggesting the storage location of personally owned firearms may be an indicator of a possible straw purchase. Bullet Point #6 appears to be describing an investigative tool in determining the status of

---

[60] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[61] First Amended Complaint ¶ 25
[62] ATF0000573; ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[63] First Amended Complaint ¶ 25
[64] ATF0000072; ATF0000131; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[65] First Amended Complaint ¶ 25

20

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a firearm during a criminal investigation of a purchaser, not a tool that can or should be used by an FFL when selling a firearm.

- **Bullet Point #7**:  "A short 'time to crime'—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime."[66]

    o **Opinion**:  Similar to Bullet Point #6, Bullet Point #7 is not an indicia of a possible straw purchase for an FFL.  An FFL would not have access to the information described in Bullet Point #7, and there are no ATF guidelines impressed upon an FFL suggesting this is an indicia of a possible straw purchase. This is an investigative tool used to identify persons and last known possessors of a traced crime gun. No FFL would have access to or be aware of this firearm crime gun trace statistic at the time of a transaction.

It is also important to note that the ATF-recognized indicia of a possible straw purchase are not necessarily considered determinative in any particular transaction.  According to ATF, there is no "magic number" of indicia that necessarily means a customer is attempting to straw purchase a firearm.  Such a formulaic approach would be counterproductive, as it could lead FFLs to be less vigilant in detecting criminal conduct that is constantly evolving and seeking to evade detection.  Rather, whether a person may be attempting to straw purchase may only be determined by assessing all of the circumstances surrounding a transaction.

### E.    ATF Trace Requests

In addition to providing guidance regarding methods for identifying and preventing straw purchases, ATF relies on FFLs to assist it with running trace requests on firearms recovered from crime scenes.  Specifically, the ATF's National Tracing Center (NTC) will initiate a crime gun trace when a law enforcement agency discovers a firearm at a crime scene and seeks to learn the origin or background of the firearm to develop investigative leads.

Tracing is a systematic process the NTC deploys for tracking the movement of a firearm, and to identify the last known unlicensed purchaser.  To facilitate a trace request, ATF will contact the firearm manufacturer or importer and trace the firearm to the wholesalers in the distribution chain with the firearm's "serial number" and date of acquisition to the last known retailer and purchaser (identified on ATF Form 4473 transaction record). The contacted FFL then has 24 hours in which to respond to ATF with disposition information of the purchaser.  The fact that an FFL receives a trace request does not mean that the FFL sold a firearm improperly, and ATF does not ordinarily notify an FFL of the circumstances that result in the FFL receiving a trace request.

---

[66] First Amended Complaint ¶ 25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### F.    ATF monitors FFLs for compliance with its rules and regulations and takes action against FFLs that are not compliant.

As described above, ATF monitors licensee compliance through on-site compliance inspections. In relevant part, ATF may inspect an FFL for purposes of "ensuring compliance with . . . record-keeping requirements . . . not more than once during any 12-month period; or at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the [FFL]."[67]

To determine which FFLs to inspect during a given fiscal year, each ATF field division creates a "Domain Assessment," which is a field division's operating plan for the fiscal year. For instance, the St. Paul Field Division in Minnesota will forecast the number of inspections each Area Office will conduct during a fiscal year, including: firearm and explosive application inspections; mandated Safe Explosive Act renewal inspections; firearm recall compliance inspections associated with administrative actions; outreach / training firearm and explosive seminars hosted within the borders of a field division; on-site firearm and explosive compliance inspections; and special request inspections or inter-agency referral inspections to be completed during the fiscal year.

Once the ATF field division has determined which FFLs to inspect, IOIs travel to that FFL's premises to evaluate compliance with GCA and ATF recordkeeping requirements. Specifically, IOIs examine the FFL's physical inventory to determine if the number of firearms on hand matches the number of firearms disclosed in the FFL acquisition and disposition bound book logs. The IOIs will also review the FFL's Form 4473s and other GCA-required records from the previous year, to confirm the FFL is properly completing and maintaining those records. In addition, while on-site, the IOIs will educate the FFL on best practices for correcting recordkeeping violations to ensure public safety and firearm traceability through compliant GCA records to achieve voluntary compliance. In the area of FFL operations, the IOI evaluates the licensee's level of compliance with firearm acquisition and disposition record keeping, bound book dispositions to other firearm licensees, and execution of Form 4473 transaction records, including background checks of dispositions to non-licensees.

The purpose of reviewing completed transaction records, both approved and denied forms, is to identify omissions, error entries, NICS or POC background checks, timely and accurate dispositions, because this data helps contribute to positive trace results. If the inspection review identifies suspicious activity, such as a transfer of a firearm previously associated with a denial to another individual bearing the same last name or address, usually occurring within days of the denial, ATF will expand the investigation to include both persons associated with the sale. As part of this process, documentation on the transferee/purchaser, including any NICS responses to

---

[67] 18 U.S.C. § 923(g)(1)(B)

22

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

background check requests, will be referred to ATF criminal enforcement to investigate. Overall, the inspection is intended to determine a licensee's compliance with the CFR and, upon discovery of a straw purchase that an FFL was complicit in or any violation of the CFR (i.e., failing to run a background check, failing to keep required records etc.), ATF may take actions through the regulatory administrative action hearing process to revoke a federal firearm license.

An ATF inspection will end with the IOIs either concluding the FFL has not made any recordkeeping violations or issuing a Report of Violation (ATF Form 5030.5) or warnings and/or requiring escalating corrective action, as described below:

- Report of Violation ("ROV"): An ROV articulates each recordkeeping violation and denotes the required corrective action that must be taken by the FFL.

- Area Supervisor Warning Letter: This letter may be issued, alongside an ROV, if an inspection uncovers repeated violations. This letter notifies the FFL that any other repeat violations of federal law or ATF regulations may be deemed willful, and may result in the FFL's license being revoked.

- Area Supervisor or Director of Industry Operations (DIO)-Led Warning Conference: Typically, this conference may occur, alongside an ROV, if an FFL has previously been the subject of a warning letter or repeat violations that include, transferring firearms other than a long gun or shotgun to an out of state resident; failure to report a theft or loss of firearms; conducting business at locations not authorized as an extension of the licensed business premises may result in a Warning Conference with either the Area Supervisor or the Director of Industry Operations.

- DIO-Led Warning Conference: This conference may occur, alongside an ROV, if approved by ATF Headquarters through the Monitored Case Process. It may be held in lieu of revocation. During a Notice of Revocation hearing, an FFL is allowed to introduce evidence and provide an explanation of the violation, in other words, present extraordinary circumstances before the DIO. If the licensee can show a mitigated risk to public safety or their ability to successfully complete firearm traces, the DIO may reconsider and retract the NOR. If this alternate action is to occur, the DIO will put the matter to rest and close the hearing as a DIO-led Warning Conference in Lieu of Revocation. If the field division accepts or accommodates a licensee's extraordinary circumstance, the field division will hold a final adjudication as a DIO-Led Warning Conference in Lieu of Revocation - Administrative Action Policy ATF O 5370.1E dated

23

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

01/28/2022.  Further, the DIO has the discretion to preside over or delegate a warning conference to the Area Supervisor.

- Notice of Revocation ("NOR"):  An NOR may be issued if the above-described post-inspection actions have not prevented further willful violations by the FFL.

In inspection situations other than a NOR, ATF will provide the FFL with opportunities to remediate their recordkeeping violations with prescribed corrective actions and will advise the FFL that repeat violations may be deemed as willful and result in revocation.

In practice, due to the disproportionate ratio of FFLs to ATF IOIs, ATF utilizes data analytics or Crime Gun Intelligence Analytics (CGIA) to identify FFLs for inspection.  Some inspection triggers are a high volume of firearm traces, short time to crime trace results, the type of crimes associated with the identified firearm trace, the licensee's inspection history, and lastly, the frequency and type of violations (specifically, those that impact public safety).

In the early 2000s, ATF began its Demand Letter Program as an additional enforcement mechanism.  This program is designed to ensure that FFLs are properly collecting and providing ATF with the data that is vital to the success of ATF's firearms tracing program.  Under this program, an FFL may receive one of three types of Demand Letters:

- **Demand Letter 1**:  A Demand Letter 1 is issued to FFLs that do not comply with their statutory responsibility to respond within 24 hours to firearm trace requests.  The FFLs that receive a Demand Letter 1 are required to send ATF their acquisition and disposition records for the past three years, and to continue to send the records on a monthly basis until told otherwise.  This information allows ATF to trace firearms if the FFL continues to be uncooperative with future requests.

- **Demand Letter 2**:  A Demand Letter 2 is issued to FFLs that had 25 or more firearms traced to them the previous calendar year with a "time-to-crime" of three years or less.  The affected FFLs are required to submit limited information regarding "used" guns acquired the previous year, including the manufacturer/importer, model, caliber or gauge and serial number along with the acquisition date.  No names of owners are submitted.  The FFL is required to submit this information quarterly until informed otherwise.

- **Demand Letter 3**:  A Demand Letter 3 is issued to certain FFLs on a monthly basis, to assist ATF in its efforts to investigate and combat the illegal movement of firearms along and across the United States' southwest border.  Specifically, the Demand Letter 3 requires licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas to report to ATF all transactions in which an unlicensed person acquired, at one time or during five consecutive business days, two or more semi-automatic rifles larger than .22 caliber

24

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

(including .223/5.56 mm) with the ability to accept a detachable magazine. The Demand Letter 3 has no application outside of Arizona, California, New Mexico, and Texas.

Notably, the mere fact that an FFL has received a Demand Letter from ATF is not an indicator that the FFL has been involved in criminal activity or has otherwise violated its obligations under federal law or ATF regulations. Instead, each Demand Letter program is based on specific FFL data, such as trace volume, time-to-crime of the traced firearm, and reporting both multiple handgun sales and long gun sales (along the SW border), used by ATF's NTC to ensure the success of firearm traces. If a licensee's business operation fits any of these criteria, they are added to the Demand Letter program.

## II.    Minnesota Statutes, Regulations, and Guidelines regarding Handgun Purchases.

The Bureau of Criminal Apprehension (BCA), pursuant to Minnesota Statutes section 624.7131, enforces the Permit to Carry and Permit to Purchase/Transfer handguns for the state. A valid Minnesota permit to carry a handgun constitutes a permit to purchase a handgun. If an individual does not possess a valid permit to carry a handgun, they must complete a Uniform Firearm Application for a Permit to Purchase / Transfer a handgun. These applications are submitted to the local police chief or county sheriff for a background check to determine the individual's eligibility. After this check is complete the associated CLEO issues a one-year permit to purchase handguns.[68]

Handgun purchase permits are obtained from the police department of the municipality in which the applicant lives. Individuals must submit a Uniform Firearm Application for a permit to purchase a handgun in person with the police chief, the sheriff's department, or other designated law enforcement in the area. An applicant must complete the Minnesota State Permit to Acquire Handgun Form.[69]

The police department will complete background checks through the FBI (NICS), BCA warrant, and local criminal record checks. Checks are also processed through the Minnesota Department of Human Services to determine if the applicant is eligible for a permit. If no prohibitions from possessing, receiving, or transporting a handgun are disclosed, the permit to purchase handguns is issued and remains valid for one year. They are valid statewide, and there is no limit on the number of handguns that may be purchased with a permit.[70]

So in order to purchase a handgun in Minnesota, a resident would have to first present a valid state permit to an FFL like Fleet Farm or any other firearm licensee. Next, the purchaser would have to present their identification to the licensee to confirm their state of residency, age (must be 21 years of age or older to purchase a handgun or 18 years old to purchase a long gun /rifle or shotgun), and

---

[68] https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/firearms-permit-to-purchase-transfer.aspx
[69] https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/firearms-permit-to-purchase-transfer.aspx
[70] https://www.stpaul.gov/books/25000-handgun-purchase-permit

25

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

physical description to qualify for handgun purchases. The licensee, here a Fleet Farm representative, would complete section A of the ATF Form 4473 and record the make, model, serial number, type, caliber, and total number of firearm(s) being purchased. Next, the purchaser completes section B of the ATF Form 4473. They provide their name, address, date of birth, and personal data (including citizenship status), and complete section 21 of the form. Question 21.a. through 21.n. contains a series of questions a purchaser answers in response to their legal status and intended use of a firearm (i.e., attesting they are the actual buyer of the firearm). Typically, if a purchaser answers "yes" to a prohibited question a licensee may immediately terminate the firearm sale. The reason for this is that an answer in the affirmative to a prohibited question (i.e., renounced citizenship, dishonorably discharged from the military, convicted of a felony, adjudicated a mental defect, etc.) is an admission of a prohibition under the Gun Control Act, which gives a licensee reason to cancel or discontinue a sale. Similarly, if a purchaser answers "no" to the question, "Are you the actual buyer of the firearm," the licensee has the discretion to cancel or void the sale. A customer finalizes the form by signing box 22 under the penalty of perjury that their answers are true and correct. The licensee uses the purchaser's form of identification, typically a valid driver's license, to again verify their identity and records this information onto the Form 4473. In instances where a handgun is purchased, the licensee would verify that the purchaser has a valid permit to purchase a handgun or permit to carry issued by the State of Minnesota prior to completing the ATF Form 4473.

After sections A, B, and C are complete, the licensee contacts the FBI NICS center for a background check. The date of this contact and NICS response is recorded on the ATF Form 4473 (boxes 27.a. through 27.c.). These NICS background checks and responses are not instantaneous, and it can take some time for the NICS center to provide a response. While waiting for a response, the prospective purchaser remains at the licensee's premise for the approval to continue the transaction. Once NICS approves the transaction, a "proceed" transaction number is provided and recorded onto the ATF Form 4473. The licensee will complete the rest of the Form 4473 by documenting their license information in box 33 and signing and dating the Form 4473. At this point, with the background check results in and the Form 4473 completed with both transferor and transferee information documented, the transaction is finalized with the purchaser taking possession of the firearm.

## OPINIONS

**I.  Fleet Farm's training policies and procedures are consistent with, and in many instances go above and beyond, ATF requirements relating to monitoring for and preventing straw purchasing.**

After reviewing Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchasing, my expert opinion is that Fleet Farm's policies and procedures go above and beyond ATF and GCA requirements and expectations.

26

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As detailed above on pages 13 through 21, ATF provides guidance to FFLs to monitor for the following five potential indicia of a possible straw purchase: (1) "[a]ttempted purchase after a denial is issued, usually by family member or friend"[71]; (2) "[t]wo customers, one looks at the gun and asks the questions- the other wants to complete the paperwork"[72]; (3) "[e]xchanges of cash in or near storefront"[73]; (4) "[t]he customer acts uncomfortable or seems unfamiliar with the product"[74]; and (5) "[c]onversations of customers while shopping, with you, with their friends or on their cell phones."[75]  And although not included in the educational seminars offered to FFLs, on at least one occasion ATF has also identified the following as potential indicia of a possible straw purchase: (1) a prior NICS denial[76]; and (2) multiple firearm purchases of the same make and caliber.[77]  And as I explained on pages 19 through 21, to the extent paragraph 25 of the First Amended Complaint suggests there are ATF-mandated indicia above and beyond these, it is inaccurate.

The policies and guidance presented by Fleet Farm begin at the granular level of the CFR and explain the "how to" on every aspect of the CFR.  In providing these policies and guidance, it is my opinion that Fleet Farm exceeds ATF guidance and ATF's expectations regarding an FFL's business operations relating to firearm sales.  In my opinion, based on my years of experience with the ATF and exposure to the policies and practices of numerous FFLs, Fleet Farm's firearm training policies are exemplary within the firearm industry.

### A.    Fleet Farm's formal and informal firearm training and policies go above and beyond what is required by the ATF.

Based on my review of Fleet Farm's core training, quarterly trainings, and informal trainings such as the "Tuesday Tidbits," as well as deposition testimony regarding these trainings and policies, it is my opinion that Fleet Farm's training related to monitoring for and preventing straw purchases goes far above what is required by the ATF.

### 1.    Fleet Farm's Core Trainings

I conducted a holistic review of Fleet Farm's training material and internal policies, which include all of the modules reflected in Fleet Farm's "Firearm Training" summary document, FF_0001497, and deposition testimony regarding the same.  These training modules discuss and guide

---

[71] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[72] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815; ATF0000573 ("One person is physically handling the firearms, but someone else is filling out the forms")
[73] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[74] ATF0000072; ATF0000131; ATF0000230; ATF0000381; ATF0000454; ATF0000815; ATF0000573 ("Someone has a shopping list of firearms to fulfill, but no knowledge about them"); ATF0000668 ("Ask yourself, does the buyer appear to know anything about firearms")
[75] ATF0000072; ATF0000131; ATF0000230; ATF0000381; ATF0000454; ATF0000815
[76] ATF0000131
[77] ATF0000131

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

employees through Fleet Farm's business practices in every aspect of firearm sale engagement.[78] The core training modules include a module entirely devoted to straw purchasing that appropriately identifies potential indicia of a possible straw purchase as follows[79]:



This training is consistent with ATF guidance,[80] ███████████████████████████ ████████████████████████████████████████████ goes above and beyond ATF's guidance. And the final bullet point ████████████████████████████████ ██████████████████████ And during the relevant time period, Fleet Farm has trained its employees to treat a multiple handgun sale as a potential indicia of a possible straw purchase.[82] Fleet Farm also

---

[78] FF_0001507; FF_0001514; FF_0001520; FF_0001531; FF_0001542; FF_0001547; FF_0001554; FF_0005711; FF_0005715; FF_0005730; FF_0005734; FF_0005745; FF_0005748; FF_0005754; FF_0005760; FF_0005769; FF_0005775; FF_0005790; FF_0005798; FF_0005802; FF_0005816; FF_0005820; FF_0005831; June 20, 2024 Radl Depo. Tr. 22:18-25:5.

[79] FF_0001508

[80] June 20, 2024 Radl Depo. Tr. 21:9-14

[81] ATF0000231

[82] Sept. 5, 2024 Klebs Depo. Tr. 30:2-9 (explaining he was "trained by Fleet Farm that multiple firearms in one transaction was a warning sign"), 59:4-17 (explaining he completed "a series of firearms training" in June 2016); June 20, 2024 Radl Depo. Tr. 16:6-7 ("Buying multiple firearms could be a red flag, as well."), 28:14-25 ("Q: In 2020 and 2021 did Fleet Farm monitor the purchase of multiple firearms as a possible warning sign of a straw buyer? A: At store level they did, yes . . . ."), 84:8-85:12 (explaining training on the 3310.4 form being "an alert of a possible straw

28

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

requires its employees to review the "Don't Lie for the Other Guy" video,[83] which is another example of Fleet Farm going above and beyond ATF requirements in training its employees to monitor for and prevent straw purchases, as discussed on page 15 above.

Further, Fleet Farm's procedures for how employees should deal with suspected straw purchasers[84] are not required by ATF, and reflect another example of Fleet Farm implementing a more robust system for dealing with suspected straw purchases than is required by ATF regulations:



Notably, as described on pages 36 through 38 below, Fleet Farm's Straw Purchase Alert system goes above and beyond what is required by ATF regulations and guidance, which contain no direction that FFLs establish an alert system that identifies potential straw purchasers.

Fleet Farm's Background Check module also exceeds ATF requirements, in that Fleet Farm requires an affirmative **proceed** message from NICS before transferring a firearm to a prospective customer, rather than following the Brady 3-day transfer rule[85]:

---

purchase" was delivered verbally before being added to the quarterly trainings in November 2021).

[83] June 13, 2024 McKown Depo. Tr. 47:23

[84] FF_0001510

[85] FF_0005738; July 24, 2024 Sierakowski Dep. Tr. 20:13-15 ("It is Fleet Farm's policy to not transfer any firearms

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



Further, Fleet Farm's Paperwork Filing Procedures and Audit modules contemplate internal paperwork protocols that go above and beyond ATF requirements.[86] ATF does not prescribe by regulation FFL internal audits or inventories, but they suggest it.

Fleet Farm has exhaustive internal audit procedures, including  None of these audits are required by ATF, and all of these auditing requirements go above and beyond Fleet Farm's legal obligation.

Fleet Farm's training of a certified Firearm Specialist culminates with a post-test certification, consisting of 88 firearm-related and situational questions, many of which are directly related to the

---

to any customers unless we get a proceed from NICS.").

[86] FF_0005790 (ATF Form filing procedures); FF_0005831 (Auditing Procedures, Daily, Weekly and Quarterly)

[87] FF_0001537 (F 4473 Section D & E double checker signature); FF_0005836 – FF_0005842 (ATF Form 4473 Audit)

[88] FF_0005834 (Weekly Firearm audits)

[89] FF_0005832 (Orange Tag Missing Firearm) – FF_0005835 (Quarterly B-T-S Audit)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CFR and industry practices.[90]   This is a comprehensive evaluation based on what the CFR regulates.  There is no requirement in the CFR that individuals selling firearms be certified or pass any test before being qualified to sell firearms.  Accordingly, in my opinion, and based on my experience, this certification requirement also goes above and beyond ATF expectations.

In sum, Fleet Farm's core trainings reflect many instances where Fleet Farm goes above and beyond what ATF prescribes with respect to firearm sales and, more specifically, detecting and prevent straw purchasing.

### 2.   Fleet Farm's Quarterly Trainings

The ATF does not mandate FFLs to provide ongoing education to their employees regarding how to monitor for or prevent straw purchasing and in general, FFL business operations.  Despite this, Fleet Farm provides their Firearm Specialists and management quarterly online webinar training to retain a working knowledge of ATF updates and GCA operational requirements.[91]  In providing these quarterly trainings, Fleet Farm goes above and beyond ATF requirements, and demonstrates their commitment to having responsible FFLs in the industry.

Likewise, as with the initial Straw Purchase module, many aspects of the discussion surrounding straw purchasing present in Fleet Farm's quarterly trainings go above and beyond ATF requirements, in that they identify more potential indicia of a possible straw purchase than ATF seminars.  Specifically:

- **November 2021 Quarterly Training[92]**: This training reiterates the same indicia of a straw purchase described in the Straw Purchase module, and also describes additional indicia:

  

  [93]  Fleet Farm's addition of these two indicia to its ongoing training materials is an enhancement of the ATF requirements and guidelines regarding straw purchasing.  My understanding is that these two indicia were added to the quarterly trainings in 2021, but that Fleet Farm trained its employees to be aware of multiple handgun sales throughout the relevant time period in this case.[94]  And regardless, that these indicia were not included in writing before 2021 is in no way a violation of ATF requirements or guidelines.

---

[90] FF_0003450 (Firearm Specialist Certification Test)

[91] FF_0000860 (Feb 2021 Q Web Training); FF_0002730 (3Q Web Training 2021); FF_0036479 (Q Web Training Apr 2021); FF_0000012 (Q Web Training Nov 2021); FF_0032623 (Q Web Training Apr 2022); FF_0040797 (Q Web Training Nov 2022); FF_0040813 (Q Web Training Apr 2023); FF_0040898 (Jun 2023 State Permit/NICS Training); FF_0040832 (Q Web Training Aug 2023); FF_0040770 (Q Web Training Nov 2023)

[92] FF_0000012

[93] FF_0000016 (Straw Purchase indicia)

[94] June 20, 2024 Radl Depo. Tr. 16:6-7, 28:14-25, 84:8-85:12; Sept. 5, 2024 Klebs Depo. Tr. 30:2-9, 59:4-17

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The November 2021 training also includes a "Suspicious Sales Activity – 3310 Form" slide, which I understand ███████████████████████████████

███████████████ Fleet Farm's ███████████████████

████████████████████████████████████████████████[6] is another illustration of Fleet Farm taking steps to go above and beyond ATF guidelines and regulations to enhance its training regarding straw purchasing.

The next slide of the November 2021 training, titled "Suspicious Activity," provides three additional guidelines for employees[97]:



These guidelines are consistent with ATF's seminars, and here again, Fleet Farm's statement that a Form 3310.4 "can provide information on potential handgun straw purchases" goes above and beyond the training ATF provides FFLs in its official educational seminars.

---

[95] FF_0000017; June 20, 2024 Radl Depo. Tr. 85:18-86:12
[96] June 19, 2024 Granato Depo. Tr. 103:1-14
[97] FF_0000018

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- **November 2022 Quarterly Training**[98]: The "Straw Sales Awareness" slide in this presentation identifies nine possible indicia of a potential straw purchase[99]:



The first five possible indicia on this slide, as well as the instruction to "[a]sk customers questions," are consistent with ATF guidelines, as described on pages 13 through 18. The next three possible indicia ███████████████████████████████████████████████ are enhancements that go above and beyond ATF guidelines.

The November 2022 training also reminds employees of the "Don't Lie For The Other Guy" materials.[100] ATF encourages FFLs to use these materials but does not require their use. Accordingly, the use of the "Don't Lie" materials is voluntary on the part of Fleet Farm, and yet another example of Fleet Farm exceeding ATF requirements for monitoring for and preventing straw purchases.

- **April 2023 Quarterly Training**[101]: This training seminar identifies four additional possible indicia of a potential straw purchase:

---

[98] FF_0040797
[99] FF_0040804
[100] FF_0040805
[101] FF_0040813

33

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



None of these additional indicia are present in ATF seminars.  This is yet another example of Fleet Farm providing its employees with additional possible indicia of a potential straw purchase, which goes above and beyond what ATF requires.  Fleet Farm retains this training material in a shared file for easy employee access, anytime.  In particular, ATF does not put out guidelines to FFLs on ███████████████████████████████████ ████████████████████████████████████ and ATF does not train FFLs to be on the lookout for cash, debit card, or gift card payments, this is beyond the scope of regulations and would place an unsanctioned burden on FFLs (outside the context of an FFL observing an exchange of cash, as discussed on page 15).

- **August and November 2023 Quarterly Trainings[102]**:  These quarterly trainings identify the same additional possible indicia of a potential straw purchase as the April 2023 quarterly training.  This refresher or in-service training illustrates Fleet Farm going above and beyond ATF requirements in training its employees on possible indicia of a potential straw purchase.

In sum, as we look through Fleet Farm's quarterly training chronologically, we see the discussion of possible indicia of a potential straw purchase becoming broader and encompassing more scenarios.  This demonstrates that Fleet Farm is constantly advancing and adopting its policies and

---

[102] FF_0040832 ; FF_0040770

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

guidelines to reflect its environment, and adapting in light of recent developments (including contact with law enforcement). From an ATF perspective, it is positive to see an FFL endeavoring to adapt and change in reaction to on-the-ground circumstances and observations. Fleet Farm's quarterly training courses demonstrate the company's commitment to being a law-abiding FFL.

### 3.      Fleet Farm's Tuesday Tidbits

I also understand that for several years, Michelle Granato, Fleet Farm's Firearm Specialist, prepared "Tuesday Tidbits" that were posted on Fleet Farm's internal social media platform and would provide employees with "a quick training" that was designed to "refresh [employees'] memory" on certain aspects of Fleet Farm's firearm policies and procedures.[103] My opinion after reviewing the content of the "Tuesday Tidbits," and specifically the "Tuesday Tidbits" that discuss straw purchasing,[104] is that they were of tremendous informative value.

These Tidbits, similar to the quarterly seminars, provided continuing education to identify and mitigate straw purchases. This method of interactive communication keeps critical firearm issues and solutions at the forefront for their firearm specialists. Providing Tuesday Tidbits is another example of Fleet Farm providing ongoing education and training in a manner that goes above and beyond what ATF requires from FFLs. Once again, this level of commitment to regulatory compliance demonstrates Fleet Farm's concern for public safety and corporate responsibilities in this space. In my opinion, this internal training tool goes far to reinforce the GCA, while providing Fleet Farm employees situational awareness, goes beyond the regulatory requirements contained in the CFR, and shows the company's commitment to compliance.

*      *      *

In sum, Fleet Farm's transparency, communication, and dedication to training its employees demonstrate corporate responsibility as the company strives to maintain currency with ATF's St. Paul Field Division, which goes above and beyond regulatory expectations.

Fleet Farm's commitment to compliance is transparent and demonstrated by its efforts to create and implement policy, and training modules, which include an exhaustive regiment of onboard training for all Firearm Specialists, that culminates with a post-certification test. And my evaluation of this training material revealed attention to every section of the CFR applicable to their FFL business operations as a licensed dealer (Type 01 FFL).[105]

Individual training modules, for instance on Straw Purchases and the internal alert database created for their Firearm Specialists, go beyond basic awareness and responsibilities under the Act.[106]

---

[103] June 19, 2024 Granato Depo. Tr. 74:3-17
[104] FF_0000910; FF_0000955; FF_0000936; FF_0000906; FF_0000898; FF_0000922 (Tuesday Tidbits)
[105] FF_0001497 (Firearm Training)
[106] FF_0001507 (Straw Purchases training module)

35

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Additional training modules include managing required GCA records, conducting FBI NICS background checks, reporting multiple handgun sale requirements, while notifying ATF and associated CLEOs, every training module is explicit and exceeds regulatory CFR requirements.[107]

Fleet Farm retains this webinar information on an internal portal for employees to access anytime to remain current with GCA requirements and ATF policies.  Because of the creative initiatives described in this section of my report, it is my opinion that Fleet Farm's policies to introduce employees to ATF CFR regulatory requirements maintain high compliance standards that go above and beyond GCA, ATF requirements for record-keeping compliance on monitoring, and preventing possible straw purchases.

> **B.    Fleet Farm has robust systems in place to prevent straw purchasing and to share information regarding straw purchasers companywide, and these systems go above and beyond ATF requirements.**

I have reviewed Fleet Farm's records and deposition transcripts regarding Fleet Farm's software recordkeeping systems, which, among other things, generate ATF forms, track inventory for both daily and quarterly box-to-steel (BTS) physical inventory, and issue straw purchase alerts.[108] These systems go beyond the GCA's and ATF's requirements.  Specifically, ATF does not require a company to establish a straw purchase notification system to share information about potential straw purchases across FFLs.

Although it is not required by ATF, Fleet Farm uses an alert system to share information about potential straw purchases across Fleet Farm stores by email.[109]  Through this system, Fleet Farm stores would send a "Straw Purchase Alert" to all other Fleet Farm stores, and "would also frequently call . . . neighboring stores, to alert them" about a possible straw purchaser.[110]  And Fleet Farm employees are directed to review incoming straw purchase alerts and stay aware of individuals who have been identified as possible straw purchasers[111]:

---

[107] FF_0001497 (Firearm Training Modules / CFR Subpart-F, Subpart-H)

[108] FF_0005715; FF_0005802; June 19, 2024 Granato Depo. Tr. 19:2-9, 35:9-36:8

[109] FF_0001511 – FF_0001513; June 13, 2024 McKown Depo. Tr. 42:4-45:4, 56:5-57:11, 226:7-227:5; June 20, 2024 Radl Depo. Tr. 33:21-34:6, 63:9-64:5

[110] June 20, 2024 Radl Depo. Tr. 26:6-18

[111] FF_0001511

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



Fleet Farm also kept a database of potential straw purchasers to avoid sales to those individuals in the future.[112] Fleet Farm's straw purchase alert system, and corresponding database, is another example of Fleet Farm going above and beyond ATF requirements in monitoring for and preventing possible straw purchases. Notably, I see the value of Fleet Farm's policies demonstrated by its disruption of approximately 110 possible straw purchases in the State of Minnesota between January 1, 2018 and October 6, 2023, in addition to hundreds of other possible straw purchases in its other non-Minnesota stores.[113]

My understanding is that although certain corporate-level employees have access to an individual's firearm transaction history across Fleet Farm FFLs, that information is not available to a store-level employee at a particular Fleet Farm FFL (e.g., a store-level employee at Fleet Farm's Blaine store does not, in the ordinary course, have access to firearm transaction records from Fleet Farm's Alexandra store).[114] There is no ATF requirement, guideline, or recommendation that a company establish cross-FFL connectivity as it concerns multiple firearm sales. And the fact that certain corporate-level employees can monitor for and evaluate multiple firearm purchases across Fleet Farm FFLs is another example of Fleet Farm implementing a system that is not required by ATF,

---

[112] June 19, 2024 Granato Depo. Tr. 44:15-25, 82:17-83:3; June 20, 2024 Radl Depo. Tr. 33:15-20; FF_0042289
[113] FF_0042289
[114] June 20, 2024 Radl Depo. Tr. 29:1-24, 127:2-22

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

goes above and beyond ATF requirements, and is an enhancement that better positions Fleet Farm for identifying and preventing potential straw purchases.[115]

**C.    That certain Fleet Farm stores have received Demand Letter 2s is not indicative of any compliance issues and has no bearing on Fleet Farm's detection and prevention of straw purchasing.**

My understanding is that certain Fleet Farm stores in Minnesota are among the numerous FFLs that have, at some point, been placed in ATF's Demand 2 Program.[116]  A Demand Letter 2 is issued to an FFL who had 25 or more firearms traced to them the previous calendar year with a "time-to-crime" of three years or less (with time-to-crime referencing the period from the date of final sale of a firearm to a purchaser to the date a law enforcement agency or ATF initiates a trace on the firearm).  The receipt of a Demand Letter 2 requires the affected FFL to submit limited information regarding "used" guns acquired the previous year, including the manufacturer/importer, model, caliber or gauge, and serial number along with the acquisition date.  As I have explained, the mere fact that an FFL has received a Demand Letter 2 from ATF is not an indicator that the FFL has been involved in criminal activity or has otherwise violated its obligations under federal law or ATF regulations.

I have also reviewed Fleet Farm's letter responses to the Demand Letter 2 requests.[117]  Based on my introduction to Fleet Farm's business model, my understanding is that Fleet Farm stores only offer new firearms for sale and do not transact in used firearms.  It is my opinion that Fleet Farm, after evaluating its business process of retail firearm sales, has done its due diligence in responding to the Bureau's Demand Letter 2 request Quarterly as requested.  This is evidenced in part by the fact that ATF has removed certain of Fleet Farm's store's Demand Letter 2 reporting obligations.[118]

**D.    ATF's renewal of Fleet Farm store licenses indicates those stores have been fully compliant with the GCA and ATF regulations.**

My review and examination of the licenses from Fleet Farm's Minnesota stores indicate that all stores have been issued FFL licenses throughout the relevant time period, and have had those licenses timely renewed as required by federal law.[119]  In my opinion and based on my experience,

---

[115] June 20, 2024 Radl Depo. Tr. 29:4-24

[116] ATF0000993; ATF0000999; ATF0001002; ATF0001005; ATF0001073; ATF0001076; ATF0001113; ATF0001116; ATF0000973; ATF0000976

[117] FF_0037694; FF_0037695; FF_0037696; FF_0037697; FF_0037698; FF_0037699; FF_0037700; FF_0037701; FF_0037702; FF_0037703; FF_0037704; FF_0037705; FF_0037706; FF_0037707; FF_0037708

[118] ATF0001109; ATF0001111; ATF0001107

[119] FF_0037002; FF_0014350; FF_0013893; FF_0029318; FF_0031753; FF_0027681; FF_0027685; FF_0027688; FF_0013977; FF_0005944; FF_0013793; FF_0014586; FF_0022785; FF_0039278; FF_0014073; FF_0027663; FF_0013785; FF_0014087; FF_0014484; FF_0013829; FF_0014671; FF_0027665; FF_0027987; FF_0013972; FF_0039242; FF_0027991; FF_0037517; FF_0014257; FF_0014278; FF_0014233; FF_0035899; FF_0036009; FF_0013860; FF_0036010; FF_0013971; FF_0013856; FF_0014453; FF_0014156; FF_0014155; FF_0034514;

ATF would only have renewed these licenses if there were no regulatory administrative actions or ATF criminal enforcement actions pending against the FFL. Further, if a Fleet Farm FFL's business operations did not comply with the GCA, any related regulatory requirement, or ATF guidelines, or if the ATF had any concerns about the FFL's regulatory compliance, that FFL's license would not have been renewed by ATF. Certainly, if ATF had concerns that a particular Fleet Farm FFL was knowingly or negligently selling handguns to straw purchasers, ATF would not have renewed that FFL's license. Accordingly, the renewal of Fleet Farm FFLs' licenses indicates these FFLs were following the GCA and regulatory requirements and operating by federal and state laws governing their firearms business.

## II. Fleet Farm's sales to Jerome Horton and Sarah Elwood did not violate the Gun Control Act or ATF regulations and guidelines relating to firearm transactions or preventing straw purchases.

As described above, Fleet Farm has a robust set of policies, procedures, and systems in place to monitor and prevent possible straw purchasing. Many of Fleet Farm's training and systems go above and beyond ATF requirements, meaning that Fleet Farm is doing far more than is required by ATF to monitor for and prevent straw purchasing. And, as discussed above, ATF does not expect FFLs to be 100% successful in preventing straw purchases.

Against this background and based on my review of the materials relating to Jerome Horton and Sarah Elwood's purchases from Fleet Farm, it is my professional opinion that Fleet Farm's sales to Horton and Elwood did not violate any provision of the GCA, ATF regulations, or ATF guidelines relating to straw purchasing.

### A. Fleet Farm's sales to Jerome Horton and Sarah Elwood did not violate ATF policies and guidelines relating to firearm transactions.

Based on my review of the ATF Form 4473s and (where applicable) 3310.4s of Horton's and Elwood's purchases from Fleet Farm stores, all available video footage of the transactions, the aggregative timeline of their purchases, communications between ATF and Fleet Farm employees regarding these transactions, and transcripts of depositions of Fleet Farm employees involved in certain transactions, it is my expert opinion that Fleet Farm's sales to Horton and Elwood did not violate any ATF policies or guidelines relating to firearm transactions.

Specifically, my review of Horton and Elwood's ATF Form 4473s and ATF Form 3310.4s disclosed nothing that would warrant an ATF violation, or in any way contrary to the CFR. Both

---

FF_0039273; FF_0013858; FF_0039254; FF_0037514; FF_0013895; FF_0036011; FF_0014058; FF_0014483; FF_0013974; FF_0039263; FF_0014373; FF_0039268; FF_0014112; FF_0014574; FF_0014656; FF_0013896; FF_00441283; FF_0014194; FF_0014345; FF_0014443; FF_0014056; FF_0036419; FF_0014641; FF_0013890; FF_0014352; FF_0014497; FF_0014354; FF_0014262; https://fflezcheck.atf.gov/FFLEzCheck/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

transferor (seller) and transferee (purchaser) data were properly recorded in required GCA records, as prescribed by regulation. Based on the completed ATF Form 4473 transaction records, available CCTV video footage, and conditions present at the time of each transaction, there was no possible way a Fleet Farm counter employee would have been aware or have knowledge that either Horton or Elwood was committing a "straw purchase."

I have reviewed all of the available video files, which total approximately 10 hours of footage of Horton's purchases. In my opinion, Horton does not display any suspicious behavior, either erratic or unusual that would give rise to a possible straw purchase.

Based on my prior experience as ATF Deputy Assistant Director, and after evaluating Fleet Farm's firearm records associated with both Elwood and Horton and reviewing video of Horton's purchases, their post-firearm purchase activity or subsequent dispositioning to a prohibited person only came to light after the ATF criminal investigation and contact with ATF's criminal enforcement group (discussed below).

Elwood and Horton fell into the same population of customers buying rifles, shotguns, handguns, and even multiple handguns from various Fleet Farm stores. Fleet Farm is licensed under the GCA by ATF to engage in the business of dealing in Title I firearms and they have. I did not find evidence that Fleet Farm personnel were aware that either Horton or Elwood were straw purchasing firearms before their contact with ATF. When they became aware of Horton and Elwood's association with straw purchases and criminal activity, they immediately ramped up their cooperation with the investigating ATF Special Agent and helped in every way possible.

### 1.    Jerome Horton

I evaluated ATF Form 4473 and (where applicable) 3310.4 transaction records for Fleet Farm's sales to Jerome Horton, as well as the available CCTV footage of these transactions. My understanding is that in his guilty plea, Horton stipulated that he made a "false statement and deceived federal firearm licensee Fleet Farm in connection with the purchase of all" of the firearms he purchased between June 15 and October 17, 2021—from Fleet Farm FFLs and other FFLs.[120] Accordingly, as I explain below, although there are no indicia of possible straw purchasing reflected in any of the video footage I reviewed, my analysis assumes that each of Horton's purchases from Fleet Farm stores between June 15 and October 17, 2021, was, in fact, a straw purchase. My observations of these transactions are detailed below.

---

[120] AGO0000262–AGO0000263

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### a.       June 15, 2021 Transaction – Brooklyn Park

Horton's first purchase from a Fleet Farm store occurred on June 15, 2021, when he purchased a Taurus G2C at the Brooklyn Park store.[121]  The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for non-licensee transactions.  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun, and specifically that he had a valid Minnesota driver's license, had been permitted by the State of Minnesota to purchase a handgun, and resided in Minnesota.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473, as he declared himself to be the actual buyer of the firearm.  Negative responses in this section of the transaction would give rise to a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.[122]  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to proceed.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.  In my opinion, Fleet Farm lawfully transferred this firearm to Horton.

Additionally, I reviewed all available CCTV footage for this transaction.[123]  In this footage, Horton does not exhibit or show any indications that would raise suspicions of a possible straw purchase.  None of the ATF-identified (or Fleet Farm-identified) indicators of a possible straw purchase can be seen in the footage.  Accordingly, based on the behavior reflected in this video footage, and even with the benefit of hindsight, Fleet Farm would not have had any reason to suspect that Jerome Horton was engaging in straw purchasing.

Isaac Nelson was the Fleet Farm employee identified as the seller of this firearm.[124]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Nelson.  Based on my review of all available CCTV video files, assuming that Nelson is the Fleet Farm employee depicted in the video, there does not appear to be any familiarity between Nelson and Horton.[125]

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

---

[121] FF_0000713; Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[122] 18 U.S.C. 922(g)
[123] FF_0037739, FF_0037740, FF_0037741, FF_0037742, FF_0037743, FF_0037744
[124] FF_0000713 (F 4473)
[125] FF_0037744 (video footage)

41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### b.    July 4, 2021 Transaction – Brooklyn Park

Horton purchased a Ruger Security 9 from the Brooklyn Park store on July 4, 2021.[126]  The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for non-licensee transactions.  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

Additionally, I reviewed the available CCTV footage for this transaction.[127]  Even with the benefit of hindsight, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns that he was committing a straw purchase.  In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by firearm specialist Brigette Rudnick.[128]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Rudnick.  Based on my review of all available CCTV video files, there does not appear to be any familiarity or any appearance of an acquaintance between Rudnick and Horton.[129]

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### c.    July 7, 2021 Transaction – Brooklyn Park

On July 7, 2021, Horton purchased a Glock G19 at the Brooklyn Park store.  I reviewed the ATF Form 4473 transaction record and corresponding video footage of the sale.[130]  I reviewed the ATF

---

[126] FF_0000471 (ATF F 4473); FF_0037750, FF_0037749, FF_0037748, FF_0037747, FF_0037746, FF_0037745 (video footage); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[127] FF_0037750
[128] FF_0000471 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[129] FF_0037750
[130] FF_0000259 (ATF F 4473); FF_0037751; FF_0037752; FF_0037753; FF_0037754 (video footage); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

42

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all of the CFR information an FFL must obtain for non-licensee transactions. The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun. Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

Additionally, I reviewed all available CCTV footage of this transaction.  Even with the benefit of hindsight, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have alerted the firearm specialist to a straw purchase.  In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by firearm specialist Greg Johnson.[131]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Johnson.[132]  Based on my review of the available CCTV footage, there does not appear to be any familiarity or any appearance of an acquaintance between Johnson and Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### d.    July 10, 2021 Transaction – Oakdale

Horton purchased a Glock G43X at the Oakdale store on July 10, 2021.[133]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for non-licensee transactions.  The completed form contains data that reflects Fleet Farm's verification of Horton's eligibility to purchase this handgun.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record

---

[131] FF_0000259 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[132] FF_0000259 (ATF F 4473)
[133] FF_0000008 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

is complete and follows CFR and Minnesota state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### e.     July 23, 2021 Transaction – Blaine

On July 23, 2021, Jerome Horton purchased a Beretta APX at Fleet Farm's Blaine store. I reviewed the ATF Form 4473 and the video footage of the sale.[134] I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained all the CFR information an FFL is required to obtain for a non-licensee transaction. The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun. Additionally, I did not see any indicia on the form as an alert to a straw purchase. There was no negative information in section 21 on the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm. This transaction record is complete and follows CFR and Minnesota state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

Video footage of the transaction has Horton accompanied by another male.[135] Even with the benefit of hindsight, I did not observe any indicia of a straw purchase, and there were no suspicious interactions between the two, nor any other indicia or behavior (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns that he was committing a straw purchase. In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

Firearm specialist Greg Carrick handled this transaction.[136] Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Carrick.[137] As observed in the video, there

---

[134] FF_0000438 (ATF F 4473)
[135] FF_0037711, FF_0037710, FF_0037709 (video footage)
[136] FF_0000438; Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[137] FF_0000438

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

does not appear to be any familiarity or any appearance of an acquaintance between Carrick and Horton, or the individual accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### f.    July 24, 2021 Transaction – Oakdale

In a July 24, 2021 transaction at the Oakdale store, Jerome Horton purchased an HS Product XDS Mod. 2 and an FN USA 503.[138]  I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for a non-licensee transaction.  The completed form is confirmation that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun, i.e., FBI NICS background check and timely completion of the Form 3310.4 report.  Additionally, I did not see any indicia, specifically in section 21 of the ATF Form 4473, that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  It appears that after receiving a "proceed" response from NICS and a unique identification number, which allowed the sale to proceed, the identified firearms were transferred. This ATF transaction record is complete, with the required purchaser and NICS documentation required by the GCA and ATF. Fleet Farm's personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

Firearm specialist Gary Hallfielder handled this transaction.  He managed the sale of another firearm to Horton on July 10, 2021.  From my observation, Fleet Farm personnel legally transferred these firearms after following GCA/CFR and Minnesota state requirements.  Once again, gun counter personnel followed the GCA requirements to obtain an accurately completed Form 4473, followed background check requirements, and obtained a "proceed" from NICS.  Based on this disposition progression, I did not find any indication that Fleet Farm personnel had knowledge of or reason to believe Horton was engaging in a straw purchase during this transaction.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

---

[138] FF_0000127 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### g.        July 26, 2021 Transaction – Oakdale

Jerome Horton purchased a Glock 26Gen5 from the Oakdale store on July 26, 2021.[139]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all the required CFR information an FFL must obtain for non-licensee transactions.  The completed form contains documentation of Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete with CFR and Minnesota state-required documentation.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.

Firearms specialist Lloyd Lau handled this sale.  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Lau.  This ATF transaction record is complete, with the required purchaser and NICS documentation in accordance with GCA requirements.  Fleet Farm personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.  This transaction was lawfully completed to Horton, and Fleet Farm's personnel would have had no cause to suspect a straw purchase in this instance.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### h.        July 27, 2021 Transaction – Blaine

On July 27, 2021, Jerome Horton purchased a Glock G43X and a Stoeger STR-9C at Fleet Farm's store in Blaine.[140]  I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all the necessary CFR information an FFL is required to obtain for non-licensee transactions. The completed form is a confirmation that Fleet Farm personnel verified and qualified Horton's eligibility to purchase these handguns.  Additionally, I did not see any indication on the forms of a possible straw purchase.  The information recorded in section 21 of the ATF Form 4473 was correct and would not have raised a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet

---

[139] FF_0000234 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[140] FF_0000331 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.  Fleet Farm's personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

Additionally, I reviewed the available CCTV footage for this transaction.[141]  Even with the benefit of hindsight, Horton's demeanor as observed in the video, his behavior, and interactions with the male that accompanied him do not provide sufficient indicia to suspect a straw purchase.  Nothing was observed on the video that could or should have alerted Fleet Farm's personnel that Horton was conducting a straw purchase, or that would otherwise have given Fleet Farm personnel a reason to stop the sale.[142]

This transaction was handled by Branden Sierakowski.[143]  Based on my review of the ATF Form 4473s, this appears to be the only sale to Horton involving Sierakowski.[144]  Based on my review of the available CCTV footage, there doesn't appear to be any familiarity or any appearance of an acquaintance between Sierakowski and Horton, or the individual accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### i.       July 31, 2021 Transaction – Blaine

On July 31, 2021, Jerome Horton purchased a Mossberg MC2C, a Ruger EC9S, and a Glock G45 from the Blaine store.[145]  I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all of the required CFR information an FFL is required to obtain for non-licensee transactions.  The completed form contains Fleet Farm personnel's verification of Horton's eligibility to purchase this handgun.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise an alarm of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.  Fleet Farm's

---

[141] FF_0037712; FF_0037713; FF_0037714 (video footage)
[142] FF_0037713
[143] Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[144] FF_0000331 (ATF F 4473)
[145] FF_0000363 (ATF F 4473 and F 3310.4); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

Additionally, I reviewed the available CCTV footage for this transaction.[146] Even with the benefit of hindsight, Horton's demeanor as observed in the video, including his behavior and his interactions with the male that accompanied him, did not appear suspicious or erratic, and I observed no indicia or behavior by Horton that would have raised concerns of a straw purchase. Horton's behavior and interactions with the gun specialist mirrored the actions of other customers being served by Fleet Farm personnel. I saw nothing in the video that would give Fleet Farm personnel a reason to stop the sale or suspect a straw purchase.

Firearm specialist Bret Nordquist handled this transaction.[147] Based on my review of the ATF Form 4473s, this appears to be the only sale to Horton involving Nordquist. As observed in the video, there doesn't appear to be any familiarity or any appearance of an acquaintance between Nordquist and Horton, or the individual accompanying Horton.

I also reviewed the Blaine Store Incident Report which I understand was created by Cory Klebs several months after this transaction was completed.[148] This incident report entry describes Fleet Farm employees taking the following steps to assess the appropriateness of the transaction: double-checking the ATF Form 4473, contacting another Fleet Farm employee to confirm company policy on firearm disposition limits, confirming with the employee behind the gun counter that they did not have any reason to suspect a possible straw purchase, and a triple check of the paperwork.[149] This document reflects Klebs doing his due diligence to confirm that the sale was proper and that no indicators of a possible straw purchase were present. I also understand that Cory Klebs testified to having a conversation with Horton during this transaction, and that he asked Horton why he was purchasing so many handguns, that Horton told Klebs he was doing so because he was starting a collection, and that Klebs was satisfied with this answer and did not suspect Horton of straw purchasing at the time the transaction occurred.[150] These efforts go above and beyond what is required and expected by ATF, and in my professional opinion, this transaction did not violate any ATF guidelines relating to non-licensee dispositions, specifically straw purchasing or any of Fleet Farm's policies and training relating to straw purchasing.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

---

[146] FF_0037715, FF_0037716, FF_0037717 (video footage)
[147] FF_000036 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[148] FF_0075711 (Blaine Store Incident Report)
[149] FF_0075711
[150] FF_0075711-FF_0075712; Sept. 5, 2024 Klebs Depo. Tr. 40:13-41:18

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### j.    August 14, 2021 Transaction – Blaine

On August 14, 2021, Jerome Horton purchased a Glock 19X at Fleet Farm's Blaine store.[151]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.   The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for non-licensee transactions.  The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see anything documented on the form or in section 21 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.  I saw nothing on the form that would have given Fleet Farm personnel a reason to pause or stop the sale.

Fleet Farm firearm specialist Zach Lohse managed this transaction.[152]  Based on my review of the ATF Form 4473s, this appears to be the only sale to Horton involving Lohse.  In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### k.    August 20, 2021 Transaction – Brooklyn Park

On August 20, 2021, Jerome Horton purchased a Glock G19 gen5 from Fleet Farm's Brooklyn Park store.[153]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all of the CFR information an FFL is required to obtain for a non-licensee transaction.  The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see any indicia of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

---

[151] FF_0000049 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[152] FF_000036 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[153] FF_0000588 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Additionally, I reviewed the available CCTV footage for this transaction.[154]  The video shows Horton being accompanied by a female during this transaction.  Horton's demeanor as observed in the video didn't appear suspicious or erratic.  I did not see the female participate or influence any part of Horton's purchase. Horton's behavior, and interactions with the gun specialist mirrored the actions of other customers being served by Fleet Farm personnel.  I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns that he was committing a straw purchase.  In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by firearm specialist Matt Benson.[155]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Benson.  As observed in the video, there doesn't appear to be any familiarity or any appearance of an acquaintance between Benson and Horton, or the female accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### l.        August 31, 2021 Transaction – Lakeville

On August 31, 2021, Horton purchased a Glock 26 Gen5 and a Mossberg MC2C pistols from the Lakeville store.[156]  I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained the required CFR information an FFL must obtain for non-licensee transactions.  The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase both handguns.  Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements, including reporting multiple handgun purchases.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.  Fleet Farm's personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

---

[154] FF_0037755; FF_0037756; FF_0037757; FF_0037758; FF_0037759 (video footage)
[155] FF_0000588 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[156] FF_0000238 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Additionally, I reviewed the available CCTV footage for this transaction.[157] Even with the benefit of hindsight, Horton's demeanor, behavior, and interaction with Fleet Farm personnel, as observed, disclosed no indicia of a straw purchase, raising no concerns about a straw purchase. In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by Logan Oja.[158] Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Oja. My opinion on the CCTV footage reviewed, there does not appear to be any familiarity or any appearance of an acquaintance between Oja and Horton, or the individual accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### m.      September 13, 2021 Transaction – Blaine

On September 13, 2021, Horton purchased a Glock G17 gen 5 from Fleet Farm's Blaine store.[159] I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained all the CFR information an FFL is required to obtain for a non-licensee transaction. The completed form is confirmation Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun. Additionally, I did not see any indicia on the form of a straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm. This transaction record is complete and follows CFR and Minnesota state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the purchaser and NICS documentation required by the GCA.

Additionally, I reviewed the available CCTV footage for this transaction.[160] The footage shows Horton accompanied by a male. I did not see the male participate or influence any part of the transaction, or otherwise exhibit any indicia of a straw purchase.[161] Likewise, even with the benefit of hindsight, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns that he was committing

---

[157] FF_0037721, FF_0037722, FF_0037723, FF_0037724, FF_0037725 (video footage)
[158] FF_0000238 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[159] FF_0000607 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[160] FF_0037726; FF_0037727; FF_0037728; FF_0037729 (video footage)
[161] FF_0037727 (video footage)

51

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a straw purchase. Certainly, from the employee's perspective of Horton approaching the counter, it would have appeared as a normal firearm purchase, following procedures established by the GCA (i.e., verify identification, eligibility to purchase handgun, then proceeding to complete the ATF Form 4473 and FBI NICS background check). Horton's behavior and interactions with the gun specialist mirrored the actions of other customers being served by Fleet Farm personnel. In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by firearm specialist Jeremy Rehbein.[162] Based on my review of the ATF Form 4473, this appears to be the only transaction involving Rehbein. Based on my review of the available CCTV footage, there does not appear to be any familiarity or any appearance of an acquaintance between Rehbein and Horton, or the individual accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### n.    September 17, 2021 Transaction – Brooklyn Park

On September 17, 2021, Horton purchased a Ruger-57 from Fleet Farm's store in Brooklyn Park.[163] I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained all the CFR purchaser and licensee data an FFL must obtain for non-licensee transactions. The completed form is a confirmation that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun. Additionally, I did not see any indication of a possible straw purchase or documentation in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm. This transaction record is complete and follows CFR and Minnesota state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

Additionally, I reviewed the available CCTV footage for this transaction.[164] The footage shows Horton being accompanied by a male during this transaction with multiple customers present. Even with the benefit of hindsight, Horton's demeanor as observed in the video, didn't appear suspicious or erratic. I did not see the male participate or influence any part of Horton's firearm

---

[162] FF_0000607; Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13

[163] FF_0000246 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

[164] FF_0037757, FF_0037758, FF_0037759, FF_0037760, FF_0037761, FF_0037762, FF_0037763, FF_0037764, FF_0037765 (video footage)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

selection or purchase. Horton's behavior, and interactions with the gun specialist mirrored the actions of other customers being served by Fleet Farm personnel. I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns of him being or committing a straw purchase. In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

This transaction was handled by firearm specialist Leetee Xiong.[165] Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Xiong. After reviewing available CCTV footage, my opinion is there does not appear to be any familiarity or any appearance of an acquaintance between Xiong and Horton, or the individual accompanying Horton.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### o.    September 18, 2021 Transaction – Blaine

On September 18, 2021, Horton purchased a Glock G19 from Fleet Farm's Blaine store.[166] I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained the CFR information an FFL is required to obtain for non-licensee transactions. The completed form reflects that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun. Additionally, I did not see any indication of a possible straw purchase or information in section 21 of the ATF Form 4473 that would raise a Fleet Farm employee's suspicion of a possible straw purchase. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm. This transaction record is complete and follows CFR and Minnesota state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

This transaction was handled by firearm specialist Zach Lohse.[167] Based on my review of the ATF Form 4473s, this appears to be the specialist's second transaction with Horton. Additionally, I reviewed available CCTV footage for this transaction.[168] The footage shows Horton accompanied by a male during this transaction, with other customers also present. Even with the benefit of hindsight, Horton's demeanor as observed in the video, didn't appear suspicious or erratic. I did

---

[165] FF_0000246 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[166] FF_0000574 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[167] FF_0000574
[168] FF_0037728, FF_0037729 (video footage)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

not see the male participate or influence any part of Horton's firearm selection or purchase or interact with Fleet Farm personnel. Horton's behavior, and interactions with gun specialist Lohse mirrored the actions of other customers being served by Fleet Farm personnel. There was no familiarity observed between Horton and Lohse. Further, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns about him committing a straw purchase. In my opinion, there is nothing the gun counter specialist would have observed to give them cause to stop the sale.

There is no indication present that Fleet Farm personnel were aware of or had knowledge that Horton was committing a straw purchase, or otherwise had cause to stop the sale. Horton exhibited no indicia of a straw purchaser during the transaction, demonstrated either on the ATF Form 4473 or CCTV.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### p.    September 26, 2021 Transaction – Blaine

On September 26, 2021, Horton purchased a Glock 26Gen5 and a Radical Firearms RF-15 from Fleet Farm's store in Blaine.[169] I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales. The ATF Form 4473 for this transaction contained all the CFR information an FFL must obtain for a non-licensee sale. The completed form contains confirmation that Fleet Farm personnel verified and qualified Horton's eligibility to purchase these handguns. Additionally, I did not see any indicia of a straw purchase or information in section 21 on the ATF Form 4473 that would have raised suspicion of a possible straw purchase. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm. This transaction record is complete and follows CFR and MN state requirements. Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements. Fleet Farm's personnel also completed and sent copies of the ATF Form 3310.4 Report of Multiple Handguns to ATF and the CLEO of their locality.

Additionally, I reviewed the available CCTV footage for this transaction.[170] Again, even with the benefit of hindsight, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns he was committing a straw purchase. Horton's behavior and interactions with the gun specialist mirrored the actions of

---

[169] FF_0000479 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[170] FF_0037730; FF_0037731 (video footage)

54

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

other customers being served by Fleet Farm personnel.  In my opinion, there is nothing the gun counter specialist would have observed or encountered with Horton to give them cause to stop the sale.

Firearm specialist Jerome Riley handled this transaction. [171]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Riley.  My opinion on the video after reviewing it, is there does not appear to be any familiarity or any appearance of an acquaintance between Riley and Horton nor any indicia of a straw purchase giving cause to stop the sale.

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### q.      October 11, 2021 Transaction – Brooklyn Park

Horton purchased a Taurus G3c on October 11, 2021, from Fleet Farm's Brooklyn Park store.[172]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all the CFR information an FFL is required to obtain for a non-licensee transaction.  The documentation on the completed form shows that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see any indicia on the form that suggests a straw purchase or information in section 21 of the ATF Form 4473 that would have raised suspicion of a possible straw purchase.  Fleet Farm also appears to have timely submitted Horton's data to the FBI NICS for a background check to determine his eligibility to possess the firearm.  This transaction record is complete and follows CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation prescribed by the GCA.

Additionally, I reviewed the available CCTV footage for this transaction.[173]  Even with the benefit of hindsight, I observed no indicia or behavior by Horton (e.g., body language, gestures, interactions with others, or other actions) that would have raised concerns that he was committing a straw purchase.  In my opinion, there is nothing the gun counter specialist would have observed during this exchange to give them cause to stop the sale.

This transaction was handled by firearm specialist Gary Peloquin.[174]  Based on my review of the ATF Form 4473s, this appears to be the only transaction involving Peloquin.  Based on my review

---

[171] FF_0000479 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13
[172] FF_0000581 (ATF F 4473)
[173] FF_0037734, FF_0037735, FF-0037736, FF-0037737, FF-0037738 (video footage)
[174] FF_000000479 (ATF F 4473); Defs.' Am. Responses & Objections to Pl.'s Interrogatory Nos. 2, 6, and 13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the available CCTV footage, there does not appear to be any familiarity or any appearance of an acquaintance between Peloquin and Horton.[175]

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### r.    October 17, 2021 Transaction – Oakdale

On October 17, 2021 Horton purchased a Glock 26Gen5 at the Fleet Farm store in Oakdale.[176]  I reviewed the ATF Form 4473 transaction record to ensure compliance with the GCA, ATF policies, and MN State law on handgun sales.  The ATF Form 4473 for this transaction contained all the CFR information an FFL must obtain for a non-licensee transaction. The completed form is accurate with relevant data and is a confirmation that Fleet Farm personnel verified and qualified Horton's eligibility to purchase this handgun.  Additionally, I did not see any indication of a possible straw purchase or documentation in section 21 of the ATF Form 4473 that would have alarmed a Fleet Farm employee of a straw purchase.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Horton's eligibility to possess the firearm.  This transaction record is complete and follows the CFR and Minnesota state requirements.  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

Additionally, I reviewed the available CCTV footage for this transaction.[177]  Even with the benefit of hindsight, I observed no indicia or behavior by Horton that would have raised concerns that he was committing a straw purchase. This transaction was handled by firearm specialist Cindy McKree. Based on my review of the ATF Form 4473s, this appears to be the only transaction involving McKree.  My understanding is that during this transaction, a Fleet Farm employee observed Horton "clearly on his phone and on a video call with someone" and thought that "Horton was showing the other person the firearm selection over the phone."[178]  Although this is a possible indicia of a potential straw purchase, my understanding is that "ATF informed the store employee to allow the purchase to go through," according to the narrative remark, so "at the time there was no reason to delay or deny the purchase."[179]

In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and

---

[175] FF_0037734 – FF_0037736 (video footage)

[176] FF_0000208 (ATF F 4473)

[177] FF_0037733 (video footage)

[178] FF_0075708 (incident report)

[179] FF_0075708 (incident report)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

training relating to straw purchasing, particularly considering that ATF affirmatively told Fleet Farm to proceed with this sale.

*        *        *

I also reviewed email communications between the ATF St. Paul Field Office and Fleet Farm regarding Jerome Horton. Fleet Farm was contacted by ATF Special Agent Kylie Williamson ("SA Williamson") on October 14, 2021.[180] In this email, SA Williamson advises Fleet Farm about her investigation of Jerome Horton and requests certain records associated with multiple handgun purchases by Horton. It appears that a few days after first her contact with  Fleet Farm's loss prevention, SA Williamson had a phone call with Michelle Granato, where she told Fleet Farm that "the cooperation she received was fantastic and everything she requested was provided very quickly," "[s]he was impressed by [Fleet Farm] in gathering the items not just at one store but every store involved," and "[s]he expressed that in no way did [Fleet Farm] do anything wrong by selling [Horton] the firearms" because "[t]here was nothing in his background that would have rendered a denied response."[181] This communication, and SA Williamson's expression that "in no way did" Fleet Farm "do anything wrong by selling" to Horton, is consistent with my opinions after having reviewed the circumstances surrounding each sale.

### 2. Sarah Elwood

I also evaluated ATF Form 4473 and (where applicable) 3310.4 transaction records for Fleet Farm's sales to Sarah Elwood.[182] My understanding is that due to Fleet Farm's standard retention protocols, there is no CCTV footage of these transactions. My understanding is also that in her guilty plea, Elwood agreed that if the criminal case against her went to trial, the United States would prove "beyond a reasonable doubt" that "[f]rom approximately May 2020 through May 2021, [she] conspired . . . to buy dozens of firearms from federally licensed firearms dealers, while knowingly making false and fictitious oral and written statements that were intended or likely to deceive those dealers regarding a fact material of the lawfulness of the sales," and that she "straw purchasing approximately 97 firearms in total," including the firearms she purchased from Fleet Farm stores.[183] Accordingly, although there are no indicia of possible straw purchasing reflected in the Elwood transaction records I reviewed, my analysis assumes that each of Elwood's purchases from Fleet Farm stores was, in fact, a straw purchase. My observations of these transactions are detailed below.

---

[180] FF_0001485

[181] FF_0001484

[182] FF_0000034; FF_0000570; FF_0000254; FF_0000467; FF_0000201; FF_0000307; FF_0000614; FF_0000311; FF_0014673; FF_0000056

[183] AGO0000207, AGO0000213-AGO0000216

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### a.    June 20, 2020 Transaction – Brooklyn Park

Elwood purchased a Canik TP9SF Elite from Fleet Farm's Brooklyn Park store on June 20, 2020.[184]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with GCA, ATF, and Minnesota state law and found no discrepancies. The ATF Form 4473 for this transaction contained all the CFR information an FFL is required to obtain for a transfer to a non-licensee resident.  The completed form contains and shows that Fleet Farm personnel verified Elwood's eligibility to purchase the firearm.  Additionally, I did not see any indicia of a straw purchase or information in section 21 of the ATF Form 4473 that would alert Fleet Farm employees of a possible straw purchase.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the form with the required purchaser information while following store protocols based on the CFR and ATF procedures.  This transaction appears to have been handled by firearm specialist Greg Johnson.  Based on my review of the ATF Form 4473s, this seems to be the only transaction involving Johnson.  By all indications, Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by checking box 21.a, on the form.  Further, there was no evidence or documentation on the form to suggest otherwise.  Fleet Farm also appears to have timely submitted Elwood's data to the FBI NICS for a background check to determine her eligibility to possess the firearm.[185]  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation according to GCA requirements.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase. In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### b.    July 30, 2020 Transaction – Brooklyn Park

Elwood's next purchase occurred on July 30, 2020 at the Brooklyn Park store, when she purchased a Taurus G2C.[186]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with GCA, ATF policy, and Minnesota state requirements and found no discrepancies.  The ATF Form 4473 for this transaction contained all the CFR information an FFL is required to obtain during a non-licensee sale.  The completed form contains and shows Fleet Farm verified Elwood's eligibility to purchase the firearm.  Additionally, I did not see any indicia of a straw purchase or information in section 21 of the ATF Form 4473 that would alert Fleet Farm employees of a possible straw purchase.  Following GCA and CFR requirements, Fleet Farm appears to have

---

[184] FF_0000034 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[185] 18 U.S.C. 922(g); 27 CFR § 478.102 (NICS background check requirement)
[186] FF_0000570 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

adequately qualified Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols based on the CFR and ATF procedures. This transaction appears to have been handled by firearm specialist Lori Jo Lamprette.  Based on my review of the ATF Form 4473s, this seems to be the only transaction involving Lamprette.

Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by checking box 21.a. on Form 4473.  Further, I did not find any evidence or documentation on the form to suggest otherwise.  Fleet Farm also appears to have timely submitted Elwood's data to the FBI NICS for a background check to determine her eligibility to possess the firearm.[187]  After receiving a "proceed" response from NICS and a unique identification number, they allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation consistent with GCA requirements.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase.  In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions, straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### c.    January 4, 2021 Transaction – Brooklyn Park

Elwood's next purchase occurred on January 4, 2021, at the Fleet Farm store located in Brooklyn Park, where she purchased a Taurus Spectrum.[188]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies.  The ATF Form 4473 for this transaction contained documentation required by the CFR, information a licensee must obtain for a non-licensee sale. The completed form contains and shows where Fleet Farm personnel verified Elwood's eligibility to purchase a handgun.  Additionally, I did not see any indication of a straw purchase or information recorded in section 21 on the ATF Form 4473 that would alert Fleet Farm employees of a straw purchase.  Following GCA and CFR requirements, Fleet Farm personnel appear to adequately qualify Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols established on the CFR and ATF procedures.  Firearms specialist Mike Williamson handled this

---

[187] 18 U.S.C. 922(g); 27 CFR § 478.102 (NICS background check requirement)
[188] FF_0000254 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transaction.  My review of Elwood's Form 4473s identified two additional transactions also associated with Williamson.  The additional sales occurred on January 11, 2021 and May 1, 2021 and will be discussed below.  In this transaction, Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by checking box 21.a. on Form 4473. There is no evidence or documentation on the form to suggest otherwise or indicia for Fleet Farm to suspect a straw purchase. Additionally, Fleet Farm also appears to have timely submitted Elwood's data to the FBI NICS for a background check. [189]  After receiving a "proceed" response from NICS and a unique identification number, Fleet Farm completed the sale. This ATF transaction record is complete, with the required purchaser and NICS documentation and is compliant with GCA requirements.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase.  In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### d.    January 11, 2021 Transaction – Brooklyn Park

Elwood's next purchase was on January 11, 2021, at the Brooklyn Park store, when she purchased a Taurus PT111G2A.[190]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with GCA, ATF, and Minnesota State law requirements and found no discrepancies. Both transferee/buyer data and transferor/seller validations are accurately and timely documented on this record. The ATF Form 4473 for this transaction contained the CFR information a licensee must obtain for a non-licensee sale.  The completed form contains documentation showing Fleet Farm personnel verified Elwood's eligibility to make the purchase.  Additionally, I did not see any indication of a straw purchase or information in section 21 that would raise Fleet Farm employee's suspicion of a straw purchase.  Following GCA and CFR requirements, Fleet Farm personnel appear to adequately qualify Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols patterned on the CFR and ATF procedures.  Firearm specialist Mike Williamson handled this Elwood transaction as well. Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by checking box 21.a. on Form 4473.  My review did not disclose any straw purchase indicia, nor was there evidence on the form to suggest otherwise.  Fleet Farm appears to have timely submitted Elwood's data to the FBI NICS for a background check to determine her eligibility to possess the firearm.[191]  Fleet Farm received a "proceed" response from NICS and a

---

[189] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirement)
[190] FF_0000467 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[191] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirement)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

unique identification number, which allowed the sale to continue.  This ATF transaction record is complete and compliant with the GCA.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase.  In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### e.        January 31, 2021 Transaction – Blaine

Elwood's next purchase was on January 31, 2021, at the Blaine store, when she purchased two Taurus Spectrums.[192]  I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies.  The ATF Form 4473 for this transaction contained all the CFR information an FFL must obtain during a non-licensee transaction.  The completed form contains required documentation, showing Fleet Farm personnel verified Elwood's eligibility to make the purchase.  Additionally, I did not see any indication of a straw purchase or information recorded in section 21 of the ATF Form 4473 that would raise suspicion of a straw purchase.  Following GCA and CFR requirements, Fleet Farm personnel appear to adequately qualify Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols and ATF procedures.  This transaction appears to have been handled by firearm specialist Branden Sierakowski.  He isn't associated with any other sales to Elwood.  Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by checking "yes" in box 21.a. on Form 4473.  My review found no evidence to suggest otherwise.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Elwood's eligibility to possess the firearm.[193]  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete and compliant with GCA and ATF requirements.  Fleet Farm personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase. In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

---

[192] FF_0000201 (ATF F 4473 and F 3310.4); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[193] 18 U.S.C. § 922(g); 27 CFR 478.102 (NICS background check requirement)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### f.        March 15, 2021 Transaction – Brooklyn Park

Elwood's next transaction occurred at the Fleet Farm store located in Brooklyn Park on March 15, 2021, when she purchased an HS Produkt/Springfield Armory XDS Mod.2.[194]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies.  The ATF Form 4473 for this transaction contained the required CFR information an FFL must obtain for a non-licensee transaction.  Additionally, I did not see any indicia of a straw purchase or information in section 21 that would cause a Fleet Farm employee to suspect a straw purchase.  Fleet Farm personnel appear to have followed all GCA, and CFR requirements to adequately qualify Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols based on the CFR and ATF procedures.  This transaction appears to have been handled by firearm specialist Matt Yeager.  Based on my review of the ATF Form 4473s, this seems to be the only transaction involving Yeager.

Elwood presented herself to Fleet Farm as the actual purchaser of the firearm by recording "yes" in box 21.a. on Form 4473.  I found no evidence or documentation on the form to suggest she was not.  Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Elwood's eligibility to possess the firearm.[195]  Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue.  This ATF transaction record is complete, with the required purchaser and NICS documentation pursuant to the GCA.

There is no indicia in this record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase.  In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### g.        May 1, 2021 Transaction – Brooklyn Park

Elwood's next firearm purchase was on May 1, 2021, at Fleet Farm's Brooklyn Park store, when she purchased a Ruger EC9S.[196]  I reviewed the ATF Form 4473 transaction record for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies.  The ATF Form 4473 for this transaction contains the required CFR information an FFL is required to obtain during a non-licensee transaction.  The completed form has confirmation

---

[194] FF_0000307 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[195] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirement)
[196] FF_0000614 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that Fleet Farm personnel verified Elwood's eligibility to make the purchase. No straw purchase indicia were on the form, specifically in section 21 to raise suspicion of a straw purchase. This transaction appears to have been handled by firearm specialist Mike Williamson. Fleet Farm personnel appear to adequately qualify Elwood's eligibility to purchase the handgun by following GCA and CFR requirements by verifying her identification, State residency, and age requirements, and only releasing the firearm after NICS approval.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store protocols, which are based on the CFR and ATF procedures. Elwood presented herself to Fleet Farm as the actual purchaser of the firearm, by marking "yes" in box 21.a. of the Form 4473. I found no evidence or documentation on the form to suggest otherwise. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Elwood's eligibility to possess the firearm.[197] Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation required by the GCA.

There are no indicia of a straw purchase in the record to alert Fleet Farm personnel nor does it appear they knew Elwood was committing a straw purchase. In my professional opinion, this transaction did not violate any ATF guidelines relating to a non-licensee sale, I found no evidence to suggest Fleet Farm knew Elwood was committing a straw purchase.

### h.        May 1, 2021 Transaction – Lakeville

On May 1, 2021, Elwood also purchased a Smith & Wesson M&P from the Fleet Farm store in Lakeville.[198] I reviewed the ATF Form 4473 transaction record for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies. The ATF Form 4473 for this transaction contained all of the CFR information required for a non-licensee transaction. The completed form contains documentation showing Fleet Farm personnel verified Elwood's eligibility to make the purchase. Additionally, I did not see any indication of a straw purchase or information in section 21 that would raise any suspicions of a straw purchase. Based on my review this transaction appears to have been handled by firearm specialist Michael Crepeau and is the only transaction involving Crepeau. Following GCA and CFR requirements, Fleet Farm personnel appear to have qualified Elwood's eligibility to purchase the handgun with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears the employee accurately and timely completed the ATF form while following ATF policy as well as Fleet Farm procedures when they completed this sale. Elwood presented herself to Fleet Farm as the actual purchaser of the firearm,

---

[197] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirement)
[198] FF_0000311 (ATF F 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

by checking "yes" in box 21.a. on the ATF Form 4473. There is no evidence or indicia on the form to suggest otherwise. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Elwood's eligibility to possess the firearm.[199] Fleet Farm received a "proceed" response from NICS and a unique identification number, which allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase. In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions or straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### i.    May 6, 2021 Transaction – Blaine

On May 6, 2021, Elwood purchased a Glock 19 and a Ruger-57 from the Fleet Farm store located in Blaine.[200] I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies. The ATF Form 4473 for this transaction contained required CFR documentation an FFL must obtain for a non-licensee transaction. The ATF Form 3310.4 was accurately completed and timely reported to the ATF and the CLEO in their jurisdiction. The completed forms convey Fleet Farm personnel verified Elwood's eligibility to make the purchase. Based on my review of this transaction, it appears to have been handled by firearm specialist Matthew Kubiak and is the only Elwood transaction he's associated with.

Additionally, I did not see any indication of a straw purchase or information in section 21 that is indicia a Fleet Farm employee would have recognized as a straw purchase. Following GCA and CFR requirements, Fleet Farm personnel appear to adequately qualify Elwood's eligibility to purchase the handgun(s) with her identification, state residency, and age requirements.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF forms with the required purchaser information while following store procedures established on the CFR and ATF procedures. Elwood presented herself to Fleet Farm as the actual purchaser of the firearm(s) by checking "yes" in box 21.a. of the Form 4473. There is no evidence or documentation on the form to suggest she wasn't. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine her eligibility to possess the firearm.[201] After receiving a "proceed" response from NICS and a unique identification number, they allowed the sale to continue. This ATF transaction record is complete, with the required purchaser and NICS documentation. Fleet Farm personnel also completed and

---

[199] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirement)
[200] FF_0014673 (ATF Form 4473); Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[201] 18 U.S.C. § 922(g); 27 CFR § 478.102 (NICS background check requirements)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality as prescribed by regulation.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase. In my professional opinion, this transaction did not violate any ATF regulations or guidelines relating to non-licensee dispositions, straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

### j.      May 12, 2021 Transaction – Blaine

On May 12, 2021, Elwood purchased a Ruger-57 and a Glock G17 from the Fleet Farm store located in Blaine.[202] I reviewed the ATF Form 4473 and ATF Form 3310.4 transaction records for accuracy and compliance with the GCA, ATF policy, and Minnesota state law requirements and found no discrepancies. The ATF Form 4473 for this transaction contained all the CFR information a licensee must obtain for a non-licensee transaction. The completed form contains documentation showing that Fleet Farm personnel verified Elwood's eligibility to make the purchase. Additionally, I did not see any indication of a straw purchase or information in section 21 that would raise suspicion of a straw purchase. Following GCA and CFR requirements, Fleet Farm personnel appear to have adequately qualified Elwood's eligibility to purchase the handgun(s) using her identification and completing a NICS background check.

Based on my review of the ATF Form 4473, it appears that the Fleet Farm employee accurately and timely completed the ATF form with the required purchaser information while following store procedures. Elwood presented herself to Fleet Farm as the actual purchaser of the firearm(s) by answering "yes" to question 21.a. on the ATF Form 4473. Fleet Farm doesn't appear to have prior knowledge, nor did I see anything documented on the form that suggests otherwise. Fleet Farm also appears to have timely submitted data to the FBI NICS for a background check to determine Elwood's eligibility to possess the firearm.[203] After receiving a "proceed" response from NICS and a unique identification number, they completed the sale. Based on my review, this transaction appears to have been handled by firearm specialist Zach Lohse and is the only Elwood transaction that he handled.

This ATF transaction record is complete, with the required purchaser and NICS documentation prescribed by regulation. Fleet Farm personnel also completed and sent copies of the ATF Form 3310.4 to ATF and the CLEO of their locality.

There is no indicia in the record that Fleet Farm personnel were aware of or had knowledge that Elwood was committing a straw purchase. In my professional opinion, this transaction did not

---

[202] FF_0000056; Defs.' Responses & Objections to Pl.'s Second Set of Interrogatories
[203] 18 U.S.C. § 922(g)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

violate any ATF regulations or guidelines relating to non-licensee dispositions, straw purchasing, or any of Fleet Farm's policies and training relating to straw purchasing.

**B.    There is no indication that Fleet Farm knew or should have known that Horton or Elwood were engaged in straw purchases at Fleet Farm stores.**

Based on my review of the ATF forms completed during Horton and Elwood's transactions, the above-referenced documents and records relating to those transactions, and the available CCTV footage of Horton's transactions, it is my professional opinion that Fleet Farm did not know, or have reason to know, that Horton was engaged in straw purchasing at Fleet Farm stores until being contacted by ATF Special Agent Kylie Williamson on October 14, 2021. Likewise, it is my professional opinion that Fleet Farm did not know, or have reason to know, that Elwood was engaged in straw purchasing at the time she completed her transactions at Fleet Farm stores.

Like many other corporate retailers, Fleet Farm conducts a high volume of firearm sales. These sales include multiple handgun dispositions, which is a normal course of the firearm business. During every transaction associated with Horton and Elwood, Fleet Farm personnel followed CFR requirements.

There is no indication that the firearm specialists at any of the Fleet Farm locations where Horton and Elwood purchased their firearms knew they were being deceived or that either Horton or Elwood were committing a straw purchase. They followed prescribed procedures established by law for firearm transactions and there is no evidence to suggest that any of the employees were aware of or had any knowledge that Horton and Elwood were making straw purchases.

A contrast can be drawn between Fleet Farm's sales to Horton and Elwood and other FFL sales to Horton. In SA Williamson's affidavit in support of the criminal complaint against Horton, SA Williamson recounted an October 14, 2021 conversation with an employee of Frontiersman Sports, an FFL in St. Louis Park, during which "[t]he employee confirmed that HORTON had purchased firearm on more than one occasion, including [a] Taurus model G2C HORTON purchased earlier that day," and that a Frontiersman Sports employee "had recorded the license plate of the vehicle in which HORTON had arrived due to suspicions regarding straw purchasing."[204] This is a textbook example of a situation where an FFL has identified an indicia of straw purchasing (the exact indicia the FFL observed is unclear, but the indicia were concerning enough for the FFL to record the vehicle's license plate), and should refuse to sell a firearm. No such circumstances were present around Horton's or Elwood's transactions from Fleet Farm stores. Likewise, SA Williamson also recounted Frontiersman Sports completing a sale of two pistols to Horton on September 29, 2021, despite a Frontiersman Sports employee having noted the following observations in a handwritten note:

---

[204] AGO0001909

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- "HORTON's purchase was a suspected straw purchase."

- "HORTON's vehicle parked in a nearby Jacuzzi business parking lot to avoid Frontiersman's surveillance cameras."

- "HORTON presented a learner's permit as opposed to a driver's license."

- "HORTON had made multiple purchases of firearms over two days."

- "While HORTON was inside the store, he received a phone call and stated 'I'm still in the store.'"

- "HORTON paid cash and used small denominations for a total of $1,160."

- "As HORTON walked toward the Jacuzzi business parking lot, HORTON waived the gun boxes in the air to people waiting outside."[205]

If all seven of these circumstances are observed during a transaction, this is not a transaction that should be completed under ATF guidelines. However, the record does not indicate that any of these circumstances were present during any of the transactions at Fleet Farm stores, let alone all seven of them during the same transaction. Specifically, there is no indication of cash payments in small denominations, no indication of receiving a phone call suggesting the other person on the call is involved in the transaction, no issues with the form of identification Horton and Elwood used, and no suggestion that they tried to avoid Fleet Farm surveillance cameras. In fact, what is described in SA Williamson's affidavit provides a stark contrast between Horton's purchases from Frontiersman Sports (where clear indicia of a possible straw purchase were present) and Horton's and Elwood's purchases from Fleet Farm (where *none* of these indicia were present).

*    *    *

In conclusion, it is my expert opinion that Fleet Farm has made the investment to take the GCA and ATF regulatory requirements and ATF guidance material (including newsletters and field division training as referenced in this report) to create internal policies and procedures (including mandatory firearm specialists training, additional reporting and tracking mechanisms of denied transactions, and an alert system by which they notify their network of FFL's about possible straw purchases) that satisfy and exceed GCA and ATF requirements. Taking this level of initiative and commitment to being good stewards of industry practices places Fleet Farm's internal control of regulatory compliance efforts above and beyond regulatory expectations. Based on my review of Fleet Farm training modules, internal controls of GCA records and firearm inventory, and the other materials cited in this report and included in Appendix B to this report, it is my opinion that Fleet

---

[205] AGO00001910

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Farm has taken every possible measure to remain compliant with its obligations under GCA and ATF laws and guidelines, and their efforts have helped to protect public safety in the State of Minnesota.

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Date: ___10/4/2024___

_____
Andrew Graham

**Appendix A**

**Andrew R. Graham**
**15466 Admiral Baker Circle**
**Haymarket, VA 20169**


**U.S. Citizen**                                                          **Cell: 720-281-0659**
**USAF/ANG Veteran**                                                **Home: 720-281-0656**
andy@grahamia.com

**Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)**
**(RETIRED) Deputy Assistant Director (Enforcement Programs Services – EPS and Field**
**Operations /Industry Operations)**

**PROFILE:**

- CEO and Founder of Graham Industry Advisors, LLC January 2023
  Firearms and Explosive Regulatory Enforcement Consultant, specializing in business operations, business infrastructure, and regulatory compliance promulgated under the 1968 Gun Control Act and Explosive Safe Explosive Act in association with domestic and international firearm and explosive industries.

- Highly experienced retired Senior Executive Service (SES) Deputy Assistant Director with Sensitive Compartmented Information (SCI) clearance, 37 years of specialized experience in Firearms and Explosives Regulatory Enforcement, Deployment of Federal Statutes, Rulings and Executive Orders affecting commerce in firearms, explosives, and tobacco industries. Oversight of ATFs national regulatory compliance programs and tax audits of the firearms, explosive and tobacco industries, ensuring public safety, national commerce in support of Federal, State, Local law enforcement stakeholders.

- Certified Office of Personnel Management (OPM) and Department of Justice (DOJ) national member of the Senior Executive Service team assigned to the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF). Assigned responsibilities for the ATFs national inspection enforcement program, Administrative Actions policy to mitigate public safety threat over: regulated firearm, explosive and tobacco licensees and permittees associated with domestic/national business commerce, licensure retention, interagency coordination with the Federal Bureau of Investigation (FBI) National Instant Criminal Background Bureaus national inspection enforcement program of the regulated firearm and explosives; coordinated efforts with the FBI National Instant Criminal Background Check System (NICS) on exemptions, and coordinated efforts with Law Enforcement organization in support of LE firearm traces, oversight of ATF's National Firearms Act (NFA) registry of both pre and post 1986 machinegun registry.

- Proven expert with planning personnel resource use across ATFs 25 Field Divisions and regulatory enforcement personnel (IOIs), developing and implementing intelligence led enforcement strategies to minimize impact on domestic/international commerce, while ensuring public safety and the diversion of firearms/explosives from legal commerce, evaluating comprehensive national regulatory policies effecting market trends, legal commerce with the distribution of firearms, commercial explosives, and display fireworks (Class B explosives).

**EXPERIENCE:**

### *Deputy Assistant Director (DAD) Enforcement Programs Services (EPS) May 2020 – December 2022*

Primary Deputy Assistant Director senior executive advisor to ATF acting Director, Cabinet appointed Director and Department of Justice components on Regulatory Enforcement Policies, Rulemakings, and operational guidance over National and International commerce of firearms and explosives regulations. Advisor on regulatory enforcement matters affecting firearm commerce under the Gun Control Act (GCA) 18 U.S.C. Chapter 44, National Firearms Act (NFA-machineguns) 26 U.S.C. Chapter 53, Arms Export Control Act (AECA) 22 U.S.C. Chapter 2778, National Instant Criminal Background Check System Regulations (NICS) 28 CFR Part 25, and Explosives Importation, Manufacture, Distribution and Storage 18 U.S.C. Chapter 40, Part 555. Oversight of 700 employees assigned to ATF's National Services Center (NSC) in Martinsburg, WV and Washington, DC. Direct oversight of an annual operating budget of $42.5 million to support services from the National Tracing Center (NTC), Firearm Ammunition Technology Division (Industry and Criminal Enforcement Branch), National Firearms Act Branch (NFA – Government and Industry services branch), Firearms Explosive Services Division and Imports Branch (FESD-Imports, firearms/explosive licensing centers), Office of Regulatory Affairs (ORA), Firearms Explosives Industry Division (FEID – firearms/explosives industry processing branches).

### Accomplishments:

- Enhanced the National Tracing Center technological capabilities with auto data capture readers, Application Programming Interface (API) State Law Enforcement, firearm industry corporate retailer stakeholders with accessing NTC Connect (automated API firearm tracing with both search and recovery automation), modernizing LE firearm trace requests of crime guns and point of sale dispositions. Enhanced collaborative efforts of ATF's Criminal Enforcement component and various State LE stakeholders on the modernization and API access to firearm trace data through ATF e-Trace (LE electronic automated firearm trace processing) National and International LE partners.

- In Fiscal Year(s) 2020, 2021 and 2023 facilitated and coordinated the acquisition plan, performance work statements, and market research procurement of the Bureaus largest general services contact for $200 million dollars, spanning multiple fiscal years use

through FY 2028 with contract services effecting ATF's firearm tracing center, national firearm act branch, firearms technology, and licensing center(s) affecting firearm and explosive businesses.

- Executive affiliation and coordination of new Notice of Proposed Rule (NPRM) with national and international impact on firearms through the Department of Justice, Office of Deputy Attorney General, Office of Legal Policy over the definition of firearm frame / receiver and the arm brace ruling.

- Created a force multiplier to regional hubs in various field divisions to house expert firearm and ammunition technology enforcement officers, with capabilities to render on-site firearm classification of weapon violations and criminal possession of weapons used in criminal acts. Establishing these hubs provided National support of public safety, enhanced stewardship of tax dollars and government response to mass critical incidents.

- Collaborated with inter-government components to modernize the bureau's collection of Special Occupational Tax (SOT), Importation fee and associated licensing fee effecting commerce in the firearms and explosive industry. Electronic processes were procured and deployed through Pay.gov on-line submissions, mitigating antiquated paper submission processes to improve performance in mainstream commerce.

- Enhanced the bureaus' effort to modernize ATF's e-Form platform to enhance submission of all associated National Firearm Act (NFA) transaction forms, both tax and non-tax paid transactions for public access (specifically the submission of ATF's e-Form-1 and Form- 4 tax paid transfers) that went live on ATF's e-Form platform in December 2021.

**_Deputy Assistant Director (DAD) Industry Operations-Regulatory Enforcement, Washington, DC, October 2014 – May 2020_**

National oversight of ATF's regulatory enforcement and administration of the 1968 Gun Control Act (GCA), Safe Explosive Act (SEA) and oversight of the bureaus regulatory inspection program governed by Chapter 44, Part 478, Part 479, of the 1968 Gun Control Act. Coordinated through the Office of Chief Counsel (OCC/ACC), deployment of ATF Administrative Action enforcement policy governing willfulness and violations of the Statute. Coordinated joint efforts with the FBI NICS Brady program relative to recognition of NICS exemptions and independent State Point of Contact validations; Oversight and deployment of regulatory inspection efforts governed by

4

Chapter 40, Part 555 commercial explosives, relative to storage, markings, Importation, manufacturing effecting local and domestic explosive commerce.

Headquarters oversight of annual field developed inspection strategies referred to as "Domain Assessments", that focused personnel and resource use to inspect explosive and firearm licensees for regulatory compliance among 25 designated field divisions, with oversight of 800 field investigators, business operation of 136,000 federal firearm licensees and 9,000 federal explosive licensees, and the timely execution of compliance inspections to ensure lawful compliance, while securing public safety. Inclusive is the Bureaus regulatory oversight of the Contraband Cigarette Trafficking Act (CCTA) and Prevent All Cigarette Trafficking act (PACT) program preventing the diversion or interstate transportation of non-state tax paid cigarettes and smokeless tobacco. Daily interaction and communication with field division Special Agents in Charge (SACs) and Director of Industry Operations (DIO) on the effective application of the Bureau's Administrative Action (AA) policy, established to administer disciplinary actions, levying fines, suspensions, and revocation of issued licenses or explosive permits of violators effecting public safety.

**<u>Accomplishments:</u>**

- Created and deployed ATF's electronic and e-mail FFLAlert notification delivery system for national announcements over Federal Firearm Licensee/Explosive burglaries, Felon notification alerts, national disasters effecting the safety and security of firearms and explosives licensees nationwide.

- Created and deployed ATF regulatory national Major Inspection Team (MIT) to manage all national level inspection(s) associated with major firearm and explosive manufacturers and major retail corporations associated with commercial and governmental distribution of firearms and explosives.

- Implemented and deployed ATFs Electronic Investigative File Management System (EIFMS) case management system for ATFs regulatory enforcement program a precursor to ATFs current Accensure based Spartan case management system, presently in use and utilized in all 25 Field Division offices nationally.

- Development of ATF's Department of Defense Contractor license inspection program associated with licensee contractors with Defense Contracting Agency (DCA), United States Government Department of Defense Contractors of munition exemptions associated with the US Armed Forces.

- Developed a Federal Firearms License (FFLs) exception with main Justice oversight for individuals to obtain FFL s to engage in business at gun shows and conduct internet

sales with all relative legal exceptions, in collaboration with State, local laws and zoning requirements. A DOJ publication was developed to disclose licensing and operating requirements for civilian use.

### *Director of Industry Operations, Denver Field Division (DFD), Denver CO, October 2006 – October 2014.*

Oversight of all firearm and explosive regulatory inspection enforcement efforts in conjunction with Chapter 44 (Firearms) Gun Control Act 1968, Chapter 40 (Explosive) Safe Explosive Act in conjunction with State law and ordinances in the states of Colorado, Montana, Utah, and Wyoming.  Managed four Area Offices with supervisors and field investigators that engaged industry with compliance inspections and supported state law enforcement with intelligence on local firearm trends and criminal activity. Duties included oversight of 6,000 federally licensed firearm manufacturers, importers, dealers, licensed firearm collectors and 700 Federally licensed explosives manufacturers, importers, dealers, and permittees, administration of ATFs Administrative Action policy of willful violators to ensure compliance with Federal laws and regulations. Served as primary advisor to the Special Agent in Charge (SAC) on all regulatory enforcement matters associated with the 1968 Gun Control Act (GCA) and Safe Explosive Act (SEA).

**Accomplishments:**

- Led the Denver Field Division in completion of Congressionally mandated Safe Explosives Act investigations associated with public safety and storage.

- Led ATF Monitored Case Program for Administrative Actions associated with licensed FFLs in violation of Federal firearms and explosives laws and regulations. Coordinated background checks efforts between state point of contacts in Colorado, Utah and FBI NICS contact for Brady background checks associated with Wyoming and Montana.

- Created and implemented the conversion of ATF's Industry Operations investigative reports to electronic files thereby improving operations, reducing administrative expenses, and facilitating management of case files at regional and national levels of operations (FY 2010 – FY 2012)

- Implemented and oversaw regulatory use of ATF criminal database to trace firearms in a collaborative effort with law enforcement personnel in Utah and in Denver, while creating a pathway to identify and link prohibited persons, associates, recoveries, firearms, and crime gun supply sources through tracing technology (crime gun intelligence trace data MS PowerBi)

6

***Acting Deputy Assistant Director, Industry Operations, ATF HQ, Washington DC, March 2011.***

During this appointed assignment, I oversaw the execution of ATF's regulatory inspections of more than 600 ATF Industry Operations (IO) personnel engaged in regulatory oversight of 150,000+ Federally licensed firearms manufacturers, importers, dealers, and collectors, and 15,000 Federally licensed manufacturers, importers, dealers, and users of explosives. Direct engagement with ATFs office of Chief Counsel on Administrative Actions involving monetary fines, suspensions of licenses, revocation and denial action determined on Federal Firearms and Explosives Licenses nationwide. Collaborated with the DOJ and OPM on IO projections for new hires and budget projections for FY 2011 and 2012.

**Accomplishments:**

- Chief advisor to the Assistant Director for Field Operations on regulatory matters pertaining to licensing oversight during Congressional hearings on division of explosives authority/jurisdiction between ATF and the FBI on domestic and international terrorism.

- Provided national statistics on explosives industry licensure and vulnerability threat assessment of explosives storage sites in ATF's explosives case management system.

- Led ATF HQ Field Operations team as liaison with U.S. Customs and Border Patrol and the Consumer Product Safety Commission to ban from importation Airsoft pellet firing rifles capable of firing full metal jacketed bullets.

- Served as executive staff panel member on hiring first and second level field supervisors and was the deciding official for hardship and voluntary personnel transfer requests associated with all 25 ATF Field Division Offices.

***Acting Director of Industry Operations (IO), New Orleans Field Division, December 2010.***

Oversaw ATF regulatory enforcement and business operations in Louisiana, Mississippi, and Arkansas. Directed Administrative Action cases in Area Offices. Reviewed/approved Safe Explosives Act license renewal inspections and risk investigations to ensure compliance with Federal firearms and explosives laws and ATF regulations.

**Accomplishments:**

- Led Administrative Action Monitored Case Program dealing with firearms and explosives industry members in willful violation of Federal Firearm and Explosive laws and regulations.

- Created an intra division system of accounting to prioritize and monitor field activity with timely and consistent management of division Administrative Action revocation and denial license cases of non-compliant federal firearm licensees and explosive permittees.

- Researched and advised ATF Bureau Deciding Official on matters pertaining to personnel disciplinary actions current and taking precedence at the time.

### *Acting Director of Industry Operations, Phoenix Field Division, July - October 2006.*

Served as the industry liaison to SAC on all regulatory operational issues relating to Administrative Action Monitored Cases, and personnel action matters. Served as primary regulatory liaison with State Law Enforcement personnel. Coordinated ATF inspections of multiple firearms dealers to identify persons associated with crime gun traces originating in Mexico. Managed travel budget for regulatory enforcement and inspections of large firearms businesses.

**Accomplishments:**

- Led ATF Monitored Case Program pertaining to revocation and denial of license applications of licensees in violation of Federal laws and regulations posing a threat to public safety.

- Primary IO contact and co-author of an Organizational Change Proposal (OCP) draft to create the Denver Field Division in October 2007. Drafted the IO segment of the OCP, managing the realignment and transfer of IO Area Offices and personnel from the St. Paul Field Division under the proposal for creating the Denver Field Division. In conjunction with the OCP, realigned operational duties for all IO field personnel in Utah, Montana, Colorado, and Wyoming to execution duties under a proposed new operating budget of $200,000 annually.

- Coordinated "surge" inspections of multiple firearms dealers and pawnbrokers along the U.S.-Mexico southwest border having a nexus to firearm traffickers southbound to Mexico.

### *Area Supervisor Denver Office, Phoenix Field Division, May 2004 – October 2007.*

Reported directly to the Director of Industry Operations and Field Division SAC located in Phoenix, AZ. Supervised 21 field Inspectors located in Colorado, Wyoming, and Utah. Planned and directed all regulatory inspections of 3,600 Federal firearms licensed manufacturers, importers, dealers, and collectors of firearms, and 800 Federal explosives, manufacturers, importers located in my area of responsibility.

**Accomplishments:**

- Developed and identified inspection strategies to improve oversight of firearms and explosives businesses with short time to crime firearm traces and firearm trafficking trends of select firearms.

- Drafted Operational Change Proposal to create new Industry Operations satellite offices to increase personnel cadre to adequately represent ATF in the Western U.S. – Grand Junction, Colorado.

- Assembled and managed investigative teams to conduct surge and team investigations of large-scale firearms businesses in Colorado, Utah and Wyoming having a nexus to violent crime gun traces stemming from the Southwest border.

- Designated as Acting Director of Industry Operations by the Phoenix SAC and Headquarters Field Operations Directorate. Primary liaison and author of Operational Change Proposal for a 24th Field Division in Denver

### *Training Manager and Program Manager, Federal Law Enforcement Training Center, ATF National Academy, February 2000 – May 2004.*

Managed basic training and development of newly hired ATF Industry Operation Investigators, through basic and advanced firearms, explosives, and tobacco training.  Created and implemented lesson plans for investigator training program, established budgets for training and personnel expenses, contracted "role play" actors, allocated personnel resources, and material necessary in the execution of regulatory enforcement firearms and explosives inspection techniques. Performed collateral firearm instructor duties as a Firearms Import and Export Instructor for the Federal Bureau of Prisons and U. S. Customs and Border Patrol for safe handling and firearm nomenclature identification of Title I and Title II (NFA) weapons. Served as the ATF National Academy vault custodian containing range and training weapon systems and as an EEO Counselor for Academy personnel.

**Accomplishments:**

- Developed a budget to manage training needs of 24 -48 new hire Investigators for ATF Industry Operations Investigator Basic Training program at the ATF National Academy.

- Tested course material for accreditation and selected instructor cadre for an 8- to 10-week basic training course for ATF Investigators.

- Expanded basic training course for Investigators to include safe handling of firearms and explosives, safe handling of weapon systems, proper use of and firing of weapon systems (pistols, rifles, shotguns, and machineguns), identification and skillset to classify weapon systems Title I vs. Title II (NFA) weapons, safe handling and identification of commercial explosive material approved for manufacture, importation, distribution, and storage table of distance.

- Developed escape and evasion, non-lethal use of force techniques for regulatory Investigators in collaboration with ATF Academy law enforcement personnel.

- Initiated training protocol, created lesson plans, and procured digital range finder for use with ATF investigator training, establishing safe table of distance confidence course for explosives magazine storage promulgated by ATF Federal regulations and explosives law.

### *Industry Operations Investigator, Nashville Field Office, July 1987 – January 2000.*

Conducted regulatory compliance inspections of industry members licensed for commerce in Alcohol, Tobacco, Firearms and Explosives. Inspections were targeted to identify violations of federal and state laws, identify tax evaders and to disrupt the diversion of firearms, explosives, and tobacco to illicit markets.  Worked with State and local law enforcement organizations to determine the legal possession of firearms by non-licensed persons, alcohol beverage commissions and state revenue offices on the payment of state tobacco tax stamp certificates. Conducted long term inspections of distilled spirit plants, producers of alcoholic beverages, tobacco manufacturers, firearms businesses, and establishments subject to excise tax payment. Collaborated with Federal law enforcement and local Alcohol Beverage Commission to identify for apprehend individuals illegally producing distilled spirits and evading excise tax payment. Focused on inspecting licensed firearms and explosives dealers to ensure public safety and compliance with ATF regulations and Federal law.  Served as inspection team leader on large scale explosives inspections of display firework manufacturers and importers of sporting firearms, volunteered for additional collateral duties as the divisions outreach firearms trainer and Diversity Career Impact Program coordinator for recruitment and hiring.

**Accomplishments:**

- Served as lead investigator on routine and significant firearms, explosives, and alcohol inspections to ensure public safety and collection of Federal excise tax.

- Served as an On-the-Job trainer for numerous new hires and served as a firearms and explosive instructor at the ATF National Law Enforcement Academy during new investigator basic training.

- Assigned DCIP coordinator for the field division servicing both law enforcement and regulatory recruitment, including industry outreach coordinator.

- Collaborated with ATF law enforcement on the prosecution of Federal firearms licensees in criminal cases and assisted state Alcohol Beverage Commission Investigators during investigations of businesses selling liquor to minors.

***United States Air Force Air National Guard June 1986 through January 1995***

Washington, DC. and Nashville Tennessee Air National Guard service (USAF)

**EDUCATION:**

- George Mason University, BA / Business Administration Program
- USAF NCO Leadership Training Courses
- ATF Executive DOJ sponsored Training Courses / SES Program
- Office of Personnel Management Qualifications Review Board Certified & Department of Justice Executive Senior Executive Service Member
- Harvard Kennedy School – graduate of the Executive Education / Strategic Management of Regulatory and Enforcement Agencies Program

**AWARDS:**

- Senior Executive Service (SES) Annual Superior Performance Bonus (2015- until retirement in December 2022) Washington, DC

- Annual Superior Performance Awards 2004 – 2014 Area Supervisor and Director of Industry Operations Denver Field Division

- Annual Superior Performance Awards 1989 – 2013 as a field investigator and ATF Academy Training/Program Manager

- Performance and Time-off Awards for establishing safeguards with regulated industry members in coordination with Administration security details associated with the Democratic & Republican National Conventions held in both Denver, CO & St. Paul, MN (FY 2008)

**Appendix B**

| | |
|---|---|
| AGO0000207 | FF_0000574 |
| AGO0000261 | FF_0000581 |
| AGO0001903 | FF_0000588 |
| ATF0000001 | FF_0000607 |
| ATF0000003 | FF_0000614 |
| ATF0000005 | FF_0000713 |
| ATF0000008 | FF_0000860 |
| ATF0000027 | FF_0000898 |
| ATF0000060 | FF_0000906 |
| ATF0000344 | FF_0000910 |
| ATF0000384 | FF_0000922 |
| ATF0000544 | FF_0000936 |
| ATF0000660 | FF_0000955 |
| ATF-000070 | FF_0001484 |
| ATF0000961 | FF_0001485 |
| ATF0000984 | FF_0001497 |
| ATF0001067 | FF_0001499 |
| ATF0001107 | FF_0001507 |
| ATF0001113 | FF_0001514 |
| FF_0000008 | FF_0001520 |
| FF_0000012 | FF_0001531 |
| FF_0000034 | FF_0001542 |
| FF_0000049 | FF_0001547 |
| FF_0000056 | FF_0001554 |
| FF_0000127 | FF_0001781 |
| FF_0000201 | FF_0001882 |
| FF_0000207 | FF_0002644 |
| FF_0000208 | FF_0002730 |
| FF_0000234 | FF_0003449 |
| FF_0000238 | FF_0003450 |
| FF_0000246 | FF_0005605 |
| FF_0000254 | FF_0005654 |
| FF_0000259 | FF_0005711 |
| FF_0000307 | FF_0005715 |
| FF_0000311 | FF_0005730 |
| FF_0000331 | FF_0005734 |
| FF_0000363 | FF_0005745 |
| FF_0000438 | FF_0005748 |
| FF_0000467 | FF_0005754 |
| FF_0000471 | FF_0005760 |
| FF_0000479 | FF_0005769 |
| FF_0000570 | FF_0005775 |

1

| | |
|---|---|
| FF_0005790 | FF_0014484 |
| FF_0005798 | FF_0014497 |
| FF_0005802 | FF_0014574 |
| FF_0005816 | FF_0014586 |
| FF_0005820 | FF_0014641 |
| FF_0005831 | FF_0014656 |
| FF_0005944 | FF_0014671 |
| FF_0013785 | FF_0014673 |
| FF_0013793 | FF_0022785 |
| FF_0013829 | FF_0027663 |
| FF_0013856 | FF_0027665 |
| FF_0013858 | FF_0027681 |
| FF_0013860 | FF_0027685 |
| FF_0013890 | FF_0027688 |
| FF_0013893 | FF_0027705 |
| FF_0013895 | FF_0027987 |
| FF_0013896 | FF_0027991 |
| FF_0013971 | FF_0029069 |
| FF_0013972 | FF_0029318 |
| FF_0013974 | FF_0029543 |
| FF_0013977 | FF_0029551 |
| FF_0014056 | FF_0029555 |
| FF_0014058 | FF_0029612 |
| FF_0014073 | FF_0031753 |
| FF_0014087 | FF_0032623 |
| FF_0014112 | FF_0034514 |
| FF_0014155 | FF_0035899 |
| FF_0014156 | FF_0036009 |
| FF_0014167 | FF_0036010 |
| FF_0014194 | FF_0036011 |
| FF_0014233 | FF_0036343 |
| FF_0014257 | FF_0036416 |
| FF_0014262 | FF_0036419 |
| FF_0014278 | FF_0036479 |
| FF_0014283 | FF_0037002 |
| FF_0014345 | FF_0037514 |
| FF_0014350 | FF_0037517 |
| FF_0014352 | FF_0037694 |
| FF_0014354 | FF_0037695 |
| FF_0014373 | FF_0037696 |
| FF_0014443 | FF_0037697 |
| FF_0014453 | FF_0037698 |
| FF_0014483 | FF_0037699 |

2

| | |
|---|---|
| FF_0037700 | FF_0037743 |
| FF_0037701 | FF_0037744 |
| FF_0037702 | FF_0037745 |
| FF_0037703 | FF_0037746 |
| FF_0037704 | FF_0037747 |
| FF_0037705 | FF_0037748 |
| FF_0037706 | FF_0037749 |
| FF_0037707 | FF_0037750 |
| FF_0037708 | FF_0037751 |
| FF_0037709 | FF_0037752 |
| FF_0037710 | FF_0037753 |
| FF_0037711 | FF_0037754 |
| FF_0037712 | FF_0037755 |
| FF_0037713 | FF_0037756 |
| FF_0037714 | FF_0037757 |
| FF_0037715 | FF_0037758 |
| FF_0037716 | FF_0037759 |
| FF_0037717 | FF_0037760 |
| FF_0037718 | FF_0037761 |
| FF_0037719 | FF_0037762 |
| FF_0037720 | FF_0037763 |
| FF_0037721 | FF_0037764 |
| FF_0037722 | FF_0037765 |
| FF_0037723 | FF_0039242 |
| FF_0037724 | FF_0039254 |
| FF_0037725 | FF_0039263 |
| FF_0037726 | FF_0039268 |
| FF_0037727 | FF_0039273 |
| FF_0037728 | FF_0039275 |
| FF_0037729 | FF_0039278 |
| FF_0037730 | FF_0040770 |
| FF_0037731 | FF_0040797 |
| FF_0037732 | FF_0040813 |
| FF_0037733 | FF_0040832 |
| FF_0037734 | FF_0040898 |
| FF_0037735 | FF_0042289 |
| FF_0037736 | FF_0075708 |
| FF_0037737 | FF_0075710 |
| FF_0037738 | FF_0075711 |
| FF_0037739 | FF_0075713 |
| FF_0037740 | FF_0075792 |
| FF_0037741 | FF_0075793 |
| FF_0037742 | FF_0075794 |

| | |
|---|---|
| 2024/06/13 Deposition Transcript of Kevin McKown pps. 1 - 8, 17 - 20, 29 - 80, 89 - 152, 169 - 172, 185 - 202, 225 - 228. | 2024/02/17 State v. Fleet Farm LLC, et al. - Defs.' Amended Responses and Objections to Plaintiff's Interrogatory Nos. 2, 6, and 13 |
| 2024/06/19 Deposition Transcript of Michelle Granato pps. 1 - 8, 17 - 136, 145 - 148, 169 - 188, 201 - 224, 233 - 244. | 2024/03/05 Fleet Farm_MN AG 2024.03.05 [ECF 79] First Amended Complaint |
| 2024/06/20 Deposition Transcript of Mike Radl pps. 1 - 4, 13 - 68, 77 - 92, 125 - 128, 233 - 136. | 2024/05/23 Fleet Farm's Amended Responses and Objections to ROG Nos. 5, 7, 9, 14, and 15 |
| 2024/06/29 Deposition Transcript of Derrick Hoernke pps. 1 - 4, 25 - 68, 77 - 92, 113 - 120, 161 - 176. | 2024/08/02 Defs.' Responses and Objections to Pl.'s Second Set of ROGs |
| 2024/07/17 Deposition Transcript of Brad Hansen pps. 1 - 8, 25 - 56, 89 - 92, 101 - 104. | 2024/08/14 Fleet Farm Suppl. Response to ROG Nos. 2 and 6 |
| 2024/07/24 Deposition Transcript of Branden Sierakowski pps. 1 - 12, 17 - 64, 81 - 104, 141 - 144, 161 - 164. | CFR 478.100 |
| | CFR 478.101 |
| 2024/07/30 Deposition Transcript of Bret Nordquist pps. 5 - 8, 157 - 160. | CFR 478.102 |
| | CFR 478.103 |
| 2024/09/05 Deposition Transcript of Cory Klebs pps. 1 - 8, 29 – 32, 37 - 48, 53 - 60, 181 - 212. | CFR 478.104 |
| | CFR 478.121 |
| | CFR 478.122 |
| 1989/00/00 ATF Newsletter 1989 Volume 2 Straw Purchases ffl-newsletter-1989-vol-2_0 | CFR 478.123 |
| | CFR 478.124 |
| 1992/00/00 ATF Newsletter 1992 Volume 1 Straw Purchases ffl-newsletter-1992-vol-1_0 | CFR 478.124a |
| | CFR 478.125 |
| 2021/06/00 ATF June 2021 Newsletter _Straw Purchase_federal_firearms_licensee_ffl_newsletter_-_june_2021_0 | CFR 478.125a |
| | CFR 478.126 |
| | CFR 478.126a |
| | CFR 478.127 |
| 2023/06/27 Fleet Farm_MN AG 2023.06.27 [ECF 36]  Memorandum Opinion and Order Denying Plaintiff's Motion to Remand and Denying Defendant's Motion to Dismiss | CFR 478.128 |
| | CFR 478.129 |
| | CFR 478.130 |
| | CFR 478.131 |
| 2023/08/00 ATF F 4473 REVISED f_5300.9_4473_firearms_transaction_record_0 | CFR 478.132 |
| | CFR 478.133 |
| | CFR 478.134 |
| 2023/08/10 Minnesota v. Fleet Farm - State's Initial Disclosures | CFR 478.41 |
| | CFR 478.45 |
| 2023/08/10 State of Minnesota v. Fleet Farm LLC, et al. - Fleet Farm's Initial Disclosures | CFR 478.47 |
| | CFR 478.91 |
| 2023/08/21 Fleet Farm's Responses and Objections to Plaintiff's First Set of Interrogatories | CFR 478.92 |
| | CFR 478.93 |
| | CFR 478.94 |
| | CFR 478.95 |
| 2023/12/04 Minnesota Response to Fleet Farm's First Set of Interrogatories | CFR 478.96 |
| | CFR 478.97 |
| | CFR 478.98 |

4

| |
|---|
| CFR 478.99 |
| Cal. Penal Code § 27535 |
| Conn. Gen. Stat. § 29-33(f) |
| Md. Code Ann., Pub. Safety § 5-128(b) |
| N.J. Stat. Ann. § 2C:58-2(a)(7) |
| Va. Code Ann. § 18.2-308.2:2(R) |
| https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016/download |
| https://www.atf.gov/firearms/apply-license |
| https://www.atf.gov/firearms/how-renew-federal-firearms-license-ffl |
| https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download |
| https://www.atf.gov/firearms/qa/how-long-are-licensees-required-maintain-atf-forms-4473#:~:text=Licensees%20shall%20retain%20each%20Form,for%20inspection%20under%20this%20part |
| https://www.atf.gov/resource-center/docs/undefined/ntc-fact-sheet-may-2023/download |
| https://www.atf.gov/firearms/docs/form/report-multiple-sale-or-other-disposition-pistols-and-revolvers-atf-form-33104/download |
| https://www.atf.gov/firearms/dont-lie-other-guy |
| https://www.dontlie.org/faq.cfm#:~:text=A%20straw%20purchase%20is%20an,the%20firearm%20for%20him%2Fher |
| https://www.atf.gov/firearms/identify-prohibited-persons/straw-purchases |
| https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/firearms-permit-to-purchase-transfer.aspx |
| https://www.stpaul.gov/books/25000-handgun-purchase-permit |
| https://fflezcheck.atf.gov/FFLEzCheck/ |

5

# EXHIBIT C

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Rebuttal Expert Report of William B. Napier**

*State of Minnesota v. Fleet Farm, LLC, et al.*, **Case No. 0:22-cv-02694-JRT-JFD**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I have reviewed the October 4, 2024 Expert Report of Joseph Bisbee submitted in *State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD. Based on my review of Mr. Bisbee's report and analysis of the issues presented in this case,[1] I offer the following rebuttal opinions:

1.      Mr. Bisbee's list of indicia of straw purchasing is inaccurate, simplistic, and not a reflection of the FFL industry standard.

2.      Mr. Bisbee's observations of Horton's and Elwood's purchases from Fleet Farm stores do not support concluding that Fleet Farm knew or should have known that any of those purchases were straw purchases.

3.      Mr. Bisbee's identification of Fleet Farm sales to just two individuals as allegedly being improper confirms that Fleet Farm has implemented effective systems to monitor for and prevent straw purchasing.

4.      Fleet Farm had a best in class straw purchase monitoring system in 2020 and 2021.

5.      Fleet Farm's internal auditing is consistent with the industry standard.

6.      Fleet Farm's use of Horton's ATF Form 3310.4 in its November 2021 quarterly training**,** hiring of Kevin McKown, and use of Michael Radl and Michelle Granato for firearms training are more examples of Fleet Farm exceeding the industry standard.

7.      The "remedial actions" that Mr. Bisbee asserts Fleet Farm should implement have no basis under the FFL industry standard.

---

[1] In my analysis of the topics raised in Mr. Bisbee's report, I considered the materials listed in **Appendix A** to this Rebuttal Report, as well as the materials previously identified in **Appendix B** to my October 4, 2024 Initial Report.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In addition to the observations contained in this rebuttal report, I fully incorporate the opinions and analysis from my October 4, 2024 expert report ("Initial Report") as part of this rebuttal report.

## Analysis and Opinions

**Opinion #1: Mr. Bisbee's list of indicia of straw purchasing is inaccurate, simplistic, and not a reflection of the FFL industry standard.**

My Initial Report details the list of indicia of straw purchasing recognized by the FFL industry, and also explains the efforts Fleet Farm has taken to train its employees on these indicia.[2] My Initial Report also explains that Fleet Farm goes above and beyond the industry standard for what indicia Fleet Farm trains its employees to monitor for, and for the frequency of and depth on which Fleet Farm provides this training.[3]

Mr. Bisbee's report contains two lists of "common indicators" or "warnings signs" of straw purchasing.[4] In my professional opinion, just like the "red flags" of straw purchasing identified in paragraph 25 of Plaintiff's First Amended Complaint, the indicators Mr. Bisbee identified are inaccurate, simplistic, or not a reflection of the FFL industry standard for the following reasons:

- "repeat customers buying multiple guns" and "repeat customers coming back to buy multiple firearms"[5]

    For the reasons explained in my Initial Report, based on my professional experience and judgment, purchasing multiple firearms in a single transaction or over several transactions by itself does not indicate a possible straw purchase scenario.[6]

---

[2] Initial Report at 4-33.
[3] Mr. Bisbee's assertion that "the training surely differs among Fleet Farm's dozens of locations" cannot be reconciled with Fleet Farm's substantial initial core trainings and quarterly trainings that are uniform and centrally administered. Initial Report at 21-30.
[4] Bisbee Report at 5-7.
[5] Bisbee Report at 5-7.
[6] Initial Report at 18-19.

2

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- "purchasing guns from different retail dealers in a short period of time" and "using multiple retail locations–even of the same company—to acquire firearms"[7]

    ATF and NSSF do not recognize this as an indicator of a possible straw purchase. Per the industry standard, FFLs are expected to monitor their own firearm transactions, but there is no industry standard or requirement that a business owning multiple FFLs establish a companywide monitoring system. Instead, law enforcement (in particular, ATF and the FBI, through NICS) has access to information reflecting an individual's cumulative gun transactions across all FFLs, not just FFLs that are owned by one company. This indicator identified by Mr. Bisbee is best categorized as a law enforcement investigatory tool, rather than an indicator that can be monitored for by an FFL at the point of sale.

- "purchasing multiple identical or similar guns, particularly small-caliber (9mm) handguns" and "multiple sales of the same or similar firearm, especially 9mm handguns"[8]

    For the reasons explained in my Initial Report, based on my professional experience and judgment, purchasing multiple firearms in a single transaction by itself does not indicate a possible straw purchase and buying multiple handguns of a certain caliber of firearm is not in and of itself indicative of a possible straw purchase attempt.[9] One reason for this is that there is no federal law and no Minnesota law limiting the number of firearms an individual can purchase in a single transaction or in a defined time period.

- "when customers are shopping for guns in a group or in pairs" and "being accompanied by other individuals who may remain throughout the purchase process, or who suddenly leave"[10]

    For the reasons explained in my Initial Report, based on my professional experience and judgment, if a buyer is accompanied to a store by another individual, that alone is not an indicator of a possible straw purchase.[11]

- "when a customer uses a cell phone to communicate with others in the course of a firearm purchase" and "customer using a cell phone in relation to the transaction"[12]

    For the reasons explained in my Initial Report, cell phone use is not an indicator of a possible straw purchase unless the FFL observes a phone communication between an individual and a third party that gives them reason to believe the individual may be shopping for another person, at which point it would be appropriate for the FFL to

---

[7] Bisbee Report at 5-7.
[8] Bisbee Report at 5-7.
[9] Initial Report at 18-19.
[10] Bisbee Report at 5-7.
[11] Initial Report at 19-20.
[12] Bisbee Report at 5-7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

assess the totality of the circumstances to determine whether they are facing a possible straw purchase scenario.[13]

- "when a customer otherwise acts suspiciously or gives suspicious or evasive answers to questions posed by a salesperson" and "customer otherwise acting suspicious or giving suspicious or evasive responses to questions posed by a salesperson"[14]

    This is an indicator of a possible straw purchase. But what is missing from Mr. Bisbee's analysis is that this indicator presumes that the FFL salesperson had reason to ask questions of the individual. It is incorrect to suggest that the FFL industry standard is to require salespersons to ask certain questions of any and all potential customers. The FFL industry standard is that salespersons should ask questions of a potential customer if they have observed other indicia that is giving rise to a concern about the nature of the transaction.

- "sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310)" and "prior history of sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310)"

    It is incorrect to suggest that ATF or NSSF directs FFLs to consider the creation of an ATF Form 3310.4, or the customer having previously purchased firearms requiring the creation of an ATF Form 3310.4, as a possible indicator of a straw purchase, or as otherwise creating any heightened level of suspicion, absent some other indicia of a possible straw purchase. But while not required by ATF or NSSF, throughout the relevant time period for this case Fleet Farm has trained its employees that the purchase of multiple firearms in a transaction should be considered a possible indicator of a potential straw purchase.[15]

- "paying cash for the firearms"[16]

    For the reasons explained in my Initial Report, based on my professional experience and judgment, the notion that purchasing firearms with cash is an indicator of a possible straw purchase is a misconception, and is not something that ATF or NSSF recognizes as being a potential indicator.[17]

- "when guns sold to a customer are recovered by law enforcement, especially when the gun is recovered in a short time frame" and "selling a firearm that, within a short time frame, is later traced by law enforcement in connection with a crime"[18]

---

[13] Initial Report at 20.

[14] Bisbee Report at 5-7.

[15] Initial Report at 23, 26-27.

[16] Bisbee Report at 7.

[17] Initial Report at 19.

[18] Bisbee Report at 5-7.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

For the reasons explained in my Initial Report, this "indicator" has no application in the context of a firearm sale, and is instead describing an ATF investigatory tool.[19]

Mr. Bisbee also opines that "FFLs need to ask questions during the sales process to determine the lawfulness of the sale and to fulfill their obligation of preventing illegal sales."[20] Fleet Farm trains its employees to do that.[21]

Mr. Bisbee has also overstated the weight that a single indicator should have on the straw purchase analysis. As I explained in my Initial Report, the industry standard is that the appropriateness of any firearm purchase should be assessed on the totality of the circumstances.[22]

I also observe that nothing in Mr. Bisbee's background indicates he has ever worked directly with FFLs on regulatory or compliance matters, let alone specifically on how to monitor for and prevent straw purchases. Mr. Bisbee does not indicate that he has experience from a regulatory perspective during his ATF experience as it relates to the duties of an ATF Industry Operations Investigator, such as conducting an FFL pre-license interview, compliance inspections of an FFL, or providing outreach to FFLs in the form of webinars and in person meetings (or reviewing or approving such materials).

**Opinion #2: Mr. Bisbee's observations of Horton's and Elwood's purchases from Fleet Farm stores do not support concluding that Fleet Farm knew or should have known that any of those purchases were straw purchases.**

I have reviewed Mr. Bisbee's observations of Horton's and Elwood's purchases from Fleet Farm stores. As described in my Initial Report, I disagree with Mr. Bisbee's characterization of these transactions,[23] and offer the following additional observations:

---

[19] Initial Report at 21.
[20] Bisbee Report at 10.
[21] Initial Report at 27-28.
[22] Initial Report at 7-8, 15-16.
[23] Initial Report at 39-46.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- In stating that Horton's purchases included "five instances where a multiple sales form was required and *should have* been completed and submitted to ATF by Fleet Farm,"[24] Mr. Bisbee seems to overlook that all of these forms were, in fact, completed and submitted to ATF.

- Mr. Bisbee references several text messages from Horton and Elwood that he appears to connect to certain of their purchases, but does not explain how or why a Fleet Farm employee behind the firearm counter should or could have known anything about the content of those text messages. Based on my review of the record and my years of experience working with FFLs, there is no basis to conclude that Fleet Farm employees should or could have known about what text messages were being sent in connection with purchases at Fleet Farm stores. As for Mr. Bisbee's reference to Elwood's cell phone records,[25] I have reviewed those records, and not a single text message in that document correlates to any purchase from Fleet Farm stores.[26] All of the text messages in the cited records occurred more than a week after Ms. Elwood's final firearm purchase from a Fleet Farm store.[27]

- As described in my Initial Report, it is not a crime or unusual for a gun buyer to bring a friend or relative to observe the transaction. In my review of the video surveillance of Horton's purchases from Fleet Farm stores, on no occasion did any of the individuals that accompanied Horton to certain transactions act or exhibit warning signs that, in the totality of the circumstances, should have led to a Fleet Farm employee denying the sale.

- Federal law does not contemplate separately licensed FFLs submitting ATF Form 3310.4s reflecting transactions occurring at multiple FFLs. In fact, in my experience, I have been

---

[24] Bisbee Report at 10.
[25] Bisbee Report at 15.
[26] ATF0002865.
[27] ATF0002865.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

advised by other FFLs that when they tried doing so they were contacted by ATF and admonished not to do so.

- As described in my Initial Report, it is not illegal or suspicious for cash to be used to purchase a firearm. It is also not illegal or suspicious for multiple methods of payment to be used to complete a firearm purchase.

- Mr. Bisbee's assessment of Fleet Farm's October 17, 2021 sale to Horton ignores that Fleet Farm contacted ATF, informed ATF about Horton's attempted purchase, and ATF instructed Fleet Farm to proceed with the sale.[28]

- Contrary to Mr. Bisbee's assertion,[29] based on my review of the record there is no indication that Horton or Elwood were nervous or sweating during any of the transactions at Fleet Farm stores.

In sum, all of Fleet Farm's transfers of firearms to Horton and Elwood were compliant with the FFL industry standard for firearm transactions.

It is highly dubious for Mr. Bisbee to point to two (out of several hundred) incidents where Fleet Farm denied a sale on the basis of the customer being a suspected straw purchaser as support for his conclusion that Fleet Farm should have known Horton or Elwood were engaging in straw purchases.[30] Fleet Farm's own descriptions of these transactions in its straw purchase alert system show the circumstances of the March 24 and 28, 2020 denied sales are far different from the sales to Horton or Elwood.

---

[28] FF_0075708.
[29] Bisbee Report at 16.
[30] Bisbee Report at 6-7.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

March 24, 2020 Denied Sale[31]

| Incident | Form | Date_TimeIss | DateOfIncident | Store | User | Summary |
|---|---|---|---|---|---|---|
| | Straw Purchase/Decline Sale,Straw Purchase | 3/25/2020 0:36 | 3/24/2020 | Oshkosh | Kyla W | On 3-24-2020, a female, later identified as Amanda Marie Tappa approached the gun counter and told us she called earlier about a lower. When the sporting goods team member asked if it was the Anderson AM 15, Amanda replied with "I think so". Then Amanda was asked if she wanted just one or two, Amanda replied with "I do not know let me check". At that time Amanda went on her phone and looked as if she was messaging someone. At this time management decided to deny the transaction. Amanda did not seemed surprised and left without any incidences. |

In this attempted transaction, clear indicia of a possible straw purchase were present based on the customer being uncertain of the type of "lower" she wanted to purchase, expressing uncertainty about the number of guns she needed to buy and telling the salesperson that she would have to "check," and going on her phone and "look[ing] as if she was messaging someone" when she said she'd need to "check." These are clear indicia of a possible straw purchase, Fleet Farm trains on these indicia consistent with the industry standard, and Fleet Farm properly denied this sale. Based on my review of the record in this case, including all available surveillance footage, these indicia of straw purchasing were not present in any of Fleet Farm's sales to Horton or Elwood.

---

[31] FF_0042289, Row 130.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

March 28, 2020 Denied Sale[32]



| Incident | Form | Date_TimeIss | DateOfIncident | Store | User | Summary |
|---|---|---|---|---|---|---|
| | Straw Purchase/Decline Sale,Straw Purchase | 3/29/2020 16:01 | 3/28/2020 | Delevan | CHALL | I was informed today that our Firearms Specialists had a female that was denied the purchase of two (2) firearms on Saturday, March 28 based upon the following information that I received from Store Management. "There is a customer Amy Dement who resides in Beloit, WI. She has been in on three different occasions in the last week with three different guys. She has purchased guns each time. She bought an M&P Shield and a Plinkster which she took possession of. Today it was noticed that she was with another guy and went to buy an EC9 and AR-556 but was on delay from the state. After a few firearms associates were talking after she left, that is when we put it all together that she was in with three different guys. We made the decision to deny the two guns today. The female is not from our community, and apparently when she is going to purchase a firearm, she never looks at it nor does she handle it in any way. She walks in the store and is directed to the firearm by the person that she is in the store with- or that is the way that it appeared to our staff. Store Management also sent a message to Mike Radl notifying him of the situation. I was asked to send out this Straw Purchase BOLO in case she attempted purchases in other stores so that an informed decision could be made based upon all available data. Thank You! Be Safe! CHALL |

In this attempted transaction, clear indicia of a possible straw purchase were present based on the customer being recognized as having been in the store on three separate occasions in the past week accompanied by three different individuals, receiving a "delay from the state," "never look[ing] at [the firearm] nor … handl[ing] it in any way," and being "directed to the firearm by the person that she [was] in the store with." These are clear indicia of a possible straw purchase, Fleet Farm trains on these indicia consistent with the industry standard, and Fleet Farm properly denied this sale. Based on my review of the record in this case, including all available surveillance footage, these indicia of straw purchasing were not present in any of Fleet Farm's sales to Horton or Elwood.

**Opinion #3: Mr. Bisbee's identification of Fleet Farm sales to just two individuals as allegedly being improper confirms that Fleet Farm has implemented effective systems to monitor for and prevent straw purchasing.**

Mr. Bisbee's report contends that Fleet Farm "did not fulfill [its] duty" and "failed to exercise appropriate care" in its firearm sales to Horton and Elwood.[33] For the reasons explained

---

[32] FF_0042289, Row 133.
[33] Bisbee Report at 22.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in my Initial Report and above, I disagree with Mr. Bisbee's assessment.[34] I also observe that out of the 184,379 firearms that were sold at Fleet Farm stores in Minnesota between 2017 and 2023,[35] Mr. Bisbee has not identified any allegedly improper sales other than the 37 firearms that were sold to Horton and Elwood (0.020067% of the total firearms sold). That Mr. Bisbee has not identified any alleged issues with 99.9799% of Fleet Farm's firearm sales from 2017 to 2023 is strong evidence that Fleet Farm's systems for monitoring for and preventing straw purchasing were effective.

Additionally, Mr. Bisbee does not appear to consider the fact that between January 2018 and October 2023, Fleet Farm declined approximately 500 sales on the basis of the customer being a suspected straw purchaser or the Fleet Farm employee otherwise observing suspicious circumstances.[36] Fleet Farm's declining of approximately 500 transactions over this time period is additional evidence that its straw purchase training policies are effective. The two examples cited by Mr. Bisbee[37] illustrate how Fleet Farm's straw purchase alert system spans their stores across Minnesota, Wisconsin and Iowa, and the training detailed in my Initial Report show, in my expert opinion, that Fleet Farm's straw purchase prevention trainings are well communicated and taught to firearm employees, and are effective and have resulted in hundreds of suspicious transactions being identified.

Mr. Bisbee also does not appear to consider the fact that in this case, the Court ordered that Fleet Farm produce to Plaintiff A&D records reflecting the handgun purchases for all individuals that purchased 4 or more handguns from Fleet Farm stores during any 14-day window between

---

[34] Initial Report at 39-46.
[35] FF_0075801.
[36] FF_0042289.
[37] Bisbee Report at 6-7.

10

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

October 5, 2016 and October 1, 2023. Fleet Farm produced these records, which identified transfers of roughly 1,100 handguns,[38] and asked Plaintiff to identify "each purchase" that it "contend[s] was a straw purchase."[39] In response, Plaintiff identified only Fleet Farm's sales to Horton and Elwood.[40] Plaintiff's identification of sales to just two individuals as sales to straw purchasers is further evidence that Fleet Farm had effective systems and processes in place to monitor for and prevent straw purchasing, and also confirms, as I have explained above, that it is incorrect for Plaintiff and Mr. Bisbee to suggest that the creation or existence of an ATF Form 3310.4, standing alone, is an indicator of a possible straw purchase.[41]

**Opinion #4: Fleet Farm had a best in class straw purchase monitoring system in 2020 and 2021.**

Mr. Bisbee criticizes the straw purchase alert system that Fleet Farm had in place during the time that it sold firearms to Horton and Elwood.[42] Mr. Bisbee's criticisms overlook three important facts.

First, a straw purchase alert system is not required by law. In essence it is a step an FFL might use over and above what is required by law to identify a straw purchase attempt. To suggest a perfectly designed straw purchase alert program must be executed by FFLs is in no way a

---

[38]  FF_0039861; FF_0039862; FF_0039863; FF_0039864; FF_0039865; FF_0039866; FF_0039867; FF_0039868; FF_0039869; FF_0039870; FF_0039871; FF_0039872; FF_0039873; FF_0039874; FF_0039875; FF_0039876; FF_0039877.

[39] State of Minnesota's Amended Responses to Defendants' Second Set of Interrogatories at 4.

[40] State of Minnesota's Amended Responses to Defendants' Second Set of Interrogatories at 4-5.

[41] Although Plaintiff's answer also "contend[ed] that the purchases of firearms … by Wayne Danielson … were straw purchases," this contention appears to have been abandoned given that Mr. Bisbee does not identify Fleet Farm sales to Danielson as being possible straw purchases. And my understanding is that a single Fleet Farm store sold Danielson four handguns in four separate transactions over a nearly 3-year period, and that Danielson has neither been indicted for nor convicted of straw purchasing. Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories at 6; FF_0013736; FF_0075792; FF_0075793; FF_0075794. Based on the record in this case, there appears to be no basis for concluding Danielson's purchases were straw purchases, or that Fleet Farm knew or should have known that at the time of each purchase.

[42] Bisbee Report at 8-9.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

reflection of the FFL industry standard. In fact, it was and remains an industry best in class practice approach for a chain of stores to have a straw purchase alert system into which gun counter staff can immediately enter information about straw purchase attempts and report the same to company loss prevention, as Fleet Farm had in 2020 and 2021.[43]

Second, I disagree with Mr. Bisbee's suggestion that it was improper for Fleet Farm to require a second-level review before straw purchase alerts could be circulated.[44] Based on my experience, it is good practice to have a second set of eyes on a suspected straw purchase before issuing an alert that will restrict that individual from purchasing firearms across company locations and that will in effect accuse the individual of attempting to commit a felony.

Third, Fleet Farm also used "Be On The Lookout," or "B.O.L.O.," alerts.[45] Unlike straw purchase alerts, "a B.O.L.O. alert was an option that was created to immediately send alerts to stores and bypass the requirement of having somebody at corporate send it out," with stores being "instructed, for any kind of incident at store level, that they felt required the immediate communication of the incident to other locations, would use this format of an alert."[46] The record in this case provides numerous examples of B.O.L.O. alerts being generated and sent out by store-level employees to alert other stores to potential straw purchase attempts.[47] Fleet Farm therefore had a system in place in 2020 and 2021 that allowed store employees to immediately notify others concerning incidents, whether they be straw purchases or otherwise. In my experience, this type

---

[43] Initial Report at 23-24, 33.

[44] Bisbee Report at 8.

[45] Initial Report at 30.

[46] Michael Radl Deposition Transcript at 65.

[47] *E.g.*, FF_0002033; FF_0003145; FF_0004805; FF_0004820; FF_0004864; FF_0004942; FF_0005129.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of system is best in class in the FFL industry, and is a feature of Fleet Farm's system that Mr. Bisbee does not appear to have considered.

**Opinion #5: Fleet Farm's internal auditing is consistent with the industry standard.**

In my Initial Report, I explained the FFL industry standard for internal auditing and that Fleet Farm's internal auditing procedures go above and beyond that industry standard by conducting audits with a "best in class" approach.[48] Internal audits are typical of a retail store to test their processes for opportunities to improve operational efficiencies. Mr. Bisbee does not appear to dispute that Fleet Farm has strong internal auditing procedures, and focuses on Fleet Farm's Brooklyn Park location receiving a "failing audit" in May 2021. According to Mr. Bisbee, this audit "contribut[ed] to missed warning signs of likely straw purchasing."[49] In my expert opinion, and based on my experience and review of the at-issue audit, Mr. Bisbee is incorrect.

Mr. Bisbee focuses on a May 6, 2021 audit of Fleet Farm's Brooklyn Park store. In my expert opinion, the Corporate Firearms Compliance Audit form for this audit does not identify any issues that would increase the likelihood of the store making a straw purchase.[50] Mr. Bisbee also does not acknowledge that in August 2021, during the time Horton was purchasing firearms from Fleet Farm's Brooklyn Park store, the store received an "Excellent" audit of "99.94%."[51]

**Opinion #6: Fleet Farm's use of Jerome Horton's ATF Form 3310.4 in its November 2021 quarterly training, hiring of Kevin McKown, and use of Michael Radl and Michelle Granato for firearms training are more examples of it exceeding the industry standard.**

Throughout his report, Mr. Bisbee places blame on Fleet Farm for taking steps to enhance its firearm training programs and corporate oversight, and for having long-tenured employees in

---

[48] Initial Report at 34-39.
[49] Bisbee Report at 17.
[50] FF_0036147.
[51] FF_0035132.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Fleet Farm's corporate office responsible for firearm training and auditing.[52] In my expert opinion and based on decades of experience working with FFLs, I disagree with Mr. Bisbee's characterizations of these efforts.

As for the use of certain of Horton's ATF Form 3310.4s and "actual purchase history" in trainings starting in November 2021,[53] in my experience FFLs frequently use this method of providing actual examples when training or updating their teams, as real-life examples provide better, and more realistic, illustrations for employees than hypotheticals. Mr. Bisbee's contrary assessment begs the question of why he thinks an FFL (or FFLs, in the case of a chain of stores) should not update training to provide more clarity to questions or situations that arise in the course of business, particularly when the training can be updated to provide real-world examples of the issues on which employees are being trained. Based on my experience I do not see any reason to find fault or call out Fleet Farm's use of Horton's purchase history in its training. On the contrary, Fleet Farm's decision to use recent examples of straw purchases based on actual ATF investigations or priorities to train its employees is a best in class approach by FFLs in the industry.[54] It is the contrary approach, where an FFL declines to train employees or modify policies based on recent experience, that would be concerning from an industry compliance perspective.

---

[52] Bisbee Report at 7-8, 19, 20.

[53] Bisbee Report at 20.

[54] To the extent Mr. Bisbee seeks to place fault on Fleet Farm for "advis[ing] firearms sales employees that, if they are engaged in a suspicious firearms sale, they should not submit a background," that is misplaced for two reasons. Once a decision has been made to stop a sale for suspected straw purchase the transaction is over and nothing more is needed unless a decision is made to contact law enforcement. And it would be a violation and misuse of the FBI NICS background check system to knowingly continue and conduct a NICS transaction once the FFL made the decision to stop the transfer due to suspected straw purchase, the customer incorrectly answering a prohibited question or some other declaration from the customer indicating intended illegal us of the firearm.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As for the hiring of Kevin McKown,[55] based on my experience there is nothing improper about FFLs adding another level of staff leadership to a chain of stores. On the contrary, there is no industry standard requiring FFLs to have a Director of Firearm Compliance, and it is a best practice for a company to continuously assess potential enhancements to firearm training, policies, and management. But an FFL making an enhancement to its firearm protocols does not mean that there was a deficiency, as both before and after the hiring of Kevin McKown, Fleet Farm's firearm trainings, policies, and procedures were consistent with and in many instances exceeded the FFL industry standard requirements, as explained in my Initial Report. In my professional opinion, to fault an FFL for making these kinds of operational and resource improvements would actually discourage the FFL from enhancing its straw purchase detection and prevention (and other compliance) functions.

As for Mr. Bisbee's statement that Mr. Radl and Ms. Granato have either "no" or "limited "formal training in firearms compliance,"[56] this commentary ignores the standard FFL industry practice. Mr. Radl and Ms. Granato both have long tenures with Fleet Farm,[57] and the use of experienced personnel to lead trainings and auditing is typical of what I see at many retail chains, and it is a best-in-class approach for an FFL to have trainings and audits conducted by persons who understand not only firearms, but also the realities of retail store operations.

**Opinion #7: The "remedial actions" that Mr. Bisbee asserts Fleet Farm should implement have no basis under the FFL industry standard.**

I have reviewed the four "remedial actions" that Mr. Bisbee identifies at the conclusion of his report.[58] My assessment of these remedial actions is noted below:

---

[55] Bisbee Report at 7, 19.
[56] Bisbee Report at 7-8.
[57] Michael Radl Deposition Transcript at 4; Michelle Granato Deposition Transcript at 11, 18.
[58] Bisbee Report at 21.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- "Improve firearms transaction system"

  The FFL industry standard does not require FFLs to "implement[] a software system that tracks all prior sales of firearms, corporate wide," at the individual store level. As discussed above, I am only aware of a single FFL, nationwide, that has such a system. Moreover, Fleet Farm has already implemented a form of companywide monitoring, as Mike Radl and/or Michelle Granato already have the ability to review a "customer's purchase history across the company."[59] Based on my review of the record, my expert opinion is that from an industry standpoint Fleet Farm does not need to take any actions to improve its firearms transaction system in order to meet the industry standard.

- "Improve suspicious activity alert system"

  Fleet Farm's straw purchase alert system is best in class, as described in my Initial Report.[60] Mr. Bisbee appears to overlook the fact that for years, Fleet Farm employees have been able to send out B.O.L.O. alerts without involving corporate headquarters, and that today Fleet Farm stores also have the ability to generate straw purchase alerts without going through corporate headquarters.[61] Based on my review of the record, my expert opinion is that from an industry standpoint Fleet Farm does not need to take any actions to improve its alert systems.

- "Improve firearms transaction training"

  Fleet Farm's robust firearm transaction training is best in class, and exceeds the FFL industry standard. Fleet Farm also already retains "subject matter experts" to provide its training in the form of Mike Radl and Michelle Granato, who have substantial industry expertise developed over decades in the industry. Based on my review of the record, my expert opinion is that from an industry standpoint Fleet Farm does not need to take any actions to improve its firearms transaction training.

- "Improve employee discipline"

  Fleet Farm's employee discipline policies are fully consistent with the FFL industry standard, and already impose accountability for firearm-related errors that includes "discipline up to and including termination."[62]   And where Mr. Bisbee states that "management … should also be held accountable for errors," he appears to overlook that Fleet Farm already does this, as its 4473 and Auditing Error Accountability Guide provides that "[a]ccountability for errors made by team members" are "ultimately the responsibility of the Sporting Goods Team Leads and the Zone Sales Manager," and that "[t]he Store GM is also responsible to ensure their store is following all firearm

---

[59] Michael Radl Deposition Transcript at 29, 39; Kevin McKown Deposition Transcript at 62-64.
[60] Initial Report at 30, 33.
[61] Michael Radl Deposition Transcript at 63-65, 218; Michelle Granato Deposition Transcript at 84-85.
[62] Initial Report at 37; FF_0002872.

16

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

procedures as required."[63] Based on my experience, this is a best in class way to ensure accountability. Fleet Farm's approach to employee discipline is an industry best practice approach on how an FFL should handle performance at the gun counter by employees. Based on my review of the record, my expert opinion is that from an industry standpoint Fleet Farm does not need to take any actions to improve its employee discipline procedures.

*    *    *

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Dated: OCTOBER 31, 2024

William B. Napier

---

[63] FF_0002873.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Appendix A

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| ATF0001772 | ATF0002403 |
| ATF0002865 | FF_0002033 |
| FF_0003145 | FF_0004805 |
| FF_0004820 | FF_0004864 |
| FF_0004942 | FF_0005129 |
| FF_0013736 | FF_0035132 |
| FF_0036147 | FF_0039861 |
| FF_0039862 | FF_0039863 |
| FF_0039864 | FF_0039865 |
| FF_0039866 | FF_0039867 |
| FF_0039868 | FF_0039869 |
| FF_0039870 | FF_0039871 |
| FF_0039872 | FF_0039873 |
| FF_0039874 | FF_0039875 |
| FF_0039876 | FF_0039877 |
| FF_0075801 | 2024/07/10 State of Minnesota's Amended Responses to Defendants' Second Set of Interrogatories |
| 2024/08/02 Defendants' Responses and Objections to Plaintiff's Second Set of Interrogatories | 2024/06/19 Deposition Transcript of Michelle Granato pps. 141 - 144, 161 - 164, 193 - 200 |
| 2024/06/20 Deposition Transcript of Michael Radl pps. 9 - 12, 161 - 164, 217 - 220 | 2024/07/24 Deposition Transcript of Branden Sierakowski pps. 65 - 72, 193 - 196 |
| 2024/07/30 Deposition Transcript of Bret Nordquist pps. 1 - 4, 41 - 44, 65 - 68 | 2024/08/13 Deposition Transcript of Gary Hallfielder pps. 1 - 4, 33 - 40, 121 - 124, 173 - 176 |
| 2024/09/05 Deposition Transcript of Cory Klebs pps. 77 - 80, 161 - 172 | 2024/09/06 Deposition Transcript of Michelle Granato pps. 250 - 253, 262 - 269 |

1

# EXHIBIT D

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Rebuttal Expert Report of Andrew Graham**

*State of Minnesota v. Fleet Farm, LLC, et al.*, **Case No. 0:22-cv-02694-JRT-JFD**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I have reviewed the Expert Report of Joseph Bisbee in *State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD, dated October 4, 2024 ("Bisbee Report"), and provide this rebuttal. In addition to the materials listed in **Appendix B** to my October 4, 2024 Expert Report ("Opening Report"), I also considered the materials listed in **Appendix A** to this Rebuttal Report as part of my analysis. I incorporate into this Rebuttal Report all of the analysis and opinions contained in my Opening Report.

## OPINIONS

**I.    Mr. Bisbee's listed indicia of straw purchasing is not reflective of the ATF-recognized potential indicia of a straw purchase.**

Under the Gun Control Act ("GCA") and Code of Federal Regulations ("CFR"), a federal firearm licensee ("FFL") may not transfer a firearm to any person they know or have reasonable cause to believe is prohibited from possessing a firearm under 18 U.S.C. 922(g), or without the completion of the ATF Form 4473 and the FBI NICS background check. Qualifying a purchaser includes evaluating responses they record on the ATF Form 4473, which includes ensuring they have not provided disqualifying answers to any of the "yes" or "no" questions contained in boxes 21.a through 21.n. Further, as detailed in my Opening Report, ATF will discuss straw purchase scenarios with FFLs during Firearms Application On-Site Inspections and training sessions.

Mr. Bisbee's report includes two lists of indicia of a possible straw purchase, on pages 5 through 7. In my expert opinion, most of these alleged indicia are overly simplified or have no basis in ATF regulations, guidelines, or trainings. My assessment of each is detailed below.

- **Mr. Bisbee's Indicator #1:** "repeat customers coming back to buy multiple firearms"[1]

  - **Opinion**: This is not one of the straw purchase indicators ATF discusses with FFLs. A repeat customer doesn't necessarily indicate a straw purchaser. Absent knowledge that a firearm is being purchased for a prohibited person, the fact that a purchaser is a repeat customer, standing alone, is not an indicator of a straw purchase. For further discussion of this asserted indicator, I refer back to page 19 of my Opening Report.

- **Mr. Bisbee's Indicator #2:** "multiple sales of the same or similar firearm, especially 9mm handguns"[2]

  - **Opinion**: For discussion of this asserted indicator, I refer back to page 19 of my Opening Report.

- **Mr. Bisbee's Indicator #3:** "sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310)"[3]

---

[1] Bisbee Report, p. 7; Bisbee Report, p. 5 (identifying "repeat customers buying multiple guns")

[2] Bisbee Report, p. 7; Bisbee Report, p. 6 (identifying "purchasing multiple identical or similar guns, particularly small-caliber (9mm) handguns")

[3] Bisbee Report, p. 7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

o **Opinion**:  It is an overstatement to suggest that ATF always considers multiple firearm purchases to be an indicator of straw purchasing.  ATF regulations require FFLs to prepare an ATF Form 3310.4 report of multiple sales or other disposition whenever selling or otherwise disposing of, at one time or during any five consecutive business days, two or more pistols, or revolvers to an unlicensed person. ATF utilizes this ATF Form 3310.4 and other data submitted by licensees to develop criminal intelligence leads for law enforcement use.  ATF does not expect or require FFLs to use ATF Form 3310.4s as part of their processes for monitoring for or preventing straw purchases.  This is a Federal Firearm Licensee (FFL) operational requirement and not a straw purchase indicator absent other circumstances that may provide a licensee awareness or knowledge of a possible straw sale occurrence.  For further discussion of this asserted indicator, I refer back to page 19 of my Opening Report.

- **Mr. Bisbee's Indicator #4:** "prior history of sales requiring a Multiple Handgun report to the ATF (i.e., Form 3310)"[4]

  o **Opinion**:  It is an overstatement to suggest that ATF always considers multiple firearm purchases to be an indicator of straw purchasing.  ATF does not identify prior history of sales triggering an ATF Form 3310.4 as a potential indicator of a possible straw purchase, and if an FFL has any policy in place instructing employees to be cognizant of ATF Form 3310.4s, such a policy would go above and beyond what ATF instructs and requires.  There is no regulatory requirement for an FFL to track or account for a private citizen's purchase history of Multiple Handgun Sale Reports or to retain any type of firearm report or repository.  Instead, ATF requires the maintenance of bound book records, 4473s, and 3310.4s, as prescribed by the CFR.  What Mr. Bisbee is asserting goes beyond ATF regulations and requirements.  For further discussion of this asserted indicator, I refer back to page 19 of my Opening Report.

- **Mr. Bisbee's Indicator #5:** "using multiple retail locations–even of the same company—to acquire firearms"[5]

  o **Opinion**:  ATF does not identify the use of multiple retail locations as a potential indicator of a possible straw purchase that an FFL should be monitoring for at the point of sale.  Neither the GCA nor the CFR requires a corporate retailer to maintain records tracking firearm activity from all locations.  In fact, ATF requires every premise selling firearms (including premises owned by the same corporate entity) to obtain individual FFL licenses and operate as a separate FFL entity, while maintaining independent records prescribed by regulation.  What Mr. Bisbee describes in this indicator may be a law enforcement investigatory tool, as it is law enforcement, and not FFLs, that have access to a complete picture of an individual's firearm purchase history across all FFLs.  And to the extent any business has a

---

[4] Bisbee Report, p. 7

[5] Bisbee Report, p. 7; Bisbee Report, pp. 5-6 (identifying "purchasing guns from different retail dealers in a short period of time")

2

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

system in place that monitors sales across multiple FFLs, whether the system is accessible to all store-level employees or corporate management, that system would go above and beyond what ATF requires.

- **Mr. Bisbee's Indicator #6:** "being accompanied by other individuals who may remain throughout the purchase process, or who suddenly leave"[6]

    o **Opinion**: For discussion of this asserted indicator, I refer back to page 20 of my Opening Report, and reiterate that a buyer being accompanied to an FFL by another person is not per se an indicator of a possible straw purchase. I further note that to the extent ATF provides guidance relating to the presence of multiple persons during an attempted firearm purchase, that training concerns observing money exchanges between the two people, or circumstances where multiple persons handle the firearm and fill out the ATF Form 4473 in tandem. Under ATF guidance, the presence of multiple individuals during a transaction does not indicate a straw purchase absent other material facts of the purchase.[7]

- **Mr. Bisbee's Indicator #7:** "customer using a cell phone in relation to the transaction"[8]

    o **Opinion**: For discussion of this asserted indicator, I refer back to page 20 of my Opening Report. This is not an ATF-recognized indicator of a possible straw purchase to the extent Mr. Bisbee suggests the mere use of a phone during a firearm transaction is an indicator of a possible straw purchase.

- **Mr. Bisbee's Indicator #8:** "customer otherwise acting suspicious or giving suspicious or evasive responses to questions posed by a salesperson"[9]

    o **Opinion**: This indicator is accurate, **<u>assuming</u>** some other suspicious circumstance has occurred prompting a store employee to ask a question that elicits a suspicious or evasive response. An FFL would not get to the circumstance where they should be asking questions of a prospective purchaser unless they have observed indicia of a straw purchase already, and ATF does not require FFLs to ask questions of potential purchasers in all transactions, and also does not require FFLs ask specific questions of all potential purchasers.[10]

---

[6] Bisbee Report, p. 7; Bisbee Report, p. 6 (identifying "when customers are shopping for guns in a group or in pairs")

[7] ATF0000072; ATF0000230; ATF0000381; ATF0000454; ATF0000573; ATF0000811; ATF0000815

[8] Bisbee Report, p. 7; Bisbee Report, p. 6 (identifying "when a customer uses a cell phone to communicate with others in the course of a firearm purchase")

[9] Bisbee Report, p. 7; Bisbee Report, p. 6 (identifying "when a customer otherwise acts suspiciously or gives suspicious or evasive answers to questions posed by a salesperson")

[10] ATF000668 ("If you believe the sale will constitute a straw sale, it is in your best interest in both a criminal context and a liability context to deny the transaction. Ask the potential buyer questions such as: -- Is this firearm for you? -- Ask yourself, does the buyer appear to know anything about firearms?")

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- **Mr. Bisbee's Indicator #9:** "paying cash for the firearms"[11]

  o **Opinion**: For discussion of this asserted indicator, I refer back to pages 19 and 20 of my Opening Report. This is not an accurate characterization of ATF guidelines or policies, without awareness of or knowledge of a third-party cash exchange.

- **Mr. Bisbee's Indicator #10:** "selling a firearm that, within a short time frame, is later traced by law enforcement in connection with a crime"[12]

  o **Opinion**: For discussion of this asserted indicator, I refer back to page 21 of my Opening Report. This is not an ATF-recognized indicator of a possible straw purchase. This is an investigative tool used to identify persons and last known possessors of a traced crime gun based on analysis and statistics cultivated by ATF. No FFL would have access to or be aware of this firearm crime gun trace statistic at the time of a transaction.

II.    **Mr. Bisbee overlooks that Fleet Farm's policies and trainings relating to monitoring for and preventing straw purchases are fully consistent with, and in many instances exceed, ATF requirements.**

Mr. Bisbee contends "Fleet Farm maintains the appearance of a robust approach to fulfilling their obligations of preventing criminals from accessing firearms," but suggests that, in practice, there were deficiencies in Fleet Farm's processes.[13] I disagree with Mr. Bisbee's assessment for the reasons outlined in my Opening Report, and offer the following supplemental observations.

First, Mr. Bisbee does not appear to have actually assessed whether Fleet Farm's training relating to monitoring for and preventing straw purchases is consistent with ATF guidelines. In fact, Mr. Bisbee's report does not even reference ATF guidelines for how FFLs should monitor for and prevent straw purchases. As explained in my Opening Report, Fleet Farm's formal and informal firearm training and policies go above and beyond what is required by ATF.[14]

Second, Mr. Bisbee's suggestion that "Fleet Farm employees … did not consistently engage customers in conversation to detect straw purchasing"[15] misunderstands both ATF guidance and Fleet Farm's policies. Fleet Farm trains its employees to "ask customers questions."[16] This existing training fully complies with ATF regulations and guidelines.[17]

Third, Mr. Bisbee does not appear to consider that during the period of January 2018 to October 2023, Fleet Farm stopped more than 500 attempted transactions as being suspected straw purchase attempts or otherwise suspicious, including approximately 125 attempted transactions from stores

---

[11] Bisbee Report, p. 7

[12] Bisbee Report, p. 7; Bisbee Report, p. 6 (identifying "when guns sold to a customer are recovered by law enforcement, especially when the gun is recovered in a short time frame")

[13] Bisbee Report, p. 7

[14] Opening Report, pp. 13-36

[15] Bisbee Report, p. 9

[16] Opening Report, pp. 31-35; FF_0000018; FF_0040804; FF_0040813; FF_0040832; FF_0040770

[17] Opening Report, p. 16; ATF0000073; ATF0000131; ATF0000231; ATF0000382; ATF0000455; ATF0000668; ATF0000816

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

located in the State of Minnesota.[18]  Based on my experience and expertise, an FFL stopping straw purchase attempts with this frequency, coupled with the fact that Mr. Bisbee can identify only two individuals that have straw purchased from Fleet Farm stores,[19] is strong evidence that Fleet Farm's policies and procedures for monitoring for and preventing straw purchases were effective throughout the relevant time period for this matter.

Fourth, Mr. Bisbee also does not appear to consider the fact that Fleet Farm has provided the State of Minnesota with Acquisition & Disposition records of handgun purchases for all individuals who purchased four or more handguns in a 14-day window between October 2016 and October 2023.[20] These records reflect the sale of approximately 1,100 handguns,[21] and Fleet Farm has also provided records indicating that it sold more than 184,000 firearms between 2017 and 2023.[22]  Of these sales, only the transfers of certain firearms to Horton and Elwood have been identified as allegedly being improper, due only to their criminal use and trace results.  In my expert opinion, that sales to just two individuals have been identified as allegedly being improper is further proof that Fleet Farm's policies and procedures for selling firearms have been effective in identifying and refusing to sell to straw purchasers.

Fifth, although Mr. Bisbee characterizes Fleet Farm's use of "Mr. Horton's actual purchase history to train store staff" as evidence that it "freely admits [its] failure,"[23] from an ATF standpoint, this is just not correct.  As explained in my Opening Report, ATF does not expect FFLs to be 100% successful in preventing straw purchases.[24]  And from an ATF standpoint, the introduction of a real life example to train employees on how to monitor for and prevent straw purchasing is an example of an FFL taking the lessons learned from assisting with an ATF investigation and immediately incorporating those lessons into trainings and policies.  That is another illustration of Fleet Farm exceeding ATF expectations for how FFLs should address regulatory issues when brought to light through an interaction with ATF.  The fact that Fleet Farm immediately implemented this experience into its training is even more impressive given that ATF informed Fleet Farm that it did nothing wrong in its sales to Horton.[25]

III.    **Mr. Bisbee's analysis of Horton and Elwood transactions fails to analyze them from the perspective of ATF regulations and guidelines, and improperly analyzes them from an aggregated law enforcement perspective, rather than from the perspective of the FFL at the time of each sale.**

I have reviewed Mr. Bisbee's summaries and conclusions regarding Fleet Farm's sales to Jerome Horton and Sarah Elwood.  I have already detailed my impressions of each of these transactions following a review of all available documents, communications, and video surveillance regarding

---

[18] FF_0042289

[19] Bisbee Report, pp. 10-22

[20] FF_0039861; FF_0039862; FF_0039863; FF_0039864; FF_0039865; FF_0039866; FF_0039867; FF_0039868; FF_0039869; FF_0039870; FF_0039871; FF_0039872; FF_0039873; FF_0039874; FF_0039875; FF_0039876; FF_0039877

[21] *Id.*

[22] FF_0075801

[23] Bisbee Report, p. 20

[24] Opening Report, pp. 5, 14-15, 39

[25] FF_0001484

5

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

each transaction.[26]  I disagree with Mr. Bisbee's characterizations of each of these sales, and refer back to my Opening Report for the bases for my disagreement regarding his analysis and characterization of each transaction.

Moreover, it is apparent from Mr. Bisbee's analysis of Horton's and Elwood's transactions that he is evaluating them from the perspective of an investigator, working backwards from the "crime scene" to the last known purchaser through the investigative process and firearm trace results, and assessing facts ascertained from, among other things, phone records, witness statements, admissions, and aggregate data regarding the straw purchaser's activities.  I know this because, as detailed above and in my Opening Report, Mr. Bisbee details a number of alleged "red flags" that are law enforcement investigatory tools, rather than the potential indicia of straw purchasing that ATF instructs FFLs to monitor for at the point of sale.[27]  And to the extent Mr. Bisbee presents his purported observations of nine "red flags" of straw purchasing in the aggregate on page 16 of his report, it is inaccurate to suggest that all nine of these circumstances were present in any of Horton's or Elwood's purchases from Fleet Farm stores.  In fact, although I disagree with Mr. Bisbee's characterization of these as "red flags," I did not observe more than two or three of these circumstances in any single transaction, and as detailed in my Opening Report, the full context of these transactions showed that the circumstances I observed were not, in context, potential indicia of a possible straw purchase.

Lastly, Mr. Bisbee does not appear to consider the fact that in Horton's and Elwood's plea agreements, they both admitted to having deceived Fleet Farm and other FFLs to obtain firearms through straw purchases.[28]  My opinion of Fleet Farm's regulatory compliance is reaffirmed by the statement made to Michelle Granato by ATF special agent, Kylie Williamson, while investigating Horton's purchases, expressing that "in no way did [Fleet Farm] do anything wrong by selling this individual the firearms" and "[t]here was nothing in his background that would have rendered a denied response."[29]  And ATF's awareness of Horton's October 17, 2021 purchase at the Fleet Farm's Oakdale store, discussion with the Fleet Farm employee working behind the counter during that purchase, and advisory, in the midst of its investigation of Horton, "to allow the purchase to go through" to Horton further confirms my opinion that Fleet Farm's sales to Horton were lawful and fully in compliance with the GCA.[30]

### IV.    The "remedial actions" that Mr. Bisbee asserts Fleet Farm should implement are not required by ATF.

I have reviewed the four "remedial actions" that Mr. Bisbee includes in his report.  My analysis of each "remedial action" is below.

- **Mr. Bisbee's Remedial Action #1:** "Fleet Farm should improve its firearms compliance procedures by implementing a software system that tracks all prior sales of firearms, corporate wide, and alerts the Fleet Farm salesperson at the point of sale of the entire

---

[26] Opening Report, pp. 39-67
[27] Bisbee Report, p. 16
[28] AGO0000207; AGO0000213-AGO0000216; AGO0000262-AGO0000263
[29] Opening Report, p. 57; FF_0001484
[30] Opening Report, pp. 56-57; FF_0075708

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

purchase history at all Fleet Farm stores before a firearm is sold, including flagging all prior 3310.4 Forms for all Fleet Farm stores."

- o **Response**: Remedial Action #1 is not a GCA or ATF requirement, and Mr. Bisbee's report does not identify any authority suggesting otherwise. Presently, Fleet Farm electronic record keeping systems comply with GCA / CFR record keeping requirements. Mr. Bisbee's suggestion of implementing a software system that tracks all prior sales of firearms across the corporation and alerts the Fleet Farm salesperson at the point of sale of this purchase history is beyond the scope and authority of the GCA and ATF regulations.

  Mr. Bisbee also appears to overlook that Fleet Farm has already taken most of the actions he describes in his Remedial Action #1, even though not required by the GCA or ATF.[31] At "the start of 2022," Fleet Farm voluntarily established reports that allow corporate employees to "monitor[] and evaluat[e] multiple gun purchases to identify possible straw buyers," including "identifying those people that are traveling to multiple Fleet Farm locations."[32] So Fleet Farm has already implemented "a software system that tracks all prior sales of firearms, corporate wide."

- **Mr. Bisbee's Remedial Action #2:** "Fleet Farm should utilize a suspicious activity alert system that is automatically and easily accessed at the point of sale. . . . [I]ndividual stores should have expanded availability to generate alerts without having to clear all alerts through the corporate headquarters first."

  - o **Response**: Remedial Action #2 is not a GCA or ATF requirement, and Mr. Bisbee's report does not identify any authority suggesting otherwise.

    ATF does not require FFLs to establish a "suspicious activity alert system." Any "suspicious activity alert system" created by an FFL is an illustration of the FFL taking steps to go above and beyond what ATF requires for monitoring for and preventing straw purchases. As I explain in my Opening Report, Fleet Farm's straw purchase monitoring system, both currently and in 2020 and 2021, goes above and beyond what is required by ATF.[33]

    Mr. Bisbee's recommended Remedial Action #2 also overlooks that Fleet Farm is already taking the actions he proposes, even though not required by the GCA or ATF. Although in 2020 and 2021, straw purchase alerts could only be sent by "LP and management," due to technological limitations, today "line employees" are also able to send straw purchase alerts directly.[34] And both today and in 2020 and 2021,

---

[31] Opening Report, pp. 37-38
[32] June 20, 2024 Radl Depo. Tr. 29:4-24; *see also id.* at 39:4-20 (Mike Radl explaining he and Michelle Granato "look into the customer's purchase history across the company" to decide whether to notify ATF of a suspected straw purchase)
[33] Opening Report, pp. 36-38
[34] June 20, 2024 Radl Depo. Tr. 63:19-66:1; June 19, 2024 Granato Tr. 84:23-85:9 (Michelle Granato explaining as of "around August" of 2023, "line employees" are able to send straw purchase alerts)

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

store employees at individual stores had the ability to generate and send "Be on the Lookout" ("B.O.L.O.") alerts "immediately" and "bypass the requirement of having somebody at corporate send it out," and were instructed to use the B.O.L.O. process "for any kind of incident at store level, that they felt required the immediate communication of the incident to other locations."[35]  Again, this dual-track system of using straw purchase alerts and B.O.L.O. alerts goes above and beyond what is required by ATF.

- **Mr. Bisbee's Remedial Action #3:** "Fleet Farm should utilize subject matter experts to train firearms sales staff (both when onboarding and through ongoing training) on proper sales procedures and implement standard operating procedures that includes engaging customers in conversation about the transaction, i.e. asking questions."

  o **Response**: Remedial Action #3 is not a GCA or ATF requirement, and Mr. Bisbee's report does not identify any authority suggesting otherwise.

    As explained in my Opening Report, Fleet Farm's training program and materials are based on CFR requirements and guidance material released by ATF, and in many instances provide enhanced trainings beyond those requirements and guidance.[36]  These trainings specifically cover, among many other things, "proper sales procedures" for firearms, and they are already implemented through standard, centralized training by firearm specialists with decades of experience in the industry.[37]  Fleet Farm also already trains its employees to "ask customers questions" (i.e., in Mr. Bisbee's words, to "engag[e] customers in conversation about the transaction, i.e. asking question").[38]  This existing training fully complies with ATF regulations and guidelines.[39]  In my view, Fleet Farm has already taken all of the actions detailed in Mr. Bisbee's Remedial Action #3.

- **Mr. Bisbee's Remedial Action #4:** "Fleet Farm should utilize their error tracking system to identify sales associates who consistently fail to follow standard operating procedures and should not be authorized to sell firearms. This system needs the commitment and support of management, who should also be held accountable for errors not addressed."

  o **Response**:  Remedial Action #4 is not a GCA or ATF requirement, and Mr. Bisbee's report does not identify any authority suggesting otherwise.  There is nothing within the GCA that addresses employee discipline as an FFL, or requires an FFL to establish any particular process for disciplining employees for firearm-related issues.

---

[35] June 20, 2024 Radl Depo. Tr. 65:7-19.

[36] Opening Report, pp. 27-35

[37] Opening Report, pp. 27-35; June 20, 2024 Radl Depo. Tr. 4:9-16 (Michael Radl explaining he has worked at Fleet Farm since 2000 (with a two-year departure from 2003 – 2005) and has been the Safety and Firearm Compliance Manager since 2017); June 19, 2024 Granato Depo. Tr. 11:9-25, 18:2-10 (Michelle Granato explaining she has worked at Fleet Farm for 40 years, and has been a Fleet Farm firearms specialist since 2014)

[38] Opening Report, pp. 31-35; FF_0000018; FF_0040804; FF_0040813; FF_0040832; FF_0040770

[39] Opening Report, p. 16; ATF0000073; ATF0000131; ATF0000231; ATF0000382; ATF0000455; ATF0000668; ATF0000816

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Date: _____11/1/2024_____                    _____

                                              Andrew Graham

9

**Appendix A**

| | |
|---|---|
| ATF0001772 | ATF0002403 |
| ATF0002865 | FF_0039861 |
| FF_0039862 | FF_0039863 |
| FF_0039864 | FF_0039865 |
| FF_0039866 | FF_0039867 |
| FF_0039868 | FF_0039869 |
| FF_0039870 | FF_0039871 |
| FF_0039872 | FF_0039873 |
| FF_0039874 | FF_0039875 |
| FF_0039876 | FF_0039877 |
| FF_0075801 | 2024/07/10 State of Minnesota's Amended Responses to Defendants' Second Set of Interrogatories |
| 2024/06/19 Deposition Transcript of Michelle Granato pps. 141 - 144, 161 - 164, 193 - 200 | 2024/06/20 Deposition Transcript of Michael Radl pps. 9 - 12, 161 - 164, 217 - 220 |
| 2024/07/24 Deposition Transcript of Branden Sierakowski pps. 65 - 72, 193 - 196 | 2024/07/30 Deposition Transcript of Bret Nordquist pps. 1 - 4, 41 - 44, 65 - 68 |
| 2024/08/13 Deposition Transcript of Gary Hallfielder pps. 1 - 4, 33 - 40, 121 - 124, 173 - 176 | 2024/09/05 Deposition Transcript of Cory Klebs pps. 77 - 80, 161 - 172 |
| 2024/09/06 Deposition Transcript of Michelle Granato pps. 250 - 253, 262 - 269 | |

**EXHIBIT E**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

State of Minnesota by its          )
Attorney General, Keith            )
Ellison,                           )
                                   )
               Plaintiff,          )
                                   )
vs.                                )No. 0:22-cv-02694-JRT-JFD
                                   )
Fleet Farm LLC, Fleet Farm         )
Group LLC, and Fleet Farm          )
Wholesale Supply Co. LLC,          )
                                   )
               Defendants.         )
_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

JOSEPH BISBEE

_____

8:53 A.M.
THURSDAY, FEBRUARY 6, 2025
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON

Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR
WA CCR #2157; OR CSR #20-0477; CA CSR #14435
Job Number 7109667

Page 6

WITNESS LOCATION:  SEATTLE, WASHINGTON; THURSDAY, FEBRUARY 6, 2025

8:53 A.M.

--oOo--

THE VIDEOGRAPHER:  We are now on the record. Good morning.  It is currently 8:53 a.m. on February 6th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Joseph Bisbee taken by counsel for Defendant in the matter of State of Minnesota versus Fleet Farm LLC, et al., filed in the United States District Court, District of Minnesota.  Case Number 0:22-cv-02694-JRT-JFD.

The location of the deposition is 1111 Third Avenue, Suite 3000 in Seattle, Washington 98101.

My name is Sarah Kleinschmidt, representing Veritext, and I am the videographer.  I am not related to any party in this action, nor am I financially

Page 7

interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. NOTEBOOM:  Todd Noteboom with the Stinson law firm on behalf of the Fleet Farm defendants.

MR. LEIENDECKER:  Andrew Leiendecker from Stinson, also on behalf of Fleet Farm.

MR. MALONEY:  Eric Maloney, assistant attorney general for the Minnesota Attorney General's Office, on behalf of the State of Minnesota, by and through its attorney general, Keith Ellison.

MS. MOERKE:  Katherine Moerke, also on behalf on -- behalf of the State of Minnesota.

THE COURT REPORTER:  With that, I'll swear in the witness.

JOSEPH BISBEE, sworn as a witness by the Certified Court Reporter, testified as follows:

THE COURT REPORTER:  Thank you.

Please proceed.

Page 180

Q.    (BY MR. NOTEBOOM)   Let's see if I can put my hands on this quickly.  Let's see if we can find that and come back to it here.

If -- focusing now just on this repeat customers coming back to buy multiple firearms.  If you're dealing with a situation where someone is purchasing two guns or two guns are sold in succession and nothing more --

You with me?

A.    I think so.

Q.    -- you wouldn't be able to say that there was something improper about that or that that was a transaction that should be stopped?

And I'm focusing just on sort of the repeat nature.  Someone comes in and buys a firearm, and that same person comes back later and buys a second firearm.

Limiting it just to that -- those set of facts, and without more, would that, in your opinion, be a reason to stop the sale?

MR. MALONEY:  Objection.  Compound. Ambiguous.

A.    Well, you're asking me to analyze a situation in isolation, and gun transactions don't occur that way. And so -- and you're also asking if that's enough to stop a sale.

With the facts that you gave me, it's not, but it still is an indicator that the salesclerk should be aware of.

Q.   (BY MR. NOTEBOOM)  And the same, I gather, would be true if someone came in and purchased two guns in a single transaction, and then that same customer came back, say, a week later and purchased two more; without any more facts, without any more indications that there may be a straw purchase in process, there's nothing about that, I gather from your testimony, that would strike you as a transaction that should be stopped by the FFL?

MR. MALONEY:  Objection.  Misstates testimony.

A.   Again, I'll give the answer that I gave for the previous question, which is:  If you're asking me to give an answer about that situation in isolation, which is not what happens, then, given the facts you presented, it would not cause -- it would not necessarily cause the sale to be stopped, but it still makes it an indicator.

Q.   (BY MR. NOTEBOOM)  Sure.

And an indicator, or even multiple indicators all together, don't require an FFL to stop a transaction; correct?

MR. MALONEY:  Objection.  Vague.

# EXHIBIT F

EXHIBIT

tabbles

215

INVESTIGATIONS

# Tens of thousands try to illegally buy guns from dealers annually, study finds



— People crowd pack a gun show in Knoxville, Tenn., on Dec. 28.    Michael Patrick / AP file

March 11, 2013, 6:32 PM EDT

## By Open Channel and Bill Briggs

Attempted illegal gun purchases occur 30,000 to 40,000 times each year among U.S. firearms retailers, according to a first-of-its-kind survey of gun sellers published Monday.

Would-be patrons seek to sway sellers to keep  transactions off the books or, more commonly, use stand-ins – often girlfriends or wives – to fill out required legal forms and undergo federal criminal background checks necessary to purchase firearms, according to the survey by the Violence Prevention Research Program at the University of California-Davis.

Perhaps the most alarming finding in the study – the first to attempt to quantify the frequency of unlawful attempts to buy guns and retailer corruption – is that some firearms dealers are "bad guy magnets," who even though they deny the most attempted "straw-man" and undocumented purchases tend to suffer the most gun thefts and appear to receive the most visits from federal agents tracing guns used in crimes.

 "They have a high-risk clientele (which may in part be) because the retailers themselves are known to look the other way," said Dr. Garen J. Wintemute, author of the study published in "Injury Prevention," a peer-reviewed health journal, and director of the Violence Prevention Research Program. "But it all goes together: The retailers who had the most denied sales were also the ones most likely to sell guns that were used in crimes."

"The (responsible) retailers consider this a very serious problem that deserves stiff punishment," he added.

Cutting down so-called "straw" purchases of guns is among the measures being pushed by gun-control advocates in the wake of the elementary school shooting in Newtown, Conn., on Dec. 14, which left 20 children, six school employees and gunman Adam Lanza and his mother dead.

On Thursday, the Senate Judiciary Committee approved a bill that seeks to make it a federal crime to purchase a firearm for someone who is not legally allowed to own a weapon, such as a convicted felon. President Barack Obama has urged the full Senate to approve the measure.

Wintemute's team mailed surveys to 1,600 gun dealers, pawnbrokers and gunsmiths who sell 50 or more firearms each year and received back 591 completed questionnaires. Participating retailers reported that would-be clients tried to make 2,051 straw purchases and 2,254 undocumented buys during the previous year.

The researchers extrapolated those rates across the nearly 10,000 U.S. gun dealers and estimated that about 34,000 straw purchases and about 37,000 attempted undocumented purchases were attempted nationally during that span. (Those figures only reflect the instances where the retailers realized they were dealing with straw buyers, so the actual number of bogus buyers is likely higher.)

**'Flashpoint': NBC News special report on guns in America**

"The key word there is 'attempt' " said Andy Molchan, director of the National Association of Federally Licensed Firearms Dealers, which has about 1,000 members. "You know, 10 16-year-olds probably go into one liquor store during each year and attempt to buy a bottle of whiskey. But if they only attempted (and were denied), they didn't buy it."

Still, Molchan acknowledged that "straw-man buying for people is a problem. There are two big sources for criminal guns –  No. 1 is theft from private homes and the other is straw-man purchases: they buy a gun for somebody who is a felon and they sell it to the other person for a mark up. It's been a problem for a long time."

For that reason, he said, members of the firearm dealers association all receive forms that they fill out during each sale – and ask the buyers to sign – attesting that the weapon is solely for that buyer and will not be re-sold in a secondary market to a felon or any other person who is restricted by state law from owning a gun. The forms have been in use for about 30 years.

"Our association is not against increased laws and increased penalties for people who are buying guns for people who are felons or shouldn't have guns," Molchan said. "We don't have any objections to that."

Many illicit, stand-in gun buyers are women, Wintemute said, citing firearms-trafficking statistics from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. Partly for that reason, he argues that reports indicating that women make up a rising share of the gun market "are a myth."

According to ATF, in nearly 20 percent of straw purchases, the buyer "is an intimate partner – the girlfriend or the spouse – of the real purchaser," Wintemute said. "In (ATF) training materials, and just in common knowledge around the industry, one of the markers of a straw purchase is a woman who is purchasing when a guy is just standing around nearby in the store."

***More from Open Channel:***

- Man wrongly imprisoned in murder case wins $13.2 million in civil rights lawsuit

- Abu Ghaith trial may illuminate Iran's treatment of al-Qaida leaders it detained

- New names show up on list of top Obama donation bundlers

***Follow Open Channel from NBCNews.com on Twitter and Facebook***