# EXHIBIT A

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Expert Report of William B. Napier, LPC**

*State of Minnesota v. Fleet Farm LLC, et al.*, Case No. 0:22-cv-02694-JRT-JFD

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Personal Background and Qualifications

My background and qualifications are provided on my curriculum vitae, attached to this report as **Appendix A**. In short, I am the President of Napier Consulting, LLC, and have more than 20 years of experience as a security analyst and an ATF compliance consultant, with responsibility for ATF compliance, firearms-related security, and investigations. I have conducted several hundred compliance visits at licensed manufacturers, distributors, facilities, and gun dealers of all sizes and shapes, and have presented at dozens of conferences, seminars, and webinars to educate industry actors on regulations they must comply with as a condition of their license as well as best industry practices for firearm sales.

Over the years, I have worked with small and growing retail chains, as well as Fortune 500 companies, and have visited hundreds of Federal Firearm Licensees (FFLs) ranging from small shops to large retail chains. In many of these visits, I have examined internal policies related to the operations of these businesses, and, where appropriate, have provided guidance and recommendations to FFLs for how to improve their operations. My experience working with FFLs has afforded me the opportunity to readily identify trend lines for appropriate, industry standard business practices, as well as industry leading approaches to firearm policies and procedures.

I am a regular guest speaker for groups such as the National Shooting Sports Foundation's (NSSF) SHOT Show, National Retail Federation (NRF), Retail Industry Leaders Association (RILA), Retail Technology (RETECH), ASIS International, and The Loss Prevention Foundation, and my byline and name have appeared in various retail-related magazine articles on such topics as emerging security technology, return fraud, physical security, and leadership.

Additionally, I have served for over 20 years in municipal law enforcement. I have volunteered as a hunter education instructor in Nebraska and served on the ASIS International Retail Loss Prevention Council as a member of its Critical Infrastructure Working Group. I have

1

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

testified before the United States House of Representatives' Rules Subcommittee on the Legislative and Budget Process regarding "Tools to Combat Gun Trafficking and Reduce Gun Violence in Our Communities."[1] I am currently involved with The Loss Prevention Research Council at the University of Florida, and am a member of the University's Violent Crime Working Group. I have also been granted emeritus status on the board of directors for The Loss Prevention Foundation, and am Loss Prevention Certified (LPC).

Further, I have been active for the past 10 years as a consultant to the firearms industry, assisting firearm manufacturers, distributors, and retail locations, from small, independent stores to the largest chain stores. I conduct ATF "mock" inspections, providing pre-build new location, mature businesses, and post incident security risk assessments. I have conducted multiple webinars on ATF compliance and FFL security as well as co-presented at FFL education seminars with the ATF and FBI. I have also opined as an expert witness regarding straw purchase activity, customer firearms purchase habits, duty to report firearm transactions, video usage by retailers, and ATF trace requests in *Cindy Coxie, et al. v. Academy, Ltd.*, Consolidated Case No. 2018-CP-42-04297, which was pending in the Court of Common Pleas, Seventh Judicial Circuit County of Spartanburg, State of South Carolina. I have authored or co-authored the following publications in the past 10 years:

- *Our Store Has a Disaster Preparedness Plan – or Do We?*, NSSF – The Firearm Industry Trade Association (February 11, 2015), https://www.nssf.org/articles/our-store-has-a-disaster-preparedness-plan-or-do-we/

- *Employee Theft – Discovering It, Stopping It, Preventing It*, NSSF – The Firearm Industry Trade Association (February 26, 2015), https://www.nssf.org/articles/employee-theft-discovering-it-stopping-it-preventing-it/

---

[1] https://www.congress.gov/event/117th-congress/house-event/114896/text

2

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- *Crime is Down, So We Can Relax, Right?*, NSSF – The Firearm Industry Trade Association (March 3, 2015), https://www.nssf.org/articles/crime-is-down-so-we-can-relax-right/

- *In-Store Firearm Carry – Much More Than a Belt and Holster*, NSSF – The Firearm Industry Trade Association (March 24, 2015), https://www.nssf.org/articles/in-store-firearm-carry-much-more-than-a-belt-and-holster-2/

- *'Boss, Can I Carry While I'm Working?'*, Insurance Thought Leadership (April 23, 2015), https://www.insurancethoughtleadership.com/commercial-lines/boss-can-i-carry-while-im-working

- *One Man's Trash is Another Man's … Crime Spree*, NSSF – The Firearm Industry Trade Association (May 14, 2015), https://www.nssf.org/articles/one-mans-trash-is-another-mans-crime-spree/

- *The Keys to the Vault*, NSSF – The Firearm Industry Trade Association (June 4, 2015), https://www.nssf.org/articles/the-keys-to-the-vault/

- *Firearm Inventory Counts and Reconciliation – Compliance Secret No. 1*, NSSF – The Firearm Industry Trade Association (June 17, 2015), https://www.nssf.org/articles/firearm-inventory-counts-and-reconciliation/

- *NSSF Debuts Security Audit Program*, The Shooting Industry; San Diego, Vol. 61, Iss. 8 (August 2016), https://www.proquest.com/docview/1814143635?sourcetype=Trade%20Journals

- *Helpful Hints for Successfully Completing ATF Form 4473*, NSSF – The Firearm Industry Trade Association, https://www.nssf.org/retailers/compliance-hints-successfully-completing-atf-form-4473/

In my analysis of this matter, I considered the materials listed in **Appendix B** to this report. I am over 18 years of age. I am being compensated at a rate of $250.00 per hour for my time on this matter. My compensation is not contingent on the results of my analysis or the substance of my testimony.

<u>**Summary of Opinions**</u>

As explained in more detail in the following section, I have formed the following opinions regarding the at-issue conduct in this matter:

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1.      Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.

2.      Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.

3.      Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms.

## Analysis and Opinions

**Opinion #1: Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.**

A.      The industry standard for monitoring for and preventing straw purchases.

The federal firearm licensee (FFL) industry standard requires FFLs to monitor for and take steps to prevent possible straw purchases, relying on various programs, including in-house training, ATF documents and seminars, and third party programs such as NSSF webinars, as well as maintaining relationships with law enforcement. The industry standard for monitoring for and preventing possible straw purchases may be gleaned from ATF training materials, NSSF guidelines and training materials, and the straw purchase prevention policies that have been implemented by other Minnesota-based FFLs.

1.      *ATF training materials*

One of the key sources of the FFL industry standard for monitoring for and preventing straw purchases is ATF training materials regarding straw purchasing.[2] The ATF provides FFLs with online materials regarding straw purchasing, newsletters addressing various issues facing the

---

[2] ATF0000001; ATF0000004; ATF0000076; ATF0000130; ATF0000172; ATF0000344; ATF0000384; ATF0000458; ATF0000544; ATF0000691; ATF0000800

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

firearms industry (including, but not limited to, straw purchasing), and in-person training for FFLs through local ATF field divisions.

Specifically, ATF trains FFLs to monitor for the following indicia of a possible straw purchase: (i) "[a]ttempted purchase after a denial is issued, usually by family member or friend"; (ii) "[t]wo customers, one looks at gun and asks the question ... the other wants to complete the paperwork"; (iii) "[e]xchanges of cash in or near storefront"; (iv) "[t]he customer acts uncomfortable or seems unfamiliar with the product"; (v) "[s]omeone has a shopping list of firearms to fulfill, but no knowledge about them"; and (vi) "[c]onversations of customers while shopping, with you, with their friends or on their cell phones."[3] ATF further advises FFLs of various "scenarios" that may constitute a straw purchase: (i) "[p]erson interested in firearm is different than buyer"; (ii) "[d]enied/delayed background check, different person attempts to acquire for denied individual"; (iii) "[p]urchaser comes in with list of firearms or is on the phone being directed what to buy"; (iv) "[b]uyer tells you they are buying for someone else"; and (v) "[p]erson who bought firearm online different than person in front of you."[4] ATF also advises FFLs to "[a]sk customer questions such as why are you buying this gun, what are you going to use it for" and "[k]eep a log of recent denials and attempted purchases to compare with new sales."[5]

Based on my experience, the aforementioned indicia of possible straw purchases have provided the foundation for the FFL industry standard on how to monitor for and prevent straw purchases.

---

[3] ATF0000072; ATF000131; ATF0000230; ATF0000381; ATF0000454; ATF0000573; ATF0000815
[4] ATF0000811 – ATF0000815
[5] ATF0000073; ATF0000131; ATF0000231; ATF0000382; ATF0000455; ATF0000816

5

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### 2.    *NSSF guidelines and training materials*

NSSF is "the firearms industry's trade association," and among many other things, NSSF provides guidance to FFLs on subjects such as firearm safety, shooting, hunting, research, and government initiatives.[6] As relevant here, NSSF has partnered with the ATF to develop materials and provide outreach to FFLs (via both webinars and in-person training) on a variety of issues facing the firearm industry.

Among other things, NSSF provides training sessions and guidance to FFLs on best practices for selling firearms, including how to monitor for and prevent straw purchases. NSSF has directed FFLs to be cognizant of the following circumstances surrounding a sale[7]:

- "Make sure there is genuine interest and questions from the customer about the firearm being considered for purchase."

- "The salesperson should be convinced of the reason and intended lawful purpose the customer has for acquiring the firearm."

- "The purchaser should not typically be referencing a note, picture or description when asking to purchase a gun."

- "Be alert to someone asking to purchase a firearm that may have been the subject of a recent NICS denial or delay. Be alert to similar last names and addresses in this scenario as well."

- "Be alert to who is paying for the firearm versus who is completing the Form 4473 and NICS."

- "Be cognizant to couples shopping together in which one person selects the firearm and the second person completes the Form 4473. This often involves a married couple in which one person may be a prohibited person. Don't accept excuses such as, 'I forgot my wallet, so my girlfriend is purchasing it for me.'"

- "Be suspicious of uneducated customers attempting to purchase more than one handgun at a time with little inquiry about the firearms."

---

[6] https://www.nssf.org/
[7] https://www.nssf.org/articles/beware-the-straw-purchase/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Similarly, NSSF's current "SHOT University Online" training identifies the following as "possible indicators of a straw purchase"[8]:

- "Nervousness. Questioning the need for Form 4473. Or tight-lipped."

- "Lack of knowledge about firearms or familiarity with the firearm they want to buy after being questioned by sale associates."

- "Evasive when asked questions by staff."

- "Bulk or repetitive purchase of the same or similar firearms, especially non-collectible models."

- "Purchases made with brand new identification documents."

- "No previous purchases, but now a frequent buyer."

- "Buying multiple firearms with large amounts of cash."

- "Another person seen passing cash to the 'buyer.'"

- "Buyer conversing with another person while completing Form 4473, particularly if the other person is in another section of the store."

- "Persons attempting to conceal conversations inside of shop."

- "Scouting of firearms by the straw buyer with the actual purchaser, who then departs the store."

- "Taking/sending cell phone pictures of firearms to persons unknown to the FFL."

- "Talking on a cell phone while looking at firearms."

- "Reluctance of the apparent buyer to complete Form 4473."

And if an FFL employee has "any doubts about the legality of any firearms sale," NSSF recommends that they ask questions of the buyer, such as: "Now tell me, who are you buying this

---

[8] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association, https://cdn.fs.pathlms.com/fKOEajVSTtmz9BZB1cyn?_gl=1*1yomeqz*_ga*MjA2MjA1NzU1OC4xNzI2NjE5MDM0*_ga_2KEDL6GGQS*MTcyNjYxOTAzNC4xLjAuMTcyNjYxOTAzNC4wLjAuMA..&_ga=2.215812375.1466964818.1726619035-2062057558.1726619034

7

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

firearm for today?"; "What is it about this firearm that you like?"; "What other models have you considered?"; and "How do you plan to use it?"[9]

NSSF also "recommend[s] that FFLs keep track of denied persons, their addresses and the firearm on denied transactions for about a week or longer and that sales associates review it prior to making a firearms transfer," and advises as follows if a straw purchase is suspected[10]:

Additionally, NSSF's "Don't Lie for the Other Guy Program" exists to provide training and education to FFLs "to help employees ... recognize attempted straw purchases," and provides "videos" and "store materials" to FFLs with the "goal ... to eliminate actual transfers to straw purchasers to the greatest extent possible."[11]

---

[9] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association

[10] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association

[11] *Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One*, NSSF – The Firearm Industry Trade Association; https://www.nssf.org/articles/tag/dont-lie-for-the-other-guy/

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### 3.    *Policies from other Minnesota-based FFLs*

I have also reviewed the straw purchase prevention policies that have been produced in this action by Bill's Gun Shop, DKMags, Inc., Frontiersman Sports, The Modern Sportsman, and The Sportsman's Warehouse. These FFLs' straw purchase prevention policies are illustrative of the types of straw purchase policies that are implemented in the FFL industry. Notably, none of these policies come close to the depth or volume of policies provided by Fleet Farm.

In the relevant portions of these policies, FFLs are seen advising their employees to monitor for the following indicia of a possible straw purchase.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Bill's Gun Shop[12]

## Straw Purchase Policy's

- If we have a new customer that is unknown to us and they begin to buy multiple handguns in a short period. This should be brought to the attention of GM who will evaluate and report to Officeadmin@bjamco.com.
- By law, all 3310 multiple sales forms are currently going to ATF, CLEO and attached to 4473.
- Office Admin will run T1 10 day disposition report and look for multi-sales and cross-store purchases, weekly report to Director of Operations and owner.
- All on-line firearm purchases MUST be picked up by the person who purchased the firearm on-line. Exceptions only with Owner approval.
- All existing and new employee will be required to review the "don't lie for the other guy" materials from the ATF and will have to sign off on completion and understanding at the time of on boarding. This will include a hand out of Red flag indicators: All staff will get a list of the Red Flag indicators during their on-boarding process and the sign off will be included with the do not lie for the other guy.

**MN Attorney General identified INDICATORS:**
- Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber
- Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns
- Purchasing firearms with cash
- The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves
- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase

---

[12] BGS000005

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

DKMags, Inc.[13]

Common Red Flag Indicators

Bulk or repeat purchase of the same firearm

Trying to avoid a Multisale report

Does not want to handle or have no interest in the firearm

One person is clearly interested and then another other person tries to complete the 4473

Multiple people come in and it's unclear who the buyer is

One person hands the other person money (or references giving them money later)

Cash use. Handling cash like it's not theirs etc.

Also: talk to the customer. Why are they buying it, where will they be practicing etc.

**If in doubt, It's never wrong to turn down a sale. Any employee can stop the sale, Even if it's not their customer. If in doubt, do not sell.**

---

[13] DKM0000012

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Frontiersman Sports[14]

6. Some obvious straw purchase behavior to watch for:

a. One person is handling and looking at a gun, decides to buy it, yet their friend or wife/girlfriend etc. is the one who will be doing the paperwork and background check. In some cases, the gun may actually be for a wife or significant other, in which case we will need credentials from the BOTH of them showing firearms possession eligibility (Purchase Permit/Carry Permit) or both pass NICS check.

b. Someone is handling and looking at a gun(s) then leaves. Soon after, someone else comes in looking to buy the same gun(s). Check the parking lot for the other person in the car! Write down plate numbers. Note date and time.

c. Someone calls on the phone asking for a specific make/model firearm, usually a man. Then someone else, usually a woman comes in shortly after looking to buy the same make/model.

d. Multiple handgun purchases in a short period of time, especially 9mm caliber pistols, and mostly those that are less expensive. If repeated purchases start to seem off or trigger your gut feeling that something isn't right, REFUSE SALE and notify manager immediately.

e. A person that came in looking for a specific make/model gun who exhibits very low firearms knowledge, someone who doesn't know how to hold or operate a gun, usually a pistol, and usually a female customer. Ask questions, listen to your gut. It may be nothing, but if any doubt exists, DO NOT SELL, and notify manager immediately.

f. Person(s) that have parked off site and intentionally out of camera view, not in our parking lot.

12

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

The Modern Sportsman[15]

Store policy on any suspected straw purchase is to notify a manager immediately and stop the firearm transfer until directed otherwise by your manager. Key indicators of straw purchasing are being on their phone audibly communicating about the firearm they are going to purchase for someone else, failing to answer simple or routine questions about their purchase or two or more customers looking at a firearm and then leaving the store prior to one member of the group attempting to purchase the firearm. As always, refer to your manager if you suspect any straw purchasing behavior or have questions regarding the policy.

Sportman's Guide, LLC[16]

**What to look for to detect "Straw Purchases"**
- ☐ The buyer may have nervous body language or tone of voice.
- ☐ The buyer's reasons for making the purchase may seem unclear, questionable, or inconsistent with their financial situation.
- ☐ Cash transactions can be used to mask illegal activities.
- ☐ Is accompanied by one or more individuals, including partners or family members
- ☐ Is accompanied by one or more individuals who then suddenly leave
- ☐ Is communicating with other individuals not present via phone, text or photos
- ☐ Has never purchased a firearm before
- ☐ Is uneducated about the firearm(s) being transferred/purchased
- ☐ Expresses no lawful purpose for the firearm(s) being transferred/purchased
- ☐ Expresses no interest in the firearm(s) being transferred/purchased
- ☐ Is buying multiple firearms, especially of the same or similar type/model
- ☐ Has purchased one or more firearms recently
- ☐ Is not paying for the firearm(s) themselves
- ☐ Acknowledges the firearm is for another individual and not a gift
- ☐ The buyer is reluctant to undergo a background check
- ☐ The buyer seems overly eager or in a hurry to make the purchase
- ☐ Documentation appears altered or filled in by different people

And some FFLs, such as Realm Firearms, "do[] not have any policies or procedures related to monitoring or preventing straw purchasing," and instead simply contact law enforcement "if there are any people who set off any red flags."[17]

---

[15] TMS0000090
[16] SG0000004
[17] RF0000001

13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As among these other Minnesota-based FFLs, DKMags, Inc., Frontiersman Sports, The Modern Sportsman, and The Sportsman's Warehouse have straw purchase prevention policies that are consistent with, and reflective of, the industry standard, both in terms of the topics addressed by the policies and the format in which the policies are presented (*e.g.*, one or two pages of discussion in either a standalone document, or as part of a broader policy manual). Bill's Gun Shop appears to have adopted the "MN Attorney General identified INDICATORS" from paragraph 25 of Plaintiff's First Amendment Complaint in this case, which, as I explain below on pages 18 through 21 of this report, are not accurate in describing the industry standard for monitoring for and preventing straw purchase. And as for Realm Firearms, it is not necessarily surprising, but certainly deficient in light of the industry standard for an FFL to have no straw purchase policies whatsoever.[18] As will be detailed below, on pages 21 through 33, Fleet Farm's straw purchase policies and guidelines stand in stark contrast to all of these policies. Fleet Farm's policies emphasize more potential indicia of straw purchasing, the policies themselves are more detailed, and Fleet Farm employs a system of continuing training and education that goes well beyond the standard industry practice. In short, Fleet Farm's approach to monitoring for and preventing straw purchasing reflects an industry best practice approach.

*        *        *

In addition to these ATF and NSSF training materials and FFL policies, based on my experience and knowledge from conducting hundreds of compliance inspections at various FFL

---

[18] In addition to Realm Sports, my understanding is that the U.S. District Court overseeing this matter has ordered Capra's Sporting Goods to produce to Fleet Farm "[a]ll documents reflecting Your policies and procedures relating to firearm transactions, including ... those relating to monitoring for and preventing straw purchasing." Dkt. 117, pp. 2–3; Dkt. 118, Ex. A; Dkt. 130. My understanding is also that, as of the date of my report, Capra's has not produced any such documents to Fleet Farm.

14

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

businesses, including firearm manufacturers, distributors, and retail locations from small, independent FFLs to large-format chain stores, I have made the following observations regarding the standard industry practices for monitoring for and preventing possible straw purchases:

- The firearms industry, as reflected in ATF and NSSF guidelines, does not expect that FFLs will be 100% successful in preventing all possible straw purchases. FFLs rely on government programs such as the execution of ATF Form 4473 by the customer, execution of ATF Form 3310.4, FBI NICS or state POC background checks, and state permit to purchase programs to determine lawful transfers of firearms. In addition, there are programs, such as NSSF's Don't Lie for the Other Guy, to educate and train FFLs how to spot and stop a possible straw purchase. Even with all of these precautions, the industry does not expect an FFL to have 100% success in preventing straw purchases, which by their very nature are intended to deceive the FFL.

- No two FFLs have the exact same approach to monitoring for and preventing straw purchases, and there is no "magic word" requirement for how FFLs teach their employees to monitor for and prevent straw purchasing. FFLs will utilize what works best for their environment to train their staff on how to detect and respond to possible straw purchase attempts.

- No two straw purchase scenarios are the same, and whether a purchase is a possible straw purchase always depends on all of the circumstances. The FFL salesclerk (*i.e.*, the employee behind the counter who is engaging in the transaction with the customer) has to carefully weigh what they observe from the customer while looking for any and all potential indicators, weighing the totality of the circumstances and trying to distinguish unlawful behavior from innocent behavior before declaring a possible straw purchase attempt. And it is

15

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

important that the salesclerk be empowered to deny a sale based on his or her own judgment and experience.

- Whether a customer is potentially engaged in straw purchasing depends on all of the circumstances. There is no single indicator that establishes a straw purchase is about to occur.

- For example, regarding paying with cash, there are customers who prefer to use cash in lieu of a credit card for numerous reasons (such as a customer who is distrustful of banks or credit card companies and wishes to use cash or a customer who simply likes to carry and use cash). I have personally witnessed numerous individuals complete legitimate firearms transactions with large amounts of cash, and there is nothing illegal or prohibited about using cash to purchase a firearm.

- Regarding using a cell phone to take photographs, customers take photographs for many reasons. Experience has shown we live in a digital world, and that people constantly use their hand-held devices to take pictures and constantly share their exploits. In fact, according to The Association of Advancing Automation, picture taking by use of cell phones has increased steadily since 2000.[19] Therefore, my expertise and experience has taught me the mere use of a cell phone to take and share pictures is not by itself necessarily indicative of a straw purchase.

- The volume of firearms a customer purchases over time is not, alone, an indicator of a possible straw purchase. For example, many individuals enjoy collecting firearms and will

---

[19] *The Evolution of Camera Phones*, Association for Advancing Automation (February 2, 2016), https://www.automate.org/vision/blogs/the-evolution-of-camera-phones#:~:text=Camera%20phones%20are%20ubiquitous%2C%20but,in%20South%20Korea%20in%202000.&text=The%20Samsung%20SCH%2DV200%20was,35%20megapixel%20photo%20resolution

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

buy several in a single transaction, and a family member (parent or grandparent) may buy several of the same type of firearm as a bona fide gift for family members. Likewise, I have observed that during periods of civil disobedience, rioting, and government-mandated restrictions, some customers make the decision to buy firearms and ammunition in larger quantities. I have also witnessed increased sales of multiple firearms to the same person right before new gun legislation goes into effect. What is more, different states have different laws regarding the total number of firearms an individual may purchase within a certain time period. California, Connecticut, Maryland, New Jersey, and Virginia have imposed caps on the number of firearms an individual may purchase within a certain time period, but Minnesota has not imposed any such cap.[20] All of this is to say that the volume of firearms purchased, in a single transaction or over a period of time, is not, standing alone, an indicator of possible straw purchasing.

- FFLs develop and maintain their own program to monitor transactions for possible straw purchase attempts. There is no regulation or requirement to keep a log of possible straw purchase attempts. Some FFLs use a handwritten log of the name and address of a person attempting a straw purchase. Some FFLs shut down the sale before the ATF Form 4473 is completed and do not record the name or address of the person attempting a straw purchase. Some FFLs put a tag on the firearm that a person attempted to straw purchase to alert other salesclerks; however, this method doesn't work for a larger retail store that displays several of the same firearm. Other FFLs share the information verbally among staff. If the FFL has other company stores in the area, the FFL may call and alert them of the straw purchase attempt.

---

[20] Cal. Penal Code § 27535; Conn. Gen. Stat. § 29-33(f); Md. Code Ann., Pub. Safety § 5-128(b); N.J. Stat. Ann. § 2C:58-2(a)(7); Va. Code Ann. § 18.2-308.2:2(R)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- FFLs trust and rely heavily on government-administered screening programs to assist them in making decisions before making the lawful transfers of firearms. These programs include: (i) the customer presenting a valid state-issue permit to purchase or permit to carry (or another state-equivalent permit); (ii) the customer correctly completing and signing the ATF Form 4473; (iii) the generation and submission of the ATF Form 3310.4 multiple handgun sales report to law enforcement (where applicable); and (iv) the receipt of an FBI NICS background check to confirm the customer is eligible to purchase the firearm(s). Put differently, before any firearm sale is made, an FFL will have received at least two independent confirmations from government entities that the customer is allowed to purchase a firearm: (i) the state- or municipality-issued permit, and (ii) the "proceed" message following the NICS background check.

- FFLs get varying responses from law enforcement, including from ATF, after notifying them of a possible straw purchase or receiving a trace request. It is extremely rare for law enforcement to provide any post notification or updates on any investigation or criminal charges.

I have also reviewed the "red flags" of straw purchasing identified in paragraph 25 of Plaintiff's First Amended Complaint.[21] In my professional opinion, the "red flags" detailed in this paragraph are either inaccurate, overly simplistic, or not applicable in the context of a firearm transaction for the following reasons:

- **"Red Flag" #1:** "Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber."[22]

---

[21] Dkt. 79 ¶ 25
[22] Dkt. 79 ¶ 25

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Based on my professional experience and judgment, purchasing multiple firearms in a single transaction by itself does not indicate a possible straw purchase. A person may decide to purchase multiple firearms to be given as bona fide gifts (such as a grandfather buying several grandsons rifles for Christmas), or because they are a collector who likes certain models of handguns (and may wish to have several handguns with consecutive serial numbers), or because they might feel that when new firearm-restrictive laws are set to become effective it could be their last chance to obtain certain firearms. There is also nothing unusual about a person wanting to purchase multiple firearms of the same model for personal defense (for example, purchasing multiple firearms to store in secure locations around their property, purchasing multiple firearms so that they may have firearms at multiple locations such as a cabin or second home, or purchasing multiple firearms so they store one of the firearms at a shooting range). In short, an FFL would need more information before forming an opinion on whether the purchase of multiple handguns is an indicator of a possible straw purchase.

- **"Red Flag" #2:** "Multiple handgun purchases, particularly 9mm caliber handguns as these are the most frequently recovered crime guns."[23]

  Based on my professional experience and judgment, buying multiple handguns of a certain caliber of firearm is not in and of itself indicative of a possible straw purchase attempt. Many individuals purchase firearms based on availability of ammunition, as well as the cost of ammunition, and are known to replace or collect 9mm handguns in particular due to its lack of recoil compared to other types of handguns (for example, .40 caliber handguns tend to have a harsher recoil as compared to 9mm handguns). An FFL would need more information before forming an opinion on whether the purchase of multiple 9mm caliber handguns is an indicator of a possible straw purchase.

- **"Red Flag" #3:** "Purchasing firearms with cash."[24]

  Based on my professional experience and judgment, the notion that purchasing firearms with cash is an indicator of a possible straw purchase is a misconception, and is not something that ATF or NSSF recognizes as being a potential indicator. This is for good reason, because I have personally witnessed many firearm transactions paid for by cash by people who do not use credit cards, people who have a windfall and have cash on their person, or people who simply use cash because they can. There is nothing illegal or per se suspicious about purchasing firearms with cash. Instead, what ATF and NSSF tell us is that a cash purchase may become suspicious if a store clerk observes a *transfer of cash* between a second person and the buyer of the firearm.

- **"Red Flag" #4:** "The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves."[25]

---

[23] Dkt. 79 ¶ 25
[24] Dkt. 79 ¶ 25
[25] Dkt. 79 ¶ 25

19

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Based on my professional experience and judgment, when persons are making large dollar purchases, such as firearms, they often bring a friend to share the excitement, gain their friend's approval, or lean on the friend for expertise (if, for example, the buyer is new to the sport, and wants advice from a friend on what type of firearm to buy). As for a person "leav[ing] before the transaction," a person accompanying the buyer may leave a store for a multitude of reasons. Notably, the purchase process for a firearm can take more time than a standard retail purchase, given the paperwork and background check involved. There is nothing illegal about a person accompanying a prospective purchaser of a firearm and leaving the store before the sale is complete. If a buyer is accompanied to a store by another individual, that alone is not an indicator of a possible straw purchase.

- **"Red Flag" #5:** "The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase."[26]

   Cell phone usage is a part of everyday life. I've observed persons seeking approval from others before making a purchase, asking for advice before making a purchase, a novice asking a friend about the differences between different types of firearms or firearm features, as well as some persons wanting to share in the excitement with (or brag to) a friend about their new firearm. Of course, if an FFL observed a phone communication between an individual and a third party that gave them reason to believe the individual may be shopping for another person, that would be an indicator of a possible straw purchase, and it would be appropriate for the FFL to then assess the totality of the circumstances to determine whether they are facing a possible straw purchase scenario.

- **"Red Flag" #6:** "The buyer does not keep the firearms in their residence for their own use."[27]

   An FFL would have no basis for knowing where or how a buyer stores their firearms. Regardless, in my experience, where a firearm is being stored is not, by itself, an indicator of a possible straw purchase. My experience has taught me that some firearm owners keep firearms in a myriad of places (for example, in their boat, in their car, in their camper, at their lake house, at their office, at their cabin, or at a shooting range). Some buyers may give a firearm to a trusted friend so that the friend can add accessories to the firearm (such as scopes, slings, accessories). Some buyers may loan a firearm to a friend for sport shooting, hunting, target practice, or varmint removal at a farm. As long as the buyer reasonably believes the person they are giving the firearm to is not prohibited from possessing the firearm, this type of practice is perfectly legal (and recognized by NSSF).[28]

---

[26] Dkt. 79 ¶ 25

[27] Dkt. 79 ¶ 25

[28] https://www.nssf.org/articles/giving-a-firearm-as-a-gift-some-reminders-from-nssf/

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- **"Red Flag" #7:** "A short 'time to crime'—the time between the purchase of the firearm and the recovery of the firearm by police in connection with a crime."[29]

  This "red flag" has no application in the context of a firearm sale. By definition, even assuming a firearm is being purchased by a straw purchaser, at the time the firearm is sold, there is no way to know what, if any, "time to crime" may be later associated with that firearm. This "red flag" is describing an ATF investigatory tool, rather than an indicator of a possible straw purchase that an FFL should be on the lookout for at the time of a firearm transaction.

B. <u>Fleet Farm's policies and procedures for monitoring for and preventing straw purchases</u>.

1. *Fleet Farm's initial training*

Fleet Farm utilizes an extensive series of training modules to ensure employees are properly educated about the company's firearm policies before being authorized to sell firearms.[30] Employees are required to complete the entire firearms training course before they are authorized to sell or have access to firearms.[31] Fleet Farm also has an extensive certification test after completing the training course.[32]

On the issue of straw purchasing, there are three key components to Fleet Farm's initial training. ***First***, Fleet Farm's module training includes a module dedicated to "Straw Purchases"[33]:

---

[29] Dkt. 79 ¶ 25
[30] FF_0001497; FF_0001499; FF_0001507; FF_0001514; FF_0001520; FF_0001531; FF_0001542; FF_0001547; FF_0001554; FF_0005711; FF_0005715; FF_0005730; FF_0005734; FF_0005745; FF_0005748; FF_0005754; FF_0005760; FF_0005769; FF_0005775; FF_0005790; FF_0005798; FF_0005802; FF_0005816; FF_0005820; FF_0005831
[31] FF_0032630
[32] FF_0003449 – FF_0003539; Michelle Granato Deposition Transcript at 56-57
[33] FF_0001507

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



In this training, Fleet Farm explains that "[i]t is a federal offense for a customer to purchase a firearm for another person who is not eligible to own/posses[s] a firearm," and provides five examples of possible straw purchase scenarios[34]:

- "The customer is observed receiving money from another customer before or during the firearm purchasing process"

- "Conversation is overheard that indicates that the customer is purchasing the firearm for someone else"

- "A friend is observed helping the customer complete the ATF Form 4473"

- "One person is asking the questions regarding the firearm but the other steps forward to complete the 4473"

- "The transactions feel[] wrong and deceitful"

---

[34] FF_0001508

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

And throughout the relevant time period, Fleet Farm has explained to its employees that another indicia of a possible straw purchase, to be assessed in the overall context of the transaction, is a customer seeking to purchase multiple handguns in the same transaction.[35]

The "Straw Purchases" module also provides direction to employees on steps to take if they suspect a possible straw purchase[36]:

## Straw Purchase (cont'd)

If you suspect a Straw Purchase, have the customer complete the ATF Form 4473, including obtaining their signature:
- From the back room, contact Management and explain your observations
- A Manager should respond to inform the customer of the denied sale
- Ensure the ATF Form 4473 is retained and filed
- Management or LP will submit a Straw Purchase Alert

From time to time Straw Purchase Alerts are emailed from other stores within the company. Ensure you read these alerts to be aware of the customer who may attempt to purchase a firearm at your store.

4 | REV. 7/3/18    Confidential & Proprietary – For Internal Use Only    **Fleet Farm.** Built for real life

And Fleet Farm stores utilize "Straw Purchase Alerts," which are emailed across Fleet Farm stores to notify all stores of possible straw purchase attempts[37]:

---

[35] Michael Radl Deposition Transcript at 16, 28, 84–85; Cory Klebs Deposition Transcript at 30, 59
[36] FF_0001510
[37] FF_0001511

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



In addition to circulating Straw Purchase Alerts by email, Fleet Farm's software allows store employees to search "LP Alerts" to "view alerts from other locations" and search by last name "to see if there were any prior alerts sent out for an individual."[38]

*Second*, in the "Background Check" module, Fleet Farm instructs its employees that: (i) "[i]f any of the questions [on the ATF Form 4473] were answered as disqualifying and not corrected, the background check MUST not be submitted and the sale is immediately declined"; (ii) "Fleet Farm doesn't transfer on a delay response using the Brady 3 day transfer rule"; and (iii) "[a] *'Proceed' is required for all transfers*"[39]:

---

[38] FF_0001512 – FF_0001513
[39] FF_0005736; FF_0005738

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



This "Proceed" requirement is also reflected in Fleet Farm's "Policies and Guidelines" for "Sales and Handling of Firearms"[40]:

> 5. Sales. Firearms will not be transferred to a customer without a "Proceed" status from NICS. Team Members may not submit a background check on themselves, a family member, or a resident of their household

*Third*, Fleet Farm uses the NSSF's "Don't Lie for the Other Guy" training video as part of its training,[41] and also uses other "Don't Lie" materials in its stores.[42]

As I explain on pages 31 through 33 below, Fleet Farm's robust and comprehensive training, and in particular its training relating to monitoring for and preventing possible straw purchases, represents an industry best practice approach to firearm transactions.

---

[40] FF_0005605
[41] FF_0000207; Kevin McKown Deposition Transcript at 47
[42] Kevin McKown Deposition Transcript at 47; FF_0040805

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.      *Quarterly Seminars and "Tuesday Tidbits"*

Beginning in 2021, Fleet Farm also provided ongoing education and training to its employees regarding its firearm policies, including ongoing training on how to monitor for and prevent possible straw purchases.[43] Through these trainings, Fleet Farm refreshed its employees' education on the following indicators of a possible straw purchase:

**November 2021[44]**

This training explains that "[e]vidence of a possible Straw Purchase includes":

- "The customer is observed receiving money from another customer before, during or after the firearm purchasing process"

- "Conversation is overheard that indicates that the customer is purchasing the firearm for someone else"

- "A friend is observed helping the customer complete the ATF Form 4473"

- "One person is asking the questions regarding the firearm but the other person completes the 4473 form"

- "The transactions feels wrong and deceitful – trust your 'gut'"

This training also explains that "[s]traw purchases can come to light" by: (i) "Team Member recogniz[ing] the customer as being a frequent purchaser," and (ii) "3310.4 Multiple Handgun form alert[ing] you to large or multiple handgun transfers with in 5 consecutive days." It also advises that the Form 3310.4 "can provide information on potential handgun straw purchases."

**November 2022[45]**

This training also reminds Fleet Farm employees to "Be aware of the activity around the firearm counter and displays," and specifically notes the following indicators of a possible straw purchase:

---

[43] FF_0000860; FF_0002730; FF_0036479; FF_0000012; FF_0032623; FF_0040797; FF_0040813; FF_0040898; FF_0040832; FF_0040770
[44] FF_0000012
[45] FF_0040797

26

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



**April 2023[46]**

In the April 2023 quarterly training, Fleet Farm trained its employees again to "[b]e aware of the activities around the gun counter and displays, to "[not] be afraid to ask questions," and to watch for the following indicia of a possible straw purchase: (i) "[m]ultiple purchases of lower-cost pistols (Ruger, Taurus, etc.)"; (ii) "[p]ays with cash of Visa/MC debit/gift cards"; (iii) "[f]riends come and go"; and (iv) "[l]ack of interest."

**August 2023**

During this seminar, Fleet Farm largely reiterated the training from April 2023 regarding "Straw Purchase Awareness":

---

[46] FF_0040813

27

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



Fleet Farm provided this same "Straw Purchase Awareness" guidance to its employees during the November 2023 quarterly training.[47]

In addition to the quarterly trainings, for multiple years Fleet Farm shared "Tuesday Tidbits" with its employees, which was another method for providing employees with ongoing education on firearm compliance and training. Several of these "Tuesday Tidbits" focused on straw purchasing,[48] and trained Fleet Farm employees regarding the following:

- To prevent a possible straw purchase, employees should "[r]emain[] calm," "[a]sk[] questions to determine if [an attempted transaction] had the elements of a straw purchase," "[g]ather[] the customer information needed to create an alert," "[c]ontact[] Management to get involved," and "[e]nsure[] the ATF 4473 form was retained."[49]

- A straw purchase "usually has at least two of these elements"[50]:

---

[47] FF_0040770

[48] FF_0000898; FF_0000906; FF_0000910; FF_0000922; FF_0000936; FF_0000955

[49] FF_0000898

[50] FF_0000906; FF_0000910

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> - **Beware Of "Helpers"** **A lot of friends come along when someone they know is buying a gun. The only thing better than purchasing a new firearm for yourself is helping a friend. But when the friend is doing more of the shopping than the buyer, it should set off an alarm.
> - ***Watch Body Language*** Far more is communicated in how we act than what we say. If a customer is nervous, it will show through actions sooner than through answers. If you ask a question to the buyer and they look at their "helper" before answering, that's a red flag.
> - ***Trust Your Gut*** Sometimes a situation just doesn't feel right. When in doubt, trust your gut. Losing a sale is a small price to pay for stopping someone illegal from getting a gun.

- Reminding employees "to complete an alert" if they encounter a possible straw purchase scenario.[51]

- Although "it's pretty much impossible to prevent ALL straw purchases," there are "tricks you can use to spot potential straw purchases," including[52]:

> - One person coming in with another and telling them what gun to buy and then handing them the money for the transaction. Or simply telling them what gun to buy. As cliché as it is, this is often a man using an intimate partner to purchase a gun for his own use.
> - Multiple purchases of the same or similar gun. It's not terribly unusual to buy several guns at once, especially for collectors, or if there are good sales, or somebody has received a windfall of cash. We all have the fantasy of walking into a gun shop and buying everything we've always wanted all at once, and that does happen. It is pretty unusual to buy multiples of the same or nearly same gun though. Treat such transactions with great care, especially if you are near an area of high crime activity or the southern border.
> - Multiple individual purchases over a few short days. This is where it pays to know your customers. Shops that deal in used or unusual guns and have well known customers who may collect certain types of guns might see multiple sales to the same person in a short time if their inventory has enough turnaround. Again, this might be common with collectors. But it should raise an alarm with people who aren't regulars, or who again, buy multiples of similar guns. Odds are a gang isn't arming up with .22's, but three or four pump action shotguns to the same person in a short time is suspicious.

- "A straw purchase can occur through oral statements as well as written statements," and "a classic example of a straw purchase that must be denied" occurs when "a customer receive[d] a delayed response and three days later someone from the same address different name inquire[s] about purchasing the same firearm."[53]

---

[51] FF_0000922

[52] FF_0000936

[53] FF_0000955

29

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- "It is not feasible to lay out the universe of possible scenarios in which a straw purchase may take place. Each case depends upon its own facts, and the analysis may shift depending upon any number of circumstances present."[54]

As I explain on pages 31 through 33 below, Fleet Farm's quarterly trainings and Tuesday Tidbits are part of what render its straw purchase awareness policies the industry best practice approach, and the guidance they provide regarding indicators of a possible straw purchase are consistent with, and often exceed, the industry standard for how employees should go about monitoring for potential straw purchases.

3.     *Straw Purchase Alerts*

As described above, Fleet Farm provides various pathways for its employees to monitor for and turn down suspicious sales. Specifically, through the Lotus Notes application, Fleet Farm's Loss Prevention and Management were able to send "Straw Purchase Alert" emails across its stores whenever a store suspected that an individual had attempted a straw purchase.[55] And for more than a decade, Fleet Farm has maintained an "Alert Database" of prior suspected straw purchasers, which is searchable by numerous criteria, including last name, "to see if there were any prior alerts sent out for" a prospective customer.[56] Stores would also send "Be on the Lookout" alerts if an employee observed suspicious activity, but "didn't have customer information to put into the Straw Purchase Alert."[57] More recently, Fleet Farm updated this system and switched over to the "Orion" platform, through which an automatic alert will issue if a prospective customer's name "matches the name of a Firearm Sales Alert that was issued within the past 1 year."[58]

---

[54] FF_0000955

[55] FF_0001507; FF_0040837; Michelle Granato Deposition Transcript at 19, 23–24; Kevin McKown Deposition Transcript at 42-45; Michael Radl Deposition Transcript at 33–34

[56] FF_0001507; FF_0000019; Michelle Granato Deposition Transcript at 44–45; Kevin McKown Deposition Transcripts at 45–49, 56–57, 75–76; Michael Radl Deposition Transcript at 36

[57] Michelle Granato Deposition Transcript at 87

[58] FF_0040836; Michelle Granato Deposition Transcript at 21–23; Kevin McKown Deposition Transcript at 56; Michael Radl Deposition Transcript at 37

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

      C.      <u>Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases meet, and in many instances exceed, the industry standard.</u>

In reviewing Fleet Farm's policies and procedures, it is important to bear in mind that retail leadership, in all industries, must balance multiple responsibilities throughout the day, including but not limited to: opening the store; determining staffing; dealing with employee call off from work, turnover, and new hire orientation; dealing with employee and customer issues; and adhering to multiple regulations and government agencies such as local zoning, Department of Weights and Measures, Department of Labor, OSHA, and ATF. One method I have observed successfully utilized in the FFL industry is a standardized and systematic approach to monitoring for and preventing straw purchases that is supported by company leadership. Fleet Farm exemplifies this standardized and systematic approach in its actions.

In this case, Fleet Farm has a highly engaged compliance staff that oversees and directs firearms policy and procedures across the enterprise. In addition, as detailed below, Fleet Farm FFL's have robust internal auditing programs relating to firearm paperwork and inventory. This is an industry best practice approach based on my observations over time at multiple other FFLs.

Fleet Farm has a robust and comprehensive written training that is updated as laws change and/or implementation is needed. The training covers manual and electronic sales. This is an industry best practice approach.

Fleet Farm requires successful training completion and passing a certification test as proof of knowledge for gun counter staff. This is an industry best practice approach.

Fleet Farm trains its employees on all of the industry recognized indicia of a possible straw purchase, by utilizing ATF and NSSF's Don't Lie For the Other Guy[59] Program and signage at

---

[59] FF_0000207

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

their gun counter, ATF newsletters,[60] ATF Webinars, and ATF in-person training. Fleet Farm's trainings also incorporate NSSF's guidance on potential indicia of a possible straw purchase. And several of the indicia identified by Fleet Farm are not required by the industry standard, and are examples of Fleet Farm training on straw purchase awareness in a way that exceeds the industry standard. Specifically, training to monitor for 3310.4 forms, monitoring for people "standing around buyer," paying in cash for more than one firearm, purchasing multiple "low dollar pistols," and paying with debit or gift cards is not included in the ATF or NSSF materials establishing the industry standard for how to monitor for and prevent straw purchasing. Further, Fleet Farm shares this information across multiple media options[61] in order to capture and further educate as many staff members as possible. This is above and beyond what I see as standard industry practice as this method of further education for staff is neither required by regulations or present in ATF or NSSF materials.

Fleet Farm provides quarterly webinars on firearms related subjects, including straw purchase avoidance. This is an industry best practice approach, and is an example of Fleet Farm going well above and beyond the industry standard.

Fleet Farm further provides email updates via Tuesday Tidbits from the compliance leadership team describing emerging trends, issues, and compliance; this email is printed out and placed into a binder for gun counter staff to refer to as well. This is an industry best practice approach, and is an example of Fleet Farm going well above and beyond the industry standard.

Fleet Farm maintains an internal acquisition and disposition system known as SOM. Gun counter staff use this system to record and dispose of firearm transfers. Gun counter staff can use

---

[60] ATF0000344
[61] FF_0032623; FF_0000922

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

this system to look up transactions by name of customer at the request of law enforcement as part of a trace request investigation or the original customer who made the purchase and had a loss and needs the serial number for reporting to law enforcement. Using electronic record keeping and gun sale management in a high volume retail environment is an industry best practice approach. And, in my opinion, the volume of instances where a Fleet Farm store has denied a sale for being a possible straw purchase or otherwise suspicious is another demonstration of how Fleet Farm's policies and procedures have been effective in preventing possible straw purchases.[62]

Fleet Farm has a straw purchase alert system into which gun counter staff can immediately enter information about straw purchase attempts and report the same to company loss prevention staff. This is an industry best practice approach.

Fleet Farm also uses training resources, such as ATF seminars and NSSF guidance described in this report, that are not required by regulation. The use of these resources to supplement Fleet Farm's internal training and policies is an industry best practice approach.

*    *    *

In summary, Fleet Farm meets and exceeds the industry standard for transferring firearms, as well as monitoring for and preventing possible straw purchases. Furthermore, Fleet Farm provides best in industry training, tools, and support for gun counter employees to be successful in their role.

---

[62] FF_0042289

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opinion #2: Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.**

> A.    <u>The industry standard for auditing firearm sales and ensuring employee compliance with firearm policies and procedures</u>.

On the topic of auditing, it is standard practice for FFLs to require a second set of eyes for reviewing firearm-related paperwork, including the ATF Forms 4473 and 3310.4 and A&D book entries, to ensure compliance with internal policies as well as federal recordkeeping and reporting requirements. It is also standard industry practice for FFLs to implement certain additional auditing programs, including monthly reviews of firearm-related paperwork and firearm inventory counts with varying frequencies.

On the topic of employee discipline, disciplinary practices vary significantly amongst FFLs, but as a general matter, small, independent FFLs tend to have less formal disciplinary procedures, while larger FFLs and chain stores tend to have progressive discipline policies, whereby an employee may be subject to a series of escalating disciplinary activities for violating firearm policies, up to and including possible termination.

During my hundreds of visits to FFLs and discussions with them regarding how to audit and ensure compliance with ATF regulations, I, consistent with these standard practices, often recommend that FFLs implement certain industry standard steps, including:

- Auditing paperwork and processes related to firearm transfers, such as reviews of the Firearm Acquisition and Disposition (A&D) record, government forms, filing procedures, inventory audits, counting of firearms on hand, and matching ATF forms to the A&D record to ensure proper documentation.

- Establishing a consistently applied disciplinary process for advising employees of errors committed and the consequences. Each FFL has different needs based on the size of its business. For example, a small one-person FFL typically does not have a written process; however, larger FFLs will have a written process and partner with their Human Resources department to write, train, and execute applicable gun counter process policies.

34

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

In summary, an FFL that implements a second set of eyes on firearm-related paperwork, conducts regular auditing programs relating to that paperwork and its firearm inventory, and enforces a progressive disciplinary policy is operating in accordance with the industry standard for auditing firearm sales and ensuring employee compliance with firearm transaction policies.

      B.      <u>Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures.</u>

Fleet Farm deploys extensive internal measures to audit firearm sales and safety, and to ensure that its employees operate in compliance with its firearm policies and procedures, which in my view are best in class.

Beginning with auditing, Fleet Farm requires its stores and employees to perform daily, weekly, quarterly, and annual firearm audits, as described in Fleet Farm's "Policies and Guidelines" for "Sales and Handling of Firearms"[63]:

> 4. <u>Auditing</u>. All Team Members in firearm sales will conduct a visual audit of all publically displayed firearms on a daily basis. All stores will conduct weekly and quarterly firearm inventory audits. A Corporate Firearms Compliance Audit will be done annually at each location. Store compliance with all required audits will be monitored monthly with reporting to the Regional Director and the Safety and Firearms Compliance Manager.

This is also reflected in Fleet Farm's quarterly trainings:

---

[63] FF_0005605

35

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Specifically, Fleet Farm's daily audits entail an inspection of stores' "openly-displayed firearms," an inspection of disposal records and ATF 4473 forms "to ensure no forms are misplaced and the firearm and customer's information . . . in SOM matches any manual corrections made on the 4473," revising any SOM entries "that don't reflect manual corrections made to [the] 4473 form," and a review of employee "Error Tracking Sheets" for potential disciplinary action.[64]

Fleet Farm's weekly audits include a "physical firearm inventory audit," whereby "[e]very firearm's serial number barcode [is] scanned" to confirm that "[e]very firearm display [has] a matching serial number barcode label applied to the back of the pricing tag," with any discrepancies required to be "addressed the same day as the audit."[65]

---

[64] FF_0000102-FF_0000103; FF_0000108-FF_0000117; FF_0024411; Michelle Granato Deposition Transcript at 70-71; Kevin McKown Deposition Transcript at 114-15, 119
[65] FF_0000104; FF_0000118-FF_0000125; Michelle Granato Deposition Transcript at 63, 71-72; Kevin McKown Deposition Transcript at 119

Fleet Farm's quarterly "Box-to-Steel" audit entails opening "[e]very firearm box" and verifying that "the serial number on the box . . . matches the serial number on the firearm," with "[d]isplay firearm tags" also inspected "to ensure the serial number label matches the serial number on the display firearm."[66]

Fleet Farm also conducts annual store audits, which, among other things, examine and enforce "ATF regulations and policies and procedures" and train on straw purchasing.[67]

Turning to employee discipline, in relation to firearm sales, Fleet Farm has developed a set of "guidelines" that identify "Critical and Non-Critical" errors relating to ATF Form 4473s and/or firearm audits.[68] Fleet Farm has an extensive list of critical errors, including: (i) "[t]ransferring a firearm to a customer without an ATF 4473"; (ii) "[t]ransferring a firearm to a customer without a background check being contemplated where required"; (iii) "[t]ransferring a firearm to a customer on a 'Denied' or 'Delayed' transaction without a 'Proceed' response"; (iv) "[t]ransferring a firearm to a customer with an answer to questions [on the ATF Form 4473] that indicate the customer was a prohibited person"; (v) "[t]ransferring a firearm to a customer willfully knowing that the transaction is a 'Straw Purchase'"; (vi) "[c]ompleting any portion of Section A [of the ATF Form 4473] for a customer"; and (vii) "[f]ailing to have form double-checked prior to transfer."[69] Fleet Farm provides that "[a]ccountability for a Critical error is generally progressive in nature unless the error was deemed intentional and/or the error was intentionally covered up, then the error is subject to discipline up to and including termination based on the offense."[70] Fleet Farm stores

---

[66] FF_0000105; FF_0000126; Michelle Granato Deposition Transcript at 72; Kevin McKown Deposition Transcript at 119-20

[67] Kevin McKown Deposition Transcript at 120-21

[68] FF_0002871

[69] FF_0002871

[70] FF_0002872; *see also* Kevin McKown Deposition Transcripts at 135-37, 142-43

utilize an "ATF 4473 and Firearm Auditing Error Tracking Sheet" to log instances of employees committing critical or non-critical errors.[71] And records in this case illustrate that Fleet Farm disciplines its employees for violating its firearm policies.[72]

      C.      Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures meet, and in many instances exceed, the industry standard.

Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its policies and procedures meet, and in many instances exceed, the industry standard. Specifically, for auditing, Fleet Farm uses electronic record keeping processes and has a robust written audit program to identify and correct errors and educate staff on key findings. And it utilizes a series of auditing processes to ensure that firearm-related paperwork is properly completed and maintained, and that firearm inventories remain secure and accurate. These auditing processes are wholly consistent with industry standard, and are more robust than those implemented by many FFLs. In my expert opinion, Fleet Farm appears to never stop reviewing their processes and firearms transactions, learning about industry regulations, sharing the learning with gun counter staff, upgrading or updating their approach, and embracing technology to assist with execution of processes. In this regard, Fleet Farm stands out in my opinion as responsive and always striving to have its FFLs operating as "best in class" in the firearms industry.

As for employee discipline, Fleet Farm has a robust disciplinary program to identify and address gun counter staff errors. Fleet Farm's progressive discipline policy establishes levels of errors and the expected action to be taken, and in cases of staff members who are not able to correct behavior, the process can end in termination of employment for the staff member. In fact, records in this case reflect that Fleet Farm employees were notified of errors that were identified, those

---

[71] FF_0002315
[72] FF_0041016; FF_0041024 FF_0041030; FF_0041058

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

employees were required to discuss the standards for acceptable performance, and, depending on the frequency and severity of the offense, employee discipline ranged from managers meeting, to verbal or written warnings, to termination of employment.[73] These records demonstrate a robust diligence and discipline practice at Fleet Farm.[74] To put it simply, Fleet Farm's approach to employee discipline is an industry best practice approach on how an FFL should handle performance at the gun counter by employees.

**Opinion #3: Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms**

I have reviewed all of the ATF Form 4473s and, where applicable, ATF Form 3310.4s for Fleet Farm's sales to Sarah Elwood and Jerome Horton.[75] In my expert opinion, each of these forms was completed properly, and it appears that NICS instructed Fleet Farm to "Proceed" with each of the sales to Horton and Elwood.

I have also reviewed other records surrounding these transactions. Specifically, I reviewed all of the available video footage of sales to Jerome Horton.[76] This video footage does not show any conduct by Horton that should have resulted in the Fleet Farm employee refusing to complete

---

[73] 0041016; FF_0041024 FF_0041030; FF_0041058

[74] FF_0041016; FF_0041024 FF_0041030; FF_0041058

[75] FF_0000008; FF_0000034; FF_0000049; FF_0000056; FF_0000127; FF_0000201; FF_0000208; FF_0000234; FF_0000238; FF_0000246; FF_0000254; FF_0000259; FF_0000307; FF_0000311; FF_0000331; FF_0000363; FF_0000438; FF_0000467; FF_0000471; FF_0000479; FF_0000570; FF_0000574; FF_0000581; FF_0000588; FF_0000607; FF_0000614; FF_0000713; FF_0014673

[76] FF_0037709; FF_0037710; FF_0037711; FF_0037712; FF_0037713; FF_0037714; FF_0037715; FF_0037716; FF_0037717; FF_0037718; FF_0037719; FF_0037720; FF_0037721; FF_0037722; FF_0037723; FF_0037724; FF_0037725; FF_0037726; FF_0037727; FF_0037728; FF_0037729; FF_0037730; FF_0037731; FF_0037732; FF_0037733; FF_0037734; FF_0037735; FF_0037736; FF_0037737; FF_0037738; FF_0037739; FF_0037740; FF_0037741; FF_0037742; FF_0037743; FF_0037744; FF_0037745; FF_0037746; FF_0037747; FF_0037748; FF_0037749; FF_0037750; FF_0037751; FF_0037752; FF_0037753; FF_0037754; FF_0037755; FF_0037756; FF_0037757; FF_0037758; FF_0037759; FF_0037760; FF_0037761; FF_0037762; FF_0037763; FF_0037764; FF_0037765

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the sale. Throughout these videos, Horton appears poised and not anxious while waiting for the transactions to be completed. There were no indications of delays or denials from NICS (as confirmed by the ATF Form 4473s themselves, which indicate that Fleet Farm received a "Proceed" message before completing each transaction). As for the presence of individuals alongside Horton in certain videos, quite often customers are excited about buying a new firearm and will bring a friend or relative along. Without hearing Horton's conversations or seeing more video footage (which I understand does not exist, due to Fleet Farm's standard retention policies), it is impossible to deduce why Horton was accompanied by others during certain transfers of firearms. And again, the mere fact that Horton was accompanied by others during certain transfers is not, by itself, an indicator of a possible straw purchase. Lastly, Horton purchased accessories from Fleet Farm during several transactions.[77] In my experience, straw purchasers and/or firearm traffickers are often solely interested in purchasing the firearm(s) and getting out of the store as quickly as possible.

I also reviewed the incident report that Fleet Farm employee Cory Klebs prepared roughly half a year after the July 31, 2021 sale of three firearms to Horton, which recounts his recollection of that sale.[78] In Mr. Klebs' notes from this incident report,[79] Klebs detailed looking at Horton's required completed government documents not once but twice, rechecking company policy with another member of management, asking the gun counter staff member if there were any concerns, and authorizing the transaction to proceed after being satisfied that there were no concerns with

---

[77] FF_0001781; FF_0001821

[78] FF_0075711

[79] It is not standard practice for FFLs to maintain records similar to Fleet Farm's "incident reports." I am impressed with Fleet Farm maintaining a repository of "incident reports," as this provides the company with a central point to keep notes and update documentation on specific incidents that occur in a large retail store. From a recordkeeping standpoint, this is another example of Fleet Farm operating above the industry standard.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the transaction, and then afterwards – although there was no basis to prevent this transfer from taking place – sending a recap to Fleet Farm's corporate office for additional scrutiny.[80] The steps that Klebs describes in this incident report are above and beyond what I see at other FFLs, both in terms of the act of documenting and updating notes on incidents, as well as in terms of the lengths of steps detailed in the report that Klebs undertook to ensure a firearm transfer is lawful and to assess the circumstances for indicators of a possible straw purchase attempt.

Additionally, Klebs testified that during this sale, he "was involved in the double-check" and "went through and . . . ask[ed] him if he was the actual purchaser of the firearm and why he was purchasing so many .9 millimeters at the same time."[81] Horton told Klebs that he was the actual buyer, and that "he was trying to start up a collection."[82] Klebs was "satisfied with his answers," and at the time of the sale, neither Klebs nor Fleet Farm gun counter employee Bret Nordquist believed Horton's transaction to be a potential straw purchase.[83] This is a best in class approach for how an employee should go about examining a transaction for indicators of a possible straw purchase, and goes beyond what ATF and NSSF recommends.

In addition to these records, my conclusion that Fleet Farm's sales to Horton and Elwood did not violate industry standard or Fleet Farm's own policies is supported by ATF communications to Fleet Farm and Horton and Elwood's plea agreements.

On October 14, 2021, ATF Special Agent Kylie Williamson contacted Fleet Farm to request records for Horton's firearm purchases from Fleet Farm stores, including "any available records regarding the method of payment and any available surveillance video associated with any

---

[80] FF_0075711
[81] Cory Klebs Deposition Transcript at 40
[82] Cory Klebs Deposition Transcript at 41
[83] Cory Klebs Deposition Transcript at 41-42, 167, 177, 215

firearms related purchases."[84] Fleet Farm provided Agent Williamson with "all of the paperwork we have" one day later,[85] and also provided all available videos of the transactions.[86] And on October 20, 2021, Agent Williamson told Fleet Farm "that the cooperation she received was fantastic and everything she requested was provided very quickly," "[s]he was impressed by our organization in gathering the items not just at one store but every store involved," and "[s]he expressed that in no way did [Fleet Farm] do anything wrong by selling this individual the firearms" because "[t]here was nothing in his background that would have rendered a denied response."[87] The written response from the ATF agent is above and beyond what I have typically seen. In my experience FFLs generally experience anxiety when interacting with a federal agency such as the ATF and in a lot of cases the ATF will not provide feedback on ongoing cases, give advice such as whether to proceed with a firearm transfer, or comment on the FFL's operations. Here, in contrast, it is notable that the ATF agent praised Fleet Farm for its cooperation in the investigation. And in my experience, a statement from ATF to Fleet Farm that "in no way did [Fleet Farm] do anything wrong by selling this individual the firearms" confirms my own analysis of Fleet Farm's sales to Horton: there is nothing in Horton's written records or the video recordings of Horton's transactions that should have alerted Fleet Farm to the possibility that Horton was engaging in straw purchasing.

Horton and Elwood were charged with straw purchasing in federal court, and both pleaded guilty. In Horton's Plea Agreement, he "stipulate[d] and agree[d] that on July 31, 2021, he knowingly and voluntarily made a false written statement to Fleet Farm . . . . This false statement

---

[84] FF_0001485
[85] FF_0002644
[86] FF_0075713; FF_0076414
[87] FF_0001484

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

was made in connection with the acquisition of a firearm, and *was intended and likely to deceive Fleet Farm* about a fact material to the lawfulness of the sale of the firearm."[88] He "further stipulate[d] that he purchased 32 additional firearms from [FFLs] . . . and made similar false statements in connection with the purchase of all of them."[89] And in Elwood's Plea Agreement, she agreed that she "conspired . . . to buy dozens of firearms from [FFLs], while knowingly making false and fictitious oral and written statements that *were intended or likely to deceive those dealers* regarding a fact material to the lawfulness of the sale," particularly by "knowingly misrepresent[ing] to the dealer both orally and in writing that she was the actual purchaser" of the firearms.[90]

In reviewing Horton and Elwood's federal plea agreements, there is no indication that Fleet Farm was aware of, participated in, had knowledge of the straw purchases being perpetrated. On the contrary, Horton and Elwood accepted responsibility for their actions, and acknowledged that they were successful in perpetrating their straw purchasing crime by making false statements at several different FFLs. That both Horton and Elwood were able to deceive this many different FFLs indicates to me that they were very adept at deception, and further supports the conclusion that Fleet Farm did not know or have reason to know Horton or Elwood were engaging in straw purchasing when they visited Fleet Farm's stores. Again, the industry standard does not expect an FFL to be 100% successful in preventing all straw purchases. This is certainly the case where, as here, straw purchases have occurred, but the circumstances surrounding those purchases show that (i) the FFL had robust policies in place for monitoring for and preventing straw purchases, (ii)

---

[88] AGO0000262
[89] AGO0000262 – AGO0000263
[90] AGO0000207 – AGO0000208

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

those policies were followed as to those purchases, and (iii) the straw purchasers did not exhibit indicia of straw purchasing during the transaction that should have resulted in a refused sale.

In fact, the conduct of the other FFLs that sold firearms to Horton stand in stark contrast to Fleet Farm, and confirm that Fleet Farm did not have reason to suspect Horton of straw purchasing at the time of his transactions at their stores. In ATF Special Agent Kylie Williamson's affidavit in support of the criminal complaint against Horton,[91] Agent Williamson described two transactions that Horton made at the Frontiersman Sports in St. Louis Park:

**Transaction #1[92]**

> 11.   On October 14, 2021, I spoke to an employee of Frontiersman Sports in St. Louis Park. The employee confirmed that HORTON had purchased firearms on more than one occasion, including the Taurus model G2C HORTON purchased earlier that day. The employee informed me that one of his co-workers had recorded the license plate of the vehicle in which HORTON had arrived due to suspicions regarding straw purchasing.

Under Fleet Farm's straw purchase policies, described above, this transaction would not have been allowed because the Frontiersman Sports employee reported having "suspicions regarding straw purchasing" at the time of the transaction, and the indicia of a straw purchase described here do not appear anywhere in the record for Fleet Farm's sales to Horton or Elwood.

---

[91] ATF0001903
[92] AGO0001909

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Transaction #2[93]**

12. On October 15, 2021, I went to Frontiersman Sports in St. Louis Park. Employees provided me with ATF Forms 4473 for firearms HORTON had purchased on four different occasions. An employee also provided still photographs captured during each purchase, as well hand-written notes the employee had made related to HORTON's

purchase of two pistols on September 29, 2021. The notes indicated the following:

    a. HORTON's purchase was a suspected straw purchase.

    b. HORTON's vehicle parked in a nearby Jacuzzi business parking lot to avoid Frontiersman's surveillance cameras.

    c. HORTON presented a learner's permit as opposed to a driver's license.

    d. HORTON had made multiple purchase of firearms over two days.

    e. While HORTON was inside the store, he received a phone call and stated "I'm still in the store."

    f. HORTON paid cash and used small denominations for a total of $1,160.

    g. As HORTON walked toward the Jacuzzi business parking lot, HORTON waived the gun boxes in the air to people waiting outside.



Fig. 1: a screen shot from surveillance video by the Frontiersman Sports employee surveillance, showing HORTON waiving the gun boxes to people waiting outside.

---

[93] AGO0001909-AGO0001910

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Here again, based on all the observations described in Frontiersman Sports' note, this transaction would not have been allowed under Fleet Farm's policies, and the indicia of a straw purchase described here do not appear anywhere in the record for Fleet Farm's sales to Horton or Elwood.

\*        \*        \*

Based on my professional experience, including decades in the firearms business and my observations of hundreds of other FFLs, my expert opinion is that Fleet Farm operates a "best in class" approach and execution of processes relating to firearm sales, including its adherence to government regulations, holistic training on how to examine firearm transactions for indicia of a possible straw purchase attempt, and its extensive onboarding training and ongoing training for gun counter staff regarding the sale of firearms. Fleet Farm's programs result in their FFLs operating in a manner that exceeds the industry standard for monitoring for and preventing straw purchases, as well as the programs that have been implemented by many of the other large retail FFL chains. So, I will end where I began this opinion with the following, summary observations:

1. Fleet Farm's policies and procedures relating to monitoring for and preventing straw purchases are consistent with, and in many instances exceed, the FFL industry standard.

2. Fleet Farm's policies and procedures for auditing firearm sales and ensuring employee compliance with its firearm policies and procedures are consistent with, and in many instances exceed, the FFL industry standard.

3. Fleet Farm's sales of firearms to Jerome Horton and Sarah Elwood did not violate industry standards or its own policies and procedures for selling firearms.

46

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In the event that additional information is made available to me, I reserve the right to supplement or amend my opinions.

Dated: OCTOBER 3, 2024

William B. Napier

**Appendix A**

# William B. Napier, LPC

lpcbill@gmail.com
308-249-0131

*Napier Consulting, LLC*                                        *2014 - Present*
*President*

Provide world class professional and "C" suite executive consulting services to the retail industry. Share post visit executive summary with suggested action items on ATF compliance, operations and security practices for retail, distributors, and manufactures. Educate industry leadership on cost effective retail operations solutions, loss prevention and security best practices from start up through mature programs.

Lead training and conduct public speaking engagements for major industry trade group, National Shooting Sports Foundation (NSSF). Liaison with Alcohol Tobacco and Firearms (ATF) on behalf of industry trade group and Federal Firearms Licensees. Develop, distribute, then educate industry on relevant programs. Conduct analysis of emerging trends with industry-wide reporting.

Testified before the United States House of Representatives' Rules Subcommittee on the Legislative and Budget Process regarding "Tools to Combat Gun Trafficking and Reduce Gun Violence in Our Communities." Opined as an expert witness regarding straw purchase activity, customer firearms purchase habits, duty to report firearm transactions, video usage by retailers, and ATF trace requests.

*Cabela's, Sidney, Nebraska*                                        *2005 – 2013*
*Operations Senior Manager Corporate Asset Protection*

Built and led the decentralized asset protection team for this Omni-channel, multi-national specialty retailer with sales of more than 3 billion dollars and over 12,000 team members. Planned and managed "enterprise-wide" investigations, loss reduction culture using exception-based reporting, analytical and problem solving as well as root cause analysis. Established best practice review, and ROI modeling.

- Collaborated to develop effective audit program at all levels of the company.
- Developed a successful crisis management plan through companywide partnerships to mitigate risk and loss to the company during critical incidents and emergency response, with annual program testing.
- Established and maintained liaisons with law enforcement.
- Built and implemented aviation department security plan.
- Initiated, conducted, and managed numerous in-depth investigations at all levels of the organization.
- Developed and managed comprehensive executive protection program.
- Built a team that analyzed statistical data to determine risk.

- Approved and managed third party vendors for installation of innovative technology physical security systems such as burglar alarm, CCTV, and card access.
- Collaborated with IT development and implementation teams to integrate security systems into enterprise IT plan.
- Built and operated enterprise-wide regulatory initiatives program.
- Provided executive leadership to developed talent and highly engaged decentralized team.
- Effectively communicated recommendations and findings at all levels of the organization.
- Planned, developed, and managed expense and capital budgets above $10 million with proven ROI.

1

*Reserve Police Sergeant*
*Lawrence Indiana Police Department*
*Muncie Indiana Police Department*

Provided law enforcement service to citizens of community, led teams of officers.

- Uniform patrol duties enforcing local and state laws.
- Plain clothes, executive and witness protection, juvenile and adult criminal investigations.
- Specialized training on impaired driving enforcement, recognized by MADD for results.

- Supervised team of officers.
- Provided certified law enforcement training to officers.
- Engaged in off duty security at major concert venues and professional sporting events.

## *Continuing Education*
- Maintain business relevance at related seminars, conferences, workshops.

- Law enforcement classes, seminars, workshops, certifications, more than 600 training hours.

## *Professional Certifications*
- Loss Prevention Certified (LPC), The Loss Prevention Foundation
- Wicklander-Zulawski and Associates interviewing and interrogation.

- Lean Six Sigma Yellow Belt
- LEOSA Firearms Qualification

## *Relevant Affiliations that Maintain Cutting Edge and Give Back to Industry*
- The Loss Prevention Foundation – Emeritus - Board of Directors
- Former member - ASIS International Retail Asset Protection Council, Learning and Strategy Committee

- LPRC (Loss Prevention Research Council) - University of Florida

## *Global Impact to Industry*
- Published in business magazines NRF Stores, Loss Prevention Magazine, Apparel Magazine, Security Director News, SHOT Business, SHOT Show Television and Security Magazine.
- Guest speaker for The Loss Prevention Foundation, National Retail Federation, ASIS, and National Shooting Sports Foundation.
- Presentations at ATF, FBI Seminars across the country.
- Former Hunter Education Instructor – Nebraska.

www.linkedin.com/in/bill-napier-lpc-8505508

2

**Appendix B**

| | |
|---|---|
| AGO0000207 | FF_0000259 |
| AGO0000261 | FF_0000307 |
| AGO0001903 | FF_0000311 |
| ATF0000001 | FF_0000331 |
| ATF0000004 | FF_0000363 |
| ATF0000076 | FF_0000438 |
| ATF0000130 | FF_0000467 |
| ATF0000172 | FF_0000471 |
| ATF0000344 | FF_0000479 |
| ATF0000384 | FF_0000570 |
| ATF0000458 | FF_0000574 |
| ATF0000544 | FF_0000581 |
| ATF0000691 | FF_0000588 |
| ATF0000800 | FF_0000607 |
| BGS0000005 | FF_0000614 |
| DKM0000012 | FF_0000713 |
| FF_0000008 | FF_0000860 |
| FF_0000012 | FF_0000898 |
| FF_0000034 | FF_0000906 |
| FF_0000049 | FF_0000910 |
| FF_0000056 | FF_0000922 |
| FF_0000101 | FF_0000936 |
| FF_0000127 | FF_0000955 |
| FF_0000201 | FF_0001484 |
| FF_0000207 | FF_0001485 |
| FF_0000208 | FF_0001497 |
| FF_0000234 | FF_0001499 |
| FF_0000238 | FF_0001507 |
| FF_0000246 | FF_0001514 |
| FF_0000254 | FF_0001520 |

| | |
|---|---|
| FF_0001531 | FF_0032623 |
| FF_0001542 | FF_0035424 |
| FF_0001547 | FF_0035701 |
| FF_0001554 | FF_0035710 |
| FF_0001781 | FF_0036479 |
| FF_0001882 | FF_0036513 |
| FF_0002315 | FF_0037709 |
| FF_0002730 | FF_0037710 |
| FF_0002871 | FF_0037711 |
| FF_0003424 | FF_0037712 |
| FF_0003449 | FF_0037713 |
| FF_0003450 | FF_0037714 |
| FF_0005654 | FF_0037715 |
| FF_0005711 | FF_0037716 |
| FF_0005715 | FF_0037717 |
| FF_0005730 | FF_0037718 |
| FF_0005734 | FF_0037719 |
| FF_0005745 | FF_0037720 |
| FF_0005748 | FF_0037721 |
| FF_0005754 | FF_0037722 |
| FF_0005760 | FF_0037723 |
| FF_0005769 | FF_0037724 |
| FF_0005775 | FF_0037725 |
| FF_0005790 | FF_0037726 |
| FF_0005798 | FF_0037727 |
| FF_0005802 | FF_0037728 |
| FF_0005816 | FF_0037729 |
| FF_0005820 | FF_0037730 |
| FF_0005831 | FF_0037731 |
| FF_0014673 | FF_0037732 |
| FF_0024411 | FF_0037733 |

| | |
|---|---|
| FF_0037734 | FF_0037761 |
| FF_0037735 | FF_0037762 |
| FF_0037736 | FF_0037763 |
| FF_0037737 | FF_0037764 |
| FF_0037738 | FF_0037765 |
| FF_0037739 | FF_0040770 |
| FF_0037740 | FF_0040797 |
| FF_0037741 | FF_0040813 |
| FF_0037742 | FF_0040832 |
| FF_0037743 | FF_0040898 |
| FF_0037744 | FF_0041016 |
| FF_0037745 | FF_0041024 |
| FF_0037746 | FF_0041030 |
| FF_0037747 | FF_0041058 |
| FF_0037748 | FF_0042289 |
| FF_0037749 | FF_0075711 |
| FF_0037750 | FF_0075713 |
| FF_0037751 | FF_0076414 |
| FF_0037752 | FS0000001 |
| FF_0037753 | RF0000001 |
| FF_0037754 | SG0000004 |
| FF_0037755 | TMS0000089 |
| FF_0037756 | 2024/06/13 Deposition Transcript of Kevin McKown pps. 1 - 8, 17 - 20, 29 - 80, 89 - 152, 169 - 172, 185 - 202, 225 - 228. |
| FF_0037757 | 2024/06/19 Deposition Transcript of Michelle Granato pps. 1 - 8, 17 - 136, 145 - 148, 169 - 188, 201 - 224, 233 - 244. |
| FF_0037758 | 2024/06/20 Deposition Transcript of Mike Radl pps. 1 - 4, 13 - 68, 77 - 92, 125 - 128, 233 - 136. |
| FF_0037759 | 2024/06/29 Deposition Transcript of Derrick Hoernke pps. 1 - 4, 25 - 68, 77 - 92, 113 - 120, 161 - 176. |
| FF_0037760 | 2024/07/17 Deposition Transcript of Brad Hansen pps. 1 - 8, 25 - 56, 89 - 92, 101 - 104. |

3

| |
|---|
| 2024/07/24 Deposition Transcript of Branden Sierakowski pps. 1 - 12, 17 - 64, 81 - 104, 141 - 144, 161 - 164. |
| 2024/07/30 Deposition Transcript of Bret Nordquist pps. 5 - 8, 157 - 160. |
| 2024/09/05 Deposition Transcript of Cory Klebs pps. 1 - 8, 29 - 32, 37 - 48, 53 - 60, 181 - 212. |
| 2023/06/27 Fleet Farm_MN AG 2023.06.27 [ECF 36]  Memorandum Opinion and Order Denying Plaintiff's Motion to Remand and Denying Defendant's Motion to Dismiss |
| 2023/08/10 State of Minnesota v. Fleet Farm LLC, et al. - State's Initial Disclosures |
| 2023/08/10 State of Minnesota v. Fleet Farm LLC, et al. - Fleet Farm's Initial Disclosures |
| 2023/08/21 Fleet Farm's Responses and Objections to Plaintiff's First Set of Interrogatories |
| 2023/12/04 Minnesota Response to Fleet Farm's First Set of Interrogatories |
| 2024/02/17 State v. Fleet Farm LLC, et al. - Defs.' Amended Responses and Objections to Plaintiff's Interrogatory Nos. 2, 6, and 13 |
| 2024/03/05 Fleet Farm_MN AG 2024.03.05 [ECF 79] First Amended Complaint |
| 2024/07/12 Fleet Farm_MN AG [ECF 117] Fleet Farm Mem. ISO Motion to Compel |
| 2024/07/12 Fleet Farm_MN AG [ECF 118] Wright Declaration in Support of Motion to Compel and Exhibits |
| 2024/07/29 Fleet Farm_MN AG [ECF 130] Order on Motion to Compel |
| https://www.nssf.org/articles/beware-the-straw-purchase/ |
| Straw Purchases – Tactics to Help Avoid Them and What to Do If You Think You Made One, NSSF – The Firearm Industry Trade Association |
| https://www.nssf.org/articles/tag/dont-lie-for-the-other-guy/ |
| The Evolution of Camera Phones, Association for Advancing Automation (February 2, 2016) |
| https://www.nssf.org/articles/giving-a-firearm-as-a-gift-some-reminders-from-nssf/ |

4