Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

State of Minnesota by its        )
Attorney General, Keith          )
Ellison,                         )
                                 )
            Plaintiff,           )
                                 )
vs.                              )No. 0:22-cv-02694-JRT-JFD
                                 )
Fleet Farm LLC, Fleet Farm       )
Group LLC, and Fleet Farm        )
Wholesale Supply Co. LLC,        )
                                 )
            Defendants.          )
_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

JOSEPH BISBEE

_____

8:53 A.M.
THURSDAY, FEBRUARY 6, 2025
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON

Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR
WA CCR #2157; OR CSR #20-0477; CA CSR #14435
Job Number 7109667

Page 6

WITNESS LOCATION:  SEATTLE, WASHINGTON; THURSDAY,

FEBRUARY 6, 2025

8:53 A.M.

--oOo--


THE VIDEOGRAPHER:  We are now on the record. Good morning.  It is currently 8:53 a.m. on February 6th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Joseph Bisbee taken by counsel for Defendant in the matter of State of Minnesota versus Fleet Farm LLC, et al., filed in the United States District Court, District of Minnesota.  Case Number 0:22-cv-02694-JRT-JFD.

The location of the deposition is 1111 Third Avenue, Suite 3000 in Seattle, Washington 98101.

My name is Sarah Kleinschmidt, representing Veritext, and I am the videographer.  I am not related to any party in this action, nor am I financially

Page 12

Q.   All right.  Was one of those the matter of the City of Kansas versus Jimenez Arms?

A.   Jimenez Arms, yes.

Q.   That was a matter pending in the Missouri Circuit Court; correct?

A.   I believe so, yes.

Q.   You also were retained as an expert witness in the matter of Madden versus P&S Security; is that correct?

A.   Yes.

Q.   And that was a matter in state court in Kansas; correct?

A.   I believe so, yes.

Q.   You were also retained in the matter of California versus Polymer80; correct?

A.   Polymer80, yes.

Q.   Polymer80.

And that was a case that was filed in state court in California?

A.   Yes.

Q.   You were also retained as an expert witness, as I understand it, in the matter of LaManno versus Walmart, pending in state court in Missouri; is that correct?

A.   Yes.  I can't remember if that case was in

Page 13

Missouri or Kansas, but, yes, LaManno v. Walmart.

Q.   And I also understand that you were retained as an expert in the matter of United States versus Thomas Bing; is that correct?

A.   No, that's not correct.

Q.   Did you have a role in that proceeding?

A.   Yes.

Q.   What was your role?

A.   At that point, I was a special agent with ATF testifying as an expert on behalf of the government in the criminal case.

Q.   Okay.  So you were testifying as an expert in that matter?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   I was testifying as an expert in the criminal case while I was an ATF special agent.

Q.   (BY MR. NOTEBOOM)  Right.  And so my question was simply about matters in which you have been retained as an expert.

And so the differentiation you're making is you weren't retained as an expert in that case, you were testifying as an expert while you worked for the ATF. Do I understand --

MR. MALONEY:  Objection.  Form.  Compound.

Page 14

Q.   (BY MR. NOTEBOOM)  Do I understand you correctly?

MR. MALONEY:  Same objection.

A.   Yeah, I was not retained by the government.  I was employed by the government.

Q.   (BY MR. NOTEBOOM)  Understood.  Understood.

Other than those five matters, are there additional matters where you have worked or served as an expert witness?

A.   Yes.

Q.   Can you -- do you recall any of the names of those?

A.   No.  They would have been testifying as an expert during my employment with ATF.  Based on the way the federal firearms laws work, sometimes we would have to testify as an expert as to the interstate nexus of firearms.  So I would testify as to the interstate movement of firearms during criminal cases while I was an ATF special agent.

Q.   Understood.

In any of those matters -- and by those matters, I mean matters where you testified as an expert while working for or employed by the ATF -- did you testify or render opinions about the responsibilities of an FFL with respect to straw purchasing?

Page 15

MR. MALONEY:  Object to form.

A.   During the testimony when -- in regards to the interstate movement of firearms, no.

During the Bing case, I don't recall if FFL matters came into play.  I don't recall that.

And then the other -- some of the other cases you cited, there was -- there was matters that dealt with FFLs.

Q.   (BY MR. NOTEBOOM)  Yeah, and my question was simply focused on your time with ATF while you were employed by ATF and testifying as an expert.

And my understanding, from what you just said, is in none of those matters were you testifying as an expert about the responsibilities of an FFL as it relates to straw purchasing.

Do I have that right?

MR. MALONEY:  Object to form.  Misstates prior testimony.  Compound.

A.   Like I said, I can't recall if in the Bing case -- if responsibilities of an FFL came into play or not.  I don't recall.

Q.   (BY MR. NOTEBOOM)  For the other matters where you were a retained expert witness -- and I think, from my count, there were four of those.

Do I have that right?

Page 16

A.   I've been retained on other cases that I've not been deposed on.

Q.   Okay.  My question was simply:  Are there any other matters where you have been retained as an expert witness?

MR. MALONEY:  Objection.  Vague.  Form.

A.   Yes.

Q.   (BY MR. NOTEBOOM)  Okay.  Other than the ones that you've testified to, what additional matters do you remember?

A.   Oh.  Yeah, I don't recall the list right now.  There's not -- like I said, overall, it's probably been ten or less, but I don't recall the other specific cases, other than the list that you have of the ones where I've been deposed.

Q.   Okay.  And in each of the ones that I listed for you a few minutes ago, were you deposed in each of those?

A.   If you can go over the list again.

Q.   Sure.  Were you deposed in the City of Kansas City matter?

A.   Yes.  The -- Kansas City versus Jimenez?

Q.   Correct.

A.   Yes.

Q.   And were you deposed in the P&S Security

Page 17

matter?

A.   Yes.

Q.   And did that occur in February of 2023, roughly?

A.   I don't recall the date.

Q.   All right.  Were you deposed in the Polymer80 matter?

A.   Yes.

Q.   And I know you were deposed in the LaManno versus Walmart matter; correct?

A.   Yes.

Q.   Okay.  Which of those matters, as best you can recall, involved opinions that you had or testimony on your part about the responsibilities that an FFL has with respect to straw purchasing?

MR. MALONEY:  Object to form.  Compound. Vague.

A.   The LaManno case and the P&S Security case. And I don't recall in the Jimenez case.  I'm not sure about the Jimenez case.

Q.   (BY MR. NOTEBOOM)  Tell me what the issues were in the LaManno case --

MR. MALONEY:  Object --

Q.   (BY MR. NOTEBOOM)  -- as best you can recall.

MR. MALONEY:  Object to form.  Vague.

Page 18

A.   That case involved an individual that straw purchased the firearm from Walmart that was later used in a mass shooting.

Q.   (BY MR. NOTEBOOM)   And what were you retained to do in that matter?

A.   I was retained to give my opinion as to if Walmart knew or had reasonable knowledge to believe that the firearms transaction that they completed was a straw purchase.

Q.   Did you opine on the ATF-recognized indicia of straw purchasing that FFLs should be monitoring for at the point of sale?

MR. MALONEY:   Object to form.

A.   I opined on straw purchase indicators and whether Walmart knew or should have known that those indicators were present, and if they knew or should have known to deny that sale.

Q.   (BY MR. NOTEBOOM)   As part of your work in that matter, did you review Walmart's policies and procedures relating to gun sales?

A.   Yes.

Q.   As part of that matter, did you review training materials, if any, that Walmart had relating to personnel in their stores that were authorized to sell firearms?

Page 19

A.   Yes.

Q.   And over what period of time were those policies and procedures and training materials in place, as best you can recall?

MR. MALONEY:  Object to form.  Foundation.

A.   I don't recall.

Q.   (BY MR. NOTEBOOM)  Did you endeavor to determine whether there were industry standards for policies and procedures relative to the sale of firearms as part of your work on the Walmart matter?

MR. MALONEY:  Object to form.  Vague.

A.   I would say I reviewed their training standards.  I don't recall if those standards were compared with other FFLs.  So I will say at this point I don't recall.

Q.   (BY MR. NOTEBOOM)  Okay.  You don't have any recollection, as you sit here today, of doing that?  And by "that," I mean comparing Walmart's policies and procedures or training materials with the policies and procedures and training materials of any other FFL -- do you?

MR. MALONEY:  Object to form.  Misstates prior testimony.  Vague and ambiguous.  Compound.

A.   Correct.  I don't recall.

Q.   (BY MR. NOTEBOOM)  In any of your work as an

Page 20

expert in any matter, is that something that you've done?

MR. MALONEY:  Object to form.  Overbroad.

A.   Can you specify?

Q.   (BY MR. NOTEBOOM)  Sure.  No, happy to.  My question is really, I hope, a simple one, which is, in any of the work that you've done, either while at ATF or after you left ATF, have you undertaken to assemble the policies and procedures of different FFLs that relate to gun sales and compare them against each other?

MR. MALONEY:  Object to form.  Vague.

A.   I have reviewed the training materials and training policies of FFLs and used that to analyze between FFLs.

So yes -- I guess, yes.

Q.   (BY MR. NOTEBOOM)  Which FFLs do you remember -- which FFLs policies and procedures did you look at?

MR. MALONEY:  Objection.  Foundation.  Overbroad.

A.   The cases that you've cited, I've reviewed their training policies and procedures.  And then just in my course of my being an ATF agent and working and dealing with FFLs, I've talked to them about their training, policies, and procedures.

Page 21

I can't give you specific FFLs.

Q.   (BY MR. NOTEBOOM)  So let's break that down for just a second.

So in connection with your work in the Walmart matter, your testimony is you would have looked at Walmart's policies and procedures relating to gun sales; correct?

A.   Yes.

Q.   And in connection with your work in the P&S Security matter, as I understand it, is your answer the same, you would have looked at their policies and procedures relative to gun sales?

MR. MALONEY:  Object to form.

A.   I believe so.

Q.   (BY MR. NOTEBOOM)  Okay.  You don't -- you're not sure, as you sit here today?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   I believe -- I believe I reviewed their training, yes.

Q.   (BY MR. NOTEBOOM)  Okay.

A.   I don't recall specific.

Q.   And other than looking at Walmart's policies and procedures and training materials, and potentially looking at the policies and procedures and training

Page 22

materials from P&S Security, do you remember any other specific FFL's policies, procedures, or training materials that you have reviewed?

MR. MALONEY:  Object to form.

A.  I can't give you specific FFLs.  Yeah, I can't give you specific names of FFLs sitting here today.

Q.  (BY MR. NOTEBOOM)  In terms of a comprehensive review -- and let's focus just on policies and procedures that an FFL might have in place relating to gun sales, where your job would be to go in and look at all of the policies and procedures that a particular FFL has in place.

Do you understand?

MR. MALONEY:  Objection -- object to form. Compound.  Ambiguous.

A.  I think I'll get to understand once you get to your question.

Q.  (BY MR. NOTEBOOM)  Leaving aside the P&S Security matter and the LaManno versus Walmart matter, is that something that you've ever done, a comprehensive review of an FFL's policies and procedures that relate to gun sales?

MR. MALONEY:  Object to form.  Compound. Vague.

A.  Well, I can say I've never been hired by an

Page 33

A.   I worked for the firearms enforcement division, and I worked for the international affairs division.

Q.   And what was the firearms enforcement division responsible for?

A.   We were responsible for monitoring sensitive high-profile cases, responsible for responding to congressional inquiries.  We were responsible for developing and implementing the firearms trafficking program.  We were responsible for training the field divisions on firearms trafficking programming.  I was responsible for the stolen firearms program.

I'm trying to recall what else we did there. That's what I can remember at this point.

Q.   The responsibility for inspections being done of FFLs was not part of the firearms enforcement division; correct?

A.   Correct.

Q.   So during your time in the firearms enforcement division, that wouldn't have been a responsibility you had; correct?

A.   To conduct inspections?

Q.   Or in other ways participate in inspections that were being conducted of FFLs; correct?

MR. MALONEY:  Object to form.

Page 35

responsibilities weren't inspecting FFLs for regulatory compliance; correct?

        MR. MALONEY:  Object to form.  Ambiguous.

     A.    Correct.

     Q.    (BY MR. NOTEBOOM)  And a regular part of your job responsibilities, either when you were in the international division or the firearms enforcement division, wasn't reviewing FFLs' policies and procedures relating to firearm sales to make sure they were compliant, were they?

        MR. MALONEY:  Object to form.  Ambiguous.

     A.    Well, during my time in the firearms enforcement division and in developing the firearms trafficking -- not myself, but assisting with developing the firearms trafficking programs that ATF used back then and still uses much of it today, there would be a component of -- the FFL component.  So that part was involved, but I was not doing compliance inspections myself.

     Q.    (BY MR. NOTEBOOM)  When you say "there was an FFL component involved," what do you mean?

     A.    Well, in developing the firearms trafficking programs, part of that is identifying how criminals get firearms, and criminals get firearms from FFLs, and so it's that component.  Identifying the ways that

Page 36

criminals access firearms.

Q. All right. Other than your work in those two roles, with the firearms enforcement division and with the international trafficking responsibilities you've just described, all of your other time at ATF, if I understand it, was in the Office of Field Operations; is that correct?

A. Yes. Yes.

Q. Okay. And my understanding, within the Office of Field Operations, is that that directorate or that -- what's the terminology you use to describe those different divisions or directorates of ATF?

A. That's a good question. Like I say, it changes. So, for me, it was divisions. I think now they might call them directorates.

Q. Okay. Well, I'm going to use divisions today, because I understand that's the terminology you're accustomed to, but just for clarity for purposes of my questions, I'm referring to what I understand the terminology today is, which is directorates.

Do you understand?

A. Yes.

Q. All right. So within the division of the Office of Field Operations, my understanding is that that division is really broken into two parts. And one

Page 37

part is ATF's criminal enforcement division, and the other is the industry operations division.

Do I have that right?

MR. MALONEY:  Object to form.

A.   Yes.  That's a -- ATF is split between regulatory and law enforcement.  I don't know if that split is under the Office of Field Operations or if it's separate from that.

But there is -- there is a split between sworn law enforcement agents and regulatory personnel.

Q.   (BY MR. NOTEBOOM)  Okay.  So that distinction existed.  You're just not clear whether it was specific to Office of Field Operations or if it was a broader distinction that ATF drew; correct?

A.   It's a broader distinction, but regulatory enforcement is -- has positions within the Office of Field Operations; they also have positions outside of the Office of Field Operations.

Q.   Right.

And during all of your time in the Office of Field Operations, as I understand it from your description of your experience at ATF, you were working on the criminal enforcement side of the Office of Field Operations.

Do I have that right?

Page 38

A.   Yes.  I was a special agent my entire time.

Q.   That's what I understood.

And at no time did you work in the industry operations side of things at ATF; correct?

A.   At no time was I a regulatory enforcement personnel.

Q.   Okay.  As best you understand it, what did the regulatory enforcement personnel have responsibility for?

MR. MALONEY:  Objection.  Overbroad.

A.   So they're responsible with licensing and regulating the firearms -- back when I started -- alcohol, tobacco, and explosives industries.

So responsible for licensing and then regulating those industries.

Q.   (BY MR. NOTEBOOM)  So if an FFL is going to apply to become an FFL in the first instance, it is the industry operations side of things at ATF that would make those kinds of determinations; is that fair?

MR. MALONEY:  Objection.  Assumes facts not in evidence.  Foundation.

A.   Yes.  They would process those applications and do the necessary contacts.

Q.   (BY MR. NOTEBOOM)  And in terms of ongoing inspections that would be done of FFLs once they are

Page 39

licensed, it would also be in the regulatory side of things at ATF that those types of inspections would occur; correct?

MR. MALONEY:  Object to form.

A.    Correct.

Q.    (BY MR. NOTEBOOM)  And in terms of regular work and looking at the policies and procedures that an FFL may have in place, to the extent ATF is doing that, that's happening in the industry operations division, not in the criminal enforcement division; correct?

MR. MALONEY:  Object to form.  Compound.

A.    Not necessarily.  Again, as a special agent and as a special agent that focused on firearms trafficking, we would, again, look at how criminals access firearms.  And so if they're accessing them from an FFL, we would be looking at:  "How are they accomplishing that?"

So we would be looking at the -- so in a way, we would be looking at those policies and procedures of FFLs and how was that happening, how were criminals getting the firearms.

Q.    (BY MR. NOTEBOOM)  Describe in some more detail, please, how you would do that in your experience.

MR. MALONEY:  Object to form.  Overbroad.

Page 40

A.   So it would be -- again, one component could be straw purchasing, one component could be a different type of diversion where somebody might be using fictitious IDs.  It could be theft from FFLs.  And so it's more like looking at what is the problem and how do we address the problem.

And so it's hard to say specifics because, again, you're looking at -- you're looking at a -- well, I guess I'll back up a second.

So there's kind of two ways we did things is deny criminals access to firearms and then prosecute the violent offenders.  So this would be in that realm of deny criminals access to firearms.

Where are they getting the firearms?  And so if we're looking at the FFL component, it's how do we address that problem again?

So the policies and procedures of FFLs would come into play in that.

Q.   (BY MR. NOTEBOOM)  And so from time to time, if you'd be looking at a particular issue with a -- as a broader matter in terms of looking at gun trafficking -- drug trafficking -- sorry, I'm having trouble saying that -- there may be instances where you would need to engage within an FFL or multiple FFLs about their policies and procedures; is that fair?

Page 41

MR. MALONEY:  Object to form.

A.   We would frequently be in contact with FFLs.

Q.   (BY MR. NOTEBOOM)  And as part of that, is it your testimony that you would be reviewing their policies and procedures with respect to straw purchasing?

A.   Yes.  Yes.  We would talk -- I mean, reviewing it, not as in -- well, reviewing as in dealing with the FFL in trying to help them address that problem.

Q.   Okay.  So I want to drill into that for just a second, because I think we may be talking past each other and I just want to make sure we're not.

So what I'm hearing you say is that as part of that work with respect to gun trafficking, there would be instances where you would engage with FFLs to talk with them about that concern; is that fair?

A.   Yes.

Q.   And as part of those discussions with FFLs, you would talk about ways that they might do things differently with respect to their policies and procedures?

A.   Yes.

Q.   And that was based on, from a criminal enforcement side, issues that you were seeing in the field that you thought FFLs should be aware of; is that

Page 42

fair?

A.   Yes.

Q.   Okay.  But what you weren't doing, at least as a common practice, as I understand it, was doing comprehensive reviews of the policies and procedures that an FFL had in place with respect to gun sales; fair?

MR. MALONEY:  Object to form.  Misstates prior testimony.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And what you weren't doing, as a general matter, would be reviewing the training modules that an FFL would have in place to train its sales personnel responsible for selling firearms; correct?

A.   Correct.

Q.   And what you wouldn't do, as a general matter, in the line of work you had with ATF would be to conduct inspections of the FFLs to make sure that they were compliant with everything that ATF expected them to be compliant with; is that correct?

MR. MALONEY:  Object to form.  Vague.

A.   I would not conduct inspections, but I would accompany regulatory personnel on occasion when they were conducting inspections.

Page 44

Did I mishear you?

A.   No.   I said industry operations conducts training for FFLs in relation to issues such as straw purchasing.   But law enforcement personnel participate in those trainings as well.

Q.   Okay.   How often did you participate, during your time at ATF, in trainings of FFLs with respect to straw purchasing?

A.   I -- if I did, it was very rare as far as participating with regulatory personnel on their organized trainings.

Q.   And as I understand it from your testimony in other matters, you didn't prepare any training materials yourself relating to straw purchasing that were used by ATF with FFLs; correct?

MR. MALONEY:   Objection.  Foundation.  Assumes facts not in evidence.

A.   So specific -- is your question specific to training materials that I prepared or produced that were the -- the specific audience was licensed gun dealers?

Q.   (BY MR. NOTEBOOM)  It is.

A.   No, I did not create any specific training where the audience was licensed gun dealers.

Q.   Okay.  And you're qualifying your answer to licensed gun dealers.

Page 45

Did you prepare those kinds of materials for different audiences?

A. Yes.

Q. Which audiences?

A. For law enforcement, both domestic and international, for members of the public, for the shipping industry, and also for FFLs but not in relation to straw purchasing.

MR. NOTEBOOM: Why don't we take just a five-minute break.

THE VIDEOGRAPHER: We are going off the record at 9:45.

(Brief break taken.)

THE VIDEOGRAPHER: We are back on the record at 9:54.

Q. (BY MR. NOTEBOOM) Mr. Bisbee, what's the highest level of education you've received?

A. I have a bachelor's degree in arts and sciences.

Q. And is that from Kent State University?

A. Yes, sir.

Q. When did you receive your degree?

A. 1988.

Q. And what did an arts and sciences degree at Kent State involve? What was the focus of your studies?

Page 69

the transaction took?

A.   I don't remember.

Q.   Let's go back to page -- the Exhibit A to your report, Mr. Bisbee.

MR. MALONEY:   Exhibit 1, Counsel?

MR. NOTEBOOM:   Exhibit 1, Appendix A.

Q.   (BY MR. NOTEBOOM)   And I want to focus here on your work with "Armed with Knowledge."   Okay?

A.   Yes.

Q.   I understand from your -- from Appendix A, that you are the principal officer for Armed with Knowledge; is that correct?

A.   Yes.

Q.   And what does that mean?

A.   It means that I developed and opened Armed with Knowledge.

Q.   When did you do that?

A.   When I retired from ATF, so that would have been in 2015.

Q.   And are you the only employee of Armed with Knowledge?

A.   Yes.

Q.   Has that always been true since the time you started the company?

A.   Yes.

Page 70

Q.   And I characterized it as a company, but, if you know, what is the legal nature of the business?  Is it a company?  Is it an LLC?  How have you set it up?

MR. MALONEY:  Object to form.  Compound.

A.   You know, I don't know, to be honest with you.

Q.   (BY MR. NOTEBOOM)  Okay.  And is it a -- essentially, is it a part-time vocation of yours? Because I understand you also currently work for the Washington Police Department [sic]; correct?

A.   Correct.  I'm currently a police officer in Washington State.  And so, yes, it is a part-time side job.

Q.   And from -- in an average year or a typical year, how much of your time is devoted to work at Armed with Knowledge?

MR. MALONEY:  Object to form.

A.   It varies.  It depends.  But I probably -- as far as this type of work for the -- for this type of work, maybe one or two cases a year.

Q.   (BY MR. NOTEBOOM)  And when you say "this type of work," are you referring to expert work?

A.   The expert consulting or expert -- yeah.

Q.   And I understand from your report that this is some of the kind of work you do, meaning expert work in the context of lawsuits; correct?

Page 71

MR. MALONEY:  Object to form.

A.   Yes, it's part -- it's part of it, yes.

Q.   (BY MR. NOTEBOOM)  And since founding Armed with Knowledge, is it through that entity that you do your expert work?  Have you been -- is it Armed with Knowledge that was -- strike that.

Is it Armed with Knowledge that has the engagement with the State of Minnesota in this matter as opposed to you personally?

MR. MALONEY:  Object to form.  Compound.

A.   Yeah, I don't know how the contract is -- I don't know how the contract is worded.  I don't recall.

Q.   (BY MR. NOTEBOOM)  What was your purpose in setting up Armed with Knowledge?

A.   Well, the purpose was to try to work in helping reduce firearms-related violent crime, work with other law enforcement agencies or organizations, provide some information back to the public on firearms issues, because I find a lot of people don't quite understand them very well.

So that -- I mean, that was the purpose.

Q.   And I've read that on your website.

Part of what you've been doing through Armed with Knowledge is to provide expert testimony in lawsuits; correct?

Page 72

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.   Yes.

Q.   (BY MR. NOTEBOOM)  In addition to the expert work that you're doing, what other sources of revenue does Armed with Knowledge have?

A.   Currently, no other sources.

Q.   So the only work that you're doing now, at least for compensation purposes, is expert services?

MR. MALONEY:  Object to form.  Misstates prior testimony.

A.   Currently.

Q.   (BY MR. NOTEBOOM)  In the past, have you been retained -- has Armed with Knowledge been retained for work other than expert testimony?

A.   Yes.

Q.   Describe that, please.

A.   It would be more kind of security consulting for retail.

Q.   What do you mean by "security consulting"?

A.   It would be reviewing a company's physical security and then -- and also kind of more in relation to organized retail theft and stuff like that, and providing recommendations on how they can improve their processes, whether that's physical or whether that's

Page 179

MR. MALONEY:  Objection.  Compound.

A.   Well, I'm not going to keep my answers specific to Minnesota because I'd say ATF, as a federal agency, we put in -- or, we -- formerly we -- ATF puts information out there for the national audience.  And, again, the indicators are presented just for -- to aid FFLs in determining if sales are lawful.

So it is an indicator that is put out there to help FFLs.

Q.   (BY MR. NOTEBOOM)  You're aware that ATF has put out training materials that suggest that someone coming in to buy a gun for the first time can be a red flag.

You're aware of that?

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.   Well, my thought of that is a new customer that's unfamiliar with firearms.

Q.   (BY MR. NOTEBOOM)  That's your understanding of it?

MR. MALONEY:  Object to form.

A.   Without knowing what specifically you're referring to or referencing, my thought -- my recollection right now is new customers that are unfamiliar with firearms.

Page 202

A.   No.   My objective was to look at the transactions to determine if they knew or had reasonable cause to believe that they allowed straw purchases. Part of that would be to look at their training.

Q.   (BY MR. NOTEBOOM)   Okay.   And as part of that review of our training, you didn't compare our training of our employees against the training that's being used by other FFLs in Minnesota during the relevant period, did you?

MR. MALONEY:   Objection.   Assumes facts not in evidence.   Misstates testimony.

A.   Correct.

Q.   (BY MR. NOTEBOOM)   Still on page 6 in the large full paragraph near the -- I guess in the middle of the page, you talk about ATF Special Agent Kylie Williamson.

Do you see that?

A.   Yes, I see her referenced a couple times.

(Exhibit Number 6 marked for identification.)

Q.   (BY MR. NOTEBOOM)   Handing you what's been marked as Exhibit 6.   Do you see that this is the criminal complaint filed in the United States District Court for the District of Minnesota against Mr. Horton?

A.   Yes.

Q.   This is one of the documents that you reviewed

Page 262

THE VIDEOGRAPHER: We are back on the record at 4:30.

Q. (BY MR. NOTEBOOM) Mr. Bisbee, I'd ask you to -- you can set the document in front of you aside, and I would ask you to get Exhibit 1, a copy of your expert report, back in front of you, and when you do, to turn to page 21.

A. Okay.

Q. And in this final section of your report, sir, you opine on four remedial actions, as you call them, that you believe Fleet Farm should undertake; is that right?

A. Yes.

Q. And the first of these remedial actions is to "improve firearms transaction system"; correct?

A. Yes.

Q. What, in your opinion, is deficient about Fleet Farm's current firearms transaction system?

A. Well, as stated in that bullet point, they should -- if they want to identify and prevent straw purchases -- implement a software system that tracks all prior sales of firearms corporate-wide and alerts the salesperson at the point of sale about the purchase history of that person before the firearm is sold. And that would include flagging all prior multiple purchases

Page 263

from all Fleet Farm stores.

Q.   Is -- to the best of your knowledge, sir, is that a change to our system that is required by ATF?

A.   No.

Q.   To the best of your knowledge, sir, is that a change that is required by any law or regulation or requirement in the state of Minnesota?

A.   No.

Q.   Do you know whether that kind of a system, as you've just described it, is being utilized today widely in the FFL industry in the state of Minnesota?

MR. MALONEY:  Objection.  Vague.

A.   I don't know.

Q.   (BY MR. NOTEBOOM)  Do you know of any other FFL in the state of Minnesota that is using the type of system that you propose Fleet Farm utilize here?

A.   I don't know.

Q.   Now, you've reviewed Mike Radl's deposition testimony in this case; correct?

A.   Yes.

Q.   And do you recall in his testimony -- we can get it out if we need to.  But do you recall in his testimony that he explained that -- at least since the start of 2022, that Fleet Farm has already implemented a system that allows corporate-level employees to monitor

Page 264

and evaluate multiple gun purchases to identify possible straw purchasers or buyers across stores?

Do you recall seeing that?

A. That sounds familiar, yes.

Q. Okay. And that system, as implemented, enables, at a corporate level, Fleet Farm to identify people that are traveling to multiple Fleet Farm locations to make purchases.

That's your understanding?

MR. MALONEY: Objection. Assumes facts not in evidence.

A. Yes.

Q. (BY MR. NOTEBOOM) Okay. And, again, I'm happy to get this out if we need to. I'm trying to keep things moving here.

But do you recall Mr. Radl explaining that he and Ms. Granato used that system to look into the customer's purchase history across the company and to decide whether to notify ATF of suspicious purchasing patterns?

A. I don't recall specifically. I would say that's different from -- if we've completely moved on from my bullet point 1, I think that's different from my bullet point 1 there.

Q. I'm not -- I'm asking you whether you recall

Page 265

that testimony from Mr. Radl about some of the enhancements that have been made to the Fleet Farm system at least since early 2022.

MR. MALONEY:  Objection.  Compound.

A.   I recall a system that you're talking about. As far as what they were doing with that information, I don't recall exactly.

Q.   (BY MR. NOTEBOOM)  Okay.  And that system is not available to FFL salespeople at the point of sale, at least not today.  That's your understanding?

MR. MALONEY:  Objection.  Assumes facts not in evidence.

A.   Correct.

Q.   (BY MR. NOTEBOOM)  And so I just want to understand kind of what your first remedial measure proposal actually means in practice.

Is the only remedial action that you're suggesting that Fleet Farm should make to the system it put in place in 2022 is to make that available at the point of sale?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   No.  It would be the entire purchase history, not just multiple sales.

Q.   (BY MR. NOTEBOOM)  So that a Fleet Farm

Page 266

employee could see every single firearm that a purchaser had purchased in any other Fleet Farm store, period?

A.   Correct.

Q.   And how far back, in your opinion, should that go?

A.   Well, again, depending upon the capability of the system, you could put a time limit on it.  So I'm, again, not here to recommend a time limit, but it would not have to be indefinite.

Q.   The second remedial action that you recommend on page 21 of your report is to "improve suspicious activity alert system"; correct?

A.   Yes.

Q.   What, in your opinion, sir, is deficient about Fleet Farm's current suspicious activity alert system?

A.   Well, I think we spoke about that.  I know they had -- at the time anyway, they had the straw purchase alert system, and then they also had a BOLO alert system.  And so depending on if they wanted to combine the systems or still keep it a straw purchase alert system or a system to alert for potential illegal sales, again, it needs to be accessible, available, and convenient for the clerk to have.  And the clerk would need to be able to find the individual in that system.

So the current system doesn't fit that

Page 267

criteria.

Then the other thing -- in looking over what I put in there, the other thing is right now the alerts have to be cleared through corporate headquarters.  And that's -- it should be something that they have the ability to put in because putting in the alerts at the store level would be more -- would be more timely.

Q.   Are any of those changes that you recommend making in connection with this second remedial measure -- to the best of your understanding, sir, are they required by ATF?

A.   No.

Q.   Okay.  Are any of them, to the best of your understanding, sir, required by the State of Minnesota?

A.   No.

Q.   And I gather from your earlier testimony, you don't have an understanding of whether any other FFLs in the state of Minnesota are doing this now, do you?

A.   Correct, I do not.

Q.   And so the basis for your recommendation here is really just because you think it would be better; correct?

MR. MALONEY:  Objection.  Misstates prior testimony.

A.   Well, my basis is that it would improve the

Page 278

Farm should implement that it hasn't already?

A.   That's all I can think of right now.

Q.   All right.  Let's move on to remedial -- the fourth bullet point on page 21 of your report, sir, which is your last suggested remedial action, which is "improving employee discipline."

A.   Yes.

Q.   What, in your opinion, sir, is deficient about Fleet Farm's current employee discipline procedures?

A.   Well, according to the information that I reviewed, Fleet Farm saw that they had a problem with employees not -- or employees being engaged in firearms compliance issues.  There were several documents I reviewed indicating that they even were committing serious violations.  There was concerns about how it would affect their license to sell firearms.

At some point, they implemented an error tracking system to try to help identify the problem employees and then be able to focus on the problems that they had and improve their ability to follow the directions.

Unfortunately, based on the information I reviewed, it sounds like that error tracking system was not used and that management just didn't -- just didn't use it.

Page 279

Q.    What information are you referring to that suggests that it wasn't used?

A.    I believe that was, I think, from one of the depositions, but I can't recall which firearms compliance manager it was.  But there was an indication that it wasn't being used.

I also know there was an email exchange between Mr. Radl and -- I can't remember if it was Mr. Hoernke or -- I can't remember who it was an email exchange with, but they were discussing how there was a problem with employees in regards to the compliance and that management wasn't addressing the problem.

Q.    Anything else?

A.    That's all I can think of right now.

Q.    And with respect to your recommended changes regarding employee discipline, are any of those changes required, sir, by ATF, to your knowledge?

A.    No.

Q.    Are any of them required by Minnesota law or regulation to the best of your understanding, sir?

A.    No.

Q.    Part of the suggested change is that "Fleet Farm should utilize their error tracking system to identify sales associates who consistently fail to follow standard operating procedures and should not be

Page 309

EXAMINATION

BY MR. MALONEY:

Q.    I think a few -- well, actually many hours earlier, you discussed with Mr. Noteboom ATF inspection reports that you had asked the State to provide to you in the course of formulating your opinions in this case; is that right?

A.    Yes.

Q.    And to the best of your knowledge, did the State provide all the ATF inspection reports that were in the State's possession to you in the course of your work?

A.    Yes.

Q.    You spent a lot of time with Mr. Noteboom talking about your time at the ATF and training that happened there.

While you were at the ATF, did you help develop training regarding straw purchase warning signs?

A.    Yes.

Q.    Can you describe that for the record?

A.    So I was in bureau headquarters, in the firearms enforcement branch, when I was involved with others in developing the firearms trafficking programs that we implemented at that point and then, to the best of my knowledge, are still being used today.

Page 310

And so the firearms trafficking program encompassed a different variety of trafficking scenarios, and one of them being straw purchases. And so we focused a lot of efforts on that part of trafficking.

Q. Did you see, or have you seen a lot of those same indicators in the ATF guidance materials on straw purchasing that you discussed with Mr. Noteboom today?

A. Yes. Those indicators have then kind of filtered out to other various publications or other organizations.

And so, yeah, they're widely out there now.

Q. Does that include documentation from the National Sports Shooting Foundation as well?

A. Yes.

Q. At -- towards the beginning of your deposition, Mr. Noteboom asked you if your initial report contained all of your opinions in this matter; is that right?

A. Yes.

Q. But you also provided a rebuttal report of the defendant's experts in this case; right?

A. Yes, I did.

Q. So is it fair to say that your initial expert report, combined with your rebuttal expert report,

Page 320

REPORTER'S CERTIFICATE

I, TAMI LYNN VONDRAN, CCR, CSR, RMR, CRR, the undersigned Certified Court Reporter authorized to administer oaths and affirmations in and for the states of Washington (2157), Oregon (20-0477), and California (14435) do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision. That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 13th day of February, 2025.

TAMI LYNN VONDRAN, CRR, RMR

Washington CCR #2157, Expires 10/6/2025

Oregon CSR #20-0477, Expires 9/30/2027

California CSR #14435, Expires 10/31/2025

Page 323

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7109667
CASE NAME: State Of Minnesota v. Fleet Farm LLC
DATE OF DEPOSITION: 2/6/2025
WITNESS' NAME: Joseph Bisbee

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____3/18/25_____          _____
Date                        Joseph Bisbee

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
            in the appended Errata Sheet;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.
        I have affixed my name and official seal
this __18th__ day of __March_____, 20_25_.

_____
Notary Public

___08/23/2028_____
Commission Expiration Date

Page 324

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7109667

PAGE/LINE(S) /        CHANGE        /REASON

THROUGHOUT DEPOSITION CHANGE ".9 MILLIMETER" TO "9 MILLIMETER" /CORRECTION

P112, LINE 7 CHANGE "NOBODY" TO "SOMEBODY" /TRANSCRIPTION ERROR

P112, LINE 8 CHANGE "THAN" TO "WHEN" /TRANSCRIPTION ERROR

P171, LINE 9 CHANGE "THEN PUTS" TO "INPUTS" /TRANSCRIPTION ERROR



3/18/25

Date                         Joseph Bisbee

SUBSCRIBED AND SWORN TO BEFORE ME THIS 18th

DAY OF  March               , 20 25   .

Notary Public

05/23/2028

Commission Expiration Date

ARIELLE KAGARABI
MY COMM. EXP. 05-23-28
NOTARY PUBLIC
COMM. NO. 2402817
STATE OF WASHINGTON