# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota by its Attorney General, Keith Ellison, <br><br> Plaintiff, <br><br> v. <br><br> Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC, <br><br> Defendants. | Case No.: 0:22-cv-02694-JRT-JFD <br><br> **STATE OF MINNESOTA'S MEMORANDUM IN OPPOSITION TO FLEET FARM'S MOTION FOR SUMMARY JUDGMENT** |

Fleet Farm's motion for summary judgment argues that its sales of 37 guns to two straw buyers in 2020 and 2021 were essentially inconsequential and harmless. Fleet Farm ignores the fact that these dozens of sales themselves were illegal. Some of the guns Fleet Farm sold to these straw buyers have already caused physical injuries and other harms to Minnesotans. At the same time, most of the guns Fleet Farm sold to these straw buyers remain unaccounted for and pose an ongoing threat to the public. The State is pursuing this action to address these harms—and to prevent future harms from even more gun sales to more straw buyers.

Fleet Farm's motion also argues that Fleet Farm could not have known that Jerome Horton and Sarah Elwood were straw buyers despite compelling facts showing the opposite. There were obvious warning signs of straw buying during Fleet Farm's sales to Horton and Elwood, including multiple purchases of 9mm handguns in short periods of time. Based on these warning signs, a Fleet Farm manager at the Blaine store, ███████ ████████████████████████ during the middle of Horton's buying spree from

1

Fleet Farm stores. Ex. 1 at 2.[1]

Ex. 2 at 1. Unfortunately, ████████████████

█████████████████, and Fleet Farm went on to sell 11 more guns to Horton. But that

is not all.

After the ATF told Fleet Farm that Horton was a straw buyer in October 2021,

during mandatory training for all employees

who sell firearms. Ex. 3 at 6. Fleet Farm's corporate-level firearms compliance personnel

instructed employees that

The State agrees.

Fleet Farm's motion for summary judgment should be denied.

First, the fact that private parties have sued Fleet Farm for damages resulting from

the mass shooting involving one of the guns Fleet Farm sold to straw buyers does not mean

that the State lacks *parens patriae* standing. The Attorney General has broad authority and

discretion to bring common law claims on behalf of the public to protect the health and

well-being of Minnesota residents. Fleet Farm mischaracterizes the State's claims to argue

that the claims are limited to injuries to an identifiable group of individual residents. The

---

[1] All exhibits are attached to the Declaration of Katherine A. Moerke.

State has standing to bring this action to protect the public from gun trafficking and gun violence from straw buying.

Second, proximate cause is generally a question of fact for the jury, and there is ample evidence of proximate cause for a jury to rule in the State's favor. Fleet Farm's so-called "unrebutted expert testimony" that straw purchasing is not a substantial factor in gun trafficking by Professor Gary Kleck is contrary to law, irrelevant, and not well-supported. State Mem. re. Motion to Exclude Expert Testimony of Gary Kleck, Doc. 187, at 11–18. This testimony is rebutted—and it should be excluded. Moreover, expert testimony is not required for causation (or any other issue) in this case. Thus, the fact that the State does not rebut Kleck's flawed opinions with expert testimony does not mean that Fleet Farm is entitled to summary judgment. And Fleet Farm's arguments about proximate cause and intervening criminal acts are contrary to law.

Third, none of Fleet Farm's remaining arguments warrant summary judgment. That the State has not identified Fleet Farm gun sales to additional straw buyers besides Horton and Elwood does not mean that Fleet Farm is entitled to summary judgment on the State's public nuisance claim. Aiding and abetting does not require "actual knowledge," and a reasonable jury could easily conclude that Fleet Farm knew or should have known that Horton and Elwood were straw buyers. Fleet Farm's arguments about negligent entrustment were already rejected by the Court when denying Fleet Farm's motion to dismiss the complaint. Fleet Farm argues that summary judgment is appropriate for the State's negligence and negligence per se claims because no evidence suggests Fleet Farm violated the law. But negligence does not require a statutory violation, and, in any event,

3

there is evidence that Fleet Farm violated multiple statutes. Finally, beyond Fleet Farm's flawed proximate cause arguments, Fleet Farm admits that summary judgment on the State's claim under the Minnesota Gun Control Act is not warranted and seeks only to limit, not prevail on, this claim.

## BACKGROUND

### I.    The State's Lawsuit and Requested Relief

The State of Minnesota brought six claims against Fleet Farm for selling firearms to straw buyers despite obvious warning signs of straw buying: (1) negligence; (2) negligence per se; (3) negligent entrustment; (4) aiding and abetting; (5) public nuisance; and (6) violations of the Minnesota Gun Control Act, which prohibits firearms sales to straw buyers.[2]

Fleet Farm brought a motion to dismiss the claims in the State's original complaint. The Court denied this motion in full. Order, Doc. 36 (June 27, 2023). The Court later denied Fleet Farm's motion to certify the order denying Fleet Farm's motion to dismiss for appeal, because Fleet Farm had failed to satisfy any of the required elements for the certification of an interlocutory appeal. Doc. 60 (January 2, 2024) at 2.

The State requests multiple forms of public relief in this case, including injunctive relief, civil penalties, and disgorgement. Amend. Compl. (Doc. 79) at 36–38. On

---

[2] The State's sixth claim under the Minnesota Gun Control Act was added after the State moved to amend its complaint and the Court granted the motion, finding "that the proposed new claim is plausible on its face and does not fall outside the scope of the Minnesota Attorney General's authority granted by Minn. Stat. § 8.31, subd. 1." Order, Doc. 76 at 5 (March 5, 2024). District Judge Tunheim upheld the amendment after an appeal from Fleet Farm. Order, Doc. 98 (May 23, 2024).

November 6, 2024, via a sworn interrogatory response, the State informed Fleet Farm that the State was not seeking proprietary legal damages related to spending by the State, as originally requested in paragraph 4 of the complaint's request for relief. Doc. 196-1 at 5 ("[T]he State will not be seeking damages from Fleet Farm in this action due to the costs to the State associated with investigating, monitoring, treating, policing, and remediating the misuse of firearms in Minnesota for which Fleet Farm is responsible.").

## II. Federally Licensed Firearm Dealers and Illegal Firearms Sales to Straw Buyers

A Federal Firearms License (FFL) is issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to allow individuals or businesses to engage in the business of selling firearms. *See, e.g.*, Federal Firearms Licenses, https://www.atf.gov/firearms/federal-firearms-licenses ("If you intend to engage in a business involving the dealing, manufacturing, or importing of firearms, or manufacturing or importing ammunition, you must apply for a federal firearms license (FFL) from ATF."). The "FFL" acronym is also used to refer to the license holder. *See, e.g.*, Ex. 4 at 2 (referring to "Federal Firearms Licensee (*FFLs*)").

A straw purchase is the illegal purchase of a firearm by a straw buyer on behalf of the actual buyer. Ex. 5 at 1. "Federal firearms licensed (FFL) dealers are the first line of defense against [] straw purchasing." *Id*. at 3.

### A. ATF Form 4473 – Firearms Transaction Record

An FFL must complete an ATF Form 4473, "Firearms Transaction Record," for every firearms transaction:

5

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

## Firearms Transaction Record

| WARNING: The information you provide will be used to determine whether you are prohibited by Federal or State law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. Any person who exports a firearm without a proper authorization from either the Department of Commerce or the Department of State, as applicable, is subject to a fine of not more than $1,000,000 and up to 20 years imprisonment. | Transferor's/Seller's Transaction Serial Number (if any) |
|---|---|
| Read the Notices, Instructions, and Definitions on this form. Prepare in original only at the licensed premises (including business temporarily conducted from a qualifying gun show or event in the same State in which the premises is located) unless the transaction qualifies under 18 U.S.C. 922(c). All entries must be handwritten in ink unless completed under ATF Rul. 2016-2. PLEASE PRINT. | |

**Section A - Must Be Completed By Transferor/Seller Before Transferee/Buyer Completes Section B**

| 1. Manufacturer and Importer (if any) (If the manufacturer and importer are different, include both.) | 2. Model (if designated) | 3. Serial Number | 4. Type | 5. Caliber or Gauge |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

| 6. Total Number of Firearms to be Transferred (Please spell total number e.g., one, two, etc. Do not use numerals.) | 7. Check if any part of this transaction is a pawn redemption.   Record Line Number(s) From Question 1: | |
|---|---|---|
| | 8. Check if this transaction is to facilitate a private party transfer. | |

**Section B - Must Be Completed Personally By Transferee/Buyer**

9. Transferee's/Buyer's Full Name (If legal name contains an initial only, record the initial followed by "IO" in quotes. If no middle initial or name, record "NMN".)

| Last Name (including suffix, e.g., Jr, Sr, II, III) | First Name | Middle Name |
|---|---|---|
| | | |

10. Current State of Residence and Address (U.S. postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | State | ZIP Code | County/Parish/Borough |
|---|---|---|---|---|
| | | | | |

Ex. 6.[3]

Form 4473 provides "NOTICES, INSTRUCTIONS, AND DEFINITIONS" to FFLs beginning on page 3. *Id*. These begin with an explanation that the "Purpose of the Form" is to help an FFL determine whether or not the FFL can lawfully sell a firearm:

> The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he/she may lawfully sell or deliver a firearm to the person identified in Section B, and to alert the transferee/buyer of certain restrictions on the receipt and possession of firearms.

---

[3] Exhibit 6 is the version of ATF Form 4473 in effect during Fleet Farm's sales to Horton and Elwood. The ATF revised Form 4473 in 2023. Updated ATF Form 4473 - Firearms Transaction Record (August 2023 Revisions), https://www.atf.gov/firearms/updated-atf-form-4473-firearms-transaction-record-august-2023-revisions. The revisions did not change the relevant contents cited here.

*Id*. at 3.

Form 4473 instructs that the FFL must evaluate and ensure the sale is lawful: "The transferor/seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction." *Id.*

Form 4473 also provides an additional warning that, regardless of whether a buyer passes a background check, making a prohibited firearms sale breaks the law, if an FFL knew or should have known that the sale was prohibited:

> **Warning:** Any person who transfers a firearm to any person knowing or having reasonable cause to believe the sale or disposition to such person is prohibited violates the law, 18 U.S.C. § 922(d), even if the transferor/seller has complied with the Federal background check requirements.

*Id*. at 6 (emphasis in original).

Like federal law, Minnesota law also prohibits the sale of a firearm to someone that the seller knows or should know is a straw buyer:

> Except as otherwise provided in paragraph (b), a person who does any of the following is guilty of a gross misdemeanor . . . (2) transfers a pistol or semiautomatic military-style assault weapon to a person who has made a false statement in order to become a transferee, if the transferor *knows or has reason to know* the transferee has made the false statement.

Minn. Stat. § 624.7132, subd. 15(a)(2) (emphasis added).

FFLs are required to maintain Form 4473s for twenty years but not regularly submit these forms to the ATF. Ex. 6 at 3 ("After the transferor/seller has completed the firearms transaction, he/she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of

his/her permanent records. Such Forms 4473 must be retained for at least 20 years and after that period may be submitted to ATF.").

## B. ATF Form 3310.4 – Report of Multiple Sale or Other Disposition of Pistols and Revolvers

An FFL must complete an ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers, for certain sales of multiple guns:

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0003 (01/31/2028)

**Report of Multiple Sale or Other Disposition of Pistols and Revolvers**

*(Please complete all information)*

| 1. Date of Report | 2a. Federal Firearms Licensee *(FFL)* Number |
|---|---|

2b. Trade or Corporate Name and Full Address *(If you have complete information available on a rubber stamp, please place information here.)*

2c. Are any of the firearm*(s)* connected to another multiple sale? *(If yes, specify date.) (See instruction 2.)* ☐ Yes ☐ No Date _____

2d. If you sold these firearms at a gun show or other qualifying event, identify the event and provide a complete address of the event.

3. Any combination of pistols and revolvers disposed of to the same unlicensed person at one time or during any five consecutive business days. *(See instruction 3.)*

| Manufacturer | Importer *(if any)* | Model | Serial Number | Type *(pistol or revolver)* | Caliber | Date Transferred |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Ex. 4.

Form 3310.4 provides that "Federal Firearms Licensee (*FFLs*) must use this form to report all transactions in which an unlicensed person (*i.e., non-FFL holder*) acquired any combination of two or more pistols or revolvers totalling two or more at one time or during five consecutive business days." *Id*. at 2 (Instruction No. 1).

Unlike Form 4473s, FFLs are required to submit Form 3310.4 to the ATF—and to do so "no later than the close of business on the day that the multiple sale or other disposition occurs." *Id.* at 2 (Instruction No. 7).

### C.   ATF Guidance to FFLs on Warning Signs of Straw Buyers

Other than the requirements provided on ATF Form 4473 that an FFL must ensure each firearm sale is lawful and that an FFL violates 18 U.S.C. § 922(d) if the FFL had reasonable cause to know the buyer was not the actual buyer, the ATF does not have specific requirements or regulations for how FFLs should prevent straw purchasing. Instead, the ATF provides guidance on preventing straw purchases to FFLs in multiple ways, including the "Don't Lie for the Other Guy" program in partnership with the NSSF (National Shooting Sports Foundation). *See, e.g.*, Exs. 5, 7-10.

Guidance from the ATF and NSSF focuses on training FFLs to identify and watch for warning signs (or red flags or indicators) of a possible straw purchase. "Educating employees to recognize and respond to red flags indicating a possible straw purchase are key." Ex. 5 at 3. The ATF and NSSF have identified all of the following as warning signs of a possible straw purchase:

- Multiple purchases of guns, especially if the guns are similar: "Bulk or repetitive purchase of the same or similar firearms, especially noncollectible models." Ex. 7 at 8; Ex. 8 at 87; Ex. 10 at 17; *see also* Joseph Bisbee Expert Report at 5–6, 7 (Doc. 181-1 at 6–7, 8).

- Large cash purchases of guns: "Paying with large amount of cash." Ex. 7 at 8; Ex. 8 at 87. "Buying multiple firearms with large amounts of cash." Ex. 10 at 17; *see also* Bisbee Report at 5–6, 7 (Doc. 181-1 at 6–7, 8).

- Shopping for guns with another person: "'Scouting' of firearm by person with purchaser." Ex. 7 at 9; Ex. 8 at 88. "Conversations of customers while shopping,

9

with you, with their friends or on their cell phones." Ex. 9 at 69; *see also* Bisbee Report at 5–6, 7 (Doc. 181-1 at 6–7, 8).

- Using a cell phone while shopping for guns: "a buyer who is . . . in communication with a third party via phone during the purchase." Ex. 5 at 3. "Taking/sending cell phone photos of firearms." or "Talking on telephone while looking at firearms." Ex. 7 at 9; Ex. 8 at 88; *see also* Bisbee Report at 5–6, 7 (Doc. 181-1 at 6–7, 8).

- A new frequent gun buyer: "No previous purchases but now frequent buying." Ex. 7 at 8; Ex. 8 at 87. "No previous purchases, but now a frequent buyer." Ex. 10 at 17; see also Bisbee Report at 5–6, 7 (Doc. 181-1 at 6–7, 8).

- Avoiding requirements for ATF Form 3310.4, including purchasing guns from different FFLs: "Structuring purchases to avoid MS reporting." Ex. 7 at 8; Ex. 8 at 87. "[P]urchasing guns from different retail dealers in a short period of time" and "using multiple retail locations–even of the same company—to acquire firearms." Bisbee Report at 5–6, 7 (Doc. 181-1 at 6–7, 8); *see also* Ex. 10 at 24 ("FFLs that have good rapport with local competitors, report what happened to them. If they tried one store, they probably would try others.").

Many of these warning signs were present during Fleet Farm's sales of multiple guns to Horton and Elwood.

## III.    Evidence That Fleet Farm Should Have Known That Horton and Elwood Were Straw Buyers and Evidence of Resulting Harm

Multiple Fleet Farm stores sold 37 guns to straw buyers Jerome Horton and Sarah Elwood.[4] Fleet Farm admits that Fleet Farm stores made all of these sales, and Fleet Farm admits that Horton and Elwood were straw buyers.[5] Answer, Doc. 99, at 10–11, ¶¶ 38–39, 41, 45–49; *id*. at 15–16, ¶¶ 54–55, 57. Fleet Farm's sales of guns to Horton and Elwood

---

[4] Fleet Farm sold the last gun to Horton with the ATF's knowledge after the ATF told Fleet Farm that Horton was a suspected straw purchaser.

[5] Each Fleet Farm store has its own FFL.

increased gun trafficking in Minnesota by 37 guns.[6] And there is compelling evidence that

Fleet Farm knew or should have known that Horton and Elwood were straw buyers.

### A.    Horton's and Elwood's Suspicious Purchasing of Multiple Handguns in Short Periods of Time

During a five-month period in 2021, four separate Fleet Farm stores in Minnesota

sold 24 guns to straw purchaser Jerome Horton, 22 of which were 9mm handguns:



Amend. Compl. (Doc. 79) at 14.

As illustrated above, on five separate occasions, Fleet Farm stores sold multiple

guns to Horton in separate transactions spaced just a day or a few days apart. Fleet Farm's

sales to Horton included eight 9mm handguns in just one week. ATF Form 3310.4s were

---

[6] Fleet Farm wrongly says that "it is undisputed that 99.9805% of Fleet Farm's sales during this time were proper." Fleet Farm Mem. at 5 (Doc. 200 at 12). That the State only seeks to prove Fleet Farm's sales to Horton and Elwood were careless and violated the law does not mean that the State agrees that all other sales of guns by Fleet Farm were proper.

required for eight of these transactions at four different Fleet Farm stores (Blaine, Brooklyn Park, Lakeville, and Oakdale), although, as explained below, Fleet Farm did not timely submit all of these required Form 3310.4s.

Fleet Farm also sold 13 handguns to straw purchaser Sarah Elwood in 2020 and 2021 and most of these guns were 9mm handguns:



Amend. Compl. (Doc. 79) at 21.

On four different occasions, as illustrated above, Fleet Farm sold multiple handguns on the same day to Elwood. For instance, Defendants sold Elwood two handguns on May 1, 2021, two more handguns on May 6, 2021, and two more handguns on May 12, 2021. ATF Form 3310.4s were required for three of these transactions, which were all at the same Fleet Farm store in Blaine.

12

**B.**    ███████████████████████████████████████  **and  Fleet Farm's Failure to Act on These Concerns**

On July 31, 2021, in the midst of Horton's straw buying spree, a Fleet Farm manager for the Blaine store, ████████████████████████████████████████████████

████████████████████████████████████████████████████████ In the manager's own words, ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████

███████████████████████████████████████████████████
████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████

██████████████████████████████████████████████████████
███████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████

Ex. 1 at 2.

After Fleet Farm's sales of three guns to Horton on July 31, 2021, ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████



Ex. 2 at 1.



*Id.* at 6, 12.

██████████████████████████ or took any other action. Ex. 1 at 2 ("█

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████."); Ex. 11 at 255–57 █████████████████

███████████████████████████).

Fleet Farm went on to sell 11 more guns to Horton in August, September, and October 2021, before the ATF told Fleet Farm that Horton was a straw buyer.

Ultimately, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████. Ex. 1 at 2.[7]

**C.      Fleet Farm's Compliance Webinar Admitting That** ████████████
████████████████████████████

After the ATF told Fleet Farm that Horton was a straw buyer in October 2021, Fleet Farm's two compliance employees—Granato and Mike Radl—trained employees company-wide on ████████████████████████████████████

████████████████████████████████████████████

█████████.

[7] ████████████████████████████████████████████

████████████████████████████████████████████

15

On November 9 and 10, 2021, Fleet Farm gave a PowerPoint presentation on firearms compliance to all stores:



Ex. 3 at 1.

The presentation addressed preventing straw buying and instructed that the "▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮":



*Id*. at 5.

Fleet Farm then displayed the key contents from the ████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████ :



*Id.* at 6. These are the same ███████████████████████████████

███████, but were ignored. The training slide depicting ███████████████

███████████████████████████████████████████████████

███████████.

While orally presenting the training, Fleet Farm's compliance team went even further. Granato instructed Fleet Farm employees that ███████████████████

███████████████████████████████:

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

18

█████████████████████████████████████████████████

Ex. 12 at 138: 6–17 (transcription of recording). Similarly, Mike Radl said Fleet Farm

employees seeing █████████████████████████████████████████████████

████████████████████████████████████████████████.” Ex. 13 at

120:7–121:6.

Accordingly, Fleet Farm has *admitted* that the ██████████████████████

██████████████████████████████████████████████.

### D. The State's Expert Testimony That Fleet Farm Should Have Known Horton and Elwood Were Straw Buyers

Fleet Farm's motion misleadingly states over and over that the State's expert

witness "agrees that Fleet Farm never 'willfully' or 'knowingly' allowed a straw purchase

to occur."[8] Fleet Farm Mem. at 1 (Doc. 200 at 8); *see also id.* at 7, 19, 24, 27 (Doc. 200 at

14, 26, 31, 34).

When the testimony of the State's expert, Joseph Bisbee, is read in context, it is

clear that Mr. Bisbee testified that Fleet Farm should have known that Horton and Elwood

were straw buyers, but Fleet Farm did not have "actual knowledge" that Horton and

Elwood were straw buyers such that Fleet Farm willfully sold guns to them:

> Q . . . .You haven't seen any documents or evidence, sir, have you, indicating
> that Fleet Farm had *actual knowledge* that Mr. Horton or Ms. Elwood were
> straw purchasing at the time of their. . . sales; correct?
> . . .

---

[8] There is evidence that ███████████████████████████

██████████████████████████████. Ex. 14.

A. I would refer back to the webinar in which ███████████ ██████████████ that they should have known, again, based on a lot of factors, but using that and the comments that were made and the presentation that was made indicates that *Fleet Farm should have known that those sales were illegal*.

Q. And that wasn't my question. *My question was actual knowledge. . . .* Are you aware of any – are you aware of any documents or evidence that suggest Fleet Farm had *actual knowledge, not that they should have known but they actually knew* any of the sales to Mr. Horton or Ms. Elwood were straw purchases?

A. *So you're asking me if they willingly participated in a straw purchase?*

Q. My question is: Have you seen any documents or evidence suggesting that Fleet Farm had actual knowledge?

A. Again, so the way I understand the question -- and, again, we spoke earlier about I'm supposed to understand your questions. The way I understand that question is: Did they willfully participate in a straw purchase? Am I misunderstanding?

Q. You are. I'm asking whether you have any documents or evidence that suggests that Fleet Farm had *actual knowledge*, that they actually knew that Mr. Horton or Ms. Elwood, at the time of the sales, were straw purchasing?

A. *But if they had actual knowledge and the purchase went through, then they would willfully participate in a straw purchase.*

Q. . . . Well, we can agree to disagree about that. *But do you have any knowledge that any of the sales, according to your interpretation of my question, were willful?*

A. I don't believe that they willfully and knowingly allowed a straw purchase.

Ex. 15 at 306:22–308:5 (emphasis added).

In short, the State's expert's opinion and testimony is that Fleet Farm should have known that Horton and Elwood were straw buyers. As demonstrated above, there is substantial evidence supporting this expert opinion.

20

### E. Fleet Farm's Failure to Submit Required ATF Records

Fleet Farm failed to timely submit a ███████████████████████████████████

████████████████████████████████. Specifically, ███████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Instead, ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████. Ex. 16; *see also* Ex. 12 at 178:12–17, 199:11–200:17,

243:2–244:19.

Both of Fleet Farm's proffered experts on ATF regulations and guidance to FFLs—

Andrew Graham and William Napier—admitted during their depositions that (███████████

█████████████) ██████████████████████████████████████████████████████████

███████████.

Graham, a former Deputy Assistant Director at the ATF, testified that Fleet Farm's

████████████████████████████████████████████████████████████████████████.

Ex. 17 at 172:16–25.

Likewise, Napier, who advises FFLs on security and compliance and is part of NSSF's Compliance Consultant Team, testified that Fleet Farm's ███████████████ ████████████████, was a "███████":

███████████████████████████████████████████
████████████████████

████████

███████████████████████████████████

████████████████

Ex. 18 at 242:1–7.

The timing of Fleet Farm's ████████████████████████ is significant. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

## F.    Harms Resulting from Fleet Farm's Sales to Horton and Elwood

There are three categories of harms caused by Fleet Farm's admitted sales of 37 guns to straw buyers.

First, because Fleet Farm sold at least 37 guns to straw buyers, these guns have been trafficked, despite Fleet Farm's repeated refrain that there is no evidence that these sales caused "any alleged increase in gun trafficking or crime in Minnesota." Fleet Farm Mem.

at 1, 5, 13, 17, 22 (Doc. 200 at 8, 12, 20, 24, 29). Fleet Farm cites Professor Kleck's report for this refrain, but Kleck's so-called "unrebutted expert testimony" that straw purchasing is not a substantial factor in gun trafficking is contrary to law.[9] State Mem. re. Motion to Exclude Expert Testimony of Gary Kleck, Doc. 187, at 11. Thus, Kleck's testimony is disputed (and his testimony should be excluded). Straw buying is a method of gun trafficking. Indeed, according to an April 2024 ATF report, the second-highest share of firearm-trafficking cases investigated by the ATF during the prior five years was straw purchases. National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations - Volume Three, https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking, Part III (Firearm Trafficking Channels and Methods Used) at 1 ("[T]he most frequent types of trafficking channels identified in ATF investigations were unlicensed firearm dealing by private persons (40.7%) and straw purchasing from FFLs (39.5%)." Thus, Fleet Farm's sales of guns to these straw buyers increased gun trafficking in Minnesota by definition.

Second, some of the guns that Fleet Farm sold to Horton and Elwood have been recovered and used in crimes. Indeed, one of these guns directly contributed to tragedy. On October 10, 2021, the Mossberg MC2C 9mm semiautomatic pistol that Fleet Farm's Blaine store sold to Horton on July 31, 2021, was fired in the Seventh Street Truck Park shooting in St. Paul. This pistol was fired by Devondre Trevon Phillips, who had a prior felony

---

[9] Fleet Farm also cites the State's rebuttal expert report for purportedly "declining to dispute these opinions" of Kleck. Fleet Farm Mem. at 5 (Doc. 200 at 12). That Bisbee, who is not a criminologist, did not offer expert testimony rebutting Kleck on this point does not mean that that Kleck's fatally flawed opinions (*see* Doc. 187) are not rebutted.

conviction for aggravated first-degree robbery, which makes him ineligible to possess firearms. Ex. 19 at 2; *see also* Ex. 20 at 6. Phillips fired the gun in a chaotic shootout at a St. Paul area bar where the exchange of gunfire between three different gunmen injured 14 people and killed a 27-year-old woman, Marquisha Wiley.

If Fleet Farm's Blaine store had not sold guns to Horton on July 31, 2021, it is possible that the mass shooting, and the injuries and death that followed, could have been prevented. Moreover, this harm is not the only harm resulting from Fleet Farm's carelessness.

On August 13, 2021, the Glock 43X 9mm pistol that Fleet Farm sold to Horton on July 10, 2021, was fired in Minneapolis and found by police in the possession of an individual without a permit to carry a handgun who had found the gun in an alley. Ex. 21 at 2.

On September 6, 2021, the Glock 19 9mm pistol that Fleet Farm sold to Horton on July 7, 2021, was found by a six-year-old boy in the front yard of his family's house in Minneapolis.

On September 26, 2021, the Glock 26 9mm pistol that Fleet Farm sold to Horton on July 26, 2021, was found by police in the possession of an individual without a permit to carry a handgun. Ex. 22 at 1.

On September 30, 2021, the Springfield Armory XDS 9mm pistol Fleet Farm sold to Horton on July 24, 2021, was found by police in the possession of a prohibited person with prior convictions for first-degree aggravated robbery and aiding and abetting first-degree burglary. Ex. 23 at 2.

Most of the guns Fleet Farm sold to Elwood remain unrecovered but one gun has been recovered from a subsequent crime. On July 7, 2021, a person who is ineligible to possess firearms due to a prior conviction for first-degree aggravated robbery was caught by police with the Taurus Spectrum .380 caliber pistol that Fleet Farm sold to Elwood on January 4, 2021, after allegedly using it to threaten someone in public. Ex. 24.

Third, most of the guns that were trafficked via Fleet Farm's sales to Horton and Elwood remain unrecovered. Because straw buying allows guns to get into the hands of people not allowed to have them, these guns remain in the wrong hands and risk harm to people throughout the State. These unrecovered trafficked guns pose an ongoing threat to the health and safety of Minnesotans. Indeed, the mass shooting at the Truck Park demonstrates how just one gun trafficked through straw purchasing can do incredible harm to public safety and the safety and well-being of Minnesotans.

## ARGUMENT

Fleet Farm's motion for summary judgment should be denied. There are disputed material facts (and undisputed facts), and Fleet Farm is not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). There is more than sufficient evidence for a reasonable jury to return a verdict for the State on all six claims against Fleet Farm. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

First, the State has *parens patriae* standing to protect the health and well-being of Minnesotans from gun violence. The private suit against Fleet Farm and the State's decision not to seek one particular type of remedy does not mean the State lacks standing. Second, there are genuine disputes as to material facts relevant to proximate cause, and

25

Fleet Farm is not entitled to judgment as a matter of law. Third, none of Fleet Farm's remaining arguments about specific claims warrant summary judgment.

## I.    The State Has Standing for All of Its Claims.

### A.    The Attorney General Has Authority to Pursue Lawsuits Addressing Gun Trafficking and Gun Violence to Protect the Health and Well Being of Minnesota Residents.

The Attorney General is the chief law enforcement officer of Minnesota. *State ex rel. Young v. Robinson*, 112 N.W. 269, 272 (Minn. 1907). The Attorney General has "extensive common-law powers which are inherent in his office."[10] *Dunn v. Schmid*, 60 N.W.2d 14, 17 n.8 (Minn. 1953). These powers include the authority to "institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights." *Slezak v. Ousdigian*, 110 N.W.2d 1, 5 (Minn. 1961) ("He has the authority to institute in a district court a civil suit in the name of the state whenever the interests of the state so require."), *overruled in part on other grounds*, *Christensen v. Minneapolis Mun. Emps. Ret. Bd.* , 331 N.W.2d 740, 745 (Minn. 1983).

The "courts will not control the discretionary power of the attorney general in conducting litigation for the state." *Slezak*, 110 N.W.2d at 5; *see also State v. City of Fraser*, 254 N.W. 776, 778–79 (Minn. 1934) ("[I]nasmuch as the Attorney General in his discretion decided that he should proceed, there is nothing for any court to pass upon as to the

---

[10] The Attorney General also has "broad and comprehensive" statutory powers to "investigate violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." Minn. Stat. § 8.31, subd. 1.

necessity for or policy of proceeding. In that field, the discretion of the Attorney General is plenary."). "It is clear that the attorney general may commence an action whenever, in his opinion, the interests of the state require it. He possesses such power pursuant to both common law and statute." *Head v. Special Sch. Dist. No. 1*, 182 N.W.2d 887, 892 (Minn. 1970) (rejecting argument that the Attorney General lacked standing to bring a lawsuit), *overruled on other grounds*, *Nyhus v. Civil Serv. Bd.*, 232 N.W.2d 779, 780 n.1 (Minn. 1975). The Attorney General "possesses original discretion which he may exercise in instituting proper proceedings to secure the enforcement of law." *Head*, 182 N.W.2d at 892.

Despite the Attorney General's broad authority and discretion to bring lawsuits in the public interest on behalf of the State, Fleet Farm argues that there is no standing for the State's four common law claims.[11] To advance this argument, Fleet Farm mischaracterizes the State's claims and the State's requests for relief. Fleet Farm asserts that, "[a]t its core, this case now concerns a single transaction: the sale of three handguns on July 31, 2021, to Jerome Horton, one of which was used—after multiple non-party criminal actions—during the October 2021 gunfight at the Truck Yard bar in Saint Paul."[12] Fleet Farm Mem. at 1–2 (Doc. 200 at 8–9); *see also id.* at 13 (stating that the State's "claims are based on . . the fifteen victims of the Truck Yard shooting (and, possibly, the three '[f]amily members who

---

[11] Fleet Farm does not argue that the State does not have standing for its other two claims—public nuisance and violation of the Minnesota Gun Control Act.

[12] The State assumes that references in Fleet Farm's memorandum to "Truck Yard" are meant to refer to the Truck Park, which is the name of the business at which a handgun sold by Fleet Farm was used in a mass shooting.

discovered a firearm purchased from Fleet Farm in their yard'"")).

The State's claims are not limited to Fleet Farm's sales of three guns to Horton on July 31, 2021, or to the mass shooting involving one of these guns at the Truck Park in downtown St. Paul (though that would be enough). Instead, the State's claims encompass every one of Fleet Farm's sales of 37 guns to Horton and Elwood themselves along with additional harms after these sales—some that have already occurred and some that have yet to occur from unrecovered guns that remain in the wrong hands and continue to pose a threat to the health and safety of Minnesotans. Further, the State seeks injunctive relief to prevent future sales to straw buyers by Fleet Farm stores to protect Minnesota residents from additional gun trafficking and gun violence.

For all these reasons, this case directly concerns the State's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general," and the State has standing to pursue equitable relief related to those public interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982), *quoted in* Fleet Farm Mem. at 11 (Doc. 200 at 18); *see also State v. Standard Oil Co.*, 568 F. Supp. 556, 564 (D. Minn. 1983) ("Indeed, there is some evidence that the court should defer to a state's analysis of its quasi-sovereign interests in determining whether the state may bring a parens patriae action.").

In addition, the State alleges much more "than injury to an identifiable group of individual residents," because the State alleges injury to "a sufficiently substantial segment of its population." *See Snapp*, 458 U.S. at 607. Just one gun in the wrong hands can harm numerous people, as evidenced by the mass shooting involving just one of the guns Fleet

28

Farm sold to straw buyers. Further, gun trafficking and gun violence harm Minnesotans both directly and indirectly, including through myriad secondary effects of gun violence. *See id.* ("[T]he indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population"). The State does not lack standing because of the subsequently filed lawsuit brought by private parties seeking monetary compensation for their injuries based on *some* of the same facts at issue in this case. The Minnesota Court of Appeals has rejected the argument that "because the facts underlying the state's claim are the same facts that would permit private relief, the state is necessarily seeking to protect only private interests":

> Just as the state does not step into the shoes of victims of crime when it acts in its prosecutorial role, the state does not step into the shoes of individual [victims] in this case but acts as an independent party. The state is asserting a state interest that is based on the facts involving individual [victims]. . . . It is not dispositive that the attorney general seeks victim-specific relief or that the claim is based on the facts that could permit an individual to obtain relief through a private tort claim. . . . *The state's purpose in bringing the claim is to secure protection of a public interest.*

*State ex rel. Hatch v. Cross Country Bank, Inc.*, 703 N.W.2d 562, 569–70 (Minn. App. 2005) (emphasis added). The State has standing to seek equitable relief to protect the public from harm from gun trafficking.

None of Fleet Farm's cases regarding purported "analogous circumstances" show otherwise. *See* Fleet Farm Mem. at 13–14 (Doc. 200 at 20–21). Unlike in *Koster*, "complete relief" is not available to injured parties, who are not limited to the victims of the Truck Park shooting. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017). Likewise, unlike in *Harrison*, the State's interest is not "wholly derivative" of the victims

of the Truck Park shooting. *Harrison v. Jefferson Parish Sch. Bd.*, 78 F.4th 765, 773 (5th Cir. 2023). The Attorney General is not a nominal party seeking to recover damages to the identified victims of the Truck Park shooting, unlike in *Life of Mid-America* and *Ohio*. *See People of State of Ill. v. Life of Mid-Am. Ins. Co.*, 805 F.2d 763, 766 (7th Cir. 1986); *Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 749 (N.D. Ohio 2011). Indeed, the State is not seeking to recover money for these victims at all.

### B.     That the State Does Not Offer Expert Testimony to Opine That Straw Buying Is Harmful Does Not Mean the State Lacks Standing.

Fleet Farm also argues that the State has no *parens patriae* standing because the State has not offered expert testimony that straw buying and gun trafficking is harmful. Fleet Farm Mem. at 13 (Doc. 200 at 20). This is nonsense. The ATF itself explains that sales of guns to straw buyers are illegal and pose "a serious risk to public safety" because when guns end up in the wrong hands, bad things happen:

> In the United States, federal law prohibits certain individuals from legally purchasing firearms. These restrictions are designed to prevent guns from falling into the hands of those who might pose a danger to themselves or others. A straw purchase is the illegal buying of a gun by an individual, a "straw buyer," on behalf of such a person. Straw purchasing of firearms poses a serious a risk to public safety. As the primary governmental agency tasked with protecting communities from violent crime and reducing the risk to public safety caused by the criminal possession and use of firearms, ATF aggressively pursues those engaged in straw purchasing.

Ex. 5 at 1.

Indeed, two of Fleet Farm's proffered experts fully agree with the State that straw purchasing harms the public and disagree with Fleet Farm's third expert, Professor Kleck. Graham testified that straw purchasing is problematic and harmful:

Q. This may seem like an obvious question, Mr. Graham, but do you agree that straw purchasing is a problem?
A. Yes.
Q. I mean, it's against the law?
A. Correct.
Q. And it leads to real harm; right?
A. If a bad guy gets the guns through straw purchasing, yes.

Ex. 17 at 130:9–17.

Likewise, Napier testified that straw buying threatens public safety:

Q. Do you think straw purchasing is a problem?
A. Yes, ma'am.
Q. Why is straw purchasing a problem?
A. It's a threat to public safety.

Ex. 18 at 61:24–62:2.

### C.    That the State Does Not Seek Proprietary Damages Does Not Mean the State Lacks Standing.

Finally, Fleet Farm argues—that because the State is not seeking proprietary damages, even though the State seeks multiple other forms of relief—the State is not seeking relief on behalf of Minnesota residents and is instead seeking relief only on behalf of the victims of the Truck Park shooting. Fleet Farm Mem. at 13 (Doc. 200 at 20).

This argument makes no sense. The State seeks statewide relief—including injunctive relief and monetary equitable relief via disgorgement—to address statewide harm to the safety and well-being of Minnesota residents and protect the public going forward.[13] The private parties that have sued Fleet Farm cannot seek these remedies, which

---

[13] Even if the State were seeking equitable monetary relief for specific individuals harmed as a result of Fleet Farm's conduct, the State would still have *parens patriae* standing. *See Minn. Sch. of Bus*, 935 N.W.2d 124, 138–39 (Minn. 2019) (explaining that the restitution sought by the Attorney General was equitable rather than "money damages for each

are unique to the Attorney General's authority to protect the public interest. Indeed, there is no overlap between the relief sought by the State and the private parties in the other lawsuit.

\*\*\*

The State has *parens patriae* standing, and Fleet Farm is not entitled to summary judgment on this basis—or any other.

## II.    There Are Genuine Disputes of Material Fact Regarding Proximate Cause, and Fleet Farm Is Not Entitled to Judgment as a Matter of Law.

Fleet Farm's arguments that there is no evidence of proximate cause are contrary to law and must be rejected.[14] Proximate cause requires that the defendant's conduct was a substantial factor in causing harm and that harm was foreseeable. There is more than adequate evidence of both requirements in this case. Moreover, "[w]hether proximate cause exists in a particular case is a question of fact for the jury to decide." *Norberg v. Northwestern Hosp. Ass'n, Inc.,* 270 N.W.2d 271, 274 (Minn. 1978).

### A.    Fleet Farm's Conduct Was a Substantial Factor in Causing Harm.

The Minnesota Supreme Court "long ago defined a proximate cause of a given result

---

individual [victim]"); *see also, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295–96 (2002) (recognizing that when government brings an enforcement action it is seeking to vindicate a public interest even when it pursues victim-specific relief); *Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1424 (11th Cir. 1998) (holding private class settlement did not bar government agency's restitution claims because the government's enforcement action was pursuing "national public interests separate and distinct from those of the . . . private litigants").

[14] Fleet Farm wrongly claims that all of the State's claims require proximate cause. *See* Fleet Farm Mem. at 15–16 n.5 (Doc. 200 at 22–23). Minnesota Statutes section 8.31 does not require proximate cause.

as 'a material element or a substantial factor in the happening of that result.'" *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 372 (Minn. 2008) (quoting *Peterson v. Fulton*, 256 N.W. 901, 903 (Minn. 1934); *see also George v. Estate of Baker*, 724 N.W.2d 1, 10 (Minn. 2006) ("Minnesota applies the substantial factor test for causation. The negligent act is a direct, or proximate, cause of harm if the act was a substantial factor in the harm's occurrence.").

Fleet Farm argues its actions were not a substantial factor in causing harm by (again) mischaracterizing and minimizing the harms from its illegal sales to straw buyers. *See, e.g.*, Fleet Farm Mem. at 16 (Doc. 200 at 23). Fleet Farm argues that, because the State is not seeking proprietary damages, this means that "the State cannot establish 'widespread' (or any) societal harm—and thus cannot show Fleet Farm's conduct was a substantial factor contributing to such harm." Fleet Farm Mem. at 16 (Doc. 200 at 23). Fleet Farm further argues that the "only specific harm remaining in this case" is the mass shooting at the Truck Park restaurant. Fleet Farm Mem. at 16.

Fleet Farm's arguments should be rejected. Fleet Farm's illegal sales of dozens of guns to straw buyers Horton and Elwood are a substantial factor in multiple harms: (1) every one of those sales themselves, (2) the trafficking of these straw purchased guns to prohibited persons, (3) subsequent harms that have already occurred involving the trafficked guns, including but not limited to the Truck Park shooting, and (4) the risk of future harms from the remaining unrecovered guns.

Fleet Farm further argues that the State cannot show that Fleet Farm was a substantial factor in causing harm because the State has not offered expert testimony on

33

this issue. Fleet Farm Mem. at 16–17 (Doc. 200 at 23–24). But expert testimony is not required to prove causation (or anything else) in this case:

> Generally, lay testimony establishing a sequence of events that provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation. . . . Lay testimony is adequate to prove causation in cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition.

*Dawson v. Briggs*, 107 S.W.3d 739, 753–54 (Tex. App. 2003); *see also, e.g.*, *Berdyck v. Shinde*, 613 N.E.2d 1014, 1022 (Ohio 1993) ("In a negligence action involving conduct within the common knowledge and experience of jurors, expert testimony is not required."). *Cf. Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 380 (Minn. 2008) ("The question of causation is often one for the jury. But *when the issue of causation presents a matter that is outside the common understanding of lay people*, *we require expert testimony* to support the element of causation in order for a plaintiff to get her case to the jury." (emphasis added)).

Unlike the decisions on which Fleet Farm relies, this lawsuit is not a medical malpractice or similar action in which expert testimony is required to prove causation. *See Newport v. United States*, 2025 WL 579188, at *5 (E.D. Cal. Feb. 21, 2025) (granting summary judgment in a medical malpractice action when the plaintiff did not challenge an "expert opinion regarding that nursing, non-attending physician, and non-midlevel staff were not a substantial factor in causing Plaintiff's alleged injuries"); *Estate of Pesante ex rel. Pesante v. Geneva Med. Grp.*, 2002 WL 398517, at *5 (N.Y. Super. Ct. Mar. 11, 2002) (granting summary judgment in wrongful death action when there was unrebutted expert

34

testimony that the failure to report child abuse "did not contribute nor was it a substantial factor in bringing about [the child's] later injuries and death").

Finally, Fleet Farm argues that there is no proximate cause because Horton and Elwood hypothetically could have bought the guns they bought from Fleet Farm from other retailers. Fleet Farm Mem. at 18 (Doc. 200 at 25) ("Fleet Farm's expert testified that 'there is no evidence that any of the ultimate recipients of these guns could not have obtained guns from other sources or by other means that did not involve straw purchasing' from Fleet Farm."). Fleet Farm is not entitled to summary judgment based on a lack of evidence that something "could not have" occurred. Plus, this is not what "but for" causation means.[15]

"But for" causation does not mean that harm *hypothetically* could have arisen without Fleet Farm's action. Rather, "but for" causation means that, but for Fleet Farm's carelessness, the harm would not have happened. It is true that—but for Fleet Farm selling a gun to Horton on July 31, 2021—that gun could not have been used in the mass shooting at the Truck Park. If Fleet Farm had not sold this gun to Horton, Horton would not have transferred this gun to someone else, this gun would not have been present at the Truck Park, and this gun could not have been fired at the Truck Park. *See George*, 724 N.W.2d at

---

[15] "Factual, or but for, causation is insufficient to establish liability in Minnesota because '[i]n a philosophical sense, the causes of an accident go back to the birth of the parties and the discovery of America.' . . . But-for causation, however, is still necessary for substantial factor causation because if the harm would have occurred even without the negligent act, the act could not have been a substantial factor in bringing about the harm." *George v. Estate of Baker*, 724 N.W.2d 1, 10–11 (Minn. 2006) (quoting William L. Prosser, *The Minnesota Court on Proximate Cause*, 21 Minn. L. Rev. 19, 22 (1936)).

11 ("The classic test for determining factual cause is to compare what actually happened with a hypothetical situation identical to what actually happened but without the negligent act."). Likewise, it is also true that—but for Fleet Farm selling 37 guns to Horton and Elwood—37 illegal straw purchases that were then trafficked to prohibited persons would not have transpired. That is what "but for" cause means, and this requirement is fully satisfied in this case.

**B.    There Was No Superseding, Intervening Cause That Breaks Causation.**

In addition to arguing that Fleet Farm's conduct was not a substantial factor, Fleet Farm argues that there is no proximate cause because of the intervening "criminal act of a third person." Fleet Farm Mem. at 18–19 (Doc. 200 at 25–26). But proximate cause does not mean sole cause.

"A defendant is liable, despite an intervening cause, if the cause is foreseeable." *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 625 (Minn. 1984). This is true even for intervening criminal acts. *See id.* (holding that alleged criminal violations of OSHA "in these circumstances were reasonably foreseeable and thus do not constitute superseding cause"); *Hilligoss v. Cross Cos.*, 228 N.W.2d 585, 586 (Minn. 1975) ("[T]o be a legally sufficient intervening cause, the criminal act itself must not be reasonably foreseeable.").

Fleet Farm argues that "the harms resulting from the Truck Yard shooting were not foreseeable to Fleet Farm" because Horton was licensed and passed background checks. Fleet Farm Mem. at 19 (Doc. 200 at 26). This is illogical, however, because the reason straw buyers buy guns for other people is because straw buyers can pass background checks.

36

Moreover, Minnesota law is clear that the *specific* harm that results does not need to be foreseeable: "[Defendant] is incorrect in arguing that the *specific* conduct of the third party must be foreseeable. It is sufficient to establish a lack of superseding cause that the unreasonable risk of harm attributable to the third party's conduct be foreseeable." *Rieger v. Zackoski*, 321 N.W.2d 16, 21 (Minn. 1982) (emphasis in original) (citing *Rum River Lumer Co. v. State*, 282 N.W.2d 882, 884 (Minn. 1979). Thus, Fleet Farm's argument that it was not foreseeable that a mass shooting would occur at the Truck Park in St. Paul should be rejected. It was absolutely foreseeable that selling guns to straw buyers could cause harm, including gun violence—that is why straw buying is illegal and FFLs have a duty to prevent sales to straw buyers.

## III. Fleet Farm Is Not Entitled to Summary Judgment on Any of the State's Claims for Fleet Farm's Remaining Reasons.

### A. Undisputed Facts Do Not Show That Fleet Farm Is Entitled to Summary Judgment on the State's Public Nuisance Claim Because There Is No Minimum Numerical Requirement for Harm.

Fleet Farm argues that the State cannot prove its public nuisance claim because the State does not seek to prove that Fleet Farm sold guns to straw buyers in addition to Horton and Elwood.[16] Fleet Farm Mem. at 22 (Doc. 200 at 29). But Fleet Farm's sales of 37 guns to these two buyers is enough. Because of these sales, at least 37 straw purchased guns from Fleet Farm have been trafficked in Minnesota. Six of these guns have been used in additional crimes, and the remaining unrecovered guns threaten additional crimes.

---

[16] Fleet Farm also argues again that Kleck's "unrebutted expert testimony" warrants summary judgment. As demonstrated above, his testimony is not unrebutted and does not warrant summary judgment.

37

The State's case has not "narrowed to alleged injuries and endangerment to less than two dozen Minnesotans," as Fleet Farm says. Fleet Farm Mem. at 23 (Doc. 200 at 30). Many more people than those who were shot and killed at the Truck Park mass shooting were endangered by the shooting. Moreover, many more people remain endangered by Fleet Farm's crime guns that remain at large. Finally, the State seeks injunctive relief to prevent future sales to straw buyers by Fleet Farm. This is nothing like the three residents "unreasonably annoyed" in the single case Fleet Farm cites for its flawed counting argument. Fleet Farm Mem. at 23 (Doc. 200 at 30) (citing *In re N. Mankato City Council*, 2021 WL 4517273, at *5 (Minn. Ct. App. Oct. 4, 2021)). Summary judgment is not appropriate on the State's nuisance claim.

B. **Undisputed Facts Do Not Show That Fleet Farm Is Entitled to Summary Judgment on the State's Aiding and Abetting Claim Because Actual Knowledge Is Not Required.**

Fleet Farm wrongly states that the "State's aiding-and-abetting claim requires proving actual knowledge—*i.e.*, that Fleet Farm *knew* Elwood or Horton were straw purchasing at the time of the sales." Fleet Farm Mem. at 23 (Doc. 200 at 30) (emphasis in original).[17] The Minnesota Supreme Court case on which Fleet Farm relies, *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999), does not stand for this proposition.

*Witzman* did not hold that "actual knowledge" was required for an aiding and

---

[17] The parties previously disputed this same issue with respect to Fleet Farm's motion to dismiss, and the Court declined to "address this dispute in detail because the Court concludes that the State has sufficiently pled enough facts at this stage to suggest actual knowledge." Order (Doc. 36) at 32.

abetting claim under Minnesota law. *See generally id.* To the contrary, *Witzman* indicated that "constructive knowledge" could satisfy the "knowledge" requirement under certain circumstances. *Witzman*, 601 N.W.2d at 188.

Moreover, *Witzman* held that the elements of knowledge and substantial assistance are evaluated "in tandem." *Witzman*, 601 N.W.2d at 188. Thus, "'where there is a minimal showing of substantial assistance, a greater showing of scienter is required.'" *Witzman*, 601 N.W.2d at 188 (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)); *see also FedEx*, 39 F.4th at 771 (referring to *Witzman* as "adopting a sliding-scale approach between actual and constructive knowledge"). *Witzman* further explained that "[w]hether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case." *Witzman*, 601 N.W.2d at 188. Accordingly, *Witzman* shows that actual knowledge is not required under Minnesota law.[18]

Furthermore, even if actual knowledge were required, there is evidence from which a reasonable jury could find that Fleet Farm knew that Horton and Elwood were straw buyers. This evidence includes their suspicious purchasing patterns of multiple 9mm handguns across multiple Fleet Farm stores and ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ on July 31, 2021. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (explaining that the "willful blindness" can constitute actual knowledge required by statutes and "defendants cannot

---

[18] Fleet Farm's citation of a conflicting Eight Circuit decision is unavailing. *See* Fleet Farm Mem. at 3, 23 (Doc. 200 at 10, 30) (citing *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 715 (8th Cir. 2019)). The highest court of a state—not a federal court—is the final arbiter of state law. *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).

escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances").

Summary judgment is not appropriate on the State's aiding and abetting claim.

**C.    Fleet Farm Is Not Entitled to Summary Judgment on the State's Negligent Entrustment Claim.**

The Court recited the three elements for a negligent entrustment claim when denying Fleet Farm's prior motion to dismiss:

> (1) Fleet Farm "supplie[d] directly or through a third party"; (2) "a chattel for the use of another whom [Fleet Farm] knows or has reason to know to be likely because of [their] youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to [themselves] and others whom the supplier should expect to share in or be endangered by its use"; and (3) that physical harm resulted.

Order (Doc. 36) at 33 (quoting Restatement (Second) of Torts § 390 (Am. L. Inst. 1977), and citing *Johnson v. Johnson*, 611 N.W.2d 823, 826 (Minn. Ct. App. 2000)). As shown above, there is ample evidence of all these elements in this case.

Despite this evidence, Fleet Farm makes two arguments to try to obtain summary judgment on this claim. *See* Fleet Farm Mem. at 3 (Doc. 200 at 10) ("[T]he record shows Fleet Farm lacked the right to "control" the firearms after selling them, and neither Elwood nor Horton "used" the firearms "in a manner involving unreasonable risk of physical harm."). Both arguments should be rejected.

First, "control" is not an element of a negligence per se claim. The uses of the word "control" in the *Johnson* decision relate to the second element of the claim—that harm be foreseeable. *See Johnson*, 611 N.W.2d at 827. In this case, the risks from sales of firearms to straw buyers—as opposed to sales of motor vehicles to legitimate, actual buyers—are

eminently foreseeable.

Second, the Court rejected Fleet Farm's argument about the "use" requirement when denying Fleet Farm's motion to dismiss: "The very nature of straw purchasing gives a reason to believe the purchaser cannot be trusted to use the firearm in a reasonably safe manner." Order (Doc. 36) at 34.

Summary judgment is not warranted on the State's negligent entrustment claim.

**D.      Undisputed Facts Do Not Show That Fleet Farm Is Entitled to Judgment as a Matter of Law on the State's Negligence and Negligence Per Se Claims Because Facts Show Fleet Farm Has Violated Multiple Federal and State Statutes.**

Fleet Farm is not entitled to judgment on the State's negligence or negligence per se claims. Although the State's negligence claim includes allegations of statutory violations, the State's negligence claim is not limited to such statutory violations. There is ample evidence of the elements of a negligence claim—duty, breach, injury, and proximate cause—and a reasonable jury could find Fleet Farm liable based on this evidence. Indeed, in the State's view, a jury is likely to do so given the compelling evidence of Fleet Farm's gross negligence.

Furthermore, there is ample evidence that Fleet Farm did violate federal and state firearms laws, contrary to Fleet Farm's suggestions otherwise. *See* Fleet Farm Mem. at 25–28 (Doc. 200 at 32–35). First, if the jury concludes that Fleet Farm should have known that Horton and Elwood were straw buyers, Fleet Farm's sales to straw buyers Horton and Elwood violated the federal Gun Control Act. 18 U.S.C. § 922(d); Ex. 6 at 6. Likewise, if the jury concludes that Fleet Farm should have known that Horton and Elwood were straw

41

buyers, Fleet Farm's sales to straw buyers Horton and Elwood violated the Minnesota Gun

Control Act. Minn. Stat. § 624.7132, subd. 15(a)(2).

In addition, Fleet Farm's failure to timely submit a Form 3310.4 Form on July 24,

2021, violated the federal Gun Control Act. The Gun Control Act sets forth when FFLs

must prepare and submit a Form 3310.4:

> Each licensee shall prepare a report of multiple sales or other dispositions
> whenever the licensee sells or otherwise disposes of, at one time or during
> any five consecutive business days, two or more pistols, or revolvers, or any
> combination of pistols and revolvers totalling two or more, to an unlicensed
> person. The report shall be prepared on a form specified by the Attorney
> General and forwarded to the office specified thereon and to the department
> of State police or State law enforcement agency of the State or local law
> enforcement agency of the local jurisdiction in which the sale or other
> disposition took place, *not later than the close of business on the day that the
> multiple sale or other disposition occurs*.

18 U.S.C. § 923(g)(3) (emphasis added); *see also* 27 C.F.R. § 478.21(a) ("All of the

information called for in each form shall be furnished as indicated by the headings on the

form and the instructions on or pertaining to the form. In addition, information called for

in each form shall be furnished as required by this part.").[19]

Section 922 of the Gun Control Act provides that it is unlawful not to make records

as required by Section 923:

> It shall be unlawful for any licensed importer, licensed manufacturer,
> licensed dealer, or licensed collector knowingly to make any false entry in,
> to fail to make appropriate entry in, or to fail to properly maintain, any record
> which he is required to keep pursuant to section 923 of this chapter or

---

[19] Fleet Farm wrongly states that 27 C.F.R. § 478.21(a) has "not been violated because there are no facts indicating Fleet Farm failed to 'properly complete[]' or failed to 'sign and date' ATF Forms." Fleet Farm Mem. at 27 (Doc. 200 at 34). Fleet Farm failed to *timely* submit the Form 3310.4 for Fleet Farm's sales to Horton on July 24, 2021, as 18 U.S.C. § 923(g)(3) requires.

42

regulations promulgated thereunder.

18 U.S.C. § 922(m).[20]

Fleet Farm argues that its violations of these laws do not count because "the State must prove Fleet Farm committed a 'knowing' violation" and Fleet did not "*knowingly* violate" the law. Fleet Farm Mem. at 26 (Doc. 200 at 33) (emphasis in original). But constructive knowledge is sufficient: "[T]he scienter required to establish a knowing violation of [the predicate statute applicable to the sale or marketing of firearms] is knowledge 'or . . . reasonable cause to believe that Mr. Mace was prohibited from possessing a firearm under Maryland law.'" *Brady v. Walmart Inc.*, No. No. 8:21-cv-01412, 2024 WL 2273382, at *8–9 (D. Md. May 2024) (quoting the court's prior decision denying motion for judgment on the pleadings, *Brady v. Walmart Inc.*, No. 8:21-cv-1412-AAQ, 2022 WL 2987078, at *9 (D. Md. July 28, 2022), and denying defendants' motion for summary judgment and rejecting the argument that actual knowledge was required under PLCAA's predicate exception). As demonstrated above, there is compelling evidence that Fleet Farm *should have known* that Horton and Elwood were straw buyers.

Finally, Fleet Farm argues that it is entitled to summary judgment on the State's negligence claims because criminal provisions that do not provide for civil liability cannot

---

[20] Courts have held that, if an FFL knew or reasonably should have known that it was selling guns to straw buyers, this also violates 18 U.S.C. § 922(m). *Shawano Gun & Loan, LLC v. Hughes*, 650 F.3d 1070, 1073 (7th Cir. 2011) ("A dealer violates the GCA if the dealer transfers a firearm based upon information in ATF Form 4473 that he knows or has reason to believe is false."); *Chiapperini v. Gander Mountain Co.*, 13 N.Y.S.3d 777, 787 (N.Y. Sup. Ct. 2014) (A "violation [of 18 U.S. § 922(m)] can occur when a seller knows, or has reason to believe, that the information entered on the ATF Form 4473 is false, including information about the actual buyer.").

be the basis of negligence per se claims. Fleet Farm Mem. at 28 (Doc. 200 at 35). This argument conflicts with Minnesota law and was already rejected by the Court when denying Fleet Farm's motion to dismiss. *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981) ("Negligence per se may exist when the reasonable person standard is supplanted by a standard of care established by the legislature. Such statutes are often penal statutes that do not provide for a civil action."); Order (Doc. 36) at 36 ("Fleet Farm also argues that the negligence per se claim fails because none of the statutes relied upon by the State create a private right of action. This argument is in direct conflict with Minnesota law since negligence per se claims may arise for violations of penal statutes that otherwise do not provide for a civil action." (citing *Seim*, 306 N.W.2d at 810)).

### E. Fleet Farm Is Not Entitled to Summary Judgment on the State's MNGCA Claim, and Fleet Farm Does Not Even Argue That It Is.

Other than Fleet Farm's proximate cause argument, Fleet Farm does not present an argument that the State's entire claim under the Minnesota Gun Control Act should be dismissed. Rather, Fleet Farm argues only that summary judgment is warranted "on most of the MNGA claim." Fleet Farm Mem. at 28 (Doc. 200 at 35). Specifically, Fleet Farm argues that the Court should dismiss the MNGCA claim "to the extent that it is premised" on some—but not all—of Fleet Farm's sales transactions to Horton and Elwood.

This argument does not make any sense. The State only needs to prove one sale— not multiple sales—to someone the FFL should have known was a straw buyer to establish a violation of the MNGCA. Minn. Stat. § 624.7132, subd. 15(a)(2) ("[A] person who does any of the following is guilty of a gross misdemeanor . . . transfers *a pistol* or semiautomatic

military-style assault weapon to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement" (emphasis added)).

Moreover, there is ample evidence that Fleet Farm should have known that both Horton and Elwood were straw buyers based on the presence of multiple warnings signs, including purchases of multiple 9mm handguns during short periods of time. Indeed, ███ ████████████████████████████ on July 31, 2021 ████████████████ .

Further, if Fleet Farm had been tracking sales across Fleet Farm stores and watching out for purchases of multiple guns from separate stores, Fleet Farm could have identified even more, as Fleet Farm's proffered expert Graham testified:



Ex. 17 at 201:13–21 (testifying that, ████████████████████████ ████████████████████████████████ ██████████████████████ ).

Accordingly, a reasonable jury could conclude that Fleet Farm knew or had "reason to know" that Horton and Elwood were straw buyers in violation of the MNGCA.

## CONCLUSION

For all the reasons demonstrated above, Fleet Farm's motion for summary judgment should be denied.

Dated:  April 25, 2025

KEITH ELLISON
Attorney General
State of Minnesota

JAMES W. CANADAY (#030234X)
Deputy Attorney General

**/s/** *Katherine A. Moerke*

KATHERINE MOERKE (#0312277)
JASON PLEGGENKUHLE (#0391772)
ERIC J. MALONEY (#0396326)
Assistant Attorneys General

445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
jason.pleggenkuhle@ag.state.mn.us
Telephone: (651) 757-1147
eric.maloney@ag.state.mn.us
Telephone: (651) 757-1021

**UNIVERSITY OF MINNESOTA GUN
VIOLENCE PREVENTION CLINIC**

MEGAN WALSH (#0394837)
Special Assistant Attorney General

CALLAN SHOWERS
ARIELLE HUGEL
WILLIAM ROBERTS
Certified Student Attorneys

University of Minnesota Law School
190 Mondale Hall
229 19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-5515
wals0270@umn.edu

*Attorneys for State of Minnesota*

46