**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

STATE OF MINNESOTA,

                                        Civil No. 22-2694 (JRT/JFD)

                    Plaintiff,

v.

                                        **MEMORANDUM OPINION AND ORDER**
FLEET FARM LLC, FLEET FARM GROUP        **ON MOTIONS TO EXCLUDE AND**
LLC, and FLEET FARM WHOLESALE           **MOTIONS FOR SUMMARY JUDGMENT**
SUPPLY CO. LLC,

                    Defendants.

---

Eric John Maloney, Jason T. Pleggenkuhle, and Katherine Moerke, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suites 600, 1100, 1200, Saint Paul, MN 55101; Megan M. Walsh, **UNIVERSITY OF MINNESOTA LAW CLINICS**, Mondale Hall, 229 Nineteenth Avenue South, Suite 190, Minneapolis, MN 55455, for Plaintiff.

Andrew W. Davis, Andrew Leiendecker, Sharon Robin Markowitz, Todd A. Noteboom, and Zach Wright, **STINSON LLP**, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for Defendants.

The State of Minnesota (the "State") brought this action against Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (collectively, "Fleet Farm" or "Defendants") for allegedly selling firearms to individuals that Fleet Farm knew or should have known were straw purchasers of firearms—or people who purchase firearms for those who cannot legally obtain or possess them. The State alleges six theories of liability: public nuisance, aiding and abetting, negligent entrustment, negligence, negligence per se, and violation of the Minnesota Gun Control Act ("MNGCA"). Following

discovery, Fleet Farm moved to exclude the expert testimony of the State's sole expert, Joseph Bisbee, and the State moved to exclude the expert testimony of one of Fleet Farm's experts, Dr. Gary Kleck. Fleet Farm also moved for summary judgment on all six counts based on lack of parens patriae standing, proximate causation, and failure as a matter of law. The State moved for summary judgment on Fleet Farm's remaining affirmative defenses.

The Court will deny the motions to exclude because the experts are qualified, and their opinions are relevant and based on reliable methodology and data. Because the State has demonstrated parens patriae standing and created genuine issues of material fact on proximate cause and some of the State's claims, the Court will grant in part and deny in part Fleet Farm's motion for summary judgment. In particular, the Court will grant summary judgment to Fleet Farm on the aiding and abetting and negligent entrustment claims and on certain firearm transactions underlying the MNGCA claim but will deny summary judgment to Fleet Farm on the negligence, negligence per se, public nuisance, and remaining MNGCA claims. Finally, the Court will grant summary judgment to the State on Fleet Farm's fourth, sixth, ninth, eleventh, twelfth, thirteenth, fourteenth, sixteenth, and seventeenth affirmative defenses because they are legally inapplicable, duplicative, or fail as a matter of law.

## BACKGROUND

### I.    FACTS

The State brings this civil enforcement action against Fleet Farm, a federally licensed firearms dealer, for allegedly facilitating straw purchases of firearms. (*See generally* Am. Compl., Mar. 5, 2024, Docket No. 79.) The State's claims center on two individuals—Jerome Horton and Sarah Elwood—who collectively straw purchased at least 37 handguns from Fleet Farm stores in 2020 and 2021. (*Id.* ¶¶ 38, 54; Decl. of Kevin McKown ("McKown Decl.") ¶¶ 31–58, Exs. 28–55, Apr. 4, 2025, Docket No. 201.) According to the State, Fleet Farm ignored widely recognized indicators of straw purchasing and thus contributed to unlawful firearm transfers linked to gun violence in Minnesota. (Am. Compl. ¶ 4.)

#### A.    Legal and Regulatory Framework

Firearms dealers in the United States are regulated under the federal Gun Control Act of 1968, 18 U.S.C. §§ 921–931. To deal in firearms, a person must obtain a federal firearms license issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). *Id.* § 923(a). Federal firearms licensed dealers ("FFLs") "are the first line of defense" against straw purchasing, which is "the illegal buying of a gun by an individual, a 'straw buyer,' on behalf of" someone who is prohibited from legally purchasing a gun. (Decl. of Katherine A. Moerke ("Moerke Decl.") ¶ 5, Ex. 5, Apr. 25, 2025, Docket No. 221.)

Before completing a firearms sale, FFLs must conduct a background check of the buyer through the National Instant Criminal Background Check System ("NICS"), verify the

buyer's identity, and record the transaction in a firearms transaction record ("ATF Form 4473").  18 U.S.C. § 922(t)(1); 27 C.F.R. §§ 478.102, 478.124(a); (*see also* Moerke Decl. ¶ 6, Ex. 6 (blank ATF Form 4473).)  FFLs may not transfer a firearm if they know or have reason to believe the buyer is a prohibited person or that the information on the ATF Form 4473 is false.  18 U.S.C. § 933(a)(1).

When multiple guns are purchased by the same buyer, FFLs must complete an ATF Form 3310.4 for sales of multiple guns in a single transaction or within any five consecutive business days.  *Id.* § 923(g)(3)(A); 27 C.F.R. § 478.126a.  The ATF Form 3310.4 must be submitted to the ATF "no later than the close of business on the day that the multiple sale or other disposition occurs."  (Moerke Decl. ¶ 4, Ex. 4 (blank ATF Form 3310.4).)

Federal guidance identifies various "red flags" that may indicate a straw purchase, including multiple purchases in a short period of time, especially if the guns are similar; large cash purchases of firearms; shopping for guns with another person; communication while shopping for firearms, including use of a cell phone; a new frequent gun buyer; and purchasing firearms from different FFLs to avoid ATF Form 3310.4 reporting requirements.  (*See id.* ¶¶ 5, 7–10, Exs. 5, 7–10.)

In addition, Minnesota has its own Minnesota Gun Control Act ("MNGCA"), which echoes federal law.  The MNGCA prohibits the "transfer" of a firearm "to a person who has made a false statement in order to become a transferee, if the transferor knows or

has reason to know the transferee has made the false statement." Minn. Stat. § 624.7132, subd. 15(a)(2). These legal standards provide the backdrop for the State's claims.

### B.    Firearm Sales to Elwood and Horton

Fleet Farm has 17 locations across Minnesota, which all have federal firearms licenses. (McKown Decl. ¶ 3.) From 2017 through 2023, the Minnesota Fleet Farm stores sold 184,379 firearms, which amounts to about four firearms per day at each store. (*Id.* ¶ 4, Ex. 1.) Between January 2018 and October 2023, the number of transactions that were denied as potential straw purchases by all Fleet Farm stores—not just those in Minnesota—totaled more than 500. (*Id.* ¶ 5, Ex. 2.) More than 125 of those denied transactions occurred in Minnesota. (*Id.*)

Between January 1, 2017, and October 1, 2023, a total of 1,099 handguns were purchased by 96 different individuals in Minnesota who had bought four or more handguns within a 14-day period—and thus raised straw-purchasing suspicions. (Decl. of Andrew W. Davis ("Davis Decl.") ¶ 5, Ex. B at 61:12–19, 67:9–14, 69:1–4, Apr. 4, 2025, Docket No. 205; McKown Decl. ¶¶ 6–22, Exs. 3–19.) Sarah Elwood and Jerome Horton were among those individuals who raised straw purchasing concerns.[1] (McKown Decl. ¶¶ 6–22, Exs. 3–19.)

---

[1] The State recently supplemented Elwood and Horton's straw purchases with nine transactions by William Earl Burton. (*See* Decl. of Katherine A. Moerke, July 14, 2025, Docket No. 241.)

### 1.    Sarah Elwood

Sarah Elwood purchased 13 firearms from three Fleet Farm stores between June 2020 and May 2021.  (McKown Decl. ¶¶ 31–40, Exs. 28–37.)  Most of these guns were 9mm handguns.  (*See* Am. Compl. at 21.)  Several of Elwood's purchases occurred in close succession or involved multiple handguns, which triggered mandatory multiple-sale reporting to the ATF through ATF Form 3310.4s.  (Decl. of Andrew P. Leiendecker ("Leiendecker Decl.") ¶ 4, Ex. A ("Bisbee Rep.") at 14–15, Apr. 4, 2025, Docket No. 181.)[2] Nonetheless, each transaction was approved after Elwood presented a valid permit and passed a NICS background check.  (McKown Decl. ¶¶ 31–40, Exs. 28–37.)  Elwood later pleaded guilty to making false statements in connection with a firearm purchase.  (Davis Decl. ¶ 25, Ex. V at 1.)

When the State's expert, Joseph Bisbee, was asked to identify the sales to Elwood that he believed Fleet Farm should have stopped, he testified that, of Elwood's ten transactions, only one transaction on May 12, 2021, which involved two handguns, "should not have been allowed to proceed."  (Davis Decl. ¶ 19, Ex. P at 215:16–216:3; McKown Decl. ¶ 40, Ex. 37.)

Most of the guns purchased by Elwood remain unrecovered, but one was found on a person prohibited from possessing firearms after the person had allegedly used it to threaten someone in public.  (*See* Moerke Decl. ¶ 24, Ex. 24.)

---

[2] The Court cites to the original pagination of the expert reports.

### 2.   Jerome Horton

Jerome Horton purchased 24 handguns[3] from four Fleet Farm stores between June 15 and October 17, 2021.  (McKown Decl. ¶¶ 41–58, Exs. 38–55.)  22 of those guns were 9mm handguns, and some of the transactions were for multiple guns spaced just days apart.  (Am. Compl. at 14.)  In fact, Fleet Farm sold eight 9mm handguns to Horton in one week.  (*Id.*)  Nevertheless, like Elwood, Horton held a valid permit and passed NICS checks for each purchase.  (McKown Decl. ¶¶ 41–58, Exs. 38–55.)  He also later pleaded guilty to making false statements in connection with a firearm purchase.  (Davis Decl. ¶ 26, Ex. W ¶ 2 (copy of plea agreement).)

Despite the fact that ATF Form 3310.4s were required for Horton's purchases, Fleet Farm did not timely submit one such form to ATF.  (Bisbee Rep. at 10–14.)  Specifically, Fleet Farm did not submit an ATF Form 3310.4 on July 26, 2021, for the sales of two handguns to Horton on July 24, 2021, and one handgun to Horton on July 26, 2021; instead, Fleet Farm created and submitted the form for those sales on October 21, 2021.  (Moerke Decl. ¶ 16, Ex. 16; *id.* ¶ 12, Ex. 12 at 178:12–17, 199:11–200:17, 243:2–244:19.)

The State's expert identified 11 of Horton's transactions as suspicious.  (Davis Decl. ¶ 19, Ex. P at 205:12–206:1, 209:1–5, 209:20–23, 213:12–24.)  In fact, on July 31, 2021,

---

[3] The parties cite slightly different figures regarding the number of firearms that were straw purchased by Elwood and Horton.  Fleet Farm asserts that 36 firearms were involved, 23 of which are attributable to Horton.  The State contends the total is 37.  Based on the record, the Court counts 24 firearms that were purchased by Horton, for a total of 37 firearms between Elwood and Horton.

Cory Klebs, a Fleet Farm manager for the Blaine store, reported his concern that Horton was a straw purchaser to Michelle Granato, one of Fleet Farm's firearms compliance employees.  (Moerke Decl. ¶ 1, Ex. 1 at 2; *id.* ¶ 2, Ex. 2 (email Klebs sent to Granato with attached copies of the ATF Form 4473s and ATF Form 3310.4s).)  Klebs apparently never heard back.  (*Id.* ¶ 1, Ex. 1 at 2 (reporting that he "never go[t] a response back" from Granato); *id.* ¶ 11, Ex. 11 at 255–57 (Granato testifying that she had no recollection of Horton or Klebs).)

One of the firearms Horton purchased was later used by Devondre Phillips in the October 2021 mass shooting at the Truck Park bar in St. Paul, which left one person dead and 14 injured.  (Davis Decl. ¶¶ 27–29, Exs. X–Z (state criminal case documents).)  The firearm changed hands several times between the initial purchase and the shooting, passing through Gabriel Young-Duncan and "Mo" before reaching Phillips.  (*Id.*)

Several of the other firearms purchased by Horton have been recovered from the possession of individuals without permits to carry or people prohibited from possessing firearms.  (Moerke Decl. ¶¶ 21–23, Exs. 21–23.)  In addition, a 9mm pistol that Horton purchased from Fleet Farm on July 7, 2021, was discovered months later by a six-year-old boy in the front yard of his family's home in south Minneapolis.  (Davis Decl. ¶ 16, Ex. M at 7.)  According to police reports, the firearm was likely discarded by suspects fleeing an earlier public shooting incident in the neighborhood.  (*Id.* at 11.)

### C.    Fleet Farm's Policies to Prevent Straw Purchases

Fleet Farm implements various policies and training programs to detect and prevent straw purchases.  For example, employees must undergo specific training before they are authorized to sell firearms, including instruction on identifying straw purchasing indicators.  (McKown Decl. ¶¶ 24–25, Exs. 21–22; Davis Decl. ¶ 22, Ex. S at 22:16–24, 30:2–9, 36:12–23, 59:13–17; *id.* ¶ 23, Ex. T at 28:14–25, 84:8–85:12.)  Fleet Farm also provides quarterly refresher trainings, which instruct employees to "ask questions," to be aware of "3310.4 Multiple Handgun form alerts," and to look for signs such as the "[e]xchange of money," "[l]ack of interest from buyer," and "[p]aying cash for more than one firearm."  (McKown Decl. ¶ 26, Ex. 23 at 5; *id.* ¶ 27, Ex. 24 at 9; *id.* ¶ 28, Ex. 25 at 15; *id.* ¶ 29, Ex. 26 at 4; *id.* ¶ 30, Ex. 27 at 22.)  In addition, Fleet Farm issues "Straw Purchase Alerts" and "Be On the Lookout" notices to notify other stores of suspicious individuals, and employees regularly call neighboring locations to share information about suspected straw buyers.  (McKown Decl. ¶ 25, Ex. 22 at 4–6; Davis Decl. ¶ 23, Ex. T at 26:6–18, 33:21–34:6, 63:9–65:22; Davis Decl. ¶ 24, Ex. U at 42:4–45:4, 56:5–57:11, 226:7–227:5.)  Since 2022, Fleet Farm has enabled corporate-level personnel to monitor multiple purchases across stores to help identify potential straw purchasing activity.  (Davis Decl. ¶ 23, Ex. T at 29:1–24, 33:15–20, 39:4–20, 127:2–22.)

In late 2021, Granato and Mike Radl—the two firearms compliance employees at Fleet Farm—began training employees on "suspicious sales activity" using the exact same ATF Form 3310.4s that Klebs had found suspicious in July 2021.  (Moerke Decl. ¶ 3, Ex. 3

(presentation from November 2021).)  In fact, during the presentation Granato stated that the ATF Form 3310.4s for July 23 and July 27, 2021, were "[n]ot real suspicious, but, you know, should raise a flag," but that "it appears to be pretty obvious what's going on" with the purchase on July 31.  (*Id.* ¶ 12, Ex. 12 at 138:6–17 (transcription of recording).)  Radl similarly agreed that "something [wa]s up" with Horton's third July sale, and that "the employee's radar should be up."  (*Id.* ¶ 13, Ex. 13 at 120:7–121:6.)

### D.    Related Civil Litigation

On October 8, 2024, plaintiffs filed a separate civil action against Fleet Farm and the Truck Park bar on behalf of those injured in the Truck Park shooting.  (Davis Decl. ¶ 30, Ex. AA ("Wiley Compl.").)  Plaintiffs in that case, *Wiley v. Fleet Farm LLC*, assert claims for negligence, negligence per se, and negligent entrustment based on Fleet Farm's July 31, 2021, sale to Horton.  (Wiley Compl. ¶¶ 85–107.)  They seek damages for personal injuries and other economic losses.  (*Id.*)

## II.    PROCEDURAL HISTORY

The State filed this civil enforcement action in Minnesota state court on July 20, 2023, asserting five claims under Minnesota law: negligence, negligence per se, negligent entrustment, aiding and abetting, and public nuisance.  (Notice of Removal, Ex. A, Oct. 26, 2022, Docket No. 1.)  After removal to this Court, the Court denied the State's motion to remand and denied Fleet Farm's motion to dismiss.  *Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 848 (D. Minn. 2023).  The State was thereafter granted leave to amend its complaint to add a sixth claim for violation of the MNGCA, Minn. Stat. § 624.7132,

brought pursuant to the Minnesota Attorney General's enforcement authority under

Minn. Stat. § 8.31.  (*See* Am. Compl. at 35–36.)  The State seeks injunctive relief, civil

penalties, and equitable monetary relief.  (*Id.* at 36–38.)  The Court denied Fleet Farm's

request for interlocutory appeal of the motion-to-dismiss order.  *Minnesota v. Fleet Farm*

*LLC*, No. 22-2694, 2024 WL 22102, at *2 (D. Minn. Jan. 2, 2024).

Following discovery, the parties disclosed expert witnesses.  The State identified

former ATF agent Joseph Bisbee, and Fleet Farm disclosed Andrew Graham, William

Napier, and Gary Kleck.

On April 4, 2025, the parties filed cross motions to exclude expert testimony under

Federal Rule of Evidence 702.  (Def.'s Mot. Exclude Bisbee Test., Docket No. 178; Pl.'s Mot.

Exclude Kleck Test., Docket No. 186.)  That same day, the State moved for summary

judgment on Fleet Farm's remaining affirmative defenses.  (Pl.'s Mot. Summ. J., Apr. 4,

2025, Docket No. 194.)  Fleet Farm also moved for summary judgment on all six of the

State's claims.  (Def.'s Mot. Summ. J., Apr. 4, 2025, Docket No. 198.)

**MOTIONS TO EXCLUDE**

I.    **STANDARD OF REVIEW**

Federal Rule of Evidence 702 governs the admissibility of expert testimony and

provides the following:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of
> an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). Expert testimony is inadmissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). However, the Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up

to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

## II.   FLEET FARM'S MOTION TO EXCLUDE

Fleet Farm moves to exclude expert testimony of the State's sole expert, Joseph Bisbee. Bisbee is a former ATF special agent with over 25 years of experience investigating firearms tracking. (Bisbee Rep., App'x A at 1.) During his tenure at ATF, he served in various field and supervisory roles—such as special agent, headquarters project officer, assistant country attaché to Canada, and group supervisor of the Violent Gang Task Force in the Seattle Field Division. (*Id.* at 1–2.) He has also led and supervised national and international firearms trafficking investigations and trained law enforcement on straw purchasing indicators. (*Id.* at 2.)

In this case, Bisbee reviewed Fleet Farm's internal procedures, transaction records, deposition testimony, and ATF guidance. (Bisbee Rep. at 2–10.) He identifies patterns in Horton and Elwood's transactions—such as bulk purchases, repeat purchases of the same model firearms, and transactions across multiple stores—that he concludes should have raised red flags for a reasonable firearms dealer. (*Id.* at 16–22.) He also opines that Fleet Farm's policies and training fell short of what a reasonable FFL should implement. (*Id.*)

-13-

Fleet Farm seeks to exclude portions of Bisbee's testimony under Federal Rule of Evidence 702. While it does not dispute his qualifications to identify straw-purchasing indicators from a law enforcement perspective, Fleet Farm argues that several of Bisbee's opinions exceed the permissible scope of expert testimony. Specifically, Fleet Farm objects on four grounds: (1) lack of qualifications to opine on federal law and guidelines for FFL operations or the industry standard for FFL operations; (2) speculative or unsupported opinions; (3) improper narrative testimony; and (4) improper legal conclusions. The Court will address each in turn.

### A. Qualifications

Fleet Farm argues that Bisbee is unqualified under Rule 702 to testify on two areas: (1) Fleet Farm's compliance with federal laws and guidelines regarding straw purchase prevention, and (2) whether Fleet Farm's operations, training, and procedures align with FFL industry practice. According to Fleet Farm, Bisbee's background as a criminal investigator, not a regulatory or compliance officer, means he lacks expertise in FFL compliance, training creation, or auditing. But Fleet Farm's view that only a regulatory or compliance specialist is qualified to opine on FFL training and operations is too narrow. Rule 702 does not require perfect symmetry between an expert's experience and the precise subject matter of their testimony. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). Rather, the relevant inquiry is whether the expert's background equips him to help the jury understand the facts or issues in dispute.

Bisbee's background more than suffices.  For decades, he conducted and supervised firearms trafficking investigations that necessarily required an understanding of FFL responsibilities, compliance, and industry practices.  (Leiendecker Decl. ¶ 5, Ex. B at 39:6–42:2; Bisbee Rep. at 1.)  That experience qualifies him to opine on industry expectations, compliance practices, and indicators of straw purchasing.  *See Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1078–79 (D. Minn. 2015) (finding that expert's industry knowledge and contextual experience were sufficient, even without technical familiarity with the exact product).

Any perceived gaps in Bisbee's experience may be explored on cross-examination, but they do not warrant exclusion.  His qualifications satisfy Rule 702.

## B.    Reliability and Speculation

Fleet Farm next argues that Bisbee's opinions that Fleet Farm's sales contributed to an increase in crime guns, and that the company's internal practices require reform are speculative and unreliable.  Neither argument supports exclusion.

On the first point, Bisbee ground his opinion in record evidence.  He identifies multiple firearms sold to straw purchasers that were later recovered during criminal investigations.  (Bisbee Rep. at 11–12.)  He then contextualizes those facts using peer-reviewed research and decades of experience investigating firearms trafficking.  That foundation satisfies Rule 702.  *See, e.g.*, *Kumho*, 526 U.S. 137 at 155 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on specialized experience.").

Fleet Farm's criticism that Bisbee's opinion rests on speculation is unavailing. The Eighth Circuit has held that some speculation is not only permissible in expert testimony, but inevitable. *See, e.g.*, *Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760–61 (8th Cir. 2003). The key question is whether the expert applies reasoned judgment to facts in the record. Fed. R. Evid. 702. Bisbee does.

The same reasoning applies to Bisbee's recommendations regarding Fleet Farm's remedial measures relating to its firearms procedures. Rule 702 does not require expert recommendations to reflect binding legal obligations. It requires only that they reflect reliable methods applied to the record. Bisbee's reform opinions meet that standard.

### C.    Narrative Testimony

Fleet Farm also objects that portions of Bisbee's report impermissibly veer into improper narrative testimony. It points to his discussion of ATF Form 4473, ATF-published guidance, and Fleet Farm training videos, and it contends that the jury does not need expert assistance to understand those documents. (*See* Bisbee Rep. at 2–4.)

That objection misreads Rule 702. Experts may discuss the facts they relied on—especially technical forms, regulatory policies, and agency practices—if doing so helps contextualize their opinion. *See United States v. Van Dyke*, 14 F.3d 415, 422 (8th Cir. 1994); *Ocasio v. C.R. Bard, Inc.*, No. 8:13-1962, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015).

That is precisely what Bisbee does here. He refers to ATF Form 4473, agency guidance, and Fleet Farm's training materials not to summarize the record, but to explain

what red flags should have been recognized and how compliance obligations applied to the transactions in question. Such analysis is permissible.

### D.    Legal Conclusions

Finally, Fleet Farm argues that Bisbee crosses the line into legal conclusions by using terms like "duty" and "appropriate care." To be sure, terms that carry legal meaning must be handled with care. At trial, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).

But context matters. Bisbee does not purport to define legal standards or interpret statutory obligations. Rather, he uses familiar terminology to describe industry norms grounded in training, policy, and investigative experience. Expert testimony is not inadmissible just because it overlaps with a legal concept. *See, e.g.*, *United States v. Kelly*, 679 F.2d 135, 136 (8th Cir. 1982) (noting that expert "testimony is not defective because it utilized the words of a legal standard"). So long as the expert does not offer legal instructions to the jury, such testimony remains permissible.

The Court is confident that the jury will understand that Bisbee is testifying as an expert in firearms trafficking, not as a legal authority. Any necessary limiting instructions can be addressed at trial.

\*        \*        \*

In sum, Bisbee is qualified; his opinions are grounded in sufficient experience and data; and his methodology is reliable. The Court will therefore deny Fleet Farm's Motion to Exclude portions of his testimony.

## III.    STATE'S MOTION TO EXCLUDE

The State moves to exclude expert testimony of one of Fleet Farm's experts, Dr. Gary Kleck. Dr. Kleck is an emeritus professor of criminology with decades of experience analyzing the relationship between firearms and violence. (Decl. of Eric J. Maloney ("Maloney Decl.") ¶ 2, Ex. 1 ("Kleck Rep.") at 2, Apr. 4, 2025, Docket No. 190.) His report offers three central opinions: (1) that straw purchases from FFLs account for a negligible share of guns used in crime; (2) that the straw purchases by Horton and Elwood did not meaningfully contribute to gun crime or trafficking in Minnesota; and (3) that multiple-gun sales are routine and not inherently suspicious. (*Id.* at 4.) The State challenges each opinion as irrelevant and unreliable. The Court will take each in turn.

### A.  Straw Purchases and Crime Guns

The State first challenges Dr. Kleck's opinion that straw purchases are not a major source of crime guns. It argues that the opinion is irrelevant because straw purchasing is criminal per se and faults Dr. Kleck for failing to specify whether he refers to violent crime or crime more broadly. The State also claims his methodology is unreliable because he selectively interprets outdated sources while ignoring contrary studies.

The Court finds that Dr. Kleck's opinion is relevant. Whether straw purchasing is a significant contributor to crime guns bears directly on the State's theory that Fleet Farm's

conduct exacerbated gun violence and trafficking.  Dr. Kleck's testimony may assist the jury in evaluating that causal link.

As for reliability, Dr. Kleck's methodology is not without limitations, but it is admissible.  He draws on national crime statistics, ATF trace data, and peer-reviewed literature.  (Kleck Rep. at 5–8.)  He also identifies known data limitations and explains why he discounts certain sources.  (Maloney Decl. ¶ 3, Ex. 2 ("Kleck Dep.") at 126:4–128:8, 147:4–7, 149:17–150:6, 167:5–168:8.)  That analytical approach satisfies Rule 702.  The State's critiques go to weight of the evidence, not its admissibility.  *See Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002); *Bonner*, 259 F.3d at 929–30.

### B.    Causal Significance of Horton and Elwood's Purchases

The State next seeks to exclude Dr. Kleck's opinion that the straw purchases by Horton and Elwood were not a significant cause of gun crime or trafficking in Minnesota. (Kleck Rep. at 9.)  It contends that the opinion is irrelevant because any straw purchase necessarily increases trafficking risk and faults Dr. Kleck for failing to address the specifics of the sales at issue.  The State also objects to Dr. Kleck's use of a ten-year lookback period and his comparison between the 37 straw-purchased firearms and the 15,840 violent firearm crimes recorded in Minnesota from 2021 to 2023.  (*Id.* at 10.)  Finally, the State challenges Dr. Kleck's view that the firearms would likely have been acquired elsewhere as both unsupported and misleading.  (*Id.* at 11.)

These objections do not warrant exclusion.  Dr. Kleck calculates that the 37 allegedly straw-purchased firearms would account for, at most, one in every 428 violent

firearm crimes in Minnesota over a three-year period.  (*Id.* at 10–11.)  That framing is relevant and may assist the trier of fact in assessing the significance of Fleet Farm's conduct.  Dr. Kleck's related opinion—that the firearms in question could have been obtained from elsewhere—rests on criminological research and is similarly relevant.

The closer question is reliability.  Dr. Kleck acknowledges that he had not previously used the precise ten-year lookback period applied here.  (Kleck Dep. at 197:2–17.)  But he explains that this approach reflects how long firearms often remain in circulation before recovery, based on ATF trace data and prior studies.  (Kleck Rep. at 10.)  That is a permissible application of specialized experience to available data.  *See Kumho*, 526 U.S. at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'").

### C.    Multiple-Gun Sales

Finally, the State objects to Dr. Kleck's opinion that multiple-gun sales are common and not inherently suspicious.  It argues that the opinion is irrelevant given that Fleet Farm did sell multiple firearms to Horton and Elwood, some of which were later used in crimes.  On reliability, the State criticizes Dr. Kleck's reliance on a 2005 Maryland study, his use of anecdotal evidence, and his comment that purchases become suspicious when they involve "dozens" of firearms.  (Kleck Rep. at 11.)

This opinion is both relevant and admissible.  Dr. Kleck addresses a central issue in this case—whether Fleet Farm should have recognized the Horton and Elwood transactions as red flags.  His opinion, grounded in empirical data and industry norms,

offers the view that multiple-gun purchases, standing alone, do not necessarily indicate straw purchase trafficking.  (Kleck Rep. at 12–13.)  That view may help the jury in assessing Fleet Farm's training practices and employee conduct.

Dr. Kleck's methodology also meets Rule 702's standards.  He relies on published data and decades of professional experience.  The 2005 Maryland study on which he principally relies analyzed more than 180,000 handgun sales and found that multiple-gun purchases were slightly less likely than single purchases to result in crime-gun recoveries.  (*Id.* at 12.)  The State may disagree with Dr. Kleck's interpretation or criticize the study's age, but those points go to weight, not admissibility.  *See Marmo*, 457 F.3d 757–58.

The State also seizes on Dr. Kleck's remark that suspicion "might seem plausible" only in cases involving "dozens" of firearms.  (Kleck Rep. at 11.)  But that statement does not reflect a categorical threshold.  Dr. Kleck clarified at his deposition that context matters and that even smaller purchases may raise suspicion in some circumstances.  (Kleck Dep. at 219:20–24, 220:2–221:2.)  His core conclusion—that the purchases in this case are typical of lawful transactions and, standing alone, do not warrant suspicion—is supported by trace data, criminological literature, and decades of professional research.  That is sufficient under Rule 702.  *See Kumho*, 526 U.S. at 148.

* * *

In sum, Dr. Kleck's testimony is relevant, methodologically sound, and grounded in sufficient data and experience.  The State's objections may be explored through cross-

examination but do not justify exclusion. The Court will therefore deny the State's Motion to Exclude Dr. Kleck's testimony.

## MOTIONS FOR SUMMARY JUDGMENT

### I.    STANDARD OF REVIEW

Summary judgment on a claim or defense is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.    FLEET FARM'S MOTION FOR SUMMARY JUDGMENT

Fleet Farm moves for summary judgment on all six of the State's claims based on lack of parens patriae standing, lack of proximate causation, and failure as a matter of law.  The Court will address each argument in turn.

### A.  Standing

Fleet Farm contends that the State lacks parens patriae standing to pursue its common law claims.  According to Fleet Farm, the State has not demonstrated harm to the public at large, and its allegations concern only the injuries suffered by the victims of the Truck Park shooting, who are already seeking relief in a private civil action.

The parens patriae, or "parent of the country," action is rooted in the English common-law concept of royal prerogative, which included the power of the king to act "as guardian of persons under legal disabilities to act for themselves." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972).  After this country's founding, the parens patriae power passed to the states and has since evolved over time. *Id.*  Under the modern scope of the doctrine, a state will have standing to sue as parens patriae where it can pass the so-called *Snapp* test.  To do this, a state must "articulate an interest apart from the interests of particular private parties" and "express a quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).  A quasi-sovereign interest "is a judicial construct that does not lend itself to a simple or exact definition," but

includes "interests that the State has in the well-being of its populace." *Id.* at 601–02. Generally, such interests fall into two categories, one of which is relevant to this action: a state's quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents in general." *Id.* at 607.

To decide whether a state's interest pertains to "its residents in general" as opposed to an "identifiable group of individual residents," a court will consider the direct and indirect effects of the alleged injury. *Id.* An "alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.* Although the American concept of parens patriae is broad, it "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Id.* at 600. If that is the case, "i.e., if the State is only a nominal party without a real interest of its own—then it will not have standing under the parens patriae doctrine." *Id.*

The State asserts that Fleet Farm's unlawful sales to Horton and Elwood facilitated the illegal flow of firearms, thus contributing to gun trafficking and increasing the risk of gun violence statewide. Although Fleet Farm contends that the State's case is confined to a handful of transactions—particularly the July 31, 2021, sale to Horton that preceded the Truck Park shooting—the record shows otherwise. The State challenges 37 separate transactions over many months, and the majority of the firearms sold in those

transactions remain at large. Those unrecovered firearms pose an ongoing public safety threat to Minnesotans as a whole. That threat is neither speculative nor theoretical. Rather, it is supported by longstanding ATF guidance, expert testimony, and common sense. (Moerke Decl. ¶ 5, Ex. 5; *id.* ¶ 17, Ex. 17 at 130:9–17 (deposition of Andrew Graham).) And that threat threatens "the general population of [Minnesota] in a substantial way." *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981).

Fleet Farm's argument that the State is merely stepping into the shoes of the private plaintiffs harmed in the Truck Park shooting and acting as a nominal party without a distinct sovereign interest misses the mark. Parens patriae standing does not require the State's claims to be entirely distinct from private litigation. So long as the State asserts a distinct quasi-sovereign interest—as it does here with its interest in protecting its citizens from increased gun trafficking and gun violence—any overlap in factual allegations does not defeat standing. *See State ex rel. Hatch v. Cross Country Bank, Inc.*, 703 N.W.2d 562, 569–70 (Minn. Ct. App. 2005).

Fleet Farm's reliance on *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017) and *Harrison v. Jefferson Parish School Board*, 78 F.4th 765 (5th Cir. 2023) is unpersuasive. In both cases, the states attempted to vindicate the interests of specific, identifiable groups—egg farmers in *Koster* and individual students in *Harrison*. *Koster*, 847 F.3d at 652–53; *Harrison*, 78 F.4th at 773. Here, by contrast, the State alleges ongoing and diffuse harms to the entire population of Minnesota arising from unlawful gun sales and the

continued circulation of unrecovered firearms.  That public safety interest is both broader and more directly tied to the State's sovereign responsibility than the interests asserted in the private action.

In sum, the State has adequately alleged and supported a quasi-sovereign interest sufficient to satisfy the *Snapp* test.  The Court will thus deny Fleet Farm's Motion for Summary Judgment based on standing.

### B.    Proximate Causation

Fleet Farm argues that the State cannot establish proximate cause for either the general societal harms associated with gun trafficking and violence or the specific injuries stemming from the Truck Park shooting, which is detrimental to all of the State's claims. Fleet Farm contends that its conduct was not a substantial factor and that the independent criminal acts of third parties sever any causal link.

Proximate cause is typically a question of fact for the jury.  *Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 621 (Minn. 2021); *see also Green Plains Otter Tail, LLC v. Pro-Env't, Inc.*, 953 F.3d 541, 547 (8th Cir. 2020) (applying Minnesota law). However, the Court decides proximate cause as a matter of law where reasonable minds could not disagree on the issue.  *Staub*, 964 N.W.2d at 621.

At the summary judgment stage, the Court does not resolve competing theories of causation.  Its task is only to determine whether the State has offered sufficient evidence from which a jury could reasonably conclude that Fleet Farm's conduct proximately caused the alleged harms.  The Court concludes that it has.

### 1.  Substantial Factor

Fleet Farm first contends that its conduct was not a substantial factor in causing any broader harm resulting from gun trafficking or violence.  It points to the State's decision not to seek damages, its lack of expert testimony rebutting Dr. Kleck's causation opinion, and what Fleet Farm describes as the State's own disclaimer about the relevance of these issues.[4]

These arguments are unpersuasive.  Under Minnesota law, proximate cause exists where the defendant's conduct was a material element or substantial factor in bringing about the harm.  *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 372 (Minn. 2008).  The State has presented evidence that Fleet Farm's sales to Horton and Elwood enabled straw purchasing, contributed to gun trafficking and violence, and worsened risks to public safety.  The State's decision to forego proprietary damages does not negate the underlying harm; it merely reflects the difficulty of quantifying the impact on public safety through traditional damages.

---

[4] Fleet Farm points to the State's *Daubert* briefing, where the State argues that whether straw-purchased handguns are "rarely used in crimes," whether the 37 guns sold by Fleet Farm are a "significant cause" of trafficking, and whether multiple-gun sales are "suspect," are not at issue in this case.  (Pl.'s Mem. Supp. *Daubert* Mot. at 2–3, Apr. 4, 2025, Docket No. 187.)  The Court understands the State's position to be that these specific statistical debates are not dispositive of causation and do not limit the broader theory of harm it advances—namely, that Fleet Farm's unlawful sales contributed to the proliferation of firearms in Minnesota and fueled gun trafficking in ways that foreseeably endangered public safety.

Fleet Farm also argues that the absence of rebuttal expert testimony to Dr. Kleck's causation opinion is fatal to the State's claims. It is not. Expert testimony is not required where causation falls within the general understanding of lay jurors. *See Dawson v. Briggs*, 107 S.W.3d 739, 753–54 (Tex. Ct. App. 2003); *Berdyck v. Shinde*, 613 N.E.2d 1014, 1022 (Ohio 1993). The relationship between illegal firearm sales and downstream violence is a matter of common knowledge. The State need not prove causation with mathematical precision. It need only show that "reasonable persons might draw different conclusions from the evidence presented." *Osborne*, 749 N.W.2d at 380. It has done so here.

Accordingly, the State has presented sufficient evidence to create a genuine issue of fact whether Fleet Farm's conduct was a substantial factor in the harms alleged.

## 2. Intervening Criminal Acts

Fleet Farm next contends that any connection between its firearm sales and the Truck Park shooting is too attenuated to support proximate cause. It identifies several intervening actors—Horton, Young-Duncan, "Mo," and Phillips—and asserts that their criminal conduct breaks the causal chain.

That argument also fails. Under Minnesota law, an intervening act severs liability only if it was not reasonably foreseeable. *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 915 (Minn. 1983). A superseding, or "intervening efficient cause," "breaks the chain of causation and 'prevents the original negligent actor from being liable for the final injury.'" *Green Plains Otter Tail*, 953 F.3d at 547 (quoting *Wartnick v. Moss & Barnett*,

490 N.W.2d 108, 113 (Minn. 1992)).  "[A] criminal act of a third person is an intervening

efficient cause sufficient to break the chain of causation."  *Hilligoss v. Cross Cos.*, 228

N.W.2d 585, 586 (Minn. 1975) (citation omitted).  Though, "the criminal act itself must

not be reasonably foreseeable."  *Id.* (citation omitted).  "The question of foreseeability of

an intervening act is normally one for the trial court and should be submitted to a jury

only where there might be a reasonable difference of opinion."  *Id.* (citation omitted).

Here, a jury could reasonably find that selling firearms to Horton or Elwood

foreseeably leads to increased gun trafficking and gun violence.  *Cf. State v. Glock, Inc.*,

No. 27-24-18827, 2025 WL 2531619, at *7 (Minn. Dist. Ct. Aug. 21, 2025) (concluding that

the State sufficiently pleaded that the defendant's manufacturing and promotion of

handguns that are susceptible to illegal modification into automatic firearms caused the

"foreseeable proliferation of machine guns and other resultant harms in Minnesota").

The record shows that Horton displayed textbook indicators of straw purchasing—so

much so that Fleet Farm later used his transactions as training examples.  Klebs raised

straw purchasing suspicions internally, yet those concerns were disregarded.  Against that

backdrop, the unlawful use of a firearm sold to Horton was not an unpredictable anomaly

but a foreseeable risk.

Fleet Farm also asserts that its sales cannot be the "but for" cause of any

widespread harm because straw buyers could have obtained firearms elsewhere.  But

Minnesota law does not require the plaintiff to prove that no other actor could possibly

have contributed to the harm.  The test is whether the harm would have occurred without the defendant's conduct.  *George v. Estate of Baker*, 724 N.W.2d 1, 10–11 (Minn. 2006).  On this record, a reasonable jury could conclude that it would not have.

In sum, the State has presented sufficient evidence to create genuine disputes of material fact as to whether Fleet Farm's conduct was a proximate cause of both the general societal harms and the specific injuries arising from the Truck Park shooting.  The Court will therefore deny Fleet Farm's Motion for Summary Judgment on proximate cause grounds.

### C.    Additional Bases for Dismissal

Fleet Farm's final argument is that all of the State's claims fail as a matter of law for various reasons.

#### 1.  Public Nuisance

Fleet Farm contends that the State's public nuisance claim fails because there is no evidence that it maintained or permitted a condition that unreasonably endangered the public, nor any evidence that a considerable number of Minnesotans were affected.

These arguments are unavailing.  Under Minnesota law, a public nuisance is defined as an "act or failure to perform a legal duty" that "maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public," or any other act or omission that the law has declared a public nuisance.  Minn. Stat. § 609.74.

Fleet Farm asserts that the alleged harm is too remote to meet that definition. It notes the absence of expert testimony tying its conduct to widespread public harm and argues that the State's case focuses narrowly on the victims of the Truck Park shooting, which is too small a population to constitute a "considerable number of members of the public" for a public nuisance claim.

But the record tells a different story. The State alleges that Fleet Farm's unlawful sales facilitated the diversion of firearms into the illegal market, contributing to broader risks of gun violence and trafficking throughout Minnesota. Many of the firearms sold to Horton and Elwood remain unrecovered and continue to pose an ongoing threat to public safety. A jury could reasonably conclude that those risks affect a considerable number of Minnesotans.

This case stands in stark contrast to *In re North Mankato City Council*, where the alleged nuisance involved an overgrown yard, and the harms were purely aesthetic and confined to a few neighbors. No. A21-0143, 2021 WL 4517273, at *5 (Minn. Ct. App. Oct. 4, 2021). The alleged nuisance here involves matters of public safety and criminal violence—harms of a different kind and significantly broader scope.

Fleet Farm also suggests that the State's public nuisance theory has shifted impermissibly. That is incorrect. From the outset, the State has alleged that Fleet Farm's sales to straw purchasers maintained or permitted a public nuisance that endangered the safety of Minnesotans. (Am. Compl. ¶ 107.) That theory has not changed.

-31-

Viewing the record in the light most favorable to the State, a jury could find that Fleet Farm maintained or permitted a condition that endangers the safety of a considerable number of members of the public.  The Court will therefore deny Fleet Farm's Motion for Summary Judgment on the public nuisance claim.

### 2.    Aiding and Abetting

To prevail on a claim of aiding and abetting under Minnesota law, a plaintiff must show: (1) the primary tortfeasor committed a tort that caused injury; (2) the defendant knew the conduct constituted a breach of duty; and (3) the defendant substantially assisted or encouraged the tort.  *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).  These elements are evaluated on a sliding scale: minimal assistance requires stronger evidence of scienter.  *Id.* at 188.

Fleet Farm argues that summary judgment is warranted because the State has not presented evidence that Fleet Farm had actual knowledge that Horton or Elwood were engaged in straw purchasing.  The Court concludes that summary judgment is warranted.

Although the State suggests that *Witzman* leaves open the possibility of liability based on constructive knowledge, that reading overstates the decision.  *Witzman*, 601 N.W.2d at 188.  In *Witzman*, the Minnesota Supreme Court applied an actual knowledge standard and did not adopt a constructive knowledge exception.  *Id.*  Subsequent courts have interpreted *Witzman* accordingly.  *See Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857–58 (D. Minn. 2013) (holding that constructive knowledge is insufficient under *Witzman*); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 719–20 (8th Cir. 2019) (agreeing

with *Varga* and reaffirming the actual knowledge requirement).  Even if *Witzman* left room for a narrow constructive knowledge exception involving long-term relationships or plainly tortious conduct, the record does not support its application here.  The State has not shown that Fleet Farm had an ongoing relationship with Horton or Elwood, nor that the transactions were facially unlawful or plainly tortious at the time they occurred.

The State likewise fails to offer evidence of actual knowledge.  Its case rests largely on red flags in Horton's purchasing behavior and internal concerns raised by Fleet Farm employees.   But suspicion—even reasonable suspicion—does not establish actual knowledge.  As the Eighth Circuit explained in *Zayed*, actual knowledge requires proof that the defendant knew the conduct was wrongful.   *Zayed*, 913 F.3d at 715.  Here, the State's own expert, Joseph Bisbee, testified that he "do[es]n't believe that [Fleet Farm] willfully and knowingly allowed a straw purchase."  (Davis Decl. ¶ 19, Ex. P at 307:14– 308:15 (deposition of Joseph Bisbee).)  That admission reinforces that the record falls short of the threshold required to support an aiding and abetting claim.

Because the State has not presented evidence that Fleet Farm knew Horton or Elwood were straw purchasers, the Court will grant summary judgment to Fleet Farm on the aiding and abetting claim.

### 3.    Negligent Entrustment

To establish negligent entrustment under Minnesota law, a plaintiff must show: (1) the defendant supplied a chattel for the use of another; (2) the defendant knew or had reason to know that the user, because of youth, inexperience, or otherwise, was likely to

use the chattel in a manner involving unreasonable risk of physical harm; and (3) that physical harm resulted. *Johnson v. Johnson*, 611 N.W.2d 823, 826 (Minn. Ct. App. 2000) (quoting Restatement (Second) of Torts § 390 (Am. L. Inst. 1977)).

Fleet Farm argues that this claim fails for two reasons. First, it contends that Minnesota courts have not recognized negligent entrustment in the context of a sale and that Fleet Farm lacked control over the firearms at the time of the alleged harm. Second, it asserts that the doctrine does not extend to harm caused by third parties and that here, Horton or Elwood—the individuals allegedly entrusted—did not personally misuse the firearms. Both grounds support summary judgment here.

As to the first ground, lack of control is not a formal element of negligent entrustment. Indeed, *Johnson* considered lack of control in evaluating foreseeability, not as a threshold requirement. *Id.* at 827. But the State identifies no Minnesota authority imposing negligent entrustment liability in a commercial sale context. And both *Johnson* and *Bertelsen* expressly declined to extend negligent entrustment to sales and questioned whether the doctrine should apply in that context. *See Johnson*, 611 N.W.2d at 826; *Bertelsen v. Walker*, No. 19HA-CV-19-4898, 2020 WL 11039168, at *4 (Minn. Dist. Ct. Nov. 10, 2020). Considering this absence of precedent and the caution expressed in the few relevant cases, the Court declines to expand Minnesota tort law into novel territory.

Even assuming such a theory were viable, the claim would still face considerable obstacles. Whether Horton and Elwood "used" the firearms in a manner involving

-34-

unreasonable risk of physical harm presents a closer question. Purchasing firearms and transferring them to individuals prohibited from possessing them could arguably satisfy that standard. But under *Johnson*, the foreseeability of harm is informed by whether the defendant retained control over the chattel. Fleet Farm had no such control here. And critically, the firearms were misused not by Horton or Elwood, but by individuals further down the chain of possession. That distinction further undermines the claim.

Because Minnesota has not recognized negligent entrustment in the context of retail firearm sales, and because the record would not support such liability even if the theory were cognizable, the Court will grant summary judgment to Fleet Farm on this claim.

### 4.    Negligence and Negligence per se

To prevail on a negligence claim, the State must show: (1) a duty of care; (2) breach of that duty; (3) an injury; and (4) that the breach proximately caused the injury. *Gradjelick v. Hance*, 646 N.W.2d 225, 230 (Minn. 2002). In Minnesota, "general negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). Minnesota also imposes a duty of reasonable care when the defendant's conduct creates a dangerous situation. *Id.* at 26. Although foreseeability of injury is ordinarily decided by the court, "[i]n close cases, the issue of foreseeability should be submitted to the jury." *Id.* at 27; *see also Ileto v. Glock Inc.*, 349

F.3d 1191, 1204 (9th Cir. 2003) ("Although whether a duty exists is a question of law, foreseeability often is a question left for the jury to decide.").

"Negligence per se is a form of ordinary negligence that results from a violation of a statute." *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981). The fundamental rule in Minnesota is that "breach of a statute gives rise to negligence per se if the persons harmed by that violation are within the intended protection of the statute and the harm suffered is of the type the legislation was intended to prevent." *Pacific Indem. Co. v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548 (Minn. 1977), *superseded by statute on other grounds*, Act of Apr. 7, 1980, ch. 518, § 2, 1980 Minn. Laws 595, 596 (codified as amended at Minn. Stat. § 541.051 (2020)).

Fleet Farm argues that the State's claims fail for multiple reasons. First, it asserts there is no evidence that it knowingly violated any state or federal firearms laws, as required to qualify for the predicate exception to the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. § 7903(5)(A)(iii). Second, it contends that many of the statutes on which the State relies are criminal provisions and cannot support negligence or negligence per se claims.

The Court is not persuaded. As an initial matter, the PLCAA exempts actions "brought against a seller for negligent entrustment or negligence per se" from preemption. 15 U.S.C. § 7903(5)(A)(ii). For other torts such as common-law negligence, the predicate exception requires a showing that the seller "knowingly violated a State or

Federal statute applicable to the sale or marketing of" firearms. *Id.* § 7903(5)(A)(iii). While courts differ on whether this provision requires actual or constructive knowledge, Fleet Farm cites no binding precedent rejecting constructive knowledge as insufficient. In contrast, the State cites persuasive authority interpreting the exception to include violations committed with constructive knowledge. *See Brady v. Walmart Inc.*, No. 8:21-1412, 2024 WL 2273382, at *9 (D. Md. May 20, 2024).

Here, the State has produced evidence from which a reasonable jury could conclude that Fleet Farm knew or should have known it was selling firearms to straw purchasers. Horton's and Elwood's transactions triggered multiple red flags identified in federal guidance. A Fleet Farm employee raised concerns about Horton's purchases, and Fleet Farm later used those transactions in employee training as examples of suspicious straw purchasing conduct. These facts raise a triable issue as to whether Fleet Farm violated applicable firearm laws and breached its duty of care.[5]

Fleet Farm also challenges the State's reliance on certain criminal statutes, arguing they cannot support negligence claims. But the Minnesota Supreme Court has recognized that negligence per se claims may be based on penal statutes even if they do not provide

---

[5] The Court notes, however, that not all the statutory violations alleged as supporting the negligence claims are supported by the record. For example, there is evidence that the FFLs involved were properly licensed, undermining the State's reliance on 18 U.S.C. §§ 922(a)(1), 923(a). In addition, although certain statutes impose liability on straw purchasers, Fleet Farm itself is not alleged to be a straw purchaser, and the State has not presented any evidence to the contrary. Accordingly, the State's reliance on 18 U.S.C. § 922(a)(6) and Minn. Stat. § 624.7133 is unavailing.

a private right of action. *Seim*, 306 N.W.2d at 810. Although the issue is less clearly settled with respect to common-law negligence, the Court considered and rejected this argument at the motion to dismiss stage and sees no reason to revisit that conclusion now. *See Fleet Farm LLC*, 679 F. Supp. 3d at 847.

Accordingly, the Court will deny Fleet Farm's Motion for Summary Judgment as to the State's negligence and negligence per se claims.

### 5.    MNGCA

The MNGCA prohibits, in relevant part, the transfer of "a pistol or semiautomatic military-style assault weapon to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement." Minn. Stat. § 624.7132, subd. 15(a)(2). The State alleges that Fleet Farm sold firearms to customers who were acting as straw purchasers. The transfer of a pistol or semiautomatic military-style assault weapon to a straw purchaser in violation of the MNGCA would be an "unlawful practice[ ] in business, commerce, or trade." Minn. Stat. § 8.31, subd. 1.

Fleet Farm moves for partial summary judgment, arguing that the State has not identified sufficient evidence that it knew or had reason to know that Horton or Elwood were straw purchasers in connection with 16 specific transactions. Fleet Farm relies on the deposition testimony of the State's expert, Joseph Bisbee, who acknowledged that, in his view, some of those transactions were not ones that Fleet Farm should have halted.

The MNGCA claim must be narrowed. Bisbee testified that Fleet Farm should have stopped Horton's June 15, 2021 purchase and purchases from July 27 to October 11, 2021, and that only one of Elwood's ten transactions—her May 12, 2021 purchase—was sufficiently suspicious to warrant intervention. (Davis Decl. ¶ 19, Ex. P at 209:1–5, 209:20–23, 215:4–6, 215:16–216:3.) Specifically, Bisbee did not testify that Horton's transactions between July 4 and July 26 should have been stopped, and his understanding was that the October 17, 2021 transaction occurred "at the request of law enforcement." (*Id.* at 204:20–206:1, 209:20–23, 213:12–24.) The State has not introduced contrary evidence that would permit a reasonable jury to find that Fleet Farm knew or had reason to know that Horton or Elwood made false statements in connection with those transactions. The State's general assertions about Fleet Farm's internal practices and training are insufficient to create a genuine dispute of material fact on this point.

Accordingly, the Court will grant partial summary judgment to Fleet Farm on the MNGCA claim insofar as it is based on: (1) Horton's purchases between July 4 and July 26, 2021, and on October 17, 2021; and (2) Elwood's purchases other than her transaction on May 12, 2021. The MNGCA claim may proceed only as to Horton's purchases on June 15, 2021, and between July 27 and October 11, 2021, and Elwood's purchase on May 12, 2021.

\*       \*       \*

The Court will grant Fleet Farm's Motion for Summary Judgment in part and deny it in part. The Court will grant the Motion as to the State's claims for aiding and abetting, negligent entrustment, and the MNGCA claim to the extent it is based on the transactions identified above. The Court will deny the Motion as to the State's remaining claims for public nuisance, negligence, negligence per se, and the remaining transactions underlying the MNGCA claim.

## III.   STATE'S MOTION FOR SUMMARY JUDGMENT

Fleet Farm initially asserted 17 affirmative defenses. Five were later stipulated to dismissal. (Stipulation, Apr. 3, 2025, Docket No. 176.) The State now moves for summary judgment on nine of Fleet Farm's remaining defenses. Three affirmative defenses— unclean hands, failure to join necessary parties, and the "free public services doctrine"— are not meaningfully disputed and may be resolved at the outset.[6] The Court addresses the remaining six defenses below.

---

[6] Fleet Farm concedes that its ninth affirmative defense (unclean hands and unjust enrichment) may be dismissed. It also clarified that its thirteenth affirmative defense (failure to join necessary parties) is duplicative of its comparative fault arguments, which are addressed separately. The twelfth affirmative defense (based on the "free public services doctrine" or "municipal cost recovery rule") fails because, to the Court's knowledge, Minnesota has not adopted the doctrine, and the State is not seeking to recover the cost of providing public services. *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004) (explaining the doctrine). Accordingly, the Court will grant summary judgment to the State on the ninth, twelfth, and thirteenth affirmative defenses.

### A. Damages Defenses

Fleet Farm's fourteenth affirmative defense asserts that the State's claims are barred to the extent the alleged damages are speculative or hypothetical. Its sixteenth affirmative defense asserts that the State failed to mitigate its damages. The State contends these defenses are now irrelevant because it is no longer seeking proprietary damages. In a formal filing, the State conceded that "[T]he State will not be seeking damages from Fleet Farm in this action due to the costs to the State associated with investigating, monitoring, treating, policing, and remediating the misuse of firearms in Minnesota for which Fleet Farm is responsible." (Davis Decl. ¶ 12, Ex. I at 23.)

Fleet Farm argues that these defenses remain viable because the State declined to stipulate that it will not pursue any monetary relief beyond civil penalties and disgorgement. The State clarifies that it continues to seek equitable monetary relief in the form of disgorgement, civil penalties, and attorney's fees and costs, but not traditional compensatory damages.

The Court concludes that the parties agree in substance. To eliminate any residual ambiguity, the Court construes the State's representations as a waiver of any claim for damages beyond civil penalties, equitable monetary relief, and attorney's fees and costs. Accordingly, the Court will dismiss the State's demand for damages to the extent it seeks proprietary relief beyond those categories and grant summary judgment to the State on Fleet Farm's fourteenth and sixteenth affirmative defenses.

B.    **Comparative Fault Defenses**

Fleet Farm's fourth, sixth, and eleventh affirmative defenses assert variations of comparative fault.  The fourth alleges that the State's claims are barred by comparative or contributory fault; the sixth invokes Minn. Stat. § 604.01 and contends that the State's own conduct caused its injuries; and the eleventh asserts that the State assumed the risk of harm.

These defenses are inapplicable because the State is not seeking proprietary damages.  Minnesota's comparative fault statute applies only in actions "to recover damages for fault resulting in death, in injury to person or property, or in economic loss."  Minn. Stat. § 604.01, subd. 1.  It further provides that "[e]vidence of unreasonable failure to avoid aggravating an injury or to mitigate damages may be considered only in determining the damages to which the claimant is entitled.  It may not be considered in determining the cause of an accident."  *Id.* § 604.01, subd. 1a.  Likewise, assumption of risk is considered an aspect of contributory negligence and is factored into comparative fault.  *See Soderberg v. Anderson*, 922 N.W.2d 200, 202–03 (Minn. 2019).  The lack of damages sought in this case precludes its applicability.

Fleet Farm argues that relative fault remains relevant to the appropriateness of equitable relief.  It relies on *Minnwest*, where the Court of Appeals considered comparable fault in denying injunctive relief in a property encroachment case.  *In re Minnwest Bank Litig. Concerning Real Prop.*, 873 N.W.2d 135, 145–46 (Minn. Ct. App. 2015).  But *Minnwest* involved a request for both monetary and injunctive relief and did

not address whether comparative fault applies when damages are not sought. *Id.* Courts have expressly rejected the application of comparative fault in suits for equitable relief. *See N. Carolina ex rel. Cooper v. Tennessee Valley Auth.*, 549 F. Supp. 2d 725, 733–34 (W.D.N.C. 2008) (concluding that "comparative fault is not a proper consideration in a suit for injunctive relief").

Fleet Farm also contends that the jury should consider fault-based evidence relating to non-party actors—including the FBI, the State, other FFLs, Horton, Elwood, and various criminal actors. But even assuming such evidence were relevant to equitable remedies, those remedies are determined by the Court, not the jury. *See* Minn. Stat. § 8.31, subd. 3 (granting the Attorney General authority to seek civil penalties and injunctive relief "in an amount to be determined by the court"). Fault-based defenses are thus immaterial to any claim or remedy triable to the jury.

Accordingly, the Court will grant summary judgment to the State on Fleet Farm's fourth, sixth, and eleventh affirmative defenses.

### C.    Adequate Remedy at Law

Fleet Farm's seventeenth affirmative defense asserts that the State's request for equitable relief is barred because an adequate remedy at law exists. The parties appear to agree that this defense pertains, if at all, only to the State's request for injunctive relief on its common law claims. It does not apply to the statutory claims under the MNGCA or Minnesota's public nuisance statute.

Because the availability of injunctive relief is a matter for the Court, not the jury, the Court will grant summary judgment to the State on this defense to the extent it seeks to preclude Fleet Farm from presenting it to the jury. The Court may still consider the adequacy of legal remedies when evaluating injunctive relief, if warranted.

\*     \*     \*

The Court will grant the State's Motion for Summary Judgment as to Fleet Farm's fourth, sixth, ninth, eleventh, twelfth, thirteenth, fourteenth, sixteenth, and seventeenth affirmative defenses. These defenses are dismissed in full and may not be presented at trial. The Court may still consider arguments relevant to equitable relief where appropriate.

## CONCLUSION

The Court will deny the motions to exclude expert testimony because neither party has adequately challenged the qualifications, methodology, or reliability of the opposing expert under Rule 702. The Court will grant in part and deny in part Fleet Farm's Motion for Summary Judgment: The motion is granted as to the State's claims for aiding and abetting, negligent entrustment and certain transactions underlying the MNGCA claim; the motion is denied as to the State's claims for negligence, negligence per se, public nuisance, and the narrowed MNGCA claim. The Court will also grant the State's Motion for Summary Judgment on Fleet Farm's affirmative defenses.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants' Motion to Exclude Expert Testimony of Joseph Bisbee [Docket No. 178] is **DENIED**;

2.  Plaintiff's Motion to Exclude Expert Testimony of Gary Kleck [Docket No. 186] is **DENIED**;

3.  Defendants' Motion for Summary Judgment [Docket No. 198] is **GRANTED in part and DENIED in part** as follows:

    a.  Summary judgment is **GRANTED** as to the State's claims for aiding and abetting and negligent entrustment;

    b.  Summary judgment is **GRANTED** as to the State's claim under the Minnesota Gun Control Act to the extent it is based on:

        i.  Jerome Horton's purchases between July 4 and July 26, 2021;

        ii.  Jerome Horton's purchase on October 17, 2021; and

        iii.  Sarah Elwood's purchases other than her May 12, 2021 transaction.

    c.  Summary judgment is **DENIED** as to the State's remaining claims for negligence, negligence per se, public nuisance, and the narrowed MNGCA claim.

4.  Plaintiff's Motion for Summary Judgment [Docket No. 194] is **GRANTED**.


DATED:  October 1, 2025
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge