UNITED STATES DISTRICT COURT
DISTRICT of MINNESOTA

---

State of Minnesota by its Attorney, General Keith Ellison,

Plaintiff,

vs.

Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC,

Defendants.

File No. 22-cv-2694 (JRT/JFD)

Minneapolis, Minnesota
July 23, 2025
2:11 p.m.

---

BEFORE THE HONORABLE JOHN R. TUNHEIM
UNITED STATES DISTRICT COURT JUDGE

**(MOTIONS HEARING)**

Proceedings reported by certified court reporter; transcript produced with computer.

**APPEARANCES**:

For the Plaintiff: Minnesota Attorney General's Office
ERIC J. MALONEY, ESQ.
KATHERINE MOERKE, ESQ.
445 Minnesota Street
Suite 1200
St. Paul, Minnesota 55101

For the Defendants: Stinson, LLP
ANDREW W. DAVIS, ESQ.
ANDREW LEIENDECKER, ESQ.
TODD A. NOTEBOOM, ESQ.
50 South Sixth Street
Suite 2600
Minneapolis, Minnesota 55402

Court Reporter: LORI A. SIMPSON, RMR-CRR
300 South Fourth Street
1005 U.S. Courthouse
Minneapolis, Minnesota 55415

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: This is Civil Case Number 22 -- State of Minnesota vs. Fleet Farm, LLC, et al. We are here for a number of motions today.

Counsel, let's note appearances for the record. First for the State?

MS. MOERKE: Good afternoon, Your Honor. Katherine Moerke, Assistant Attorney General, on behalf of the State.

THE COURT: Good afternoon.

MR. MALONEY: Good afternoon, Your Honor. Assistant Attorney General Eric Maloney on behalf of the State.

THE COURT: Good afternoon to both of you.

For the defense?

MR. DAVIS: Good afternoon, Your Honor. Andy Davis on behalf of the defendant, Fleet Farm.

MR. NOTEBOOM: Good afternoon, Your Honor. Todd Noteboom also on behalf of the Fleet Farm defendants.

MR. LEIENDECKER: Good afternoon, Your Honor. Andrew Leiendecker also on behalf of Fleet Farm.

THE COURT: All right.

MR. NOTEBOOM: Your Honor, if I may?

THE COURT: Sure.

MR. NOTEBOOM: With us today is the general counsel of Fleet Farm, AJ Peterman, who is sitting in the back.

THE COURT: Good afternoon. Thank you for coming. And good afternoon to each of you.

All right. The Court has read the briefs in preparation for argument today. We have set aside 90 minutes, and I am kind of relying on the parties to decide what is most important to argue.

I did note ahead of time that the summary judgment motion probably deserves the most attention here, but at the same time, I'm not limiting anybody from raising any issues, so.

All right. Do you want to begin, Mr. Davis?

MR. DAVIS: Yes, I do. Thank you, Your Honor.

THE COURT: Go ahead.

And thank the parties for the briefing in this case. It was very thorough.

MR. DAVIS: And, Your Honor, just to be clear, we will plan to spend about 35 of our 45 minutes on our -- on Fleet Farm's motion for summary judgment.

THE COURT: Okay.

MR. DAVIS: We will reserve whatever remainder of time we have on our side to address our Rule 702 motion to

exclude the State's expert, Joseph Bisbee. And unless the Court has specific questions, we plan to rest on the papers with respect to the State's two motions that are also before the Court.

THE COURT: All right.

MR. DAVIS: We talked before the hearing. Our understanding is that the State is generally amenable to that approach this morning -- or this afternoon.

THE COURT: All right. Very well.

MR. DAVIS: May it please the Court.

When the State filed this case almost three years ago, it alleged that Fleet Farm was engaged in widespread and pervasive wrongdoing. It claimed that Fleet Farm knowingly and recklessly ignored red flags of criminal straw purchasing in its stores, fueling a surge in gun trafficking and gun violence throughout the state of Minnesota. In short, the State ultimately sought to hold a single firearms retailer responsible for the scourge of gun violence in the state.

We are here this afternoon because there is no evidence in the record to support this expansive theory of wrongdoing. In fact, the State's case has shrunk to its narrowest possible version. It now concerns a handful of gun sales to a straw purchaser, Jerome Horton, and specific harms to a limited identifiable group of individuals, all of

which were known to the State at the time it filed its Complaint in October of 2022.

And the State doesn't dispute this lack of evidence. In fact, the State admits it. In the State's motion to exclude Fleet Farm's expert, Professor Gary Kleck, the State says that it is no longer focused on the impact of Fleet Farm sales on gun trafficking and violent crime in the state of Minnesota. That's at ECF Docket Number 187, throughout their motion and in particular at page 19. It is this inability to develop any evidence to support its broad claims that is fatal to the State's case.

First, as to all of the State's common law claims, there's no longer *parens patriae* authority. The only basis for their common law claims must show that there is an injury to a substantial segment of the population and harms that are separate and apart from an identifiable group of individuals.

Second, the narrowing of the State's case fundamentally changes the proximate causation analysis and this is fatal to all of the State's claims, not only the common law claims, but its statutory claims for public nuisance and the Gun Control Act as well.

THE COURT: On the statewide impact, can the Court take into account the generalized concern that probably most everyone has about gun violence?

MR. DAVIS: Your Honor, that is a fundamental question with respect to our first argument on *parens patriae* authority, and so the question now -- certainly at the Rule 12 stage of this case, that was alleged. The question now is: Can the State meet its burden in response to our summary judgment motion to come forward with specific evidence of harm?

And we will point the Court to the very few places in the record in which there is discussion or identification of the harms that the State is seeking to recover for or to remedy in this case, and there's really just a handful of places: The State's supplemental Rule 26 disclosures in which it identified as potential witnesses for their claims the individuals involved in the Truck Park shooting itself, the individuals who were injured in the Truck Park shooting, as well as a family in Minneapolis who had discovered a firearm at some point in their front yard.

THE COURT: What about the fact that there presumably are, I'm not sure, 36, 35, depending on how you count, handguns that are somewhere because they were either sold or handed over to people who may or may not have had permission to own those guns? What about the threat of that violence that likely is still out there?

MR. DAVIS: Yes, Your Honor. That is really a question that goes, again, to the nature of the harm here,

and these are really -- when we're talking about firearms that have been sold by Fleet Farm, have not yet been recovered and are potentially circulating -- we really don't know -- in society, in Minnesota, elsewhere, this is really an argument about future harm.

And we know from the case law that discusses *parens patriae* as a doctrine, that future harms in general are not sufficient to establish the kind of concrete injury necessary for *parens patriae* standing.

*Parens patriae* is a standing doctrine, and so like any other standing doctrine, there has to be concrete and particularized injury. So when we're talking about, you know, what could happen in the future with respect to a firearm, that's highly speculative. We simply don't know the answer to that question and it's not sufficient for *parens patriae* standing.

I would point the Court to the Ninth Circuit decision in *Koster vs. Harris*. That's a 2017 decision. That was a *parens patriae* decision. It did not involve firearms. It involved actually the sale of eggs.

And one of the harms that the plaintiffs alleged in connection with California law requiring the caging of chickens for the sale of eggs was that eventually, you know, there's the potential -- wasn't just the egg farmers in the state of Missouri who were impacted by this, but it was all

consumers in Missouri who would eventually feel the impact of higher prices. And the court said that that was future harm and it was really too speculative for *parens patriae* standing.

The second point on that, Your Honor, is that there's simply no evidence in the record regarding these future harms. We specifically asked the State to identify the harms that it was, you know, seeking to recover for in this case, and there's nothing in the record with respect to that type of future harm.

The last point on that, Your Honor, is that the State's argument is really contradicted by its own briefing. And I mentioned the State's motion to exclude Professor Gary Kleck. In that motion the State specifically refers to future harms as hypothetical, academic, and a straw man. So the State has made it clear in their own briefing that they are not seeking to recover for those types of harms.

So getting back to the general framework for *parens patriae* authority, the requirement that the State must meet to satisfy this standing doctrine is that there must be injury to a sufficiently substantial segment of the population, number one; and, number two, an interest that is separate and apart from the interest of private parties. So there has to be a quasi-sovereign interest, something that the State is seeking that's different from what private

individuals are seeking.

THE COURT: Is there injury just merely by the fact that there are these guns out there that perhaps haven't been used yet but might be used? Is there enough there to show a present injury, the concern that people have?

MR. DAVIS: You know, Your Honor, respectfully, there simply is not. And, again, we pressed the State to provide evidence associated with that harm or injury.

And it's instructive, I think, to look to the State's Complaint at paragraph 110 in which at that point the State was alleging the kinds of costs they were going to seek to recover in this case, and that included costs to investigate this kind of gun trafficking, costs to monitor, to treat, to police, or to remediate the misuse of firearms writ large.

Similarly, in their initial interrogatory responses, when we asked the State please identify the harms that you are seeking to recover for in this case, the State identified at that point, very early in the case, community violence protection programs, youth education programs, and other public safety programs.

However, as this case proceeded in discovery, the State was simply unable to develop any evidence on those points. And in its second supplemental discovery responses,

the State ultimately said we are no longer seeking damages associated with any of those activities.

So the State has never identified in this case harm to more than a handful of individuals, and namely, it's the individuals who were impacted and harmed at the Truck Park shooting in October of 2021. There's not a shred of evidence in the summary judgment record of harm beyond that. And, again, it's the State's burden at summary judgment to come forward with any other evidence to establish injury to a larger segment of the population.

The number of affected individuals in this case is similar to and actually significantly less than other cases that have rejected *parens patriae* authority. I already talked about the *Koster vs. Harris* case, which involved all chicken farmers in the state of Missouri. That was not a sufficient population group. In *Harris vs. Jefferson Parish* (Fifth Circuit 2023), the population was 52,000 school children in a school district in Louisiana. And in *Ohio vs. GMAC Mortgage* (Northern District of Ohio 2011), the population was all Ohio residents with a GMAC mortgage at the time of the Great Recession.

So if these populations are not sufficiently large for *parens patriae* authority, the 15 individuals who were identified by the State in discovery as actually harmed in this case is certainly not a sufficient number under the

case law.

There's also -- on the second prong of *Snapp*, there's no evidence in the record to establish that the State has an interest in this case that's separate and apart from the victims of the Truck Park shooting itself.

As Your Honor likely knows, those same individuals have now commenced their own lawsuit, asserting the exact same common law claims for the exact same injuries stemming from the exact same incident in the *Wiley vs. Fleet Farm* case pending in front of Judge Provinzino. Again --

THE COURT: That's got a pending motion to dismiss?

MR. DAVIS: It does. It does.

And so when you put together the absence of evidence in the summary judgment record of any harms to anyone other than that specific limited group of individuals, what we have here is really the State stepping into the shoes of private individuals as a nominal party, and that meets the second prong of *Snapp* and they can't establish it.

THE COURT: What about -- the State, I think, relies on the Minnesota Court of Appeals decision in that *Hatch* case involving credit cards. Why doesn't that provide direct authority here? *Hatch* -- *State ex rel. Hatch vs.*, I think, *Cross Country Bank*.

MR. DAVIS: Sure, Your Honor. Let me just grab my notes on that.

*(Pause)*

THE COURT: There was a standing issue in that case, and the court found that there was standing to protect --

MR. DAVIS: Yes, Your Honor.

THE COURT: -- the privacy of citizens.

MR. DAVIS: I found it.

THE COURT: Sort of a quasi-sovereign interest theory.

MR. DAVIS: So what I would say about that case and, frankly, all of the State's cases -- thank you -- first of all, that is a case that was really about arbitration. There was nothing in that case that sort of spoke to the question of *parens patriae* authority.

In fact, that is the only case that the State cited that postdates the *Snapp* decision of the U.S. Supreme Court. Every other case they cited on this issue relates to pre-*Snapp* authority.

But none of their cases, including the *Hatch vs. Cross Country Bank* case, addressed specifically the question of *parens patriae* authority. That was really a case about arbitration and whether the State could be deemed a party to an arbitration agreement.

So I would submit to the Court that the more pertinent authorities for purposes of evaluating whether a state has an interest that is separate and apart from the interest of the private residents is really cases -- as the ones I just mentioned, *Harrison vs. Jefferson Parish*, *Ohio vs. GMAC Mortgage* (Northern District of Ohio), *Illinois vs. Mid-American Insurance*. That's Seventh Circuit 1986.

In all of these cases the State brings, you know, actions that ultimately not only involve population groups that are comparable to, in fact, even a little bit larger than the group we have in question here, but in those cases the court finds that the State is ultimately acting in the shoes of the private litigant.

THE COURT: I guess the whole issue here is how narrow or how wide is the potential harm that we're addressing. Does it narrow down to the actual victims of the one handgun or does it broaden out to impact individuals who may be affected by gun violence in terms of the guns that are out there? I guess that's the tough question here.

MR. DAVIS: I agree that is the tough question, Judge, and we would submit to the Court that that is why the shrinking of the State's case from what it pled in October of 2022 to where we are today is so significant.

When the case was pled, we believe the State was seeking to tie Fleet Farm's conduct to a generalized

societal harm related to gun trafficking and gun violence, and so that's the case that we defended. That's the case that the parties engaged in with respect to hard-fought discovery.

And the State had the opportunity in discovery to conduct extensive examination of Fleet Farm records, extensive review of Fleet Farm transactions, you know, and attempt to identify additional straw purchasers, additional firearms that have been used in criminal activity in society as a whole. And after the end of all of that work, the State has come up empty-handed. The State is essentially where it was when it filed this case.

And we have -- as we've argued, Your Honor, we have pressed them to identify harm separate and apart from the harm that relates to the Truck Park shooting, and they simply have not been able to do it; and that is why this case really collapses into a case that is about an identifiable group of individuals and the State acting, in effect, as that private party.

Now, the State makes a number of other arguments in addition to the harm argument, Judge, that you have articulated here this morning. The State argues that it is seeking injunctive relief in this case that the *Wiley* plaintiffs are not seeking and, because of that, that shows that the State is acting in a capacity other than directly

in the shoes of the private litigants.

And there's a number of problems with this argument. First of all, that argument goes to the remedy that the State is seeking as opposed to the injury that is being remedied.

And so, as I noted earlier, *parens patriae*, as any standing doctrine is, is concerned -- is effectively a standing inquiry. And so for standing, you look to the injury, not the remedy. The injury here that's been identified is nothing more than the injury that the State was aware of when it filed its Complaint and the injury to those limited individuals involving the Truck Park shooting.

To the extent the State is seeking injunctive relief, it's largely related to future harm. And so, again, those are the very harms that the State has disavowed in this case. They have walked back their argument about future harm. They are no longer seeking to recover future harm.

And we know that because they filed a motion to exclude Fleet Farm's expert, Professor Gary Kleck, whose primary opinion, one of his three opinions, was to connect or to review the causal connection, if any, between Fleet Farm sales and general societal harm. And the State ultimately said that's not relevant, we're not seeking to prove that in this case.

And then, Your Honor, I would also point the Court to *Connecticut vs. Physician Health Services*, which is a District of Connecticut decision in 2000, and that case examined a situation in which the victims -- or alleged victims of a health plan fraud did not seek injunctive relief. The State of Connecticut came in and did seek injunctive relief. But the court held in that case that, you know, merely -- the fact that the State was seeking relief that was different from what the plaintiffs were seeking was really not dispositive.

So, Your Honor, on all of the common law claims in this case, there is no *parens patriae* standing.

And, again, if this case were -- if we rewinded back to October of 2022, this case looks very different. If we have to accept the State's allegations as true, which we did certainly at the Rule 12 phase, this case in October of 2022 is about Fleet Farm's conduct and a widespread, pervasive gun trafficking epidemic.

The case today is completely different. The case today is Fleet Farm's conduct, one limited incident three months later in St. Paul, Minnesota. And that's not enough for *parens patriae* standing.

So if the common law claims are out of the case, and we submit that they should be under the *parens patriae* doctrine, that leaves two statutory claims, the public

nuisance claim and the Gun Control Act claim.

That brings us to the issue of proximate causation. Now, proximate causation is a requirement for all of the State's claims, both common law and statutory, and we submit that proximate causation is lacking for all of those claims.

Just as an aside, I think the State argues in its brief that there is no causation requirement for Section 8.31 claims, and we would point the Court to the Minnesota Supreme Court decision in *Group Health Plans vs. Philip Morris*, which is a 2019 decision, which expressly holds that there is a causation requirement in the plain language of 8.31. And both the public nuisance and the GCA claims in this case are brought pursuant to the Attorney General's authority under 8.31.

Additionally, while proximate causation often presents fact issues, where reasonable minds could not differ on the issue, it becomes a proper question for the Court at summary judgment; and we would submit that that is certainly the case here. To establish proximate causation, the State must show that Fleet Farm's conduct was a substantial factor in bringing about the specific harm identified by the State.

And so for this analysis, Your Honor, it's helpful, again, to identify what are the categories of harms

that the State is seeking.

And we've talked at length about general societal harm. They are no longer seeking general societal harm. They are no longer identifying that as a harm specifically in this case. There's nothing in the record to support harm beyond those limited individuals at the Truck Park shooting.

And so that category of harm is really out of this case, so we are left with the connection between Fleet Farm's conduct and that specific harm in October of 2021 in the Truck -- at the Truck Park shooting.

We submit that there's insufficient evidence that Fleet Farm's conduct was a substantial factor in bringing about that harm, and the primary reason --

THE COURT: Does the decision not to seek damages for any kind of statewide harm impact -- really impact the proximate cause, the substantial factor issue that we have to look at right now?

You know, obviously, if you are looking at statewide harm or potential harm or existing harm, it's really hard to quantify. It would be a difficult case to try to prove what the actual damages might be.

Does it really matter for purposes of the substantial factor issue?

MR. DAVIS: Your Honor, I think it does, and this is why: Again, the overall -- I guess you would call it the

fundamental flaw in the State's case at this point is the fact that their case is no longer about societal gun trafficking and gun crime. It is -- because of the way discovery developed in this case, their inability to identify any other harm, that also collapses the proximate causation question.

So whereas if the harm is gun trafficking, there is a fairly close one-to-one connection between Fleet Farm's alleged misconduct in making a sale and the gun trafficking. That is a close causal connection.

We wouldn't concede that it's established in that case, but it's a lot closer than a situation like we have here, where it is not the gun trafficking that's the harm. It is now a specific incident that occurred three months later. And the question becomes is that specific danger reasonably foreseeable to Fleet Farm at the time of the sale. The question isn't is it foreseeable that there's going to be gun trafficking, because that is no longer a category of harm that we are dealing with today.

And that introduces a very significant issue here, which is the superseding criminal acts that occurred in between the point of sale of the -- really the one handgun at this point that's at issue, July 31, 2021.

There were no fewer than four superseding criminal acts that occurred in between that sale and the ultimate

decision with criminal intent to use that handgun, pull the trigger at a shooting in St. Paul, and someone was killed and people were injured.

That is a far cry from the type of causation that the State initially believed it could show, which was a one-to-one sale, gun trafficking. It's a much different question now. And, again, that is why the State -- the shrinking of the State's case in this way is significant in terms of proximate causation.

THE COURT: I think at least reading the State's case, their arguments right now, I think they're still arguing that it's a broader societal harm issue.

Is it foreseeable, for example, that the 36 or 37 guns remaining out there might cause harm at some point in time? Maybe sooner. Maybe later. It's a -- I think it's broader than just the one gun and the Truck Park shooting that occurred as a result of that one gun being transferred to a number of different people and then on to the shooter.

That's the struggle in this case. How broad do you go? Can you narrow it down? But we can't forget about the fact that there are additional guns out there that were sold as part of the straw purchases here at Fleet Farm that are still subject to being used in a way that will harm people.

MR. DAVIS: I understand the question and I am

sympathetic to the point that the Court is making. My response to that would be that we are at summary judgment. The State has the burden to come forward with evidence of this, what I'll say is an abstract harm that the Court is articulating. The State has the burden.

You know, we spent two and a half years in pretty significant discovery, you know, getting at the heart of this very question, because that -- again, that was the case we were prepared to defend, but it is not the case that the State has today.

And I would, you know, invite the Court to have State's counsel identify any harm in the record apart from those limited harms that we're talking about with respect to the handful of guns that were sold in 2021.

And, again, I'll point the Court to the State's motion to exclude Fleet Farm's expert. Fleet Farm's expert was a criminologist, Ph.D. criminologist, who came in and opined on what is the relationship between both Fleet Farm's sales specifically, but also straw purchase sales more generally and the effect of that on gun crime and gun trafficking.

Of course, our expert concluded that Fleet Farm's sales did not -- were not a substantial factor in terms of causing gun trafficking or gun crime. The State has, in their motion to exclude that testimony, has taken the

position that that's all irrelevant. That's why they want Professor Kleck out of this case.

We are resting on the papers with respect to Professor Kleck, the motion on Kleck, but it's relevant for this reason: The State has conceded that the only issue in this case anymore is that limited number of handguns that were sold. This is not about gun trafficking or gun violence more generally.

But, Your Honor, if the Court is struggling with proximate causation, we submit that this is one of those rare cases where proximate causation could be handled as a legal issue before the Court. This is the right kind of case.

I will point the Court to *Ashley County vs. Pfizer*. That was a case involving the sale of cold medicine ultimately used to make methamphetamine with three superseding causes, which were criminal conduct, in between the sale from a retailer or manufacturer, from a drug manufacturer, to the point of cooking and, you know, selling and using the meth. And the court said that is not -- and that was Rule 12 -- that is not enough for proximate causation and we can decide that as a matter of law.

And actually in that case, the Eighth Circuit, in sort of examining proximate causation, looks to these kinds of gun cases under PLCAA and says this is a lot like the

kinds of firearm cases where a manufacturer or a seller of a firearm ends up being sued by a victim of a gun crime several steps down the chain of causation.

So for the court in *Ashley County vs. Pfizer*, it was a one-to-one match -- this kind of case, that kind of case, proximity causation -- as a matter of law.

I'm getting short on time, so I want to wrap up on the two statutory claims.

With respect to public nuisance, if this Court is struggling with proximate causation, there is a different path. Remember, *parens patriae* really takes care of the common law claims in this case. There's simply no basis to assert those. There's insufficient evidence in the record to establish *parens patriae*. So we are left with two statutory claims.

The public nuisance claim. What was the nuisance that was pled by the State of Minnesota? It was that there was an unlawful proliferation of firearms and an illegal secondary market for firearms. Again, they have effectively conceded that that is no longer an issue in this case, and they've conceded that when they challenged Professor Kleck's expert opinion.

On the Minnesota Gun Control Act, if this Court finds that there is sufficient evidence of proximate causation, it can still grant partial summary judgment on

the Minnesota Gun Control Act claims and here's why:

The GCA requires that Fleet Farm knew or had reason to know that when it made these sales, it was selling to a straw purchaser. The State's expert witness testified under oath that for 16 of those transactions, there was no reason for Fleet Farm to have stopped the sale, and he examined each of these transactions very carefully. He was deposed and his testimony was very clear: For 16 of 28 total transactions, there's no reason Fleet Farm needed to stop that sale. Of course, that lines up perfectly with Fleet Farm's two experts who testified on the same point.

So there's no evidence in the record on summary judgment to support the GCA claim for at least 16 transactions. That would leave at the end of the day, if this Court is not inclined to grant summary judgment across the board, a very limited claim under the Minnesota GCA with respect to 12 firearm transactions.

I'm at about 32 minutes and so I think I will -- unless the Court has additional questions right now, I will take a seat and let the State provide their response.

THE COURT: Okay. Thank you, Mr. Davis. Appreciate that.

Ms. Moerke, I guess the main question here is: Has the State narrowed the case such that you don't have standing anymore?

MS. MOERKE: Your Honor, we have not. The case -- the State has standing. This case is about keeping guns out of the wrong hands. Fleet Farm put guns into the wrong hands. Fleet Farm sold guns to straw buyers. Fleet Farm admittedly sold 37 guns to straw buyers. We pled those allegations. Fleet Farm has admitted it. That is evidence in this case.

Fleet Farm did so despite obvious warning signs that they were straw buying. There is evidence that Fleet Farm was careless and even willfully ignorant. Fleet Farm could have and should have stopped these sales.

Because Fleet Farm made these sales, people in our state have already been hurt and, as Your Honor pointed out, most of these guns that Fleet Farm sold to straw buyers are unrecovered. These guns are in dangerous hands by the very nature of what occurred and these guns pose ongoing threats to the public at large. This case is not limited to the Truck Park shooting.

Fleet Farm mischaracterizes our case and Fleet Farm mischaracterizes our motion to exclude Professor Kleck. And in a nutshell, Your Honor, the reason that the Kleck motion is mischaracterized, it's not that this case isn't about gun trafficking or the proliferation of guns in Minnesota. That's exactly what this case is about.

But what happened in this case actually happened,

and what Kleck does is do a bunch of math to hypothesize about theoretical futures that don't exist. He ignores the actual facts, facts of this case.

Your Honor, I have -- Fleet Farm really makes -- as to standing, Fleet Farm kind of makes these two factual arguments: Basically that they couldn't have known Horton and Elwood were straw buyers and that Fleet Farm sales of 37 guns to these straw buyers, these guns that remain at large, were not harmful enough, that not enough bad things have happened or will happen for the State to have standing. And to address standing, Your Honor, I would like to address the evidence of harm.

And I have a PowerPoint I would like to share. I have two versions of it because some of the information on it has been designated by Fleet Farm as confidential, though I'm not sure if there's anyone in the courtroom who is not counsel for the parties. I'm happy to hand out the confidential version and only display the public version.

THE COURT: Mr. Davis?

MR. DAVIS: I can't quite tell, but there may be some reporters in the courtroom, so --

THE COURT: Okay. Well, we should probably -- you could hand up the complete version but use the public version, if that's okay?

MR. DAVIS: That's okay. Thank you.

MS. MOERKE: Thank you, Your Honor. Happy to proceed that way. May I approach?

THE COURT: You may.

MS. MOERKE: I think my colleague can turn on the display for me.

*(Document handed to the Court)*

THE COURT: Go ahead.

MS. MOERKE: Thank you, Your Honor.

THE COURT: Let me get this one on back here. It should be on, but let's see. Gallery. Gallery. Gallery. Gallery. Is it on in the jury there?

COURT EXTERNS/INTERNS: (Nodding.)

THE COURT: Could you just text Heather to come out and get that one on?

All right. Go ahead.

MS. MOERKE: Thank you for checking, Your Honor.

So if we advance to slide 2, can you -- these are the guns that Fleet Farm sold to Jerome Horton. Fleet Farm has admitted each and every one of these sales. Within five months, four Fleet Farm stores sold 24 guns to straw buyer Jerome Horton. Fleet Farm sold Horton multiple guns at once on five different days and multiple guns during multiple visits within short time frames. These sales included eight 9-millimeter semi-automatic handguns in just one week.

If we advance to the next slide, we see that Fleet

Farm also sold 13 handguns to straw purchaser Sarah Elwood. On four different occasions Fleet Farm sold Elwood multiple handguns on the same day. Fleet Farm sold Elwood two handguns on May 1st, two more on May 6th, and two more on May 12th.

Now, I'm not going to display it in the courtroom, Your Honor, but the next several slides in the confidential version that I've handed up to the Court and given to counsel include documents that Fleet Farm produced in this case that we fought to get and got in discovery. Fleet Farm has designated these documents as confidential. We disagree. That motion is pending before the Court, but certainly honor that today.

This is evidence -- Fleet Farm's counsel said that the State has come up empty-handed. The State has not, Your Honor. We have discovered compelling evidence of Fleet Farm's culpability and, as I said, willful blindness. This is shocking evidence of responsibility and admissions relating to Fleet Farm's knowledge during the middle of Horton's gun-buying spree.

A manager took detailed notes. I won't say what those notes say, but they're in the record.

A manager asked questions that weren't answered. I won't say what those are, but the Court can see them.

And a training was presented where Fleet Farm

admitted that these sales should not have taken place.

Let's advance to the next slide in the public PowerPoint.

Like I said, the -- Fleet Farm's counsel invited us to show evidence of harm. This is the evidence of harm, Your Honor. Some harm has already occurred.

Obviously, one of the guns that Fleet Farm sold to Jerome Horton was used in this mass shootout at a St. Paul venue. This case, the State's case, is not limited to this, but this is part of the State's case. And that was -- not only was a gun involved in this mass shooting, but it was the gun during the -- the critical evidence that's been designated confidential.

If we advance to the next slide, one of the guns, another gun that Fleet Farm sold to Jerome Horton, was found -- was fired and was found by police by someone who couldn't have it.

If we advance to the next slide -- and I don't think we are advancing to the next slides. Are we? Okay. Maybe I just -- I am not seeing it on my screen there.

So on -- the next one I want to talk about is a 6-year-old boy who found it in his yard. He found a gun. Thank goodness that he didn't play with it or give it to a friend, but gave it to his dad.

On September 26th, 2021, another gun was found in

possession of someone who could not have it.

On September 30th, 2021, another of the guns was found in the possession of someone who could not have it because the law deems him too dangerous to do so.

The same thing happened with a gun that was found by the police on July 7th, 2021.

And that brings us to where we are today, Your Honor: 37 guns. Six have been recovered. This is the evidence.

Gun trafficking in Minnesota increased by all these guns. It is undisputed that Fleet Farm sold these guns, that they were trafficked, that they remain and threaten the people in our state.

And the people in our state at large are threatened, Your Honor. A gun is not like eggs. One gun can harm multiple people. And the danger here is greater because these guns are, by definition, in the hands of people who the law says are too dangerous to have them. It is not limited to the victims of the Truck Park shooting. It is about the public at large.

And the State -- Fleet Farm has really seized on the fact that the State did not identify during discovery additional straw buyers and that the State is not seeking one particular kind of monetary relief in this case. But that doesn't mean we don't have standing, Your Honor. It's

not about this -- as you said, this case is not about that one transaction. And it's really not -- it's not just a numerical inquiry, although the numerical inquiry is satisfied. Numerous unrecovered trafficked guns in Minnesota that threaten people in our communities.

But it's also the character. What the State is seeking, the State is seeking relief to address the harm, and the harm is the fact that these trafficked guns remain in dangerous hands and endanger people in our state.

The Court can absolutely take judicial notice that the public is endangered by gun violence and that the public fears gun violence.

THE COURT: Is there any evidence in the record about gun trafficking and gun violence in the period of time since all of these sales? Is there anything there in the record right now or are we relying really on kind of the general concern that all people have about gun violence just because of the dangerousness of it?

MS. MOERKE: Yes, Your Honor. I'm just thinking off the top of my head. I know we have -- it's general, but we have evidence in the record from the ATF itself talking about how straw buying is a major source of gun trafficking and a danger to our communities. So that evidence is in the record.

What I don't think we have is, like,

Minnesota-specific super quantitative analysis in the time period since Fleet Farm's sales to these straw buyers, but we do have --

THE COURT: It would be hard to narrow it down. It would have to be general numbers, probably, because people who are prohibited parties can purchase firearms at, you know, gun sales and private sales and all of that, as well as getting them from straw buyers.

MS. MOERKE: Exactly, Your Honor. Yeah.

THE COURT: I'm not sure how you could narrow that down. Maybe ATF keeps such statistics. I don't know.

MS. MOERKE: They certainly have done studies, and I know we produced a number of them in this case, but I'm not able to recall the details right now.

As Your Honor pointed out, the *Cross Country Bank* decision does say that even if there's some overlap, with respect to standing, some overlap between redress that the private individual -- private plaintiffs seek and the State, that does not mean that the State does not have *parens patriae* standing.

It would be -- the State is not stepping into the shoes of the Fleet -- of the Truck Park shooting, and I think it would be a shocking conclusion if the State did not have *parens patriae* authority to bring an action like this to address statewide --

THE COURT: Is it the State's claim that the harm from the unrecovered guns, most of them, not all of them, of course, is that substantial enough to affect the entire state's population? Is that a claim that the State is making?

MS. MOERKE: It is substantial enough, Your Honor, to threaten a substantial amount of the State's population. I think that's the test we need to satisfy, not that it's everyone, but it's substantial.

And, yes, Your Honor, I think given that we're talking about guns and the harm that can come from one gun, not a handful, as Fleet Farm counsel said -- this is not a handful of guns in the slide in front of you -- and that they're in the hands of dangerous people, yeah, a substantial amount of the general population.

Your Honor, I will move on to proximate cause unless --

THE COURT: Go ahead.

MS. MOERKE: -- you have more questions on standing.

As we all know, proximate cause is generally a question of fact for a jury. I think this case has ample evidence of proximate cause for the case to go to a jury.

There are these two requirements. We agree with Fleet Farm's counsel about the two requirements, that the

defendant's conduct must be a substantial factor and that the harm must be foreseeable.

The fact that the harm must be foreseeable takes care of the intervening criminal act argument. An intervening criminal act only means there's not proximate cause when that act or even multiple criminal acts are not foreseeable.

They're foreseeable here because of the very nature of straw purchasing. It's a mechanism by which criminals put guns in the hands of people who aren't allowed to have them because the law deems them too dangerous.

It is not -- while the harm needs to be foreseeable, Your Honor, the precise scenario of foreseeable harm -- the precise scenario does not need to be foreseeable.

So we did not need to foresee that there would be a mass shooting in downtown St. Paul at a venue called the Truck Park by someone who bought a gun through the chain that started with Jerome Horton, but it is certainly foreseeable that if an FFL sells a -- an FFL, firearms dealer, sells a gun to a straw buyer, despite obvious warning signs, that that straw buyer is by definition trafficking that gun and putting it into dangerous hands with a threat of gun violence. It is foreseeable.

And it is also -- Fleet Farm's conduct was a

substantial factor because Fleet Farm put these 37 guns in the wrong hands. That is substantial.

In Fleet Farm's reply brief, Fleet Farm says that this argument the State makes that the precise scenario doesn't need to be foreseeable, based on the *Rieger* case we cited in our brief -- Fleet Farm cites *Abel vs. Abbott*, but that's fully consistent -- it simply says that whether the specific danger was objectively reasonable to expect. And here, of course, that specific danger is shooting people and hurting and killing them. What that case said was you can't just say within the realm of any conceivable possibility. But that's not what we are talking about here.

Public nuisance, Your Honor. There's absolutely evidence to support this claim. Fleet Farm focuses on the part of the public nuisance statute that says any considerable number of members of the public. We've been talking about that already in the context of standing. Certainly the State's position is that these numerous dozens of guns do endanger a considerable number of members of the public, but I also want to point out --

THE COURT: What about Fleet Farm's argument that that really isn't relevant here because that's just simply future potential harm rather than existing harm right now?

MS. MOERKE: Your Honor, with respect to nuisance in particular, future harm is a harm. The nuisance statute

says a condition which annoys, injures, or endangers. Endangers means threatens. It means poses a risk. That's exactly what we have here. That is why there is a public nuisance. That is why we pled the claim and that is why that claim should proceed to trial.

Future harm is absolutely redressable, especially by the State in a *parens patriae* capacity. The harm -- there's harm -- I mean, it would be very hard, as you said, to recover that one type of monetary relief of legal damages of but-for damages of future harm. We're not trying to prove that. That would be difficult.

We couldn't say but for these unrecovered guns, you know, we're going to spend this much money in policing or things like that. But in terms of the claims and what's needed for the claims, future harm is absolutely cognizable, including with respect to nuisance.

Your Honor, I could address aiding and abetting or negligent entrustment or negligence, but I know Fleet Farm's counsel didn't address, so I will move on unless the Court has questions.

THE COURT: I do have one question. What's the difference between the negligence claim and negligence per se claim?

MS. MOERKE: Thank you, Your Honor. The negligence claim is common negligence like we learned in law

school: duty, breach, harm, and proximate cause.

THE COURT: So it's not based on a statute?

MS. MOERKE: It doesn't have to be. Yeah, the negligence claim is just you were careless, which really -- while I think all of our claims are both cognizable and have ample evidence to support them, the negligence claim is perhaps the most straightforward, everyday way to explain what happened here. Fleet Farm was careless. I think even reckless, but absolutely they were careless. That's the negligence claim.

It's against the backdrop, I suppose, of the statute that Fleet Farm has a duty to sell -- doesn't have a duty to sell, pardon me. It has a duty not to sell to straw buyers as an FFL, but that's different than -- our negligence per se claim is basically just that the duty and breach elements of the negligence test are satisfied by the violation of a statute.

So, for example, violating the statute that says you can't sell to straw buyers if you have reason to know they're straw buyers, that's the negligence per se.

THE COURT: Okay.

MS. MOERKE: Your Honor, with respect to the Minnesota Gun Control Act claim, of course this one and nuisance, you know, don't have -- are not subject to the same standing argument that Fleet Farm makes.

The claims should not be limited. The statute is whether -- the standard is whether the FFL knew or had reason to know. If you read the deposition testimony of the State's expert, which we attempted to quote in full in our briefing, the knowledge -- the sort of actual knowledge versus constructive knowledge question that I think makes sense to us as lawyers does not make sense to our retired ATF special agent. He doesn't think about them the same way. He did absolutely say these weren't willful -- right? -- these weren't willful.

Fleet Farm was not engaged in a conspiracy with Horton, but there were warning signs present, Your Honor, during every single one of these sales, including even -- of course they increased, right? If we look at the timeline I showed at the beginning, of course the warning signs increased over time as the pattern grew.

But there were warning signs even on Horton's first sale. He was shopping with a friend. That's a warning sign recognized by the ATF. He had -- he went to Fleet Farm because he had addresses that didn't match on his identification and his permit, and he bought a 9-millimeter.

Thank you, Your Honor. Ample evidence supports the State's claims. Fleet Farm's motion should be denied and the case should proceed to trial.

Thank you.

THE COURT: Thank you, Ms. Moerke.

Why don't we -- since we are close to an hour here in court, we have a little time left anyway, however much more you want to take, let's take about a three-, four-minute break here. Okay?

MS. MOERKE: Thank you, Your Honor.

MR. DAVIS: Thank you.

*(Recess taken at 3:07 p.m.)*

* * * * *

*(3:15 p.m.)*

**IN OPEN COURT**

THE COURT: All right. Mr. Davis.

MR. DAVIS: Thank you, Your Honor.

Your Honor, Ms. Moerke told the Court that she would identify for the Court other harms in the record beyond those that we identified and the State initially identified in its Complaint related to those limited incidents in the Truck Park shooting, and there is not a single reference to evidence in the summary judgment record beyond those limited instances that Ms. Moerke was able to point to.

So, Your Honor, our position remains there is simply no summary judgment evidence supporting a harm beyond those limited individuals and limited instances involving a

sale of a firearm to Jerome Horton.

And, Your Honor, you don't simply have to take my word for it because, again, if you review the State's motion in support of -- to exclude Professor Kleck, the State says very clearly that its claims now pertain only to guns sold to two known straw purchasers. That's at page 10.

At page 12, "The State will not be seeking to prove the general prevalence of straw purchasing and its connection to future crime at trial in this case." That's page 12.

At page 13, "The general frequency or likelihood of a straw-purchased firearm later being used in a crime is simply not at issue in this case."

At page 19, "The State's case is not focused on how 'significant' the impact of Fleet Farm sales were on gun trafficking and violent crime..."

So not only is there no evidence, the State has made it abundantly clear that they are not pursuing a theory of harm related to gun trafficking or gun violence.

I did not hear Ms. Moerke rebut a single case on *parens patriae* that we presented to you in our opening. Again, the State must come forward with evidence of harm to a substantial segment of the population and harm that is separate and apart from that of private individuals. It has not done so.

The State's position would be an enormous expansion of the State's power to use *parens patriae* authority to assert common law claims on behalf of individual citizens.

On nuisance, Your Honor, again, the only nuisance that was pled in this case was the nuisance of societal gun trafficking and gun harm. That is -- again, no evidence in the record at all of that nuisance and the State has walked that back.

On the GCA claim, the Court simply needs to review Joseph Bisbee's deposition transcript. At page 308 it's very clear.

The question to Mr. Bisbee is: "Do you have any knowledge that any of the sales, according to your interpretation of my question, were willful?

"Answer: I don't believe that they willfully and knowingly allowed a straw purchase."

That's the State's expert witness. That's their only testimony with respect to knowledge that's in the record before the Court, and it establishes clearly that there was no knowledge at all to support those GCA claims.

So, Your Honor, again, the way in which the cases -- the State's case has shrunk fundamentally changes the nature of the harm, it changes the number of affected individuals, and it changes the foreseeability of the

injury. And these changes expose a fatal flaw in the State's theory of the case. It simply has no basis today for *parens patriae* standing in this case and there's insufficient evidence of proximate cause.

This case is no longer at the Rule 12 phase. We no longer have to take the State's allegations as true on their face. The State has the burden to come forward with specific evidence in the record of harm other than the harm to a limited number of individuals involving a single shooting. They can't do that. The State can't meet its burden. And on the record before this Court, summary judgment is appropriate.

Unless you have additional questions, Your Honor, I will allow Mr. Noteboom to present on the Bisbee motion.

THE COURT: That's fine.

MR. DAVIS: Thank you.

THE COURT: Mr. Noteboom.

MR. NOTEBOOM: Thank you, Your Honor, and good afternoon again.

Just as a point of clarification or logistics, and I think this was clear from our opening remarks, but I think the parties have agreed to stand on the briefing as to the Professor Kleck motion and as to the State's motion for summary judgment.

I don't feel the need, absent any questions the

Court may have, to fully present on the Bisbee motion. What I thought I would do is take just a few minutes to touch on issues that I think may be the focus of the Court's consideration in particular in thinking about this and try to zero in on just a few pieces, having re-read and re-read again the briefing getting ready for today, that I think are perhaps most important.

Let me start with just a bit of an observation that I know has been true for me in preparing for this argument, indeed in preparing to take Mr. Bisbee's deposition, which I did in February of this year, is that this report proceeds quite a bit differently than a standard report that I am accustomed to seeing in federal cases around the country.

It doesn't address the specific opinions that Mr. Bisbee has until you get to the very last page of his report. The report includes lengthy narratives that come from deposition testimony, documents, and other sources without tethering them in any direct way in many instances to the report, to the opinions, or to the bases for them. The report and the opinions in particular at the very end include legal conclusions or ultimate conclusions that you don't typically see in an expert report, at least in my experience.

And all of that sort of has given rise to, I

think, some challenges for us that are presented in our papers and I'm largely going to leave on the papers for today.

But I do think that what may be helpful, and I will turn to this in a minute, is to talk about what I think follows beyond just a proposed order we've put before the Court in terms of the specific opinions at the end of Mr. Bisbee's report that we think should be excluded and why, because I'm not sure, at least for me, that that came through as clearly as it could have from the briefing.

THE COURT: Okay.

MR. NOTEBOOM: Before I do that, if I may, Your Honor, I would like to just spend a minute or two on the first part of our challenge to Mr. Bisbee because to us it is most central and it really does map onto the primary reason why most of his opinions at the end, according to Fleet Farm, should be excluded.

The fundamental problem, and it really requires a bit of a step back, Your Honor, is that of course the ATF is a very large agency. It has many different divisions to it. They are now called directorates, but many different divisions within it.

One of them is the Office of Field Operations, and it is in the Office of Field Operations for most of his time at ATF where Mr. Bisbee worked. And that office,

Your Honor, like most at ATF, has different and distinct functions and different and distinct subdivisions to it. It has a regulatory, regulatory enforcement side and it has a criminal enforcement side. And during the entirety, the entirety of Mr. Bisbee's tenure at ATF, he was on the criminal enforcement side.

And, of course, there are plenty of other expert options who are out there, people who come out of ATF who have worked on the regulatory enforcement side who the State could have retained and who likely would have had the requisite background to be opining on many of the things that Mr. Bisbee purports to opine on here.

But for reasons known only to the State, they didn't go there. They didn't hire someone like Andy Graham, who Fleet Farm has hired and his report is before the Court, who spent his entire 30-year career on the regulatory enforcement side.

And on the enforcement side, you're doing things, perhaps it's self-evident, but you are engaging, when you are in that function, with retailers like Fleet Farm. You're examining --

THE COURT: But you are working on the criminal enforcement side. Wouldn't you necessarily have to have a significant amount of knowledge of the regulatory side?

MR. NOTEBOOM: No, Your Honor. And so maybe the

way to think about it is it's a little bit about did he come into contact with some regulatory side of things from time to time as part of his criminal enforcement work. There's no question that that happened. He was at ATF for several decades.

And what you see in the State's opposition to our motion are the few instances that he talked about in his deposition where that would happen, but I want to emphasize it really is just a few instances.

And when you get down into his actual testimony -- and I spent seven long hours taking his deposition. And I think the best place for the Court to look at this is in pages 5 through 8 of our reply brief.

But there we examine with some care the actual testimony from Mr. Bisbee on this topic, and what he says in principal part is that there were rare instances where he would have done certain things, that it was infrequent was the word that he used.

And what you really have before the Court today, Your Honor, is someone whose life's work has been in criminal enforcement, who has had some infrequent, some irregular encounters with the regulatory enforcement side, who now wants to come in and purport to express opinions about what Fleet Farm was doing internally, how it was doing it; and we think that's improper.

And so what I think should come through from the undisputed record before the Court, at least I hope it does, is that Mr. Bisbee never, not once was involved in issuing licenses or renewals to FFLs like Fleet Farm.

He never had responsibility -- he might have from time to time had interaction with, but he never had responsibility, Your Honor, for reviewing FFL policies or trainings that relate to firearm sales or straw purchases.

One of the things that I think is critically important here is that he never, during his decades at ATF, made it his business nor was it his job responsibility to compare the FFL's trainings and policies for those sorts of things, for firearms sales or for the prevention of straw purchases, one to the other.

So when I asked him under oath in February of this year have you gone and compared, did you spend time comparing how Fleet Farm's policies and procedures on the one hand compared with Cabela's or compared with Bill's or compared with the Frontiersman Gun Shop out on Highway 394, his answer was, no, these are not things he does.

And so whether ours are infinitely better or in line with what those other companies are doing, he doesn't have the foggiest idea other than in connection with his rebuttal report taking a quick glance at a few of them that we subpoenaed as part of this case. This is not what this

expert does.

And so let me talk briefly, then, just about where I think that leads us and what we're asking the Court to do.

At the very end of Mr. Bisbee's report, and it starts on page 21 and carries over to the -- it's really the first half of page 20 -- 22, rather, right before his signature, there are ten enumerated opinions.

If the Court agrees with us on the primary challenge, which is that Mr. Bisbee's background, qualifications, and experience at ATF and beyond, which he has had no real dealings with FFLs since leaving ATF, if the Court agrees with us, then we submit, Your Honor, that opinions 1 through 6 are out.

Some of those opinions, 4, 5, and 6, also, we think, are out because of other problems, and I'm happy to get into those, but they're addressed with some care in our briefing.

But 1 through 6, Your Honor, are out if the Court agrees with Fleet Farm that his qualifications simply aren't adequate for him to be opining in this court about the kinds of things he's opining on here.

Again, 4, 5, and 6, Your Honor, would be out because Mr. Bisbee is rendering ultimate conclusion testimony here. He's talking about in opinion 5 how Fleet Farm stores did not fulfill their duty. An expert can't do

that. He's talking about in opinion 6 how Fleet Farm allegedly failed to exercise appropriate care. An expert can't do that. So those are additional grounds for excluding those portions of his report.

And then finally, Your Honor, with respect to opinions 9 and 10 on page 20 -- 22, those should be excluded because that is classic unsupported and speculative opinion testimony from the expert. It's what many courts have called expert say-so. It's simply Mr. Bisbee saying, In my opinion, this is what I think should happen. These are the kinds of remedies that I think should issue here. And he simply has no basis for doing that. His report doesn't provide any elucidation of that. And we think those opinions have to be struck as well.

The final thing I'll say, if it wasn't clear from our papers, is we are not asking the Court to exclude Mr. Bisbee completely. The State's case significantly narrowed, as it now is, focuses on the small number of transactions that were sold to Mr. Horton and the even smaller number of guns that were sold to Ms. Elwood, and Fleet Farm can deal with on cross-examination, and I will welcome doing that on cross-examination, with Mr. Bisbee whatever testimony he has about, from the criminal enforcement perspective, red flags that he believes were there that we should have seen and didn't pay adequate

attention to.

That's all I have subject to any other questions the Court may have.

THE COURT: That's fine. Thank you, Mr. Noteboom.

MR. NOTEBOOM: Appreciate it, Judge. Thank you.

THE COURT: All right.

MR. MALONEY: Thank you, Your Honor, and I will just have a brief response from the State regarding Fleet Farm's motion to exclude Joseph Bisbee.

THE COURT: Go ahead, Mr. Maloney.

MR. MALONEY: Thank you, Judge.

Let's start with his report and the form of the report. I didn't think we were going to be starting here, but why don't we start there.

So Fleet Farm's motion talked about or critiqued Bisbee's report for being overly narrative. I would submit, first, that if you read the reports of Fleet Farm's experts, they are similarly, if not more, narrative.

I also wanted to make the point of -- you know, Mr. Noteboom talked about that, you know, it was in a different format or kind of had a different structuring than other expert reports that have been used in this district or in other courts.

I would submit that, you know, this is a report written by Joseph Bisbee. I think as my co-counsel alluded

to, he is not a lawyer, right? And we, you know, took care to ensure that it complied with the rule, but otherwise he wrote the content and structured the formatting of it.

It complies with the rule. The opinions are there. The narratives are well-founded and will be helpful to the jury. And I -- to my ear, that argument, I think, is elevating form over function -- right? -- in terms of what's needed to be in a report and how it could be structured.

Let's talk about Joe Bisbee's qualifications. So I think as has been mentioned by both sides at this point, Joseph Bisbee is a former ATF special agent. He worked a few different jobs kind of throughout the eastern part of the country for about 25 years.

Contrary to Fleet Farm's contention of, you know, what is necessary for him to be able to testify on these topics, he's more than qualified here. He worked for the ATF for 25 years. His deposition talked about him having frequent contact with FFLs as a part of his investigations.

So he -- I can actually point the Court to a quote from his deposition. This is on page 39. I'll start reading here on line 12. So in answering a question from Mr. Noteboom, Joseph Bisbee says, "Again, as a special agent and as a special agent that focused on firearms trafficking, we would, again, look at how criminals access firearms. And so if they're accessing them from an FFL, we would be

looking at: 'How are they accomplishing that?'"

The next paragraph he goes on. "So we would be looking at the -- so in a way, we would be looking at those policies and procedures of FFLs and how was that happening, how were criminals getting the firearms."

Joseph Bisbee worked with FFLs, investigated FFLs as a part of 25 years and hundreds of firearms trafficking investigations with the ATF. He knows his stuff, right? And whether or not, you know, he issued FFL licenses or worked on the regulatory side, as a part of stopping firearms trafficking, he worked with FFLs. They're a part of that chain. That was a part of his work.

And if you read his report, that's what he will testify on -- right? -- is that, you know, from doing these investigations and knowing the red flags of straw buying and of gun trafficking, he knows -- he has worked and he knows how to work with FFLs to educate them on what should be happening in your store, what should your policies have, things like that.

Because he knows the red flags front to back, I would submit, better than Fleet Farm's expert -- right? -- who worked on the regulatory side, might know the paperwork better, doesn't know the red flags as well.

So, you know, the six opinions that Mr. Noteboom pointed to at the end of Joseph Bisbee's report, I would

submit that Joseph Bisbee is more than qualified to offer those opinions. They are rooted in his investigatory experience, his training with the ATF.

And in his -- you know, Fleet Farm concedes that he is more than qualified to testify about red flags, and I think his knowledge of red flags and trafficking suffuses his analysis of FFLs just as much.

And frankly, Fleet Farm's argument is really hyper technical, you know, taking a look at the structure of the ATF and thinking about which side of the house he's on and, oh, he's on the wrong side, so he should be disqualified even before we're even at trial.

I don't think that is what *Daubert* says is required for Bisbee to be qualified to be able to come in and testify, and he should not be excluded on that basis by Your Honor.

A few other things to touch on that Mr. Noteboom raised.

On the argument that Mr. Bisbee is offering inappropriate legal conclusions, I think the briefing covers that pretty well. There's a rule -- it's Rule of Evidence 704 -- that allows experts to offer opinions on ultimate issues. Our submission is that is exactly what Joseph Bisbee would be doing here.

And we put some case law in that talks about, you

know, the expert can opine on -- I'm going to read from the *Scalia vs. Reliance Trust* case -- can offer an opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied.

If you read Joseph Bisbee's report, that's exactly what he's offering. I think there's no intent from him or from the State to subsume Your Honor's role in instructing the jury, in guiding the jury as to law or, you know, making the decision for the jury of whether or not Fleet Farm broke the law, right? That's for you. That's for the jury.

THE COURT: Well, one of the problems here is there's a line that's fairly -- always a little bit hard to tell between testimony utilizing professional judgment and testimony that reaches legal conclusions. And I think, you know, one way the Court has typically dealt with that is to give limiting instructions in case it goes too far, which may be the best result here. But anyway, I understand the arguments.

MR. MALONEY: I think that's a good point, Your Honor, and again something as we near trial that we could deal with in motions in limine and think about in the instructions phase too. That makes sense to me.

And just one last point on that, too, is that we were careful -- or that, you know, Joseph Bisbee was careful to kind of craft his opinion around the language of

obligation -- right? -- and kind of not reach the ultimate legal issues.

The end of Joseph Bisbee's opinion which talks about remedial measures and I believe Mr. Noteboom also mentioned another part of his opinion that talks about the harm posed by unrecovered guns, Fleet Farm characterizes those two sections as unsupported.

I think if you read the reports, the rebuttal report from Joseph Bisbee and his deposition, that to say that they are completely just his say-so, that they are unsupported is just flat -- is just flat out not true, right? Especially when it comes to the remedial measures -- right? -- where it is basically Joseph Bisbee saying, I have looked at the facts of this case, I have done a report where I have analyzed everything, and he is basically saying the next step is here's what I would propose to fix the issue.

The State is asking for an injunction here. You know, he is giving his opinion on, you know, what could make sense to remedy the problems here. That's supported by his background, years of experience, his expertise, his training, his interactions with FFLs over the course of almost three decades, right?

So similarly with Joseph Bisbee's opinion on the harm posed by the unrecovered guns -- we talked about that quite a bit today -- his report cites to, I think, two or

three different scholarly sources that talk about ATF data and things like that showing, you know, what can happen with, you know -- what harm is posed by straw-purchased guns that goes above and beyond just a typical gun bought in a typical sales process -- right? -- and how those guns end up being involved in crime at a much higher rate.

And, again, this is also based on he's investigated hundreds of gun crimes and seen straw purchasing cases. And Joseph Bisbee knows what happens with those guns, right? That is -- you know, he has his slice of it.

It is somewhat anecdotal, but he has experienced enough and has done enough investigations, we would submit, to kind of undergird his opinion about, hey, when a straw buy happens, those guns, if they're not recovered, they pose a great risk to the public because I've seen what can happen with them.

I mean, here we know, you know, these guns that are on the left side of this screen right here have been recovered by police in connection with crimes, including a horrible shooting where someone died.

So, you know, that is -- we would submit that his part of that report, based on his experience and these articles, is well-supported by the evidence.

And with that, unless the Court has any further

questions, that will be it.

THE COURT: I don't. Thank you, Mr. Maloney.

MR. MALONEY: Thank you.

THE COURT: Anything else from defendant? Mr. Noteboom?

MR. NOTEBOOM: Mr. Maloney says that Mr. Bisbee knows his stuff from 25 years at ATF. I have every confidence that that's true, that he knows a lot of stuff from his time there, and I think in the right case he could be a compelling expert.

What I heard Mr. Maloney just say is that he has investigating -- he has been investigating gun cases and knows what happens with these guns, and I think that's a very fair, succinct summary of what Mr. Bisbee knows. He has investigated gun cases and he knows what happens to guns.

What he doesn't know, Your Honor, and it's really the central part of our motion, is what stores do, how they develop their policies, what goes into these policies, how they train, what they train, what's industry standard, how stores differ from each other.

And the State has stretched what he actually has said in his deposition, and I would refer the Court again to our reply brief starting -- it actually starts at page 7 and goes to page 9, but what Mr. Bisbee actually testified to in

his deposition is that, and I am quoting, "We would frequently be in contact with FFLs, but that I would not conduct inspections and, quote, infrequently I would accompany regulatory personnel on occasion when they were conducting inspections. "Infrequently." These were rare occurrences.

And so the question that really is at the center of this part of our motion that goes to so many of his opinions is does someone who did something else while he was at ATF, that infrequently did the stuff that's at issue in this case get to come before this Court and talk before a jury about things that he doesn't really know or only knows peripherally.

If we were here, Your Honor, on a case involving corporate law or corporate governance, the State's position would be like going to a large law firm and saying, We're going to hire a lawyer from the trial division, someone like me, to come in and talk about corporate governance and corporate law because from time to time in their trial work they would have had encounters with corporate lawyers or dealt with corporate lawyers.

But these are not people. They didn't go to the right division inside the law firm in my example. They didn't bring to this Court a corporate lawyer. They didn't bring someone who does this kind of work day in and day out,

day in and day out, who actually knows this, who understands the difference between some kinds of forms in my example and other kinds of forms.

And here he doesn't know the difference, one iota, in terms of whether ours are -- our policies, our procedures, our training modules are average or best in class or none of the above. That's the fundamental problem with Mr. Bisbee and it's why we ask that his opinions be excluded.

Thank you.

THE COURT: Thank you, Mr. Noteboom.

Anything else from the State?

MR. MALONEY: Very briefly, Your Honor.

So the quote that Mr. Noteboom read, I think, is instructive, right? So that was a quote from Joseph Bisbee's deposition where he was talking about his role specifically in the inspections part of the ATF's regulatory regime, right? That he was kind of rarely involved in that phase or kind of segment of what the ATF does.

I mean, I think I -- hopefully this came across in my initial presentation, but this case is not about the ATF's regulatory side. It's not about the inspections. It's not about licensing. This is about the sale of guns to straw buyers, and that's what Joseph Bisbee investigated and that's what he knows.

So I think this overly kind of technical focus on did he do licensing work, did he do inspections work is not really germane to looking at -- look at his report, look at what he is testifying on, and is Joseph Bisbee qualified to offer those opinions.

He's not talking about whether or not the ATF should have granted Fleet Farm an FFL license, right? He's not talking about whether or not -- what happened during an ATF inspection of a, you know, Fleet Farm facility.

He's focused on what happened on the store floor when, you know, Fleet Farm employees sold guns to Jerome Horton and to Sarah Elwood and then those guns got out. That's what he's focused on.

One last point to make. Not to belabor this, but on Joseph Bisbee's experience as well, I talked about him receiving training from the ATF. He also helped the ATF create trainings about gun trafficking and straw buying. And I believe in a portion of his deposition testimony he talked about the fact that even some of his trainings had made it through to FFLs, I think not pertaining to straw buying, but, you know, on trafficking issues in general.

So, again, the State would submit that Joseph Bisbee is more than qualified to testify as an expert in this matter.

Thank you.

THE COURT: All right. Thank you, Mr. Maloney.

Thank you, Counsel, for your arguments today. The Court will take the various motions under advisement and will issue a written order as quickly as possible. I appreciate hearing from both sides today. We'll be in recess.

*(Court adjourned at 3:45 p.m.)*

* * *

I, Lori A. Simpson, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Lori A. Simpson*

Lori A. Simpson, RMR-CRR